## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**MARK HALE, TODD SHADLE**
**and CARLY VICKERS MORSE,**
**on behalf of themselves and all**
**others similarly situated,**

**Plaintiffs,**

**v.**

**STATE FARM MUTUAL AUTOMOBILE**
**INSURANCE COMPANY, EDWARD**
**MURNANE, and WILLIAM G. SHEPHERD,**


**Defendants.**                                     **No. 12-0660-DRH**

## MEMORANDUM and ORDER

**HERNDON, Chief Judge:**

### Introduction and Background

Pending before the Court are defendants' motions to dismiss plaintiffs'
class action complaint (Docs. 13, 32, and 61).  Plaintiffs filed oppositions to the
motions (Docs. 50 & 63).  Based on the complaint and the following, the Court
denies the motions to dismiss.

On May 29, 2012, plaintiffs Mark Hale, Todd Shadle and Carly Vickers
Morse, on behalf of themselves and all others similarly situated, filed a two-count
Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et
seq., class action complaint against State Farm Mutual Automobile Insurance

Company, Ed Murnane, William G. Shepherd and Citizens for Karmeier (Doc. 2).[1]

Count One alleges violations of 18 U.S.C. §1962(c) and Count Two alleges violations of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c). According to the complaint and during the time periods alleged in the complaint, Hale is a citizen of New York; Morse is a citizen of Maryland and Shadle is a citizen of Texas.  State Farm is a mutual non-stock company, organized and existing under the laws of Illinois, having its principal place of business in Bloomington, Illinois.  Shepherd is a citizen of Illinois and was employed by State Farm. Murnane is a citizen of Illinois and was the president of the ICJL.  Citizens for Karmeier is an Illinois organization and the political committee for Illinois Supreme Court Justice Lloyd Karmeier.[2]

In the class action complaint, plaintiffs allege in their Introduction and Nature of Action section the following:

1. From 2003 to the present, State Farm, Murnane, Shepherd and Citizens for Karmeier (collectively, "Defendants") created and conducted the RICO

---

[1] Plaintiffs purport to represent the following class of individuals:
All persons who were members of the Certified Class in *Avery v. State Farm Mut. Auto. Ins. Co.*, No. 97-L-114 (First Jud. Cir. Williamson County, Ill.), more specifically described as:

> All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts.  Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.

> The following persons are excluded from the class: (1) persons who resided or garaged their vehicles in Illinois and whose Illinois insurance policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996.

[2] The officers listed for Citizens for Karmeier are David Luechtefeld and Gary S. Malaway.  On September 26, 2012, plaintiffs filed a notice of voluntary dismissal as to Citizens for Karmeier (Doc. 54).  That same day, the Court acknowledged the notice of voluntary dismissal and dismissed without prejudice Citizens for Karmeier as a defendant (Doc. 55).

enterprise described below to enable State Farm to evade payment of a $1.05 billion judgment affirmed in favor of approximately 4.7 million State Farm policyholders by the Illinois Appellate Court.

2. Plaintiffs bring this class action for damages against Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961 et seq., in particular, §§ 1962(c), (d); and 1964 for perpetrating a scheme through an enterprise specifically designed to defraud Plaintiffs and Class out of a $1.05 billion judgment.

3. Plaintiffs were each named plaintiffs, class representatives and class members in *Avery v. State Farm Mutual Automobile Insurance Company* ("*Avery Action*"), a class action litigated in the Illinois state court system. The *Avery Action* was certified as a class action, tried to jury verdict on a breach of contract claim, and tried to the Court on a claim under the Illinois Consumer Fraud Act ("ICFA"), resulting in a judgment of $1.18 billion.

4. The Illinois Appellate Court upheld a $1.05 billion judgment, sustaining the compensatory and punitive damages, and disallowing disgorgement damages as duplicative. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 321 Ill. App. 3d 269, 275, 292 (Ill. App. Ct. 5th Dist. 2001)(A true copy of the *Avery* Appellate Court decision is attached hereto as Exhibit "A").

5. On October 2, 2002, the Illinois Supreme Court accepted State Farm's appeal. The appeal was fully-briefed, argued and submitted as of May

2003, yet the matter remained under submission without a decision until August 18, 2005.

6. From the fall of 2003 until November 2004, Trial Judge Lloyd Karmeier ("Karmeier") and Appellate Judge Gordon Maag waged a judicial campaign for a vacant seat on the Illinois Supreme Court, ultimately resulting in Karmeier's election.  In January 2005, having received reliable information that State Farm had exerted financial and political influence to achieve Karmeier's election, the *Avery* plaintiffs moved to disqualify Karmeier him [sic] from participating in the appeal of the *Avery Action*.

7. On or about January 31, 2005, State Farm filed its response to the disqualification motion, grossly misrepresenting the magnitude of State Farm's financial support (and the degree of participation by its executives, surrogates, lawyers and employees) of Karmeier's campaign.

8. Plaintiffs' motion was denied, and on August 18, 2005, with now-Justice Karmeier participating in the Court's deliberations and casting his vote in State Farm's favor, the Illinois Supreme Court issued a decision overturning the $1.05 billion judgment.  *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill2d 100, 835 N.E.2d 801 (Ill. 2005). (A true copy of this decision is attached hereto as Exhibit "B").

9. In December 2010, spurred in part by a recent United States Supreme Court decision vacating a West Virginia Supreme Court ruling in a case which featured similar facts, *i.e.*, involving a party's political and financial

influence to elect a justice whose vote it sought for its appeal, Plaintiffs' counsel launched an investigation into State Farm's covert involvement in the Karmeier campaign. The investigation, led by a retired FBI Special Agent, uncovered evidence that to gain reversal of the $1.05 billion judgment in the *Avery Action*, State Farm – acting through Murnane, Shepherd and the Illinois Civil Justice League ("ICJL") – recruited Karmeier, directed his campaign, had developed a vast network of contributors and funneled as much as $4 million to the campaign. Then, after achieving Karmeier's election, State Farm deliberately concealed all of this from the Illinois Supreme Court while its appeal was pending.

10. On September 9, 2011, based on the information uncovered in the Reece investigation, the *Avery* plaintiffs petitioned the Illinois Supreme Court to vacate its decision overturning the $1.05 billion judgment. Responding on September 19, 2011, State Farm again deliberately misrepresented its role in directing and financing Karmeier's campaign. On November 17, 2011, the Illinois Supreme Court denied Plaintiff's petition, without comment.

11. Reece's investigation had revealed, among other things, that, having been ordered on April 5, 2001 by the Appellate Court to pay a 1.05 billion judgment to the *Avery* class, and having succeeded in persuading the Illinois Supreme Court to accept its appeal, State Farm had next developed an elaborate plan to obtain reversal of the judgment. The initial component of the plan was to recruit a candidate for the open Fifth District

seat on the Illinois Supreme Court for the November 2004 election who would support State Farm once its appeal came before the Court for disposition.  Of course, there was no guarantee for State Farm that the appeal would not be decided *before* the November 2004 election, but the risk – *a $2 to $4 million investment for a possible $1.05 billion return* – was sufficiently minimal to make it a worthwhile gamble.

12. Defendants' scheme was developed and implemented in two distinct but related phases.  In the first phase, State Farm sought to recruit, finance, direct, and elect a candidate to the Illinois Supreme Court who, once elected, would vote to overturn the $1.05 billion judgment.  As Plaintiffs describe below, Defendants ultimately succeeded in obtaining this objective.  Nine months after his election, Karmeier voted in favor of State Farm to overturn the $1.05 billion judgment of the Appellate Court.

13. Once the initial phase of the scheme had succeeded, the second phase featured two spirits of affirmative fraudulent activity, each furthered by use the of the U.S. mails: the 2005 and 2011 written misrepresentations to the Illinois Supreme Court.  Specifically, this phase consisted of: (a) a continuing concealment of these facts to permit Karmeier to participate in the deliberations and cast his vote to overturn the judgment in 2005 (this was accomplished, in part, by State Farm's January 31, 2005 filing), and (b) withholding information from the Illinois Supreme Court that would have conceivably led it to vacate the decision in 2011 (this was

accomplished, in part, by State Farm's September 19, 2011 filing).  Again, both filings were made through the U.S. mail, having been mailed to the Clerk of the Illinois Supreme Court and to Plaintiffs' counsel in several states, including Illinois, Louisiana, Mississippi and Tennessee.

14. From its inception, Plaintiffs and the other Class members in the *Avery Action* were the targets of and ultimate victims of the racketeering acts and the RICO enterprise – stripped of hundreds or even thousands of dollars each, seized of a class-wide judgment totaling $1.05 billion which compensated them for their losses – as a proximate result of Defendants' actions and the actions of the Enterprise participants.

15. In both the 2005 and 2011 filings, State Farm continued to hide and conceal its role in Karmeier's campaign, and deliberately misled the Court by omitting and concealing material facts regarding State Farm's role in Karmeier's campaign, which it directed through Shepherd, Murnane, the ICJL and Citizens for Karmeier, including: (a) recruiting Karmeier to be a candidate; (b) selecting Murnane to direct Karmeier's campaign; (c) creating Karmeier's judicial campaign contribution network; and (d) funding Karmeier's campaign.

16. To carry out and conceal this elaborate and covert scheme, Defendants created and conducted a continuing pattern and practice of activity through an association-in-fact Enterprise consisting of, among others, the following: Shepherd; Murnane; Murnane's non-profit organization, the ICJL; the

Shepherd-led ICJL Executive Committee ("Executive Committee"); Citizens for Karmeier (the campaign committee of Karmeier); JUSTPAC (the ICJL's political action committee); and the United States Chamber of Commerce ("US Chamber").

17. The ICJL and the Executive Committee, through Murnane and Shepherd, respectively, aided by the Citizens for Karmeier, functioned collectively as State Farm's vehicle to: (a) recruit Karmeier as a candidate; (b) direct Karmeier's campaign, (c) lend credibility to that campaign via endorsement, and (d) assure that Karmeier's campaign was well-funded. Campaign finance disclosures show that State Farm secretly funneled to Karmeier's campaign as much as $4 million (over 80%) of Karmeier's total $4.8 million campaign contributions.  Led by Murnane and Shepherd, the ICJL and its Executive Committee were the "glue" that held together the many pieces of State Farm's judicial campaign contribution network.

18. The utilization of the U.S. mail throughout every stage of Defendants' scheme – to solicit, receive and direct contributions, to conduct conferences and disseminate communications and campaign strategies, and to conceal the extent of State Farm's role in Karmeier's campaign – was essential to the conduct of this Enterprise.

19. Various Enterprise participants and co-conspirators also used electronic mail to carry out the initial phase of Defendants' scheme throughout 2003-

2004 to communicate details regarding the direction, management and financing of the campaign to fellow Enterprise participants.

20. As the following paragraphs illustrate, the motivation for this seven-year-long-cover-up is both plausible and demonstrable.   State Farm's misrepresentations and deception directed toward the Illinois Supreme Court by its mailed court-filings, and the continuing use of the mails by Defendants and Enterprise participants to carry out the scheme (to evade payment of the $1.05 billion judgment) constitutes a pattern and practice of knowing and deceptive conduct employed to effectuate and then to conceal State Farm's extraordinary support for Karmeier.

(Doc. 2, ps. 1-6).

Thereafter, defendants State Farm, Shepherd and Murnane all filed motions to dismiss based on the *Rooker-Feldman* doctrine; res judicata and/or collateral estoppel; untimeliness of the RICO claims; and failure to sufficiently plead violations of RICO and RICO conspiracy.   Obviously, plaintiffs oppose the motions.   As the motions are ripe, the Court rules as follows.[3]

## Motion to Dismiss Standard

The purpose of a Rule 12(b) motion to dismiss is not to decide the merits of the case.   A Rule 12(b)(6) motion tests the sufficiency of the complaint, *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990), while a Rule 12(b)(1)

---

[3] On July 31, 2012, the Court stayed the initial disclosures and discovery pending ruling on the motions to dismiss (Doc. 30).

motion tests whether the Court has subject matter jurisdiction. *Long v. Shorebank Development Corp.,* 182 F.3d 548, 554 (7th Cir. 1999). In reviewing a motion to dismiss under either rule, the Court takes as true all factual allegations in plaintiffs' complaint and draws all reasonable inferences in their favor. *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir. 2007); *Long,* 182 F.3d at 554.

To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed.R.Civ.P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O. C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true, * * * 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[O]nce a

claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563. A motion seeking dismissal based on *res judicata* or collateral estoppel under Rule 12(c) is evaluated using the same standard that governs a motion to dismiss under Rule 12(b)(6). See *Buchanan–Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

Surviving a Rule 12(b)(1) motion to dismiss is more difficult. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003). Federal courts are courts of limited jurisdiction; "they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). Pursuant to 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The plaintiff bears the burden of establishing that a district court has proper jurisdiction of an action. *Transit Express*, 246 F.3d at 1023. A defendant arguing that the plaintiff has not met this burden with respect to an action may move for dismissal under Rule 12(b)(1). A challenge based on the Court's lack of subject matter jurisdiction is properly brought in a motion under Federal Rule of Civil Procedure 12(b)(1), rather than as a motion to dismiss under Rule 12(b)(6). See also Fed.R.Civ.P. 12(h)(3) (court must dismiss for lack of subject matter jurisdiction). Under Rule 12(b)(1), consideration of evidence extrinsic to the pleadings is appropriate. *Hay v. Indiana State Bd. of Tax*

*Commis*, 312 F.3d 876, 879 (7th Cir. 2002) ("the district court had not only the right, but the duty to look beyond the allegations of the complaint to determine that it had jurisdiction to hear the landowners' claim").

Allegations of fraud in a civil RICO complaint are subject to Rule 9(b)'s heightened pleading standard, which requires a plaintiff to plead all averments of fraud with particularity. Fed.R.Civ.P. 9(b); *see Goren v. New Vision Intern, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). "While dismissal of a RICO claim is appropriate if the plaintiff fails to allege sufficient facts to state a claim that is plausible on its face, the adequate number of facts varies depending on the complexity of the case." *Kaye v. D'Amato*, 357 Fed.App'x 706, 710 (7th Cir. 2009). To plead with particularity means to allege "the who, what, when, where, and how" of the alleged fraud. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir.2012) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Financing Svc's, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008)). With these principles in mind, the Court turns to address the merits of the motions.

## Analysis

### *Rooker-Feldman*

First, defendants all argue that the *Rooker-Feldman* doctrine requires plaintiffs' class action complaint to be dismissed for lack of subject jurisdiction as plaintiffs' federal claims are based on the same factual allegations as their previous state law claims. Specifically, defendants maintain that plaintiffs clearly satisfy the "state court loser" requirement in that plaintiffs were all named

plaintiffs in *Avery* and that plaintiffs' injury, that the Illinois Supreme Court's reversal of the $1.05 billion judgment, satisfies the second requirement. Thus, defendants contend that plaintiffs' alleged injuries stem from the Illinois Supreme Court judgment they lost and their claims are barred by *Rooker-Feldman*. Plaintiffs counter that *Rooker-Feldman* cannot apply to this case and that this case does not require the Court to review the merits of the judgment in *Avery*. In particular, plaintiffs assert that they neither seek review nor rejection of the *Avery* judgment and that plaintiffs' injuries were not caused by any action of the Illinois Supreme Court but solely as the result of these defendants' conduct. The Court agrees with plaintiffs.

The *Rooker–Feldman* doctrine, articulated by the Supreme Court in *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), is a jurisdictional rule directing that only the Supreme Court of the United States may review the judgment of a state court in civil litigation. *Freedom Mortg. Corp. v. Burnham Mortg., Inc.,* 569 F.3d 667, 670 (7th Cir. 2009); *Commonwealth Plaza Condominium v. City of Chicago*, 693 F.3d 743, 745 (7th Cir. 2012). The doctrine holds that federal district courts lack jurisdiction over lawsuits " 'brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commence and inviting district court review and rejection of those judgments.' " *Lance v. Dennis,* 546 U.S. 459, 464, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006)

(quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)); *see also Freedom Mortg. Corp.,* 569 F.3d at 671; *Kelley v. Med–1 Solutions, LLC,* 548 F.3d 600, 603 (7th Cir. 2008). Thus, the doctrine " 'precludes lower federal court jurisdiction over claims seeking review of state court judgments … [because] no matter how erroneous or unconstitutional the state court judgment may be, the Supreme Court of the United States is the only federal court that could have jurisdiction to review a state court judgment.' " *Taylor v. Fed. Nat'l Mortg. Ass'n,* 374 F.3d 529, 532 (7th Cir. 2004) (quoting *Brokaw v. Weaver,* 305 F.3d 660, 664 (7th Cir. 2002)).

The *Rooker–Feldman* doctrine still deprives lower federal courts of jurisdiction if the claims made in federal court are "inextricably intertwined" with the state court judgment. *Feldman,* 460 U.S. at 486; *Brokaw,* 305 F.3d at 664. Although "'inextricably intertwined' is a somewhat metaphysical concept," the key issue is whether the district court is being asked to review the state court decision, and this "determination hinges on whether the federal claim alleges that the injury was caused by the state court judgment, or, alternatively, whether the federal claim alleges an independent prior injury that the state court failed to remedy." *Taylor*, 374 F.3d at 533.  In other words, the *Rooker–Feldman* doctrine is inapplicable when the alleged injury is distinct from the judgment. *Johnson v. Orr,* 551 F.3d 564, 568 (7th Cir. 2008).

If a claim is "inextricably intertwined" with a state court decision, the court must then determine whether the plaintiff had a "reasonable opportunity to raise

the issue in the state court proceedings." *Taylor*, 374 F.3d at 533. To establish that there was no reasonable opportunity to raise an issue in state court, a plaintiff must point to "some factor independent of the actions of the opposing party that precluded the litigants from raising their federal claims during the state court proceedings." *Long,* 182 F.3d at 558. A plaintiff may then proceed in federal court if she can make this showing. *Taylor*, 375 F.3d at 533.

If, on the other hand, the claimed injury is independent of the state-court judgment, or if the federal claim is based on "a prior injury that a state court failed to remedy," *Rooker–Feldman* does not bar the claim. *See Centres, Inc. v. Town of Brookfield, Wis.,* 148 F.3d 699, 701–02 (7th Cir.1998).

Here, at this stage of the pleadings and as accepting the allegations as true as the Court must, the Court concludes that the complaint does not request that the *Avery* judgment be overturned or reviewed. Plaintiffs' federal claims allege separate injuries and violations that are separate from the *Avery* judgment. Plaintiffs are not asking for the Illinois Supreme Court's judgment to be overturned or reviewed.  Nor does it appear that plaintiffs are attacking the merits of the *Avery* judgment.  It appears from the complaint that they are asserting claims for an independent legal wrong: the illegal acts or omissions by defendants.   The complaint contains specific allegations that State Farm and others, including Shepherd and Murnane, conspired with others to ensure a predetermined decision in *Avery*.   Particularly, plaintiffs are challenging defendants' actions in procuring the *Avery* judgment. Plaintiffs allege that the

improper actions of defendants during and after the *Avery* proceedings in the Illinois Supreme Court – specifically defendants' mail fraud containing misrepresentations to the Illinois Supreme Court– resulted in the denial of their constitutional rights and the related injury. They do not allege that they have been injured by the Illinois Supreme Court. Instead they allege that defendants' conduct and Justice Karmeier's failure to step aside prevented them from raising their claims before the full Illinois Supreme Court. Based on these allegations, the Court finds that the *Rooker-Feldman* doctrine does not bar this Court's exercise of jurisdiction. The Court concludes that it has subject matter jurisdiction in this case.

### Res Judicata and Collateral Estoppel

Next, defendants argue that *res judicata* and/or collateral estoppel bar plaintiffs' claims here as these same claims and issues were litigated in the Illinois Supreme Court and cannot be relitigated again in this cause of action. Defendants maintain that the issue of the proprietary of Justice Karmeier's participation in *Avery* and the legitimacy of the judgment in that case were finally and conclusively litigated and adjudicated by the Illinois Supreme Court. Plaintiffs counter that theory of their case is that defendants and others committed a "new wrong" separate and apart from the *Avery* case. Specifically, that these cases do not contain the same causes of action as *Avery* deals with State Farm's failure to properly pay for replacement automobile parts and this

cause of action deals with defendants fraudulently reversing a judgment by colluding to elect a judge.

The doctrine of *res judicata*, also known as claim preclusion, prevents relitigation of matters that were fully litigated in an earlier suit that resulted in a judgment on the merits. *Groesch v. City of Springfield*, 635 F.3d 1020, 1029 (7th Cir. 2011). Because of the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give a state court judgment the same preclusive effect that the court rendering the judgment would give it. *Haber v. Biomet, Inc.*, 578 F.3d 553, 556 (7th Cir. 2009); *Licari v. City of Chicago*, 298 F.3d 664, 666 (7th Cir. 2002). Thus, when examining whether an Illinois court judgment bars a federal lawsuit because of *res judicata* the Court looks to the preclusive effect an Illinois court would give the judgment in question. *Groesch*, 635 F.3d at 1029; *Licari*, 298 F.3d at 666.

Under Illinois law, *res judicata* applies if the prior decision (1) was a final judgment on the merits rendered by a court of competent jurisdiction, (2) involved the same parties or their privies, and (3) constituted the same cause of action as the current suit. *Nowak v. St. Rita High Sch.*, 197 Ill.2d 381, 258 Ill.Dec. 782, 757 N.E.2d 471, 477 (Ill. 2001); *People ex rel. Burris v. Progressive Land Developers, Inc.*, 151 Ill.2d 285, 176 Ill.Dec. 874, 602 N.E.2d 820, 825 (Ill.1992); *Groesch*, 635 F.3d at 1029.

Illinois uses a transactional approach to determining whether different claims constitute the same cause of action for *res judicata* purposes. *River Park,*

*Inc. v. City of Highland Park,* 184 Ill.2d 290, 234 Ill.Dec. 783, 703 N.E.2d 883, 893 (Ill.1998); *see Garcia v. Village of Mt. Prospect,* 360 F.3d 630, 637 (7th Cir.2004). Under the transactional approach, "separate claims will be considered the same cause of action for purposes of res judicata if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *River Park,* 234 Ill.Dec. 783, 703 N.E.2d at 891; *accord Rodgers v. St. Mary's Hosp.,* 149 Ill.2d 302, 173 Ill.Dec. 642, 597 N.E.2d 616, 621 (Ill.1992)(*res judicata* bars suit if "the same facts were essential to maintain both actions" or if "a single group of operative facts gives rise to the assertion of relief"). As a corollary to this rule, Illinois observes the doctrine of merger and bar which precludes the relitigation not only of claims that were *actually* litigated but also claims that *could have been* litigated. *People ex rel. Burris,* 176 Ill.Dec. 874, 602 N.E.2d at 825; *River Park,* 234 Ill.Dec. 783, 703 N.E.2d at 889 *see Garcia,* 360 F.3d at 639.

28 U.S.C. § 1738's "full faith and credit" requirement also encompasses the equitable principle of collateral estoppel. Generally, collateral estoppel prohibits the relitigation of any settled issue that was necessary to a prior final judgment. Under Illinois law the "minimum requirements" for application of collateral estoppel are:

> the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.

*Gumma v. White,* 216 Ill.2d 23, 295 Ill.Dec. 628, 833 N.E.2d 834, 843 (2005).

Defendants argue that *res judicata* and/or collateral estoppel bars this lawsuit as plaintiffs have already fully litigated their claims regarding Justice Karmeier's participation in *Avery* and those claims were conclusively rejected by the Illinois Supreme Court.  Specifically, as to *res judicata*, defendants assert that all three elements are met in that (1)that the Illinois Supreme Court issued a final judgment on the merits, reversing the $1.05 billion judgment against State Farm, and rejected repeated challenges to Justice Karmeier's participation and that the United States Supreme Court denied plaintiffs' petition for certiorari; (2) that plaintiffs allege in the complaint the same core of operative facts that they alleged unsuccessfully in the Illinois and the United States Supreme Courts in challenging *Avery*; and (3) that the identity of the parties is satisfied as the plaintiffs are the same and State Farm was an adverse party in the prior proceedings as it is an adversary party in this case and that defendants Shepherd and Murnane are in privity.   As to collateral estoppel, defendants argue that the issue of the propriety of Justice Karmeier's participation *Avery* and the legitimacy of the *Avery* judgment were finally and conclusively litigated and adjudicated by the Illinois Supreme Court.  Plaintiffs counter that the first element of *res judicata* has not been met as the *Avery* judgment was entered through fraud and, thus, plaintiffs contend that the *Avery* judgment is void. Plaintiffs argue that the judgment in *Avery* was void because it was procured through fraud based on defendants' conduct.  Plaintiffs assert that that defendants committed a "new wrong" separate and apart from *Avery*, thus the cases do not present the same causes of action or

operative facts. Further, plaintiffs argue that defendants' statements that were made to the Illinois Supreme Court and to plaintiffs' counsel prevented plaintiffs from exhibiting their case and circumvented an adjudication on the merits of the *Avery* appeal.

The Court finds that making such factual determinations regarding *res judicata* and/ or collateral estoppel at this stage in the proceedings is not proper and declines to do so.  It is unclear from the record before the Court what merits were reached regarding the issues contained in plaintiffs' complaint at bar and it is unclear whether plaintiffs had a full and fair opportunity to litigate those issues during the *Avery* proceedings before the Illinois Supreme Court. The Court concludes that these arguments are better suited for discussion and decision after discovery has been completed.

**RICO CLAIM**

**Timeliness of Plaintiffs' claims**

Next, defendants assert that plaintiffs' RICO claims are untimely. Specifically, defendants argue that plaintiffs' alleged claims accrued in 2005 with the Illinois Supreme Court's decision in *Avery*, or at the latest, in 2006 with the United States Supreme Court's denial of certiorari, and the limitations period expired in either 2009, or 2010, well before plaintiffs' filed their complaint on May 29, 2012.  Plaintiffs counter that while they may have been aware of some of the background facts of the alleged pattern of racketeering, they had not been injured until 2011 and no claim for a RICO violation could begin to accrue until it existed.

Plaintiffs allege that they were not injured until at least September 19, 2011, when State Farm mailed the second of its briefs falsely denying its substantial role in Justice Karmeier's election. (Doc. 2, ¶¶ 101-103).  Thus, plaintiffs maintain that they could not have filed their RICO action before September 19, 2011 and that their complaint is timely.

RICO does not provide an express statute of limitations for actions brought under its civil enforcement provision.  However, the Supreme Court has held that civil RICO claims should be governed by the same four-year statute of limitations period that governs closely related claims under the Clayton Act. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 150–56, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (analyzing the statutory relationship and legislative history of 18 U.S.C. § 1964 and the Clayton Act, 15 U.S.C. § 15); *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP,* 559 F.3d 671, 674 (7th Cir. 2009) ("The statute of limitations for a civil RICO cause of action is a fairly generous four years.").

The statute of limitations is an affirmative defense, *see* Fed.R.Civ.P. 8(c), and need not be addressed by plaintiffs in their complaint. *See U.S. Gypsum Co. v. Indiana Gas Co., Inc.,* 350 F.3d 623, 626 (7th Cir. 2003); *see also United States v. N. Trust Co.,* 372 F.3d 886, 888 (7th Cir. 2004) ("[A] complaint states a claim on which relief may be granted whether or not some defense is potentially available."). Therefore, complaints need not anticipate defenses, and the resolution of the statute of limitations comes after the complaint stage. *See*

*Trust Co.,* 372 F.3d at 888 (citing *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). This general rule is subject to an important exception: the statute of limitations issue may be resolved definitely on the face of the complaint when the plaintiff pleads too much and admits definitively that the applicable limitations period has expired. *See id; Gypsum,* 350 F.3d at 626 ("A litigant may plead itself out of court by alleging (and thus admitting) the ingredients of a defense...."). Therefore, this Court must determine whether plaintiffs have pleaded themselves out of court based on the allegations in its complaint.

A plaintiff's RICO claim does not accrue until after the alleged defendants have engaged in a "pattern of racketeering" activity. *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1465 (7th Cir. 1992) ("There must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury."). Therefore, the RICO statute of limitations begins to accrue when both a "pattern of racketeering"-i.e. two predicate acts-has occurred, and when the plaintiff knows or should know he or she was injured. The Court views the allegations in the complaint in the light most favorable plaintiffs and accepts for the purposes of this analysis that each alleged predicate act (the alleged count of mail fraud) is plead with sufficient particularity and would indeed support plaintiffs' allegation of a predicate act of "racketeering" under RICO. The four year statute of limitations for civil RICO claims does not begin to run until a plaintiff knows or should have known he was

injured. *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n,* 377 F.3d 682, 688 (7th Cir. 2004); McCool, 972 F.2d at 1464; *see also Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 186–87, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (rejecting "last predicate act" rule for determining accrual). This rule applies even where the plaintiff has not yet discovered the pattern. *See Rotella v. Wood,* 528 U.S. 549, 554 n. 2, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (rejecting "last predicate act" rule and "injury and pattern discovery rule").

The Court finds the situation presented here is not one where the plaintiffs have "plead itself out of court" based on the allegations in the complaint. The complaint describes defendants' actions in detail from conceiving the plan to elect Justice Karmeier in late 2003, to how the Karmeier campaign was directed, supported and funded by State Farm and others, to Justice Karmeier's election, to State Farm's first act of mail fraud on January 31, 2005, to Justice Karmeier's decision to participate in the *Avery* decision in 2005, and leading up to State Farm's second act of mail fraud on September 19, 2011. Thus, according to plaintiffs' complaint, they were not injured until at least September 19, 2011, when State Farm mailed the second of its briefs falsely denying its role in Justice Karmeier's election. Plaintiffs filed their complaint on May 29, 2012, well within the four year statute of limitations.

Assuming *arguendo* that that the claims are time-barred, the Court addresses fraudulent concealment and equitably tolling. Defendants argue that it is clear from the complaint and their court papers in 2005 and 2006 that

plaintiffs in 2006 at the latest did know the facts that they are now relying on to establish their RICO claims.  Further, defendants argue that plaintiffs failed to investigate these claims in that they admitted that they waited until December 2010 to investigate and that nothing prevented plaintiffs from starting that investigation years sooner.  At this stage of the pleadings, the Court rejects this argument.

While the doctrine of equitable tolling does not require fault on the part of the defendant, it is applied sparingly and only where extraordinary circumstances beyond the litigant's control prevented timely filing. *Asher v. Chase Bank United States, N.A.,* 310 Fed. Appx. 912, 917 (7th Cir. 2009); *see also United States v. Marcello,* 212 F.3d 1005, 1010 (7th Cir. 2000). Equitable tolling is frequently confused with fraudulent concealment, a subset of equitable estoppel. *Shropshear v. Corp. Counsel of Chi.,* 275 F.3d 593, 595 (7th Cir. 2001); *see also Asher,* 310 Fed. Appx. at 917. However, the Seventh Circuit has clearly held that equitable tolling and fraudulent concealment are two separate doctrines, *see Shropshear,* 275 F.3d at 595.

Unlike equitable estoppel**,** equitable tolling "applies when the plaintiff, though diligent, could not have obtained the information necessary to file a claim before the end of the limitations period." *Asher,* 310 Fed. Appx. at 917. Under the doctrine of equitable tolling, "even if a defendant is not responsible for the plaintiff's failure to sue within the limitations period, the [plaintiff] can get an extension of time within which to sue if it would have been unreasonable to expect

him to be able to sue earlier." *Shropshear*, 275 F.3d at 595. However, "an essential element [of such an extension] is that the plaintiff have exercised due diligence; in other words that he have acted reasonably." *Id* . Furthermore, the plaintiffs bear the burden of demonstrating that the applicable statute of limitations should be tolled. *Asher*, 310 Fed. Appx. at 917.  While fraudulent concealment implies deliberate efforts by the defendant to prevent the plaintiff from suing within the applicable statute of limitation, which efforts are above and beyond the wrongdoing upon which the plaintiff's underlying claim is based. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir. 1990).

In their complaint, plaintiffs allege that State Farm's January 31, 2005 mailing "failed to disclose the prominent role played by Shepherd in forming the ICJL, as a member of the ICJL Executive Committee (which engineered Karmeier's candidacy, endorsed him, and insured a substantial flow of case from State Farm Executives, employees, and corporate and political partners), as a central figure in Karmeier's campaign." (Doc. 2, ¶ 53).  Plaintiffs further assert that "State Farm falsely denied Murnane's involvement in Karmeier's campaign and declared 'Mr. Murnane ... was not Karmeier's campaign manager or campaign finance chairman and was not employed by Karmeier's campaign ....' *See* State Farm's Opposition, at pp. 15-16." (Doc. 2, ¶ 54 & 103).  Also, plaintiffs allege that it was not until September 11, 2011 that State Farm "conceded that Shepherd was a charter member of the Executive Committee, thus unveiling the missing [sic] connecting State Farm to the ICJL, to JUSTPAC, to Murnane, to the

discarded emails, and finally, to Karmeier's campaign." (Doc. 2, ¶ 106). According to plaintiffs, this concession provided the context: "Shepherd's position explains Murnane's role in Karmeier's campaign, how State Farm was able to use the ICJL and JUSTPAC as vehicles to raise nearly $1.2 million and funnel it to Citizens for Karmeier, and why the Executive Committee supported Karmeier's candidacy from "Day One" and gave him its "official endorsement," signaling other ICJL members that Karmeier was State Farm's choice." (Doc. 2, ¶ 107). Further, plaintiffs' complaint alleges: "Not only did State Farm fail to utter a single word about Shepherd's position on the Executive Committee until September 19, 2011, it also failed to explain why it did not do so." (Doc. 2, ¶108). Based on these allegations contained in the complaint, the Court finds that the limitations should be tolled until September 19, 2011 and the claims are not time-barred. Therefore, dismissal for failure to file a complaint within the statute of limitations period is not appropriate at this stage in the proceedings.

Defendants next argue that plaintiffs' RICO claims fail as a matter of law in that they lack standing because they have not adequately alleged causation; have not adequately pled a pattern of racketeering activity; the allegations of an enterprise are deficient as a matter of law and have failed to allege a nexus between the purported activity and the affairs of the enterprise. The Court addresses causation first.

**Proximate Cause**

Defendants argue that plaintiffs' RICO claims fail for lack of standing because they have not alleged causation.  In particular, defendants argue there was every expectation that *Avery* would be decided long before the newly elected justice took office and that plaintiffs' allegations that State Farm was taking a "long shot" do not solve the lack of direct proximate causal relationship.  Further, defendants contend that Justice Karmeier did not cast the deciding vote as to the unanimous holding in *Avery* that there could be no nationwide contract and ICFA classed, thus his participation did not cause their injury.  Defendants also argue that plaintiffs fail to allege facts to support their contention that the purported contributions to Justice Karmeier's campaign influenced his vote on the *Avery* case. Plaintiffs respond that their complaint sufficiently links their injuries to defendants' actions.

Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court...." 18 U.S.C. § 1964(c). "A cause of action under § 1964(c) requires a plaintiff to plead '(1) an injury in its business or property (2) by reason of (3) the defendants' violation of section 1962.'" *DeGuelle v. Camilli*, 664 F.3d 192, 198 (7th Cir. 2011)(quoting *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 685 (7th Cir. 2008)) (internal quotation marks and brackets omitted).

Section 1962(c) makes it unlawful for an employee of an enterprise engaged in interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…." 18 U.S.C. 1962(c).  To state a claim for relief under 1962(c), plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *DeGuelle*, 666 F.3d at 199 (quoting *United States v. Shamah*, 624 F.3d 449, 454 (7th Cir. 2010), cert denied, --- U.S. --- 131 S.Ct. 1529, (2011)).

"The phrase 'injured in business or property' [in § 1964(c) ] has been interpreted as a standing requirement—rather than an element of the cause of action—which must be satisfied in order to prevail on a RICO claim." *Evans v. City of Chicago,* 434 F.3d 916, 924 (7th Cir. 2006) (citation omitted).  Likewise, "the causation component of § 1964(c)—whether an alleged RICO injury was caused 'by reason of' a violation of the statute—has also been considered a component of standing." *Id.*; *RWB Servs.*, 539 F.3d at 686; *see also Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) (holding that a plaintiff does not have standing to sue for a civil RICO violation unless its injury was proximately caused by the alleged violation).

In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258 (1992), the Supreme Court concluded that the "by reason of" language in 18 U.S.C. § 1964(c) requires a showing that the defendant's violation not only was the "but-for" cause of the plaintiff's injury, but the proximate cause as well. *See Id.* at 267–268. In so holding, the Court explained that it used the term " 'proximate cause' to label

generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Id.* at 268.  As set forth in *Holmes*, in a civil RICO action, proximate cause is determined by examining whether a direct relationship exists between the injury asserted and the injurious conduct alleged. *See Id.* at 268–269 (describing the interpretation federal courts had given to the term in the past and holding that the same interpretation applies to section 1964(c) the Court stated that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand too remote a distance to recover." *Id. See also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ("When a court evaluates a RICO claim for proximate causation the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

The Court in *Holmes* discussed three policy considerations for requiring a direct relationship between the alleged harm and the alleged injurious conduct:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269–270 (internal citations omitted).

Here, in their complaint, plaintiffs allege:

"Defendants' motive in conducting the Enterprise … was to deceive the Illinois Supreme Court into believing that State Farm's support of Karmeier's campaign was minimal.  The scheme was designed and implemented for the purpose of recruiting a candidate, financing that candidate, electing that candidate and effectively concealing its support for that candidate.  State Farm's efforts to escape liability to pay the $1.05 billion judgment rested on the continued success of every aspect of this scheme.

(Doc. 2, ¶ 98).  Further, the complaint alleges

"The scheme was designed to achieve, and did achieve, its intended result: approximately 4.7 million State Farm policyholders suffered damage to their business and property, seized of the rightful damages awarded to them by the Avery Action judgment.

(Doc. 2, ¶ 99).  Thus, plaintiffs' allege that defendants acted to defraud plaintiffs out of their property.  Specifically, plaintiffs allege that defendants perpetrated a scheme to defraud plaintiffs of their property and the alleged scheme took place in two phases:  (1) State Farm decided to select its own candidate for the vacant Illinois Supreme Court seat and place him on the Court to insure a decisive vote and (2) to keep the candidate on the bench despite State Farm's support.  Plaintiffs allege that State Farm used the U.S. mail to conceal these facts to permit Karmeier to participate in the *Avery* decision and to make misrepresentations to the Illinois Supreme Court.  These mailings took place on January 31, 2005 with its filing in the Illinois Supreme Court and on September 19, 2011 with its filing in the Illinois Supreme Court.  Based on these allegations, the Court finds that plaintiffs have alleged a set of facts and cognizable damages that are sufficient to demonstrate that defendants' alleged acts proximately caused a loss to plaintiffs.

As to the injury, plaintiffs allege that defendants recruited Karmeier to run for the vacant seat and together defendants directed Karmeier's campaign. Plaintiffs allege that State Farm engineered $4,200,417 of the $4,800,000 raised by Karmeier's campaign.   Plaintiffs allege that thereafter, Justice Karmeier refused to recuse himself from the appeal and voted to overturn plaintiffs' $1.05 billion judgment.   Based on the record before the Court, the Court finds that plaintiffs have sufficiently alleged injury to business or property element and that they have standing to pursue the RICO claims.

**Pattern of Racketeering Activity**

As to pattern of racketeering activity, defendants contend that plaintiffs' allegations are based upon a single purported "fraudulent scheme" to "obtain, exert, and deliberately misrepresent its control over and extraordinary financial support of Karmeier's campaign" and to "suppress and conceal the level of such control and support from the Illinois Supreme Court," in order to obtain "the Karmeier vote to gain reversal of the $1.05 billion judgment."   Defendants further contend that plaintiffs do not allege a threat of continuing future racketeering activity and do not allege facts that would show either closed or open-ended continuity.   Plaintiffs maintain that their complaint alleges predicate acts of mail fraud occurring within a ten-year period, beginning approximately November 2003 and continuing at least through September 19, 2011.  The Court agrees with plaintiffs.

The Seventh Circuit has acknowledged that "the tremendous breadth of the language of civil RICO has caused a large number of garden-variety fraud claims to be brought in federal court." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 973 (7th Cir. 1986). However, to prevent RICO from being misused as a vehicle for federalizing state law fraud claims, the courts have sought to limit RICO's reach by requiring plaintiffs to demonstrate that defendants engaged in a sufficiently continuous "pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240–42, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Gamboa v. Valez*, 457 F.3d 703, 710 (7th Cir. 2006). A pattern of racketeering activity requires at least two predicate acts of racketeering within a ten year period. 18 U.S.C. § 1961(5); *see also Vicom, Inc. v. Harbirdge Merchant Services, Inc.*, 20 F.3d 771, 779 (7th Cir. 1994).   Establishing a pattern also requires a showing of the "continuity plus relationship" test: that the racketeering predicates are related to one another and pose a threat of continued criminal activity. *See Northwestern Bell*, 492 U.S. at 237, 109 S.Ct. 2893 (holding that the definitions set forth in 18 U.S.C. § 1961 do "not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern"); *see also Gamboa*, 475 F.3d at 706 ("[I]solated instances of criminal behavior, not presenting at least some threat of future harm, cannot meet § 1962(c)'s continuity element."). This approach recognizes that in enacting RICO, "Congress was concerned … with long-term criminal conduct." *Vicom*, 20 F.3d at 780. In order to demonstrate sufficient relationship and continuity among

the predicate acts, the plaintiff must establish either (1) a series of related predicate acts extended over a substantial period of time—also known as "closed-ended continuity," or (2) that the past predicate acts by their very nature project into the future with a threat of repetition—known as "open-ended continuity." *See Northwestern Bell*, 492 U.S. at 241–242; *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 473 (7th Cir. 2007).

The Court finds that plaintiffs have alleged a pattern of racketeering activity. Plaintiffs allege that defendants' scheme was two-fold: (1) to elect Justice Karmeier and gain his vote to undo the $1.05 billion judgment and (2) then to get away with it in the face of a challenge. The complaint alleges that the conduct spanned a seven year period beginning no later than January 31, 2005 when State Farm first misrepresented its involvement in Karmeier's recruitment, campaign and election. Plaintiffs also allege that State Farm continues to conceal the scope of its involvement. Further, plaintiffs' complaint contains the two predicate acts of mail fraud within a ten year time frame: the January 31, 2005 mailing and the subsequent September 19, 2011 mailing. Plaintiffs have alleged continuity and a pattern of racketeering.

**RICO Enterprise**

Defendants maintain that the allegations of enterprise are deficient as a matter of law. Specifically, defendants maintain that plaintiffs have not provided a plausible factual basis for asserting that the members of the enterprise "associated together for the common purpose of allowing State Farm to evade

$1.05 billion judgment" as the common purpose was simply to support Justice Karmeier's election.  Further, defendants assert that plaintiffs fail to allege the necessary relationships of enterprise members and longevity.  Plaintiffs counter that they have sufficiently identified the enterprise members, their common purpose and their relationships.

The RICO statute defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' " *Boyle v. United States,* 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) (citing 18 U.S.C. § 1961(4)). A RICO enterprise is not limited to "business-like entities," but rather requires "an ongoing organization, formal or informal" that "function[s] as a continuing unit." *Id.* at 945, 950, 129 S.Ct. 2237 (quoting *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to continue to pursue the enterprise's purpose." *Id.* at 946, 129 S.Ct. 2237.  It does not require "a structural hierarchy, role differentiation, a unique modus operandi, a chain of command, professionalism and sophistication of organization, diversity and complexity of crimes, membership dues, rules and regulations, uncharged or additional crimes aside from predicate acts, an internal discipline mechanism, regular meetings regarding enterprise affairs, an enterprise name, [or] induction or initiation

ceremonies and rituals." *Boyle,* 556 U.S. at 948, 129 S.Ct. 2237 (internal quotation marks omitted).

Here, the plaintiffs allege the following as to enterprise:

"The Enterprise is an association-in-fact of State Farm executives and employees, including Shepherd, as well as Murnane, Citizens for Karmeier, political operatives, a political action committee, political organizations, an Executive Committee of one such organization which wields significant political influence in Illinois, a political campaign committee, insurance and business lobbyists and the US Chamber.   The Enterprise is distinct from, albeit conducted, by State Farm, through Shepherd, Murnane and the ICJL, and has an ongoing existence.  Specifically, participants in the Enterprise include: ...."

(Doc. 2, ¶ 30).  The complaint names and describes the relationships between State Farm and fifteen other individuals and/or organizations that are alleged participants in the enterprise.[4]  These allegations sufficiently describe the nature of the enterprise and the relationships between State Farm and the enterprise members and the longevity.   Based on those allegations, there is a plausible factual basis for asserting that the members of the enterprise "associated together for the common purpose of allowing State Farm to evade the 1.05 billion judgment." Pursuant to *Boyle,* these allegations are sufficient to infer the existence of a RICO enterprise. 556 U.S. at 946–948, 129 S.Ct. 2237.

---

[4] For instance, the complaint describes Ed Rust as a participant.  It alleges he is "State Farm's CEO and played an important role in the US Chamber committee that targeted the Karmeier-Maag race in 2004 and steered millions of dollars to Illinois to elect Karmeier.  Further, as to Al Admonite, another participant, the complaint alleges that he was "hired by Murnane as a consultant to Karmeier's campaign, paid by the campaign.  Currently, he is Vice President and Director of Government Relations.  Admonite confirmed Murnane's control over Karmeier's campaign and that Murnane had provided a substantial portion of the funding for the campaign -- $1.19 million through JUSTPAC."  It also alleges that David Leuchtefeld was "'chairman' of 'Citizens for Karmeier' whose discarded emails evidence the inner-workings of the Karmeier campaign."

Next, both Shepherd and Murnane argue that plaintiffs have not alleged a nexus between the purported racketeering activity and the affairs of the enterprise. Specifically, Shepherd and Murnane contend that plaintiffs have not alleged facts showing that they personally committed any of the alleged predicate acts, that they were not parties to *Avery* and that plaintiffs have not alleged any facts showing that their relationships with State Farm facilitated the representations made by State Farm during the *Avery* case. Both defendants maintain that their alleged actions are "protected political speech" under the First Amendment. Plaintiffs respond that the nexus is well established in their complaint. The Court agrees with plaintiffs.

As stated previously, the RICO statute provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...," and the RICO conspiracy statute makes it unlawful to conspire to violate this provision. 18 U.S.C. § 1962(c) & (d). The Supreme Court has ruled that

[i]n order to "participate, directly, or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

*Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (footnote *omitted*). The Court rejected, however, an interpretation that

would require a RICO defendant to have "*significant control* over or within an enterprise." *Id.* at 179 n. 4 (emphasis in original; internal quotation marks omitted). Rather, the Court held that the statute requires proof of participation in the operation or management of the enterprise. *Id.* at 179.

The complaint alleges the existence of multiple people, including Murnane and Shepherd acting in concert over a period of time with the purpose of perpetuating the RICO fraud. The acts alleged have a purpose:  to recruit, elect Karmeier to the Illinois Supreme Court and make possible his participation in the *Avery* decision to rule in State Farm's favor.  The complaint alleges that Shepherd helped create the ICJL, hired Murnane as the ICJL's president, and served as a member of the ICJL's Executive Committee.  The complaint also alleges that Shepherd recruited Karmeier on State Farm's behalf to be a candidate and that he insured a substantial amount of cash flow to Karmeier from State Farm executives, employees, and corporate and political partners. As to the allegations against Murnane, the complaint states: "A July 2003 *Forbes Magazine* article quoted Murnane as saying the Illinois Supreme Court is 4-3 "anti-business" and that ICJL would target the 2004 Fifth District race to change the composition of the Court.  The article cites the *Avery Action* – which was already pending before the Illinois Supreme Court. (*See* Forbes article, Exhibit D hereto).  A second article from 2004 stated that Murnane viewed the *Avery* verdict against State Farm as part of the problem with courts in the Fifth District."  (Doc. 2, ¶ 64). Further, the complaint alleges that Murnane recruited Karmeier, directed the

Karmeier campaign and was used by State Farm as a middleman through which State Farm could funnel millions of dollars to the campaign. (Doc. 2, ¶¶ 65-90). Clearly, the allegations directed against both Shepherd and Murnane are sufficient as to their participation in the operation and/or management of the enterprise.

As to defendants' protected First Amendment argument, the Court finds that this argument is best addressed at the summary judgment stage. As the Court stated previously "[o]rders under Rule 12(b)(6) are not appropriate responses to the invocation of defenses, for plaintiffs need not anticipate and attempt to plead around all potential defense. *Xechem, Inc. v. Bristol–Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004). A "[c]omplaint need not contain *any* information about defenses and may not be dismissed for that omission." *Id.* (emphasis in the original). Nevertheless, a plaintiff can plead itself out of court when it "admits all the ingredients of an impenetrable defense" *Id.*

Thus, whether defendants' actions are in fact false or misleading, as may be necessary to determine the existence of any First Amendment protection, is a factual inquiry beyond the scope of this motion. The Court finds that whether defendants' actions are protected by the First Amendment will ultimately require resolution of a number of factual issues which are more appropriately reserved for resolution at summary judgment or trial on a full factual record.

### Predicate Acts

Defendants also argue that State Farm's 2005 and 2011 mail submissions to the Illinois Supreme Court in response to plaintiffs' motions to disqualify

Justice Karmeier cannot as a matter of law serve as RICO predicate acts. Further, defendants argue that the predicate acts lack factual development. Plaintiffs counter that they have sufficiently described a scheme or artifice to defraud through the use of the mails.

First, defendants maintain that the *Noerr-Pennington* doctrine is applicable in this case and, thus, plaintiffs' predicate acts are not actionable as serving litigation documents cannot constitute mail fraud.[5] The Court rejects this argument based on the sham exception at this stage of the proceedings. As the Seventh Circuit stated in *Mercatus*, "there is little doubt that fraudulent misrepresentations may render purported petitioning activity a sham not protected from antitrust liability." *Mercatus*, 834 F.3d at 842. (citations omitted). "[A] a misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceedings." *Id*. at 843 (citations omitted). Further, defendants cite *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002) for the proposition that "servicing legal documents by mail" cannot constitute mail fraud. However, the Court notes that the accurate holding is: "Similarly, we held in *Pendergraft* that, **absent an intent to deceive** the victim, the 'mailing of litigation documents, even

---

[5] "The First Amendment of the Constitution states that Congress shall make no law abridging the 'right of the people to peaceably assemble, and to petition the Government for redress of grievances.' Under the *Noerr-Pennington* doctrine, federal antitrust laws have been interpreted to protect these First Amendment rights by petitioning activity from liability." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 837 (7th Cir. 2011). "The doctrine extends absolute liability under antitrust laws to "businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Id*. at 841.

perjurious ones, did not violate the mail-fraud statute.'" *Raney v. Allstate Insurance Co.*, 370 F.3d 1086, 1088 (11th Cir. 2004) (emphasis added).

As to the sufficiency of the predicate acts, the Court finds that plaintiffs have stated predicate acts. As to the first predicate act, plaintiffs allege the following facts: it was a January 31, 2005 mailing of a brief by State Farm's counsel from its offices in Edwardsville, Illinois, served via U.S. mail, on the Clerk of the Illinois Supreme Court and also on *Avery* counsel in Illinois and elsewhere. As to the substance of the misrepresentation, plaintiffs allege:

> "In the January 31,2005 mailing and filing, State Farm falsely represented its support of Karmeier as consisting of 'quite modest contributions' and characterized as 'incorrect and meritless' Plaintiffs' claim that State Farm had funneled $350,000 to and peddled its enormous political influence to Karmeier's benefit. *See* State Farm's Opposition, at pp. 12-13. State Farm flatly denied 'engineering contributions' to Karmeier's campaign 'for the purpose of impacting the outcome of this case' (*see* State Farm's Opposition, at pp. 11) and downplayed the charge that it was responsible for $350,000 in direct contributions to Karmeier's campaign by suggesting that Plaintiffs' counsel had presented 'no evidence whatsoever to back up' their claim that those contributions were made by State Farm 'front groups.' *See* State Farm's Opposition, at p.11. State Farm also failed to inform the Court that its employee, Shepherd, was a member of the ICJL Executive Committee which recruited and vetted Karmeier, and through Murnane, it had organized, funded and directed Karmeier's campaign."

(Doc. 2, ¶ 102).  The complaint also alleges that State Farm falsely denied that Murnane ran all phases of Karmeier's campaign. As to the second predicate act, plaintiffs allege the following: it was a September 19, 2011 mailing of a brief via U.S. mail by State Farm's counsel to the Clerk of the Illinois Supreme Court and to plaintiffs' counsel in Illinois, Louisiana, Mississippi and Tennessee. Plaintiffs allege:

"In its brief, State Farm again denied Murnane's true role in Karmeier's campaign, *see* State Farm's Response, at ¶ 27 ('Murnane was not Karmeier's campaign manager ....'), and failed to produce evidence to counter Murnane's statement that 'I'm running this campaign.'"

(Doc. 2, ¶ 105).  Further, plaintiffs allege:

"For the first time, however, State Farm conceded that Shepherd was a charter member of the Executive Committee, thus unveiling the missing [sic] connecting State Farm to the ICJL, to JUSTPAC, to Murnane, to the discarded emails, and finally, to Karmeier's campaign."

(Doc. 2, ¶ 106).   Clearly, these allegations suffice as predicate acts of mail fraud to support plaintiffs' theory that State Farm's mailings of litigation documents contained false statements that intended to mislead and conceal from the Illinois Supreme Court and plaintiffs' counsel State Farm's nature and support of Justice Karmeier.

### Conspiracy

Finally, defendants argue that the RICO conspiracy claim likewise fails as a matter of law as they have not adequately alleged the elements of proximate cause, injury, pattern, enterprise and predicate acts.

As with the 1962(c) claim, plaintiffs must allege that they were injured "by reason of" a violation of 1962.  *See* 18 U.S.C. 1962(d).  "[I]njury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO … is not sufficient to give rise to a cause of action under 1964(c) for a violation of 1962(d)."  *Beck v. Prupis*, 529 U.S. 494, 505, 120 S.Ct. 1608 (2000).  "A RICO conspiracy plaintiff must 'allege injury from an act that is … independently wrongful under RICO.'"  *DeGuelle*, 664 F.3d at 204.

In order to state a claim for 1962(d) conspiracy, "a plaintiff must allege that (1) defendant agreed to maintain an interest or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Id.* (quoting *Slaney v. In'tl Amateur Althletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001)). "[T]he touchstone of liability under 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Id.* (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998)). "The defendant need not personally commit a predicate act; rather, 'a plaintiff must allege that the defendant agreed that *someone* would commit at least two predicate acts in furtherance of the conspiracy.'" *Id.* (citing *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999)). Where a plaintiff fails to allege a claim for a violation of §1962(c), the plaintiff's § 1962(d) conspiracy claim fails if it is based on the same nucleus of operative facts as its § 1962(c) claim. *See Stachon v. United Consumers Club. Inc.*, 229 F.3d 673, 677 (7th Cir. 2000). Plaintiffs' §1962(d) claim is based on the same allegations as its § 1962(c) claim.

As the Court found above that plaintiffs have stated a claim under 18 U.S.C. § 1862(c), the Court likewise finds that plaintiffs have stated a cause of action for the RICO conspiracy claim. Plaintiffs allege that defendants violate 18 U.S.C. 1962(d) by conspiring to violate 18 U.S.C. 1962(c) by agreeing to commit at least two predicate acts. Plaintiffs' allegations are sufficient to assert that there was an

agreement between the defendants to engage in unlawful activity. The Court finds that plaintiffs have adequately pled the existence of a conspiracy between the defendants.

## Conclusion

Accordingly, the Court **DENIES** defendants' motions to dismiss (Docs. 13, 32 & 61). Also, the Court **LIFTS** the stay on the initial disclosures and discovery Further, the Court **DIRECTS** Magistrate Judge Williams to issue a Scheduling and Discovery Order.

   **IT IS SO ORDERED.**

   Signed this 28th day of March, 2013.

Digitally signed by
David R. Herndon
Date: 2013.03.28
14:14:02 -05'00'

   **Chief Judge**
   **United States District Court**.