1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    MARK HALE, ET AL.,                )
                                       )
4                      Plaintiff,      )
                                       )
5         vs.                          ) No. 12-cv-00660-DRH-SCW
                                       )
6    STATE FARM MUTUAL AUTOMOBILE      )
     INSURANCE COMPANY,                )
7                                      ) status conference
                       Defendants.     )
8

9                     **TRANSCRIPT OF PROCEEDINGS**
                          **IN-COURT HEARING**
10           **BEFORE THE HONORABLE STEPHEN C. WILLIAMS**
                  **UNITED STATES MAGISTRATE JUDGE**
11

     **APPEARANCES:**
12

     For the Plaintiffs:          Robert A. Clifford, Esq.
13                                George S. Bellas, Esq.
                                  Clifford Law Offices, P.C.
14                                120 N. LaSalle St., Suite 3100
                                  Chicago, IL  60602
15                                (312) 899-9090

16                                Steven P. Blonder, Esq.
                                  Much, Shelist, et al.
17                                191 N. Wacker Dr., Suite 1800
                                  Chicago, IL  60606-1615
18                                (312) 521-2000

19                                Richard R. Barrett,Esq.
                                  Barrett Law Office - MS
20                                2086 Old Taylor Rd., Suite 1011
                                  Oxford, MS  38655
21                                (662) 380-5018

22                                Robert J. Nelson, Esq.
                                  Lieff, Cabraser, et al.
23                                275 Battery St., 29th Floor
                                  San Francisco, CA  94111
24                                (415) 956-1000

25

```
 1   For the Defendant:        Joseph A. Cancila,Jr., Esq.
     State Farm                Ronald S. Safer, Esq.
 2                             Harnaik Kahlon, Esq.
                               Schiff Hardin LLP
 3                             233 S. Wacker Dr., Suite 6600
                               Chicago, IL  60606
 4                             (312) 258-5500

 5                             Patrick D. Cloud, Esq.
                               Heyl, Royster, et al.
 6                             105 W. Vandalia St., Suite 100
                               Edwardsville, IL  62025
 7                             (618) 656-4646

 8   For the Defendant:        Patrick E. Croke, Esq.
     Murnane                   Sidley Austin LLP
 9                             One South Dearborn St.
                               Chicago, IL  60603
10                             (312) 853-7688

11   For the Defendant:        Russell K. Scott, Esq.
     Shepherd                  Andrew Tessman,Esq.
12                             Greensfelder, Hemker & Gale
                               12 Wolf Creek Dr., Suite 100
13                             Swansea, IL  62226
                               (618) 257-7308
14
     For the Defendant/:       Anthony L. Martin, Esq.
15   Karmeier                  Sandberg, Phoenix, et al.
                               600 Washington Ave., 15th Floor
16                             St. Louis, MO  63101-1313
                               (314) 231-3332
17
     Court Reporter:           Laura A. Esposito, RPR, CRR
18                             U.S. District Court
                               750 Missouri Avenue
19                             East St. Louis, IL  62201
                               (618) 482-9481
20

21

22        Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23

24

25
```

1      *(Court convened)*

2           *COURTROOM DEPUTY:*  Case *Mark Hale vs. State Farm*

3   *Mutual Automobile Insurance Company, et al.*, Case

4   No. 12-660.  Will the parties please get their name in the

5   record.

6           *MR. CLIFFORD:*  Robert Clifford, Steven Blonder, and

7   George Bellas on behalf of the plaintiffs.  Good afternoon,

8   Your Honor.

9           *THE COURT:*  Good afternoon.

10          *MR. SAFER:*  Good afternoon, Your Honor.  Ron Safer,

11  Joe Cancila, and Patrick Cloud on behalf of State Farm.

12          *THE COURT:*  Good afternoon.

13          *MR. SCOTT:*  Russell Scott and Andrew Tessman on

14  behalf of defendant William Shepherd.

15          *THE COURT:*  Good afternoon.  And Mr. Lucco?

16          *MR. LUCCO:*  Good afternoon, Your Honor.  Bill Lucco

17  on behalf of Korein Tillery and associated lawyers.

18          *THE COURT:*  Okay.  All right.  So we're here for a

19  hearing on issues raised in filings related to privilege.

20  We've got the competing briefs that were filed by the

21  Korein Tillery group and defendants, and then also

22  plaintiffs and defendants.

23          So what we're going to do is this:  I'm going to

24  give State Farm 30 minutes to address the Korein Tillery

25  Group's assertions; then, Mr. Lucco, I'm going to give you

1    45 minutes to respond if you wish, if you want to take that

2    long; and then State Farm, you get another 15 minutes, or

3    other defendants, however you want to break that up.

4          Then we're going to go into the assertions between

5    plaintiffs and defendants.  Plaintiffs get 30 minutes;

6    State Farm, you get 45; and then plaintiffs, you get another

7    15.  In between those two we're going to take a break.  So

8    that should get us through most of the afternoon.  I'll have

9    some questions, but let's go ahead and get started.

10         *MR. CANCILA:*  Good afternoon, Your Honor.

11   Joe Cancila for State Farm.

12         Your Honor, State Farm has moved to overrule the

13   Tillery Group's objections to the Wojcieszak and

14   Denton/Tactical Investigations documents.  There are 413

15   documents at issue in respect to those privilege assertions

16   spanning some 31 pages.  It's Exhibit 8 to our opening brief

17   on the issue, Your Honor.  I believe Your Honor has already

18   had those documents for in camera review, so --

19         *THE COURT:*  I have them.  I can tell you, I've only

20   scratched the surface.  I've got reasons for not having gone

21   all the way into them, but, yes, I do have them.  They

22   provided all of them to me.

23         *MR. CANCILA:*  Okay.  So the privilege assertions

24   break down into three categories.  There's roughly 88, 90

25   work product assertions.  There's 300-plus on the First

1    Amendment nature and a handful or so of attorney-client

2    assertions.

3         We want to establish at the outset how demonstrably

4    relevant and central to State Farm's defenses these

5    Wojcieszak and Denton/Tactical Investigation documents are.

6    So Doug Wojcieszak is a key witness in this matter.  He

7    provided three affidavits to plaintiffs in 2005 and 2011 in

8    the *Avery* litigation where he made various factual

9    assertions about State Farm's role, or alleged role, in the

10   Karmeier campaign and State Farm's alleged indirect

11   contributions to the Karmeier campaign.

12        Tactical Investigations is his firm, or the firm

13   that he was formerly associated with.  Tom Denton is his

14   partner.  So when you're seeing the Bates stamp numbers, the

15   Denton Bates stamp numbers come from Tactical Investigation

16   possessed documents; Wojcieszak documents come from

17   Mr. Wojcieszak.  Those documents concern, among other

18   things, the Karmeier/Maag race, the financing of the

19   Karmeier campaign, the Karmeier campaign management about

20   which there's been myriad allegations made by plaintiffs as

21   to who truly was in charge of that campaign, supposedly.

22   There's documents attributing the indirect contributions

23   that were made to various entities, although in respect to

24   the documents possessed by Wojcieszak and Denton, for which

25   the Tillery Group asserted privileges, those attributions

1    are pointed to Philip Morris, or Big Tobacco, and not to

2    State Farm.

3          So there are documents that relate to ICJL,

4    JUSTPAC, ATRA, the Chamber, and who -- Illinois Chamber, the

5    U.S. Chamber, who supposedly was behind all of those

6    contributions that those groups made.  We expect that what

7    these documents will reveal -- and we've gotten smidgens of

8    that already from the documents that had been produced,

9    never mind the ones that have been withheld -- are that

10   Mr. Wojcieszak and Mr. Denton and Tactical Investigations

11   attributed all the corporate contributions that they said in

12   *Avery* and that plaintiffs have said here and in *Avery* that

13   State Farm was responsible for.  They attribute those to

14   Philip Morris.

15         They have created these demonstrative charts.

16   They're elaborate charts showing, you know, the connections,

17   the interconnections, all leading between, you know --

18   either State Farm is the version of it that was filed in

19   *Avery*, or Philip Morris is a version of it that was supplied

20   to the Tillery Group -- and they're basically

21   fill-in-the-blank demonstrative exhibits.  You know, just

22   replace State Farm by Philip Morris and you have essentially

23   the same thing.

24         Indeed, in addressing a recusal motion in the *Price*

25   case just last month, you know, Justice Karmeier recognized

1    the remarkable similarity in the allegations and the

2    supposed proofs that had been submitted to justify his

3    requested recusal, only in one instance -- again, in *Price*,

4    Philip Morris; in the Hale case, State Farm -- supposedly

5    behind everything.

6            The documents also show and refute plaintiffs'

7    allegations about the Karmeier campaign management, you

8    know, and you see those assertions even made in the

9    plaintiffs' brief, which we'll get to later, in terms of

10   supposedly Mr. Murnane ran everything.  Well, if you look at

11   the documents that we've seen that were provided to the

12   Tillery Group, you see that those documents suggest that it

13   wasn't Mr. Murnane; it was Steve Tomaszewski that ran the

14   campaign and that was announced to be the campaign manager.

15   And you see it both in documents that attempt to smear

16   Mr. Tomaszewski as well as in documents where Wojcieszak

17   gives a sworn statement to plaintiffs' attorneys here where

18   he indicates Tomaszewski ran the campaign.

19           *THE COURT:*  Isn't it the case that at least there's

20   some evidence that Mr. Murnane was the de facto campaign

21   manager before Mr. Tomaszewski took over and that

22   Mr. Murnane considered himself to be the de facto campaign

23   manager?

24           *MR. CANCILA:*  We've seen one document that has been

25   produced where there was that short-term characterization

 1    made in the document.

 2         THE COURT:  That's what I'm talking about, is

 3    there's -- the assertion is, *I've been the de facto campaign*

 4    *manager*, or -- that's the phrase used, "de facto campaign

 5    manager" -- *and we need to get someone on the ground*, and

 6    then once that person is on the ground, that being

 7    Mr. Tomaszewski, then that role ends as de facto campaign

 8    manager when he takes over.

 9         MR. CANCILA:  And as I acknowledge, there is such a

10    document that we've seen in the production in this case as

11    to an interim self-assessment apparently by Mr. Murnane in

12    that respect.

13         THE COURT:  Yeah.

14         MR. CANCILA:  Nothing linking that self-assessment

15    to anything State Farm knew or was aware of or

16    what-have-you.  We saw it the same time plaintiffs did when

17    it was produced in this litigation.

18         THE COURT:  Well, that was my question.

19         MR. CANCILA:  Right, right.

20         THE COURT:  That particular e-mail you had not seen

21    until this case?

22         MR. CANCILA:  Correct.  That is correct.

23         THE COURT:  Okay.

24         MR. CANCILA:  Besides the relevance to these --

25         THE COURT:  And you assert -- I'm sorry.  Are you

1    asserting that State Farm also had never seen that e-mail?

2    I know you haven't.  Can you also affirmatively state

3    whether or not State Farm had ever seen that e-mail from

4    Mr. Murnane prior to this litigation commencing?

5         *MR. CANCILA:*  Okay.  So I am unaware of anyone from

6    State Farm ever having seen that e-mail before this lawsuit

7    commenced, Your Honor.

8         *THE COURT:*  Okay.  Well, that answered my question.

9    Thank you.

10        *MR. CANCILA:*  Besides the relevance to these key

11   considerations relative to who ran the campaign, who funded

12   the campaign, who do you attribute these indirect

13   contributions to, all of this information from the

14   Wojcieszak and Denton documents, and presumably from those

15   that have been withheld as well -- because they're even in

16   the non-withheld ones -- also goes to Wojcieszak's

17   credibility as a witness.  He's been listed as a fact

18   witness in their Rule 26(a)(1) disclosures, and it

19   illustrates a great deal about what plaintiffs themselves

20   didn't say about Wojcieszak when they filed his affidavits

21   in 2005 and 2011.

22        There was -- this information that I've just

23   reviewed in terms of the competitive world view, the

24   diametrically different world view that Wojcieszak and

25   Denton had taken, none of that was mentioned in the 2005 or

```
 1   2011 pleadings that plaintiffs filed in Avery.  So in terms

 2   of the notion about what there's an affirmative obligation

 3   to disclose, plaintiffs apparently felt no affirmative

 4   obligation to disclose any such information themselves in

 5   their own filings.

 6        THE COURT:  Well, we're focusing on

 7   Korein Tillery's.

 8        MR. CANCILA:  I appreciate that.  I'm about to move

 9   on.

10        THE COURT:  Because that's the time you're allotted

11   right now, just so you're aware.

12        MR. CANCILA:  All righty.

13        Here's why the Tillery Group is not entitled to the

14   work product privileges they assert:  Right from the outset

15   the Rule 26(b)(3) doesn't even apply to the Tillery Group.

16   26(b)(3) applies to work product prepared in anticipation of

17   the litigation by a party or an agent of the party, so the

18   precise language of Rule 26(b)(3) does not even extend to

19   plaintiffs.  And there's two Northern District cases --

20        THE COURT:  All right.  So in Appleton papers,

21   Seventh Circuit case binding on this Court, there was a

22   request via Freedom of Information Act, nonparty, totally

23   outside the scope of litigation, and the Seventh Circuit

24   says you apply Rule 26 and you apply the work product -- all

25   of those rules, and so if it's excepted from relevance under
```

1    those circumstances, Work Product Doctrine applies.

2           How's that not binding and how does that not answer

3    this particular question?  Doesn't answer all the questions,

4    but the question of whether or not you can assert work

5    product now just because you're not actually a party to the

6    litigation when you got work product together for some other

7    piece of litigation, it seems to answer that question

8    directly, and the answer is:  It applies.  Doesn't go away

9    just because your litigation is over, making it free for

10   everyone else to see.

11          For example, let's say Mr. Tillery some day down

12   the road files his own lawsuit here in federal court.  I

13   don't know if that's going to happen.  Let's speculate for

14   awhile.  And he says, *I want every bit of work product from*

15   *defense counsel's firm in State Farm.*  Does work product not

16   apply now if he were to do that?  I can't imagine you would

17   think that it would.  It's hard for me to imagine saying it

18   would.

19          *MR. CANCILA:*  Okay.  So in terms of *Appleton*, if

20   I'm not mistaken -- I've read a number of cases here

21   recently.  I believe *Appleton* was a FOIA dispute and a FOIA

22   lawsuit where the party seeking the -- where the party

23   seeking the documents brought a FOIA lawsuit to pursue.

24          *THE COURT:*  Right, yes.

25          *MR. CANCILA:*  And it was government-related, you

 1   know, documents that were withheld.  So I'm stretching my

 2   recall of the case now.  So I thought it was an inapt case.

 3   I thought we distinguished that in our cases.  And we had

 4   identified both a 2010 and 2012, or 2008 and 2012 Northern

 5   District of Illinois cases that were explicit on that

 6   proposition.

 7           THE COURT:  This is a Seventh Circuit case.  It's

 8   fairly explicit.

 9           MR. CANCILA:  I'll look at it in my 15-minute

10   return.

11           Moving on to a second topic.  The notion that these

12   investigative materials are protected, you know, there's the

13   basic Seventh Circuit law on no private investigator

14   privilege, that NCAA decision.  So there's not an

15   entitlement to insulating this material simply because it

16   was undertaken by an investigator.

17           THE COURT:  Right, but there's also -- it doesn't

18   just go away because it's an investigator also.  If the

19   investigator's employed by a lawyer, it's there, as long as

20   it otherwise meets the requirements for work product.  Isn't

21   that just plain as day also?  I mean, again, in the *Appleton*

22   case, United States retained Amendola and other firms in

23   preparation for Fox River and other litigation.  They

24   retained an engineering firm -- they weren't lawyers -- and

25   they compiled reports, work product.  They were hired by the

 1    law firm.  I mean -- and here, this is only some threshold

 2    questions we're dealing with here, but I mean these are kind

 3    of some basic principles.  If you hire an investigator as a

 4    lawyer to work on your case, doesn't it apply under most

 5    circumstances?

 6         MR. CANCILA:  It depends what the work is that the

 7    factual investigator is doing.  It depends whether the

 8    factual investigator's work reflects the mental impressions

 9    of the attorneys.

10         THE COURT:  No, it doesn't have anything to do with

11    that initially.  I mean that gets special protection, but

12    whether or not the, quote, unquote, "fact work product" as a

13    matter of -- if you look at it and you say, *Is this work*

14    *product or not*, you don't get into the analysis of mental

15    impressions.  We don't want you to piggyback on someone

16    else's work.  That's what it's there for as far as I can

17    tell.  Again, the *Appleton* case also seems to make that

18    patently clear.

19         MR. CANCILA:  I'll return to the *Appleton* case.

20         THE COURT:  Sure.

21         MR. CANCILA:  A third proposition that we wanted to

22    mention is, much of this is simply public relations work and

23    nothing more than public relations work.  That's the way

24    it's characterized in the agreement that Korein Tillery had

25    with Tactical Investigations.  That's how Wojcieszak

1   described the principal work that he was performing for

2   Korein Tillery and other lawyers:  Public relations work.

3   That's recited in the excerpted portion of the sworn

4   statement transcript we submitted, Your Honor, and it's also

5   covered in the exhibit that the Tillery Group submitted as

6   well.

7            THE COURT:  The log?

8            MR. CANCILA:  The -- I'm sorry.  The law?

9            THE COURT:  Are you saying it's also reflected at

10   certain entries in the privilege log itself?

11            MR. CANCILA:  Yes, yes, yes.

12            THE COURT:  Got you.  And public relations work is

13   not work product.

14            MR. CANCILA:  Is not work product, correct.  And

15   so, you know -- there's the *Burke vs. Lakin Law Firm* case

16   here in the Southern District which addresses that very

17   issue, and the kind of public relations consequences of

18   pending litigation doesn't insulate that material from, you

19   know, work product protection.  I think that's the

20   proposition that was established in the *Burke* case that

21   we've cited.

22            The fourth proposition is that this material was

23   freely shared with the plaintiffs' attorneys here.  So one

24   of the first entries that appears on the log itself

25   reflects -- on the Tillery log itself reflects not only

1    Korein Tillery but also reflects Robert Clifford as a

2    recipient of the information.  Now, plaintiffs have cited

3    law for the proposition, but, well, they're not an

4    adversary, you know.  But that's not the standard, whether

5    they're an adversary; it's whether or not the sharing of

6    that information makes it substantially more likely that

7    it's going to be made available, you know, to an opposing

8    party.  So that's the standard.  And so --

9         THE COURT:  Do you think that under these

10   circumstances that we're discussing here today that you've

11   met that standard?

12        MR. CANCILA:  I believe so.  I believe so, both

13   because --

14        THE COURT:  We're fighting tooth and nail about

15   reviewing these documents.  Nobody's giving them up

16   voluntarily.

17        MR. CANCILA:  They're not, but I believe they have

18   waived that as a consequence of what they've done.  Now, to

19   be sure, they're not, you know, adversaries in the sense

20   that they're both, you know, plaintiff trial lawyers, and

21   capable trial lawyers to be sure, but they're taking

22   diametrically inconsistent positions in their respective

23   litigation as to who was responsible for the expenditures

24   that were made by various trade associations.  Who was

25   responsible for supposed indirect contributions and the

 1   like?  Who supposedly controlled various trade

 2   organizations?  So there is adversity in their positions in

 3   that regard.

 4        The other thing that hasn't happened here is

 5   there's been no showing that the holders of the documents,

 6   Wojcieszak and Denton, maintain that information as

 7   confidential.  You know, they haven't made any showing that

 8   it wasn't shared more broadly than that.  And in fact, we

 9   indicated, you know, in our argument, in identifying some of

10   the disclosures were made, that it went more broadly than

11   just to plaintiffs' counsel.  It went more broadly to other

12   folks as well.  There's documents out there where Wojcieszak

13   and Denton are talking about writing a book about all of

14   this material.

15        So I want to leave work product and go to First

16   Amendment.  On the First Amendment front we know from the

17   outset it's a qualified privilege.  It's clearly not

18   absolute.  We don't think that Tillery Group has made the

19   showing that would be required here to support a First

20   Amendment assertion.  They haven't described the nature of

21   any association that is asserting this First Amendment

22   privilege.  They haven't identified kind of the core --

23        *THE COURT:*  I want to back you up for just a second

24   because there was -- I wanted to ask you this question on

25   work product:  So if they share a document, your contention

1    seems to be they've shared it all and that waives the

2    privilege as to everything, and that's -- let's assume that

3    we get past -- you're not sharing with an adversary but

4    you're sharing it with someone else.  They may not be an

5    adversary but it's freely enough shared that you've waived

6    the privilege as to that particular document.  And they're

7    telling me that, as to work product, *We're not holding on to*

8    *those things*.  Maybe on the First Amendment issues we are,

9    but as to work product, no.

10        *MR. CANCILA:  We're not holding on to those things*.

11   I'm not sure I follow.

12        *THE COURT:*  We're not holding on to documents that

13   were shared with Mr. Clifford, for instance.

14        *MR. CANCILA:*  Well, we're at a disadvantage since

15   we don't know what has been held on.  I mean we've seen the

16   advocate statements made in the briefs.  But one of the

17   first log entries that's reflected on the Tillery log has

18   Mr. Clifford's name on it as a recipient, so that seems to

19   run counter to that assertion.  Have no idea, you know, what

20   the magnitude of that sharing was.

21        And you, obviously, Your Honor, would be in a

22   better position, from an in camera review, to assess whether

23   the subject matter contained on some of those documents that

24   were shared spanned over to these other documents.  We're

25   not really in a position to see that on the strength of the

 1  law.  We're not taking the position that, Katy-bar-the-door,

 2  if you give one document to Mr. Clifford, that means you can

 3  never claim any privilege assertion again.  It's basically a

 4  subject matter related --

 5      THE COURT:  Is it the same?  Is it as broad as

 6  subject matter waiver, just like with attorney-client

 7  privilege, or is it different than that with work product?

 8  Do you waive all claims of privilege to any subject matter

 9  that's related to the work product document that you have

10  voluntarily as well as all other documents that are your

11  work product that relate to that subject matter?

12      MR. CANCILA:  I think it would come to what the

13  definition of the subject matter is that's involved there.

14  That's my understanding, that it is a subject matter-driven

15  waiver and not simply a document-specific waiver.  If they

16  turned over documents to Mr. Clifford that, you know,

17  reflected the views relative to Wojcieszak and Denton's view

18  as to Philip Morris being behind contributions, I would

19  assume that that would waive as to any other Philip Morris

20  related, you know, documents, for example.

21      THE COURT:  Yeah.  So I think it's five -- 502 has

22  some language in that about that.  So the extra requirement

23  that is listed there is, they ought to in fairness be

24  considered together, but that presumes there's a waiver to

25  begin with by disclosing it to Mr. Clifford.

1          *MR. CANCILA:*  Right.

2          *THE COURT:*  Okay.  Sorry.  I'm done asking

3     questions about that for now.

4          *MR. CANCILA:*  Okay.  Going on to First Amendment.

5     As I was mentioning, we don't think they've met their

6     prima facie burden of establishing a core group that, you

7     know, has some type of associational protections to which it

8     would be entitled.  We don't think they've made a showing

9     that there'll be any chilling of any variety, of any speech,

10    any contributions or the like, and it's hard to conceive of

11    how there would be, given the dated nature of most of these

12    documents.  I many they're largely ten-year-old documents

13    dealing with the Karmeier/Maag race and the like.

14         On top of that, Your Honor entered a protective

15    order that, you know, was a hard fought, you know, battle as

16    to whether or not First Amendment privileged materials would

17    be deemed confidential, and Your Honor adopted that order,

18    which not only provided that confidential assertions could

19    be made but further provided that there be no waiver

20    subsequently as a result of, you know, the production here.

21    Kind of builds in the protection of the evidentiary rule to

22    which you were just, you know, referring.

23         *THE COURT:*  So their position that was articulated,

24    if I recall this correctly, is just like we said in our

25    affidavits, and citing to -- there's some District Court

1   cases that adopt this approach.  We say that we are afraid

2   of retribution and that should be enough.  That's their

3   additional evidence from their position that we didn't

4   necessarily talk about when we had our discussion about the

5   protective order previously.

6          *MR. CANCILA:*  Right.

7          *THE COURT:*  And so is there something more that's

8   needed in the protective order or otherwise or --

9          *MR. CANCILA:*  I don't think so, especially when

10  it's no secret the nature of the Tillery Group contributions

11  to Justice Maag's campaign.  They're reported in the Board

12  of Election records, they're reported in the contributions

13  that were made to the Justice for All PAC, you know, which

14  was substantially, you know, funded by the Tillery Group.

15  So the notion that there's going to be something more beyond

16  retribution when there's a public record of the hundreds of

17  thousands or more in contributions that were made, is just

18  very speculative.

19         *THE COURT:*  Well, but you're not interested in how

20  much money they gave them.  I mean you're looking for

21  statements and discussions and strategy and things that are

22  going to impact your cross-examination of Wojcieszak and

23  Denton.

24         *MR. CANCILA:*  Absolutely, absolutely.  So the

25  notion -- I mean our thought is that they can't make a

1    showing of retribution in view of what's already in the
2    public domain, and plus the dated nature of the documents at
3    issue.  You know, we could really care less about the
4    Tillery Group's political involvement in anything.  That's
5    not the reason we want the documents.  We want the documents
6    to establish the contradictory assertions that Wojcieszak
7    has made, the contradictory world view, the diametrically
8    different world view that he's put forth.  And we've seen a
9    lot of that but we haven't seen the withheld documents to
10   know what more there is in that regard.  But we've
11   definitely shown that these materials go to the heart of the
12   matter of the defense, you know, that would enable us to
13   overcome the qualified privilege even if they had made a
14   threshold requirement in the first place.
15            *THE COURT:*  You're all done?
16            *MR. CANCILA:*  Right.  Thank you.
17            *THE COURT:*  All right.  So Mr. Lucco?
18            *MR. LUCCO:*  Thank you, Your Honor.  May it please
19   the Court, counsel.
20            Because of my familiarity with this courtroom and
21   others, I must say it's a heartwarming sight when I see so
22   many people in here, none of whom have ankle bracelets on.
23   It's encouraging, especially when some are from Chicago,
24   Your Honor.  Having said that, I don't think I'll be as
25   long --

1          MR. SAFER:  I think the record should reflect that

2     he was looking at Mr. Clifford with regard to the

3     adversarial question, Your Honor.

4          MR. CLIFFORD:  That's okay.

5          THE COURT:  When he mentioned ankle bracelets.

6          MR. LUCCO:  Indeed, I'm honored to be here,

7     Your Honor.  Thank you.  And I'll try to be as succinct as I

8     often am not.

9          Look, we're asserting essentially two privileges:

10    What I consider the time-honored trial privilege, work

11    product, and even a more sacred First Amendment privilege of

12    right of association and freedom of speech and so forth.

13    And I'm going to get right to the point here because what I

14    heard State Farm argue, what I read them argue, what I heard

15    you in essence refute are, to me, all the side issues that

16    demonstrate the weakness of their position that they cannot

17    establish any -- they cannot meet either of the tests for

18    getting the work product disclosed or overcoming the First

19    Amendment.

20         And let's just think about this for a second.  The

21    tests are somewhat similar.  In work product, they've got to

22    show a substantial need for the document to prepare their

23    case, and then secondarily, assuming they do that, they've

24    got to --

25         THE COURT:  If it wasn't waived.

 1            MR. LUCCO:  If it wasn't waived, they've got to

 2    show without hardship they can't get it by other means.  On

 3    the First Amendment issue, they've got to show, in so many

 4    words, after all comes down to the heightened scrutiny test

 5    and the high relevancy and so forth, they've got to show

 6    that these documents go to the heart of the matter, they're

 7    crucial to the parties' case.

 8            And then again, secondarily, they got to show

 9    they've exhausted all other ways of getting this in a less

10    chilling manner.  And I want to address these first, then

11    I'll come back to all these side issues or answer your

12    questions as I go.

13            THE COURT:  Okay.  So threshold question:  The

14    documents aren't in your possession; they're in the

15    possession of?

16            MR. LUCCO:  Our agent.

17            THE COURT:  Well, that's my question, is, you've

18    got -- a contractual relationship is one thing that's been

19    asserted that extends the timeframe for which they've agreed

20    not to disclose it for another couple years.  But they're

21    not in your possession, and so in terms of -- when we're

22    talking about associations that are engaged in political

23    speech on controversial topics, business associations,

24    political associations on the one hand and their internal

25    communications, which cases seem to deal with versus hiring

1   an investigator to do political work on the other hand,

2   isn't there a distinction there?

3        I mean what we're talking about is, this

4   individual, these individuals are hired not to do just -- I

5   mean there's political work involved but then there's also

6   work that's directly associated with a case.  And does it

7   make any difference if, for example, some of the assertions

8   might relate to documents that are both, or, as raised by

9   the defendants, just simply PR?  So isn't there something to

10   that notion?  They're not your documents, so do you have

11   that same right?  If you're an association and you say, *We*

12   *don't want to release our membership list, our internal*

13   *communications*, they're the ones who are making that

14   assertion.  I don't know that if you voluntarily made

15   yourself a part of that organization or made communications

16   to that organization, do you have a right to keep those

17   protected as opposed to the organization itself?

18        *MR. LUCCO:*  If we're talking about the First

19   Amendment --

20        *THE COURT:*  That's what we're talking about.

21        *MR. LUCCO:*  I think we have the association here of

22   some professionals with professionals who are lawyers doing

23   political advocacy, in this particular instance having to do

24   with the judiciary.  And I think the point is, whether we've

25   held on to those documents or received a copy because it's

 1   e-mails going back and forth, and the large large body of

 2   these documents not only are First Amendment, as was pointed

 3   out by counsel, but they're e-mails.  They're communications

 4   between these people.  And I think that goes to the heart of

 5   the problem that's raised in all of these First Amendment

 6   cases.

 7          This is, in fact, the chilling effect, is whether

 8   people are going to participate in any kind of an

 9   association who's going to take political positions.  I

10   don't even think they have to be controversial, although we

11   see that.  And we have the affidavit supplied in this case

12   by each of the members I'm representing, and we saw it in

13   the other cases where people say, *I'm not even going to --*

14   in essence, *I won't go to these meetings, I won't have these*

15   *conversations.  I'm not going to sit at my desk and e-mail*

16   *back and forth to my colleagues, my associates, if I think*

17   *these e-mails, because they're in the hands of a sever or*

18   *sender, even within our association, could be subpoenaed,*

19   *and the consent of those e-mails now are in the domain.*

20          *THE COURT:*  If we take just the lawyers who are

21   involved in the advocacy, we're not dealing with those

22   documents, so we're exclusively here dealing with --

23          *MR. LUCCO:*  But we could be.

24          *THE COURT:*  But we're not.  And I'm not asking a

25   question that goes to that situation.  We've got a group of

1    lawyers involved in political advocacy involving the

2    judiciary.  They're also involved in a case.  And does it

3    not make any difference at all when the same investigators

4    who you are using to further advance your political

5    advocacy, then also opt to have -- sign affidavits which you

6    submit in support of advocacy, or you're aware that they may

7    do it for someone else, or those individuals choose to do it

8    for someone else.  Doesn't that have any impact at all on

9    really what we're characterizing it as, or shouldn't it have

10   any impact at all?

11        *MR. LUCCO:*  I think not, and I don't think it

12   should, Your Honor, quite frankly.

13        This is a small association at the time we're

14   talking about, and we have in it -- it's no different than

15   if we had members and we had an executive director or we had

16   an executive committee that ran things and now those people

17   end up doing other work, although we sit in on the

18   communications, we participate in meetings, we add our 2

19   cents about thoughts in debate, which we want to be able to

20   do freely and without fear of this becoming public, I don't

21   see how it's any different than that.

22        I think we have an unusual situation because people

23   are being used in a work product role and they're being used

24   in a role that is political advocacy.  Does that -- I mean

25   they've argued in there that the fact that you combine those

1   has actually watered down the effect of the work product.

2   Somehow that belies its work product if some aspect of this

3   is First Amendment.  Well, we did our very best, if *Price*

4   was implicated in the communications, if you will, to call

5   it work product, and if it was not, it was what we called it

6   First Amendment.  But there were e-mails and chains where

7   there's both --

8          *THE COURT:*  What if it's just advocacy, for

9   example, to change public perception about *Price*?  Not

10   advance an agenda as to a particular political candidate,

11   not -- I'm just saying hypothetically, what if there's --

12          *MR. LUCCO:*  I don't think it matters a whit,

13   Your Honor.

14          *THE COURT:*  What do we call that if the --

15          *MR. LUCCO:*  I think we might call it both.  I think

16   it's certainly political advocacy, "political" with a small

17   "p".  It's political advocacy on any issue.  It could be

18   that Clorox has got a bad spelling.  It could be anything.

19   I don't think it has to be controversial.  Now, let's don't

20   kid ourselves.  It's not what we have here.  That's not why

21   they want these documents.  And these documents, once we

22   start understanding that they are largely e-mails, to me, it

23   raises another layer of questions about, what is the purpose

24   of this?

25            And if I may now, I'm going to say why I think they

 1    fail rather dramatically satisfying that this is a
 2    substantial need in the work product area or that it goes to
 3    the heart of the matter.  And let's think.  What would be
 4    the substantial need to State Farm?  And what is so highly
 5    relevant that it goes to their case?  Work product, First
 6    Amendment.  Well, they tell us that.  I heard a little bit
 7    of the nuance to it today, but in their briefs -- they filed
 8    a brief, then they filed a reply brief.  They make
 9    overwhelmingly clear, they want to be able to impeach
10    Mr. Wojcieszak.  They can call it, they want to show
11    conflicting world views, they want to show inconsistencies
12    as whether it's State Farm or Philip Morris, but the reality
13    is, they want to impeach Mr. Wojcieszak.  They say that on
14    page 2, the very part of their brief.  They say on page 1,
15    the very first part of reply.  They say it on the last two
16    pages of each, the last page of the brief and the last page
17    of the reply.  They go back to the same point that they want
18    to show the contradictory statements about the source of the
19    contributions, and then they just make kind of the assertion
20    that they need this highly relevant information and it far
21    outweighs our First Amendment interest.
22            They then go on to say, and it was reiterated
23    today, look, the focus here, Your Honor, they say in their
24    brief, is not on the Tillery Group political activities but
25    how these documents will undermine Wojcieszak and the Hale

1    allegations that State Farm is a source of the money.  This,

2    as I understand it, is a racketeering case, something I know

3    a little bit about.  And as I understand, the predicate acts

4    are mail fraud.  And as I understand it, the mail fraud is

5    rather simple, as we all know:  A scheme to defraud.  You

6    intended to do so and you used the mails.

7          So we're talking about a scheme to defraud.  How

8    does the impeachment of Mr. Wojcieszak go to that scheme to

9    defraud?  Mr. Wojcieszak is not going to be a witness as to

10   how much money State Farm gave or didn't give or who they

11   gave it to.  They said in the Hale brief, Your Honor, that

12   they really are not intending to use him, that they used him

13   as context to explain things in the complaint.  They listed

14   him as a potential witness.  Okay.  If he's a witness, it's

15   another matter to impeach him, but I'm going to tell you

16   they then failed to satisfy the second prong that they can't

17   get this information elsewhere.

18         They have tons of information.  They've recited the

19   various documents they have.  One shows a world view of

20   Philip Morris, one shows a world view of State Farm.  They

21   have all of these documents to impeach Mr. Wojcieszak with.

22   They've said so on page 19 of their brief.  They've attached

23   three exhibits:  17, 16, and 12, that they already have to

24   render Mr. Wojcieszak an incredible witness.  So they don't

25   need it, they have it, and it doesn't go to the heart of

1    their case.  It does not go to a scheme to defraud.

2           Now, they then roll in, in the reply -- I think

3    it's in the reply -- that they may need it for the defense

4    of limitations and what these counsel knew and when they

5    knew it.  Okay.  That's -- I don't have any interest in

6    that, I must tell you, but it's my understanding that

7    Judge Herndon has ruled on that, that that limitation's

8    defense is off.  That it was triggered by the second

9    predicate act, which is 2011.  That's my recollection.

10         *THE COURT:*  They assert that you've also got an

11   assertion of a tolling, that equitable tolling that is based

12   on what plaintiffs' knowledge is in their case.  They're

13   saying that's plaintiffs' counsel, and, as a consequence,

14   their investigators knew what they knew is relevant to that.

15   That's an argument they made, not us.  And while true

16   enough, you've still got the second predicate act in 2011.

17   Case was filed in 2012.  But they're both discussed, I

18   believe.

19         *MR. LUCCO:*  They are.  And I think -- so my

20   position on this, Your Honor, is, neither that limitation's

21   point or the impeachment point, which are all that are cited

22   in these briefs for the reason in these documents, shows

23   substantial need or go to the heart of the matter.

24         I know the weight to be given District Court cases,

25   but sometimes you see one that the language is so good that

 1   it has to be read.  I'm going to quote, Your Honor -- it's a
 2   case actually cited by the plaintiffs called *1100 West vs.*
 3   *Red Spot Paint*, and in that case the court quotes from
 4   another case, *McPeek vs. Ashcroft*, and *McPeek* [ph.] says as
 5   follows:
 6           *If the desire to impeach a witness with a prior*
 7        *inconsistent statement is a sufficient showing of*
 8        *substantial need, the work product privilege would*
 9        *cease to exist.  There is not a lawyer born who would*
10        *not like to see opposing counsel's files in order to*
11        *search for inconsistencies in opposing witnesses'*
12        *potential testimony.*
13           To me, that does say it all, and it's because I
14   believe they have failed to show the substantial need and
15   it's because they fail to save these documents that can lead
16   to the heart of their case that they start grasping at the
17   things Your Honor has now already debunked, which I made my
18   own list of these things:  They're a non-party; the
19   investigator doesn't have a privilege; they went so far as
20   to say you cannot protect facts, only opinions.  He makes
21   comments about the mental impressions.
22           And by the way, all of that is dealt with in
23   *Appleton*.  This point, particularly in *Appleton*, caught my
24   eye because this point had been raised by them.  It wasn't
25   mentioned today, but they're entitled to get to the facts

1    that are not the mental impressions -- legal theories.

2    That's not true.  The Seventh Circuit, in *Appleton*, plainly

3    says the facts are protected.  As you commented, if it goes

4    to the mental impressions, it's got another layer of

5    protection.

6         THE COURT:  Right.  You can waive facts, not mental

7    impressions.

8         MR. LUCCO:  Now, as to these documents that he

9    mentions that are on the privilege log or referenced by

10   being sent and shared --

11        THE COURT:  I should restate that.  You can show a

12   substantial need for facts, not mental impressions.  You can

13   waive those.  Sorry.  Go ahead.  I don't want that to be

14   uncorrected.

15        MR. LUCCO:  As to the documents that were shared,

16   we have an affidavit that we didn't authorize them to share

17   anything -- that was our communications, our work product or

18   anything of our First Amendment.  But it is our

19   understanding it's been alleged in the case -- I have no

20   reason to know whether it's true or not true, but that there

21   were documents recovered from a trash receptacle of some

22   sort and that those documents may have been sent or were

23   sent, may have been sent to plaintiffs' counsel.  We are not

24   asserting any work product or First Amendment privilege on

25   those documents.  They're not on our log.

1          THE COURT:  What about the ones that are on the log

2     that went to Mr. -- obviously those you are asserting.  So

3     you're acknowledging, you're making assertions as to some

4     documents or communications?

5          MR. LUCCO:  Absolutely.  As to the communications,

6     absolutely.  And they argue we didn't make the prima facie

7     showing.  Well, all those cases that are in our brief, and,

8     of course, *City of Greenville* and *Syngenta* is a nearby one,

9     we satisfy those declarations by what the associates here

10    have said.  And I think really that it is the free

11    discussion and the negating of that exchange of ideas that

12    is the greatest victim of this kind of chilling effect.

13          Now, they also want to say, and they did say again

14    here today, that somehow what's our complaint when it's

15    publicly known that these various associates opposed a

16    particular candidate and supported another one?  Well, I

17    think that's quite beside the point.  In fact, I think it's

18    completely beside the point.  I can put a yard -- a sign in

19    my yard says, as big as I want, who I'm for, and everybody

20    in the world that wants to drive by there in a public place

21    can see it.  I can make contributions, and the election laws

22    and so forth cover how that gets disclosed and who can see

23    that.  That, we all know -- not I think any informed citizen

24    understands -- that is a world away from thinking what my

25    friend and I or the six of us sit around my table at night

1  having a coffee and start talking about how we want to
2  support the guy whose name's on the sign and how we want to
3  oppose the guy who we're against and what we think of them
4  and what we think of their mothers and what they think of
5  their kids, that's a whole 'nother matter.

6         And they want to get into the private
7  communications of these people who are doing nothing but
8  what a citizen is obliged, at least has the opportunity and
9  they should take it, to do:  Associate freely, exchange and
10 debate matters of government importance, and think when you
11 do that among your associates, that you're not submitting to
12 a public body, the government, like NAACP in Alabama or
13 submitting to a corporate entity, some of which are larger
14 than government.  And that's what they want to do, and they
15 do not have a substantial need for it.  It doesn't go to the
16 heart of their case.  They've got it elsewhere.  This is
17 just an exercise in, I believe, trying to do just what we're
18 trying to not let them do, crush people into not doing this
19 no matter how much money they might give to a campaign.
20 That's a whole lot different than getting into our
21 communications we sent back and forth one way or another.

22         So Judge, I think they have failed to meet either
23 of the two tests for either of the claimed privileges, and
24 it's why I think they go through this laundry list of other
25 matters here, because they can't get there.

1          *THE COURT:*  I want to go back to the -- how do you

2    distinguish advocacy on behalf of a particular issue that

3    may relate directly to a case from PR, or do we need to --

4    should PR also be covered?

5          *MR. LUCCO:*  I think it should be.  I mean you asked

6    me that question, so yes, I think it should be.  I don't

7    think there is -- I mean what we characterize in preparation

8    for a trial, I mean what we go through to protect a case for

9    trial has so many facets to it.  It's not just researching

10   the law and interviewing witnesses.  And there are a lot of

11   things that go into the PR aspect of how a witness is on the

12   stand, what they wear.

13         *THE COURT:*  What about an at by?

14         *MR. LUCCO:*  An at by.

15         *THE COURT:*  At some point --

16         *MR. LUCCO:*  So you asked me, do I think PR should

17   be under that umbrella?  I do.  In fact, it makes no sense

18   to me that anyone thinks it isn't.

19         *THE COURT:*  So I mean at some point to say your

20   freedom of association and the privilege that attaches to

21   that, how far does that go?  I mean how big is that umbrella

22   in terms of communications?

23         *MR. LUCCO:*  Well --

24         *THE COURT:*  Must have some limits; otherwise, you

25   could say everything I do is a freedom of association,

1    everything I say, every person I meet with, because it's

2    important to me, it's an issue, I'm an association of one.

3           MR. LUCCO:  Well, I guess I'm going to cop out and

4    answer it this way:  I don't think that what we're asserting

5    here stretches those limits at all.  I think these are kind

6    of textbook work product sphere and First Amendment sphere.

7    I think they overlap a bit because of the nature of the case

8    and the nature of the politics, and I think they overlap a

9    bit because some of the people are involved in both the work

10   product aspect of it and the political association aspect of

11   it.  I think that muddies it a little bit.  It doesn't make

12   it as clear to just say, how are we going to deal with this?

13   But I don't think it weakens either position, or should

14   cause the Court to not protect those privileges.

15          And I was just assisted here.  I'm glad because I

16   skipped over it earlier.  I think there's also the limit of,

17   is there a realistic fear of reprisal?  That's what the

18   cases say.  Now, we have submitted affidavits that support

19   that, make the prima facie showing of that.  We could

20   certainly imagine circumstances where that would not be the

21   case, so I think the fact that the cases put that as an

22   element --

23          THE COURT:  So that's --

24          MR. LUCCO:  Is perhaps a limiting aspect when you

25   say, is this just going to --

1          THE COURT:  So the showing that we're talking about

2     as described by the Seventh Circuit, for instance, and I'm

3     talking about this *Marisi* [ph.] case that's quite -- saying

4     if it were engaged in controversial views and the exposure

5     or publication of its internal files would expose members to

6     retaliation, then it would not have an absolute, but the

7     parties then would have the burden of coming forth with

8     information that -- or, rather, of showing the information,

9     so it was essential to the case.

10         So obviously the Seventh Circuit hasn't refined

11    that, but when we're talking about that issue, and this was

12    spoken to by State Farm, what is really realistic?  I mean

13    at what point, when we're talking about information here

14    that's over ten years old, there's -- yes, there's an

15    agreement in place that evidently expires in 2016, which

16    isn't that far off.  Isn't there room here for some sort of

17    a protective order that would allow for the dissemination to

18    parties in the case, or is there one for that?  And maybe it

19    requires something more than what's currently in the

20    existing protective order, but is there room for that?

21    Because the parties in the case, for instance -- no one in

22    the judiciary that's actually in the case.  Justice Karmeier

23    is, like yourselves, responding to a subpoena.  He

24    wouldn't -- he's not -- if I order any of this, he doesn't

25    get it.  It's the defendants, the plaintiffs.  You

1    understand what I'm saying?  And so the fear of reprisal,

2    where is it coming from at this point?

3         MR. LUCCO:  Okay.  Let me address that, if I may.

4    And maybe it's unique to lawyers.  Maybe it's unique that

5    this is an association of lawyers.

6         THE COURT:  By the way, I'm not suggesting that

7    Justice Karmeier -- that they have a basis for that or not.

8    They're saying they got a fear of reprisal.  I'm just

9    speculating as to --

10         MR. LUCCO:  I understand.  You have clients whose

11   interests you have to look out for when you represent them,

12   when you advocate for them, and this not only affects a

13   judge in a pending matter, but it could affect attitudes of

14   judges in matters completely unrelated to State Farm or

15   unrelated to *Price*.  If personal -- not contributions, not

16   whose yard sign you put in your yard, but what you say about

17   people in the privacy of your association, that could have a

18   very chilling effect on your ability to represent clients,

19   on clients being referred to you, on your ongoing business,

20   quite frankly.  That may be unique to lawyers in this kind

21   of a circumstance that we have, but I think it's real.

22         I think their motion to overrule should be denied,

23   Your Honor.

24         THE COURT:  Thank you.

25         MR. LUCCO:  Thank you.

 1          *THE COURT:*  Okay.  Back to State Farm.

 2          *MR. CANCILA:*  Your Honor, I have taken a quick look

 3     at *Appleton*, and I think the reason it hadn't stuck in my

 4     mind is because I did think it was inapt when I read it and

 5     I thought it was inapt because it was a FOIA action.  It

 6     wasn't a nonparty asserting work product protection; it was

 7     the government asserting work product protection itself in a

 8     FOIA proceeding.  So that, I think, is a material

 9     distinction relative to engineering reports it had

10     previously used in other enforcement proceedings, and it

11     asserted the same work product protection again.  And

12     then --

13          *THE COURT:*  But why is it materially different?  I

14     mean you can say -- I mean the FOIA request is like a

15     third-party subpoena.  That's the route you've taken.  It's

16     not the same case.  In fact, the Seventh Circuit makes that

17     point explicitly.  It's not the same case.  And in fact, I

18     think they say somewhere in here, they might want to use

19     this information in another litigation going forward.

20     They're applying Rule 26.  Statutorily they're supposed to

21     apply Rule 26, so they apply Rule 26, so why isn't the exact

22     same analysis?

23          *MR. CANCILA:*  Because the government's a party in

24     this proceeding.  The government is not a party -- I'm

25     sorry, the Tillery Group is not a party in this proceeding.

```
 1    The government is a party in the *Appleton* vs. *Environmental*
 2    *Protection Agency* matter.  The government is asserting work
 3    product protection as to its own work product.
 4         THE COURT:  So maybe -- so only the government gets
 5    to discover work product on an ongoing basis; everybody else
 6    is stuck?  With State Farm, for instance, if they want
 7    State Farm's documents as to the Hale case, can
 8    Tillery Group get that?
 9         MR. CANCILA:  No.
10         THE COURT:  In *Price*?
11         MR. CANCILA:  I'm not suggesting that.
12         THE COURT:  Can Hale get State Farm's documents
13    that you're utilizing in the defense of the price matter?
14         MR. CANCILA:  I'm not suggesting that.
15         THE COURT:  I'm sorry.  Could they get
16    Philip Morris's documents?
17         MR. CANCILA:  I'm not suggesting that.  The
18    distinction is, the government was a party in the matter in
19    which the work product was asserted.  That is, the issue is
20    that it was a party, not that it was the government.  So the
21    distinction I was drawing previously was 26(b)(3)
22    specifically extends to parties, you know.
23         THE COURT:  Yeah, but the -- what we're talking
24    about is assertions by lawyers.  They're the ones who have
25    the work product privilege to assert, and those lawyers --
```

1    I'm not talking about their First Amendment arguments; we're

2    just talking about work product.  Those are the lawyers in

3    *Price*.  They're parties.

4         *MR. CANCILA:*  And we're not trying to free ride on

5    their mental impressions in respect to their prosecution of

6    the *Price* action.  That's what the work product privilege is

7    intended to, you know, protect against.  You know, we're

8    looking to try to obtain material that doesn't come within

9    the explicit wording of Rule 26(b)(3) because they're not

10   parties, and we've cited cases that go to that very

11   proposition.  I don't believe the *Appleton* case is different

12   than that since the government's work product is what was

13   being sought to be protected, and the government was a party

14   in the litigation itself.  That's the only distinction I'm

15   drawing.  One of the elements of 26(b)(3) --

16        *THE COURT:*  That litigation, FOIA litigation, its

17   sole purpose was for the acquisition of a document.  Let's

18   say that Korein Tillery was not in this district and you had

19   to file a lawsuit and go get the subpoena somewhere else,

20   and it was being decided by a different judge.  Does that

21   change it under those circumstances?

22        Now you've got a lawsuit that's open solely for the

23   purpose of enforcement of a subpoena, just like a FOIA

24   request.  It's *State Farm vs. the Tillery Group*.  Now it's

25   analogous, direct -- I just don't see the distinction.  They

1   were a party.  These folks are parties by virtue of the fact

2   that they're the lawyers.  It's the lawyers for the

3   government that are asserting this.  It's as to their

4   investigators.

5          *MR. CANCILA:*  It's the government asserting the

6   work product protection.

7          *THE COURT:*  Sure.

8          *MR. CANCILA:*  It's not the lawyers asserting it;

9   it's the government asserting its interest as a party on the

10   work product of its lawyers.

11          *THE COURT:*  That's true.  But is that a distinction

12   without a difference I guess is the question?

13          *MR. CANCILA:*  Okay.  And then you had asked the

14   earlier question on 502 as well.  I think you had answered

15   that yourself in terms of looking at the language, and the

16   issue of waiver occurs when the disclosure is intentional.

17   The disclosed material concerns the same subject matter in

18   fairness requires.  So it's not the same document.  I mean

19   it's the same subject matter and it's just kind of a

20   question of how that --

21          *THE COURT:*  But it's not automatic.

22          *MR. CANCILA:*  No.

23          *THE COURT:*  Even if it's the same subject matter?

24          *MR. CANCILA:*  I'm not suggesting it is automatic.

25          *THE COURT:*  There's that extra requirement,

 1    fairness.

 2         MR. CANCILA:  Your questions regarding --

 3    Mr. Lucco, regarding public relations I think warrant a

 4    look -- I'm sure you've looked at it -- at the

 5    *Burke vs. Lakin* case.  And clearly there the issues of the

 6    litigating -- clearly the issue there of defense in the

 7    court of public opinion is not something that's subject to

 8    work product.  I think those precise words were used.  So I

 9    think that's directly applicable to the public relations

10    style assertions of privilege that they're making.

11         THE COURT:  But would you agree, even if I adopt

12    that view, there is a distinction between that public

13    relations in furtherance of a particular case versus

14    something else that amounts to advocacy for a particular

15    candidate or against a particular candidate?  Those are two

16    different things.

17         MR. CANCILA:  Or contrary to tort reform generally.

18    Those may well be.

19         THE COURT:  Those are political issues.

20         MR. CANCILA:  Right.

21         THE COURT:  Okay.

22         MR. CANCILA:  The notion of -- I think the point

23    was raised that Judge Herndon already ruled that the statute

24    of limitations defense wasn't valid.  That wasn't the

25    ruling.  The ruling was denying a motion to dismiss on the

1   strength of the allegations and accepting the allegations as

2   true, rejecting the statute of limitations defense there in

3   that context, and accepting plaintiffs' allegations related

4   to equitable estoppel.  There's no ruling that that defense

5   or issue is out of the case by any stretch of the

6   imagination.

7        THE COURT:  What about the -- do the plaintiffs

8   need equitable estoppel if the second predicate act is

9   proven?  If they don't prove it -- if you don't prove the

10  second predicate act, you don't have the RICO case anyway,

11  so --

12       MR. CANCILA:  We would argue that they do need

13  that, yes.

14       THE COURT:  You need the second predicate act?

15       MR. CANCILA:  Right, right.

16       THE COURT:  So what do they need equitable estoppel

17  for?

18       MR. CANCILA:  They need to be able to establish,

19  you know -- and I think Judge Herndon used this language in

20  his ruling, that there was due diligence exercised, you

21  know, in the pursuit of whatever needed to be known to

22  reflect the injury, to reflect the second act, to reflect

23  the supposed concealment.  He had language that went to the

24  due diligence issue that directly goes to what they knew and

25  when they knew it.  Clearly those defenses aren't off the

```
 1   table.  So, you know, I just wanted to address that
 2   assertion right away.
 3              THE COURT:  The order speaks to both things.
 4              MR. CANCILA:  Right.  The notion --
 5              THE COURT:  Yeah.  And it doesn't dispose of in
 6   terms of the case.  The case is still going.
 7              MR. CANCILA:  It is.
 8              THE COURT:  It's not disposed of on the pleadings.
 9              MR. CANCILA:  Right.  But it didn't reject the
10   defenses other than for pleading purposes.
11              THE COURT:  True.
12              MR. CANCILA:  The notion of what these documents
13   may show or may not show -- and it's just impeachment
14   material.  The thing is, is these are so striking of
15   documents that we attached an Exhibit 5 to our reply, and
16   this just illustrates how directly, directly diametrically
17   opposed the contentions are that were made by Wojcieszak in
18   behalf of the Tillery Group and those asserted by plaintiffs
19   here.
20              So this is Exhibit 5 to the reply to the Tillery
21   brief, so it's -- the e-mail is from Wojcieszak to
22   Mr. Tillery and a number of other individuals as well.  The
23   subject is, "Money from Tort Reformers", and the text is:
24              JUSTPAC dropped another 300K into Karmeier's war
25         chest today, Thursday.  JUSTPAC is getting its
```

1           *dollars from the American Tort Reform Association,*

2           *a/k/a Philip Morris Tobacco.*

3           It's just directly contradictory to allegations

4   that are made by plaintiffs.  And this is illustrative.

5           Now, you know, are there other e-mails there that,

6   you know, say these sorts of things?  We don't know.  But

7   there are 400-plus documents that have been withheld that we

8   have strong reason to believe will provide similar evidence

9   to contradict the assertions that plaintiffs have made,

10  Your Honor.

11          *THE COURT:*  I'm looking at the wrong Exhibit 5, I

12  believe.  I apologize.

13          *MR. CANCILA:*  It was exhibit to the reply

14  submission.  There were maybe -- there were more exhibits.

15  There was a thicker stack that went with the old one.

16          *THE COURT:*  Okay.

17          *MR. CANCILA:*  And in terms of it being a simple

18  RICO case with mail fraud being asserted, it goes back to

19  this notion to what plaintiffs say was false or unstated or

20  not included in State Farm's filings are the very items that

21  these documents address.  I don't know how one can get more

22  to the heart of the matter than directly inconsistent

23  assertions by Wojcieszak to track those contributions to a

24  different entity.  I mean it's -- it basically undercuts

25  plaintiffs' assertions in this case as to the contended

1   asserted misleading or unstated items contained in

2   State Farm's submissions.

3           *THE COURT:*  It's not impeachment --

4           *MR. CANCILA:*  Correct.

5           *THE COURT:*  -- is what you're saying?

6           *MR. CANCILA:*  Correct.

7           *THE COURT:*  It's -- he's claiming to have direct

8   evidence, personal knowledge of a fact that rebuts

9   completely the assertions that he's made as it relates to

10  State Farm?

11          *MR. CANCILA:*  Right.  Just as he claimed to have

12  personal knowledge in the affidavits that were filed, you

13  know, on the strength of his investigations in the *Avery*

14  case, two times in 2005, once in 2011.  And he even states

15  in those affidavits, you know, that he supports the

16  assertions being made by plaintiffs in their submissions.

17          *MR. CANCILA:*  Thank you.

18          *THE COURT:*  Thank you.  Okay.  Let's take a break.

19  Start back in 15 minutes.

20      **(Break)**

21                      *   *   *   *

22      **(Reconvened)**

23          *THE COURT:*  We're going to now address privilege

24  assertions between the plaintiffs and defendants, and start

25  with plaintiffs.  Mr. Blonder?

1          MR. BLONDER:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          MR. BLONDER:  There are essentially three issues

4    that we've addressed in the briefs, and I obviously don't

5    want to repeat what's in the briefs and Mr. Lucco's argument

6    about an hour ago and some of the Court's back and forth.

7    Don't want to retread over landscape that's already been

8    plowed.

9          I guess to start out, does the Court have

10   particular issues that it wants me to address or just kind

11   of take it in the order we dealt with it in the briefs?

12         THE COURT:  Take it in that order and I'll ask you

13   questions as you go.

14         MR. BLONDER:  That's fine.

15         So the first issue, Judge, that we raise goes to

16   the investigators, and we're talking about Mr. Wojcieszak

17   and Mr. Denton.  And they were employed by Mr. Clifford and

18   a couple of the other plaintiffs' lawyers in this case -- in

19   the *Avery* case and this case post-2005 for a period until

20   approximately 2006, 2007, and then it was dormant 'til after

21   the *Caperton*  case comes down from the Supreme Court in

22   2008/2009.  They're re-engaged and are performing work at

23   the direction of Mr. Clifford, Mr. Barrett, Mr. Ball.  So

24   the issue goes to, we're asserting work product.

25         THE COURT:  When did *Caperton* come out?

1              *MR. BLONDER:*  2009.

2              *THE COURT:*  So they were re-engaged?

3              *MR. BLONDER:*  They were re-engaged in connection

4    with the *Caperton* case.

5              *THE COURT:*  Before it was decided?

6              *MR. BLONDER:*  Yes; while it was pending, before it

7    was decided.  And there are materials that we are claiming

8    as work product.  It was work that was done at the direction

9    of the lawyers, specifically him, Mr. Clifford, Mr. Ball,

10   Mr. Barrett, and it was kind of saying, *Hey, go look at*

11   *this.  Here's what we found*.  It's kind of building a case

12   together.  Again, and it culminated in Mr. Wojcieszak

13   providing an affidavit in 2005 in the motion to recuse that

14   was filed in the state court, and subsequently in 2011.

15             So we believe -- you know, Court talked about the

16   *Appleton* case and we cited that in our briefs, and it's

17   directly on point.  In terms of the fact that there is an

18   investigator involved doesn't mean it's not work product.

19   And here particularly, it was done at the direction of the

20   lawyers and it's about building the case.  One thing, we

21   have approximately 900 entries on our privilege log.  As we

22   made clear in our response brief, we have some of our

23   colleagues re-going through all of those in the sense we are

24   going to be producing some of the materials on that

25   privilege log.

1          *THE COURT:*  So let's talk about work product.

2     Obviously, you know, I have a view that I'm trying to stay

3     open-minded about in terms of what the *Appleton* case says,

4     but, you know, my view of it is:  It applies to

5     investigators, and the issue of whether it's in this case or

6     not is not an issue here.  That's really just for what we've

7     argued before.  So the Court's view is, it applies to

8     investigators.

9          But we're going to obviously get to the issue of

10    waiver, not -- let's set aside sharing of documents.

11         *MR. BLONDER:*  Okay.

12         *THE COURT:*  Using the affidavit, okay, there's been

13    multiple times plaintiffs have made assertions and continued

14    to in support of the crime fraud exception, relevant time

15    period, based on these investigations, so they're at issue.

16    They're being utilized in the case as we speak.  So we have

17    to engage in an analysis of waiver as to issues surrounding

18    voluntarily or intentionally disclosed material and then

19    those documents which fairly fall within that subject matter

20    and then -- and this is the hard part -- well, subject

21    matter, of course, is a hard part too because how far does

22    subject matter go?  But then what should fairly be

23    disclosed?  And really, that's -- as to your work product

24    assertions, at a minimum, we've got to go through that,

25    don't we?

1          MR. BLONDER:  I think we may, Your Honor.  And one

2    way to look at that is, you talk about the 2005 and 2011

3    affidavits from Mr. Wojcieszak in the Illinois Supreme Court

4    in connection with the petition to recall the mandate and

5    the motion for recusal.  Now, one of the interesting issues

6    there when you talk about work product protection in this

7    case is, the submissions of those motions, the affidavit of

8    Mr. Wojcieszak, isn't at issue in this litigation because

9    the issue is not, what did plaintiffs allege to try and get

10   the Court to do something; the issue is, State Farm had

11   information that they either made an affirmative

12   misrepresentation or an omission, and we look at it with

13   respect to State Farm's conduct.  What plaintiffs said in

14   connection with those filings in the Illinois Supreme Court

15   is largely irrelevant because that's not an issue that's in

16   the case.  That's number one.

17         THE COURT:  Well, you're not going to rely on this

18   investigation to prove the facts that you're alleging that

19   State Farm essentially committed a fraud?  You're not going

20   to rely on Mr. Wojcieszak or Mr. Denton for that?

21         MR. BLONDER:  We may or may not.  You know, our

22   hope is to be able to have all the underlying third-party

23   materials, then start backing up what we've alleged,

24   obviously to the extent we get it.  That being said, we may

25   need Mr. Wojcieszak describing how he had to go through the

1    garbage cans to get the information or about something that

2    someone may have said to Mr. Wojcieszak or information in

3    his personal knowledge.  Can't rule that out at this

4    juncture.  He is listed as a potential witness.

5           But the fundamental here is State Farm's conduct,

6    what State Farm did or didn't do, and to the extent that

7    plaintiffs have at this point used the affidavits, it was in

8    connection with pleading to the Illinois Supreme Court in

9    the form of a motion or a pleading to take affirmative steps

10   that the Court declined to take.  That's not an issue that's

11   in play here in the sense of use of those affidavits, the

12   information we may need in connection with our case here,

13   but even if there has been a waiver, it then goes to still

14   kind of a balancing of what level of work product we're

15   talking about versus State Farm's need for the information.

16          *THE COURT:*  Let me just back up.  Are you saying

17   you haven't relied on those affidavits in this case to make

18   your -- to begin building it, to make factual assertions

19   about what those individuals claim in their affidavits?

20          *MR. BLONDER:*  No.  What I'm saying is that

21   information has formed a core or a set of information that

22   we have used and taken and worked with in developing our

23   case, developing our theory.  We've subsequently served

24   subpoenas, received documents through disclosures, received

25   documents in discovery which have added to that and have

1    kind of taken it in some different directions and nuances

2    from what we had anticipated before.

3          THE COURT:  These are still folks whose affidavits

4    and work you've disclosed and relied on, disclosed to the

5    Court, relied on in your arguments to the Court, continue to

6    rely on in your arguments to the Court.  I mean --

7          MR. BLONDER:  We've used certain facts that were

8    alleged there.  What we haven't -- to the extent --

9          THE COURT:  Have you cited to an affidavit?

10         MR. BLONDER:  Yes, we have.

11         THE COURT:  That's what I thought.

12         MR. BLONDER:  I'm not trying to walk away from

13   anything that we've done or not done.

14         THE COURT:  So they're witnesses in the case that

15   you're not only my -- you've already used them, haven't you?

16         MR. BLONDER:  We've used them for certain purposes.

17   The case law in terms of waiver talks about testimony at

18   trial, trial or deposition, which we haven't used them for.

19   In terms of it's a line in the cases that State Farm relies

20   on in its brief.  I believe we distinguish those cases in

21   our response on the testimonial issue.  It's page 5 of our

22   response.  The one case that was not a testimonial situation

23   is the *Belmont Holdings vs. Suntrust Banks* case from the

24   Northern District of Georgia where the District Court held

25   that the party asserting work product had presented --

1          *THE COURT:*  Bare with me for one second.

2          *MR. BLONDER:*  It's page 5.

3          *THE COURT:*  I'm looking at page 5 of your response.

4          *MR. BLONDER:*  We're talking about *Nobles*, *Brown vs.*

5     *Trigg*, *Kallas vs. Carnival*.  Again, all the cases they put

6     forth are situations where the person testified at trial or

7     in the deposition, and again, with the one case that's an

8     exception to that rule, which is where the court determined

9     in a hearing that the investigator's testimony was being

10    used in a misleading or selective way, and fundamental

11    fairness required, you know, disclosure of the rest of the

12    information.  So we're not at that stage.  So when we talk

13    about the law that's been laid out on this --

14         *THE COURT:*  Isn't an affidavit just per se

15    testimonial?  I mean it's a sworn statement.  It's being

16    offered to prove the truth of the matter asserted.  It may

17    be hearsay but it's certainly testimonial.

18         *MR. BLONDER:*  It's testimonial by nature but,

19    again, the case law that's been put forth to the Court from

20    State Farm specifically talks about kind of a different set

21    of circumstances.  Talk about --

22         *THE COURT:*  Trial?

23         *MR. BLONDER:*  Yeah.

24         *THE COURT:*  So work product waivers don't kick in

25    until the moment that witness gets on the stand, and then

1    when that happens, hold off, everybody -- the jurors go back

2    into the witness room.  We've got a whole bunch of

3    disclosing to do.

4         *MR. BLONDER:*  If I was on the side doing the

5    disclosing I would love that rule.  If I was on the other

6    side I would hate that rule.  It would probably come at the

7    time the parties do their final witness list.

8         *THE COURT:*  After the close of discovery?

9         *MR. BLONDER:*  Either after the close or --

10        *THE COURT:*  That's kind of unworkable too.

11        *MR. BLONDER:*  The Court can, under its own rules,

12   kind of re-open in limited circumstances for information, so

13   it's not a position where someone would be irreparably

14   harmed because they didn't get it.  It certainly shouldn't

15   be dealt with at the outset of litigation on the kind of

16   possibility they may testify, may not testify, and just open

17   the barn door at the outset.  Because again, these are --

18   we're talking about people who specifically did work at the

19   direction of the lawyers to help build the case, so --

20        *THE COURT:*  I got you on that.  There's no doubt.

21   I mean I'm with you.  These are -- I think I've signaled

22   pretty strongly, I don't have a problem with an investigator

23   who's employed by counsel as qualifying within the work

24   product umbrella.  This is mostly about then the next

25   question of waiver, and so because -- what I'm getting at

1    then is, do we -- don't we have to go through the 502

2    analysis then?  But you're saying we have to wait and see.

3         MR. BLONDER:  Personally, I think we need to wait

4    and see, but to the extent the Court cease it differently,

5    then we would need to go through the 502 analysis at this

6    juncture.  Again, I think the more pragmatic approach would

7    be to defer this issue because one of the particular

8    components is going to be the defendant's ability to get the

9    information through alternative means.  In terms of the

10   prejudicial and probative balancing of the information, how

11   essential is it to their claim, and can they get it through

12   alternative means?

13        THE COURT:  But if it's been waived, we don't even

14   arrive -- I mean that is available to the other side.

15   That's their argument of last resort.  So they don't have to

16   rely on that until they lose on waiver.

17        MR. BLONDER:  Correct.  But the issue then that

18   we've got is that focuses on the scope of that waiver.  If

19   the Court's going to go into the 502 analysis, the question

20   is:  How broad or narrow is that waiver and to what does it

21   actually apply?

22        THE COURT:  Yeah, agreed.  Yeah.  I mean when we're

23   talking about waiver, that's -- it's certainly not as all

24   encompassing as -- well, it's not all encompassing.

25        MR. BLONDER:  It's certainly not a situation here

1    where the 900 documents -- I believe it's 900 on our

2    privilege log to which we're asserting the work product

3    doctrine -- would automatically be turned over.  And I

4    think, again, to the extent the Court wants us to go down

5    that route --

6         THE COURT:  That doesn't surprise me that you would

7    say that.  Very well could be the case.

8         MR. BLONDER:  To the extent the Court's going to go

9    down that path the parties would need to kind of address the

10   502 analysis and the scope of the waiver so that we could

11   have informed discussion on that.

12        THE COURT:  I would also agree with that.

13        MR. BLONDER:  The second issue that we framed is,

14   the plaintiffs want a log of the communications between and

15   amongst plaintiffs' counsel, kind of the discussions we've

16   had between the sides basically saying, we don't believe

17   that you can get those under any circumstance, to which we

18   agreed to say, okay, first let's focus on the issue, do we

19   need to log them; then if we do have to log them, kind of

20   next step will be a discussion of, once we log them, what's

21   privileged, what's not, kind of what's fair game?  And our

22   position is, that they're not entitled to our

23   communications.

24        So for example, if I'm e-mailing to Mr. Clifford

25   about what arguments should we be making or how should we

1    present something, that's not something they're entitled to

2    know.  I've never been in a case in 20-plus years of

3    practice I've had to log my communications with co-counsel.

4    It could be Mr. Thrash looking at the Chamber of Commerce

5    documents and is finding all kinds of things as he's

6    e-mailing us as we're here.  The idea that we would have to

7    log those communications, that they're entitled to our

8    internal communications, just to me is nonsense.

9         And to the extent we're going to start going down

10   that path, I mean that's the fundamental idea of what's

11   protected here is the communications and the lawyers putting

12   their case together.  So I don't know what more I need to

13   say on that.  If the Court has questions on that issue,

14   happy to address them, but --

15        *THE COURT:*  Well, I may as well ask this question:

16   They say you've injected the issue of equitable estoppel,

17   and this relates to both your investigators' knowledge and

18   yours, and so it's possible that your internal

19   communications between lawyers would be reflective of that;

20   therefore, you must log it so that we can look at it and

21   see.  Then we can make an argument.

22        *MR. BLONDER:*  If we're going to that, we're not

23   talking about waiver in terms of the 502 analysis; we're

24   talking about whether it's still protected, and we go

25   through, hey, can State Farm get the information through

 1    other means?  Is it essential to a fundamental issue in the

 2    case?

 3           Mr. Lucco made the point, when talking about

 4    statute of limitations, and I think Mr. Cancila addressed it

 5    as well, Judge Herndon, on the pleadings, said, hey, look,

 6    second predicate act is 2011, alleged, so lawsuit fits

 7    within that second predicate act.  So --

 8           THE COURT:  I was just looking at that order.  So

 9    that's the primary holding.

10           MR. BLONDER:  Correct.

11           THE COURT:  Of course, it assumes that you proved

12    it.

13           MR. BLONDER:  Assumes we proved the second

14    predicate act.  As you said before, if we don't prove the

15    second predicate act, we lose.

16           THE COURT:  So what do you need equitable estoppel

17    for?

18           MR. BLONDER:  I don't know that we do.  I think in

19    the original briefs on the motion to dismiss it was about

20    suspenders, kind of, let's address everything that we think

21    can address.  I wasn't actually in the case at that time,

22    nor was Mr. Clifford, nor was Mr. Bellas.

23           THE COURT:  Because if it's not an issue, then

24    that's the primary basis upon which they're asking for it.

25           MR. BLONDER:  Even if you look at that as an issue

    1   in the case, the inquiry that --

    2           THE COURT:  You're not prepared to give up on that

    3   one?

    4           MR. BLONDER:  Oh, no, I'm not prepared to give up

    5   on that one.

    6           THE COURT:  I was going to ask.  Doesn't look like

    7   you're willing.

    8           MR. BLONDER:  No.  But the inquiry would be State

    9   Farm -- an inquiry on equitable estoppel or the fraudulent

   10   concealment could look at when State Farm admitted or

   11   conceded certain facts without ever having to get into, what

   12   did the plaintiffs figure out and what was conjecture in

   13   their mind and what did they think they might be able to

   14   prove?

   15           We're alleging that State Farm made

   16   misrepresentations by omission and commission, so the

   17   question would be, for the equitable kind of tolling,

   18   fraudulent concealment:  When did State Farm concede certain

   19   things?  When did they put certain things out in the open,

   20   some of which has been after this lawsuit was filed?  So

   21   there's a factor where, even if the equitable tolling

   22   becomes -- comes into play, the plaintiffs' communications

   23   between their lawyers is still not necessary to get to that

   24   issue because the Court can look at it through the eyes of

   25   State Farm, the primary alleged wrongdoer in this case.

1          The third issue that we've addressed is the

2     communications between State Farm and its attorneys relevant

3     to the two briefs that form the predicate acts.  And we're

4     not talking about trying to get all the files, all the

5     communications, kind of all the back and forth.

6          THE COURT:  But you want them to log it just like

7     they want you to log yours?

8          MR. BLONDER:  No.  We want them to log specific

9     things.

10          THE COURT:  How else do you pick which ones you're

11     going to ask me to look at?

12          MR. BLONDER:  We'd like a very specific thing,

13     which is they made representations, commissions, and

14     omissions in the two briefs.  We are entitled to find out

15     the basis for the statements in the briefs that we allege

16     are fraudulent or misleading.  So what we're asking for is

17     the communications that relate to the facts in those briefs,

18     a very narrow set of information or guidelines, and --

19          THE COURT:  You are entitled to know the basis for

20     those representations, there's no doubt about that, the

21     factual basis for those representations.  Now -- or you can

22     ask the question anyway.  I might be phrasing this

23     improperly because their position is, in part, we're just

24     responding to the facts you alleged.  So it becomes a bit

25     convoluted.  But in any event, that's very different from

 1    them -- and we want the communications that are relaying

 2    those facts to the lawyers.

 3         MR. BLONDER:  Well, again, assuming that we're

 4    alleging that there's an omission or commission here, the

 5    question is:  Did State Farm mislead its own lawyers with

 6    respect to the filings and the briefs or did the lawyers

 7    take information which was provided by State Farm and use it

 8    in a way to perpetrate the underlying mail fraud?  The

 9    question is:  How did the facts get in the brief and who

10    knew what to put them in the brief?  Again, does it lie at

11    the lawyers who are on the briefs or does it lie at

12    State Farm?

13         THE COURT:  So, you know, they're saying that

14    you've made this allegation in your briefs here in this case

15    that you didn't know, you didn't have enough information to

16    know certain things until it was revealed in a filing.  So

17    can they just on that basis say, not only is it essential

18    for us to establish equitable estoppel, we think that that's

19    wrong, we think it's a lie, so we are entitled to those

20    communications between counsel, between counsel and the

21    investigators so that we can verify where it came from.

22         MR. BLONDER:  Again, that goes to what's an

23    essential issue in the underlying case.  If the Court wants

24    to draw a line that says, look, you're not -- plaintiffs,

25    you're not going to get the actual communications between

 1    State Farm and its lawyers; and State Farm, you're not going

 2    to get the communications between the investigators and the

 3    lawyers, or the internal communications the lawyers on the

 4    plaintiffs' side, we can live with that.  We can live with

 5    one set of rules.  State Farm has been pushing very hard --

 6         *THE COURT:*  Let me just -- when you throw in

 7    investigators, that's different.  Internal communications

 8    and communications with your clients are the same.  We're

 9    talking apples and apples to State Farm's internal

10    communications and communications with its client.

11         *MR. BLONDER:*  Again, with the one inquiry that I

12    laid out for the Court earlier, which is taking the

13    statement in the brief and asking point blank, what's the

14    factual basis for the statement?

15         *THE COURT:*  They've already said the basis for the

16    statement is advocacy.

17         *MR. BLONDER:*  Okay.  So --

18         *THE COURT:*  And I did ask the question, did you

19    have -- because you've presented me with one thing that was

20    very clear, and I'm not saying it's material or not.  I'm

21    not going to reveal that because I don't know that I've made

22    that decision anyway, but the -- but you have a statement in

23    an e-mail from Mr. Murnane saying, *I've considered myself a*

24    *de facto campaign for a limited period of time.*

25         *MR. BLONDER:*  Correct.  Page 65, I believe, of the

1    exhibit.

2         THE COURT:  So -- but their position on that was,

3    well, he wasn't the campaign manager.  There wasn't evidence

4    that he was that was submitted.  And furthermore, when asked

5    point blank, we didn't know that.

6         MR. BLONDER:  Well, Mr. Cancila was very careful.

7    He said, "as far as I know".  So it wasn't, State Farm

8    didn't have that, State Farm didn't know that; it was, "as

9    far as I know".

10        THE COURT:  But, again, you know, that's -- if

11   you're trying to say that the lawyers were the instruments

12   in some way by being fed fraudulent information, certainly

13   verify the lawyers didn't know.

14        MR. BLONDER:  And I'm not suggesting -- I'm not

15   trying the suggest that the lawyers, you know, consciously

16   did something inappropriate.  Not at all.  The issue though

17   goes to, what information lawyers were presented by

18   State Farm that the lawyers were given to work with.  And

19   that's why we make the argument that the lawyers were the

20   kind of instrumentality with respect to the crime fraud

21   exception that we're raising in our briefs.  But as I said,

22   to the extent that the Court wants to adopt the rule that I

23   suggested, you know, I mean, we can live with that, again,

24   so long as we're able to explore the factual bases for the

25   statements in the briefs.

 1          THE COURT:  If the case is about lawyers engaged in

 2    that -- the crime fraud exception is a pretty serious matter

 3    to be alleging.  That's one -- I mean, you know, I'm looking

 4    at that and saying -- I think they're accurate in terms of

 5    what was in the brief, in terms of what has been presented

 6    by the other side.

 7          MR. BLONDER:  I think it's a line though in terms

 8    of -- again, we talked about fraud by commission or

 9    omission.  I think that there are certainly things that --

10    even if a statement in the brief is not an outright

11    falsehood, it's certainly misleading with respect to the lay

12    of the land and the omissions and the duty of candor of

13    complete disclosure once you say something.

14          THE COURT:  Well, but what I have in front of me

15    is, from briefing on previous -- briefing on the scope and

16    looking at what has been also presented.  You've got a check

17    from the Chamber of Commerce; you got a check from

18    State Farm and the Chamber of Commerce.  There's a whole

19    bunch of people that are part of the Institute for Legal

20    Reform.  When I say "people", people and corporations to the

21    extent they're different.

22          MR. BLONDER:  Absolutely.

23          THE COURT:  And there's a whole bunch of people who

24    are directors, to include, yes, Mr. Rust, who apparently

25    wasn't there when the vote was made -- not an insignificant

1    fact.  But so there's -- and my understanding from a

2    previous hearing that we had, and I can't remember if it was

3    Mr. Cancila who was telling me this or not, but, you know,

4    they've got a bunch of membership levels at the ILR, and I

5    don't know where State Farm falls -- if they have silver,

6    gold, or diamond membership -- but it's a million a year.

7    How many have that same level?  I don't know.  I still

8    don't -- I don't know.  So one of the key assertions is they

9    paid them a million bucks and then, you know, turned around

10   a month later and voted to send it right back.

11        *MR. BLONDER:*  They round tripped it basically

12   through there.  I believe in the previous hearing we talked

13   about the article from Tom Donohue from the Chamber and Wall

14   Street Journal and how the Chamber was putting itself out

15   there as a means by which contributions could be made to

16   candidates that didn't have to be reported.  That was the

17   discussion we had last time when we were talking about the

18   timeframe for discovery.

19        *THE COURT:*  You've got -- I mean it certainly was

20   targeted, but that wasn't the only place it was targeted.

21   And there were other interests expressed in those very

22   documents, medical malpractice reform, that community, the

23   asbestos defense community, all those folks.

24        *MR. BLONDER:*  Judge, I think our fundamental

25   position is, and one of the reasons we cited the ISBA

 1   materials, is State Farm's brief created -- in the Illinois

 2   Supreme Court, created the impression State Farm gave a

 3   de minimis amount to Justice Karmeier and that was the

 4   extent of their involvement.  What we seem to be finding

 5   out, through discovery, at least to date, is, this appears

 6   to have been a well orchestrated well calculated effort to

 7   change the composition of the Supreme Court in Illinois

 8   while the *Avery* case was there.  I mean, again, the issues

 9   of the ISBA bear that out.  Some of the issues of the

10   financial contributions we've been tracking that we attached

11   to our briefs, that's the point here.  And that's a far cry

12   from the position that's laid out in the briefs.

13          *THE COURT:*  But there were lots of entities that

14   were involved in that effort.  Yes, *Avery* was pending, but

15   there was -- Justice Karmeier had a lot of supporters.

16          *MR. BLONDER:*  He did.  And our position --

17          *THE COURT:*  Wasn't just State Farm.

18          *MR. BLONDER:*  That's correct.  But our position is,

19   had State Farm come clean with the extent of their

20   involvement in this well orchestrated, well funded campaign,

21   Karmeier would have had to recuse himself or the Illinois

22   Supreme Court could have done something differently.

23   State Farm, in minimizing its involvement and not presenting

24   the fair picture of the complete involvement it had, by

25   omission or commission, committed mail fraud by putting the

1   brief in the mail.  I mean that's a fundamental position

2   we're taking on the mail fraud claim and how this fits in

3   the crime fraud exception.

4       THE COURT:  The dots don't connect.  I mean from

5   the -- from State Farm to Chamber back, there's not -- the

6   person who was supposedly voting wasn't there.  I'm not

7   saying -- I don't know what you'll eventually be able to

8   prove, but today what I'm looking at, it's -- there was

9   money thrown in a pot and from that pot money went back.  I

10  don't think that's -- you know, it's not a constructive

11  trust.

12      MR. BLONDER:  Right.  I understand.  And again, I

13  don't want to belabor this point because I understand the

14  Court's point.

15      THE COURT:  I'm belaboring it.  Sorry.

16      MR. BLONDER:  That's okay.  So anyway, that was our

17  position on the crime fraud exception.  Like I said, we

18  would -- we do think that that could be a workable rule of

19  this kind of -- not allowing kind of the inquiry on either

20  side with the limited issue that I talked about with the

21  Court.

22      THE COURT:  Attorney-client privilege is a big

23  deal, there's no doubt about that.

24      MR. BLONDER:  So that's what I have to say, unless

25  the Court has additional questions.

 1          *THE COURT:*  No.  Thank you.

 2          *MR. SAFER:*  Your Honor, would you mind if we

 3     addressed the crime fraud exception first?

 4          *THE COURT:*  That's fine, yeah.

 5          *MR. SAFER:*  The idea that the crime fraud exception

 6     was put in their brief to get some sort of tit-for-tat is

 7     silly.  They're two totally different things.  It's not

 8     playing by one set of rules.

 9          On the one hand, they are acknowledging that

10     there's a -- these are privileged communications that have

11     not been waived.  They are saying there's an exception, the

12     most serious kind of exception there can be, crime fraud,

13     and the rules are, according to the Supreme Court, that they

14     cannot stand here on assertions or cite to their complaint;

15     they have to prove it, they have to come forth with

16     prima facie evidence that satisfies that crime fraud

17     exception:  One, that a crime or fraud was committed; and

18     two, that the specific communication that they are seeking

19     furthered that crime or fraud.

20          Your Honor wouldn't know it from the plaintiffs'

21     briefs, but we have logged our communications with

22     State Farm relating to these briefs, relating to the 2005

23     brief and relating the 2011 brief.  Those are contained on a

24     privilege log.  Plaintiffs did not seek at all to identify

25     any specific communication for Your Honor.

1          *THE COURT:*  Is that log in the record?

2          *MR. CANCILA:*  It is.

3          *THE COURT:*  I wanted to make sure I wasn't missing

4     something obvious.

5          *MR. SAFER:*  If plaintiffs had any hope of

6     satisfying the second prong of that, they would have put it

7     in the record and they would have said, here are the

8     communications that we seek because here is the prima facie

9     case that those communications furthered the fraud.  They

10    haven't done that, so there is no chance that they have

11    satisfied the crime fraud exception, so -- but the point

12    that we're playing by the same rules, that is a totally

13    different inquiry than, does the attorney-client privilege

14    apply to their communications with their investigators,

15    which could be part of work product, and have they waived

16    that?  It's not playing by the same rules.  Two totally

17    different inquiries, two totally different rulings.

18         *THE COURT:*  Again, I hate to -- this isn't

19    hair-splitting.  The investigators and their communications

20    with the investigators, or, rather, those documents which

21    reflect those communications, that's different.

22         *MR. SAFER:*  Exactly.  It's different.

23         *THE COURT:*  The assertion is work product.

24         *MR. SAFER:*  Yes.

25         *THE COURT:*  But communications amongst the lawyers,

```
 1   it's different but a lot less different.  And you're

 2   asserting that these things are relevant to -- that those

 3   communications are relevant to a defense?

 4           MR. SAFER:  Right.

 5           THE COURT:  Based on?

 6           MR. SAFER:  Well, based on evidence that we have.

 7   Mr. Cancila will address it.  But clearly they have put

 8   the -- you know, it's relevant to the defense.  Even as we

 9   go through the crime fraud exception, we will -- I can point

10   out to you when they are specifically relying on allegations

11   that are contained only in Wojcieszak affidavit.

12           THE COURT:  Is it Wojcieszak?

13           MR. BLONDER:  Wojcieszak.

14           MR. SAFER:  Wojcieszak.  Thank you, Your Honor.  In

15   Wojcieszak's affidavit.  They are using that as testimonial

16   evidence.

17           THE COURT:  That's been conceded, and we're

18   really -- on that issue, when we're talking about that

19   narrower analysis of waiver, the issue really is -- and

20   maybe, Mr. Blonder, you haven't conceded it, but I think you

21   agree that an affidavit is testimonial.  But if I'm wrong

22   about that, you can correct me.  But the issue seems more to

23   be, when is it appropriate?  Should we wait, should we do it

24   later?

25           MR. SAFER:  I don't want to steal from Mr. Cancila,
```

 1   but that is kind of an easy one, Judge.  It is so

 2   unworkable.

 3         *THE COURT:*  We can get back to crime fraud.

 4         *MR. SAFER:*  Yes, okay.  Crime fraud.

 5         There are -- first, with regard to the 2005 brief,

 6   they say that -- State Farm says that it gave minimal

 7   contributions, and that is false because State Farm gave

 8   $2 million to the U.S. Chamber of Commerce in 2003 and 2004,

 9   and Ed Rust voted to send that money back to

10   Justice Karmeier.

11         It is critically important to look at what

12   State Farm did say in its brief because once you see that

13   you say that there is absolutely nothing to plaintiffs'

14   argument.  What State Farm said is:  *Although plaintiffs*

15   *attempt to link large sums in contributions by a variety of*

16   *persons and organizations to Justice Karmeier's campaign to*

17   *State Farm, their moving papers and supporting*

18   *documentation, in fact, reveal that a limited number of*

19   *State Farm officers and employees made quite modest*

20   *contributions to Justice Karmeier's campaign.*

21         It was a comment on plaintiffs' allegations, moving

22   papers, and supporting documentation.  That cannot -- that

23   comment on the adequacy of their moving papers cannot

24   support an allegation of fraud, and the *Apotex* case is

25   squarely on point.  Common sense tells you that.

 1          Second, the allegations of the misrepresentation --
 2   that support the misrepresentation are flawed; that is, that
 3   State Farm's $2 million contribution to the U.S. Chamber
 4   over two years, 1 million a year, that is their dues, that
 5   that was a contribution to Karmeier.  First of all, there is
 6   no evidence of earmarking.  As Your Honor pointed out, the
 7   plaintiffs' own exhibits -- in Exhibit 2, for example, shows
 8   that there are a number of different things that this money
 9   is going to be used for.  It proves that there is no
10   earmarking.  It says, on the page Hale 823, that the board
11   approved spending between 1.8 and 2 million to try to
12   improve the litigation climate in Illinois.  Goes on to say:
13   *Similar programs will be mounted in Mississippi,*
14   *West Virginia, and in California.*
15          And at the end of that same exhibit, 1296 -- it's a
16   separate document talking about the same vote -- it said:
17   *The board approved a comprehensive public relations campaign*
18   *for Illinois.  The campaign will highlight the state's*
19   *flawed legal system, particularly in the southern part of*
20   *the state, including Madison County, and will educate the*
21   *public about the importance of having judges who will uphold*
22   *the rule of law with integrity and impartiality.*
23          So plaintiffs' own exhibits show that their
24   assertion in the brief is false.  It's not -- the board did
25   not vote to send the money back -- State Farm's money, no

1    less -- back to Justice Karmeier.  Of course, as Your Honor

2    points out, plaintiffs' brief says, quote, *"Ed Rust voted,*

3    *on September 29th, 2003, to send that money back to Illinois*

4    *for the Karmeier campaign, and for the ILR to work with the*

5    *I C J L to help Justice Karmeier."*  That was false;

6    patently, demonstrably false.  Rust was not at the meeting.

7    And by the way, the absurdity of using, as a RICO predicate

8    or fraud, a lawyer's allegation --

9            THE COURT:  Let me just -- let me ask you one

10   thing.

11           MR. SAFER:  Yes.

12           THE COURT:  Does he have proxy?

13           MR. SAFER:  There is no evidence that they took any

14   kind of proxies, Your Honor.

15           THE COURT:  You don't know whether --

16           MR. SAFER:  No.  Nor is there any evidence, none.

17           THE COURT:  I'm not suggesting there's evidence;

18   I'm just asking the question.

19           MR. SAFER:  Right.  Yes.  I appreciate that,

20   Your Honor.  But at this point they have to come forth with

21   evidence.  They didn't say he voted by proxy; they said he

22   voted.  And he did not.  It is demonstrably false.  And by

23   the way, if a lawyer's statement in a brief is fraud, they

24   just committed it because that was an absolute false

25   statement and now they're one predicate away from a RICO

1    claim.  That's the absurdity of this process.

2              Third, the Tillery documents show that Wojcieszak

3    attributes that same money from the U.S. Chamber to Altrea

4    [ph.].  The facts are that State Farm contributed

5    $2 million, which is less than two -- 3 percent of ILR's

6    contributions.

7              Second, other donors --

8              THE COURT:  Did you -- I apologize.  I missed that

9    part in here.  So point -- is it in your brief?

10             MR. SAFER:  It is, Your Honor.

11             THE COURT:  Well, that's -- can you point me to

12   that.

13             MR. SAFER:  I'm sure I can.

14             THE COURT:  If it's in there, it's in there, but --

15             MR. SAFER:  I will.

16             THE COURT:  It's jumping out at me that you're

17   using this number right now.  I don't remember.

18             MR. SAFER:  What I will do is when -- while

19   Mr. Blonder is on his rebuttal, I will find that.

20             Other donors gave similar amounts, and there is no

21   earmark.  There's zero evidence of fraud, let alone a

22   prima facie case.

23             The second argument they make is about Ed Murnane

24   that Your Honor has seized upon.  And there, what State Farm

25   said was -- so on State Farm's responsive brief, Your Honor,

 1    on -- it's attached.

 2            THE COURT:  Responding to plaintiffs?

 3            MR. SAFER:  Yes.  It's attached as Exhibit 2, but

 4    on the top of page 6 of the brief it says that State Farm's

 5    contribution comprised less than 3 percent of the

 6    contributions received by the ILR, and it --

 7            THE COURT:  Oh, okay.  You're talking about --

 8    okay.  So this is the 300 -- what is that?  38 million?

 9            MR. SAFER:  Yes, exactly.  And other ILR members

10    make these same level contributions.

11            So back to Murnane.  What the 2005 brief stated

12    was:  "Murnane, although in support of Justice Karmeier's

13    candidacy, was not Justice Karmeier's campaign manager and

14    not his campaign finance manager," end quote.  Murnane was

15    not Karmeier's campaign manager; Tomaszewski was.  Now --

16    and by the way, again, the Tillery documents show that

17    Wojcieszak was advocating dirty tricks against Tomaszewski

18    because he was Karmeier's campaign manager.

19            Second, the exhibits cited by plaintiffs

20    demonstrate that Murnane was not Karmeier's campaign

21    manager.  Context and timing is important, Your Honor.  So

22    there are two exhibits that reference this de facto campaign

23    manager; one that is wholly without any foundation has no

24    date, but clearly in the early days says that he acted to an

25    extent as campaign manager for a while, according to him,

 1   and then on November 3rd there's an e-mail that says he's

 2   hoping to hire -- they're hoping to hire a campaign manager

 3   soon.  He was a, quote, "senior advisor or de facto campaign

 4   manager," end quote.  That's a month before Karmeier even

 5   announced his candidacy, Your Honor.  So that Murnane

 6   thought that he was a advisor/de facto campaign manager

 7   before the campaign even starts is -- has no possible

 8   relevance.  There is absolutely no evidence that plaintiff

 9   provides, as they must in making their prima facie case,

10   that State Farm even remotely knew, first, that Karmeier --

11   that Murnane was, in fact, Karmeier's campaign manager --

12   not that he thought himself as one, but that he was; and

13   there's not even evidence that State Farm was aware that

14   Murnane thought of himself, even for a day, as Karmeier's

15   campaign manager.  So there is absolutely no evidence

16   regarding that.

17           Here is what's really important.  Again,

18   plaintiffs' response contains patently false allegations.

19   Here's what they say, Judge:  Quote, "State Farm also lied

20   about who managed Judge Karmeier's campaign."  Pause for an

21   editorial comment:  That's really strong.  That's really

22   strong.  State Farm lied about who managed Judge Karmeier's

23   campaign.  Pick up the quote.  Quote:  "In its 2005 brief

24   State Farm, through its lawyers, told the Illinois Supreme

25   Court that Ed Murnane played no role in managing

 1   Judge Karmeier's campaign."  That's at page 11 of their

 2   brief.  That's patently false.  That's not what State Farm

 3   said.  What State Farm said was, quote, "Mr. Murnane,

 4   although in support of Justice Karmeier's candidacy, was not

 5   Justice Karmeier's campaign manager or campaign finance

 6   chairman and was not employed by Justice Karmeier's

 7   campaign."

 8        It doesn't say what plaintiffs boldly assert it

 9   says, and was a lie.  That's the second RICO predicate,

10   Judge.  They've committed the crime in these briefs alone.

11   There is no evidence, none, let alone prima facie case, that

12   State Farm committed any fraud regarding the Murnane

13   assertion.

14        Finally, they talk about the 2011 brief.  And

15   again, it is a comment on plaintiffs' allegations, and as

16   the first one, quote -- this is the quote from the brief:

17   Quote, "The evidence now submitted by plaintiffs does not

18   back up their assertions.  According to plaintiffs,

19   State Farm somehow picked Justice Karmeier as a candidate,

20   managed his campaign, and made massive contributions to his

21   campaign.  The picture plaintiffs attempt to paint was no

22   relationship to reality."

23        Again, if that's a fraud, then any time somebody

24   says in a brief before Your Honor, a party's position is

25   wholly without merit, then they open up a fraud

1    investigation if somebody can prove, well, actually there

2    was a portion of their position that everybody acknowledges

3    has merit, and that's fraud.  It's patently absurd.

4          Second, plaintiffs again used false statements to

5    show that -- to try to make their prima facie showing.  They

6    say, in their response, at page 9, State Farm gave $150,000

7    to the Civil Justice Reform Group.  That's true.  Then they

8    say, this CJRG then sent 100,000 to JUSTPAC, the ICJL's

9    political action committee.  That's false, patently false.

10         Predicate act number three:  Plaintiffs' response,

11   Exhibit No. 4, shows you that.  Plaintiffs response,

12   Exhibit 4 --

13         *THE COURT:*  Plaintiffs' response to your opening

14   brief?

15         *MR. SAFER:*  Yes.  This is what they point to to say

16   that the CJRC sent $100,000 to JUSTPAC.  This, in fact --

17   this exhibit is, in fact, money received by ICJL, not

18   JUSTPAC, and you know that because in the second page

19   there's a little box.

20         *THE COURT:*  Received by ICJL.

21         *MR. SAFER:*  Yes.  That's what this is a summary of.

22   Received at ICJL.  And in fact, plaintiffs' own exhibit,

23   plaintiffs knew that State Farm gave zero to JUSTPAC.  Look

24   at Exhibit 9 to their response -- I'm sorry, Exhibit 8.

25   Exhibit 8 to their response.  Major contributors to JUSTPAC,

1   September 2003 to present, their own exhibit, State Farm,

2   absent.  There is a -- State Farm made a disclosure in its

3   initial disclosures, document SF Hale 312, that lists all of

4   JUSTPAC -- contributions to JUSTPAC this time period.

5   State Farm is not there.  Plaintiffs knew their assertion

6   was wrong.

7           THE COURT:  Hang on one second.  You call -- what

8   was the Bates number you gave?  You said this was Exhibit 8

9   or Exhibit 9?

10          MR. SAFER:  Exhibit 8.  Exhibit 8.  And then --

11          THE COURT:  This has Murnane 326 major contributors

12  to JUSTPAC.

13          MR. SAFER:  Yes, yes, that's right.  So that shows

14  State Farm was not a major contributor to JUSTPAC.

15          And then there is another document, one that's not

16  attached to the exhibits.  Because of the briefing, we

17  didn't reply to this response.  But there's another

18  document, SF Hale 312, that has all of the contributions,

19  and State Farm is not on there.  Plaintiffs knew that, yet

20  they made this false argument to support their false

21  assertion.  The plaintiffs' argument relies on tortured

22  logic and unsupported assertions.  They say ICJL was founded

23  by Shepherd, citing Wojcieszak -- sorry.

24          THE COURT:  Wojcieszak.

25          MR. SAFER:  Wojcieszak.  Thank you.  Between Tom --

1    I somehow keep melding Tomaszewski and Wojcieszak.

2           But Mr. -- citing their complaint, and Wojcieszak,

3    that's not proof.  They now need to have to come forth with

4    some prima facie evidence.  They then say that Shepherd

5    hired Murnane as ICJL's president, again citing their

6    complaint.  They then say that Murnane talked to Karmeier

7    and other candidates; therefore, State Farm recruited

8    Karmeier.  It's ridiculous.  Again, zero evidence of fraud.

9           What they say is, to complete the picture -- so

10   everything that State Farm said was true.  The only way they

11   can make it untrue is to blatantly misstate what State Farm

12   said.  Now they say, well, to complete the picture, what

13   they should have said was, not only are plaintiffs'

14   allegations unsupported, but State Farm did contribute to an

15   organization that contributed to an organization that

16   contributed to an organization that contributed to

17   Justice Karmeier's campaign.  That's ludicrous, Judge.

18          There is absolutely no proof of any crime in this

19   case whatsoever, let alone a prima facie showing, or, beyond

20   these misstatements, bold misstatements in plaintiffs'

21   briefs, the crime fraud exception should not be raised, let

22   alone found in this case.  Thank you.

23          *THE COURT:*  Thank you.

24          *MR. CANCILA:*  Your Honor, I was going to address

25   the work product-related issues.  And I won't repeat

1    arguments made in respect to the Tillery Group's assertions,

2    but did want to focus on the nature of the privilege

3    assertions being made.

4         Exhibit 6 is the list that comprises the log as to

5    the Wojcieszak and the Denton Tactical Investigations

6    documents, so --

7         THE COURT:  And that's the same as the color-coded

8    copy that you gave me last time.

9         MR. CANCILA:  Right.  So Exhibit 7 is the

10   color-coded version which flags what we view as deficiencies

11   in the log.

12        Mr. Blonder didn't mention it, but there are other

13   privilege assertions at issue, and that's in respect to

14   Daniel Reece, who's another factual witness, an investigator

15   that plaintiffs have used.  His documents that were withheld

16   are reflected on Exhibit 5.  There's far fewer documents

17   reflected; they just have very generic descriptions.

18   There's like 15 items comprising 603 pages.

19        THE COURT:  Your Exhibit 5 to your --

20        MR. CANCILA:  Opening brief, correct.  So that's

21   the road map, if you will, to the privilege assertions that

22   have been made.

23        THE COURT:  Are you going to further address the

24   notion that they should be logging their internal

25   communications with one another?

1          *MR. CANCILA:*  Yes, I definitely will.  I can

2     address that right this second.

3          *THE COURT:*  Let's start with that.

4          *MR. CANCILA:*  First, just to be clear, we have

5     never asked for their post-Hale lawsuit filing

6     communications.  In fact, the parties have an agreement,

7     memorialized by a letter, that reflects there's no post-Hale

8     lawsuit logging that is taking place, so we are not seeking

9     any of their post-Hale lawsuit internal, you know,

10    communications amongst counsel.

11         We are solely seeking their -- a log of their

12    communications amongst themselves during the timeframe where

13    they put their knowledge at issue, you know, where they've

14    contended, you know, an absence of knowledge as to what

15    would have given rise, you know, to their asserted RICO

16    claim.  So we haven't asked for post-Hale logging.  We've

17    only asked for pre-Hale logging.  And we've asked for it,

18    you know, so that we get sufficient description to be able

19    to recognize whether or not the communication is of a

20    variety that would implicate the at issue waiver that we

21    contend they've undertaken.

22         *THE COURT:*  So there's two components to this that

23    I think are important, or among those things that are

24    important:  One, the notion that the equitable estoppel is

25    even important to the inquiry.  I know that Mr. Blonder

```
 1   doesn't want to say, I'm not going to bring it up ever
 2   again, because don't want to say that at this point in time.
 3   But Judge Herndon's order was very clear as to the primary
 4   basis.  Final predicate act was in '11, lawsuits filed less
 5   than a year later.  What's the issue?  I mean if you're
 6   talking about reliance, the folks who -- the allegation is
 7   that the folks who were defrauded were in the Illinois
 8   Supreme Court.
 9         MR. CANCILA:  The allegation also is that
10   plaintiffs' counsel weren't in the know, and they only
11   learned that they had some claim to make after State Farm
12   supposedly made additional omissions in this September 2011
13   filing.  So plaintiffs claim not to know the basis for their
14   claim, not to know things like whether or not Mr. Shepherd
15   was on the executive committee of the ICJL or various other
16   facts that they say were uncovered by the Reece
17   investigation.
18         THE COURT:  What difference does that make?
19         MR. CANCILA:  They allege it in their complaint.
20         THE COURT:  Again, you could put a lot of things in
21   the complaint.  Some of it matters, some of it doesn't.  I
22   mean is it a material allegation at all?  Because what
23   prompts the second predicate act is, we got to do some more
24   briefing in the Supreme Court.  Until you get to that point,
25   there's not a second predicate act.
```

1          MR. CANCILA:  That's what plaintiffs are claiming

2    now.  They've only identified two predicate acts, and for

3    sure the second act they identified was in September 2011.

4    The judge's ruling, they spent two to three pages on statute

5    of limitations and equitable estoppel or equitable tolling.

6    That was part of the basis of his ruling.

7          We believe we're entitled to pursue discovery

8    addressing the -- what he accepted on a pleading basis in

9    respect to the motion to dismiss.  If they knew, if they

10   knew, you know -- I mean they say that new revelation was

11   this supposed concession that Bill Shepherd was on the

12   executive committee.  If they knew that previously, how

13   could they make out an injury claim?  When did their injury

14   flow?  They said their injury wasn't triggered until, you

15   know, the second predicate act supposedly occurred.  You

16   know, but if they had this knowledge previously, which they

17   claim they didn't know, you know, in their papers, which

18   they claim they didn't know in resistance to the motion to

19   dismiss, which they claim they didn't know in the complaint,

20   you know, then how could there have been injury flowing from

21   this second predicate act?

22          THE COURT:  Because until you say it by dropping it

23   in the mail and filing it with the Supreme Court, there is

24   no second predicate act, so there's no RICO claim period.

25          MR. CANCILA:  They haven't abandoned that argument.

1   And you asked specifically whether they had.  We're

2   certainly entitled to pursue discovery of matters that they

3   have not abandoned.

4        THE COURT:  So then the second question is though,

5   if it's something that's -- where when Judge Herndon says,

6   *You loose, but even if you didn't, I would find that this is*

7   *an issue*, on that basis you should get attorney-client

8   privilege communications essentially because that's what

9   you're asking for.  The communications between the attorneys

10  are no different than those between you and your clients.

11       MR. CANCILA:  Sure.  They created the timing of

12  this second predicate act.  That's -- I mean they created it

13  by their filing of a paper where they made various

14  accusations to which, you know, State Farm needed to

15  respond, so --

16       THE COURT:  But what if -- what difference does it

17  make though if -- to state a RICO claim do you have to get

18  into whether or not the Illinois Supreme Court would have

19  otherwise decided that it was late?

20       MR. CANCILA:  I think so.  I think so.  I mean

21  that -- they made these same assertions in trying to vacate

22  the judgment.  They made the same assertions of what they

23  knew and how they knew it, you know, in those papers.  They

24  made, if you will, testimonial use of the timing of when

25  they had that knowledge.  They even included that

1    information about what they knew and when they knew it in

2    the affidavits that they submitted on behalf of the

3    investigators and the like.

4         They contended -- Reece contends in an affidavit,

5    *plaintiffs' counsel didn't know about this stuff before I*

6    *investigated it and found it out.*  You know, so he put their

7    knowledge even at issue with his affidavit that he

8    submitted, in addition to these -- the defenses we've

9    asserted in respect to statute of limitations and equitable

10   tolling.

11        *THE COURT:*  So if we assume, for purposes of

12   argument, like Judge Herndon did, for purposes of argument

13   only, that this is potentially relevant, then -- again,

14   nevertheless then, for that back-up, you want

15   attorney-client privileged information.  I mean this is

16   different than, we want to know what the investigators knew.

17        *MR. CANCILA:*  All we've asked for at this point,

18   Your Honor, is a log.  We haven't asked to see any

19   documents, although we don't think they're privileged since

20   they put it at issue, but we're basically talking about

21   whether they have an obligation to log this stuff when

22   they've made assertions about what their knowledge is and

23   when they've known it throughout the complaint, throughout

24   various pleadings, and in argument in resistance to the

25   motion to dismiss.  All we're asking for at this point is a

1    log.

2         THE COURT:  That's kind of a big deal though, I

3    mean, to ask for a log for any communication, so whether

4    e-mail, phone call, face-to-face, going on at counsel's

5    office or between offices, that's a massive undertaking.

6    It's a huge undertaking.  I can only imagine.  How do you go

7    about even doing it for one thing?  I mean I guess you can

8    try but it just -- it's rarely done because it's such a big

9    deal.

10         MR. CANCILA:  But it's an unusual thing to put the

11   knowledge of the lawyers at issue in respect to the claims

12   in the complaint, and to make multiple occasions.  And we

13   included just illustrations of that as an attachment to

14   our -- I can't recall whether it's the opening brief or the

15   responsive brief where we gave a listing, illustrations of,

16   you know, more than a dozen instances where plaintiffs had

17   put their knowledge at issue either in the complaint, in

18   resistance to the dismissal motion, or in resistance to the

19   motion to reconsider that the defendants filed.

20         THE COURT:  Threw you off.  Go ahead.  You can

21   return to whatever track you want to get on to.

22         MR. CANCILA:  That's great.  So I think I've

23   covered what I wanted to cover relative to that logging

24   information to clarify what we have sought, to make it clear

25   that we haven't sought post-Hale filings -- or post-Hale

1    logging, and why we seek that information.

2            As you look at the logs, Your Honor -- and one of

3    the reasons we did the color-coding log was -- and this is,

4    by the way, the second version of the log, so you know,

5    you're seeing that they're a revised, cleaned up version of

6    the log.  They gave us an earlier one couple months prior to

7    the one that is attached as Exhibit 6 and 7.  This is

8    supposed to be the cleaned up version.  There's at least a

9    couple hundred communications that are just between

10   Wojcieszak and Denton, and those are highlighted as yellow.

11   There's -- many of those appear to be PR, tort reform, media

12   coverage style issues that it's unclear how work product

13   could properly be asserted relative to that.

14           Some of them, there's just extraordinarily

15   deficient information upon which to base a privilege

16   assertion, and that's the blue highlighting that shows the

17   broad gaps of basic information that one would be expected

18   to give with a privilege assertion.  And really, the entire

19   Reece log is deficient in its description of documents to

20   support the assertions.

21           I know that we have visited on --

22           THE COURT:  When you say -- oh, I'm sorry.

23           MR. CANCILA:  Which was Exhibit 5.  I know we have

24   visited on whether the private investigators could assert

25   work product privilege as well or not, and I would just -- I

1    just want to take a quick run at flagging for Your Honor

2    this *Jentz* decision, *Jentz vs. ConAgra.*  You may already

3    be --

4          *THE COURT:*  I've read it.  Look, it's from 2011.

5    It's looking at the *Sandra T.E.* case and distinguishing that

6    and saying that that case is not on all fours.  An equally

7    applicable basis is that it wasn't a lawyer-driven

8    investigation, and so -- and you know, it occupies a blurb

9    about that in the decision.  So I'm not being critical of

10    the order itself, but it doesn't address what we're talking

11    about, first off.

12          And secondly, we've got a 2012 Seventh Circuit

13    opinion that clearly states, clearly, that you hire an

14    investigator and it's direct -- and you're directing their

15    efforts and you've got a work product protection.  So

16    there's nothing left of *Jentz* as to that particular issue

17    for me to think about.

18          *MR. CANCILA:*  Okay.  The next area -- I mention

19    that a number of those documents appeared to be of a PR

20    nature, public relations nature.  We flagged those and we

21    also cited again to the *Burke vs. Lakin Law Firm* case

22    relative to those assertions.

23          *THE COURT:*  For the PR assertions?

24          *MR. CANCILA:*  Right.

25          *THE COURT:*  Got you.

 1          MR. CANCILA:  They haven't made a First Amendment

 2   privilege assertion, but the fact that the description looks

 3   like it's PR suggested to us work product wasn't

 4   appropriately asserted.

 5          In terms of the testimonial use that plaintiffs

 6   have made of the Wojcieszak and Reece affidavits, first I'd

 7   like to flag -- I think Mr. Blonder conceded that they have

 8   made use of those affidavits.  Their brief, their

 9   response -- you know, brief -- actually says --

10          THE COURT:  I think he's agreed that he has used

11   them up 'til now, but the brief, if I'm not mistaken, is a

12   piece of advocacy that also says we may not use him at

13   trial.  I might not be quoting it, but I think that's the

14   distinction, that we may not use him as a witness, but

15   correct me if I'm wrong, that's the gist of what I was

16   taking his argument.

17          MR. CANCILA:  Here's what the brief actually said:

18   Even if those affidavits were the type testimonial use

19   inviting limited discovery, it would make no difference here

20   because those affidavits were not used in this case.  So

21   there was --

22          THE COURT:  And that's a fair point.  I think how

23   Mr. Blonder explained that was -- that's what I heard up

24   here is they were used in the other case, and that's what we

25   were using them for now.  I agree with you, they were used

1    in this case, so --

2            MR. CANCILA:  All right.  And then in terms of the

3    502 analysis.

4            THE COURT:  But I also understand what

5    Mr. Blonder's argument was.

6            MR. CANCILA:  Right, right.  And I want to address

7    that argument as well.  In terms of the waiver point, the

8    502 point, this would really be sort of an easier

9    circumstance in which to evaluate the waiver and what would

10   be fair or what would not be fair because the topics of the

11   extent of the waiver have been framed by the affidavits

12   themselves.  So you have a lengthy Reece affidavit that was

13   submitted in *Avery*.  You have three Wojcieszak affidavits

14   that were submitted in *Avery*.  So those frame quite an

15   extensive picture as to what subject matter is involved.

16   And those are all in the record, you know, that were

17   submitted as part of the motion to dismiss briefing as well.

18           Now, this proposition that you have to use the

19   testimony at trial in order for it to make a difference and

20   constitute a waiver --

21           THE COURT:  I don't agree with that.

22           MR. CANCILA:  Okay.  All right.  And we actually

23   did cite several cases, you know, about that, and there were

24   more than the *Belmont*, you know, case, so we did flag a case

25   where affidavits had been used in a class certification

 1    motion and that affidavit was deemed to be sufficient.  We

 2    cited a case where someone testified in the juvenile court

 3    hearing and that was sufficient work product waiver to allow

 4    for examination at trial, and that was in the *Briggs* case, a

 5    Seventh Circuit case.  So there's a number of cases that are

 6    consistent with Your Honor's understanding there as well.

 7          And of course, it's been the source of the various

 8    factual assertions that they've made, which is a point that

 9    Mr. Safer already made.  And it's not just the notion of

10    making testimonial use; it's kind of a broader proposition

11    that's been recited in the case law that you can't use work

12    product materials in a manner inconsistent with the

13    protections.  You can't use it as both a sword and a shield,

14    you know, in the same proceeding, which is essentially what

15    they've done in *Avery* and now here.

16          *THE COURT:*  Well, I think he actually can but

17    there's limits.

18          *MR. CANCILA:*  The other cases --

19          *THE COURT:*  That's exactly what it's there for, so

20    that you can use it as a sword and a shield.

21          *MR. CANCILA:*  The other cases -- the flag that I

22    mention, the one that involved the affidavit with the class

23    certification motion, was *Callis vs. Carnival* case, Southern

24    District of Florida case.  Mr. Blonder acknowledged the

25    *Belmont* case.  And then the *Briggs* case was the additional

1    case that I want to mention.

2            You asked Mr. Safer whether Mr. Rust had a proxy at

3    that meeting the September 2003 meeting.  I know, because I

4    recognize the names in the document, he did not have a proxy

5    at that meeting.

6            MR. SAFER:  There's one other fact, Your Honor.

7    The bylaws, although not in the record because nobody made

8    that argument, we can provide it.

9            THE COURT:  I asked the question.

10           MR. SAFER:  Right.  The by-laws of the Chamber ILR

11   at Section 11 say, quote:  "At any regular or special

12   meeting each director shall vote in person and not by proxy,

13   and shall be entitled to only one vote."  So it's a great

14   question but there's the answer.

15           THE COURT:  There it is.

16           MR. CANCILA:  And finally, there were some

17   attorney-client privilege assertions made in the privilege

18   log.  No support has been provided for those attorney-client

19   assertions, so we flagged that as well.  And nothing was

20   discussed about that in any of the plaintiffs' submissions.

21           THE COURT:  So I don't know -- actually, I've been

22   keeping track, but I wanted to ask you a couple questions

23   about this.  So do we let you -- one of the things that

24   Mr. Blonder suggested is that it might be appropriate to

25   have some more discussion about this.  The Court's view is

1   that 502, at a minimum, applies, and you must -- the

2   affidavits that have been submitted have been referenced in

3   the case, they're in the record, and they've been used, by

4   the Court's definition.  They've been used.  And I'm just

5   talking about plaintiffs' privilege.  I'm not talking about

6   Tillery Group's.  So that I believe has to be done.

7          Now, that doesn't necessarily answer some of these

8   other issues that you're talking about such as the

9   sufficiency of the log in other respects, which less time

10  has been spent on the privilege assertions, the assertion

11  that some of these are simply PR.  I have not requested yet

12  the documents to be provided in camera if I'm going to have

13  to do any in camera review, I want it to be as limited as

14  possible, of course.  So it might be worthwhile for the two

15  of you to discuss that and see if you can come up with an

16  idea because the Court's view of it is that that's the

17  proper analysis to undertake.  It's not a complete waiver of

18  the use of that.  Those affidavits are all work product.

19  But it is a waiver of some, and that's what we have to look

20  at.  And then I may have to -- once there's an evaluation

21  and a meet-and-confer done, I may have to go ahead and look

22  at some more of those and decide whether I agree.  We can

23  leave that open.  But I'm proposing that as a way of at

24  least dealing with some of this.  And you might want to --

25  that's not going to address some of the other problems that

 1   you've raised, and maybe we need to go through those bit by

 2   bit.  Has there been further meet-and-confer since the

 3   color-coding?

 4          *MR. CANCILA:*  No, no, there has not on this issue.

 5          *MR. BLONDER:*  Judge, if I could suggest -- you said

 6   November 3rd, I believe, for -- I believe Mr. Cancila --

 7   that's less than two weeks from today.  I believe

 8   Mr. Cancila and I would be in a position to go through the

 9   color-coding between now and then.  I mentioned earlier, and

10   we said in our briefs, we are going to be producing some of

11   the materials that are on here.  Our target was October 30th

12   for that.  Hoping still make that, if not a few days after

13   that, but we'd certainly be in a position to address the

14   color-coding if there are specific issues we can resolve.

15          *THE COURT:*  And you know that has to happen.  As

16   you raised, it does look to me like there's either something

17   that's not there that has to be put in there or the

18   explanation may simply be, we don't know.  If mean if some

19   of these -- for instance there's no from and to.  Well, this

20   might be a document that somebody created.  It's not a from

21   and to, but one of the plaintiffs' lawyers created it and

22   it's sitting on their drive and anyone can have access to it

23   at the firm, for example, so that wouldn't -- if it's that

24   type of a document, that would explain.  That tells you who

25   has access to it I guess.

1            MR. BLONDER:  Or it could be, for example,

2    Mr. Clifford asked Mr. Wojcieszak, prepare X, and it's that

3    draft of X, in which case it's not to or from anyone.  It

4    wasn't actually sent to someone; it's what Mr. Clifford

5    asked Mr. Wojcieszak to prepare.

6            THE COURT:  So there's an example though of who

7    prepared it being important, so if it's one of the lawyers

8    who prepared it, that maybe doesn't need to be identified,

9    but if it's Mr. Wojcieszak who prepared it, that then goes

10   directly to the issue of, well, now we look at his affidavit

11   and other documents of his -- stick with the affidavit to

12   avoid going into other controversial areas.  At the very

13   least you look at the affidavit, you say, is this something

14   that falls within the scope of the 502 waiver?

15           MR. CLIFFORD:  Your Honor, may I interject

16   something here while you're on this point?

17           THE COURT:  Yes.

18           MR. CLIFFORD:  And that is that using Mr. Blonder's

19   last example about -- and I don't have anything specific in

20   mind, but if I had directed Doug Wojcieszak to do X, Y, and

21   Z and report back to me, we certainly maintain that my

22   mental impressions about this case or whatever it was are

23   interwoven into the comeback.  I just think that's important

24   to point out here.

25           THE COURT:  So if the document is prepared by

1    Wojcieszak and it doesn't say anything about the fact that,

2    *Mr. Clifford directed me to do this*, then at least if that

3    eliminates that part, what you're suggesting is that even

4    under those circumstances just the creation of the document

5    itself may suggest mental impressions.

6        *MR. CLIFFORD:*  I absolutely believe that.

7        *THE COURT:*  Well, that could very well be the case.

8    And then again, then it may require that I have to take a

9    look at something that they don't agree with, if you can

10   explain that.  Because if it's simply a way to organize

11   something that's already been said, like, *Create me a chart*

12   *that, for example, expresses in a different form exactly*

13   *what's here*, I don't know, that might be something.  That's

14   got facts in it and maybe mental impressions as well.  I

15   want to be careful.  I'm not saying one way or another

16   because this isn't concrete, but --

17       *MR. CANCILA:*  So we're happy to confer with

18   plaintiffs to try to narrow the area of dispute and prevent

19   you from having an unnecessarily large in camera review.

20       *THE COURT:*  If I've to do it, I -- you know, what

21   I've to do, I've got to do.

22       *MR. CANCILA:*  Sure.

23       *THE COURT:*  I'll memorialize it.  But the Court's

24   view is that to the extent the evidence has been disclosed

25   voluntarily, 502(a) kicks in.  We got to do that analysis.

1    One thing I've been able to resolve here.

2        MR. BLONDER:  I was going through -- Mr. Cancila

3    made reference to other privileges we've asserted other than

4    work product.  I just went through the color-coded log again

5    and --

6        MR. CANCILA:  There's some attorney-client.

7        MR. BLONDER:  I didn't see anything that said

8    "attorney-client".  Everything I saw said "work product" or

9    "attorney work product", but we'll sort that out.

10       THE COURT:  If it's there, it's on a very limited

11   extent.  We've got time to address that.

12       MR. CANCILA:  Did you have any other questions,

13   Your Honor?

14       THE COURT:  No.

15       MR. CANCILA:  Thank you.

16       THE COURT:  So Mr. Blonder?

17       MR. BLONDER:  Very briefly, Your Honor.

18       THE COURT:  You get up to 15 more.

19       MR. BLONDER:  I don't intend to take it unless

20   you've got a lot of questions.  I'll start kind of from the

21   beginning to the end.

22       Essentially, as I heard Mr. Safer, you know, our

23   fundamental position is, we believe more than $4 million was

24   contributed to the campaign, and the question:  Do they

25   really want us to believe that Mr. Tomaszewski raised that

1    money?  And the question is:  Who do we really believe got

2    the Chamber to send the money back to Illinois?  I mean the

3    documents we've gotten from Chamber today show the close

4    interrelationship between Mr. Rust and State Farm and the

5    Chamber.  Mr. Donohue in particular, the head of the

6    Chamber.

7         You know, we talk about Mr. Murnane, the man with

8    all the connections.  He was much more than a mere supporter

9    of Justice Karmeier, as I think we bore out.  One e-mail in

10   particular, or document -- it's Exhibit 3 to our response

11   that Mr. Safer was talking about I want to focus on because

12   it's the e-mail from Dwight Kay [ph.].  This is -- we're

13   talking about JUSTPAC and the campaign, and it's Exhibit 3

14   filed under seal.  It's a one-page e-mail that's from

15   Mr. Kay.

16        *THE COURT:*  This is in?

17        *MR. BLONDER:*  Our response.

18        *THE COURT:*  Exhibit 3?

19        *MR. BLONDER:*  Exhibit 3.

20        *THE COURT:*  Thank you.  I have it right here.

21        *MR. BLONDER:*  It's from Mr. Kay to Mr. Tomaszewski,

22   cc'g Mr. Murnane, Justice Karmeier, and Senator Luechtefeld,

23   who was the chairman of the campaign.  And in the first

24   paragraph they're talking about whoever Paul Walhausen [ph.]

25   is, and I don't know who that is, but it says, you know,

third line:  *He also committed $5,000 to the judge today.*
*He'll either send it directly to the campaign or to JUSTPAC.*

       What they're essentially saying is a contribution
to JUSTPAC is a contribution to the campaign.  That's to
Justice Karmeier, Mr. Murnane, Senator Luechtefeld, to
Mr. Tomaszewski from Dwight Kay.  So we talk about some of
the interconnections.  It doesn't say State Farm did that
but it talks about the connection between particularly
JUSTPAC and the campaign with Justice Karmeier specifically
on the e-mail.  So I just wanted to kind of point that one
out in particular because --

       *THE COURT:*  We can all agree JUSTPAC gave his
campaign considerable support.

       *MR. BLONDER:*  Agreed.  But in terms of the concept
of a contribution, the two are one in the same, at least
from -- it's a reasonable interpretation of that line in the
e-mail of money being raised for the campaign could either
flow through JUSTPAC or directly to the campaign.  Again,
it's an inference ultimately for a trial in this matter or
for a summary judgment in this matter, but it goes to who
knew what and some of the interrelationships and suggestion
that some of the information that we may have said is
misleading or not there, I think when you dig deeper into
some of the actual documents and parse them line-by-line,
there's support for some of the statements.  But different

1    issue.

2        THE COURT:  So if you have some additional response

3    to this, you're not willing to concede that, or state, *We*

4    *want to hold on to this equitable estoppel in case we need*

5    *it.  I want to keep it in my pocket.  We put it at issue.*

6    And so their argument is, *Hey, it's a very narrow category*

7    *of things that we want you to log.*

8        MR. BLONDER:  Right.  And on that, Judge, again,

9    you would get there by looking at what State Farm conceded,

10   when they conceded it.  Objective information within their

11   control, their abilities, their knowledge, which would go to

12   this equitable tolling issue.  Again, you never even have to

13   get to the plaintiffs' side.  You get to exactly what did

14   State Farm say and when.

15       Again, you know, courts talk about, when you're

16   looking about is there some kind of waiver of privilege or

17   waiver of work product, the question is:  Can you get the

18   information from another means?  The answer is:  Here, they

19   can.  They can get it from their own files.

20       THE COURT:  But they want to know what you knew

21   that they can't get from their files.  They want to know

22   what you knew and when.  That's -- because that's where the

23   diligence inquiry comes in.

24       MR. BLONDER:  And what we knew when and where in

25   this case, because of the 2011 allegation, becomes

1   irrelevant, being the second predicate act.

2           THE COURT:  But you're not really -- but you still

3   want to hang on to it in case it's not irrelevant.

4           MR. BLONDER:  I think that's conflating two things

5   together that don't necessarily go together, and I don't

6   even think we need to get there, the equitable tolling

7   issue, until they can show that they don't have that

8   information and they don't have the information, because

9   again, what we knew and when we knew it would become

10  irrelevant if they're still concealing it.  So the issue

11  really on the fraudulent concealment -- it's fraudulent

12  concealment, equitable tolling.  They go together, in Judge

13  Herndon's opinion, and he's talking about the fraudulent

14  concealment, so the issue there becomes:  When did they stop

15  concealing it?  Then once we establish when did they stop

16  concealing it, then the issue comes to:  What did we know,

17  when, how soon did we act after that point in time?

18          Here, the first time they allege Shepherd is on the

19  executive committee is 2011.  So I guess the inquiry would

20  be:  Well, how soon did we act after that?  Within a year

21  we'd filed a complaint.  So the relevant timeframe would be

22  2011 to 2012.  And there's nothing suggesting that that's

23  dilatory delay or not acting with due diligence to within

24  that year have the complaint filed ready to go.  Because

25  that's actually what the inquiry would be.  It's not, *Hey,*

1    *did plaintiffs surmise in 2004 that Bill Shepherd was the on*

2    *the ICJL executive committee, or 2002 or 2006?*  Again, it

3    doesn't matter.  The issue goes to, when did they stop

4    concealing the information?

5         THE COURT:  What if there's an e-mail?  What if

6    there was an e-mail from -- you know, that said, *Hey,*

7    *Wojcieszak told me that he just found out that Shepherd was*

8    *on the executive committee*, and it's dated '06, that would

9    be irrelevant to the inquiry?

10        MR. BLONDER:  It would be irrelevant because

11   they -- State Farm can still be concealing the information,

12   which is the inquiry on the fraudulent concealment.  When

13   did they cease concealing it?  So the issue of whether the

14   plaintiffs knew it or not has no bearing on when the

15   concealment stopped.  So that would be the inquiry.  Again,

16   it's conflating two different things that shouldn't be

17   conflated.  You only look at the diligence after the

18   disclosure was made, and I think that's a distinction that's

19   important.

20        Unless the Court has additional questions, that was

21   essentially I think what I wanted to say.

22        THE COURT:  All right.  So the rest of the issues

23   I'll take under advisement.  I may have some more questions

24   in November 1.  May not.  So -- but other than the privilege

25   log relating to work product that the plaintiffs have and

 1    whether or not certain documents have been -- or the

 2    assertion should be waived or had been waived under 502,

 3    there were a couple letters, three I believe that were sent

 4    to the Court yesterday regarding discovery issues that are

 5    ripening.  Let me get those out.

 6          Before we get to that, another matter.  I'm mulling

 7    and struggling with the issue of the sealed documents that

 8    were included in the previous briefing, and whether the

 9    Court can say, well, I haven't considered any of that,

10    especially in light of what we've been arguing about here

11    today.  So it's likely that we're just going to have to

12    address all of those things head on, because I've looked at

13    all of it at some point, not going -- some things I've

14    looked at and decided, in the initial briefing, they weren't

15    all that important.  But it's not that I didn't see it.

16          It's difficult for me to parse out what I'm

17    thinking about as I'm considering these issues we're dealing

18    with today, which raise substantive questions, so I'm

19    leaning towards -- and I'll tell you, I'm -- I think we're

20    just going to have to address everything that's been filed

21    to include what's at issue in this current round of briefing

22    and what has before and figure out a way to chew on that

23    elephant.  We'll do that next time.

24          Okay.  So -- and this is in response to

25    Mr. Cancila's suggestion, and I think it was a good one at

```
 1   the time, hey, if you didn't think about it, then didn't
 2   rely on it at all, no big deal, it can stay under seal.  I
 3   don't think I can make it that simple any more.  So do we
 4   want to talk about any of these issues now and figure out
 5   how we want to address them?  Mr. Clifford?
 6        MR. CLIFFORD:  Thank you, Your Honor.  At least
 7   from what I recall reading in Mr. Cancila's letter to the
 8   Court, I think we're addressing most of those concerns in
 9   what Mr. Blonder described about review of the privilege log
10   and the production of some documents.  There certainly are
11   some other issues about production that we can include in
12   the meet-and-confer conversation that we're going to have
13   before November 3rd.  We're here next on November 3rd.
14        THE COURT:  I'm sorry, I said the 1st.  That's
15   Saturday, I think.
16        MR. CLIFFORD:  That will be a good day.  We'll be
17   here if you want.  So at least --
18        THE COURT:  Day after Halloween too, so --
19        MR. CLIFFORD:  So anyway, that's my at least
20   tentative response to anything Mr. Cancila wanted to bring
21   up.
22        Our issues, as we note in our letter, pertain to
23   some lingering State Farm issues on 30(b)(6), and then
24   actually on the bigger issue for us today, frankly, is the
25   Shepherd production or lack thereof.  You know, I had a
```

1    conversation with Mr. Scott today and I know that his intent

2    is to try to produce some materials to us by the 15th.

3    Candidly, we were surprised to learn that they do indeed

4    have a personal computer that they've sent to a forensic

5    expert, at least as has been reported to me, and so we're

6    going to have some conversation about that.  We tend to

7    believe that there's a basis for requesting that we enter

8    into a protocol on forensic examination of that computer on

9    our own, and there may have been some confusion because it's

10   very clear Russ has been relying on State Farm in many

11   respects, so there's overlap between the State Farm computer

12   and his personal computer.  We're trying to work those out.

13          Wanted to tee up as an issue -- Mr. Martin is here

14   today.  Wanted to tee up as an issue the discussion about

15   setting Justice Karmeier's deposition.  Just looking for

16   some direction from the Court how may be best to frame that

17   issue because I know they're going to object to it.  They

18   want the things we've talked about in the past.  So that's

19   an issue.

20          THE COURT:  Have we dealt with the production?

21          MR. CLIFFORD:  No.

22          THE COURT:  Have we established the -- because

23   there's the outstanding subpoena, much of which I think

24   there was agreement achieved on.  We don't have --

25          MR. CLIFFORD:  Mr. Cox isn't here but we actually

 1   deferred it until after the election.  We did reach an

 2   accord on most items, as I recall, and -- but we're

 3   definitely, we think, at a point where we want to establish

 4   a protocol for taking Judge Karmeier's deposition after the

 5   election, as we've agreed, but we want to get it on the

 6   books.  You know, sound like a broken record here, and I

 7   apologize, but I've got my eye on that clock in terms of the

 8   timeframe for discovery.

 9        THE COURT:  Well, I knew you'd made that agreement

10   previously, and so -- but what's left?  So do we have to

11   deal with any more of the subpoena other than the deposition

12   itself?

13        MR. MARTIN:  Clearly there are issues regarding the

14   telephone subpoena issues that we've exchanged some

15   correspondence on, and to our mind, that has not been

16   resolved, Judge.

17        MR. CLIFFORD:  On that score, as far as we know, as

18   far as we're concerned, that issue, if there's an issue

19   there, it's for them to bring that to the attention of the

20   Court.  There's a very clear written record between Mr. Cox

21   and Mr. Blonder about how the subpoena for records was

22   processed, how the records were handled upon receipt, how

23   whatever phone numbers were logged by us and sought by us

24   were provided by Mr. Cox, and that the phone numbers, in

25   fact, of which they complain were not phone numbers provided

1    to us by counsel for Justice Karmeier; they were in the mix

2    of all the things.  We didn't even know that these phone

3    numbers were associated with Justice Karmeier, and so as far

4    as we're concerned, the issue should be rightfully over.

5    The records have been sequestered.  They've not been looked

6    at.  We've made affirmative, you know, representations about

7    all of that as officers of the Court, so we don't know

8    what's left on that.  If they have something, let them file

9    something.

10         MR. MARTIN:  We understood from the correspondence,

11   and maybe we misread it, that you all were going to file a

12   motion regarding it, so that's the confusion.

13         THE COURT:  Motion for what?

14         MR. BLONDER:  The motion that we would like to file

15   that I think Mr. Martin -- we would like to actually now go

16   look at the phone records and consider them as discovery.

17         THE COURT:  That has not been resolved.

18         MR. BLONDER:  That's the issue that is now on the

19   table that -- when Mr. Clifford says we want to at the next

20   hearing address the documents from Justice Karmeier, it's --

21   we want to start both getting the documents that they may

22   have agreed to produce and start looking at the ones that,

23   again, we've sequestered because it was held in abeyance.

24         THE COURT:  Okay.  And so the argument is they

25   shouldn't have to look at them at all?

1    MR. MARTIN:  Certainly the telephone records.  I

2  mean we have -- we sent a detailed letter to Mr. Blonder

3  including questions that we wanted to have answered, and the

4  way I read the latest letter from Mr. Blonder was that they

5  were going to file a motion with the Court, which I haven't

6  seen, so this is catching me a little bit off.

7    THE COURT:  Well, we -- that's -- you know, based

8  on the way I want to handle this, we can decide first what

9  the issue is, and that's going to require some additional

10  conversation because to just file a motion and we don't know

11  what it's even going to be about, may not even require that.

12  I know we've been filing a lot of motions.  They were

13  appropriate when it comes to these privilege issues, but --

14  and it may be for this too, but --

15    MR. BLONDER:  The issues that at this point we want

16  to be able to look at the phone records that have been

17  sequestered and proceed with discovery of Justice Karmeier,

18  again, as it's been deferred.

19    THE COURT:  All right.  So when you say discovery

20  of Justice Karmeier, you're talking about his deposition?

21    MR. BLONDER:  Correct.

22    MR. CLIFFORD:  That's correct, Your Honor.  The way

23  that we envision it, and just in fairness to Mr. Martin,

24  it's been Courtney who's been in touch with Mr. Blonder

25  mosts of the time.

 1          *THE COURT:*  Do you want to tell me on the first

 2     what it is that you disagree on?

 3          *MR. CLIFFORD:*  Third.

 4          *THE COURT:*  Third.  I'm sorry.  Tell me on

 5     November 3rd what you disagree on.

 6          *MR. CLIFFORD:*  I think that would be fair to him

 7     because when he just spoke about that letter, they sent us a

 8     letter that outlined things that, as far as we're concerned,

 9     are moot and go to the propriety of what we may have done in

10     response to the information they gave us, and we think

11     that's past.  So if they have an issue with that we think

12     they should bring it to the Court's attention.

13          *THE COURT:*  Okay.  So that's one.

14          *MR. MARTIN:*  To answer your question, Judge.

15     November 3 would be a proper time to deal with these issues,

16     and probably before November 3 we should discuss, so there's

17     clarity on what the issues are.

18          *THE COURT:*  Yeah.  All right.  Sounds good.  So

19     that's two things we're talking about.

20          *MR. CLIFFORD:*  We have another one.

21          *MR. MARTIN:*  And just so the Court's -- I think the

22     Court's aware, we don't get these letters that -- for

23     example, that's in front of Mr. Clifford right now that the

24     parties exchange.

25          *MR. CLIFFORD:*  You're not referenced in this

 1   letter.  I'll send you one if you want.

 2        THE COURT:  If it concerns you, you should be

 3   getting it.

 4        MR. CLIFFORD:  And it does.  Another item not

 5   referenced in this letter, and Mr. Nester did receive a copy

 6   of, is we did issue subpoenas to the ISBA, and there's some

 7   pushback from the ISBA, and this relates to the judicial

 8   evaluation process and committee that was formed to vet

 9   Judges Maag and Karmeier, and we issued subpoenas, I

10   believe, for two depositions.  Mr. Cancila has objected, and

11   I believe Mr. Nester is objecting, and we're probably going

12   to have to tee up for you somehow those issues because

13   there's no question, and we readily acknowledge there's some

14   qualified privilege associated with the judicial evaluation

15   process, but it's not absolute and we believe we know how to

16   ask questions to stay within the boundaries of what's

17   permissible.

18        THE COURT:  I guess one page wasn't enough to

19   describe what the discovery disputes were going to be.

20   Mr. Nester -- Mr. Nester, good afternoon.

21        MR. NESTER:  Good afternoon, Your Honor.

22        THE COURT:  You're representing?

23        MR. NESTER:  I've been retained by ISBA to

24   represent --

25        THE COURT:  Do you want to come up.  Thank you for

  1  being here.  Hope you found the last three hours

  2  educational.

  3          MR. NESTER:  They've been informative, Your Honor.

  4          THE COURT:  So you've got objections regarding

  5  these deposition notices.  The question is:  Evidently they

  6  cannot be worked out informally.  These issues?

  7          MR. NESTER:  Judge, what has transpired is that I

  8  contacted Mr. Clifford after I was notified by ISBA that it

  9  had received a subpoena duces tecum and after four of its

 10  committee members who served on the judicial evaluation

 11  committee received a notice of intent to schedule their

 12  depositions.  I've been retained to represent ISBA and two

 13  of those committee members.  And Mr. Clifford, after my

 14  contact or communication with him, was gracious enough to

 15  give me 30 days within which to have an opportunity to

 16  review the pertinent or relevant records, confer with my

 17  clients, pleural, and then stake out a course of action.

 18  And Your Honor, I'm working on that endeavor as we speak.

 19          MR. CLIFFORD:  Can we report back to you on

 20  November 3?

 21          THE COURT:  Yes.  What time did I tell you all on

 22  the 3rd?

 23          MR. CLIFFORD:  I have 1:00.

 24          MR. BLONDER:  I have 1:00.

 25          MR. CLIFFORD:  That's kind of a good time for those

1    of us who travel the same day.

2             THE COURT:  All right.  Okay.  So yes, we'll talk

3    on the 3rd about that.  Okay.  What else?

4             MR. NESTER:  Thank you, Your Honor.

5             THE COURT:  Thank you.  And that's not going to

6    pose a problem for that time to be here?

7             MR. NESTER:  Your Honor, I should be able to attend

8    in person.  Should not present a problem.

9             THE COURT:  All right, great.

10            MR. CLIFFORD:  The only thing I had left on my

11   rolling agenda, Your Honor, was, the Court is going to be

12   issuing an order on the amended complaint?

13            THE COURT:  Yes, yes.  I owe you that.

14            MR. CLIFFORD:  That's all I have, sir.

15            THE COURT:  All right.  Anyone else?

16            MR. CANCILA:  Just quickly, Your Honor.

17            After we sent this letter to you yesterday we

18   received verifications from plaintiffs that we're looking at

19   now.  The verifications were dated July of 2014 -- I can't

20   recall the specific dates -- so we did receive the

21   verifications.  Just wanted you to be aware of that.

22            THE COURT:  Okay.

23            MR. CANCILA:  And we're continuing to

24   meet-and-confer with plaintiffs' counsel.  We did send a

25   letter of objections relative to two of the ISBA noticed

 1    subpoenas, which were Robert Schultz, Barney Schultz, who's

 2    in-house at State Farm now, that was one of the subpoenas;

 3    and Alan Sternberg, who is a retired counsel from

 4    State Farm, in-house counsel from State Farm.  So we did

 5    informally send objections to plaintiffs and will be able to

 6    better inform Your Honor relative to those on November 3.

 7            THE COURT:  Okay.  So more on that.  All right.

 8    And then I got a letter from Mr. Jorgensen.  Is

 9    Mr. Jorgensen still there?

10            UNIDENTIFIED SPEAKER:  Your Honor, this is --

11            THE COURT:  Hang on one second.  I was hearing

12    papers shuffle before.  So were you able to hear everything

13    earlier?

14            UNIDENTIFIED SPEAKER:  I was, Your Honor.

15            THE COURT:  Okay.  I'm sorry.  Can you state your

16    name for the record again.

17            MR. BASARIA:  Yes.  This is Karim Basaria.  Karim,

18    K-A-R-I-M, M as in "Mary"; last name, B as in "boy",

19    A-S-A-R-I-A.

20            THE COURT:  I'm only looking at a piece of the

21    docket sheet.  Are you entered on the case?

22            MR. BASARIA:  I am.

23            THE COURT:  Okay.  Great.  All right.  So you want

24    to discuss what you have in your -- in Mr. Jorgensen's

25    letter?

 1          *MR. BASARIA:*  You know, I'm actually -- I'm not

 2     familiar with the letter, and I sent Mr. Jorgensen a message

 3     so he can jump back on.  In the letter -- I apologize that

 4     I'm not able to speak to it.

 5          *THE COURT:*  Well, I'll go ahead and ask plaintiffs

 6     because -- while we're waiting.  They sent your request for

 7     production on March 24th.  They got initial disclosures.

 8     There were meet-and-confers, and there has been production.

 9          *MR. BELLAS:*  Your Honor, George Bellas.  That's

10     correct.  We've discussed having that production completed

11     by November 15th, consistent with the other productions.

12          *THE COURT:*  Okay.  And did you talk to

13     Mr. Jorgensen about that?

14          *MR. BELLAS:*  We spoke -- yes.  No.  We spoke to his

15     the attorney that left that firm.

16          *MR. CLIFFORD:*  Scott Berliant.

17          *MR. BELLAS:*  That was about 30 days ago.

18     Mr. Berliant is no longer with the firm.

19          *THE COURT:*  But was he okay with that?

20          *MR. BELLAS:*  Yes.

21          *THE COURT:*  The 15th.  It appears though that

22     Mr. Jorgensen probably wasn't aware of that agreement, so --

23          *MR. BELLAS:*  I will contact him and work it out.

24          *THE COURT:*  So Mr. Basaria, that was the issue

25     expressed, and Mr. Bellas is going to talk to Mr. Jorgensen

1    so you can let him know that was discussed here today.

2          *MR. BASARIA:*  Sounds good.  Thank you, Your Honor.

3          *THE COURT:*  All right.  Anything else?  All right.

4    I will see you all on November 3rd.  If you want to appear

5    by phone, you can.  It's up to you.

6          **(Court adjourned)**

7                        *   *   *   *

8

9                      **REPORTER'S CERTIFICATE**

10

11        I, Laura A. Esposito, RPR, CRR, CCR(MO), Official Court
     Reporter for the U.S. District Court, Southern District of
12   Illinois, do hereby certify that I reported in shorthand the
     proceedings contained in the foregoing 116 pages, and that
13   the same is a full, true, correct, and complete transcript
     from the record of proceedings in the above-entitled matter.

14        Dated this 28th day of October, 2014.

15

16

17                      _____
                        LAURA A. ESPOSITO, RPR, CRR, CCR

18

19

20

21

22

23

24

25