Forbes.com - Magazine Article     Case 3:12-cv-00436-DRH-SCW Document 189-4  Filed 05/29/14  Page 1 of 4  Page ID #1355      http://www.forbes.com/forbes/2003/0721/064_print.html



# Buying Justice

Robert Lenzner Matthew Miller, 07.21.03

**For years the trial lawyers had state courts wrapped around their fingers. Now big business is striking back. It is waging a secret election-campaign war on judges who favor plaintiffs in tort cases.**

Justice C.P. (Chuck) McRae is adored by trial lawyers--and reviled by business. A colorful, cocky figure who drives a motorcycle to the courthouse and dresses in cowboy boots, blue jeans and lots of leather, he was once president of the Mississippi Trial Lawyers Association. Nearly all of his $700,000 campaign fund in 2000 came in the form of $5,000 gifts from plaintiff attorneys who stand a chance of appearing before him. McRae says he is proud of "defending the have-nots against the haves for more than 11 years," a populist sentiment that unsettles business execs. He was "the dominant force on the court and in line to be the next chief justice," says Chip Reno, director of Stop Lawsuit Abuse, a local pro-business lobby.

That is, McRae *was*, until voters threw him out of office last November. Chuck McRae, 57, ends his 11-year tenure next January, passing the gavel to a pro-business corporate lawyer and Republican named Jess Dickinson. Dickinson was swept into office on a down-and-dirty, name-calling campaign bankrolled by $1.2 million he raised from doctors and small-business owners--an unheard of sum for a judicial election. But he also had a hidden helper: Unbeknownst to some Mississippi voters, the U.S. Chamber of Commerce pumped $1 million more into anti-McRae ads, funneling it through local groups such as Mississippians for Economic Progress.

McRae's ouster is part of a secret war on judges now being waged by the chamber. It has spent $100 million since 2000 and will spend $50 million or more this year. The prime objective: to vote out judges supported by trial lawyers, labor unions and the Democratic Party and install new judges sympathetic to insurance companies, multinational corporations and the Republican Party. The chamber also is taking aim at state attorneys general, trial lawyers and state legislators.

So far the chamber has won in 21 of 24 judicial elections in eight states--and prevailed in 11 attorney general races. It helped win 7 open seats in Illinois, Pennsylvania, Texas and elsewhere and helped reelect 11 pro-business jurists. And it ousted 3 incumbents--2 in Alabama and 1 in Mississippi (Justice McRae). Sixty-three judges in 28 states are standing for reelection next year, and the chamber hopes to throw at least 10 of them out of office, aiming in particular at antibusiness courts in West Virginia, Texas, Mississippi and Ohio.

West Virginia Supreme Court Justice Warren McGraw will be among the targets. In five years McGraw has sided with the court majority in favoring workers in compensation claims 88% of the time. In one case the court ruled that a worker with bronchitis was eligible for workers' compensation. She went on to get "permanent total disability," which typically awards $400,000 over a lifetime. No wonder the fund for state workers' compensation now runs $3.6 billion in the red.

Judge McGraw also ruled, in a startling case in 1999, that workers could sue their employers if they feared a future accident--without having been injured at all. This gave rise to cases that lawyers describe as "No proof? No problem!" McGraw's son, lawyer Warren McGraw II, has brought more cases under this ruling than he can count. For moral support the judge can turn to his older brother, Darrell V. McGraw Jr., who sat on the state supreme court from 1977 to 1989. Darrell is now West Virginia's attorney general, and he has filed dozens of antitrust and consumer-protection cases against companies; his office has argued hundreds of cases before his brother's bench.

The judge declines comment; his brother, Darrell, says of the chamber's war, "It's reprehensible. It's dangerous to the American concept of self-governance and democracy." But the chamber's scrappy, driven president, Thomas Donohue, says business merely is trying to even the score with trial lawyers, who until now have dominated judicial elections and enjoyed a cozy, symbiotic relationship with jurists. "We led. We succeeded. Now the money is rolling in from drug companies, heavy manufacturers, large retailers, insurance companies, even banks," he declares.

Insurance giant American International Group, Home Depot and DaimlerChrysler are chipping in. The influx of money has raised the stakes: In 2000 candidates spent $46 million in state judicial elections--or $430,000 per race, up 60% from the previous election, says a study by the Brennan Center for Justice at New York University Law School and the National Institute on Money in State Politics. The chamber thus has reshaped the once sedate, lawyer-friendly game of electing judges, roiling it with vituperative politics replete with attack ads, whisper campaigns and allegations of election-law violations.

This is a dirty business. The Brennan Center says ads have "grown increasingly negative and controversial, and in some cases [have] fallen far beneath the level of dignity most Americans associate with their judicial system." Adding to the intrigue, the chamber cloaks its efforts by sidestepping disclosure laws that require revealing contributions. Instead of donating cash to candidates, it provides ad money and couches the effort as "informational" and policy-based. "We're seeing that politics is rearing its ugly head," says professor Lester Brickman of the Cardozo Law School in New York. "But politics has always been present, if shrouded in black robes. Now it's out in the open."

Lawsuits brought by Mississippi and an Ohio group charge the chamber with illegal tactics in election advertising. The American Bar Association last month issued a blistering report entitled "Justice in Jeopardy," attacking "the corrosive effects of excessive money in judicial campaigns." It was striking back at the chamber's $10 million TV ad campaign in five states last year, which asserted that judges and lawyers impose a "lawsuit abuse tax" of almost $2,000 a year on every family of four in the U.S. One spot shows a needy mother and child waiting in a long line at the courthouse, while a smarmy trial lawyer saunters up to the front. "It's a cheap trick," says ABA President Alfred P. Carlton Jr., "offensive imagery, non sequiturs and factual inaccuracies."

But chamber-backers such as Maurice (Hank) Greenberg, the 78-year-old chairman of AIG, the nation's largest insurer, say there isn't any choice but to wage allout war. In February AIG took a jolting $1.8 billion charge for the 2002 fourth quarter, blaming "egregious jury awards and settlements for litigation related to asbestos, medical malpractice and other damages." AIG's stock fell from $55 to $47 in a week, wiping out $23.5 billion in market value. Though the stock recovered, Greenberg remains riled. "A bubble economy translated into a bubble on awards," he huffs. "It's coming out of our companies, out of the insurance industry, and it is being divided among the lawyers and some of the plaintiffs." The costs of litigation and liability claims exploded from 0.6% of GDP in 1950 to 2% of GDP by 2001--$200 billion a year. The annual toll could hit $300 billion by 2005. Lawyers typically pocket a third of the loot.

Tort litigation is big business in Illinois, particularly in Madison County (pop. 260,000). A jury there last year awarded $250 million (including $200 million in punitive damages) to a lone man claiming asbestos exposure at a U.S. Steel plant. Never mind that the plant was in Indiana, the man lives in Indiana and U.S. Steel is based in Pennsylvania. Rather than appeal, U.S. Steel settled the case for considerably less.

Illinois has no restrictions or limits on back-scratching between judges and trial lawyers. Lawyers can donate any amount they like to judges--and then have their cases tried before them. One day last fall Stephen M. Tillery, a partner at the St. Louis, Mo. law firm of Korein Tillery, and 18 others contributed a combined $10,000 to the successful reelection campaign of Madison County trial court Judge Nicholas Byron. Tillery's firm also donated small sums to two judges on the state's Fifth District Appellate Court.

Cut to March 2003: Judge Byron presides over a jury that levies $10.1 billion in damages ($7.1 billion compensatory, $3 billion punitive) against Philip Morris, the tobacco giant now known as Altria, on behalf of a class of smokers using light cigarettes that were promoted as less dangerous than regular ones.

The lead lawyer in the case: Stephen Tillery. Should the Altria verdict be upheld, Tillery will collect a hefty portion of the $1.8 billion in legal fees. The case is now under appeal at, of all places, the Fifth District Appellate Court, which is "just as bad as Madison County," says Edward Murnane, president of the Illinois Civil Justice League, which, despite its civic-sounding name, is a pro-business group funded by the U.S. Chamber of Commerce. Because the Illinois court is now 4-to-3 antibusiness, Murnane says, his group will target the sole state supreme court seat up for election in 2004.

In another case in Marion, Ill., trial lawyers said State Farm deceived 4.7 million policyholders by authorizing the use of cheapie parts to repair their cars. Judge John Speroni, himself a former attorney for State Farm, ordered the insurer to pay policyholders $1 billion plus interest. If the lawyers take the typical 30% cut, each plaintiff will get $202--while the lawyers will rake in $408 million.

Case 3:12-cv-00660-DRH-SCW Document 289-4 Filed 05/29/14 Page 3 of 4 Page ID #3571

The war on the judges began in 2000, when Donohue, who had run the American Truckers Association and took over the chamber in 1997, visited Bernard Marcus, the firebrand founder of Home Depot, at the company's base in Atlanta. The now-retired Marcus stunned Donohue with his outrage, complaining of getting hit with a new lawsuit every day. "Every time I sit down with a CEO I'm told their major economic problem is the trial lawyers," Marcus told Donohue, adding, "I have never seen such fear and intimidation in my life."

Marcus helped him raise $8 million to target judges in the 2000 elections; that expanded to $20 million in 2001 and to $40 million in 2002. Much of the money went to the Institute for Legal Reform, a tax-exempt chamber unit that runs this anti-judge "voter education" effort. Thus, 60% of the money is tax-deductible for the companies that gave it.

In 2000 state officials in Mississippi and a grass-roots organization in Ohio accused the U.S. Chamber of Commerce of improperly trying to influence the elections. In Mississippi, Attorney General Michael Moore, who played a critical role in the $244 billion national tobacco settlement, charged that the chamber had pushed beyond the boundaries of "issue advocacy" by promoting the four candidates it supported. The case went to the U.S. Supreme Court, which denied review; a federal appeals court then ruled in the chamber's favor.

In 2002 the chamber conducted its strongest blitz yet, backing candidates who won all nine of the state supreme court seats that the business group had sought. But this time it took a lower profile, masking its role and allying with groups such as the American Taxpayers Alliance, the Civil Justice League in Illinois and Stop Lawsuit Abuse in Mississippi, funding some of them.

As it braced for war, the chamber targeted eight antibusiness states, including Alabama, Ohio, Illinois and Mississippi. It ordered up detailed evaluations of rulings by every high court judge in each targeted state, grading them for positive or negative impact on the state's economy. Then the chamber's Institute for Legal Reform, whose board members include chiefs of major corporate donors to the judge-ousting campaign, recommended which judges to target. Tom Donohue made the final decision.

In Alabama, where judges had been infamously bad for business, the chamber swept the five seats of the nine-member supreme court up for reelection in 2000. Of those wins, the victory by chamber-supported Lyn Stuart over incumbent Justice Ralph Cook was crucial to insurance companies. A mid-1990s decision by Cook let the jury say life insurance companies defrauded their customers by charging the maximum state-regulated premium, costing the companies tens of millions of dollars. Next year a likely target will be Alabama Supreme Court Justice Douglas Johnstone, who has expanded corporate liability in 69% of his relevant decisions, according to research by a chamber consultant.

In Ohio the high court's ruling in two cases--one in 1999, one in 2000--forced employers to cover their employees' damages if they were involved in a car accident with an uninsured driver on their own time, resulting in $1.5 billion in additional liabilities. So the chamber took the low road in 2000. It ran ads bluntly suggesting that incumbent state Supreme Court Justice Alice Resnick could be bought by trial lawyers and unions. "Alice Resnick: Is Justice for Sale?" one ad's voiceover asked, as paper money rained down on the scales of justice. The spot claimed that Resnick had done the bidding of trial lawyers and unions almost 70% of the time, in return for contributions of $750,000. A second ad accused her of changing a vote to please a contributor. "But the chamber never produced any evidence to substantiate [the accusation]," according to the Brennan Center report. Despite the assault, Resnick won.

The chamber fared better in Ohio in 2002. The state legislature had passed a sweeping reform of tort laws, but the Ohio Supreme Court invalidated it, ruling the bills unconstitutional. Now the court has a 3-to-2 pro-business majority, after the chamber helped elect two conservative Republicans: Evelyn Stratton, an incumbent, and Maureen O'Connor, who was Ohio's lieutenant governor. It looks as if business could use a little help. Last year an Ohio jury awarded $261 million in damages (including $250 million punitive) to 250 investors because a Prudential stockbroker had moved their investments out of the stock market in late 1998 without their permission.

Donohue's assault team won big in Illinois in 2002, helping Rita Garman, a Republican appellate judge, win an open Supreme Court seat and defeat Democrat Sue Myerscough by a vote of 53% to 47%. The American Taxpayers Alliance, the chamber ally, ran TV ads alleging Myerscough wanted to turn the court into "a social service agency." ATA, based in Washington, D.C., is run by Scott Reed, who ran Robert Dole's 1996 presidential campaign and founded Chesapeake Enterprises, a consultancy that is close to the chamber.

The toughest battles are playing out in Mississippi, where litigation over asbestos and the faulty diet drug fen-phen are huge sources of revenue. In one case in 2001 a jury in Holmes County Court awarded $150 million to six plaintiffs who never became ill from asbestos exposure--they simply feared they would some day. In a three-county district presided over by trial court Judge Lamar Pickard, lawyers have filed some 4,000 separate fen-phen cases. Typically these lawyers gather plaintiffs by distributing circulars listing a hotline number and hiring legmen to work the smaller rural towns in search of more "victims." To settle such complaints nationwide, Wyeth (formerly American Home Products) has dished out $12.8 billion thus far, but it is far from done. The plaintiff lawyers have landed up to $3.8 billion, assuming a traditional 30% lawyer's fee.

In 2000 the chamber pushed too hard. Voters reacted so badly to chamber-paid ads for then-chief justice Lenore Prather that Prather asked the chamber to stop running the spots. The chamber refused--and Prather lost the race. It had better luck in 2002 dogging Justice Chuck McRae, who has a record of expanding liabilities on behalf of the plaintiff in 92% of his cases, a chamber consultant says. In addition to the chamber's $1 million that it channeled to local groups, the Law Enforcement Alliance of America, which is associated with the National Rifle Association, pumped in another $500,000 for ads attacking McRae; it also ran negative ads on several other candidates in the last weeks of other elections that year. In smearing McRae, one television ad said he was soft on child molesters: "When a 3-year-old was sexually assaulted, the Mississippi Supreme Court upheld the murderous conviction. Only Judge Chuck McRae voted to reverse it. No wonder Reader's Digest named him one of America's worst judges."

In response, Citizens for Truth in Government, a front group for trial lawyers, ran an ad charging McRae's Republican rival, Dickinson, had been sued for hitting a customer in the face with a whiskey bottle (in a bar where he worked years earlier) and, separately, for not paying his bills. Dickinson calls the ads "a total distortion of the facts," and asserts that in response McRae supporters spread the word at black churches that he wanted to retain the Confederate flag--and told white churches he wanted to ban it. McRae denies this.

The mutual mudslinging turned out badly for McRae. The incumbent judge got only 23% of the vote to Dickinson's 53%. A third candidate, Larry Buffington, who also was backed by a group of trial lawyers, got 24%. Chuck McRae will serve out his term until January 2004. Once Dickinson takes his seat, the Mississippi Supreme Court will have a 5-to-4 pro-business majority.

The plaintiff lawyers may be demonized even more if a federal investigation results in criminal charges. The U.S. Attorney in Jackson, Miss. is investigating the relationship between two leading trial lawyers, Richard Scruggs and Paul Minor, and Justice Oliver E. Diaz Jr., who won a seat on the state supreme court in 2000. Both Scruggs and Minor guaranteed two bank loans totaling $150,000 to Diaz. The federal grand jury on this investigation has been extended six months.

Scruggs, a brother-in-law of Senator Trent Lott (R-Miss.), says in an interview he guaranteed an $80,000 Diaz loan--and paid it off--in direct response to the Chamber of Commerce's war on Diaz. At an investment seminar in June 2002, Scruggs, who stands to share a portion of the $12.3 billion due to attorneys involved in the 1998 national tobacco settlement, said that "in certain jurisdictions, the judiciary is elected with verdict money. The trial lawyers have established relationships with the judges that are elected. ... It's almost impossible to get a fair trial."

But even some chamber backers are uncomfortable with this crusade. DaimlerChrysler says it supports "voter education," not a war on judges. But this ugly battle will go on for a while; judges ordinarily sit for 6 to 12 years before they face reelection. Says Tom Donohue: "We want to play a full-court press--challenge [the trial lawyers] in the courts, in the voting booth, in the court of public opinion and in the state legislatures and Congress. Then they have to play everywhere at the same time. They become more visible and have to defend themselves."

**Charts**
The Chamber's Battleground
-