## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARK HALE, TODD SHADLE, | ) | |
| LAURIE LOGER and | ) | |
| MARK COVINGTON, on | ) | |
| Behalf of themselves and all others | ) | |
| Similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:12-cv-00660-DRH-PMF |
| vs. | ) | Chief Judge David R. Herndon |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY, ED MURANE, | ) | DEFENDANT DEMANDS |
| and WILLIAM G. SHEPHERD, | ) | TRIAL BY JURY |
| | ) | |
| Defendants. | ) | |

### ANSWER AND DEFENSES OF WILLIAM G. SHEPHERD TO PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

COMES NOW the Defendant, William G. Shepherd (hereinafter "Shepherd" or "Defendant Shepherd"), by and through his attorneys, Greensfelder, Hemker, & Gale P.C., and for his Answer to Plaintiffs' Class Action Complaint states as follows:

## I.    INTRODUCTION AND NATURE OF ACTION

1.    From 2003 to the present, State Farm, Murnane, and Shepherd (collectively, "Defendants") created and conducted the RICO enterprise described below to enable State Farm to evade payment of a $1.05 billion judgment affirmed in favor of approximately 4.7 million State Farm policyholders by the Illinois Appellate Court.

    **Answer:    Denied.**

2.    Plaintiffs bring this class action for damages against Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., in particular, §§ 1962(c), (d); and 1964 for perpetrating a scheme through

1

an enterprise specifically designed to defraud Plaintiffs and Class out of a $1.05 billion judgment.

> **Answer:**     **Denied.**

3.      Plaintiffs were each named plaintiffs, class representatives and class members in *Avery v. State Farm Mutual Automobile Insurance Company* ("*Avery Action*"), a class action litigated in the Illinois state court system. The *Avery Action* was certified as a class action, tried to jury verdict on a breach of contract claim, and tried to the Court on a claim under the Illinois Consumer Fraud Act ("ICFA"), resulting in a judgment of $1.18 billion.

> **Answer:**     **Defendant Shepherd admits that *Avery v. State Farm Mutual Automobile Ins. Co.* was a putative class action brought in the Illinois state court system. Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 3 and therefore denies the same.**

4.      The Illinois Appellate Court upheld a $1.05 billion judgment, sustaining the compensatory and punitive damages, and disallowing disgorgement damages as duplicative. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 321 Ill. App. 3d 269, 275, 292 (Ill. App. Ct. 5th Dist. 2001). (A true copy of the *Avery* Appellate Court decision is attached hereto as Exhibit "A").

> **Answer:**     **Defendant Shepherd admits that the Illinois Appellate Court issued a decision in *Avery v. State Farm Mut. Auto. Ins. Co.*, 321 Ill. App. 3d 269, 275, 292 (5th Dist. 2001). Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 4 and therefore denies the same.**

5.     On October 2, 2002, the Illinois Supreme Court accepted State Farm's appeal. The appeal was fully-briefed, argued and submitted as of May 2003, yet the matter remained under submission without a decision until August 18, 2005.

**Answer:     Defendant Shepherd admits that the Illinois Supreme Court accepted an appeal from *Avery v. State Farm Mut. Auto. Ins. Co.,* 321 Ill. App. 3d 269, 275, 292 (5th Dist. 2001). Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 5 and therefore denies the same.**

6.     From the fall of 2003 until November 2004, Trial Judge Lloyd Karmeier ("Karmeier") and Appellate Judge Gordon Maag waged a judicial campaign for a vacant seat on the Illinois Supreme Court, ultimately resulting in Karmeier's election. In January 2005, having received reliable information that State Farm had exerted financial and political influence to achieve Karmeier's election, the *Avery* plaintiffs moved to disqualify Karmeier him from participating in the appeal of the *Avery Action*.

**Answer:     Defendant Shepherd admits that there was a campaign for a vacant seat on the Illinois Supreme Court in 2003 and 2004, and that Justice Karmeier was elected to that seat. Defendant Shepherd lacks sufficient information to admit or deny whether the Avery plaintiffs moved to disqualify Justice Karmeier from participation in the appeal in the Avery action and therefore denies the same. Defendant Shepherd denies all remaining allegations of paragraph 6.**

7.     On or about January 31, 2005, State Farm filed its response to the disqualification motion, grossly misrepresenting the magnitude of State Farm's financial support (and the degree of participation by its executives, surrogates, lawyers and

employees) of Karmeier's campaign.

**Answer:** **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 7 and therefore denies the same.**

8.    Plaintiffs' motion was denied, and on August 18, 2005, with now-Justice Karmeier participating in the Court's deliberations and casting his vote in State Farm's favor, the Illinois Supreme Court issued a decision overturning the $1.05 billion judgment. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 835 N.E.2d 801 (Ill. 2005). (A true copy of this decision is attached hereto as Exhibit "B").

**Answer:** **Defendant Shepherd admits that the Illinois Supreme Court issued a decision in *Avery v. State Farm Mut. Auto. Ins. Co*., 216 Ill.2d 100, 835 N.E.2d 801 (Ill. 2005). Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 8 and therefore denies the same.**

9.    In December 2010, spurred in part by a recent United States Supreme Court decision vacating a West Virginia Supreme Court ruling in a case which featured similar facts, *i.e.*, involving a party's political and financial influence to elect a justice whose vote it sought for its appeal, Plaintiffs' counsel launched an investigation into State Farm's covert involvement in the Karmeier campaign. The investigation, led by a retired FBI Special Agent, uncovered evidence that to gain reversal of the $1.05 billion judgment in the *Avery Action*, State Farm -acting through Murnane, Shepherd and the Illinois Civil Justice League ("ICJL") - recruited Karmeier, directed his campaign, had developed a vast network of contributors and funneled as much as $4 million to the campaign. Then, after achieving Karmeier's election, State Farm deliberately concealed all of this from the Illinois Supreme Court while its appeal was pending.

**Answer:        Defendant Shepherd denies that he recruited Justice Karmeier, directed his campaign, developed a network of contributors, funneled as much as $4 million or any other amount to the campaign, and/or was involved in any way in any concealment from the Illinois Supreme Court. Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 9 and therefore denies the same.**

10.     On September 9, 2011, based on information uncovered in the Reece investigation, the *Avery* plaintiffs petitioned the Illinois Supreme Court to vacate its decision overturning the $1.05 billion judgment. Responding on September 19, 2011, State Farm again deliberately misrepresented its role in directing and financing Karmeier's campaign. On November 17, 2011, the Illinois Supreme Court denied Plaintiffs' petition, without comment.

**Answer:        Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 10 and therefore denies the same.**

11.     Reece's investigation had revealed, among other things, that, having been ordered on April 5, 2001 by the Appellate Court to pay a $1.05 billion judgment to the *Avery* class, and having succeeded in persuading the Illinois Supreme Court to accept its appeal, State Farm had next developed an elaborate plan to obtain reversal of the judgment. The initial component of the plan was to recruit a candidate for the open Fifth District seat on the Illinois Supreme Court for the November 2004 election who would support State Farm once its appeal came before the Court for disposition. Of course, there was no guarantee for State Farm that the appeal would not be decided *before* the November 2004 election, but the risk – *a $2 to $4 million investment for a possible $1.05*

5

*billion return* – was sufficiently minimal to make it a worthwhile gamble.

**Answer:       Defendant Shepherd lacks sufficient information to know when the *Avery* decision could have been decided by the Supreme Court and therefore denies that and all other allegations of paragraph 11.**

12.    Defendants' scheme was developed and implemented in two distinct but related phases. In the first phase, State Farm sought to recruit, finance, direct, and elect a candidate to the Illinois Supreme Court who, once elected, would vote to overturn the $1.05 billion judgment. As Plaintiffs describe below, Defendants ultimately succeeded in achieving this objective. Nine months after his election, Karmeier voted in favor of State Farm to overturn the $1.05 billion judgment of the Appellate Court.

**Answer:       Defendant Shepherd admits that Justice Karmeier participated in the decision issued by the Illinois Supreme Court in *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 835 N.E.2d 801 (Ill. 2005).  Defendant Shepherd lacks sufficient information to admit or deny all remaining allegations of paragraph 12 and therefore denies same.**

13.    Once the initial phase of the scheme had succeeded, the second phase featured two spirits of affirmative fraudulent activity, each furthered by use of the U.S. mails: the 2005 and 2011 written misrepresentations to the Illinois Supreme Court. Specifically, this phase consisted of: (a) a continuing concealment of these facts to permit Karmeier to participate in the deliberations and cast his vote to overturn the judgment in 2005 (this was accomplished, in part, by State Farm's January 31, 2005 filing), and (b) withholding information from the Illinois Supreme Court that would have conceivably led it to vacate the decision in 2011 (this was accomplished, in part, by State Farm's

September 19, 2011 filing).  Again, both filings were made through the U.S. mail, having been mailed to the Clerk of the Illinois Supreme Court and to Plaintiffs' counsel in several states, including Illinois, Louisiana, Mississippi and Tennessee.

> **Answer:**      **Denied.**

14.      From its inception, Plaintiffs and other Class members in the *Avery Action* were the targets of and ultimate victims of the racketeering acts and the RICO enterprise - stripped of hundreds or even thousands of dollars each, seized of a class-wide judgment totaling $1.05 billion which compensated them for their losses - as a proximate result of Defendants' actions and the actions of the Enterprise participants.

> **Answer:**      **Denied.**

15.      In both the 2005 and 2011 filings, State Farm continued to hide and conceal its role in Karmeier's campaign, and deliberately misled the Court by omitting and concealing material facts regarding State Farm's role in Karmeier's campaign, which it directed through Shepherd, Murnane, the ICJL and Citizens for Karmeier, including: (a) recruiting Karmeier to be a candidate; (b) selecting Murnane to direct Karmeier's campaign; (c) creating Karmeier's judicial campaign contribution network; and (d) funding Karmeier's campaign.

> **Answer:**      **Denied.**

16.      To carry out and conceal this elaborate and covert scheme, Defendants created and conducted a continuing pattern and practice of activity through an association-in-fact Enterprise consisting of, among others, the following: Shepherd; Murnane; Murnane's non-profit organization, the ICJL; the Shepherd-led ICJL Executive Committee ("Executive Committee"); Citizens for Karmeier (the campaign committee of

Karmeier); JUSTPAC (the ICJL's political action committee); and the United States Chamber of Commerce ("US Chamber").

**Answer:** **Denied.**

17.   The ICJL and Executive Committee, through Murnane and Shepherd, respectively, aided by Citizens for Karmeier, functioned collectively as State Farm's vehicle to: (a) recruit Karmeier as a candidate, (b) direct Karmeier's campaign, (c) lend credibility to that campaign via endorsement, and (d) assure that Karmeier's campaign was  well-funded campaign finance disclosures show that State Farm secretly funneled to Karmeier's campaign as much as $4 million (over 80%) of Karmeier's total $4.8 million campaign contributions. Led by Murnane and Shepherd, the ICJL and its Executive Committee were the "glue" that held together the many pieces of State Farm's judicial campaign contribution network.

**Answer:** **Denied.**

18.   The utilization of the U.S. mail throughout every stage of Defendants' scheme - to solicit, receive and direct contributions, to conduct conferences and disseminate communications and campaign strategies, and to conceal the extent of State Farm's role in Karmeier's campaign -was essential to the conduct of this Enterprise.

**Answer:** **Denied.**

19.   Various Enterprise participants and co-conspirators also used electronic mail to carry out the initial phase of Defendants' scheme throughout 2003-2004 to communicate details regarding the direction, management and financing of the campaign to fellow Enterprise participants.

**Answer:** **Denied.**

20.     As the following paragraphs illustrate, the motivation for this seven-year-long cover-up is both plausible and demonstrable. State Farm's misrepresentations and deception directed toward the Illinois Supreme Court by its mailed court-filings, and the continuing use of the mails by Defendants and Enterprise participants to carry out the scheme (to evade payment of the $1.05 billion judgment) constitutes a pattern and practice of knowing and deceptive conduct employed to effectuate and then to conceal State Farm's extraordinary support of Karmeier.

**Answer:       Denied.**

## II.   PARTIES

### A.   Plaintiffs

21.     Mark Hale a citizen of the State of New York. Todd Shadle is a citizen of the State of Texas. Laurie Loger is a citizen of the State of Illinois. Reverend Mark Covington is a citizen of the State of Mississippi. Plaintiffs are natural persons who were auto policyholders of State Farm, and named Plaintiffs and members of the Class of policyholders certified in the *Avery Action*.

**Answer:       Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 21 and therefore denies the same.**

### B.   Defendants

22.     State Farm Mutual Automobile Insurance Company is a mutual non-stock company, organized and existing under the laws of the State of Illinois, and having its principal office at One State Farm Plaza, Bloomington, Illinois 61710.

**Answer:       Admitted.**

23.     William G. Shepherd is, upon information and belief, a citizen and resident

of the State of Illinois, with his principal office at One State Farm Plaza, Corporate Law A3, Bloomington, Illinois 61710-0001. At all times relevant to this action, Shepherd was employed by State Farm. On information and belief, Shepherd violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in State Farm's scheme to recruit, finance and elect Karmeier to the Illinois Supreme Court and fraudulently conceal State Farm's true role in Karmeier's campaign from the Illinois Supreme Court, which had the intended result of defrauding Plaintiffs and the Class and causing damage to their business and property.

**Answer:       Defendant Shepherd admits that he is a citizen and resident of the State of Illinois, with his principal office at One State Farm Plaza, Corporate Law A3, Bloomington, Illinois, and that he is employed by State Farm.  Defendant Shepherd denies all remaining allegations of paragraph 22.**

24.       Ed Murnane is, upon information and belief, a citizen and resident of the State of Illinois, residing at 436 S. Belmont Avenue, Arlington Heights, Illinois 60005 in Cook County, and having his principal office at 330 N. Wabash Street, Suite 2800, Chicago, Illinois 60611. At all times relevant to this action, Murnane was President of the Illinois Civil Justice League. On information and belief, Murnane violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the association-in-fact conducted by State Farm to recruit, finance and elect Karmeier to the Illinois Supreme Court and fraudulently conceal State Farm's true role in Karmeier's campaign from that Court, which had the intended result of defrauding Plaintiffs and the Class and causing damage to their business and property.

**Answer:       Defendant Shepherd lacks sufficient information to admit or**

deny the allegations of paragraph 24 and therefore denies the same.

III.   UNNAMED CO-CONSPIRATORS

25.   Although not named as a party herein, the ICJL is a 501(c)(6) not-for-profit corporation, incorporated under the laws of the State of Illinois, with its principal place of business in Arlington Heights, Illinois. On information and belief, the ICJL violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in State Farm's scheme to recruit, finance and elect Karmeier and fraudulently conceal State Farm's role in Karmeier's campaign from the Illinois Supreme Court, which had the intended result of defrauding Plaintiffs and the Class and causing them damage to their business and property.

**Answer:**   **Defendant Shepherd lacks sufficient information to admit or deny the first sentence of paragraph 25 and therefore denies same.  Defendant Shepherd denies all remaining allegations of paragraph 25.**

26.   Although not named as a party herein, the US Chamber is a non-profit corporation incorporated under the laws of the District of Columbia with its principal place of business located at 1615 H High Street, NW, Washington, D.C. 20062-2000. For purposes of Plaintiffs' claims under 18 U.S.C. § 1962(c) and (d), the US Chamber participated in the enterprise through which Defendants conducted their racketeering activity.

**Answer:**   **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 26 and therefore denies the same.**

27.   Various other persons, firms, organizations, corporations and business entities, some unknown and others known, have participated as co-conspirators in the

violations and conduct alleged herein and performed acts in furtherance of the conspiracy described herein.

     **Answer:**     **Denied.**

## IV.   <u>THE RICO ENTERPRISE</u>

     28.    Defendants and their above-named co-conspirators conducted or actively participated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Alternatively, Defendants, co-conspirators and Enterprise participants identified herein, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The actions of Defendants, co-conspirators and Enterprise participants were in furtherance of the Enterprise and in violation of 18 U.S.C. § 1962(d).

     **Answer:**     **Denied.**

     29.    The Enterprise is an association-in-fact of State Farm executives and employees, including Shepherd, as well as Murnane, Citizens for Karmeier, political operatives, a political action committee, political organizations, an Executive Committee of one such organization which wields significant political influence in Illinois, a political campaign committee, insurance and business lobbyists and the US Chamber. The Enterprise is distinct from, albeit conducted by, State Farm, through Shepherd, Murnane and the ICJL, and has an ongoing existence. Specifically, participants in the Enterprise include:

- <u>William G. Shepherd</u>, a State Farm corporate lawyer and lobbyist. Shepherd helped found the ICJL, hired Ed Murnane as the ICJL's President, and is a member of the ICJL's "Executive Committee."

- <u>Ed Murnane</u> is the President of the ICJL and treasurer of JUSTPAC. He was hired by Shepherd and co-founding ICJL-member and Executive Committee member, Karen Melchert. Murnane recruited Karmeier as a candidate and directed all phases of the Karmeier campaign.

- <u>The Illinois Civil Justice League</u> describes itself as "a coalition of Illinois citizens, small and large businesses, associations, professional societies, not-for-profit organizations and local governments that have joined together to work for fairness in the Illinois civil justice system." Through Murnane and Shepherd, the ICJL played an essential and vital role in Karmeier's campaign as the conduit between State Farm and Karmeier.

- <u>The ICJL Executive Committee</u> vetted Karmeier as a candidate, then endorsed Karmeier's candidacy, and was the ICJL's governing committee during the 2004 campaign.

- <u>JUSTPAC</u> is the ICJL's PAC. It contributed $1,191,453 directly to Judge Karmeier's campaign. 90% of all contributions made to JUSTPAC in 2004 went to Karmeier's campaign. Dwight Kay, Karmeier's finance chair, equated a contribution to JUSTPAC with a contribution to Citizens for Karmeier.

- <u>Citizens for Karmeier</u> is the official political committee for Karmeier and the recipient of most of the cash campaign contributions.

- <u>US Chamber</u> is a non-profit corporation incorporated under the laws of the District of Columbia, targeted the Karmeier-Maag race in 2004 and contributed millions of dollars to elect Karmeier.

- <u>Ed Rust</u> is State Farm's CEO and played an important role in the US Chamber committee that targeted the Karmeier-Maag race in 2004 and steered millions of dollars to Illinois to help elect Karmeier.

- <u>Al Adomite</u> was hired by Murnane as consultant to Karmeier's campaign, paid by the campaign. Currently, he is Vice President and Director of Government Relations. Adomite confirmed Murnane's control over Karmeier's campaign and that Murnane had provided a substantial portion of the funding for the campaign - $1.19 million - through JUSTPAC.

- <u>Karen Melchert</u> is Director of State Government Relations for CNA Insurance Companies ("CNA"). Along with Shepherd, she is a founding member of the ICJL Executive Committee, and partly responsible for hiring Murnane as ICJL President.

- <u>Todd Maisch</u> is an Executive Committee member of the ICJL and chairman of JUSTPAC.

- Kim Maisch is Illinois Director of the National Federation of Independent Businesses and served on the ICJL Executive Committee for many years, including during the 2004 election cycle.

- Dwight Kay was Karmeier's finance chairman in 2004.

- David Leuchtefeld was "chairman" of "Citizens for Karmeier" whose discarded emails evidence the inner-workings of the Karmeier campaign.

- Lloyd Karmeier was an Illinois trial judge recruited in 2003 by, among others, Murnane and Shepherd, to be the Republican candidate for the vacant seat on the Illinois Supreme Court in the 2004 election.

**Answer:**     **Defendant Shepherd admits that William Shepherd is a State Farm corporate lawyer and registered lobbyist and served, at certain times, on behalf of State Farm, as a member of the ICJL's "Executive Committee." Defendant Shepherd denies that he hired Ed Murnane. Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 29 and therefore denies the same.**

## V.     JURISDICTION

30.     The subject matter jurisdiction of this Court is conferred and invoked pursuant to 28 § 1331, and the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 § 1961 et seq. (specifically 18 U.S.C. § 1964(c)).

**Answer:**     **Paragraph 30 contains a legal conclusion to which no answer is required. To the extent that an answer is deemed necessary, Defendant Shepherd denies such allegations.**

31.     This Court also has jurisdiction over this action as a class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars

($5,000,000), exclusive of interests and costs. See 28 U.S.C. §§ 1332(d)(2) and (6).

> **Answer:**       **Paragraph 31 contains a legal conclusion to which no answer is required. To the extent that an answer is deemed necessary, Defendant Shepherd denies such allegations.**

VI.    <u>**VENUE**</u>

32.    Venue is proper in this judicial district under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a), (b) and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Southern District of Illinois and because Defendants transacted business in this district.

> **Answer:**       **Denied**

33.    The Enterprise was formed in the Southern District of Illinois and a substantial part of the conduct surrounding Defendants' scheme occurred in the Southern District of Illinois.

> **Answer:**       **Denied**

34.    The Southern District of Illinois is the appropriate venue for this action because the *Avery Action,* brought in the Circuit Court for Williamson County, Illinois (situated within\ this district), was the genesis of the conduct described here. Also, the Fifth Appellate District of the State of Illinois, situated within the Southern District of Illinois, was the epicenter of the Citizens for Karmeier campaign. What's more, the foundation of the relationships between these Defendants, their co-conspirators and Enterprise participants was Karmeier's candidacy for the Fifth District seat on the Illinois Supreme Court. Finally, two acts of mail-fraud, separated by six years – the August 18, 2005 and the September 19, 2011 mailings by State Farm to the Illinois Supreme Court –

were transacted in Edwardsville, Illinois, located in Madison County, also situated within the Southern District of Illinois. These circumstances are sufficient to demonstrate that a substantial part of the events or omissions giving rise to this action occurred in the Southern District of Illinois.

**Answer:    Denied**

35.    Venue is also proper in this district because Defendant State Farm is engaged in substantial business here and has minimum contacts with this district, such that it is subject to personal jurisdiction here.

**Answer:    Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 35 and therefore denies same.**

36.    Venue is proper in this district because the ends of justice require it.

**Answer:    Denied.**

## VII.    CLASS ACTION ALLEGATIONS

37.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class defined as:

> All persons who were members of the Certified Class in *Avery v. State Farm Mut. Auto. Ins. Co.*, No. 97-L-114 (First Jud. Cir. Williamson County, Ill.), more specifically described as:
>
>> All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts. Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.
>>
>> The following persons are excluded from the class: (1) persons who resided or garaged their vehicles in Illinois and whose Illinois insurance

policies were issued/executed prior to April 16, 1994, and (2) persons who
resided in California and whose policies were issued/executed prior to
September 26, 1996.

**Answer:**      **Denied.**

38.    The Class consists of approximately 4.7 million State Farm policyholders,
geographically dispersed throughout the United States, making the Class so numerous
that individual joinder is impractical under Rule 23(a)(1). The Class is ascertainable,
being identical to the class previously defined, certified and notified in the *Avery Action*.

**Answer:**      **Denied.**

39.    Numerous questions of law and fact exist that are common to Plaintiffs
and the Class. The answers to these common questions are significant and will
substantially advance the adjudication and resolution of this case, and predominate over
any questions that may affect only individual Class members, thereby satisfying Rule
23(a)(2) and 23(b)(3). These common question/common answer issues include:

     a.    Whether State Farm misrepresented and concealed material
information in its mailings to and filings with the Illinois Supreme
Court concerning State Farm's support of Karmeier's campaign in
2005 and 2011;

     b.    Whether State Farm engaged in a fraudulent and/or deceptive
scheme to deceive the Illinois Supreme Court;

     c.    Whether Defendants engaged in a pattern and practice of
materially false information, misrepresentations, omissions and
concealment regarding State Farm's support of Karmeier's
campaign;

     d.    Whether this conduct continues to the present;

     e.    Whether Defendants' conduct injured Class members in their
business or property within the meaning of the RICO statute;

     f.    Whether State Farm, Murnane, Shepherd and Citizens for
Karmeier violated and conspired with others to violate RICO by

the conduct of an association-in-fact Enterprise, through a pattern of racketeering activity involving mail fraud;

g.      Whether Class members are entitled to compensatory damages and, if so, the nature and extent of such damages; and

h.      Whether Class members are entitled to treble damages under Civil RICO.

**Answer:      Defendant Shepherd denies all allegations of paragraph 39, including all subparagraphs.**

40.      The claims of the Plaintiffs are typical of the claims of the Class, as required by Rule 23(a)(3), in that Plaintiffs are persons or entities who, like all Class members, were members of the certified class in the *Avery Action* and "were insured by a vehicle casualty insurance policy issued by State Farm" and "made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts." Plaintiffs, like all Class members, have been damaged by Defendants' misconduct, in that, among other things, they have lost the value and benefit of the $1.05 billion judgment entered against State Farm by the Illinois Appellate Court on April 5, 2001 as a direct result of Defendants' continuing pattern of fraudulent conduct.

**Answer:      Denied.**

41.      The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a common thread of fraud, deceit, and other misconduct resulting in injury to Plaintiffs and Class members.

**Answer:      Denied.**

42.      Plaintiffs will fairly and adequately represent and protect the interests of

18

Class members, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in the prosecution of nationwide class actions. Plaintiffs and their counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to the Class.

       **Answer:**       **Denied.**

     43.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action, most Class members would certainly find the cost of litigating their claims to be prohibitive, and would thus have no effective access to the courts or remedy at law. State Farm's wrongdoing in the underlying *Avery Action* (breach of contract and consumer fraud) was proved at a month-long trial through evidence, documentary proof, live testimony, and multiple experts' testimony. The dedication of time, effort, and money to the case was considerable, beyond the resources of any single member. The *Avery Action* was economically feasible only as a class action. Typical damage to an individual Class member in the *Avery Action* ranged from several hundred to less than $2500, an amount that unfairly damaged each Class member, and enriched State Farm, but that would not warrant the substantive costs of an individual action. The same is true with respect to the efforts and expertise that have gone into tracing State Farm's subsequent cause of fraudulent conduct and its pattern of RICO-violative activity, by which Plaintiffs allege Defendants defrauded a Court and deprived the Class of its property. The class treatment of common questions of law and fact is thus superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants,

makes access to the court and redress on the merits possible, and promotes consistency and efficiency of adjudication.

**Answer:        Denied.**

44.        Plaintiffs seek the certification of a nationwide Class under their civil RICO claims, asserted for violations of 18 U.S.C. §1962(c) and 1962(d) under 1964(c) in this Complaint. All questions of law and fact are common to the civil RICO counts and predominate over individual questions. This case also presents common issues of fact and law that are each appropriate for issue-class certification under Rule 23 (c)(4) and the management of this action may be facilitated through the certification of additional subclasses under Rule 23(c)(5), if necessary and appropriate.

**Answer:        Denied.**

## VIII.   FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.        Trial and Appellate Court Proceedings in the *Avery Action*

45.        The named Plaintiffs in this action were also named plaintiffs in *Avery v. State Farm Mut. Auto. Ins. Co.*, 321 Ill. App. 3d 269, 275 (Ill. App. Ct. 5th Dist. 2001), the largest class action judgment in Illinois history. Plaintiffs in the *Avery Action* filed their class action complaint in July 1997. At trial, a Williamson County jury found that State Farm had breached its contracts with 4.7 million policyholders in 48 states by specifying the use of inferior non OEM parts. The Trial Court agreed and issued its Judgment on October 4, 1999, confirming a total award of $456,636,180 in breach of contract damages. The Trial Court also found that State Farm had willfully violated the Illinois Consumer Fraud Act ("ICFA") and awarded punitive damages in the sum of $600,000,000 to the ICFA Class. The Trial Court also awarded disgorgement damages of

20

$130,000,000. *See Avery*, 321 Ill. App. 3d at 275.

**Answer:** **Defendant Shepherd states that the decision** *Avery v. State Farm Mut. Auto. Ins. Co.*, **321 Ill. App. 3d 269, 275 (5th Dist. 2001), speaks for itself. Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 45 and therefore denies the same.**

46.    Following an appeal by State Farm, on April 05, 2001, the Illinois Appellate Court affirmed a $1.05 billion judgment, but disallowed, as duplicative of the damage award, the award of disgorgement damages.

**Answer:** **Defendant Shepherd states that the decision in** *Avery v. State Farm Mut. Auto. Ins. Co.*, **321 Ill. App. 3d 269, 275 (5th Dist. 2001), speaks for itself. Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 46 and therefore denies the same.**

**B.    Proceedings in Illinois Supreme Court from October 2, 2002 to August 18, 2005**

47.    On October 2, 2002, the Illinois Supreme Court granted State Farm leave to appeal. In May 2003, the Court heard oral argument. From May 2003 until August 2005, the *Avery* appeal lingered - without explanation - before the Court without a decision.

**Answer:** **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 47 and therefore denies the same.**

48.    During this period, Trial Judge Lloyd Karmeier waged a campaign to be elected to the Illinois Supreme Court against Appellate Court Judge Gordon Maag. In November 2004, Karmeier was elected to the Illinois Supreme Court.

**Answer:** **Defendant Shepherd admits that there was an election for the**

21

Illinois Supreme Court and that Justice Karmeier was elected. Defendant Shepherd lacks sufficient information to admit or deny the remaining allegations of paragraph 48 and therefore denies the same.

49. On January 26, 2005, plaintiffs in the *Avery Action* filed a "Conditional Motion for Non-Participation" asking Karmeier to recuse himself because an investigation by counsel had uncovered that about $350,000 of the $4.8 million he spent to get elected came directly from State Farm employees, lawyers, and others involved with State Farm and its appeal.

**Answer:** **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 49 and therefore denies the same.**

50. State Farm responded on January 31, 2005 in a court-filing opposing the motion for recusal, materially understating its support of Karmeier's campaign. *See* State Farm's Opposition to Plaintiffs-Appellees' Conditional Motion for Non-Participation, at pp. 10-18 (attached hereto as Exhibit C). State Farm represented (falsely) that its support of Karmeier consisted of "quite modest contributions" and characterized as "incorrect and meritless" the claim that State Farm had funneled $350,000 to Karmeier. *See* State Farm's Opposition, at pp. 12-13. State Farm denied (falsely) "engineering contributions" to Karmeier's campaign "for the purpose of impacting the outcome of this case" (*see* State Farm's Opposition, at p. 11) and downplayed the charge that it was responsible for $350,000 in direct contributions to Karmeier's campaign, suggesting that plaintiffs' counsel had presented "no evidence whatsoever to back up" their claim that those contributions were made by State Farm "front groups." *See* State Farm's Opposition, at p. 11.

22

**Answer:** **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 50 and therefore denies the same.**

51. However, State Farm failed to inform the Court that its own employee, Defendant Shepherd, was a founding member of the ICJL Executive Committee that recruited and "vetted" Karmeier, and, through Murnane and the ICJL, that State Farm had organized, directed and funded the Karmeier campaign.

**Answer:** **Denied.**

52. State Farm's brief was rife with misleading statements and omissions. Most notably, State Farm failed to disclose the prominent role played by Shepherd in forming the ICJL, as a member of the ICJL Executive Committee (which engineered Karmeier's candidacy, endorsed him, and insured a substantial flow of cash from State Farm executives, employees, and corporate and political partners), and as a central figure in Karmeier's campaign.

**Answer:** **Denied.**

53. Second, State Farm falsely denied Murnane's involvement in Karmeier's campaign and declared "Mr. Murnane . . . was not Karmeier's campaign manager or campaign finance chairman and was not employed by Karmeier's campaign . . . ." *See* State Farm's Opposition, at pp. 15-16.

**Answer:** **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 53 and therefore denies the same.**

54. On March 16, 2005, with Karmeier taking no action on the motion to recuse, the Illinois Supreme Court denied plaintiffs' motion, ruling that the subject of recusal was up to Karmeier, and not subject to further review by the Illinois Supreme

Court.

**Answer:**       **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 54 and therefore denies the same.**

55.    On May 20, 2005, the Illinois Supreme Court issued still a second order, which stated that, because Karmeier had declined to recuse himself, the recusal motion was "moot."

**Answer:**       **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 55 and therefore denies the same.**

56.    On August 18, 2005, Karmeier cast a vote to overturn the $1.05 billion judgment. This vote was decisive. Absent Karmeier's participation, only those portions of the Illinois Supreme Court's opinion which were joined by one of the two dissenting Justices would have had the votes required by law to overturn the judgment, and at least part of the judgment would have stood. However, Karmeier's participation in the deliberations of the Court tainted every part of the Court's opinion.

**Answer:**       **Denied.**

57.    On September 8, 2005, plaintiffs in the *Avery Action* moved for a rehearing and again challenged Karmeier's participation. However, on September 26, 2005, their petition was denied, without comment, with Karmeier participating.

**Answer:**       **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 57 and therefore denies the same.**

58.    Plaintiffs ultimately sought review by the U.S. Supreme Court, based upon information then available to them. On March, 2006, that Court denied the petition for certiorari.

24

**Answer:**     **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 58 and therefore denies the same.**

59.     As time would tell, a significant amount of evidence that would have buttressed Plaintiffs' 2005 claims was concealed and suppressed until recently.

**Answer:**     **Denied.**

**C.**     **Plaintiffs' Counsel's 2010 Investigation Into State Farm's Involvement in Karmeier's 2004 Campaign**

60.     In December 2010, prompted by a recent U.S. Supreme Court decision addressing due process concerns in a similar case, *see Caperton v. A.T. Massey Coal Co.*, 129 S. Ct. 2252 (2009), Plaintiffs' counsel enlisted the services of retired FBI Special Agent Daniel L. Reece ("Reece") to investigate State Farm's involvement in Karmeier's campaign.

**Answer:**     **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 60 and therefore denies the same.**

61.     Information obtained in that investigation, combined with previously known information, revealed the extent to which individuals and entities aided State Farm in enabling the election of Karmeier and in concealing its actions from the Illinois Supreme Court.

**Answer:**     **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 61 and therefore denies the same.**

**1.**     **State Farm and CNA formed the ICJL**

62.     According to CNA's Karen Melchert, State Farm, through Shepherd, and CNA, through Melchert, organized the ICJL in the early 1990's. Together, Shepherd and Melchert hired Murnane in 1993 as President of the ICJL.

25

**Answer:**       **Denied.**

**2.**       **Recruitment of Lloyd Karmeier as State Farm's Candidate for the Illinois Supreme Court**

63.       A July 2003 *Forbes Magazine* article quoted Murnane as saying the Illinois Supreme Court is 4-3 "anti-business" and that the ICJL would target the 2004 Fifth District race to change the composition of the Court. The article cites the *Avery Action* – which was already pending before the Illinois Supreme Court. (*See* Forbes article, Exhibit D hereto). A second article from 2004 stated that Murnane viewed the *Avery* verdict against State Farm as part of the problem with courts in the Fifth District.

**Answer:**       **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 63 and therefore denies the same.**

64.       While State Farm's appeal was pending, Murnane evaluated possible candidates for the open Supreme Court seat. Working at the direction of Shepherd and the Executive Committee, Murnane served as the principal recruiter of Karmeier. Murnane, Shepherd and other members of the Executive Committee placed the considerable support of the State Farm-backed ICJL and its political action committee, JUSTPAC, behind Karmeier.

**Answer:**       **Denied.**

**3.**       **Campaign Emails Reveal Murnane and the ICJL's Involvement in the Management, Direction and Financing of the Campaign**

65.       E-mails generated within Karmeier's campaign organization unmistakably show that Murnane directed Karmeier's fund-raising, his media relations and his speeches.

**Answer:**       **Defendant Shepherd lacks sufficient information to admit or**

deny the allegations of paragraph 65 and therefore denies the same.

66.     In or about January 2004, Doug Wojcieszak was working for a group of trial lawyers involved in an appeal pending before the Illinois Supreme Court (*Price v. Philip Morris*). His company was doing background research on Illinois Republican State Senator David Luechtefeld, Karmeier's campaign chairman. An investigator routinely checked Sen. Luechtefeld's discarded outdoor trash for any papers relevant to their investigation. Several discarded emails surfaced which provide insight into the Karmeier campaign.

**Answer:      Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 66 and therefore denies the same.**

67.     The emails also show: (1) Murnane was – by any reasonable account – fully in-charge of Karmeier's campaign; (2) the ICJL Executive Committee played a dominant role in recruiting Karmeier, vetting him and supporting his campaign; and (3) a contribution to the ICJL's PAC - JUSTPAC - was viewed as a contribution to Karmeier's campaign.

**Answer:      Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 67 and therefore denies same.**

68.     In one email, Murnane told Karmeier, "You've passed all the tryouts we need."

**Answer:      Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 68 and therefore denies the same.**

69.     Another email by Murnane refers to the Executive Committee's support of Karmeier's candidacy from "Day One," as well as an endorsement by the Executive

Committee.

**Answer:      Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 69 and therefore denies the same.**

70.     Yet another email reveals that the Executive Committee endorsed Karmeier. That State Farm had a prominent seat on the Executive Committee (Shepherd) during its appeal when the Executive Committee recruited and endorsed Karmeier is a strong and direct link between State Farm and Karmeier, a link State Farm concealed from the Illinois Supreme Court in its January 31, 2005 filing.

**Answer:      Defendant Shepherd admits that he was a member of the Executive Committee of the ICJL at certain times.  Defendant Shepherd denies all remaining allegations of paragraph 70.**

71.     An April 29, 2004 e-mail from Murnane to Dwight Kay, Karmeier's finance chairman, shows Murnane telling Kay that it is not a "good idea" to send out press releases about fund-raising events. Kay deferred to Murnane, who was acting as *de facto* head of the campaign.

**Answer:      Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 71 and therefore denies the same.**

72.     A March 15, 2004 email from Murnane to campaign aide Steve Tomaszewski and Kay, with a copy to Karmeier and others, refers to a direct-mail piece, and credits JUSTPAC. This email demonstrates the support - here, financing a direct mail piece - given to Karmeier's campaign by JUSTPAC.

**Answer:      Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 72 and therefore denies the same.**

73.     An email dated January 22, 2004 from Kay says that a contributor "committed $5,000 to the judge today" and would "either send it directly to the campaign or to JUSTPAC," confirming that a contribution to JUSTPAC was viewed as a contribution to Karmeier.

**Answer:     Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 73 and therefore denies the same.**

74.     A January 20, 2004 email from Murnane to Karmeier, Kay and Tomaszewski refers to two contributors, including JUSTPAC, and tells Karmeier, "close your eyes, Judge," in response to an email from Karmeier in which he writes about getting lawyers to contribute by not disclosing their names. This email shows that Murnane provided information to Karmeier regarding contributors.

**Answer:     Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 74 and therefore denies the same.**

### 4.     State Farm's Financing of Karmeier's Campaign

75.     During the course of the Reece investigation, three Illinois tort reform-insiders -Karmeier's 2004 campaign consultant, Al Adomite, and Executive Committee members Karen Melchert and Kim Maisch - told Reece that State Farm's support of Karmeier was "significant" and "tremendous."

**Answer:     Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 75 and therefore denies the same.**

76.     Citizens for Karmeier's official campaign disclosure reports identified contributions and expenditures. The contributions - direct and in-kind - now known to have originated from State Farm or its political partners, include, as described below:

- $350,000 in contributions originally described by *Avery's* counsel in their January 2005 recusal motion, see Appellees' Conditional Motion for Non-Participation ("Recusal Motion"), pp. 11-21;

- $1,190,452.72 in contributions raised by the ICJL through its fundraising vehicle, JUSTPAC, to Citizens for Karmeier;

- $1,000,000 State Farm contribution to the U.S. Chamber; and

- $719,000 in undisclosed in-kind contributions from the ICJL to Citizens for Karmeier.

**Answer:       Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 76 and therefore denies the same.**

a.       **State Farm Funnels Nearly $1.2 Million to Citizens for Karmeier Through JUSTPAC**

77.       Publicly-available records from the Illinois Board of Elections show that JUSTPAC provided nearly $1.2 million in reported contributions to Karmeier's campaign for the period beginning September 26, 2003 and ending October 27, 2004. In view of Shepherd's prominent role with the ICJL, those funds can now be attributed to State Farm, as it controlled the ICJL and JUSTPAC.

**Answer:       Defendant Shepherd lacks sufficient information to admit or deny the first sentence of paragraph 77 and therefore denies same. Defendant Shepherd denies the second sentence of paragraph 77.**

78.       Shepherd's affiliation with the ICJL was not confirmed until September 19, 2011, when State Farm submitted and served its response to the petition to recall the mandate and vacate the August 18, 2005 judgment, admitting Shepherd's affiliation with the Executive Committee. (*See* State Farm's Response, ¶ 34, attached as Exhibit E). Plaintiffs' counsel did not know that Shepherd had helped choose Murnane – JUSTPAC's treasurer – as ICJL President until or about on or about December 2010, when it was

30

uncovered by Reece.

> **Answer:** **Denied.**

79.     State Farm steered JUSTPAC contributions to Citizens of Karmeier. State Farm and CNA founded the ICJL. Shepherd helped hire Murnane to head the ICJL and was State Farm's representative on the Executive Committee. The Executive Committee recruited and vetted Karmeier, and the Executive Committee officially-endorsed and raised funds for him.

> **Answer:** **Denied.**

80.     Karmeier's finance chairman, Dwight Kay, confirmed the connection between JUSTPAC and Karmeier in an email from January 22, 2004 in which he equated a contribution to JUSTPAC as a contribution to Karmeier.

> **Answer:** **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 80 and therefore denies the same.**

### b.     State Farm Funnels $1 Million to Citizens for Karmeier through U.S. Chamber of Commerce

81.     In deposition testimony in unrelated litigation, *Voters Educ. Comm. v. Washington State Pub. Disclosure Comm'n*, No. 04- 2-23551-1 (Wash. Super. Ct.), on January 11, 2005, Robert Engstrom, Jr., Vice President of Political Affairs for the US Chamber's Institute for Legal Reform, identified Edward Rust, State Farm CEO, as part of the US Chamber's leadership team that selected judicial campaigns to target in 2004. Illinois was prioritized as a "Tier I" race. The Karmeier-Maag race was the only major judicial race in Illinois that year, thus making that race the "Tier I" priority race.

> **Answer:** **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 81 and therefore denies the same.**

82.     State Farm contributed $1 million to the US Chamber, which then contributed $2.05 million to the Illinois Republican Party, which then contributed nearly twice that amount to Karmeier. Thus, State Farm's $1 million donation to the US Chamber in Washington DC wound up back in Illinois after the US Chamber contributed more than twice that sum to the Illinois Republican Party, which, in turn, promptly paid for nearly $2 million in media advertisements for Karmeier. Yet, the $1 million donation was never disclosed by State Farm as part of its "quite modest" support.

**Answer:**     **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 82 and therefore denies the same.**

83.     With State Farm's $1 million in-hand, on October 20, 2004, the US Chamber contributed another $950,000 to the Illinois Republican Party, followed by $350,000 two days later. From September 30, 2004 to the end of the campaign, the Republican Party contributed $1,940,000 to Citizens for Karmeier, consisting of media "buys" in the St. Louis market.

**Answer:**     **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 83 and therefore denies the same.**

84.     In its September 19, 2011 filing with the Illinois Supreme Court, State Farm did not dispute that it gave the US Chamber $1 million or, for that matter, that the Chamber contributed that sum (and more) to the Illinois Republican Party. *See* State Farm's Response, at ¶¶ 42-44. While it may not have been a State Farm-endorsed check that wound up in the bank account of Citizens for Karmeier, $1 million of those funds originated from State Farm.

**Answer:**     **Defendant Shepherd lacks sufficient information to admit or**

deny the allegations of paragraph 84 and therefore denies the same.

**c.**    **Murnane and the ICJL's unreported in-kind contribution of $718,965 to Citizens for Karmeier**

85.    While Murnane was "running the campaign" of Karmeier, and using his official ICJL e-mail address – emurnane@icjl.org – for campaign-related activities, his professional time and expenses were not reported or disclosed as in-kind contributions to the Karmeier campaign.

**Answer:**    **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 85 and therefore denies same.**

86.    IRS Form 990 report from 2004 for the ICJL shows a grand total of $718,965 in expenditures, which included Murnane's salary, benefits, and expenses ($177,749), as well as media, advertising and fundraising, and other managerial expenses that almost exclusively benefitted the Karmeier campaign. None of the expenses were reported as in-kind donations by Citizens for Karmeier in the reports it mailed to and filed with the Board. Including these unreported in-kind contributions from the ICJL to Karmeier's campaign increases the State Farm-influenced contributions to over $3.2 million.

**Answer:**    **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 86 and therefore denies same.**

**d.**    **Other State Farm-influenced contributions**

88.    State Farm-influenced contributions to Citizens for Karmeier exceed the $3,260,452 accounted for above. State Farm CEO Rust, in his US Chamber leadership post, was able to insure that State Farm's $1 million was steered back to Karmeier. Rust was also in a position to steer money from other corporate donors to the campaign,

33

increasing the total State Farm-related contributions to Karmeier to $4,200,417, or over *eighty-seven percent (87%)* of the $4,800,000 reportedly raised by the Karmeier campaign.

      **Answer:**      **Denied.**

      **5.**      <u>**Karmeier Was Aware of State Farm's Support**</u>

89.      Karmeier knew the sources of his contributions. First, Karmeier campaign aide Adomite stated that Murnane informed Karmeier of day-to-day campaign operations, along with its fund-raising, and that Karmeier was on the office e-mail list, very active in his campaign, and aware of campaign activities. Adomite concluded he did not see how Karmeier "could not have known the source of all campaign funds."  Second, Karmeier is a prominent sender/recipient of several emails that discussed fundraising and/or expenditures.  And third, State Farm conceded that the Illinois Judicial Ethics Committee has advised judges that it is "desirable" for them to know their contributors. *See* State Farm's Response, at ¶55.

      **Answer:**      **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 89 and therefore denies the same.**

**IX.**      <u>**ONGOING PATTERN, FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING OF STATUTES OF LIMITATIONS**</u>

90.      Plaintiffs incorporate by reference all preceding paragraphs.

      **Answer:**      **Defendant Shepherd incorporates his Answers to all preceding paragraphs.**

91.      The pattern and practices of RICO violations are continuous and ongoing.

      **Answer:**      **Denied.**

92.      The Enterprise and Defendants' RICO violations – specifically, the

concealment of State Farm's support of Karmeier - continue. Plaintiffs were not and could not have been aware of Defendants' pattern of misconduct before September 19, 2011, when State Farm submitted to the Illinois Supreme Court and served its response to the petition to recall the mandate and vacate the August 18, 2005 judgment.

**Answer:**      **Denied.**

93.     From 2003 to the present, State Farm concealed the nature and extent of its support of Karmeier by lying to and misleading the Illinois Supreme Court about that support, first in January 2005 and again in September 2011.

**Answer:**      **Denied.**

94.     From 2004 to the present, Citizens for Karmeier concealed the nature and extent of State Farm's support of Karmeier by submitting campaign finance disclosures which failed to list the direct and in-kind contributions for which State Farm was responsible, including, but not limited to, contributions from ICJL, JUSTPAC and Murnane.

**Answer:**      **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 94 and therefore denies the same.**

95.     As a result, Plaintiffs could not have discovered State Farm's conduct, its control of the Enterprise or the structure and success of that Enterprise, by exercising reasonable diligence.

**Answer:**      **Denied.**

96.     Any applicable statutes of limitations have been tolled by Defendants' knowing, ongoing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members were kept ignorant of vital information essential to pursue

35

their claims, without any fault or lack of diligence on their part. Plaintiffs and Class members could not reasonably have discovered the nature of Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat the claim asserted herein.

      **Answer:**    **Denied.**

## X.    DEFENDANTS' MOTIVE, FRAUDULENT INTENT AND DAMAGES TO THE CLASS

    97.    Defendants' motive in conducting the Enterprise described herein with respect to the pattern and practice of affirmative fraud and the ongoing concealment of wrongdoing from 2004 to the present, was to deceive the Illinois Supreme Court into believing that State Farm's support of Karmeier's campaign was minimal. The scheme was designed and implemented for the purpose of recruiting a candidate, financing that candidate, electing that candidate and effectively concealing its support for the candidate. State Farm's efforts to escape liability to pay the $1.05 billion judgment rested on the continued success of every aspect of this scheme.

      **Answer:**    **Denied.**

    98.    The scheme was designed to achieve, and did achieve, its intended result: approximately 4.7 million State Farm policyholders suffered damage to their business and property, seized of the rightful damages awarded to them by the *Avery Action* judgment.

      **Answer:**    **Denied.**

## XI.    USE OF THE MAILS IN FURTHERANCE OF THE SCHEME TO DEFRAUD

    **State Farm's 2005 and 2011 Misrepresentations and Misleading Statements**

**via the United States Mail to the Illinois Supreme Court and Plaintiffs'
Counsel to Defraud Plaintiffs and the Class Out of the $1.05 Billion
Judgment.**

99.     State Farm used the U.S. mail to create, execute and manage the second

phase of the fraudulent scheme: concealing the true extent of its support of Karmeier

from the Illinois Supreme Court. Specifically, State Farm, in 2005 and 2011, mailed

documents to that Court for filing, serving them upon Plaintiffs' counsel, containing lies,

misleading statements and material omissions representing that its support of Karmeier

was minimal and that it exerted no control over Karmeier's candidacy, his campaign or

his fundraising.

> **Answer:**     **Denied.**

**A.     State Farm's January 31, 2005 Mailing and Court-Filing**

100.     On January 31, 2005, State Farm made a court-filing opposing Plaintiffs'

motion for recusal which grossly understated its "tremendous" support of Karmeier's

campaign. *See* State Farm's Opposition to Plaintiffs-Appellees' Conditional Motion for

Non-Participation, at pp. 10-18. This brief was mailed to the Court from Edwardsville

and served via U.S. mail on Plaintiffs' counsel in several states, including Illinois,

Louisiana, Mississippi and Tennessee.

> **Answer:**     **Denied.**

101.     In the January 31, 2005 mailing and filing, State Farm falsely represented

its support of Karmeier as consisting of "quite modest contributions" and characterized as

"incorrect and meritless" Plaintiffs' claim that State Farm had funneled $350,000 to and

peddled its enormous political influence to Karmeier's benefit. *See* State Farm's

Opposition, at pp. 12-13. State Farm flatly denied "engineering contributions" to

Karmeier's campaign "for the purpose of impacting the outcome of this case" (*see* State Farm's Opposition, at p. 11) and downplayed the charge that it was responsible for $350,000 in direct contributions to Karmeier's campaign by suggesting that Plaintiffs' counsel had presented "no evidence whatsoever to back up" their claim that those contributions were made by State Farm "front groups." *See* State Farm's Opposition, at p. 11. State Farm also failed to inform the Court that its employee, Shepherd, was a member of the ICJL Executive Committee which recruited and vetted Karmeier, and, through Murnane, it had organized, funded and directed Karmeier's campaign.

       **Answer:**      **Denied.**

     102.    In its January 31, 2005 mailing and filing, State Farm falsely denied that Murnane ran all phases of Karmeier's campaign. Not only did State Farm deny Murnane's involvement in Karmeier's campaign, but it also declared "Mr. Murnane . . . was not Karmeier's campaign manager or campaign finance chairman and was not employed by Karmeier's campaign . . . ." *See* State Farm's Opposition, at pp. 15-16.

       **Answer:**      **Denied.**

       **B.**    **State Farm's September 19, 2011 Mailing and Court-Filing**

     103.    Plaintiffs asked the Illinois Supreme Court to recall the mandate of and vacate the August 18, 2005 judgment on September 9, 2011. Facing serious and unprecedented charges of unscrupulous conduct and that it had perpetrated a fraud on that Court in 2005, State Farm responded on September 19, 2011 in a 38-page, 75-paragraph brief mailed to Plaintiff's counsel.

       **Answer:**      **Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 103 and therefore denies the same.**

104.    In its brief, State Farm again denied Murnane's true role in Karmeier's campaign, *see* State Farm's Response, at ¶ 27 ("Murnane was not Karmeier's campaign manager . . . ."), and failed to produce evidence to counter Murnane's statement that "I'm running this campaign."

**Answer:       Defendant Shepherd lacks sufficient information to admit or deny the allegations of paragraph 104 and therefore denies the same.**

105.    For the first time, however, State Farm conceded that Shepherd was a charter member of the Executive Committee, thus unveiling the missing connecting State Farm to the ICJL, to JUSTPAC, to Murnane, to the discarded emails, and finally, to Karmeier's campaign.

**Answer:       Denied.**

106.    Shepherd's position explains Murnane's role in Karmeier's campaign, how State Farm was able to use the ICJL and JUSTPAC as vehicles to raise nearly $1.2 million and funnel it to Citizens for Karmeier, and why the Executive Committee supported Karmeier's candidacy from "Day One" and gave him its "official endorsement," signaling other ICJL members that Karmeier was State Farm's choice.

**Answer:       Denied.**

107.    Not only did State Farm fail to utter a single word about Shepherd's position on the Executive Committee until September 19, 2011, it also failed to explain why it did not do so.

**Answer:       Denied.**

**XII.   CLAIMS FOR RELIEF**

     **A.       COUNT ONE: VIOLATION OF 18 U.S.C. §1962(c)**

108.    Plaintiffs incorporate by reference all preceding paragraphs.

**Answer:        Defendant Shepherd incorporates by reference his Answers to all preceding paragraphs.**

109.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by . . . any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

**Answer:        Defendant Shepherd states that paragraph 110 states a legal conclusion for which no answer is required.  To the extent an answers is deemed necessary, Defendant Shepherd denies that paragraph 109 is a complete or accurate statement of the law.**

110.    Defendants and their co-conspirators, as identified herein, are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

**Answer:        Denied.**

111.    The Enterprise was engaged in, and the activities of the Enterprise affect, interstate commerce, as Class members in forty-eight (48) states were the ultimate beneficiaries of and claimants to the property targeted by Defendants: the $1.05 billion judgment in the *Avery Action*. Furthermore, a substantial part of the acts described herein, including the predicate acts of mailing and acts of various Enterprise participants, affected interstate commerce.

**Answer:        Denied.**

**THE ENTERPRISE**

40

112.    The association-in-fact Enterprise consists of Defendants State Farm, Shepherd, Murnane and Citizens for Karmeier, along with the ICJL, JUSTPAC, the US Chamber, and their officers, employees, and agents, among others, as identified in Section IV of this Complaint. State Farm created, controlled and conducted the Enterprise to develop and effectuate every aspect of its scheme, as alleged above. State Farm created and/or used this association-in-fact Enterprise – an ongoing organization functioning as a continuing unit – as a separate entity and tool to effectuate the pattern of racketeering activity that damaged the Class.

**Answer:      Denied.**

113.    State Farm, acting through Shepherd and Murnane, exerted ongoing and continuous control over the Enterprise, and participated in the operation or management of the affairs of the Enterprise, through the following actions:

    a.    asserting direct control over false, deceptive, and misleading information disseminated to the Illinois Supreme Court regarding its support of Karmeier;

    b.    asserting direct control over the creation and operation of the elaborate cover-up scheme used to conceal its support of Karmeier from the Illinois Supreme Court;

    c.    placing employees and/or agents in positions of authority and control in the Enterprise; and

    d.    mailing documents containing misrepresentations and omissions to the Illinois Supreme Court on January 31, 2005 and September 19, 2011.

**Answer:      Defendant Shepherd denies all allegations, including all subparagraphs, of paragraph 113.**

114.    From its inception, the Enterprise had a clear decision-making hierarchy or structure, with State Farm, acting through Shepherd and Murnane, positioned at the

top. State Farm paid Shepherd, not simply as an employee, but rather as a co-conspirator, intent on helping the Enterprise succeed in electing Karmeier to the Illinois Supreme Court and concealing, by misrepresentations and omissions, its extraordinary support of Karmeier's campaign.

**Answer:      Denied.**

115.    Though State Farm, through Shepherd and Murnane, exercised and continues to exercise maximal control of the Enterprise, all of the Enterprise's members are distinct from the Enterprise and its activity and each exercised and continues to exercise control over various functions of the Enterprise.

**Answer:      Denied.**

116.    The persons and entities comprising the Enterprise have associated together for the common purpose of allowing State Farm to evade the $1.05 billion judgment, plus post-judgment interest since October 1999 entered by the Appellate Court and defrauding Plaintiffs and the Class out of those funds.

**Answer:      Denied.**

117.    The contribution network developed by State Farm, through Shepherd and Murnane, to advocate the election of Karmeier (*i.e.*, the first phase of State Farm's scheme to defraud the Plaintiffs and Class) and to conceal the breadth of State Farm's support of Karmeier (the second phase of the scheme to defraud the Plaintiffs and Class) was and is the passive instrument of Defendants' racketeering activity, and together, constitutes an alternative "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

**Answer:      Denied.**

## PATTERN OF RACKETEERING

118.    This Complaint details the ongoing pattern of racketeering based on facts that are known to Plaintiffs and their counsel. It is filed without the benefit of discovery, which will likely uncover many more predicate acts and further demonstrate the breadth and scope of the Enterprise's racketeering.

**Answer:        Denied.**

119.    The Enterprise - with State Farm at the hub, acting through Shepherd and Murnane - engaged in a pattern of racketeering activity. From approximately November 2003 at least through September 19, 2011, Defendants and the Enterprise, as well as others known or unknown, being persons employed by and associated with State Farm, the ICJL, JUSTPAC, Citizens for Karmeier, the US Chamber, and others identified herein, engaged in activities which affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts, as set forth herein.

**Answer:        Denied.**

120.    The foregoing pattern of racketeering activity is distinct from the Enterprise itself, which does not solely engage in the above-described acts.

**Answer:        Denied.**

121.    Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes predicate acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1346 (deprivation of honest services through bribes and kickbacks) through the aforementioned

actions.

> **Answer:** **Denied.**

122.    In implementing the fraudulent scheme, State Farm was aware that the Illinois Supreme Court depended on the honesty of State Farm to represent truthfully the facts of its support of Karmeier.

> **Answer:** **Denied.**

123.    As detailed above, the fraudulent scheme consisted of, inter alia: using mail fraud to enable State Farm (a) to obtain, exert, and deliberately misrepresent its control over and extraordinary financial support of Karmeier's campaign; and (b) suppress and conceal the level of such control and support from the Illinois Supreme Court.

> **Answer:** **Denied.**

124.    The unlawful predicate acts of racketeering activity committed by Defendants had a common purpose, were related and had continuity. From its inception, Defendants' scheme depended upon concealing the breadth of State Farm's support of Karmeier from the Illinois Supreme Court. Without accomplishing that critical final component of the scheme, the scheme was doomed to fail in its purpose, as State Farm needed the Karmeier vote in order to gain reversal of the $1.05 billion judgment.

> **Answer:** **Denied.**

125.    The Enterprise used the mail to create, execute and manage their scheme, acting in violation of 18 U.S.C. § 1341. By misrepresenting State Farm's support of Karmeier's campaign to the Illinois Supreme Court via the U.S. mail, the Enterprise perpetrated these unlawful predicate acts.

**Answer:**      **Denied.**

126.    The predicate acts committed by the Enterprise were and are similar, continuous, and related. State Farm's support of Karmeier was "extraordinary" and "tremendous," rising to as much as $4 million. Nevertheless, State Farm actively concealed from the Illinois Supreme Court the true facts of its support. This consistent message - denying the breadth of its true involvement in Karmeier's campaign - illustrates how the predicate acts of mail fraud were similar, continuous, and related.

**Answer:**      **Denied.**

127.    The scheme was calculated to ensure that Plaintiffs and the Class would not recover any of the $1.05 billion judgment entered in their favor. The targets of the Enterprise and the ultimate victims of State Farm's scheme and predicate acts of mail fraud number approximately 4.7 million.

**Answer:**      **Denied.**

128.    Each of the fraudulent mailings constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations, occurring over several years, are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

**Answer:**      **Denied.**

129.    Each activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

**Answer:**      **Denied.**

130.    All predicate acts committed by Defendants and the Enterprise are related and were committed with a common scheme in mind: <u>to support and elect Karmeier to</u>

the Illinois Supreme Court and conceal that support to insure Karmeier participated in the *Avery* decision. The final part of the scheme was to use the U.S. mail to deliver court-filings to the Illinois Supreme Court and Plaintiffs' counsel on January 31, 2005 and September 19, 2011 in a continuing effort to conceal material facts related to State Farm's support for Karmeier, in violation of 18 U.S.C. § 1341.

**Answer:      Denied.**

131.    Defendants' conduct of the Enterprise was designed to, and succeeded in, defrauding the Illinois Supreme Court and in ultimately depriving Plaintiffs and the Class of the individual and aggregate benefits of the $1.05 billion judgment awarded to them in the *Avery Action*, and enabling State Farm to evade its obligations to the Class.

**Answer:      Denied.**

**B.      COUNT TWO: VIOLATION OF 18 U.S.C. §1962(d) BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(c)**

132.    Plaintiffs incorporate by reference all preceding paragraphs.

**Answer:      Defendant Shepherd incorporates by reference his Answers to all preceding paragraphs.**

133.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

**Answer:      Defendant Shepherd states that paragraph 133 states a legal conclusion for which no answer is required.  To the extent an answer is deemed necessary, Defendant Shepherd denies that paragraph 133 is a complete or accurate statement of the law.**

134.    Defendants violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in,

46

directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprise described previously through a pattern of racketeering activity. Defendants, co-conspirators and Enterprise participants agreed to join the conspiracy, agreed to commit and did commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

>    **Answer:**    **Denied.**

135.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and the Class of money.

>    **Answer:**    **Denied.**

136.    The nature of the above-described acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that Defendant, co-conspirators and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

>    **Answer:**    **Denied.**

137.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business or property, as set forth more fully above.

>    **Answer:**    **Defendant Shepherd denies all allegations of paragraph 137, including all allegations of proximate cause and that Plaintiffs were injured to the**

extent claimed or any extent.

Defendant Shepherd further denies that he is liable to Plaintiffs in any way, either in law or in equity and any paragraph contained in this Complaint not expressly admitted is denied.

## <u>ADDITIONAL DEFENSES</u>

### I.   PLAINTIFFS' CLAIMS ARE BARRED BY THE *ROOKER-FELDMAN* DOCTRINE.

1.      The *Rooker-Feldman* doctrine provides that federal district courts do not possess subject matter jurisdiction to review state courts' final civil judgments, such as the judgment of the Illinois Supreme Court at issue here. Rather, the United States Supreme Court is the only federal court that may sit in review of a state court's judgment.

2.      Plaintiffs' claims are "inextricably intertwined" with the Illinois Supreme Court judgment in *Avery* because Plaintiffs' supposed injury was caused by the Illinois Supreme Court judgment in *Avery* setting aside the judgment.

3.      Plaintiffs' entire cause of action is based on various allegedly fraudulent representations to the Illinois courts for the alleged purpose of evading the judgment entered by the Illinois appellate court in *Avery*.

4.      The injuries that Plaintiffs claim in this case do not arise from an independent wrong committed against Plaintiffs prior to the *Avery* action.  The injures that Plaintiffs allege arise directly from the purported fraud on the *Avery* court and their subsequent deprivation of the *Avery* judgment overturned by the Illinois Supreme Court.

5.      Plaintiffs' RICO claims in this case cannot be resolved without this Court determining that the Illinois Supreme Court erred in overturning the judgment at issue *Avery*.

6.      Plaintiffs had a reasonable opportunity to raise the issue before the Illinois Supreme Court.

7.      Plaintiffs litigated their claims extensively both before and after the Illinois Supreme Court's decision in *Avery*, in their petition for certiorari to the United States Supreme Court, and in their 2011 Petition to the Illinois Supreme Court.

8.      Therefore, Plaintiffs' claims are barred by the R*ooker-Feldman* doctrine.

## II.    COLLATERAL ESTOPPEL

9.      Plaintiffs' claims are barred by the doctrine of collateral estoppel.

10.     The issue of the propriety of Justice Karmeier's participation in *Avery* and the legitimacy of the judgment in that case were finally and conclusively litigated and adjudicated by the Illinois Supreme Court.

11.     The issue presented in this action, whether *Avery* was improperly reversed based on Justice Karmeier's participation and State Farm's alleged misrepresentations, was raised repeatedly by Plaintiffs and was actually and necessarily decided by the Illinois Supreme Court.

12.     The Illinois Supreme Court issued a final judgment on the merits, reversing the $1.05 billion judgment against State Farm, and rejected repeated challenges to Justice Karmeier's participation in the judgment.

13.     The United States Supreme Court then denied Plaintiffs' Petition for Certiorari, which again challenged Justice Karmeier's participation in *Avery*.

14.     The Plaintiffs against whom collateral estoppel is asserted were named Plaintiffs and class members in *Avery*.

15.     Plaintiffs had a full and fair opportunity to litigate their claims regarding

49

Justice Karmeier's participation in *Avery* in the Illinois Supreme Court.

16.     Fairness considerations support issue preclusion to prevent Plaintiffs from relitigating essentially the same issue that has been heard and decided by the Illinois Supreme Court multiple times.

17.     Therefore, Plaintiffs' claims are barred by the doctrine of collateral estoppel.

## III.    PLAINTIFFS' CLAIMS ARE TIME-BARRED.

18.     Plaintiffs' RICO claims are time-barred under RICO's four-year statute of limitations.

19.     Plaintiffs' alleged claims accrued in 2005 with the Illinois Supreme Court's decision in *Avery*, or at the latest, in 2006 with the United States Supreme Court's denial of certiorari, and the limitations period expired in 2009 or 2010, well before Plaintiffs filed their Complaint on May 29, 2012.

20.     Plaintiffs allege that they sustained an injury from Defendants' RICO violations in the form of the reversal of the $1.05 billion judgment in favor of the *Avery* class.  That purported injury occurred on August 18, 2005 with the Illinois Supreme Court's decision, *see id.*, or at the latest on March 6, 2006, when Plaintiffs' petition for certiorari, which was also based upon Justice Karmeier's participation in *Avery*, was denied.

## IV.    PLAINTIFFS HAVE FILED TO STATE A CLAIM UNDER RICO.

### A.  Plaintiffs have not adequately alleged causation.

21.     Plaintiffs' RICO claims fail for lack of standing because they have not adequately alleged causation.

22.    Plaintiffs' claim – that Defendants, through improper campaign contributions and other conduct, engineered the election of Justice Karmeier to the Illinois Supreme Court, that his participation in *Avery* resulted in reversal of the $1.05 billion judgment, and that State Farm covered up its support of Justice Karmeier's campaign in various court filings – involves "multiple steps" that "separate the alleged wrongful conduct . . . and the alleged injuries."

23.    In addition to the uncertainty inherent in the outcome of the election, it was extremely unlikely that the justice elected in November 2004 would participate in the *Avery* decision because *Avery* had been fully briefed and argued before the Illinois Supreme Court in May 2003, a year and a half before Justice Karmeier's election.

24.    Furthermore, the Illinois Supreme Court in *Avery* was unanimous in holding that there could be no nationwide contract and ICFA classes, and thus the Court was also unanimous in vacating the $1.05 billion judgment on that ground.

25.    Justice Karmeier did not cast the deciding vote as to those holdings, and his participation did not cause Plaintiffs' injury.

26.    Plaintiffs' provide no plausible reason to suppose that Justice Karmeier, as a newly elected justice, had significant influence on the decision, and whether the other justices might have voted differently if Justice Karmeier had not participated is a matter of sheer speculation.

27.    Plaintiffs also fail to allege facts supporting their contention that the purported contributions to Justice Karmeier's campaign influenced his vote on the *Avery* case, as would be necessary to link Plaintiffs' purported injury to State Farm's conduct.

   **B.    Plaintiffs have failed to establish a pattern of racketeering activity.**

28.     Plaintiffs' allegations are insufficient to establish a "pattern of racketeering activity" as required for a violation of section 1962(c).

29.     Plaintiffs' allegations of a "pattern" are based upon a single purported "fraudulent scheme" to "obtain, exert, and deliberately misrepresent its control over and extraordinary financial support of Karmeier's campaign" and to "suppress and conceal the level of such control and support from the Illinois Supreme Court," in order to obtain "the Karmeier vote in order to gain reversal of the $1.05 billion judgment."

30.     Plaintiffs do not allege a threat of continuing future racketeering activity and do not allege any facts that would show either closed or open-ended continuity.

31.     Plaintiffs' conclusory allegation of continuity rests solely on State Farm's purported "continuing effort to conceal material facts related to State Farm's support for Karmeier" in its filings to the Illinois Supreme Court.

32.     While Plaintiffs allege an association in fact "associated together for the common purpose of allowing State Farm to evade the $1.05 billion judgment," Plaintiffs have not provided a plausible factual basis for that assertion.

33.     If anything, to the extent the purported members of the association had a common purpose, that purpose was simply to support Justice Karmeier's election.

34.     Plaintiffs also fail to allege the necessary relationships among the purported members of the association-in-fact enterprise.  Although Plaintiffs allege that State Farm was the "hub" that controlled the enterprise they do not allege a "rim" that would tie the participants together.

**C.     Plaintiffs' Allegations of an Enterprise Are Deficient as a Matter of Law.**

35.     Plaintiffs' allegations "do not indicate how the different actors are

associated and do not suggest a group of persons acting together for a common purpose or course of conduct.

36.    The structural feature of longevity is likewise missing.

37.    Plaintiffs do not allege any facts that showing that the purported enterprise continued beyond Justice Karmeier's election.

38.    Plaintiffs provide no factual allegations as to support the alleged "contribution network," purportedly developed by State Farm, through Shepherd and Murnane, and do not allege the relationships among the contributors who presumably are part of the network, or how the network constitutes a continuing unit that functions with a common purpose.

**D.    Plaintiffs Have Failed to Allege a Nexus Between the Purported Racketeering Activity and the Affairs of the Enterprise.**

39.    Plaintiffs have not alleged facts showing that Mr. Shepherd personally committed any of the alleged predicate acts, as Shepherd was not a party to the *Avery* case, and Plaintiffs have not alleged any facts showing how Shepherd's position or relationship with State Farm facilitated the representations made by State Farm during the *Avery* case.

40.    Plaintiffs allege only that Shepherd was employed by State Farm while also participating in the Illinois Civil Justice League as a member of its Executive Committee.    The First Amendment protects Mr. Shepherd's right to participate in political speech, regardless of his employer.

41.    All of the actions Plaintiffs allege Mr. Shepherd undertook in participating the Illinois Civil Justice League, including purportedly recruiting, financing, and electing Justice Karmeier, are fundamentally protected political speech.

**E.** **Plaintiffs' Allegations of Predicate Acts Are Deficient as a Matter of Law.**

42.     Plaintiffs' allegations that the predicate acts of serving litigation documents by mail cannot constitute mail fraud as a predicate act under RICO pursuant to the *Noerr-Pennington* doctrine, the judicial deliberation privilege, and any other applicable litigation privilege.

## V.     ADDITIONAL DEFENSES

43.     Injury, if any, allegedly suffered by Plaintiffs and alleged members of the putative class did not result from and was not proximately caused by any wrongful conduct on the part of Defendant Shepherd.

44.     To the extent that Plaintiffs and the alleged members of the putative class have sustained any legally cognizable damages as a result of the matters alleged in the Complaint, which Defendant Shepherd specifically denies, they have failed to mitigate those damages.

45.     The claims of Plaintiffs and alleged members of the putative class are barred by the doctrines of laches, waiver, estoppel, and/or unclean hands.

46.     The claims of Plaintiffs and the alleged members of the putative class are barred by applicable statutes of limitation or other prescriptive periods, whether general or specific, by contract or statute.

47.     This action may not be maintained as a class action because (a) Plaintiffs are not adequate class representatives and cannot fairly and adequately protect the interests of the purported class; (b) Plaintiffs' claims and the defenses applicable to those claims are not typical of those of the alleged members of the putative class; (c) there are no material questions common to the asserted class, and even if there were, individual

54

issues of law or fact predominate over any common questions; (d) a class action is not a superior method for the fair and efficient adjudication of the controversy; and (e) other requirements of maintaining this action as a class action have not been met, e.g., a properly-defined and readily ascertainable proposed class.  Further, any adjudication of Plaintiffs' claims and those of the alleged members of the putative class through purported generalized class-wide proof would violate Defendant Shepherd's rights to Due Process and Trial by Jury under the United States Constitution and applicable state constitutions.

48.     This action may not be maintained as a class action because principles of collateral estoppel and comity bar Plaintiffs' attempt to obtain certification of the same class for which certification was rejected in *Avery*.

49.     The claims of Plaintiffs and the alleged members of the putative class are barred by the First Amendment to the United States Constitution, including without limitation the freedom of political speech and the freedom of association as articulated in *Citizens United v. Federal Election Commission,* and under the *Noerr-Pennington* doctrine, and by similar provisions of any applicable state constitutions.  Indeed, the pendency of this lawsuit chills the First Amendment rights of Defendant Shepherd and others.

50.     To the extent Plaintiffs' claims for damages are based upon a claimed entitlement to punitive damages, such claims are unconstitutional insofar as they violate the due process protections afforded by the United States Constitution, the excessive fines clause of the Eighth Amendment of the United States Constitution, the Commerce Clause of the United States Constitution, the Full Faith and Credit Clause of the United

States Constitution, and similar provisions of any applicable state constitution.  Any law, statute, or other authority purporting to permit the recovery of punitive damages in this case is unconstitutional, facially and as applied, to the extent that, without limitation, it: (1) lacks constitutionally sufficient standards to guide and restrain the jury's discretion in determining whether to award punitive damages and/or the amount, if any; (2) is void for vagueness in that it failed to provide adequate advance notice as to what conduct would result in punitive damages; (3) unconstitutionally may permit recovery of punitive damages based on out-of-state conduct, conduct that complied with applicable law, or conduct that was not directed, or did not proximately cause harm, to Plaintiffs; (4) unconstitutionally may permit recovery of punitive damages in an amount that is not both reasonable and proportionate to the amount of harm, if any, to Plaintiffs and to the amount of compensatory damages, if any; (5) unconstitutionally may permit a jury to award punitive damages for harm to nonparties; (6) unconstitutionally may permit jury consideration of net worth or other financial information relating to Defendant Shepherd; (7) lacks constitutionally sufficient standards to be applied by the trial court in post-verdict review of any punitive damages award; (8) lacks constitutionally sufficient standards for appellate review of punitive damages awards; and (9) otherwise fails to satisfy United States Supreme Court precedent, including, without limitation, *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991), *TXO Production Corp. v. Alliance Resources, Inc.*, 509 U.S. 443 (1993), *BMW of North America, Inc. v. Gore*, 517 U.S. 599 (1996), *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), and *Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007).

WHEREFORE, William G. Shepherd, having answered Plaintiffs' Complaint, paragraph by paragraph, having denied each and every allegation that might impute liability, and having asserted certain defenses, and reserving the right to amend his answers or assert additional defenses as warranted, respectfully requests that the Court dismiss the Complaint filed against him and enter judgment in his favor, together with costs and fees.

Respectfully submitted,

/s/ Russell K. Scott
Russell K. Scott, #02533642
Andrew J. Tessman, #6297763
Greensfelder, Hemker & Gale, P.C.
12 Wolf Creek Street, Suite 100
Belleville, IL 62226
Phone:  618-257-7308
Fax:  618-257-7353
rks@greensfelder.com
atessman@greensfelder.com

*Attorneys for Defendant*
*William G. Shepherd*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of Defendant William G. Shepherd's Answer to

Plaintiffs' Class Action Complaint was served upon the following counsel on

November 19, 2014, via the Court's CM/ECF system:

- **A. Courtney Cox**
  ccox@sandbergphoenix.com, tvogt@sandbergphoenix.com
- **Andrew J. Tessman**
  atessman@greensfelder.com
- **Anthony L. Martin**
  amartin@sandbergphoenix.com, bwunderlich@sandbergphoenix.com
- **Brent W. Landau**
  blandau@hausfeldllp.com
- **Charles F. Barrett**
  charles@cfbfirm.com, dawn@cfbfirm.com, ddaugherty@ballandscott.com
- **Colin H. Dunn**
  chd@cliffordlaw.com, jmg@cliffordlaw.com
- **David Alan Eisenberg**
  deisenberg@muchshelist.com, daeisenberg@gmail.com
- **David Gavin Jorgensen**
  djorgensen@sidley.com, efilingnotice@sidley.com
- **David T. Brown**
  dbrown@muchshelist.com, tcronin@muchshelist.com
- **Elizabeth J. Cabraser**
  ecabraser@lchb.com
- **George S. Bellas**
  george@bellas-wachowski.com, melissa@bellas-wachowski.com
- **Harnaik Kahlon**
  nkahlon@schiffhardin.com, nickkahlon@gmail.com
- **J. Timothy Eaton**
  teaton@shefskylaw.com
- **J. William Lucco**
  blucco@lbtdlaw.com, akoester@lbtdlaw.com
- **James P. Gaughan**
  jgaughan@schiffhardin.com,                    edocket@schiffhardin.com,
  sstojanovic@schiffhardin.com
- **Jessica A. Perez**
  jperez@pbclawfirm.com
- **John W. Barrett**
  dbarrett@barrettlawgroup.com

- **Joseph A. Cancila , Jr**
  jcancila@schiffhardin.com
- **Joseph R. Brown , Jr**
  jbrown@lbtdlaw.com, akoester@lbtdlaw.com, lscarborough@lbtdlaw.com
- **Karim Basaria**
  kbasaria@sidley.com, efilingnotice@sidley.com
- **Kevin Reid Budner**
  kbudner@lchb.com, dgray@lchb.com
- **Kristofer S. Riddle**
  KSR@cliffordlaw.com, jmreasor@cliffordlaw.com
- **Lance K. Baker**
  lkb@gordonball.com
- **Michael S. Krzak**
  msk@cliffordlaw.com, jmg@cliffordlaw.com
- **Nicholas R. Rockforte**
  nrockforte@pbclawfirm.com
- **Patrick D. Cloud**
  pcloud@heylroyster.com, edwecf@heylroyster.com
- **Patrick W. Pendley**
  pwpendley@pbclawfirm.com
- **Richard H Taylor**
  richardtaylor@taylormartino.com, penny@taylormartino.com
- **Richard J. O'Brien**
  robrien@sidley.com, efilingnotice@sidley.com
- **Richard M Heimann**
  rheimann@lchb.com
- **Richard R. Barrett**
  rrb@rrblawfirm.net, rrblawfirm@rocketmail.com
- **Robert A. Clifford**
  rac@cliffordlaw.com,jg@cliffordlaw.com,                    jmreasor@cliffordlaw.com,
  ksr@cliffordlaw.com
- **Robert J Nelson**
  rnelson@lchb.com
- **Robert P Sheridan**
  rps@cliffordlaw.com, jg@cliffordlaw.com
- **Ronald S. Safer**
  rsafer@schiffhardin.com
- **Russell K. Scott**
  rks@greensfelder.com, cc@greensfelder.com
- **Shannon M McNulty**
  smm@cliffordlaw.com, smarquez@cliffordlaw.com
- **Sidney W. Jackson , III**
  sid@jacksonfosterlaw.com, keri@jacksonfosterlaw.com
- **Steven A. Martino**
  stevemartino@taylormartino.com, ctrott@taylormartino.com

- **Steven P Blonder**
  sblonder@muchshelist.com, tjaskiewicz@muchshelist.com
- **Thomas P. Thrash**
  tomthrash@sbcglobal.net
- **W Lloyd Copeland**
  lloyd@taylormartino.com, ctrott@taylormartino.com
- **W. Gordon Ball**
  gball@gordonball.com, ddaugherty@gordonball.com, tbenson@gordonball.com

Dated:  November 19, 2014

/s/ Russell K. Scott

*Attorney   for   Defendant   William   G. Shepherd*