IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARK HALE, TODD SHADLE, LAURIE LOGER, and MARK COVINGTON, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.  12-cv-00660 DRH-SCW |
| v. | ) ) | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, EDWARD MURNANE, and WILLIAM G. SHEPHERD, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO APPEAL
FROM PORTION OF MAGISTRATE JUDGE'S NON-DISPOSITIVE
MEMORANDUM AND ORDER OF JANUARY 12, 2015**

**PRELIMINARY STATEMENT**

To adjudicate this appeal, it is necessary to recall why Plaintiffs filed this RICO action.

Plaintiffs allege that while the appeal from the $1.05 billion judgment against State Farm in

*Avery v. State Farm Mut. Auto. Ins. Co.* was pending in the Illinois Supreme Court, Defendants

conspired to recruit Justice Karmeier to run for that Court's Fifth District seat, and helped

orchestrate and finance his judicial campaign, all without disclosing State Farm's involvement to

the Illinois Supreme Court or the *Avery* class in briefs filed by State Farm in 2005 or 2011. On

March 28, 2013, this Court issued a 43-page Memorandum and Order holding that Plaintiffs'

allegations – including State Farm's motive for and involvement in the scheme (namely evading

the judgment), its partnerships with business and political associates to carry out the scheme, and

its financial support of Justice Karmeier – state a plausible RICO claim, causation, and injury,

and directed discovery to proceed. (Doc. 67 *passim*.) That ruling has withstood a motion for

reconsideration and Seventh Circuit mandamus review.

In discovery, Plaintiffs have learned that Robert Shultz, a leading member of State Farm's *Avery* defense team, actively participated in the Illinois State Bar Association ("ISBA") Judicial Evaluation Committee's ("Committee") evaluations of Justices Karmeier and Maag in 2004, at the very time *Avery* was pending in the Illinois Supreme Court and Mr. Shultz was representing State Farm there. Justice Karmeier received a "highly qualified" evaluation, while Justice Maag received a "qualified" evaluation. Those evaluations played an important part in Justice Karmeier's campaign for the Fifth District seat. Mr. Shultz accepted his appointment to the Committee in 2003, while the *Avery* case was pending before the Illinois Supreme Court. He did not recuse himself from evaluating Justices Karmeier or Maag, though he agreed to do so whenever he had reason to believe that he could not objectively fulfill his responsibility to evaluate the judicial candidate. State Farm did not disclose Mr. Shultz's participation in the ISBA's vetting process to the Illinois Supreme Court before it adjudicated *Avery*.

This is a civil conspiracy case. Plaintiffs allege that State Farm's January 31, 2005 brief opposing the *Avery* plaintiffs' motion for conditional non-participation and State Farm's September 19, 2011 response to the *Avery* plaintiffs' petition to recall the mandate and vacate the Illinois Supreme Court's August 18, 2005 opinion are the predicate acts of mail fraud supporting their RICO action in this Court. The signature block of State Farm's 2005 brief contains Shultz's name, and he signed State Farm's 2011 brief. Civil conspiracy is usually proved with circumstantial evidence, from which an overall fraudulent enterprise may be inferred. Plaintiffs contend that Shultz's participation in the evaluations of Justices Karmeier and Maag is further evidence of an overall scheme to defraud the *Avery* plaintiffs and the Illinois Supreme Court. That the evidence is circumstantial does not reduce its importance as proof of Defendants' fraudulent enterprise. Coupled with other evidence, a trier of fact can infer that there was and is a

conspiracy to defraud the *Avery* plaintiffs and the Illinois Supreme Court. Plaintiffs therefore appeal that portion of the Memorandum and Order of January 12, 2015 ("January 12 Order") quashing Plaintiffs' subpoena for Shultz's deposition. (Doc. 326.) Plaintiffs suggest that the Magistrate Judge erred in two ways:

*First*, the Magistrate Judge applied Illinois, instead of federal, privilege law. In this case, federal law governs because federal policies are at issue – including the policy that a fair hearing in an impartial forum with an impartial judge is a basic requirement of due process. As such, federal privilege law should have applied. That law supports Plaintiffs' deposition of Mr. Shultz regarding his participation in the Committee's evaluations of Justices Karmeier and Maag.

*Second*, the Magistrate Judge wrongly applied the qualified judicial evaluation privilege, which protects the integrity of the judicial evaluation process and ensures reliable public judicial evaluations. When Mr. Shultz participated in the Committee's evaluations of Justices Karmeier and Maag while the *Avery* case was pending before the Supreme Court, that goal – critical to the integrity of the process – was compromised. Mr. Shultz's client, State Farm, had a direct interest in the outcome of the process. Mr. Shultz knew of State Farm's interest, knew of the pending *Avery* appeal in the Supreme Court, was personally representing State Farm in that Court, and presumably knew of State Farm's support for Justice Karmeier. Yet he did not recuse himself or disclose the conflict. That defeated the purpose of the privilege: to encourage reliable and untainted judicial evaluations. Voters relied on those evaluations, which translated into votes and campaign funds for Justice Karmeier. Such omissions thus further the inference of a conspiracy to defraud the *Avery* plaintiffs and the Illinois Supreme Court. Details of Mr. Shultz's participation in the judicial evaluation process are only available from Mr. Shultz, and are relevant and important to Plaintiffs' case.

## STATEMENT OF FACTS

In an opinion authored by Justice Maag, the Illinois Appellate Court largely affirmed a $1.05 billion judgment against State Farm in *Avery v. State Farm*, 321 Ill. App. 3d 269 (5th Dist. 2001). On October 2, 2002, the Illinois Supreme Court granted State Farm's petition for leave to appeal. The appeal was under advisement as of May 2003, but was not decided until August, 2005. From Fall 2003 to November 2004, Justices Karmeier and Maag campaigned for a vacant seat on the Illinois Supreme Court.

On January 31, 2004, the Committee interviewed Justices Karmeier and Maag. (Doc. 301 Ex. E.) On February 6, 2004, the Committee discussed evaluations for those candidates. (*Id.*) Robert Shultz interviewed both candidates and participated in the Committee's evaluation discussions. (*Id.*) Shultz joined the Committee in January 2003, (Doc. 304 ¶ 3), while the *Avery* case was pending in the Supreme Court and before oral argument in the case. Mr. Shultz was "centrally involved in State Farm's defense in *Avery*." (Doc. 302 at 4.) Indeed, Mr. Shultz tried the *Avery* case for State Farm. He was State Farm's counsel on the 2005 and 2011 briefs which are the mail fraud predicates in Plaintiffs' complaint here.

In 2004, Mr. Shultz signed an ISBA Evaluator's Confidentiality Agreement ("Agreement"), acknowledging his participation in the evaluations and interviews of Justices Karmeier and Maag. (Doc. 301-3, at 1-2.) In so doing, Shultz agreed "to recuse myself from participating in any evaluation" or "any interview" in which "I have reason to believe that I cannot objectively fulfill my responsibility to evaluate [or interview] the judicial candidate because, to a reasonable and credible third party there would be a credible and objective appearance of bias or impropriety were I to remain involved in such evaluation [or interview]." (*Id.*) He did not recuse himself from evaluating Justices Karmeier or Maag, despite his prominent

4

role in the pending *Avery* case, and though Justice Karmeier could – and ultimately would –

participate in the adjudication of *Avery* if he won the election.

On February 17, 2004, the ISBA gave Justice Karmeier a "highly qualified" rating, and

Justice Maag a lower "qualified" rating. These ratings became a key fundraising tool for the

Karmeier campaign. Through the Illinois Civil Justice League ("ICJL") and its political action

committee, JUSTPAC, Defendant Edward Murnane featured the ISBA's evaluation to advance

fundraising efforts for the Karmeier campaign. (Doc. 312 Exs. 1-5.) He sent many emails on

February 17, 2004, discussing the ISBA ratings. (*Id.*) Recipients of such communications

included State Farm Chairman Ed Rust and State Farm attorney David L. Hill; Rob Engstrom,

Sean Heather, and Sean McBride of the U.S. Chamber of Commerce; Justice Karmeier; and

State Farm lawyers William Shepherd and William Vainisi. (*Id.*)

The ICJL pursued many of these recipients for funds. (*Id.*) On February 24, 2004, for

example, Murnane circulated an email with the ICJL's "February Update," indicating that "[w]e

have been using this and some other printed materials in our fund-raising efforts." (*Id.* Ex. 6.)

The publication discussed the value of the ISBA evaluations to the Karmeier campaign and to

fundraising efforts:

> The most significant development thus far has been the announcement early this
> week that the Illinois State Bar Association rates Judge Karmeier higher than his
> opponent, Appellate Judge Gordon Maag, a former Madison County trial lawyer.
>
> Because of Maag's 10 years on the Appellate Court, and the fact that the Illinois
> State Bar Association is plaintiff-lawyer dominated, it had been anticipated that
> both Maag and Karmeier would receive "highly qualified" ratings. The surprise
> lower "qualified" rating for Maag is a serious blow to Maag's candidacy.
>
> . . . .
>
> While this evaluation by the Illinois State Bar Association is only one indicator of
> the approval Judge Karmeier has received from his appears [sic], it is a significant
> step because many (probably most in Southern Illinois) rely heavily on the Bar

5

> Association ratings in making their endorsement because they readily
> acknowledge they do not know the judicial candidates as well as they know
> candidates for other offices.
>
> Voters similarly rely on outside guidance: newspaper endorsements, bar
> association ratings and even the Justice 2004 website of the Illinois Civil Justice
> League.
>
> **The bottom line on the ISBA evaluations: they can and should be a
> significant help to Judge Karmeier**.

(*Id.* Ex. 6, at 1.) (Emphasis in the original.) The rest of the February Update focuses on

fundraising. (*Id.* Ex. 6 *passim*.)

Murnane circulated the February Update to 27 other people, stating "I am attaching a

confidential update on the current situation and activities in the Fifth Judicial District of Illinois

and second document describing funding options. Financial support remains a crucial concern."

(*Id.* Exs. 7, 8.) Variations on this theme appeared in later monthly updates. (*Id.* Exs. 11-15.) For

instance, the March Update, sent to State Farm's Chairman, Ed Rust, called the ISBA's

evaluation of Justice Karmeier a "significant[] development in the race." (*Id.* Ex. 9, at 4.) By

letter of February 24, 2004, to State Farm counsel Defendant William Shepherd, Murnane

requested substantial financial support, telling Shepherd that "the Illinois State Bar Association

has rated our candidate, Judge Lloyd Karmeier, higher than Appellate Judge Gordon Maag, the

former Madison County trial lawyer who thinks he is entitled to the seat." (*Id.* Ex. 10.)

(Emphasis in the original.)

When the ISBA confirmed that Mr. Shultz had participated in the Committee's 2004

interviews and evaluations of Justices Karmeier and Maag, Plaintiffs served a subpoena for

deposition on him. (Doc. 302-1.) In its motion to quash the subpoena, State Farm argued that:

- the Committee's evaluation of Justice Karmeier is irrelevant to Plaintiffs' claim;

- Shultz's participation did not compromise the Committee's evaluations;

- even so, details of Shultz's participation are protected by the judicial evaluation privilege; and

- deposing Shultz, State Farm's "lead trial counsel" in *Avery*, would invade attorney-client and work product privileges.

(Doc. 302 at 4-11.) State Farm's motion to quash was not supported by an affidavit.

Plaintiffs answered that the work product and attorney-client privileges would not be violated because Plaintiffs do not seek information about Shultz's legal work in *Avery*. (Doc. 312 at 5.) Plaintiffs only seek to depose Shultz about his participation in the Committee's evaluations of Justices Karmeier and Maag. (*Id.* at 5-6.) In this RICO case, Plaintiffs allege that Defendants conspired to recruit Justice Karmeier for the Supreme Court, and helped orchestrate and finance his campaign through political action committees or third parties they formed or controlled, all while *Avery* was pending before the Court and without disclosing State Farm's involvement to the *Avery* class or the Court. (*Id.* at 2.) The policy thereby implicated is the due process interest of a litigant to a fair hearing in an impartial forum with an impartial judge. (*E.g.*, Doc. 201 at 11-15.) The undisclosed participation on the Committee of a leading member of State Farm's *Avery* defense team to evaluate Justices Karmeier and Maag is relevant to that issue – it is important additional evidence of one way in which State Farm advanced its scheme to put Justice Karmeier on the Court without disclosing its role in his election. (Doc. 302 at 7.) Documents appended to Plaintiffs' response to the motion to quash show that the ICJL (where State Farm had an influential and continuing presence on the Executive Committee and the Board of Directors), through Murnane, used the evaluations to procure money for Justice Karmeier and promote his election to the Court. (*Id.* Exs. 1-16.) All of this advanced Defendants' overall scheme to defraud.

Plaintiffs further noted that the judicial evaluation privilege is a qualified privilege which protects the integrity of the judicial evaluation process and ensures reliable evaluations. (*Id.* at 6-

7

10.) Those were exactly the concerns raised by Mr. Shultz's participation in the Committee's evaluations of Justices Karmeier and Maag while the *Avery* case was pending in the Illinois Supreme Court. (*Id.*) Mr. Shultz's client had a direct interest in the outcome of the process in which he was participating, and presumably Mr. Schultz knew of that interest and the pending *Avery* case in the Supreme Court. (*Id.*) Yet he did not recuse himself or disclose the conflict. (*Id.*) That misled the public and the *Avery* class, defeating the purpose of the judicial evaluation privilege: to encourage reliable and untainted judicial evaluations. (*Id.*)

Plaintiffs also argued that the judicial evaluation privilege should not be applied because the focus of this case is federal law and federal policy. Under *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058 (7th Cir. 1981), the Court need not apply state privilege law when federal law supplies the rule of decision as to a claim.

But the Magistrate Judge held that a "strong policy of comity" required him to enforce Illinois privilege law, and he would not "deny a state law privilege just because this case is based on federal law." (Doc. 326 at 4.) In the January 12 Order, he held that Plaintiffs' right to depose Shultz is barred by the judicial evaluation privilege under *In re Illinois Judicial Inquiry Bd.*, 128 Ill. App. 3d 798 (1st Dist. 1984). (Doc. 326 at 4-5.) The Magistrate Judge held that the "ISBA evaluation process of Justice Karmeier has nothing to do with the allegations set forth in Plaintiffs' Amended Complaint," there was "very close to zero evidence" that Mr. Shultz was a "pawn[] of State Farm," and "the Court has seen no evidence that there was "improper motive, influence, and manipulation of the ISBA judicial evaluation process." (*Id.* at 5-6.) He dismissed Mr. Shultz's participation in the evaluations, holding there was no evidence that he knew "the *Avery* case would even be before the potential victor as the *Avery* case was fully briefed and

argued, and an opinion could have been issued at any time before or after the election." [1] (*Id.* at 7.) He made that finding despite this allegation in Plaintiffs' complaint: "Of course, there was no guarantee for State Farm that the appeal would not be decided *before* the November 2004 election, but the risk – a $2 to $4 million investment for a possible $1.05 billion return – was sufficiently minimal to make it a worthwhile gamble." (Doc. 2 ¶ 11; Doc. 289 ¶ 11.) (Emphasis in the originals.) The Magistrate Judge distinguished case law holding that federal privilege law applies when the case presents a federal question and raises important federal interests, and allowed the motion to quash. (Doc. 326 at 3, 7.) Plaintiffs appeal that order as to Mr. Shultz.

## ARGUMENT

This appeal arises from the Magistrate Judge's resolution of a discovery dispute. This Court can consider timely objections to non-dispositive orders of a magistrate judge, and modify or set aside any part of the order that is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); Local Rule 73.1(a). A ruling is clearly erroneous if "the district court is left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Industries Co., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997). A ruling is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure. *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F. Supp. 2d 70, 74 (N.D.N.Y 2000).

The issue here is whether the Magistrate Judge properly quashed Plaintiffs' subpoena to depose Mr. Shultz. Plaintiffs submit that they should be able to depose Mr. Shultz about his

---

[1]    Notably, had Justice Maag won the election, he could *not* have participated in the Supreme Court's *Avery* deliberations: "It is elementary that no judge may sit in review of a case decided by him. It is not only a matter of avoiding the appearance of impropriety, it is an essential element of the guarantee that those who sit in review have open minds." *Kendler v. Rutledge*, 78 Ill. App. 3d 312, 317 (1st Dist. 1979).

participation in the evaluations of Justices Karmeier and Maag, and the Magistrate Judge erred in denying them that opportunity.

I.    **The Magistrate Judge clearly erred by applying Illinois privilege law over federal privilege law.**

    A.    **This case involves an important federal policy, requiring the application of federal privilege law.**

The Federal Rules of Civil Procedure govern discovery in civil actions brought in federal courts. *Memorial Hospital*, 664 F.2d at 1061. "The standard for discovery under those rules is extremely broad." *Id.* Parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim," which "need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

"The common law – as interpreted by United States courts in light of reason and experience – governs a claim of privilege," except in a civil case where "state law supplies the rule of decision." Fed. R. Evid. 501. "A lawsuit is supposed to be a search for the truth," *Miller v. Time-Warner Communications, Inc.*, No. 97 Civ. 7286(JSM), 1999 WL 739528, at *1 (S.D.N.Y. Sept. 22, 1999), and privilege doctrine is antithetical to that search: "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed for they are in derogation of the search for the truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974). Thus "privileges must be narrowly construed because they block the judicial fact-finding function." *Ryan v. Comm'r of Internal Revenue*, 568 F.2d 531, 542 (7th Cir. 1977). Federal courts decide privilege application on a case-by-case basis, weighing "the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Id.* at 543.

In the January 12 Order, the Magistrate Judge, citing *Memorial Hospital*, held "there is a strong policy of comity which compels courts to recognize state privilege regardless of the fact that a case is based on federal law." (Doc. 326 at 4.) Though Plaintiffs live throughout the country, *(*Doc. 289 ¶ 21), the Magistrate Judge held that Illinois, with its "strong policy in protecting the judicial evaluation process," had a more compelling interest, and "[i]nterference with the judicial evaluation process would make the evaluators of candidates, other lawyers, less likely to offer 'candid and frank evaluations,' and thus would be less beneficial to the public." (*Id.*) (quoting *Illinois Judicial Inquiry Bd.*, 128 Ill. App. 3d at 801.) The Magistrate Judge, however, did not discuss the underlying facts in *Memorial Hospital*. Viewed in that context, *Memorial Hospital* (where the Seventh Circuit affirmed a discovery order declining to apply Illinois privilege law) is far closer to this case than the Magistrate Judge acknowledged. The result here should have mirrored the Seventh Circuit's holding in *Memorial Hospital*.

*Memorial Hospital* arose from a civil antitrust action brought by Dr. Tambone, who alleged that competing doctors on were using their positions on Memorial Hospital's admission committee to deny him staff privileges and destroy his practice. 664 F.2d at 1059-60. Tambone claimed that this constituted restraint of trade and violated the Sherman Act. *Id.* at 1060-61. He served a notice on the Hospital to produce documents regarding doctors who had applied for admission to its medical staff. *Id.* at 1060. Under the Illinois Medical Studies Act, those documents were privileged and confidential. *Id.* A magistrate judge sustained the Hospital's objection to the discovery request, and Tambone appealed. *Id.* The district court held that state law did not apply, and ordered the Hospital to produce the documents under a protective order. *Id.* In a mandamus petition to the Seventh Circuit, the Hospital argued that the district judge had

exceeded his authority by ordering the production in violation of Illinois law, and comity

required the district court to defer to Illinois policy and law. *Id.*

The Seventh Circuit noted that (1) there is an "extremely broad" federal discovery

standard, (2) evidentiary privilege blocks fact-finding and excludes relevant evidence, and (3)

Tambone had alleged a violation of a federal law. *Id.* at 1061. "Because state law does not supply

the rule of decision as to this claim, the district court was not required to apply state law in

determining whether the material sought by Dr. Tambone is privileged. Instead, the question of

whether the privilege asserted by the Hospital should be recognized in this case is 'governed by

the principles of the common law as they may have been interpreted by the courts of the United

States in the light of reason and experience.'" *Id.* (quoting Fed. R. Evid. 501).

The Seventh Circuit observed that the district court could consider Illinois law. A "strong

policy of comity between state and federal sovereignties impels federal courts to recognize state

privileges *where this can be accomplished at no substantial cost to federal substantive and

procedural policy*." *Id.* (emphasis added) (quoting *United States v. King*, 73 F.R.D. 103, 105

(E.D.N.Y. 1976)). Where a state "holds out the expectation of protection to its citizens, they

should not be disappointed by a *mechanical and unnecessary application* of the federal rule." *Id.*

(quoting *Lora v. Bd. of Education*, 74 F.R.D. 565 (E.D.N.Y. 1977)). But the court had to weigh

the policy protected by the Illinois privilege against the trier of fact's "always substantial" need

for full disclosure. *Id.*

The Seventh Circuit held that Tambone needed the Hospital's information. *Id.* at 1062.

He had charged that doctors had conspired to deny him hospital staff privileges and destroy his

practice to limit their competition in the medical marketplace. *Id.* At issue was an important

federal policy: "the strong public interest in open and fair competition which is embodied in the

Sherman Act under which the case arises." *Id.* at 1062. If Tambone proved his case, he would vindicate that policy and his own right to practice medicine in the community. *Id.*

To be sure, the policy protected by the Illinois privilege – assuring confidentiality to promote honest and effective in-hospital peer review committees overseeing medical care and treatment – was substantial. *Id.* But using that privilege to deny discovery to Tambone in his antitrust action would bar relevant and important evidence both to him and the fact finder, and could prevent him from proving his case and vindicating the important federal policy of open and fair competition. *Id.* at 1062-63. "To recognize hospital disciplinary proceedings as privileged, regardless of the purpose for which disclosure is sought, would in effect grant such committees, their members and participants absolute immunity from prosecution for all statements made and actions taken in the context of such proceedings." *Id.* at 1063. "The public's interest in private enforcement of federal antitrust limitation law in this context is simply too strong to permit the exclusion of relevant and possibly crucial evidence by application of the Hospital's privilege." *Id.* The district court had correctly granted the discovery to Tambone, subject to a protective order. The Seventh Circuit denied the mandamus petition. *Id.*

Likewise, Plaintiffs pursue an important federal policy: a litigant's due process right to a fair hearing in an impartial forum with an impartial judge. The Magistrate Judge did not discuss that in the January 12 Order. Plaintiffs allege that Defendants violated their due process rights by conspiring to recruit Justice Karmeier for the Illinois Supreme Court, helping to orchestrate his judicial campaign, and helping to finance his campaign through political action committees or third parties they formed or controlled, while *Avery* was pending in the Supreme Court, and without disclosing State Farm's involvement to the Court or the *Avery* class. The United States

Supreme Court enforced the same policy in *Caperton v. Massey Coal Co.*, 556 U.S. 868, 884

(2009), holding that

> there is a serious risk of actual bias – based on objective and reasonable
> perceptions – when a person with a personal stake in a particular case had a
> *significant and disproportionate influence in placing the judge on the case by
> raising funds or directing the judge's election campaign when the case was
> pending or imminent*. The inquiry centers on the contribution's relative size in
> comparison to the total amount of money contributed to the campaign, the total
> amount spent on the election, and the apparent effect such contribution had on the
> outcome of the election.

(Emphasis added.) Under facts similar to this case, the Court held that it was a due process

violation for a Justice of the West Virginia Supreme Court to rule in a case that was pending

during his judicial campaign, where the appellant in that case had played an important role in

procuring his election. *Id.* at 876, 882. "Due process requires an objective inquiry into whether

the contributor's influence on the election under all circumstances 'would offer a possible

temptation to the average . . . judge  to . . . lead him not to hold the balance nice, clear and true.'"

*Id.* at 885 (ellipses in the original) (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

Surely the judicial evaluation privilege – which protects the integrity of the judicial

evaluation process and promotes reliable evaluations for the voting public – should promote that

policy, and not prevent what – as this Court has already held – is a plausible inquiry of its

violation. (Doc. 67.) And whereas the judicial evaluation privilege is supposed to benefit Illinois

residents, *Illinois Judicial Inquiry Bd.*, 128 Ill. App. 3d at 801, this case is brought for people

residing nationally. The federal policies in this case affect persons everywhere in the country,

and go well beyond the Illinois policies that the judicial evaluation privilege protects, valid

though they may be. The Magistrate Judge should have applied federal privilege law.

**B.    Details about Mr. Shultz's participation in the evaluations of Justices Karmeier and Maag are relevant and necessary to Plaintiffs' case, and are only available from Mr. Shultz.**

Contrary to the Magistrate Judge's finding, discovery on Mr. Shultz's participation in the evaluations of Justices Karmeier and Maag is relevant and necessary to Plaintiffs' case. The *Avery* case, with its $1.05 billion liability against State Farm, was pending in the Illinois Supreme Court at the time of the Committee's evaluation process. There was an open seat on that Court. With State Farm's help, a sympathetic candidate could be elected who could participate in the *Avery* adjudication. Mr. Shultz's client, State Farm, had an obvious interest in the outcome of the evaluation process in which its lawyer was participating, and he knew of that interest and the pending *Avery* case in the Supreme Court. Despite his confidentiality agreement, Mr. Shultz did not recuse himself or disclose the conflict. Justice Karmeier got the higher rating, Justice Maag got the lower rating, and the ICJL (where State Farm sat on the Board of Directors and State Farm's Shepherd sat on the Executive Committee) used the evaluations to fundraise for and advance the Karmeier campaign.

State Farm omitted that information to the Supreme Court and the *Avery* class from its 2005 and 2011 briefs. Plaintiffs allege that State Farm's January 31, 2005 brief opposing the *Avery* plaintiffs' motion for conditional non-participation and State Farm's September 19, 2011 response to the *Avery* plaintiffs' petition to recall the mandate and vacate the Illinois Supreme Court's August 18, 2005 opinion are the predicate acts of mail fraud supporting their case. Fraud can be proved by misrepresentation or omission.[2] To constitute mail fraud, State Farm's mailings

---

[2]    Courts sometimes conflate all forms of fraud into fraud by misrepresentation or omission, but that is a category error. For example, a claim of fraudulent concealment does not require a fraudulent statement at all. Consider the classic case of bad bricks hidden on the inside of a stack of bricks. The seller does not tell a lie. The placement of any one brick is not a bad act in itself,

need not have contained any false statements as long as the mailings furthered execution of the overall fraudulent enterprise. *See McDonald v. Schenker*, 18 F.3d 491, 494 (7th Cir. 1994); *Rench v. TD Bank, N.A.*, No. 3:13-cv-00922-DRH-PMF, 2014 WL 3893279, at *3 (S.D. Ill. Aug. 8, 2014). The information that State Farm omitted from its briefs is as telling as the representations that it included.

The point is illustrated in an important 2008 RICO decision, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). There, the United States Supreme Court considered allegations that bidders at a Cook County property tax lien auction had defrauded other bidders by falsely representing to the county that multiple bidding entities were independent when they were not. *Id.* at 643. The defendants participating in the enterprise violated Cook County's single, simultaneous bidder rule, submitting false affidavits that they had complied with the rule, and thereby positioning themselves to procure a disproportionate number of winning bids on the property liens. *Id.* at 643-44. As in this case, the RICO claim rested on mail fraud allegations. *Id.* at 641-42. The predicate mailings were required notices that the defendants mailed to the property owners to inform them who owned the liens. *Id.* at 648. The defendants argued that those mailings contained no fraudulent statements. The Court answered that it did not matter; the gravamen of mail fraud is "the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself 'contain[s] no false information.'" *Id.* at 647 (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989)).

---

but what is accomplished is a deceptive impression, i.e., that all the bricks are good when they are not, which is what accomplishes the fraud on the buyer.

Similarly, Plaintiffs contend that State Farm used its briefs to further Defendants' fraudulent enterprise: recruiting Justice Karmeier to run for the Illinois Supreme Court seat, and helping to orchestrate and finance his judicial campaign, all while the *Avery* case was pending before the Illinois Supreme Court and without disclosing State Farm's involvement to the Illinois Supreme Court or the *Avery* class. Justice Karmeier's election was necessary to the success of the enterprise, and a favorable ISBA evaluation was advantageous to his election, both to convey a positive impression on voters and to raise money for his judicial campaign. Mr. Shultz's participation in the ISBA's evaluations of Justices Karmeier and Maag thus furthered the execution of Defendants' overall fraudulent scheme. The Magistrate Judge observed that the Illinois Supreme Court could have adjudicated the *Avery* case before Justice Karmeier's November 2004 election. (Doc. 327 at 7.) But the point is inapposite. As Plaintiffs allege, "the risk – a $2 to $4 million investment for a possible $1.05 billion return – was sufficiently minimal to make it a worthwhile gamble." (Doc. 2 ¶ 11; Doc. 289 ¶ 11.)

Details of Mr. Shultz's participation in the evaluations of Justices Karmeier and Maag are only available from Mr. Shultz. While the evidence is circumstantial and requires inferences to be drawn, that does not diminish the importance of Mr. Shultz's participation in the evaluation process to further Defendants' overall fraudulent scheme. A civil conspiracy plaintiff "is not required to show an express agreement; conspiracies, by their very nature, are not susceptible to direct proof." *U.S. ex. rel Ducholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). A conspiracy "is almost never susceptible to direct proof, but rather must be established from circumstantial evidence and inferences drawn from evidence, couple with common-sense knowledge of the behavior of persons in similar circumstances." *Janusz v. City of Chicago*, No. 03 C 4402, 2013

WL 6577375, at *8 (N.D. Ill. Dec. 13, 2013). Plaintiffs should be permitted to depose Mr. Shultz regarding his participation in the Committee's evaluations of Justices Karmeier and Maag.

## II.    The Magistrate Judge clearly erred in applying the judicial evaluation privilege.

The judicial evaluation privilege is a qualified privilege which may be forfeited when the privilege is abused. *Babb v. Minder*, 806 F.2d 749, 754 (7th Cir. 1986). Mr. Shultz participated in the evaluations of Justices Karmeier and Maag:

- while *Avery* was pending in the Illinois Supreme Court;

- while he represented State Farm in the *Avery* case in the Supreme Court;

- without disclosure to the Illinois Supreme Court or the *Avery* class; and

- despite his written agreement to recuse himself when he had reason to believe that he could not objectively fulfill his responsibility to interview or evaluate the judicial candidate.

These facts indicate that the privilege was abused. Even if the Magistrate Judge could apply the judicial evaluation privilege, he should not have done so.

The Magistrate Judge relied on *Illinois Judicial Inquiry Bd.*, (Doc. 326 at 4-5), where the Illinois Judicial Inquiry Board sought to enforce its subpoenas for judicial evaluation records from the Chicago Bar Association. The court identified four standards to apply the privilege:

1.    The communication must originate in a *confidence* that they will not be disclosed.

2.    This element of *confidentiality* must be essential to the full and satisfactory maintenance of the relation between the parties.

3.    The relation must be one in which the opinion of the community ought to be sedulously *fostered*.

4.    The injury that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of the litigation.

*Id.*, 128 Ill. App. 3d at 800 (quoting 8 Wigmore, *Evidence* § 2285 (McNaughton rev. 1961)). The CBA satisfied the first two elements with an affidavit highlighting the need for confidentiality to voice their opinions in the evaluation process. *Id.* at 800. Here, no such affidavit was filed. The third and fourth elements were satisfied because the court acknowledged the importance of reliable judicial evaluations and the special role of lawyers in evaluating the judiciary in Illinois, where the public elects its judges: "We believe it is axiomatic that the public is best served when the electorate is well informed as to the qualifications of judicial candidates." *Id.* at 801. The court could have disregarded the privilege if the Judicial Inquiry Board had shown a "particularized need for the privileged material," but it did not. *Id.* So the court affirmed the trial court's order quashing the subpoenas. *Id.*

The circumstances here are far different. The evidence suggests the judicial evaluation process was compromised for private purposes. The policy that the privilege was supposed to protect was not protected. The ISBA relies on its evaluators to recuse themselves when they have reason to believe they cannot objectively fulfill their responsibilities. (Doc. 301-3, at 1-2.) Mr. Shultz had ample reason to recuse himself from the evaluations of Justices Karmeier and Maag, and did not. Only he can talk about that. His information is relevant and necessary to Plaintiffs' case. Therefore, the Magistrate Judge erred by quashing Plaintiffs' subpoena to depose Shultz.

## CONCLUSION

Accordingly, it is respectfully submitted that the Court should enter an order modifying that portion of the January 12 Order quashing Plaintiffs' subpoena to depose Shultz, and directing his deposition to proceed.

Dated: January 26, 2015

By: ___/s/ Robert A. Clifford_____
Robert A. Clifford #0461849
George S. Bellas
Clifford Law Offices
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602
Tel: 312-899-9090


John W. "Don" Barrett
Barrett Law Group, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095-0927
Tel: 662-834-2488


Patrick W. Pendley (LABA #10421)
Nicholas R. Rockforte (LABA #31305)
Pendley, Baudin & Coffin, L.L.P.
Post Office Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: 888-725-2477


Thomas P. Thrash
Marcus N. Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: 501-374-1058


Brent W. Landau
Hausfeld, LLP
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: 215-985-3273

By: ___/s/ Gordon Ball_____
Gordon Ball (TN BPR# 1135)
Law Offices of Gordon Ball
7001 Old Kent Drive
Knoxville, TN 37919
Tel: 865-525-7028
Fax: 865-525-4679


Steven P. Blonder #6215773
Much Shelist, P.C.
191 N. Wacker, Suite 1800
Chicago, IL 60606-2000
Tel: 312-521-2402


Charles F. Barrett
Charles Barrett, P.C.
6518 Highway 100, Suite 210
Nashville, TN 37205
Tel: 615-515-3393


Elizabeth J. Cabraser
Robert J. Nelson
Kevin R. Budner
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000


Steven A. Martino
Richard Taylor
Lloyd Copeland
Taylor Martino, P.C.
51 Saint Joseph Street
Mobile, AL 36602
Tel: 251-433-3131

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

Dated: January 26, 2015

<u>/s/Robert A. Clifford</u>
Attorney for Plaintiffs