1        IN THE DISTRICT OF THE UNITED STATES OF AMERICA
              FOR THE SOUTHERN DISTRICT OF ILLINOIS
2    _____
                                     )
3    **MARK HALE, *et al.*,**             )
                                     )
4                  Plaintiff(s),     )
                                     )
5         vs.                        )   Case No. **12-660-DRH-SCW**
                                     )
6    **STATE FARM MUTUAL AUTOMOBILE**     )
     **INSURANCE COMPANY, *et al.*,**     )
7                                    )
                   Defendant(s).     )
8    _____)

9

10

11              **DISCOVERY DISPUTE CONFERENCE**

12   BE IT REMEMBERED AND CERTIFIED that heretofore on  **07/02/2015**,

13   the same being one of the regular judicial days in and for the

14     United States District Court for the Southern District of

15       Illinois, **Honorable Stephen C. Williams**, United States

16    Magistrate Judge, presiding, the following proceedings were

17     recorded by mechanical stenography; transcript produced by

18                        computer.

19

20

21

22

23   *REPORTED BY*:  **Molly N. Clayton, RPR, FCRR**, Official Reporter
     for United States District Court, SDIL, 750 Missouri Ave., East
24   St. Louis, Illinois 62201, (618)482-9226,
                    *molly_clayton@ilsd.uscourts.gov*
25

1                              **APPEARANCES:**

2    *FOR PLAINTIFFS:*
         **Robert A. Clifford, George S. Bellas, and Kristopher S.**
3    **Riddle** of Clifford Law Offices P.C., 120 North LaSalle St.,
     31st Floor, Suite 3100, Chicago, IL 60602; **and,**
4
         **Steven P. Blonder** of Much Shelist *et al.*, Cook County, 191
5    North Wacker Drive, Suite 1800, Chicago, IL 60606-1615; **and,**

6

7    *FOR DEFENDANT STATE FARM:*
         **Joseph A. Cancila, Jr. and Harnaik Kahlon** of Schiff Hardin
8    LLP, 233 South Wacker Drive, Suite 6600, Chicago, IL 60606;
     **and,**
9
         **Patrick D. Cloud** of Heyl Royster *et al.* - Edwardsville,
10   105 West Vandalia St., Ste. 100, P.O. Box 467, Edwardsville, IL
     62025.
11

12   *FOR DEFENDANT MURNANE:*
         **Paul Veith** of Sidley Austin LLP - Chicago, One South
13   Dearborn Street, Chicago, IL 60603.

14

15   *FOR DEFENDANT SHEPHERD:*
         **Russell K. Scott and Andrew J. Tessman and Megha Shah** of
16   Greensfelder, Hemker & Gale PC - Swansea, 12 Wolf Creek Drive,
     Suite 100, Swansea, IL 62226
17

18

19   **FOR INTERESTED PARTY LLOYD A KARMEIER:**
         **A. Courtney Cox** of Sandberg, Phoenix et al. - Carbondale,
20   2015 West Main Street, Suite 111, Carbondale, IL 62901-2073

21

22

23

24

25

1   **INDEX OF WITNESS EXAMINATION**

2                                   **DX**        **CX**        **R-DX**        **R-CX**

3   No witness testimony.

4

5                           **INDEX OF EXHIBITS**

6   **EXHIBIT**              **DESCRIPTION**              **Id'D**        **Rcv'd**

7   No exhibits identified or received.

8

9                         **MISCELLANEOUS INDEX**

10                                          **PAGE**

11  No miscellaneous index entries.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         *THE COURT:*  Okay.

2                   *(Judge calling teleconference)*

3         *THE COURT:*  Good morning.  This is Judge Williams.

4    Who is on the line?

5         *MR. VEITH:*  Good morning, Judge.  This is Paul Veith,

6    from Sidley Austin, in Chicago, for Defendant Edward Murnane.

7         *THE COURT:*  Okay.  Mr. Veith.  Is it Veith?

8         *MR. VEITH:*  Yeah.  Veith.  "V" as in Victor.

9         *THE COURT:*  Okay.  Good morning.

10        Anyone else on the telephone?

11        Okay.  We are here for *Hale versus State Farm* for a

12   discovery dispute hearing.

13        So we have Mr. Veith on the telephone.  And let's go

14   ahead and get everyone else's name in the record, starting with

15   Mr. Cloud.

16        *MR. CLOUD:*  Good morning, your Honor, Patrick Cloud

17   for State Farm.

18        *THE COURT:*  Good morning.

19        *MR. CANCILA:*  Joe Cancila for State Farm along with

20   Nick Kahlon for State Farm.

21        *THE COURT:*  Okay.  Mr. Cancila, Mr. Kahlon, good

22   morning.

23        *MR. SCOTT:*  Russell Scott and Andrew Tessman for

24   Defendant Shepherd.

25        *THE COURT:*  Okay.  Mr. Scott, Mr. Tessman, good

1   morning.

2       *MR. CLIFFORD:*  Robert Clifford for plaintiffs, your

3   Honor.

4       *THE COURT:*  Mr. Clifford, good morning.

5       *MR. RIDDLE:*  Kris Riddle on behalf of the plaintiffs

6   as well, your Honor.

7       *THE COURT:*  Okay.  Good morning.

8       *MR. BLONDER:*  Steven Blonder on behalf of the

9   plaintiffs.

10      *THE COURT:*  Mr. Blonder.

11      *MR. BELLAS:*  George Bellas for the plaintiffs.

12      *THE COURT:*  Okay.  And Mr. Bellas.  Good morning.

13      *MR. SCOTT:*  Your Honor, we also have Megha Shah here

14  with us this morning.  She has not yet entered her appearance

15  but will do so later today.

16      *THE COURT:*  Okay.  Ms. Shah, good morning.  Welcome.

17      All right.  We have got a number of issues to cover.

18  I've got two submissions from the parties.  In addition to

19  that, we had continued the matter regarding the subpoena to

20  Mr. Kay.  And let me just touch on that real quick because I

21  don't think we have anyone here.

22      *MR. CLIFFORD:*  No, your Honor.  Mr. Kay is represented

23  by counsel Gary Meadows, who has been regularly engaged with me

24  regarding production and compliance.  The status is that they

25  recently produced twice the number of materials that had

1   previously been produced.  We're reviewing those now.  He's

2   also searching for what he believes to be a DVD or CD of some

3   kind that he has yet to find.  I spoke with him just yesterday,

4   and I told him I would report this to the Court and ask the

5   Court to continue this for further status and give him

6   opportunity to continue his efforts.

7        *THE COURT:*  That's fine with me.  And he did file an

8   official response back on the 15th.  But what we will do is, we

9   will just wait to hear from you.  If you want to call it up for

10  a hearing --

11       *MR. CLIFFORD:*  Great.

12       *THE COURT:*  -- we can.  But at some point, I will want

13  to clear the issue.

14       *MR. CLIFFORD:*  Talk a little.

15       *THE COURT:*  Yeah.  So we can talk about it again next

16  time.

17       *MR. CLIFFORD:*  Yes, sir.

18       *THE COURT:*  Okay.  So let's start with scope of

19  production.  That's been raised as a general issue and there

20  hasn't -- other than the specific issues that plaintiff then

21  later presents, I've just got kind of a generalized complaint.

22  It appears much of the things that have been raised have

23  already been addressed.  You know, all the old objections have

24  been topics that there have been supplements to.  I've been

25  given a rehash of the theory of the case and the general rules

1    regarding discovery.

2          Suffice it to say that the rules provide us with the

3    framework.  You know, if it's relevant to the claims and

4    defenses, that's the issue.  That doesn't mean that something

5    that doesn't pertain directly to a claim or defense would not

6    be relevant to it and that's -- you know, that's what you have

7    to make a determination about.

8          In other words, is it possible that contributions to

9    other organizations other than directly to Justice Karmeier

10   could be relevant?  Yes.  That's a possibility.  So I don't

11   know if that's what exactly we're talking about here, but I

12   need to see a specific issue that's in dispute, not a

13   generalized one, and we don't have a specific one, so there's

14   nothing to talk about on this today.  But relevance is the key.

15   And it is defined by -- or the anchor for it is what's in the

16   claims and defenses.  But it is broad.  So, there you have it.

17          MR. CLIFFORD:  Are we done?

18          THE COURT:  Yeah.  We are.

19          And if there's a -- so if there's a specific request

20   to produce or interrogatory that relates to the scope of what

21   the production is going to be and what is relevant and what's

22   not relevant, we can talk about that, what's relevant and

23   what's not relevant.  But we are not going today because I

24   haven't been presented with anything specific beyond what's in

25   the papers.

1        So let's move on to the next thing.  The next thing is
2    the search terms.  So we are still arguing about search terms.
3        *MR. CLIFFORD:*  Well, may I address that, please?
4        *THE COURT:*  Sure.
5        *MR. CLIFFORD:*  Your Honor, thank you.
6        We met with counsel for State Farm.  We pared -- I
7    personally pared the search terms down dramatically.  In the
8    meeting that we had, the meetings that we had, I left those
9    meetings believing that we made enormous reductions.  I did not
10   hear one word at that time about they're still too broad.  We
11   have this issue about "relevancy" and who wants to define it
12   and what it means.
13       *THE COURT:*  Yeah.  Here's a specific issue on
14   relevance.  I agree.
15       *MR. CLIFFORD:*  And, frankly -- and I don't know where
16   to even begin with this one.  But, you know, we have, as you
17   would expect, outside consultants that we talk to on a regular
18   basis.  Just yesterday we are being told by our consultant that
19   the production -- and it's having an impact on the search for
20   relevancy, for relevant information, has been done in such a
21   way that the metadata has been -- there's a lot of different
22   words being used -- altered, manipulated, changed.  And we will
23   be more than happy to make those people available to the Court
24   to talk further about it.  But we now have --
25       *THE COURT:*  Right now we are just talking about search

1    terms.   Those are issues that are also in the papers that have

2    been submitted, at least what I've read.

3         MR. CLIFFORD:   But as far as the plaintiffs are

4    concerned, we have pared the search terms down to the core.   We

5    have not been told that it is not enough.   Again, we have yet

6    to be told that.   We went further than we thought we would or

7    should, but we did it to get this rolling.   And that's where we

8    stand, and we stand on our search terms as provided to counsel

9    in this last meeting.

10        THE COURT:   Right.

11        And so their -- defense position -- go ahead and give

12   me your quick response.

13        MR. KAHLON:   Sure your Honor.   The quick response is

14   that when we had the meeting, which is referenced in our

15   papers, we walked away from that meeting -- and I actually have

16   a marked-up list of search terms -- believing that the

17   plaintiffs were going to pare their list down by half or more.

18   And I've got Xs through all the terms that we went through.

19   When we got the -- and that the remaining terms, we had a brief

20   discussion with them, and I thought that we were going to get

21   limiting terms imposed on those.   We weren't going to have all

22   of these, for example, 600 "ors" that, as we pointed out

23   previously, dramatically expands the list of terms.

24        The list we finally got weeks later doesn't comport

25   with what we believe we understood was going to happen at that

1    meet-and-confer.  And so our concerns remain with the list.  We

2    don't believe it's been sufficiently pared down.  We have given

3    your Honor a couple of examples where they have actually

4    expanded terms.  We still have over a thousand terms once you

5    include all of these "ors" that seek all kinds of irrelevant

6    information.  We don't believe that they have complied with our

7    request for reasonable terms, what the *Sedona Principles*

8    suggests the parties at the beginning should talk about, which

9    never happened, as your Honor pointed out.  And we don't

10   believe that they've complied with the Court's orders on this

11   point.

12          *THE COURT:*  Okay.  So this is what we are going to do.

13   I was hoping we didn't have come to this.  But we are going to

14   meet, assuming my trial is over on July 8th, you are each going

15   to designate one person who is going to be here.  As many

16   people who want to come can come.  We are not doing it by

17   phone.  We're going to sit at one of these tables.  I'll turn

18   on the court's recording equipment.  And I'm going to sit with

19   those two people, and we are going to go through all of this.

20   And at the end we are going to have search terms and the "ands"

21   or "ors" are going to be worked out.  So get a hotel room

22   because we might be here really late.  I'll see you on July 8th

23   for that one.

24          *MR. CLIFFORD:*  10:00?  9:30?  8:30?

25          *THE COURT:*  You are going to be here at 2:00.  We are

 1   going to start at 2:00.

 2          *MR. CLIFFORD:*  Okay.

 3          *THE COURT:*  I'd like to think we could start earlier

 4   than that.  We might actually have to start later than that.

 5   It just depends on the trial.

 6          *MR. CANCILA:*  I'm sorry, Judge.  Could you say that

 7   time again?

 8          *THE COURT:*  2:00.

 9          If you want to come early...

10          *MR. CLIFFORD:*  Watch the trial.

11          *THE COURT:*  If you don't mind waiting, we can do that.

12          So you guys talk about that.

13          So that way we can get started earlier.

14          All right.  And in -- what I want to do, then,

15   obviously, at that is you will have identified what it is we

16   are going to argue about, and we are just going to take them

17   one at a time and go through all of the "ands" and "ors."  And

18   I guess it is mostly "ors" that the concern is.

19          And the fact that there may have been a term added to

20   it, that I don't deem as particularly problematic necessarily

21   because it is a work in progress, obviously, still.  But for

22   whatever reason, you all can't come to an agreement after

23   months of talking about this, which I find astounding.  And,

24   yes, we didn't get started on this when we should have.  That

25   would have been last year when you all would have looked at

1    this and started trying to work on it in the first place, but

2    neither side made that attempt either.

3            So, now, with the next issue is the Avaya phone

4    records.  Is this something that we need to actually address?

5    It says:  "We still don't have a date for the discussion on the

6    scope of that production."  So I assume that that means that

7    there's still to be a meet-and-confer.

8            On the other hand, from the plaintiffs -- or, rather,

9    the defense response is they've migrated 3.7 billion records

10   from the Avaya phone system and are now confirming the records

11   have migrated successfully.  So that's really where it stands,

12   and you are going to meet-and-confer, is what it sounds like,

13   right?

14           MR. KAHLON:  That's correct, your Honor.

15           THE COURT:  Okay.  Mr. Bellas.

16           MR. BELLAS:  I don't think a meet-and-confer is

17   necessary.  The question is, When are they going to complete

18   it?  Because they said they were going to produce it in an

19   Excel spreadsheet to review.  I don't know if a meet-and-confer

20   is necessary.

21           THE COURT:  Oh, okay.  Well, I'm just reading the last

22   sentence that the plaintiffs provided to me:  "We still don't

23   have a date for the discussion on the scope of that

24   production."

25           So that assumes that there's going to be some

1    discussion, according to you.

2        MR. BELLAS:  Yeah.  Again, we would like to know when

3    it is going to be completed.  We are up against the clock on

4    this matter.

5        THE COURT:  Okay.  So...

6        MR. KAHLON:  Your Honor, just to be clear, there's

7    never been a request for any particular phone records.  What

8    the request was, when we started talking about this, we told

9    them we've got these old tapes, which I thought were physical

10   tapes, and it turned out they're like virtual tapes of some

11   kind.  Those are in the process of being migrated to Cisco.  We

12   believe they will be searchable.  When we complete that

13   process, we'll talk to you about what you want to search for

14   then.  We never said we were going to give them 3.8 or

15   3.7 billion phone records.

16       THE COURT:  I know.  What it says is that's what you

17   were migrating.

18       MR. KAHLON:  Exactly.  And so we just haven't had even

19   the discussion of what they're looking for in those tapes and

20   what kinds of phone records they want.  We are going to have

21   that once we know what we can search and what the searchability

22   is.  That was my understanding.

23       THE COURT:  And has there been a formal request for

24   phone records or a request that you believe encompasses the

25   phone records?

1        *MR. BELLAS:*  Absolutely.

2        *THE COURT:*  Okay.  So tell them what that is because

3   they think you haven't requested it formally, although you are

4   looking for it.  So you are doing that for a reason.  I'm

5   assuming there's a reason why you are actually complying with

6   the request to look at the phone records.

7        *MR. KAHLON:*  Because we are good guys, your Honor.  We

8   had these meet-and-confers about data sources.  We pointed this

9   out.  They asked us what the searchability was.  We disclosed

10  it.  I scoured the request.  I don't see anything for phone

11  records, but we are going to do it anyway.  I don't have a

12  problem working with them on framing that request, giving them

13  the information they reasonably want once they tell us what it

14  is, but I haven't had that call.  There's been a subpoena for

15  phone records on third parties, but nothing to State Farm.

16       *THE COURT:*  So in terms of what it is you are looking

17  for, you believe they already know what it is you want.

18       *MR. BELLAS:*  Yes, sir.

19       *THE COURT:*  Okay.  They say they don't.  Where does

20  that -- where does that disconnect come from?

21       *MR. CLIFFORD:*  It's a mystery, Judge.  We will

22  meet-and-confer with your permission.

23       *THE COURT:*  Yeah.  Okay.  That sounds good.

24  Meet-and-confer no later than next Wednesday.  But next

25  Wednesday is not going to be for the purpose of doing anything

1    other than going through the search terms.  That's just when

2    you will have your meet-and-confer by.

3            *MR. CLIFFORD:*  A point of order?

4            *THE COURT:*  Yeah.

5            *MR. CLIFFORD:*  So on next Wednesday, and given what

6    you just said, would you mind if the parties being prepared,

7    though, once you get past the search term issue, to broaden the

8    discussion to what we believe are some serious ESI questions

9    that at least ought to be teed up and addressed and framed?

10           *THE COURT:*  Well, let's --

11           *MR. CLIFFORD:*  I don't know for a decision, but at

12   least talked about broadly.

13           *THE COURT:*  Aren't we going to talk about some of

14   those today?

15           *MR. CLIFFORD:*  I hope we are.

16           *THE COURT:*  Yeah.  I mean, there are other issues

17   raised regarding ESI here in these papers.

18           All right.  The organizational charts:  No one has

19   identified for the 2002 to 2005 time period from the public

20   policy group federal affairs or special projects and strategic

21   alliances groups as it relates to identifying custodians

22   involved in the *Avery* litigation.  That's one of the things

23   that's raised regarding organizational charts.

24           State Farm has never agreed that it would provide a

25   list of current and former assistance.  I don't think we are

1    talking about the same thing here.

2         So from the plaintiffs perspective, where is the

3    deficiency in what the Court has previously ordered or what has

4    been agreed to that needs to be cured prior to what I already

5    said, is, go ahead and do your 30(b)(6) on this.  This is what

6    led us down this path.  Now, 30(b)(6) is appropriate.

7         MR. BELLAS:  We will issue the 30(b)(6).

8         THE COURT:  Okay.

9         MR. BELLAS:  Judge, the point is that we are seeking

10   custodians for that time period that we're involved in a

11   portion apparently and as best we can determine so far, the

12   corporate level department had several departments, one of

13   which was public affairs or lobbying groups or whatever that

14   were under the umbrella of the legal department.  We are still

15   trying to identify what potential custodians there were in

16   those departments and who was in those departments at the time.

17        THE COURT:  Right.  I understand that's what you are

18   looking for.  Has -- so what I'm not clear on is, have they not

19   given you something that the Court has ordered them to give you

20   that you believe they have?

21        MR. BELLAS:  The answer to that is no.

22        THE COURT:  So the reason we were going through this

23   process is to short-circuit some of these 30(b)(6) topics that

24   were just noticed right off the bat before any meet-and-confer.

25   This, as the Court has already said now is -- it's reached the

1    point where the meet-and-confers have apparently run dry, and

2    this is now an appropriate topic and was as of our last hearing

3    for a 30(b)(6).

4         MR. BELLAS:  Okay.

5         THE COURT:  There were certain things that the Court

6    did not feel were appropriately addressed by way of a 30(b)(6).

7    This clearly is.  I understand why you want it.

8         MR. BELLAS:  Okay.

9         THE COURT:  So --

10        MR. BELLAS:  All right.

11        THE COURT:  -- that's the route that we go at this

12   point.

13        MR. BELLAS:  We will issue it immediately, your Honor.

14        THE COURT:  All right.

15        There is a subsection or a topic heading of "ATRA" in

16   the plaintiffs' submission which is not -- it doesn't have a

17   corresponding heading in the defenses' response so...

18        MR. KAHLON:  Your Honor, just to flag it for you, we

19   addressed in the trial scope of production.  We used it as an

20   example on Page 1 of our response to plaintiffs' status report.

21   We addressed that contention regarding ATRA --

22        THE COURT:  Okay.

23        MR. KAHLON:  -- to point out that we actually have

24   agreed to do something different than they're representing, and

25   we actually have produced many ATRA communications.

1    THE COURT:  Okay.  So where's the deficiency?  Right

2    on Page 1 of their response, it says: State Farm agreed to

3    produce all nonprivileged documents related to the American

4    Tort Reform Association that relate to Justice Karmeier, his

5    election, the involvement of any defendant in the election for

6    the purported concealment of such involvement or Avery, in

7    addition to all records of State Farm's contributions to ATRA

8    over the ten-year period from 2001 to 2011, plus all

9    nonprivileged documents that reference ATRA in any way,

10   regardless of any connection with this lawsuit during the time

11   period of the Justice Karmeier recruitment campaign or

12   election.

13       So this is what they've agreed to produce.

14       MR. BELLAS:  Now we have it clarified, your Honor.

15       THE COURT:  All right.  Great.

16       MR. KAHLON:  Just to be clear, that was in our

17   supplemental discovery responses.

18       THE COURT:  I understood that, and I did see it in

19   here.  And it's just not in a separate heading.  So I

20   appreciate that.

21       All right.  Now, moving on to -- in other words, it's

22   already been produced.  So if you can't find it, ask 'em where

23   it is that they say, but I think in their letter they indicate

24   that it's already in there.

25       MR. BLONDER:  Judge, that issue of where it is in the

1    production is an issue that we have framed, I think, later on.

2    It will be ripe for discussion later on.  That's something that

3    we want to talk about.

4              THE COURT:  Okay.

5              Retention periods.

6              MR. BELLAS:  Your Honor, you've clarified that that

7    was one of the issues that we could take a 30(b)(6) on, and we

8    will issue the notice for that.

9              THE COURT:  Okay.  I did not have this flagged as a

10   30(b)(6) issue.  But is everyone in agreement that this falls

11   within the scope of what's been identified as a topic the Court

12   has said go forward with your 30(b)(6)?

13             MR. KAHLON:  Yeah.  Your Honor, I think at one of the

14   earlier hearings your Honor did say if they had questions about

15   the retention program, that might be appropriate for a

16   30(b)(6).

17             THE COURT:  Okay.  Thank you.

18             All right.  Payroll records:  State Farm indicates

19   that their records are kept in separate module with the

20   PeopleSoft software.  Plaintiff wishes to discuss the searches

21   that can be paid of the payroll records -- I'm jumping to the

22   last sentence -- to ensure that the pertinent information is

23   received.  State Farm refuses to engage in any preproduction

24   discussions relative to the searches that are conducted.  So

25   that is essentially plaintiffs' contention.

1    State Farm says it never refused to engage in any

2    preproduction discussions relating to searches that are

3    conducted.  State Farm objected to plaintiffs' new request for

4    production of payroll records for dozens of individuals, many

5    of whom are not even employed by State Farm.  Plaintiffs have

6    never raised any issue with that objection, and the parties

7    have not conferred.  So, disconnect again.

8         *MR. BELLAS:*  In our second supplemental request for

9    production of documents, we asked for that specifically, and we

10   are trying to engage in a discussion about a search of their

11   payroll records, as we should under 26(f), and we haven't had

12   any opportunity to discuss that with them as to what should be

13   searched and how they should be searched or what modules they

14   are, what format they are in, what search terms might be

15   appropriate so that we could narrow it down and get that

16   record.  The point is, apparently, those individuals made

17   contributions directly to the campaign, and we are trying to

18   find out if there were corresponding payments to those

19   individuals from State Farm to reimburse them for those

20   expenses.  And it's a very simple request.  I don't know why

21   its gotten complicated.

22        *THE COURT:*  Okay.  So at this point, though, you have

23   said they're not going to discuss it with you.  They say they

24   haven't.  So you just have to have the discussion.  I

25   understand what Mr. Bellas is saying.  There is a request out

1   there.

2        MR. KAHLON:  Yeah.

3        THE COURT:  Now, if there's -- as far as an objection

4   goes, we may as well talk about that.

5        MR. KAHLON:  Your Honor, just to be clear, that

6   explanation is the first time I'm hearing about why they've

7   listed these 40-plus individuals for whom they want payroll

8   records.  That's the point.  We got this request.  We served

9   our objections.  We haven't had any sort of articulation of why

10  they believe the information is relevant for those individuals.

11  Now that I'm hearing that, I have no problem having a

12  conference with them about whether or not that's appropriate

13  information or what we would be willing to produce and so

14  forth.

15       THE COURT:  Okay.  So meet-and-confer by next

16  Wednesday.

17            All right.  Machines in storage:  So the Court ordered

18  designation of hard drives to be searched.  And what the

19  plaintiffs did, according to the defense, was designated 19

20  instead of 20, unilaterally decided to reserve whether or not

21  to designate a 20th, and propounded a number of questions

22  instead of designating a 20th.

23            And then that's where it stands, right?

24       MR. KAHLON:  Yes, your Honor.

25       MR. BELLAS:  That's correct.

1          THE COURT:  All right.  Okay.  So -- so you just -- so

2     it's true.  You just decided you weren't going to designate a

3     20th, you wanted to get this information first.

4          MR. BELLAS:  That's correct, your Honor.

5          THE COURT:  All right.  Well, designate your 20th, and

6     then we can talk about this other issue.

7          When this was brought to the Court, we talked about

8     this issue.  Designate your 20, see what happens, and then we

9     will talk some more.  So that's the process that we adopted.

10         Archiving of e-mails:  All right.  So there was a

11    letter provided on June 26th.  Does this address the question

12    or not?

13         MR. BELLAS:  Yes, it does, your Honor.

14         THE COURT:  Okay.  Document management policy.

15         MR. BELLAS:  This goes to the 30(b)(6) issue.

16         THE COURT:  Okay.

17         Are we in agreement on that, that the -- I mean, oh,

18    yes, I'm sorry.  This -- we are not at the format of State

19    Farm's production.  So, still, on document management policy,

20    are we in agreement that a 30(b)(6) is appropriate on this?

21         MR. CANCILA:  Well, your Honor indicated that a

22    30(b)(6) was appropriate on that.

23         THE COURT:  Well, that's what I'm going to make sure

24    that we are in agreement.  This is a topic that was covered by

25    the scope of a previous order.

1          MR. CANCILA:  Yeah, right.  We thought that the

2     records that we produced were sufficient to answer the

3     questions, but your Honor disagreed with that.

4          THE COURT:  Yeah.  So do the 30(b)(6).  We don't need

5     to talk about that one any further today.

6          All right.  Now, format of State Farm's production.

7          MR. CLIFFORD:  May I, your Honor?

8          THE COURT:  Yeah.

9          MR. CLIFFORD:  On format of State Farm's production,

10    there's two issues that come to mind.  The first is that as

11    near as we can tell, it is impossible for us to determine which

12    production request they're responding to with a given

13    production.  We feel they have an obligation -- excuse me, your

14    Honor.

15         THE COURT:  This is -- we are talking about here.

16    This is how it's framed because we've got a number of different

17    issues.  So this is the first submission.  Here's how you all

18    frame it.

19         "Format of State Farm's Production to Date:

20    Plaintiffs requested State Farm confer with plaintiffs before

21    their initial production.  State Farm never did but produced

22    documents in a default format that plaintiffs had requested

23    with no prior discussions.  However, there have been problems

24    with the production format.  For example, State Farm does not

25    provide all of the fields that are listed in the discovery

 1    protocol.  For instance, a document extension or 'date sent'
 2    are routinely missing."
 3          So this is -- this relates to ESI issues.
 4          MR. CLIFFORD:  Right.  I just started with the wrong
 5    issue, according to both of you.  The issue that we think is
 6    teed up and is foremost for us to talk about today is the fact
 7    that the metadata has been mechanically manipulated or
 8    eliminated.  There is a manufactured field.  We cannot tell the
 9    file path.  The file path has been interfered with.  They claim
10    that they have the right to do that, based upon their sense of
11    work product and/or privilege.  When we requested the material
12    in its native form, it is indisputable that that is an
13    industry-wide understanding that metadata is being requested
14    as-is, and it's been altered.  And it's created a lot of
15    difficulties relevant to searching, including this issue of
16    identifying where it came from and what it's responsive to.
17          So I start that as our first issue to discuss.
18          MR. BLONDER:  Just to add to that, Judge, we had a
19    meet-and-confer -- and this jumps into our second submission
20    from the parties with respect to the second set of production
21    requests.  On Monday of this week, e-mail Mr. Bellas, myself,
22    and Mr. Riddle, and we asked the question about the -- for
23    example, the file path information, which would be akin to
24    saying, hey, where -- whose file cabinet -- it was a hard
25    document.  Whose file cabinet was it in?  What was the routing

1    of it, and who's touched the document?

2              *THE COURT:*  So we are combining --

3              *MR. BLONDER:*  Right.  This is the --

4              *THE COURT:*  -- the first issue and the second

5    submission --

6              *MR. BLONDER:*  Yes.

7              *THE COURT:*  -- regarding plaintiffs' second set of

8    production requests with the second-to-last issue in the first

9    submission.

10             *MR. BLONDER:*  Correct, because there is some overlap.

11   And, Judge, one of the things that they told us is, the way

12   State Farm has collected documents in this case, there's

13   apparently additional metadata being put into the system such

14   that they can't give us file path information because it would

15   reveal information about how they're gathering materials or

16   reviewing it, which, to us, is nonsensical.  And it may happen

17   that way, but what it is doing is, it's depriving us of the

18   actual information about where the document was sitting, whose

19   files it was in, where it went, which is the information we

20   want.

21             So they're either altering the document, if that's

22   happening, or there's got to be a way to segregate it out and

23   say, okay, from the document prior to any collection efforts in

24   this case, here's the metadata that goes to that.  And what our

25   consultant has informed us is what they've done is created some

1     artificial fields such as "to" or "from" to kind of manually

2     input information.

3            Again, this is what our consultants have shared with

4     us in looking this through.  So the end result is we can't go

5     through and identify what was there.  You know, date issues are

6     all messed up, as we've kind of given examples in the

7     submission, and it's causing us a real problem in terms of

8     searching, matching, putting things together.

9            THE COURT:  Okay.  So let's first start with, in what

10    way -- Mr. Blonder, I have a question for you and then I'll --

11           MR. BLONDER:  Yes.

12           THE COURT:  So, first off, in what way is this

13    deviating from the protocol that was agreed to in the case, the

14    ESI protocol?

15           MR. CLIFFORD:  There wasn't a formal protocol.  There

16    was -- initially, going back a year ago, we asked for -- we

17    sent a letter and kind of -- we went through and we thought --

18    we asked for things in native format, and we asked for some

19    specific fields as well.  What it appears to us -- again, and

20    I'm certainly no ESI expert, you know, we rely entirely on what

21    our consultants tell us, is that we have manufactured fields in

22    here, and we don't have the native form.

23           THE COURT:  Okay.  Well, I just want to make sure that

24    we don't -- would you agree there's not an ESI protocol that's

25    been agreed to?

1          MR. KAHLON:  Not at all, your Honor.  I'm happy to

2    make my presentation, if you would like.

3          THE COURT:  Yeah.

4          MR. KAHLON:  Okay.

5          THE COURT:  I'm talking about just outside of what the

6    rules provide.

7          MR. KAHLON:  I agree.  So let's be clear about what

8    was requested and where we are now; no ESI protocol agreed to

9    before requests for production served, no protocol in the

10   requests themselves.  We get a letter from Mr. Blonder on

11   June 2nd specifying the production format that they wanted.

12   Okay.  And that's important when you get to metadata issues.

13         THE COURT:  June 2nd of this year.

14         MR. KAHLON:  No.  June 2nd of 2014, your Honor.

15         So that's several months after they served the request

16   for production.  After we had already collected documents,

17   Mr. Blonder sends us a letter saying here's the format we want

18   your production to be in.  No request for native file format,

19   let's be very, very clear about that.  What that letter

20   requested was searchable TIFF images.  Subsequent to that

21   letter, I think like a week or two because we actually

22   physically produced the disk, Mr. Bellas asked during a

23   meet-and-confer if they could have e-mails in native file

24   format.  We said we will attempt to do that going forward after

25   this production.  So that's the protocol that the parties had

1    agreed to.

2           We had already collected our documents.  They asked

3    for a specific production format.  File path wasn't in there.

4    And then after that, Mr. Bellas says, We would like e-mails in

5    native file format.  We said we would attempt to accommodate

6    that request.  Since that production, I believe we actually

7    have produced most e-mails, to the extent they exist in native

8    file format, in that format.

9           This notion about manufacturing data, the first time

10   we heard about this was in the paper that we got, I think, late

11   Tuesday night.  So we haven't even had a chance to look into

12   this, haven't had a chance to talk to plaintiffs' counsel about

13   it.

14          What I think that might be referring to is the fact

15   that when e-mails are in hard copy format, when there is a PDF

16   of a document, for example, State Farm has software that

17   populates the fields for the benefit of the plaintiffs.  It is

18   not a document that exists in electronic format.  It is a scan

19   of a paper e-mail that's been printed out and stuck in a file.

20   That's where, for example -- and we explained this to them in

21   summer of last year -- that there will be certain documents

22   that have, for example, the 1902 date field.  Because if it is

23   a scan of a PDF document, sometimes the software can pick up

24   the date and sometimes it can't.  And where it can't, it will

25   put in that date as a filler.  We explained that to them many,

1    many months ago, your Honor.  They keep rehashing that issue,
2    even though we've talked to them about it.
3          So that's the protocol that the party -- that they
4    requested and that we have conformed with up until now.  The
5    issues that they raised in their paper about these so-called
6    format of production issues relating to "date sent," I think we
7    did a pretty good job of explaining why those aren't issues.
8          The only new issue is date sent, date type, or date
9    extension field or something.  They said there's some documents
10   for which those fields are combined, which, by itself, is a
11   concession that, contrary to their paper, we actually gave them
12   that information.  We went back and looked.  Since we got this
13   paper on Tuesday -- I'm sorry on Monday -- we went back and
14   looked and can't find which ones they are talking about; happy
15   to confer with them to straighten out that issue.
16         But this file path issue, it is a complete new request
17   that came out after we had already collected documents, after
18   they had already served the request for production, after the
19   protocol that we've attempted to comply with has already been
20   agreed to by us, and after we have already produced documents.
21         We set forth in our papers why we don't believe
22   they're even entitled to that information.  But the core point
23   is, the cat's out of the bag, and if we had talked about this
24   at the beginning, then when we collected documents, if we had
25   agreed to provide that information, we could have taken steps

1    to prevent the issues that Mr. Blonder is referring to now.

2         And just for the Court's benefit, what that is, is the

3    file path won't show necessarily who the document came from.

4    If it resides, for example, in State Farm's e-mail archive

5    database -- and this is, again, something we have already

6    explained to them -- there isn't a custodian of it in the

7    classic sense.  There is one individual, a systems person, who

8    is kind of responsible for maintaining that archive; not very

9    many e-mails in that archive relevant to this case, produced

10   them to the extent that we think that they are or they hit on

11   any of the terms.  The file path would show, for example, that

12   e-mail archive then when it went -- that it went to corporate

13   law, then that it went to review platform.

14        Because they never requested that information, we

15   never conferred about it or never took steps to make sure any

16   of that information was preserved at any step of the process.

17   So if we were to go back and try and recreate it, we would have

18   to do an enormous amount of redactions, so that's, I think, the

19   issue, your Honor.  So I just wanted to make sure that your

20   Honor was clear on our positions.

21        THE COURT:  So the -- they're asserting that they did

22   ask for native files and that that would have included file

23   path information.

24        MR. KAHLON:  I don't agree, your Honor.

25        THE COURT:  Let's just get to that.  Do you agree they

1    did ask for native files last year?

2         MR. KAHLON:  I agree that they asked for e-mails in

3    native file format.  I don't agree that by asking that, that

4    somehow includes retroactively all of the metadata that they

5    think that they're entitled to.

6         And my -- Mr. Cancila just further confirmed to me

7    that that was after most of documents had already been

8    collected and produced.

9         THE COURT:  Right.  So what you are saying, when you

10   were making -- when you were starting off, you said, We had

11   some requests regarding the format that came in, in June, after

12   we had done our initial production, and then you get another

13   call and -- from Mr. Bellas asking for e-mails to be produced

14   in native file format.

15        MR. KAHLON:  After the initial collection and

16   production is pretty much already completed, your Honor.  And

17   it wasn't a call, it was during a meet-and-confer.  And so what

18   we said was that going forward we will attempt to produce

19   e-mails in native file format, and we have attempted to do

20   that.  But those are, I believe, already e-mails that we had

21   already collected.  And so, yeah, for example, they were --

22   hadn't been produced yet, or we were in the process of

23   reviewing them for privilege, and so then when we went forward

24   after that request, we have attempted to produce those e-mails

25   in native file format.

1          *MR. BLONDER:*  Judge, there was a misconnection.  They

2     did a collection.  They didn't produce documents until

3     significantly after that point in time.  So they -- it wasn't

4     that they produced things, and then we said want a different

5     format, that's Number 1.  Number 2, our understanding --

6     Mr. Bellas can speak more to it -- in asking for things in

7     native format, which Mr. Kahlon confirmed we did do, that would

8     include the file path.

9          *THE COURT:*  That's what I'm trying to narrow in on, is

10    their contention, though, is that it was only with respect to

11    e-mails that hadn't yet been either collected or produced.

12         *MR. BLONDER:*  No.  We asked for e-mails in native

13    format, which is what we asked for.

14         *THE COURT:*  Okay.

15         *MR. BLONDER:*  And at that point, nothing had been

16    produced.  We didn't know what they were doing in terms of

17    document issues.  So it's not that, hey, we got something,

18    didn't like it, and said go back and do it again.  We were

19    saying --

20         *THE COURT:*  Okay.  Let me address that particular

21    point.  First of all, we are talking -- as far as the request

22    for documents to be in native file format, I don't know how

23    much this makes a difference in terms of the total production,

24    but we are talking about that request was made relating to

25    e-mails.

1          MR. BELLAS:  It was actually -- your Honor, first of

2     all, let me -- we will try to cut this.

3          THE COURT:  Well, that's what I'm trying to do, is get

4     down to what everyone agrees to, if there's anything.

5          MR. BELLAS:  But this has also been --

6          THE COURT:  We are talking about stuff that happened a

7     year ago now.

8          MR. BELLAS:  I agree.  Going back to our initial

9     preproduction 16 -- Rule 16 conference.  I specifically

10    remember two occasions where I looked at -- I talked -- it was

11    on the telephone.  I asked if we could have an e-discovery

12    conversation.  "We are not ready" was the answer we got.  So

13    before anything was being done, just to set the scheduling

14    order, I specifically asked for an e-discovery conference.

15    They told me on two occasions, "We are not prepared to have

16    that discussion."

17         At our first face-to-face, I said can we have an

18    e-discovery conversation.  This was before any production.

19    That was the first time Mr. Kahlon sat across from me and said

20    that "we have documents in hard copy."  And we went back and

21    forth on that issue, saying that that's how they retain

22    documents.  And then he started talking about what they were

23    doing, without any conversation about us, about what we wanted,

24    and that they were going ahead with it.  Following that, I sent

25    a letter, the June 2nd letter.  The letter -- the last

1    paragraph, I believe, of that letter says our first preference
2    is to have everything in native file format.
3         Let me say something further about the native file
4    format.  The rules say that we should be getting documents in
5    native file format, not anything else.  Then if there's issues
6    with that and we can't get it, then there's a discussion about
7    what should be done.
8         ESI is a very important -- an important part of
9    production of ESI is the metadata, and that should be preserved
10   for us in the native file format with everything else.
11        One of the essential elements of that is the file path
12   and the content.  The information we have indicates that that
13   file path had to have been removed from the data that we got.
14   In other words --
15        THE COURT:  I understand that part.  I understand the
16   importance of the metadata, and what I'm trying to hone in on
17   is when things were produced, when things were asked for, what
18   was agreed to, and then there's also what's in the rules.
19        MR. BELLAS:  Okay.
20        THE COURT:  All right.  So...
21        MR. BELLAS:  So the answer to those questions, then,
22   is, Number 1, nothing was ever agreed to in advance, all right.
23   We never had a discussion.
24        THE COURT:  But you did ask for documents in native
25   file format in your June 2nd letter.

1          MR. BELLAS:  Yes, sir.

2          MR. KAHLON:  That's not right, your Honor.  The letter

3     didn't come from Mr. Bellas, it came from Mr. Blonder.

4          MR. BLONDER:  Mr. Bellas wrote it.

5          MR. KAHLON:  No. well, it wasn't signed by him.  We

6     had had a meet-and-confer subsequent to that that letter, which

7     was when Mr. Bellas raised -- it was the first time I ever

8     talked to Mr. Bellas, where he raised to me for the first time,

9     "We want e-mails in native file format."

10         He may be referring to a second letter.  I can

11    guarantee you the June 2nd letter, which we've attached

12    multiple times, doesn't ask for anything in native file format,

13    which was the very issue that we raised with Mr. Bellas at that

14    subsequent meet-and-confer.

15         The request for production had been served back in

16    March.  By the time of the June 2nd letter, we were already

17    preparing the documents for production.  By the time of the

18    meet-and-confer, where the native file format request was first

19    made, we were literally in the process of getting the documents

20    burned to disk, so we said, We can't accommodate you this time.

21    Going forward, when we produce e-mails, we will attempt to

22    produce them in native file format.

23         That's also in a confirming letter, which was

24    attached, I believe, to our February 2015 letter brief.  We

25    have already gone through this time line with them multiple

1    times.

2         MR. BELLAS:  At the end of the day, your Honor, in

3    order for them to have produced the documents in native file

4    format, it should have had those fields in it, and those fields

5    aren't there.  For them -- for those documents now to not have

6    that field is of concern to us.  And it ought to be to the

7    Court because they have to have purposely gone into every

8    document and removed that path.  I will admit that it was an

9    oversight on our part in the June 2nd letter where we

10   identified the fields that we wanted, that the file path was

11   omitted.  It was a mistake.  But that file path is part of the

12   native file format.

13         More importantly now, with the second request for

14   production of documents, we have asked for that, all of those

15   fields, in the second request for production of documents.  So

16   going forward, all right, we should -- we may be able to get

17   it.  I don't know.  We haven't seen the documents that have

18   been produced pursuant to that second request.  They have not

19   raised an issue with the format that we have made -- the

20   request we made in that second request.  They've objected to

21   it, but we've not had a discussion about that yet.

22         And those -- we got those objections last Friday, I

23   believe, their responses.  At the end of the day, we still lack

24   essential information that should have been part of the

25   document.

1        THE COURT:  Well, the way we got here is still

2   important to that because we are talking about requests that

3   were made a year ago, responses that were received months ago.

4   And now we've got a new set, which is different.  So the fact

5   of whether or not you requested it and when you requested it to

6   be in native file format versus when things were received is

7   very important.

8        So would you agree, Mr. Kahlon, though, that when we

9   are talking about -- when a request for something in native

10   file format is made, that should include the file path

11   information?

12       MR. KAHLON:  I don't agree, your Honor, because I've

13   never seen any authority for that position.  I understand that

14   they're asserting it here.  If that had been part of what -- it

15   certainly wasn't part of what we had agreed to because, recall,

16   by this time, we had already collected all the documents.

17       THE COURT:  Yeah.  But they're saying that you didn't

18   engage them in the ESI protocol discussion.

19       MR. KAHLON:  I'll let Mr. Cancila speak to that, but I

20   will point out that the critical fact is, your Honor -- first

21   of all, I wasn't involved.  The first time I talked to

22   Mr. Bellas was months after they served the request for

23   production.  The key in my mind, because it is based upon what

24   the rules say, no production format in that request.  So then

25   we go out, and the rules then say if they don't request a

```
1    particular format, you, the producing party -- it is subpart
2    (ii) of 34(b)(E), I think, says that if no request is
3    specified, no format is specified, you, the producing party,
4    have the option of doing it these ways.  So that's what we
5    started doing.
6            Then we get the June 2nd letter, and we say, Okay.
7    You guys are asking for these fields.  We are going to try and
8    include them.  You just heard Mr. Bellas say no request for
9    file path.
10           THE COURT:  Right.
11           MR. KAHLON:  We have also attached that letter
12   multiple times, and no request for native format.  Then they
13   request native format, and we said, Okay.  We will try to
14   produce them in native format.  And the representation that was
15   made to us at the time was, Well, native format will allow us
16   enhanced searchability.  We want to be -- fine.  We will try to
17   and produce them in that manner, and that's all we have tried
18   to do.  The rules say what the rules say, and we have tried to
19   accommodate that.
20           THE COURT:  All right.  So going from the moment that
21   it is requested that they are produced in native file format,
22   when you say "we'll try," what do you mean by "we'll try"?  Did
23   you do it or not?
24           MR. KAHLON:  We have.  I don't think there is any
25   dispute that we have produced many e-mails.  I think we've
```

1    produced over a thousand.  This is, again, in one of our letter

2    briefs, we pointed it out.  I think we have produced over a

3    thousand e-mails in native file format.

4         THE COURT:  Yeah.  And I can't -- I don't have a bank

5    of chapter and verse of all these issues in my mind, so you are

6    going to have to be clear about where -- if there's something

7    you want me to look at in a prior letter, we are going to have

8    to get it out and have me look at it.

9         MR. KAHLON:  That's fine, your Honor.  I'm going off

10   of memory.

11        THE COURT:  I'm not disputing what you are saying.

12        MR. KAHLON:  Yeah.  I don't think there is any

13   dispute.  I think they were just saying when they produced it

14   in native form, they didn't contain X, Y, or Z.  So we have

15   attempted to accommodate that request, again, in our view,

16   belated request, but we have attempted to accommodate it, to

17   the extent we can.

18        This issue of file path, again, never raised until

19   after our productions.  We understand, yes, they have now

20   requested in their second set of requests for production.  The

21   point that we make in our papers is that those requests are

22   largely duplicative of ones we have already received and that

23   we have already produced documents for, so we certainly are not

24   required to go back and re-produce documents.  The rules are

25   pretty clear on that.

1       So I think the only issue that we're dealing with here

2  is whether going forward for the documents that -- the

3  additional documents that are responsive to this second request

4  for production, we should include that information.  The point

5  that we make in our papers is, we are still going to have to go

6  back to documents we have already collected largely, and we

7  don't believe that they would be entitled to this information

8  anyway.  That's how I -- that's at least how I see the dispute.

9       THE COURT:  All right.  So before we get to whether

10  you are entitled to it under the rules in the first place,

11  let's then address -- well, if you want to make one more

12  comment regarding the things that were asked for and produced

13  months ago.

14       MR. CLIFFORD:  Well, certainly, what you just heard,

15  if I -- listening to this just raw, I think we were told

16  that -- just told -- that on their own unilaterally they go out

17  and start to gather information.  They repeatedly deny an

18  opportunity to sit down and talk about structure.  And -- but

19  during that time when they're denying that opportunity to sit

20  down and talk about the structure, which there's no question

21  that we objected to that, that they were gathering documents.

22  And counsel just said, well, when there was no pending request

23  out.  So the rule that he cites didn't particularly apply

24  because they just unilaterally selected one of these three

25  ways, their way of going about granting the documents.

1          *THE COURT:*  But wait --

2          *MR. CLIFFORD:*  Judge, let me finish.

3          *THE COURT:*  No, no, no.  I have a question.

4          *MR. CLIFFORD:*  Okay.

5          *THE COURT:*  So when you say -- I'll let you finish,

6     but I have a question about something you already said.

7          *MR. CLIFFORD:*  Yeah.

8          *THE COURT:*  So the -- when you say there was no

9     request out, that part, my understanding there was a request.

10    They were responding to a request.

11         *MR. CLIFFORD:*  Well, maybe I just heard something

12    different.  And maybe I misunderstood what counsel said.  I

13    believe counsel said that they started gathering documents

14    before they were dealing with a specific request.

15         *THE COURT:*  Okay.  That's not how I understood it, but

16    let's clarify that.

17         *MR. CLIFFORD:*  Let's clarify that.  Because it goes to

18    the heart of this because --

19         *THE COURT:*  It does.

20         *MR. CLIFFORD:*  -- if they gathered documents in the

21    way they wanted to gather them.  And it is indisputable that

22    when you ask for document in its native form, it includes that

23    metadata, and metadata includes that file path.

24         *THE COURT:*  So that is the disputed, for one thing.

25    But was -- were there requests to produce already out or not?

1        MR. KAHLON:  There were, your Honor.  The point I was

2   making was there was no format for ESI production specified in

3   that request which --

4        THE COURT:  Right.  That's what I understood you to be

5   saying.

6        MR. KAHLON:  Right.  Which under the rules then says

7   it leaves it to the producing party to choose the format.  Then

8   we get Mr. Blonder's letter, which still allowed us time to

9   conform to it, so we attempted to conform to the production

10  format in that letter.  Then we have the meet-and-confer, where

11  native is requested for the first time, and, again, we have a

12  letter confirming this, we tell them we can't comply with it

13  for this production.  Going forward, we will attempt to produce

14  e-mails in native format.

15       THE COURT:  The reason I stopped you, Mr. Clifford, is

16  this is an important point, as you agreed to, which is there

17  was a formal request to produce sent out.  There wasn't a

18  format specified.  Rule 34 does say what you do when that's the

19  case.  In the interim, there was a letter from Mr. Blonder.  It

20  doesn't say anything about file path, and it doesn't say native

21  file format either.

22       MR. CLIFFORD:  Well, that's --

23       MR. BLONDER:  Mr. Bellas says it it does, Number 1.

24       MR. CLIFFORD:  That, we dispute.

25       MR. BLONDER:  Number 2, at the same time, as

1   Mr. Bellas just said, he was trying to have discussions with

2   State Farm regarding the method of production, and they were

3   refusing to engage with him.  So it can't sit there and say,

4   well, it wasn't specified in their request.  Mr. Bellas was

5   trying to engage with them.  They won't engage, so therefore

6   they can do what they want.  Because that process is, if it's

7   not designated, you have the conversation to agree to the

8   protocol, which is what Mr. Bellas is saying he was trying to

9   do.

10          THE COURT:  No.  What the process says is when you

11  make the request in order to make -- so there's -- so we don't

12  have to have this discussion a year later.

13          MR. BLONDER:  Right.

14          THE COURT:  When you make the request, you put in your

15  request to produce what the file format is that you want, or

16  you send them a letter that says what it is that you want.

17          MR. BLONDER:  And before they produced a single

18  document, they received a letter.

19          THE COURT:  All right.  So let's look at that letter.

20          MR. KAHLON:  I'm trying to have one of our paralegals

21  send it to us, your Honor.

22          THE COURT:  All right.  We are going to be in recess.

23          MR. KAHLON:  Your Honor, it's -- I believe it is

24  Exhibit 6 to our February 2nd 2015, letter brief.  I think

25  that's what it is, if I'm reading this citation correctly.  But

1   I don't have that brief with me, unfortunately.

2           *THE COURT:*  February 2nd?

3           *MR. KAHLON:*  I think that's right, your Honor.

4           *THE COURT:*  Exhibit 6?

5           *MR. KAHLON:*  I think it is Exhibit 6, according to my

6   little reference here.  It's Mr. Blonder's June 2nd 2014,

7   letter, I think.  I think that's what the exhibit is.  I'm

8   hoping my citation is right.

9           *THE COURT:*  You are correct.  So I'm going to print

10  this out.  And I will print out a copy for each of you.  We are

11  going to read it, and we will continue.

12          We are in recess for 15 minutes.

13          *MR. KAHLON:*  Thank you, your Honor.

14                          *(Recess)*

15          *THE COURT:*  So we went off the record to review the

16  June 2nd letter, and while that was happening, the Court was

17  referenced to three additional letters, which we're making

18  copies of, and we are going to consider those.  But since we

19  may be running out of time for this morning, we are going to

20  try to skip forward to some of these other issues, and then we

21  will return to the format of the ESI production and get as much

22  of that done as we can.

23          So authentication of State Farm documents was the next

24  issue.

25          *MR. CLIFFORD:*  Right.  And there, your Honor, my

1    recommendation is a meet-and-confer.  That is a pending issue,

2    but I had a snippet of a conversation with Mr. Safer the other

3    day at a celebration of their partner becoming president of the

4    Chicago Bar, and all the past presidents, we go to that.  And I

5    said, I'd like to talk to you about that, and he said fine, and

6    then I guess he is on vacation now.

7           So my recommendation there is that I initiate a call

8    to Mr. Cancila and Mr. Safer and set up a meeting and then we

9    report back to you about where we are at.

10          *THE COURT:*  Okay.

11          *MR. CLIFFORD:*  Is that okay?

12          *THE COURT:*  Yes.

13          *MR. CANCILA:*  And that's fine for such a discussion to

14   occur.  I don't think that's quite on the fast burner issue as

15   these other items.

16          *THE COURT:*  Right.

17          *MR. BLONDER:*  It is, Joe, to the extent we will need

18   discovery to authenticate --

19          *MR. CANCILA:*  I'm just saying next week.

20          *MR. CLIFFORD:*  It is not a next week.

21          *MR. CANCILA:*  It's not a next-week issue.

22          *THE COURT:*  You know, I understand why this needs to

23   be clarified, you know.  Do they need to go out and lay

24   foundation or not?

25          *MR. BLONDER:*  Right.

1          THE COURT:  And I also understand that, with respect

2     to some of the documents you have produced, you may not be in a

3     position to stipulate to the authenticity, while I would guess

4     that the vast majority of them you would be able to, especially

5     ones there aren't third-party documents.

6          MR. CLIFFORD:  Right.

7          MR. CANCILA:  There's a big -- third-party issues

8     associated with this, and that's what we have to kind of work

9     through and discuss.

10          THE COURT:  That makes sense to me, third-party

11     documents especially.

12          MR. CLIFFORD:  I'll initiate the call.

13          THE COURT:  All right.  Sounds good.  So there will be

14     meet-and-confers on authentication issues.  And then in the

15     second submission, in addition to the overlapping issues

16     regarding ESI format, there is the issues raised with respect

17     to requests to produce specifically relating to State Farm's

18     briefs in the Illinois Supreme Court.  And the primary

19     objection to this is there's work product and attorney-client

20     privilege, and we already talked about that.

21          I think it goes beyond that, and the Court's read of

22     this issue, in my mind, it goes beyond that.  There's some of

23     these requests, in the Court's mind, clearly are

24     attorney-client privilege protected and work product protected,

25     and while relevant, most attorney-client work product is.  And

1    so this is -- and I'm using the Number 79 as the benchmark

2    here.  My initial thoughts on this are A, B, C, and D, and H

3    and I and J and K are attorney-client and/or work product

4    protected documents.

5            MR. CANCILA:  A through D, H through K?

6            THE COURT:  Yes.

7            Then this is my initial thought on these.  You know,

8    we are not talking about crime fraud again.

9            MR. BLONDER:  No.

10           THE COURT:  We are just talking about is this

11   protected.  Now, as it relates to E, F, and G -- well, let me

12   first go to H, I, J -- L.  I don't see how -- you know, that's

13   obviously not protected.  We are talking about communications

14   between State Farm and another person or party.  So those

15   aren't protected, even if it's between the attorneys.  So those

16   documents -- so then we -- and in addition to that, I don't see

17   how there is any issue there with respect to work product or

18   there being a problem with there being some issue relating to,

19   is this a contention of some sort?  And I'm not sure that's an

20   issue anyway.  It pertains to the statements in the briefs.

21   That's pretty much a standard discovery request.

22           MR. CANCILA:  So as to that, I mean, we have produced

23   documents that relate to Justice Karmeier, so those would have

24   been swept in what we have previously produced.  Work product I

25   think would only come in here to the extent we are dealing with

1  something like post-litigation filing, e-mail communications

2  between State Farm counsel and Justice Karmeier counsel, for

3  instance, you know, relating to whatever pleadings are filed.

4       THE COURT:  In this case.  Post-litigation in this

5  case.

6       MR. CANCILA:  Yes, yes.

7       THE COURT:  Okay.

8       MR. CLIFFORD:  So -- and that's a separate subject

9  that's not before the Court I would think at the moment.

10      THE COURT:  Yes, it's not.  So if there's -- we can

11  revisit that if there's an argument that that's -- shouldn't be

12  considered work product or privileged.

13      MR. CLIFFORD:  I mean, you know.

14      THE COURT:  That would have to fall within some sort

15  of joint defense type of theory, wouldn't it?

16      MR. CLIFFORD:  Well, that's an interesting question in

17  and of itself.

18      THE COURT:  Well, I'm just saying that's those are --

19  that's all food for thought.  You all can chew on those things.

20  I agree.  That's not before the Court, and I'm not prepared to

21  delve into that.

22      MR. CLIFFORD:  And counsel just made a remark about

23  production pertaining to Justice Karmeier that used the term

24  of -- the nice term of folded into or encompassed by other

25  things that we produced.  That's been one of our ongoing

1    problems, is identifying what they believe they're producing

2    and what it is responsive to in terms of the request.

3            THE COURT:  Well, we are going to talk about that here

4    in a minute also.

5            MR. BLONDER:  Judge, I'm looking at I and J that you

6    just flagged.

7            THE COURT:  Yeah.

8            MR. BLONDER:  As I look at those, it wouldn't

9    implicate privilege or work product because it is foundational

10   in the sense of who the people are.  It doesn't ask for what

11   would be a privileged communication, but it says who are the

12   people who would know about this.

13           MR. CANCILA:  Well, that shows persons with whom

14   attorneys would have spoken.  Documents that identify the

15   person with State Farm who supplied the information to the

16   attorneys.

17           MR. BLONDER:  But that would be --

18           MR. CANCILA:  What could that mean other than --

19           MR. BLONDER:  Well, that would be on a privilege log.

20   That would be information in terms of foundational information

21   to establish a privilege or a work product exception, so it

22   would be information that's not necessarily protected.  Because

23   it's not who did the attorney think through and say, well, who

24   I do need to go talk to?  It is reflective of who are the

25   people who would have the information or for which a privilege

1    would be asserted.

2         *MR. CANCILA:*  They've had two logs from us for some

3    extended period of time that list many documents relative to

4    the 2005 and 2011 pleadings.

5         *THE COURT:*  So would you agree that to the extent that

6    I and J simply calls for identification of communications that

7    are on a privilege log, that they would be identified?

8         *MR. CANCILA:*  You mean identified those documents on

9    the privilege log that relate to 2005 and 2011 pleading?  I'm

10   just trying to understand what else that means.

11        *MR. BLONDER:*  I think it is something different.

12        *THE COURT:*  Let me --

13        *MR. BLONDER:*  I'm sorry.

14        *THE COURT:*  So these are -- we are talking about H and

15   I.

16        *MR. BLONDER:*  I and J.

17        *THE COURT:*  Okay.

18        *MR. CANCILA:*  Documents that identified the attorneys

19   with knowledge that the statements were accurate or inaccurate.

20   I don't know how that is anything but straight work product

21   attorney-client.

22        *MR. BLONDER:*  Well, but if they are going to say, for

23   example, if Mr. Cancila had knowledge of something, the fact

24   the Mr. Cancila may or may not have knowledge of something

25   isn't privileged.  That goes to a foundational issue as to the

1    communications with him may be privileged, but the fact that he

2    is a person for whom certain knowledge may exist is a

3    foundational issue to establish a privilege.  It's not the

4    privileged communication in and of itself.

5         MR. CANCILA:  It goes to what I know as counsel for

6    State Farm relative to any particular statement being accurate

7    or not accurate.

8         MR. BLONDER:  But --

9         THE COURT:  I don't see how -- I don't see how J --

10        MR. BLONDER:  If there was an e-mail.

11        THE COURT:  -- can be anything but attorney-client

12   privilege.

13        MR. BLONDER:  Well, but what it may be, Judge, is --

14        THE COURT:  Because it's contained in a document.

15        MR. BLONDER:  So if there is a document, for example,

16   from Ed Rust to Mr. Cancila -- I'll just pick two examples.

17   The contents of the document may be privileged, but the fact

18   that there's a communication from Mr. Rust to Mr. Cancila, that

19   part would be disclosed.  It would be on -- either they

20   produced a document and redact the substance of it as

21   privileged or work product, unless it fits within an exception,

22   or they would take that document, in total, and put it on a

23   privilege log.  So the document itself isn't protected.  The

24   contents, the substance of it may be protected, but the

25   foundational elements of it are not.

1          *MR. CANCILA:*  So I think I've indicated already that

2     relative to the 2005 and 2011 pleadings, we have logged any,

3     you know, privileged communications and supplied that log to

4     plaintiffs.  In one instance, it was a log last year, I

5     believe, that we supplied; in another, it was several months

6     ago.  So whatever this foundational element stuff is, they've

7     got a log.  And they have that.

8          *THE COURT:*  So you are saying you would agree that --

9     because, of course, we are talking about documents, not

10    communications.  So if there's a document that would fall

11    within this category, it's already on a log.

12         *MR. CANCILA:*  Correct.

13         *THE COURT:*  That's been produced.

14         *MR. CANCILA:*  Correct.

15         *THE COURT:*  All right.  So it's logged.  That's the

16    representation that's being made.  It's already been logged.

17         *MR. BLONDER:*  Okay.  If that's -- you know.

18         *THE COURT:*  And that would relate to I as well.

19    Because if there was a document that went from someone at State

20    Farm to one of their attorneys, that would be on the privilege

21    log, right?

22         *MR. CANCILA:*  Correct.

23         *THE COURT:*  Okay.

24         *MR. BLONDER:*  A, Judge, we're not asking for the

25    privileged communication.  State Farm made representations to

1    the Court.  State Farm -- the basis on which State Farm made

2    the representations, that would be -- in my mind, that's fair

3    game.  And, again, it is not asking for what was the lawyers

4    given.  What was State Farm's basis for a position?

5         THE COURT:  The -- there is a difference between each

6    document that State Farm relied upon and what's the basis for

7    your position.  So what did you rely on in making this

8    analysis?  That's attorney-client.

9         MR. BLONDER:  So if we re-formed subpoint A.

10        THE COURT:  Well, this goes to my initial thoughts

11   about the distinction between what's attorney-client privilege

12   and work product, is like a contention in an interrogatory,

13   what's the basis for this?  Tell me the basis for the

14   statement.  Similarly, if you are in oral argument on this,

15   what's the basis for your statement, counsel?  That's a proper

16   question.  And you couldn't say to the Court -- you know, you

17   couldn't say to the Supreme Court during oral argument, well,

18   that's attorney-client privilege.

19        MR. CANCILA:  Sure.

20        THE COURT:  You have to tell the basis.

21        MR. CANCILA:  Right.

22        THE COURT:  And so the basis, I believe, would be

23   appropriate.  Identify any documents that reflect the basis for

24   that assertion.

25        MR. CANCILA:  As a contention interrogatory.

1          *THE COURT:*  Well --

2          *MR. CANCILA:*  I mean, as a document request, you take

3     20 requests, and you give 12 subparts to each, and you have 240

4     contention interrogatories that have been posed by these

5     requests.

6          *THE COURT:*  So that's the separate issue.  That is a

7     little more complicated, is there are clearly things here that

8     are not privileged.  I mean, identifying the -- unless you

9     are -- because it is one thing to say it is just advocacy.  We

10    are not saying it's true.  That is not the position.  You know,

11    my ruling on crime fraud had multiple bases.  Your defense has

12    multiple bases, one of which it is just advocacy, but you are

13    not resting on that.

14         *MR. CANCILA:*  No.  Certainly.  Whether what they said

15    is make believe fiction or not, which is State Farm's position,

16    or whether there's any basis to it, you know, that's -- that's

17    a separate issue.

18         *THE COURT:*  Yeah.  And so if you are making -- if you

19    make a contention in a brief that has a factual basis separate

20    and apart from everything that the attorneys considered, in

21    other words, here it is now.  It's on the brief.

22         *MR. CANCILA:*  Right.

23         *THE COURT:*  We've adopted this.  What is the factual

24    basis that you can assert for that?  That's a fair question.

25         *MR. CANCILA:*  As a contention interrogatory.

1        THE COURT:  Well, all right.  So, yes, it would be for

2    that.  Is it a fair question with respect to a request to

3    produce then is the next step.  And in looking at that issue,

4    you know, where is the line?  I mean, when you ask -- it is a

5    very specific request.  What are the documents that support

6    this particular contention, in your mind?  Produce them.

7        Why is that an improper request to produce?  Do the

8    rules not allow for that?

9        MR. CANCILA:  Right.  Well, the issue isn't so much

10   produce the documents that support your contention X.  The

11   issue is more we are giving you this ton of granular identify

12   the documents that support this contention, this contention,

13   this contention, this contention, span over, you know, 20.

14       And then isolate for us by request, probably subpart,

15   in their minds, you know, which ones, you know, fit which ones.

16       That's like over the -- that's really over the top.  I

17   mean we believe in the course of the production we are making

18   in any event and have made in any event that we've provided the

19   documents responsive to these, you know, what they're, you

20   know, driving at here.  And we've given illustrations of not

21   only the myriad documents that we've produced, but the

22   documents in their own investigators' materials, in the

23   third-party depositions that have taken place, and other

24   productions that support, you know, our views as well.

25       So that's where the rub becomes, in that, you know,

1  kind of granularity aspect of it.

2       MR. BLONDER: Well, we didn't ask for what third

3  parties may have produced that support their view. We are

4  asking for State Farm's -- to use the Court's rephrasing of our

5  first request, the basis for certain assertions, State Farm's

6  basis. That's what we are asking for, Number 1.

7       Number 2, there's nothing about Rule 34 that says you

8  can't ask a production request for documents that relate to an

9  assertion, you know, in terms of a contention request, I guess

10  would be the way to describe it. It is not prohibited by the

11  rules. There is no -- it says -- you know, Rule 34 says you

12  can ask for documents and tangible things, and they either

13  exist or they don't exist.

14       THE COURT: Right. But the question is, at what level

15  are you allowed to say, tell me everything about your defense?

16  Here's a contention interrogatory, here's a contention request

17  to produce, and I want you to detail this.

18       MR. BLONDER: Well, but we didn't ask for.

19       THE COURT: And with specificity.

20       MR. BLONDER: We didn't ask for it that way. We asked

21  for documents that they relied upon, but, again, take the

22  reformulation of documents that were the basis for. They may

23  have things that aren't in documents that are a basis for.

24  That's not what's asked for here. It's saying what

25  documents -- you know, there's a distinction between the

1   interrogatory, per se, and the information that would be

2   covered and, here, just what documents is it.

3        THE COURT:  Right.  But when you take the two, you

4   know, where is the limit in terms of what you can ask through a

5   combination of interrogatories or requests to produce about?

6   Tell us your defense.  Tell us your case.

7        MR. BLONDER:  Again, Judge, I think if we had gone

8   beyond kind of "give us the documents that were used at that

9   time," again, it's also a temporal issue.  We are not asking

10  for now what they may think necessarily.  You know, for

11  example, I look at A, and that's just the one I'm focused on.

12  We point to a particular statement in the brief and we say "the

13  documents that State Farm relied upon to make the

14  representation before they were made to the Court."

15       So it's not saying what have you learned in discovery

16  that would relate back, it's at that time, what were the

17  documents that formed the basis of the representation?  So it's

18  a -- it's a -- I think that's the distinction.  If it was an

19  interrogatory saying, tell us every reason that this was true

20  or that was true.  And it was more encompassing temporally.

21  Then I think it might potentially get into the issue you are

22  raising about an interrogatory.  We are saying, at that point

23  in time, what are the documents?

24       MR. CANCILA:  You have already ruled A through D and H

25  through K, and then I think we've addressed I through J.

1          THE COURT:  Well, other than -- I also have said --
2     and so you may get a revised one -- or each document that
3     formed the basis of the -- or you know -- of the
4     representation.
5          MR. CANCILA:  Each document that formed the basis of
6     the representation --
7          THE COURT:  Yeah.
8          MR. CANCILA:  -- or each document that provides a
9     basis for --
10          THE COURT:  Provides a basis.
11          MR. BLONDER:  Hold on.  "Provides" takes out the
12     temporal issue.  And provides would bring it all the way now so
13     if they looked and said in discovery, for example, the chamber
14     of commerce last week produced a document that said X, that
15     would fit within --
16          THE COURT:  No.  The representation before they were
17     made to the Court.  You have got that in there.  I'm still on
18     A.  You have got before they were made to the Court.  So the
19     temporal limitation is still there.
20          MR. BLONDER:  Okay.
21          THE COURT:  Provides a basis.
22          MR. CANCILA:  Right.  And in --
23          THE COURT:  So...
24          MR. CANCILA:  But in terms of the notion they're not
25     trying to jump temporal to now, how else can one explain E

1   through G?  Each document that State Farm -- I'm looking at

2   G -- or its attorneys at any time after the representation was

3   made that would indicate the -- that the representation was not

4   true and/or accurate when made.

5           *MR. BLONDER:*  That one would leap, Joe.

6           *MR. CANCILA:*  Pardon me?

7           *MR. BLONDER:*  That would leap the temporal issue.

8           *MR. CANCILA:*  Well, right.  That's the point.  This

9   notion that these aren't trying to, you know, impose obligation

10  now or address all, you know, discovery now or address what

11  other people have produced, you know, is crazy when you just

12  look at the wording of those things.

13          *MR. BLONDER:*  We are basically saying what was the

14  basis -- the documents that formed the basis at that point in

15  time, and then subsequent to that, documents that provide a

16  basis that that's either true or false.

17          *MR. CANCILA:*  What was the basis at the time -- keep

18  in mind the timing of these pleadings.  So plaintiffs filed,

19  for example, their January 2005 pleading in one week on one

20  day.  One week later, or ten days later, you know, State Farm

21  filed its opposition that is supposedly a predicate act now.

22  In the September pleading, again, we are talking -- I can't

23  remember if it was two weeks or three weeks or what, you know.

24  So that's kind of the time frame we're talking about in terms

25  of the reaction to a boat load of assertions that are contained

1    in those pleadings by plaintiffs -- provocative assertions.

2            *THE COURT:*  Mr. Clifford.

3            *MR. CLIFFORD:*  Certainly having been there for one

4    part of it, specifically being the filer of the '05 document,

5    having argued the case in the Illinois Supreme Court in May of

6    '03, what counsel just said kind of suggests that they didn't

7    have a lot of time to get this right and to make the

8    allegations and remarks that they did because they were doing

9    so in a very quick and hurried way when that belies the facts,

10   it belies what we now know in discovery about communications

11   between Mr. Murnane and State Farm.

12           And so that's why we are pushing on this stuff.  And

13   to -- at least alert the Court by way of background to a

14   further issue.  In the discovery that we've been doing over the

15   last month or so, it's clear they're challenging the ethics of

16   the lawyers in this case vis-a-vis what those lawyers did or

17   did not do to tell the Illinois Supreme Court about political

18   donations that they had made at the time of the '05 and 2011

19   filings.

20           So ethics -- lawyer ethics are coming here.  And they

21   are going to be intertwined somehow.  We haven't quite figured

22   out yet where they are going with all this stuff.

23           *THE COURT:*  Well, feel free not to intertwine them.

24           *MR. CLIFFORD:*  But, you know, this is a goose-gander

25   thing that we've talked about all along with counsel, and that

1    is there were affirmative representations of fact made to the

2    Illinois Supreme Court by lawyers for State Farm, which we

3    maintain and believe the proof will show were outright wrong.

4    And where wrong and what other descriptions you want to give

5    them, that's for another day.  So I think that background is

6    helpful for you.

7         MR. CANCILA:  And the goose-gander illustration is

8    helpful just recall not document one from plaintiffs produced

9    to us.

10        THE COURT:  Now, I'm just looking at this request.  I

11   mean, the problem -- if you look at this and you say, Hey, we

12   don't believe that it was inaccurate, well, that part of it is

13   easy.

14        So the next piece of this is identification of

15   documents that have already been produced.  And so you make a

16   supplemental request, and they say, Well, we have already given

17   you all of that.  We have got nothing else to give.

18        Now, do you need to say where to find it?

19        MR. BLONDER:  I believe they do, Judge, because that's

20   the old needle in the haystack.

21        THE COURT:  When this is brought to me, these issues,

22   in most cases, here's a pile of documents that are responsive

23   to your 30 requests, they're all in there, I -- if someone

24   complains about that, I say, well, identify it by dates

25   whatever the pages are of documents that are responsive.  Why

1    shouldn't that be the case for a supplemental request?  If the

2    request is, here's some additional requests, and your answer is

3    simply we've already given that to you.  Well, you obviously

4    know you have already given it to them.  You have to have gone

5    through that analysis, so you know what you have given them.

6    And you can identify where they are, can't you?

7         MR. CANCILA:  So, I mean, we were guided by, you know,

8    the subpart of a Rule 34 that addresses, you know, what's a

9    reasonably usable form or forms.

10        THE COURT:  Right.

11        MR. CANCILA:  And --

12        THE COURT:  But that's the form and format, which we

13   are going to -- which we are enmeshed in that.  But there is a

14   difference between "here's the form we are producing it in" and

15   "this is what identifies what's there."

16        MR. CANCILA:  Well, sometimes that reasonably usable

17   form also addresses whether you have to identify and associate

18   production with particular requests, you know, or may rely on

19   the fact that the documents you've provided are in searchable

20   format.  And, you know, we have cited to your Honor case law

21   where that issue has come up and addressed the issue of is

22   there an obligation to identify and associate the documents

23   produced with particular requests when they've been furnished,

24   you know, in searchable format, and that kind of search can be

25   done itself.

1          *MR. KAHLON:*  Sorry, Steve, real quick.

2          Let me add one other issue, your Honor.  On the

3     contention interrogatory front, as your Honor is certainly

4     aware, when you are ask an interrogatory like, Identify all the

5     facts or documents that support or refute your defenses,

6     usually -- at least in the cases I've been involved with --

7     those are deferred until the end of discovery, that's one

8     issue.  The other issue is you usually identify the exemplar

9     ranges, et cetera, but that's when you are dealing with a

10    contingent interrogatory.

11          Our view is that you don't -- you can't -- as they

12    themselves concede, use requests for production as a guise for

13    the type of information that Rule 33 is supposed to provide.

14          *THE COURT:*  But they're saying, We just want the

15    documents.  We don't want the --

16          *MR. KAHLON:*  And they have them.  That's our -- to the

17    extent there are nonprivileged documents, that's one of the

18    things we said in our response.  If you are asking for us, you

19    know, all the documents that relate that other basis for this

20    allegation, we have to go through and pick out the documents.

21    The point is we have produced them or on a log, and that's what

22    we said in our responses.

23          *MR. CANCILA:*  And they're in a searchable format.

24          *MR. KAHLON:*  Right.  Exactly.

25          *THE COURT:*  But searching.

1             *MR. BLONDER:*  That doesn't address.

2             *THE COURT:*  There's no way -- in this instance,

3    relating to this issue, searching doesn't provide the answer.

4             *MR. CANCILA:*  Well, if you can search "I, C, J, L,"

5    you could search "Karmeier."

6             *THE COURT:*  Well, what is it State Farm provides a

7    basis for this statement in this brief?  You can't search that.

8             *MR. KAHLON:*  That's a contention interrogatory, in our

9    view.

10            *THE COURT:*  Well, you know, again, the question is, is

11   yes that's a -- you can frame that issue as a contention

12   interrogatory, but you can also say provide the documents.

13   There's interrogatories, there's documents.  The Court does not

14   see there is a strict limitation on you can't ask for -- give

15   me the documents that provide the basis.  Because you wouldn't

16   necessarily get that same answer when you ask a contention

17   interrogatory.  In answering an interrogatory, you can be very

18   specific.  You can also reference documents.  That's an option

19   that you have.  You don't have to.  So I don't find that that

20   limitation is that strict.

21            So the Court is okay with this notion of what we are

22   going to call in general, you know, requests for production

23   being contention-type requests for production.  I think that

24   that is, in general, okay.  There are limitations, but I don't

25   see that they have been exceeded here, and I don't think that,

1   as it relates to these, a searchable format is going to be able

2   to address the issue.

3           So what we are left with is, you are going to have to

4   rephrase A --

5           *MR. BLONDER:*  Yep.

6           *THE COURT:*  -- as I've started.  And then we've got E,

7   F, and G, which we haven't had as much discussion about.

8           *MR. BLONDER:*  And L.  And L you said was okay.

9           *THE COURT:*  L, you know that -- L is fine.

10          *MR. BLONDER:*  Yeah.

11          *THE COURT:*  L is an appropriate request.

12          *MR. CANCILA:*  Could we provide further briefing to

13  your Honor on this?  This is something that we put together

14  in -- actually, Mr. Kahlon put it together.

15          *THE COURT:*  The answer is yes.  I've always said if I

16  get these things the day before, and there's been some

17  meet-and-confer, and there's a particular topic that you want

18  to provide additional information on, I'm okay with that.

19          *MR. CANCILA:*  Okay.

20          *MR. BLONDER:*  Joe, on which aspect, just so we're...

21          *MR. CANCILA:*  On -- I mean I -- I want to understand

22  where you're -- what I've heard you leaning is that some of

23  these are clearly privileged --

24          *THE COURT:*  Right.

25          *MR. CANCILA:*  -- and that was.

1          THE COURT:  And if they're privileged and it's

2     represented in a document, unless it's post litigation --

3          MR. CANCILA:  It has to be on a log.

4          THE COURT:  -- everyone has agreed that has to be on a

5     log.

6          MR. CANCILA:  Right.  Right.

7          THE COURT:  And if -- so that is encompassed within B,

8     C, D, H, I, J, and K.

9          MR. BLONDER:  Right.

10         THE COURT:  A, in the manner reformulated by the Court

11    would be appropriate; as written, it's also privileged.

12         MR. BLONDER:  Judge, do you want us to serve another

13    request for each of these reformulated to A, or can we modify

14    it on its face based on what we are doing on the record?

15         MR. KAHLON:  I didn't mean to take your Honor's --

16         THE COURT:  Oh, I think the quicker way through it is

17    just to modify it, as we've discussed.

18         MR. CANCILA:  Well, I mean --

19         MR. CLIFFORD:  Yes.

20         MR. CANCILA:  -- if they could provide us with what

21    that is.

22         MR. CLIFFORD:  We will.

23         MR. BLONDER:  Sure.

24         THE COURT:  You are in agreement was what it is in

25    writing, but just modify it.  You don't have to send it -- send

1  a letter.

2         *MR. CANCILA:*  Right.  Right.

3         *THE COURT:*  And that leaves E, F, and G and A.

4         *COURT REPORTER:*  G and what, Judge?

5         *THE COURT:*  E, F, G, and A, as referred.

6         *MR. CANCILA:*  Right.  Right.  And so the issue there I

7  think would be kind of a -- you know, to what extent we have to

8  go through this identification process, the granularity

9  involved with that.  Or if you are not commenting on what a

10 good faith level of identification is.  You know, there's going

11 to be like a lot of, you know, overlap, you know, between these

12 various requests.  Can you give a little sense of what your

13 exceptions would be?

14        *THE COURT:*  Well, if there's overlap, that's fine.

15 There's no problem with overlap.

16        *MR. CANCILA:*  Granularity-wise.

17        *THE COURT:*  Well, the documents responsive to this

18 request are found here.

19        *MR. CANCILA:*  To request 79, not the subparts.

20        *THE COURT:*  No.  I think the subparts have to be

21 identified because there's a clear difference between, for

22 instance, A and G.

23        *MR. CANCILA:*  Okay.  How many pages?  Five?

24        *MR. KAHLON:*  For the brief?  Yeah.  I think five

25 should be okay.  And just to be -- because I want to make sure

1   I understand where your Honor is coming from.  Because this is

2   obviously going to effect the discovery we serve on the

3   plaintiffs because even if -- you know, I think what your Honor

4   is suggesting is that the parties might have an obligation in

5   response to a request for production to marshal all of the

6   evidence that either supports their case or doesn't in response

7   to these requests.

8           THE COURT:  Well, this is the second.  You had raised

9   the issue of putting these off -- the responses --

10          MR. KAHLON:  That's -- yes.

11          THE COURT:  -- until the close of discovery.

12          MR. KAHLON:  And that's where I was going with it,

13  your Honor.

14          THE COURT:  And that's -- and that's something you can

15  address as well --

16          MR. CANCILA:  Okay.

17          THE COURT:  -- within that request.  Because these are

18  contention requests, is that something that you should be able

19  to respond to at the end --

20          MR. CANCILA:  Right.

21          THE COURT:  -- or not?

22          MR. CANCILA:  Okay.

23          THE COURT:  And you all can give me your views on that

24  as well, but I think we have narrowed it, to some degree.

25          MR. CANCILA:  Can we suggest five or seven pages?

1          MR. KAHLON:  I think we have got the hearing next

2     week.  So maybe what does your Honor think in terms of timing,

3     at least maybe two weeks?

4          THE COURT:  Yeah.  If we are not going to cover this

5     one at the next one, which I don't intend to, but what would

6     you like in terms of time to address this particular point?

7          MR. KAHLON:  I think two weeks.

8          MR. BLONDER:  Two weeks from tomorrow.

9          MR. KAHLON:  Two weeks from tomorrow should be

10    sufficient time, your Honor.

11         THE COURT:  Can you do it simultaneously?

12         MR. BLONDER:  I think -- we don't know exactly what

13    they are going to say.  So...

14         THE COURT:  All right.  So two weeks from tomorrow.

15    You want seven pages?

16         MR. KAHLON:  I think that's fine.

17         THE COURT:  A letter brief, single-spaced, is that

18    what you're asking for?

19         MR. KAHLON:  That's perfectly fine, your Honor.

20         MR. CANCILA:  Nine font.

21         MR. BLONDER:  We will respond a week after that.

22         THE COURT:  All right.  So that puts us at the 9th and

23    the 23rd.

24         MR. KAHLON:  And just to be clear, your Honor, I think

25    our positions on a lot of this have already been signaled to

1   plaintiffs' counsel.  We have never heard their response to it.

2   So we would like, actually, if we are going to do briefing on

3   this, because it is a big issue, simultaneous or give us the

4   chance to reply because we never heard their --

5         *THE COURT:*  Reply.

6         *MR. BLONDER:*  Okay.

7         *THE COURT:*  Let me give you until the 29th to reply.

8   And we might as well get a time for us to come back anyway for

9   our next -- wait a minute.

10        *MR. CLIFFORD:*  Judge, are you thinking July still?

11        *THE COURT:*  We are not going to have this issue done

12   until the end of July so...

13        *MR. CLIFFORD:*  Okay.  Yeah.

14        *THE COURT:*  We can do it at the very beginning of

15   August.  How about the 7th?

16        *MR. CLIFFORD:*  I personally can't be here.  On

17   July 29, I will be married 42 years, and there is a little

18   trip.  And if I cancel that trip --

19        *THE COURT:*  I'm not asking you.

20        *MR. CLIFFORD:*  -- you might have to invoke some of

21   your other powers.

22        *MR. BLONDER:*  Judge, the 7th doesn't work for me, and

23   if Mr. Clifford can't be here.

24        *THE COURT:*  Can you do it the following week?

25        *MR. CLIFFORD:*  I don't return to the States until the

1    18th of August.  I come back the 17th.

2              *THE COURT:*  Well...

3              *MR. CLIFFORD:*  I could be here on the 18th or 19th.

4              *THE COURT:*  That's putting things off a while.

5              *MR. BLONDER:*  Judge, I could be here the 11th, 12th,

6    or 13th.

7              *MR. CLIFFORD:*  I can try to phone in.

8              *THE COURT:*  As long as that won't -- well, I'll leave

9    that at your discretion.

10             *MR. CLIFFORD:*  I can engineer that one.

11             *MR. CANCILA:*  The 11th or 12th would work for me, not

12   the 13th.

13                  *(An off-the-record discussion was had)*

14             *THE COURT:*  August 11th, at 2:00, we will address this

15   issue, and there will be others.  The 8th, we are going to

16   address the issue of search terms.  And the one thing that we

17   haven't nailed down is also the format for ESI.

18             *MR. KAHLON:*  That's right, your Honor.

19             *MR. BLONDER:*  Judge, before we get to that or others,

20   our proposal is that the entire schedule be re-set by 90 days.

21   Just as we are trying to get through discovery, we just take

22   all dates and just -- 90 days.

23             *THE COURT:*  You guys just file a quick joint motion on

24   that.

25             *MR. CANCILA:*  Yeah.  I don't think that's going to be

1   a joint motion.  So, you know, in terms of the 90 days,

2   because, I mean, we are not really to the point of having a

3   discovery close or anything, what I think they're trying to

4   avoid, perhaps, is the impending class certification.

5        MR. BLONDER:  Actually, no, that's not the issue.

6   That's not the issue.

7        THE COURT:  All right.  Talk about it and file either

8   a joint or non-joint motion.  Yeah.

9        MR. BLONDER:  Just so the Court knows, we are looking

10  basically suggesting 90 days for everything.

11       THE COURT:  I understand.  I understand.  But I think

12  since there is not agreement, and there may not be a joint

13  motion, talk about it and file what it is you are asking for so

14  that it is clear what's being agreed to and what's not.

15       MR. CLIFFORD:  Yes, sir.

16       MR. CANCILA:  Are you done with your -- do you have

17  anything else?

18       MR. BLONDER:  On the scheduling issue, if we are going

19  to back to the form production issue, I have one comment before

20  we get into the letters or other issues.  I can either hold it

21  or --

22       THE COURT:  Do we have any other.

23       MR. CANCILA:  Well, I want to raise -- and I haven't

24  had a chance to meet-and-confer yet with plaintiffs on this,

25  but I wanted to just preview with your Honor that we may have

1    an issue with a pending 30(b)(6) request that we just received

2    that we are going to be objecting to, and we will

3    meet-and-confer with plaintiffs.

4              MR. BLONDER:  Why am I not surprised?

5              MR. CANCILA:  It is like on a --

6              THE COURT:  All right.  So January 8th, it's going to

7    now be at 1:00.

8              MR. CANCILA:  January.

9              THE COURT:  July 8th, at 1:00, we are going to talk

10   about the search terms.  We are going to talk about the format

11   of production -- because I have kept my people out there in the

12   hall long enough.  And then we are going to also address, if

13   necessary, the 30(b)(6) issue.

14             MR. BLONDER:  And we are going to deal with the

15   schedule at that point in time too?  Because, again, Judge, we

16   had not meant this as an issue with respect to class cert.

17   briefs, but if they are now going to fight us on that 30(b)(6)

18   deposition, which does relate to that, then there will be an

19   intertwining of this.

20             THE COURT:  That's fine.  I mean, if you can identify

21   what the disagreement is, we can talk about it.

22             MR. CLIFFORD:  That's always a good start, to identify

23   where you are.

24             THE COURT:  Yeah.

25             MR. CANCILA:  Okay.

```
1              THE COURT:  All right.  So that's it, right?
2              MR. KAHLON:  I believe so.
3              MR. CLIFFORD:  I believe so, sir.
4              THE COURT:  All right.
5              MR. KAHLON:  Thank you, your Honor.
6              THE COURT:  See you all next Wednesday.
7              MR. CLIFFORD:  I suggested that we have a court
8   reporter next Wednesday.  Is that okay or no?
9              THE COURT:  Yes.
10             MR. CLIFFORD:  It is going to be easier.
11             THE COURT:  I've talked to them, and we are going to
12  have at least one of them who can be here late.
13             MR. CLIFFORD:  That would be great.
14             THE COURT:  All right.
15             MR. CLIFFORD:  Thank you.
16             MR. KAHLON:  Before we go off the record, I just
17  wanted to clarify something because your Honor, I think, is
18  going to be looking at the letters.  I wanted to clarify one of
19  the statements I made earlier.  I had said that we didn't
20  produce any documents or there wasn't a request for native file
21  format.  I just wanted to clarify because this is not in
22  dispute, I think.  I don't want to mislead the Court.  They did
23  ask for PowerPoints and Excel spreadsheets in native file
24  format, and we have been producing those consistently.  I just
25  wanted to make sure that was in the record.
```

1        MR. CLIFFORD:  And we challenge that interpretation of

2   the request, but that's for another time.

3        MR. BLONDER:  And just for the record, I understand

4   Mr. Kahlon's point.  When we had ED folder on the list, we have

5   just spoken with our consultants during the break.  They said

6   that's file path.  So from the techno side, ED folder is file

7   path.

8        MR. KAHLON:  We will address that at the next hearing,

9   your Honor.  We have a letter that deals with that issue.

10        THE COURT:  Okay.  Great.  See you next Wednesday.

11

12                            -oOo-

13                    REPORTER'S CERTIFICATE

14       I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
    for the U.S. District Court, Southern District of Illinois, do
15   hereby certify that I reported with mechanical stenography the
    proceedings contained in pages 1 - 75; and that the same is a
16   full, true, correct and complete transcript from the record of
    proceedings in the above-entitled matter.

17
                DATED this 9th day of July, 2015.
18

19
                    s/Molly Clayton, RPR, FCRR
20                  _____

21

22

23

24

25