IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK HALE, TODD SHADLE,
and LAURIE LOGER, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, and WILLIAM G. SHEPHERD,

Defendants.                                                No. 12-0660-DRH

MEMORANDUM and ORDER

HERNDON, District Judge:

## I.  Introduction and Background

Now before the Court is plaintiffs' motion for class certification
(Docs. 438 & 492).   Naturally, defendants strongly oppose the motion
(Docs. 467 & 468).[1]  After extensively reviewing the voluminous pleadings
and the various related motions (which include the briefings on the motions

---

[1]State Farm Mutual Insurance Company ("State Farm") prepared a response (Doc. 467);
Murnane also prepared a response and joined in State Farm's response (Doc. 468); and
Shepherd joined in the responses (Docs.  475).

to exclude experts and the June 2, 2016 Memorandum and Order (Doc. 541) regarding those motions) and the applicable law, the Court finds the class certification is proper and grants the motion for class certification.[2]

On May 29, 2012, plaintiffs Mark Hale, Todd Shadle and Carly Vickers Morse, on behalf of themselves and all others similarly situated, filed a two-count Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., class action complaint against State Farm, Ed Murnane, William G. Shepherd and Citizens for Karmeier (Doc. 2).[3] Count One alleges violations of 18 U.S.C. §1962(c) and Count Two alleges violations of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c).

On November 4, 2014, plaintiffs filed a first amended complaint containing the same counts as the original complaint (Doc. 289).  This first amended complaint added Mark Covington and Laurie Loger as named plaintiffs.[4]  According to the first amended complaint, Hale is a citizen of New York; Shadle is a citizen of Texas and Loger is a citizen of the State of

---

[2]Defendants devote a portion of the response inviting the Court to revisit the issues of *Rooker-Feldman*, *res judicata* and collateral estoppel.  At this point in the litigation, the Court declines the invitation.  The Court will address these issues via a properly filed summary judgment motion.

[3]On September 26, 2012, plaintiffs filed a notice of voluntary dismissal as to Citizens for Karmeier (Doc. 54).  That same day, the Court acknowledged the notice of voluntary dismissal and dismissed without prejudice Citizens for Karmeier as a defendant (Doc. 55).

[4]On October 27, 2014, Magistrate Judge Williams allowed Carly Vickers Morse to withdraw as a named plaintiff from the case and allowed plaintiffs leave to file an amended complaint adding Laurie Loger and Mark Covington as named plaintiffs to the case (Doc. 286).  Thereafter, on September 11, 2015, the Court granted named plaintiff Mark Covington's motion for withdrawal and dismissal of his claims without prejudice (Doc. 417).

Illinois.  State Farm is a mutual non-stock company, organized and existing

under the laws of Illinois, having its principal place of business in

Bloomington, Illinois.  Shepherd is a citizen of Illinois and was employed by

State Farm. Murnane is a citizen of Illinois and was the president of the

Illinois Civil Justice League ("ICJL").

In the first amended class action complaint, plaintiffs allege in their

Introduction and Nature of Action section the following:

1. From 2003 to the present, State Farm, Murnane, and Shepherd
   (collectively, "Defendants") created and conducted the RICO
   enterprise described below to enable State Farm to evade payment of
   a $1.05 billion judgment affirmed in favor of approximately 4.7
   million State Farm policyholders by the Illinois Appellate Court.

2. Plaintiffs bring this class action for damages against Defendants for
   violation of the Racketeer Influenced and Corrupt Organizations Act
   ("RICO"), 18 U.S.C. § § 1961 et seq., in particular, §§ 1962(c), (d);
   and 1964 for perpetrating a scheme through an enterprise
   specifically designed to defraud Plaintiffs and Class out of a $1.05
   billion judgment.

3. Plaintiffs were each named plaintiffs, class representatives and class
   members in *Avery v. State Farm Mutual Automobile Insurance
   Company* ("*Avery Action*"), a class action litigated in the Illinois state
   court system.  The *Avery Action* was certified as a class action, tried
   to jury verdict on a breach of contract claim, and tried to the Court
   on a claim under the Illinois Consumer Fraud Act ("ICFA"), resulting
   in a judgment of $1.18 billion.

4. The Illinois Appellate Court upheld a $1.05 billion judgment,
   sustaining the compensatory and punitive damages, and disallowing
   disgorgement damages as duplicative.  *See Avery v. State Farm Mut.
   Auto. Ins. Co.*, 321 Ill. App. 3d 269, 275, 292 (Ill. App. Ct. 5th Dist.
   2001)(A true copy of the *Avery* Appellate Court decision is attached
   hereto as Exhibit "A").

5. On October 2, 2002, the Illinois Supreme Court accepted State
   Farm's appeal.  The appeal was fully-briefed, argued and submitted
   as of May 2003, yet the matter remained under submission without a
   decision until August 18, 2005.

6. From the fall of 2003 until November 2004, Trial Judge Lloyd
   Karmeier ("Karmeier") and Appellate Judge Gordon Maag waged a

judicial campaign for a vacant seat on the Illinois Supreme Court, ultimately resulting in Karmeier's election. In January 2005, having received reliable information that State Farm had exerted financial and political influence to achieve Karmeier's election, the *Avery* plaintiffs moved to disqualify Karmeier him [sic] from participating in the appeal of the *Avery Action*.

7. On or about January 31, 2005, State Farm filed its response to the disqualification motion, grossly misrepresenting the magnitude of State Farm's financial support (and the degree of participation by its executives, surrogates, lawyers and employees) of Karmeier's campaign.

8. Plaintiffs' motion was denied, and on August 18, 2005, with now-Justice Karmeier participating in the Court's deliberations and casting his vote in State Farm's favor, the Illinois Supreme Court issued a decision overturning the $1.05 billion judgment. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 835 N.E.2d 801 (Ill. 2005). (A true copy of this decision is attached hereto as Exhibit "B").

9. In December 2010, spurred in part by a recent United States Supreme Court decision vacating a West Virginia Supreme Court ruling in a case which featured similar facts, *i.e.*, involving a party's political and financial influence to elect a justice whose vote it sought for its appeal, Plaintiffs' counsel launched an investigation into State Farm's covert involvement in the Karmeier campaign. The investigation, led by a retired FBI Special Agent, uncovered evidence that to gain reversal of the $1.05 billion judgment in the *Avery Action*, State Farm – acting through Murnane, Shepherd and the Illinois Civil Justice League ("ICJL") – recruited Karmeier, directed his campaign, had developed a vast network of contributors and funneled as much as $4 million to the campaign. Then, after achieving Karmeier's election, State Farm deliberately concealed all of this from the Illinois Supreme Court while its appeal was pending.

10. On September 9, 2011, based on the information uncovered in the Reece investigation, the *Avery* plaintiffs petitioned the Illinois Supreme Court to vacate its decision overturning the $1.05 billion judgment. Responding on September 19, 2011, State Farm again deliberately misrepresented its role in directing and financing Karmeier's campaign. On November 17, 2011, the Illinois Supreme Court denied Plaintiff's petition, without comment.

11. Reece's investigation had revealed, among other things, that, having been ordered on April 5, 2001 by the Appellate Court to pay a 1.05 billion judgment to the *Avery* class, and having succeeded in persuading the Illinois Supreme Court to accept its appeal, State Farm had next developed an elaborate plan to obtain reversal of the

judgment.   The initial component of the plan was to recruit a candidate for the open Fifth District seat on the Illinois Supreme Court for the November 2004 election who would support State Farm once its appeal came before the Court for disposition.   Of course, there was no guarantee for State Farm that the appeal would not be decided *before* the November 2004 election, but the risk – *a $2 to $4 million investment for a possible $1.05 billion return* – was sufficiently minimal to make it a worthwhile gamble.

12.  Defendants' scheme was developed and implemented in two distinct but related phases.  In the first phase, State Farm sought to recruit, finance, direct, and elect a candidate to the Illinois Supreme Court who, once elected, would vote to overturn the $1.05 billion judgment. As Plaintiffs describe below, Defendants ultimately succeeded in obtaining this objective.  Nine months after his election, Karmeier voted in favor of State Farm to overturn the $1.05 billion judgment of the Appellate Court.

13.  Once the initial phase of the scheme had succeeded, the second phase featured two spirits of affirmative fraudulent activity, each furthered by use the of the U.S. mails: the 2005 and 2011 written misrepresentations to the Illinois Supreme Court.  Specifically, this phase consisted of: (a) a continuing concealment of these facts to permit Karmeier to participate in the deliberations and cast his vote to overturn the judgment in 2005 (this was accomplished, in part, by State Farm's January 31, 2005 filing), and (b) withholding information from the Illinois Supreme Court that would have conceivably led it to vacate the decision in 2011 (this was accomplished, in part, by State Farm's September 19, 2011 filing). Again, both filings were made through the U.S. mail, having been mailed to the Clerk of the Illinois Supreme Court and to Plaintiffs' counsel in several states, including Illinois, Louisiana, Mississippi and Tennessee.

14.  From its inception, Plaintiffs and the other Class members in the *Avery Action* were the targets of and ultimate victims of the racketeering acts and the RICO enterprise – stripped of hundreds or even thousands of dollars each, seized of a class-wide judgment totaling $1.05 billion which compensated them for their losses – as a proximate result of Defendants' actions and the actions of the Enterprise participants.

15.  In both the 2005 and 2011 filings, State Farm continued to hide and conceal its role in Karmeier's campaign, and deliberately misled the Court by omitting and concealing material facts regarding State Farm's role in Karmeier's campaign, which it directed through Shepherd, Murnane, the ICJL and Citizens for Karmeier, including: (a) recruiting Karmeier to be a candidate; (b) selecting Murnane to

direct Karmeier's campaign; (c) creating Karmeier's judicial campaign contribution network; and (d) funding Karmeier's campaign.

16. To carry out and conceal this elaborate and covert scheme, Defendants created and conducted a continuing pattern and practice of activity through an association-in-fact Enterprise consisting of, among others, the following: Shepherd; Murnane; Murnane's non-profit organization, the ICJL; the Shepherd-led ICJL Executive Committee ("Executive Committee"); Citizens for Karmeier (the campaign committee of Karmeier); JUSTPAC (the ICJL's political action committee); and the United States Chamber of Commerce ("US Chamber").

17. The ICJL and the Executive Committee, through Murnane and Shepherd, respectively, aided by the Citizens for Karmeier, functioned collectively as State Farm's vehicle to: (a) recruit Karmeier as a candidate; (b) direct Karmeier's campaign, (c) lend credibility to that campaign via endorsement, and (d) assure that Karmeier's campaign was well-funded. Campaign finance disclosures show that State Farm secretly funneled to Karmeier's campaign as much as $4 million (over 80%) of Karmeier's total $4.8 million campaign contributions. Led by Murnane and Shepherd, the ICJL and its Executive Committee were the "glue" that held together the many pieces of State Farm's judicial campaign contribution network.

18. The utilization of the U.S. mail throughout every stage of Defendants' scheme – to solicit, receive and direct contributions, to conduct conferences and disseminate communications and campaign strategies, and to conceal the extent of State Farm's role in Karmeier's campaign – was essential to the conduct of this Enterprise.

19. Various Enterprise participants and co-conspirators also used electronic mail to carry out the initial phase of Defendants' scheme throughout 2003-2004 to communicate details regarding the direction, management and financing of the campaign to fellow Enterprise participants.

20. As the following paragraphs illustrate, the motivation for this seven-year-long-cover-up is both plausible and demonstrable. State Farm's misrepresentations and deception directed toward the Illinois Supreme Court by its mailed court-filings, and the continuing use of the mails by Defendants and Enterprise participants to carry out the scheme (to evade payment of the $1.05 billion judgment) constitutes a pattern and practice of knowing and deceptive conduct employed to effectuate and then to conceal State Farm's extraordinary support for Karmeier.

(Doc. 289, ps. 1-6).

## II. <u>Analysis</u>

In their motion for class certification, plaintiffs assert that common questions of fact regarding defendants' pattern of conduct deprived the class of an unbiased judicial forum, resulting in the loss of the judgment, which was the property of the class. Plaintiffs maintain that the proposed class consists of the group of plaintiffs that was deprived of its property interests in the *Avery* class judgment due to defendants' scheme to taint the tribunal before which that judgment was then pending. Further, plaintiffs assert that certification is warranted because the claims all rely on the same evidence and will rise and fall in unison. Specifically, plaintiffs ask the Court to certify the following class:

> all persons who were members of the certified class in *Avery v. State Farm Mut. Auto. Ins. Co.*, No. 97-L-114 (First Jud. Cir. Williamson County, Ill.), more specifically described as:
>
> All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) "crash parts" installed on or specified for their vehicles or else received monetary compensation determined in relation to the cost of such parts. Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.
>
> The following persons are excluded from the class: (1) persons who resided or garaged their vehicles in Illinois and whose Illinois insurance policies were issued/executed prior to April

16, 1994,and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996.[5]

The defendants sternly oppose class certification on a number of grounds: whether common questions predominate; whether superiority and manageability are satisfied; whether plaintiffs are adequate representatives; whether the class is ascertainable; whether the class definition is permissible and whether class counsel are adequate.

A court's analysis of class certification "is not free-form, but rather has been carefully scripted by the Federal Rules of Civil Procedure." *Chi. Teachers Union, Local No. 1. v. Bd. of Educ. of City of Chi.,* 797 F.3d 426, 433 (7th Cir. 2015). To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see Bell v. PNC Bank, Nat'l Ass'n,* 800 F.3d 360, 373–74 (7th Cir. 2015). If Rule 23(a) is satisfied, the proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described

---

[5]*Avery* contained an almost identical class:

All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) "crash parts" installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts.
*Avery,* 835 N.E.2d 801, 814 (2005).

as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.,* 633 F.3d 574, 583 (7th Cir. 2011); *see also Bell,* 800 F.3d at 374.

Plaintiffs seek certification under Rule 23(b)(3), which requires that plaintiffs establish that "questions of law or fact common to all class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, --- U.S. ---, 133 S.Ct. 1426, 1432 (2013). Finally, the class must be "identifiable as a class," meaning that the "class definitions must be definite enough that the class can be ascertained." *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006) (citing *All. to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir. 1977)); *see also Mullins v. Direct Dig., LLC,* 795 F.3d 654, 659–61 (7th Cir. 2015). "Failure to meet any one of the requirements of

23 precludes certification of a class." *Harriston v. Chi. Tribune Co.,* 992 F.2d 697, 703 (7th Cir. 1993)(internal quotation marks omitted).

The putative class representative bears the burden of showing that each requirement is satisfied. *See Chi. Teachers Union,* 797 F.3d at 433; *Messner v. NorthShore Univ. Healthsystem,* 669 F.3d 802, 811 (7th Cir. 2012); *Retired Chi. Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993). Although "as a general principle, a court is not allowed to engage in analysis of the merits in order to determine whether a class action may be maintained[,] ... the boundary between a class determination and the merits may not always be easily discernible," *Retired Chi. Police,* 7 F.3d at 598–99 (internal quotation marks omitted), and "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Chi. Teachers Union,* 797 F.3d at 435 (quoting *Comcast Corp.,* 133 S.Ct. at 1432); *see also Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (noting that class certification analysis "[f]requently ... will entail some overlap with the merits of the plaintiff's underlying claim") (quoting *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)) (internal quotation marks omitted). As the Seventh Circuit has explained, "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements

for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 815 (7th Cir. 2010) (citing *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)); *see also Kartman v. State Farm Mut. Auto. Ins. Co.,* 634 F.3d 883, 889–90 & n. 6 (7th Cir. 2011). The Seventh Circuit has instructed district courts to exercise "caution" before certifying a class. *Thorogood v. Sears, Roebuck & Co.,* 547 F.3d 742, 746 (7th Cir. 2008). That caution demands a close look at each of the Rule 23 requirements. With these principles in mind, the Court turns to consider the motion.

**I. Rule 23(a)**

**A. Rule 23(a)(1): Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A plaintiff need not plead or prove the exact number of class members to establish numerosity under Rule 23(a)(1), *Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir. 1989), and the court may make common sense assumptions to determine numerosity. *See Arreola v. Godinez,* 546 F.3d 788, 797 (7th Cir. 2008) (finding numerosity after the plaintiff had identified 14 class members and introduced evidence that "support[ed] a much larger estimate"). Plaintiffs contend that the class consists of "more than four

million" members.   Defendants do not dispute this figure.   Thus, the numerosity element has been met.

**B. Rule 23(a)(2): Commonality**

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and that "[t]heir claims ... depend upon a common contention ... of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 131 S.Ct. at 2551 (internal quotation marks omitted); *see also Chi. Teachers Union,* 797 F.3d at 434. "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Wal-Mart,* 131 S.Ct. at 2556 (internal quotation marks and alterations omitted).

Rule 23(a)(2) requires that the claims of the named plaintiff and class:

> depend on common contention.... That common contention, moreover, must be of such a nature that it is capable of classwide resolution -which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.... What matters to class certification ... is not the raising of common "questions" -even in droves- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.   Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

131 S.Ct at 2551 (quote omitted).   "[A] common nucleus of operative fact is usually enough to satisfy the commonality requirement."   *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).   Courts have found a

common nucleus of operative fact in situations where a defendant has engaged in standardized conduct toward members of the class. *See, e.g. Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)(listing cases).  "Rule 23(a)(2) does not demand that every member of the class have an identical claim," and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified. *Spano,* 633 F.3d at 585.

The commonality requirement is easily satisfied here and the Court agrees with plaintiff that *all* questions of law and fact are common as to the putative class: did defendants act in concert over a period of time to select and elect Justice Karmeier and to fraudulently conceal the nature and the scope of their involvement to enable and defend his participation in *Avery.* These are allegations that affected plaintiffs and all of the members of the purported class.  According to plaintiffs, each *Hale* member has an equal right to an equal share of the damages.  By contrast to the circumstances presented in *Wal-Mart,* the putative class members here were not affected by individual decisions made by different decision makers. Instead, each putative class member's   claim   arises   from   defendants'   unlawful conduct. *See Berger v. Xerox Corp. Ret. Inc. Guarantee Plan,* 338 F.3d 755, 763 (7th Cir. 2003) ("What is sought is a declaration that Xerox's method of computing the lump sums to which withdrawing employees are entitled is unlawful. That is a ground common to all members of the class.").

**C. Rule 23(a)(3): Typicality**

The typicality requirement of Rule 23(a)(3) is closely related to the commonality of Rule 23(a)(2).  *Rosario*, 963 F.2d at 1018.   The Rule 23(a)(3) typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chi. Police,* 7 F.3d at 597.  In *Spano*, the Seventh Circuit stated that the "starting point" for the typicality analysis is "that there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano*, 633 F.3d at 586.  A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983). "[T]ypicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *CE Design Ltd. v. King,* 637 F.3d 721, 725 (7th Cir. 2011); *see also Danvers Motor Co. v. Ford Motor Co.,* 543 F.3d 141, 150 (3d Cir. 2008) ("Factual differences will not defeat typicality *if* the named plaintiffs' claims arise from the same event or course of conduct that gives rise to the claims of the class members and are based on the same legal theory."); *Rosario,* 963 F.2d at 1018 ("[W]e

look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3).").

The Court concludes that plaintiffs' claims are typical of those of the purported class. Similar to commonality, all of the named plaintiffs and the putative class members allegedly were subjected to the same course of conduct by defendants. Plaintiffs and the class members had an interest in the *Avery* judgment and plaintiffs allege that all of them were deprived of that judgment before the proceeds could be allocated and distributed among them. The named plaintiffs' claims have the same characteristics of the proposed class.

**D. Rule 23(a)(4): Adequacy**

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). The adequacy inquiry "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.,* 649 F.3d 583, 592 (7th Cir. 2011).

Defendants argue that the named plaintiffs lack standing and are inadequate representatives with atypical claims in that they have no

concrete or actual injury to business and that they have no clear and definite amount of damages. Further, defendants argue that Hale and Loger lack standing because they cannot prove non-OEM parts were installed on the vehicles and that Hale and Shadle reside outside of Illinois therefore barring them from representing any claims of damages under the IFCA. The Court rejects defendants' arguments. The Court concludes that named plaintiffs have no conflicts of interest with the members of the proposed class that prevent them from serving as adequate class representatives. Plaintiffs are seeking the same relief and share the same interest in establishing defendants' liability. For class certification purposes, plaintiffs and the proposed class have standing and the claims are typical of the purported class. The record reflects that Hale had several other accidents which occurred within the class period and resulted in the specification of non-OEM parts. Further, the class definition covers anyone who had non-OEM parts installed or specified. Thus, Loger and Hale both hold a property interest in the *Avery* class judgment. Furthermore, Shadle and Hale are proper representatives despite their states of residence. *Avery* contained a nationwide class action based on breach of contract and ICFA. This class proposes to be a nationwide class action based on the tainted tribunal. Lastly, as to defendants' argument that Shadle disavowed an interest in the *Avery* judgment, the record reveals that Shadle, during his deposition, testified that he stands by the allegations in the complaint and

that he relies solely upon his counsel to explain the legal theories and damages models and that he understands that his claim is based on a tainted tribunal that resulted in the loss of the *Avery* judgment.

Further, the Court finds that proposed class counsel are adequate and are qualified to proceed as class counsel for the proposed class. Class counsel have extensive experience in prosecuting RICO claims, class actions and various complex cases. Furthermore, class counsel have engaged in substantial discovery, have litigated discovery issues and have devoted significant time and resources in this action. Defendants maintain that proposed class counsel are inadequate because of conflicts. Specifically, defendants maintain that proposed class counsel have conflicts with the class because of the significant contributions the proposed class counsel made in the 2004 election cycle to the Democratic party and Friends of Madigan, which significantly contributed to Justice Maag's campaign, because of the contributions the proposed class counsel made in support of other Illinois Supreme Court justices who sat on the *Avery* appeal in 2005 and 2011. Further, defendants take issue with the investigators that the proposed class counsel hired. The Court agrees with plaintiffs in that the fact that the proposed class counsel publicly contributed to Justice Maag's campaign is irrelevant to the issues in this case. Those campaign contributions were transparent and fully disclosed and do not create a conflict of interest with the proposed class. Likewise, the Court does not

see a conflict with the investigators and their findings regarding the contributions.   The Court rejects these arguments as unpersuasive and irrelevant.

## II. Rule 23(b)(3)

Rule 23(b)(3) specifies two requirements: (1) "that the questions of law or fact in common to the class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Subsection (b)(3) "poses the question whether a single suit would handle the dispute better than multiple suits."   *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th. Cir. 2011).   The policy at the core of the class action mechanism is to overcome the problem when small recoveries do not provide incentive for an individual to bring a solo action. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014). Considerations pertinent to the Rule 23(b)(3) requirements include the class members' interest in individually controlling separate actions, the extent of any litigation already begun by class members, the desirability of concentrating the litigation in this forum, and likely difficulties in managing a class action.   Fed.R.Civ.P. 23(b)(3)(A)-(D).

## A. Damages

In determining whether predominance and superiority are satisfied, the Court must ask whether the plaintiffs' "damages are susceptible of measurement across the entire class." *Suchanek*, 764 at 760 (citing *Comcast Corp.* 133 S.Ct. at 1433). If damages can be estimated, the Court will move on to examine the matters identified in Rule 23(b)(3), which "deal with interests of individualized members of the class controlling their own litigations and carry them on as they see fit." *Suchanek*, 764 F.3d at 760 (citing *Amchem Products*, 521 U.S. at615-16 (1997)) (internal quotation marks omitted); *see* Fed.R.Civ.P. 23(b)(3). In particular, the Court should assess the difficulty and complexity of class-wide issues as compared with the individual issues." *Suchanek*, 764 F.3d at 760. The Court should also assess "whether the class allegations are satisfied through evidentiary proof." *Id*.

"Damages are susceptible of measurement across the entire class" if there is "a single or common method that can be used to measure and quantify the damages of each class member." WILLIAM RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 12:4 (5th ed. 2013). If damages are capable for measurement on a class-wide basis, questions of individual damage calculations will not overwhelm questions common to the class. *Comcast Corp.*, 133 S.Ct. 1433. "It is well established that the presence of individualized questions regarding damages does not prevent certification."

*Messner*, 669 F.3d at 815 (citing *Wal-Mart* 131 S.Ct. at 2558 ("individualized monetary claims belong in Rule 23(b)(3)")).

Here, plaintiffs argue that the damages theory is a simple one.[6] Plaintiffs argue that but for State Farm's petition to the Illinois Supreme Court and defendants' conspiracy to deprive plaintiffs of the *Avery* judgment, the *Avery* judgment would have been divided and distributed. Plaintiffs assert that the damages correspond to the loss of the judgment, a concrete and recognized property interest that the entire class possessed prior to the RICO misconduct. Plaintiffs propose to allocate the damages award on a *per capita* basis, with an equal share to each class member. Defendants counter that plaintiffs and the class members purported damages from the loss of the *Avery* judgment varied considerably as did the factual circumstances of the repairs to the cars and the legal theories, thus, defendants contend that whether individual class members would have been entitled to any recovery under *Avery* presents overwhelming individualized issues of liability, injury and amount of damages. The Court agrees with plaintiffs' reasoning. The damages in this case are not based on State Farm's practice of equipping its insureds' vehicles with substandard non-OEM crash parts as the damages were based in *Avery*; instead the injury in this case is based on the interest the plaintiffs and the proposed

---

[6] Plaintiffs' expert Thomas Myers testified that plaintiffs' damages are $7,612,643,917.00. Myers performed the calculation based on the formula supplied by plaintiffs' lawyers. Understandably, defendants dispute this figure and the method used to calculate this figure.

class members had in a neutral forum and the damages correspond with

the undivided interest in the judgment each lost as a result of the tainted

tribunal.   This issue is identical for all plaintiffs and class members.

Accordingly, plaintiffs have met their burden of showing a proposed class-

wide damage is consistent with their theory of liability.

**B. Predominance**

"Analysis of predominance under Rule 23(b)(3) 'begins, of course,

with the elements of the underlying cause of action.;" *Messner*, 699 F.3d at

815 (quoting *Erica P John Fund, Inc. v. Halliburton Co.*¸--- U.S. ---, 131

S.Ct. 2179 2184 (2011)) (internal quotation marks omitted).   The Rule

23(b)(3) predominance inquiry test whether the proposed classes are

sufficiently cohesive to warrant adjudication by representation." *Amchem*

*Prods.*, 521 U.S. at 623.  As the Supreme Court explained:

> To gain class-action certification under Rule 23(b)(3), the
> named plaintiff must demonstrate, and the District Court must
> find, that the questions of law or fact common to the class
> members predominate over any questions affecting only
> individual members.    This predominance requirement is
> meant to test whether proposed classes are sufficiently
> cohesive to warrant adjudication by representation, but it
> scarcely demands commonality to all questions.  In particular,
> when adjudication of questions of liability common to the class
> will achieve economies of time and expense, the predominance
> standard is generally satisfied even if damages are not provable
> in the aggregate.

*Comcast Corp*, 133 S.Ct. at 1436-37 (alterations, citations, and internal

quotation marks omitted).

Predominance is similar to Rule 23(a)'s typicality and commonality requirements but "the predominance criterion is far more demanding." *Id.* (internal quotation marks omitted).  Generally, predominance is satisfied "'when common questions represent a significant aspect of [a] case and … can be resolved for all members of [a] class in a single adjudication.'" *Id.* (quoting 7AA Wright and Miller, Federal Practice & Procedure § 1778 (3 Ed. 2011).   Thus, "common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class." *Id.* (internal quotation marks omitted).  The presence of some individual questions is not fatal, but individual questions cannot predominate over the common ones.  *Id.* To determine if a question is common, the Court must look to all the evidence necessary to answer that question: if "the members of a proposed class will need to present evidence that varies from member to member" to answer the question, then the question is an individual one.  *Id.* (internal quotation marks omitted).  Conversely, "if the same evidence will suffice for each member" to answer the question at issue, then the question is common." *Id.*  Predominance is not satisfied where liability determinations are individual and fact-intensive, *see Kartman*, 634 F.3d at 891, and "[m]ere assertion by class counsel that common issues predominate[] is not enough," *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014)(alterations omitted).

Predominance is satisfied here.   Plaintiffs have established that
common questions predominate as there are common questions regarding
defendants' acts and omissions to evade the *Avery* judgment.   The common
issues predominate over individual issues.    There appears to be no
differences among class members with respect to proving liability,
causation and class-wide damages.   According to plaintiffs, defendants did
not take different positions/actions as to the individual class members.
The claims are for an independent legal wrong: the illegal acts or omissions
by defendants. Plaintiffs' theory of liability is based on defendants' alleged
conspiracy to secretly subvert the judicial process and deprive plaintiffs of
an impartial forum.   All the members of the class will prove the loss of
something of value – the *Avery* judgment – through common evidence.
Whether plaintiffs' theory fails or prevails, it does so for the entire proposed
class.   As previously discussed, the common class-wide issues in this case
are based on defendants' acts and omissions. These common questions are
particularly appropriate for class-wide resolution.   It is identical across
every class member because all of the proof needed to resolve causation
and liability – the evidence and expert testimony – is common to all class
members.   It is also costly.   For these reasons, it would be extraordinary
duplicative and wasteful of the time and resources of both the Court and
the parties to litigate these questions in individual cases.    Individual
litigation is not even a realistic alternative.   The extensive evidence and

expert testimony needed to prove the issues of causation and liability would cost considerably more than the claims are worth, which almost certainly eviscerates any interest an individual would have in filing individual suit.

Accordingly, the Court finds that "it makes good sense" to resolve the common issues of causation and liability "in one fell swoop." *Pella Corp. v/ Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (citing *Mejdrech v. Met-Coil Systems, Inc.*, 319 F.3d 910, 911 (7th Cir. 2003)). *See also Chi. Teachers Union*, 797 F.3d at 444 ("[W]hen adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied.") In sum, the Court has poured over the parties' extensive submissions and the accompanying evidentiary record and finds that plaintiffs have satisfied the predominance requirement of Rule 23(b)(3) based on competent evidence common to the class.

## C. Superiority

The four Rule 23(b)(3) factors all support a finding of superiority. First, "the class members' interest in individually controlling the prosecution or defense of separate actions," Fed.R.Civ.P 23(b)(3)(A), is minimal, as there is no other pending individual lawsuits that the Court is aware. Second, because no other cases have been brought to the Court's attention, "the extent and nature of any litigation concerning the controversy already begun by or against class members" is not a factor.  Fed.R.Civ.P. 23(b)(3)(B).  Third, "the desirability or undesirability of concentrating the

litigation of the claims in the particular forum" favors predominance, Fed.R.Civ.P. 23(b)(3(C), as the questions/issues contained in this case should be decided only once and the Southern District of Illinois is as appropriate forum as a substantial part of the events giving rise to plaintiffs' claims arouse in this district.   Fourth, "the likely difficulties in managing a class action" in this case are minimal given the predominance of common issues and the readily available identity of all class members and the relative ease of administering the claims process.   Fed.Civ.P. 23(b)(3)(D).   Finally, "as part of careful application of Rule 23(b)(3)'s superiority standard, [the court] must recognize both the costs and benefits of class device."   *Mullins*, 795 F.3d at 663.   Parallel litigation for each class member would entail same discovery and require multiple courts to weigh the same factual and legal bases.   That does not make sense.

To conclude, the RICO liability, causation and damages will be proved with common evidence in this case.   Thus, because common issues of law and fact predominate, and trying these claims individually would result in a substantial amount of repetition and wasted resources, proceeding as a class action is the superior form of adjudication for this case.

**D. Definitiveness, Ascertainability and Administratively Feasible**

As noted, class definition "must be definite enough that the class can be ascertained."   *Oshana*, 472 F.3d at 513; *see also Jamie S. v. Milwaukee*

*Pub. SCh.*, 668 F.3d 481, 495-97 (7th Cir. 2012); 7A Charles Alan Wright *et al., Federal Practice and Procedure* § 1760 (3d ed. 2005)("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."). "Class definitions have failed this requirement whether they were too vague or subjective, or when class membership was defined in terms of success on the merits." *Mullins*, 795 F.3d at 657.

The proposed class here is permissible and appropriate. It is set by a precise and objective definition. It contains State Farm insureds who, during a particular period of time, (1) had non-OEM crash parts installed on their vehicles, (2) received monetary compensation determined by the non-OEM crash parts and/order (3) had such parts specified by State Farm in a repair estimate. These are the insureds that had claims in *Avery*.

Defendants' next objection to the proposed class is that there is no administratively feasible or objectively determinable way to identify class members who had their cars repaired over a $10^{\frac{1}{2}}$ year period and either had non-OEM parts used in the repair or had non-OEM parts specified on their repair estimates. Defendants also maintain that any of the cars in *Avery* were likely disposed of long ago which makes it impossible to determine whether putative class members had non-OEM parts installed or

whether the installation diminished the car's value as required for class membership.

The Seventh Circuit has "long recognized an implicit requirement under Rule 23" that a class must be ascertainable, meaning "the class must be defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). In *Mullins*, the Seventh Circuit noted that some courts have recently imposed a "new" and "heightened" requirement to ascertainability by "requiring plaintiffs to prove at the certification stage that there is a 'reliable and administratively feasible' way to identify all who fall within the class definition." *Mullins*, 795 F.3d at 657. The Seventh Circuit declined to follow suit for two general reasons. First, the new, more "stringent" version of ascertainability "does not further any interest of Rule 23 that is not already adequately protected by the Rule's explicit requirements." *Id.* at 662. And second, the costs of imposing the requirement are high because it "erect[s] a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims," namely low-value consumer class actions like the instant case. *Id.* Accordingly, the Seventh Circuit opted to "stick with our settled law," which focuses on "the adequacy of the class definition itself," and not "whether, given an adequate class definition, it would be difficult to identify particular members of the class." *Id.* at 659. Under that standard, as

previously indicated, plaintiffs have satisfied the requirement of ascertainability.  Plaintiffs have proposed a class that consists of those who had a property interest in the *Avery* class judgment: State Farm policyholders, who during a particular period, received quotes for non-OEM crash parts and/or had those parts installed.

### III.  Conclusion

Accordingly, the Court **GRANTS** plaintiffs' motion for class certification (Doc. 438).   The Court **CERTIFIES** the following class:

> All persons who were members of the certified class in *Avery v. State Farm Mut. Auto. Ins. Co.*, No. 97-L-114 (First Jud. Cir. Williamson County, Ill.), more specifically described as:
> All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts.

Further, the Court **APPOINTS** plaintiffs Mark Hale, Todd Shadle and Laurie Loger as representatives of the class.  The Court, also, **APPOINTS** the following law firms as class counsel:   Lieff Cabraser Heimann & Bernstein, LLP; Barrett Law Group, P.A.; Hausfeld, LLP; Clifford Law Offices; Much Shelist, P.C.; Thrash Law Firm, P.A.; Law Offices of Gordon Ball; Pendley, Baudin & Coffin, LLP; and Erwin Chemerinsky, Esq.

Lastly, the parties shall confer regarding class notice and shall file a status report with their joint proposal or competing proposals by October 15, 2016.

**IT IS SO ORDERED.**

Signed this 16th day of September, 2016.

Digitally signed by Judge David R. Herndon
Date: 2016.09.16 13:58:45 -05'00'

**United States District Judge**