**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MARK HALE, TODD SHADLE, and LAURIE LOGER, on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs<br><br>    v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, EDWARD MURNANE, and WILLIAM G. SHEPHERD,<br><br>        Defendants. | Case No. 3:12-cv-00660-DRH-SCW<br><br>Judge David R. Herndon<br><br>Magistrate Judge Stephen C. Williams |

**PLAINTIFFS' OPPOSITION TO**
**STATE FARM'S MOTION FOR SUMMARY JUDGMENT**
**ON GROUNDS OF *ROOKER-FELDMAN*, *RES JUDICATA*,**
**AND COLLATERAL ESTOPPEL**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS ............................................................................... 3

I.      Phase I–the Set Up: Defendants Conspire to Put a Justice on the Illinois Supreme Court. ............................................................................................................ 3

    A.      State Farm Exerts Considerable Influence Over the ICJL. .................................... 3

    B.      Defendants Recruit Judge Karmeier and Manage His Campaign. ........................ 5

    C.      State Farm Funds the Karmeier Campaign ........................................................... 6

    D.      Judge Karmeier Knew State Farm Played a Significant Role in Funding His Campaign ...................................................................................................... 11

    E.      Defendants Further Enhance Judge Karmeier's Odds of Winning the Election by Subverting the State Bar's Judicial Candidate Evaluation Process. ................................................................................................................ 12

II.     Phase II–the Pay Off: State Farm Deceives the Illinois Supreme Court Regarding Its Participation in and Funding of the Karmeier Campaign. .......................................... 13

LEGAL STANDARD ................................................................................... 16

ARGUMENT ................................................................................................ 16

I.      THE "NARROW" *ROOKER-FELDMAN* DOCTRINE DOES NOT DEPRIVE THIS COURT OF JURISDICTION TO HEAR THE PLAINTIFFS' RICO CLAIM. ............................................................................................................ 16

    A.      *Rooker-Feldman* Is a "Narrow" and "Limited" Doctrine. ................................. 17

    B.      *Rooker-Feldman* Does Not Deprive Federal Courts of Jurisdiction Over Federal Actions Involving Allegations and Proof of a Tainted Tribunal. ........... 18

    C.      Plaintiffs Did Not Have an Adequate Opportunity to Fully Present their Claims in State Court. ....................................................................................... 25

    D.      *Rooker-Feldman* Does Not Apply Where, As Here, Defendants' Unlawful Conspiracy, Not the *Avery* Decisions, Caused Plaintiffs' Injury, and Plaintiffs Do Not Seek Review or Rejection of the State Court Rulings............. 26

II.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY *RES JUDICATA* ............................ 30

III.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY COLLATERAL ESTOPPEL ........ 36

CONCLUSION ................................................................................................ 38

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Addington v. US Airline Pilots Ass'n*,
  Nos. CV 08-1633, CV08-1728, 2009 WL 899647 (D. Ariz. Mar. 26, 2009)........................... 36

*Amcast Indus. Corp. v. Detrex Corp.*,
  45 F.3d 155 (7th Cir. 1995) ........................................................... 32

*Atonio v. Wards Cove Packing Co.*,
  810 F.2d 1477 (9th Cir. 1987) ....................................................... 36

*Avery v. State Farm Mut. Auto. Ins. Co.*,
  321 Ill. 746 N.E.2d 1242 (2001), *aff'd in part, rev'd in part*, 835 N.E.2d 801 (2005) ............. 3

*Avery v. State Farm Mut. Auto. Ins. Co.*,
  835 N.E.2d 801 (2005) ........................................................... 3, 36

*Bank of N. Ill. v. Nugent*,
  584 N.E.2d 948 (Ill. App. Ct. 1991) ............................................... 34

*Bieneman v. City of Chicago*,
  838 F.2d 962 (7th Cir. 1988) ....................................................... 36

*Brokaw v. Weaver*,
  305 F.3d 660 (7th Cir. 2002) ................................................... passim

*Brown v. Allen*,
  344 U.S. 443 (1953)................................................................ 32

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009)................................................... 13, 23, 24, 35

*Carr v. Tillery*,
  No. 07-314-DRH, 2010 WL 4781127 (S.D. Ill. Sept. 20, 2010)...................... 31, 34

*Charles E. Harding Co. v. Harding*,
  186 N.E. 152 (Ill. 1933) ........................................................... 35

*City of Chicago v. Midland Smelting Co.*,
  896 N.E.2d 364 (Ill. App. Ct. 2008) ............................................... 31

*Davit v. Davit*,
  173 Fed. App'x 515 (7th Cir. 2006) ............................................... 20

*Dawaji v. Askar*,
  618 F. App'x 858 (7th Cir. 2015) ............................................... 29, 30

*District of Columbia Court of Appeals v. Feldman*,
  460 U.S. 462 (1983)................................................................ 17

*Ennenga v. Starns*,
  677 F.3d 766 (7th Cir. 2012) ....................................................... 33

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
  544 U.S. 280 (2005)............................................................ 18, 28

*Fischer v. Avanade, Inc.*,
  519 F.3d 393 (7th Cir. 2008) ................................................... 1, 16

## TABLE OF AUTHORITIES
### (continued)

Page

*Garcia v. Vill. of Mount Prospect*,
  360 F.3d 630 (7th Cir. 2004) ........................................................ 35

*Gen. Elec. Co. v. Honeywell Int'l, Inc.*,
  No. 05-3239, 2006 WL 988468 (C.D. Ill. Apr. 13, 2006) ..................... 37

*Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*,
  804 F.2d 390 (7th Cir. 1986) ........................................................ 38

*Great W. Mining & Mineral Co. v. Fox Rothschild Inc.*,
  615 F.3d 159 (3d Cir. 2010) .................................................. 21, 28

*Green v. Jefferson Cnty. Comm'n*,
  563 F.3d 1243 (11th Cir. 2009) ..................................................... 18

*Hamilton v. City of New Albany, Indiana*,
  No. 16-3901, 2017 WL 2615453 (7th Cir. June 16, 2017) .................... 25

*Harold v. Steel*,
  773 F.3d 884 (7th Cir. 2014) .................................................. 28, 30

*Herzog v. Lexington Twp.*,
  657 N.E.2d 926 (Ill. 1995) ........................................................... 35

*Highway J Citizens Grp. v. U.S. Dep't of Transp.*,
  456 F.3d 734 (7th Cir. 2006) .................................................. 31, 34

*In re Ch. W.*,
  948 N.E.2d 641 (Ill. App. Ct. 2011) .......................................... 37, 38

*In re Smith*,
  349 Fed. App'x 12 (6th Cir. 2009) ................................................. 18

*Iqbal v. Patel*,
  780 F.3d 728 (7th Cir. 2015) .................................................. 28, 29

*Johnson v. Pushpin Holdings, LLC*,
  748 F.3d 769 (7th Cir. 2014) .................................................. 21, 29

*Jones v. City of Alton*,
  757 F.2d 878 (7th Cir. 1985) ................................................. passim

*Jones v. Syntex Labs., Inc.*,
  1 Fed. App'x. 539 (7th Cir. 2001) ................................................. 33

*Klayman v. Deluca*,
  No. 15-CV-80310-KAM, 2016 WL 1045851 (S.D. Fla. Mar. 16, 2016), *appeal dismissed*
  (June 16, 2016) ........................................................................ 30

*Lance v. Dennis*,
  546 U.S. 459 (2006) ............................................................ 18, 26

*Ledbetter v. Good Samaritan Ministries*,
  No. 13-CV-308, 2016 WL 3746204 (S.D. Ill. July 13, 2016) ............. 1, 16

*Lennon v. City of Carmel, Indiana*,
  No. 16-3836, 2017 WL 3140942 (7th Cir. July 25, 2017) ................ 29, 30

# TABLE OF AUTHORITIES
## (continued)

Page

*Leow v. A & B Freight Line, Inc.*,
   676 N.E.2d 1284 (Ill. 97) ........................................................................................ 31

*Licari v. City of Chicago*,
   298 F.3d 664 (7th Cir.2002) .................................................................................... 34

*Limestone Dev. Corp. v. Vill. of Lemont*,
   520 F.3d 797 (7th Cir. 2008) ................................................................................... 34

*Long v. Shorebank Dev. Corp.*,
   182 F.3d 548 (7th Cir. 1999) ................................................................. 2, 25, 27, 28

*Loubser v. Thacker*,
   440 F.3d 439 (7th Cir. 2006) ...................................................................... 20, 21, 22

*Mains v. Citibank*,
   852 F.3d 669 (7th Cir. 2017), *petition for cert. filed* (July 19, 2017) (No. 17-89) ............ 29, 30

*Manos v. Caira*,
   162 F. Supp. 2d 979 (N.D. Ill. 2001) ....................................................................... 19

*McDermott v. Barton*,
   No. 14-CV-704-NJR-PMF, 2014 WL 6704544 (S.D. Ill. Nov. 26, 2014) .............................. 30

*Moore v. Sievers*,
   168 N.E. 259 (Ill. 1929) ........................................................................................... 35

*Nesses v. Shepard*,
   68 F.3d 1003 (7th Cir. 1995) ............................................................................. passim

*Nowak v. St. Rita High School*,
   197 Ill.2d 381 (2001) ................................................................................... 31, 36, 37

*O'Brien v. Sky Chefs, Inc.*,
   670 F.2d 864 (9th Cir. 1982) ................................................................................... 36

*Pactiv Corp. v. Sanchez*,
   No. 13-cv-8182, 2015 WL 4508667 (N.D. Ill. July 23, 2015) ...................................... 34

*Parker v. Lyons*,
   757 F.3d 701 (7th Cir. 2014) ................................................................................... 21

*People v. Edgeworth*,
   332 N.E.2d 716 (Ill. App. Ct. 1975) ........................................................................ 32

*People v. Pawlaczyk*,
   724 N.E.2d 901 (Ill. 2000) ....................................................................................... 38

*Price v. Philip Morris Inc.*,
   43 N.E.3d 53 (Ill. 2015) ........................................................................................... 33

*Richardson v. Koch Law Firm, P.C.*,
   768 F.3d 732 (7th Cir. 2014) ................................................................................... 28

*Rooker v. Fidelity Trust Co.*,
   263 U.S. 413 (1923) ................................................................................................. 17

*S.C. Johnson & Son, Inc. v. Buske*,
   No. 09-286-GPM, 2009 WL 3010833 (S.D. Ill. Sept. 17, 2009) ................................ 28

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Santaella v. Metro. Life Ins. Co.,*
    123 F.3d 456 (7th Cir. 1997) ................................................. 16

*Scott v. Harris,*
    550 U.S. 372 (2007) ................................................. 1, 16

*Sedima, S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985) ................................................. 28, 37

*Sheikhani v. Wells Fargo Bank,*
    526 F. App'x 705 (7th Cir. 2013) ................................................. 22

*Skinner v. Switzer,*
    131 S. Ct. 1289 (2011) ................................................. 17

*St. John v. CACH, LLC,*
    No. 14 C 0733, 2014 WL 3377354 (N.D. Ill. July 8, 2014) ................................................. 37

*State of Md. v. Baltimore Radio Show, Inc.,*
    338 U.S. 912 (1950) ................................................. 32

*Sykes v. Cook Cnty.,*
    837 F.3d at 742 (7th Cir. 2016) ................................................. 29

*Taylor v. Fed. Nat. Mortg. Ass'n,*
    374 F.3d 529 (7th Cir. 2004) ................................................. 25

*Vulcan Chem. Techs., Inc. v. Barker,*
    297 F.3d 332 (4th Cir. 2002) ................................................. 18

*Walsh Constr. Co. of Ill. v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa.,*
    153 F.3d 830 (7th Cir. 1998) ................................................. 33

*Weisman v. Schiller, Ducanto & Fleck,*
    733 N.E.2d 818 (Ill. App. Ct. 2000) ................................................. 35

*William S. v. Gill,*
    591 F. Supp. 422 (N.D. Ill. 1984) ................................................. 36

*Zurich Am. Ins. Co. v. Superior Court for State of Cal.,*
    326 F.3d 816 (7th Cir. 2002) ................................................. 28

**Statutes**

18 U.S.C. § 1961 *et seq.* ................................................. passim

28 U.S.C. § 1257 ................................................. 17

**Rules**

Fed. R. Civ. P. 56(a) ................................................. 16

Ill. S. Ct. R. 63C ................................................. 13

**Treatises**

Chemerinsky, Federal Jurisdiction (6th ed. 2012) ................................................. 18, 39

Restatement (Second) of Judgments § 26(1)(c) ................................................. 35

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Other Authorities**

Barry Friedman & James E. Gaylord, *Rooker-Feldman, from the Ground Up*,
  74 Notre Dame L. Rev. 1129 (1999) ........................................................................ 18

Dustin E. Buehler, *Revisiting Rooker-Feldman: Extending the Doctrine to State Court
  Interlocutory Orders*, 36 Fla. St. U. L. Rev. 373 (2009) ........................................ 18

## INTRODUCTION

This case arises from allegations—and now proof—of Defendants' extraordinary and secret efforts to secure the election of an Illinois Supreme Court Justice sympathetic to State Farm, to ensure his participation in the review of a billion dollar judgment pending against State Farm, and, in so doing, to deprive Plaintiffs of their right to an impartial tribunal and the judgment that tribunal was reviewing. The evidence, described here and in Plaintiffs' Motion for Class Certification (Doc. 438, incorporated by reference), shows that State Farm and its co-conspirators (1) secretly recruited Judge Karmeier to run for an open seat on the Illinois Supreme Court, before which a billion dollar judgment against State Farm was pending; (2) organized and managed his campaign behind the scenes; (3) covertly funneled millions of dollars (well over a majority of all reported campaign funds) to support the campaign through intermediary organizations over which it exerted considerable influence; and, (4) after securing Justice Karmeier's election to the Illinois Supreme Court, obscured, concealed, and misrepresented the degree and nature of their support so that Justice Karmeier could participate in the *Avery* deliberations.[1]

Defendants' scheme to deprive Plaintiffs of their constitutionally-guaranteed right to be judged by a tribunal uncontaminated by politics was a success. Plaintiffs had no opportunity in the state court appellate process to conduct the discovery necessary to pull back the curtain on State Farm's deception, and their procedurally-limited recusal efforts were summarily denied—by Justice Karmeier himself. As a result, Justice Karmeier participated in the *Avery* deliberations and, as he stated, broke the "deadlock[]" that had prevented disposition up until that point. PA1172. Unsurprisingly, he voted to overturn the judgment, and provided the essential fourth vote necessary for the majority's opinion to become law.

---

[1] Naturally, the Defendants dispute and offer competing interpretations of this evidence. But at this stage, all factual disputes must be resolved in Plaintiffs' favor. *Ledbetter v. Good Samaritan Ministries*, No. 13-CV-308, 2016 WL 3746204, at *2 (S.D. Ill. July 13, 2016) (Herndon, J.) (citing *Scott v. Harris*, 550 U.S. 372 (2007); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)). Of course, the existence of such material factual disputes requires denial of summary judgment, in favor of determination by the jury as factfinder at trial.

These actions give rise to Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* These claims are based on Defendants' own conduct—including misrepresentations to and concealment from Plaintiffs and the court—*not on the state court decisions*, and Plaintiffs do not invite this Court to review or reject those decisions. The claims could not have been asserted in the state court proceedings (indeed, they did not even fully manifest until after the *Avery* plaintiffs' last state court filing) and were not litigated therein. No legal doctrine deprives this Court of jurisdiction to hear them.

The *Rooker-Feldman* doctrine upon which State Farm so heavily relies is a narrow one that the Seventh Circuit has confirmed *does not apply* to claims addressing a state court proceeding that was "contaminated by politics" as a result of the defendants' actions. *See, e.g.*, *Nesses v. Shepard*, 68 F.3d 1003 (7th Cir. 1995). It also does not apply where, as here, the federal plaintiffs lacked a meaningful and adequate opportunity to fully present their claims in state court. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 558 (7th Cir. 1999). Finally, the doctrine does not apply to claims directed not at a state court judgment, but at a defendant's tortious conduct. This is true "[e]ven if [a plaintiff] would not have suffered any damages absent the state order." *Brokaw v. Weaver*, 305 F.3d 660, 667 (7th Cir. 2002).

For all these reasons, this Court already concluded that the "*Rooker-Feldman* doctrine does not bar this Court's exercise of jurisdiction." Doc. 67 at 16. And, although Defendants have urged the Seventh Circuit to review this and related rulings on three separate occasions, the court of appeals has turned them down every time. Docs. 175, 572, 618.

For similar reasons, Plaintiffs "did not [previously] have a full and fair opportunity to litigate" the claims advanced in this RICO cause of action—indeed, the RICO claims did not even accrue until the very end of the state court proceedings, years after the initial recusal decisions and reversal of the state court judgment. *See Jones v. City of Alton*, 757 F.2d 878, 884 (7th Cir. 1985). Relatedly, State Farm cannot demonstrate that the issues raised in this RICO action are identical to any issues that were decided by a final judgment on the merits in the *Avery* proceedings. Thus, neither *res judicata* nor collateral estoppel bar Plaintiffs' claims.

Plaintiffs' claims are not precluded, and the Court has jurisdiction over them. It must exercise that jurisdiction to ensure that Plaintiffs have an opportunity to present evidence of this extraordinary scheme to a jury of their peers.

## STATEMENT OF FACTS

*Avery v. State Farm Mut. Auto. Ins. Co.* was a nationwide class action filed in Illinois state court. 835 N.E.2d 801, 810 (2005). The *Avery* plaintiffs sued State Farm based on allegations that it specified non-original equipment manufacturer crash parts for its insureds' vehicles, in breach of their contract and in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.* at 811. Upon a jury verdict, the trial court entered judgment for over $1.1 billion. *Id.* at 810; PA1215-32. The Illinois court of appeals affirmed a judgment against State Farm for $1.05 billion. *Avery v. State Farm Mut. Auto. Ins. Co.*, 321 Ill. 746 N.E.2d 1242, 1262 (2001), *aff'd in part, rev'd in part*, 835 N.E.2d 801 (2005). The Illinois Supreme Court granted State Farm leave to appeal in 2002, and heard oral argument in May 2003. Doc. 289 ¶ 47. At about the same time, State Farm and others formulated a two-phase RICO conspiracy to elect a Justice beholden to State Farm, to hide what they were doing, and then to lie about it, so that State Farm's chosen Justice—Lloyd Karmeier—could participate in the appeal of the $1.05 billion judgment against it.

## I.   Phase I–the Set Up: Defendants Conspire to Put a Justice on the Illinois Supreme Court.

### A.   State Farm Exerts Considerable Influence Over the ICJL.

State Farm's principal instrumentality in the management and funding of the Karmeier campaign was the Illinois Civil Justice League ("ICJL"), a "tort reform" group created by and as an instrument of the Illinois Business Round Table ("IBRT"), a group of corporations intent on placing jurists sympathetic to corporate interest on Illinois courts. Plaintiffs' Appendix ("PA") 0001-12. In 2000, after State Farm's trial court defeat in *Avery*, State Farm Chairman and CEO Edward B. Rust, Jr. became Chairman of the IBRT. PA0013-15. In 2001, the IBRT moved the ICJL into its offices. *Id.* Through the 2004 Illinois Supreme Court election the Rust-led IBRT

supported the ICJL and was active on the ICJL's Board and Executive Committee while the ICJL provided support for the IBRT's Civil Justice Reform Task Force. *Id.*

███████████████████████████████

████████████████████████████████████████

PA0009. Murnane and the ICJL answered to Rust's IBRT as well as to the ICJL Executive Committee. PA0016.

███████████████████████████████

████████████████████████████████████████

PA0008; PA0017-27. ████████████████████ PA0016; PA0028-29. So was State Farm, through its in-house counsel and lobbyist, Defendant Shepherd. PA0030. State Farm therefore wielded great power over Murnane, and held a majority of the votes on the committee which controlled his compensation. *Id.*; PA0028-29. In addition, Rust (State Farm's CEO) and Murnane were close. PA0031-32. Murnane boasted that "when I say I talked to the State Farm people, I mean the CEO and General Counsel." PA0033. And on the day the Illinois Supreme Court overturned *Avery*, in 2005, it was Murnane to whom Rust turned for information. PA0034-35. ████████████████████████████████

████████████████████ PA0036-37.

State Farm's Shepherd and Murnane were also close. Shepherd exercised State Farm's influence over ICJL through emails and telephone calls at least three times per week (PA0038), through personal visits during the campaign (PA0039), and in-person ICJL status conferences about the campaign (PA0040-42). ███████████████████

██████████████████████████████

████████████████████████████████████

██████████████████████ PA0043-44. ██████████████

████████████████████████████████████

██████████████████████ " PA0045-46.

**B.**   **Defendants Recruit Judge Karmeier and Manage His Campaign.**

The ICJL was actively engaged in a campaign to recruit a candidate for the open Fifth District seat on the Illinois Supreme Court by the end of 2002. PA0041-42. ████████

████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

PA0097-98. Murnane assuaged this fear in a July 26, 2003 meeting, assuring Judge Karmeier he would go to Washington, D.C. to seek $2 million on Judge Karmeier's behalf. PA0203-04. By August 2003, Murnane was sharing with donors an ICJL campaign plan for Judge Karmeier, "[o]ur candidate for the Supreme Court." PA0203-15.

A PowerPoint presentation that Murnane developed for the IBRT confirms the State Farm-influenced ICJL's central role in recruiting and seeking funds for Judge Karmeier. It states: "***Found Judge Karmeier, convinced him to run***; pledged support up front; worked to build organization." PA0242-46 (emphasis added).[3] That was true. Besides recruiting Judge Karmeier, the ICJL, through Murnane:

- built a coalition of organizations supporting the Karmeier campaign (PA0052);
- interviewed and hired Judge Karmeier's campaign manager, Steve Tomaszewski *id.*;
- paid media and direct mail consultants, *id.*;
- took Judge Karmeier around Illinois and Washington to meet donors (PA0285-86);
- helped Judge Karmeier develop a budget for the campaign (PA0287);
- set up and ran the Karmeier campaign website including the site's credit card processing (PA0288-94);
- commissioned a study to use in campaign attack ads, *which State Farm paid for directly* (PA0295-96);
- ran the polling and prepared press releases for the Karmeier campaign (PA0297-98);
- helped create the "Round Two" plan for conducting the campaign from July 2004 through Election Day (PA0299-300);
- handled direct mailings to voters through its paid consultants (PA0301);

---

[2] For instance, Murnane delivered a presentation to the Civil Justice Reform Group—co-chaired by State Farm's General Counsel Kim Brunner—explaining that ICJL was looking for the "right candidate" for the open Illinois Supreme Court seat. PA0074-78.

[3] December 18, 2003 IBRT annual meeting minutes, with Rust as Chairman, state that "[t]he ICJL helped recruit Circuit Judge Lloyd Karmeier to run for this office, and, with the IBRT, has been working to acquire financial and political support for the campaign." PA0262-83. A January 25, 2004 e-mail from Murnane to Judge Karmeier confirms Judge Karmeier was Defendants' hand-picked candidate: "You've passed all the tryouts we need." PA0284.

- made sure that Karmeier campaign donors could remain anonymous (PA0302);
- worked with State Farm on rallies at State Farm offices in Marion, Collinsville, and Mount Vernon, (PA0304), and in Bloomington, State Farm's hometown (PA0303-06); and
- Acted as "clearinghouse" for Karmeier Campaign contributions (PA00314; PA0042), a fact State Farm was well aware of.[4]



PA0329-30; PA0045-46

PA0331-32.

### C.   State Farm Funds the Karmeier Campaign

Judge Karmeier was described as a "Quantum Leap Forward" for Defendants, and they went to great lengths to secure his election. PA0359. Those on his campaign believed they would need at least $3 million to elect Judge Karmeier. PA0355. State Farm itself contributed even more than that,[5] and it did so covertly, through a web of intermediaries, to enable it to deny its influence and ensure that a future Justice Karmeier could participate in *Avery*, if *Avery* were still pending after the election. State Farm executives and agents held strategic positions within the leadership of the intermediaries, enabling State Farm to covertly influence the direction of funds through the intermediaries to the Karmeier campaign. These included:

> **U.S. Chamber of Commerce** ("U.S. Chamber") and its campaign donor organization, the **Institute for Legal Reform** ("ILR"):

- State Farm CEO Rust was a Director of the ILR in 2003 and 2004 (PA0508-22);

---

[4] This is confirmed in the notes of Regina Dillard, a State Farm in-house lawyer who attended a U.S. Chamber/ILR donor meeting on May 25, 2004 in the course of her employment. PA0314. Ms. Dillard's notes of the remarks at the meeting indicate that the Fifth District Illinois Supreme Court race was the ILR's "highest priority," and the U.S. Chamber was supporting Judge Karmeier. PA0308. The *Avery* case was covered at the meeting. *Id.*; PA0315-28.

[5] Expert Thomas A. Myers is a forensic accountant whose report traces the flow of funds from State Farm to the Karmeier campaign. PA0376. Myers determined, based on all the financial records and evidence, that State Farm secretly funneled more than $3.5 million to the Karmeier campaign, over three-quarters of its reported campaign funds.

- State Farm Vice-President David Hill was on the ILR Elections Task Force (PA0523-24);

- State Farm General Counsel Kim Brunner was on the ILR Audit Committee (PA0534); and

- State Farm Chief Administrative Officer James Rutrough was on the U.S. Chamber's board from 2004 to 2011 (PA0646-66; PA0684).

**American Tort Reform Association** ("ATRA"):

- State Farm Vice-President Hill was a Director in 2004. PA0704.

**Civil Justice Reform Group** ("CJRG"):

-  (PA0710-12); and

-  (PA0713-14) (PA0715) (PA0716-17).

**ICJL** and its political action committee, **JUSTPAC**:

- Murnane served as ICJL President (PA0016);

- State Farm's Shepherd served on the ICJL Executive Committee (PA0030);

- State Farm held a board seat on the ICJL (PA0718); and

- Murnane served as Treasurer of JUSTPAC (PA0719).

**Illinois Chamber of Commerce** ("Illinois Chamber"):

- State Farm executives Mike Davidson and Peggy Echols held seats on the Board of Directors. PA0720-21.

**Illinois Coalition for Jobs, Growth and Prosperity** ("Illinois Job Coalition"):

- Formed by the ICJL, the Illinois Chamber, and the IBRT (with Rust as IBRT Chairman) to "participate in a meaningful way in the 2004 elections." PA0722-24.

State Farm's contributions to these intermediaries led directly to large expenditures benefitting the Karmeier campaign including, for example: (1) $1,940,000 funneled from State Farm through the U.S. Chamber/ILR, then to the Illinois Republican Party and then to Citizens for Karmeier; (2) $415,000 that flowed from State Farm through ATRA and then to JUSTPAC, a documented proxy for the Karmeier campaign; (3) $150,000 from State Farm to the ICJL to

JUSTPAC; and (4) $100,000 from State Farm through the CJRG to the ICJL. PA0390-97; *see also* PA0725-26 (Murnane "acknowledge[d] that many Illinois corporations, and many out-of-state corporations, are supporting the Illinois effort through the US Chamber or through ATRA.").

**U.S. Chamber/ILR.** In November 1999, soon after the *Avery* class judgment, Tom Donohue, President of the U.S. Chamber, wrote to State Farm CEO Rust asking for money and promising to do anything possible "to help [State Farm's] industry," and to "always be available when [State Farm has] a particular concern." PA0727. With the *Avery* appeal pending, State Farm availed itself of Donohue's offer to marshal the U.S. Chamber on behalf of select corporations "as a means of *anonymously* pursuing their own political ends." PA0728-32 (emphasis added).[6]

Before the *Avery* judgment, State Farm's largest contribution to the U.S. Chamber was $26,000; afterwards, State Farm's yearly contribution ballooned to over $1 million. PA0384-85. And when the Karmeier campaign was heating up in mid-2004, State Farm wrote two more million-dollar checks to the U.S. Chamber's ILR division. PA0457-59.[7] At the same time, *Avery* became a recurring subject in conversations between State Farm's Rust and the U.S. Chamber's Donohue (*see, e.g.*, PA0780; PA0760; PA0794; PA0799), with Rust telling Donohue "to keep an eye on [State Farm's] Supreme Court case in I[llinois]" (PA0794). Donohue did so. When Rust pledged the second of the two $1 million donations to the U.S. Chamber's ILR in 2004, he knew State Farm could "[c]ount on [ILR] to be very helpful in [upcoming] judicial elections." PA0810-11. Indeed, the ILR designated the 2004 Illinois Supreme Court race a "Tier I" election of the very "highest priority." PA0812-15.

---

[6] Donohue sent Rust a copy of the newspaper article in which this quote appeared explaining the corporate utility of the USCC, with a personal letter to Rust thanking State Farm for its financial commitment. PA0737-38

[7] State Farm contributed an additional $500,000 to the ILR in December 2000 (PA0739-55), after the *Avery* verdict, and after a meeting in October 2000 where Donohue emphasized the millions in contributions the U.S. Chamber was making to influence judicial elections (PA0756; PA0740; PA0759).

On cue, the U.S. Chamber and ILR (which shared a bank account) made three contributions during a 30-day period in the fall of 2004 to the Illinois Republican Party totaling $2.05 million dollars, almost the exact amount donated by State Farm to the U.S. Chamber. PA0390-91. The Illinois Republican Party then contributed $1.94 million to Citizens for Karmeier in the 40-day period between the U.S. Chamber's initial contribution to ILR on September 24, 2004 and Karmeier's election on November 2, 2004. *Id.*

The proximity of the payments and near identical amounts prove this was no coincidence. The expenses that the Illinois Republican Party incurred in furtherance of the Karmeier campaign moved in lockstep with the U.S. Chamber's contributions. PA0390-93 (U.S. Chamber transfers of $750,000 and $1.3 million to the Illinois Republican Party, which then passed on near exact amounts to benefit Citizens for Karmeier). State Farm was not identified as the source of any funds transferred from the Illinois Republican Party to the Karmeier campaign. PA0391.[8]

**ATRA/JUSTPAC.** State Farm contributed almost $1 million to ATRA in late 2003 and 2004. PA0394-403. ATRA, whose Director was State Farm's Vice-President David Hill, then gave $100,000 to the Illinois Chamber (whose funding of the Karmeier campaign is highlighted above), as well as $415,000 to JUSTPAC. PA0394. A donation to JUSTPAC was a donation to the Karmeier campaign. PA0725-26; PA0823-24. ATRA's President testified: "I think we understood that the election of Lloyd Karmeier was JUSTPAC's top priority." PA0825-902. JUSTPAC was the largest direct contributor to the Karmeier campaign (PA0052), and its 2004 focus was "almost exclusively directed to the Supreme Court race" (PA0905).[9]

---

[8] ████████████████████████████████████
████████████████████████████████ PA0816.

[9] JUSTPAC ultimately contributed $1,186,453 to the Karmeier campaign. PA0397. Before 2004, JUSTPAC had never raised over $80,000 in a single year. PA0417. In 2004, it made $1.41 million in "expenditures"—$1.186 million (84%) of which went directly to the Karmeier campaign. PA0416. Murnane (JUSTPAC Treasurer and ICJL President), confirmed that "most of [JUSTPAC's] financial support is being used on behalf of the Karmeier campaign." PA0824. JUSTPAC became the largest single contributor to the Karmeier campaign, transferring donations from other groups. (Illinois Job Coalition ($150,000 to JUSTPAC—$150,000 received from State Farm); ATRA ($415,000 to JUSTPAC—$958,000 received from State Farm); the U.S. Chamber ($200,000 to JUSTPAC—$2.2 million received from State Farm); and the Illinois Chamber ($91,000 to JUSTPAC—$37,500 received from State Farm). PA0416-17.

██████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████ PA0906-88; PA 0851. ATRA and State Farm knew that JUSTPAC would apply the $50,000 to the Karmeier campaign. PA0856.

**Illinois Jobs Coalition.** State Farm contributed $150,000 to the Illinois Jobs Coalition in 2004. PA0404. On the same day State Farm wrote its final $50,000 check to the Illinois Jobs Coalition, the Illinois Jobs Coalition transferred the full $150,000 to JUSTPAC, which promptly transferred it to Judge Karmeier's campaign. PA0405-07.

**CJRG.** State Farm contributed $150,000 to the CJRG on January 6, 2004. PA0409-10. The CJRG transferred $100,000 to the ICJL, which was used to benefit the Karmeier campaign. PA0411-12. ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ PA0916-17.

Any of these examples would raise an eyebrow. Together, the scope of State Farm's contributions to Karmeier's campaign was extraordinary and, critically, was intentionally kept secret. Illinois campaign finance rules require an entity contributing to a campaign to reveal its sub-donors if any sub-donor accounts for over one-third of that entity's contributions to the campaign. State Farm kept its contributions anonymous by ensuring that the groups it used did not cross the 33% threshold. *E.g.*, PA0302. ██████████████████████

██████████████████████████████████████████

██████████████████████████ PA0919-20. █████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ *Id.* ████████████████████

██████████████████████████████ *Id.* Indeed, State Farm-funded groups supplied the vast majority of the Karmeier campaign's funds, but each one remained under the one-third level to cloak State Farm's involvement in secrecy, maintain plausible deniability, and permit a future Justice Karmeier to participate in *Avery*. PA0302.

   **D.     Judge Karmeier Knew State Farm Played a Significant Role in Funding His Campaign.**

██████████████████████████████████████████████

██████████████████████████████████████

████████████████████████ PA0921-24; PA0095. █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ PA0925-32. ███████████████████

████████████████████████████████████████████████

████████████████ PA0933-49. ███████████████████████

████████████████████████████████ PA0094-98; PA203-04.

████████████████████████████████████████████████.

PA0950. ████████████████████████████████████

████████████████████ PA0100; PA0951-52. ██████████████

████████████████████████████████████████████████

██████████ PA0953-58.

████████████████████████████████████

██████████████████████████████████████████ PA0101.

████████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

██████████ PA0141; PA0959-60. ██████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███ PA0816. ███████████████████████████████

███████████████████████████████████████████████

███████████████████ *Id.* ██████████████████████

███████████████████████ PA0961. ████████████████

███████████████████████████████████████████████

████████████████████████ PA0962-64.

### E.    Defendants Further Enhance Judge Karmeier's Odds of Winning the Election by Subverting the State Bar's Judicial Candidate Evaluation Process.

State Farm also helped the Karmeier campaign by placing two of its lead lawyers—Robert Shultz (who tried *Avery* for State Farm and participated in the post-verdict appeals) and Alan Sternberg (State Farm's Associate General Counsel, who was responsible for the *Avery* case and hired Shultz to represent State Farm)—on the Illinois State Bar Association's presumably independent committee to vet the two candidates. PA0965-1022. The ISBA committee rated Judge Karmeier "highly qualified," while giving his opponent a lower, "qualified" rating. PA1023-24. An article trumpeting the different ratings appeared in the U.S. Chamber's newspaper within *two hours* of the ratings announcement. PA1025-26.

Shultz testified that he applied to join the Judicial Evaluations Committee after the entry of the *Avery* class judgment at Sternberg's request. PA0987. To serve on this committee, Shultz certified that his involvement created no "credible and objective appearance of bias or impropriety"—even though Shultz argued *Avery* before an appellate panel that included Judge Karmeier's opponent (who wrote the opinion mostly affirming judgment against State Farm), and Shultz continued to represent State Farm in the pending *Avery* appeal in the Illinois Supreme Court. PA0981-83. Shultz never revealed any of this to the ISBA. He also never told the Illinois Supreme Court, or counsel for the *Avery* plaintiffs, that he and Sternberg had vetted the two candidates for the ISBA, even when he *knew* that Justice Karmeier would rule in *Avery*. PA0990.

## II.    Phase II–the Pay Off: State Farm Deceives the Illinois Supreme Court Regarding Its Participation in and Funding of the Karmeier Campaign.

Having succeeded in placing Justice Karmeier on the high court, Defendants had to make sure he was not disqualified from participating in *Avery*. At the time of Justice Karmeier's election, Illinois Supreme Court Rule 63 mandated that a Justice "*shall* disqualify himself or herself in a proceeding in which the judge's impartiality *might reasonably be questioned*." Ill. S. Ct. R. 63C (emphasis added). Moreover, on June 8, 2009, before State Farm's second offensive mailing, the United States Supreme Court held that due process requires recusal "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009). This is exactly what State Farm had done. Defendants knew, then, that to secure Justice Karmeier's participation in the *Avery* decision, they must conceal State Farm's involvement in the Karmeier campaign. *E.g.*, PA1027. That is precisely what they did.

On January 26, 2005, the *Avery* plaintiffs filed a Conditional Motion for Non-Participation in the Illinois Supreme Court, suggesting that if Justice Karmeier intended to participate in the *Avery* adjudication, he should not because his campaign had received "substantial donations" from State Farm's "attorneys and law firms," a "trial witness" of State Farm, and State Farm employees and lobbyists. A00027. This motion was supported largely by newspaper articles and public campaign disclosure records. Those articles and records, however, *did not reveal* State Farm's influence over the ICJL and Murnane; its involvement in the selection of Justice Karmeier; its financial support and covert direction of funds for the Karmeier campaign through intermediaries; its influence over those intermediaries; or its subversion of the ISBA's judicial candidate evaluation process. None of that information was in the public record, and Plaintiffs had no recourse to discovery to test their suspicions. Only State Farm could have confirmed its role in Justice Karmeier's election, and it did not do so.

Instead, in a January 31, 2005 brief mailed to the high court, State Farm falsely denied its extraordinary support for Justice Karmeier's candidacy; falsely denied that it had "engineered

contributions" for "the purpose of impacting the outcome of this case"; failed to disclose that State Farm officials had helped recruit and vet Justice Karmeier; and failed to disclose that State Farm had organized, funded, and directed the Karmeier campaign. PA1028-130. In addition, and by way of example, State Farm's brief stated that:

- "Plaintiffs have concocted a contention that State Farm somehow engineered contributions to Justice Karmeier's campaign for the purpose of impacting the outcome of this case. This is . . . unsupported by any facts." PA1038.
- "Plaintiffs' assertion that campaign contributions from organizations like ATRA were part of an 'attempt [by State Farm] to cloak their influence over Lloyd Karmeier's election' . . . is incorrect and meritless." PA1039.
- "Although Plaintiffs attempt to link large sums in contributions by a variety of persons and organizations to Justice Karmeier's campaign to State Farm, their moving papers and supporting documentation in fact reveal that a limited number of State Farm officers and employees made *quite modest* contributions to Justice Karmeier's campaign." PA1040 (emphasis added).

The Illinois Supreme Court denied the Motion for Conditional Non-Participation without Justice Karmeier's participation, and without explaining its ruling. State Farm's Appendix ("A") 00334.

The *Avery* plaintiffs then moved for reconsideration—citing media reports that the U.S. Chamber had made significant contributions to Justice Karmeier's campaign, but again, lacking formal discovery—and requested a written decision. A00317-21. Instead, the Illinois Supreme Court vacated its order denying the Motion for Conditional Participation and entered an order stating: "Disqualification being a decision exclusively within the determination of the individual judge per Rule 63, and Justice Karmeier having advised the Court that he will not disqualify himself under Rule 63, the motion for conditional non-participation of January 26, 2005, and the motion to reconsider of March 22, 2005, are denied as moot." A00315.

Soon after plaintiffs' recusal efforts were denied, Justice Karmeier voted to overturn the *Avery* judgment. Before then, the Court had been "unable to reach a consensus on how to dispose of" the case. PA1172. Justice Karmeier broke the "deadlock[]." *Id.*

On September 8, 2011, the *Avery* plaintiffs filed in the Illinois Supreme Court a Petition to Recall Mandate and Vacate August 18, 2005 Judgment, based on new information that State Farm had played a role in Justice Karmeier's election. A00422-52. The Petition was supported

by the affidavits of retired FBI Special Agent Daniel Reece and private investigator Douglas Wojcieszak based on information discovered through their own informal investigative efforts. *Id.*

There was, however, much that the *Avery* plaintiffs did not know and could not have uncovered, without formal discovery. They did not know of the close relationships Rust had with Shepherd and Murnane, or of State Farm's power over Murnane and its decision-making influence within the ICJL. Nor did they know that, soon after winning the election and before Justice Karmeier was sworn in, Justice Karmeier and Rust met privately in Chicago, while the *Avery* case was pending. They did not know that the ICJL was a "clearinghouse" for the Karmeier campaign; that State Farm had funded a study to discredit Judge Karmeier's opponent; or the extent to which Murnane, through the ICJL, recruited Justice Karmeier, selected his campaign team, raised campaign funds for him, and ran his campaign. They did not know the extent to which Justice Karmeier knew the sources of his campaign funds, and could not specifically track the money that went anonymously from State Farm, through the intermediary organizations, to the Karmeier campaign. They could not document State Farm's influence over the activities of its intermediaries. Nor did they know that State Farm had compromised the ISBA's judicial candidate evaluation process.

State Farm moved to strike the Reece and Wojcieszak affidavits, claiming they were "plainly incompetent and entirely lacking in evidentiary value." A00972-89; A01014-30. Plaintiffs replied that they had no recourse to discovery in the Illinois Supreme Court to obtain other evidence, so they had no means other than the Petition to inform the Court of State Farm's fraud. A00997; A01038.

In further response to the Petition, State Farm filed a second offensive mailing, namely its September 19, 2011 brief to the Illinois Supreme Court. PA1131-70. There, State Farm again falsely denied Murnane's extensive role in the Karmeier campaign. *Id.* State Farm also failed to state that Shepherd had helped to recruit and vet Judge Karmeier and helped ensure the ICJL supported the Karmeier campaign. *Id.* In addition, State Farm's submission stated that

- "State Farm itself made no contribution to the campaign" (PA1134);

- "[T]here was no 'funnel[ing]' of money from State Farm through JUSTPAC to Justice Karmeier" (PA1155-56); and
- "According to [the *Avery*] Plaintiffs, State Farm somehow picked Justice Karmeier as a candidate, managed his campaign, and made massive contributions to his campaign. The picture [the Avery] Plaintiffs attempt to paint has *no relationship to reality*" (PA1134) (emphasis added).

The Illinois Supreme Court struck the affidavits and denied the Petition without explanation. A01865-67.

## LEGAL STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law." *Ledbetter*, 2016 WL 3746204, at *2 (citing *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). "All reasonable inferences are drawn in favor of the nonmovant and all factual disputes are resolved in favor of the nonmovant." *Id.* (citing *Scott*, 550 U.S. 372; *Fischer*, 519 F.3d 393, 401).

## ARGUMENT

I.   **THE "NARROW" *ROOKER-FELDMAN* DOCTRINE DOES NOT DEPRIVE THIS COURT OF JURISDICTION TO HEAR THE PLAINTIFFS' RICO CLAIM.**

The Court has already rejected State Farm's misguided *Rooker-Feldman* arguments, Doc. 67, and the Seventh Circuit has thrice declined to consider them, notwithstanding State Farm's claim that doctrine raises jurisdictional issues that warrant immediate appellate review. Docs. 175, 572, 618. That is because the *Hale* Plaintiffs do not seek review or rejection of the *Avery* rulings; instead, they focus their RICO action on Defendants' fraudulent scheme to deprive Plaintiffs of an impartial tribunal. *Rooker-Feldman*, therefore, does not bar Plaintiffs' claims, as this Court already concluded:

> Plaintiffs' federal claims allege separate injuries and violations that are separate from the *Avery* judgment. Plaintiffs are not asking for the Illinois Supreme Court's judgment to be overturned or reviewed. Nor does it appear that plaintiffs are attacking the merits of the *Avery* judgment. It appears from the complaint that they are asserting claims for an independent legal wrong:  the illegal acts or omissions by defendants. The complaint contains specific allegations that State Farm and others, including Shepherd and Murnane, conspired with others to ensure a predetermined decision in *Avery*. Particularly, plaintiffs are challenging

> defendants' actions in procuring the *Avery* judgment. Plaintiffs allege that the improper actions of defendants during and after the *Avery* proceedings in the Illinois Supreme Court – specifically defendants' mail fraud containing misrepresentations to the Illinois Supreme Court – resulted in the denial of their constitutional rights and the related injury. . . . Based on these allegations, the Court finds that the *Rooker-Feldman* doctrine does not bar this Court's exercise of jurisdiction.

Doc. 67 at 15-16.

The Court's analysis is still correct. The only difference now is that Plaintiffs have had the benefit of discovery. What was little more than "information and belief" when Plaintiffs filed the Complaint has been bolstered by evidence of an extraordinary money and email trail that confirms Defendants' central role in orchestrating Justice Karmeier's winning campaign and his participation in the *Avery* matter then pending before the Illinois Supreme Court. This evidence of a tainted tribunal further supports the Court's already well-reasoned conclusion that *Rooker-Feldman* does not deprive the Court of jurisdiction.

### A.    *Rooker-Feldman* Is a "Narrow" and "Limited" Doctrine.

In limited circumstances, where a federal suit follows a state suit, the *Rooker-Feldman* doctrine prohibits federal district courts from exercising jurisdiction. The doctrine has been applied by the United States Supreme Court only twice, in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). In both cases, "[t]he losing party in state court filed suit in a U.S. District Court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking federal-court review and rejection of that judgment." *Skinner v. Switzer*, 131 S. Ct. 1289, 1297 (2011). In both cases, plaintiffs "asked the District Court to overturn the injurious state-court judgment." *Id.* And, in both cases, the Supreme Court held that "the District Courts lacked subject-matter jurisdiction over such claims, for 28 U.S.C. § 1257 vests authority to review a state's court judgment solely [in the Supreme Court]." *Id.* (quotation marks omitted). Outside these narrow circumstances, the Supreme Court has never applied the doctrine.

At various times and by various courts, however, the *Rooker-Feldman* doctrine has been construed more broadly than in *Rooker* in 1923 or in *Feldman* in 1983, to bar a range of federal court litigation brought on the heels of a state court case. *See Exxon Mobil Corp. v. Saudi Basic*

*Indus. Corp.*, 544 U.S. 280, 283 (2005) (observing that lower courts have extended the *Rooker-Feldman* doctrine "far beyond the contours of the *Rooker* and *Feldman* cases"). Yet, the Supreme Court has consistently held that such expansive application is in error, and that *Rooker-Feldman* occupies only a very "narrow ground," *Exxon*, 544 U.S. at 284, and applies in only "limited circumstances." *Id.* at 291. *See also Lance v. Dennis*, 546 U.S. 459, 464 (2006) (*Rooker-Feldman* is a "narrow doctrine" that "applies only in 'limited circumstances'"). Indeed, Justice Stevens went so far as to proclaim that the Court's previous rulings had "interred" the dusty *Rooker-Feldman* doctrine. *Id.* at 468 (Stevens, J., dissenting).[10]

*Rooker-Feldman* doctrine thus bars federal district courts from hearing only a narrow set of lawsuits (1) "brought by state-court losers" (2) who are "complaining of injuries caused by state-court judgments" (3) "rendered before the district court proceedings commenced," (4) if, and only if, the federal action "invit[es] district court review and rejection of those judgments." *Lance*, 546 U.S. at 464; *accord Exxon*, 544 U.S. at 284. Even if all conditions are met, the Seventh Circuit has long recognized that *Rooker-Feldman* does not apply to claims involving allegations of a tainted state court tribunal. *See, e.g.*, Nesses, 68 F.3d 1003.

### B.   *Rooker-Feldman* Does Not Deprive Federal Courts of Jurisdiction Over Federal Actions Involving Allegations and Proof of a Tainted Tribunal.

The evidence in this case shows that State Farm and its co-conspirators rigged the state court judicial system at the highest levels, concealing their extraordinary level of organizational and financial support for a Supreme Court justice who, because of State Farm's RICO-violative scheme, was able to participate in the deliberations to review and ultimately overturn a $1.05

---

[10] Courts of appeal have recognized the same. *See, e.g.*, *Green v. Jefferson Cnty. Comm'n*, 563 F.3d 1243, 1245 (11th Cir. 2009) (describing *Rooker–Feldman* as an "extremely narrow exception[]" to the federal courts' "virtually unflagging" duty "to adjudicate claims within their jurisdiction"); *Vulcan Chem. Techs., Inc. v. Barker*, 297 F.3d 332, 338 (4th Cir. 2002); *In re Smith*, 349 Fed. App'x 12, 18 (6th Cir. 2009). Commentators, too, have also recognized the limits of the doctrine and have criticized it. *See, e.g.*, Dustin E. Buehler, *Revisiting Rooker-Feldman: Extending the Doctrine to State Court Interlocutory Orders*, 36 Fla. St. U. L. Rev. 373, 374 (2009) ("Judges and scholars have heaped scathing criticism on the 'so-called *Rooker-Feldman* doctrine'"); Barry Friedman & James E. Gaylord, *Rooker-Feldman, from the Ground Up*, 74 Notre Dame L. Rev. 1129, 1133 (1999) ("The *Rooker-Feldman* doctrine should be abolished."); Erwin Chemerinsky, *Federal Jurisdiction*, 499 n.8 (6th ed. 2012) (explaining that, in recent years, the Supreme Court has further "limited the application of the *Rooker-Feldman* doctrine").

billion judgment pending against State Farm. These facts bring the case squarely within the ambit of *Nesses* and its progeny—cases which, as State Farm recognizes, constitute an "exception to *Rooker-Feldman*." Doc. 646 at 19; *see also Manos v. Caira*, 162 F. Supp. 2d 979, 986–87 (N.D. Ill. 2001) ("*Nesses* carved out an exception to the application of the *Rooker-Feldman* doctrine" where the plaintiff "alleges that defendants succeeded in corrupting the judicial process in order to obtain a favorable ruling" in the state system).

In *Nesses*, the Seventh Circuit confirmed that a federal plaintiff may pursue a claim to vindicate his right to "be judged by a tribunal that is uncontaminated by politics . . . without being blocked by the *Rooker-Feldman* doctrine." 68 F.3d at 1005. There, after losing a breach of contract suit in state court, the plaintiff filed a federal action "alleg[ing] a massive, tentacular conspiracy among the lawyers and the judges to engineer Nesses' defeat" in the state court action. *Id.* at 1004. The district court dismissed the plaintiff's suit under *Rooker-Feldman*.

The Seventh Circuit reversed. Writing for the majority, Judge Posner conceded that the plaintiff's suit was "in a sense attacking the ruling by the state court . . . [and] the decisions themselves that dismissed his suit." *Id.* But, he concluded, though it might appear that *Rooker-Feldman* would bar such a suit, the "doctrine is not that broad." *Id.* at 1005. The court explained:

> Were Nesses merely claiming that the decision of the state court was incorrect, even that it denied him some constitutional right, the doctrine would indeed bar his claim. But if he claims, as he does, that people involved in the decision violated some independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by the *Rooker–Feldman* doctrine, sue to vindicate that right and show as part of his claim for damages that the violation caused the decision to be adverse to him and thus did him harm. Otherwise there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment . . . .

*Id.*

In his partial dissent, Judge Fairchild argued that Nesses' "complaint could have no meaning unless it sought a determination that the state court judgments were wrong" and, therefore, that "the *Rooker-Feldman* doctrine requires dismissal for lack of jurisdiction." *Id.* at 1006. This is precisely State Farm's reasoning here. The majority opinion rejected it.

Since *Nesses*, the Seventh Circuit has confirmed and re-affirmed that *Rooker-Feldman* does not preclude federal remedies for damages arising from state court corruption. In *Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006), for example, the plaintiff brought a § 1983 suit against more than forty individuals whom she alleged "conspired to defraud her by corrupting her [state court] divorce proceedings," which ultimately "deprived her of property to which she was entitled." *Id*. at 440. Again, the district court dismissed the case, citing *Rooker-Feldman*. Again, the court of appeals reversed and reiterated its conclusion that *Rooker-Feldman* does not preclude review of claims alleging that a defendant "so far succeeded in corrupting the state judicial process as to obtain a favorable judgment." *Id.* at 441 (citations omitted). "Otherwise," the court of appeals observed, "there would be no federal remedy other than an appeal to the U.S. Supreme Court, and that remedy would be ineffectual because the plaintiff could not present evidence showing that the judicial proceeding had been a farce." *Id.* at 441-42. In other words, *Rooker-Feldman* does not bar claims based on allegations that a plaintiff "was denied the right to be judged by an uncorrupted tribunal and seek[ing] damages for the resulting harm," even where there is "no question" that the complaint constitutes "an attack on the proceedings in . . . state court." *Id.* at 444 (Sykes, J., concurring).

In *Davit v. Davit*, cited by State Farm, the Seventh Circuit reiterated this conclusion, and applied it to reject a district court's decision to dismiss a RICO action under *Rooker-Feldman*. 173 Fed. App'x 515, 517 (7th Cir. 2006). The court of appeals concluded that the federal plaintiff's allegations "that the defendants conspired to deny him an honest tribunal" in his state court proceedings set the case beyond the reach of *Rooker-Feldman*. *Id.*

Several Seventh Circuit cases decided after this Court's initial order rejecting State Farm's *Rooker-Feldman* arguments are in accord. In *Johnson v. Pushpin Holdings, LLC*, for example, the Seventh Circuit, citing *Nesses*, held that *Rooker–Feldman* "does not bar a federal suit that seeks damages for a fraud that resulted in a judgment adverse to the plaintiff" because "[s]uch a suit does not seek to disturb the judgment of the state court, but to obtain damages *for the unlawful conduct that misled the court into issuing the judgment.*" 748 F.3d 769, 773 (7th

Cir. 2014) (emphasis added). Similarly, in *Parker v. Lyons*, the Seventh Circuit again concluded that because plaintiffs' "claims are premised on detailed allegations that the winning party obtained a favorable civil judgment by corrupting the state judicial process, *Rooker-Feldman* does not bar them." 757 F.3d 701, 706 (7th Cir. 2014).[11]

This line of well-reasoned authority clearly instructs that *Rooker-Feldman* cannot and does not deprive this Court of jurisdiction over Plaintiffs' claims. Plaintiffs here seek to vindicate their right to be "judged by a tribunal that is uncontaminated by politics." *Nesses*, 68 F.3d at 1005. They allege that Defendants' fraudulent scheme robbed them of that right to an untainted tribunal, and "so far succeeded in corrupting the state judicial process as to obtain a favorable judgment." *Id.* The evidence adduced thus far supports this allegation and demonstrates that Defendants' scheme erected an insurmountable barrier to fair adjudication. These claims, and the proof supporting them, place this action beyond the reach of *Rooker-Feldman*.[12]

Perhaps recognizing the threat that these cases pose to their *Rooker-Feldman* arguments, State Farm attempts to distinguish *Nesses* and its progeny by arguing that they apply only where there is "actual judicial corruption." Doc. 646 at 33. This strained interpretation cannot be reconciled with the reasoning of those cases.

It is true that in both *Nesses* and *Loubser* the plaintiffs alleged conspiracies in which judges were claimed co-conspirators, but the Seventh Circuit's holdings do not rest on that fact. Instead, the crucial allegation in both cases was simply that plaintiffs claimed a violation of their right "to be judged by a tribunal that is uncontaminated by politics." *Nesses*, 68 F.3d at 1005; *see*

---

[11] Other circuit courts are in accord. *See, e.g.*, *Great W. Mining & Mineral Co. v. Fox Rothschild Inc.*, 615 F.3d 159 (3d Cir. 2010) (finding that *Rooker-Feldman* did not apply even though Great Western was "attacking the state-court judgments" because "Great Western asserts an independent constitutional claim that the alleged conspiracy violated its right to be heard in an impartial forum" and "the source of Great Western's purported injury was the actions of Defendants and members of the Pennsylvania judiciary, not the state-court decisions themselves").

[12] Of course, the 2004 Illinois Supreme Court election was a partisan one, but Defendants' participation took it far beyond politics as usual or proper. Justice Maag's supporters knew he could not participate in the *Avery* decision if elected (because he had authored the appellate decision below); Defendants, in contrast, selected, financed, and counted on Justice Karmeier to do just that.

*also Loubser*, 440 F.3d 439. Furthermore, in *Nesses*, Judge Posner made clear that "judicial corruption" is not necessary to trigger the exception by analogizing Nesses' claims to one in which a plaintiff sued "police officers . . . for having fabricated evidence that resulted in the plaintiff's being convicted in a state court." *Nesses*, 68 F.3d at 1005. Of course, in that analogy, the alleged corruption lies solely with the police officers, *not with the judge*. Yet the result is the same: federal courts retain jurisdiction to adjudicate claims that fraud in the state court proceedings tainted the tribunal.

The actual motivations of a judicial decision maker can never be demonstrated conclusively—the deliberative privilege prevents that inquiry. But again, where, as here, Plaintiffs have alleged (and have advanced evidence to prove) that Defendants' actions in the state court tainted that tribunal, *Rooker-Feldman* does not apply.

Contrary to State Farm's assertion, *Sheikhani v. Wells Fargo Bank*, 526 F. App'x 705 (7th Cir. 2013), does not undermine this conclusion, or otherwise hold that "'corruption' for the purpose of *Nesses* and *Loubser* clearly does not include mere allegations that the defendants made fraudulent representations to the state court or procured a judgment by fraud." Doc. 646 at 33. In *Sheikhani*, the Seventh Circuit confirmed that *Rooker-Feldman* does not bar jurisdiction "if the state court imposed an insurmountable obstacle to adjudication," and cited "a conspiracy among the judge and state-court adversaries" merely as an "*example*" of such a scenario. 526 F. App'x at 706 (emphasis added). Ultimately, the court held that *Rooker-Feldman* applied, but only because the plaintiff had *not* "allege[d] that the foreclosure proceedings were corrupted; in fact he stressed . . . that he was not questioning the integrity of those proceedings." *Id.* at 706-07. Here, in contrast, Plaintiffs' RICO allegations clearly challenge the integrity of the state court proceedings—and they have advanced significant evidence supporting that claim.

But even assuming, for the sake of argument, that *Nesses* applied only if a judge has been corrupted (an incorrect interpretation), Plaintiffs have adduced evidence that, at the very least, creates a triable issue of fact on this issue. Plaintiffs have presented documents, cited above, showing that Judge Karmeier knew that his campaign received millions of dollars from

organizations in which State Farm exerted significant influence—including the U.S Chamber, the ICJL, and IBRT. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ PA0141; PA0959-60; PA0794. And, again, while the judicial deliberation privilege prevented Plaintiffs from asking Justice Karmeier whether this knowledge influenced his decisions or deliberations in *Avery*, these documents, and all the other evidence of the RICO scheme, allow a trier of fact to conclude it did.[13]

Recent precedent from the United States Supreme Court highlights the critical policy underlying the holdings in *Nesses*, *Loubser*, *Davit*, *Pushpin Holdings*, *Parker*, and other similar cases, and confirms that a panel can be unconstitutionally contaminated by politics not just by actual judicial corruption, but also by the "*risk* of actual bias" that arises "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Caperton*, 556 U.S. at 884; *see also Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016). *Caperton* arose under facts similar to those presented here: the CEO (Don Blankenship) of a company (A.T. Massey Coal Co.) that had a $50 million judgment pending against it in West Virginia state court contributed up to $3 million through a political organization supporting the campaign of a judge (Justice Benjamin) running for a seat on the West Virginia Supreme Court. *Id.* at 872-73. Justice Benjamin was elected, refused to recuse himself from hearing the appeal of the judgment against Massey Coal, and ultimately voted to overturn it. *Id.* at 874. The United States Supreme Court held that, under these facts, the due process rights of Massey Coal's adversary had been violated. The Court observed "the difficulties of inquiring into actual [judicial] bias" and concluded that "[d]ue process requires an

---

[13] Plaintiffs have contended that they need not show that Judge Karmeier knew the source of his donations to prove their RICO claims. *See* Doc. 646 at 15. But this does not mean that they cannot prove this fact to establish the kind of judicial corruption that State Farm incorrectly asserts is necessary to invoke the *Nesses* exception. As explained above, Plaintiffs can do so.

objective inquiry into whether the contributor's influence on the election under all the circumstances 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.'" *Id.* at 885 (citation omitted). Under those facts, the Court concluded that there was a "serious risk of actual bias" that violated due process. *Id.* at 884.

In important respects, the facts presented here are even more threatening to the judicial process than those presented in *Caperton*. In *Caperton*, the contributions of Massey Coal to Justice Benjamin's campaign were made in the open and were transparent (it was well-known that Blankenship was the source of the intermediary organization's funds). Here, in contrast, State Farm sought to hide its contributions from the public, presumably so that it could plausibly deny its participation in helping to elect Justice Karmeier. According to judicial ethics expert Professor Charles Geyh, the fact, if true, that State Farm sought to hide its contributions to Justice Karmeier's campaign "portend something new and even more disturbing than the scenario in *Caperton*." PA1194. It would be the ultimate irony, and a betrayal of the principles inherent in *Caperton*, were *Rooker-Feldman*, an earlier prudential creation of the Supreme Court, misused to enable defendants to escape *Caperton* and evade accountability in the federal courts for subversion of state court process.

The Supreme Court has also recently confirmed that one possibly biased justice on a multi-member state supreme court can infect and undermine the integrity of that court's decision-making. *Williams*, 136 S.Ct. 1899. The Supreme Court held:

> A multimember court must not have its guarantee of neutrality undermined, for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part. An insistence on the appearance of neutrality is not some artificial attempt to mask imperfection in the judicial process, but rather an essential means of ensuring the reality of a fair adjudication. Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself.

*Id.* at 1909.  Thus, where, as here, there is a real risk that a single member of a panel was biased, the entire tribunal's decisions are impermissibly infected with and contaminated by politics.

Under *Nesses* and its progeny—and under the United States Supreme Court precedent that underscores its rationale—*Rooker-Feldman* does not apply to Plaintiffs' claims, which are rooted in facts and evidence that Defendants conspired to taint the state court tribunal.

### C.    Plaintiffs Did Not Have an Adequate Opportunity to Fully Present their Claims in State Court.

A related exception to the *Rooker-Feldman* doctrine applies when the state court parties lacked a "reasonable opportunity to raise the issue in state court proceedings." *Long*, 182 F.3d at 558; *Brokaw*, 305 F.3d at 668; *Taylor v. Fed. Nat. Mortg. Ass'n*, 374 F.3d 529, 534-35 (7th Cir. 2004); *Hamilton v. City of New Albany, Indiana*, No. 16-3901, 2017 WL 2615453, at *4 (7th Cir. June 16, 2017). "The 'reasonable opportunity' inquiry focuses not on ripeness, but on difficulties caused by "factor[s] independent of the actions of the opposing part[ies] that precluded" a plaintiff from bringing federal claims in state court, such as state court rules or procedures. *Taylor*, 374 F.3d at 534-35 (citation omitted).

Defendants make much of the fact that allegations of State Farm's wrongful conduct surfaced in the *Avery* proceedings. What State Farm overlooks, however, is that the *Avery* plaintiffs had no opportunity for discovery related to the allegedly wrongful conduct that tainted the proceedings. The *Avery* plaintiffs assembled and presented what they could through their own investigation, but those efforts were limited. They could not depose, or otherwise take discovery from, Murnane, Shepherd, or other State Farm officials, and they did not know—and could not possibly have known—what several years of formal discovery have revealed regarding the relationship between and among Defendants and the participants in their RICO enterprise. Plaintiffs could not prove, for example, that Shepherd was in constant communication with Murnane and was on the ICJL Executive Committee, a crucial link connecting State Farm to Judge Karmeier's campaign. They also did not know that Justice Karmeier met privately with State Farm's CEO in December 2004, a month after the November 2004 judicial election and a month before he agreed to participate on the *Avery* appeal, even though the oral argument had taken place years prior. Nor did Plaintiffs previously have an opportunity to test the credibility of

Justice Karmeier himself, including his claim that he remained ignorant of the millions of dollars that State Farm contributed to his campaign.

Notably, in *Avery*, State Farm itself decried the plaintiffs' lack of evidence and moved to strike the investigator affidavits submitted in connection with their recusal efforts, arguing they were comprised of hearsay and lacked foundation. A00972-89; A01014-1030. The Illinois Supreme Court granted this motion, thereby denying Plaintiffs the opportunity to present even the modest information they could collect outside of formal discovery. Ironically, this is the very same evidence that State Farm now points to as proof that Plaintiffs had an opportunity to litigate their claims in state court. Clearly, they did not. For this separate reason, *Rooker-Feldman* does not apply.

> **D.**      ***Rooker-Feldman* Does Not Apply Where, As Here, Defendants' Unlawful Conspiracy, Not the *Avery* Decisions, Caused Plaintiffs' Injury, and Plaintiffs Do Not Seek Review or Rejection of the State Court Rulings.**

Even without the *Nesses* "exception" described above, and even assuming the *Avery* plaintiffs had a reasonable opportunity to litigate the recusal issues in state court, *Rooker-Feldman* does not deprive this Court of jurisdiction because Plaintiffs' federal claims allege injuries and violations that are separate from the *Avery* judgment, and they do not "invit[e] district court review and rejection of those judgments." *Lance*, 546 U.S. at 464 (2006) (quotation marks omitted). As the Court correctly concluded when ruling on this issue previously:

> Plaintiffs' federal claims allege separate injuries and violations that are separate from the *Avery* judgment. Plaintiffs are not asking for the Illinois Supreme Court's judgment to be overturned or reviewed. Nor does it appear that plaintiffs are attacking the merits of the *Avery* judgment.

Doc. 67 at 15. Again, nothing has changed since then, and State Farm's request for reconsideration of this ruling finds no support in controlling law.

The focus of Plaintiffs' RICO claim is the fraudulent conduct of State Farm and its co-conspirators. It was State Farm and its co-conspirators who secretly advanced their hand-picked candidate to the Illinois Supreme Court while the *Avery* judgment was pending in the Supreme Court. It was State Farm which funneled millions to the Karmeier campaign and which then covered up and lied about the extent of its support for, and connection with, Justice Karmeier.

And it was State Farm's actions which robbed Plaintiffs of their right to an impartial tribunal and thereby caused Plaintiffs' injuries. In short, Plaintiffs' claims are focused on Defendants' actions and will succeed or fail based on whether they satisfy the elements of a RICO action, not on whether a federal court reverses the state court decisions. Plaintiffs' RICO claim, therefore, is focused entirely on the actions of the Defendants, does not invite review or rejection of any state court ruling, and does not implicate *Rooker-Feldman*.

Seventh Circuit case law confirms this conclusion. In *Brokaw*, for example, a federal plaintiff suing county and state officials alleged a conspiracy to remove her from her parents' home by state court judicial proceedings. 305 F.3d 660, 662. Reversing the district court's dismissal, the court of appeals held that *Rooker-Feldman* did not bar the federal claims because the plaintiff alleged that "the people involved in the decision to forcibly remove her from her home and her parents . . . violated her constitutional rights, independently of the state court decision." *Id.* at 665. The claims arose from defendants' conduct, not the state court judgment.

In *Long*, the Seventh Circuit again recognized federal jurisdiction over a plaintiff's claims even though they implicated a state-court judgment. 182 F.3d 548. The plaintiff claimed her lessor misled her about a debt in the form of unpaid rent, and tried to extract payment in violation of the Fair Debt Collection Practices Act. *Id.* at 552-53. The lessor thereby obtained a judgment against the plaintiff that led to her eviction. *Id.* The court of appeals rejected the district court's conclusion that the plaintiff's claims were "inextricably intertwined" with the state court eviction judgment because "the gravamen" of her complaint was that the defendants "fraudulently obtained the Circuit Court judgment." *Id.* at 553, 556. Instead, the Seventh Circuit reasoned, "[i]t makes no difference that [plaintiff] may also deny the correctness of the eviction order in pursuing these claims." *Id.* at 556. The court therefore found that *Rooker-Feldman* did not deprive the district court of jurisdiction.

Similarly, in *Iqbal v. Patel*, the Seventh Circuit criticized the district court for invoking the *Rooker-Feldman* doctrine based on the district court's conclusion that "any pre-litigation fraud is 'intertwined' with the state court judgments and therefore forecloses federal litigation."

780 F.3d 728, 730 (7th Cir. 2015). Citing *Exxon*, the Seventh Circuit held that "the *Rooker-Feldman* doctrine asks what injury the plaintiff asks the federal court to redress, not whether the injury is 'intertwined' with something else." *Id.* (citing *Richardson v. Koch Law Firm, P.C.*, 768 F.3d 732, 734 (7th Cir. 2014)); *see also Zurich Am. Ins. Co. v. Superior Court for State of Cal.*, 326 F.3d 816, 822 (7th Cir. 2002) (*Rooker-Feldman* inapplicable when the federal plaintiff's "injury was not caused by the state court, but by its adversary's conduct"); *S.C. Johnson & Son, Inc. v. Buske*, No. 09-286-GPM, 2009 WL 3010833, at *5 (S.D. Ill. Sept. 17, 2009) (Murphy, J.) ("Here S.C. Johnson alleges that it has been injured by the conduct of Sara and Thomas Buske in the Madison County court, not that it has been injured by the Madison County court, and accordingly, the *Rooker-Feldman* doctrine does not bar this Court's exercise of jurisdiction.").

As in *Brokaw*, *Long*, *Iqbal*, and *Zurich*, Plaintiffs here allege violations independent from the *Avery* judgments, and finding for Plaintiffs' on their federal claims would not disturb the state court judgments. Their claims rest on Defendants' conspiracy to deprive Plaintiffs of a neutral tribunal. To prove a civil RICO violation, Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The conduct underlying this claim is Defendants' conduct in violation of the RICO statute, not *Avery*. That Defendants' violation resulted in the *Avery* decisions that stripped Plaintiffs of their judgment informs the quantum of damages that flowed from Plaintiffs' injury, but it does not transform the fundamental nature of Plaintiffs' claim. *See Great W. Mining*, 615 F.3d at 173 (rejecting a similar *Rooker-Feldman* challenge and holding "while Great Western's claim for damages may require review of state-court judgments and even a conclusion that they were erroneous, those judgments would not have to be rejected or overruled for Great Western to prevail.").

The cases that State Farm cites for the contrary position do not hold otherwise. For example, in *Harold v. Steel*, a state court granted a judgment-creditor's request to enforce a judgment and garnish the debtor's wages. 773 F.3d 884 (7th Cir. 2014). The debtor then filed a federal action claiming the opposing attorney in the state court action had misrepresented the

identity of the creditor and its authority to enforce the debt. The court of appeals affirmed the district court's dismissal, concluding that before the entry of the state court judgment, the debtor had not lost any rights or suffered any injury. Thus, the only injury was attributable to the state court decision, which the federal court could not review. Similarly, in *Dawaji v. Askar*, the Seventh Circuit invoked *Rooker-Feldman* only after concluding that without the state court order at issue the federal plaintiff "would have had no injury *or* damages to claim." 618 F. App'x 858, 859 (7th Cir. 2015). Likewise, in *Mains v. Citibank*, the Seventh Circuit reiterated that *Rooker-Feldman* applies only if there is "'no way for the injury complained of by a plaintiff to be separated from a state court judgment.'" 852 F.3d 669, 675 (7th Cir. 2017), *petition for cert. filed* (July 19, 2017) (No. 17-89) (quoting *Sykes v. Cook Cnty.*, 837 F.3d at 742 (7th Cir. 2016)). In contrast, "if the suit does not seek to vacate the judgment of the state court and instead seeks damages for independently unlawful conduct, it is not barred by *Rooker-Feldman*." *Id.* at 675 (citing *Pushpin Holdings*, 748 F.3d at 773).

Finally, in the Seventh Circuit's most recent examination of *Rooker-Feldman*, *Lennon v. City of Carmel, Indiana*, the court dismissed the claims of federal plaintiffs who were effectively seeking an order "declar[ing] that the state-court judgments are void." No. 16-3836, 2017 WL 3140942, at *3 (7th Cir. July 25, 2017). In other words, in *Lennon*, the injury *was* the state court judgments, and plaintiffs asked the federal court to "review those judgments—precisely the step that *Rooker-Feldman* says we cannot take." *Id.*  Far from announcing some new principle of law, *Lennon* simply reaffirms the case law holding that plaintiffs cannot seek review of state court rulings or bring claims for an injury that arises exclusively from a previous state court judgment.[14] State Farm has already invoked this line of cases in aid of its dismissal efforts, and

---

[14] Although the claims of corruption in *Lennon* arguably could have brought the case within the ambit of the *Nesses* exception, the allegations of conspiracy were so "hodge-podge," "wide-ranging," and implausible that *Nesses* was not even worth mentioning.  *See* 2017 WL 3140942, at *1. State Farm therefore cannot credibly argue that *Lennon* somehow overrules *Nesses* or its progeny. *See Iqbal* , 780 F.3d at 729 (One panel cannot overrule another "without so much as citing it. That's not how precedent works. In this circuit it takes a circulation to the full court under Circuit Rule 40(e) for one panel to overrule another.").

has been denied repeatedly, both by this Court and by the Seventh Circuit. The same result should follow here.

Notwithstanding State Farm's repeated attempts to reframe Plaintiffs' case, for the purpose of the *Rooker-Feldman* analysis, the lost *Avery* judgment is merely one measure of *damages* that resulted from the independent injury Plaintiffs allege; it is not the injury itself. Thus, the holdings in *Harold*, *Dawaji*, *Mains*, and *Lennon* do not deprive this Court of jurisdiction. This is especially true given the Seventh Circuit's recognition that Rooker-Feldman does not prevent a plaintiff from bringing claims in federal court "*[e]ven if [a plaintiff] would not have suffered any damages absent the state order.*" *Brokaw*, 305 F.3d at 667 (emphasis added); *see also Klayman v. Deluca*, No. 15-CV-80310-KAM, 2016 WL 1045851, at \*8 (S.D. Fla. Mar. 16, 2016), *appeal dismissed* (June 16, 2016) (*Rooker-Feldman* not applicable even though "[a]warding [the requested] damages may require the Court to deny a legal conclusion reached by the state court, but it would not void, vacate, reverse, or otherwise modify the state-court judgment"); *McDermott v. Barton*, No. 14-CV-704-NJR-PMF, 2014 WL 6704544, at \*2 (S.D. Ill. Nov. 26, 2014) (Plaintiff "alleges that [defendant] made false representations and used deceptive means to obtain and enforce the default judgment," but "the fact that [plaintiff's] pursuit of his claims could ultimately show that the state court default judgment was erroneous does not render *Rooker-Feldman* applicable.").

For all the reasons stated above, Plaintiffs' federal RICO claims: (1) are focused exclusively on *Defendants'* illegal scheme to taint a tribunal reviewing a billion dollar judgment against State Farm; (2) do not seek review or rejection of the Illinois Supreme Court's rulings in the *Avery*; and, therefore, (3) are not barred by *Rooker-Feldman*.

## II.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY *RES JUDICATA*

To establish a claim is precluded by *res judicata*, also known as claim preclusion, the party seeking dismissal must show that "three criteria [are] met: (1) there must be a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of causes of action; and (3) an identity of parties or their privies." *Leow v. A & B Freight Line, Inc.*, 676

N.E.2d 1284, 1285–86 (Ill. 1997). State Farm cannot satisfy its "heavy burden" in establishing that any decision in the *Avery* proceedings constituted a final judgment on the merits of Plaintiffs' RICO claims, which were not raised in the state court, and which did not even accrue until State Farm's second predicate mailing in 2011. *City of Alton*, 757 F.2d at 885-86 (applying Illinois law). The prerequisites for *res judicata* therefore are not met, and it would be "fundamentally unfair" to preclude Plaintiffs from litigating their RICO fraud claims in this forum. *See Nowak v. St. Rita High School*, 197 Ill.2d 381, 390 (2001) ("Res judicata will not be applied where it would be fundamentally unfair to do so."); *see also City of Chicago v. Midland Smelting Co.*, 896 N.E.2d 364, 382 (Ill. App. Ct. 2008) ("[I]t is well settled that res judicata is an equitable doctrine that should only be applied as fairness and justice require. . . . Equity dictates that the doctrine of *res judicata* should not be technically applied if to do so would be fundamentally unfair or would create inequitable or unjust results.").

The inapplicability of *res judicata* principles to this case is illustrated by State Farm's difficulty in identifying precisely which prior judgment supposedly bars Plaintiffs' federal RICO claim. State Farm first mentions the Illinois Supreme Court judgment in *Avery*, but that cannot possibly bar Plaintiffs' RICO claims because there is no "identity of cause of action" between *Avery*, which was about State Farm's failure to equip its insureds' vehicles with proper replacement parts, and the tainted tribunal RICO claims at issue in *Hale*—the two cases clearly do not "arise from the 'same transaction' and involve 'the same, or nearly the same[,] factual allegations." *Highway J Citizens Grp. v. U.S. Dep't of Transp.*, 456 F.3d 734, 740 (7th Cir. 2006) (citation omitted). That is, they are not "related in time, space, origin, or motivation" and do not "arise out of the same transaction, seek redress for essentially the same basic wrong, [or] rest on the same or a substantially similar factual basis." *Carr v. Tillery*, No. 07-314-DRH, 2010 WL 4781127, at *5 (S.D. Ill. Sept. 20, 2010) (Herndon, C.J.).

State Farm also points to the United States Supreme Court's denial of the petition for certiorari to the Illinois Supreme Court in *Avery*, but that cannot be a basis for *res judicata* either, because denial of a certiorari petition does not have *res judicata* effect greater than whatever

would have come from the underlying judgment as to which review is sought. *See People v. Edgeworth*, 332 N.E.2d 716, 719 (Ill. App. Ct. 1975) (holding that denial of permission to appeal does not establish *res judicata*, and noting that "the United States Supreme Court has consistently taken the position that its denial of a petition for writ of certiorari decides nothing as to the merits of the issues raised in the petition, and merely denotes that fewer than four justices deemed it advisable to review the lower court's holding") (citing *State of Md. v. Baltimore Radio Show, Inc.*, 338 U.S. 912 (1950); *Brown v. Allen*, 344 U.S. 443 (1953)).[15] Because *Avery* and *Hale* are not the same "cause of action" for purposes of *res judicata* for the reasons discussed above, the fact that the United States Supreme Court did not choose to grant certiorari could not have endowed *Avery* with some new preclusive effect beyond whatever it did or did not have at the time of the Illinois Supreme Court's decision.

State Farm is then left with one final straw on which to rest its *res judicata* argument— the 2011 petition to the Illinois Supreme Court to recall its mandate in *Avery*. But that petition was not a "cause of action" at all, and the Illinois Supreme Court's decision not to recall its mandate, as with the United States Supreme Court's order denying certiorari, could have had no preclusive effect greater than whatever the underlying *Avery* judgment already did or did not possess. While State Farm points to certain facts presented in connection with the 2011 petition, that fact at most goes to *issue* preclusion rather than *claim* preclusion. *Amcast Indus. Corp. v. Detrex Corp.*, 45 F.3d 155, 158 (7th Cir. 1995) (observing that case presented issues of "collateral estoppel rather than *res judicata*" when the request was to "prevent [a party] from relitigating a specific issue"). As discussed in the next section, however, State Farm's collateral estoppel argument is also without merit.

State Farm insists that the petition to recall the mandate was a motion for post-judgment relief under Section 2-1401 of the Illinois Code of Civil Procedure, and therefore, that the decision denying it has preclusive effect. But, while the 2011 petition did cite a subsection of that

---

[15] In his concurrence, Justice Jackson said only that the judgment below stands with whatever *res judicata* consequences it may already have, not that the certiorari denial itself has any independent preclusive effect. *See Brown*, 344 U.S. at 543 (Jackson, J., concurring).

statute, the Illinois Supreme Court subsequently made clear that Section 2-1401 is not applicable where the ruling that the movants sought to review was issued by an appellate court as opposed to a trial court. *Price v. Philip Morris Inc.*, 43 N.E.3d 53, 65 (Ill. 2015). Thus, the *Avery* plaintiffs' petition to recall the mandate, properly construed, was based on the court's inherent power, and *not* on Section 2-1401. *Id.* (describing the 2011 petition in *Avery* as an example of a motion to recall the mandate under the court's inherent power rather than a Section 2-1401 motion).[16] The decision not to recall the mandate was not, therefore, a "judgment" that could have *res judicata* effect.

Even if that decision could, theoretically, be construed as a final judgment for purposes of *res judicata* (and it cannot), the Illinois Supreme Court's one-line order denying the petition cannot conclusively, or even plausibly, be a judgment on the "same merits" of the issues raised in Plaintiffs' RICO claims. *See City of Alton*, 757 F.2d at 885 ("the prior decision must have been on the merits of the issue"). There is no court rule or specific standard that governs Illinois Supreme Court's power to recall its mandate. *Price*, 43 N.E.3d at 65. Thus, only through impermissible speculation could this Court divine the basis for the Illinois Supreme Court's decision to deny the 2011 petition—and that is not nearly sufficient for State Farm to sustain its "heavy burden" of "showing *with clarity and certainty* what was determined by the prior judgment." *City of Alton*, 757 F.2d at 885. "To speculate on the grounds for the prior judgment" as State Farm asks the Court to do here, "would be to [impermissibly] remove the burden placed on the proponent." *Id.*[17]

---

[16] In any event, the Seventh Circuit has questioned whether even denials of Section 2-1401 motions have any *res judicata* effect. *See Jones v. Syntex Labs., Inc.*, 1 Fed. App'x 539, 542 (7th Cir. 2001); *see also Walsh Constr. Co. of Ill. v. Nat. Union Fire Ins. Co. of Pittsburgh, Pa.*, 153 F.3d 830, 833 (7th Cir. 1998)).

[17] State Farm contends that no written opinion is required, citing *Ennenga v. Starns*, 677 F.3d 766 (7th Cir. 2012). But in *Ennenga* there was no question about the reason for the court's prior decision—the case was dismissed due to the plaintiff's abandonment of the claims. *Id.* at 771. By contrast, the Illinois Supreme Court itself has looked to the written reasoning of prior court orders to determine whether they were "on the merits" or not. *See River Park*, 184 Ill.2d at 290, 304-06 (1998).

In addition to the 2011 petition not constituting a "cause of action" for *res judicata* purposes, there is a further fundamental reason why the petition does not have preclusive effect as to the RICO allegations in *Hale*: the RICO claim had not yet accrued at the time the petition was filed on September 9, 2011. This is because the second RICO predicate act—the mailing of State Farm's response to the petition to recall the mandate—did not occur until September 19, 2011. *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801-02 (7th Cir. 2008) ("[S]ince a course of racketeering activity, to amount to a 'pattern' and thus be actionable under RICO, requires at least two predicate acts and some temporal continuity, a RICO claim *cannot* accrue at the time of the first predicate."). This alone defeats State Farm's *res judicata* argument. *See Carr*, 591 F.3d 909, 918 (holding that *res judicata* did not bar RICO allegations that post-dated events giving rise to earlier state court litigation); *Bank of N. Ill. v. Nugent*, 584 N.E.2d 948, 957 (Ill. App. Ct. 1991) ("Furthermore, the causes of action alleged in the plaintiffs' amended complaint arose, in part, after the judgment on the contract claim had been entered. It is absurd to plead that a cause of action is barred by a prior judgment that did not exist at the time the judgment was entered. Therefore, the plaintiffs should not be barred from advancing the two additional theories as a basis for relief.").[18]

Furthermore, because the RICO claim had not yet accrued at the time of the 2011 petition (or the 2005 judgment and certiorari denial, for that matter), Plaintiffs necessarily "did not have a full and fair opportunity to litigate the issue in the earlier case"—yet another reason why *res judicata* is inappropriate here. *City of Alton*, 757 F.2d at 884.[19] In addition to the obvious

---

[18] *Cf. Highway J*, 456 F.3d at 744 ("Notably, Citizens has not argued that they were not *able* to bring their present claims in the earlier litigation. . . . All transactions forming the basis of the plaintiffs' causes of action . . . had occurred by the time *Citizens I* was filed on July 3, 2002.") (emphasis in original).

[19] *See also Licari v. City of Chicago*, 298 F.3d 664, 666–67 (7th Cir.2002) ("An exception to the res judicata rule exists if the plaintiff did not have a full and fair opportunity to litigate his claim in state court."); *Carr*, 2010 WL 4781127, at *8 ("It is true that, even where all requirements for application of res judicata have been met, a prior Illinois state court proceeding will not bar a claim if a court concludes that in those earlier proceedings the plaintiff did not have a full and fair opportunity to litigate his or her claim."); *Pactiv Corp. v. Sanchez*, No. 13-cv-8182, 2015 WL 4508667, at *7 (N.D. Ill. July 23, 2015) ("Importantly, however, claim preclusion does not apply if the 'plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts . . . and the plaintiff desires in the second action to rely on that theory or

impediment that the second predicate act under RICO had not yet occurred, the 2011 petition to recall the mandate would have offered no procedural mechanism to present the RICO claim to the state court at that time. It is not as though the *Avery* plaintiffs could have filed an amended complaint directly with the Illinois Supreme Court asserting federal RICO fraud claims and seeking discovery and a jury trial on those claims. *See Weisman v. Schiller, Ducanto & Fleck*, 733 N.E.2d 818, 822 (Ill. App. Ct. 2000) ("We hold that the application of the doctrine of res judicata in the case at bar would create an injustice by impermissibly infringing upon plaintiff's fundamental rights to a full remedy and to a trial by jury.").[20]

State court judgments can have *res judicata* effect in federal court only when the state court proceedings complied with the requirements of constitutional due process. *See City of Alton*, 757 F.2d at 884; *Garcia v. Vill. of Mount Prospect*, 360 F.3d 630, 634 (7th Cir. 2004). While it is far from clear what the Illinois Supreme Court actually decided, or indeed whether it reached the merits at all, a proceeding in which the plaintiff must litigate a claim that has not yet come into existence, with no right to discovery or a hearing and no possibility of a jury trial, would not comport with due process standards. And that is even before considering the serious due process dimensions of State Farm's misconduct here, which deprived Plaintiffs of a fair tribunal for their underlying claims. *See, e.g.*, *Caperton*, 556 U.S. 868; cf. *Moore v. Sievers*, 168 N.E. 259, 262 (Ill. 1929) ('The maxim that fraud vitiates every transaction into which it enters applies to judgments as well as to contracts and other transactions."); *Charles E. Harding Co. v. Harding*, 186 N.E. 152, 156 (Ill. 1933), *abrogated on other grounds*, *Herzog v. Lexington Twp.*, 657 N.E.2d 926 (Ill. 1995).

Finally, it would be fundamentally unfair to preclude the claims of millions of absent class members on the basis of a judgment that by its very terms did not bind them, because the

---

to seek that remedy or form of relief[.]'") (quoting Restatement (Second) of Judgments § 26(1)(c)).

[20] Not only was no discovery available in connection with the 2011 petition, but, as described above, the Illinois Supreme Court, at State Farm's request, struck from the record the factual declarations proffered in support of the petition. A01867; s*ee City of Alton*, 757 F.2d at 885-86 (finding no preclusive effect when the plaintiff was prevented from offering evidence in a state proceeding).

Illinois Supreme Court reversed the *Avery* class certification. *Avery*, 835 N.E.2d at 824.

*See Bieneman v. City of Chicago*, 838 F.2d 962, 964 (7th Cir. 1988) (noting that denial of class certification "avoid[s] the preclusive effect of the judgment"); *O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 869 (9th Cir. 1982) ("decertification avoided any *res judicata* effect against the class"), *overruled on other grounds*, *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir. 1987); *William S. v. Gill*, 591 F. Supp. 422, 431 (N.D. Ill. 1984) (holding that "no res judicata impact on putative class members is appropriate" following class decertification, despite adverse ruling on the merits); *Addington v. US Airline Pilots Ass'n*, Nos. CV 08-1633, CV08-1728, 2009 WL 899647, at *1 (D. Ariz. Mar. 26, 2009) ("If the Court of Appeals permits an appeal and reverses the class certification, it would not change the issues at trial or the scope of relief except to limit USAPA's own privilege of res judicata in the event of a defense verdict."). For all these reasons, *res judicata* does not bar Plaintiffs' RICO claims.

## III.   **PLAINTIFFS' CLAIMS ARE NOT BARRED BY COLLATERAL ESTOPPEL**

Collateral estoppel, also known as issue preclusion, is similar to *res judicata*, and State Farm's efforts to invoke it fail for similar reasons. "The minimum threshold requirements for the application of collateral estoppel are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Nowak*, 757 N.E.2d at 478 (citations omitted). "Application of the doctrine of collateral estoppel must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment." *Id.* Under the doctrine of collateral estoppel, a "judgment in the first suit operates as an estoppel only as to the point or question actually litigated and determined and not as to other matters which *might* have been litigated and determined." *Id.* (emphasis in original). Furthermore, "[e]ven where the threshold elements of the doctrine are satisfied, collateral estoppel must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped." *Id.*

State Farm's notably cursory argument that Plaintiffs are collaterally estopped from asserting their RICO claim reflects its fundamental weakness. State Farm does not, and cannot, demonstrate that two of the three elements of estoppel—identity of the issues and final judgment on the merits of *those issues* in the prior action—are satisfied. *See id.* And, for the reasons stated above, it cannot demonstrate that Plaintiffs had "a full and fair opportunity to litigate" the issues raised in this RICO action—an inquiry that requires examination of the "practical realities of litigation." *Id.*

As to the identity of the issues, the issues must in fact be "*identical.*" *Id.* The issues State Farm asserts were previously decided—the propriety of Justice Karmeier's participation in *Avery* and the "legitimacy" of the *Avery* judgment—are not those raised in this action. *See, e.g.*, *St. John v. CACH, LLC,* No. 14 C 0733, 2014 WL 3377354, at *4 (N.D. Ill. July 8, 2014) (finding an issue not estopped because state court did not decide the "exact, identical" factual question before the federal court). Again, to prevail on their RICO claims here, Plaintiffs must show only that Defendants' deprived Plaintiffs of an impartial tribunal and caused attendant damages through "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496. These are not "identical" any issues decided in the *Avery* proceedings.

For similar reasons, State Farm cannot meet its "heavy burden of showing with certainty and clarity" that the issues estopped were clearly determined in the prior judgment. *Gen. Elec. Co. v. Honeywell Int'l, Inc.*, No. 05-3239, 2006 WL 988468, at *8 (C.D. Ill. Apr. 13, 2006); *City of Alton*, 757 F.2d at 885; *In re Ch. W.*, 948 N.E.2d 641, 649 (Ill. App. Ct. 2011). It is not enough for a prior decision to be "tantamount" to a judgment on the issue in question. *See In re Ch. W.*, 948 N.E.2d at 649. Instead, "[a]pplication of. . . collateral estoppel must be narrowly tailored to fit the *precise facts and issues* that were clearly determined in the prior judgment." *Nowak,* 757 N.E.2d at 478 (emphasis added). As with *res judicata*, a court cannot rely on "pure speculation as to the finding of the trial court in the prior litigation." *City of Alton*, 757 F.2d at 885. And when it is unclear what facts and standards the prior court used in deciding a purportedly

identical question, collateral estoppel must not be applied. *See People v. Pawlaczyk*, 724 N.E.2d 901, 910 (Ill. 2000).

Not only did the Illinois Supreme Court's denial of Plaintiffs' Motion for Conditional Non-Participation lack any explanation that might illuminate *what* the court decided (A00334), it later vacated that order (A00315), thus deciding *nothing* as to Justice Karmeier's participation or State Farm's support of his campaign, and denied the motion as moot. A00315. Nor did Justice Karmeier's decision to decline recusal (which is far from a judgment) or the Illinois Supreme Court's come with any explanation. The Supreme Court's 2011 order denying the *Avery* plaintiffs' Petition to Recall the Mandate was also issued without explanation. A01867.

This is important because State Farm raised many arguments in its opposition to the *Avery* plaintiffs' motions in the Illinois Supreme Court—including, for example, that the plaintiffs' petition to recall the mandate was time-barred (A01061-69)—that have absolutely nothing to do with the contention that Justice Karmeier should not have participated in the 2005 *Avery* decision overturning the judgment against State Farm. Given the lack of reasoning in the various *Avery* decisions, and the lack of any articulated standard governing the Illinois Supreme Court's review, any of these grounds could have formed the basis for the court's decisions.

Accordingly, State Farm itself asserts only that the issues presented in this lawsuit were "*necessarily* decided" in *Avery*. Doc. 646 at 39 (emphasis added). That is both incorrect and insufficient, for collateral estoppel can apply only to issues that were "clearly determined" by the Illinois Supreme Court. *See In re Ch. W.*, 948 N.E.2d at 649. In fact, the Illinois Supreme Court *never* decided the propriety of Justice Karmeier's participation in the 2005 *Avery* decision, much less the issues essential to a RICO claim pending before this Court. Because this Court cannot know which issues were decided, Plaintiffs' RICO claims cannot be collaterally estopped. *See Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 395 (7th Cir. 1986).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny State Farm's Motion.

Dated: July 31, 2017

Respectfully submitted,

/s/ *Steven P. Blonder*
Steven P. Blonder #6215773
Jonathan L. Loew
Much Shelist, P.C.
191 N. Wacker, Suite 1800
Chicago, IL 60606-2000
Tel: 312-521-2402

Robert A. Clifford #0461849
Kristofer S. Riddle
Clifford Law Offices
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602
Tel: 312-899-9090

Elizabeth J. Cabraser
Robert J. Nelson
Kevin R. Budner
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000

John W. "Don" Barrett
Barrett Law Group, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095-0927
Tel: 662-834-2488

Brent W. Landau
Jeannine M. Kenney
Hausfeld, LLP
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: 215-985-3273

Patrick W. Pendley
Pendley, Baudin & Coffin, LLP
Post Office Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: 888-725-2477

Erwin Chemerinsky
University of California, Berkeley School of Law
215 Boalt Hall,
Berkeley, CA 94720
(510) 642-6483

Thomas P. Thrash
Marcus N. Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: 501-374-1058

Richard R. Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, Mississippi 38655
Tel: 662-380-5018

Gordon Ball
Gordon Ball PLLC
550 Main Street
Bank of America Center, Ste. 600
Knoxville, TN 37902
Tel: 865.525.7028

*Attorneys for Plaintiffs*

1359365.1

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 7.1(b), I certify that a copy of the foregoing was served upon

counsel on via the Court's CM/ECF system.

<u>/s/ *Steven P. Blonder*  </u>