# EXHIBIT A

## EXPERT REPORT OF MICHAEL T. REAGAN

I have been retained by the law firm of Riley Safer Holmes & Cancila in connection with its representation of State Farm Mutual Automobile Insurance Company, defendant in *Hale, et al. v. State Farm Mutual Automobile Insurance Company, et al.*, now pending in the United States District Court for the Southern District of Illinois under Case No. 12-cv-660-DRH. My assignment is to offer opinions in rebuttal to those expressed by Plaintiffs' designated experts Mark Harrison and Joanna Shepherd concerning *Avery v. State Farm Mutual Automobile Ins. Co.*, 216 Ill.2d 100 (2005), and to offer my opinions in respect to several questions relating to the decisions rendered by the Illinois Supreme Court in *Avery* which are relevant to my rebuttal opinions.

### Qualifications

1.      I have practiced law on a full-time basis continuously in Illinois since being admitted to practice by the Supreme Court of Illinois on November 8, 1972. Since January 1, 2011, I have been a sole practitioner, maintaining the Law Offices of Michael T. Reagan in Ottawa, Illinois. For many years prior to that, I was a partner with Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., with offices in Ottawa and LaSalle, Illinois.

2.      I graduated from Purdue University with a Bachelor of Science in Mechanical Engineering in 1969. I received my law degree from the Georgetown University Law Center in 1972. I commenced practicing in Ottawa immediately upon being admitted to the bar in 1972. Although I have engaged in many aspects of the general practice of law, the great bulk of my practice has always been devoted to civil litigation. By 1990, I was concentrating heavily on civil appeals, mostly in the Illinois reviewing courts.

3.      I have tried both bench and jury cases in many Illinois counties. I have handled appeals and presented oral arguments in every district of the Illinois Appellate Court, in the Illinois Supreme Court and in the Seventh Circuit Court of Appeals.

4.      I have participated in approximately 30 cases which were decided by the Illinois Supreme Court. In addition, I have represented clients in many other matters in the Illinois Supreme Court, including petitions for leave to appeal, answers to petitions for leave to appeal, and motions which requested exercise of the court's supervisory authority or the grant of equitable relief.

5.      I have served on several committees by appointment of the Illinois Supreme Court:

- I was appointed to the Illinois Supreme Court Committee on Pattern Jury Instructions in 1985 and served continuously on that committee until 1995. Effective January 1, 1996, I was appointed by the Supreme Court to act as the Reporter to that Committee. I did that work until September, 2003.

- In 2003, I was appointed as a member of the Special Supreme Court Committee on Unpublished Opinions/Supreme Court Rule 23.

- In 2016, I was appointed by the Supreme Court as a member of the Supreme Court Judicial Performance Evaluation Committee.

6.     Much of my work with bar associations of which I am a member involved the appellate and supreme courts.  In 2001, I co-chaired with Justice Mary Jane Theis, then justice of the Appellate Court, First District, an Illinois State Bar Association Special Committee on Appellate Practice which was charged with examining common matters of interest between the appellate court and the practicing bar.  A number of recommendations were made to the Supreme Court as the result of that committee.

7.     Until late 2016, I co-chaired a Special Committee on Supreme Court Rule 23, composed of representatives of the Chicago Bar Association, the Illinois State Bar Association, the Appellate Lawyers Association, and the Illinois Judges Association, which worked with the Illinois Supreme Court on that topic.

8.     Since 2001 I have been engaged in presenting the Supreme Court Review, first in written form and then in oral presentations.  In 2001 through 2003, I co-authored articles summarizing the Supreme Court term for each year which were published in the Illinois Bar Journal.  Commencing in approximately 2007, together with Justice Mary Jane Theis, then justice of the Appellate Court, First District, we presented oral programs summarizing the key civil cases of the Supreme Court for the preceding year. Since 2010, when Justice Theis was appointed to the Supreme Court, those programs have continued on an annual basis with Justice Ann Jorgensen, then justice of the Appellate Court, Second District.

9.     For at least seven years, in conjunction with two other appellate lawyers, we have written short summaries of all civil opinions of the Illinois Supreme Court for email distribution by the Illinois State Bar Association to the bench and bar, with those summaries being distributed either on the day of or the day following the issuance of each opinion.

10.    As a result of these professional bar activities, for many years I have read essentially every opinion of the Illinois Supreme Court within a reasonable time following its issuance. Preceding this work, from the beginning of my practice, I closely followed the work of the Court because of the nature of my practice and my desire to keep current with legal developments.

11.    I have had experience with all of the justices on the court and am also familiar with their work as expressed in their opinions.

12.    I served as president of the Illinois Appellate Lawyers Association in 1995-96.  I am currently co-chair of the Past Presidents Advisory Committee.

13.    In 2017, I was named a Laureate by the Academy of Illinois Lawyers of the Illinois State Bar Association.

14.    My CV is attached as Exhibit A.

15.    I have not testified as an expert at trial or by deposition in the four years previous to the date of this report.

2

16.    I have reviewed and considered the following materials in developing my opinions and preparing this report:

- *Avery v. State Farm Mutual Automobile Ins. Co.*, 216 Ill.2d 100 (2005)
- The rehearing documents in the Supreme Court
- *Avery v. State Farm Mutual Automobile Ins. Co.*, 321 Ill. App. 3d 269 (5th Dist. 2001)
- Petition for Leave to Appeal
- Appellees' Conditional Motion for Non-Participation (2005)
- Opposition of Defendant-Appellant State Farm Mutual Automobile Insurance Company to Plaintiffs-Appellees' Conditional Motion for Non-Participation (2005)
- Motion for Reconsideration of Denial of Conditional Motion (2005)
- Petition to Recall Mandate and Vacate August 18, 2005 Judgment (2011)
- Response in Opposition to Petition to Recall Mandate and Vacate August 18, 2005 Judgment (2011)
- Motion for Recusal Pursuant to Supreme Court Rule 63(C) (2011)
- Response in Opposition to Motion for Recusal Pursuant to Supreme Court Rule 63(C) (2011)
- The Supreme Court of the United States certiorari documents in *Avery*
- Any other substantive filing in *Avery* subsequent to the Fifth District's opinion
- Orders relating to the foregoing motions and petitions
- Expert Report of Mark I. Harrison
- Expert Report of Joanna M. Shepherd
- Expert Report of Bruce A. Green
- Supplemental Expert Report of Thomas A. Myers
- Deposition of Mark I. Harrison (including exhibits)
- Deposition of Justice Lloyd Karmeier (including exhibits)
- Deposition of Joanna M. Shepherd (including exhibits)
- *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)
- *Caperton v. A.T. Massey Coal Co.*, 690 S.E.2d 322 (W. Va. 2009)
- *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016)
- www.Illinoiscourts.gov/SupremeCourt
- Illinois legal research re: Illinois Supreme Court reversal rates 2003-05; treatment of class actions in Illinois Supreme Court, 1995-2010; Ill. Supreme Court opinions with one or more recusals (1995 to present)

I also read selected pleadings and orders in the *Hale* case including, but not limited to:

- First Amended Complaint
- Plaintiffs' Amended Objections and Responses to State Farm's First Set of Requests for Admission
- Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law
- Defendant State Farm Mutual Automobile Insurance Company's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification
- Memorandum and Order entered by Magistrate Judge Williams on November 25, 2014

3

17.     I am being compensated at the rate of $400.00 per hour for time spent in studying and analyzing this matter, as well as for preparation of this report and for the future time which might be necessary for preparation for and participation in a deposition and testimony at trial.

## Opinions

18.     I offer the following opinions based on my training, professional experience and consideration of the noted materials.

**I.      The Legal Developments in *Avery* in All Reviewing Courts.**

19.     To give context to the opinions expressed in this report, I provide the following timeline and narrative of the substantive proceedings in the reviewing courts in *Avery* subsequent to the issuance of the decision of the Illinois Appellate Court, 321 Ill. App. 3d 269 (5th Dist. 2001). Here are those key events, after the issuance of the Fifth District's opinion:

- May 8, 2001: State Farm filed its Petition for Leave to Appeal ("PLA") with the Illinois Supreme Court.
- October 2, 2002: The Illinois Supreme Court granted the PLA.  As discussed further below, the granting of the PLA is unusual and requires the affirmative vote of at least four of the seven members of the Court to occur.  Only approximately 2% to 5% of PLAs in civil cases are granted by the Illinois Supreme Court.
- May 14, 2003: The Illinois Supreme Court held oral argument in *Avery*.  As noted below, Illinois Supreme Court decisions ordinarily issue within five months of the oral argument.
- January 26, 2005: Plaintiffs filed a Conditional Motion for Non-Participation, by which they requested that Justice Karmeier not participate in the *Avery* decision based on State Farm's alleged involvement in the financing of his campaign.
- January 31, 2005: State Farm filed a Response in Opposition to that conditional motion.
- March 16, 2005: The Illinois Supreme Court denied Plaintiffs' Conditional Motion for Non-Participation, with Justices Thomas and Karmeier not participating.  No reason was provided by the Court for the denial.  Accordingly, the reason for that denial is unknown.  Specifically, it is not known whether it was denied on the basis of the submissions, or for any other reason.
- March 22, 2005: Plaintiffs filed their Motion for Reconsideration of Denial of Conditional Motion for Non-Participation.
- May 20, 2005: The Illinois Supreme Court vacated its denial of Conditional Motion for Non-Participation.  In light of Justice Karmeier having advised the court that he will not disqualify himself under Rule 63, the Conditional Motion for Non-Participation of January 26, 2005, and the Motion to Reconsider of March 22, 2005, are denied as moot.
- August 18, 2005: The Illinois Supreme Court issued its decision in *Avery*. The *Avery* Court decided several distinct issues in State Farm's favor, many of which were unanimous.  The key aspects will be explained, in part, using Exhibit B.
- September 8, 2005: Plaintiffs File Petition for Rehearing of *Avery* decision.
- September 26, 2005: Illinois Supreme Court denies Petition for Rehearing.
- December 27, 2005: Plaintiffs file a Petition for Writ of Certiorari to Supreme Court of the United States.  State Farm filed a brief in opposition to that writ.

- March 6, 2006: The Writ of Certiorari was denied by the Supreme Court of the United States.
- September 8, 2011: Plaintiffs file Petition to Recall Mandate and Vacate Judgment.
- September 8, 2011: Plaintiffs file Motion for Recusal Pursuant to SCR 63(C).
- September 19, 2011: State Farm files its response in opposition to the preceding motions.
- November 17, 2011: The Illinois Supreme Court denied Plaintiffs' Petition to Recall Mandate and Vacate the August 18, 2005 Judgment. No reason was provided by the Court for the denial. Accordingly, the reason for the denial is unknown. Specifically, it is not known whether it was denied on the basis of the submissions, or for any other reason. Further, Plaintiffs' Motion for Recusal of Justice Karmeier was dismissed as moot. Justices Thomas and Karmeier took no part in the decision of either order.

20.     I make the following additional observations. Based on my experience with matters before the Illinois Supreme Court, the Court is diligent in the issuance of its opinions, such that the bulk of its opinions are issued within approximately five months from the date of oral argument, with most of the opinions being issued before that time. It is my further opinion that accordingly as time passes beyond the five-month point. it becomes increasingly likely that an opinion will issue soon. It is my further opinion that an informed party could not reasonably believe, even in the summer of 2004, that, even if Justice Karmeier won the election in November 2004, he would be sworn in before the issuance of the *Avery* opinion.

Orders in the Illinois Supreme Court on motions generally do not provide an explanation for the ruling. For example, no reason was provided by the Court in either its March 16, 2005 order or its November 17, 2011 order. Consequently, it is not known whether the parties' submissions provided the basis for those rulings.

II.     **Mr. Harrison's Opinion About How *Avery* Would Have Been Decided if Justice Karmeier Had Not Participated is Complete Speculation and is Contrary to the Text of the *Avery* Opinion. It is Impossible to Predict With Certainty What the Court Would Have Done if Justice Karmeier Had Not Participated. However, Mr. Harrison's Speculation is Unsupportable and is Contrary to the Available Evidence, Which Suggests that the Remaining Justices Would Have Vacated the Verdict and the Circuit Court Judgment Entered on It, Acting on the Many Significant Points of Agreement Among Them.**

21.     Mark I. Harrison, in his expert report, speculates about what would have happened in *Avery* if Justice Karmeier had not participated. We know that Justice Thomas was not participating. Accordingly, under Mr. Harrison's hypothetical, two justices would not be participating in his hypothetical posture. The Constitution of Illinois, 1970, Article VI, Section 3, requires that four justices of the Supreme Court concur in order to take action. In *Perlman v. First National Bank of Chicago*, 60 Ill.2d 529 (1975), two justices recused themselves and the remaining members of the court were divided such that the necessary concurrence of four justices could not be obtained. As a result, the appeal in *Perlman* was dismissed.

22.     Mr. Harrison asserts without qualification that under his hypothetical premise, with Justice Karmeier not participating that "in *Avery*, if the Supreme Court had remained 'deadlocked' but had followed the *Perlman* decision – as it has in five other cases – the $1.05 billion judgment

of the intermediate appellate court against State Farm would have been affirmed." Harrison Op., ¶ 19.

23.     Mr. Harrison persisted in that opinion in his deposition, e.g., Harrison deposition, pp. 114-115, 137-138, 145.

24.     Mr. Harrison's opinion is not based in fact, or in a textual analysis of *Avery*, or in a proper understanding of Illinois Supreme Court procedure. I offer the opinion that it is impossible to know with certainty how *Avery* would have been decided if Justice Karmeier had not participated in the decision. The deliberations were confidential. There is no testimony from any of the other justices as to how they might have reasoned and voted in Justice Karmeier's absence, and there are no minutes or recordings of any deliberations of the court.

25.     Analysis of Mr. Harrison's hypothetical compels the conclusion that Mr. Harrison can only speculate as to the outcome of *Avery* had Justice Karmeier not participated.

26.     Mr. Harrison admits that he has no actual knowledge as to the manner of deliberation employed by the Illinois Supreme Court in its decision-making process on cases and that any answer he might give in that regard would be speculative. Harrison deposition, pp. 37, 116 ("I have already said I don't know what took place."). Accordingly, any opinion offered by Mr. Harrison as to what the court would have done in the event of the non-participation of Justice Karmeier on a hypothetical basis is nothing more than speculation.

27.     It is my further opinion that Mr. Harrison's speculation is not only unsupportable, but is also belied by the circumstances of this case when compared to the strong evidence from the opinions in *Avery* that the hypothetical absence of Justice Karmeier from the case would not have altered the fact that the verdict and judgment in *Avery* would have been vacated.

*28.*     My opinion that Mr. Harrison's opinion as to the outcome in *Avery* under his hypothetical is no more than a guess is further supported by his admitted unfamiliarity with the *Avery* opinion. In his deposition, when he was asked whether he had read and studied the *Avery* decision, he responded that "I read it once but I wouldn't say I studied it with any care… It's lengthy and it's got an awful lot of stuff in it that wasn't of particular pertinence to my engagement but I did read it once." Harrison deposition, p. 131-132. He further stated that if the court was deadlocked on any point, that "I don't know precisely over what fact or issue of law they deadlocked…." *Id.* at 132. At his deposition, he did not know "what the lineup eventually was on the *Avery* decision." *Id.* When asked whether there were any unanimous elements his response was, "My vague recollection of that kind of prolix opinion is that there were things about which people agreed, things about which people didn't agree. There were disparate views about certain issues. So I suspect there were issues about which there was unanimity, but I'm not positive." *Id.* at 132-133. He did not recall how many opinions there were in the case. *Id.* at 133.

29.     While knowing that it is impossible to predict with certainty how *Avery* would have been resolved but for Justice Karmeier's participation, the actual text of the two opinions in *Avery* are strong evidence that undercuts Mr. Harrison's speculative opinion.

30.     Chief Justice McMorrow wrote the opinion for the court. That opinion was joined by Justices Fitzgerald, Garman and Karmeier. Justice Freeman wrote a concurring and dissenting opinion, which was joined by Justice Kilbride. Justice Thomas did not participate in the case.

31.     The table attached to this report as Exhibit B, which was marked as an exhibit in the J. Shepherd deposition, and is captioned "Composition Avery Court 2005-2006" lists the members of the court at the time of the issuance of the *Avery* opinion and further sets out the holdings of the court and the vote of the justices with respect to each holding. As is seen from that table, the six participating members of the court agreed unanimously on five principal points, which required that the verdict and the judgment of the circuit court be vacated. It is impossible to consider that tabulation of the elements of the opinion on which there was unanimous agreement and to thereafter conclude anything other than there was a strong agreement to reverse.

32.     Both by means of express statements by members of the court in opinions over the years and also by empirical examination of the court's actions, it is apparent that the court strives to reach an opinion with at least some disposition of the questions presented to the court when such an outcome is possible and appropriate. When the court has devoted its time and resources to a case after granting discretionary review, the likelihood of an opinion being issued with some disposition is high.

33.     From 1995 until mid-July 2017, there were only seven occasions on which the court was unable to achieve the constitutionally required concurrence of four justices on an opinion:

- *Chultem v. Ticor Title Insurance Co.*, 2017 IL 120448
- *Keating v. City of Chicago*, 386 Ill.Dec. 702 (2014)
- *Vill v. Industrial Commission*, 218 Ill.2d 124 (2005)
- *People v. Griffith*, 212 Ill.2d 57 (2004)
- *South 51 Development Co. v. Vega*, 211 Ill.2d 189 (2004)
- *Commerce Bank v. Youth Services of Mid-Illinois, Inc.*, 211 Ill.2d 188 (2004)
- *PHL, Inc. v. Pullman Bank and Trust Co.*, 181 Ill.2d 575 (1998)

34.     Based upon legal research undertaken at my request, from 1995 until mid-July 2017, in those cases before the Supreme Court in which one or more justices did not participate, the court was still able to reach the constitutionally required four concurring votes the vast majority of the time.

35.     The situation being considered here presents a substantial amount of data which can be analyzed. Both Justice McMorrow's opinion and Justice Freeman's opinion are very detailed in setting out their respective reasoning and conclusions. Further, Justice Freeman's opinion is highly specific in listing those points in the majority opinion with which the concurring and dissenting justices expressly agree. The justices who joined Justice McMorrow's opinion are in agreement on all points; Justice Kilbride is in agreement with Justice Freeman on all points in Justice Freeman's opinion. Accordingly, the points on which the five justices other than Justice Karmeier agreed can be determined readily and with clarity.

36.    In cases in which the Supreme Court is so divided that it cannot reach the required four votes in favor of any disposition of the case, the appeal is to be dismissed. *Perlman v. First National Bank of Chicago*, 60 Ill.2d 529 (1975).

37.    If at least four justices agree on some aspects of the case, then the court will enter its opinion acting upon those points of agreement. In *Getschow v. Commonwealth Edison Co.*, 99 Ill.2d 528 (1984), the court did not have four concurring votes as to one issue and therefore let that portion of the ruling below stand, but because four justices were of the opinion that the appellate court erred in its affirmance of the circuit court's award of punitive damages, that part of the judgment was reversed, with remand to the circuit court with directions.

38.    That procedure has met with approval in the supreme courts of other states, e.g.: *Christensen v. Epley*, 287 Or. 539, 548 (1979); *Anderson v. State ex rel. Central Bering*, 78 P.3d 710, 713 (Ak. 2003); *Proctor v. North Carolina Farm Bureau*, 439 S.E.2d 112, 113 (NC 1994); *Wise v. Valley Bank*, 861 So.2d 1029, 1032 (Miss. 2003) (judicial dicta, court not actually divided here); *Hornback v. Archdiocese of Milwaukee*, 752 N.W.2d 862, 878 (Wis. 2008); and *Moore v. City of Creedmoor*, 481 S.E.2d 14, 24 (N.C. 1997). This procedure has also been followed by the Supreme Court of the United States, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 476, 484 (2008), and by a United States Court of Appeals, *Peoples v. CCA Detention Centers*, 449 F.3d 1097, 1099 (10th Cir. 2006).

39.    If a majority agrees on a reversal even though they may not agree as to the grounds for that reversal, the reversal is binding on the parties to that case. *People v. Cruz*, 643 N.E.2d 636, 671 n.1 (Ill. 1994). *Blue v. Environmental Engineering, Inc.*, 215 Ill.2d 78 (2005) is an example of where the court had many areas of disagreement as to the reasoning underlying the action to be taken but nonetheless unanimously agreed as to the action to be taken. Four opinions were issued in the case. Justice Karmeier did not participate.

40.    The knowledge that we have of the thinking and opinions of each member of the court as expressed in the filed opinions in *Avery* distinguishes this case from those cases where the court was divided and could not reach the required four votes and in which only an order dismissing the appeal, without any explanation of the views of the justices, was entered.

41.    In *Avery,* Justice Freeman, joined by Justice Kilbride, concurred with the view stated in Justice McMorrow's opinion with respect to the following points.

- The nationwide class certification cannot stand. 216 Ill.2d at 205, 210-211. Justices Freeman and Kilbride would reverse the multi-state certification of a class. *Id.* at 215.
- The "specification" damages have no basis in law, thus necessitating reversal. *Id.* at 205, 229.
- Justices Freeman and Kilbride concur in the McMorrow opinion's analysis of the consumer fraud issue. *Id.* at 234. The Illinois Consumer Fraud Act has no out-of-state effect and would apply, if at all, only to those policyholders whose vehicles were both assessed and repaired in Illinois. *Id.* at 234. Because the plaintiff DeFrank was not actually deceived by anything State Farm did or said, then the majority's analysis and treatment of the consumer fraud issue, disallowing any recovery is agreed upon. *Id.* at 235.

8

42.    The language employed in the opinions of both Justice McMorrow and Justice Freeman with respect to the holdings on which they agree is plainly stated and leaves no doubt as to the clarity of their agreement on those points.

43.    On the lack of propriety of a nationwide contract class, Justice McMorrow's opinion states:

> "In sum, there is simply no evidentiary support for the lower courts' conclusion that *all* of State Farm's various policies are uniform. Where a putative class includes members who are insured under policies that are materially different, the commonality and predominance requirement of Section 2-801 cannot be met. [Citations] Accordingly, it was an abuse of discretion for the circuit court to certify plaintiffs' breach of contract claim as a class action. … We therefore reverse the certification of the nationwide contract class." *Id.* at 134-135.

44.    On that point, Justice Freeman's opinion states:

> "I agree with two major points. First, I concur in the judgment that the nationwide class certification cannot stand. While I disagree with the court's analysis, I believe its conclusion is correct." *Id.* at 205. He believed that it would have been unconstitutional. *Id.* at 215.

45.    As to the impropriety of the claim for specification damages, Justice McMorrow's opinion states:

> "In our view, plaintiffs' theory of 'specification damages' has no basis in the law." *Id.* at 145.

46.    Justice Freeman's opinion agrees on that point:

> "[A]lthough the court rightly concludes that the 'specification damages' have no basis in law, thus necessitating reversal, I cannot completely join in this portion of the court's opinion because of some unnecessary *dicta*." *Id.* at 205.

47.    Justice McMorrow's opinion with respect to the Illinois Consumer Fraud Act states:

> "We conclude, therefore, that the out-of-state plaintiffs in this case have no cognizable cause of action under the Consumer Fraud Act." *Id.* at 188.

As to the only Illinois plaintiff, the opinion states:

> "[W]e conclude that (his) claim fails because he suffered no actual damage as required under the Act, and because he failed to establish proximate causation. *Id.* at 195.

48.     Justice Freeman's opinion was plain on those points as well:

> "I concur in the court's analysis of the consumer fraud issue." *Id.* at 234. "[T]he court opinion correctly holds that the Illinois Consumer Fraud Act has no out-of-state effect and I expressly agree with the court's analysis of this issue." *Id.* at 234.

49.     Based on the Avery text, it is exceedingly doubtful that Mr. Harrison's speculative opinion about the *Avery* outcome absent Justice Karmeier's participation would have been realized. It would have been much more highly likely that the five remaining members of the court would have issued collective opinions vacating the appellate court's opinion.[1]

50.     The holdings of *Avery* have not been vacated or reversed in the years since it was issued. In addition, in *Gridley v. State Farm Mutual Automobile Co.*, 217 Ill.2d 158 (2005), in an opinion written by Justice Thomas, who had not participated in *Avery*, and in which Justice Karmeier did not participate, the court unanimously ruled in express reliance upon *Avery's* treatment of the Illinois Consumer Fraud Act.

51.     There is further evidence that the Illinois Supreme Court was in agreement that the opinion of the Fifth District in *Avery* had to be reversed. On September 8, 2011, the *Avery* plaintiffs filed their Petition to Recall Mandate and Vacate August 18, 2005 Judgment. In that petition they made the same type of allegations being maintained in *Hale*. In reliance upon those detailed allegations, they requested that the court recall its mandate, vacate the court's 2005 opinion and judgment, and reinstate in full the April 5, 2001 opinion of the Appellate Court, Fifth District.

52.     By that time, Justices McMorrow and Fitzgerald had retired from the court and their seats had been assumed by Justices Burke (2006) and Theis (2010), respectively. On November 17, 2011, with the court newly constituted in that manner and without the participation of Justices Thomas and Karmeier, the motion to recall the mandate and vacate the August 18, 2005 judgment was denied. At the time of that order, Justice Kilbride, who had joined with Justice Freeman's concurring and dissenting opinion in *Avery*, was chief justice.

## III.   Contrary to the Views Expressed by Mark I. Harrison and Joanna M. Shepherd, Participation in the *Avery* Decision by Justice Karmeier Would Not Have Caused Any Bias, Prejudice or Alteration in the Legal Beliefs of the Other Members of the Court.

53.     Both Mr. Harrison and Ms. Shepherd offer legal conclusions when they assert that Justice Karmeier's participation in the *Avery* decision would have impermissibly tainted all

---

[1] Such opinions would most likely have also affirmed that portion of the appellate court judgment which affirmed the circuit court's denial of equitable relief and which reversed the circuit court's award of disgorgement damages.

10

proceedings in *Avery*. Mr. Harrison states in his report that "the decision of the Illinois Supreme Court to overturn the $1.05 billion judgment in favor of the plaintiff class in *Avery v. State Farm* was tainted and denied plaintiffs due process and deprived plaintiffs of the consideration and disposition of the appeal by a fair and impartial court." Report, ¶ 25. He expresses that same opinion throughout his deposition. He states his opinion that Justice Karmeier was biased and that bias is the equivalent of taint in this case. Harrison Deposition, p. 115. He is of the further opinion that "once Justice Karmeier elected to participate, that basically disqualified the entire panel." *Id.* at 117. As will be elaborated on below, he is of the opinion that the proceedings were "tainted, quite frankly from the day Justice Karmeier took the bench," and that "the passage of time didn't eliminate that taint, which affected the original judgment." *Id.*, 157, 158. As noted below, I disagree with these conclusions.

54.    Ms. Shepherd maintains similar opinions. In her report she expressed the opinion that "I would expect that Justice Karmeier's involvement in the *Avery* decision influenced the thinking and votes of the judges deciding the case," and that "as such, it is my conclusion that the *Avery* decision was likely unfairly tainted in State Farm's favor." Report, p. 16. Again, as noted below, I disagree with these conclusions. Indeed, in her deposition, Ms. Shepherd admitted that it is "impossible" to know if Justice Karmeier influenced any of the other *Avery* justices. Shepherd Deposition, p. 33:13-16.

55.    There is no evidence, nor could there be any evidence, as to what actions Justice Karmeier took with respect to the *Avery* opinion. There is no evidence that Justice Karmeier had any "interchange," "discussion" or "interaction" with anyone on the Court regarding *Avery*. It is quite possible that he merely announced his vote joining Justice McMorrow's opinion and did not engage in any discussion with the members of the court. It is also possible that that vote could have been disseminated through the clerk's office. In order for Justice Karmeier to have influenced the views of the other justices, there would have to be participation of some type other than the mere casting of a vote.

56.    In their depositions, both Mr. Harrison and Ms. Shepherd freely admit that they have no knowledge of Justice Karmeier's actions or whether there was any influence exerted by him on any other justice. The following notations regarding Ms. Shepherd's deposition are not exhaustive:

- She does not know at all what happened in the deliberations in *Avery*. No one does. Shepherd Deposition, p. 33:8-12.
- She agreed that "it's impossible to tell whether Justice Karmeier had an influence on the other judges (in *Avery*)." *Id.* p. 33:16.
- She does not have any knowledge as to whether Justice Karmeier deliberated with the rest of the justices with respect to *Avery*, or whether he exchanged any views whatsoever with them. *Id.* p. 44.
- She admitted that it was entirely possible that the entire substance of his involvement with *Avery* was stating that he agreed with Justice McMorrow's opinion. *Id.* p. 52.
- She has no way of knowing whether Justice Karmeier caused any other justice to change any vote on any issue in *Avery*. *Id.* p. 54.
- She has no knowledge, either way, as to whether any justice did anything other than apply the law as they believed it in good faith. *Id.* p. 61.

11

57.     Mr. Harrison's deposition also reveals a lack of knowledge as to the specifics of any influence supposedly exerted by Justice Karmeier. These, too, are not exhaustive:

- He has no knowledge of the manner of deliberation employed by the Illinois Supreme Court in deciding cases. Any answer he would give would be "speculative." Harrison Deposition, p. 37.
- He has no idea what actual deliberations took place but regards that to be irrelevant because once Justice Karmeier elected to participate the entire panel was disqualified in his opinion. *Id.* p. 116-117.

58.     Neither the reports nor the depositions of Mr. Harrison or Ms. Shepherd reveal any familiarity with the details and likelihood of various actions which attend to and follow from the filing of a Petition for Leave to Appeal in the Illinois Supreme Court.

59.     Based on my experience and common understanding, while the rate at which petitions for leave to appeal are allowed by the Illinois Supreme Court varies slightly from year to year, the number is always low and the allowance rate in civil cases typically ranges between 2% and 5%.

60.     Again, it takes the votes of at least four justices to allow a PLA. Justice Karmeier was not on the court in October 2002 when the PLA was allowed in *Avery.*

61.     Based on legal research undertaken at my direction, in those civil cases from 2003 through 2005 in which a PLA is allowed, such as *Avery*, in a majority of the cases, the lower court was reversed, in whole or in part.

62.     Based on legal research undertaken at my request, an examination of Illinois Supreme Court opinions involving various aspects of class actions from 1999 through 2010, but excepting *Avery*, reveals that there is a significant likelihood that the defendants would receive favorable treatment on some aspect of their case by action of the Supreme Court.

63.     Purely as a matter of statistics, once the Court decided to hear the *Avery* appeal, it was likely that some aspect of the lower court's decision in *Avery* would be reversed.

64.     I have had experience with all of the justices on the court and am also familiar with their work as expressed in their opinions.

65.     Chief Justice McMorrow began practicing law in Illinois in 1953. After she became an assistant state's attorney of Cook County, she was the first woman to prosecute felony cases there. She was elected as circuit court judge in 1976, and was assigned to the Illinois Appellate Court in 1985 by the Supreme Court. She was elected as appellate court justice in 1986, and then elected to the Supreme Court in 1992. She was the first woman to serve on the Supreme Court in the then 173 years of its existence. When she was elected by the other justices to be chief justice in May of 2002, she became the first woman to head any of the three branches of the state government of Illinois.

66.     Justice Garman was valedictorian of her high school class. She graduated from the University of Illinois with the highest honors, is a Bronze Tablet scholar, and received her J.D.

degree, with distinction, from the University of Iowa College of Law. She served as an assistant state's attorney in Vermilion County for four years, and then served as an associate circuit judge for 12 years. She was a circuit judge from 1986 to 1995. After she was assigned to the Fourth District of the appellate court in July 1995, she was elected to that court in November of 1996. She was appointed to the Supreme Court in February of 2001 and elected to the Supreme Court in November 2002.

67.      Justice Fitzgerald served in the United States Navy before attending John Marshall Law School, where he was one of the editors of the Law Review. Justice Fitzgerald's father was a circuit court judge in Cook County. He was a prosecutor with the Cook County State's Attorney's office. When he was elected to the bench in 1976, he was then the youngest elected circuit judge in Cook County. In 1987 he was named the Supervising Judge of Traffic Court. In 1989 he became the Presiding Judge of the Criminal Division in Cook County. In 1999, the Supreme Court named him to be chairperson of the Special Supreme Court Committee on Capital Cases. That committee ultimately drafted the comprehensive set of rules which were later approved by the Supreme Court to improve the quality of justice in the trial of death penalty cases. He was elected to the Supreme Court of Illinois in 2000.

68.      Justice Freeman graduated from John Marshall Law School in February 1962. He served as an assistant attorney general, an assistant state's attorney, and as attorney for the Board of Election Commissioners. He was an arbitrator at the Illinois Industrial Commission from 1965 through September 1973. From that time until December 1976, he served as a commissioner on the Illinois Commerce Commission. He was elected to the circuit court in 1976, and served 10 years on the Circuit Court of Cook County. He was elected to the appellate court in 1986. He was then elected to the Supreme Court in November 1990, and was the first African-American to serve on the court. He served as Chief Justice from 1997 until January 1, 2000.

69.      Thomas L. Kilbride received a B.A. degree magna cum laude from St. Mary's College in 1978 and received his law degree from Antioch School of Law in Washington, D.C., in 1981. He practiced law for 20 years in Rock Island, engaging in a wide-ranging general practice. He is a past board member and past president of the Illinois Township Attorneys Association and a past volunteer lawyer and charter member of the Illinois Pro Bono Center. He has served as a volunteer legal advisor for the Community Caring Conference and for Quad City Harvest, Inc. He also is a past member of the Rock Island Human Relations Commission.

70.      Although Justice Karmeier served as circuit judge from 1986 to 2004, he had never served on a reviewing court. At the time of the *Avery* opinion, Chief Justice McMorrow had served with distinction on the Supreme Court for 13 years, Justice Garman, the second woman member of the court, had been serving for approximately four years, and Justice Fitzgerald had been serving for approximately five years.

71.      It is my opinion that each of those justices had clear views of the law and of their role on the court. While each of those members of the court is respectful of the views of their fellow justices, it is my opinion that in 2005 it is unlikely that Justice Karmeier would have been able to sway their opinion to divert from what their independent view of the law was based upon their own knowledge and research, and the work of their individual clerks. The other members of the court were each strong personalities with individualistic well-formed judicial approaches, with

many years of substantial service. They were each known to be strong, independent proponents of their own views.

72.    As noted earlier in this report, on September 8, 2011, the *Avery* plaintiffs filed their Petition to Recall Mandate and Vacate August 18, 2005 Judgment.

73.    By that time, Justices Burke and Theis were the new members of the court.

74.    Justice Anne M. Burke went on the court in 2006 and Justice Mary Jane Theis joined the court in 2010.

75.    Anne M. Burke received her B.A. degree in education from DePaul University in 1976 and her J.D. degree from IIT/Chicago-Kent College of Law in 1983. She was appointed a Judge to the Court of Claims and served in that capacity under two governors. In April 1994, she was appointed special counsel to the Governor for Child Welfare Services. She was appointed to the Appellate Court, First District in August 1995 and was elected to the Appellate Court, First District, for a full term in 1996. Thereafter, she was appointed to the Illinois Supreme Court in 2006 upon Justice McMorrow's retirement, and was elected to the Court in 2008. She was a co-founder of the Special Olympics.

76.    Justice Theis, the daughter of a judge, was appointed as an associate judge in Cook County in 1983. She was elected to the circuit court in 1988, and served in several significant divisions of that court. She was appointed to the Appellate Court, First District, in 1993 and elected to the Appellate Court in 1994. She was appointed to the Supreme Court upon the retirement of Chief Justice Thomas R. Fitzgerald in 2010. She was thereafter elected to serve on the court. Justice Theis is extraordinarily active in bench and bar activities. She has been president of both the Illinois Appellate Lawyers Association and the Illinois Judges Association. She has served on the Board of Governors of the Illinois State Bar Association and the Board of Managers of the Chicago Bar Association. She very recently received the Justice John Paul Stevens Award from the Chicago Bar Association.

77.    Each of those justices also had strong views of the law, and they each had significant experience on the appellate court before ascending to the Supreme Court. They, too, would vote their own minds and their own consciences.

78.    The newly constituted court, acting without the participation of Justices Thomas and Karmeier, denied that motion to recall the mandate and vacate the August 18, 2005 judgment by order dated November 17, 2011.

79.    That action of the court in 2011 further illustrates the lack of influence, bias or taint. New justices participated; Justice Karmeier did not.

80.    The untenability of the opinions regarding taint or bias on the part of Mr. Harrison is emphasized by his opinion that Justice Karmeier's participation in 2005 extended to an action of the court in 2011 in which he did not participate. See Harrison Deposition, pp. 71-72.

81.    It is my opinion that the claim of bias, taint or influence made with respect to Justice Karmeier with respect to his participation in the 2005 opinion would have no conceivable impact on the court's unanimous denial of that motion in 2011.

82.    In both *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) and *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016), the remedy ordered by the court was a remand for a hearing without participation by the justice against whom a challenge had been made. It is notable that that is effectively what was provided to the *Avery* plaintiffs here where the Illinois Supreme Court, without any participation by Justice Karmeier, effectively denied a rehearing premised upon the allegations of influence.

83.    Based upon my observations of justices coming on to the court over the years, and further based upon my observation of new justices coming on to appellate courts throughout the state, I differ from Ms. Joanna Shepherd's conclusions expressed in the last three pages of her report dated September 21, 2017 and in her deposition. There is nothing about Justice Karmeier's personal status which worked a significant change in the court. Further, the issues involved in *Avery* are unrelated to sex, race or other personal characteristics. Justice Karmeier was joining a court of strong, independent personalities, all of whom had significant reviewing court experience, and he was embarking upon his first service on a reviewing court.

Date: October 30, 2017

Michael T. Reagan

# EXHIBIT A

### MICHAEL T. REAGAN

Mr. Reagan graduated from Purdue University with a BS in Mechanical Engineering.  He received his JD from Georgetown University.

Mr. Reagan served as a member of the Illinois Supreme Court Committee on Pattern Jury Instructions from 1985 to 1995, serving as either chair or co-chair of the "Tort Reform" and "Contribution" Subcommittees.  Effective January 1, 1996, the Illinois Supreme Court appointed him as the Reporter to that Committee.  He served in that capacity until September 2003.

In 2003, he was appointed as a member of the Special Supreme Court Committee on Unpublished Opinions/Supreme Court Rule 23. Until late 2016, he co-chaired a Special Committee on Rule 23, composed of representatives of the Chicago Bar Association, the Illinois State Bar Association, the Appellate Lawyers Association, and the Illinois Judges Association, which worked with the Supreme Court on that topic.

In 2016, he was appointed as a member of the Supreme Court Judicial Performance Evaluation Committee.

He served as the president of the Illinois Appellate Lawyers Association in 1995-1996, and in 2001 was named chair of the Past Presidents Advisory Committee.  He continues in that position.  He is also a member of the Chicago, LaSalle County, Illinois State, and American Bar Associations.

As a member of the Illinois State Bar Association, he was a member of the Standing Committee on Judicial Advisory Polls; the Council on Environmental Control Law; and the Chair of the Tort Law Section Council.  In 1995-6 he served as a member of the Select ad hoc Committee on Judicial Merit Selection.  In 1996-7 he was on the President's Committee for Access to Justice.  He served on the President's Committee on the Future of the Profession, and on the Steering Committee for the Conference on the Future of the

# EXHIBIT A

Courts. In 2001 he was named co-chair with Justice Mary Jane Theis of an ISBA Special Committee on Appellate Practice to examine common matters of interest between the appellate court and the bar.

He received the 2009 Maloney Tradition of Excellence Award from the ISBA at its Annual Meeting in June 2009.

In 2017, he was named a Laureate by the Academy of Illinois Lawyers by the Illinois State Bar Association.

He is a member of the Lawyers Club of the City of Chicago.

He is also a member of the Illinois Association of Defense Trial Counsel and Illinois Trial Lawyers Association.

In April 2003 he was named as a Fellow of the American Academy of Appellate Lawyers.

He has lectured and prepared numerous written submissions for the Illinois State Bar Association, Illinois Trial Lawyers Association, Illinois Defense Counsel, the Chicago Bar Association, the Illinois Institute for Continuing Legal Education, the Winnebago County Bar Association, the Kane County Bar Association, the Appellate Lawyers Association, the *Appellate Law Review*, and numerous clients.

Among other publications, he has authored, or co-authored, the following articles in the *Illinois Bar Journal:* "But Compared to What?: Comparative Fault, Contribution, and Joint and Several Liability in Illinois", with Thomas A. Demetrio, April 1998; "Supreme Court Rule 23: The Terrain of the Debate and a Proposed Revision", April 2002; "Supreme Court Review 2001: Getting to Know the New Court", with co-authors, May 2002; "The Illinois Supreme Court's 2002 Civil Cases: A New Court Settles In", April 2003, with co-authors; and "The Too-Expansive Illinois General Verdict Rule", March 2013, with co-authors.

He is co-author with Jill A. Berkeley of Neal Gerber and Eisenberg of "Duty to Defend"; a
chapter within both *Commercial and Professional Liability Insurance* and *Illinois Liability
Insurance*, Illinois Institute of Continuing Legal Education, as well as various other IICLE
materials.  Together with J. Timothy Eaton and Michael W. Rathsack, he is an author of
IICLE's "Civil Appellate Practice: State and Federal".  He contributed a section to the most
recent edition of Judge Aldisert's "Winning on Appeal."

For many years, and continuing at the present time, in conjunction with two other
appellate lawyers, he has written summaries of all civil cases decided by the Illinois
Supreme Court for immediate publication by the Illinois State Bar Association to its
members, most frequently on the same day that each opinion is issued.

Mr. Reagan concentrates on civil trials and appeals.  He has tried both jury and bench
cases in many Illinois counties.  He has participated in appeals in every district of the
Illinois Appellate Court, the Illinois Supreme Court, and the Seventh Circuit Court of
Appeals.  Among the appeals he has handled are:

   • Kotecki v. Cyclops Welding, 146 Ill.2d 155, 585 N.E.2d 1023 (1991) (limiting the
contribution liability of Illinois employers to an amount no greater than their workers'
compensation liability).

   • Charles v. Seigfried, 165 Ill.2d 482, 651 N.E.2d 154 (1995) (reversing three
appellate court opinions and confirming the absence of any tort liability for the corporate
or personal service of alcohol against any Illinois defendant outside the Illinois Dramshop
Act, and further discussing the relationship between the legislative and judicial branches
of government in the formulation of tort responsibility).

   • Talty v. Talty, 166 Ill.2d 232, 652 N.E.2d 330 (1995) (creating for the first time a
distinction between personal good will and enterprise good will in the valuation of closely
held corporations).

3

• <u>Economy Preferred Ins. Co. v. Grandadam</u>, 275 Ill.App.3d 866, 656 N.E.2d 787 (3rd Dist. 1995) (the first Illinois appellate opinion examining the meaning of the "absolute" pollution exclusion to a liability insurance policy, and finding that it applied).

• <u>Dubina v. Litgen</u>, 197 Ill.2d 185 (2001) (finding a $9,000,000 settlement to be in bad faith within the meaning of the Contribution Act).

• <u>Kopczick v. Hobart</u>, 721 N.E.2d 769 (3rd Dist. 1999) (reversing a verdict of $20,000,000 for punitive damages, with JNOV, in a product liability action).

• <u>Geddes v. Mill Creek</u>, 196 Ill.2d 302 (2001) (applying the doctrine of equitable estoppel in a case involving the operation of a golf course).

• <u>First American Bank v. Guerine</u>, 198 Ill.2d 511 (2002) (reversing a *forum non conveniens* ruling and examining the rule to be applied in such cases).

• <u>Dillon v. Evanston Hospital</u>, 199 Ill.2d 483 (2002) (establishing a new rule of law concerning future injuries).

• <u>Arthur v. Catour</u>, 216 Ill.2d 72 (2005) (examining issues concerning discounted medical bills).

• <u>ABN AMRO Mortgage Group, Inc. v. McGahan</u>, 931 N.E.2d 1190, 237 Ill.2d 526 (2010) (clarifying an issue of foreclosure procedure involved in a large number of cases).

• <u>Italia Foods, Inc. v. Sun Tours, Inc.</u>, 986 N.E.2d 55 (Ill., 2011) (certified questions in a class action).

• <u>Powell v. Dean Foods</u>, 965 N.E.2d 404 (Ill., 2012) (reversing circuit and appellate courts on basis of standing to appeal).

4

- <u>In re Pension Reform Litigation</u>, 2015 IL 118585 (affirming the unconstitutionality of legislation reducing state pension benefits.)

- <u>Moon v. Rhode</u>, 2016 IL 119572 (concerning the application of the discovery rule for purposes of the statute of limitations in Wrongful Death Act cases).

- <u>Illinois Landowners Alliance, NFP, et al. v. Illinois Commerce Commission, et al.</u>, 2017 IL 121302 (affirming the appellate court's conclusion that a proposed power line affecting hundreds of Illinois farmers was not properly granted a certificate of public convenience and necessity).

He has served as both mediator and arbitrator in a range of matters.

He has been selected as a "Leading Lawyer," a "Super Lawyer," and "Best Lawyers in America" (In Appellate Law, Tier 1, both nationally and Chicago). He is listed by "Benchmark Litigation" as a top Seventh Circuit appellate specialist. In 2012, he was selected by Super Lawyers as the top solo litigator in Illinois. In 2014, he was ranked by Leading Lawyers as third among all downstate business lawyers, and fifth statewide among all civil appellate lawyers.

He serves as a Director of the First National Bank of Ottawa.

# EXHIBIT B

COMPOSITION *AVERY* COURT 2005-2006

| Judge | Party Affiliation | Year Elected to Bench |
|-------|-------------------|------------------------|
| Charles E. Freeman | Democrat | 1990 |
| Mary Ann McMorrow | Democrat | 1992 |
| Thomas R. Fitzgerald | Democrat | 2000 |
| Thomas L. Kilbride | Democrat | 2000 |
| Robert R. Thomas* | Republican | 2000 |
| Rita B. Garman | Republican | 2001 |
| Lloyd A. Karmeier | Republican | 2004 |

*Did not participate*

| Issue | Holding | Vote |
|-------|---------|------|
| Propriety of Nationwide Contract Class | Nationwide class should be de-certified | 6-0 |
| Specification Damages | Specification damages cannot be recovered | 6-0 |
| Propriety of Nationwide Consumer Fraud Act Class | Nationwide class should be de-certified | 6-0 |
| Consumer Fraud Act Subclass | Illinois subclass could be certified, but only named IL plaintiff cannot state valid claim here | 6-0 |
| Punitive Damages Award | Punitive damages award reversed | 6-0 |
| Contract Subclass | Subclasses cannot be certified | 4-2    (remand for determination) |
| Installation Damages | Installation damages cannot be recovered | 4-2 |



EXHIBIT 5
Shepherd
10/17/2017