**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

MARK HALE, TODD SHADLE, and
LAURIE LOGER, on behalf of themselves and
all others similarly situated,

        Plaintiffs

     v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, and WILLIAM G. SHEPHERD,

        Defendants.

Case No. 3:12-cv-00660-DRH-SCW

Judge David R. Herndon

Magistrate Judge Stephen C. Williams

<u>**PLAINTIFFS' OPPOSITION TO STATE FARM MUTUAL INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' RICO CLAIMS**</u>

1509068.2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

I.     Phase I–the Set Up: Defendants Conspired to Put Justice Karmeier on the Illinois Supreme Court. ............................................................................................ 3

     A.     State Farm Exerted Considerable Influence Over the ICJL.................................. 3

     B.     Defendants Recruited Judge Karmeier and Managed His Campaign.................... 4

     C.     State Farm Funded the Karmeier Campaign........................................................ 6

     D.     Judge Karmeier Knew State Farm Played a Significant Role in His Campaign. ..................................................................................................... 14

     E.     Defendants Further Enhanced Judge Karmeier's Odds of Winning by Subverting the State Bar's Judicial Candidate Evaluation Process. ................... 19

II.    Phase II–the Pay Off: State Farm Deceived the Illinois Supreme Court Regarding Its Participation in and Funding of the Karmeier Campaign. ............................ 19

LEGAL STANDARD ............................................................................................. 23

ARGUMENT .......................................................................................................... 23

I.     PLAINTIFFS HAVE ESTABLISHED RICO CAUSATION. ............................. 23

II.    PLAINTIFFS HAVE SUSTAINED A COGNIZABLE RICO INJURY. ............. 28

III.   STATE FARM'S BRIEFS CONSTITUTE RICO PREDICATE ACTS. ............ 31

     A.     Service of Litigation Documents Can Constitute Mail Fraud. ........................... 31

     B.     State Farm's Mailings Furthered its Fraudulent Scheme................................... 33

           1.    State Farm Affirmatively Misrepresented or Concealed the Truth. ........ 33

           2.    A Jury Need Only Determine That the Mailings Were Made in Furtherance of a Fraudulent Scheme to Find RICO Liability................. 34

IV.   PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED. ................................... 35

     A.     Plaintiffs' Claims Accrued in 2011..................................................................... 36

     B.     The Limitation Period Was Tolled. ..................................................................... 38

CONCLUSION....................................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aetna Life Ins. Co. v. Lavoie*,
 475 U.S. 813 (1986) ........................................................................................... 26

*Avery v. State Farm Mut. Auto. Ins. Co.*,
 746 N.E.2d 1242 (Ill. App. Ct. 2001), *aff'd in part, rev'd in part*,
 835 N.E.2d 801 (Ill. 2005) ........................................................................... passim

*BCS Servs., Inc. v. BG Investments, Inc.*,
 728 F.3d 633 (7th Cir. 2013) ............................................................................. 30

*BCS Servs., Inc. v. Heartwood 88*,
 *LLC*, 637 F.3d 750 (7th Cir. 2011) ........................................................ 24, 27, 28

*Bigelow v. RKO Radio Pictures, Inc.*,
 327 U.S. 251 (1946) ............................................................................... 25, 27, 31

*Bridge v. Phoenix Bond & Indem. Co.*,
 553 U.S. 639 (2008) ............................................................................... 24, 30, 35

*Caperton v. A.T. Massey Coal Co.*,
 556 U.S. 868 (2009) ..................................................................................... 20, 27

*Chultem v. Ticor Title Ins. Co.*,
 No. 120448, 2017 IL 120448 (Ill. May 18, 2017) ........................................... 28

*DeBoskey v. SunTrust Mortg., Inc.*,
 No. 8:14-CV-1778-MSS-TGW, 2017 WL 4083557 (M.D. Fla. Sept. 14, 2017) ................... 32

*Deck v. Engineered Laminates*,
 349 F.3d 1253 (10th Cir. 2003) ......................................................................... 30

*Doe v. Roe*,
 958 F.2d 763 (7th Cir. 1992) ............................................................................. 29

*Evans v. City of Chicago*,
 689 F.2d 1286 (7th Cir. 1982), *overruled on other grounds*,
 873 F.2d 1007 (7th Cir. 1989) ........................................................................... 29

*Fischer v. Avanade, Inc.*,
 519 F.3d 393 (7th Cir. 2008) ......................................................................... 1, 23

*Gil Ramirez Group, L.L.C. v. Houston Ind. Sch. Dist.*,
 786 F.3d 400 (5th Cir. 2015) ............................................................................. 30

*In re Copper Antitrust Litig.*,
 436 F.3d 782 (7th Cir. 2006) ............................................................................. 39

*In re Lightfoot*,
 217 F.3d 914 (7th Cir. 2000) ............................................................................. 40

*In re Marriage of Duggan*,
 877 N.E.2d 1140 (Ill. App. Ct. 2007) ............................................................... 29

*In re Neurontin Mktg. and Sales Practices Litig.*,
 712 F.3d 21 (1st Cir. 2013) ......................................................................... 24, 27

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Sulfuric Acid Antitrust Litig.*,
743 F. Supp. 2d 827 (N.D. Ill. 2010) ................................................................ 39, 40

*Ira Holtzman, C.P.A. v. Turza*,
728 F.3d 682 (7th Cir. 2013) ................................................................................. 31

*Jay E. Hayden Found. v. First Neighbor Bank*,
610 F.3d 382 (7th Cir. 2010) .................................................................... 36, 37, 40

*Keating v. City of Chicago*,
21 N.E.3d 465 (Ill. 2014) ....................................................................................... 28

*Klinger v. Baltimore & Ohio R.R. Co.*,
432 F.2d 506 (2d Cir. 1970) .................................................................................. 25

*LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC*,
287 F.3d 279 (3d Cir. 2002) .................................................................................. 39

*Ledbetter v. Good Samaritan Ministries*,
No. 13-CV-308, 2016 WL 3746204 (S.D. Ill. July 13, 2016) ........................... 1, 23

*Limestone Dev. Corp. v. Vill. of Lemont*,
520 F.3d 797 (7th Cir. 2008) ................................................................................. 36

*Malley-Duff & Assocs. v. Crown Life Ins. Co.*,
792 F.2d 341 (3d Cir. 1986), *aff'd*, 483 U.S. 143 (1987) ...................................... 29

*Martin v. Consultants & Adm'rs, Inc.*,
966 F.2d 1078 (7th Cir. 1992) .......................................................................... 38, 39

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ................................................................................. 32

*Motorists Mut. Ins. Co. v. Simpson*,
404 F.2d 511 (7th Cir. 1968) ................................................................................. 31

*Nero v. Mayan Mainstreet Inv 1, LLC*,
645 F. App'x 864 (11th Cir. 2016) ........................................................................ 32

*Overstreet v. Ky. Cent. Life Ins. Co.*,
950 F.2d 931 (4th Cir. 1991) ................................................................................. 38

*Package Closure Corp. v. Sealright Co., Inc.*,
141 F.2d 972 (2d Cir. 1944) .................................................................................. 25

*Price v. Pinnacle Brands, Inc.*,
138 F.3d 602 (5th Cir. 1998) ................................................................................. 30

*Raney v. Allstate Ins. Co.*,
370 F.3d 1086 (11th Cir. 2004) ............................................................................. 32

*Santaella v. Metro. Life Ins. Co.*,
123 F.3d 456 (7th Cir. 1997) ................................................................................. 23

*Scott v. Harris*,
550 U.S. 372 (2007) ............................................................................................ 1, 23

*Shropshear v. Corp. Counsel of the City of Chi.*,
275 F.3d 593 (7th Cir. 2001) ................................................................................. 38

## TABLE OF AUTHORITIES
### (continued)

Page

*Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*,
   15 F.3d 1427 (7th Cir. 1994) ........................................................... 37

*Tolliver v. Northrop Corp.*,
   786 F.2d 316 (7th Cir. 1986) ........................................................... 40

*Travelers Prop. Cas. v. Good*,
   689 F.3d 714 (7th Cir. 2012) ........................................................... 31

*U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt., Ltd.*,
   540 F. Supp. 2d 994 (N.D. Ill. 1989) ............................................... 40

*United States v. Barger*,
   178 F.3d 844 (7th Cir. 1999) ........................................................... 35

*United States v. Keplinger*,
   776 F.2d 678 (7th Cir. 1985) ........................................................... 34

*United States v. Lee*,
   427 F.3d 881 (11th Cir. 2005) ......................................................... 32

*United States v. McClain*,
   934 F.2d 822 (7th Cir. 1991) ........................................................... 35

*United States v. Pendergraft*,
   297 F.3d 1198 (11th Cir. 2002) ................................................... 31, 32

*United States v. Szarwark*,
   168 F.3d 993 (7th Cir. 1999) ........................................................... 35

*United States v. Useni*,
   516 F.3d 634 (7th Cir. 2008) ........................................................... 35

*United States v. Waymer*,
   55 F.3d 564 (11th Cir. 1995) ........................................................... 39

*United States v. Weimert*,
   819 F.3d 351 (7th Cir. 2016) ........................................................... 34

*Ward v. Vill. of Monroeville, Ohio*,
   409 U.S. 57 (1972) .......................................................................... 26

*Wilk v. Am. Med. Ass'n*,
   719 F.2d 207 (7th Cir.1983) ............................................................ 32

*Williams v. Pennsylvania*,
   136 S. Ct. 1899 (2016) ............................................................... 27, 28

*Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*,
   No. 14-CV-7349 (AJN), 2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) ................................ 30

**Rules**

11th Cir. R. 36-2 ................................................................................ 32

Fed. R. Civ. P. 56(a) ........................................................................ 23

Ill. S. Ct. R. 63(C)(1) ....................................................................... 26

Ill. S. Ct. R. 63C ....................................................................... 19, 34

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**Constitutional Provisions**

Ill. Const. Art. VI, § 3 .................................................................................................................... 27

## INTRODUCTION

This case arises from allegations—and now substantial proof—of Defendants' extraordinary clandestine efforts to secure the election of an Illinois Supreme Court Justice sympathetic to State Farm, to ensure his participation in the review of a billion-dollar judgment pending against State Farm, and, in so doing, to deprive Plaintiffs of their right to an impartial tribunal and the judgment that tribunal was reviewing. The evidence shows that Defendants (1) secretly recruited Judge Karmeier to run for an open seat on the Illinois Supreme Court, before which a billion-dollar judgment against State Farm was pending; (2) helped organize and manage his campaign behind the scenes; (3) covertly funneled millions of dollars (well over a majority of all reported campaign funds) to support the campaign through intermediary organizations over which it exerted considerable influence; and (4) after securing Justice Karmeier's election, obscured, concealed, and misrepresented the degree and nature of their support so that Justice Karmeier could participate in the *Avery* deliberations.[1]

Defendants' scheme to deprive Plaintiffs of their constitutionally-guaranteed right to be judged by a tribunal uncontaminated by politics, and to thereby ensure that Plaintiffs were dispossessed of their billion-dollar judgment, was a success. Plaintiffs had no opportunity in the state court appellate process to conduct the discovery necessary to pull back the curtain on State Farm's deception, and their procedurally-limited recusal efforts were summarily denied—by Justice Karmeier himself. As a result, Justice Karmeier participated in the *Avery* deliberations and, as he has advised, broke the "deadlock[]" that had prevented disposition up until that point, and voted to overturn the *Avery* judgment. Plaintiffs' Appendix ("PA") 1172.

This scheme gives rise to Plaintiffs' two RICO claims, and Plaintiffs have amassed a wealth of evidence to prove it. In its second motion for summary judgment, State Farm seeks dismissal of Plaintiffs' case based on purported failures to satisfy various requirements of the

---

[1] Naturally, the Defendants dispute and offer competing interpretations of this evidence. But at this stage, all factual disputes must be resolved in Plaintiffs' favor. *Ledbetter v. Good Samaritan Ministries*, No. 13-CV-308, 2016 WL 3746204, at *2 (S.D. Ill. July 13, 2016) (Herndon, J.) (citing *Scott v. Harris*, 550 U.S. 372 (2007); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)). And the existence of material factual disputes requires denial of summary judgment.

RICO statute. If State Farm's motion looks familiar, that's because it is. State Farm has raised, and the Court has previously rejected, virtually every attack that State Farm advances here. The Court previously concluded, for example, that Plaintiffs' lost interest in the *Avery* judgment is, as a matter of law, a valid RICO injury and that it was proximately caused by the RICO scheme that Plaintiffs alleged. The Court also concluded that State Farm's mailings are actionable RICO predicate acts, and that based on Plaintiffs' allegations, Plaintiffs' claims were not time-barred. In opposition to this motion, Plaintiffs now establish, at a minimum, a question of fact as to every factual predicate underpinning the Court's previous rulings.

State Farm's second motion for summary judgment is, in essence, a plea for the Court to reconsider its prior conclusions and, in so doing, lay waste to the last five years of exhaustive discovery and intensive litigation. The Court should reject this plea. Its decisions are well-supported by the law and now by the evidence advanced. The Defendants perpetrated an extraordinary scheme to cheat its insureds and to subvert the judiciary at the highest level, and their actions must now be scrutinized by the ultimate finder of facts.

## STATEMENT OF FACTS

*Avery v. State Farm Mut. Auto. Ins. Co.* was a nationwide class action filed in Illinois state court in 1997, based on allegations that State Farm specified non-original equipment manufacturer crash parts for its insureds' vehicles in breach of their contracts and in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. 835 N.E.2d 801, 810-11 (2005). In 1999, the trial court entered judgment against State Farm for over $1.1 billion. *Id.* at 810; PA1215-32. The Illinois court of appeals affirmed a judgment for $1.05 billion. *Avery v. State Farm Mut. Auto. Ins. Co.,* 746 N.E.2d 1242, 1262 (Ill. App. Ct. 2001), *aff'd in part, rev'd in part,* 835 N.E.2d 801 (Ill. 2005). The Illinois Supreme Court granted State Farm leave to appeal in 2002, and heard oral argument in May 2003. [289] ¶ 47. State Farm and others then formulated a two-phase RICO conspiracy: first, to elect a Justice beholden to State Farm, and, second, to hide what they were doing and then lie about it, so that State Farm's chosen Justice— Lloyd Karmeier—could participate in the appeal of the $1.05 billion judgment against it.

I.      **Phase I–the Set Up: Defendants Conspired to Put Justice Karmeier on the Illinois Supreme Court.**

      A.      **State Farm Exerted Considerable Influence Over the ICJL.**

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████ PA0001-12. In 2000, after State Farm's trial court defeat in *Avery*, State Farm Chairman and CEO Edward B. Rust, Jr. became Chairman of the IBRT, which then shared offices with the ICJL. PA0013-0015.

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ PA0009. █████████████████

████████████████████████████████████████████. PA0016; PA1236.

    ██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████[2] PA0008; PA0017-27; PA1240-42; PA1246-51; PA153-58. ██████████████████████████████. PA0016; PA0028-29. So was State Farm, through its in-house counsel and lobbyist, Defendant Shepherd. PA0030.███████████

███████████████████████████████████████████████████████████

████████████████████████ *Id.*; PA0028-29. In addition, Rust (State Farm's CEO) and Murnane were close. PA0031-32. Murnane boasted that "when I say I talked to the State Farm people, I mean the CEO and General Counsel." PA0033. ██████████████████

██████████████████████████████████████ PA1259-60; PA1272. And on the

---
[2] ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████ PA1282-83.

day the Illinois Supreme Court overturned *Avery*, in 2005, it was Murnane to whom Rust turned
for information. PA0034-35. ████████████████████████████████████████████

████████████████████████████████████ PA0036-37.

State Farm's Shepherd and Murnane were also close. Shepherd exercised State Farm's
control over ICJL through emails and telephone calls at least three times per week (PA0038),
through personal visits during the campaign (PA0039), and through in-person ICJL status
conferences about the campaign (PA0040-42).████████████████████████████████

████████████████████████████████████████████████

████████████ PA1390-452.████████████████████████████████

████████████ PA0043-44.████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ PA0045-46.

## B.  Defendants Recruited Judge Karmeier and Managed His Campaign.

By the end of 2002, the ICJL was actively engaged in a campaign to recruit a candidate
for the open Fifth District seat on the Illinois Supreme Court. PA0041-42.[3] ████████████

████████████████████████████████████████████████

████████████████████████████████████████ PA0097-98.

Murnane assuaged this fear in a July 26, 2003 meeting, assuring Judge Karmeier he would go to
Washington, D.C. to seek $2 million on Judge Karmeier's behalf. PA0203-04.[4] ████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[3] For instance, Murnane delivered a presentation to the Civil Justice Reform Group—co-chaired
by State Farm's General Counsel Kim Brunner—explaining that the ICJL was looking for the
"right candidate" for the open Illinois Supreme Court seat. PA0074-78.

[4] Remarkably, when Murnane informed Judge Karmeier that the ICJL would be able to help raise
the funds for a million-dollar campaign, the ICJL had only $8.20 in the bank. PA1505-06.

███████████████████████████ PA1507-10.

A PowerPoint presentation that Murnane developed for the IBRT after the election confirms the State Farm-controlled ICJL's central role in recruiting and seeking funds for Judge Karmeier. It states that the ICJL: "***Found Judge Karmeier, convinced him to run***; pledged support up front; worked to build organization." PA0242-46 (emphasis added).[5] That was true. Besides recruiting Judge Karmeier, the ICJL, through Murnane, and as overseen by State Farm:

- built a coalition of organizations supporting the Karmeier campaign (PA0052);
- ████████████████████████████████████ (PA1511-16; PA2322; PA1517-18);
- █████████████████████████████████████████ (PA0052; PA1524-26; PA1531), ████████████████████████ ████████ (PA1550-51; PA1553), ████████████ ████████████████████████████ (PA1556-57);
- ████████████████████████████ (PA1559-60; PA1563-65), █████████████████████████████████████ ████████████████████████ (PA1528-29; PA1538-39; PA1561-62; PA1568-69; PA1571-73);
- assembled the campaign team, campaign staff, and the campaign finance team (PA0285-86; PA1577-80), ████████████████████ (PA1524-26; PA1536-37; PA1261);
- ████████████████████ (PA1511-16; PA1581-82; PA1583; PA1527; PA1530-31);
- paid media and direct mail consultants (PA0052);
- hired a fundraising consultant for the Karmeier campaign (PA1584-86; PA1587-88), and ████████████████████████ (PA1589; PA1577-1580; PA1590-95);
- took Judge Karmeier around Illinois and Washington to meet donors (PA0285-86);
- ████████████████████████ (PA0287; PA1534-35);
- set up and ran the Karmeier campaign website and credit card processing (PA0288-94);
- commissioned a study to use in campaign attack ads, *which State Farm paid for directly* (PA0295-96);

---

[5] The December 18, 2003 IBRT annual meeting minutes, with Rust as Chairman, further confirm this fact. They state that "[t]he ICJL helped recruit Circuit Judge Lloyd Karmeier to run for this office, and, with the IBRT, has been working to acquire financial and political support for the campaign." PA0262-83. Moreover, a January 25, 2004 e-mail from Murnane to Judge Karmeier confirms Judge Karmeier was Defendants' hand-picked candidate: "You've passed all the tryouts we need." PA0284.

[6] Indeed, the named campaign chairman, State Senator David Luechtefeld, admitted he was "the campaign chairman in name only" (PA1576) and that Murnane ran the show.

- ran the polling and prepared press releases for the Karmeier campaign (PA0297-98);
- helped create the "Round Two" plan for conducting the campaign from July 2004 through Election Day (PA0299-300);
- handled direct mailings to voters through its paid consultants (PA0301);
- made sure that Karmeier campaign donors could remain anonymous (PA0302);
- worked with State Farm on rallies at various State Farm offices (PA0303-06); and
- served as "clearinghouse" for Karmeier campaign contributions (PA00314; PA0042), a fact State Farm was well aware of.[7]

██████████████████████████████████████ PA0329-30; PA0045-46 ("The ICJL's role in the 2004 Supreme Court election in Southern Illinois is well known"; "the [ICJL] took the lead role and was largely responsible—from Day One—for the success of that election"). █████████████████████████████████████████████

████████████████████████████████████████ PA0331-32.

### C.    State Farm Funded the Karmeier Campaign.

Judge Karmeier was described as a "Quantum Leap Forward" for Defendants, and they went to great lengths to secure his election. PA0359. Those on his campaign believed they would need at least $3 million to elect Judge Karmeier. PA0355. State Farm itself contributed even more than that,[8] and it did so covertly, through a web of intermediaries, to enable it to deny its influence and ensure that a future Justice Karmeier could participate in *Avery*, if *Avery* were still pending after the election.

State Farm had a vast infrastructure in place to coordinate these efforts. ████████

---

[7] This is confirmed in the notes of Regina Dillard, a State Farm in-house lawyer who attended a U.S. Chamber/ILR donor meeting on May 25, 2004 in the course of her employment. PA0314. Ms. Dillard's notes of the remarks at the meeting indicate that the Fifth District Illinois Supreme Court race was the ILR's "highest priority," and the U.S. Chamber was supporting Judge Karmeier. PA0308. ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ PA1634-42.

[8] Expert Thomas A. Myers is a forensic accountant and fraud investigator whose report traces the flow of funds from State Farm to the Karmeier campaign. PA0376. █████████████████ ████████████████████████████████████████████████████ PA1643-1756. PA2328-400. █████████████████████████████████████████ ████████████████████████████ PA1852-88; PA1889-1907.



PA1600-01; PA1613; PA1275-76; PA1278-79. ████████████████████████████ (PA1599; PA1285-86), ████████████████████████████ (PA1597-98) ████████████████████ (PA1628). ████████████████████ PA1758-59; PA1762-63; PA1760-61; PA1764-65. Moreover, State Farm officials held strategic positions within the leadership of the intermediaries, enabling State Farm to covertly influence the direction of funds through these intermediaries, and ultimately to the Karmeier campaign. These included:

> **U.S. Chamber of Commerce** ("U.S. Chamber") and its campaign donor organization, the **Institute for Legal Reform** ("ILR"):

- State Farm CEO Rust was a Director of the ILR in 2003 and 2004 (PA0508-22);
- State Farm Vice-President David Hill was on the ILR Elections Task Force, which had the responsibility of "approv[ing] proposed expenditures" (PA0523-24; PA0533);
- State Farm General Counsel Kim Brunner was on the ILR Audit Committee tasked with "[p]rovid[ing] oversight of annual ILR budget and fundraising program" and "[r]eview[ing] organizational capabilities and resources" (PA0534; PA0533); and
- State Farm Chief Administrative Officer James Rutrough was on the U.S. Chamber's board from 2004 to 2011 (PA0646-66; PA0684).

> **American Tort Reform Association** ("ATRA"):

- Murnane and State Farm Vice-President Hill were Directors in 2004. PA0704; PA1770.

> **Civil Justice Reform Group** ("CJRG"):

- State Farm General Counsel Brunner was Co-Chair of the Steering Committee of the CJRG (PA0713-14), which served as the "brain trust" whose members played leadership roles in other key reform groups and were positioned to ensure activities like the Karmeier election were well coordinated among those groups (PA0710-12);
- ████████████████████████████e (PA1771), ████████████ (PA0715) ████████████████ (PA0716-17); and
- ████████████████████████████ (PA1772-99).

> **ICJL** and its political action committee, **JUSTPAC**:

- Murnane served as ICJL President (PA0016);
- State Farm's Shepherd served on the ICJL Executive Committee (PA0030), ████████████ ████████████████████████ (PA1800-01);

- State Farm's Shepherd served as one of three members of the Compensation Review Committee (PA0016);
- State Farm held a seat on the ICJL board (PA0718); and
- Murnane served as Treasurer of JUSTPAC (PA0719).

| **Illinois Chamber of Commerce** ("Illinois Chamber"): |
|---|

- State Farm executives Mike Davidson and Peggy Echols held seats on the Board of Directors. PA0720-21.

| **Illinois Coalition for Jobs, Growth and Prosperity** ("Illinois Job Coalition"): |
|---|

- Formed by the ICJL, the Illinois Chamber, and the IBRT (with Rust as IBRT Chairman) to "participate in a meaningful way in the 2004 elections." PA0722-24.

State Farm's contributions to these intermediaries led directly to large expenditures benefitting the Karmeier campaign including, but not limited to: (1) $1,940,000 funneled from State Farm through the U.S. Chamber/ILR, then to the Illinois Republican Party and then to Citizens for Karmeier; (2) $415,000 that flowed from State Farm through ATRA and then to JUSTPAC, a documented proxy for the Karmeier campaign; (3) $150,000 from State Farm through the Illinois Jobs Coalition to JUSTPAC; and (4) $100,000 from State Farm through the CJRG to the ICJL. PA0390-97; PA0725-26. ███████████████

████████████████████████████████████████████

████████████████████████ PA2270-72. █████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ PA1802-18.

**U.S. Chamber/ILR.** In November 1999, soon after the *Avery* class judgment, Tom Donohue, President of the U.S. Chamber, wrote to State Farm CEO Rust asking for money and promising to do anything possible "to help [State Farm's] industry," and to "always be available when [State Farm has] a particular concern." PA0727. With the *Avery* appeal pending, State Farm availed itself of Donohue's offer to marshal the U.S. Chamber on behalf of select corporations "as a means of *anonymously* pursuing their own political ends." PA0728-32

(emphasis added).[9] 

██████████████ PA1624-27.

Before the *Avery* judgment, State Farm's largest contribution to the U.S. Chamber was $26,000; afterwards, State Farm's yearly contribution ballooned to over $1 million. PA0384-85.

████████████████████████████████████████

██████████████ PA1819. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ PA1820-21; PA1824-27.[10] In all, State Farm wrote two million-dollar checks to the U.S. Chamber's ILR division in the time period critical to Judge Karmeier's campaign. PA0457-59.[11]

At the same time, *Avery* was a recurring subject in conversations between State Farm's Rust and the U.S. Chamber's Donohue (*see, e.g.*, PA0780; PA0760; PA0794; PA0799), with Rust telling Donohue "to keep an eye on [State Farm's] Supreme Court case in I[llinois]" (PA0794). Donohue did so. When Rust pledged the second of the two million-dollar donations to the U.S. Chamber's ILR in 2004, he knew State Farm could "[c]ount on [ILR] to be very helpful in [upcoming] judicial elections." PA0810-11. The ILR then designated the 2004 Illinois

---

[9] Donohue sent Rust a copy of the newspaper article in which this quote appeared explaining the corporate utility of the U.S. Chamber, with a personal letter to Rust thanking State Farm for its financial commitment. PA0737-38

[10]  ████████████████████ PA1623; PA1628; PA1630-33. ███████████████ PA1602-06. ████████████████ (PA1607-11) ████████ PA1287; PA1829-30; PA1768. █████████████████ PA2757-60; PA1457-1504.

[11] State Farm contributed an additional $500,000 to the ILR in December 2000 (PA0739-55), after the *Avery* verdict and after a meeting in October 2000 where Donohue emphasized the millions in contributions the U.S. Chamber was making to influence judicial elections (PA0756; PA0740; PA0759).

Supreme Court race a "Tier I" election of the very "highest priority." PA0812-15.

On cue, the U.S. Chamber and ILR (which shared a bank account) made three contributions during a 30-day period in the fall of 2004 to the Illinois Republican Party totaling $2.05 million dollars, almost the exact amount donated by State Farm to the U.S. Chamber. PA0390-91. The Illinois Republican Party then contributed $1.94 million to Citizens for Karmeier in the 40-day period between the U.S. Chamber's initial contribution to ILR on September 24, 2004 and Justice Karmeier's election on November 2, 2004. *Id.*

The proximity of the payments and near-identical amounts prove this was no coincidence. The expenses that the Illinois Republican Party incurred to aid the Karmeier campaign moved in lockstep with the U.S. Chamber's contributions. PA0390-93 (the U.S. Chamber transferred $750,000 and $1.3 million to the Illinois Republican Party, which then passed on near exact amounts to benefit Citizens for Karmeier). State Farm was not identified as the source of any funds transferred from the Illinois Republican Party to the Karmeier campaign. PA0391.[12]  ███████████████████████████████████  PA1843-44.

**ATRA/JUSTPAC.** State Farm contributed almost $1 million to ATRA in late 2003 and 2004. PA0394-403. ATRA—with State Farm's Vice-President David Hill as Director—then gave $100,000 to the Illinois Chamber (whose funding of the Karmeier campaign is highlighted above), as well as $415,000 to JUSTPAC. PA0394. A donation to JUSTPAC was a donation to the Karmeier campaign (PA0725-26; PA0823-24), and ATRA's President "understood that the election of Lloyd Karmeier was JUSTPAC's top priority." PA0825-902. JUSTPAC was the largest direct contributor to the Karmeier campaign (PA0052), and its 2004 focus was "almost exclusively directed to the Supreme Court race" (PA0905).[13]

---

[12] ██████████████████████████████
████████████████████ PA0816.

[13] JUSTPAC ultimately contributed $1,186,453 to the Karmeier campaign. PA0397. Before 2004, JUSTPAC had never raised over $80,000 in a single year. PA0417. In 2004, it made $1.41 million in "expenditures"—$1.186 million (84%) of which went directly to the Karmeier campaign. PA0416. Murnane (JUSTPAC Treasurer and ICJL President), confirmed that "most of [JUSTPAC's] financial support is being used on behalf of the Karmeier campaign." PA0824. JUSTPAC became the largest single contributor to the Karmeier campaign, transferring donations from other groups. (Illinois Job Coalition ($150,000 to JUSTPAC—$150,000 received from State Farm); ATRA ($415,000 to JUSTPAC—$958,000 received from State Farm); the

A later State Farm contribution further shows how State Farm secretly funneled monies through ATRA to the Karmeier campaign. ███████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████ PA1845-46. We need to "stop talking and put your money into the key judicial races now," to buy advertising for the Karmeier campaign, the email continued. State Farm took heed. ████████████████████████ (PA1455), ███████████████████

███████████████████████████████ (PA1847-48). State Farm received the invoice on September 27, 2004 (PA1849), ██████████████████████████████

██ (PA1444). ████████████████████████████████

███████████████████████ PA1444-45. ████████████████

███████████████ PA1848. That $50,000 was deposited into an ATRA account on October 6, 2004, and immediately transferred to JUSTPAC. PA0906-08; PA0851. That same day, Joyce confirmed with McManus "that this contribution . . . is not tax deductible" (PA0906-07), thereby confirming that the money would be used for political purposes. Indeed, the contribution was coded for ATRA's "special projects 956A," which referred to contributions to JUSTPAC. PA0906-08. ████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ PA1850-51. ATRA and State Farm knew that JUSTPAC would apply the $50,000 to the Karmeier campaign. PA0856.

**Illinois Jobs Coalition ("IJC").** The IJC was formed to "participate in a meaningful way in the 2004 elections," to "engage in a direct voter education and outreach activity prior to 2004 election," and to "make the supreme court election in the fifth judicial district a high priority." PA0722-0724; PA1908; PA0047-67. ██████████████████████████████

██████████ (PA1909-39; PA1940-45), ██████████████████████████ (PA1946-47; PA0071,; PA1593; PA0285-86; PA0203-04; PA1949-51; PA1955; PA1957), ████████████████

U.S. Chamber ($200,000 to JUSTPAC—$2.2 million received from State Farm); and the Illinois Chamber ($91,000 to JUSTPAC—$37,500 received from State Farm). PA0416-17.

█████████ (PA1940-45). ████████████████████████████████

████████████████████████████ (PA1961).

The IJC told its members that it would raise money for the Karmeier campaign through JUSTPAC such that donors would not be disclosed. PA1962-63. ████████████████

████████████████████████████████████████████

█████████████ PA0404; PA1831-41. ████████████████████████

█████████████████████████████████████ PA1964-66.

████████████████████████████████████████

████████████████████ PA1444. ████████████████████

███████ *Id.* ██████████████ PA1389. █████████████████

████████████████████████ PA1445. On the same day State Farm wrote its final $50,000 check to the IJC, $150,000 was transferred to JUSTPAC, which promptly transferred it to the campaign. PA0405-07.[14] In sum, the State Farm-funded IJC played a significant role in the Karmeier campaign. PA2020-22.

**CJRG.** State Farm's many connections to the CJRG are documented above. ████████████

█████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████ PA0716-17. ████████████████

████████████████████████████████████

PA2023-25. ██████████████████████████████████

███████████████████████████████████████████

████████████████████████ PA2026-50.

With these connections in place, State Farm used the CJRG to control the flow of State Farm's contributions from different groups to the ICJL/JUSTPAC and then on (anonymously) to the Karmeier campaign—as at least one documented transaction demonstrates. State Farm contributed $150,000 to the CJRG on January 6, 2004. PA0409-10. The CJRG then transferred

---

[14] After State Farm's contributions, the IJC sent over 600,000 mailers that either attacked Justice Karmeier's opponent or were complimentary to Justice Karmeier. PA1967-97; PA1998-2019.

$100,000 to the ICJL, which was used to benefit the Karmeier campaign. PA0411-12. ████████

██████████████████████████████████████████████████████████████████

PA2051-66. In a telling 2006 memo, Brunner wrote, "I don't expect or even want CJRG to take

credit for victories…. I'm not used to taking credit for success (*e.g.,… Avery*)." PA0916-17.

**ICJL.** As explained above, State Farm wielded enormous influence over the ICJL—an

organization that was crucial to the Karmeier campaign and a key intermediary donor for State

Farm in its efforts to fund the campaign through a web of entities without public disclosure. The

ICJL's role in the campaign was, in short, to "primarily be in raising and *funneling* money"

(PA2067-68) (emphasis added), ████████████████████████████████████████

████████████████████████████████████████ PA1239; PA1589; PA2069; PA1590-

95; PA2070-72; PA2067-68; PA2073-74; PA2075-76; PA2078; PA2079-80; PA2081-82;

PA2083-85; PA2086-88; PA2089-90; PA2091; PA2092; PA0823. The Karmeier election was

the ICJL's "highest priority ever." PA2093-95.

The ICJL accomplished this mission, in part, by taking a lead role in the staffing,

advertising, and polling for the Karmeier campaign. ████████████████████████████

(PA1511-16; PA2096-97; PA1577-80; PA2098-99; PA1550; PA1552-53), ████████████████

████████████████████████████████████ (PA2098-99), and then spent at

least $250,000 for advertisements attacking Justice Karmeier's opponent (*Id.*; PA2100). It also

financed a media campaign to follow the U.S. Chamber's campaign. PA2101-04.[15]

But ICJL's most important role was in building a "coalition of organizations supporting

the campaign" (PA1908; PA0047-67), and utilizing them to funnel money from State Farm to

the Karmeier campaign (PA2073-74; PA1962-63). Murnane made it clear that he was the one

coordinating the campaign's fundraising. He referred to himself as the "traffic cop" and

emphasized that all parties should coordinate with him because, "I am in close contact with the

---

[15] ████████████████████████████████████████████████████████████

████████████████████████████████ (PA2105-08; PA1264-67) that featured opposition

research on Justice Maag (PA2119). When Murnane received the completed report, he sent it to

State Farm's Shepherd (PA0295), ████████████████████████████████████████████████

████████ (PA2105-08).

campaign." PA1511-16; PA2083-85. ████████████████████████████████

████████████████████████ PA1589; PA2126-28; PA1908; PA0047; PA0285-86; PA2070-72; PA1590-95. Murnane and the ICJL were beholden to State Farm, and much of the money that came through the organization was State Farm money. ██████████████████

████████████████████████████████████ PA1766-67.

\* \* \*

Any of these examples would raise an eyebrow. Together, the scope of State Farm's contributions to Karmeier's campaign was extraordinary and, critically, was purposely designed to avoid public disclosure. Illinois campaign finance rules require an entity contributing to a campaign to reveal its sub-donors if any sub-donor accounts for over one-third of that entity's contributions to the campaign. State Farm kept its contributions anonymous by ensuring that the groups it used did not cross the 33% threshold. *E.g.*, PA0302. ████████████████

████████████████████████████████████████

████████████████████████ PA0919-20. ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████ *Id.*

████████████████ (*id.*) and State Farm's funneling efforts went undisclosed. State Farm-funded groups supplied the vast majority of the Karmeier campaign's funds, but each one remained under the one-third level to cloak State Farm's involvement in secrecy, maintain plausible deniability, and permit a future Justice Karmeier to participate in *Avery*. PA0302.[16]

### D.    Judge Karmeier Knew State Farm Played a Significant Role in His Campaign.

████████████████████████████████████████

---

[16] ████████████████████████████████████████ PA2574-75. ████████
████████████████████████████████████ PA2631.

█████████████████████████████████████████████████████████

███████████████████████████████ PA0921-24; PA0095. ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████ PA0925-32; *see also* PA1243-45; PA1252; PA1270.

████████████████████████████████████████ (PA0098; PA1273), ████████

██████████████████████████████ (PA0097; PA0133). ██████████████████

██████████████████████████████████████████████████████████

PA1555; PA0134; PA1543-48; PA0928. █████████████████████████████

███████████████████████████████████████████████████

█████████████████ PA0933-49. The promise of campaign funds from Murnane was an important factor for the Karmeiers, but Judge Karmeier knew Murnane and the ICJL didn't have the money (PA0097; PA0109). To assuage these concerns, Murnane told Judge Karmeier that major sources for his campaign funds would include the U.S. Chamber and ATRA. PA0094-98; PA0203-04.

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ (PA0136; PA1520-21; PA1542)—was important to State Farm. ███████████████████████████████████████████

█████████████████████████████████ PA0950. ██████████████████████

████████████████████████████████████████████████████

███████████████████████████ *Id.* █████████████████████████████

████████████████████████████████████ PA0100; PA0951-52. ██████████

█████████████████████████████████████████████████████

██████████ (PA0953-58), █████████████████████████████████████

██████████████████████████████r (PA0085). █████████████████████

███████████████████████████ PA1541.

█████████████████████████████████████████████████



[17] PA0101.

PA0959-60.

PA0141; PA0959-60.

PA0959.

PA2186-96.

PA0816.

*Id.*

PA0961.

PA2186-96; PA0127. Based on this meeting alone, it is clear that Justice Karmeier knew about State Farm's involvement in his campaign before he decided to break the "deadlock[]" in the *Avery* deliberations and overturn the judgment against State Farm.

Judge Karmeier also knew of the financial support from the State Farm-led CJRG.

[17]

PA2129-30; PA2183-85.
(PA1234; PA1236),
(PA2183-85).
PA1359-77.                                      PA1320-53.



PA2061.[18]

PA2241; PA2203-39; PA2240; PA1262-63; PA0098. These ICJL updates informed Judge Karmeier that State Farm was one of five major corporations supporting his campaign (PA2083-85; PA2242-43), (PA2244-49). Judge Karmeier knew that contributions made to the ICJL did not have to be disclosed or reported. PA2250-51; PA2252-56.[19] Furthermore, the ICJL sponsored a reception on May 20, 2004, for Judge Karmeier and select members of the ICJL. PA2264-65. State Farm CEO Rust was among those invited to attend. *Id.*; PA2266-68.

PA2269; PA0041.

PA1620-21.

PA0962-64.

PA1574.

---

[18] Murnane met with State Farm in Bloomington, Illinois on June 4, 2004 and met again with State Farm on June 15, 2004, following Justice Karmeier's meeting with CJRG. PA2197-98. (PA1439), (PA1291-1292). PA1388.

[19] PA0203-04; PA2257-2262.



PA2270-72 (emphasis added).

PA2273-92.

PA2293-94. Judge Karmeier knew it was State Farm that was "having an event in Bloomington on August 24," (PA2295-

PA1823; PA1263; PA0306; PA2293-94; PA1618-19; PA2297-99; PA2300-11; PA2295-96.[20]

PA1566-67; PA1570; PA1574-75; PA0130-31.

Karmeier

[20]

(PA1292-93)—and on the day of the fundraiser, Shepherd met with Murnane at State Farm's offices. PA2312-13.

(PA1441), PA1293; PA2312-13.

PA1823; PA1618-19.

PA2314-18.

████████████████████████████████████████████

████████████████████████████ PA1290; PA1291-93; PA1390-1452.

As this record makes clear, State Farm's involvement in Judge Karmeier's election was no secret to those involved with the Karmeier campaign or to Judge Karmeier himself.

### E.   Defendants Further Enhanced Judge Karmeier's Odds of Winning by Subverting the State Bar's Judicial Candidate Evaluation Process.

State Farm also helped the Karmeier campaign by placing four of its lawyers—including lead attorneys ████████████████████████████████ Sternberg (State Farm's Associate General Counsel, who was responsible for the *Avery* case and hired Shultz to represent State Farm) (PA2320-21)—on the Illinois State Bar Association's ("ISBA") presumably independent committee to vet the two candidates for the Illinois Supreme Court. PA0965-1022. The ISBA committee rated Judge Karmeier "highly qualified," while giving his opponent, Justice Maag, a lower, "qualified" rating. PA1023-24. An article trumpeting the different ratings appeared in the U.S. Chamber's newspaper and website within *two hours* of the ratings announcement. PA1025-26. While representing State Farm on appeal, Schultz never told the Illinois Supreme Court, or counsel for the *Avery* plaintiffs, that he and Sternberg had vetted the two candidates for the ISBA, even after he knew that Justice Karmeier would rule in *Avery*. PA0990.

### II.   Phase II–the Pay Off: State Farm Deceived the Illinois Supreme Court Regarding Its Participation in and Funding of the Karmeier Campaign.

Having succeeded in placing Justice Karmeier on the Illinois high court, Defendants had to make sure Justice Karmeier was not disqualified from participating in *Avery*. At the time of Justice Karmeier's election, Illinois Supreme Court Rule 63 mandated that a Justice "*shall disqualify himself or herself in a proceeding in which the judge's impartiality *might reasonably be questioned*." Ill. S. Ct. R. 63C (emphasis added). Moreover, on June 8, 2009—before State Farm's second offensive mailing—the United States Supreme Court held that due process requires recusal "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the

judge's election campaign when the case was pending or imminent." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009). This is exactly what State Farm had done. Murnane himself acknowledged the problems that State Farm would face should its contributions become public, when he wrote in a private email: "The U.S. Supreme Court's recent ruling last week in Caperton v. Massey Coal Co. . . . is certain to re-kindle talk of the 2004 Illinois Supreme Court election. . . . Karmeier was supported by interests with close ties to State Farm Insurance which had a case pending before the Supreme Court." PA1027.

Defendants knew that to secure Justice Karmeier's participation in the *Avery* decision they had to conceal State Farm's involvement in the Karmeier campaign. *E.g.*, *id.* That is precisely what they did. On January 26, 2005, the *Avery* plaintiffs filed a Conditional Motion for Non-Participation in the Illinois Supreme Court, suggesting that if Justice Karmeier intended to participate in the *Avery* adjudication, he should not because his campaign had received "substantial donations" from State Farm's "attorneys and law firms," a "trial witness" of State Farm, and State Farm employees and lobbyists. A00080. This motion was supported largely by newspaper articles and public campaign disclosure records. Those articles and records, however, *did not reveal* State Farm's control over the ICJL and Murnane; its involvement in the selection of Justice Karmeier; its financial support and covert direction of funds for the Karmeier campaign through intermediaries; its influence over those intermediaries; or its subversion of the ISBA's judicial candidate evaluation process. None of that information was in the public record, and Plaintiffs had no recourse to discovery to test their suspicions. Only State Farm could have confirmed its role in Justice Karmeier's election, and, pursuant to its plan, it did not do so.

In a January 31, 2005 brief mailed to the Illinois Supreme Court, State Farm falsely denied its extraordinary support for Justice Karmeier's candidacy; falsely denied that it had "engineered contributions" for "the purpose of impacting the outcome of this case"; failed to disclose that Defendants had helped recruit and vet Justice Karmeier; and failed to disclose that State Farm had organized, funded, and directed the Karmeier campaign. PA1028-130. In addition, and by way of example, State Farm's brief stated that:

- "Plaintiffs have concocted a contention that State Farm somehow engineered contributions to Justice Karmeier's campaign for the purpose of impacting the outcome of this case. This is . . . unsupported by any facts." PA1038.
- "Plaintiffs' assertion that campaign contributions from organizations like ATRA were part of an 'attempt [by State Farm] to cloak their influence over Lloyd Karmeier's election' . . . is incorrect and meritless." PA1039.
- "Although Plaintiffs attempt to link large sums in contributions by a variety of persons and organizations to Justice Karmeier's campaign to State Farm, their moving papers and supporting documentation in fact reveal that a limited number of State Farm officers and employees made *quite modest* contributions to Justice Karmeier's campaign." PA1040 (emphasis added).

The Illinois Supreme Court denied the Motion for Conditional Non-Participation without Justice Karmeier's participation, and without explaining its ruling. State Farm's Appendix ("A") 01284.

The *Avery* plaintiffs then moved for reconsideration—citing media reports that the U.S. Chamber had made significant contributions to Justice Karmeier's campaign, but again, lacking formal discovery—and requested a written decision. A00238-44. Instead, the Illinois Supreme Court vacated its order denying the Motion for Conditional Participation and entered an order stating: "Disqualification being a decision exclusively within the determination of the individual judge per Rule 63, and Justice Karmeier having advised the Court that he will not disqualify himself under Rule 63, the motion for conditional non-participation of January 26, 2005, and the motion to reconsider of March 22, 2005, are denied as moot." A01320.

Soon after plaintiffs' recusal efforts were denied, Justice Karmeier voted to overturn the *Avery* judgment. Before then, the Court had been "unable to reach a consensus on how to dispose of" the case. PA1172. According to Justice Karmeier, he broke the "deadlock[]." *Id.*

On September 8, 2011, the *Avery* plaintiffs filed in the Illinois Supreme Court a Petition to Recall Mandate and Vacate August 18, 2005 Judgment, based on new information that State Farm had played a role in Justice Karmeier's election. A00357-897. The Petition was supported by the affidavits of retired FBI Special Agent Daniel Reece and private investigator Douglas Wojcieszak based on information discovered through their own informal investigative efforts. *Id.*

Yet, at this time in 2011, there was still much that the *Avery* plaintiffs did not know and could not have uncovered without formal discovery. For example, they did not know of the close relationships Rust had with Shepherd and Murnane; or of State Farm's power over Murnane and

its decision-making influence within the ICJL; or of Justice Karmeier's contacts with and knowledge of State Farm's support. They did not know that, soon after winning the election and before Justice Karmeier was sworn in, Justice Karmeier and Rust met privately in Chicago, while the *Avery* case was pending. Nor did they know that State Farm held a fundraiser for Justice Karmeier attended by at least 44 of State Farm's top executives. They did not know that the ICJL was a "clearinghouse" for contributions to the Karmeier campaign; that State Farm had funded a study to discredit Justice Karmeier's opponent; or the extent to which Murnane, through the ICJL, recruited Justice Karmeier, selected his campaign team, raised campaign funds for him, and ran his campaign. They did not know the extent to which Justice Karmeier knew the sources of his campaign funds, and, most important, they could not specifically track the money that went anonymously from State Farm, through the intermediary organizations, to the Karmeier campaign to avoid public disclosure and accountability—especially without confirmation that Shepherd played a key role on the ICJL's Executive Committee. They could not document State Farm's influence over the activities of its intermediaries. Nor did they know that State Farm had compromised the ISBA's judicial candidate evaluation process.

State Farm moved to strike the Reece and Wojcieszak affidavits, claiming they were "plainly incompetent and entirely lacking in evidentiary value." A02426-44; A02445-62. Plaintiffs replied that they had no recourse to discovery in the Illinois Supreme Court to obtain other evidence, so they had no means other than the Petition to inform the Court of State Farm's fraud. PA2713-35; PA2736-56.

In further response to the Petition, State Farm filed a second offensive mailing, namely its September 19, 2011 brief to the Illinois Supreme Court. PA1131-70. There, State Farm again falsely denied Murnane's extensive role in the Karmeier campaign. *Id.* State Farm also failed to state that Defendants had helped to recruit and vet Judge Karmeier and helped ensure the ICJL supported the Karmeier campaign. *Id.* In addition, State Farm's submission stated:

- "State Farm itself made no contribution to the campaign" (PA1134);
- "[T]here was no 'funnel[ing]' of money from State Farm through JUSTPAC to Justice Karmeier" (PA1155-56); and

- "According to [the *Avery*] Plaintiffs, State Farm somehow picked Justice Karmeier as a candidate, managed his campaign, and made massive contributions to his campaign. The picture [the Avery] Plaintiffs attempt to paint has *no relationship to reality*" (PA1134) (emphasis added).

The Illinois Supreme Court struck the affidavits and denied the Petition without explanation. A02465-66.[21] The Defendants' scheme had succeeded.

## LEGAL STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law." *Ledbetter*, 2016 WL 3746204, at *2 (citing *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). "All reasonable inferences are drawn in favor of the nonmovant and all factual disputes are resolved in favor of the nonmovant." *Id.* (citing *Scott*, 550 U.S. at 377; *Fischer*, 519 F.3d at 401). "Where the parties present two vastly different stories . . . it is almost certain that there are genuine issues of material fact in dispute." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## ARGUMENT

## I.   PLAINTIFFS HAVE ESTABLISHED RICO CAUSATION.

As with most of its motion, State Farm's attacks on RICO causation rehash arguments this Court has already rejected. In its motion to dismiss, as in the instant motion, State Farm argued that causation could not be established as a matter of law because "Justice Karmeier did not cast the deciding vote as to the unanimous holding in *Avery*" and Plaintiffs "failed to allege facts to support their contention that the purported contributions to Justice Karmeier's campaign influenced his vote on the *Avery* case." [67] at 27. The Court disagreed:

> [P]laintiffs allege that defendants perpetrated a scheme to defraud plaintiffs of their property and the alleged scheme took place in two phases: (1) State Farm decided to select its own candidate for the vacant Illinois Supreme Court seat and place him on the Court to insure a decisive vote and (2) to keep the candidate on the bench despite State Farm's support. Plaintiffs allege that State Farm used the

<hr />

21 ███████████████████████████████████████████████████

███████████████████████████████████████████████████

PA2461-518; PA2519-32

> U.S. mail to conceal these facts to permit Karmeier to participate in the *Avery* decision and to make misrepresentations to the Illinois Supreme Court. These mailings took place on January 31, 2005 with its filing in the Illinois Supreme Court and on September 19, 2011 with its filing in the Illinois Supreme Court. *Based on these allegations, the Court finds that plaintiffs have alleged a set of facts and cognizable damages that are sufficient to demonstrate that defendants' alleged acts proximately caused a loss to plaintiffs.*

*Id.* at 30 (emphasis added). As shown above, Plaintiffs have advanced ample evidence to support a jury verdict regarding the two phases of the scheme that Plaintiffs alleged and that the Court found sufficient to establish RICO causation. *See* Statement of Facts ("SOF") §§ I-II. The Court's ruling, therefore, applies with as much force now as it did before.

In both common law and the RICO context, "[p]roximate cause . . . is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (citation omitted). The inquiry serves primarily to limit recovery to only the primary victims of the "foreseeable . . . consequences" of the defendants' fraud. *BCS Servs., Inc. v. Heartwood 88*, LLC, 637 F.3d 750, 755 (7th Cir. 2011). Causation is thus satisfied where the defendant's "aim" is to deprive plaintiff of property, it succeeds in doing so, and the plaintiff suffers the "only injury." *Id.* at 756; *see also id.* at 758 ("Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation."); *In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 21, 38 (1st Cir. 2013) ("[T]he core proximate causation principle . . . allow[s] compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the intended victims of a defendant's wrongful conduct."). This is exactly what happened here. As the evidence demonstrates, the "aim" of Defendants' scheme was to overturn the *Avery* judgment. It was the foreseeable result of a plan to secretly orchestrate the election of a sympathetic jurist and then conceal the truth so that justice could participate in the appellate review. And Plaintiffs were the only ones to suffer injury.

Moreover, courts recognize that when a defendant's fraudulent conspiracy prevents a fulsome inquiry into precise damages, or obscures some components of causation, the burden of proof may be relaxed. *See, e.g.*, *BCS Servs.*, 637 F.3d at 754. The *BCS* court applied the analysis

in the damages context; the Supreme Court case upon which it relied held that the same analysis applies to causation as well. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946). Indeed, the Supreme Court observed that failing to account for a defendant's role in complicating the causation analysis would mean that "the more grievous the wrong done, the less likelihood there would be of a recovery." *Id.* The Court continued: the "most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principle is an ancient one, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application." *Id.* In cases of "collusion," the "wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because [it is] not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." *Id.*[22]

In light of the above, State Farm's attempts to complicate the causation analysis are both irrelevant—because Plaintiffs have advanced evidence to prove the allegations this Court held were sufficient to establish causation—and wrong. State Farm argues, for example, that "there is no evidence that State Farm's purported misrepresentations in its brief led to Justice Karmeier's participation in *Avery*" because "Justice Karmeier's uncontroverted testimony is that he himself had no knowledge that State Farm supported his campaign in any way." [694] at 21. This is quintessential cherry-picking. Setting aside this one moment in Justice Karmeier's self-serving deposition testimony (which a jury may or may not find credible), Plaintiffs have amassed considerable evidence upon which a jury could reasonably rely to conclude that Justice Karmeier was, in fact, aware that State Farm was heavily involved in recruiting him, managing his campaign, and securing the majority of the contributions to his extraordinarily expensive campaign. *See* SOF § I.D.

---

[22] *See also Package Closure Corp. v. Sealright Co., Inc.*, 141 F.2d 972, 976 (2d Cir. 1944) (rejecting arguments that plaintiff could not prove "by reason of" causation requirement of the Sherman Act, and holding that where the "natural and probable effect" of the defendants' actions was to cause the complained-of injury, defendants could not complain that the causation pleading was less specific than might otherwise be required); *Klinger v. Baltimore & Ohio R.R. Co.*, 432 F.2d 506, 516 (2d Cir. 1970) (When the "defendant's wrongdoing . . . created the difficulties of proof," the burden of disproving causation shifts to the defendants.).

Even if Justice Karmeier's deposition testimony were credited and all contrary evidence rejected, it does not follow that no reasonable jury could find that either Justice Karmeier or any other member of the Illinois Supreme Court relied on State Farm's misrepresentations. The thrust of Plaintiffs' claims is that the Defendants were able to deprive Plaintiffs of an impartial tribunal and to cause Plaintiffs' injury only by misrepresenting and concealing the true nature of State Farm's involvement in the Karmeier campaign. Had that involvement been revealed, Justice Karmeier's "impartiality" could have been "reasonably questioned," he could not have participated in the review of the *Avery* judgment, and Plaintiffs would have suffered no injury or damages. *See, e.g.*, Ill. S. Ct. R. 63(C)(1) (a judge "shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned"); PA2412 (Report of Plaintiffs' expert, Joanna Shepherd) (█████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████); PA2443 (Report of Plaintiffs' expert, Mark Harrison) (█████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████).

State Farm also argues that Plaintiffs cannot establish causation without proving that, but for Justice Karmeier's participation, the Illinois Supreme Court would have affirmed the judgment. [694] at 20-23. This is not the law, as this Court has already concluded.

As noted above, the recusal standard governing Illinois judges at all times relevant to this litigation provided that a judge "shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Ill. S. Ct. R. 63(C)(1). For decades, moreover, the United States Supreme Court has recognized that recusal is required when the circumstances "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." *Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 60 (1972); accord *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986). More recently, the Court

confirmed that a judge may not hear a case "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Caperton*, 556 U.S. at 884. The Court also held that one possibly biased judge on a multi-member panel infects and undermines the integrity of the entire panel's decision-making, and requires the reversal of any such decision. *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1909 (2016) ("A multimember court must not have its guarantee of neutrality undermined.").

This is exactly what happened when Justice Karmeier participated in the *Avery* proceedings. State Farm's oft-repeated argument that *Williams* and *Caperton* addressed due process standards, and not RICO, is beside the point. The result that emerged from proceedings Defendants tainted was precisely the result Defendants foresaw, intended, and secretly worked so hard to achieve: the *Avery* judgment was reversed, with Justice Karmeier's participation. Fraudulent conduct causing foreseeable and intended consequences, prosecuted by the only parties injured by the conduct—this is all the "flexible" proximate cause inquiry requires. *BCS*, 637 F.3d at 755; *In re Neurontin*, 712 F.3d at 38. State Farm cannot hide behind the deliberative process—which typically prevents parties from reverse engineering a panel's decision—to escape liability for the intended consequences of its actions. Such an outcome would violate the "most elementary conceptions of justice and public policy" which "require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265.

But even if the Court now concludes that causation is satisfied only upon a showing that Plaintiffs would have kept the *Avery* judgment without Justice Karmeier's participation, Plaintiffs would still defeat summary judgment. Justice Karmeier himself admitted that he "broke the 'deadlock[]'"—one that had prevented the Illinois Supreme Court from issuing an opinion for more than two years—"when he voted to overturn the judgment." [726] at 3; PA1172. The Illinois constitution mandates that when no decision with four supporting votes can be reached, the order of the intermediate appellate court—in this case, one affirming a judgment of $1.05 billion—is reinstated without precedential effect. Ill. Const. Art. VI, § 3; *Chultem v.*

*Ticor Title Ins. Co.*, No. 120448, 2017 IL 120448 (Ill. May 18, 2017); *Keating v. City of Chicago*, 21 N.E.3d 465, ¶ 1 (Ill. 2014). And, while State Farm asserts that the remaining justices would have voted precisely as they ultimately did even without Justice Karmeier's participation, Supreme Court precedent teaches otherwise. *Lavoie*, 475 U.S. at 831 ("[W]hile the influence of any single participant in this [deliberative] process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition."); *Williams*, 136 S. Ct. at 1909 ("[I]t is neither possible nor productive to inquire whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process. Indeed, one purpose of judicial confidentiality is to assure jurists that they can reexamine old ideas and suggest new ones, while both seeking to persuade and being open to persuasion by their colleagues.").

In sum, the vote count in the *Avery* decision does not matter—both because Defendants' actions tainted the deliberations that led to that decision and because the evidence shows that without Justice Karmeier's participation the Court was "deadlocked"—and  Plaintiffs have advanced evidence sufficient to establish that Defendants' fraudulent scheme caused Plaintiffs' injury. As the Seventh Circuit has confirmed, when RICO plaintiffs make such a showing, their claims go to trial. *BCS*, 637 F.3d at 761.

## II.     PLAINTIFFS HAVE SUSTAINED A COGNIZABLE RICO INJURY.

Here, too, State Farm asks the Court to reverse itself. In denying Defendants' motions to dismiss, the Court held:

> As to the injury, plaintiffs allege that defendants recruited Karmeier to run for the vacant seat and together defendants directed Karmeier's campaign. Plaintiffs allege that State Farm engineered $4,200,417 of the $4,800,000 raised by Karmeier's campaign. Plaintiffs allege that thereafter, Justice Karmeier refused to recuse himself from the appeal and voted to overturn plaintiffs' $1.05 billion judgment. Based on the record before the Court, the Court finds that plaintiffs have sufficiently alleged injury to business or property element and that they have standing to pursue the RICO claims.

[67] at 31. Again, Plaintiffs have advanced evidence to prove that State Farm engineered significant funds to Justice Karmeier's campaign (although the precise number has changed with further analysis), *see* SOF § I.C, and the fact that Justice Karmeier "refused to recuse himself

from the appeal and voted to overturn plaintiffs' $1.05 billion judgment" is undisputed. Moreover, in opposition to class certification, State Farm argued that (1) "the deprivation of [the property interest in the judgment] . . . is not an injury to property for RICO standing;" (2) "the "due process 'right to an impartial tribunal . . . does not constitute property under RICO," and (3) "there is no 'basis for Plaintiffs' claim that all purported class members suffered injury in the amount of an equal share of the full amount of the Illinois Appellate Court verdict.'" [467] at 21-22. This is exactly what State Farm again argues here. [694] at 24-29. But each of these contentions raise questions of law, not fact, and the Court has already rejected all of them. *See* [67] at 31; [556] at 23 ("All the members of the class will prove the loss of something of value – the *Avery* judgment – through common evidence."); [726] at 10 (Plaintiffs have advanced "evidence" to prove that "a judgment was rendered in the Illinois Supreme Court but that process was tainted by politics depriving plaintiffs of the opportunity for due process and a fair hearing, *that damaged plaintiffs by taking away something of value which plaintiffs had in the jury's verdict and in the trial court and the appellate court judgments*.") (emphasis added).

The Court was correct in so ruling. RICO requires only that a plaintiff suffers injury to "business or property," as opposed to "personal or emotional" injuries. *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992). It should be uncontroversial that Plaintiffs' loss of a monetary judgment fits into the "property" category rather than the "personal or emotional" one. *See, e.g.*, *Malley-Duff & Assocs. v. Crown Life Ins. Co.*, 792 F.2d 341, 354 (3d Cir. 1986) ("A cause of action, of course, is a form of 'property' . . . ."), *aff'd*, 483 U.S. 143 (1987).[23] Tellingly, the majority of the cases State Farm cites on this point are not RICO cases at all, but concern the difference between "vested" and "non-vested" property rights. *In re Marriage of Duggan*, 877 N.E.2d 1140, 1144-45 (Ill. App. Ct. 2007); *Evans v. City of Chicago*, 689 F.2d 1286, 1296 (7th Cir. 1982), *overruled on other grounds*, 873 F.2d 1007 (7th Cir. 1989). The one cited case

---

[23] State Farm's effort to limit this straightforward principle to suits brought by businesses, rather than individuals, is contrary to law. *See Malley-Duff*, 792 F.2d at 354 ("If RICO's reference to injury to 'business *or* property' is to be given meaning, RICO standing cannot be limited to 'business' injuries only."). Indeed, State Farm quotes *Malley-Duff* out of context to suggest the opposite meaning of what the court actually held.

involving RICO, an out-of-Circuit district court opinion, analyzed the property interest in the context of an extortion claim. *Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, No. 14-CV-7349 (AJN), 2016 WL 1298987, at \*6 (S.D.N.Y. Mar. 31, 2016). Moreover, the United States Supreme Court has confirmed that, in the RICO context, deprivation of the "opportunity" for monetary gain is a compensable injury. *Bridge*, 553 U.S. at 644, 648. After hearing the facts, a jury ultimately compensated the plaintiffs for that lost opportunity. *BCS Servs., Inc. v. BG Investments, Inc.*, 728 F.3d 633, 638 (7th Cir. 2013) (affirming jury verdict).

That the *Avery* judgment was subject to review by the Illinois Supreme Court is immaterial to whether members of the *Avery* class were injured when that judgment was taken away from them. Importantly, Plaintiffs allege that State Farm's wrongful conduct denied them an impartial forum for that very review. Moreover, a RICO plaintiff's injury from a lost cause of action can come about in ways other than a non-appealable disposition; indeed, even "fraud . . . that causes one to relinquish a cause of action" is sufficient. *Deck v. Engineered Laminates*, 349 F.3d 1253, 1259 (10th Cir. 2003). State Farm's citation to cases about "mere expectancy interests" such as the luck of drawing a particular card from a deck, as in *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998), is unavailing: as the Fifth Circuit more recently held, "*Pinnacle Brands* thus stands for the unremarkable proposition that a RICO plaintiff must demonstrate harm. . . . The rule that emerges from these cases is that loss of a legal entitlement is sufficient but not invariably necessary to sustain a RICO claim." *Gil Ramirez Group, L.L.C. v. Houston Ind. Sch. Dist.*, 786 F.3d 400, 409-10 (5th Cir. 2015). In sum, and as this Court has already concluded, Plaintiffs have established a cognizable RICO injury.

This conclusion is not undermined by State Farm's recycled contention that "per capita damages are improper." [694] at 27. In essence, State Farm argues that because individual damages had not been allocated when the judgment was overturned, no Plaintiff should be allowed to recover anything. This is not the law. While it is true that, had the *Avery* judgment been affirmed, individual damages would have later been determined, at the time the judgment was taken from Plaintiffs, the *interest had not been divided*. Thus, the *Hale* Plaintiffs' interest in

the judgment—the property they lost—is undivided. But undivided does not mean non-existent, and none of State Farm's inapposite authorities hold otherwise.[24]

This is especially true because it was the *Defendants' fraudulent conspiracy* that prevented the damages allocation in *Avery*. When defendants' actions complicate a traditional damages analysis, a more relaxed standard applies: "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Bigelow*, 327 U.S. at 264. Thus, the Court should reject State Farm's request to be immunized from liability simply because each class member's individual interests in the *Avery* judgment had not been quantified at the time it was taken from them.

## III.    STATE FARM'S BRIEFS CONSTITUTE RICO PREDICATE ACTS.

Plaintiffs have presented evidence demonstrating Defendants' extraordinary and secret conspiracy to secure the election of Justice Karmeier, to ensure his participation in the review of the *Avery* judgment, and to deprive Plaintiffs of their right to an impartial tribunal and the judgment that tribunal was reviewing. In furtherance of this conspiracy, State Farm committed two acts of mail fraud by submitting briefs to the Illinois Supreme Court—first on January 31, 2005, and again on September 19, 2011—containing assertions it knew to be false. In the instant motion, State Farm once again challenges whether such court filings can, as a matter of law, constitute RICO predicate acts. This Court has unequivocally established that they can. [67] at 38-41 (rejecting the argument that the implicated briefs "cannot as a matter of law serve as RICO predicate acts"). State Farm provides no compelling reason to disturb this ruling.

### A.    Service of Litigation Documents Can Constitute Mail Fraud.

In furtherance of its recycled arguments, State Farm once again relies on *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002). There, the Eleventh Circuit observed that several courts, on policy grounds, had rejected the possibility that filing court documents could

---

[24] *See, e.g.*, *Travelers Prop. Cas. v. Good*, 689 F.3d 714 (7th Cir. 2012) (addressing aggregation of claims for amount in controversy jurisdictional threshold); *Motorists Mut. Ins. Co. v. Simpson*, 404 F.2d 511 (7th Cir. 1968) (same); *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013) (rejecting district court's decision to direct unclaimed monies to "*cy pres*" recipient).

constitute mail fraud. *Id.* at 1208. Nevertheless, looking to the language of the RICO statute, the *Pendergraft* court concluded that such submissions *can* form the basis of a mail fraud if there is an intent to deceive. *Id.* at 1208–09. Moreover, in two subsequent decisions, the Eleventh Circuit made clear that it never intended a blanket prohibition of mail fraud charges based on the filing of court documents. *See United States v. Lee*, 427 F.3d 881, 890 (11th Cir. 2005) (noting that the policy concerns referenced in *Pendergraft* were "simply dicta"); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 n.2 (11th Cir. 2004) ("[W]e held in *Pendergraft* that, absent an intent to deceive the victim, the 'mailing of litigation documents, even perjurious ones, did not violate the mail-fraud statute.'"); s*ee also* [67] at 39-40. To the extent State Farm argues the contrary, it relies on either its own misreading of *Pendergraft* and *Raney* or subsequent unpublished decisions[25] that misinterpret those cases.[26]

Relatedly, and as the Court previously concluded, Plaintiffs' RICO claim is not constitutionally barred under the *Noerr-Pennington* doctrine. While that doctrine protects from liability the petitioning of legislative bodies, administrative agencies, and the courts, *see Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 229 (7th Cir.1983), such activity is *not protected* when it is based on fraudulent misrepresentations. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 842 (7th Cir. 2011). This so-called "sham exception" applies when the defendant makes an intentional and material misrepresentation. *Id.* at 843.

As Plaintiffs have demonstrated, *see* SOF § II, State Farm's misrepresentations to the

---

[25] State Farm advances a misinterpretation of *Pendergraft* in *Nero v. Mayan Mainstreet Inv 1, LLC*, 645 F. App'x 864, 868 (11th Cir. 2016), an unpublished Eleventh Circuit case. That decision, however, carries no precedential weight, *see* 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent . . . ."), and is directly contradicted by the Eleventh Circuit's published opinion in *Raney*.

[26] For example, State Farm and a district court case on which it relies cite *Pendergraft* and *Raney* for the proposition that the Eleventh Circuit was "troubled by *any use* of this federal criminal statute to punish civil litigants." [694] at 38 (emphasis added); *DeBoskey v. SunTrust Mortg., Inc.*, No. 8:14-CV-1778-MSS-TGW, 2017 WL 4083557, at *9 (M.D. Fla. Sept. 14, 2017). However, in *Pendergraft* and in *Raney*, the "federal criminal statute" to which Eleventh Circuit referred was the Hobbs Act—not the federal mail fraud statute or RICO. *See Raney*, 370 F.3d at 1087–88 ("Raney's RICO claim depends upon his ability to show a violation of *the Hobbs Act*, which bars interference in interstate commerce by means of *extortion*.") (emphasis added); *Pendergraft*, 297 F.3d at 1207 ("Allowing litigants to be charged with *extortion* would open yet another collateral way for litigants to attack one another.") (emphasis added).

Illinois Supreme Court were a central part of its scheme to deprive Plaintiffs of their rights, and—notwithstanding State Farm's contrasting interpretation of the evidence—a jury could reasonably conclude that those misrepresentations were material and made with an intent to deceive. Accordingly, to the extent the *Noerr-Pennington* doctrine can be applied in this case, Plaintiffs' RICO claims survive under the sham exception.

### B.     State Farm's Mailings Furthered its Fraudulent Scheme.

#### 1.     State Farm Affirmatively Misrepresented or Concealed the Truth.

In its 2005 and 2011 briefs, State Farm repeated several false or misleading assertions about its involvement in Justice Karmeier's election. State Farm denied it funneled campaign contributions through its agents and various organizations to support the Karmeier campaign, denied Murnane's extensive role in the campaign, and failed to acknowledge Shepherd's role in recruiting and vetting Judge Karmeier as part of the enterprise. *See* SOF § II.

State Farm's assertions to the Illinois Supreme Court are far from the "advocacy" or "rational interpretation of the facts" Defendants now claim them to be. [694] at 35-38. To the contrary, most of its statements were offered as undisputed fact, without qualification. For example, in its January 31, 2005 brief, State Farm labeled as "meritless" allegations that it attempted to cloak its influence over the election by funneling money through various organizations, and allegations connecting Defendant Murnane to Justice Karmeier's campaign. *See* PA1038; PA1042-43. Similarly, in its September 19, 2011 brief, State Farm outright denied its role in Justice Karmeier's election, claiming allegations that State Farm "picked Justice Karmeier as a candidate, managed his campaign, and made massive contributions to his campaign" had "no relationship to reality." PA1134; *see also* PA1155–56 ("[T]here was no 'funnel[ing]' of money from State Farm through JUSTPAC to Justice Karmeier."). As is plain from State Farm's briefs, these statements are not merely argumentative: State Farm affirmatively misrepresented to the Illinois Supreme Court that it had no meaningful relationship with Justice Karmeier's election—an issue that goes directly to the issue of whether Karmeier had a reason to disqualify himself from the *Avery* proceedings.

The evidence now before the Court supports a finding that the statements in State Farm's 2005 and 2011 briefs were fraudulent.[27] The record is replete with evidence of extensive coordination between State Farm's agents, including Shepherd and Murnane, a network of donor organizations, and the Karmeier campaign itself. *See* SOF §§ I-II. State Farm executives and agents controlled key intermediary organizations, which received State Farm funds and in turn made contributions benefitting the Karmeier campaign. State Farm's contributions to each of these intermediary organizations were designed to avoid the 33% trigger requiring public disclosure under Illinois campaign finance rules. Shepherd and Murnane also maintained a direct relationship to the Karmeier campaign throughout the relevant time period, exerted substantial control over the campaign, and led efforts to route funds toward the campaign. A reasonable jury could easily conclude that the scale and breadth of State Farm's financial and organizational assistance to the Karmeier campaign was not a mere coincidence, and that State Farm was fully aware of its involvement in the campaign and misrepresented its connections to Justice Karmeier through the predicate briefs.

**2.    A Jury Need Only Determine That the Mailings Were Made in Furtherance of a Fraudulent Scheme to Find RICO Liability.**

In any event, State Farm's attacks on the substance of its misrepresentations to the Illinois Supreme Court miss the point. Even if a jury were to conclude that the statements made in State Farm's briefs were not themselves false or fraudulent, it could still find RICO liability. As the Supreme Court explained, the predicate act of mail fraud

> occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do."  The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," even if the mailing itself "contain[s] no false information."

---

[27] Even if State Farm's statements somehow could be construed to constitute mere advocacy, "omissions or concealment of material information can constitute fraud . . . cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation." *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985); *accord United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). Here, State Farm's involvement in Karmeier's campaign was material and, indeed, central to the issue of whether Justice Karmeier's impartiality might reasonably be questioned. *See* Ill. S. Ct. R. 63C.

*Bridge*, 553 U.S. at 647 (citations omitted); accord *United States v. Useni*, 516 F.3d 634, 648 (7th Cir. 2008) ("A conviction for mail fraud must be supported by evidence that a defendant participated in a scheme to defraud and caused the mails to be used in furtherance of that scheme.") (citing *United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999)). Thus, the mailings themselves—in this case, State Farm's submissions to the Illinois Supreme Court—need not be false or fraudulent on their own. Rather, inquiry focuses on "the relationship of the mailing to the fraudulent scheme." *United States v. McClain*, 934 F.2d 822, 835 (7th Cir. 1991); *see also United States v. Szarwark*, 168 F.3d 993, 995 (7th Cir. 1999) ("[C]ourts must consider the full scope of the scheme when determining the sufficiency of the mailing element.").

Plaintiffs have presented ample evidence to establish Defendants' broad-ranging scheme to orchestrate the campaign to elect Justice Karmeier so that he could participate in the *Avery* appeal. After successfully placing Justice Karmeier on the Supreme Court, Defendants necessarily had to ensure that he was not then disqualified from influencing the Court's decision in *Avery*. Thus, State Farm's statements in its 2005 and 2011 briefs were central to Defendants' scheme to defraud Plaintiffs of an impartial tribunal and, ultimately, the *Avery* judgment.

## IV.   PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED.

In denying State Farm's motion to dismiss, the Court concluded that Plaintiffs "were not injured until at least September 19, 2011, when State Farm mailed the second of its briefs falsely denying its role in Justice Karmeier's election. Plaintiffs filed their complaint on May 29, 2012, well within the four year statute of limitations." [67] at 23. The Court reiterated this conclusion in denying State Farm's first motion for summary judgment, holding that "Plaintiffs' RICO claims . . . did not accrue until State Farm's 2011 mailing." [726] at 15; *see also id.* at 13 ("The Court agrees . . . that the RICO claims did not accrue until the very end of the state court proceedings."). This conclusion is well supported by controlling law, and—notwithstanding State Farm's extensive discovery on their statute of limitations defense, *see* [336]—State Farm offers no compelling facts or arguments to disturb it.

A.   **Plaintiffs' Claims Accrued in 2011.**

RICO claims have a four-year limitations period that cannot accrue until the second predicate act occurs—here, the mailing of State Farm's response to the petition to recall the mandate on September 19, 2011. *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801-02 (7th Cir. 2008) ("[S]ince a course of racketeering activity, to amount to a 'pattern' and thus be actionable under RICO, requires at least two predicate acts and some temporal continuity, a RICO claim cannot accrue at the time of the first predicate."). The claims also cannot accrue until the prospective plaintiff discovers *both* the injury that gives rise to its claim *and* the injurer. *Jay E. Hayden Found. v. First Neighbor Bank*, 610 F.3d 382, 386 (7th Cir. 2010). This, too, did not happen until September 19, 2011, because it was State Farm's brief that revealed the *identity of the injurers* (Defendants). There, State Farm disclosed—for the first time—that its own lawyer and lobbyist, Shepherd, represented State Farm on the ICJL's Executive Committee, thereby providing critical information connecting the injury to the injurers. The ICJL Executive Committee had endorsed Karmeier and empowered Murnane and the ICJL to recruit Karmeier, select his campaign team, raise campaign funds for him, and run his campaign for the open Illinois Supreme Court seat. State Farm's membership on the ICJL Executive Committee connected State Farm to the ICJL, to JUSTPAC, to Murnane, and to Justice Karmeier's campaign. Only then did Plaintiffs know that *State Farm* had chosen its own judge while concealing its conduct—and that of the other Defendants—from the Illinois Supreme Court and Plaintiffs. As this Court has determined, that was when the four-year RICO limitations period commenced.

State Farm focuses on the fact that "Plaintiffs' alleged RICO injury, the loss of the $1.05 billion judgment in *Avery*," occurred on August 18, 2005, when the Illinois Supreme Court issued its decision, or in 2006, when the United States Supreme Court denied Plaintiffs' certiorari petition. [694] at 30. But these filings did not disclose State Farm's extraordinary role in advancing Justice Karmeier's 2004 election to the Illinois Supreme Court. Of course, State Farm could and should have disclosed its membership on the ICJL Executive Committee to the Illinois Supreme Court and the *Avery* plaintiffs in 2005. Had it done so, Plaintiffs could have

identified their injurers years earlier. But State Farm deliberately concealed that information in its 2005 and 2006 filings, solemnly denying that it had played any role in Justice Karmeier's recruitment and election. State Farm did not disclose its membership on the ICJL Executive Committee until September 19, 2011, when it filed the second of its briefs in the Illinois Supreme Court, all the while actively concealing and denying its role in Justice Karmeier's election. The RICO statute of limitations begins with the discovery of the injury and the injurer. *Hayden*, 610 F.3d at 387. That did not happen here until September 19, 2011.

As the Seventh Circuit has confirmed, statutes of limitations cannot be applied "in a way that pressures litigants to file suits based merely on suspicions and fears." *Sokol Crystal Prods., Inc. v. DSC Commc's Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994) (quotation omitted). "'[S]uspicion and fear are not sufficient predicates for launching a lawsuit, and to file an action with no other basis would offend norms articulated in rules like Federal Rule of Civil Procedure 11.'" *Id.* It is important to note, therefore, that Plaintiffs could not test State Farm's misrepresentations to the Illinois Supreme Court. State Farm operated under deep cover, and Plaintiffs could not do discovery with the case pending in the Illinois Supreme Court. Even if Plaintiffs suspected in 2005 that State Farm was involved in Justice Karmeier's election, there was no way for them to confirm it—there were no public records revealing that State Farm held a seat on the ICJL Executive Committee; that a seat on the ICJL Executive Committee gave State Farm power over Murnane and the ICJL; or that State Farm's membership on the ICJL Executive Committee connected it to the Karmeier campaign. There were no public records documenting Shepherd's constant communications with Murnane; or that State Farm's CEO, Ed Rust, and Murnane were directly communicating with each other; or that Justice Karmeier met privately with Rust in December 2004, a month after the November 2004 judicial election and just prior to assuming the bench when he agreed to participate in the *Avery* appeal because the Court was "deadlocked." There were no public records showing that the ICJL was a "clearinghouse" for the Karmeier campaign; or that State Farm had funded a study to discredit Justice Karmeier's opponent; or that two of State Farm's lead lawyers in *Avery* had served on the

ISBA Judicial Evaluation Committee that rated Judge Karmeier more qualified for the Illinois Supreme Court than his opponent. And there were no public records showing that State Farm was secretly contributing millions of dollars to organizations to advance Justice Karmeier's election without disclosing State Farm as the source.

In short, Plaintiffs could not have known in 2005 or 2006 that Defendants had engineered a tainted tribunal resulting in the loss of the *Avery* judgment. No inquiry, however diligent, would have changed that. State Farm informed the Illinois Supreme Court that Plaintiffs' concerns were fantasies "unsupported by any facts" and had "no relationship to reality." Plaintiffs did not know that Defendants had played a critical role in Justice Karmeier's election, and State Farm reassured all that it had played no role. Now, after years of discovery, Plaintiffs know those representations were false, but they did not know that when State Farm made them. Plaintiffs had suspicions, but State Farm had all the facts. Thus, again, the four-year limitations period began on September 19, 2011, and Plaintiffs timely filed this action on May 29, 2012.

## B. <u>The Limitation Period Was Tolled.</u>

Even if the Court now decides that the statute of limitations began to run in 2005 or 2006, Plaintiffs' claims are timely because the statute was both equitably estopped (also known as fraudulent concealment) and equitably tolled. Fraudulent concealment applies when a defendant perpetrates fraud "*of such character as to conceal itself.*" *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992) (emphasis in original). "Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite the exercise of all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Shropshear v. Corp. Counsel of the City of Chi.*, 275 F.3d 593, 595 (7th Cir. 2001). Both doctrines apply here.

As to fraudulent concealment, State Farm misrepresented facts to the Illinois Supreme Court and Plaintiffs in *Avery* and concealed or omitted facts that Plaintiffs should have known when Plaintiffs suggested that State Farm had assisted in Justice Karmeier's election. Action taken to conceal is the equivalent of a deceptive statement, *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 940 (4th Cir. 1991), and failure to disclose a material fact is the same as

misrepresentation, *United States v. Waymer*, 55 F.3d 564, 571 (11th Cir. 1995). Plainly, State Farm intended that its misrepresentations be relied on, and they were reasonably relied on. That is why State Farm made them: "The court and all parties before the court rely upon representations made by counsel. We believe without qualification that an attorney's word is his bond." *LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC*, 287 F.3d 279, 293 (3d Cir. 2002).

Until September 19, 2011, State Farm did not inform the Illinois Supreme Court or Plaintiffs that it held a seat on the ICJL Executive Committee. State Farm's seat on the ICJL Executive Committee gave it power over Murnane and the ICJL, and connected it to the Karmeier campaign. Thus, and for all the reasons and facts discussed above, there is, at the very least, a material factual issue dispute to State Farm's fraudulent concealment, and summary judgment must therefore be denied. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 791-92 (7th Cir. 2006) (reversing summary judgment for defendant on a limitations defense where defendant misled authorities and concealed its conduct through non-disclosure agreements with former officers); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 854-56 (N.D. Ill. 2010) (summary judgment motion denied because, "even if Plaintiffs had harbored suspicions early on, it remains unclear whether a reasonable investigation would have revealed incriminating evidence sufficient to support an antitrust claim against Defendants").

Contrary to State Farm's suggestion, fraudulent concealment applies even when the concealment occurs in the course of the underlying fraudulent conduct. In *Martin*, the defendants characterized kickbacks as receipts for services rendered and funneled money through a sham corporation to avoid discovery. "To be sure," held the court, "concealment occurred in the course of the fraud itself rather than independently of it. But it surely consisted of steps taken by [the wrongdoers] to cover their tracks." 966 F.2d at 1095-96 (quotations and citation omitted). In his concurrence, Judge Posner noted that the issue is whether the defendant acted deceptively and the plaintiff reasonably relied on the misrepresentations or omissions. *Id.* at 1102. If so, the defendant is at fault, the limitations period is tolled, and the plaintiff need not show diligence in pursuing its remedies. *Id.*

That State Farm used lawyers to accomplish its fraud also does not diminish its responsibility for the fraudulent concealment. Lawyers must present facts accurately and completely to the court. "The orderly and fair administration of justice demands this, and to offer less is disrespectful of the judicial process and at odds with the bedrock principle that cases must be decided on their merits." *U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt., Ltd.*, 540 F. Supp. 2d 994, 1006 (N.D. Ill. 2008); *In re Lightfoot*, 217 F.3d 914, 917 (7th Cir. 2000) (When a lawyer "defeat[s] an opposing party's claims by misleading the court, whether by a misrepresentation or by a pregnant omission . . . [t]hat is misconduct."). "Holding the client responsible for the lawyer's deeds ensures that both clients and lawyers take care to comply. If the lawyer's neglect protected the client from ill consequences, neglect would become all too common." *Tolliver v. Northrop Corp.*, 786 F.2d 316, 319 (7th Cir. 1986).

As for its claim that Plaintiffs cannot show diligence because they did not begin an inquiry in 2005 or 2006, [694] at 33-34, State Farm mischaracterizes the law. It is "the discovery of the injury (and injurer), not of the facts that establish a particular legal theory, that starts the limitations period running." *Hayden*, 610 F.3d at 387. The unstated premise of State Farm's argument is that Plaintiffs could identify their injurers in 2005 or 2006, and they could not— State Farm made sure of that. The critical information necessary to Plaintiffs' RICO claims could not have been obtained any sooner than it was, and Plaintiffs moved swiftly to advance their claims upon discovering that information. Where, as here, there is no "indisputable" evidence to the contrary, the "point at which a reasonable person would have appreciated the need for diligent inquiry, or whether a resulting investigation would have produced useful results, are ultimately questions of fact for a juror to decide." *Sulfuric Acid*, 743 F. Supp. 2d at 856.

Thus, even if the Plaintiffs' accrued earlier than 2011 (which they did not), Plaintiffs' claims were timely filed because the statute of limitations was tolled.

## **CONCLUSION**

Plaintiffs respectfully request that the Court deny State Farm's Motion.

Dated: February 15, 2018

Respectfully submitted,

/s/ *Robert A. Clifford*
Robert A. Clifford #0461849
George S. Bellas
Kristofer S. Riddle
Clifford Law Offices
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602
Tel: 312-899-9090

Steven P. Blonder #6215773
Jonathan L. Loew
Much Shelist, P.C.
191 N. Wacker, Suite 1800
Chicago, IL 60606-2000
Tel: 312-521-2402

Elizabeth J. Cabraser
Robert J. Nelson
Kevin R. Budner
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000

John W. "Don" Barrett
Barrett Law Group, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095-0927
Tel: 662-834-2488

Brent W. Landau
Jeannine M. Kenney
Hausfeld, LLP
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: 215-985-3273

Patrick W. Pendley
Pendley, Baudin & Coffin, LLP
Post Office Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: 888-725-2477

Erwin Chemerinsky
University of California, Berkeley School of Law
215 Boalt Hall,
Berkeley, CA 94720
Tel: 510- 642-6483

Thomas P. Thrash
Marcus N. Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: 501-374-1058

Richard R. Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, Mississippi 38655
Tel: 662-380-5018

Gordon Ball
Gordon Ball PLLC
550 Main Street
Bank of America Center, Ste. 600
Knoxville, TN 37902
Tel: 865-525-7028

Stephen A. Saltzburg,
The George Washington University Law School,
2000 H. Street, NW
Washington, D.C. 20052
Tel: 202-994-7089

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 7.1(b), I certify that a copy of the foregoing was served upon counsel via the Court's CM/ECF system.

<u>*/s/ Robert A. Clifford*</u>