Exhibit 2

# In the Matter of:

## *Mark Hale, et al.*
### *vs.*
## *State Farm, et al.*

_____

## *Thomas A. Myers, CPA*

### *October 19, 2017*

_____



**Court Reporting Solutions**

105 W. Adams, Suite 1200, Chicago, IL 60603
Phone: 312.386.2000 - Fax: 312.386.2275

```
        IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF ILLINOIS
```

Civil Action No. 3:12-cv-006600-DRH-SCW
_____

DEPOSITION OF:  THOMAS A. MYERS, CPA
                October 19, 2017
_____

MARK HALE, TODD SHADLE and LAURIE LOGER, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ED
MURNANE and WILLIAM G. SHEPHERD,

Defendants.
_____


        PURSUANT TO NOTICE, the deposition of
THOMAS A. MYERS, CPA, was taken on behalf of the
Defendant State Farm Mutual Automobile Insurance
Company at 1125 17th Street, Suite 2100, Denver,
Colorado 80202, on October 19, 2017, at 10:03 a.m.,
before Teresa Coogle, Registered Professional
Reporter, Certified Realtime Reporter, and Notary
Public within Colorado.

Thomas A. Myers, CPA          10/19/2017

---

Page 2

```
1         A P P E A R A N C E S
2  For the Plaintiffs:
3     ROBERT A. CLIFFORD, ESQ.
      BRADLEY M. COSGROVE, ESQ.
4     KRISTOFER S. RIDDLE, ESQ.
      Clifford Law Offices
5     120 North LaSalle Street, 31st Floor
      Chicago, Illinois 60602
6
      RICHARD R. BARRETT, ESQ.
7     Barrett Law Group, P.A.
      2086 Old Taylor Road, Suite 1011
8     Oxford, Mississippi 38655
9     PATRICK W. PENDLEY, ESQ.
      Pendley Baudin & Coffin
10    Post Office Draw 61
      24119 Eden Street
11    Plaquemine, Louisiana 70765
12    THOMAS P. THRASH, ESQ.
      1101 Garland Street
13    Little Rock Arkansas 72201
      (Appearing telephonically)
14
   For the Defendant State Farm Mutual Automobile
15 Insurance Company:
16    RONALD S. SAFER, ESQ.
      JOSEPH A. CANCILA, JR., ESQ.
17    PATRICIA MATHY, ESQ.
      Riley Safer Holmes & Cancila, L.L.P.
18    Three First National Plaza
      70 W. Madison Street, Suite 2900
19    Chicago, Illinois 60602
      (Ms. Mathy appearing telephonically)
20
   For the Defendant Ed Murnane:
21
      ANDREW CHINSKEY, ESQ.
22    SIDLEY AUSTIN, L.L.P.
      Hines-One South Dearborn Gp
23    1 S Dearborn Street
      Chicago, Illinois 60603
24    (Appearing telephonically)
25
```

---

Page 4

```
1            I N D E X
2  EXAMINATION OF THOMAS A. MYERS, CPA:      PAGE
   October 19, 2017
3
   By Mr. Safer              7
4
   By Mr. Clifford          138
5
6              INITIAL
   DEPOSITION EXHIBITS:              REFERENCE
7
   Exhibit 11  Supplement Expert Report of     27
8      Thomas A. Myers
9  Exhibit 12  Supreme Court Of Illinois    77
      Order
10
   Exhibit 13  Plaintiffs-Appellees'        77
11     Memorandum In Support Of Motion
       For Recusal Or Disqualification
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1    For the Defendant William G. Shepherd:
2      MEGHA SHAH, ESQ.
       Greensfelder, Hemker & Gale, P.C.
3      10 South Broadway, Suite 2000
       St. Louis, Missouri 63102
4
   Also Present:
5
       Bruce Dubinsky
6      Jerry DeBoer, Videographer
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
1        WHEREUPON, the following proceedings were
2  taken pursuant to the Federal Rules of Civil
3  Procedure.
4          *  *  *  *  *
5        THE VIDEOGRAPHER:  Here begins videotape
6  No. 1 in the deposition of Thomas Arthur Myers, CPA,
7  in the matter of Mark Hale, et al., versus State Farm
8  Mutual Automobile Insurance Company, et al., in the
9  United States District Court Southern District of
10 Illinois, Case No. 3:12-cv-00660-DRH-SCW.
11       Today's date is October 19, 2017, and the
12 time on the monitor is 10:04 a.m.  The video operator
13 today is Jerry DeBoer.  This video deposition is
14 taking place at Sweetbaum Sands Anderson located at
15 1125 17th Street, Suite 2100, Denver, Colorado.
16       Counsel, please voice identify yourselves
17 and state who you represent.
18       MR. CLIFFORD:  Robert Clifford on behalf
19 of the Hale plaintiffs.
20       MR. COSGROVE:  Brad Cosgrove on behalf of
21 plaintiff.
22       MR. RIDDLE:  Kris Riddle on behalf of the
23 plaintiff.
24       MR. BARRETT:  Richard Barrett on behalf
25 of the plaintiffs.
```

---

2 (Pages 2 to 5)

Thomas A. Myers, CPA          10/19/2017

Page 6

1      MR. PENDLEY: Patrick Pendley on behalf
2   of the plaintiffs.
3      MS. SHAH: Megha Shah on behalf of the
4   Defendant William Shepherd.
5      MR. CANCILA: Joe Cancila on behalf of
6   Defendant State Farm.
7      MR. SAFER: Ron Safer on behalf of State
8   Farm. And with us is Bruce Dubinsky from Duff &
9   Phelps.
10      THE VIDEOGRAPHER: The court reporter is
11   Teresa -- oh, excuse me. Counsel on the phone?
12      MR. CHINSKY: Andrew Chinsky on behalf of
13   Edward Murnane.
14      MR. THRASH: Tom Thrash on behalf of the
15   plaintiff.
16      MS. MATHY: Patricia Mathy for State
17   Farm.
18      THE VIDEOGRAPHER: The court reporter is
19   Teresa Coogle for DTI Chicago and will now swear in
20   the witness.
21          THOMAS A. MYERS, CPA,
22   having been first duly sworn to state the whole truth,
23   testified as follows:
24      (Deponent's Response: "I do.")
25      THE COURT REPORTER: Thanks.

Page 7

1      THE DEPONENT: You're welcome.
2          EXAMINATION
3   BY MR. SAFER:
4      Q. Mr. Myers, you are a forensic accountant?
5      A. Yes.
6      Q. Were you bound by any professional
7   standards in performing your analysis in this case?
8      A. No. It's incidental that I'm a forensic
9   accountant. I wasn't engaged to do that. I was
10   engaged as an expert witness.
11      Q. As an expert witness in what?
12      A. To testify about the facts in this
13   matter.
14      Q. And what is your expertise?
15      A. I have given you my curriculum vitae.
16   It's extensive. One of the things that I --
17   credentials that I have is a CPA, certified public
18   accountant, but --
19      Q. Did you testify -- have you prepared your
20   opinions in this case as a forensic accountant?
21      A. It's part of my credentialing, but not --
22   I wasn't engaged as a forensic accountant.
23      Q. So did you use forensic accountant --
24   accounting in performing your analyses in this case?
25      A. Yes.

Page 8

1      Q. And in what respect?
2      A. Well, forensic accounting is a
3   combination of accounting and legal skills. And I
4   bring to the table the accounting skills by virtue of
5   my CPA and experience in dealing with
6   matters relating to com -- complex financial fraud.
7      I've also had extensive experience with
8   complex litigation matters. And that's basically what
9   I bring to the table in terms of my credentials. I
10   mean, we can expand on that. I have had numerous
11   publications. I've chaired 13 conferences for the
12   industry and the regulators on problem loan situations
13   that involve accounting and legal analysis.
14      Q. What do you mean by you weren't engaged
15   as a forensic accountant?
16      A. Well, typically, if I were engaged as a
17   CPA, I would be -- that would be the -- the only
18   exercise -- or expertise that would be germane. But I
19   have many other credentials besides just being a CPA.
20      Q. Okay. So you were bound by no
21   professional standards in performing your analysis in
22   this case?
23      A. That's not true. There are -- there are
24   standards for CPAs.
25      Q. Okay. And what -- are you familiar with

Page 9

1   the AICPA?
2      A. Yes.
3      Q. What is the AICPA?
4      A. American Institute of Certified Public
5   Accountants.
6      Q. Are you a member of good standing with
7   the AICPA?
8      A. Yes.
9      Q. Does the AICPA have a certification for
10   forensic accountants?
11      A. Yes.
12      Q. And what is that --
13      A. I'm not sure what the designation is.
14      Q. Is it certified in financial forensics,
15   CFF?
16      A. It could be.
17      Q. Do you hold that certification?
18      A. No.
19      Q. Is there a generally accepted methodology
20   for forensic accounting?
21      A. I think that that's a general question
22   because forensic accounting can entail many, many
23   different types of analyses. So I'm -- I'm sorry.
24   Your question again, please.
25      Q. Is there a generally accepted methodology

3 (Pages 6 to 9)

Thomas A. Myers, CPA          10/19/2017

Page 10

1   for forensic accounting?
2       A.  There's not a generally accepted
3   methodology.  There are -- there are guidelines in the
4   industry with respect to -- to analysis of, for
5   example, money laundering techniques, and things like
6   that.  But there's not a generally accepted
7   methodology that encompasses or subsumes all of the
8   different areas that a forensic analyst might be
9   involved with.
10      Q.  You say "forensic analyst."  Do you
11  differentiate that from a forensic accountant?
12      A.  No, I mean a forensic accountant.
13      Q.  When you said that there were guidelines
14  available, what guidelines were you referring to?
15      A.  For example, the FBI has an investigation
16  manual that deals with money laundering processing and
17  procedures.  The U.S. Department of Justice had a
18  criminal resource manual that deals with money
19  laundering.  The financial accounting task force has
20  comprehensive recommendations with respect to
21  disguised financial transactions and money laundering.
22  Things of that nature.
23      Q.  Did you use any of those resources in
24  performing your work in this case?
25      A.  I'm aware of those resources, but I

Page 11

1   didn't -- I didn't need to consult them to undertake
2   the -- what I did in this particular matter.
3       Q.  Are you familiar with the Association for
4   Certified Fraud Examiners?
5       A.  Yes.
6       Q.  What is that?
7       A.  I think that's an organization
8   established by Joe Wells, who was a co-lecturer with
9   me many, many years ago.  That's about all I know
10  about it.
11      Q.  Is -- do you know that the Association
12  for Certified Fraud Examiners is the world's largest
13  anti-fraud organization?
14      A.  That wouldn't surprise me.
15      Q.  Are you familiar with the Certified Fraud
16  Examiner certification?
17      A.  I'm familiar that there's a designation
18  as a CFE, yes.
19      Q.  Do you hold that certification?
20      A.  No.
21      Q.  Do you follow their professional code of
22  ethics?
23      A.  No.
24      Q.  Are you aware of their professional --
25      A.  I don't know what their -- I have -- show

Page 12

1   me what their code of ethics is, and I can tell you.
2       Q.  Do you follow their professional
3   standards on work conducted in the field of fraud
4   detection?
5       A.  I don't have any connection with the
6   certified fraud examiners.  I don't --
7       Q.  Are --
8       A.  I don't necessarily acknowledge that they
9   are leaders in the industry in forensic accounting.
10  They are fraud analysts, they are fraud examiners; but
11  fraud transcends just forensic accounting and forensic
12  accounting is a different subject matter than just
13  fraud.  It implies a higher degree of sophistication,
14  in my view, than what the CFE designation provides.
15      Q.  How -- how does it provide a -- a greater
16  degree of sophistication?
17      A.  Because you don't even have to have a
18  college degree to be a CFE.  I can have experience to
19  qualify to get the certificate, and -- and I consider
20  that to be -- I can't imagine how somebody could be
21  considered to be a forensic accountant and not have a
22  CPA or at least an accounting degree.
23      Q.  Is there --
24      A.  There are many different types of fraud.
25  There's computer fraud, and so forth.  We're talking

Page 13

1   about forensic accounting.
2       Q.  And what distinguishes forensic
3   accounting from, say, computer fraud and other general
4   types of fraud?
5       A.  Well, the other general types of fraud
6   don't have anything to do with accounting.
7       Q.  You talked about money laundering, and
8   you've mentioned money laundering in your report.  Are
9   you familiar with the association of certified
10  anti-money laundering specialists?
11      A.  I'm familiar with a number of different
12  outfits that profess to be anti-money laundering
13  specialists.
14      Q.  Do you hold any certification in that
15  field?
16      A.  No.
17      Q.  What accounting precepts did you apply in
18  generating your conclusions in this report?
19      A.  For example, Financial Accounting
20  Standards Concept No. 8 in dealing with substance over
21  form was one of the ones that I used.
22      Q.  What other accounting precepts did you
23  use?
24      A.  I would need to see the list of
25  accounting precepts.  I can't do that for you off the

Thomas A. Myers, CPA          10/19/2017

Page 14

1 top of my head.
2     Q.  So as you sit there, the only accounting
3 precepts that you can provide us with is No. 8?
4     A.  Yes.
5     Q.  What accounting precepts did you use to
6 examine the contributions made by State Farm or any
7 other entity to the United States Chamber of Commerce?
8     A.  I used the general methodology that's
9 recommended and referred to by the FBI in their
10 investigative manual on money laundering processes and
11 procedures.  The examination that I did or analysis of
12 the record was consistent with the Justice
13 Department's Criminal Resource Manual and also
14 consistent with the Financial Accounting Task Force
15 recommendations.
16     Q.  What accounting precepts did you use to
17 examine the contributions made by State Farm or any
18 other entity to the U.S. Chamber of Commerce?
19         MR. CLIFFORD:  Objection, asked and
20 answered.
21     A.  You did ask me that before; but I, in
22 particular, applied the substance over form concept in
23 my analysis of the disguised financial transactions.
24     Q.  (BY MR. SAFER)  You say "in particular."
25 What other accounting precepts did you use to examine

Page 15

1 the contributions made by State Farm or any other
2 entity to the U.S. Chamber of Commerce?
3         MR. CLIFFORD:  Objection.  Excuse me.
4 Mr. Myers, you have to wait until any exchange between
5 counsel is complete, okay?  Objection, asked and
6 answered for the third time.
7     A.  Oh, I -- I already answered that.  And
8 the answer is none.
9     Q.  (BY MR. SAFER)  Okay.
10     A.  Or none -- my answer -- to be clear, you
11 would need to lead -- list for me the financial -- the
12 accounting precepts that you're referring to.  If
13 you've got a copy of those, I can tell you which ones
14 were incorporated in my analysis.  But I didn't
15 consciously go through the GAAP literature and say,
16 Oh, here I'm applying this particular pronouncement or
17 this particular procedure.  I didn't endeavor to
18 analyze that.
19     Q.  Did you refer to GAAP at all in your
20 reports?
21     A.  Not -- no, no.
22     Q.  Have you referred to any accounting
23 precepts in your reports?
24     A.  No.  And as I stated, I wasn't hired as a
25 CPA.  That's one of my credentials, but I wasn't

Page 16

1 undertaking my examination as -- like an audit, or
2 something like that.
3     Q.  What do you mean by "substance versus
4 form"?
5     A.  Well, a financial transaction can appear
6 to be one thing when, in fact, in substance and in
7 form, it looks like something -- for example, a
8 contribution by State Farm to ATRA for $50,000.  But
9 in form, it's really a contribution to the Citizens
10 for Karmeier campaign.  So accountants have an
11 obligation to reflect the substance of a transaction
12 over the form.
13     Q.  And how do accountants determine the
14 substance of a transaction as opposed to the form?
15     A.  It's experiential.  It's based on
16 judgment.
17     Q.  And is that judgment guided in any way by
18 any accounting principles?
19     A.  It's guided by industry literature,
20 accounting principles.  It's covered by the whole body
21 of accounting literature.
22     Q.  Well, what --
23     A.  Can I -- let me hear that question again,
24 please.  Please restate it.
25         (The last question was read back as

Page 17

1 follows:  "And is that judgment guided in any way by
2 any accounting principles?"
3     A.  Which judgment?
4     Q.  (BY MR. SAFER)  The judgment that you
5 referred to in your previous answer when you said
6 accountants use judgment to determine form over
7 substance in a transaction.
8     A.  Well, I think it's a function of the
9 training of the accountant and the experience of the
10 accountant.  In my particular situation, I have
11 extensive experience that goes way beyond what a
12 typical CPA would have with respect to
13 substance-over-form transactions, disguised financial
14 transactions, such as the one we're discussing in the
15 a -- in the Avery -- in the State Farm litigation.
16     Q.  What accounting functions did you use to
17 examine the expenditures made by the U.S. Chamber of
18 Commerce?
19     A.  As I stated, I didn't undertake this
20 examination as a CPA.  In other words, it wasn't a --
21 an examination that -- that I attempted to do in
22 accordance with a particular CPA engagement.  The fact
23 that I'm a CPA is incidental.  I mean, it connotes a
24 certain amount of experience and expertise and
25 accounting; but that isn't the sole basis of my

                              5 (Pages 14 to 17)

Thomas A. Myers, CPA          10/19/2017

Page 18

1  expertise.
2       The basis of my expertise is numerous
3  publications, numerous lectures, the fact that I've
4  chaired conferences on this subject.  The fact that
5  I've lectured the FBI on fraud, the fact that I've
6  lectured the U. S. Department of Justice on fraud, the
7  fact that I've lectured all -- and trained all of the
8  banking regulators, Office of Comptroller of Currency,
9  the FDIC, Office of Thrift Supervision, National
10  Credit Association.
11       So that experience, to me, goes way
12  beyond what a typical CPA would have based on the --
13  the standard qualifications.  I wasn't doing this
14  examination strictly as a CPA.  I did bring my CPA
15  expertise into bear, but the -- the real basis of my
16  expertise is my extensive experience in the fraud
17  arena in training professionals.
18       When you talk about the CFE, I was
19  already testifying in front of Congress about fraud on
20  -- in the savings and loan industry.  Before the CFE
21  was even thought of, I was already an expert in fraud.
22       MR. SAFER:  I move to strike that answer
23  as non-responsive.
24       MR. CLIFFORD:  To which we would object.
25       Q.  (BY MR. SAFER)  Your question -- the

Page 19

1  question was not about your expertise.  The question
2  was what accounting functions did you use to examine
3  the expenditures made by the United States Commerce
4  that you referred to in your report?
5       MR. CLIFFORD:  Objection, asked and
6  answered.
7       MR. COSGROVE:  Further objection to your
8  question, sir.  You have a statement prior to your
9  question which is improper in form and move to strike
10  your statement prior to the question.
11       A.  As I've said --
12       MR. CLIFFORD:  You can answer the
13  question.
14       A.  As I've said consistently, I wasn't
15  engaged as an accountant, per se, for this matter.  I
16  was engaged for the full body of my experience.
17       One of the credentials that I hold is a
18  CPA.  I have degrees in accounting and mathematics,
19  but I have -- the reason I'm here as an expert in this
20  matter isn't just because I'm a CPA.  It goes way
21  beyond that.
22       And I didn't -- some of the analysis that
23  I undertook didn't necessarily engage with accounting
24  principles or accounting theory, per se; but I adopted
25  more credence to the FBI standards, the U.S.

Page 20

1  Department of Justice standards.  These are esoteric
2  areas.
3       Q.  (BY MR. SAFER)  Did any of the analysis
4  that you referred -- that you performed refer to and
5  use accounting theory and accounting principles?
6       A.  I think that that's something that would
7  really require a thoughtful response from me where I
8  would have to go back and look at the accounting
9  principles and theory and tell you exactly which ones
10  were applied.
11       Undoubtedly auditing, general --
12  generally accepted auditing standards, and accounting
13  theory comes in with substance-over-form concepts.
14  Accounting practice and my knowledge of financial
15  statement preparation and issues also comes into play,
16  as well as business law.
17       So there are a myriad instances.  If you
18  gave me -- if you allowed me to take the time to go
19  through the accounting principles, the accounting
20  theory, business law principles, and auditing
21  principles, I could list many, many of those that
22  could apply arguably with respect to my analysis.
23       But I didn't -- I didn't say to myself I
24  better consult the -- the AICPA guidance on this to
25  see what I need to do when I'm analyzing a check that

Page 21

1  was made out to a particular party or something.
2       Q.  What generally accepted auditing
3  standards did you apply in your analysis in this case?
4       A.  I just told you that I didn't consciously
5  -- I didn't do this as an auditor, as an independent
6  CPA auditor.  I did it as -- in the context of a
7  forensic analysis that transcends just -- just
8  auditing skills or CPA issues.
9       Q.  What financial statement preparation
10  knowledge did you use in your analysis?
11       A.  As I said to you, I would need to look at
12  the guidelines, the universe of guidelines for
13  auditing, accounting practice, accounting theory, and
14  business law.  And I could sit here all day and point
15  out principles that were applied arguably, but not --
16  but -- but I don't have time to do that now.  If you
17  want to give me some principles and ask me if they
18  applied, I can tell you that.
19       Q.  Well, I'm asking you what principles did
20  you apply as you sit there?
21       MR. COSGROVE:  Objection, form, asked and
22  answered this might be the third time.
23       A.  I believe that's been asked and answered.
24       Q.  (BY MR. SAFER)  I'm asking again.
25       A.  Well, let's -- can I get my previous

6 (Pages 18 to 21)

Thomas A. Myers, CPA        10/19/2017

Page 22

1  answer back?
2       MR. COSGROVE:  Yes.
3       (The last answer was read back as
4  follows:  "As I said to you, I would need to look at
5  the guidelines, the universe of guidelines for
6  auditing, accounting practice, accounting theory, and
7  business law, and I could sit here all day and point
8  out principles that were applied arguably, but I don't
9  have time to do that now.  If you want to give me some
10  principles and ask me if they applied, I can tell you
11  that.")
12       A.  In other words, that's a vague and
13  ambiguous question, sir.
14       Q.  (BY MR. SAFER)  So as you sit there, can
15  you point to any generally accepted auditing principle
16  or financial preparation principle that you used in
17  your report?
18       MR. CLIFFORD:  Objection, asked and
19  answered.
20       A.  As I sit here, no.  If I were given time,
21  I could give you plenty.
22       Q.  (BY MR. SAFER)  Well, take all the time
23  you need.
24       A.  I would need to have access to my
25  research resources, and so forth.  I can't do that

Page 23

1  here.  If you have them for me, I'll be happy to take
2  a look at it, if your consultant has them.
3       Q.  Are any financial auditing -- generally
4  accepted auditing principles, generally accepted
5  accounting principles or other accounting principles
6  referred to in either of your reports?
7       A.  No.
8       MR. COSGROVE:  Objection to the compound
9  nature of your question.
10       THE DEPONENT:  Sorry.
11       A.  No.  No, sir.
12       Q.  (BY MR. SAFER)  Did you examine the books
13  and records of any of the organizations discussed in
14  your report?
15       A.  Those were not available to me.  The
16  answer is no.
17       Q.  Did you examine the bank accounts of any
18  organizations discussed in your report?
19       A.  Neither of those were available to me, so
20  the answer is no.
21       Q.  You're familiar with the term tracing as
22  it applies in forensic accounting?
23       A.  Sure.  Why don't you explain to me what
24  it means.
25       Q.  Well, what do you know it as?

Page 24

1       A.  Tracing, to me, would connote if you're
2  looking at a deposit, where did it come from, where
3  did it originate from, something of that order.
4       Q.  So what steps would you take to trace
5  money?
6       MR. COSGROVE:  Objection to the form of
7  the question as vague and ambiguous.
8       A.  Exactly.  What money?  What are you
9  talking about?
10       Q.  (BY MR. SAFER)  Any money.
11       A.  What's the context?  Any money?
12       Q.  Yeah.
13       MR. COSGROVE:  Same objection to the
14  question, vague and ambiguous, no premise to the
15  answer.
16       THE DEPONENT:  Can I have the question,
17  back, please?
18       MR. COSGROVE:  What money?
19       MR. CLIFFORD:  She'll read the question,
20  if you need the question.
21       Q.  (BY MR. SAFER)  I'll give you a new
22  question.
23       MR. CLIFFORD:  Thank you.
24       Q.  (BY MR. SAFER)  What steps would you take
25  to trace funds?

Page 25

1       A.  In what context?  Trace funds where?
2       Q.  Let's say from one organization to
3  another.  What --
4       A.  Okay.  Now I do understand.  Thank you
5  for that clarification.  For -- I can do this by way
6  of an example.  If State Farm, Ed Rust, made out a
7  million-dollar check and -- and it's dated and it's
8  made out to the Institute For Legal Reform, then I
9  would consider that money to have gone from State Farm
10  to the Institute Of Legal Reform.
11       If I'm trying to understand what
12  happened -- I was asked to analyze what money was
13  contributed by State Farm to these affiliated
14  organizations and how much money came out of those
15  affiliated organizations ultimately into the Karmeier
16  campaign.  And I just watched -- for -- for example,
17  with that transaction, I saw the million-dollar check
18  go from Ed Rust, for example, on May 30, 2003, to the
19  ILR.  And then I saw later a check -- or I didn't see
20  the check, but I saw a receipt from the Illinois
21  Republican Party on their D-2 that's formed -- that's
22  filed in California for a receipt of something like
23  $1.95 million.  And that's what -- if that's what you
24  mean by "tracing," that's what I did.
25       Q.  Do -- do you consider that tracing of

7 (Pages 22 to 25)

Thomas A. Myers, CPA          10/19/2017

Page 26

1  funds?
2      A.  Sure, in the context of what I was doing.
3      Q.  And --
4      A.  Since you haven't given me a specific
5  context, you just said tracing money; so --
6      Q.  When you say the receipt that you saw for
7  the money coming out of the United States Chamber to
8  the Illinois Republican Party, when was that receipt?
9      A.  I don't recall the date, but it would
10  have been in 2004.
11      Q.  September of 2004?
12      A.  Could be.
13      Q.  And so you -- is it your testimony that
14  you have traced the check that State Farm wrote in May
15  of 2003 to ILR to the money that the chamber then
16  wrote a year and a half later to the Illinois
17  Republican Party?
18      A.  I'm making a connection between that,
19  yes.  I don't -- I don't know if I would call that
20  tracing it.  I'm pointing out that the money that went
21  into these affiliated organizations was approximately
22  equal to the money that came out of those
23  organizations into the -- into the Karmeier campaign.
24      Q.  And the question is would you regard that
25  as tracing money?

Page 27

1          MR. CLIFFORD:  Objection, asked and
2  answered.  He just answer --
3      A.  I attach no particular significance to
4  the term tracing.
5      Q.  (BY MR. SAFER)  You added language in --
6  in this report, your supplemental expert report, that
7  your opinions have been reached based on a reasonable
8  degree of professional certainty in the field of
9  forensic accounting.
10      A.  Can I --
11      Q.  Do you recall that?
12      A.  Can I see that?
13      Q.  Sure.
14          (Deposition Exhibit 11 was marked.)
15      A.  What page was that, sir?
16      Q.  It's on page 85.
17          MR. COSGROVE:  There's one extra.
18      A.  Yes.
19      Q.  (BY MR. SAFER)  Was it your idea to put
20  that in your supplemental report?
21      A.  No, it's something that typically goes
22  into an expert report that I would prepare.
23      Q.  You did not include that in your original
24  report in this case, did you?
25      A.  I'm not sure; but if I didn't -- I don't

Page 28

1  know.
2      Q.  What does that mean, to a reasonable
3  degree of professional certainty in the field of
4  forensic accounting?
5      A.  In other words, a peer analyst, I
6  believe, would come to the same conclusion or find my
7  conclusion reasonable.  Let -- may I explain what --
8  what I did in this particular?
9          MR. CLIFFORD:  Well, answer his pending
10  question, and then he'll ask you another question.
11          THE DEPONENT:  Okay.
12      A.  I would like to explain the process that
13  I undertook in doing my analysis, if you're
14  interested.
15      Q.  (BY MR. SAFER)  Okay.  Can you -- can you
16  first answer the question?
17      A.  Okay.  What was the question again,
18  please?  I'm sorry.
19          (The last question was read back as
20  follows:  "What does that mean, to a reasonable degree
21  of professional certainty in the field of forensic
22  accounting?")
23      A.  And I answered that.
24      Q.  Okay.  You've completed your answer to
25  that?

Page 29

1      A.  Yes.
2      Q.  Okay.
3      A.  Oh.
4      Q.  You wanted to explain what you did in
5  this -- in this analysis.  Could you --
6          MR. CLIFFORD:  And I'm instructing you to
7  answer questions.  If there's a pending question, such
8  as he just described, that's fine.  But there is no
9  pending question, so please await a question.
10          THE DEPONENT:  Okay.
11      Q.  (BY MR. SAFER)  So you wanted to explain
12  what you've done in this case; is that right?
13      A.  Yeah.
14          MR. CLIFFORD:  Objection.  Is there -- is
15  there a question, Counsel?
16          MR. SAFER:  Yeah.
17          MR. CLIFFORD:  What is the question?
18  What is the question?
19          MR. SAFER:  Do you want to read it back?
20          (The last question was read back as
21  follows:
22          Question:  "So you wanted to explain what
23  you've done in this case; is that right?"
24          Answer:  "Yeah.")
25          MR. CLIFFORD:  If you can answer --

8 (Pages 26 to 29)

Thomas A. Myers, CPA          10/19/2017

Page 30

1 objection, form, argumentative. Go ahead, if you have
2 an answer --
3          THE DEPONENT: Sure.
4          MR. CLIFFORD: -- to that question.
5     A.   I -- what I did is based on all of my
6 experience in the arena dealing with these things,
7 lecturing, publishing books on the subject, and so
8 forth. To me, it's like a jigsaw puzzle. I have
9 information that's provided to me, various bits and
10 myriad sources of information. And I try to put the
11 jigsaw puzzle together.
12          A jigsaw puzzle typically has about 1,026
13 pieces, and it's 3 feet by 2 feet. And so, for
14 example -- and so, for example, if we had, let's say,
15 an aerial view of Washington, D.C. for a jigsaw
16 puzzle, I would take pieces of information, I would
17 evaluate that information and analyze them based on my
18 -- the information based on my experience, which
19 includes experience as a CPA and accounting experience
20 and auditing experience, and so forth, and I would say
21 this is where this piece goes.
22          I don't need to see all 1,026 pieces of
23 information in order to determine that this is an
24 aerial view of Washington, D.C., taken from the
25 Washington Monument. I may be able to come to that

Page 31

1 conclusion by looking at the capitol building or the
2 Grand Mall. I can tell there's no other place in the
3 world that has this configuration of buildings. And
4 that's kind of what it's like to do this forensic
5 analysis that I undertook.
6          There's much -- many, many, different
7 pieces of information. And I sift through them and
8 analyze them in the context of my total experience,
9 not just as a CPA as an auditor or as a financial
10 analyst, but also experience in working on government
11 investigations of disguised financial transactions,
12 helping to author the complaint against Enron, to
13 prepare -- help securities fraud analysts prepare
14 complaints in complex financial matters. All of that
15 experience comes into play.
16     Q.   (BY MR. SAFER)  Is there any written
17 resource that you know of that defines a reasonable
18 degree of certainty in the forensic accounting field?
19     A.   I wouldn't refer specifically to the
20 forensic accounting field. I -- I consider that as
21 something that is expected of an expert witness. And
22 a reasonable degree of certainty means to me -- the
23 way I interpret that is that a qualified expert, given
24 the similar set of circumstances to evaluate, would --
25 would come to a similar conclusion. In other words,

Page 32

1 based on my experience, I'm telling you that I'm
2 certain --
3          (Cell phone.)
4     A.   Excuse me. I'm telling you that I am --
5 based on all of my -- totality of my experience, this
6 is -- I feel sure, certain of my -- my conclusions.
7     Q.   Would -- the question was about the field
8 of forensic accounting.
9     A.   Um-hum.
10     Q.   Is there any resource that you know of,
11 written resource you know of, that would define
12 reasonable degree of professional certainty in the
13 field of forensic accounting?
14     A.   I have tried to explain to you my
15 interpretation of that, but I don't -- I couldn't
16 quote for you if there is a standard or an
17 acknowledged -- what -- who -- which standard are you
18 talking about? CFE, did you say?
19     Q.   No, no. A reason --
20     A.   Forensic accounting standard?
21     Q.   A -- the question is is there a resource
22 that describes what a reasonable degree of
23 professional certainty in the field of forensic
24 accounting is?
25     A.   I'm not aware of that, no.

Page 33

1     Q.   Mr. Myers, how many hours have you worked
2 on this case?
3     A.   I'm not sure. Hundreds.
4     Q.   As many as a thousand?
5     A.   It's possible.
6     Q.   Have you been paid in this case?
7     A.   Yes.
8     Q.   How much have you been paid to date?
9     A.   I don't know.
10     Q.   Do you know approximately how much you've
11 been paid to date?
12     A.   More than $100,000.
13     Q.   I believe at -- in your last deposition
14 back in 2015, you testified that you had already been
15 paid more than $100,000 by that time.
16     A.   My answer is accurate, then, huh?
17     Q.   Do you know how much more than 100,000?
18     A.   I really don't know.
19     Q.   Do you know how much you've been paid in
20 the last year on this case.
21     A.   I didn't do that analysis. I can get
22 that number for you.
23     Q.   On page 7 of the report that you have in
24 front of you, you state that the United States Chamber
25 of Commerce acted as a pass-through organization.

9 (Pages 30 to 33)

Thomas A. Myers, CPA          10/19/2017

Page 34

1      A.  Yes.
2      Q.  **What is your definition of a pass-through**
3  **organization?**
4      A.  They were like a conduit representing the
5  contributor and taking -- assisting to effectuate
6  political outcomes.  The money was passing through
7  from the contributor to the ultimate object of the
8  contributor's interest typically in a judicial context
9  or in some kind of political context.
10     Q.  **Are you -- are you an expert in the field**
11 **of Illinois campaign finance law?**
12     A.  No.
13     Q.  **Have you read the Illinois campaign**
14 **finance laws?**
15     A.  Some of it.
16     Q.  **Which have you read?**
17     A.  Well, for example, on page 16, I cite a
18 Illinois campaign finance law that comes from
19 something that Justice Karmeier wrote in his Philips
20 Morris supervisory order where he specifically
21 condemned the practice of obscuring the identity of a
22 preliminary contributor as illegal.  And I footnote --
23 I put Footnote 60 in there that gives the full quote
24 of the justice's opinion, which comes from Illinois
25 campaign law.

Page 35

1          And it says that "Illinois law requires
2  campaign committees to register and make public
3  disclosures of all contributions they receive from any
4  individual or an entity in excess of $150, 10 ILCS
5  5/9-10,11 (West 2012).  Political action" --
6  continuing with the quote from the judge -- or from
7  the law -- "Political action committees or PACs are
8  also required to file periodic reports listing the
9  contributions they receive.  It is illegal to obscure
10 the identity of contributors to such organizations by,
11 for example, giving money to a third party and
12 directing them to make a contribution."  That comes
13 from 10 ILCS 5/9-25.  So I do know that piece of
14 Illinois law -- campaign law.
15     Q.  **Have you read any other Illinois campaign**
16 **finance laws?**
17     A.  Yes.  I also cite to the campaign -- I
18 believe it's the Campaign Disclosure Act.  If you give
19 me a second, I'll show you where that is.  Yes.  It's
20 on page 17.  And I talk about the Illinois Board of
21 Elections Guide to Campaign Disclosure.  And I quote
22 specifically from that campaign disclosure material,
23 which is -- yeah.
24     Q.  **Okay.  So that's not the Illinois**
25 **campaign finance law, correct?**

Page 36

1      A.  No, it's not the code, but it's an
2  interpretation of it.
3      Q.  **Have you read anything other than you**
4  **just cited in the Illinois campaign finance laws?**
5      A.  I actually downloaded the -- the material
6  that relates to the last section that I cited about a
7  contributor -- it being illegal for a contributor to
8  obscure their identity.  I read that -- I mean, I
9  didn't read the whole section, but I downloaded it.
10 That's the only other section that I've looked at.
11     Q.  **Do you know how contribution was defined**
12 **under the Illinois campaign finance law in 2004?**
13     A.  I didn't.  I didn't parse out the meaning
14 of that word.
15     Q.  **You are not opining as to whether or not**
16 **State Farm made any contribution in the 2004 campaign**
17 **as that term is defined by the Illinois campaign**
18 **finance laws, are you?**
19         MR. COSGROVE:  Object to form and
20 foundation, incomplete hypothetical.
21     A.  Why don't you define that for me, under
22 the Illinois law, because I'm not familiar with the
23 definition.
24     Q.  **(BY MR. SAFER)  Right.  So the question**
25 **is --**

Page 37

1      A.  Other than the plain English
2  interpretation.
3      Q.  **The question is are you opining as to**
4  **whether or not State Farm made any contribution in the**
5  **2004 campaign as that term is defined by the Illinois**
6  **campaign finance laws?**
7          MR. COSGROVE:  Same objection.
8      A.  And you would have to give me that
9  definition because I don't have it in my head.  If you
10 give me the definition, I'll give you my opinion.
11     Q.  **(BY MR. SAFER)  Have you made an opinion**
12 **about that?**
13         MR. COSGROVE:  Same objection.
14     A.  Yes, I believe that -- that State Farm
15 did contribute to the campaign finance effort of
16 Mr. Karmeier.
17     Q.  **(BY MR. SAFER)  Without knowing what the**
18 **definition of contribution is in the Illinois campaign**
19 **finance laws in 2004?**
20     A.  Yes.  I assume that it has a general
21 usage of the term contribution.  If there's something
22 esoteric about it, I'm not aware of it, other than the
23 plain English interpretation.
24     Q.  **So are you opining as to whether or not**
25 **State Farm violated the Illinois campaign finance laws**

10  (Pages 34 to 37)

Thomas A. Myers, CPA          10/19/2017

Page 38

1  as those laws existed in 2004?
2      A.  No.
3      Q.  Did State Farm ever direct that the cham
4  -- the United States Chamber of Commerce or ILR give
5  State Farm's contribution to a specific source?
6      A.  I have to go back to my jigsaw puzzle
7  analogy with you because I never saw any explicit
8  contract between State Farm, for example, and the U.S.
9  Chamber.  But I did -- I can give you an idea and some
10 insight into how I examined the evidentiary record to
11 come to the conclusion that in -- there's substantial
12 evidence that they did make a contribution through the
13 ILR to the Karmeier campaign.
14     Q.  Okay.  The -- when you say you saw no
15 explicit contract, what do you mean?
16     A.  There was no -- there was no -- I think
17 that's clear.  What -- what part of that don't you
18 understand?  I said there's no explicit contract.
19     Q.  So do you mean that there would -- you
20 saw nothing explicit that State Farm directed the
21 United States Chamber of Commerce or the ILR to give
22 State Farm's contribution to a specific source?
23     A.  I saw nothing in writing in that context,
24 but I did see considerable evidence to indicate that
25 that was, in fact, the agreement between the parties

Page 39

1  or that would support the allegation that that was the
2  agreement.
3      Q.  You -- did you review the deposition
4  testimony of Lisa Rickard?
5      A.  I saw excerpts from her deposition, but I
6  didn't read the whole deposition.
7      Q.  Who selected the excerpts for you?
8      A.  Carolyn Chaw in my office.  I didn't have
9  time to read all of the depositions.
10     Q.  Did -- did you delineate which excerpts
11 you've read and which --
12     A.  I don't recall specifically.
13     Q.  Did you delin --
14     A.  I --
15     Q.  I'm sorry.
16         MR. CLIFFORD:  Let him finish.
17         THE DEPONENT:  I'm sorry?
18         MR. CLIFFORD:  You finish answering, and
19 then let him finish his question.
20         THE DEPONENT:  That's how it works.
21 Thank you.
22     Q.  (BY MR. SAFER)  Were you done?  I'm
23 sorry.
24     A.  I am done.  Thank you.
25     Q.  Did you delineate anywhere in your report

Page 40

1  which excerpts of depositions you read?
2      A.  No, I don't believe so.
3      Q.  Did you take into account in formulating
4  your opinions the excerpts of Ms. Rickard's deposition
5  testimony that you read?
6      A.  I obviously would have subconsciously
7  taken it into account.  There was nothing she said
8  that I relied on to form my opinion.
9      Q.  Did you review the deposition of Rod
10 Engstrom?
11     A.  Yes.
12     Q.  Is that listed in your report?
13     A.  I believe it is.
14     Q.  Could you look at page 109 of your
15 report?
16     A.  Sure.
17     Q.  Is that where you list the deposition
18 transcripts that you reviewed in whole or in part?
19     A.  Yes.  I have received Engstrom, though,
20 and I did review it.  It's not -- if it's not there, I
21 must have received it after my report was filed or
22 other -- otherwise, it was inadvertently omitted.
23     Q.  Do --
24     A.  I don't cite to it.
25     Q.  Do you know which -- when -- when was

Page 41

1  your -- your report was filed pretty recently, right?
2      A.  Right.
3      Q.  Do -- do you believe you have received
4  Rod Engstrom's deposition after you filed --
5      A.  It's possible.  I don't know.  I could
6  check.
7      Q.  But you reviewed those transcripts?
8      A.  Yes.
9      Q.  Do -- did you review them in whole or in
10 part?
11     A.  In part.
12     Q.  So is there any way of telling, from
13 looking at your report, which parts of any of these
14 depositions you reviewed?
15     A.  I could describe the methodology; but,
16 no, I can't tell you specifically what pages.
17     Q.  Okay.  Could you describe the
18 methodology?
19     A.  Sure.  I would search for particular
20 terms that I was interested in.  If I -- if I didn't
21 have time to read the whole depositions, I would
22 assign a staff person to do that and highlight it for
23 me for issues that were germane to -- to my analysis.
24         If I didn't have a highlighted
25 transcript, I would search for terms.  Like, for

Thomas A. Myers, CPA          10/19/2017

Page 42

1   example, with Engstrom, I was interested in his -- if
2   the term "sponsoring entity" came up in his deposition
3   because there's an issue of an email from Mr. Murnane
4   to Mr. Engstrom in September of 2004 where Mr. Murnane
5   purported to do a calculation based on the existing
6   contributions to -- to JUSTPAC.  And -- and he
7   informed Mr. Engstrom of how much money the U.S.
8   Chamber would have to provide in order to avoid the
9   sponsoring-entity designation under the Illinois
10  Campaign Act and avoid disclosure.
11          So I was interested in Mr. Engstrom's
12  side and what he thought about that, what -- what he
13  was going to say about that, because I thought it was
14  particularly probative in terms of the motives of the
15  affiliated organizations in State Farm.
16          But I didn't find anything that -- I was
17  hoping to find his explanation or some cogent
18  explanation.  And I would weigh that evidence in terms
19  of should I change my opinion about the -- the nature
20  of that transaction.  I didn't find anything in his
21  testimony that shed any light on that particular
22  issue.
23          **Q.  Did you -- did you search for the term**
24  **"earmarking" in the -- in any of the depositions that**
25  **you reviewed?**

Page 43

1           A.  No.  I just looked primarily for terms
2   that touched on issues that I had discussed in my
3   report.
4           **Q.  You discuss earmarking in your report,**
5   **don't you?**
6           A.  I -- I don't think so.  I don't think I
7   used that term.  Maybe.  It's possible.
8           **Q.  So on page 10 --**
9           A.  Yes.
10          **Q.  You were just discussing Engstrom.  So it**
11  **says, "Engstrom sought to ensure that the use of the**
12  **Chamber" --**
13          A.  Forgive me, sir.  I don't know exactly
14  where you're at.
15          **Q.  Yeah.  Oh, Engstrom -- do you see where**
16  **it says, "Engstrom"?**
17          A.  Oh, okay.  Thank you.
18          **Q.  Sure.  -- "as a paid conduit for**
19  **donations earmarked for the Karmeier campaign would**
20  **remain confidential."**
21          A.  Yeah, I do see that.  But I did check for
22  that issue from Mr. Engstrom.  I wanted to see what
23  his take was on all that.
24          **Q.  Did you check, for Mr. Engstrom, the term**
25  **"earmarking"?**

Page 44

1           A.  No.
2           **Q.  Did you take into account the testimony**
3   **of U.S. Cham -- well, did you read the testimony of**
4   **Mr. Engstrom that earmarking of contributions is not**
5   **permitted by the Chamber or ILR?**
6           A.  I am familiar with his testimony in that
7   regard, but it contradicts the evidentiary stuff that
8   I examined.  So it was of interest to me, and I would
9   expect him to say that.
10          **Q.  Why would you expect him to say that?**
11          A.  Because I don't think that the -- the
12  U.S. Chamber enjoys being involved in litigation like
13  this and the negative publicity that could engender or
14  result from this type of an action.  I don't think
15  they are proud of what they did.
16          **Q.  Or is it --**
17          A.  Excuse me.  That's wrong.  I think they
18  were proud -- at one time, they were proud of what
19  they did.  They are not now.
20          **Q.  So you are opining as to the U.S.**
21  **Chamber's state of mind and whether or not they are**
22  **proud; is that true?**
23          MR. CLIFFORD:  Objection, argumentative,
24  misleading.
25          A.  Well, for example, I am -- I'm inferring

Page 45

1   -- I'm not a psychologist, and I'm not opining on
2   their state of mind.  I think the trier of fact can
3   evaluate this.  But the fact that -- when Mr. Rust
4   from State Farm originally signed up for the
5   million-dollar campaign with ILR, Ed Rust sent him a
6   letter thanking him for his role in all the actions
7   that he had taken to help with the legal reform.  And
8   then he attached a copy of The Wall Street Journal
9   article that he bragged about.  He said, I'd like -- I
10  need to see exactly what he said.  Can I have a second
11  to do that?
12          MR. CLIFFORD:  Sure.
13          A.  Well --
14          MR. CLIFFORD:  Look at page 25.
15          THE DEPONENT:  Page 25, yeah.
16          MR. CLIFFORD:  Is that where you're at?
17          THE DEPONENT:  Yes.
18          MR. CLIFFORD:  Page 25 -- Counsel, he's
19  on page 25 of his report.
20          A.  The specific letter that I'm referring to
21  is a letter in 2001 to Mr. Rust thanking him for his
22  million-dollar contribution and for all of his support
23  and looking forward to working with him on legal
24  reform.
25          And there -- if I could see the letter, I

12 (Pages 42 to 45)

Thomas A. Myers, CPA        10/19/2017

Page 46

1  would be happy to elaborate further what I'm talking
2  about.  But at the end of the letter, he said, I'd
3  like for you to take a look at that recent Wall Street
4  Journal article that basically was touting the
5  Chamber's role in functioning as this conduit that I
6  described in my -- in my report that we referred to
7  earlier.
8          Specifically in that Wall Street Journal
9  article -- this is of September 11, 2001 -- the name
10  is Business Lobby Recovers Its Clout By Dispensing
11  Favors For Members.  The -- the quote from that
12  article, which Mr. Donohue was calling Mr. Rust's
13  attention to, he said -- when he said he was proud of
14  it, I assume if he's calling his attention to it and
15  bragging about the article that he's proud of it.
16          But anyway, the article said, among other
17  things, "The organization" -- U.S. Chamber -- "has
18  created several special accounts to take in money for
19  projects on behalf of individual companies or groups
20  of companies with a common policy goal.  In some
21  cases, the money is spent just days after it comes in
22  the door.  The chamber, like many other non-profit
23  organizations, isn't required to report the sources of
24  its funding, which makes it an attractive vehicle for
25  those . . . who sometimes like to operate under the

Page 47

1  radar."
2          There's more quotes from this particular
3  article.  And that's exactly what I was asked to
4  analyze as a forensic analyst.
5        MR. SAFER:  I move to strike everything
6  in that answer after the first phrase about not being
7  a psychologist.
8        MR. CLIFFORD:  To which we would object.
9      Q.  (BY MR. SAFER)  That article that you
10  just cited and you just talked about, the creation of
11  several special accounts by the U.S. Chamber of
12  Commerce or ILR?
13      A.  Um-hum.
14        MR. CLIFFORD:  Objection to the question
15  and argue waiver of the previous objection.  Go ahead,
16  please.
17      A.  The question, please?
18      Q.  (BY MR. SAFER)  You -- you referred to an
19  article that -- in your report that talked about the
20  creation of several special accounts to take in money?
21      A.  I did.
22      Q.  Have you seen evidence of the U.S.
23  Chamber of Commerce or ILR having special accounts
24  into which they took in money?
25      A.  I have not been able to examine the

Page 48

1  records of the U.S. Chamber to that extent, but I've
2  seen evidence that indicates that's exactly what
3  happened.
4      Q.  What evidence of special accounts have
5  you seen?
6      A.  For example, when Mr. Rust originally
7  wrote his -- or wrote a $1 million check to the
8  Chamber, Institute for Legal Reform, on May 30 of
9  2003, that immediately engendered the formation of the
10  Madison County Coalition, which is something that
11  State Farm would have been seriously in favor of.  In
12  fact, Mr. Shepherd was a member of the coalition --
13  Madison County Coalition, I believe.
14        Within less than a week, the Madison
15  County Coalition was formed, $20,000 was sent by the
16  chamber to ICJL and Mr. Murnane to kind of prime the
17  pump for the campaign.  And Mr. Murnane was out there
18  recruiting Karmeier, and so forth.  So it does look
19  like a quid pro quo to me.
20      Q.  What evidence do you rely on for your
21  opinion that it was -- that State Farm's donation of a
22  million dollars was a quid pro quo for the creation of
23  the Madison County Coalition?
24      A.  There are numerous documents that would
25  indicate that that is true.  I don't have them

Page 49

1  committed to memory, and I'm sure that as we -- as we
2  continue -- for example, Donohue -- I'm looking at
3  page 25 again, a quote from The Washington Monthly
4  which says, "A large part of what the Chamber sells is
5  political cover.  For multibillion-dollar issuers,
6  drug-makers, and medical device manufacturers who are
7  too smart and image conscious to make public attacks
8  of their own, the Chamber of Commerce is a friend who
9  will do the dirty work.  'I want to give them all of
10  the deniability they need,' says Donohoe."
11        So, yeah, when I say quid pro quo, I
12  think that's what they are talking about.  And Donohue
13  himself seems to be -- and perhaps this is a wrong
14  word to use.  I used the word proud before, but
15  Donohue himself is promoting the -- language of
16  these articles to his prospective high-rolling
17  contributors.
18        And another reason why I believe that the
19  -- the amount of money that State Farm was able to
20  flash in front of Mr. Donohue was determinative and
21  proportional to the effort that the ILR and the U.S.
22  Chamber used to help him with his campaign problem in
23  Illinois.  The -- there was around that time -- and
24  I'm doing this out of memory, but there's a document
25  that says in an ILR board meeting that they were going

13 (Pages 46 to 49)

Thomas A. Myers, CPA        10/19/2017

Page 50

1  to emphasize those members of the ILR -- ILR that had
2  contributed the million dollars or more.  And they
3  were going to give them special input into the
4  placements of the funds, and so on.
5      Q.  So is it your testimony that you believe
6  that a part of the million dollars that State Farm
7  contributed in 2003 was sent to ICJL in its efforts
8  with regard to the Madison County Coalition?
9      A.  Well, I need to qualify that because I
10  don't believe that Mr. Rust gave them a suitcase full
11  of $100 bills and those very same bills found their
12  way into the Karmeier campaign.  But, yes, there was
13  -- there was -- I don't know if there was a physical
14  account maintained or if it's a mental thing; but
15  certainly over the years since the Avery litigation,
16  Ed Rust had built up tremendous goodwill with the
17  Chamber.  And for a non-profit organization that
18  doesn't have other revenues, the money in has got to
19  equal the money out.  Otherwise, they are insolvent.
20  So that money that -- that the ILR wired to the
21  Illinois Republican Party had to come from somewhere.
22  They didn't have a billion dollars retained earnings,
23  or anything like that.  It came from State Farm in my
24  view.
25      Q.  And what accounting principles did you

Page 51

1  use to determine that that money that went to the
2  Illinois Republican Party from the U.S. Chamber of
3  Commerce came from State Farm?
4      A.  Substance over form.  But I need to
5  remind you, again, that I didn't sit here consciously
6  as I was doing the analysis and wonder is this
7  consistent with generally accepted accounting
8  principles.  I didn't -- it's incidental that I'm a
9  CPA.
10      Q.  How much -- how much of State Farm's
11  money went in 2003 to the creation of the Madison
12  County Coalition?
13      A.  I don't know.
14      Q.  Do you have any approximation?
15      A.  Well, I know from Mr. -- Mr. Murnane's
16  letter that when he was wooing Mr. Karmeier to become
17  the judge, he talked about big bucks that were
18  available in Washington and from the Chamber.  I don't
19  remember exactly the point in time when he referred to
20  -- maybe it was later on in 2003 when he talked about
21  the 1.8 to $2.0 billion that -- that he was looking
22  forward to getting from the U.S. Chamber.
23      I need to see these documents.  I'm doing
24  this off the top of my head, and I may be misquoting
25  somewhat.  If you have the document, I'll be happy

Page 52

1  to --
2      Q.  The question -- you testified that there
3  was a quid pro quo between State Farm's contribution
4  in 2003 to the creation of the Madison County
5  Coalition one week later.
6      A.  Yes, sir.
7      Q.  How much money was paid for -- for the
8  creation of the Madison County Coalition that came
9  from State Farm?
10      A.  That information wasn't available to me.
11  Again, this is like a jigsaw analogy.  I didn't get
12  everything handed to me on a silver platter.
13      Q.  What did you try to do to get ILR's
14  financial records?
15      A.  I examined the database that we had.  Of
16  course, as I mentioned in my previous deposition, I
17  would love to be able to go in and see the accounting
18  records for the U.S. Chamber for ATRA for the ILR, and
19  so forth; but that wasn't available to me.
20      Q.  Why would you love to be able to see
21  those records?
22      A.  Because it would clarify the situation.
23  I'm working with a jigsaw puzzle.  The more pieces I
24  can get, the -- the better informed my opinion.
25      Q.  What did -- I'm sorry.

Page 53

1      A.  But at a certain point, sir, you don't
2  have to have 1,026 pieces to know that it's a
3  Washington, D.C. -- aerial view from the Washington
4  Monument.  You can do it from as little as 20 pieces
5  or 100 pieces, but I had a considerable amount of
6  evidence that I needed to form the conclusion that I
7  express in my -- or articulate in my report.
8      Q.  What did you do to try to get those
9  records, those financial records from ILR, the U.S.
10  Chamber, ATRA, et cetera?
11      A.  I assumed it was futile.  I didn't -- I
12  mean, I could -- I guess I could ask Tom Donohue if he
13  would let me take a look at his records, let me come
14  over there and take a look for a couple of days; but I
15  didn't expect him to be amenable to that.
16      Q.  So you assumed it was --
17      A.  Forgive the sarcasm.  You're being very
18  courteous, and I don't want to be a smart aleck.
19      Q.  You assumed it was futile, so you did
20  nothing?
21      A.  That's correct -- well, no, I didn't do
22  -- it's not that I didn't do nothing.  I inquired if
23  he had anything in the database further than what we
24  had, and the answer was no.  And ultimately, we would
25  search the database for relevant information.

14 (Pages 50 to 53)

Thomas A. Myers, CPA          10/19/2017

Page 54

1    MR. SAFER:  Why don't we take a brief
2  break.
3    THE VIDEOGRAPHER:  Going off the record.
4  The time is 11:07.
5    (Recess taken, 11:07 a.m. to 11:19 a.m.)
6    THE VIDEOGRAPHER:  We're back on the
7  record.  The time is 11:19.
8    Q.  (BY MR. SAFER)  Mr. Myers, you mentioned
9  an FBI manual that you said that you relied upon in
10 conducting your work in this case.  Is that referenced
11 anywhere in your -- either of your reports?
12   A.  No.
13   Q.  Is the DOJ manual you referred to earlier
14 referenced anywhere either in -- in either of your
15 reports?
16   A.  No.
17   Q.  Why not?
18   A.  And I should clarify that because I
19 didn't rely on them.  I cited them in my testimony as
20 authoritative sources of guidance.  I didn't need to
21 -- I know that my examination was consistent with
22 those guidelines, but I didn't rely on them; no more
23 than I relied on any kind of accounting practices or
24 audit -- generally accepted auditing standards.
25   Q.  Have you seen an email where any State

Page 55

1  Farm employee directed ILR to use State Farm's
2  contribution in a certain way?
3    A.  I never saw anything explicit in writing.
4    Q.  Have you --
5    A.  Excuse me.  Let me finish my question --
6  or my answer, please.  I referred to financial
7  accounting standard board concept date substance over
8  form.  And I applied that liberally throughout my
9  analysis.  What is the substance of the transaction?
10 What is the economic substance?  Where did this money
11 ultimately go to?
12   No, I didn't see any explicit writing or
13 contract that called for particular earmarking; but
14 that's, in fact, what happened in my view.  There's
15 overwhelming evidence to support that.
16   MR. SAFER:  I move to strike the answer
17 after the first phrase.
18   MR. CLIFFORD:  To which we would object.
19 It was completely responsive to your question.
20   Q.  (BY MR. SAFER)  Have you seen a letter
21 where state -- any State Farm employee directed ILR to
22 use State Farm's contribution in a certain way?
23   A.  Well, not explicitly.  But, for example
24 something I would weigh or take into consideration was
25 an email -- and I don't have it in front of me, but

Page 56

1  that's best I recollect.  It was an email from
2  Mr. Murnane to Mr. Pintak and someone -- I believe it
3  was Engstrom from the U.S. Chamber -- talking about
4  the Chamber's efforts in preparing negative ads deep
5  into the campaign timeline, November 2004.
6    So I think that the -- the ILR and the
7  Chamber -- I didn't see any explicit contract for
8  that, but I know that the ILR and the Chamber were
9  doing work in that regard.  At least that piece of
10 evidence would seem to infer that.
11   Q.  And that piece of evidence -- from that
12 piece of evidence, you inferred that a State Farm
13 employee directed ILR to use State Farm's contribution
14 in that way?
15   A.  No, no, they are -- there are myriad
16 pieces of evidence, and my report is replete with
17 references to those -- to those pieces of evidence.
18 And I refer you to my report if you don't understand
19 what I'm talking about.
20   MR. SAFER:  I move to strike everything
21 after, "No."
22   MR. COSGROVE:  I believe it was
23 responsive.  We would have an objection to your motion
24 to strike.
25   Q.  (BY MR. SAFER)  Have you seen an email or

Page 57

1  any other writing where any State Farm employee
2  directed the United States Chamber of Commerce to use
3  State Farm's contribution in a certain way?
4    A.  I would give the same answer.  My report
5  is full of references that would imply that pieces of
6  evidence that I took into consideration and, in fact,
7  relied on.  But I never saw any explicit writing or
8  contract that would articulate the terms that you just
9  described.
10   Q.  Is -- have you ever seen an email or any
11 other writing where any State Farm employee directed
12 any of the organizations cited in your report as
13 affiliated organizations to use State Farm's
14 contribution in a certain way?
15   A.  The same response.  I would refer you to
16 my report where there are numerous instances of the
17 evidence that I considered in that regard.  Having
18 said that, the -- the simple answer is, no, I haven't
19 seen any explicit writing.
20   Q.  Have you seen the recounting of a
21 conversation in which someone from State Farm directed
22 any of the affiliate organizations to use State Farm's
23 contribution in a certain way?
24   A.  No.
25   Q.  Okay.  If we could look for a moment at

15 (Pages 54 to 57)

Thomas A. Myers, CPA          10/19/2017

Page 58

1  page 8 of your report.  Do you see the paragraph that
2  starts --
3      A.  I'm sorry.  I'm not there.  I have fumble
4  fingers.
5      Q.  No problem.
6      A.  Please.
7      Q.  On page 8, I'm looking at the paragraph
8  that starts, "State Farm."
9      A.  Yes.
10     Q.  It says, "State Farm dramatically
11 increased its donations to the Chamber after the
12 program was put in place."
13         Do you see that --
14     A.  Yes.
15     Q.  -- paragraph?  And it says, "And while
16 the Avery action and appeal were pending."
17     A.  Yes.
18     Q.  When did State Farm's contribution to the
19 United States Chamber of Commerce first dramatically
20 increase by your definition?
21     A.  I -- I don't have it in memory, but I can
22 tell you the best that -- when Mr. Donohue came
23 onboard in 1997, I think the State Farm contributions
24 went from something like, I recall, $26,000 a year to
25 $100,000 for the President's Advisory Group.  And then

Page 59

1  it subsequently increased around 2001 to a million
2  dollars plus the $100,000 for the President's Advisory
3  Group.
4          I'm referring to -- I'm relying on Agnes
5  Warfield's memorandum on that.  And if you showed it
6  to me, I could tell you -- give you an exact answer.
7      Q.  What evidence did you see that this
8  increase was related in any way related to Avery?
9      A.  Well, the proposition that State Farm was
10 enmeshed in a billion-dollar lawsuit which had been
11 decided against them that had been affirmed on appeal
12 and was hanging out basically for $1,056,636,180 with
13 interest accumulating at more than $250,000 a day, I
14 think that would have got their attention.
15     Q.  Is there any other evidence that you saw
16 that the increase in State Farm's contribution was
17 related in any way to the Avery case?
18     A.  Well, there was correspondence between
19 Mr. Rust and Mr. Donohue that talked about him taking
20 care of them and the Illinois -- these are general
21 recollections.  I need to see the document.  The -- my
22 report cites all of this stuff much more thoroughly
23 than I can do off the top of my head, but Mr. Donohue
24 assures Mr. Rust that his interest in the judicial
25 elections in Illinois will be taken care of.  And

Page 60

1  there were several references like that that caused me
2  to think that they were -- Rust was counting on the
3  support of the Chamber in Avery, notwithstanding the
4  fact also that the Chamber was issuing amicus briefs
5  in support of their position in the Avery class
6  action.
7          So there was a lot of reason for Mr. Rust
8  to be excited about his relationship with Mr. Donohue
9  and for Mr. Donohue to be excited about the money that
10 was going to come in from Mr. Rust and the opportunity
11 to function in the manner that he -- is described in
12 The Wall Street Journal article that we alluded to
13 earlier.
14     Q.  So you are giving an opinion as to
15 Mr. Rust or Mr. Donohue's state of mind or level of
16 excitement?
17     A.  With respect to what point?
18     Q.  Your -- your previous answer.
19     A.  Can I hear that again, please?
20         (The last answer was read back as
21 follows:  "Well, there was correspondence between
22 Mr. Rust and Mr. Donohue that talked about him taking
23 care of them and the Illinois -- these are general
24 recollections.  I need to see the document.  My report
25 cites all of this stuff much more thoroughly than I

Page 61

1  can do off the top of my head, but Mr. Donohue assures
2  Mr. Rust that his interest in the judicial elections
3  in Illinois will be taken care of.  And there were
4  several references like that that caused me to think
5  that they were -- Rust was counting on the support of
6  the Chamber in Avery, notwithstanding the fact also
7  that the Chamber was issuing amicus briefs in support
8  of their position in the Avery class action.
9          There was a lot of reason for Mr. Rust to
10 be excited about his relationship with Mr. Donohue and
11 for Mr. Donohue to be excited about the money that was
12 going to come in from Mr. Rust and the opportunity to
13 function in the manner that he -- is described in The
14 Wall Street Journal article that we alluded to
15 earlier."
16     A.  I don't think that I'm referring to the
17 state of mind of Mr. Donohue or Mr. Rust.  I'm talking
18 about the implications of the explicit -- explicit
19 exchange of communication between them.
20         And I would add to that, the Sheehan
21 award that was given to -- to -- to Mr. Rust in June
22 of 2004 acknowledging that he was, in fact, one of
23 Tom Donohue's best friends from the beginning who had
24 done, perhaps, more than anyone to pursue the programs
25 that Donohue espoused at the Chamber.  He's a leader

16 (Pages 58 to 61)

Thomas A. Myers, CPA          10/19/2017

Page 62

1   in civil justice reform, and things like that. There
2   are -- my report is far more complete in terms of
3   being responsive to your question, but that's what
4   comes to my mind off the top of my head.
5       Q.  (BY MR. SAFER)  Is it your testimony that
6   the Sheehan award was because of Mr. Rust's leadership
7   in the civil justice reform?
8       A.  No.  I think that I alluded to a
9   relationship that seemed to be blossoming without --
10  without characterizing what their -- their
11  psychological state of mind.  But it seemed like
12  Mr. Rust certainly met a need that the U.S. Chamber
13  had, and the U.S. Chamber certainly met a need that
14  State Farm had.  And in that context and that
15  environment, I think the relationship would flourish.
16  I would expect that.
17      Q.  You -- you testified, and I think you
18  said you'd seen the documents and -- and if you want
19  to look at page 9, it confirms your testimony that in
20  1997 -- at the very top -- State Farm increased its
21  contribution to the chamber to $100,000.  Does -- does
22  that confirm your memory?
23      A.  Yes.
24      Q.  And -- and that the -- State Farm joined
25  the President's Advisory Group in 1997?

Page 63

1       A.  Yes, sir.
2       Q.  Is that related in any way to the Avery
3   case?
4       A.  No.  That wouldn't be related to the
5   Avery case, but it does relate to the fact that Agnes
6   Warfield, at one point in one of her memos to
7   Mr. Donohue, said that State Farm was like a
8   litigation magnet.  That wasn't her exact words, but
9   they said -- she said something like one-fourth of all
10  of the litigation -- tort litigation relates to State
11  Farm.
12          So State Farm didn't just encounter this
13  problem for the first time with Avery.  Apparently, at
14  least according to the U.S. Chamber, it had
15  considerable experience in the litigation arena --
16      MR. SAFER:  Move --
17      A.  -- as a defendant.
18      MR. SAFER:  I move to strike the answer
19  after the first phrase.
20      MR. CLIFFORD:  Objection to the motion
21  and also add waiver.
22      MR. SAFER:  So that I understand it, what
23  is -- what -- what's the waiver, so I don't do that
24  again.
25      MR. COSGROVE:  Your question invited the

Page 64

1   answer that came.
2       MR. SAFER:  Okay.  Well, that's not
3   waiver.  That -- that might be responsive.  What's --
4   I just want to understand the waiver point.
5       MR. CLIFFORD:  You -- you have our
6   answer.
7       MR. SAFER:  Okay.
8       Q.  (BY MR. SAFER)  Did you attach any
9   significance to the fact that State Farm had a seat on
10  the President's Advisory Group in 1997 before the
11  Avery case was tried?
12      A.  Yes.  I would say yes because, as I just
13  explained, State Farm had a history of copious
14  litigation.  And State Farm would have been interested
15  in legal reform, classification reform irrespective of
16  their position with respect to Avery.
17          So they have always had this need -- they
18  were drawn to each other, the Chamber and State
19  Farm -- but it intensified as -- as was demonstrated
20  by the level of contributions with the Avery case and
21  with the subsequent billion-dollar judgment,
22  affirmation of that judgment.  And it became
23  particularly intense when it was appealed to the
24  Illinois Supreme Court and there was an election for a
25  seat where it was possible to find a judge that might

Page 65

1   be predisposed favorably toward State Farm's position
2   versus someone else that might not be.
3       MR. SAFER:  I move to strike the answer
4   as unresponsive.
5       MR. COSGROVE:  Could you -- we -- could
6   you state the question back for a second before I
7   respond?
8          (The last question was read back as
9   follows: "Did you attach any significance to the fact
10  that State Farm had a seat on the president's advisory
11  group in 1997 before the Avery case was tried?")
12      MR. COSGROVE:  Thank you.  We would
13  object -- we would object to your motion and state for
14  the record that your question invited the question and
15  answer that was provided by the witness, and it was
16  appropriate under the circumstance.
17      Q.  (BY MR. SAFER)  What is the President's
18  Advisory Group?
19      MR. CLIFFORD:  Objection to the question.
20  Assumes facts not in evidence.
21      A.  I'm sure that I explain it in the -- if I
22  don't explain it literally in the narrative of the --
23  my report, it's referred to in a footnote, because I
24  recall seeing it.  But I can tell you the President's
25  Advisory Group is sort of a favored status in

17 (Pages 62 to 65)

Page 66

1  recognition for making a -- a generous contribution,
2  that sort of thing.
3      Q.  (BY MR. SAFER)  How many people are on
4  the President's Advisory Group?
5      A.  I don't know.
6      Q.  How often did it meet?
7      A.  I don't know.
8      Q.  Who else other than State Farm was on it?
9      A.  I don't know.
10     Q.  Do you --
11     A.  Excuse me.  I do.  I think I've seen --
12  there -- there's a roster of people on there, but I
13  don't recall, as I sit here, how many were -- there
14  were certainly many more than just one.
15     Q.  Do you -- do you know whether it ever
16  met?
17     A.  No.
18     Q.  Did you consider Ed Rust's testimony
19  about the President's Advisory Group in performing
20  your analysis?
21     A.  No.  There was nothing about the
22  President's Advisory Group that I relied on other than
23  the fact that it was another 100 grand that was going
24  from State Farm to the U.S. Chamber.
25     Q.  You noted that in 2002 State Farm

Page 67

1  accelerated its annual payment to ILR.  Do you know
2  why ILR requested that?
3      A.  I thought it was because they wanted it
4  for the election cycle.  I thought that's what the
5  letter said.
6      Q.  Do you understand that ILR typically ran
7  at a deficit in the early months of the year?
8      A.  No.  There's no way I would know that.
9  We talked about the -- not having access to the
10  accounting records.
11     Q.  And have you seen any documents to that
12  effect, to the effect that they ran at a deficit in
13  the early months of the year?
14     MR. CLIFFORD:  Objection, asked and
15  answered, assumes facts not in evidence.
16     MR. COSGROVE:  And I'll also add to the
17  objection foundation.
18     A.  No.
19     Q.  (BY MR. SAFER)  You stated on page 9 that
20  Ed Rust was on the board of directors of ILR where he
21  could -- he would have influence over ILR's
22  pass-through contributions to various campaigns and
23  races including the Karmeier campaign.
24     A.  Can you direct me --
25     Q.  Yes.

Page 68

1      A.  -- specifically to where that is?
2      Q.  Page 9.  It's about eight lines from the
3  bottom, eight lines up from the bottom.
4      A.  Okay.  "Chamber" --
5      MR. COSGROVE:  That's on 9, correct?
6      MR. SAFER:  Yes.
7      A.  Okay.  And your question was -- I'm
8  sorry.  Could you repeat, please?
9      Q.  (BY MR. SAFER)  Yeah, sure.  What
10 evidence did you see that Ed Rust influenced the
11 contributions that ILR made?
12     A.  The contributions that ILR made?
13     Q.  Yes.
14     A.  I -- ILR didn't make any contributions.
15 Rust -- State Farm made the contributions.
16     Q.  Yes.
17     A.  I don't understand what you mean.
18     Q.  So did --
19     MR. COSGROVE:  I'll place an objection to
20 the question and ask you to rephrase, please.
21     A.  Are you talking about contributions to
22 the Illinois Republican Party?
23     Q.  (BY MR. SAFER)  Any --
24     MR. COSGROVE:  Hold on.
25     Q.  (BY MR. SAFER)  So --

Page 69

1      MR. COSGROVE:  Hold on.  Hold on.  He'll
2  ask you a question, and he'll clear this up to make
3  sure that there's a proper question and a proper
4  answer.
5      Q.  (BY MR. SAFER)  What evidence have you
6  seen that Ed Rust influenced any contributions that
7  ILR made?
8      A.  Oh, okay.
9      MR. CLIFFORD:  Objection to the
10 incomplete nature of the question.  To whom?
11     MR. SAFER:  To anyone.
12     A.  I've already spoke to the -- the fact
13 that The Wall Street Journal article in 2001 alluded
14 to Donohue's formula basically for taking big money
15 from contributors and applying them to political ends
16 -- mean -- ends for the contributor.
17     I've also offered other testimony that's
18 consistent with that.  My report is full of
19 documentation and discussion that alludes to that
20 phenomenon.
21     So -- so I -- and, again, I would
22 reiterate that I have never seen any explicit writing
23 or contract that earmarked these funds for the
24 Karmeier campaign, but the -- the substance over form
25 doctrine causes me to take into consideration and

18 (Pages 66 to 69)

Thomas A. Myers, CPA          10/19/2017

Page 70

1   weigh and rely upon the other evidentiary record,
2   which is copious in this regard.
3        Q.   By the way, is precept 8 or the
4   substantive form doctrine referred to anywhere in
5   either of your reports?
6        A.   No.  As I said, I do this -- I wasn't
7   going into this analysis as primarily a CPA or an
8   auditor or a CFE, or anything like that.  I was going
9   as an expert witness that has a unique record for
10  dealing with complex financial transactions.
11       Q.   On page 13 of your report -- and I'll
12  wait until you get there.
13       A.   Yes.  Thank you.
14       Q.   Okay.  You -- you discuss a -- an
15  Illinois business round table meeting at which Justice
16  Karmeier spoke.  And -- and you write in the second
17  full paragraph that "It's also worthy of note that at
18  the meeting, the IBRT touted its support for the
19  Karmeier campaign."  Do you see that?
20       A.   Yes.
21       Q.   Do you know whether Justice Karmeier was
22  present when that happened?
23            MR. COSGROVE:  I just -- objection to the
24  form of the question.  What is the -- what's the what?
25  The premise --

Page 71

1            MR. SAFER:  The tout -- the touting.
2            MR. COSGROVE:  I have an objection to
3   form.  I'm not sure it's clear to me what the question
4   is.  Maybe it is to the witness.
5        Q.   (BY MR. SAFER)  Do you understand the
6   question?
7        A.   Could I have it one more time, please?
8        Q.   Sure.  You write that the IBRT
9   touted its support for the Karmeier campaign.  Do you
10  know whether Justice Karmeier was present when any
11  touting of the IBRT's support for the Karmeier
12  campaign was done?
13       A.   No.
14       Q.   Do you know whether Justice Karmeier
15  received the agenda for the meeting that you cite?
16       A.   I assume he would; he's the honored
17  guest, but -- but I don't have any -- I don't recall
18  reading any testimony from Karmeier on that point.
19       Q.   Do you recall seeing the -- any documents
20  that sent the agenda to him?
21       A.   Well, now I do remember emails generally
22  going out from ICJL, I think, and Mr. Murnane's
23  office.  And I don't -- I'm sure that Kar -- well, I
24  would assume that Mr. Karmeier was one of the
25  recipients of those -- those emails, but I don't know

Page 72

1   that for a fact.
2        Q.   Okay.  So what is the basis of your
3   assumption that Justice Karmeier received the agenda
4   for the meeting?
5        A.   Well, all I know is if I were to step
6   into Ed Murnane's shoes and I was promoting this
7   celebratory meeting and rounding up all of the cast of
8   characters that contributed to this, I would think
9   that Mr. Karmeier would enjoy being aware of the
10  agenda.  And I can't -- I can't imagine Mr. Murnane
11  not taking the opportunity to inform him of the role
12  that IBRT and these affiliated organizations had
13  played in getting him elected.  That's just an
14  assumption, though, and based on what I think a
15  reasonable person would do; but I -- I don't have any
16  evidence of that.  I don't -- excuse me -- I have
17  evidence of that, but I don't have any factual --
18  anything in explicit writing.
19       Q.   You did read Judge -- Justice Karmeier's
20  deposition --
21       A.   Correct.
22       Q.   -- correct?  How did that affect your
23  analysis about the IBRT meeting?
24            MR. COSGROVE:  We object to the form, and
25  it's a vague question that does not have a subject or

Page 73

1   premise.  Ask for a restatement.
2        I'm sorry.  That's -- that is kind of
3   vague and ambiguous.
4        Q.   (BY MR. SAFER)  So --
5        A.   No offense.
6        Q.   -- did you read -- did you read Justice
7   Karmeier's testimony about the Illinois business round
8   table meeting that he attended?
9        A.   I read his deposition, but I don't recall
10  his test -- his testimony in that regard.
11       Q.   Do you -- so do you recall whether or not
12  his testimony about the meeting affected your analysis
13  of that meeting?
14       A.   It wouldn't change my opinion whether he
15  got the agenda or not.  We're talking about a jigsaw
16  puzzle with a thousand pieces.  If one piece is taken
17  away, it still doesn't change my opinion that this is
18  the Capitol Building and that's the mall and that's
19  the Lincoln Memorial, et cetera.
20       Q.   Beginning on page 13 of your report, you
21  -- you discussed Justice Karmeier's opinion in the
22  Philip Morris case.
23       A.   Yes.
24       Q.   You say that, quote, "State Farm lied to
25  the Illinois Supreme Court about its dominant role and

19 (Pages 70 to 73)

Thomas A. Myers, CPA       10/19/2017

Page 74

1  massive financial support for the Karmeier campaign."
2  That's on page 16.
3       A.  Forgive me, can you show --
4       Q.  Yes.
5       A.  -- me where you're reading from?  Page
6  16?
7       Q.  The very top.
8       A.  Okay.  Okay.  I'm with you.  When you say
9  "lied," are you opining about State Farm's intent?
10         MR. COSGROVE:  Object to the form of the
11  question.  That's vague and ambiguous.
12      A.  I think that my opinion in that regard is
13  articulated a bit more precisely in the conclusion
14  where I talk about the misrepresentations or the
15  representations that were made by State Farm to the
16  Illinois Supreme Court in the 2005 and 2011 filings.
17         In fact, I list each specific statement
18  with -- which I believe is incorrect and false.  Now,
19  I don't know what their intent was.  I don't know how
20  much due diligence went into actually preparing those
21  responses, but they were false, basically, based on --
22  or let me put it this way:  The overwhelming
23  evidentiary record would support the allegation that
24  they were false.
25      Q.  (BY MR. SAFER)  Are you opining about

Page 75

1  State Farm's intent?
2       A.  No.
3         MR. CLIFFORD:  Objection, asked and
4  answered.
5       A.  No.
6       Q.  (BY MR. SAFER)  Now, when you say that --
7  at the very top of 16, "dominant role," dominant in
8  relation to whom?
9       A.  Dominant with respect to the entire
10  affiliated organization.  Dominant with respect to
11  financing, dominant with respect to collection or --
12  or solicitation of Judge Karmeier, dominant in terms
13  of controlling the campaign effort's advertising and
14  in-kind contributions all through the relationship
15  they had with Mr. Murnane, ICJL and Shepherd.
16      Q.  Now, you said --
17      A.  Mr. Shepherd.
18      Q.  Let's go back to page 14 and -- I'll wait
19  until you get there.  You said that Justice Karmeier's
20  comparison of the Philip Morris case to the case in
21  Avery was misplaced, right?
22      A.  And it think I used those words, but I
23  -- the spirit, yes, I agree with.
24      Q.  And you said that "Justice Karmeier's
25  belief expressed in his Supervisory Order in Philip

Page 76

1  Morris, that proof of State Farm's support for his
2  campaign bore an 'unmistakable similarity' to Philip
3  Morris and" --
4       A.  I'm sorry, sir.  I don't -- where are you
5  reading from?  You are on page 14?
6       Q.  Yes.
7       A.  Whereabouts, please?
8       Q.  Whoops.  I'm sorry.  I'm sorry.  I'm on
9  -- now I'm on page -- thank you -- page 16, note --
10  yeah.  Thank you.  So page 16 --
11      A.  You threw me a curve ball.
12         MR. CLIFFORD:  Hold -- hold on.  He'll
13  straighten it out.
14      Q.  (BY MR. SAFER)  Page 16, second full
15  sentence.  Right at the top.  So where it says,
16  "Justice Karmeier's belief expressed in his
17  Supervisory Order" --
18      A.  Yes, thank you.
19      Q.  Yes -- "that proof of State Farm's
20  support for his campaign bore an unmistakable
21  similarity to Philip Morris and was similarly
22  inadequate under "--
23         MR. COSGROVE:  Similar -- "similarly."
24         MR. SAFER:  That's -- that's what I said.
25         MR. COSGROVE:  It's okay.  Sorry.

Page 77

1       Q.  (BY MR. SAFER)  -- "underscores the
2  pernicious influence of State Farm's
3  misrepresentations to the court."  Do you see that?
4       A.  Yes.
5       Q.  And you cite to the Supervisory Order at
6  page 11; is that right?
7       A.  Yes.  Yes.
8       Q.  But Judge Karmeier, in his ruling, didn't
9  say anything about proof in either case, did he?
10      A.  I'd have to review the order.
11      Q.  Okay.
12      A.  In order to save time, can you direct me
13  to where you're talking about?
14         MR. CLIFFORD:  He will.  Let's wait for a
15  question.
16         MR. COSGROVE:  Thank you.  Thank you,
17  Counsel.
18         (Deposition Exhibit 12 was marked.)
19      Q.  (BY MR. SAFER)  So do -- do you have an
20  exhibit in front of you, sir?
21      A.  I do.
22      Q.  And it is marked Myers 12.  Could -- are
23  you familiar with that --
24      A.  Yes.
25      Q.  -- exhibit?  What is it?

20  (Pages 74 to 77)

Thomas A. Myers, CPA        10/19/2017

Page 78

1      A.  It's a Supervisory Order issued by Judge
2   Karmeier in the Philip Morris matter.
3      Q.  And you've previously read this document?
4      A.  I -- I have.
5      Q.  And I believe you cite in Footnote 11 --
6   from this passage that we just read, you cite to page
7   11 of -- of the Supervisory Order.
8      A.  I'm there.
9      MR. CLIFFORD:  See what he has to say.
10      Q.  (BY MR. SAFER)  Justice Karmeier did not
11   say anything about the proof in either the Avery case
12   or the Philip Morris case, did he?
13      MR. COSGROVE:  I'll object to the form of
14   the question as being argumentative and to the use of
15   the ambiguous word of "proof" without a definition.
16      MR. CLIFFORD:  Let me add further to
17   that.  This whole line of discussion began with
18   counsel initially being mistaken about which page of
19   Mr. Myers's report he was reading from.  He corrected
20   that.  And we're now at page 16.  You directed him to
21   Footnote 62 citing the Supervisory Order that is in
22   front of him at page 11.  And if you go, however, to
23   the paragraph citing the Supervisory Order -- and I
24   don't know if you attempted to paraphrase, but it's an
25   improper paraphrase of the paragraph, with all due

Page 79

1   respect.  I think it's a confusing question.  That's
2   all.
3      MR. COSGROVE:  I'm confused, too.
4      MR. SAFER:  Really?  You're both confused
5   because --
6      MR. COSGROVE:  You don't care about my
7   confusion?
8      MR. SAFER:  Because we just read the para
9   -- we just read the quote.  It wasn't a paraphrase, we
10   read it.  So, yes, you're both confused.  I get it.
11      MR. CLIFFORD:  About what the actual
12   question is.  We're trying to figure out what the
13   actual question is.
14      MR. COSGROVE:  When you say --
15      MR. CLIFFORD:  Let me --
16      Q.  (BY MR. SAFER)  The question is -- the
17   question is Justice Karmeier, in his Supervisory
18   Order, did not say anything about the proof in either
19   Avery or -- or Philip Morris on page 11, does he?
20      A.  That word is not used by Judge Karmeier.
21      Q.  Well, what he's referring to is -- and
22   comparing it to Avery in the quote that you use, do
23   you -- you are quoting -- let me start again.  I'm
24   sorry.
25      You are quoting on page 16 of your report

Page 80

1   from the first sentence of the first full paragraph of
2   the Supervisory Order on page 11, correct?
3      A.  The first sentence -- full sentence that
4   begins, "An affidavit"?
5      Q.  That begins, "In reviewing" --
6      A.  Okay.  First full paragraph.  Thank you.
7   "In reviewing correspondence" -- yes.
8      Q.  And you're --
9      A.  I'm -- I'm using the term "proof" sort of
10   ambiguously here.  You could just as easily say the
11   record of State Farm's support.  I didn't mean proof
12   literally.  Of course, there isn't any proof of State
13   Farm's support.
14      Q.  What Justice Karmeier was comparing is
15   the contentions -- the allegations that the
16   respondents had made in the Philip Morris case,
17   correct?
18      MR. CLIFFORD:  Objection to the form of
19   the question.  It's argumentative.  You -- you are
20   misleading the witness, with all due respect.  You
21   have him on page 11.  You're quoting from page 11.
22   You're ignoring the entirety of the citation,
23   specifically the very last sentence of the paragraph
24   that you referenced on page 11, and it's unfair to the
25   witness.

Page 81

1      Q.  (BY MR. SAFER)  Do you have the question?
2      A.  Again, please.
3      MR. SAFER:  Could you read the question,
4   please?
5      (The last question was read back as
6   follows:  "What Justice Karmeier was comparing is the
7   contentions -- the allegations that the respondents
8   had made in the Philip Morris case, correct?")
9      MR. CLIFFORD:  Same objection.
10      THE DEPONENT:  I -- I need to have that
11   one more time.
12      Q.  (BY MR. SAFER)  So let me --
13      A.  Can you clarify?
14      Q.  Let me see if -- yeah.
15      A.  Thank you.
16      Q.  What -- what Justice Karmeier was
17   comparing when he said in -- in your material, that
18   is, "unmistakably similar," is the allegations that
19   are made in the Philip Morris case to the materials
20   filed by the plaintiff in Avery, correct?
21      A.  I'm really kind of confused by the
22   question.  And I think you're asking me to form a
23   legal conclusion here, but I'm struggling through
24   Karmeier's language because he used the term "proof"
25   himself -- or "proved" in that sentence at the bottom

Thomas A. Myers, CPA       10/19/2017

Page 82

1  of that paragraph, so --
2      Q.  Yes, Mr. Clifford has -- has referred you
3  to --
4      A.  Yes.
5      Q.  -- something that is -- is that what you
6  were quoting in your report?  Were you quoting the
7  last sentence of -- of this -- of -- on page 11 to
8  which Mr. Clifford referred you, sir?
9          MR. COSGROVE:  I'd like to place an
10 objection on the record as to the statement that pre
11 -- the preamble that was before the question that was
12 asked and move to strike, and ask that a new question
13 be posed to the witness.
14     A.  I'm thoroughly confused because you say
15 I'm quoting on page 16.  I don't see quoting on the
16 word "proof" or --
17     Q.  (BY MR. SAFER)  No.  There are no quotes
18 on the word "proof."
19     A.  Well, what was your -- can I have --
20     Q.  The quotes --
21     A.  -- your question back?
22     Q.  The quotes are -- very simple, sir.  The
23 second sentence, do you see on page 16 when you say,
24 "Justice Karmeier's belief expressed in his
25 Supervisory Order in Philip Morris that proof of State

Page 83

1  Farm's support for his campaign bore an 'unmistakable
2  similarity' to Philip Morris"?  Do you see that?
3      A.  Yes.
4      Q.  That -- you were referring to the first
5  full paragraph -- to the first sentence of the first
6  full paragraph of Justice Karmeier's opinion on page
7  11, correct?
8      A.  I don't know that that's correct or not.
9  I don't recall what I was thinking when I wrote that,
10 but I can tell you what --
11     Q.  Where did the term "unmistakable
12 similarity" appear?
13         MR. CLIFFORD:  Objection to that
14 question.  The witness was interrupted and not allowed
15 to finish his last answer before he was interrupted by
16 you.
17         MR. COSGROVE:  Could we have the last
18 question read back and the portion of his answer that
19 he began with so that the witness can recall where he
20 was in his response potentially before he was
21 interrupted?
22         (The last question and answer were read
23 back as follows:
24         Question:  "You were referring to the
25 first full paragraph -- to the first sentence of the

Page 84

1  first full paragraph of Justice Karmeier's opinion on
2  page 11, correct?"
3          Answer:  "I don't know that that's
4  correct or not.  I don't recall what I was thinking
5  when I wrote that, but I can tell you what --")
6          MR. CLIFFORD:  And then he was
7  interrupted.
8      A.  You -- you said I was referring in the
9  first -- were you talking about page 16 or page 11 of
10 the Supervisory Order or page 16 of my report?  I
11 don't understand.
12     Q.  (BY MR. SAFER)  On page 16 of your
13 report.
14     A.  Yes.
15     Q.  Do you have page 16 of your report --
16     A.  Yes.
17     Q.  -- in front of you?
18     A.  I do.
19     Q.  Do you see the sentence that begins,
20 "Justice Karmeier's belief"?
21     A.  I do.
22     Q.  Do you see a sentence that has within it,
23 the quote "unmistakable similarity"?
24     A.  Right.  I do --
25     Q.  Does --

Page 85

1      A.  -- see that.
2      Q.  Does that refer to page 11 of Justice
3  Karmeier's Supervisory Order when he says, "In
4  reviewing respondents' contentions, I cannot help but
5  notice that they bear an mistakably" -- "unmistakable
6  similarity to materials filed by plaintiffs in Avery"?
7  Do you see that?
8      A.  Yes, I do.  Thank you.
9      Q.  Is that where the quote was taken from?
10     A.  I -- I assume so.  I don't recall what --
11 what I was thinking at the time, but it makes sense.
12     Q.  And Justice Karmeier's statement on
13 page 11 regards the respondent, that is, Philip
14 Morris's contentions, correct?
15         MR. COSGROVE:  Form and foundation.
16     A.  I -- how -- where -- how are you
17 developing that logic --
18     Q.  (BY MR. SAFER)  It says --
19     A.  "In reviewing respondents' contentions."
20 Okay.  I'm with you on that.  Yes, I agree.
21     Q.  (BY MR. SAFER)  Did you analyze the
22 contentions made by -- in the Philip Morris case when
23 you were -- when you were evaluating Justice
24 Karmeier's comparison of the two cases in your report?
25     A.  Again?

22 (Pages 82 to 85)

Thomas A. Myers, CPA          10/19/2017

Page 86

1     (The last question was read back as
2  follows: "Did you analyze the contentions made in the
3  Philip Morris case when you were evaluating Justice
4  Karmeier's comparison of the two cases in your
5  report?")
6     MR. COSGROVE: I'm just going to place an
7  objection as the question is vague. There's a -- this
8  is, to be as concise as possible, a 16-page
9  supervisory order that has multiple contentions.
10 Which specific contention are you suggesting or
11 questioning? The premise of your question is unclear.
12    MR. SAFER: As -- you know, we've
13 tolerated lots of speaking objections. This is
14 important. If you want to say vague and ambiguous,
15 that's fine.
16    A. I --
17    MR. CLIFFORD: Well, wait a minute. To
18 be clear here, we certainly are permitted -- we
19 certainly are permitted to make neutral comments,
20 whether you call them speaking, or otherwise, as a
21 pejorative design to communicate something to the
22 witness. So, I mean, go ahead and give your
23 instruction to us that we can say vague and ambiguous;
24 but to be clear, if the record warrants a neutral
25 comment about the nature of that objection, we are

Page 87

1  entitled to make that, Counsel.
2     **Q. (BY MR. SAFER) Do you have the question**
3  **in mind, sir?**
4     A. No.
5     MR. SAFER: Can you reread the question,
6  please?
7     (The last question was read back as
8  follows: "Did you analyze the contentions made in the
9  Philip Morris case when you were evaluating Justice
10 Karmeier's comparison of the two cases in your
11 report?")
12    MR. COSGROVE: Same objection that was
13 previously made on the record as it relates to the
14 vague and ambiguous terms in the premise of the
15 question.
16    A. And all I know is I'm sitting here with a
17 16-page legal opinion from Judge Karmeier that I
18 haven't reviewed in probably months, and you're asking
19 me what contentions he was talking about. I don't --
20 I don't even understand where you're going with the
21 question. What is it that you want me to admit to?
22 Maybe I'll just do that.
23    MR. CLIFFORD: No.
24    A. I don't -- I don't get it. There's --
25 there's nothing --

Page 88

1     **Q. (BY MR. SAFER) Sir -- okay. You -- you**
2  **-- let's go back to your report.**
3     MR. CLIFFORD: Let him finish the line of
4  questioning.
5     THE DEPONENT: Okay.
6     **Q. (BY MR. SAFER) And on page 14 --**
7     A. 14. 16 or 14?
8     **Q. 14. And you -- you begin the discussion**
9  **on page 14 of the allegations in the Philip Morris**
10 **case, correct?**
11    A. Where is that? On the first paragraph?
12    **Q. First full paragraph.**
13    A. Okay.
14    **Q. Well --**
15    MR. CLIFFORD: Second full paragraph.
16    **Q. (BY MR. SAFER) Well, you actually begin**
17 **it in -- on page 13.**
18    MR. COSGROVE: What's the question?
19    MR. CLIFFORD: He's okay.
20    A. Okay. Page 13, last paragraph?
21    MR. CLIFFORD: Yes.
22    A. Would you like me to review that?
23    **Q. (BY MR. SAFER) The question is you begin**
24 **the discussion of the Philip Morris case there,**
25 **correct?**

Page 89

1     A. Yes.
2     **Q. And then on page 14, on the second full**
3  **paragraph, you say, "With respect to allegations, made**
4  **by the smokers and their families, that Philip Morris**
5  **funded contributions through the Illinois Chamber of**
6  **Commerce, Justice Karmeier reasoned that the alleged**
7  **contribution amount was only $20,000 or .4 percent of**
8  **the total of 4.8 million in contributions to his**
9  **campaign."**
10    **Do you see that?**
11    A. Yes.
12    **Q. And you then say, "Justice Karmeier**
13 **compared" --**
14    A. Wait, wait.
15    MR. CLIFFORD: Next paragraph.
16    **Q. (BY MR. SAFER) Next para --**
17    A. Do you skip down?
18    **Q. Next paragraph.**
19    A. Okay.
20    **Q. "Justice Karmeier compared the smokers**
21 **case to the case made by the Avery plaintiffs in**
22 **seeking his recusal for receiving contributions from**
23 **State Farm."**
24    **Do you see that?**
25    A. Yes.

DTI Court Reporting Solutions  -  Chicago

Thomas A. Myers, CPA          10/19/2017

Page 90

1      Q.  Okay.  And you say at the very bottom of
2   that page, page 14, "That the Judge would consider --
3      A.  Wait, wait.  Very bottom.  I don't see
4   anything --
5          MR. CLIFFORD:  No, no, at the end of
6   the -- at the end of the paragraph on -- the last
7   paragraph on 14.
8          MR. COSGROVE:  Three words.
9          MR. CLIFFORD:  Three words, "That the
10  judge."
11         THE DEPONENT:  Okay.
12         MR. CLIFFORD:  And it goes over to the
13  next page.
14         THE DEPONENT:  Thank you.
15     Q.  (BY MR. SAFER)  -- "would consider the
16  substantial contributions made by State Farm to be
17  comparable to the relatively minor contributions made
18  by Philip Morris underscores the impact of
19  State Farm's for verifications."
20     A.  Yes.
21     Q.  Do you see that?
22     A.  Yes.
23     Q.  Now, let's get back to what -- to the
24  opinion.  What Justice Karmeier was comparing were the
25  contentions of the respondent in the Philip Morris

Page 91

1   case, correct?
2      A.  Yes.
3      Q.  And my question is did you review the
4   contentions that were made by the plaintiffs in the
5   Philip Morris case before critiquing Justice
6   Karmeier's comparison?
7      A.  No.
8          THE VIDEOGRAPHER:  Counsel, five minutes
9   until media change.
10         MR. SAFER:  Okay.  All right.  Well, why
11  don't you change then.
12         THE VIDEOGRAPHER:  This is the end of
13  Media No. 1 in the deposition of Thomas Myers, CPA.
14  Going off the record.  The time is 12:08.
15         (Recess taken, 12:08 p.m. 12:10 p.m.)
16         THE VIDEOGRAPHER:  We are back on the
17  record.  The time is 12:10.  This is the beginning of
18  Media No. 2 in the deposition of Thomas Myers, CPA.
19         (Deposition Exhibit 13 was marked.)
20     Q.  (BY MR. SAFER)  I've marked what is Myers
21  Exhibit 13, which is a pleading filed by
22  Plaintiff-Appellees' Memorandum in Support Of Motion
23  For Recusal Or Disqualification dated November 17,
24  2015.
25  Do you see that document?

Page 92

1      A.  Yes, sir.
2      Q.  Have you ever seen that document before?
3      A.  Yes.
4      Q.  When did you see it?
5      A.  Probably two weeks ago.
6      Q.  How did you come across it?
7      A.  Hold on a second.  Let me make sure that
8   I've identified -- oh, I'm sorry.  Excuse me.  I
9   thought this was the State Farm motion.  No, I haven't
10  seen that document before.
11     Q.  So you did not review what the
12  respondents' contentions were in the Philip Morris
13  case?
14     A.  No.  Not -- not from this document here,
15  no.
16     Q.  Okay.
17     A.  I don't recall doing that, anyway.
18     Q.  Looking at page 2 of the numbered page 2
19  at the bottom --
20     A.  I'm sorry.  Are you talking about the
21  Exhibit 13?
22     Q.  Yes.
23     A.  Numbered page 2.  Okay.  I'm with you.
24     Q.  Okay.  Do you see where it says at -- at
25  the bottom, the last full sentence of the page, "Over

Page 93

1   the course of the following year, Justice Karmeier's
2   campaign would spend 4.8 million" -- it's got an exact
3   figure --
4      A.  Right.
5      Q.  -- "to secure his election.  Of that
6   amount, $3,396,457.79, came directly or indirectly
7   from Philip Morris, its affiliates, and its supporters
8   before the court that Justice Meier" -- "Karmeier
9   hoped to join."
10         Do you see that?
11     A.  Yes.
12     Q.  And this is in the Price v. Philip Morris
13  case, correct?
14     A.  Okay.  Yes.
15     Q.  If the plaintiffs in this case are
16  correct, then your conclusion that State Farm is
17  responsible for contributing $3.5 million to Justice
18  Karmeier campaign is wrong?
19         MR. CLIFFORD:  Objection, argumentative,
20  foundation, assumes facts not in evidence nor will
21  ever be in evidence.  And it's contrary to the facts
22  that are in evidence.
23     A.  Again.
24         MR. SAFER:  Could you read the question
25  back, please?

DTI Court Reporting Solutions  -  Chicago
800-868-0061                              www.deposition.com

Thomas A. Myers, CPA        10/19/2017

Page 94

1      (The last question was read back as
2   follows: "If the plaintiffs in this case are correct,
3   then your conclusion that State Farm is responsible
4   for contributing $3.5 million to Justice Karmeier
5   campaign is wrong?")
6      MR. CLIFFORD: Same objection.
7      A.  Obviously, you can't have both; but the
8   evidentiary record that I examined points to explicit
9   proof that Philip Morris did not fund the Karmeier
10  campaign as articulated -- I think it's in my report.
11  If not, I can expound on it.
12     Q.  (BY MR. SAFER)  The same dollars cannot
13  be contributed by two different entities, correct?
14     MR. CLIFFORD:  Objection.
15     A.  Absolutely.
16     MR. CLIFFORD:  Argumentative.
17     Q.  (BY MR. SAFER)  The -- if we look at page
18  3, that first full paragraph -- or the only full
19  paragraph -- the plaintiffs in the Philip Morris case
20  said that -- claim that the over $2 million the U.S.
21  Chamber contributed to the Illinois Republican party
22  came from Philip Morris.  Do you see that much?
23     A.  Yes.
24     Q.  And those are the same dollars that you
25  attribute to State Farm --

Page 95

1      A.  Right.
2      Q.  -- correct?
3      MR. CLIFFORD:  Objection, argumentative,
4   foundation, assumes facts not in evidence nor will
5   ever be in evidence and the witness has already
6   answered this question.
7      A.  It says that, but I did an extensive
8   analysis of the evidentiary record and State Farm.
9   And I'm basing my opinion on what unequivocally -- on
10  what I saw.  And I explain explicitly what I relied on
11  in my report.
12     I know nothing about Philip Morris's
13  claim other than to say that there is a spreadsheet
14  that was produced by Ed Murnane in or around September
15  of 2004 where he purported to list all of the
16  contributors to the Karmeier campaign.  And Altria,
17  the holding company for Philip Morris, was one of
18  those contributors.  And it said that they would not
19  contribute to the Karmeier campaign because they had a
20  conflict of interest.  They had a case in front of the
21  Supreme Court.  That's explicit evidence.  I know
22  nothing about what these guys -- what the plaintiffs
23  in Philip Morris are arguing.  I strenuously disagree
24  with their argument.
25     Q.  (BY MR. SAFER)  Have you analyzed Philip

Page 96

1   Morris's role at the U.S. Chamber of Commerce?
2      A.  No.
3      Q.  Have you analyzed Philip Morris's role at
4   ILR?
5      A.  As I just said, I've asked and answered
6   -- that's already been asked and answered.  I said I
7   examined extensively the State Farm evidentiary
8   record.
9      I never looked at Philip Morris.  I never
10  had that available to me.  My opinion is based on my
11  exhaustive, comprehensive examination of the -- of the
12  State Farm record.  And therefore, I would disagree on
13  that basis with the Philip Morris plaintiffs.
14     Q.  Have you analyzed Philip Morris's role at
15  ILR?
16     MR. CLIFFORD:  Objection, asked and
17  answered.  He just gave you the answer to that
18  question.
19     A.  I haven't examined Philip Morris's role
20  in anything.
21     Q.  (BY MR. SAFER)  How much --
22     A.  Other than on that spreadsheet.
23     Q.  How much did Philip Morris contribute to
24  the United States Chamber of Commerce in 2003 and
25  2004?

Page 97

1      MR. CLIFFORD:  Objection, Counsel.  Asked
2   and answered, assuming facts not in evidence nor
3   provided to the witness, foundation, repeatedly asked
4   and answered.
5      A.  I haven't examined anything regarding
6   Philip Morris other than that spreadsheet from Ed
7   Murnane.
8      Q.  (BY MR. SAFER)  So you do not know how
9   much Philip Morris contributed to any of the
10  affiliated organizations described in your report in
11  2003 or 2004, correct?
12     MR. CLIFFORD:  Objection, asked and
13  answered, argumentative.
14     A.  That's correct.
15     Q.  (BY MR. SAFER)  Do you know whether
16  Philip Morris requested that the U.S. Chamber or ILR
17  contributed money to the Karmeier campaign?
18     MR. CLIFFORD:  Objection, argumentative,
19  assuming facts in evidence.
20     A.  Same answer, no.  I mean, I said that I
21  haven't examined anything relating to Philip Morris's
22  conduct.
23     Q.  (BY MR. SAFER)  Did you evaluate the
24  influence of any other company with the U.S. Chamber
25  of Commerce?

25 (Pages 94 to 97)

Thomas A. Myers, CPA          10/19/2017

Page 98

1    A.  In the context of the Karmeier --
2 Karmeier campaign?
3    Q.  Yes.
4    A.  I did.  I wanted to see who the corporate
5 contributors were to the Karmeier campaign and if any
6 of them had a billion-dollar lawsuit that was pending
7 in the Illinois Supreme Court.
8    Q.  And what did you find?
9    A.  There was no one like State Farm.  State
10 Farm was the -- was the material contributor to the
11 Karmeier campaign, and they had a huge axe to grind in
12 terms of the billion-dollar judgment that was coming
13 up before the Illinois Supreme Court where Karmeier
14 would be seated, should he win.
15    Q.  What was the judgment in the Price case
16 against Philip Morris?
17    A.  I don't know.
18    Q.  Was it $10 billion?
19    A.  It has no -- it has no bearing on my
20 opinion about State Farm's conduct.
21    Q.  I don't understand.  Let me start again.
22 You have just said that you analyzed the other donors
23 to see whether any of them had a billion-dollar
24 verdict pending at the time.
25    A.  And I said that Philip Morris was not a

Page 99

1 donor.  They refused to contribute because they had
2 had a conflict of interest with the Supreme Court.  So
3 they weren't -- I didn't consider them -- I was aware
4 that Philip Morris had a substantial judgment against
5 them in Illinois that was pending before the Supreme
6 Court.
7    Q.  But Philip Morris was a donor to the U.S.
8 Chamber of Commerce, correct?
9    A.  I've already answered that question
10 probably three times.
11    Q.  Okay.  Other than to see whether or not
12 anybody had verdicts, did you evaluate the influence
13 of any other company with the U.S. Chamber of
14 Commerce?
15    A.  No, I had no access to those records.
16    Q.  Did you evaluate the influence of any
17 other company with ILR?
18    A.  No, sir.
19    Q.  Did you evaluate the influence of any
20 other company with regard to any of the affiliated
21 organizations in your report in 2003 and 2004?
22    A.  Not that I recall.
23    Q.  How many companies does Tom Donohue meet
24 with a year?
25    MR. COSGROVE:  Foundation.  When?

Page 100

1    A.  I think he represented -- oh, sorry.
2    MR. COSGROVE:  I have a foundation
objection as to the vagueness of the time frame.
4    Q.  (BY MR. SAFER)  Okay.  How many -- during
the 2003/2004 time period, how many companies did Tom
6 Donohue meet with?
7    A.  I think he met with something like 200;
8 but only one of them got the Sheehan award, the
9 president.
10    Q.  Were there any other awards that -- that
11 the chamber gave?
12    A.  I'm not aware of that.
13    Q.  Did you analyze whether they were any
14 other awards?
15    A.  I simply analyzed the commentary on the
16 Sheehan award where they purported that Mr. Rust was
17 the -- I can't -- if you had the -- the Agnes Warfield
18 document, I could tell you exactly what it says.  But
19 Ed Shee -- or Ed Rust was, like, the No. 1 fan -- Tom
20 Donohue was the No. 1 fan of Ed Rust because of his
21 activity in legal reform and --
22    MR. SAFER:  I move to strike that answer
23 as nonresponsive.
24    MR. CLIFFORD:  To which we would object.
25    Q.  (BY MR. SAFER)  The question is did you

Page 101

1 analyze any other awards that the Chamber or ILR gave
2 other than the Sheehan award?
3    A.  No, I didn't have access to that
4 information.
5    Q.  On page 4 of Myers Exhibit 12 --
6    A.  I've got 13.
7    Q.  (BY MR. SAFER)  13?  Thank you.
8    MR. CLIFFORD:  Wait, wait.  Are you
9 talking about the --
10    MR. SAFER:  13.
11    Q.  (BY MR. SAFER)  It -- the plaintiffs in
12 the Price case also assert that the Illinois Civil
13 Justice League and Ed Murnane's conduct was at the
14 behest of Philip Morris.  Do you see that?
15    A.  Give me a chance to review it, please.
16    Q.  Sure.
17    MR. CLIFFORD:  Are you quoting, Counsel?
18    MR. SAFER:  No.
19    MR. CLIFFORD:  Well, then, which
20 paragraph on page 4 are you referring to?
21    MR. SAFER:  The first --
22    MR. CLIFFORD:  The entirety?
23    MR. SAFER:  The first full paragraph.
24    MR. CLIFFORD:  The first full paragraph.
25 Okay.  Fair enough.

26  (Pages 98 to 101)

Thomas A. Myers, CPA       10/19/2017

---

Page 102

1      A.  I have had a chance to review it.
2      Q.  (BY MR. SAFER)  Okay.  Did you examine
3  Philip Morris's influence in the Illinois Justice
4  League?
5      A.  Sure.  I looked at the D-2 that was filed
6  by its PAC -- JUSTPAC, and there was no reference to
7  Philip Morris.
8      Q.  Did you do anything else to examine
9  Philip Morris's influence over the Illinois Civil
10  Justice League?
11         MR. CLIFFORD:  Objection, assuming facts
12  not in evidence, foundation, asked and answered.
13      A.  No.
14      Q.  (BY MR. SAFER)  Did you study contacts
15  between Philip Morris and the Illinois Civil Justice
16  League?
17      A.  No.
18      Q.  Did you study contacts between Philip
19  Morris and Ed Murnane?
20      A.  As I've said at least half a dozen times,
21  I think, I didn't examine anything with regard to
22  Philip Morris's conduct regarding -- anything other
23  than to note that their holding company declined to
24  contribute to ICJL or the Karmeier campaign because
25  they had a conflict of interest.  That was

---

Page 103

1  Mr. Murnane's spreadsheet.  That was his comment.
2  Those are his words.  So that -- all of that
3  contradicts what you're telling me about here or what
4  you're pointing out to me here.
5      Q.  Did you review emails from Ed Murnane
6  that provided updates on the Karmeier/Maag election
7  sent directly to Altria representatives?
8         MR. CLIFFORD:  Objection, foundation,
9  argumentative.  You don't need to raise your voice.
10  Assuming facts not in evidence.
11         MR. SAFER:  Did you think that I had
12  raised my voice?
13         THE DEPONENT:  No, I'm not offended.  But
14  I appreciate the support.
15      Q.  (BY MR. SAFER)  Do you have the question?
16      A.  We're all buddies.  I'm sorry.  Yeah.
17  You know, but what -- what counsel is -- is alluding
18  to is the fact that, yes, I have said so many times I
19  never looked at anything specifically regarding Philip
20  Morris.  And he's exactly right.  But I'm not
21  offended.  Continue.  Take as much time as you want.
22      Q.  Thank you.
23      A.  May I say one qualification to that
24  answer, please.  I did want -- I did review numerous
25  weekly alerts, and so forth, from Mr. Murnane.  Now,

---

Page 104

1  if they went to Philip Morris, I wouldn't know.
2      Q.  Well, there was a -- a distribution list
3  on a number of --
4      A.  I don't.
5      Q.  -- of the documents that are included in
6  your report and referenced in your report.
7      A.  Fair enough.  I don't recall seeing that.
8      Q.  And you don't recall -- do you recall
9  seeing the name Derek Crawford with an Altria email
10  address on those distributions?
11      A.  No.
12      Q.  The plaintiffs in the Price -- Price case
13  go on at page 4 and 5 to assert that ATRA's
14  contributions should be attributable to Philip Morris.
15         MR. CLIFFORD:  Is that a question?
16         MR. SAFER:  Well, I'm letting -- I'm
17  letting him catch up to me.
18         THE DEPONENT:  You're on page 4?
19         MR. SAFER:  Yeah, bottom of page 4 and
20  then on to page 5.
21         THE DEPONENT:  Okay.
22      Q.  (BY MR. SAFER)  And my question will be,
23  so you have it in mind, those are the same dollars
24  that you attribute to State Farm?
25      A.  Right.  Will you give me a --

---

Page 105

1      Q.  Yes.
2      A.  -- a second to review this please?  Thank
3  you.
4      Q.  All the time you want.
5      A.  Did you want me to continue?
6         MR. CLIFFORD:  Review the -- what he
7  directed you to do, and then he'll ask a question.
8      A.  Well, I'm done reading.
9      Q.  (BY MR. SAFER)  So the questions was
10  those are the same dollars that you attribute to State
11  Farm?
12         MR. CLIFFORD:  Objection, argumentative,
13  form, foundation, assuming facts not in evidence.
14         MR. COSGROVE:  Asked and answered.
15         MR. CLIFFORD:  Asked and answered.
16         MR. CANCILA:  You even asked and answered
17  your tag team objections there.
18      A.  They would have to be the same, $415,000.
19      Q.  (BY MR. SAFER)  Did you evaluate Philip
20  Morris's contributions to ATRA?
21         MR. CLIFFORD:  Objection.  Repeatedly
22  asked and answered.
23      A.  No.
24      Q.  (BY MR. SAFER)  Did you evaluate Philip
25  Morris's influence at ATRA?

---

27 (Pages 102 to 105)

Thomas A. Myers, CPA          10/19/2017

Page 106

1      A.  No.  But I will say, you know, this,
2  again, is a jigsaw puzzle situation.  But I saw
3  specific instances of ATRA working hand in hand with
4  State Farm to get contributions to the Karmeier
5  campaign and what I would characterize as conduct that
6  was contrary to the Illinois campaign law that -- that
7  Justice Karmeier referred to.
8          In other words, they helped State Farm
9  obscure their contribution.  And they would take money
10  earmarked -- earmarked for Karmeier and send it over
11  to the Illinois Chamber of Commerce, the Illinois
12  Chamber of Commerce PAC, in a roundabout way, which is
13  exactly what Judge Karmeier, in my view, argued was
14  illegal.
15          So they did this on behalf of State Farm.
16  I never saw any activity that benefited Philip Morris.
17  But, again, I didn't look for it.
18          MR. SAFER:  I move to strike the answer
19  after "no."
20          MR. CLIFFORD:  Object -- excuse me.
21  Objection, completely responsive, invited answer.
22  And, therefore, waived in terms of any motion to
23  strike or objection.
24      Q.  (BY MR. SAFER)  Do you know whether
25  Philip Morris directed ATRA to contribute money to

Page 107

1  Justice Karmeier?
2      A.  No.
3      Q.  Do you know whether Philip Morris
4  directed ILR to contribute money to Justice Karmeier?
5      A.  As I said before, I didn't investigate
6  the activity of Philip Morris, nor did I have the
7  record of available to me to ascertain exactly what
8  their conduct was with respect to any of the questions
9  you've asked me previously.
10          MR. SAFER:  This is probably a good time
11  as any to break.
12          THE VIDEOGRAPHER:  Going off the record
13  the time is 12:31.
14          (Recess taken, 12:31 p.m. to 1:31 p.m.)
15          THE VIDEOGRAPHER:  We are back at record.
16  The time is 1:32.
17      Q.  (BY MR. SAFER)  Good afternoon,
18  Mr. Myers.
19      A.  Good afternoon.
20      Q.  Now, you are not an expert in Illinois
21  campaign disclosure laws, are you?
22      A.  No, I'm not.
23      Q.  You did reference earlier that on page
24  17, you cite a -- a summary of a part of the law.  Do
25  -- and I'll just let you turn to page 17 for a moment.

Page 108

1      A.  Yes.
2      Q.  That's a summary of the law as it exists
3  today, correct?
4      A.  I'm not sure.
5      Q.  Do you --
6      A.  I believe it's from 2004, but I couldn't
7  confirm that.
8      Q.  This -- do you have a date for this guide
9  to campaign disclosure?
10      A.  Well, let's see.  It says -- no, I don't
11  have a date on it.
12      Q.  Okay.  Well, you are aware that the
13  Illinois campaign finance laws have changed
14  dramatically from 2004 to 2015, correct?
15          MR. CLIFFORD:  Objection, form,
16  foundation, argumentative, assumes fact not in
17  evidence.
18      A.  I'm aware there has been some change.
19      Q.  (BY MR. SAFER)  Are you aware that the
20  definition of electioneering communication under
21  Section 9-1.14 has changed since 2004?
22          MR. CLIFFORD:  Same objection.
23      A.  I'm not aware of that.
24      Q.  (BY MR. SAFER)  Are you aware that the
25  definitions of expenditures and contributions have

Page 109

1  changed since 2004?
2          MR. CLIFFORD:  Objection, form,
3  foundation, assumes fact not in evidence.
4      A.  No.
5      Q.  (BY MR. SAFER)  Do you -- in your report,
6  you cite this summary that says under little No. 3 --
7      A.  I'm sorry.  Where are you?
8      Q.  Yeah, I'm trying to say -- in the
9  indented paragraph little No. 3 --
10      A.  Yes, I'm with you.  Thank you.
11      Q.  Okay.  Where it says, "Have made
12  independent expenditures in excess of 5,000."
13          Do you see that?
14      A.  Yes.
15      Q.  Were you aware that the term "independent
16  expenditure" does not appear in the Illinois election
17  law as it existed in 2004?
18          MR. CLIFFORD:  Objection, foundation,
19  assumes facts not in evidence.
20      A.  No.
21      Q.  (BY MR. SAFER)  Were you aware that
22  expenditures could have been made on behalf of a
23  candidate that did not have to be disclosed in 2004,
24  but would have to be disclosed under the present law?
25          MR. CLIFFORD:  Objection, foundation,

28 (Pages 106 to 109)

Thomas A. Myers, CPA          10/19/2017

Page 110

1   assumes facts not in evidence, calls for a legal
2   conclusion.
3        A.  I didn't study the changes between the
4   current law and the 2004 law, if any.
5        Q.  (BY MR. SAFER)  Were you aware that
6   whether an expenditure, as that term was defined in
7   Section 9-1.5 of the Illinois campaign finance laws,
8   were evaluated regardless of whether the communication
9   was made in concert or cooperation with or at the
10  request, suggestion or knowledge of the candidate?
11       MR. CLIFFORD:  Objection.
12       MR. COSGROVE:  Objection.
13       A.  Can I have that back, please?
14       (The last question was read back as
15  follows:  "Were you aware that whether expenditure, as
16  that term was defined in Section 9-1.5 of the Illinois
17  campaign finance laws, were evaluated regardless of
18  whether the communication was made in concert or
19  cooperation with or at the request suggestion or
20  knowledge of the candidate?")
21       MR. COSGROVE:  I'd like to continue my
22  objection preliminarily as to the form and compound
23  nature of the question.  Further, it is an incomplete
24  hypothetical.  It assumes facts not in evidence, and
25  it lacks foundation.

Page 111

1        A.  I thought it was a bit compound, too.  I
2   didn't really get your gist on it.  Can we --
3        Q.  (BY MR. SAFER)  Really?  That's what this
4   -- okay.  What I'm doing is reading to you from
5   Section 9 -- so that there are no secrets -- 9-1.5 as
6   it existed in --
7        A.  In 2000 --
8        Q.  -- in 2004.  So -- so the -- then having
9   clued into the predicate, my question is, were you
10  aware that an expenditure, which is defined by 9-1.5,
11  of the Illinois campaign finance laws in 2004 were
12  evaluated "regardless of whether the communication is
13  made in concert or cooperation with or at the request,
14  suggestion or knowledge of the candidate"?
15       MR. CLIFFORD:  Same objection.
16       A.  I wasn't aware of that exact language.
17       Q.  (BY MR. SAFER)  What no coordination
18  rules existed between campaigns and PACs under
19  Illinois campaign finance law as that law existed in
20  2004?
21       MR. CLIFFORD:  Objection, asked and
22  answered, the witness has answered your question
23  pertaining to knowledge and expertise on this subject
24  matter.  It's an improper question.
25       A.  I'm not aware of the -- innuendos,

Page 112

1   and so forth, of the subtleties of the -- or the
2   difference between 2004 and current contemporary
3   campaign disclosure requirements.  I've never parsed
4   that definition.
5        Q.  (BY MR. SAFER)  Yeah, and you're --
6   you're not opining as to whether anybody violated --
7        A.  No.
8        Q.  I'm sorry?
9        A.  Forgive me.
10       Q.  That's okay.  All right.  You're not
11  opining as to whether anybody violated any no
12  coordination rules for political action committees?
13       A.  No.
14       Q.  You -- you, again, talk about the
15  campaign disclosure laws when you talk about the
16  Illinois coalition for jobs, growth and prosperity.
17  And I'm looking at page 51 now of your report.
18       A.  Okay.
19       Q.  And you -- you first talk about a -- a
20  memo from Mr. Shepherd to -- to Mr. Rust.  Do you see
21  that?
22       A.  Yes, I do.
23       Q.  Okay.  And then you say -- in the next
24  paragraph on the third sentence, you say,
25  "Mr. Shepherd appears to have been well aware that

Page 113

1   State Farm's contribution to the IJC might be
2   considered political, which would require disclosure."
3        Do you see that?
4        A.  Yes.
5        Q.  Are -- where in the campaign finance laws
6   is the term "political" defined?
7        A.  I think that's a loose use of that term
8   on my part to imply expenditure, a political
9   expenditure.
10       Q.  Okay.  And expenditure, at least in 2004,
11  was -- had a reference to electioneering
12  communication; is that right?
13       MR. CLIFFORD:  Objection, argumentative,
14  foundation, misleading.
15       A.  As I said before, I'm not an expert on
16  the Illinois campaign disclosure laws, and I'm not
17  aware of any subtle changes between 2004 and the
18  current.
19       Q.  (BY MR. SAFER)  You -- you testified
20  earlier and you spoke in here about the sponsoring
21  entity.
22       A.  Yes.
23       Q.  What is the significance of -- of being a
24  sponsoring entity under Illinois campaign finance
25  laws?

29 (Pages 110 to 113)

Thomas A. Myers, CPA          10/19/2017

Page 114

1    A.  Well, as I understand it, it requires
2  disclosure in association with the PAC or the
3  committee that the -- where the sponsoring entity
4  designation resulted.  But the reason why I focused on
5  it wasn't simply to parse the definition of sponsoring
6  entity.  I wanted to feature and acknowledge the fact
7  that -- that Ed Murnane had sent this analysis, this
8  spreadsheet analysis to Engstrom of the U.S. Chamber
9  where it was clear that he was coordinating all of the
10  campaign -- of what I designated as affiliated
11  organizations in my report.  And he was orchestrating
12  them such that none of them would have to deal with
13  the sponsoring entity categorization.
14    And -- and -- I'm not so concerned about
15  whether -- what the Illinois requirement is as I am
16  with the fact that Murnane was -- was orchestrating
17  and coordinating and calling the shots with respect to
18  material financial issues on behalf of the whole
19  group.
20    Q.  Going to -- I'm going to talk about the
21  phone call analyses for a few minutes.
22    A.  You bet.
23    Q.  Or I'm going to ask you questions about
24  that.  Where did you get the data for the phone call
25  analyses?

Page 115

1    A.  From counsel, from plaintiffs' counsel.
2    Q.  What did you do to validate that data?
3    A.  First of all, I was told that I could
4  rely on that data for its accuracy, and counsel was
5  prepared to prove the authenticity at the appropriate
6  time.  But having said that, we actually took
7  spreadsheets of the phone calls and traced them down
8  to the original data, phone calls that were provided
9  by State Farm.
10    Q.  Who -- who did that?
11    A.  Carolyn Chaw would have done that.
12    Q.  And what -- what original data did she
13  audit -- or did she perform an audit of?
14    A.  Well, I have -- I have hard copies that
15  were sent from Mr. Thrash's office that purport to be
16  227 pages -- I think it's 227 pages of data that's not
17  really organized in any fashion or not readily -- it
18  is organized in some fashion, but that's the data that
19  we traced the phone numbers down into.
20    Q.  Okay.  And how -- how --
21    A.  I said --
22    Q.  -- much of that?
23    A.  Excuse me.  I said "phone numbers."  I
24  meant phone calls.
25    Q.  How much of that was done?

Page 116

1    A.  We did with -- we did it with respect to
2  the ones that we have in the report.
3    Q.  And not every one, I assume, or did you?
4  In other words, did you trace every one of these calls
5  back to the original data?
6    A.  I believe so.
7    Q.  Now, the phone data indicates a
8  connection between two phone lines, correct?
9    A.  Yes, that's my understanding.
10    Q.  You don't know who was actually on the
11  phone, correct?
12    A.  No.
13    Q.  You don't know what was said?
14    A.  No.
15    Q.  And you don't know, in fact, whether it
16  was a fax or a conversation, do you?
17    A.  My understanding it was a phone
18  conversation, but -- but I -- I can't verify that.  My
19  understanding is that counsel will do the
20  authentication of this information.
21    Q.  But your assumption was that they were
22  all conversations?
23    A.  Yes.  But if they were faxes, I would be
24  interested in those as well.
25    Q.  Now, on pages 39 through 44, you discuss

Page 117

1  that $50,000 contribution to ATRA from State Farm that
2  you referenced earlier in your testimony.
3    A.  Okay.
4    Q.  And you conclude that the $50,000 that
5  State Farm contributed to ATRA went to JUSTPAC?
6    A.  May I take a minute to read this?
7    Q.  Oh, yes.  Sure.
8    A.  And your question again, please?
9    MR. CLIFFORD:  There is no question at
10  the moment.
11    MR. SAFER:  Yeah, there is.
12    MR. CLIFFORD:  Well, you said you
13  conclude, but there's not a reference to the document.
14  He asked a general question, I concede that, but not
15  in reference to the page of the material.
16    MR. SAFER:  Right.
17    MR. CLIFFORD:  Okay.  He's looking for
18  the page you're talking about.
19    MR. SAFER:  Thank you.
20    Q.  (BY MR. SAFER)  No, I'm saying, in
21  general, what you conclude is that the $50,000 went to
22  JUSTPAC?
23    A.  Yes.
24    Q.  Okay.  Did you analyze other expenditures
25  that ATRA made for special projects at the same time?

30 (Pages 114 to 117)

Thomas A. Myers, CPA          10/19/2017

Page 118

1    A. No.
2    Q. Were you provided with any documents
3 reflecting other expenditures ATRA made to special
4 projects at this same time?
5    A. I recall seeing documents allocating the
6 contribution from State Farm to special projects in
7 various states, and so forth; but I haven't looked at
8 that in a while.
9    Q. Yeah. No, what I'm referring to is any
10 other expenditures that ATRA made around this same
11 time to the special project.
12    A. No.
13    Q. Were you shown any documents about
14 Balance PAC?
15    A. I don't recall that -- seeing anything
16 like that.
17    Q. Did you examine any evidence that State
18 Farm was supporting ATRA's development of Balance PAC?
19    A. I don't recall.
20    Q. Did you read Steve McManus's deposition
21 about this $50,000 contribution to ATRA that he
22 approved?
23    A. Hold on a second, please. This -- I
24 don't remember Mr. McManus's testimony in that regard.
25    Q. On page 44, you state, right before the

Page 119

1 chart -- when you say, "His telephone calls to ATRA,"
2 meaning Mr. McManus's telephone calls to --
3    A. Okay. Excuse me. I don't see where
4 you're at.
5    Q. Okay.
6    A. In the first paragraph there?
7    Q. Yeah, first paragraph --
8    A. On page 44.
9    Q. -- next-to-last sentence.
10    A. Yes, I'm with you. Thank you.
11    Q. Sure. "His" -- and that refers to
12 Mr. McManus --
13    A. Right.
14    Q. -- "telephone calls to ATRA during the
15 concurrent time period underscores the complicity to
16 transfer State Farm's $50,000 to JUSTPAC." Do you see
17 that?
18    A. Yes.
19    Q. Now, you don't know what Mr. McManus and
20 someone at ATRA talked about in these phone calls,
21 correct?
22    A. That's correct.
23    Q. Is it possible that they were talking
24 about the Balance PAC?
25    MR. CLIFFORD: Objection, form,

Page 120

1 foundation, assumes facts not in evidence.
2    A. I don't have any knowledge of the content
3 of their conversation.
4    Q. (BY MR. SAFER) Would you be interested
5 in seeing what else ATRA was spending at this time
6 with regard to special projects?
7    MR. CLIFFORD: Objection, argumentative,
8 assumes facts not in evidence.
9    A. Sure.
10    Q. (BY MR. SAFER) You used the term
11 "earmarking" in your report, as we discussed earlier.
12 What is your definition of "earmarking"?
13    A. I would think that earmarking would
14 connote a designation by the parties involved that
15 specific funds be directed towards an agreed-upon
16 objective.
17    Q. And where does that definition come from?
18    A. Here (indicating).
19    Q. And where did it come from to get in
20 there?
21    A. Just common sense. I've never really
22 bothered to -- I'm not aware of the legal implications
23 of the term "earmark."
24    Q. Now --
25    A. I'm giving you my general -- I'm giving

Page 121

1 you my general construance.
2    Q. Sorry. Mr. Myers, you've worked on money
3 laundering cases, right?
4    A. Yes.
5    Q. There is no evidence that State Farm was
6 involved in money laundering in this case, correct?
7    A. I disagree.
8    Q. Money laundering involves the use of
9 funds that have an elicit source, doesn't it?
10    MR. CLIFFORD: Objection, form,
11 foundation, calls for a legal opinion, assumes facts
12 not in evidence -- well, strike that. Form,
13 foundation, calls for a legal opinion.
14    A. It does. And I'm not here to give a
15 legal opinion, but 18 U.S.C. Section 1956 talks about
16 the money coming from an unlawful purpose. I would
17 talk about reverse money laundering. This is more
18 indicative of reverse money laundering, which is
19 typically used with respect to terrorist financing.
20    Q. Well, you're not -- certainly you're not
21 saying that State Farm has financed any terrorist
22 organizations, right?
23    A. No, but I would -- I would be -- I would
24 not be uncomfortable with saying that the money was
25 laundered through these various entities.

31 (Pages 118 to 121)

Thomas A. Myers, CPA          10/19/2017

Page 122

1       Q.  Not in the sense as used in 1956?
2           MR. CLIFFORD: Objection.
3       A.  I have no opinion.
4           MR. CLIFFORD: Foundation, argumentative.
5       A.  I have no opinion.
6           MR. CLIFFORD: Calls for a legal opinion.
7           THE DEPONENT: Sorry, Bob.
8       A.  I have no opinion on that.
9       Q.  (BY MR. SAFER) Is there any evidence
10  that you saw that State Farm played a major role in
11  selecting Justice Karmeier as a candidate?
12      A.  Yes.
13      Q.  What is that?
14      A.  Because it's clear there's a -- a lengthy
15  email from Ed Murnane of the ICJL to Judge Karmeier --
16  or Lloyd Karmeier and his wife talking about the May 5
17  -- 30 -- or the Madison County Coalition and all of
18  the -- all the benefits and all the help and support
19  that Karmeier would get if he were to be selected as a
20  judge.
21          I construed that as a solicitation of the
22  judge and a reaching out around the time of the
23  Madison County Coalition and the $1 million
24  contribution from Ed Rust to the ILR.  And my reason
25  -- or my analysis takes into consideration and weights

Page 123

1   heavily that William Shepherd was on the executive
2   committee of ICJL.  And there were actually hundreds
3   of phone calls between William Shepherd and Ed Murnane
4   around -- or during that time period, relevant time
5   period.  And, in fact, I think there was a 27-minute
6   call.
7           I don't reference it in my report, but
8   it's hard for me to -- to believe that -- that William
9   Shepherd, who is an attorney and agent for State Farm,
10  wouldn't have been aware of -- of the activities of
11  Mr. Murnane in selecting Karmeier as a judge and --
12  and all of the other -- what I would characterize as
13  coordinating activities that are demonstrated in the
14  record that -- that Mr. Murnane, and not the ICJL,
15  undertook.
16      Q.  Is there any other evidence that you saw
17  that State Farm played a major role in selecting
18  Justice Karmeier as a candidate?
19      A.  There may be.  I'd have to refer to my
20  report -- report.
21      Q.  Feel free.
22      A.  I don't think there's anything explicit
23  on the record that -- there's nothing that I recall.
24      Q.  Is there any evidence that you saw that
25  State Farm played a major role in managing Justice

Page 124

1   Karmeier's campaign?
2       A.  Yes.
3       Q.  What is that?
4       A.  Again, the extensive activities of
5   Mr. Murnane through ICJL and coordinating many
6   critical aspects of the coord -- of the -- the -- what
7   I would refer to as an enterprise of affiliated
8   organizations that I discuss thoroughly in my report.
9           And I believe that Mr. Shepherd, through
10  his association with the ICJL and Mr. Murnane, would
11  have knowledge of these activities since this was
12  professed by Mr. Murnane to be the primary activity of
13  the ICJL during 2004.  So I would assume that he would
14  know that.
15      Q.  Is there any other evidence that you saw
16  that State Farm played a major role in managing
17  Justice Karmeier's campaign?
18      A.  Well, I read with interest the deposition
19  testimony of Mr. Tomaszewski, who was ostensibly the
20  manager of Citizens For Karmeier.  And he acceded and
21  seemed to admit under penalty of perjury that
22  Mr. Murnane was calling the shots and that
23  Mr. Luechtefeld and he were certainly -- if not under
24  the direction and control of Mr. Murnane, certainly
25  gave Mr. Murnane a wide birth in terms of what his

Page 125

1   wishes were in connection with the campaign
2   management.
3           MR. CANCILA: We've gotten a message on
4   folks from the phone that they are having hearing you,
5   Mr. Myers.
6           THE DEPONENT: I'm sorry.  I have a vocal
7   cord issue.  So I --
8           MR. RIDDLE: Can we move phone a little
9   closer?  I don't know --
10          MR. SAFER: You just --
11          THE VIDEOGRAPHER: Do you want to go off
12  the record, Counsel?
13          MR. CLIFFORD: Yeah, let's go off the
14  record just a minute.
15          THE VIDEOGRAPHER: Going off the record.
16  The time is 1:56.
17          (Discussion off the record.)
18          THE VIDEOGRAPHER: We are back on the
19  record.  The time is 1:59.
20      Q.  (BY MR. SAFER) Is there any other
21  evidence that you saw that State Farm played a major
22  role in managing Justice Karmeier's campaign?
23          MR. CLIFFORD: Objection, form,
24  foundation, argumentative in terms.
25      A.  I'd like some clarification on how you

32 (Pages 122 to 125)

Thomas A. Myers, CPA        10/19/2017

---

Page 126

1  define managing, because I think that's somewhat
2  ambiguous.  Could you provide that for me, please?
3      Q.  (BY MR. SAFER)  It's your word in your
4  report.
5      A.  Okay.  Then I'll construe it the way that
6  I would -- I construe it that State Farm basically was
7  involved in and had knowledge of the Karmeier campaign
8  through, among other things, the activities of ICJL,
9  which I assume that Mr. Murnane would have reported to
10  Mr. Shepherd.  But also, as documented thoroughly
11  throughout my report, State Farm had extensive
12  involvement with all of these enterprise affiliated
13  organizations -- not all of them, but certainly with
14  -- with ATRA, the U.S. Chamber of Commerce, the
15  Illinois Chamber of Commerce.  And there may be others
16  that, as I sit here, I don't recall.  Oh, Civil
17  Justice Reform Group, of course, and the Illinois Jobs
18  Coalition.  I think State Farm had representatives and
19  agents that were involved in all of these
20  organizations.  And to the extent that they
21  deliberated with Mr. Murnane to coordinate
22  advertising, and things like that, State Farm would at
23  least have indirect control over management.
24      Q.  And is there any other evidence that you
25  -- that you believe supports the conclusion that State

---

Page 127

1  Farm played a major role in managing Justice
2  Karmeier's campaign?
3      A.  Yeah.  I think I need to clarify, though,
4  I'm not proposing that they actively directed traffic
5  on behalf of the campaign.  I simply say that they
6  acquiesced and their approval was important in the
7  management of the -- of the campaign which, based on
8  my analysis, was heavily controlled by Mr. Murnane.
9      Q.  So what evidence is there that State Farm
10  acquiesced in -- as you use that word -- in the
11  management of Justice Karmeier's campaign?
12      A.  Well, if they knew what was going on
13  through William Shepherd, they didn't object to
14  anything.  And they -- their silence was -- was loud.
15      Q.  Okay.  You referred to, in your report, a
16  study of judicial decisions performed by Sequoyah.
17      A.  Yes.
18      Q.  And that that partially paid for by State
19  Farm.
20      A.  Yes, sir.
21      Q.  Okay.  Do you know what that study
22  entailed?
23      A.  Yes.
24      Q.  Did -- have you read that study?
25      A.  I read the criminal one.

---

Page 128

1      Q.  Okay.  And do you know that there's
2  another study?
3      A.  I -- I understand that there -- State
4  Farm represents there is.
5      Q.  Have you seen it?
6      A.  I think that I have.  I haven't read it,
7  though.
8      Q.  Does the fact that there is another study
9  that you've been supplied, but have not read, have any
10  significance to you?
11      A.  I think it's -- it has significance
12  because my understanding is that State Farm contends
13  or William Shepherd contends that he never got the --
14  the -- the Sequoyah report that dealt with criminal
15  issues and -- and Judge Maag, Lloyd Karmeier's
16  opponent.
17      Q.  Yeah, I --
18      A.  So it's significant in that context.
19      Q.  I think the -- well, are you aware of the
20  testimony by Bill Shepherd that the only Sequoyah
21  study that was in his files was the civil study?
22      A.  Yes, I'm aware of that.
23      Q.  Does that have any significance to you?
24      A.  Well, certainly it has significance
25  because I try to weigh all of the evidence and I look

---

Page 129

1  at the different pieces of information and put them
2  into perspective.  But I also know that Mr. Murnane
3  sent an email to him which referred to the criminal
4  study, and it was sent to Mr. Shepherd.  And I know
5  that the -- based on the testimony of Mr. Pintak and
6  -- and others that Gordon Maag material played a
7  key role with respect to the ads that were promulgated
8  through the ILR and the Illinois Jobs Coalition and
9  others.
10      So -- so -- so I find it hard to believe,
11  but you're certainly welcome to your opinion.  I mean,
12  Mr. Shepherd can testify that he never saw that, but I
13  think that stretches the bounds of credibility; but
14  let the trier of fact decide that.
15      Q.  Well, the question is how do you know
16  that what State Farm paid part of was the criminal
17  study as opposed to the civil study?
18      A.  Oh.  I have seen no explicit written --
19  evidence either way.
20      Q.  Now, let me ask you a couple of questions
21  with regard to the damages thing.  Do you have a -- an
22  opinion on whether or not an equal share to all class
23  members best accounts for the economic harm suffered?
24      A.  No.
25      Q.  Are you aware of how the 1.05-and --

---

33 (Pages 126 to 129)

Page 130

1    and-more-billion-dollar judgment amount and its
2    component parts, in particular, the $212.44 million
3    installation damages, were determined?
4         A.  Well --
5         MR. CLIFFORD:  Excuse me, Counsel,
6    objection, form, foundation.  Context -- are we
7    talking about the underlying case here?
8         MR. SAFER:  Yeah.
9         MR. COSGROVE:  Not the jury decision?
10        MR. CLIFFORD:  No, no.
11        MR. SAFER:  Yeah.
12        MR. CLIFFORD:  You're talking about the
13   Avery case, how it was determined in the Avery case.
14        MR. SAFER:  Yes, yes.
15        A.  Again, please, the question?
16        Q.  (BY MR. SAFER)  So -- so I can --
17        MR. CLIFFORD:  She can read it, if you'd
18   like.
19        MR. SAFER:  Okay.  But I've got it
20   written down --
21        THE DEPONENT:  All right.
22        MR. SAFER:  -- so I can do it --
23        THE DEPONENT:  Enjoy.
24        MR. SAFER:  -- to save time.
25        Q.  (BY MR. SAFER)  Are you aware of how the

Page 131

1    $1.05 billion judgment amount and its component parts,
2    in particular, the $212.44 million installation
3    damages, were determined?
4         A.  No.
5         Q.  Have you performed any analysis on
6    whether or not all Hale plaintiffs suffered
7    installation damages?
8         A.  No.  I simply -- that exercise, as I
9    testified in my previous deposition, was done at the
10   request of counsel where I was instructed to use the
11   amount that -- my understanding is from the appeals
12   court after remitter, and that's the amount that I
13   used.  And I did no analysis independent --
14   independent analysis.  I simply did the arithmetic
15   calculation 9 percent interest for the days involved
16   in the period.
17        Q.  (BY MR. SAFER)  So you're -- you're
18   offering no opinion of whether that's fair or accurate
19   or -- you're just doing the math?
20        MR. CLIFFORD:  That -- just -- objection.
21   Clarification.
22        MR. SAFER:  Well --
23        MR. CLIFFORD:  "That" being the under --
24        MR. SAFER:  I shouldn't say --
25        MR. CLIFFORD:  -- lying analysis?

Page 132

1         MR. SAFER:  I shouldn't say "accurate,"
2    because that's wrong.  Right.
3         Q.  (BY MR. SAFER)  So are -- you're --
4    you're not opining as to whether the underlying
5    damages were -- you know, are fair, appropriate --
6    you're just doing the math?
7         A.  I was asked to assume the -- the -- that
8    those numbers are the correct numbers and told that
9    counsel would be prepared to prove that at the
10   appropriate -- authenticate the -- that at the -- at
11   the appropriate time.
12        Q.  Do you have an opinion on the economic
13   validity of using 9 percent simple interest for
14   calculating present value?
15        A.  No.
16        Q.  Have you used 9 percent simple interest
17   in previous analysis of economic damages?
18        MR. CLIFFORD:  Go ahead.
19        A.  No.
20        Q.  (BY MR. SAFER)  Have you used interest
21   close to 9 percent?
22        A.  I don't recall doing an economic damage
23   analysis the way that this one was performed.  This
24   was done -- I was asked to assume the authenticity of
25   the numbers.

Page 133

1         MR. CLIFFORD:  And I have to move to
2    strike the answer and move to strike the question.
3    With all due respect, Counsel possibly misspoke.
4    There's no record, no evidence that Mr. Myers used a
5    9 percent calculation to present value.  The record is
6    clear that he used the 9 percent in the terms that he
7    described in his report, which does not state that.
8    That's all.
9         THE DEPONENT:  I missed that.
10        MR. CLIFFORD:  I'm not trying --
11        MR. SAFER:  Wait, wait.  We've got the
12   gist of what's going on.
13        THE DEPONENT:  Can I have my answer or
14   the question --
15        MR. CLIFFORD:  It's okay.  The record is
16   clear.  We're all right.
17        A.  It was a simple interest calculation.
18        Q.  (BY MR. SAFER)  Right.
19        A.  Yeah.
20        Q.  And do you have an opinion as to whether
21   simple interest should be used to calculate economic
22   damages?
23        A.  No.
24        Q.  Okay.  Just a question about your report.
25   In Appendix C, you have --

34 (Pages 130 to 133)

Thomas A. Myers, CPA          10/19/2017

Page 134

1          A.  Is there a page number on that?
2          Q.  Oh, 106.
3          A.  Okay.  I'm with you.
4          Q.  Okay.  So it says, "Documents produced
5  and replied upon for my report."  That means -- I'm
6  sure means relied upon for my report, right?
7          A.  It doesn't say.  It says Documents
8  Produced.
9          Q.  No -- I'm sorry, but then down -- down in
10  the middle of the page.
11          A.  Oh, I'm -- okay.  I'm with you.  Yes,
12  that's what it says.
13          Q.  Okay.  And -- and you mean there that
14  these are relied upon for your report --
15          A.  Yes.
16          Q.  -- correct?  Are there other documents
17  that you reviewed in the case that you didn't rely on?
18          A.  You know, I'm sure there were, but
19  nothing comes to mind as I sit here.  I mean, I looked
20  at tons of studies and data, and so forth, that I
21  examined independently from the database that was
22  provided in this case; but I couldn't tell you what
23  that would be.
24          Q.  Did you keep a record of the documents
25  that you -- that you considered in this case?

Page 135

1          A.  No.  I gave you everything that I have
2  relied on.
3          Q.  And you don't know, as you sit here, what
4  you considered, and you don't have a record of that?
5          A.  That's a large universe.
6          Q.  But it -- right.  Do you have a record of
7  that?
8          A.  No.
9          Q.  Okay.  Have you ever been excluded as an
10  expert in any case?
11          A.  No.
12          Q.  Have -- have your opinions in any way
13  ever been limited in any case?
14          A.  There have been a couple of cases where
15  the -- my opinion was submitted with a motion -- or
16  for summary judgment, and the judge decided that --
17  that he didn't need my legal advice.  So there's been
18  -- there's been several cases like that over the last
19  three decades or so.
20          Q.  Okay.  Do you recall the names of those
21  cases?
22          A.  I know that one of them is Menola Baymon
23  versus GMAC where the Mississippi Supreme Court, as I
24  understand it, challenged the judge for allowing me to
25  talk about an insurance matter that the Illinois

Page 136

1  Supreme Court decided --
2          MR. CLIFFORD:  Illinois?
3          THE DEPONENT:
4          A.  I'm sorry.  Forgive me.  Mississippi
5  Supreme Court decided was beyond my -- although they
6  acknowledge that I was an expert in banking matters.
7          Q.  (BY MR. SAFER)  And any other such cases
8  that you recall?
9          A.  I don't remember exactly, but . . .
10          Q.  Your report is your complete statement of
11  opinions as of this date?
12          MR. CLIFFORD:  Objection.  Go ahead.  I'm
13  sorry.
14          MR. SAFER:  Yeah, let me -- let me --
15          Q.  (BY MR. SAFER)  The report is the
16  complete statement of opinions that you currently
17  intend to give at trial in this case?
18          MR. CLIFFORD:  Objection to the form of
19  the question.  It calls for an incomplete
20  hypothetical.  He has given two depositions now, and
21  one could fairly state that there are logical
22  corollaries associated with that testimony and
23  reports.
24          A.  I would slightly disagree with you.  I
25  would say that this was the status of my opinion at

Page 137

1  this time as expounded on and clarified and elaborated
2  upon in your discussion today.
3          Having said that, my analysis is ongoing,
4  though.  And I intend to inform myself regarding
5  issues related to the case up until the day of trial,
6  should that occur.
7          Q.  Do you have any supplement to your report
8  that you want to make now?
9          A.  No.
10          MR. SAFER:  All right.  If we can have
11  two minutes, we may be done.
12          THE VIDEOGRAPHER:  Going off the record.
13  The time is 2:15.
14          (Recess taken, 2:15 p.m. to 2:25 p.m.)
15          THE VIDEOGRAPHER:  We're back on the
16  record.  The time is 2:25.
17          MR. SAFER:  I have no further questions.
18  Thank you, Mr. Myers.
19          THE DEPONENT:  Thank you, sir.
20          MR. CLIFFORD:  Megha, do you have any
21  questions?
22          MS. SHAH:  No.
23          MR. CLIFFORD:  Andrew, do you have any
24  questions?  Andrew Chinsky?  Hearing none, we're going
25  to assume no.

35 (Pages 134 to 137)

Thomas A. Myers, CPA          10/19/2017

Page 138

EXAMINATION

BY MR. CLIFFORD:

1                 EXAMINATION
2  BY MR. CLIFFORD:
3     Q.   Mr. Myers, I want to ask you just briefly
4  a couple matters -- or a few matters, rather.  Taking
5  you back to the discussion you had with counsel about
6  the supervisory order in the Price versus Philip
7  Morris case, I believe that was Exhibit No. 12 --
8     A.   Yes.
9     Q.   -- and then also in concert with Exhibit
10  No. 13, which was the memorandum in that case, the
11  Price case, by counsel for the plaintiffs --
12     A.   Okay.
13     Q.   -- are you aware -- here's my question:
14  Are you aware of any efforts in the instant
15  litigation, the Hale litigation, or aware of any
16  materials acquired from those efforts that State Farm
17  made to run down, if you will, or try to subpoena and
18  gather information from either the U.S. Chamber or
19  ATRA about the claims that the Price plaintiffs were
20  making about the source of money that went to citizens
21  for Karmeier from Philip Morris?
22     A.   No.
23     Q.   So that when we had ar -- claims being
24  made by counsel for the plaintiffs in that Price case
25  that Philip Morris was the source of the funds, you

Page 139

1  can't have two sources of the same funds; do you
2  remember that discussion?
3     A.   Yes, sir.
4     Q.   Okay.  Are you aware of any effort that
5  was made by State Farm to establish the veracity of
6  the allegations that Philip Morris was the source of
7  those funds?
8     A.   No.
9     Q.   And related to that, are you aware, from
10  the actual supervisory order itself that Justice
11  Karmeier wrote -- please look at page 8 --
12     A.   What exhibit number is that, please?
13     Q.   That will be Exhibit No. 12, sir.  Look
14  at page 8.
15     A.   I'm with you.
16     Q.   At the top of the page, the last sentence
17  of the paragraph that Justice Karmeier wrote, "As
18  movant points out" --
19     A.   I'm sorry.  I'm not with you.  This is
20  page 8?
21     Q.   Yes, sir, of the report -- of the
22  document, of Exhibit 12.
23     A.   Exhibit 12? Show me where you're at.
24     Q.   Page 8, first paragraph.
25     A.   Again, please.  I'm sorry.

Page 140

1     Q.   Yes.  My question is -- strike any
2  pending question.  My question is are you aware that
3  Justice Karmeier wrote that there was no factual
4  subpoena for the claim of the source of the funds
5  being from Philip Morris?
6     A.   I am.
7     Q.   New subject.  We're done with -- counsel
8  asked you about a PAC called Balance PAC.  Do you
9  remember that line of discussion?
10     A.   Yes.
11     Q.   It was in reference to the deposition of
12  Mr. McManus?
13     A.   Yes.
14     Q.   Are you aware, from your review of the
15  Citizens For Karmeier D-2s, the disclosure forms from
16  the Illinois State Board of Elections, that Balance
17  PAC made one or more in-kind contributions to the
18  Citizen For Karmeier?
19     A.   I didn't note that.
20     MR. CLIFFORD:  Thank you.  I have no
21  further questions.
22     THE DEPONENT:  Thank you.
23     MR. SAFER:  We have nothing further.
24     THE VIDEOGRAPHER:  This is the end --
25  this is the end of Video 2 of 2 of the deposition of

Page 141

1  Thomas Myers, CPA.  Going off are the record.  The
2  time is 2:30.
3     WHEREUPON, the within proceedings were
4  concluded at the approximate hour of 2:30 p.m. on the
5  19th day of October, 2017.
6     *   *   *   *   *

36 (Pages 138 to 141)

Thomas A. Myers, CPA          10/19/2017

Page 142

1        I, THOMAS A. MYERS, CPA, do hereby
2    certify that I have read the above and foregoing
3    deposition and that the same is a true and accurate
4    transcription of my testimony, except for attached
5    amendments, if any.
6        Amendments attached  ( ) Yes  ( ) No
7
8
9    _____
     THOMAS A. MYERS, CPA
10
11
12
13        The signature above of THOMAS A. MYERS,
14   CPA, was subscribed and sworn to before me in the
15   county of _____, state of
16   _____ , this _____ day of
17   _____, 2017.
18
19
20   _____
     Notary Public
21   My commission expires
22
23
24
25   Mark Hale 10/19/17 (tc)

Page 143

REPORTER'S CERTIFICATE
STATE OF COLORADO        )
                          ) ss.
CITY AND COUNTY OF DENVER )
        I, TERESA COOGLE, Registered Professional
Reporter, Certified Realtime Reporter, and Notary
Public ID 19994013288, State of Colorado, do hereby
certify that previous to the commencement of the
examination, the said THOMAS A. MYERS, CPA, was duly
sworn by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.

        I further certify that I am not employed by,
related to, nor counsel for any of the parties herein,
nor otherwise interested in the outcome of this
litigation.
        IN WITNESS WHEREOF, I have affixed my
signature this 24th day of October, 2017.

        My commission expires May 24, 2019.

__x__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing was not required.

37 (Pages 142 to 143)

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           ) ss.
CITY AND COUNTY OF DENVER  )

          I, TERESA COOGLE, Registered Professional
Reporter, Certified Realtime Reporter, and Notary
Public ID 19994013288, State of Colorado, do hereby
certify that previous to the commencement of the
examination, the said THOMAS A. MYERS, CPA, was duly
sworn by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.

          I further certify that I am not employed by,
related to, nor counsel for any of the parties herein,
nor otherwise interested in the outcome of this
litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 24th day of October, 2017.


          My commission expires May 24, 2019.



__x__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing was not required.




_____
Teresa Coogle
Certified Realtime Reporter
Registered Professional Reporter