Exhibit 3

# In the Matter of:

*Mark Hale, et al.*
*vs.*
*State Farm, et al.*

_____

# *Thomas Arthur Myers, CPA*

# *5/22/2015*

_____

# *\*CONFIDENTIAL\**

**MERRILL CORPORATION**

**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

Case No. 12-cv-00660-DRH-SCW

_____

CONFIDENTIAL TELEPHONE DEPOSITION OF:
THOMAS ARTHUR MYERS, CPA - May 22, 2015
(Confidential Designations Pending)

_____

MARK HALE, et al., on behalf of Themselves and all
others similarly situated,
Plaintiffs,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
EDWARD MURNAME, and WILLIAM G. SHEPHERD,

Defendants.

_____

PURSUANT TO NOTICE, the telephone
deposition of THOMAS ARTHUR MYERS, CPA, was taken on
behalf of the Defendant State Farm Mutual Automobile
Insurance Company at 7001 Yampa Street, Denver,
Colorado 80249, on May 22, 2015, at 9:05 a.m., before
Darcy Curtis, Registered Professional Reporter and
Notary Public within Colorado.

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

**2**

A P P E A R A N C E S

For the Plaintiffs:
    STEVEN P. BLONDER, ESQ.
    Much Shelist, P.C.
    191 North Wacker Drive, Suite 1800
    Chicago, Illinois 60606
    sblonder@muchshelist.com
    ROBERT A. CLIFFORD, ESQ.
    KRISTOFER S. RIDDLE, ESQ.
    Clifford Law Offices
    120 North LaSalle Street, 31st Floor
    rac@cliffordlaw.com
    RICHARD R. BARRETT, ESQ.
    Barrett Law Group, P.A.
    2086 Old Taylor Road, Suite 1011
    Oxford, Mississippi 38655
    rrb@rrblawfirm.net
    (Appearing Telephonically)

    RICHARD H. TAYLOR, ESQ.
    Taylor Martino, P.C.
    51 Saint Joseph Street
    Mobile, Alabama 36602
    richardtaylor@taylormartino.com
    (Appearing Telephonically)
    THOMAS P. THRASH, ESQ.
    1101 Garland Street
    Little Rock, Arkansas 72201
    tomthrash@sbcglobal.net
    (Appearing Telephonically)

For the Defendant State Farm Mutual Automobile
Insurance Company:
    RONALD S. SAFER, ESQ.
    JOSEPH A. CANCILA, ESQ.
    Schiff Hardin LLP
    233 South Wacker Drive, Suite 6600
    Chicago, Illinois 60606
    rsafer@schiffhardin.com
    jcancila@schiffhardin.com

**3**

For the Defendant Edward Murnane:
    DAVID G. JORGENSEN, ESQ.
    Sidley Austin LLP
    One South Dearborn
    Chicago, Illinois 60603
    djorgensen@sidley.com
    (Appearing Telephonically)

For the Defendant William G. Shepherd:
    RUSSELL K. SCOTT, ESQ.
    Greensfelder, Hemker & Gale, P.C.
    12 Wolf Creek Drive, Suite 100
    Belleville, Illinois 62226
    rks@greensfelder.com

**4**

I N D E X

EXAMINATION OF THOMAS ARTHUR MYERS:        PAGE
May 22, 2015

By Mr. Safer                    5, 153

By Mr. Blonder                  145

By Mr. Clifford                 147, 153

                    INITIAL
DEPOSITION EXHIBITS:            REFERENCE

Exhibit 1  Expert Report of Thomas A. Myers        12

Exhibit 2  Form 990, Return of Organization        91
           Exempt From Income Tax, Chamber
           of Commerce of the USA, 2004

Exhibit 3  Form 990, Return of Organization        93
           Exempt From Income Tax, Institute
           For Legal Reform, 2004

Exhibit 4  Deposition of Stanton Anderson,         99
           1/12/05
Exhibit 5  Memorandum to Post and Dougherty       110
           from Nelson, 12/12/03

Exhibit 6  E-mail to Brunner, et al. from         118
           Glass on behalf of McManus,
           4/26/04, Subject: CJRG Operating
           Committee-Minutes of April 22-23
           Meeting

Exhibit 7  The Illinois Chamber, Officers &       125
           Directors for 2004-2005
Exhibit 8  E-mail to Mayers from Echols,          130
           3/7/04, Subject: IL Chamber
           Board Meeting
Exhibit 9  Illinois Chamber of Commerce           133
           Board of Directors Meeting, 6/18/04

Exhibit 10 Voucher Cover Sheet, 9/24/04,          136
           with attachments

**5**

1       WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4       *   *   *   *   *
5       THOMAS ARTHUR MYERS, CPA,
6  having been first duly sworn to state the whole truth,
7  testified as follows:
8       (Deposition Exhibit 1 was marked.)
9       (At this time Mr. Taylor and Mr. Thrash
10 were not present.)
11      EXAMINATION
12 BY MR. SAFER:
13      Q.  Good morning, Mr. Myers.
14      A.  How are you?
15      Q.  Would you state your name, please.
16      A.  Thomas Arthur Myers.
17      Q.  Mr. Myers, you have been retained by
18 plaintiffs in this case to testify as an expert?
19      A.  That is true.
20      Q.  And you have testified many times before?
21      A.  Yes.
22      Q.  Approximately how many cases have you
23 worked on as an expert witness?
24      A.  I can't really be sure about that, but
25 probably over a hundred.

2 (Pages 2 to 5)

CONFIDENTIAL
Thomas Arthur Myers, CPA     May 22, 2015

---

**6**

1      Q.   Approximately how many depositions have
2  you given in cases as an expert witness?
3      A.   50, 60.
4      Q.   Approximately how many trials have you
5  testified at?
6      A.   Maybe three dozen.
7      Q.   And what percentage of your work -- well,
8  let me start a little bit before then.  By whom are
9  you employed?
10     A.   T.A. Myers & Co.
11     Q.   And how many employees does T.A. Myers &
12  Co. have?
13     A.   It varies.  We have probably five full
14  time and a number of analysts that we use on different
15  projects.
16     Q.   What is the nature of the full-time
17  employees?
18     A.   I'm not sure what . . .
19     Q.   What do they do?
20     A.   They're analysts, financial analysts.
21     Q.   What are their backgrounds?
22     A.   Law and finance and accounting.
23     Q.   Did any of them work on this project?
24     A.   Yes.
25     Q.   Who worked on this project?

---

**7**

1      A.   William Platz, P-l-a-t-z, Carolyn Chaw,
2  C-h-a-w, Connie Brown, Josie Zhao, Z-h-a-o, and I
3  think that's about it.
4      Q.   What did Mr. Platz do on this project?
5      A.   He had various assignments, including
6  going through the various documents and preparing
7  spreadsheets, things like that.
8      Q.   What documents are you referring to?
9      A.   I couldn't tell you off the top of my
10  head.  We've done many -- hundreds of different
11  documents.
12     Q.   Is there someplace you would go to find
13  out what documents Mr. Platz reviewed?
14     A.   No.  I couldn't say that.  I would
15  propose that all of the documents referenced in my
16  report would be at least a subset of those documents,
17  and there are other documents as well.
18     Q.   What documents other than the ones that
19  are referenced in your report were reviewed by you or
20  somebody else at your direction?
21     A.   With my report I provided a list of
22  documents that I relied on and that would be
23  comprehensive.  Since that time I've looked at other
24  documents as well, but I couldn't tell you off the top
25  of my head as I sit here what those documents are.

---

**8**

1      Q.   What type of documents were they?
2      A.   Oh.  It would be Internet research kinds
3  of things.
4      Q.   Internet research on what?
5      A.   For example, I looked at the 501(c)
6  judicial election issues, searched the Internet for
7  various articles and information on that.
8      Q.   What are you referring to as 501(c)
9  judicial election issues?
10     A.   Well, the search query would be something
11  along those lines.  And I was looking for articles,
12  commentaries, and so forth about the phenomenon of
13  tax-exempt 501(c) organizations getting involved in
14  judicial -- state judicial elections.
15     Q.   What other Internet research did you do?
16     A.   I can't think of anything as I sit here.
17     Q.   Did you keep a record of the other
18  documents other than those identified in your report
19  that were reviewed in this engagement?
20     A.   No.
21     Q.   What did Ms. Chaw do on this assignment?
22     A.   She did things similar to what Mr. Platz
23  did, reviewed documents, did analysis and research.
24     Q.   What did Ms. Brown do on this project?
25     A.   Same thing.

---

**9**

1      Q.   And what did Ms. Zhao do on this project?
2      A.   Ms. Zhao was primarily involved in
3  retrieving documents from the database.
4      Q.   What database did you use?
5      A.   That would be the database that was made
6  available to us through the attorneys, the plaintiffs'
7  attorneys.
8      Q.   So did you have access to all of the
9  documents that were produced in this case?
10     A.   Yes.
11     Q.   Did you perform your own searches?
12     A.   Yes.
13     Q.   What documents did you personally review?
14     A.   I've reviewed all of the documents that
15  are referenced in the report, plus a bunch of others
16  that I couldn't tell you off the top of my head.
17     Q.   Well, what types of other documents did
18  you review that were not referenced in your report?
19     A.   Generally they would be documents that
20  were provided through some aspect of discovery
21  relevant to this litigation or else Internet research
22  that would be germane to the issues that present
23  themselves in this litigation.
24     Q.   Have you billed for your time and that of
25  the others in T.A. Myers & Co. on this case?

---

3 (Pages 6 to 9)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

---

**10**

1    A.  T.A. Myers & Co. has billed for that,
2  yes.
3        Q.  And approximately how many hours has T.A.
4  Myers & Co. billed for on this matter?
5        A.  I really don't know off the top of my
6  head, but I would estimate that I personally spent a
7  couple of hundred hours and the staff has probably
8  spent three or four times that.
9        Q.  Have you been paid for your work on this
10  matter?
11        A.  Yes.
12        Q.  And how much has T.A. Myers & Co.
13  received for its time?
14        A.  I don't know off the top of my head, but
15  if I were to estimate, it would be in the hundred-
16  thousand-dollar range.
17        Q.  What is your hourly rate?
18        A.  $450 an hour for testimony and -- excuse
19  me.  I think that's for analysis.  I'm not really sure
20  what my rate is.
21        Q.  What is it approximately?
22        A.  $450 an hour.  Sometimes it's up to 600
23  for testimony.
24        Q.  Have you done -- well, let me ask you:
25  What percentage of the work that T.A. Myers & Co. does

---

**11**

1  is as an expert witness?
2        A.  I really couldn't tell you off the top of
3  my head, but work involving some aspect of dispute
4  resolution, I would say, is at least 50 percent.
5        Q.  What other type of work does T.A. Myers &
6  Co. do?
7        A.  We do litigation -- excuse me -- due
8  diligence on investment opportunities, typically
9  internationally, oftentimes in Asia.  I do a lot of
10  training also.
11        Q.  Is there any other type of work that T.A.
12  Myers & Co. does?
13        A.  Well, I would describe it generally as
14  forensic analysis.  We're researching acquisition
15  targets for companies that are interested in joint
16  venture opportunities, things like that.
17        Q.  And that's the due diligence on it?
18        A.  Yes, sir.
19        Q.  Is there any other type of work that T.A.
20  Myers & Co. does?
21        A.  No.
22        Q.  Have you done other work for the
23  plaintiffs' attorneys in this case; that is, have you
24  done work in other cases for the people who are
25  plaintiffs' attorneys in this case?

---

**12**

1        A.  I have done some work with one of the
2  attorneys that's involved in this consortium.
3        Q.  And who among this consortium is that?
4        A.  Mr. Barrett, Donald Barrett.
5        Q.  And have you worked on -- how many other
6  cases have you worked on with Mr. Barrett?
7        A.  I believe it would be two.
8        Q.  When were those?
9        A.  Quite some time ago.  If I had to guess,
10  I would say 15 or 10 years ago.
11        Q.  Let me show you what has been marked as
12  Myers Exhibit 1.
13        MR. CLIFFORD:  Ron, I know you're giving
14  Steve a copy, which is fine, but if perchance you have
15  an extra, we would take it.
16        MR. RIDDLE:  Thanks.
17        MR. CLIFFORD:  Thank you.
18        Q.  (BY MR. SAFER)  Do you recognize Myers
19  Exhibit 1?
20        A.  I do.
21        Q.  What is it?
22        A.  It's the expert report that I prepared in
23  this matter.
24        Q.  You have been asked to form an expert
25  opinion on the extent of State Farm's activities with

---

**13**

1  respect to the election of the Illinois Supreme Court
2  Justice Karmeier and the pattern of any concealment
3  that State Farm may have employed to disguise its
4  involvement; is that right?
5        A.  That is accurate, yes.
6        Q.  In what field of expertise is the opinion
7  that you've offered in this case?
8        A.  I would say that generally it encompasses
9  my expertise in forensic accounting.
10        Q.  What is forensic accounting?
11        A.  I would characterize it as a discipline
12  in finance and accounting that applies itself
13  generally to complicated financial situations in
14  specific contexts and interprets the financial
15  transactions and the financial situations in the
16  context of often dispute resolution issues and
17  litigation.
18        Q.  And what are the tools that you use in
19  forensic accounting to analyze these complicated
20  financial transactions?
21        A.  Well, we would use the computer,
22  obviously, but the discipline that you're referring to
23  would be the generally accepted accounting principles,
24  financial issues, and expertise and experience that's
25  germane to the discipline of analyzing complex

---

4 (Pages 10 to 13)

CONFIDENTIAL
Thomas Arthur Myers, CPA     May 22, 2015

---

14

1  financial situations.
2      Q.  With regard to GAAP, generally accepted
3  accounting principles, how does a forensic accountant
4  use these principles?
5      A.  Well, it depends on the particular set of
6  circumstances.  You need to look at the context.  In
7  certain situations, GAAP principles wouldn't even
8  apply; in others they would be quite germane.  For
9  example, if you're talking about a securities fraud
10  analysis, GAAP issues would be prominent.  But in a
11  case like this, GAAP issues are less important.
12      Q.  Why would they be prominent in a
13  securities fraud case?
14      A.  Because securities fraud cases often
15  hinge on misrepresentations in the financial
16  disclosures of the particular registrant or the
17  entity.  And the financial disclosures are governed
18  and relate to accounting principles that must be
19  interpreted with full disclosure accurately by the
20  registrant reporting entity.
21      Q.  You have also testified and been involved
22  in money laundering cases; is that right?
23      A.  I have.
24      Q.  And in those cases, you've been asked to
25  trace money from a specified unlawful activity through

---

15

1  to some ultimate source, correct?
2      A.  That is true.
3      Q.  That is ultimately the definition of
4  money laundering, that there is the money taken from a
5  specified unlawful activity, there are financial
6  transactions that are designed to conceal the true
7  nature of that money, the true source of that money,
8  correct?
9      A.  I would have to look at the code.  I'm
10  not sure that the unlawful activity for the
11  origination of the money is a requirement.  There is
12  some information on that in the U.S. Attorneys'
13  Handbook, so that can be construed differently by
14  other people.  But generally what you're saying I
15  agree with.
16      Q.  Okay.  And have you participated in that
17  kind of activity where you trace the money from a
18  specified unlawful activity through to its ultimate
19  source?
20      A.  Yes, I have.
21      Q.  And how did you do that?
22      A.  Well, the situations that I've worked in
23  have been confidential, but I can tell you generally
24  that the -- one of the big cases that I worked on --
25  it wasn't actually litigated.  It was a government

---

16

1  investigation -- had to do with foreign illegal
2  activity and processing of that money and ultimately
3  running it through U.S. banks to essentially launder
4  it.
5      Q.  And how did you trace the money from the
6  foreign illegal activity through to its ultimate
7  source?
8      A.  Well, there would be a series of layered
9  transactions in different accounts that ostensibly
10  were legitimate business enterprises, but the money
11  would flow through those legitimate business
12  enterprises but ultimately end up with a recipient who
13  was somebody that was not disclosed.
14      Q.  And did you analyze the books and records
15  of the purportedly legitimate business enterprise to
16  follow the money?
17      A.  Part of that would be.
18      Q.  For what part would you use it?
19      A.  Well, again, the stuff that I worked on
20  is confidential, but I would be looking at the bank
21  records and suspicious activity reports and different
22  accounts, currency running through those accounts,
23  tracing them to offshore oftentimes destinations,
24  things like that.
25      Q.  And have you ever analyzed, in these

---

17

1  kinds of cases where you're tracing money, the books
2  and records of a purportedly legitimate business
3  enterprise to distinguish between legitimate sources
4  of money and the unlawful specified activity?
5      A.  Yes, I have.
6      Q.  And what books and records types, not
7  specifically, types, did you analyze?
8      A.  We would look at things -- and I don't
9  think it's quite accurate to describe them as books.
10  They're not financial statements or general ledger
11  accounts, but they would be invoices and remittances,
12  things like that.
13      Q.  What are general ledger accounts?
14      A.  A general ledger account would be the set
15  of books, just referring to books generically, where
16  all of the accounts that are necessary to describe the
17  financial activity of a particular entity will be set
18  up and so that all of the transactions that a
19  particular entity will incur will run through some
20  general ledger account and they will all be
21  represented in the general ledger.  It's like the
22  universe that would subsume the chart of accounts for
23  the particular reporting entity.
24      Q.  Now, you believe you are qualified to
25  testify as an expert by virtue of your experience in

---

5 (Pages 14 to 17)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

---

**18**

1  matters pertaining to the analysis of complex
2  financial transactions in business and financial
3  accounting matters; is that right?
4      A.  That is true.
5      Q.  Did you find that transactions regarding
6  Justice Karmeier's election in this case particularly
7  complex?
8      A.  I think the actual tangled web of money
9  flow through the various affiliated organizations was
10  complex, yes, and required some analysis to figure out
11  who was doing what to whom.
12      Q.  In what way were they complex?
13      A.  Just seeing the forest through the trees
14  and interpreting the various activities in the context
15  of this particular litigation, I propose, is complex.
16      Q.  Well, what do you mean by seeing the
17  forest from the trees?
18      A.  Well, for example, if you look at my
19  report, the chart on page 20, I propose, represents a
20  pretty complex set of interactions between multiple
21  entities.  And the work and analysis required in order
22  to ascertain these interrelationships is complex.
23      Q.  Why?  What makes it complex?
24      A.  Because it involves sifting through
25  numerous records and documents and assessing and

---

**19**

1  evaluating the interrelationships in the context of
2  other written materials that may or may not relate to
3  the transactions.  It involved hundreds of hours of
4  analysis of documents that required sophisticated
5  interpretation, in my view.
6      Q.  What types of documents were needed to
7  create the flowchart with these dollar signs that
8  are -- you're referencing the chart on page 20 of your
9  report; is that right?
10      A.  Yes, sir.
11      Q.  What kinds of documents were necessary to
12  be analyzed to create this flowchart?
13      A.  Well, the entire universe of documents
14  that are referred to in my report.  I think there's
15  over 250 footnotes for openers, but we would have
16  looked at at least probably ten times that number of
17  documents to distill it to this particular iteration
18  or this point.
19      Q.  So all of the documents that you
20  reviewed --
21      A.  Yes.
22      Q.  -- you contend?
23      A.  Absolutely, yes.
24      Q.  Did you analyze the accounting treatment
25  of any financial transactions in this case?

---

**20**

1      A.  I did look at the political expenditures
2  or the 501(c)s to ascertain possible motivations to
3  avoid direct donations or characterizations of 527,
4  Code Section 527, income, things like that.
5      Q.  Other than that, did you analyze the
6  accounting treatment of any financial transaction in
7  this case?
8      A.  I looked at a couple of the entities to
9  see how they were accounting for the contributions,
10  whether they earmarked contributions for particular
11  purposes and how they treated them, but I only had
12  limited information.  If I had more information, I
13  would be very interested in that aspect if you had
14  additional discovery.
15      MR. SAFER:  Okay.  I'm sorry.  Could you
16  read that back to me?
17      (The last answer was read back as
18  follows:  "I looked at a couple of the entities to see
19  how they were accounting for the contributions,
20  whether they earmarked contributions for particular
21  purposes and how they treated them, but I only had
22  limited information.  If I had more information, I
23  would be very interested in that aspect if you had
24  additional discovery.")
25      Q.  (BY MR. SAFER)  You said you looked at a

---

**21**

1  couple of entities in this manner.  Which entities did
2  you look at?
3      A.  Okay.  And this would be in a perfunctory
4  sense because I didn't have the full set of records.
5  But I looked at the American Tort Reform Association
6  and the ILR/U.S. Chamber relationship.
7      Q.  Were there any other entities that you
8  looked at to see how they accounted for contributions
9  and whether they earmarked?
10      A.  Just let me say that I'm interested in
11  all of the entities, but the only two that I had any
12  information on was the ILR and U.S. Chamber.  So the
13  short answer to your question is no.  But it would be
14  very interesting to me to see.  I would want to have
15  available to me the books and records of each of the
16  501(c) organizations that are germane to this
17  particular -- what I describe as affiliated
18  organizations.
19      Q.  What did you do to determine whether or
20  not the entities that you reviewed in this manner
21  earmarked money for particular purposes?
22      A.  I wasn't able to make that determination
23  because I didn't have enough information.  It's
24  something I would be interested in analyzing.  It
25  would be germane to my opinion.

---

6 (Pages 18 to 21)

CONFIDENTIAL
Thomas Arthur Myers, CPA      May 22, 2015

22

1      Q.  How would it be germane to your opinion?
2      A.  It would either tie into the alleged
3  activity of these what I refer to as affiliated
4  organizations in supporting the campaign of Illinois
5  Supreme Court Justice Karmeier, and the books and
6  records would shed light on the activity of the
7  particular entity with respect to that fundamental
8  underlying issue with respect to this litigation.
9      Q.  It would either support or refute your
10  conclusions?
11      A.  I don't know that there's anything in the
12  books and records that would refute my opinion, but it
13  would be germane.  Let me give you an example.  501(c)
14  corporations are required to file a Form 990 income
15  tax report.  And on line 81 of that Form 990, they
16  must disclose political expenditures.  Those political
17  expenditures are taxable to the 501(c) entity.  I
18  would like to know -- it would be interesting to me if
19  these entities were breaking the law in terms of not
20  reporting taxable income.
21          There's also a requirement for a 501(c)
22  to reflect grants to other organizations.  I think
23  it's on line 20.  And I don't believe that that was
24  being done, but I would have to see the books and
25  records to make a determination regarding that.  So

23

1  if, for example, the affiliated organizations were
2  entering into illegal activities, that would be
3  germane to my opinion.
4      Q.  Is there anything else that you -- when
5  you said you would be interested to see the books and
6  records, is there anything else other than what you've
7  just stated that you would be interested in seeing the
8  books and records for?
9      A.  Sure.  I mean, I don't know until I see
10  the books and records, but they would be of great
11  interest to me.
12      Q.  What would you be looking for?
13      A.  Other contributors, other activities of
14  the organization.
15      Q.  Why would that be relevant?
16      A.  Because as a forensic accountant, I
17  really can't be sure that I have all of the
18  information that's germane to the issues in this
19  particular litigation.  For example, there may have
20  been more contributions that I'm not aware of.  We --
21  or I think that it's possible that the Karmeier
22  campaign received more money than we actually have
23  reflected in my report.  It's possible.  That's not my
24  opinion.  But I would like to examine the books and
25  records to see if there's any evidence of that or if

24

1  there's evidence that would refute any of the
2  conclusion that I have.  I would be interested in
3  finding -- basically ascertaining the truth of the
4  situation.
5      Q.  You have no information or basis to say,
6  and you're not saying, that any of these organizations
7  broke the tax laws, are you?
8      A.  No, I'm not saying that.
9      Q.  And you have no information that leads
10  you to believe that they broke the tax laws, do you?
11      A.  Well, where there's smoke, there's fire.
12  I mean, I believe that if these -- I believe that
13  there was a concerted effort on the part of what I
14  describe as affiliated organizations in this report to
15  obscure their role with respect to supporting direct
16  contributions to the Karmeier campaign.  And if that's
17  true, it's interesting to me.  And you said I have no
18  indication or no evidence.  That's not true.  I think
19  there is evidence of the affiliated organizations
20  manipulating the disclosure requirements under the
21  Illinois campaign election laws.
22      Q.  The question involved tax laws.
23      A.  Okay.
24      Q.  What information do you have to believe
25  that any of these entities violated the tax laws?

25

1      A.  There's work that's been done on the
2  Internet by Public Citizen, which is a 501(c)
3  corporation itself, that makes what I consider to be
4  very sophisticated and informed analyses of the
5  situation with the ILR and the U.S. Chamber.  And it
6  compares statements by Mr. Donohue where he would brag
7  or boast on the public record of supporting numerous
8  judicial elections, attorney general elections, and
9  other political elections.  But the ILR/U.S. Chamber
10  Form 990 did not show any political expenditure for
11  the years 2000 to 2003.  So there's a very well-framed
12  discussion of the deficiencies with respect to the ILR
13  and the U.S. Chamber.
14      Q.  So other than what you've read at the
15  Public -- I'm sorry.
16      A.  Public Citizen.
17      Q.  Public Citizen Web information --
18      A.  Yeah.
19      Q.  -- are they contending that ILR and U.S.
20  Chamber broke the tax laws?
21      A.  Yes.
22      Q.  Other than what you've read on that Web
23  site, do you have information that ILR or U.S. Chamber
24  broke the tax laws?
25      A.  No.  But that also brings to mind there's

7 (Pages 22 to 25)

26

1  another allegation that the ILR and the U.S. Chamber
2  commingled funds, just had one account, and that comes
3  from a lawsuit in Washington state.  I haven't
4  confirmed that.  That's not my opinion, but that would
5  be germane to me.  That would be something of interest
6  which would be reflected in the books and records.  So
7  you had asked me previously what am I looking for.  I
8  really don't know what I'm looking for.  It's kind of
9  like a smorgasbord of things.
10     **Q.  You've relied on the fact that ILR and**
11  **U.S. Chamber have a shared bank account, correct?**
12     A.  No, that is not true.  That's something
13  that I'm aware is alleged, but I haven't confirmed
14  that and that's not part of my opinion.  I have also
15  been informed somewhere -- and I can't tell you
16  exactly how -- that ATRA, the American Tort Reform
17  Association, has one account for everything, but I
18  don't know that.  That's not part of my opinion.
19     **Q.  Now, with regard to concealment, you**
20  **would agree that just because something is concealed**
21  **does not mean it's wrong or unlawful, correct?**
22     A.  I would agree with that.  Well, it
23  depends on the context, of course.
24     **Q.  Exactly.**
25     A.  But in this particular context, the fact

27

1  that a contributor to a 501(c), that that contribution
2  is concealed, is not per se in and of itself illegal
3  or there's nothing wrong with that.  It's
4  contemplated.
5     **Q.  And in my many other different contexts,**
6  **the identities are concealed without it being wrong or**
7  **illegal, correct?**
8     A.  That's true.
9     **Q.  So, for instance, a purchaser of land can**
10  **do so through a land trust to prevent their identity**
11  **as the purchaser of land from being disclosed?**
12     A.  That is true.
13     **Q.  And there's nothing wrong with that?**
14     A.  No.
15     **Q.  And there are many other situations where**
16  **that can be done?**
17     A.  Sure.  However, if they're asked under
18  oath whether they invested in that land and they
19  misinform or misstate, that's wrong.
20     **Q.  Now, you've testified in other cases**
21  **about the adequacy of disclosure statements, for**
22  **instance, as you talked about in public filings?**
23     A.  In the SEC context, yes.
24     **Q.  Like proxy statements, 10-Ks, 10-Qs?**
25     A.  10-Qs, yes.

28

1     **Q.  And you understand, as I think you've**
2  **already testified, that there's a large body of law**
3  **that governs disclosures in public filings?**
4     A.  Well, okay, now you're talking about
5  public filings, but I think we need to narrow that
6  down a little better.  If you're talking about SEC
7  disclosures pursuant to Section 10b-5, those kinds of
8  things --
9     **Q.  Yes.**
10     A.  -- yes, there's a wide body of -- the
11  Securities and Exchange Act of 1933 and 1934, but also
12  there's a wide body of case law and interpretations
13  and so on that govern that whole area.
14     **Q.  And regulations regarding 10b-5 and other**
15  **statutes?**
16     A.  Yes, sir.
17     **Q.  And you considered those laws in the**
18  **context of your opinion, forming your opinions in**
19  **those SEC disclosure cases, correct?**
20     A.  That is true.
21     **Q.  And you've already testified that there**
22  **is a body of law that governs campaign -- what**
23  **campaign contributions have to be disclosed, correct?**
24     A.  No.  I don't think I've testified about
25  that.

29

1     **Q.  Okay.  Is there a body of law that**
2  **governs what campaign contributions have to be**
3  **disclosed?**
4     A.  Okay.  Let me first state on the record
5  that I'm not here to provide an opinion on the law, so
6  I don't purport to know all of the campaign disclosure
7  laws.  Having said that, I'm certainly aware of the
8  Illinois Campaign Disclosure Act and what's provided
9  there in the context of this particular litigation.
10     **Q.  Are you an expert in Illinois campaign**
11  **finance law?**
12     A.  No.
13     **Q.  Are you an expert in any campaign finance**
14  **law?**
15     A.  No.
16     **Q.  Did you review the Illinois campaign --**
17     A.  Excuse me.  May I just qualify that for a
18  second.  I certainly can read what the disclosure
19  requirements are and interpret them for a client or
20  for somebody who asks me what does it say.  So to that
21  extent, I have expertise, but I'm not an expert on any
22  area of the law.  I'm a forensic accountant.
23     **Q.  But you would interpret the law for**
24  **clients?**
25     A.  Yes.  As a financial adviser, sure.  To

30

1    the extent that it dovetails with my expertise or
2    would be areas that I would be able to advise them on,
3    yes.
4        Q.   Have you reviewed the Illinois campaign
5    finance laws?
6        A.   Yes.
7        Q.   What laws have you reviewed?
8        A.   Generally -- and I cite it in here.  I
9    can't tell you what the official name is for it, but I
10   actually excerpt from it.  If you give me a second,
11   I'll tell you what I've reviewed.  Yes.  I'm reading
12   from page 13 of my report where I state that the -- I
13   refer to the Illinois State -- excuse me.  I'm at the
14   last paragraph, not the indented quote but the last
15   paragraph on page 13.  And the last sentence in that
16   paragraph says, "The Illinois State Board of Elections
17   'A Guide to Campaign Disclosure' explains which
18   entities are required to disclose political
19   contributions and/or expenditures under the Illinois
20   Campaign Disclosure Act."  And then I provide an
21   excerpt to -- that's a quote from the Illinois State
22   Board of Elections guide for a campaign disclosure,
23   who is covered by the act.
24       Q.   Right.
25       A.   So you asked me what I reviewed and

31

1    that's one of the things that I reviewed.
2        Q.   One of the things you reviewed was the
3    guide provided by the Illinois State Board of
4    Elections?
5        A.   Yes, sir.
6        Q.   Did you review the Illinois Campaign
7    Disclosure Act itself?
8        A.   I don't think so.  I think there's a
9    handbook, a rather extensive handbook, that's
10   published by the State of Illinois, if I remember
11   correctly -- it might be 80 pages long or so -- that I
12   did have occasion to go through, but I didn't study
13   it.  And most of what I gleaned from that analysis,
14   what was germane, is this particular excerpt that's
15   published in my report on pages 13 and 14.
16       Q.   How did you determine which documents to
17   review in this case?
18       A.   It was really pretty much pursuant to our
19   protocol.  And we would work backwards from the --
20   whatever material, the pleadings we had or disclosures
21   that we have in the complaint and any other pleadings
22   that might be germane.  So we would start our search
23   that way, and then it's kind of like a ballistic
24   missile.  It's trial and error.  You look in one area
25   and then you find information out and it leads you to

32

1    another area and you narrow down your research until
2    you kind of hone in on the target.  It's teleological.
3        Q.   Now, you reviewed State Farm's filings in
4    the Avery case before the supreme court addressing
5    Justice Karmeier's involvement in the case?
6        A.   Yes, sir, the 2005 and 2011 filings.  And
7    I define what I mean by that in the report --
8        Q.   Right.  And you actually --
9        A.   -- and reference them specifically.
10       Q.   In your appendix?
11       A.   Yes -- well, no, not in the appendix.
12   There's a discussion -- let me just refer you to that.
13       Q.   I'm familiar with the discussion, but
14   what I --
15       A.   Okay.  On page 63.
16       Q.   But what I would like to address first is
17   what you reviewed.  And that is in your appendix,
18   correct?
19       A.   Yes.  I would say that -- well, hold on.
20   I don't believe that we've reprinted all of the
21   filings, the 2005 and 2011 filings.  And let me just
22   on the record describe them a little more accurately,
23   what I'm talking about, the 2005 filings.
24       Q.   Can I refer you to page 89 of your
25   report?  I think you do list them.

33

1        A.   Oh, I do have them all.  Okay.  And what
2    specifically are you referring me to?
3        Q.   What I'm asking you is, looking at
4    Appendix C, page 89, under "Case Pleadings," are those
5    the documents that you reviewed -- well, does that
6    include all of the documents that you reviewed that
7    were pleadings concerning -- in the Avery case
8    concerning Justice Karmeier's participation in that
9    case?
10       A.   I don't believe so.  I refer to them
11   specifically on page 63 and define what I mean by 2005
12   filing and 2011 filing.  And I refer with elaborate
13   footnote references to the specific pleadings that
14   were germane to the recusal hearings relating to
15   Justice Karmeier.
16       Q.   Are there any documents in that
17   discussion at pages 63 to 65 that are not referenced
18   in your appendix?
19       A.   I'm not sure that these particular
20   documents are referenced there, but clearly they're
21   referenced in the report.  I'm not sure.  I wouldn't
22   be able to go through all of the . . .
23       Q.   These are State Farm pleadings, correct?
24       A.   Yes.
25       Q.   All State Farm pleadings?

9 (Pages 30 to 33)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

34

1    A.  I've also read the motions by the
2  plaintiffs in that matter.
3    Q.  Why isn't that included in your report?
4    A.  I'm not sure that it isn't.  I can't tell
5  you.  I could go through right now the documents.
6  Appendix C is documents produced.  I don't know if
7  it's in there or not.  I didn't put together this
8  whole list.  I reviewed it, but I can't tell you for
9  sure that the plaintiffs' motions are included.  But I
10  can tell you, as I sit here now, I've read the
11  plaintiffs' motions, not in their entirety but I've
12  reviewed them.
13    Q.  Have you ever addressed class
14  certification issues as an expert before this case?
15    A.  I believe that I have provided testimony
16  in a class certification hearing, but I'm not sure as
17  I sit here.  I don't recall the specific situation.
18    Q.  So you do not recall, as you sit here,
19  ever having addressed class certification issues
20  before this case?
21    A.  I believe that I have, but I can't tell
22  you off the top of my head which case or which cases.
23    Q.  You believe that there may have been a
24  number of cases?
25    A.  It's possible, yes.

35

1    Q.  But you can't cite any of them?
2    A.  No.  They would have been more than ten
3  years ago.
4    Q.  Have you ever opined as an expert before
5  as to whether certain issues of fact are common to all
6  members of a proposed class?
7    A.  I believe I have, but I'm not sure.
8    Q.  You cannot cite any case in which you
9  have opined as an expert, before this one, as to
10  whether certain issues or facts are common to all
11  members of a proposed class?
12    A.  Not as I sit here.
13    MR. SAFER:  Okay.  Why don't we take a
14  brief break.
15    (Recess taken, 9:50 a.m. to 9:58 a.m.)
16    Q.  (BY MR. SAFER)  Mr. Myers, is there
17  anything other than what's listed in Appendix C in
18  terms of documents that you relied upon for your
19  opinions in this case?
20    MR. CLIFFORD:  Counsel, let me interject
21  here.  Mr. Myers will answer that question, but it is
22  clear from the record that the discovery in this case
23  is ongoing and that, as I think you're aware, I think
24  all parties are engaged in reviewing the thousands of
25  pages of material that are being provided to both

36

1  sides in discovery.  Certainly Mr. Myers has been
2  provided, as he will identify as best he can to you
3  this morning, any new material that we have given to
4  him postdating the report before you.  And we
5  certainly will continue to do that and reserve the
6  right to do that as discovery continues.  And when
7  necessary and appropriate, we will certainly
8  supplement his report as needed and also make him
9  available for a supplemental deposition as needed and
10  required, if required at all.  Thank you.
11    Mr. Myers, you can answer the question.
12    A.  The question again, please.
13    Q.  (BY MR. SAFER)  The question is:  Are
14  there documents other than what is listed on
15  Appendix C that you relied upon for your opinions?
16    A.  Let me first address my opinions prior to
17  when this report was filed.  And the Appendix C:
18  Documents Produced is my attempt to capture the
19  universe of documents upon which I relied.  But I
20  would also subsume the documents that are referenced
21  in the footnotes, because I've tried to be completely
22  transparent and candid about where I'm deriving my
23  opinions from.  So if there's something inadvertently
24  missing in Appendix C, I would also subsume these
25  documents that are referenced in the footnotes.

37

1    Having said that, I would underscore what
2  Mr. Clifford just said, because there has been other
3  documents that I've reviewed subsequent to the filing
4  of the report.  And I wasn't asked to prepare a list
5  of those documents, but I would be happy to do that if
6  the attorneys concur with that.  But, for example, one
7  thing that I would like to mention specifically is the
8  Public Citizen report that I referred to.  There are
9  numerous exhibits that are germane to issues in this
10  case.  And, yes, I would be weighing them in the
11  context of informing my opinion.
12    Q.  What other documents other than the
13  Public Citizen report have you been provided or
14  obtained that you rely upon in your opinions?
15    A.  I'm not prepared to off the top of my
16  head be able to list all of those for you now, but I
17  can tell you there's another document that I found of
18  particular interest that was a February 2, 2004,
19  document.  I believe it was an ILR or U.S. Chamber
20  document that listed ten bullet points relating to the
21  U.S. Chamber and the ILR's experience with State Farm.
22    Q.  Are there any other documents that you
23  recall?  I understand you need to provide us with a
24  list, an additional list, but you've now referenced
25  two specific sources.  Are there any other documents?

10  (Pages 34 to 37)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

38

1    A.  I wasn't prepared to regurgitate that,
2  but as I sit here, there's nothing that comes to my
3  mind.
4        MR. BLONDER:  Ron, I believe the
5  February 2 document he's referring to is U.S. Chamber
6  4771 by Bates number.
7        Q.  (BY MR. SAFER)  And that document was in
8  the database that you had been provided, correct?
9        A.  I'm not sure if it was provided
10 subsequent to my report or how it was discovered, but
11 counsel showed it to me.
12       Q.  Have your opinions changed since you
13 wrote your report?
14       A.  No.
15       Q.  Do you have any additional opinions that
16 you intend to offer in this case in addition to the
17 ones that are in this report?
18       MR. BLONDER:  Ron, just for the record,
19 this report has been tendered in connection with class
20 cert.  To the extent on non-class cert issues, we may
21 or may not choose to have Mr. Myers give additional
22 opinion.  If so, they will be disclosed in accord with
23 any schedule for that.
24       A.  Your question again, please.
25       Q.  (BY MR. SAFER)  Are there any additional

39

1  opinions that you have other than what is in this
2  report?
3        A.  I would say that any additional
4  opinions -- of course, I've examined more information
5  and my opinion is a bit of a moving target, but any
6  additional opinions would be subsumed within the
7  opinions that are already articulated in my report.
8        Q.  So the answer is, no, there are no
9  additional opinions?
10       A.  Subject to that qualification.
11       Q.  The qualification being that your
12 opinions are a bit of a moving target?
13       A.  No.  As I said -- I can say that again --
14 there are different -- new pieces of information that
15 are germane and underscore opinions that I previously
16 gave, but those new, if you want to call them
17 opinions, would be subsumed or they're part of a
18 subset of the universe of other opinions that I've
19 already articulated.
20       Q.  Okay.  Have you spoken with anybody who
21 purports to have firsthand knowledge of the facts of
22 this case?
23       MR. CLIFFORD:  Objection to the form of
24 the question.  Please define firsthand knowledge.
25       A.  I haven't spoken with any percipient

40

1  witnesses or people who were actually involved.  I've
2  talked to the attorneys, of course.
3        Q.  (BY MR. SAFER)  Have you talked at all
4  with Doug Wojcieszak?
5        A.  No.
6        Q.  Have you talked at all with Daniel Reece?
7        A.  No.
8        Q.  Have you received directly any
9  information from either of those gentlemen?
10       A.  I was aware at some point early on in
11 this case of a chart that Mr. Wojcieszak did.
12       Q.  What kind of a chart?
13       A.  It was an attempt -- at least the way I
14 perceived it, was an attempt to reflect the
15 interrelationships between the organizations that were
16 engaged in providing funding for the Karmeier
17 election.
18       Q.  So a chart in the nature of the chart you
19 have on page 20?
20       A.  Yes.  Less refined, of course.
21       Q.  I'm sorry.  From whom did -- what was the
22 source of that?
23       A.  Well, you had asked me about
24 Mr. Wojcieszak.
25       Q.  Right.  Okay.

41

1        A.  And that's the only thing that I have
2  seen personally from him.
3        Q.  Well, you have seen his affidavit; is
4  that correct?
5        A.  Yes, that's true.  I'm sorry.  And
6  Mr. Reece's affidavit as well.
7        Q.  And did you rely upon either of those
8  affidavits in formulating your opinions?
9        A.  No.
10       Q.  Now, there is a section of your report
11 that is called The Money Trail.  Do you recall that?
12       A.  Yes.
13       Q.  And that is where you trace money from
14 State Farm to the Karmeier campaign; is that right?
15       A.  Yes.
16       Q.  And you say that State Farm engaged in a
17 pattern of disguised financial transactions designed
18 to funnel money to the Karmeier campaign.
19       A.  Can you tell me where you're reading
20 from, please.
21       (Joining the meeting:  Richard Taylor.)
22       MR. CANCILA:  Mr. Taylor is another
23 counsel for the plaintiffs.
24       Q.  (BY MR. SAFER)  I don't have quotations,
25 but I am either quoting or paraphrasing from pages 18

11 (Pages 38 to 41)

42

1 **and 19.**
2     A.  Thank you.  Your question again?
3     **Q.  The question is:  You say State Farm**
4 **engaged in a pattern of disguised funnel**
5 **transactions designed to funnel money to the Karmeier**
6 **campaign.**
7     A.  Where do I say that?
8     **Q.  On pages 18 and 19.**
9     A.  Just generally, that's a paraphrase of
10 what I say?
11     **Q.  Yes.**
12     A.  Okay.
13     **Q.  Do you --**
14     A.  I agree with you, yes.  I don't know the
15 specific language that you're using.  I would like you
16 to point me to it so I can -- oh, here, okay,
17 "illustrates the flow of funds that were funneled
18 through disguised financial transactions into
19 various" -- yes.  Okay.  Thank you.
20     **Q.  So you agree?**
21     A.  We're on the same page, yes, literally.
22     **Q.  When did this plan to funnel money to the**
23 **Karmeier campaign through a series of disguised**
24 **transactions begin?**
25     A.  I don't know that I could identify

43

1 specifically the chronology or the genesis of this
2 concept.  But I would propose that Mr. Rust's, State
3 Farm chairman, relationship with Mr. Donohue and the
4 ILR and the U.S. Chamber, as detailed in my report,
5 show early on, even from the time of the first Avery
6 verdict, an interrelationship between the ILR, the
7 U.S. Chamber, and specifically Mr. Donohue and
8 Mr. Rust that showed a big concern with legal reform.
9 And it was always a major topic of discussion.
10     I recall seeing some internal U.S.
11 Chamber or -- I don't distinguish necessarily between
12 the ILR and the U.S. Chamber, but one of their
13 internal documents that referred to the extensive
14 litigation that State Farm had experienced.  And I
15 think they said something like 25 percent of the tort
16 litigation of the country was related to State Farm.
17 And I'm not relying on that, but that was something
18 wherein that was obviously a major topic between State Farm
19 and the U.S. Chamber.
20     So I don't know -- I would propose that
21 State Farm was always interested, at least based on
22 the record that I've examined, in improving from their
23 perspective the litigation landscape.  I would say
24 more directly that the ILR program with respect to
25 initiating the Madison County initiative in early --

44

1 around May of 2003 would be as good a place as any.
2 If we have to have a birth of the notion to elect
3 Karmeier, it would be there.  And State Farm, ICJL,
4 Mr. Murnane, the U.S. Chamber, and a lot of the people
5 who are ultimately involved in this pattern of
6 activity were involved in the Madison County
7 initiative.  And I would say that when State Farm cut
8 a check shortly thereafter on May 30 to the ILR for a
9 million dollars, that primed the pump.
10     (Joining the meeting.)
11     MR. CANCILA:  Who just joined?
12     MR. THRASH:  This is Tom Thrash.
13     A.  I would say when State Farm cut a check
14 for a million dollars to the ILR on May 30 of 2003,
15 that primed the pump and gave the incentive to people
16 like Murnane and the ICJL, Illinois Civil Justice
17 League, to initiate a plan that would involve the
18 interrelationship of what I describe as affiliated
19 organizations to see the election of someone from the
20 fifth -- in Illinois that would be more predisposed
21 towards a State Farm position with respect to
22 litigation before the Illinois Supreme Court.
23     **Q.  (BY MR. SAFER)  You stated that Rust, Ed**
24 **Rust, and Tom Donohue had a relationship and were**
25 **interested in legal reform.  It's that interest in**

45

1 **legal reform, in your mind, the beginning of State**
2 **Farm engaging in a pattern of disguised financial**
3 **transactions to funnel money to the Karmeier campaign?**
4     A.  No.  It depends on -- for example, if
5 we're talking about when the Amazon -- where it
6 started and what was the first drop of water, I would
7 propose that these discussions would be the first drop
8 of water in this analogy.  But I would say that the
9 Madison County coalition formation, the infusion of
10 capital from Mr. Rust or from State Farm to the ILR on
11 May 30, 2003, set things in motion where Ed Murnane
12 and the Illinois Civil Justice League started actively
13 planning and putting together and orchestrating the
14 ultimate cast of characters through which it was
15 possible to accomplish the election of Mr. Karmeier.
16     I would also refer to a specific letter
17 on July 26 of 2003 from Mr. Murnane to Karmeier
18 wherein I would characterize the letter as essentially
19 putting big pressure on Mr. Karmeier in sort of a
20 courtship context to talk him into becoming the
21 candidate, the U.S. Chamber -- or the ICJL's candidate
22 and ultimately State Farm's candidate for the Illinois
23 Supreme Court.  In that letter Murnane talks about
24 going to Washington to talk to the American Tort
25 Reform Association, to talk to the U.S. Chamber.  He

12  (Pages 42 to 45)

46

1 talks about possibly lining up $2 million from the
2 Chamber to fund this effort. So I would propose if
3 we're talking about etiology, where is the exact date
4 of birth, I would say that's as good a place as any to
5 start.
6     Q.  Which?
7     A.  The July 26, 2003, letter and the Madison
8 County coalition which is around that time, a little
9 bit earlier. Mr. Murnane also even reflects a role of
10 the Illinois Republican Party in discussions with Ron
11 Gidwitz, who is a prime fundraiser for the Illinois
12 Republican Party. So a lot of what ultimately ensued
13 with respect to this pattern of activity that I
14 document in my report was conceptualized at that
15 point, I think.
16     Q.  Who was it who initially conceived of
17 this plan to funnel money to the Karmeier campaign
18 through a series of disguised transactions?
19     A.  I think the genesis came from discussions
20 between Mr. Rust and Mr. Donohue, but I can't document
21 that at this point. I can only point to evidence that
22 I have examined that would lead me to that conclusion.
23 And I'll be happy to go through that evidence with
24 you, if you would like, and it's all documented in my
25 report.

47

1     Q.  Okay. We'll get there.
2     A.  Okay.
3     Q.  You said you can't document the
4 conversations between Rust and Donohue that you
5 believe was the genesis of this plan?
6     A.  I don't have a tape recording. I don't
7 have any smoking gun, absolute evidence of Mr. Rust
8 discussing State Farm's -- well, I take that back. I
9 do have evidence of that, but I don't know when -- I
10 can't point to a particular piece of evidence that
11 would lead me to believe that that was the initiation,
12 the birth of the concept to engineer the election of
13 an Illinois Supreme Court Justice that would look more
14 favorably upon State Farm's interests.
15     Q.  Okay. That's not the question. There's
16 nothing wrong, is there, with looking for a candidate
17 or supporting a candidate who you believe would
18 support your interests, is there?
19     A.  No. The problem lies in lying about
20 that.
21         MR. SAFER: I move to strike the answer
22 after no.
23     Q.  (BY MR. SAFER) The question is: There's
24 nothing wrong with seeking a candidate for any office
25 who you believe would be more sympathetic to your

48

1 point of view, is there?
2     A.  There's nothing wrong with that.
3     Q.  So the question is: Who conceived of the
4 plan to funnel money to the Karmeier campaign through
5 a series of disguised transactions?
6         MR. BLONDER: Objection. Beyond the
7 scope of his opinions.
8     A.  I also think it's been asked and
9 answered. You asked me when this concept was
10 originated and I gave you my best shot at that.
11     Q.  (BY MR. SAFER) The question is who.
12         MR. BLONDER: The question was who
13 conceived it.
14         THE DEPONENT: Oh, who.
15         MR. BLONDER: And that's beyond the scope
16 of the witness's opinions.
17     A.  Well, I felt like I answered that. I
18 believe that the ultimate genesis of this came from
19 conversations between Mr. Rust and Mr. Donohue.
20     Q.  (BY MR. SAFER) Now, you analyzed three
21 contributions that State Farm made to the Illinois
22 Jobs Coalition in 2004?
23     A.  That is true.
24     Q.  I'll refer you generally to pages 42 and
25 the pages immediately following of your report.

49

1     A.  Okay.
2     Q.  Is that where you analyzed those three
3 contributions?
4     A.  Yes, sir.
5     Q.  Now, you state on page 43 that "The
6 contributions are far from routine."
7     A.  Okay.
8     Q.  Do you see that?
9     A.  Uh-huh.
10     Q.  You have to answer audibly.
11     A.  Oh, I'm sorry. Yes.
12     Q.  Why was it important to you that the
13 contributions were not routine?
14     A.  I think they were part -- the reason
15 they're not routine is because they were part of an
16 effort by State Farm to disguise their role in funding
17 the Karmeier campaign.
18     Q.  The question is not why weren't they
19 routine. The question was: Why was the fact that
20 they were not routine important to you?
21     A.  Oh. I looked at the Illinois Jobs
22 Coalition with particular interest because it was
23 formed by the Illinois Business Roundtable, which Ed
24 Rust was a co-chairman of, the ICJL, which Ed Murnane
25 was instrumental with, and the Illinois Chamber of

13 (Pages 46 to 49)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

50

1  Commerce, among others, to specifically target the
2  supreme court justice election in Illinois in 2004.
3  That's not routine.  And it's not routine that the --
4  well, there are other things about the Illinois Jobs
5  Coalition transaction that are not routine, as far as
6  I'm concerned.
7       MR. SAFER:  I move to strike that answer
8  as unresponsive.
9       MR. CLIFFORD:  Objection.
10      MR. BLONDER:  Objection.  It is
11  responsive.
12      Q.  (BY MR. SAFER)  Why was the fact that it
13  was not routine important to you?
14      MR. BLONDER:  Objection.  Asked and
15  answered.
16      A.  I think that that's a matter of
17  semantics.  I would say that I would not put
18  particular significance to the statement that it's not
19  routine.  The context that I'm referring to is that
20  there were many things about the transactions with the
21  Illinois Jobs Coalition that were not routine.  It's
22  not that -- contributors to 501(c)s make contributions
23  every single day.  That's routine.  But this
24  particular transaction is interesting, because Ed
25  Murnane and the ICJL knew about it before it ever took

51

1  place.
2       Q.  (BY MR. SAFER)  You state, "State Farm
3  paid $150,000 to the Illinois Jobs Coalition by way of
4  three $50,000 transfers, all made during the peak of
5  the Karmeier campaign.  The contributions are far from
6  routine.  On the contrary, they were approved and
7  handled by top-level State Farm executives."
8       It's not my semantics, sir.  It's yours.
9  Why was the fact that those contributions were not
10  routine worthy of note in your report?
11      MR. CLIFFORD:  Object to the question.
12  It's been asked and answered and it's argumentative.
13      A.  I did the best I could to answer your
14  question.  I'll elaborate further, if you would like,
15  about why the whole Illinois Jobs Coalition
16  contribution by State Farm is unusual.
17      Q.  (BY MR. SAFER)  That's not my question.
18      A.  Okay.
19      Q.  My question is --
20      A.  Excuse me.
21      Q.  -- why is the fact it's not routine
22  important to you and worthy of note in your report?
23      A.  When you say "not routine," I'm
24  interpreting that as meaning unusual.  And I just
25  offered to explain to you why this series of

52

1  transactions was unusual, in my view, from the
2  perspective of a forensic accountant.  I'll be happy
3  to elaborate on that, if you would like me to.  Excuse
4  me, sir.  I'm interpreting routine, the definition of
5  routine, as -- not routine as being unusual.  So I can
6  tell you why this transaction -- these transactions
7  with the Illinois Jobs Coalition were not routine, in
8  my view.
9       Q.  You identified $2.2 million of payments
10  from State Farm to the U.S. Chamber of Commerce and
11  ILR as disguised financial transactions designed to
12  funnel money to the Karmeier campaign?
13      A.  That is true.
14      Q.  The $2.2 million of payments that State
15  Farm made was comprised of four payments, each of
16  which you conclude were designed to be disguised
17  financial transactions designed to funnel money to the
18  Karmeier campaign?
19      A.  And where are you referring to now?
20      Q.  28.
21      A.  28.
22      Q.  Beginning on.  Yes.
23      A.  I'm sorry.  You were reading from
24  someplace.
25      Q.  I wasn't reading, sir.

53

1       A.  Oh, okay.  I'm sorry.
2       Q.  The question is:  The $2.2 million of
3  payments that State Farm made was comprised of four
4  payments, each of which you conclude were designed to
5  be disguised financial transactions designed to funnel
6  money to the Karmeier campaign?
7       A.  I said they're consistent with the
8  allegations of the plaintiff and they support that
9  allegation.  And, yes, they are -- were disguised
10  financial transactions, in my view.
11      Q.  There were four checks, correct?
12      A.  Yes.
13      Q.  The first was $1 million to ILR for
14  annual dues on May 30, 2003?
15      A.  That is the way the check was described,
16  yes.
17      Q.  The second was $100,000 to U.S. Chamber
18  for annual dues on June 27, 2003?
19      A.  Yes.
20      Q.  The third was a million dollars to ILR
21  for annual dues on May 17, 2004?
22      A.  Right.
23      Q.  The fourth was $100,000 to U.S. Chamber
24  for annual dues on June 21, 2004?
25      A.  Yes.

14 (Pages 50 to 53)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

54

1    **Q.  Okay.  Let's talk first about the payment**
2    **of the million dollars for annual dues on May 30,**
3    **2003.  What is your basis for concluding that this**
4    **payment was designed by State Farm to be a disguised**
5    **financial transaction to funnel money to the Karmeier**
6    **campaign?**
7        A.  It's consistent with State Farm -- I
8    describe it as priming the pump -- providing the
9    funding to launch the Madison County coalition
10   campaign to elect a pro-business, pro-State Farm
11   supreme court justice.  And the rationale regarding
12   where that comes from and so forth is set out in
13   detail in my report.
14       **Q.  What is the basis for concluding that**
15   **that million dollars --**
16           MR. CANCILA:  It sounds like someone
17   dropped off, is what that sounds like.
18           MR. CLIFFORD:  Did anyone join?  Please
19   continue.
20       **Q.  (BY MR. SAFER)  What is the basis for**
21   **your conclusion that the million-dollar payment on**
22   **May 30, 2003, for annual dues was designed to prime**
23   **the pump for the Madison County campaign?**
24       A.  As I discussed earlier in responding to a
25   previous question, this set in motion the apparatus,

55

1    which was primarily run through Murnane and the ICJL,
2    to see Karmeier elected.  Shortly after this check was
3    issued, Murnane boasted or at least held out a carrot
4    to Mr. Karmeier that he could get $2 million from the
5    U.S. Chamber to support the Karmeier campaign.
6        Well, I asked myself, where does that
7    $2 million come from?  Mr. Donohue is known as a
8    fundraiser.  501(c) organizations like the U.S.
9    Chamber don't sell widgets for revenue.  They have to
10   have contributions that match outflows of cash.  So if
11   there's going to be a $2-million commitment from the
12   U.S. Chamber, that money has got to come from
13   somewhere.  And the money came from State Farm.
14       **Q.  What is your conclusion -- what is the**
15   **basis for your conclusion that this million dollars**
16   **was half of that $2-million commitment or $2-million**
17   **boast, to use your terms?**
18       A.  It's consistent with -- Mr. Donohue had a
19   placard on his desk that said show me the money.
20   Okay.  State Farm and Ed Rust were big-time spenders
21   with the U.S. Chamber.  That would empower the U.S.
22   Chamber to spend big to support their candidate and
23   State Farm's candidate in Illinois.  It's a simple
24   concept.
25       **Q.  Is there any other basis that you have**

56

1    **for concluding that State Farm's May 30, 2003,**
2    **contribution was half of Murnane's $2-million boast?**
3        A.  Of course, there is.  There are numerous
4    citings of various materials that support that
5    conclusion on my part that are referenced in the
6    report.  So it's not just that one thing.  There's a
7    subsequent -- I referenced it earlier.  I think it's
8    USC 4771 where the U.S. Chamber is memorializing
9    discussions with Ed Rust and Ed Rust is being
10   approached to fund $5 million over the subsequent five
11   years for the U.S. Chamber.  This is in February of
12   2004.  And in the same breath that Thomas Donohue is
13   asking him for the $5-million contribution or as
14   that's being done, Ed Rust says don't forget about my
15   supreme court election in Illinois or something to
16   that effect.  That to me is pretty solid evidence that
17   Mr. Rust contemplated some action on the part of the
18   Chamber that would reward State Farm for their
19   generous support of the Chamber and the ILR.
20       **Q.  Okay.  You're referring to the document**
21   **that you did not reference in your report?**
22       A.  It's not referenced in my report.
23       **Q.  Okay.  When did you first see that**
24   **document?**
25       A.  Yesterday.  And that document simply

57

1    underscores the opinion that I already reached based
2    on the other documents that are cited specifically in
3    my report.
4        **Q.  Okay.  Tell me what supports, in your**
5    **report, the conclusion that the State Farm May 30,**
6    **2003, million-dollar contribution was half of what**
7    **Murnane boasted to Karmeier about in July of 2003, to**
8    **use your words.**
9        A.  I think I've already answered that
10   question.
11       **Q.  Okay.  Well, you said there were other**
12   **things in your report.**
13       A.  We can go through the report, if you
14   would like.
15       **Q.  Well, I want to know specifically with**
16   **regard to that question.**
17       A.  Okay.  Beginning on page 7, I discuss --
18   under the heading "State Farm Concealed Its Support of
19   the Karmeier Campaign," I talk about in detail the
20   willingness of the U.S. Chamber and Mr. Donohue to
21   represent contributors who have customized political
22   agendas and that's documented thoroughly here.  So I
23   don't have a recording of a conversation between
24   Mr. Rust and Mr. Donohue where they said, hey, we're
25   going to need some help in the Illinois Supreme

15 (Pages 54 to 57)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

58

1  Court -- I don't have that.
2      So as a forensic accountant, what I do in
3  investigating something is to look at all of the
4  various pieces of evidence and support in both pro and
5  con for a particular proposition and that's what I'm
6  doing here. The U.S. Chamber is well-known, based on
7  the record in this case and also from accounts of
8  others, to hold themselves out as proponents of
9  particular political agendas on the part of
10 contributors who wish not to be disclosed, who wish to
11 be anonymous. So that fits the pattern of State
12 Farm's conduct, in my view.
13     Q.  That is evidence that you believe proves
14 **that the million-dollar annual dues that State Farm**
15 **paid on May 30, 2003, was the money that Murnane was**
16 **referring to in his discussion with Karmeier?**
17     A.  That's a complete mischaracterization of
18 what I said. This is one of the pieces of evidence
19 that I weighed in forming my opinion. I looked at
20 thousands of documents literally. I didn't say that
21 that proved that it was half of the $2 million that
22 found its way into the Karmeier campaign.
23     Q.  What does prove it?
24     A.  The accumulation of the preponderance of
25 all of the different documents that I reviewed that

59

1  are cited and articulated in my report. That's what
2  have guided me in my opinion, informed my opinion.
3     Q.  Okay.
4     A.  I think it's clear.
5     Q.  Can you be more specific?
6     A.  Sure. We can go through all of the
7  various documents that are cited here in my report,
8  and I'll be happy to do that. Okay.
9     Q.  As long as it answers the question, sir.
10     MR. CLIFFORD: Objection to the
11 gratuitous remark.
12     Q.  (BY MR. SAFER) I'm just guiding you. I
13 **don't want you to read me your report.**
14     A.  No, no.
15     Q.  I want you to answer the question, which
16 **is: What evidence did you base your opinion on that**
17 **State Farm's payment of a million dollars for annual**
18 **dues on May 30, 2003, was half of the money that**
19 **Murnane was talking to Karmeier about in July of 2003?**
20     MR. BLONDER: Objection. Asked and
21 answered.
22     A.  I believe I have answered that. It's the
23 modus operandi of the ILR and the U.S. Chamber to
24 undertake these kinds of transactions. It's entirely
25 consistent with a motivation, as I understand it, from

60

1  my extensive examination of the record, the motivation
2  of State Farm. When you step back and look, for
3  example, at the inflows of money from State Farm to
4  these various what I refer to as affiliated
5  organizations -- they are by and large 501(c) tax-
6  exempt organizations -- it's not a coincidence that
7  the money in is equal to the money out. I can't --
8  I'm not suggesting here that Mr. Rust showed up with a
9  briefcase full of hundred dollar bills that were
10 marked and those same hundred dollar bills ultimately
11 found their way into the Karmeier campaign. But, yes,
12 the pattern of this activity is, I believe,
13 conclusive. And I think the trier of fact will make
14 that ultimate determination. But in my opinion as a
15 forensic accountant who has investigated numerous
16 situations where disguised financial transactions have
17 played a role, I believe that this is one of them,
18 yes.
19     MR. SAFER: I move to strike that answer
20 as unresponsive.
21     MR. CLIFFORD: A motion to which we
22 object.
23     Q.  (BY MR. SAFER) You did say during that
24 **answer that you believe it's not a coincidence that**
25 **the money in is equal to the money out?**

61

1     A.  Yes.
2     Q.  So that is a factor as you detail in the
3  **money trail that you relied on for your opinion, that**
4  **you detail in --**
5     A.  Well, I don't know that I articulated it
6  in my report. But in responding to a previous
7  question of yours, I'm explaining from my perspective,
8  a 501(c) corporation such as the U.S. Chamber or ATRA
9  or the Illinois Jobs Coalition has no revenue source
10 other than contributions. So there must be a quid
11 pro -- there must be an inflow to match an outflow;
12 otherwise, it just doesn't work. That's the way these
13 organizations operate. And I look at State Farm and I
14 see $2.2 million coming into the Illinois Chamber or
15 the ILR and I see 2.05 going to the Illinois
16 Republican Party as an intermediary, which ultimately
17 finds its way into Citizens for Karmeier. I see
18 another 200,000 from the U.S. Chamber to JUSTPAC.
19 Well, the math -- I don't think it's a coincidence
20 that there's 2.2 million coming in or 2.2 coming out.
21 I think that's engineered by Mr. Donohue and Mr. Rust
22 acquiescing to it. I think it's cheap for him,
23 $2 million, to have a supreme court justice that will
24 be responsive to State Farm's interest. In his mind,
25 I believe it was a good business decision.

16 (Pages 58 to 61)

62

1    Q.  Well, what evidence do you have about
2  what Mr. Rust was thinking at the time?
3    A.  I don't have any evidence.  I'm not a
4  psychologist.  I'm just saying that considering the
5  exposure that State Farm has to Avery and other
6  litigation, it would not be a bad business decision.
7  I can't testify that Mr. Rust came to that same
8  conclusion.  But as a reasonable businessman, I think
9  that he very well could have come to that conclusion.
10   Q.  So when you testified that Rust -- in his
11  mind, it was a good business decision, you meant it --
12   A.  Any reasonable businessman --
13       MR. BLONDER:  Objection.  It
14  mischaracterized his testimony.
15       THE DEPONENT:  I would like to read it
16  back.
17       MR. SAFER:  Let's read it back.  You have
18  to go back a few questions.
19       (The answer on page 61, line 5, was read
20  back as follows:  "Well, I don't know that I
21  articulated it in my report.  But in responding to a
22  previous question of yours, I'm explaining from my
23  perspective, a 501(c) corporation such as the U.S.
24  Chamber or ATRA or the Illinois Jobs Coalition has no
25  revenue source other than contributions.  So there

63

1  must be a quid pro -- there must be an inflow to match
2  an outflow; otherwise, it just doesn't work.  That's
3  the way these organizations operate.  And I look at
4  State Farm and I see $2.2 million coming into the
5  Illinois Chamber or the ILR and I see 2.05 going to
6  the Illinois Republican Party as an intermediary,
7  which ultimately finds its way into Citizens for
8  Karmeier.  I see another 200,000 from the U.S. Chamber
9  to JUSTPAC.  Well, the math -- I don't think it's a
10  coincidence that there's 2.2 million coming in or 2.2
11  coming out.  I think that's engineered by Mr. Donohue
12  and Mr. Rust acquiescing to it.  I think it's cheap
13  for him, $2 million, to have a supreme court justice
14  that will be responsive to State Farm's interest.  In
15  his mind, I believe it was a good business decision.")
16       (Discussion off the record.)
17   Q.  (BY MR. SAFER)  You wanted to correct --
18   A.  Yeah.  I believe in that first response I
19  read I said the Illinois Chamber of Commerce.  I meant
20  the U.S. Chamber of Commerce.  When I was referring to
21  the ILR and the Illinois Chamber of Commerce, I meant
22  the ILR and the U.S. Chamber of Commerce.  There's
23  different chambers of commerce here.
24   Q.  Do you believe that anybody intended the
25  million dollars that State Farm paid on May 30, 2003,

64

1  to be funneled to the Karmeier campaign at the time
2  that payment was made?
3    A.  I believe that the intent of State Farm
4  was for that to benefit State Farm and the State of
5  Illinois somehow in the context of prospective
6  litigation or existing litigation.  It was an attempt
7  to influence, in a favorable way, the litigation
8  environment of State Farm in Illinois.
9    Q.  And, once again, there is nothing wrong,
10  you would agree, with contributing to a campaign of
11  someone who you believe would produce a judicial
12  climate that would be more favorable to your position?
13   A.  That is true, yes, I agree with you.
14   Q.  Now, State Farm began paying a million
15  dollars in dues to ILR in 2002; is that correct?
16   A.  Yes.
17       MR. CLIFFORD:  Objection to the form of
18  the question and characterization of the funds as,
19  quote, unquote, dues.  It's a self-described term by
20  State Farm and the Chamber.
21       MR. SAFER:  This is a -- let's go off the
22  record for a minute.
23       (Discussion off the record.)
24   Q.  (BY MR. SAFER)  State Farm began paying a
25  million dollars in dues to ILR in 2002; is that

65

1  correct?
2    A.  Yes.
3    Q.  And State Farm had previously paid a
4  lower amount in dues to ILR; is that correct?
5    A.  That is true.
6    Q.  In previous years?
7    A.  Yes.
8    Q.  Did State Farm initiate the increase in
9  dues?
10   A.  I think that -- I don't know from the
11  record.  I think there was a rapport, from my
12  examination of the record, between Mr. Donohue and
13  Mr. Rust that accelerated in the post-Avery era.  But
14  that's just from the e-mails and the documents that I
15  have reviewed, that that would indicate that to be the
16  case.  I don't know if in their conversations it
17  became clear.  I don't know that State Farm had a lot
18  of motivation and good reason to be concerned about
19  the litigation climate.  And so I think -- I mean, I
20  don't know who initiated the concept of State Farm
21  anteing up basically on the money that they were
22  contributing to the Chamber and the ILR.
23   Q.  Did you review documents that indicated
24  to you that around this time period all board members
25  or the vast majority of board members had contributed

17 (Pages 62 to 65)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

---

66

1  a million dollars to the ILR?
2      A.  Did I review that?
3      Q.  Yes.
4      A.  I don't recall seeing that specifically.
5  I recall reading media articles about Donohue becoming
6  increasingly involved in soliciting big money from
7  major corporations to effect litigation, the judicial
8  climate, but I don't recall seeing any documents in
9  this particular case germane to that.
10     Q.  Okay.  Do you believe that the increase
11 in dues in 2002 was part of the plan to funnel money
12 to Karmeier?
13     A.  No.
14     Q.  State Farm has paid a million dollars in
15 dues to ILR --
16     A.  Excuse me.  May I just explain that
17 answer.  I said, no, that was not part of State Farm's
18 plan, to influence the election of Karmeier.  Karmeier
19 wasn't even on the scene at that point in time.  He
20 didn't commit until late 2003, if I understand
21 correctly.  So that's impossible, what you just said.
22 But having said that, do I believe that State Farm was
23 attempting to influence the judicial climate in
24 Illinois with that money, I would say unequivocally,
25 yes.

---

67

1      Q.  State Farm has paid a million dollars in
2  dues to ILR every year since 2002, correct?
3      A.  Yes.
4      Q.  It is a routine payment, correct?
5      A.  It's not, by any stretch of the
6  imagination, a routine payment.  It's extraordinary,
7  in my view.
8      Q.  So every company that pays annual dues to
9  ILR has made an extraordinary payment, in your view?
10     A.  Yes.  I think the concept of buying
11 political influence through a 501(c) may be something
12 that is more commonly in practice by the major
13 corporations.  But I would still say that that's
14 extraordinary in the context of manipulation of
15 elections and things like that.
16     Q.  The hundred thousand dollars a year that
17 State Farm paid to the U.S. Chamber was for an annual
18 leadership fund contribution, correct?
19     A.  Say again, please.
20     Q.  The hundred thousand dollars a year that
21 State Farm paid to the U.S. Chamber was for an annual
22 leadership fund contribution?
23     A.  I thought it was for the president's
24 advisory group, which would ensure access to
25 Mr. Donohue firsthand.

---

68

1      Q.  So did you believe that State Farm had to
2  pay this hundred thousand dollars a year to the U.S.
3  Chamber to ensure access to Mr. Donohue firsthand?
4      A.  I think that they were interested in
5  cementing the relationship with Mr. Donohue and would
6  acquiesce within reason to what he proposed.  For
7  example, I reference that USC 4771 where Donohue is
8  heading Mr. Rust up for a $5-million contribution.
9  And right after that, the next sentence in the
10 memorialization by the U.S. Chamber, Mr. Rust talks
11 about his problem with the Illinois Supreme Court.
12 And so is there something going on there?  Is there
13 some expectation that Mr. Rust believes that the
14 Chamber, the ILR, can somehow help him with that
15 issue?  I think there is.  That's the conclusion I
16 come to.
17     Q.  And you come to that conclusion from this
18 document that you cite?
19     A.  And from all of the other documents that
20 I site.
21     Q.  When did the hundred-thousand-dollar-a-
22 year contribution start?
23     A.  I don't know.  I would have to -- I
24 haven't committed that to memory.  It was sometime
25 around 2002, 2003.

---

69

1      Q.  The hundred thousand dollars?
2      A.  That's my understanding, yes.
3      Q.  Was the time that it started important to
4  you at all?
5      A.  No.  I think that the whole litany of
6  interactions between Donohue, Rust, the U.S. Chamber,
7  and State Farm, it was all during the post-Avery era.
8  And so whether it was 2001, 2002, it was subsequent to
9  the appeal, the appeal court decision, which basically
10 upheld the original judgment at a time when everyone
11 knew that it would be appealed to the Illinois Supreme
12 Court.  So I think that the landscape, the
13 environment, intensified in that context.  So when I
14 looked at the contributions of State Farm to the ILR
15 and the U.S. Chamber in the post-Avery era, I think we
16 calculated something like over $6 million.  So I think
17 State Farm was well paid up.
18     Q.  Well, and in fact post-Avery in 2005,
19 State Farm has contributed far more than that?
20     A.  Yes.  They've done well with the U.S.
21 Chamber, I propose.
22         MR. SAFER:  I object.
23     A.  If you look at the math.  Let's talk
24 about the math here.  Okay.
25         MR. SAFER:  I move to strike the answer

18 (Pages 66 to 69)

**Page 70**

1  as non-responsive.
2      A.  Can we talk about the math here?
3          MR. BLONDER:  Hold on.  Let the witness
4  finish his answer.
5      A.  Avery was overturned.  Okay.  Karmeier
6  was in on that decision, so that's a billion dollars
7  right there.  So to spend $5 million or $3 million or
8  whatever, from the context of a reasonable
9  businessman's decision, that's a good return.
10         MR. SAFER:  I move to strike that answer
11  as unresponsive.
12      Q.  (BY MR. SAFER)  The question is:  After
13  Avery was reversed, State Farm paid or contributed to
14  the U.S. Chamber far more than $6 million, correct?
15      A.  Correct.  And State Farm continues to
16  have pervasive litigation issues, so they would have
17  an interest in that subject of tort reform.  Mr. Rust
18  was co-chair of an industry group to ameliorate or
19  make it easier on -- or make it more difficult for
20  class actions to be prosecuted and so forth.  So, yes,
21  State Farm has a continuing concern with this issue, I
22  propose.
23         MR. SAFER:  I move to strike the answer
24  as unresponsive after yes.
25         MR. CANCILA:  After the word "correct."

**Page 71**

1          MR. SAFER:  Correct.  Sorry.
2      Q.  (BY MR. SAFER)  How much money do you
3  contend -- now, just to focus you, I've asked some
4  questions about money into ILR and the U.S. Chamber.
5  Now I'm going to ask some questions about the money
6  out of ILR and the U.S. Chamber.  How much money do
7  you contend ILR funneled to the Karmeier campaign in
8  2003?
9      A.  I don't have an opinion on that.  I'm not
10  contending that they funded anything to the Karmeier
11  campaign in 2003.
12      Q.  How much money do you contend that the
13  U.S. Chamber of Commerce funneled to the Karmeier
14  campaign in 2003?
15      A.  I don't contend that they funneled money
16  into the Karmeier campaign in 2003.
17      Q.  How much money do you contend that ILR
18  funneled to the Karmeier campaign in 2004?
19      A.  $2.2 million.  Well, when you say ILR,
20  I'm not distinguishing between ILR and the U.S.
21  Chamber.  So those combined entities funded around
22  2.2 million that I know of, that I can document.
23      Q.  Did you do anything to create an audit
24  trail of the money from State Farm through to JUSTPAC
25  or the Illinois Republican Party?

**Page 72**

1      A.  My report reflects relevant invoices and
2  checks going from -- where they were available going
3  from State Farm to the various entities.  They
4  weren't, obviously, always available.  And the money
5  trail basically from the affiliated organization to
6  the Karmeier campaign is either documented by a check
7  or an invoice or a reflection on the D-2 campaign
8  statement for JUSTPAC or Citizens for Karmeier.
9      Q.  Well, you understand that ILR and the
10  U.S. Chamber spend money on lots of activities?
11      A.  They do.  They do indeed.  I think
12  Mr. Donohue bragged about effecting 15 out of 16
13  judicial elections in 2004.
14         MR. SAFER:  I move to strike the answer
15  after they do indeed as unresponsive.
16      Q.  (BY MR. SAFER)  They -- and when I say
17  "they," you will understand that as ILR and the U.S.
18  Chamber --
19      A.  Fine.
20      Q.  -- at least for these questions?
21      A.  Yes.
22      Q.  They lobby concerning legislation?
23      A.  I'm not aware of that, but I assume
24  that's true.
25      Q.  Some of the materials that were in that

**Page 73**

1  database were board meeting books?
2      A.  Yes.
3      Q.  Did you review any of those?
4      A.  Yes.
5      Q.  And did those detail or -- maybe not
6  detail, but outline the general topics that were
7  reported to the board?
8      A.  Yes.
9      Q.  So then you did review those?
10      A.  I did, sure.  Certainly.
11      Q.  Okay.  But it's your testimony that
12  you're unaware that they lobby concerning legislation?
13      A.  Well, this is one of the things that
14  harkens back to your previous question about the books
15  and records.  The U.S. Chamber and the ILR are not
16  exactly transparent.  I would love to see their books
17  and records.  And if in fact what you say, there's
18  some substantial portion of their budget that goes to
19  lobbying or activities, I would like to see that.  It
20  would be interesting to me, but I can't tell you.
21  Most of the accounts that I've seen refer to their
22  activity in providing funding with respect to judicial
23  elections, both supreme court justices and state
24  attorney generals, and also national political
25  campaigns.  But they're widely purported to be heavily

19 (Pages 70 to 73)

CONFIDENTIAL
Thomas Arthur Myers, CPA     May 22, 2015

---

74

1  involved in engineering elections of individuals that
2  are sponsored or who are reflecting the wishes of
3  their contributors.
4        **Q.  Why would it be interesting to you if**
5  **they spent resources on lobbying concerning**
6  **legislation?**
7        A.  I would just like to see anything about
8  their activities that would shed light possibly on
9  what we're seeing here.  For example --
10       **Q.  When you say "what we're seeing here,"**
11  **you're tapping on page 20?**
12       A.  On the fifth judicial district election,
13  the Illinois Supreme Court election.
14       **Q.  And specifically the money flow?**
15       A.  Yes.
16       **Q.  That you --**
17       A.  Yes.
18       **Q.  -- chart on page 20?**
19       A.  Yes.
20       **Q.  How would the resources that they spent,**
21  **if any, on lobbying for legislation affect that?**
22       A.  I don't know.  I would have to see.
23       **Q.  What would you be looking for?**
24       A.  I would want to see the extent of the
25  U.S. Chamber's commitment to funding elections,

---

75

1  compare that proportionally to the amount of
2  contributions and the extent of the lobbying activity.
3  Even the lobbying activity in some shape or form may
4  relate to the candidate's elections, because that's
5  part of the whole process.
6        **Q.  So why would you be interested in looking**
7  **at the proportion of that expenditure of money to the**
8  **expenditure money on elections?**
9        A.  Well, for example, if you showed me that
10  the U.S. Chamber spent 92 percent of its budget on
11  lobbying, I would want to know, first of all, what
12  that lobbying activity was.  So there's just many,
13  many questions that I would have.  It might be germane
14  to my opinion.
15       **Q.  How?**
16       A.  Suppose they're not spending money on
17  judicial elections.  I know that they're spending
18  money on the Karmeier election, because it's a
19  function of the D-2s that are provided by the Illinois
20  Republican Party and the Illinois Chamber of Commerce
21  and the JUSTPAC D-2.  I know that money went out, but
22  it would be interesting to me.  I would like to see
23  that.  And as I mentioned before, I'm not even sure --
24  I think it's germane, but only tangentially germane to
25  the issues in this case regarding whether the U.S.

---

76

1  Chamber or the ILR even reports these political
2  expenditures as they should.  It would be interesting
3  to me, but not necessarily -- it wouldn't affect my
4  opinion here.
5        **Q.  Let's assume for the moment that ILR and**
6  **the U.S. Chamber spent 92 percent of their budget on**
7  **lobbying for federal legislation.  Would that have any**
8  **kind of an impact on your opinions?**
9        A.  That's a hypothetical question.
10       **Q.  Right.**
11       A.  That's entirely inconsistent with the
12  facts as I understand them, but it wouldn't affect my
13  opinion in this particular matter because I see the
14  outflows of money from the U.S. Chamber and I see the
15  inflows from State Farm.  So it wouldn't affect my
16  opinion, no.
17       **Q.  Okay.  ILR and the U.S. Chamber of**
18  **Commerce do research that is unrelated to elections,**
19  **don't they?**
20       A.  I haven't investigated that.  If you say
21  so, it sounds reasonable to me.
22       **Q.  They sponsor advertisements unrelated to**
23  **elections?**
24       MR. CLIFFORD:  Objection.  Foundation.
25       A.  Can you give me an example of an

---

77

1  advertisement that they . . .
2        **Q.  (BY MR. SAFER)  Well, I'm asking you if**
3  **you are aware that they sponsor -- that they sponsor**
4  **advertisements unrelated to elections.**
5        A.  But you can't give me an example?
6        **Q.  I could give you lots of examples.  I'm**
7  **asking you are you aware of it.**
8        A.  No.
9        **Q.  You are aware that they spend money in**
10  **many different states?**
11       A.  Yes.
12       **Q.  On page 25 you state that "In early 2003,**
13  **three months after the" -- and this is a quote, so**
14  **I'll get it for you.**
15       A.  I've got it.  Thank you.
16       **Q.  Okay.**
17       A.  Thank you.
18       **Q.  "In early 2003, three months after the**
19  **Illinois Supreme Court accepted State Farm's appeal in**
20  **Avery, Rust began serving on the board of the ILR."**
21  **Do you see that?**
22       A.  Yes.
23       **Q.  Do you believe there is a causal**
24  **connection between those two events?**
25       A.  I'm noting that as part of the

---

Merrill Corporation - Chicago

(312) 386-2000                                    www.merrillcorp.com/law

78

1  evidentiary record.  I can't say that there's a causal
2  connection, but it's part of the evidence that I
3  weigh.  And when I look -- at the end of the day, I'm
4  not concerned or I'm not contending that any of this
5  is illegal or necessarily wrong.  Okay.  What I am
6  contending is that -- and what I was asked to weigh
7  and to evaluate is the statements that they made in
8  front of the Illinois Supreme Court.  I believe that
9  they misrepresented their position.  And I think that
10  the evidence shows that they omitted material facts
11  about their relationship with the Karmeier campaign.
12  So I want to make it clear on the record that I'm not
13  saying that any of this activity, as you have pointed
14  out and asked me directly, is illegal or that there's
15  anything necessarily wrong with it.  The problem or
16  the reason I'm weighing this information is in the
17  context of whether they made -- they, in this
18  situation, meaning State Farm -- made accurate
19  representations to the Illinois Supreme Court.  So
20  that's my contention, that they did.
21          MR. SAFER:  I move to strike that answer
22  as unresponsive.
23      Q.  (BY MR. SAFER)  The question is -- and in
24  fairness, I'll go back to the reference.  I
25  referenced -- so that we don't reread it -- the

79

1  statement that begins "In early 2003."
2      A.  Sure.
3      Q.  That now to paraphrase, that Rust began
4  serving on the board of ILR three months after the
5  Illinois Supreme Court accepted the Avery appeal.  Do
6  you believe there is a causal connection between those
7  two events?
8          MR. BLONDER:  Objection.  It was asked
9  and answered in the last question and answer.
10      A.  That would be conjecture on my part.  But
11  if you ask me would it be relevant to the Illinois
12  Supreme Court if they knew that Rust began serving on
13  the ILR board and the U.S. Chamber was the primary
14  contributor to the Karmeier campaign, I think that's
15  germane.  I think that's relevant.  I think that's
16  something that should have been disclosed.
17      Q.  (BY MR. SAFER)  Now, you state on page
18  26, "Under the influence of Rust and Hill, the ILR
19  channeled more than $2 million to the Karmeier
20  campaign."  Do you see that?
21      A.  Yes.
22      Q.  Is it your opinion that State Farm
23  controlled ILR and the U.S. Chamber of Commerce?
24      A.  It's not my opinion that Rust and State
25  Farm controlled the ILR or the U.S. Chamber of

80

1  Commerce.  But to the extent that they could influence
2  the agenda of the U.S. Chamber and the ILR with
3  respect to the Karmeier campaign, I do think they had
4  a good deal of control over that.  And I would add to
5  this statement -- it says "Rust and Hill" -- Mr. Hill
6  was on the elections committee for the ILR which
7  influenced the particular judicial elections that were
8  going to be adopted and sponsored by the ILR.  And I
9  would also add that Kim Brunner was one of three
10  individuals on the audit committee of the ILR which
11  controlled the fundraising and the allocation of
12  funds.  And Mr. Rust was on the board.  Whether that
13  actually is indicia of control, I believe that they
14  did, yes, they influenced significantly the outflow of
15  the money from the U.S. Chamber both through their
16  contributions to the ILR and the U.S. Chamber and
17  through their positions of authority with respect to
18  the ILR.
19          Now, I think that that's evidence that
20  should be weighed with respect to whether they
21  controlled them or not.  I think that that information
22  should have been provided to the Illinois Supreme
23  Court.  In a candid response, I think that the
24  Illinois Supreme Court should have known that and they
25  could weigh for themselves whether they think there's

81

1  some causal relationship.  I think that there is a
2  suggestion of that here.  Okay.  And I think that a
3  reasonable person would reach the same conclusion.
4  But I don't know how the Illinois Supreme Court would
5  feel about it.  They never knew.  It was never
6  disclosed to them.
7          MR. SAFER:  I move to strike the portion
8  of the answer that dealt with what should have been
9  disclosed to the supreme court.
10          MR. CLIFFORD:  Objection to the motion.
11          MR. SAFER:  Why, Bob?  Why was that
12  responsive to the question?  The question was is it
13  your opinion that Rust controlled ILR.  How is a
14  discussion and a dissertation -- because we'll be here
15  for a long time -- about what should have been
16  disclosed responsive to that question?
17          MR. CLIFFORD:  We can be here for as long
18  as you want.  The response -- I'm answering your
19  question.  The response to the question was a natural
20  corollary and extension of his direct answer to you.
21  All I'm doing and all I said, if you look at the
22  record, I said objection to the motion and I didn't
23  say another word.  I don't think it's appropriate for
24  you and I, using your own standards of a half-hour
25  ago, should engage in this colloquy.

21 (Pages 78 to 81)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

82

1      MR. SAFER:  Well, I'm not going to
2  educate the witness and that was what I was objecting
3  to off the record, by the way.
4      MR. CLIFFORD:  All I said was objection
5  to the motion.
6      Q.  (BY MR. SAFER)  How many board members
7  were there on ILR in 2004?
8      A.  I'm not sure.
9      Q.  Does 28 sound about right to you?
10     A.  I would have said 30.
11     Q.  Okay.  So Ed Rust had one vote out of 28;
12  is that correct?
13     A.  In that particular context, yes.
14     Q.  Now, you note that on page 26, "At the
15  September 29, 2003, ILR board meeting, the Illinois
16  Supreme Court race was identified as a donor
17  priority."
18     A.  Yes.
19     Q.  So it was at that board meeting that the
20  vote was to make that Illinois Supreme Court race a
21  priority?
22     A.  I believe it was that board meeting.  It
23  could have been a subsequent one, because I remember
24  seeing another document.  But, yeah, it was
25  approximately at that time.

83

1      Q.  Do you see where you say in your
2  report --
3      A.  Yes.
4      Q.  -- "At the September 29, 2003, ILR Board
5  Meeting, the Illinois Supreme Court race was
6  identified as a donor priority"?
7      A.  Yes.
8      Q.  And it was at this September 29, 2003,
9  board meeting that the ILR board formally approved,
10  according to your report, 1.8 million to $2 million
11  spending on the Illinois Supreme Court election,
12  correct?
13     A.  That's what it says.  I think there may
14  be -- I would have to see the document at footnote
15  116, because I think I've seen another document since
16  the report was issued that maybe puts the date at a
17  subsequent date.
18     Q.  I'm sorry.  What document would you have
19  to look at?
20     A.  116.  It's USCC-4617 through 4791.
21     (Document tendered.)
22     A.  Thank you.
23     Q.  Could you just read for the record, since
24  we don't have copies, what that document is?
25     A.  Yeah.  Actually, what I'm doing here is

84

1  counsel has asked me a question about a sentence on
2  page 26 of my report that refers to a footnote 116.
3  And at issue is the particular date.  There's no issue
4  in my mind as to the fact that the Illinois Supreme
5  Court race was identified as a donor priority by the
6  ILR.  But I'm not sure that the date September 29 is
7  accurate, and I'm asking to refresh my memory by
8  looking at the board of directors meeting of the U.S.
9  Chamber and the Institute for Legal Reform dated
10  January 28, 2004.
11     MR. CANCILA:  There's little numbers down
12  in the bottom of the page that, I think, is what
13  Mr. Safer was asking you to identify.
14     A.  Oh, I'm sorry.  It's Bates stamped
15  USCC-004617 and I believe it's going to go through
16  4791.
17     Q.  (BY MR. SAFER)  And in there they have
18  the minutes of the September 29, 2003, board meeting?
19     MR. CLIFFORD:  Objection to form.
20     Q.  (BY MR. SAFER)  Is that right?
21     A.  Yes.  Well, I don't see it referenced in
22  the September 29 meeting.  It could have been the
23  subsequent meeting.
24     Q.  Okay.  In your report you quote a
25  document that says, "In September, the ILR's board

85

1  approved spending between 1.8 and $2 million in 2004
2  to try to improve the litigation climate in Illinois."
3      A.  Yes.  It says in September.  But it
4  says, "The ILR board formally approved spending 1.8 to
5  $2 million on the Illinois Supreme Court election for
6  Justice Karmeier."  That's all it says.
7      Q.  It doesn't say in September, the first
8  words of that sentence?
9      A.  No.
10     MR. CANCILA:  The quoted portion.
11     A.  Oh, I'm sorry.  Okay.  I'm reading up
12  here; you're reading here.  Yes.
13     Q.  (BY MR. SAFER)  Now, did you review, in
14  preparing this report, the minutes of that board
15  meeting?
16     A.  I did.
17     Q.  Did you know that Ed Rust did not attend
18  that board meeting?
19     A.  I think I was informed of that, yes.
20     Q.  By whom were you informed of that?
21     A.  I think that one of the attorneys told me
22  that.
23     Q.  One of --
24     A.  One of the plaintiffs' attorneys.  I'm
25  aware of that fact generally.

22  (Pages 82 to 85)

86

1      Q.   And in fact the minutes themselves reveal
2  that Mr. Rust was not present at that meeting,
3  correct?
4      A.   If you represent that, I'll accept that.
5      Q.   Okay.
6          MR. BLONDER:  We'll stipulate that the
7  minutes say that.
8      Q.   (BY MR. SAFER)  Were you aware that no
9  one from State Farm attended that board meeting?
10     A.   No, I'm not aware of that.
11     Q.   So you were not aware at the time that
12 you wrote this report that at a meeting where the
13 Illinois Supreme Court race was identified as a donor
14 priority and the board approved spending of 1.8 to
15 $2 million to the effort in Illinois, that no one from
16 State Farm was in attendance and no one from State
17 Farm voted on those matters?
18     A.   I don't know whether they were in
19 attendance or whether they voted, but it wouldn't
20 change my opinion about State Farm influencing that
21 particular program.
22         MR. SAFER:  I move to strike that answer
23 as unresponsive.
24     Q.   (BY MR. SAFER)  The question is:  Did you
25 know at the time you wrote the report that at the

87

1  meeting where the Illinois Supreme Court race was
2  identified as a donor priority and the board approved
3  spending of 1.8 to $2 million to the effort in
4  Illinois, no one from State Farm was in attendance and
5  no one from State Farm voted on those matters?
6      A.   I don't know if I knew that or not,
7  because I don't reference that at all in my report.  I
8  don't claim that, so I don't know if I knew that or
9  not.  I would have to refresh my memory.
10     Q.   Do you know if there was a single board
11 meeting during -- ILR board meeting during 2003 or
12 2004 that Rust did attend?
13     A.   I'm not aware of that.
14     Q.   Do you want to take a break?
15     A.   I think it would be a good time.
16     Q.   Okay.
17     A.   Sure.
18         (Recess taken, 11:26 a.m. to 11:41 a.m.)
19     Q.   (BY MR. SAFER)  Mr. Myers, you mentioned
20 that Dave Hill was a member of the elections task
21 force.  Do you recall that testimony?
22     A.   Yes.
23     Q.   How many members were on the election
24 task force in 2004?
25     A.   I didn't count them.

88

1      Q.   Does 26 sound reasonable to you?
2      A.   Could be, yes.
3      Q.   Did you review any summaries of these
4  election task force meetings?
5      A.   I don't remember if I did or not.
6      Q.   Do you know whether these meetings were
7  not in person but rather by telephone?
8      A.   They were telephonic.
9      Q.   Have you ever been on a conference with
10 over two dozen people?
11     A.   Yes.
12     Q.   Are they typically dialogues?
13     A.   It depends on the subject matter.
14 Oftentimes I'm informing a group about things,
15 so . . .
16     Q.   Did you know that these election task
17 force meetings were in the nature of briefings, not
18 dialogues?
19         MR. CLIFFORD:  Objection.  Foundation.
20     A.   I don't have any information on that.
21     Q.   (BY MR. SAFER)  Do you know whether votes
22 were taken at these election task force meetings?
23     A.   I don't have any information.  I don't
24 recall looking at the minutes of those meetings.
25     Q.   Do you know of anything that Dave Hill

89

1  said as a member of the election task force?
2      A.   No.
3      Q.   Do you know which of the calls Dave Hill
4  attended?
5      A.   No.
6      Q.   Do you know anything that Dave Hill did
7  as a member of the election task force?
8      A.   No.
9      Q.   Okay.  You stated that on page 28 -- and
10 this is a quote.  I actually don't find the quote
11 there.  The quote is that "State Farm increased its
12 contributions over the course of the Avery
13 litigation to become one of the chamber's largest
14 donors."
15     A.   It is on page 28, the first full
16 paragraph.
17     Q.   Thank you.
18     A.   You're welcome.
19     Q.   What is the basis for your statement that
20 State Farm became one of the chamber's largest donors?
21     A.   As I sit here, I don't know what specific
22 document I'm relying on to make that statement.
23     Q.   Do you know what the other members of the
24 Chamber contributed?
25     A.   No.  But I know that State Farm is a

90

1  member of an exclusive club by virtue of having made
2  the million-dollar contribution and the hundred-
3  thousand-dollar president's advisory group
4  contribution. According to the documents that I
5  reviewed, they had personal access to Mr. Donohue and
6  that's consistent with the record that I examined.
7       MR. SAFER: I move to strike that answer
8  as unresponsive --
9       MR. CANCILA: After no.
10      MR. SAFER: -- after no.
11      Q. (BY MR. SAFER) You do not know what the
12  other members of the Chamber contributed, do you?
13      A. No.
14      Q. In 2004 State Farm contributed $100,000
15  to the United States Chamber of Commerce, correct?
16      MR. CLIFFORD: Objection. Foundation.
17      A. I believe that's correct. The million-
18  dollar contributions were to the ILR. I don't
19  distinguish between the ILR and the U.S. Chamber.
20      Q. (BY MR. SAFER) But you do delineate in
21  your report --
22      A. Yes. Yes.
23      Q. -- don't you, and so you do know that in
24  2004 State Farm contributed a hundred thousand dollars
25  to the U.S. Chamber, correct?

91

1       A. Yes.
2       Q. They wrote a check to the U.S. Chamber
3  for a hundred thousand?
4       A. Yes.
5       Q. Are you aware of the U.S. Chamber of
6  Commerce's total revenue in 2004?
7       A. I believe it was 90 million.
8       Q. Does $90,854,804 sound right?
9       A. Could be.
10      Q. Well, let's see.
11      (Deposition Exhibit 2 was marked.)
12      Q. Do you recognize what has been marked as
13  Myers Exhibit 2, which for the record is a Form 990
14  for 2004 from the Chamber of Commerce of the USA,
15  Bates No. USCC-210 through 398?
16      A. I do.
17      Q. What is that document?
18      A. It's the Form 990, Return of Organization
19  Exempt From Income Tax, that was filed by the Chamber
20  of Commerce of the USA.
21      Q. And you did review that in preparation
22  for your expert report?
23      A. Yes. Can you give me a second, please.
24      Q. Sure.
25      A. I want to take a look at this. I'm

92

1  sorry. Your question was did I review it?
2       Q. Yes.
3       A. Yes, I have.
4       Q. Okay.
5       A. I'm not sure that this is the complete
6  return, but I looked at the Form 990 for the U.S.
7  Chamber.
8       Q. Okay. And do you see total revenue of
9  $90,854,804?
10      A. Yes.
11      Q. $100,000 is .11 percent of 90,854,804,
12  correct?
13      A. Yes.
14      MR. CLIFFORD: Objection. Argumentative.
15      Q. (BY MR. SAFER) It is a little over
16  1/1,000th of that amount, correct?
17      MR. CLIFFORD: Same objection.
18      A. Yes. But I think that that comparison is
19  not relevant to my opinion. We would be looking at
20  the ILR, which took in, I think, around 30 million or
21  so. In which case, the State Farm contribution was
22  quite large compared to the agenda that the ILR had
23  nationwide. That would make State Farm one of the
24  bigger contributors.
25      Q. (BY MR. SAFER) If you treat the U.S.

93

1  Chamber of Commerce and ILR as one, as you do, State
2  Farm contributed $1.1 million to that combined entity
3  in 2004, correct?
4       A. I'm sorry. Where are you referring to?
5       Q. Your report.
6       A. Say again, please.
7       Q. Yes. State Farm contributed $1.1 million
8  in 2004 to U.S. Chamber of Commerce and ILR?
9       A. That is correct.
10      Q. You treat them as the same in your
11  report?
12      A. Yes.
13      Q. Let me show you ILR's 2004 tax return
14  before I ask you the next question.
15      (Deposition Exhibit 3 was marked.)
16      Q. Do you recognize Myers Exhibit 3, which
17  is for the record a Form 990, Institute for Legal
18  Reform, for the year 2004 Bates No. USCC-005986
19  through 6019?
20      A. I do.
21      Q. Did you review this document in
22  preparation of your report?
23      A. Yes.
24      Q. The combined revenue of the United States
25  Chamber of Commerce and ILR for 2004 was $129,149,712,

24 (Pages 90 to 93)

94

1  correct?
2       A.  You're adding --
3            MR. CLIFFORD:  Objection.  Excuse me,
4  Mr. Myers.  Objection.  Form and relevance and
5  foundation.
6       A.  You're adding the 37-million revenue from
7  the ILR to the 90 million from the U.S. Chamber; is
8  that how you're deriving that number?
9       Q.  (BY MR. SAFER)  No.  I'm adding the
10 38,294,000 --
11      A.  Okay.  So I'm looking at the 990 for ILR
12 and the number is 38 million for revenue, right?
13      Q.  Yes.
14      A.  Okay.  And you're adding that to the U.S.
15 Chamber's revenue?
16      Q.  Yes.
17      A.  Okay.  I haven't done the calculation,
18 but what was the number you gave?
19      Q.  $129,149,712.
20      A.  I'll accept that.
21      Q.  And, again, State Farm contributed
22 1.1 million to the combined entities in 2004?
23      A.  1 million to the ILR and --
24           MR. CLIFFORD:  Objection.  Relevancy,
25 foundation, argumentative.  Mr. Myers, if counsel for

95

1  plaintiff makes an objection, would you please stop
2  talking.
3            THE DEPONENT:  Excuse me.
4            MR. CLIFFORD:  Thank you.  Objection.
5  Foundation, relevancy, argumentative.
6            MR. SAFER:  I'll give it to you one more
7  time.  And we'll just register the same objection.
8            MR. CLIFFORD:  Thank you.
9       Q.  (BY MR. SAFER)  State Farm contributed to
10 the combined entity, that is U.S. Chamber of Commerce
11 and ILR, $1.1 million in 2004?
12      A.  Yes.
13      Q.  That is .8 percent of the combined
14 revenue of ILR and the United States Chamber of
15 Commerce, correct?
16           MR. CLIFFORD:  Objection.  Argumentative.
17      A.  I think that's correct, but I need to
18 comment on the comparison that you're making and why
19 it's misleading.
20      Q.  (BY MR. SAFER)  I'm sure that counsel
21 will ask you on redirect if they --
22           MR. BLONDER:  Were you done answering his
23 question?
24           THE DEPONENT:  I really wasn't.
25           MR. BLONDER:  Finish your answer.

96

1       A.  Because I'm looking at the Form 990 for
2  the ILR and that says that total contributions are
3  38 million.  Okay.  And 1 million -- 1/38th would be
4  more than 2.75 percent or something like that.  If you
5  go to line 81 of the Form 990 of ILR, you'll see what
6  the non-exempt political expenditures were, which I'm
7  reading as -- look at line 81 a of the Form 990 --
8  14,054,733.  Now, if the ILR and the U.S. Chamber
9  contributed 2.2 million, that's about 1/7th or
10 14 percent.  They had a huge agenda in the United
11 States.  So that makes the judicial district indeed a
12 big, big number for them, the fifth judicial district
13 in Illinois.  So that's the comparison that is
14 germane.  The comparison that you're making doesn't
15 have any relevance to my opinion.
16           MR. SAFER:  I object to the --
17           THE DEPONENT:  Accuracy of what I'm
18 saying?
19           MR. SAFER:  No, believe me, there's
20 nothing accurate about what you're saying.
21           MR. CLIFFORD:  Objection to the snide
22 remark.
23           THE DEPONENT:  Excuse me.  I didn't mean
24 that.
25           MR. SAFER:  I did, but I object and move

97

1  to strike the portion of the answer after the math was
2  done, the initial comment.
3       Q.  (BY MR. SAFER)  Do you know whether ILR
4  considered State Farm's payment of $1 million in dues
5  as direct or indirect political expenditures?
6       A.  I don't know how they treated it.  But in
7  my view, it was a direct political expenditure.  I
8  don't know how they treated it.  There are allegations
9  they have not treated that number correctly on their
10 returns.
11      Q.  Now, you treat a contribution to ILR as a
12 contribution to the United States Chamber of Commerce
13 because they shared a bank account; is that right?
14      A.  I don't think that's accurate.  I
15 reference the fact that there are allegations that
16 they commingled their accounts.  I don't know that for
17 a fact and I haven't relied on that.  But I have
18 assumed for purposes of my analysis, based on what I
19 have gleaned from an extensive examination of the
20 record, that the difference between the U.S. Chamber
21 and the ILR is -- I'm not distinguishing between them
22 for my purposes.
23      Q.  On page 23, note 93, do you see where you
24 state, "A contribution to ILR" --
25      A.  Can you hold on just for a second?

25  (Pages 94 to 97)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

98

1      Q.  Oh.  Sorry.
2      A.  Thank you.  Page 23?
3      Q.  Yes.
4      A.  Where are you?  What line?
5      Q.  Note 93.
6      A.  Okay.  Thank you.
7      Q.  Do you see where you state, "A
8  contribution to ILR is a contribution to the Chamber,
9  as the two organizations share a bank account"?  Do
10  you see that?
11      A.  Just a second.  Let me see what that's a
12  footnote reference to.
13      MR. BLONDER:  The phone is on hold.
14      MR. CANCILA:  Is it off now?
15      A.  Okay.  I see footnote 93.
16      MR. SAFER:  Let's go off the record for a
17  second.  They are having phone difficulties.
18      (Discussion off the record.)
19      Q.  (BY MR. SAFER)  Okay.  Do you see that?
20      A.  Yes.
21      Q.  And did you review Mr. Anderson's
22  deposition that is cited in note 93?
23      A.  I'm not sure where that -- that may have
24  come from some other source.  I'm not sure exactly
25  where that information came from.  I don't remember as

99

1  I sit here.
2      Q.  Okay.
3      (Deposition Exhibit 4 was marked.)
4      MR. CANCILA:  Madam Court Reporter, a
5  number of the documents that are being marked like
6  this one has been produced subject -- confidential,
7  subject to a protective order.  So we'll give you a
8  copy of the protective order which provides for the
9  deposition in the first instance to be marked as
10  confidential, and then there's a protocol for whether
11  any portions of it will remain so, but we will give
12  you a copy of the protective order.
13      (Discussion off the record.)
14      Q.  (BY MR. SAFER)  Mr. Myers, I've shown you
15  what's been marked as Deposition Exhibit 4.
16      (Joining the meeting.)
17      MR. SAFER:  Who just joined?
18      MR. BARRETT:  This is Richard Barrett.
19  I'm sorry.  The phone went silent on me so I called
20  back in.
21      MR. SAFER:  Okay.
22      Q.  (BY MR. SAFER)  And is the deposition of
23  Mr. Stanton Anderson taken January 12, 2005, Bates
24  marked WOJO-20988 through 21205?
25      A.  Yes.

100

1      Q.  Do you recognize that exhibit?
2      A.  Yes.
3      Q.  Have you seen that before?
4      A.  I believe I have.
5      Q.  Okay.  So looking at pages -- and the
6  paging is weird, but looking at deposition pages 144
7  to 146, do you see this shared bank account concept
8  being discussed?
9      A.  I see it on page 90 and 144 and 146.
10      Q.  Okay.  And then do you also see that
11  Mr. Anderson says on 146, line 13, "But my point is
12  that they are separately accounted for, so if I raise
13  a dollar for ILR and then I spend that dollar, that's
14  the dollar I'm spending is the dollar I raised"?  Do
15  you see that?
16      A.  I'm sorry.  What line are you on?
17      Q.  13 through 16.
18      A.  Give me a second to review this, please.
19      Q.  Sure.
20      A.  I'm just looking to see Mr. Anderson's
21  background and what qualifications he has to say this.
22      Q.  Just keep in mind the question is:  Did
23  he say that on page 146, lines 13 through 16?
24      A.  What you recited is accurate, but I think
25  we need to put it in context with his other testimony

101

1  on page 90 and 144.  And I'm looking to see what his
2  position was and whether he has -- whether we should
3  weigh -- put any value on his comments or not.
4      Q.  Okay.  That's not the question, but feel
5  free to do whatever you would like.
6      A.  Thank you.  Okay.  I'm going to read from
7  page 90.
8      Q.  There's no question pending.  You've
9  answered the question.
10      A.  You need a context.  You just want me to
11  say that it says what it says?
12      Q.  Yes.
13      A.  Okay.  It's accurate, the way you just
14  read that.
15      Q.  Thank you.
16      A.  You don't want a context, though?
17      Q.  We've seen ILR filed its own tax return
18  separate from the U.S. Chamber of Commerce, correct?
19      A.  That's not what this gentleman says.  He
20  says they're consolidated.  We've seen separate 990s,
21  but this gentleman testifies -- give me a second.
22      MR. SAFER:  Hard for me to give you that
23  time estimate.
24      MR. CLIFFORD:  Pardon?
25      MR. SAFER:  Nothing.  Answering a

26  (Pages 98 to 101)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

102

1  question Steve had.
2       A.  He says in that same -- on page 145,
3  "Well, the overall revenues of the Chamber at some
4  point get reported on a consolidated basis," which
5  would be not what we see here with the 990s.  We see
6  them reported separately, so that's inconsistent.
7       **Q.  (BY MR. SAFER)  My question to you is:**
8  **Did ILR file a Form 990 separate and apart from the**
9  **U.S. Chamber of Commerce?**
10      A.  Yes.
11      **Q.  Did the U.S. Chamber of Commerce file a**
12  **Form 990 separate and apart from ILR?**
13          MR. CLIFFORD:  Objection and move to
14  strike, foundation, and time frame.  What time period
15  are we talking about here?
16          MR. SAFER:  2004.
17          MR. CLIFFORD:  Thank you.
18      A.  Yes.
19      **Q.  (BY MR. SAFER)  Is it your opinion that**
20  **simply by virtue of two entities sharing a bank**
21  **account, they cannot account for their money**
22  **separately?**
23      A.  It would be really unusual to commingle
24  the accounts from two separate entities.  And this
25  gentleman, Anderson, seems to be saying something

103

1  different.  He says they account for everything on a
2  consolidated basis.  He says on page 145 that there's
3  a combined account.  "The combined account means just
4  the ILR account within the Chamber accounts, and so by
5  the combined account it means, you know, the money
6  that has been raised for the ILR that we've discussed
7  previously, that is accounted for by the Chamber's
8  accounting staff."
9       So that would be unusual, as far as I'm
10  concerned.
11      **Q.  My question wasn't was it unusual.  My**
12  **question was:  Is it your opinion that simply by**
13  **virtue of two entities sharing a bank account, they**
14  **cannot account for their money separately?**
15      A.  That would not be a characteristic of two
16  entities that were reporting separately, that they
17  would share a combined account.
18      **Q.  Do you know whether ILR ever spent more**
19  **money than ILR obtained in revenues?**
20      A.  No.
21      **Q.  That is, do you know whether ILR ever**
22  **exceeded its revenues and used Chamber of Commerce**
23  **money to pay ILR expenses?**
24      A.  No.
25      **Q.  No, you don't know that?**

104

1       A.  As I said, no.
2       **Q.  Now, you point to a letter in your report**
3  **from Tom Donohue to Ed Rust -- that's page 24 -- that**
4  **demonstrates to you that Ed Rust, quote, had a say,**
5  **end quote, in the designation of State Farm's annual**
6  **contribution.**
7       A.  Where are we referring to now?
8       **Q.  Page 24.**
9       A.  Okay.  Thank you.
10      **Q.  Do you see that?**
11      A.  Yes.
12      **Q.  Do you recall that note from Mr. Donohue**
13  **to Mr. Rust?**
14      A.  Give me a second to review it.  Okay.
15      **Q.  How much of ILR's or the U.S. Chamber's**
16  **expenditures did Ed Rust direct in 2002?**
17      A.  I believe that was his first million for
18  the ILR.  I don't know what the ILR's income was in --
19  reported income was in 2002.  Do you have the 990?  We
20  could take a look at it.
21      **Q.  I don't for 2002.  My question is:  How**
22  **many expenditures by ILR did Ed Rust direct in 2002?**
23          MR. BLONDER:  Objection.  Beyond the
24  scope of his opinions.
25      A.  I don't know.  I didn't examine that

105

1  particular aspect.
2       **Q.  (BY MR. SAFER)  This letter is from 2002,**
3  **correct?**
4       A.  Right.
5       **Q.  How many expenditures did Ed Rust direct**
6  **the ILR to make in 2003?**
7           MR. BLONDER:  Same objection.
8       A.  I don't think that Ed Rust directed the
9  ILR to make an expenditure.  That's not my opinion.
10      **Q.  (BY MR. SAFER)  At any time?**
11      A.  At any time.
12          MR. SAFER:  I'm about to go into another
13  area.  The question is whether we want to break now
14  for lunch.
15      (Discussion off the record.)
16      (Recess taken, 12:14 p.m. to 1:09 p.m.,
17  after which time Mr. Thrash and Mr. Taylor were not
18  present.)
19      **Q.  (BY MR. SAFER)  We'll start on 31.**
20  **Mr. Myers, just a few more questions on ILR and the**
21  **U.S. Chamber of Commerce.  You contend that money that**
22  **State Farm gave ILR and the U.S. Chamber of Commerce**
23  **in 2003 was used by them in 2004 to secretly bankroll**
24  **the Citizens for Karmeier Committee; is that right?**
25      A.  Yes.

27 (Pages 102 to 105)

106

1  **Q.  What accounting analysis did you do to**
2  **establish that ILR and the United States Chamber of**
3  **Commerce saved the money that State Farm gave them in**
4  **2003 so that it could use it in 2004?**
5      A.  Well, as I indicated, I have not had
6  access to the books and records of the Chamber and the
7  ILR, which I would welcome and would be helpful to me.
8  But basically I couldn't undertake an accounting
9  analysis.  I'm just looking at the total money that
10  came into the Chamber during that period of time
11  versus the amount of money that came out.  And I'm
12  saying that's consistent with a pattern of what we're
13  talking about here, the pattern of activity that is
14  not just typical of the U.S. Chamber and the ILR but
15  also the other affiliated organizations that are
16  referred to in my report.
17      **Q.  So you did not and you say could not do**
18  **an accounting analysis to establish that ILR and the**
19  **United States Chamber of Commerce saved the money that**
20  **State Farm gave them in 2003 so that it could use it**
21  **in 2004?**
22      A.  That is correct.
23      **Q.  What analysis of any kind did you do to**
24  **establish that ILR and United States Chamber of**
25  **Commerce in fact saved the money that State Farm gave**

107

1  **them in 2003 so that it could be used in 2004?**
2          MR. BLONDER:  Objection.  Isn't that the
3  same question you just asked --
4          MR. SAFER:  No.
5          MR. BLONDER:  -- other than the words "in
6  fact"?
7          MR. SAFER:  No.  The first was an
8  accounting analysis and the second was an analysis of
9  any kind.
10          MR. BLONDER:  Okay.
11          MR. CLIFFORD:  Add to the objection
12  relevance.
13      A.  Could I have it again, please.
14      **Q.  (BY MR. SAFER)  What analysis of any kind**
15  **did you do to establish that ILR and the United States**
16  **Chamber of Commerce in fact saved the money that State**
17  **Farm gave them in 2003 and used it in 2004?**
18      A.  I don't have anything dispositive on
19  that.
20      **Q.  What accounting analysis did you do to**
21  **establish that ILR and the U.S. Chamber of Commerce**
22  **did not spend in 2003 all of the money that had been**
23  **contributed to it by all of the revenue sources in**
24  **2003?**
25      A.  Again, I focused on the amount of money

108

1  coming from State Farm to the ILR and to the Chamber.
2  And I looked at the various D-2 statements for the
3  Illinois Republican Party and for JUSTPAC, the D-2
4  statements, campaign financing disclosures, and noted
5  that the amount coming out of the Chamber and the ILR
6  routing through these intermediaries like the Illinois
7  Republican Party and JUSTPAC equaled the amount coming
8  in.  And that was basically the analysis that we've
9  done.  I don't have more records to work with.
10      **Q.  Right.  And I'm not casting stones.  I'm**
11  **just saying there was no accounting analysis that you**
12  **did to establish that ILR and the U.S. Chamber of**
13  **Commerce did not spend all of the money that it**
14  **received -- did not spend in 2003 all of the money it**
15  **received in 2003?**
16      A.  That would not be germane to my analysis,
17  anyway.  I'm not contending that they didn't spend the
18  money in 2003.  The money is fungible.  They
19  replenished their coffers in 2004 with new money.  And
20  I'm not suggesting that the same dollar bills that
21  came in from State Farm actually found their way into
22  the Karmeier campaign.  That's not my opinion.
23      **Q.  Let's move to ATRA, the American Tort**
24  **Reform Association.**
25      A.  Fine.

109

1      **Q.  Now, you note that State Farm contributed**
2  **almost a million dollars -- wait.  I'm sorry.  One**
3  **more question on the Chamber of Commerce and ILR.  So**
4  **is it your belief or opinion that if State Farm had**
5  **contributed another $500,000 to ILR in 2004, ILR would**
6  **have funneled money to Justice Karmeier?**
7      A.  No.  I'm simply noting that the amount of
8  funding provided by ILR and the U.S. Chamber is equal
9  to the amount of money that they took in during that
10  period.
11      **Q.  Okay.  So back to --**
12      A.  And that's not a coincidence, in my view.
13      **Q.  Back to ATRA.  So you note that "State**
14  **Farm" -- and this is on page 33 -- "contributed almost**
15  **$1 million to ATRA in late 2003 and in 2004."**
16      A.  That is correct.
17      **Q.  And your opinion is that $415,000 of this**
18  **money went to JUSTPAC?**
19      A.  Yes.  Actually, I think the amount from
20  ATRA is more than that, but they routed it through the
21  Illinois Chamber and the Illinois Chamber PAC, so it's
22  really more like 400 -- 565,000.
23      **Q.  Okay.  And this was another way that, in**
24  **your opinion, State Farm funneled money through**
25  **disguised transactions to the Karmeier campaign?**

28 (Pages 106 to 109)

CONFIDENTIAL
Thomas Arthur Myers, CPA     May 22, 2015

110

1    A.  Yes.
2    Q.  ATRA is a national organization?
3    A.  Yes.
4    Q.  It has activities in many states across
5  the country?
6    A.  That is true.
7    Q.  And its membership is from companies
8  across the country?
9    A.  It's diverse.
10    Q.  Now, you note that the majority of the
11  money that State Farm provided to ATRA in late 2003
12  and 2004 was through the grassroots program?
13    A.  That's the way the invoice was
14  referenced, yes.
15    Q.  And do you know in fact whether ATRA had
16  a grassroots program?
17    A.  No.  I haven't been able to examine their
18  records, which I would like to do.
19        (Deposition Exhibit 5 was marked.)
20    Q.  Showing you Myers Exhibit 5, did you
21  review that document in preparation for your report?
22    A.  It looks familiar.
23    Q.  And do you understand that to be the
24  internal allocation of ATRA to the -- of State Farm's
25  contribution to the grassroots program?

111

1    A.  I don't know how -- what ATRA did with
2  respect to the internal allocation for this money.
3    Q.  So how did you interpret --
4        (Interruption in the proceedings.)
5        (Discussion off the record.)
6    Q.  How did you interpret the document?
7    A.  I don't know how to interpret it, because
8  I'm aware of a recent communication from the American
9  Tort Reform Association attorneys -- I think it's the
10  Covington firm -- who indicated that ATRA doesn't have
11  a policy with respect to accounting for funds
12  separately or earmarking funds.  So I don't know what
13  this refers to.
14    Q.  When you reviewed that document in
15  preparation for your report, how did you interpret it?
16    A.  It is what it is.  It says what it says.
17    Q.  Did you see any documentary evidence that
18  led you to believe that State Farm's contribution of
19  $643,866 was not apportioned as that indicates to
20  states outside of Illinois?
21    A.  And the beginning of your question was?
22    Q.  Did you see any documentation to indicate
23  that the money wasn't somewhere else?
24    A.  No.
25    Q.  Do you know when State Farm started

112

1  making contributions of the same approximate amount in
2  the mid-600,000s to ATRA's grassroots program?
3    A.  No.
4    Q.  Do you know whether it went back into the
5  1990s?
6    A.  No.
7    Q.  In addition to the 653,000, there was a
8  $250,000 State Farm contribution to the California
9  grassroots program.  Do you recall that?
10    A.  There was an invoice -- or there was a
11  check for $250,000 that came through, and the
12  indication on the invoice was that it was for the
13  California grassroots program, but I have no opinion
14  one way or another where that money went.
15    Q.  And on page 110 of your report, you have
16  a copy of Dave Hill's letter in response to that
17  invoice which says here is $250,000 in support of
18  California's Political Education Program?
19    A.  Right, correct.
20    Q.  Did you see any documentation that
21  indicated that this $250,000 went anywhere else?
22    A.  Well, that's kind of a broad question.  I
23  can give you insight into my analysis and my reaction
24  to this and the thought process that I employed as a
25  forensic accountant.

113

1    Q.  And that would be great.  The first thing
2  I would like is to see if you saw documents that
3  indicated that this $250,000 went somewhere other than
4  to ATRA's California Political Education Program.
5    A.  And that's a question that I can't answer
6  with a yes or no.
7    Q.  Okay.
8    A.  I need to explain.
9    Q.  Go ahead.
10    A.  Okay.  I spent a considerable amount of
11  time looking at the ATRA situation.  And an e-mail
12  from Ed Murnane to Engstrom from the U.S. Chamber
13  dated September 18, 2004, was of particular interest
14  to me because it described a situation with ATRA where
15  there was some concern on the part of ICJL and Murnane
16  that ATRA was running afoul of the sponsoring entity
17  disclosure requirements in the Illinois campaign laws
18  that we discussed earlier.  And so I also noted that
19  Mr. Murnane seemed to be aware of ATRA taking money,
20  contributors' money, and actually instead of making
21  the contribution to JUSTPAC, which as you know is the
22  PAC that's sponsored by the ICJL, they ran the money
23  through the Illinois Chamber of Commerce, a hundred
24  thousand dollars and $50,000 to the Illinois Chamber's
25  PAC, which I consider to be -- or which was an attempt

29 (Pages 110 to 113)

114

1    at least in my view, my interpretation, to avoid the
2    disclosure requirements in Illinois as a sponsoring
3    entity. And Mr. Murnane, in his e-mail, specifically
4    referenced that.
5         So I was curious about ATRA's willingness
6    to do something like that. And it led me to the
7    conclusion that I'm not sure that ATRA is upfront with
8    respect to all of -- I'm giving you my accounting
9    analysis -- upfront about the way they're treating
10   these contributions. And I asked myself if State Farm
11   were arguendo, hypothetically, making a contribution
12   to ATRA for the Karmeier campaign, if Mr. Rust would
13   appreciate getting an invoice from ATRA that says
14   funds earmarked for the Karmeier campaign. I don't
15   think he would.
16        And there are other documents that I
17   looked at from ICJL, for example, the ICJL list of
18   sponsor contributions to JUSTPAC at the point in
19   time -- at that point in time in September. And I
20   noted that Altria, which is the holding company for
21   the Philip Morris tobacco company, declined to make
22   any contributions to ICJL because they had a court
23   case pending in front of the Illinois Supreme Court,
24   which I would think would be the same reaction of
25   State Farm.

115

1         So my point is this, that I look with a
2    jaundiced eye or as an investigator, as a forensic
3    accountant, I'm trying to see through transactions.
4    And I'm not suggesting that ATRA did anything wrong or
5    that the money wasn't expended as indicated here, but
6    I'm just saying that I don't take that at face value,
7    that I think that ATRA is capable of manipulating its
8    situation.
9         Q. Have you seen any ATRA documents that
10   indicate that this $250,000 went somewhere other than
11   to the California Political Education Program?
12        A. I think I answered that question already.
13        Q. No. ATRA documents?
14        A. No. I haven't seen any ATRA documents.
15        Q. Okay. You have seen ATRA documents, but
16   you haven't seen any ATRA documents that indicate that
17   this $250,000 went anywhere other than to the
18   California Political Education Program?
19        A. That is true.
20        Q. You mentioned Philip Morris. You're
21   aware, aren't you, that in another case plaintiffs'
22   attorneys are asserting that these very same dollars
23   that ILR, U.S. Chamber, and other organizations
24   contributed to Karmeier's campaign was Altria's money,
25   aren't you?

116

1         MR. BLONDER: Objection.
2         MR. CLIFFORD: Objection. Relevancy.
3         MR. BLONDER: Form. Foundation. Scope.
4    A. I'm not aware of that.
5    Q. (BY MR. SAFER) You haven't seen any
6    documents related to in any way or any accountings of
7    the Price versus Philip Morris case where Justice
8    Karmeier's recusal had been sought?
9    A. No.
10   Q. Let's turn to the Civil Justice Reform
11   Group.
12   A. What page, please.
13   Q. 48. Well, around there.
14        MR. CANCILA: 47.
15   Q. (BY MR. SAFER) It starts on 47, but on
16   page 48, however, towards the bottom of the only full
17   paragraph there, you say in effect that State Farm
18   used the CJRG to secretly funnel State Farm's
19   contributions to ICJL and on to the Karmeier campaign,
20   right?
21   A. Yes.
22   Q. And how long had State Farm -- well,
23   let's go back. State Farm contributed $150,000 to
24   CJRG; is that right?
25   A. That is true.

117

1    Q. And that was in response to an invoice
2    regarding their membership dues?
3    A. Yes.
4    Q. And how long had they paid this
5    membership dues to CJRG?
6    A. I don't know.
7    Q. How long after the Karmeier election had
8    State Farm contributed this membership dues to CJRG?
9    A. I don't know.
10   Q. So that State Farm may have made these
11   payments for years before the Avery case and years
12   after do not affect your opinion in any way?
13        A. No. I'm not suggesting that the Civil
14   Justice Reform Group didn't do something for State
15   Farm previously or hasn't done something other than
16   Karmeier -- support the Karmeier campaign
17   subsequently. I'm interested in looking at the money
18   that came in to these affiliated organizations around
19   this time frame and the money that went out to the
20   Karmeier campaign. That's all I'm noting here.
21   Q. You state that, at the first sentence of
22   text, Kim Brunner was involved in -- where do I see
23   that?
24        A. It's the top of that first full
25   paragraph.

30 (Pages 114 to 117)

CONFIDENTIAL
Thomas Arthur Myers, CPA     May 22, 2015

118

1    Q.  Okay.  Yes.  Yes.  That's right.  You say
2  that Kim Brunner was involved in regular discussions
3  about the Karmeier campaign.  Do you see that?
4    A.  Yes.
5    Q.  What is your support for that?
6    A.  Footnote 181 indicates it's HALE-859PROD.
7  I don't remember off the top of my head.
8    Q.  It would be footnote 182 that's . . .
9    A.  I'm sorry.  182.  I misspoke.
10    Q.  Okay.
11    (Deposition Exhibit 6 was marked.)
12    Q.  I've shown you what's been marked as
13  Myers Exhibit 6, which is an e-mail from Beatrice
14  Glass on behalf of Steve McManus dated April 26, 2004,
15  Bates No. HALE-13785 through 87.  This is the first
16  document that is listed as support of the statement
17  that Mr. Brunner was involved in regular discussions
18  about the Karmeier campaign; is that right?
19    A.  Yes.
20    Q.  And what is it about this document that
21  supports that there were regular discussions about the
22  Karmeier campaign?
23    A.  Well, it refers to the campaigns that the
24  Civil Justice Reform Group were interested in and the
25  various states.  And Illinois is one of the states

119

1  that are prominent.  I would also add that Kim Brunner
2  was on the audit committee, one of three members of
3  the audit committee, of the ILR.
4    Q.  We'll get to that.
5    A.  And in this context, he would also be
6  very familiar with the Karmeier campaign.
7    Q.  That's the next --
8    A.  You asked for support for that statement
9  and I'm just giving it to you.
10    Q.  Well, the audit committee is the next
11  thing.
12    A.  Okay.
13    Q.  The audit committee, you say -- on the
14  audit committee, he would have had regular
15  conversations about the Karmeier campaign?
16    A.  He is one of three individuals on that
17  audit committee and the ILR who makes determinations
18  with respect to the fundraising and the funding that's
19  appropriated by ILR.  So, yes, I would assume he would
20  be familiar with the Karmeier campaign.
21    Q.  It's your testimony that the audit
22  committee makes decisions about the funding of
23  campaigns?
24    A.  Yes.
25    Q.  What is the basis for your saying that?

120

1    A.  Give me a second.  I don't know the cite
2  off the top of my head.  Could I see footnote 58?
3  That would be -- there was two documents listed there.
4    Q.  Sure.
5    A.  I'm sorry.  There's another part of the
6  report that references that same thing.  The footnote
7  is 183 on that one, so maybe we should go look at that
8  first.
9    MR. CANCILA:  That's the one that
10  Mr. Blonder just pointed out?
11    MR. BLONDER:  Yes.
12    MR. SAFER:  I think I will need my
13  notebook back, the one I gave you earlier.
14    MR. CANCILA:  USC-5407.
15    A.  Thank you.  There's another document that
16  indicates that Mr. Brunner is on the audit committee
17  for the ILR.  But this particular document,
18  USCC-005407, indicates how the function of the audit
19  committee, the three-member committee, and it says,
20  Provide oversight of annual ILR budget and fundraising
21  programs, review organizational capabilities and
22  resources.
23    This Karmeier campaign was a priority of
24  the ILR.  And I would assume that Mr. Brunner would
25  have been well familiar with that subject through his

121

1  function with the ILR.
2    Q.  (BY MR. SAFER)  You know what an audit
3  committee does, right?
4    A.  Why don't you tell me.
5    Q.  Well, do you know what an audit committee
6  does?
7    MR. BLONDER:  Again, hypothetical.  The
8  question is this audit committee or some hypothetical
9  audit committee?
10    Q.  (BY MR. SAFER)  Do you know what this
11  audit committee does?
12    A.  It says explicitly here that it provides
13  oversight of the annual ILR budget and fundraising
14  programs.  It reviews organizational capabilities and
15  resources.  That's what it says.
16    Q.  Oversight in what way?  What ways do
17  audit committees provide oversight of budget and
18  fundraising?
19    A.  I don't know.
20    MR. BLONDER:  Objection.  Incomplete
21  hypothetical.  Vague and ambiguous as a result.
22    A.  I would have to see the specific policies
23  and procedures from the ILR, but this particular
24  document, I think, speaks for itself.  It says review
25  organizational capabilities and resources.  So if, for

31 (Pages 118 to 121)

CONFIDENTIAL
Thomas Arthur Myers, CPA     May 22, 2015

122

1  example, 2.2 million of the $14 million of political
2  expenditures from the ILR were going to Karmeier, I
3  would expect it to come within the purview of
4  Mr. Brunner's responsibilities if he's exercising his
5  fiduciary role.
6      Q.  (BY MR. SAFER)  In what way?
7      A.  Well, I mean, this is a huge expenditure.
8  Before you sort of minimized the amount, but I'm
9  saying that 2.2 million out of 14 million of political
10 expenditures in 2004, assuming that ILR accounted for
11 that number correctly, is something like 1/7th or
12 14 percent of the budget.  If I'm a fiduciary, I'm on
13 the audit committee, that is probably one of the
14 biggest items that I'm going to look at.  So,
15 absolutely, the fact that he's from Illinois and with
16 State Farm gives some added interest, I would assume.
17 So, yeah, I think that Mr. Brunner would be very
18 familiar with the Karmeier campaign effort --
19     Q.  Well, in the --
20     A.  -- both through the Civil Justice Reform
21 Group and through the ILR.
22     Q.  And other than that document -- and we'll
23 agree that he's on the audit committee, so not
24 documents that show that he's on the audit committee.
25 Other than that, that is what you draw his

123

1  responsibilities on the audit committee from?
2      A.  Yes.  It's all I have.
3      Q.  Okay.  Let's talk about the Illinois
4  Chamber of Commerce.
5      A.  Would you like your notes back?
6      Q.  Or you can set them off to the side for
7  the moment.
8      A.  Okay.  The Illinois Chamber of Commerce?
9      Q.  Yes.  So I think that discussion
10 beginning on page 51 of your report.  You stated that
11 "State Farm had personnel in place at the Illinois
12 Chamber to influence its priorities and spending
13 during the Karmeier campaign"; is that right?
14     A.  Where do I say that?
15     Q.  The second sentence.
16     A.  Yes.
17     Q.  And you're referring to Peggy Echols; is
18 that right?
19     A.  Yes.
20     Q.  You note that "Peggy Echols was a member
21 of the Illinois Chamber's Board of Directors in 2003
22 and 2004."
23     A.  That's true.
24     Q.  How many board members were there in the
25 Illinois Chamber of Commerce in 2003 and 2004?

124

1      A.  I don't know.
2      Q.  Was that important to you?
3      A.  Not necessarily.  The fact that she's a
4  director of the Illinois Chamber tells me that she has
5  fiduciary responsibilities.  She's got to be aware of
6  what's going on.  And I also attach significance to
7  the fact that she made a strong pitch for the Legal
8  and Judicial Review Committee.  She even offered
9  herself as chairperson of that committee, which tells
10 me that she's interested in the legal issues that the
11 Illinois Chamber is dealing with, which is germane to
12 my analysis.
13     Q.  We'll get to that in a moment, but the
14 question is:  The number of board members was not
15 important to you?
16     A.  I wouldn't say it's not important.  It
17 wouldn't be determinative to me, but, yeah, it would
18 be relevant.
19     Q.  And we could, if you would like, look at
20 the document, but the ISCC-001218, which you include
21 at footnote 193, indicates that there were 54
22 directors and officers --
23     A.  Okay.
24     Q.  -- in the Illinois Chamber of Commerce.
25 Does that sound about right?

125

1      A.  I don't know.  I didn't check that.
2          (Deposition Exhibit 7 was marked.)
3      Q.  You know, that's actually probably wrong,
4  because I don't think I counted the people on the
5  left-hand column.
6      A.  You're saying this adds up to 54?
7      Q.  Excuse me?
8      A.  You're saying this adds up to 54?
9      Q.  Yes.  Actually, I think that's right,
10 because the people on the left-hand column are also in
11 the right.
12     A.  Okay.  I'll take your word for it.
13     Q.  Does that look about right to you?
14     A.  It does.  It does.
15     Q.  So as 1 of 54 officers and directors --
16 and, by the way, Peggy Echols did not hold a
17 leadership position on the board, did she?
18     A.  I'm not aware of that.
19     Q.  And she did not hold -- she wasn't an
20 officer of the board, right?
21     A.  No.
22     Q.  So as 1 of 54 officers and directors, do
23 you know how much influence Peggy Echols exerted?
24     A.  Well, I don't know how much influence she
25 exerted, but I would observe that none of these other

32 (Pages 122 to 125)

126

1  directors -- I'm going to have to glance through the
2  list quickly here -- are Fortune 500 --
3  representatives of a Fortunate 500 company that
4  dominates or that has a significant role and high
5  profile in the Illinois economic landscape.
6       Q.  Well, John Deere and Company is a pretty
7  significant company, don't you think?
8       A.  Okay.  That's 1.
9       Q.  Motorola is pretty significant, isn't it?
10      A.  2.
11      Q.  Quaker Foods & Beverage is pretty
12  significant, isn't it?
13      A.  I'll accept that.
14      Q.  AT&T is pretty significant?
15      A.  4.
16      Q.  Caterpillar?
17      A.  5.
18      Q.  Leo Burnett?
19      A.  Not to me.  Maybe to you.
20      Q.  RR Donnelley?
21      A.  They're not Fortune 500 companies.
22      Q.  RR Donnelley?
23      A.  You're reaching now.
24      Q.  ComEd?
25      A.  My point is that State Farm is a

127

1  particularly powerful and prestigious corporate
2  presence, not just in Illinois but nationally.  I
3  would think that Peggy Echols has more influence than,
4  say, somebody from the Bunge Milling, or most of these
5  people -- these companies I've never heard of.  I
6  think that State Farm would have a significant
7  presence.
8       Q.  How about --
9       A.  And I would also note -- excuse me, sir.
10  Are you ready for this?  It looks like you're
11  shuddering.
12      Q.  Whatever you would like.  I'm not
13  shuddering.
14      A.  Okay.  The strong pitch that she made for
15  the judicial committee tells me that she's really
16  oriented towards influencing the Chamber's policy with
17  respect to the judicial arena.  That's why I made that
18  comment.  Other than that, I don't have minutes of a
19  meeting that she participated in.  But, yeah, I
20  believe Peggy Echols had -- what's the statement that
21  I make here?  I say that had personnel in place to
22  influence the Chamber's policies and priorities, and I
23  believe that's true.  I think that Peggy Echols could
24  do that.  It's likely that she did that.
25      Q.  The board includes a representative from

128

1  Boeing Corporation; is that correct?
2       A.  You'll have to direct me.
3       Q.  Doug Bain, B-a-i-n?
4       A.  Yes.
5       Q.  BP, Gary Stewart?
6       A.  There are other big-time corporations,
7  major corporations, represented on that board, but I'm
8  just saying that State Farm would have the ear of the
9  Illinois Chamber of Commerce.
10      Q.  And why are you saying that?
11      A.  Because they are a significant presence,
12  a high-profile, prestigious presence, not just in
13  Illinois but nationally as well.
14      Q.  Now, you say that she participated in a
15  special board meeting on April 21, 2004, when the ICC
16  endorsed Karmeier?
17      A.  Right.
18      Q.  How many people participated in that
19  meeting?
20      A.  I don't know.
21      Q.  Does 43 sound about right?
22      A.  I have no -- I'll accept that.  You
23  don't need to -- if you represent that, I'll believe
24  you.
25      Q.  Okay.  It is the document that you cite,

129

1  ISCC-173 through 180, and the count is on page 180.
2       A.  Fine.  I accept that.
3       Q.  Now, that wasn't an in-person meeting,
4  was it?
5       A.  I don't remember.
6       Q.  Okay.  Let's get that.  To refresh your
7  recollection, I'll just show it to you from the
8  notebook.
9       A.  Okay.  Pending question?
10      Q.  Do you see that it --
11      A.  Yes, it was telephonic.
12      Q.  Okay.  Do you see the last page tells you
13  how many people were there?  I think it's 180,
14  No. 180, Bates stamped on the bottom.
15      A.  Oh, I see.
16      Q.  I don't know if it counts them for you.
17      A.  Do you want me to count them?
18      Q.  Well, no, not unless you --
19      A.  I'll accept what you say.
20      Q.  Okay.
21      A.  You say 43?
22      Q.  Yes.
23      A.  It doesn't count them for me, but it
24  looks about right.
25      Q.  Okay.  Now, you've testified a number of

33 (Pages 126 to 129)

130

1    times and you say in your report that Peggy Echols
2    actively pursued leadership of the Illinois Chamber
3    Legal and Judicial Review Committee prior to the
4    election of Justice Karmeier in 2004.
5        A.  That's true.
6        Q.  What did the Illinois Chamber of Commerce
7    Legal and Judicial Review Committee do?
8        A.  I don't have a description of their
9    function.
10       Q.  It was a new committee; is that right?
11       A.  I don't know that.
12       Q.  Did the committee ever meet in 2004?
13       A.  I don't know.
14       Q.  Did Peggy Echols ever become a member of
15   that committee?
16       A.  I don't know.
17       Q.  What did Ms. Echols do to actively pursue
18   leadership on this committee?
19       A.  I recall an e-mail -- and it should be
20   referenced here somewhere -- where she solicited the
21   chairperson job for that committee.
22           (Deposition Exhibit 8 was marked.)
23       Q.  Showing you what has been marked as Myers
24   Exhibit 8, which is an e-mail from Peggy Echols to
25   mayers@illinoischamber, Bates stamped ISCC-000164. Is

131

1    that the e-mail that you described?
2        A.  Yes.
3        Q.  And does that refresh your recollection
4    that this was a new committee?
5        A.  Yes.
6        Q.  And this is an e-mail where Peggy Echols
7    tells an Illinois Commerce -- Chamber of Commerce
8    official that she's going to the Bahamas on spring
9    break instead of attending the March board meeting?
10       A.  That's true.
11       Q.  Other than this single e-mail, what else
12   did Ms. Echols do to actively pursue leadership on
13   this committee?
14       A.  Well, I think this is a pretty strong
15   pitch here.  And she is interested in litigation
16   issues, and this is front and center on the State Farm
17   agenda.  I mean, she has to be aware of the issues
18   that State Farm has within Illinois, especially with
19   respect to the Illinois Supreme Court.  She's actively
20   campaigning in this particular area.  That tells me
21   that she's motivated to have some influence.  She's a
22   director from a major Fortunate 500 company.  So the
23   statement I make is that -- what I'm saying here --
24   and I'm offering this information as a support -- the
25   statement that creates this issue is "State Farm had

132

1    personnel in place at the Illinois Chamber to
2    influence its priorities and spending during the
3    Karmeier campaign."  That's a direct quote from page
4    51 of my report.  That's all I'm saying.  This is
5    prima facie evidence of that.
6            MR. SAFER:  I move to strike that answer
7    as unresponsive.
8        Q.  (BY MR. SAFER)  The question is:  Other
9    than this single e-mail, what did Peggy Echols do to
10   actively pursue leadership of the Illinois Chamber's
11   Legal Judicial Review Committee as you assert in your
12   report?
13       A.  I don't know, because I wasn't able to
14   see the entire record.
15       Q.  Is there anything else other than this
16   single e-mail that you have seen by which Peggy Echols
17   actively pursued leadership of the Illinois Chamber's
18   Legal and Judicial Review Committee?
19       A.  There's nothing that I've seen that I
20   recall as I sit here now.
21       Q.  Now, there was a June 18, 2004, Illinois
22   Chamber of Commerce board meeting when Dwight Kay, the
23   treasurer of Judge Karmeier's campaign, attended,
24   wasn't there?
25       A.  I believe that is correct.

133

1        Q.  Peggy Echols wasn't at that meeting, was
2    she?
3        A.  I don't know.
4            (Deposition Exhibit 9 was marked.)
5        Q.  Showing you what has been marked as Myers
6    Deposition Exhibit 9, which is the Illinois Chamber of
7    Commerce Board of Directors Meeting, June 18, 2004,
8    Bates stamped ISCC-000199 through 204.  Are you
9    familiar with this document?
10       A.  I don't recall seeing this before, but I
11   may have.
12       Q.  It is the annual meeting minutes for the
13   Illinois Chamber of Commerce Board of Directors
14   Meeting on June 18, 2004?
15       A.  Okay.
16       Q.  Do you see that?
17       A.  Yes.
18       Q.  And do you see that there was an
19   introduction of Dwight Kay, the finance chair for the
20   Judge Karmeier campaign?
21       A.  I'm sorry.  Where are you?
22       Q.  The second page.
23       A.  Second page.  Okay.  Give me a second,
24   please.
25       Q.  Yes.

34  (Pages 130 to 133)

134

1     A.  Okay.
2     Q.  And Mr. Kay was thanking the chamber --
3  the minutes indicate, thanking the Chamber for its
4  support and asking for more support, correct?
5     A.  Yes.
6     Q.  And Peggy Echols was not at that meeting,
7  was she?
8     A.  I don't know.
9     Q.  Do the minutes indicate the directors
10  present?
11     A.  Yes.
12     Q.  Is Peggy Echols indicated as a director
13  who was present?
14     A.  No.
15     Q.  Is anyone from State Farm indicated as
16  somebody who was present?
17     A.  I don't see anyone from State Farm.
18     Q.  Now, State Farm made two payments to the
19  Illinois Chamber of Commerce in 2004, correct?
20     A.  Yes.
21     Q.  The first was for $30,000 for membership
22  dues?
23     A.  Right.
24     Q.  And that was paid in March of 2004?
25     A.  I'm not sure of the date.

135

1     Q.  You can look at your report at page 52.
2     A.  Yes.
3     Q.  And, again, that membership dues was paid
4  by State Farm every year to the Illinois Chamber of
5  Commerce, correct?
6     A.  Right.
7     Q.  Is it your testimony that that money was
8  paid by State Farm to funnel money to Judge Karmeier's
9  campaign?
10     A.  No.
11     Q.  Now, the second payment of $7,500 was in
12  October of 2004, correct?
13     A.  Uh-huh.  Yes.
14     Q.  You noted that this payment was made
15  after a meeting with Todd Maisch, M-a-i-s-c-h?
16     A.  Where are you referring to, please.
17     Q.  Pages 52 and 53.
18     A.  Okay.  Hold on a second, please.
19     Q.  The bottom of 52 and top of 53.
20     A.  Okay.
21     Q.  Do you see that?
22     A.  Yes.
23     Q.  And you quote a letter, a thank you
24  letter, that Todd Maisch sent saying that they wanted
25  to expand their outreach and that that would be

136

1  combined with contributions from other members; is
2  that right?
3     A.  Yes.
4     Q.  I'll show you that letter.
5         (Deposition Exhibit 10 was marked.)
6     Q.  Myers Exhibit 10 is a document that
7  starts with a voucher cover sheet and is Bates stamped
8  HALE-4978 through 81.  The second page, Mr. Myers, is
9  that the letter from which you are quoting at the top
10  of page 53 of your report?
11     A.  Give me a second.
12     Q.  Yes.
13     A.  Yes.
14     Q.  The first paragraph of that letter, which
15  you do not quote, says, "Thank you for meeting with me
16  to discuss the Chamber's grassroots education and
17  activation program.  We are excited about the
18  potential to build on the success of 2004."
19     A.  Okay.
20     Q.  Isn't it a fact that he is talking about
21  a program that had concluded in 2004 and was going to
22  be repeated in 2005?
23         MR. CLIFFORD:  Objection.  Foundation.
24     A.  That appears correct.
25     Q.  (BY MR. SAFER)  Could we move to page 57

137

1  of your report?  You said that in the first -- bottom
2  of the first full paragraph on the Illinois Civil
3  Justice League, you say, "State Farm helped create
4  ICJL in 1992."
5     A.  Yes.
6     Q.  What did you rely on to show that State
7  Farm helped to create ICJL?
8     A.  I don't recall.  I've seen the document,
9  but I'm not sure if it's footnote 219 there.  There
10  are three documents that are listed.
11     Q.  You say that William Shepherd was a
12  member of ICJL's Executive Committee, correct?
13     A.  Yes.
14     Q.  And on page 17 of your report, you say he
15  was an important member of the committee.
16     A.  Yes.
17     Q.  What is the basis for your conclusion
18  that he was an important member of the committee?
19     A.  Well, it's the executive committee.
20  Every member of the executive committee is important.
21  I think that Shepherd is even more interesting and
22  more influential because he actually is employed by
23  State Farm, which has an enormous interest in funding
24  the Karmeier campaign, which is the main agenda of the
25  ICJL at that point in time.

35 (Pages 134 to 137)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

138

1      Q.   So is it your contention that he was an
2  important member of the ICJL's Executive Committee
3  only during the period when Karmeier was up for
4  election or for all time?
5      A.   I would say that if you're an executive
6  committee member, every member is important --
7      Q.   Okay.
8      A.   -- to the organization.
9      Q.   Okay.  What is your basis for asserting
10  that Shepherd, on page 18 --
11      A.   Excuse me, sir.  I'm sorry to interrupt
12  you.  There is a footnote to that, footnote 65 on
13  important member, and there is a document that shows
14  some correspondence.  But it just basically shows that
15  he was participating in the meetings and he wasn't an
16  insignificant member.  Let's put it that way.  I'm
17  sorry to interrupt you.
18      Q.   That's okay.  What is the basis for your
19  statement that -- for asserting that Shepherd
20  recruited Justice Karmeier and ran his campaign?  Very
21  top of 18.
22      A.   Give me a second.
23      MR. BLONDER:  I think your question
24  misstates what his report is saying.
25      A.   It does.  Let me read the sentence that

139

1  counsel is asking me about into the record.  "State
2  Farm withheld information from the Illinois Supreme
3  Court about its substantial actions taken to conceal
4  millions of dollars in contributions paid through
5  intermediary donors, and to conceal the roles of
6  Shepherd and Murnane in substantively recruiting
7  Justice Karmeier and running his campaign."
8      Q.   (BY MR. SAFER)  Yes.  The question is:
9  What is the basis for your assertion that Shepherd
10  substantively recruited Justice Karmeier and ran his
11  campaign?
12      MR. BLONDER:  I object.  I think that
13  mischaracterizes what the sentence says.
14      A.   You're misreading that.  I just read what
15  it says and you're completely mischaracterizing what
16  it says.
17      Q.   (BY MR. SAFER)  Okay.  So tell me what it
18  says.
19      A.   Should I read it again?
20      Q.   No.  I can read the words.
21      A.   Well, you just asked me to tell you.  Do
22  you want me to?
23      Q.   I don't want you to tell me the words.  I
24  want you to explain to me how the plain reading of the
25  words don't apply.  Are you saying that Shepherd

140

1  was -- well, let's --
2      A.   I'll be happy to explain.
3      Q.   Are you saying that Shepherd was involved
4  in recruiting Justice Karmeier and running his
5  campaign?  Are you saying that?
6      A.   I didn't say that there.
7      Q.   Okay.  Are you saying that?
8      A.   No.  Well, I mean, I suppose that
9  tangentially I am saying that in a way.  I would like
10  to explain what I meant by that sentence in my report.
11      Q.   If you could answer the question -- I
12  think you have.
13      MR. BLONDER:  I think you did answer.
14      Q.   (BY MR. SAFER)  Okay.  Could you turn to
15  Appendix E of your report, please.
16      A.   What page is that, please.
17      Q.   That's a great question.
18      MR. BLONDER:  95.
19      THE DEPONENT:  95.
20      MR. BLONDER:  95, Ron.
21      MR. SAFER:  Thank you.
22      Q.   (BY MR. SAFER)  What is the nub of this?
23  What is this designed to show?
24      A.   As I understand it, this is the document
25  that was provided to me that shows the length of time

141

1  that it takes for an appeal to run its course through
2  the Illinois Supreme Court.  And it measures -- it
3  looks at the various decisions and so forth, noting
4  that the -- and the point is that the Avery, State
5  Farm case was before the Illinois Supreme Court for an
6  unusually extended period of time.
7      Q.   And why is that included in your report?
8  I'm just trying to understand what the point of it is.
9      A.   I was asked to include it in my report.
10      Q.   For what purpose?
11      A.   Because I think it demonstrates the fact
12  there is an issue as to -- that has been raised as to
13  whether -- why would State Farm fund Karmeier's
14  campaign if the Avery case would have been decided
15  before he got on the bench.  And this shows that the
16  duration of the Avery case was unusual.
17      Q.   Right.
18      A.   I think it speaks for itself.
19      Q.   Doesn't it show that the -- one would
20  think that the Avery case would have been decided --
21  and the Gridley case as well -- long before they
22  actually were?
23      A.   Yes.
24      Q.   Who provided this to you?
25      A.   Mr. Clifford.

36 (Pages 138 to 141)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

142

1    Q.  Do you know how it was compiled?
2    A.  My understanding was it was done by
3    analysts in his firm.
4    Q.  So you had nothing to do with the
5    creation of this?
6    A.  No.
7    Q.  Did anybody from your company do any fact
8    checking on this?
9    A.  No.
10   Q.  Are you offering an opinion that each and
11   every class member was harmed by State Farm?
12   A.  Yes.
13   Q.  And how were they harmed?
14   A.  They were harmed because of the reversal
15   of the -- the Avery verdict, judgment.
16   Q.  And was each class member harmed to the
17   same extent and in the same way?
18   A.  I'm not saying that.
19   Q.  Do you have an opinion --
20   A.  They were harmed in the same way.  They
21   were harmed basically by the fact that State Farm was
22   not forthright and truthful in their responses to the
23   Illinois Supreme Court at the recusal hearing.
24   Q.  Do you have an opinion as to what would
25   have happened if State Farm had been, in your opinion,

143

1    forthright with the Illinois Supreme Court?
2         MR. BLONDER:  Objection.  Way beyond the
3    scope.
4    A.  It's beyond the scope of my opinion.
5    Q.  (BY MR. SAFER)  Do you have an opinion?
6    A.  No.
7    Q.  So do you assume for your damages
8    calculation that the entire appellate court award
9    would have been affirmed if State Farm had been
10   forthright, in your words, with the Illinois Supreme
11   Court?
12   A.  No.
13        MR. BLONDER:  Object.
14   A.  All I did, I acted as a human calculator
15   here.  I was provided with some numbers to calculate
16   and that's what I did.  I'm not offering an opinion on
17   damages or causation or anything like that.
18   Q.  (BY MR. SAFER)  How would the damages
19   have been apportioned among the individual class
20   members?
21        MR. BLONDER:  Objection.  Way beyond the
22   scope.
23   A.  That's beyond the scope of my opinion.
24   Q.  (BY MR. SAFER)  You have no opinion on
25   that?

144

1    A.  No.
2    Q.  How did you perform the work as a human
3    calculator?  What were the computations that you --
4    A.  I was provided with the amount of the
5    appeals court judgment, the date of that judgment,
6    given a time frame to calculate.  I think in the
7    report it says through March 15 -- March -- whatever
8    it says, it says.  And I simply ran the simple
9    interest calculation at 9 percent, which I was
10   instructed to do for the period of time, and then
11   added that to the original judgment and tripled it.
12   Q.  Who instructed you to use the rate of 9
13   percent?
14   A.  Mr. Blonder.
15   Q.  And did you do anything to ascertain
16   whether that rate was correct under a federal RICO
17   lawsuit?
18   A.  No.
19        MR. SAFER:  Can we take a five-minute
20   break?
21        MR. BLONDER:  Sure.
22        (Recess taken, 2:17 p.m. to 2:25 p.m.,
23   after which time Mr. Riddle was not present.)
24        MR. SAFER:  I have no further questions.
25        MR. SCOTT:  I have no questions.

145

1         MR. BLONDER:  David?
2         MR. JORGENSEN:  I have no questions.
3         MR. BLONDER:  I have a couple of
4    questions.
5              EXAMINATION
6    BY MR. BLONDER:
7    Q.  If you could, Mr. Myers, pick up
8    Exhibit 3.  I believe Mr. Safer asked you some
9    questions generally regarding the State Farm
10   contributions to the ILR in proportion to the total
11   expenditures and the expenditures on the Karmeier
12   campaign.  Do you recall that generally?
13   A.  Actually, his question was about the
14   total revenues, the combined revenues of the U.S.
15   Chamber and the ILR, but I referenced the
16   expenditures, the political expenditures.
17   Q.  Correct.  And you recall --
18        MR. CANCILA:  Objection.
19   Mischaracterizes his testimony, Mr. Blonder.
20        MR. CLIFFORD:  We have two people to
21   object now?  We've got it.
22   Q.  (BY MR. BLONDER)  And you had a point
23   that you wanted to make about the percent that
24   Mr. Safer didn't want to hear?
25   A.  Yeah.  Well, in my opinion respectfully,

37 (Pages 142 to 145)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

146

1  I believe that the counsel was distorting the actual
2  contribution of State Farm inappropriately, because he
3  took and combined the revenues of the Institute for
4  Legal Reform of 38 million and added them to, I
5  believe, it was 90-some million for the U.S. Chamber,
6  coming up with a total of something like 129 million,
7  if I remember correctly, pointing out that State
8  Farm's contribution to that combined entity was
9  something like a hundred thousand dollars.  And he
10 suggested that the fraction of contribution was
11 minuscule.
12         And I think a more appropriate measure --
13 and forgive me if I've mischaracterized what he said,
14 but that's the way I remember it.  A more appropriate
15 yardstick to measure the significance of the State
16 Farm financial contribution would be to look at the
17 political expenditures of the ILR, which is concerned
18 with judicial campaigns, that can be found on line 81
19 of the Form 990, which I believe is Exhibit 3.  And
20 that amount in box 81 is a 14 million and some change.
21 And I had suggested -- but it was objected to.  I had
22 suggested that the 2.2 million that was spent by the
23 ILR on the Karmeier campaign should be compared to
24 their total political expenditures of 14 million and
25 that would be approximately 1/7th or around

147

1  14 percent, which is a huge percentage for one of the
2  activities for the ILR when we know that the ILR is
3  spread out nationwide and they -- Donohue refers to 16
4  judicial campaigns and any number of other campaigns.
5         So the point is that the State Farm
6  expenditures were quite significant and undoubtedly
7  one of the largest expenditures made by the ILR in
8  2004 if we can believe the number on their tax return
9  for political expenditures.
10        MR. BLONDER:  I believe Mr. Clifford has
11 a few questions.
12             EXAMINATION
13 BY MR. CLIFFORD:
14     Q.  Mr. Myers, do you have Exhibit 9 in front
15 of you?  You're going to need 9 and 7 for my
16 questioning.  Tell me when you're ready, Mr. Myers.
17     A.  I'm ready.  I have those exhibits.
18     Q.  Please look at the first -- initially the
19 first two pages of Exhibit 9, which are ISCC-000199
20 and 200.
21     A.  I've got that.
22     Q.  When you were being asked questions about
23 this document, do you know if the Illinois Chamber is
24 a member of the executive committee of ICJL, a
25 representative of the Chamber?

148

1      A.  No, I don't.
2      Q.  Do you know if Karen Melchert from CNA
3  Insurance Companies is a member of the executive
4  committee of ICJL?
5      A.  I don't know that for a fact.
6          (At this time Mr. Riddle entered the
7  room.)
8      Q.  Do you know if -- turning to page 200, do
9  you know if, on page 200, David Whitley and Justin
10 Reichert, who are referred to above as Chamber staff
11 present, occasionally represent the chamber as part of
12 the ICJL Executive Committee?
13     A.  Did you mean Douglas Whitley?  I don't
14 know if I heard you correctly.
15     Q.  You know what?  Did I call him David?  I
16 meant Douglas.
17     A.  I didn't know that, no.
18     Q.  Now in two different depositions I've
19 called him David.
20     A.  I didn't recognize them as members of the
21 executive committee of the ICJL.
22     Q.  Now turning to -- why don't you walk
23 through this document with me.  This document is dated
24 June 18, 2004.  And what the chamber has produced to
25 us --

149

1      A.  Excuse me, sir.  What Bates number are
2  you on?
3      Q.  Strike any pending question.  Referring
4  you to the first page of Exhibit 9 --
5      A.  Okay.  Thank you.
6      Q.  -- looking at the Bates numbers that
7  begin 000199, go through the entire document, do they
8  appear to be in sequential order through 204?
9      A.  Yes, they do.
10     Q.  Now take a look at pages 02 and 03.  At
11 the very top of 03 --
12     A.  Excuse me a second.  I'm not there yet.
13 Go ahead, please.
14     Q.  At the very top of 03, we have page 11?
15     A.  Yes.
16     Q.  And at the very top of 02, we have page
17 4?
18     A.  Right.
19     Q.  Have you ever seen pages 5 through 10?
20     A.  No.  I don't recall seeing them.
21     Q.  And on page 11, which is ISCC-000203, the
22 first full paragraph at the top of the page, do you
23 see the remarks there that are being made by
24 Mr. Imler?
25     A.  I do.

38 (Pages 146 to 149)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

150

1    Q.  That's Bob Imler who is the chairman of
2  the board of the Illinois Chamber, vice president
3  community and government relations for RiverStone,
4  Inc. in Moline, Illinois.  What is the subject matter
5  of that paragraph?
6       A.  It says, "Imler commented on the
7  Chamber's efforts and visibility in supporting the
8  Karmeier campaign."
9       Q.  Turning to -- I'm done with this exhibit.
10  Turning to Exhibit 7, the listing of officers and
11  director for 2004 -- strike that.  Strike that.  I
12  apologize.  My fault.  My fault.
13          Please go back to Exhibit 9.
14       A.  Okay.
15       Q.  Turn to page 202.
16       A.  Okay.
17       Q.  Middle of the page, you'll see there are
18  names right in the middle of the page, the top name
19  being Brian Peterson?
20       A.  Yes.
21       Q.  The name below that being Peggy Echols?
22       A.  I see that.
23       Q.  Now, go to the paragraph that introduces
24  those names, if you will, that's right above it.  It
25  begins, "Beck then made a motion."

151

1       A.  Sure.
2       Q.  Would you read that out loud?
3       A.  "Beck then made a motion to elect the
4  following members, each of whom has been serving to
5  complete a term of an individual who resigned from the
6  board during her/his two-year appointment that began
7  in 2002.  These individuals are nominated to serve
8  their first full two-year term."
9       Q.  And then if you go down then, Peggy
10  Echols, State Farm Insurance, original full-term now
11  2004; is that correct?
12       A.  That is correct.
13       Q.  Okay.  I'm done with that exhibit.  Going
14  back to now Exhibit 7 where it lists the
15  individuals --
16       A.  Yes.
17       Q.  -- far column on the left at the very
18  bottom where it says "Vice President," it mentions
19  Todd Maisch.
20       A.  I'm sorry.  Hold on a second, please.
21  Oh, yeah.  Okay.
22       Q.  Okay.  Did you know that Todd Maisch is a
23  member of the executive committee of ICJL?
24       A.  I am tangentially aware of that, but,
25  yes, I am.

152

1       Q.  All right.  And then Kim Maisch, who is
2  not on this document, but she's -- frankly, I don't
3  remember her relationship.  I don't know if she's a
4  wife or not, so I don't want to misstate it.  But Kim
5  Maisch is also a member of the ICJL Executive
6  Committee?
7       A.  Yes.
8       Q.  And we have above that in that same
9  column under "President and CEO," then we have Douglas
10  Whitley from the Chamber being involved in the
11  executive committee of ICJL?
12       A.  Okay.
13       Q.  Now go to the next column of names in the
14  middle of the page.  You have Peggy Echols there
15  again.  Do you see that?
16       A.  Yes.
17       Q.  And then right below that two names is
18  Tim Elder?
19       A.  I see that.
20       Q.  Director of corporate public affairs,
21  Caterpillar, Peoria?
22       A.  Yes.
23       Q.  Are you aware that his colleagues, Mark
24  Anderson and Thomas Walters, are members or were
25  members of the ICJL Executive Committee during '03 and

153

1  '04?
2       A.  I was not aware of that.
3       Q.  Going to the next column in the middle of
4  the page, you'll see the name Karen Melchert?
5       A.  I do see that.
6       Q.  Vice president government -- vice
7  president state government affairs, CNA Insurance
8  Company, Chicago.  Did you know that Karen Melchert in
9  '03 and '04 was a member of the ICJL Executive
10  Committee?
11       A.  That rings a bell, yes.
12       MR. CLIFFORD:  I don't have any further
13  questions of Mr. Myers.
14       MR. SAFER:  Just one.
15            EXAMINATION
16  BY MR. SAFER:
17       Q.  Myers 9, the paragraph that you read on
18  202, that doesn't indicate to you that Peggy Echols
19  was present at this meeting, does it?
20       A.  No.
21       MR. SAFER:  That's all.
22            EXAMINATION
23  BY MR. CLIFFORD:
24       Q.  Back at you on that same score, does it
25  indicate anything one way or the other?

39 (Pages 150 to 153)

CONFIDENTIAL
Thomas Arthur Myers, CPA    May 22, 2015

154

1       A.  No.
2       **Q.  It is really on the first page where the**
3   **issue of directors present is listed?**
4       A.  That is correct.
5       **Q.  Do you know if there was anyone on the**
6   **telephone that day?**
7       A.  No, I don't know.
8           MR. CLIFFORD:  Nothing further to add to
9   the discussion.  Are we finished?
10          MR. SAFER:  Yes.
11          (Discussion off the record.)
12          MR. JORGENSEN:  I would like an e-tran
13  with scanned exhibits for David Jorgensen.  And it's
14  djorgensen@sidley.com.
15          WHEREUPON, the within proceedings were
16  concluded at the approximate hour of 2:39 p.m. on the
17  22nd day of May, 2015.
18          *   *   *   *   *
19
20
21
22
23
24
25

156

REPORTER'S CERTIFICATE
STATE OF COLORADO          )
                          ) ss.
CITY AND COUNTY OF DENVER  )
        I, Darcy Curtis, Registered Professional
Reporter and Notary Public ID 20064016972, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said THOMAS
ARTHUR MYERS, CPA was duly sworn by me to testify to
the truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.
        IN WITNESS WHEREOF, I have affixed my
signature this 4th day of June, 2015.

        My commission expires May 2, 2018.

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.

155

1       I, THOMAS ARTHUR MYERS, CPA, do hereby
2   certify that I have read the above and foregoing
3   deposition and that the same is a true and accurate
4   transcription of my testimony, except for attached
5   amendments, if any.
6       Amendments attached    ( ) Yes ( ) No
7
8       _____
        THOMAS ARTHUR MYERS, CPA
9
10
11      The signature above of THOMAS ARTHUR
12  MYERS, CPA was subscribed and sworn to before me in
13  the County of _____, State of Colorado, this
14  _____ day of _____, 2015.
15
16
17
18
19      _____
        Notary Public
        My commission expires
20
21
22
23
24
25  Mark Hale, et al. 5/22/15 (dc)

40 (Pages 154 to 156)

REPORTER'S CERTIFICATE

STATE OF COLORADO           )
                            ) ss.
CITY AND COUNTY OF DENVER   )

I, Darcy Curtis, Registered Professional
Reporter and Notary Public ID 20064016972, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said THOMAS
ARTHUR MYERS, CPA was duly sworn by me to testify to
the truth in relation to the matters in controversy
between the parties hereto; that the said deposition
was taken in machine shorthand by me at the time and
place aforesaid and was thereafter reduced to
typewritten form; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.

I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

IN WITNESS WHEREOF, I have affixed my
signature this 4th day of June, 2015.

My commission expires May 2, 2018.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.


_____
Darcy Curtis
Registered Professional Reporter
Certified Shorthand Reporter