Exhibit 6

*** CONFIDENTIAL ***
Rob Engstrom    May 19, 2015

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

```
------------------------------x
MARK HALE, et al., on behalf  :
of Themselves and all others  :
similarly situated,           :
                              :
          Plaintiffs,         :
                              :       Case No.
     vs.                      :
                              : 12-CV-00660-DRH-SCW
STATE FARM MUTUAL AUTOMOBILE  :
INSURANCE COMPANY, EDWARD     :
MURNANE, and WILLIAM G.       :
SHEPHERD,                     :  ** CONFIDENTIAL **
                              :
          Defendants.         :
------------------------------x
```

Washington, D.C.

Tuesday, May 19, 2015

VIDEOTAPE Deposition of:

ROB ENGSTROM,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

at 9:08 a.m., at the law offices of King &

Spalding LLP, 1700 Pennsylvania Avenue, Northwest,

Washington, D.C., before Dawn A. Jaques, CSR, CLR,

and Notary Public in and for the District of

Columbia, when were present on behalf of the

respective parties:

Merrill Corporation - Chicago
(312) 386-2000                   www.merrillcorp.com/law

```
 1   please?
 2              (Engstrom Deposition Exhibit 7
 3               was marked for identification.)
 4              BY MR. SAFER:
 5        Q    Showing you what has been marked as
 6   Engstrom Deposition Exhibit 7, which is a letter
 7   from Sam Skinner dated January 23rd, 2003, with
 8   attachments, numbered USCC-004294 through 4306, do
 9   you recognize this exhibit?
10        A    I do.
11        Q    What is that?
12        A    This is an invitation to join the
13   Board of Directors for the U.S. Chamber's
14   Institute for Legal Reform.
15        Q    And the second paragraph begins by
16   saying, "The board's primary responsibility, in
17   addition to providing advice and counsel, will be
18   to review and approve ILR's annual budget, program
19   of work, and fundraising activities."
20              Is that your understanding of what the
21   Board primarily did at ILR?
22        A    That is consistent with my
23   recollection and my experience both.
24        Q    So the Board did not participate in
25   drafting the priorities of ILR, did they?
```

*** CONFIDENTIAL ***
Rob Engstrom    May 19, 2015

Page 35

```
 1         A    No.
 2         Q    And they did not participate in
 3    drafting the annual budget?
 4         A    No.
 5         Q    And they did not participate in
 6    drafting the program of work?
 7         A    No.
 8         Q    In fact, no members participated in
 9    any of those steps?
10         A    That's my recollection.
11         Q    Who did?
12         A    The staff.
13         Q    The staff of ILR?
14         A    Right, the staff of ILR.
15         Q    Was the -- that budgeted amount to any
16    particular activity influenced in any way by any
17    specific member's contribution to ILR?
18         A    No, ILR did not accept earmarked
19    contributions.
20         Q    Okay.  Does an individual Board member
21    decide how ILR will spend its resources?
22         A    No.
23         Q    Does an individual member of ILR
24    decide how ILR will spend its contribution?
25         A    No.
```

*** CONFIDENTIAL ***
Rob Engstrom    May 19, 2015

Page 36

```
 1         Q   Did State Farm ever control the
 2   Chamber or ILR's priorities?
 3         A   No.
 4         Q   By the way, the bylaws for ILR's --
 5   for ILR are included in this exhibit; is that
 6   right?
 7         A   Yes.
 8         Q   And Article I, Section 11, says
 9   that -- that each director has to vote in person
10   and receives one vote.  Do you see that?
11         A   I do.
12         Q   And they cannot vote by proxy,
13   correct?
14         A   Correct.
15         Q   So only the Board member, him or
16   herself, can vote?
17         A   Correct.
18         Q   And they must be present at the
19   meeting to vote?
20         A   Yes.
21         Q   Mr. Skinner points out that the Board
22   will actually meet in person twice a year; is that
23   right?
24         A   Yes.
25         Q   And is that what happened in 2003 and
```

Merrill Corporation - Chicago
(312) 386-2000                          www.merrillcorp.com/law

*** CONFIDENTIAL ***
Rob Engstrom    May 19, 2015

Page 51

```
 1        Q    Did the Board ever reject a
 2   recommendation made by ILR staff concerning these
 3   priorities in which the -- for elections?
 4        A    No.
 5        Q    Did the Board ever modify a
 6   recommendation by ILR staff regarding elections?
 7        A    No.
 8        Q    If there was ever a disagreement
 9   between the Elections Task Force and the ILR
10   staff, who made the final decision on involvement?
11        A    ILR staff.
12        Q    And is that memorialized in your
13   standards for involvement?
14        A    It is.
15        Q    So I direct you to 4689, the next to
16   last paragraph, the final sentence.
17             Does that say, "The final decision on
18   involvement will rest with ILR"?
19        A    It does.
20        Q    And does that mean ILR staff?
21        A    Correct.
22        Q    Did State Farm ever direct that ILR
23   participate in any particular election?
24        A    No.
25        Q    Did ILR participate in the Illinois
```

*** CONFIDENTIAL ***
Rob Engstrom     May 19, 2015

Page 74

```
 1   problems, but we weren't sure yet whether the
 2   races were going to be competitive.
 3           And then Tier III were essentially
 4   states that perhaps had an election, but they
 5   weren't a priority, or they weren't competitive.
 6       Q   And was there controversy about
 7   which -- among the ILR staff, or anybody else, or
 8   the membership, about who would be ranked Tier I
 9   states?
10       A   No.  This is -- this is a document.
11   There was agreement, I would say universal
12   agreement, within the -- within the Board, also
13   the donor representatives, that these are the
14   states that represented the largest problems, and
15   if we had an opportunity to involve ourselves in
16   the elections, we would.
17       Q   Did State Farm determine that Illinois
18   would be a Tier I state for ILR?
19       A   No.
20       Q   Did State Farm have any role in
21   determining whether IL- -- Illinois would be a
22   Tier I state?
23       A   No.
24       Q   By the way, turning to page 4799, that
25   is the minutes of the in-person Board meeting from
```

*** CONFIDENTIAL ***
Rob Engstrom      May 19, 2015

Page 75

```
 1   January 28th, 2004.  Do you see that?
 2        A    Yes.
 3        Q    And Ed Rust was not present at the
 4   January 28th, 2004, Board meeting, was he?
 5        A    No, he was not.
 6        Q    No one from State Farm was present at
 7   the January 28th, 2004, ILR Board meeting?
 8        A    Correct.
 9        Q    So no one from State Farm commented on
10   or voted on anything that was done at the
11   January 28th, 2004, ILR Board meeting?
12        A    Correct.
13        Q    Now I'd like to ask you some questions
14   about the expenditure of ILR resources on
15   elections in 2004.
16             After ILR staff decided in 2004 which
17   elections IR- -- ILR would participate in, how
18   were decisions made about where, when and how much
19   money was going to be spent on which elections?
20        A    The first piece was to determine what
21   the campaign finance laws allowed outside
22   organizations to do.
23             The second piece was conducting an
24   audit of the organizations on the ground who were
25   involved in and well-positioned and competent to
```

1    execute voter education programs, in this case, in
2    Illinois.
3        Q    And who does that analysis?
4        A    I do, along with our outside
5    consultants.
6        Q    Now, you said earlier that ILR Board
7    members voted on the total budget for ILR.
8        A    Correct.
9        Q    And you said that staff puts that
10   budget together.
11       A    By -- by discipline, yes.
12       Q    Was -- were there line items in the
13   annual budget for expenditures on individual state
14   elections by state?
15       A    I don't believe so, no.
16       Q    Do you even know that at the beginning
17   of each year how much you're going to spend on
18   each state?
19       A    No, because we don't know what races
20   are going to be competitive.
21            These are low-information races,
22   meaning, you know, they usually break or become
23   competitive in the fall or late summer.  So that
24   was an unknowable -- we didn't know who had even
25   filed to run for those offices.

1    Q    Can a Board member -- can a Board
2  member direct that his or her company's
3  contribution or dues to ILR or the Chamber can
4  only be used for a specific state's elections?
5    A    No, we do not accept earmarked
6  contributions for a political program.
7    Q    Can a Board member direct that his or
8  her company's contributions or dues to ILR or the
9  Chamber could only be used for a specific
10 candidate's race?
11   A    No, they -- no, they do not.
12   Q    Can a Board member direct that his or
13 her company's contribution or dues to ILR or the
14 Chamber can only be used for a particular purpose?
15   A    No.
16   Q    What would happen if a company said to
17 ILR we want to contribute a million dollars, but
18 only if that money is used for this particular
19 purpose?
20   A    We would reject that money.
21   Q    And why is that?
22   A    Because we do not accept earmarked
23 contributions.
24   Q    Did State Farm ever direct the Chamber
25 or ILR to spend money in any particular way?

1  A   No.
2  Q   Did State Farm ever direct the Chamber
3  to spend State Farm's dues or other contributions
4  in a particular way?
5  A   No.
6  Q   Did it -- did State Farm ever direct
7  the Chamber or R- -- ILR to spend any money on the
8  Kar- -- Karmeier-Maag race?
9  A   No.
10 Q   Did it have the power to do that?
11 A   It did not.
12 Q   Why not?
13 A   Because we did not accept earmarked
14 contributions for a political program.
15         (Engstrom Deposition Exhibit 13
16          was marked for identification.)
17         BY MR. SAFER:
18 Q   Showing you what has been marked as
19 Engstrom Deposition Exhibit 13, entitled
20 United States Chamber Institute for Legal Reform,
21 Donor Representatives Meeting, May 25th, 2004, and
22 numbered USCC-005520 through 5721, do you
23 recognize this exhibit?
24 A   I do.
25 Q   What is that?

```
 1   states, correct?
 2        A    Correct.
 3        Q    And across those many races, right?
 4        A    Yes.
 5        Q    So the spending that was done in
 6   Illinois regarding elections was less than
 7   15 percent of what ILR spent on elections that
 8   year?
 9        A    Correct.
10             MR. BLONDER:  I'm going to object
11   generally to this line of questions in light of
12   some of the redactions from the documents that
13   we've received from the ILR with respect to the
14   total amount of contributions and expenditures
15   that were made by the ILR.
16             BY MR. SAFER:
17        Q    The Chamber made contributions -- or
18   strike that.
19             ILR made contributions to the Illinois
20   Republican Party in 2004 of approximately
21   $2 million; is that right?
22        A    Yes.
23        Q    Who made the decision to make these
24   contributions to the Illinois Republican Party?
25        A    I did, along with the senior
```

*** CONFIDENTIAL ***
Rob Engstrom      May 19, 2015

Page 91

```
 1   leadership of the ILR.
 2        Q    Was there any Board action taken with
 3   regard to that contribution or those
 4   contributions?
 5        A    No.
 6        Q    Was there any Election Task Force
 7   action taken regarding those contributions?
 8        A    No.
 9        Q    What money was used for that
10   contribution to the -- or contributions to the
11   Republican Party?
12        A    From the ILR general fund.
13        Q    Were any earmarked funds from any
14   particular member used for those contributions?
15        A    No.
16        Q    Did ILR ever use earmarked funds
17   for -- from any member of ILR?
18        A    No.
19        Q    Was State Farm involved in determining
20   whether to make any contribution from ILR to the
21   Illinois Republican Party?
22        A    No.
23        Q    Was State Farm involved in determining
24   the amount of any contribution to the Illinois
25   Republican Party?
```

```
 1       A    No.
 2       Q    Were State Farm earmarked funds used
 3  for that contribution?
 4       A    No.
 5       Q    ILR also made contributions to the
 6  Illinois Civil Justice League and/or JUSTPAC, do
 7  you recall that --
 8       A    Yes.
 9       Q    -- in 2004?
10       A    Yes.
11       Q    Who made the decision to make those
12  contributions to ICJL and/or JUSTPAC?
13       A    I did, along with our senior
14  leadership team at the ILR.
15       Q    Was any Board action taken with regard
16  to those contributions to ICJL or JUSTPAC?
17       A    No.
18       Q    Was any Election Task Force action
19  taken regarding contributions to ICJL or JUSTPAC?
20       A    No.
21       Q    Was -- what money was used for these
22  contributions to ICJL and/or JUSTPAC?
23       A    General revenue from the Institute for
24  Legal Reform.
25       Q    Were there any earmarked funds from
```

```
 1   any member of ILR used for that contribution?
 2        A    No.
 3        Q    Was State Farm involved in determining
 4   whether to make any contribution to ICJL or
 5   JUSTPAC?
 6        A    No.
 7        Q    Was State Farm involved in determining
 8   the amount of any contribution to ICJL or JUSTPAC?
 9        A    No.
10        Q    Were State Farm earmarked funds used
11   for any contribution to ICJL or JUSTPAC in 2004 or
12   any other time?
13        A    No.
14             MR. BURCHFIELD:  Well, objection.
15   We're dealing here with the time frame of
16   2003-2004, and he's testifying for the ILR only
17   with regard to that time frame.
18             MR. SAFER:  Okay.
19             I have nothing further at this time,
20   Mr. Engstrom.  I'll reserve the remainder of my
21   time for any redirect examination.  Thank you.
22             THE WITNESS:  Thank you.
23             MR. SCOTT:  I have no questions.
24             MR. BURCHFIELD:  Andrew, do you have
25   any questions from Mr. Murnane?
```

```
 1            CERTIFICATE OF NOTARY PUBLIC
 2       I, DAWN A. JAQUES, a Notary Public in and for
 3   the District of Columbia, before whom the foregoing
 4   deposition was taken, do hereby certify that witness
 5   whose testimony appears in the foregoing pages was
 6   duly sworn by me; that the testimony of said witness
 7   was taken by me in shorthand at the time and place
 8   mentioned in the caption hereof and thereafter
 9   reduced to typewriting under my supervision; that
10   said deposition is a true record of the testimony
11   given by said witness; that I am neither counsel
12   for, related to, nor employed by any of the parties
13   to the action in which this deposition is taken;
14   and, further, that I am not a relative or employee
15   of any attorney or counsel employed by the parties
16   thereto, nor financially or otherwise interested in
17   the outcome of the actions.
18
19
20
21                          _____
                            Dawn A. Jaques, CSR, CLR
22                          Notary Public in and for
                            District of Columbia
23
24   My commission expires:
25   January 14, 2015.
```