# Exhibit 8

(Confidential – Pursuant to Protective Order [215])

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS

MARK HALE, TODD SHADLE, LAURIE
LOGER, and MARK COVINGTON, on
behalf of themselves and all
others similarly situated,

    Plaintiffs,

    vs.

Case No.
3:12-cv-00660-
DRH-SCW

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, WILLIAM G. SHEPHERD,
and CITIZENS FOR KARMEIER,

    Defendants.

------------------------------

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

SHERMAN "TIGER" JOYCE

Thursday, May 21, 2015

Washington, D.C.

Reported by:

Lori J. Goodin

JOB NO. 14165

CONFIDENTIAL

Page 55

```
 1                   So that has been a central part of,
 2    would have been a central part of our thought
 3    process at that time.
 4          Q.    Who from State Farm spoke to you
 5    about the support ATRA could give to JUSTPAC
 6    during '04?
 7                 MR. SAFER:  Object to the form of
 8       the question.  That assumes facts not in
 9       evidence.
10    BY MR. CLIFFORD:
11          Q.    You can answer.
12          A.    I don't recall ever speaking to
13    anyone specifically about that.
14          Q.    Is it your testimony that you did
15    not speak to anyone from State Farm about the '04
16    contributions of ATRA to JUSTPAC?
17          A.    If I spoke to somebody from, whether
18    it was from State Farm or any other company,
19    interested in supporting this broader issue of
20    the state supreme courts and the state attorneys
21    general, and the, if the person from the company
22    were to say to me, we want you to use it for this
23    purpose, I would have said no.
24                   Because ultimately, I needed to
25    discharge my, to, to carry out my
```

CONFIDENTIAL

Page 56

1  responsibilities.
2              I needed to have the discretion,
3  would tell anybody that ultimately it is my
4  discretion.
5              That while we may agree with the
6  purpose that they are articulating or advocating,
7  I just couldn't do that.  I wouldn't do it today.
8  I don't, I did not do it then.
9              Did I have a discussion?  I would
10 say no.  We are talking about ten years ago.
11     Q.    Right.  And I realize, you know,
12 myself included, sometimes we can't remember
13 things ten minutes ago.  But, you are aware that
14 the election of Lloyd Karmeier was certainly
15 front and center for the State Farm company and
16 those on its board with whom you might have
17 interacted.
18           MR. TEEL:  Objection, lack of
19     foundation.
20           MR. SAFER:  Object to the form.
21           MR. CLIFFORD:  You can answer.
22           MR. TEEL:  Answer.
23           THE WITNESS:  I can't speak for
24     what, what State Farm was or wasn't thinking
25     at the time.

CONFIDENTIAL

Page 118

```
 1    in the country.  And we move the location around.
 2           Q.    Okay.  But, there is a letter from
 3    you on Page 6 to Steve McManus.
 4           A.    Right.
 5           Q.    Who is Steve McManus?
 6           A.    Steve is a -- a Associate General
 7    Counsel of State Farm.  And he was in 2004, one
 8    of the individuals we had some dealings,
 9    obviously, we worked with at the company.
10           Q.    Uh-huh.  Now, that is that
11    contribution that I was talking about that, of
12    October 6, 2004.  We have had an earlier
13    conversation about the money that went to JUSTPAC
14    on or about the same date.
15           A.    Well, I, we had a discussion, yes,
16    of the contribution, when it came in, yes.
17           Q.    And, it is your testimony that the
18    $50,000 that you are acknowledging from State
19    Farm on that letter, October 6, 2004, had nothing
20    to do with the contribution, the like amount
21    contribution that ATRA made to JUSTPAC on or
22    about the same date?
23           A.    What I was trying to explain was
24    that the, any contribution like this that we,
25    that we receive, we would indicate that it was
```

CONFIDENTIAL

Page 119

1  ultimately ATRA's discretion as to how the
2  funding would be used.
3      Q.   Well, take a look at Page 8 for a
4  moment.
5           So, here you have the actual $50,000
6  donation from State Farm to ATRA is in a check
7  dated October 1, 2004.  Do you see that?
8      A.   I'm looking for the date on it.  Oh,
9  yes, okay.
10     Q.   And, then that is regarding, and
11 then it says from the invoice -- I take it, am I
12 correct in calling what is above there, that is
13 an invoice?
14     A.   Yes.
15     Q.   Okay.  So, it says 23 September, 04,
16 contribution towards ATRA's special projects,
17 50,000.
18          That is an invoice that was sent.
19 Now, why would, why would you be invoicing State
20 Farm?
21     A.   As a part of the process of asking
22 them to send the funding.
23     Q.   But, what conversation preceded that
24 invoice?
25     A.   You know, I just don't recall the

CONFIDENTIAL

Page 178

```
 1   ATRA had to expend resources in order to
 2   accomplish that?
 3        A.   Yes.
 4        Q.   And did you issue another Judicial
 5   Hellholes document in 2004?
 6        A.   Yes.
 7                  (Joyce Exhibit Number 20
 8                   marked for identification.)
 9   BY MR. SAFER:
10        Q.   I am now showing you what has been
11   marked as Joyce deposition Exhibit 20.  Do you
12   recognize that document?
13        A.   Yes.
14        Q.   What is that document?
15        A.   It is the 2004 ATRA Judicial
16   Hellholes report.
17        Q.   And, if you turn to the 7th page of
18   that document, does it list Madison County,
19   Illinois and St. Claire County, Illinois as the
20   two worst Judicial Hellholes in 2004?
21        A.   Yes.
22        Q.   Did State Farm direct ATRA to make
23   Illinois a priority?
24        A.   No.
25        Q.   Now, I'm sorry, let me go back for a
```

CONFIDENTIAL

Page 180

```
 1            A.    Yes.
 2            Q.    And did you solicit money from your
 3    members for these political purposes in these
 4    various states?
 5            A.    Yes.
 6            Q.    Did you solicit any members for
 7    money for a single race?
 8            A.    No.
 9            Q.    Who decided where that money would
10    be spent?
11            A.    Well, I think that we had a lot of
12    information about where the opportunities were.
13    We got feedback from a variety of sources, both
14    within our membership, as well as some
15    consultants who had a good feel for the political
16    landscape.
17                  And, I think as much as anything it
18    was based on how much money we could raise to
19    participate.
20            Q.    Now, was ATRA a pass-through for its
21    members to make contributions to individual
22    campaigns?
23            A.    No.
24            Q.    Did a member of ATRA ever direct you
25    to spend its money for a particular campaign?
```

```
 1            A.    No.
 2            Q.    Did anyone from State Farm direct
 3     you to spend ATRA's money on the Karmeier
 4     campaign?
 5            A.    No.
 6            Q.    Did anyone from State Farm direct
 7     you or request that you spend money on the
 8     Karmeier campaign?
 9                  MR. BARRETT:    Object to the form.
10                  THE WITNESS:    No.  Sorry, no.
11     BY MR. SAFER:
12            Q.    Did anybody from State Farm request
13     that you spend money in Illinois?
14            A.    No.
15            Q.    Did anybody from State Farm ever
16     request that its, any political contributions
17     that it made, would be directed in any particular
18     way?
19            A.    No.
20                       (Joyce Exhibit Number 21
21                        marked for identification.)
22     BY MR. SAFER:
23            Q.    I am showing you what has been
24     marked as Joyce 21, which is American Tort Reform
25     Association Board of Directors and Officers,
```

CONFIDENTIAL

Page 191

```
 1        Q.    So, David, to the best of your
 2   memory, David Hill never once suggested to you
 3   that you were making good decisions about
 4   deploying political resources in '04?
 5        A.    No.  I don't recall him saying that.
 6   No.
 7        Q.    All right.
 8              MR. CLIFFORD:  Thank you.  Pass the
 9       witness.
10              MR. BARRETT:  Yes.  I have just a
11       handful.
12                   FURTHER EXAMINATION
13   BY MR. BARRETT:
14        Q.    You were asked by State Farm's
15   counsel, that you don't solicit funds for any one
16   race.  Do you remember that question?  And you
17   said no?
18        A.    Yes.
19        Q.    But the truth is that you do solicit
20   funds for particular races.
21              MR. SAFER:  Object to the form of
22       the question.
23              THE WITNESS:  Not that I'm aware of.
24   BY MR. BARRETT:
25        Q.    But, ATRA solicited funds from its
```

CONFIDENTIAL

Page 201

1              CERTIFICATE OF COURT REPORTER

2    UNITED STATES OF AMERICA   )

3    DISTRICT OF COLUMBIA       )

4            I, LORI J. GOODIN, the reporter before

5    whom the foregoing deposition was taken, do

6    hereby certify that the witness whose testimony

7    appears in the foregoing deposition was sworn by

8    me; that the testimony of said witness was taken

9    by me in machine shorthand and thereafter

10   transcribed by computer-aided transcription; that

11   said deposition is a true record of the testimony

12   given by said witness; that I am neither counsel

13   for, related to, nor employed by any of the

14   parties to the action in which this deposition

15   was taken; and, further, that I am not a relative

16   or employee of any attorney or counsel employed by

17   the parties hereto, or financially or otherwise

18   interested in the outcome of this action.

19

20                   _____

21                   LORI J. GOODIN

22                   Notary Public in and for the

23                   District of Columbia

24   My Commission expires:

25   May 14, 2016