Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS


MARK HALE, et al.,                    )

                Plaintiffs,   ) Case No.

        vs.                   )3:12-cv-00660-DRH-SCW

STATE FARM MUTUAL                     )

AUTOMOBILE INSURANCE CO.,             )

et al.,                               )

              Defendants.    )



THE VIDEOTAPED DEPOSITION

OF

EDWARD MURNANE

October 27, 2015



Reported By:

Juliana F. Zajicek

CSR No. 84-2604

Ref: 15100


TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

PA1233   GROUP EXHIBIT 1

Page 122

```
 1   but national, was very anxious to see that some
 2   steps be taken to try to correct that.
 3        Q.    And it was also a haven, in the -- in
 4   the eyes of the reform minded, of class action
 5   litigation?
 6        A.    It was, it was.
 7        Q.    And -- and so --
 8        A.    And -- and -- and, Bob, as you know, it
 9   also, one of the 37 counties in that district is
10   Madison County.
11        Q.    Right.
12        A.    Madison County is a magnet nationally.
13        Q.    And -- and -- and it's a -- it's a -- a
14   magnet for the Victor Schwartz-created moniker of
15   judicial hellhole, is it not?
16        A.    I may not disagree with exactly that
17   description, but -- but it is, yes.
18        Q.    Okay.  And -- and it is a fact that at
19   that -- you were there, during all of the time that
20   you were speaking to Justice -- Judge and
21   Mrs. Karmeier, you were there with the informador
22   of your executive committee, correct?  You had
23   their authority?
24        A.    There -- there -- there came a point
```

Page 123

1    when after I had met with Karmeier that I reported

2    to the executive committee because they were

3    interested in what was happening.  I was -- they

4    knew that I was going to be looking for -- for a

5    candidate, that I was going to meet with Frank

6    Watson and I would meet with others.

7         Q.    And -- and they knew that you were

8    telling whoever the candidate was that you would

9    ultimately suggest or rally behind that the race

10   would cost 1 to 3 or 3 to 5 million?

11        A.    I don't think I put a price tag on it at

12   that time.  If you have something on paper that --

13   that -- that does show that, I won't disagree with

14   it, but certainly our executive committee and other

15   members of the Civil Justice League were very

16   interested in having a candidate.

17        Q.    Isn't it true, Ed, that the -- that the

18   plan was that you expected Citizens for Karmeier to

19   raise a million, that you expected from other

20   sources in the state, and that with the assistance

21   of JUSTPAC and ICJL, another million, and that the

22   third million when the range -- when the

23   expectation was 1 to 3, that the third million

24   would come from out -- out-of-state sources?

PA1247

Page 126

```
 1   to him.
 2                    (WHEREUPON, the record was read
 3                     by the reporter as requested.)
 4   BY THE WITNESS:
 5       A.    I won't deny that I did.  I'm just --
 6   I'm just curious as to whether we had a candidate
 7   at that point or not.
 8   BY MR. CLIFFORD:
 9       Q.    Okay.
10       A.    And -- and I can't recall that.  And the
11   dates might or might not help me do that, but --
12       Q.    Okay.
13       A.    -- there was no doubt, as in previous
14   judicial elections, we reached out to potential
15   sources who would be likely to contribute to us who
16   would be reported to the State Board of Elections,
17   who would be treated as a -- a local or a state
18   contributor.
19       Q.    And, once again, your activities as an
20   employee of ICJL, whether they were in Illinois in
21   Chicago or mid-state or downstate or going to
22   Washington to do the things that you were doing,
23   those are things that were made known to your
24   board?
```

Page 127

1      A.    Sure, they were.

2      Q.    Okay.

3      MR. JORGENSEN:  Hey, Bob, we've been going for

4    about an hour, so when you get a natural...

5      MR. CLIFFORD:  Okay.  Well, let's -- let me

6    keep finishing up here then.

7      MR. JORGENSEN:  Yeah, of course.

8    BY MR. CLIFFORD:

9      Q.    And -- and by the way, when you did

10   speak to ATRA and the Chamber about money, you were

11   pretty confident that each of them was prepared to

12   commit at least a million dollars to you, isn't

13   that right?

14     A.    No, I was not confident of anything.

15   And particularly with ATRA, ATRA has never

16   contributed money.  I was hoping that ATRA might

17   make some -- do some contacting on our behalf, but

18   I was -- was not convinced that -- a million

19   dollars is a lot.  And --

20     Q.    It sure is.

21     A.    -- I was not convinced that -- that

22   anyone would agreeable -- be agreeable to

23   contributing.  Fortunately, we did have the history

24   of judicial elections in Illinois to -- to fall



# American Tort Reform Association

1101 Connecticut Avenue, NW • Suite 400 • Washington, DC 20036
(202) 682-1163 • Fax (202) 682-1022 • www.atra.org

September 21, 2004

Mr. Doug Whitley
President
Illinois Chamber of Commerce
311 S. Wacker Drive, Suite 1500
Chicago, IL 60606

Dear Mr. Whitley:

Please find enclosed a check for $100,000 to the Illinois Chamber of Commerce from the American Tort Reform Association. Thank you.

Sincerely,

Sherman Joyce
President



*50250-956*

*Code Sp. P. -956A per TS*

---

| | 862 |
|---|---|

AMERICAN TORT REFORM ASSN.
1101 CONNECTICUT AVE NW STE 400
WASHINGTON, DC 20036

15-120/540 DC
0213

DATE **9/21/04**

PAY TO THE ORDER OF   ILLINOIS CHAMBER OF COMMERCE                    $ **100,000.00**

**One hundred thousand and xx/100 --------**                    DOLLARS

Bank of America

054001204

⑈00086 2⑈  ⑈054001204⑈  0000027046⑈

| From: | Ed Murnane <emurnane@icjl.org> |
| Sent: | Tuesday, May 4, 2004 4:21 PM |
| To: | 'Matt Fullenbaum' <mfullenbaum@atra.org> |
| Subject: | Fw: Campaign Contributions |
| Attach: | Fifth District - Funding The Campaign.pdf |

Matt,

Steve at the Karmeier campaign shared your note with me. In case any prospective contributors are nervous about contributing to a judicial race (contributions are disclosed), I'm attaching a note we sent awhile back. It describes two other options: contribution to JUSTPAC (disclosed) or to the ICJL (not disclosed).

We're not discouraging contributions to Citizens for Karmeier but there are some other options for donors who might not want to be too visible.

JUSTPAC already is the largest contributor to Citizens for Karmeier ($43,000 so far) and I suspect we will continue to be so contributors can rest assured that their contribution will get where they want it.

Ed
----- Original Message -----
From: "Steve" <sgtjad@charter.net>
To: "Matt Fullenbaum" <mfullenbaum@atra.org>
Sent: Tuesday, May 04, 2004 3:58 PM
Subject: Re: Campaign Contributions


> Contributions may be sent to:
> Citizens for Karmeier
> P. O. Box 303
> Nashville, IL 62263
>
> legal disclaimer:
> A copy of our report filed with the State Board of Elections is (or will be)
> available for purchase from the State Board of Elections. Contribution are
> not deductible for federal income tax purposes. Personal, corporate, and
> PAC checks are accepted. Employer and occupation are required for
> contributions over $500.
>
> Steven Tomaszewski
> Citizens for Karmeier
> 618-792-9800
>
> ----- Original Message -----
> From: "Matt Fullenbaum" <mfullenbaum@atra.org>
> To: <info@judgekarmeier.org>
> Sent: Tuesday, May 04, 2004 12:59 PM
> Subject: Campaign Contributions
>
>
> > To Whom It May Concern:

> >
> > If I wanted to make a contribution by check, who do I make the check out
> to
> > and to what address would I send the check? We have members who are
> > interested in this race. Thanks for your help.
> >
> > Regards,
> >
> > Matt Fullenbaum
> > Assistant Director of Communications
> > American Tort Reform Association (ATRA)
> > 1101 Connecticut Ave., NW
> > Suite 400
> > Washington, DC 20036
> > Phone: (202) 682-1163 x17
> > Fax: (202) 682-1022
> >
> >
>
>



**KARLIE KLOSS MAKES TIME TO READ THE WALL STREET JOURNAL.**

FIND OUT WHY

THE WALL STREET JOURNAL.
Read ambitiously

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/SB100015411979219346

LEADER

# Business Lobby Recovers Its Clout By Dispensing Favors for Members

By JIM VANDEHEI Staff Reporter of The Wall Street Journal
Updated Sept. 11, 2001 12:01 a.m. ET

WASHINGTON -- Last summer, Philip Anschutz, chairman of Qwest Communications International Inc., wanted to defeat legislation that could have prevented his company from expanding overseas. But the billionaire investor, who shuns publicity, preferred to keep a low profile.

Enter Thomas Donohue, president of the U.S. Chamber of Commerce. Mr. Donohue, who considered Mr. Anschutz a potential $1 million donor to the chamber, eagerly proposed a solution: His organization would step up its efforts to derail the legislation, and it would keep Mr. Anschutz and his associates fully informed.

It wasn't the first time Mr. Donohue had helped a corporate chieftain out of a jam. By selectively offering such personalized assistance, the 62-year-old executive has transformed the way the nation's flagship business organization does business. Since taking over the U.S. Chamber of Commerce four years ago, he has more than doubled the group's fund-raising tally to $100 million annually. His most striking innovation has been to offer individual companies and industries the chance to use the chamber as a means of anonymously pursuing their own political ends.



EXHIBIT

Donohue 119-15

Internal chamber documents reviewed by The Wall Street Journal show that the organization has created several special accounts to take in money for projects on behalf of individual companies or groups of companies with a common policy goal. In some cases, the money is spent just days after it comes in the door. The chamber, like many nonprofit organizations, isn't required to report the sources of its funding, which makes it an attractive vehicle for those such as Mr. Anschutz who sometimes like to operate under the radar. Mr. Anschutz couldn't be reached for comment.

Mr. Donohue, who is 62 years old, defends the chamber's special projects, saying all of them are consistent with the organization's pro-business mission and its role as an advocate for the American business community at large. And, he adds, none of them conflict with the interests of any of the chamber's 150,000 dues-paying member companies. "The chamber is not for sale," Mr. Donohue says, though he adds that he is constantly marketing its lobbying and legal services to companies who could use them.

Many companies are buying. Last fall, for example, Wal-Mart Stores Inc., DaimlerChrysler AG, Home Depot Inc. and the American Council of Life Insurers all kicked in $1 million each for one of the chamber's special projects: a TV and direct-mail advertising campaign aimed at helping elect business-friendly judges. The participants had all been targets of costly lawsuits, and the chamber's campaign gave them a way to fight back -- without disclosing their identities. That allowed them, among other things, to avoid attracting the attention of the nation's trial lawyers, who were spending millions of their own to help elect plaintiff-friendly judges.

## 'Fixing' the System

Wal-Mart spokesman Tom Williams says his company joined the campaign because "we're always looking for ways to drive down costs for our business and save money for our customers." He says that the fact that Wal-Mart's sponsorship of the ads wouldn't be made public didn't figure into its decision. Nor did the prospect of anonymity sway the ACLI, says Phil Anderson, a spokesman for the Washington-based trade group. Rather, he says, the group wanted to "get people to make different political decisions" and "fix" the legal system.

"Finally," says Mr. Donohue, the "business community is finding out" that class-action lawsuits are "sucking the vitality out of their ability to develop products and do business" without ending up in court. "And somebody -- thank you very much -- was smart enough to organize" the campaign.

Although Mr. Donohue promised contributors anonymity in the effort, some balked. General Motors Corp. , which contributed $250,000 to defeat product-liability legislation, "told them that our [money] cannot be used in judicial races," says GM spokesman William H. Noack. "We did not think it was appropriate," because GM doesn't typically contribute such "soft money" to political campaigns.

Still, Mr. Donohue raised more than $5 million for judicial campaign ads in Michigan, Mississippi, Ohio, Indiana and Alabama. Many of the targeted judges had rendered verdicts against one or more of the companies contributing to the effort. In Mississippi, where the chamber spent about $1 million on the state's Supreme Court elections, it still is engaged in a court battle to protect the identities of its donors.

In mid-September, a few weeks after the money earmarked for the judicial races starting rolling in, Bruce Josten, one of Mr. Donohue's closest colleagues, approached more than a dozen pharmaceutical companies. He asked them each to pony up a sizable sum of money to run a separate set of ads under the chamber's banner. The idea was to help defend the views of GOP candidates that sided with the industry in the debate over a Medicare prescription-drug benefit.

At the time, Democrats were pounding Republican candidates and the drug industry for not supporting the initiative, which could have lowered drug prices as well as drug-company profits. The industry, arguing that the legislation would kill its incentives to invest in new drugs, struck back, launching a series of ads through its trade group. But many GOP leaders considered the ads ineffective. Mr. Josten says he offered drug-company executives a "better messenger" -- the chamber. The idea that the chamber would seem to be a less self-interested spokesman than the drug trade association wasn't a "tough sell," he adds.

See a list of contributions and expenditures for two funds run by the U.S. Chamber of Commerce.

Eleven drug makers, including Merck & Co. and Bristol-Myers Squibb Co. , contributed $1.22 million each to the campaign, internal chamber documents show. Schering-Plough Corp., which isn't a member of the chamber, chipped in a similar amount. The companies were asked to wire the money to the chamber, which, in turn, paid media-buying companies to place the TV ads under "the U.S. Chamber of Commerce" logo. The chamber collected a total of $15 million between Sept. 29 and Oct. 27, as the ads began airing.

The pharmaceutical companies would neither confirm nor deny that they contributed to the campaign. Ronald Asinari, a spokesman for Schering-Plough says his company "supports programs that facilitate public debate of new ideas that best represent the company's point of view."

GOP strategists say the chamber's ads helped Republican candidates -- Reps. Ernie Fletcher of Kentucky and Mike Rogers of Michigan, for example -- win in several House and Senate races where health care was a major issue. The ads also helped the candidates focus their own spending on other issues.

## 'Good for Getting It'

Mr. Donohue says the chamber's political campaigns benefit all chamber members because the money is spent on pro-business initiatives. "We gave them a means to do this. We gave them a mechanism to do this. We showed them that we have the courage to do this," he says. As for the fund raising, says the sharp-tongued Brooklyn native, "I'm good for getting it."

Indeed, fund raising has been an important part of Mr. Donohue's crusade to re-establish the chamber as an influential player here in Washington. The group's prestige reached its peak during the Reagan years, because of its zealous support for the president's supply-side economic program. But by the mid-1990s, the group's clout had waned. Many of its allies trace the low point to 1994, when Richard Lesher, Mr. Donohue's predecessor, endorsed Hillary Clinton's ill-fated national health-care program, sparking a revolt among his members.

When Mr. Donohue, a former leader of the American Trucking Associations, took over the chamber in 1997 after Mr. Lesher's retirement, he pledged to dispel what he said was the chamber's image as "a sleeping giant, missing in action from many important battles."

Over the next few years, he hired a stable of lobbyists, mainly Republican aides to the GOP-controlled Congress, and a new team of policy experts. During the same period, the chamber started to draw a growing percentage of its members and contributors from among the nation's biggest companies. Those companies helped the chamber raise $35 million in 2000 for general operations, up sharply from $3 million four years ago, and kicked in another $20 million for special projects.

Mr. Donohue has benefited along the way. He says his salary this year will top $1 million, about twice that of his predecessor. The chamber also will spend another $1 million this year to lease and run the eight-seat private jet that it keeps at Mr. Donohue's disposal under terms of his contract. The executive, who rides around Washington in a chauffeured Lincoln, is known for throwing some of the city's most lavish parties on the chamber's behalf. At one recent fete at the National Building Museum, pop star Bruce Hornsby provided the entertainment.

Late last year, Mr. Donohue landed a seat on the Qwest board and stock options in the company worth $750,000. He also sits on the boards of Sunrise Assisted Living Inc., XM Satellite Radio Holdings Inc. and Union Pacific Corp. "I operate at the same level as CEOs. They expect me to be on boards," Mr. Donohue says.

Mr. Donohue feels he has become so visible that he pays security companies to sweep his house, office and business cars for wire-tapping devices as often as twice a year. He fears that trial lawyers or agents from China or Cuba might be trying to listen in on his conversations.

## 'Tools' of the Trade

Mr. Donohue says his plane and parties are little more than tools to help him raise more money and make the chamber the most powerful business lobby in town. "Are we more powerful? Damn right we are," he says. The chamber, he adds, continues to spend the vast majority of its money on bread-and-butter issues that appeal to most of its members: freer trade, lower taxes and regulatory and legal reform. But he makes no apologies for the group's aggressive efforts on behalf of some of its deepest-pocketed constituents.

Take, for example, its service to Ford Motor Co. and other major auto makers in the wake of last year's recall of 6.5 million Firestone tires. Firestone tire failures on Ford Explorer vehicles had been implicated in the deaths of more than 100 Americans. The fatalities inspired a fervent crusade by GOP Sen. John McCain of Arizona, among others, for legislation to subject certain manufacturers of defective products to criminal penalties.

The legislation could have exposed the auto makers to billions of dollars in new lawsuits and might have influenced product-liability cases in other industries. Mr. Josten, the chamber's executive vice president, reached out to the Alliance of Automobile Manufacturers, the Rubber Manufacturers Association, which represents tire makers, and lawyer Victor Schwartz, who represented tire maker Bridgestone-Firestone Inc. to develop a response.

Mr. Josten and his colleagues mounted a fierce lobbying effort against the McCain bill and helped convince their GOP allies in the House to introduce an alternative that provided business with far more protection from lawsuits. The alternative measure was signed into law by President Clinton six days before the 2000 election.

The successful campaign was run out of the chamber's Institute for Legal Reform, which, according to internal documents, has received $250,000 from GM, $200,000 from Toyota Motor North America U.S.A. Inc., $150,000 from Ford and $50,000 from DaimlerChrysler. Ford felt it would be "more effective to work with a broad-based coalition of companies" with common interests rather than on its own, says company spokeswoman Ellen Dickson.

Several manufacturers and insurance companies also contributed to the Institute for Legal Reform. Wal-Mart and insurer Aegon USA Inc., for instance, each kicked in $1 million, while State Farm Mutual Automobile Insurance Cos. contributed $500,000. Sen. McCain credited the institute with persuading GOP senators to keep his bill from ever reaching the floor.

## Raised Eyebrows

Around the same time, the chamber's campaign on behalf of Mr. Anschutz was in full swing. It was urging lawmakers to reject a bill introduced by Sen. Fritz Hollings, a South Carolina Democrat, that would have barred partially state-owned foreign companies, such as Deutsche Telekom AG, from merging with a U.S. telecom firm. Mr. Anschutz's Qwest was among several companies that had expressed interest in merging with Deutsche Telekom.

At first, Mr. Donohue's decision to oppose the legislation "raised a lot of eyebrows" at the chamber, says one of the organization's senior officials. The chamber typically avoids taking a position that could hurt any of its members, and cross-border telecom mergers were likely to produce both winners and losers. But Mr. Donohue says he felt that global expansion was good for the entire telecom industry, not just the handful of companies involved in the Deutsche Telekom talks.

For help, Mr. Donohue approached the companies involved in the talks. Deutsche Telekom rebuffed his appeal for a donation. But VoiceStream Wireless, which was in advanced negotiations with the German company, agreed to join the chamber and gave it $100,000. Qwest joined, too, and kicked in $100,000. Spokesmen for both companies said their contributions weren't related to the lobbying campaign.

In early October, Mr. Donohue got AFL-CIO chief John Sweeney to join him at a news conference to denounce the legislation as bad for the U.S. economy. That left the measure as good as dead. Deutsche Telekom completed its merger with VoiceStream earlier this year.

Mr. Donohue is still hoping to talk $1 million out of Mr. Anschutz and dozens of other business leaders. "We're only about a third of the way of where we are going to get before I get out of here," says Mr. Donohue. "We're going to get bigger [and] stronger."

Write to Jim VandeHei at jim.vandehei@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

http://www.wsj.com/articles/SB100015411979219346

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

**IBRT Civil Justice Task Force and General Meeting Agenda**
**Thursday, December 16, 2004**

1.  **Judicial Elections – 2004**

Undoubtedly, the most significant development on the civil justice reform front in Illinois was the election of Justice Lloyd A. Karmeier to the Illinois Supreme Court. IBRT members played a major role in this campaign, contributing or helping raise hundreds of thousands of dollars in a judicial election that earned the distinction – dubious, certainly – as the most expensive judicial election in U.S. history. While final spending reports have not yet been made, it appears as if both sides in this contest spent in excess of $4 million.

While it would be an overstatement to describe the election as a contest "between good and evil," it clearly was a battle between the forces supporting civil justice reform and those who oppose reform and defend the status quo, particularly as justice is applied in Madison and St. Clair counties.

Many analysts have called the election a referendum on medical malpractice reform, or a referendum on tort reform, or a referendum on trial lawyer control of the courts. In truth, it was a combination of all, and probably many other factors, including the negative tone initiated by the Democratic candidate.

There is no doubt that the current medical malpractice problem facing Illinois was a factor. While the Illinois Business Roundtable and Illinois Civil Justice League and many of our allies have been working for class action reform and for asbestos reform for years, the more recent medical malpractice crisis helped generate an anger among Southern Illinois voters who were distressed, fearful and angered as they watched local doctors close their practices because of the high cost of malpractice insurance.

The combination of these issues and two very different candidates: one a former Madison County trial lawyer and the other a conservative, soft-spoken judge from Washington County, set the stage for an intense battle.

IBRT members rose to the challenge. Contributing directly to Citizens for Karmeier, or indirectly through the Illinois Civil Justice League and its political action committee, JUSTPAC, IBRT's presence was felt. JUSTPAC, which was the largest contributor to the campaign for Justice Rita Garman in 2002 with about $70,000, raised more than $1.4 million and contributed more than $1.2 million to the Karmeier effort. The US Chamber of Commerce also played a major role, contributing more than $2 million, most of it contributed through the Illinois Republican Party for use in the Karmeier campaign.

Other Illinois organizations, including the Illinois Manufacturers Association, Illinois Coalition for Jobs, Growth and Prosperity, Illinois State Medical Society, Illinois

IBR0103

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

Hospital Association and Illinois Chamber of Commerce played significant roles in the campaign.

The significance of the election is substantial, for many reasons.  One of the first tasks Justice Karmeier faces is filling vacancies on the appellate and circuit courts in Southern Illinois.  The Illinois Constitution gives that authority to the Supreme Court and the Court traditionally defers to the Justice from the district with the vacancy.  One of Justice Karmeier's first vacancies will be the one created by the rejection of former Appellate Judge Gordon Maag, who sought retention to his Appellate seat in addition to his campaign for the Supreme Court.  He lost both.

Justice Karmeier's election also changes the balance on the Supreme Court, which is now four Democrats and three Republicans.  Three of the Democrats (Justices McMorrow, Freeman and Fitzgerald, all of Cook County) are generally reasonable on business issues and civil justice issues so the Court should be a much more business-friendly court for at least the next six years (the next election is in 2010).  The election of Justice Karmeier adds a very understanding justice while removing a very hostile justice, as the Fifth District seat has been for more than three decades.

Finally, the election has sent a clear warning to other judges in Southern Illinois.  It can no longer be said that a bad judge cannot be removed from the court; it can no longer be said and assumed that the voters are going to tolerate an unfair judicial system.  And it can no longer be said that Madison County voters will not vote against the plaintiffs' bar.  Justice Karmeier carried Madison County easily and there is no doubt that voters throughout Southern Illinois are pleased with the muscle they flexed.

**2.      Prospects For The Future**

The IBRT expects to continue to work closely with the Illinois Civil Justice League as it prepares for another round of elections in 2006.  Among the highest judicial election priorities will be electing the judges who will be appointed by Justice Karmeier.  The appointments are until the next election and it is certain that the trial lawyer community will do everything possible to neutralize the major loss they suffered this year.

In addition, there are likely to be other judicial vacancies throughout Illinois.  While many good judges may be seeking retention in 2006, some who are not quite so good may also be on the ballot and the movement to correct our judicial system will continue.

**3.      Legislative Activity -  Congress Will Continue To Try**

 The new Congress is likely to revisit three contentious civil justice reform issues when it reconvenes for the New Year but the addition of several Republican seats in the US Senate is no guarantee that there will be any more progress than was achieved in the Republican-controlled Senate during the last Congress.

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

Class action reform, medical malpractice reform, and some agreement on an asbestos trust fund seem to be on the front page of most federal agendas but reform leaders have assumed they were on the verge of success many times before and it would not be wise to assume that any progress will be made in 2005. An agreement on an asbestos trust fund seems most likely to be achievable.

### 4.     Legislative Activity – Illinois Hasn't Improved  Either

While the prospects for reform in Washington aren't glowing, they are even dimmer in Illinois as hostile leadership in both the Illinois Senate and Illinois House are certain to block any significant civil justice reform. Some "solution" to the medical malpractice problem is likely to surface but the actual benefit of any such solution will be dubious if it is achieved with the approval of the plaintiffs' bar.

The IBRT's Civil Justice Task Force will continue to work with the Illinois Civil Justice League in developing our 2005 legislative agenda. Among likely legislative proposals are a venue reform bill (designed to prevent forum shopping); a jury service reform bill; and a proposal to require justification for amounts awarded for "pain and suffering" in personal injury cases. The venue reform bill would replace the class action reform bill proposed in 2003. It would include the same basis provisions but would not be limited to class action cases.

### 5.     Our Class Action Rule Change Petition To Illinois Supreme Court

In January, the Illinois Supreme Court Rules Committee will consider a proposed new rule which the IBRT and other organizations and corporations have proposed. The new rule would establish new requirements for filing class action cases in non-appropriate venues. It is anticipated that the Illinois State Bar Association will oppose the proposal but there are enough open-minded members of the Rules Committee to assure a good discussion of the proposal. In addition to the IBRT, other petitioners include the Illinois Manufacturers Association, Illinois Chamber of Commerce, Illinois Civil Justice League, Allstate Corporation, Bank One, Baxter International, Boeing Corporation, Caterpillar Inc., State Farm Insurance Companies, Walgreen Company, and several individual attorneys.

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

September 4, 2003

*9/11/03 - Post Pocket*

To:        Edward Rust, Chairman, Illinois Business Roundtable

From:      Ed Murnane, President, Illinois Civil Justice League

Subject:   Report on 2004 Judicial Elections

**2004 Judicial Elections.** Although the 2004 General Election is almost 14 months away, the Illinois Civil Justice League and the IBRT Task Force have been spending an increasing amount of time on the judicial elections, particularly in the Fifth Judicial District, which includes 37 Southern Illinois Counties, including Madison and St. Clair. The Fifth District has the only Supreme Court election in Illinois in 2004 (and in fact, this is the final Supreme Court election scheduled in Illinois until 2010).

The 2004 election involves a significant step forward for the ICJL's judicial election participation. In previous years, including the Supreme Court elections in 2000 and 2002, the ICJL endorsed candidates who had been selected through the political parties and the primary election process. In 2004, we have moved considerably forward and the candidate of choice for the Supreme Court in the Fifth District is a candidate we recruited after an extensive search both within the Republican Party and outside the party. (Note: The ICJL does not consider itself to be Republican; we have endorsed and supported (financially and otherwise) Democratic judicial candidates and we will continue to do so.)

Our candidate is **Judge Lloyd A. Karmeier**, a circuit court judge from Washington County. He is a former Washington County State's Attorney and has been on the bench since 1986. He is 63 and grew up in Washington County, which is just east of Madison and St. Clair Counties. The county seat is Nashville, Illinois.

While there were several other Republicans in the Fifth District who had contemplated a Supreme Court candidacy, they have been discouraged by (1) Judge Karmeier's stature and qualifications; (2) the support and active involvement of the Illinois Civil Justice League (which translates into business and health industry support); and (3) the desire to "clean up" the mess in the Fifth District with a judge of impeccable integrity.

Upon review of his credentials, Judge Karmeier has received the endorsement of Senator Frank Watson and the other three Republican senators in Southern Illinois (including Senator David Luechtefeld who has agreed to serve as chairman of the Karmeier campaign); both Republican Congressmen serving the district, John Shimkus and Tim Johnson, and the two Republican State Central Committeemen. We cannot guarantee that a "maverick" Republican candidate will not enter the primary, nor that the powerful plaintiffs' bar in the district will run a candidate, but we are confident at this stage that Judge Karmeier will have solid Republican support.

He is likely to have strong independent and significant Democrat support from voters outside Madison and St. Clair Counties who agree that change is needed.

The likely Democratic candidate for the Supreme Court seat is Appellate Judge Gordon Maag of St. Clair County. A practicing plaintiff's lawyer before becoming a judge, Judge Maag is one of three Illinois Appellate judges who lists his membership in the Illinois Trial Lawyers Association on his official court biography.

IBR0106

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

In addition to the Supreme Court election, there will be at least one contested **Appellate Court** race in the Fifth District. The seat previously held by Philip Rarick before he was appointed to the vacancy on the Supreme Court will be on the ballot. Rarick is from Madison County.

There could be a second open seat if Maag vacates his seat to be a candidate for the Supreme Court. There is some speculation that Maag could run for the Supreme Court and seek retention to his Appellate seat at the same time.

We have been working to find a qualified and respected Democrat to enter the Appellate race for the vacant seat and we have been in discussions with a judge from Mt. Vernon (Jefferson County) who is considering it (and also considering running as an independent). We would like to be competitive (and win) the Appellate seat as well as the Supreme Court seat and it would be politically advantageous to be supporting both a Republican and a Democrat candidate.

After the dust settles on candidate announcements and filings, we will assess the prospects of removing judges who are seeking retention in 2004. Although it is not easy, there may be an opportunity to convince voters that a "clean sweep" is needed.

This is going to costly. The ICJL is launching its fund-raising effort for our PAC this month. We are trying to raise $1 million. We also have advised the Karmeier campaign that it should try to raise at least $1 million. We will provide assistance to that campaign in that effort and already there are plans for several fund-raising events in the Fifth District, including one in Madison County.

There are other judicial elections in Illinois next year but they are a distant second to the opportunity we have in the Fifth District. There is an open Appellate seat in the Third District and we are looking for a good Republican candidate. State Rep. Mary K. O'Brien has announced her intentions to run for the Democratic nomination.

There are other Appellate seats that could open if judges who are eligible for retention next year decide to retire. Those decisions must be announced between now and December.

IBR0107

January 12, 2007 **10-A**

To: ICJL Executive Committee

From: Ed Murnane

Subject: **Proposal To Expand Executive Committee**

The ICJL by-laws provide for an Executive Committee to supervise the day-to-day operations of the ICJL. In 1993, the Executive Committee designated the president of the ICJL to serve as chairman of the Executive Committee and to conduct the day-to-day activities of the ICJL.

The number of members on the Executive Committee is not specified and through the years, the number has fluctuated from nine to 15. It has been the intention to have an Executive Committee that represents the various interests represented in the ICJL coalition.

At the present time, we have ten members. They are:

1. Illinois Civil Justice League president
2. Illinois Business Roundtable representative
3. Illinois State Medical Society representative
4. Illinois Chamber of Commerce representative
5. Illinois Government Association of Pools representative
6. National Federation of Independent Business representative
7. Caterpillar Inc. representative
8. Pfizer Inc. representative
9. State Farm representative
10. CNA Financial and insurance representative.

As most of you know, we do not ask of lot of our Executive Committee members, at least in terms of time and meetings. We do communicate fairly regularly, often 3-4 times per week.

Because some members are not always available and because participation on the Executive Committee provides diversity for the ICJL, I am proposing that we expand the Executive Committee from the present ten members to 15, effective as soon as is convenient.

I am proposing that the new members represent:

11. Representative of American Tort Reform Association
12. Representative of Civil Justice Reform Group
13. Representative of American Justice Partnership
14. Representative of Institute for Legal Reform at US Chamber of Commerce
15. Representative of Illinois Hospital Association (or hospital community in Illinois)

As the four national entities are among the most prestigious (and supportive) civil justice reform organizations, I believe it would enhance ICJL's standing and potentially lead to additional support and involvement. The hospital industry has been missing from the ICJL Executive Committee for several years and should be invited back.

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS


MARK HALE, et al.,                    )

                Plaintiffs,     ) Case No.

          vs.                    )3:12-cv-00660-DRH-SCW

STATE FARM MUTUAL                     )

AUTOMOBILE INSURANCE CO.,             )

et al.,                               )

               Defendants.     )




THE VIDEOTAPED DEPOSITION

OF

EDWARD MURNANE

October 27, 2015




Reported By:

Juliana F. Zajicek

CSR No. 84-2604

Ref: 15100

1          MR. BARRETT:  So yes.

2     BY MR. CLIFFORD:

3          Q.    Take a look at that, Ed, referring you

4     to the first one.  What's the number?

5          MR. RIDDLE:  It is 35.

6     BY MR. CLIFFORD:

7          Q.    You were coordinating -- remember in the

8     early part of our discussion today, you talked

9     about how you would be coordinating, you told

10    Carter Hendren you would be taking care of the

11    coordination for the dollar -- the funds that were

12    being raised?

13              This is part of that, isn't it, where

14    you are giving Rob Engstrom advice about how to

15    stay below the one-third threshold for sponsoring

16    entities?

17         MR. JORGENSEN:  Objection to form and

18    mischaracterizes testimony.

19    BY THE WITNESS:

20         A.    Well, I think this would suggest a

21    question was asked and I was answering the question

22    based on my knowledge.

23    BY MR. CLIFFORD:

24         Q.    Well, let's be clear about something.

| From: | Cliff Pintak <cpintak@mpgh.com> |
|---|---|
| Sent: | Monday, June 28, 2004 8:46 PM |
| To: | Ed Murnane <emurnane@icjl.org>; Steve Tomaszewski <sgtjad@charter.net> |
| Subject: | Pintak powerpoint |
| Attach: | ICJL70104.ppt |

Ed/Steve,

I've adapted and slimmed down the ppt I used at our last meeting in Madison County for use this Thursday. A copy is attached for your review/comment.

Ed,

Friday was the first I'd heard of the "donate more than 1/3 and you have a disclosure requirement" rule and I'm going to need to talk with Hantler about its impact shortly.

1) Have you confirmed that the 1/3 threshold is triggered on an annual basis? If not – what is the timeline? Every reporting period? Every quarter? Etc.

2) How much has JUSTPAC raised so far? So I can thumbnail quantify what 1/3 = in real dollars.

3) What part of the code is this – I'd like to be able to get my hands on it folks like Steve H are inevitably going to want to have their counsel examine it. This is a very important issue – that could dramatically hinder the amount of support we receive from certain groups -- I need to get Steve H and others smart on it ASAP.

Thanks,
Cliff

Murnane000890

| From: | Cliff Pintak <cpintak@mpgh.com> |
| Sent: | Sunday, September 19, 2004 12:59 AM |
| To: | Ed Murnane <emurnane@icjl.org> |
| Subject: | Re: Fw: JUSTPAC Projected Funds |

Ed,

Good luck w/Rob - be careful not to mention Hantler as the source of the ATRA money when you talk to Rob. Let me know how it turns out.

Good day of filming today but tomorrow's the tougher day when we see how good the judge will be talking to camera. I doubt I'll get out Sunday night so will likely be travling much of am Monday.

Cliff

On Saturday, September 18, 2004, at 01:02 PM, Ed Murnane wrote:

> Cliff,
>
> I thought I had better get a hard number in Rob's hands in case there is any misunderstanding on their part as to exactly where we are. The Illinois State Medical Society funds and the $125,000 from ATRA that you might not recognize are commitments I received on Friday, after our meeting.
>
> The second JOBS coalition contribution is what they plan to raise and spend, apart from the Hantler effort. They'll do it through JUSTPAC.
>
> Ed
> ----- Original Message -----
> From: Engstrom, Rob
> To: emurnane@icjl.org
> Sent: Saturday, September 18, 2004 11:56 AM
> Subject: Re: JUSTPAC Projected Funds
>
> Thanks very much ed for taking time to put this together. I'll call on mon and let's talk about this.
>
> Rob
>
>
>
> -----Original Message-----
> From: Ed Murnane <emurnane@icjl.org>
> To: Engstrom, Rob <REngstrom@USChamber.com>
> Sent: Sat Sep 18 12:36:28 2004
> Subject: JUSTPAC Projected Funds
>
> Rob,
>
> I am attaching a spread sheet showing my calculations of where JUSTPAC is right now, what we are virtually certain to received (minimally) between now and September 30, and what the US Chamber would be able to contribute and stay under the 1/3 "sponsoring entity" requirement.
>
> The yellow highlighted section shows major sources of funding we are anticipating. You'll note that there are several from ATRA: they are funds coming from various sources to ATRA which we expect to be passed on to JUSTPAC. Similarly, Illinois State Medical Society is making two separate contributions (one may be from the ISMS Insurance Exchange). The Illinois Chamber contributions are from sources that are being paid to the Illinois Chamber for the purpose of forwarding them to JUSTPAC. Same situation is true with the Illinois Jobs Coalition.
>
> This does not include other revenues that we are anticipating but can not confirm at this time.
>
> Based on the formula, we would have a total of $1,039,875 in receipts for the current reporting period.
>
> A "matching contribution" of $519,937 would bring the total to $1,559,813.
>
> One-third of that total would be $519,937.50 so a "matching" contribution could not exceed that amount.
>
> One significant point: without that "matching" contribution, ATRA would be slightly higher than one-third so they would have to reduce their level of support.
>
> As far as timing is concerned, we obviously would like to begin buying time (we already are paying for production) as quickly as possible. But for it all to work, we would need any matching funds by October 1; the reporting period ends October 2. We'll also need to know if we need to make some

Murnane000937

adjustments in the final days to keep all contributors within the one-third range.

I'll be happy to discuss this in greater detail at your convenience.  Thanks for your continued support.

Ed Murnane

Murnane000938

| From: | Cliff Pintak <cpintak@anpgh.com> |
|---|---|
| Sent: | Sunday, September 19, 2004 12:59 AM |
| To: | Ed Murnane <emurnane@icjl.org> |
| Subject: | Re: Fw: JUSTPAC Projected Funds |

Ed,

Good luck w/Rob - be careful not to mention Hantler as the source of the ATRA money when you talk to Rob. Let me know how it turns out.

Good day of filming today but tomorrow's the tougher day when we see how good the judge will be talking to camera. I doubt I'll get out Sunday night so will likely be travlling much of am Monday.

Cliff

On Saturday, September 18, 2004, at 01:02 PM, Ed Murnane wrote:

> Cliff

> I thought I had better get a hard number in Rob's hands in case there is any misunderstanding on their part as to exactly where we are. The Illinois State Medical Society funds and the $125,000 from ATRA that you might not recognize are commitments I received on Friday, after our meeting.

> The second JOBS coalition contribution is what they plan to raise and spend, apart from the Hantler effort. They'll do it through JUSTPAC.

> Ed
> ----- Original Message -----
> From: Engstrom, Rob
> To: emurnane@icjl.org
> Sent: Saturday, September 18, 2004 11:56 AM
> Subject: Re: JUSTPAC Projected Funds

> Thanks very much ed for taking time to put this together. I'll call on mon and let's talk about this.

> Rob

> -----Original Message-----
> From: Ed Murnane <emurnane@icjl.org>
> To: Engstrom, Rob <REngstrom@USChamber.com>
> Sent: Sat Sep 18 12:36:28 2004
> Subject: JUSTPAC Projected Funds

> Rob,

> I am attaching a spread sheet showing my calculations of where JUSTPAC is right now, what we are virtually certain to received (minimally) between now and September 30, and what the US Chamber would be able to contribute and stay under the 1/3 "sponsoring entity" requirement.

> The yellow highlighted section shows major sources of funding we are anticipating. You'll note that there are several from ATRA; they are funds coming from various sources to ATRA which we expect to be passed on to JUSTPAC. Similarly, Illinois State Medical Society is making two separate contributions (one may be from the ISMS Insurance Exchange). The Illinois Chamber contributions are from sources that are being paid to the Illinois Chamber for the purpose of forwarding them to JUSTPAC. Same situation is true with the Illinois Jobs Coalition.

> This does not include other revenues that we are anticipating but can not confirm at this time.

> Based on the formula, we would have a total of $1,039,875 in receipts for the current reporting period.

> A "matching contribution" of $519,937 would bring the total to $1,559,813.

> One-third of that total would be $519,937.50 so a "matching" contribution could not exceed that amount.

> One significant point: without that "matching" contribution, ATRA would be slightly higher than one-third so they would have to reduce their level of support.

> As far as timing is concerned, we obviously would like to begin buying time (we already are paying for production) as quickly as possible. But for it all to work, we would need any matching funds by October 1; the reporting period ends October 2. We'll also need to know if we need to make some

Murnane000937

adjustments in the final days to keep all contributors within the one-third range.

I'll be happy to discuss this in greater detail at your convenience.  Thanks for your continued support.

Ed Murnane

Murnane000938

**PA1963**

1

**Illinois Civil Justice League**

July 18, 2011

To:        ICJL Executive Committee, and selected ICJL Supporters

From:      Ed Murnane

Subject:   July 21 Executive Committee Meeting Discussion Points

As all of us have discussed, the July 21 meeting is more of a planning and discussion meeting, rather than a "take action **now**" meeting.

We have a number of decisions to make over the course of the next few months and I think it is important – critical? -- that we begin this discussion now to allow sufficient time for reaction, clarification and other proposals.  I do think it is important for us to reach several major agreements **by October** of this year to enable ICJL (and JUSTPAC) to focus adequate attention on fund-raising for JUSTPAC's efforts in 2012.  Changes in the campaign spending laws in Illinois limit the contribution levels during each calendar year. An interpretation of the new rules **is attached.**

We have invited several major figures in the national civil justice reform movement to attend this meeting because they are very interested in the future of the Illinois Civil Justice League and because ICJL needs to be very aware and responsive to their interests.

Expected to attend are Tiger Joyce, President of the American Tort Reform Association, and Kevin Watson, of the Institute for Legal Reform at the U.S. Chamber of Commerce.

In addition, we expect Doug Whitley, president of the Illinois Chamber of Commerce, to attend, representing Todd Maisch of ISCC who has served on the ICJL executive committee for more than ten years.

What follows is my assessment of where we are and the decisions that need to be made.

**But first, some history.**

ICJL was established by the Illinois Business Roundtable in late 1992.  The IBRT was frustrated by the inability of the business community in Illinois to enact any meaningful (and lasting) "tort reform" legislation in Illinois.  The primary focus was on product liability reform at that time.  Leaders of the IBRT were familiar with the successes they had seen and experienced in Texas since the creation of the Texas Civil Justice League.

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

2

They wanted to try to do the same thing in Illinois and, in fact, invited TCJL president Ralph Wayne to meet with them to share his thoughts on what could be done and how to do it.

A decision was made to create a similar broadly-based coalition in Illinois and discussions were held as to how to do it and how to find a president or executive director to build and lead a new group. These discussions took place in late 1992 and in fact, the organization was chartered and registered with the Illinois Secretary of State's office in December, 1992.

Coincidentally, this was at almost the exact same time as I was being "transitioned" out of my position at the White House in the George H.W. Bush administration. I would be leaving and returning to Chicago on January 20, 1993, when the Clinton administration began.

Rob Christie, who had been with FMC at the time (one of the major proponents and organizers of the ICJL) suggested that I might be good candidate for the leadership position. Rob knew that I had tort reform experience, media experience, and Springfield experience. Rob and I met while I was back in Chicago shortly after the election and after a series of subsequent meetings with other IBRT members, I was offered the position as president of the Illinois Civil Justice League.

Ed Noha, CEO of CNA Insurance, and W.H. Clark, CEO of Nalco Chemical Company, extended the offer on behalf of the ICJL. I accepted and was asked to start on February 1, 1993, 10 days after I left the White House.

The directive was clear: Build a broad-based coalition that would work to get "tort reform" passed in Illinois.

The IBRT provided initial funding, both as an association and by encouraging IBRT members to make initial contributions and pledge ongoing support.

Working together, we developed a list of other potential prospects, keeping in mind that it had to be a diverse coalition, not just a business group, but we needed to reach out to all the business organizations as well.

Our first goal was one of the most important organizations in Illinois, the Illinois State Medical Society, which generally had not worked in coalitions outside the medical community but they were frustrated with the inability to enact (and keep) medical malpractice reform legislation. I had developed contacts with a number of ISMS leaders through the years and they agreed to participate.

That decision by ISMS was probably the second most important action in ICJL history (after the IBRT's decision to form the ICJL). The involvement and blessing of ISMS opened the doors to many other Illinois organizations and entities. I had long-time political contacts with some, including Greg Baise at the Illinois Manufacturers Association, and Dave Vite at the Illinois Retail Merchants Association. We were able to convince them to participate and we began appealing to major corporations (and small businesses) to get involved. ISMS helped us recruit

ICJL001025
PA0002

3

several of the pharmaceutical manufacturers in Illinois and IMA helped us enlist some of their members.

The Medical Society was instrumental in helping recruit some of the major pharmaceutical firms, including Baxter and Abbott.

### Looking At 1994.

With the organization and recruitment process underway, the next step was to begin working on enacting tort reform legislation in Illinois and it was obvious that that was not going to happen with the present (in 1993) anti-business, pro-labor and pro-trial lawyer composition of the Illinois General Assembly.

While we tried to be "non-partisan," it was clear that in Illinois, as in most other states, Republicans were going to be our allies and Democrats would be the opposition.

The Illinois Senate was in Republican hands and appeared to be safe for at least the next six years, given the four-year terms Senators had.

The Illinois House was in Democrat control but going into the November, 1994 elections, there were 13 seats in which there was a remote chance to electing Republicans. We needed to win eight seats in order to win a Republican majority. We targeted all 13 seats and won 11, thus giving Republicans control of both chambers of the Illinois General Assembly for the first (and last) time in years.

> *We must give President Clinton and First Lady Hillary Clinton some credit for the hostile reaction to the Clinton medical reform proposal. They made it a more friendly battlefield in Illinois and elsewhere.*

Because we had made the need for tort reform a major issue in the 13 districts we targeted, it became a very high priority among Republican leadership in both chambers. In fact, leaders of the major members of the ICJL coalition, including ISMS, ISCC, IMA and others met during the Christmas holiday break with Senate President Pate Philip and incoming House Speaker Lee Daniels to discuss the strategy.

The issue was so important that it was one of the first addressed by the new General Assembly. House Bill 20 passed the Illinois on February 16, 1995, remarkably early in the legislative session, and it passed the Illinois Senate in early March and was signed into law by Governor Edgar on March 9.

### Tort Reform Passed; Job Finished

Thus the intent of the ICJL was fulfilled. Pass a comprehensive tort reform bill in Illinois. It happened.

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

4

The next challenge, however, was presented after Governor Edgar signed the bill when the first lawsuit challenging new Public Act 89-07 was filed (on the same day).

Other challenges followed in a plaintiff-friendly Illinois court system and it became obvious that significant and beneficial civil justice reform was not likely to become a reality unless an effort was made to change the thinking or the balance of the Illinois court system.

As a partisan election state, it was obvious what steps needed to be taken but in a state that had (at the time) virtually no restrictions on political campaign contributions, the task seemed immense, and generally it has been.

ICJL, through its political action committee, JUSTPAC, entered the judicial election arena in 1998 when we submitted questionnaires to judicial candidates and published responses in our e-mailed newsletter. We evaluated candidates based on their response to the questionnaire and to the assessments of our JUSTPAC members. We had a JUSTPAC executive committee that evaluated the screening results and recommendations of ICJL staff.

ICJL's involvement in judicial elections was generally successful. When we launched our **IllinoisJudges.net** website, and publicized it extensively, it attracted considerable media and public attention. In the weekend before the 2000 judicial election, there were more than 65,000 hits on the site as it was one of the only sources of information about judges available in Illinois. We included everything we could find, including candidate responses to our questionnaire, bar association ratings, newspaper endorsements, etc.

### Justice Lloyd Karmeier of Nashville, Illinois

The 2004 Supreme Court election was a milestone. Southern Illinois had been considered a Democrat (and trial lawyer) stronghold, with Madison and St. Clair Counties on the western border. The deep Southern Illinois counties border Kentucky, Missouri and Indiana on the Mississippi and Ohio Rivers. We felt we had to make an attempt to win the open seat (which Democrats thought would not be open after some of their typical manipulation). But it turned out their hand-picked candidate, Philip Rarick, suffered a stroke and was not going to be able to run so the seat would be an open seat and it provided an opening for us.

We scoured Southern Illinois for a Republican candidate and found one, Washington County Judge Lloyd Karmeier who was considering retiring. Former Illinois Senator Frank Watson deserves the credit for pointing us toward Judge Karmeier and it took several visits, including with Mrs. Karmeier, to convince him that we could help him build an organization and raise the funds that could help him get elected.

When Judge Karmeier agreed to run, there were four major reasons for his election:

1. He was even better as a candidate, judge and decent man than we had anticipated, and our expectations were high;

5

2. His opponent, former trial lawyer Gordon Maag, was arrogant, very rough around the edges and not considered a good lawyer/judge (he was on the appellate court) by the voting members of the Illinois State Bar Association;

3. We were able to raise money to compete with the trial lawyers, organized labor and Democrat establishment in Illinois. Fund-raising and campaign spending were almost equal between the two candidates;

4. At the time, Illinois – particularly Southern Illinois – was going through a medical malpractice crisis in which doctors were leaving the state because of the high cost of liability and the problem was particularly critical in Southern Illinois. Medical malpractice reform became a major issue in the race and doctor-members of the Illinois State Medical Society and a local doctor's group, SMASH, campaigned door-to-door for Judge Karmeier. Voters were actually enthused to have a chance to vote for a good, honest judge.

Not only did Karmeier win the election (and his performance during his six years on the Court has been as good or better than expected), we were also able to remove Maag from the appellate court by waging a last minute "Vote No" campaign on Maag. To some, that was just as satisfying as the election of Lloyd Karmeier to the Supreme Court.

### Karmeier Yes, McGlynn No, Wexstten, Yes.

The success we had with Lloyd Karmeier in 2004 did not carry into 2006 when one of his appointees to the Illinois Appellate Court in Southern Illinois was unable to hold on to the seat in the 2006 election. It's questionable if Steve McGlynn was the best candidate available but Justice Karmeier appointed him to fill a vacancy on the Appellate Court and there was no question he would be a good appellate justice.

(Note: someone who may be a good judge or appellate justice in Illinois may not be a good candidate.)

Another Southern Illinois challenge presented itself in 2008 when a Democrat judge from Mt. Vernon, James Wexstten, chose to seek the Democratic nomination for another appellate court seat in the Fifth District and he was challenged in the Democratic primary by the former president of the Illinois Trial Lawyers, Judy Kates. Kates was an aggressive and abrasive trial lawyer from St. Clair County who had attacked the Illinois Civil Justice League for our efforts on many occasions, including in the ITLA monthly journal while she was president.

Wexstten was a good, and relatively conservative, judge. ICJL had endorsed him in an earlier election and we knew he would be a good appellate judge, certainly in comparison with Judy Kates.

ICJL had not been actively * involved in Democratic primaries before but we got behind Wexstten, raised funds for him (we were responsible for his largest single contribution) and

ICJL001028
PA0005

6

appealed to Republicans and Democrats to vote for him in the Democrat primary, and he won. He later won the General Election and he has been a good Appellate Court justice. (Justice Wexstten spoke at the ATRA conference in Chicago in November, 2010.)

Depending on Justice Karmeier's plans in 2014, Wexstten would be a good choice for ICJL support for the Supreme Court seat in 2014.

### Justice Kilbride

And then there is Justice Kilbride – CHIEF JUSTICE KILBRIDE. If there is any judge in Illinois who can claim to have mastered the Illinois Civil Justice League, it is Thomas Kilbride of Rock Island whom we attempted to defeat in 2000 because we thought he would be terrible and whom we tried to remove in 2010 because he was even worse than we had envisioned. He now holds his Third District seat until 2020, if he wants it. He will serve as Chief Justice until 2013.

There were a variety of reasons for both losses to Kilbride. In 2000, his Republican opponent was a State Senator from Galesburg (Carl Hawkinson) who was chairman of the Illinois Senate Judiciary Committee but was a terrible candidate. Hawkinson lost what was considered to be (and should have been) a Republican seat forever.

There was no doubt that defeating Kilbride in his retention effort would be challenging. While a sitting judges needs to get a 60% favorable vote, removing him (or her) is not easy. Those who challenge the sitting judge run the risk of being in a terrible – and vulnerable – position if the removal effort fails. Major Republican leaders in Illinois either took a pass (such as former Governor Jim Edgar) or openly supported Kilbride's retention (such as former Governor Jim Thompson).

The Illinois Democratic Party, funded heavily by personal injury lawyers and organized labor, helped Kilbride raise over $3 million for his retention effort. JUSTPAC, ICJL's political action committee, raised and spent slightly more than $700,000.

### The Aftermath, and The Future

It is the post-Kilbride hang-over, . . . plus some changes in Illinois election law, . . . plus a weakening ICJL financial base, . . . plus some necessary structural and leadership changes . . . that prompts this July, 2011 meeting.

The intent is not to solve all the problems (or potential problems) but to address them and solicit comments and suggestions that can be turned into a solid plan for the ICJL by October, 2011.

October, 2011 is a critical date because IF a decision is made that ICJL should continue to participate financially in political campaigns, JUSTPAC must raise money before the end of

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

2011. There are new restrictions on campaign spending and it is no longer legal for JUSTPAC (or any political action committee) to accept huge contributions in an election year.

## THURSDAY'S AGENDA:

Here is the agenda for Thursday's meeting. It is more narrative than itemized.

### 1. Finances and Fund-raising

ICJL has increasingly depended on financing by large contributions from a handful of major contributors. Two contributors, the Civil Justice Reform Group and the Institute for Legal Reform of the U.S. Chamber of Commerce, accounted for 44% of 2010 funding ($250,000 of $572,000 and thus far in 2011, they have accounted for 61% of ICJL support.

This week, we are launching an appeal to all previous contributors asking for three-year commitment at same level of recent contributions (even take it at average of recent contributions). This year, next year (2012) and option on 2013.

The ICJL needs to overhaul our process/structure/expectations for financial stability. We need suggestions and guidance in how best to do it, and we need participation in the effort.

### 2. Objectives of ICJL

As described earlier, ICJL has continually expanded its mission through the years as the logical demands have increased. With an initial objective of "enacting tort reform," the first task was building a diverse coalition of tort reform supporters. When that was accomplished, the mission was to help elect a friendly Illinois General Assembly (while continuing to build the coalition). When that was accomplished (1994), the mission was to get reform legislation passed (1995).

When the Illinois Judicial system intruded, the mission expanded to put pressure on judges and work to elect smarter judges. That began in 1998 and continued through Supreme Court elections in 2000, 2002 and 2004 (the election of Justice Karmeier).

While all this was going on, ICJL continued to be involved in legislative activity with an aggressive reform agenda; it continued to be involved in legislative elections with legislative scorecards, support for selected legislative candidates, and a variety of other means.

ICJL also continued to expand its involvement in judicial monitoring and judicial elections -- including being named in two lawsuits.

> We also shared the pleasure of being subpoenaed by the Lakin Law Firm on the steps of the Madison County Courthouse. Three of the four recipients of subpoenas are expected to be present at our July 21 meeting.

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

8

The ICJL's mission grew in other ways too. Madison County has been a major center of judicial abuse and following the Karmeier election, and leading in to the 2006 judicial retention elections in Madison County, we developed a dialogue with Madison County judges, including new chief Judge Ann Callis, that showed some signs of progress. An obstacle to that progress was created in late 2009 when local Madison County trial lawyers, particularly the major asbestos firm, told the judges they should not continue the dialogue with the Illinois Civil Justice League and that a proposed conference we planned should NOT be held.

While that was a major setback to our dialogue, we did continue to meet with Judge Callis and with new asbestos Judge Barbara Crowder. Crowder has enacted some reforms in the conduct of the asbestos docket and we have not discussed them with her or Callis since our members who are most involved in asbestos cases have not fully analyzed and reacted.

If anything can be said about ICJL and Madison County, it is that we have caught their attention and they will engage in dialogue. No doubt, a major motivating factor is the upcoming judicial retention elections in 2012 in which Callis, Crowder and several others are on the ballot. They do not want a campaign against them and they are nervous after the Gordon Maag removal and most recently, the election of Dwight Kay to the Illinois General Assembly.

We had another opportunity to influence the Illinois judiciary in 2010 when we had a viable chance to remove an appellate judge who is likely to be the heir-apparent to Supreme Court Justice Bob Thomas (a Republican) when he retires. We could not get the financial support we needed in the Republican primary.

**3. Structure and Governance.**

When ICJL was launched in 1993, a prominent board of directors was listed on the letterhead but that quickly became a problem for some of our members because pressures were exerted on them to stay out of the tort reform battle. Some of our members chose to withdraw, at least publicly, and we have not had a full and public board of directors since 1994. Our Executive Committee, which had the overall responsibility for governing, was assembled to represent the various diverse interests of tort reform supporters, and also entities that could be helpful in recruitment, financing and participation in legislative battles.

There is no doubt the Illinois State Medical Society and Illinois Business Roundtable have been the most consistent "Since Day 1" participants. Other associations have played very active roles at some points and have faded away at others. The major corporation involvement (and support) has clearly been from State Farm, CNA and Caterpillar.

Nationally, CJRG and ILR have been major and very valuable financial supporters and the relationship we have had with ATRA has been very valuable and productive.

4. **Staffing and Future Leadership.**

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

9

ICJL has always been minimally staffed. When I was appointed president in January, 1993, there was one additional staff person, an administrative assistant-secretary. The League moved into a small office at 200 West Adams in Chicago. On occasion, we had summer helpers or part-time help during the year but in all cases, the staff people were related to ICL contributors or executive committee members.

I generally handed ICJL legislative activities in Springfield, working closely with our members on major legislative issues. There were countless meetings with Jeff Holden of the Medical Society and Greg Baise of IMA leading up to the enactment of the tort reform bill in 1995.

We had an office in Chicago, located close to the Illinois Business Roundtable. In an effort to reduce costs, we moved into space leased by the Illinois Business Roundtable and moved with IBRT when they moved into space with the Chicagoland Chamber of Commerce. When IBRT and the Chicagoland Chamber were moving from Wacker Drive to the AON building, we decided we really didn't need a full time office in the Loop so I began working out of a home office and Cristin Connerty, our administrative assistant, worked from an office in her home. When we needed conference space, we have been able to utilize space in one of our members' offices.

I was hired in 1993 at a salary comparable to what I was making at The White House. Health insurance coverage was provided by the ICJL's participation in a plan for association executives administered by the American Society of Association Executives. There was not a formal salary review process and in most of the early years, there was no plan for salary increases. Periodically, an increase would be granted and bonuses were paid on several occasions, including after the Karmeier election.

In 2007, a "phase-out" plan was proposed and accepted by the Executive Committee. It called for me to continue as ICJL president until March, 2014, my 70th birthday. In addition, it called for a 5% salary increase each year. Separately, the Executive Committee awarded me a $15,000 bonus but that was never fully paid because funds were not available.

My recent illnesses have slowed me down and clearly reduced my effectiveness for the Illinois Civil Justice League.

I am therefore proposing to the League that one option - - there may be others -- would be for me to split the time between now and March, 2014, in half – from 32 months to 16 months – and retire in November, 2012, following the election cycle.

That would get us through a major election cycle – if the ICJL determines to continue participation in elections -- and it would allow recruitment and transition.

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

10

I am not making a recommendation as to how that process should take place, nor am I making a recommendation on behalf of any single individual. Obviously, Al Adomite has worked hard and brings many talents to the ICJL and he should be considered.

Health permitting, I will work closely with any screening or recruitment process that is decided up and I will be willing and eager to offer my advice.

But I think it has to be up to the Executive Committee to decide the process as well as who a new president or leader should be.

Health permitting, I would be very interested in retaining a role with ICJL after 2012 as a consultant, writer, representative or senior statesman. That, of course, will be up to the new leadership.

### What's Next?

As I intend to indicate at the beginning of our meeting on Thursday, I don't think decisions are necessary on Thursday.

I think we need all members of the Executive Committee to offer their thoughts on all, or most, of the topics of discussion and those opinions/suggestions need to be shared with other members of the Committee.

I propose the answers to the following series of questions be submitted – by all of you, hopefully, by mid-September and they will be compiled and circulated to all in late September for review.

I further propose that an Executive Committee meeting be held in early October to implement any new plan and to discuss the next steps.

I think October is the latest we can go because IF a decision is made to keep JUSTPAC active and to continue to participate in elections, both actively and financially, we need to raise funds in 2011 and cannot wait until 2012 because of the changes in campaign spending rules.

I would also welcome – encourage – ATRA, ILR and CJRG to offer comments and suggestions, particularly based on their familiarity with the operation of other state coalition groups.

**Decisions We Need To Make:**

1.      Should ICJL continue as an independent organization, with members/supporters from various interests or should the civil justice reform movement become an arm of an existing Illinois organization?

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

11

2.     What role should ICJL play in the election process? Should the league play an active role in legislative elections, screening candidates on civil justice issues and possibly supporting candidates through endorsements and perhaps financially?

3.     Should ICJL continue – and even expand – its role in judicial candidate monitoring and screening, including candidate questionnaires, face-to-face interviews in some races? At all levels or only at the Supreme and Appellate levels? That would eliminate Madison, McLean, St. Clair and Cook from aggressive involvement. Should ICJL's role include candidate recruitment, evaluation and financial support? Should ICJL take a (or THE) lead role in judicial elections?

4.     Should ICJL continue to play an active role in legislative issues in Illinois, including proposing civil justice reform legislation, recruiting sponsors, aggressively lobbying and simultaneously working to block hostile legislation?

5.     Should ICJL get involved in gubernatorial elections, including endorsements?

6.     ICJL generally has participated in amicus briefs when asked by our allies. This usually involves only signing on, with no ICJL financial involvement. Usually, unless there is an obvious reason NOT to do it, we agree. Should we continue to do this or have a more formal (which could be more lengthy) process?

7.     What process should the executive committee establish for finding a new president?

8.     How can ICJL address the financial difficulties we have been having. Should there be a specific dollar amount for membership? Should we have a membership committee? How can we resolve this?

9.     Should there be specific term lengths for the ICJL executive committee, similar to ATRA.

10.    Should ICJL recruit non-Illinois specific interests to serve on the executive committee (i.e. Kevin Watson in California right now)?

11.    Does ICJL need a permanent, retained general counsel who has specific responsibilities to keep the organization out of trouble? (and comment on matters such as amicus brief participation, interpretation of election law, etc?

12.    What should ICJL do about funding? Should we reach out to the $5 and $10 contributor (which requires some work and effort) or should we concentrate on major contributors? This year alone, we have lost Met Life (an average of $20,000 per year); Pfizer (an average of $30,000 per year); and General Electric, and average of $15,000 per year and a seat on the ICJL's Executive Committee.

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

12

13.    Are we not communicating well enough?  One of the major issues – and it becomes a financial issue – is keeping major players (the Pfizers, Met Lifes, and Owens-Illinois) engaged in Illinois.

14.    Certainly there are other issues and questions that need to be addressed and resolved. They can be added to the discussion on Thursday or after.

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

# The Illinois Civil Justice League

## BYLAWS

**1**

### ARTICLE I

#### OFFICES

1.1 The Corporation may have offices at such places both within and without the State of Illinois as the Board of Directors may from time to time determine or the business of the Corporation may require.

1.2 The registered Agent of the Corporation within the State of Illinois and its Registered Office as stated in its Articles of Incorporation may be changed from time to time by a affirmative vote of the majority of the directors in office.

**2**

### ARTICLE II

#### MEMBERSHIP

2.1 Membership Classes. The corporation shall have two classes of members to be designated as "Members" and as "Associate Members," each to be comprised of those entities or individuals admitted by the Board of Directors as Members or Associate Members as herein provided. Each Member shall be obligated for the payment of initiation fees and dues, if any, as established by the Board of Directors and shall be entitled to one vote on each matter submitted to a vote of the Members. Associate Members may attend and participate in meetings of the Members, but shall not be entitled to vote at any such meeting. There shall be no duty to provide notice to any Associate Members of the holding of any meeting of the Members. Except as otherwise provided in these bylaws, Associate Members shall be entitled to the rights and privileges of Members of this corporation.

2.2 Admission of New Members and Associate Members. Any entity or individual may become a Member or Associate Member of this corporation upon approval by the Board of Directors and the payment of the initiation fee and dues, if any, established by the Board of Directors. As a prerequisite to the approval of any new Member of Associate Member, and in order to determine qualification therefor, the Board of Directors shall consider the particular impact the Illinois civil justice system has on the business endeavors of the prospective Member or Associate Member and the degree to which such prospective Member or Associate Member can contribute to the fulfillment of the purposes of this corporation.

2.3 Termination of Membership. The Board of Directors, by affirmative vote of two-thirds of all of the members of the Board, may suspend or expel a Member or Associate Member with or without cause and may, by a majority vote of those present at any regularly constituted meeting, suspend or expel any Member of Associate Member who shall be in default in the payment of dues for the period fixed in Article IX of these Bylaws.

1

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

Murnane014207

**PA0017**

2.4   Resignation.  Any Member or Associate Member may resign by filing a written resignation with the Secretary, but such resignation shall not relieve the Member or Associate Member so resigning of the obligation to pay any dues, assessments, or other charges theretofore accrued and unpaid.

2.5   Reinstatement.  Upon written request signed by a former Member or Associate Member and filed with the Secretary, the Board of Directors may, by the affirmative majority vote of the members of the Board, reinstate such former Member or Associate Member to membership on such terms as the Board of Directors may deem appropriate.

2.6   Transfer of Membership.  Membership in this corporation is not transferable or assignable.

3                                **ARTICLE III**

                          MEETINGS OF MEMBERS

3.1   Meetings.  All meetings of the Members for the election of directors shall be held at the registered office of the corporation or at such other place as the Board of Directors may fix from time to time.  Meetings of Members for any other purpose may be held at such time and place, within or without the State of Illinois, as shall be stated in the notice or in a duly executed waiver of notice.

3.2   Annual Meetings.  Annual meetings of the Members shall be held at such time as shall be designated by resolution of the Board of Directors.  The time of the annual meeting shall be fixed by the Board of Directors and included in the notice of the annual meeting provided to each Member in accordance with Section 3.4 of these Bylaws.  At each annual meeting of the Members, the Members shall elect a Board of Directors and shall transact such other corporate business as may be brought before the Members at that time.

3.3   Special meetings.  Special meetings of the Members may be called by the President, the Secretary, the Board of Directors, or the holder of not less than ten percent (10%) of the votes which may be cast at any meeting so called.  No question may be voted upon at a special meeting of the Members unless the notice of such meeting states that one of the purposes of such meeting will be to act upon such question except that the Members may waive such requirement in the manner hereinafter provided.

3.4   Notice of Annual and Special Meetings of Members.  Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purposes for which the meeting is called shall be delivered not less than five (5) days nor more than sixty (60) days before the date of the meeting, or in the case of a removal of one or more directors, a merger, consolidation, dissolution or sale, lease or exchange of assets, not less than twenty (20) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the officials calling the meeting, to each Member of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the Member at its address as it appears on the books of the corporation, with postage prepaid.  Such notice of the date, hour, and place, and, in the case of a special meeting, the purposes of the meeting of the Members may be waived by one or more Members by written waiver or waivers signed by the person or persons entitled to such notice, whether before or after the meeting, or in any other manner allowed by law.  Attendance at any meeting shall constitute a waiver thereof unless the person at the

2

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER                              Murnane014208
                                                                            **PA0018**

Jan 13 11 09:08a       Cristin Connerty                                          847-256-0936                    p.3

meeting objects to the holding of the meeting because of lack of proper notice. No notice of any regular or special meeting shall be required to be provided to Associate Members.

3.5   Quorum. The Members holding ten percent (10%) of the votes which may be cast at any meeting, represented in person or by proxy, shall constitute a quorum at a meeting of the Members.

3.6   Number of Votes Required and Manner of Voting at Meeting of Members. At a meeting at which the required quorum is present, the affirmative vote of a majority of the votes present and voted either in person or by proxy, and entitled to vote on the question under consideration, shall be the act of the Members unless a greater number of votes is required by law or by the Articles of Incorporation. A Member may vote either in person or by proxy executed in writing by the Member or the Member's duly authorized attorney-in-fact. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law. Cumulative voting is prohibited.

3.7   Informal Action by Members Entitled to Vote. Any action required by law to be taken or that may be taken at any meeting of the Members may be taken without a meeting and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by all of the Members entitled to vote with respect to the subject matter thereof. Such consent shall have the same force and effect as a unanimous vote of the Members and may be stated as such in any articles or documents filed with the Secretary of State.

4

## ARTICLE IV

### DIRECTORS

4.1   General Powers. The business and affairs of the corporation shall be managed by or under the director of its Board of Directors.

4.2   Number and Election of Directors. The Board of Directors of the Corporation shall not exceed forty (40) directors unless the number of directors is increased or decreased by amendment to the Bylaws. Any person that is twenty-one (21) years of age or over shall be qualified to serve as a director. Upon approval by the members, the directors may be divided into classes and the terms of the office need not be uniform. Each director shall hold office for the term for which the director is elected and until a successor shall have been elected and qualified.

4.3   Regular Meetings. Regular meetings of the Board of Directors shall be held one (1) time a year in Chicago, Illinois. Other regular meeting of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board of Directors.

4.4   Special Meetings. Special meetings of the Board of Directors may be called by or at the request of the President or a majority of the directors. The person or persons calling any such special meeting of the Board of Directors may fix the time and place either, within or without the State of Illinois, for the holding of such special meeting of the Board of Directors. If no designation is made, the place of the meeting shall be the principal office of the corporation.

4.5   Notice. No notice of any regular meetings shall be required to be provided to either current or prospective members of the Board of Directors. Notice of any special meeting shall be

3

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER                           Murnane014209

PA0019

Jan 13 11 09:09a        Cristin Connerty                                      847-256-0936                    p.4

given at least two (2) days prior to the meeting {twenty (20) days if one of the purposes of the meeting is removal of a director} by written notice delivered personally or mailed to each director at his residential or business address. Any director may waive notice of any meeting. The attendance of a director at a meeting shall constitute a waiver of notice of the meeting, except where a director attends a meeting for the express purpose of objecting to the transaction of any business because such meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

4.6    Quorum. A quorum for the transaction of business by the Board of Directors shall be one-third of the directors.

4.7    Proxy Votes. The directors may vote at any meeting of the Board of Directors either in person or by proxy (provided that each such proxy executed by a director shall be revocable and no such proxy shall be valid after three months from the date of its execution.)

4.8    Manner of Acting. The act of the majority of the directors present at a legally called or scheduled meeting of the Board of Directors at which a quorum is present shall be the act of the Board of Directors.

4.9    Change in Size of Board of Directors. The Board of Directors may be increased or decreased in size by a majority vote of the members of the Board of Directors. However, such vote shall not have the effect of removing a director or directors other than at the expiration of their term of office.

4.10   Removal. Any director may be removed from his position as a director at any time, for cause, by the affirmative vote of two-thirds of the Members present either in person or by proxy at a duly called special meeting of the Members, if notice of intention to act upon the question of removing such director shall have been stated as one of the purposes for calling such meeting.

4.11   Resignation. A director may resign at any time by written notice delivered to the Board of Directors, its Chairman or President or Secretary of the corporation. A resignation is effective when the notice is delivered unless the notice specifies a future date.

4.12   Vacancies. Any vacancy occurring in the Board of Directors due to an increase in the number of directors pursuant to section 4.9 hereof, or because of death, resignation, removal, disqualification or otherwise, may be filled by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors. A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office, if any, and otherwise until the next meeting of the Members in which an election of the Board of Directors is held.

4.13   Compensation. Directors shall not receive any stated salaries or compensation for their services as directors, but are not precluded from serving the corporation in any other capacity and receiving compensation therefor.

4.14   Liability of Directors. A director is not liable to the corporation or its Members for monetary damages for an act or omission in the director's capacity as a director, except where limited by law.

4

Murnane014210
**PA0020**

Jan 13 11 09:09a     Cristin Connerty                                           847-256-0936                    p.5

**5**                                              **ARTICLE V**

OFFICERS

5.1   Number.  The officers of the corporation shall be a Chairman of the Board of Directors, the
      President, one or more Vice Presidents (the number to be determined by the Board of
      Directors), a Secretary, a Treasurer and such other officers and assistant officers as may be
      deemed necessary, each of whom shall be elected by the Board of Directors.  Any two or
      more offices, other than the offices of President and Secretary, may be held by the same
      person.

5.2   Election and Term of Office.  The officers of the corporation shall be elected annually by the
      Board of Directors at the first regular meeting of the Board of Directors held in each year.
      Each officer shall hold office until his successor shall have been duly elected and qualified, or
      until death, resignation or removal as hereinafter provided.

5.3   Removal.  Any officer or agent elected or appointed by the Board of Directors may be
      removed by a majority vote of the Board of Directors, with or without cause, but such a
      removal shall be without prejudice to the contract rights of the person removed.

5.4   Vacancies.  A vacancy in any office because of death, resignation, removal, disqualification
      or otherwise, may be filled by majority vote of the Board of Directors.

5.5   The Chairman of the Board.  The Chairman of the Board shall preside over all meetings of
      Members and the Board of Directors and shall perform such other duties as are incident to his
      office or are assigned to him by the Board of Directors from time to time.

5.6   The President.  The President, subject to the control of the Board of Directors, shall in
      general supervise and control all of the affairs of the corporation.  He may sign, with the
      Secretary or any other proper officer of the corporation authorized by the Board of Directors,
      any deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors has
      authorized to be executed, except in cases where the signing and execution shall be expressly
      delegated by the Board of Directors to some other officer or agent of the corporation; and in
      general shall perform all duties incident to the office of President and other duties as may be
      prescribed by the Board of Directors.

5.7   The Vice Presidents.  In the absence of the President or in the event of his death, inability or
      refusal to act, the Vice President (or in the event there be more than one Vice President, the
      Vice Presidents in, the order designated at the time of their election, or in the absence of any
      designation, then in the order of their election) shall perform the duties of the President, and
      when so acting, shall have all the powers of and be subject to all the restrictions upon the
      President, and shall perform other duties as may be assigned to him by the President or by the
      Board of Directors.

5.8   The Secretary.  The Secretary shall keep the minutes of the Board of Directors meetings in
      one or more books provided for that purpose, see that all notices are duly given in accordance
      with the provisions of these Bylaws or as required by law, be the custodian of the corporate
      records, keep a register of the post office address of the directors, and of the members of any
      committee appointed by resolution of the Board of Directors and in general perform all duties

                                                  5

Jan 13 11 09:10a     Cristin Connerty                                          847-256-0936                    p.6

incident to the office of Secretary and other duties as may be assigned to him by the President or by the Board of Directors. The Secretary shall also file notice of change of the registered agent or registered office of the corporation with the Secretary of State, and such other reports with such office as may be required under the law.

5.9   The Treasurer.   The Treasurer will have charge and custody of, and be responsible for, all funds and securities of the corporation, receive and give receipts for moneys due and payable to the corporation from any source, and deposit all moneys in the name of the corporation in such banks, trust companies or other depositories as shall be selected by the Board of Directors and, in general, perform all of the duties incident to the office of Treasurer and other duties as may be assigned to him by the President or by the Board of Directors.

6                                         **ARTICLE VI**

                                           COMMITTEES

6.1   Committees of Directors.   The Board of Directors, by resolution adopted by a majority of the directors in office, may designate one or more committees, each of which shall consist of two or more persons, a majority of whom are directors, (the remaining members of any such committees need not be directors unless so provided), which committees, to the extent provided in said resolution, shall have and exercise the authority of the Board of Directors in the management of the corporation; but the designation of such committees and the delegation thereto of authority shall not operate to relieve the Board of Directors, or any individual director, of any responsibility imposed upon the Board him or her by law.

6.2   Executive Committee.   The Board of Directors may name an Executive Committee pursuant to section 6.1.

6.3   Executive Committee Number.   The number of members of the Executive Committee shall not exceed fifteen (15).

6.4   Executive Committee-Vacancies.   Executive Committee vacancies will be filled by the Board of Directors by electing new committee members at such time or times as they deem appropriate; provided, however, that the Executive Committee shall at all times consist, as a majority of its membership, of persons who are then serving as directors of the corporation.

6.5   Executive Committee and Finance and Membership Committee.   The Executive Committee shall supervise and direct the activities of the Finance and Membership Committee and the officers, employees, consultants and other agents of the corporation. The Executive Committee may also retain and/or terminate consultants, employees and other agents and representatives of the corporation upon such terms and conditions as the Executive Committee deems appropriate on behalf of the corporation.

6.6   PAC Committee.   The corporation shall be authorized to form a political action committee for state legislative elections under such terms and conditions as the Executive Committee deems appropriate.

6.7   Other Committees.   Other committees not having and exercising the authority of the Board of Directors in the management of the corporation may be designated by a resolution adopted by a majority of the directors present at a meeting at which a quorum is present or by the

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER                              Murnane014212

                                                                            **PA0022**

President if authorized by a like resolution of the Board of Directors. Such committees may be for a specific length of time or may be of indefinite duration.

6.8    Term of Office. Each member of a committee shall continue as such for the duration of the committee or until his successor is appointed, or the committee is terminated, or he is removed by the authority by which appointed. Terms shall usually be of one year duration although the committee may be of longer duration.

6.9    Chairman. One member of each committee shall be appointed chairman by the person or persons authorized to appoint the members thereof.

6.10   Vacancies. Vacancies in the membership of any committee may be filled by appointment made in the same manner as provided in the case of the original appointments.

6.11   Quorum. Unless otherwise provided in the resolution of the Board of Directors designating a committee, a majority of the whole of such committee shall constitute a quorum and the act of a majority of the members present at a meeting at which a quorum is present shall be the act of the committee.

6.12   Rules. Each committee may adopt rules for its own government not inconsistent with these Bylaws or with rules adopted by the Board of Directors, or with instructions, if any, contained in the resolution of the Board of Directors establishing such committee.

7

## ARTICLE VII

### CONTRACTS, LOANS, CHECKS AND DEPOSITS

7.1    Contracts. The Board of Directors may authorize any officer or officers, agent or agents, to enter into any contract or to execute and deliver any instrument in the name of and on behalf of the corporation, and this authority may be general or confined to specific instances.

7.2    Checks, Drafts, Etc. All checks, drafts, or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the corporation shall be signed by any two members of the Executive Committee whose signatures are on record with the corporation's depository or by such other officer of officers, agent or agents, of the corporation as shall be determined by resolution of the Board of Directors.

7.3    Deposits. All funds of the corporation not otherwise employed shall be deposited to the credit of the corporation in banks, trust companies or other depositories as the Board of Directors may select.

7.4    Gifts. The Board of Directors, or a committee, or any officer or agent designated by the Board of Directors, may accept on behalf of the corporation any contribution, gift, bequest, or devise for the general purposes, or for any special purpose of the corporation.

8

## ARTICLE VIII

### BOOKS AND RECORDS

8.1    The corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its Board of Directors, and committees having any authority of

7

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER                    Murnane014213

**PA0023**

the Board of Directors, and shall keep at its registered office or principal office in this state a record of the members of the Board of Directors entitled to vote.

**9**

## ARTICLE IX

### INITIATION FEES AND DUES

9.1   Establishment of Amount. The Board of Directors may determine from time to time the amount of the initiation fee, if any, and the annual or monthly dues payable to the corporation with respect to each current or prospective Member. In establishing the amount of the initiation fee and dues, the Board of Directors shall consider the particular impact the Illinois civil justice system has on the business endeavors of the current or prospective Member and the degree to which such current or prospective Member can contribute, or is contributing, to the fulfillment of the purposes of this corporation. The Board of Directors shall also emphasize the status of the Member as an entity or individual, and, if the Member is an entity, the nature, size, activities and ownership or membership thereof. With respect to Associate Members, the Board of Directors may from time to time establish the amount of the initiation fee, if any, and the annual or monthly dues payable to the corporation by each current or prospective Associate Member. In lieu thereof, the Board of Directors may from time to time establish the amount of the initiation fee and dues to be paid by Associate Members as a class.

9.2   Payment of Dues. Dues shall be payable in advance on the anniversary date when each Member joined unless otherwise determined by the Board of Directors. Dues of a new Member or Associate Member shall be prorated from the first day of the month or year, as applicable, in which such new Member of Associate Member is elected to membership.

9.3   Default and Termination of Membership. When any Member or Associate Member shall be in default in the payment of dues for a period of sixty (60) days from the beginning of the period for which such dues become payable, its membership may thereupon be terminated by the Board of Directors in the manner provided in Article II of the Bylaws.

**10**

## ARTICLE X

### FISCAL YEAR

10.1   Unless and until otherwise determined by the Board of Directors, the fiscal year of the corporation shall be calendar year.

**11**

## ARTICLE XI

### PROTECTION OF OFFICERS, DIRECTORS AND EMPLOYEE

11.1   Indemnification at the Discretion of the Corporation. The corporation may indemnify any person who was, is, or is threatened to be made, a named defendant or respondent in a proceeding because the person is, or was, a director, officer, employee, agent, or serving at the request of the corporation as a director, officer, employee or agent as follows:

11.1.a   Such person may be indemnified against judgments, penalties (including excise and similar taxes), fines, settlements and reasonable expenses actually incurred by the

8

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

Jan 13 11 09:12a      Cristin Connerty                                      847-256-0936                    p.9

person in connection with the proceeding; but if the proceeding was brought by or in behalf of the corporation, the indemnification is limited to reasonable expenses actually incurred by the person in connection with the proceeding. However, such person may not be indemnified for obligations resulting from a proceeding in which such person is found liable on the basis that personal benefit was improperly received by such person, whether or not the benefit resulted from an action taken in the person's official capacity, or from a proceeding in which the person is found liable to the corporation.

11.1.b  Such a person may be indemnified against obligations resulting from the above listed proceedings, but only if it is determined that such person conducted himself or herself in good faith and reasonably believed, in the case of conduct in his or her official capacity, that his or her conduct was in the corporation's best interest, and in all other cases, that his or her conduct was at least not opposed to the corporation's best interests. In the case of any criminal proceeding, an additional reasonable cause to believe his or her conduct was unlawful.

11.1.c  A determination of indemnification must be made by a majority vote of a quorum consisting of directors who at the time of the vote are not named defendants or respondents in the proceeding. If such a quorum cannot be obtained, such a determination shall be made by one of the following: (i) a majority vote of a committee of the Board of Directors, designated to act in the matter by a majority vote of all directors, consisting solely of two or more directors who at the time of the vote are not named defendants or respondents in the proceeding; (ii) by special legal counsel selected by vote of a quorum of the members of the Board of Directors or a committee of the board who at the time of the vote are not named defendants or respondents in the proceeding, or, if such a quorum cannot be obtained and such a committee cannot be established, by a majority vote of all directors; or (iii) by the Members in a vote that excludes the votes held by persons who are named defendants or respondents in the proceeding.

11.2  Indemnification for Reasonable Expenses. The corporation shall indemnify a director or officer against reasonable expenses incurred by such person in connection with a proceeding in which such person in connection with a proceeding in which such person is a party as a result of his or her position as a director or officer, if such person has been wholly successful, on the merits or otherwise, in the defense of the proceeding.

The corporation may indemnify employees, agents or persons who are or were serving at the request of the corporation as a director, officer, employee or agent, against such reasonable expenses as set forth in this section.

If the corporation is required to indemnify a director or officer or determines to so indemnify employees, agents or persons who are or were serving at the request of the corporation as a director, officer, employee or agent, against such reasonable expenses incurred as set forth in this section, a determination as to the reasonableness of the expenses must be made in the same manner as the determination that indemnification is permissible, as set forth in section 11.1(c) herein. However, if the corporation determines to so indemnify such person, and the determination is made by special legal counsel, the determination as to the reasonableness of expenses must be made by a majority vote of a quorum of the Board of Directors consisting of directors who at the time of the vote are not named defendants or respondents in the proceeding, or if such a quorum cannot be obtained , by a majority vote of a committee of the

9

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER                                      Murnane014215
PA0025

Board of Directors, designated to act in the matter by a majority vote of all directors, consisting solely of two or more directors who at the time of the vote are not named defendants or respondents in the proceeding, or, if such a committee cannot be established, by a majority vote of all directors.

11.3   Expenses Advanced. The corporation may pay or reimburse in advance of the final disposition of a proceeding, any reasonable expenses incurred by a director, officer, employee, agent or person serving at the request of the corporation as a director, officer, employee or agent who was, is, or is threatened to be made a named defendant or respondent in such a proceeding after the corporation receives (a) a written affirmation by such person of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification as set forth in section 11.1 hereof and (b) a written undertaking by or on behalf of such person to repay the amount paid or reimbursed if it is ultimately determined that he or she has not met those requirements, and after a determination is made in good faith that the facts known to those making the determination would not preclude indemnification under Article 108.75 of the Illinois General Not For Profit Corporation Act of 1987.

Expenses for which such a person may be reimbursed under the terms of this section include expenses incurred in connection with the appearance of such a person as a witness or other participation in a proceeding at a time when he or she is not a named defendant or respondent in the proceeding.

11.4   Insurance. The corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, agent or serving at the request of the corporation as a director, officer, employee or agent, against any liability asserted against and incurred by such person in such a capacity or arising out of his or her status as such a person, whether or not the corporation would have the power to indemnify such person against that liability under these Bylaws or the laws of the State of Illinois.

11.5   Other Protection and Indemnification. The protection and indemnification provided hereunder shall not be deemed exclusive of any other rights to which such person may be entitled, under any agreement, insurance policy or vote of Members, or otherwise.

11.6   Notice of Indemnification of or Advance of Expenses. Any indemnification of, or advance of expenses to, a person in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

**12**

### ARTICLE XII

#### NOTICE AND WAIVER OF NOTICE

12.1   Notice. Any notice required to be given to any Member or director or officer by the provisions of these Bylaws shall be deemed to have been given if such notice is in writing and delivered personally or mailed. If mailed, the notice shall be deemed to be delivered when deposited in the United States mail, properly addressed with the correct postage.

12.2   Waiver. Whenever any notice is required to be given to any director, officer or Member under the provisions of these Bylaws or under the provisions of the Illinois Non-Profit

10

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

Jan 13 11 09:14a        Cristin Connerty                                    847-256-0936                    p.11

Corporation Act of 1987, a waiver thereof, in writing, signed by the person or persons entitled to the notice, whether signed before or after the required or stated time, shall be deemed equivalent to the giving of the notice.

**13**

## ARTICLE XIII

### DISTRIBUTION OF ASSETS ON DISSOLUTION

13.1   Upon dissolution of this corporation, the property then on hand, if any, after distribution according to Article 12 of the Illinois Not for Profit Corporation Act of 1987 will be donated to a non-profit organization to be designated and determined by majority vote of the Board of Directors.

**14**

## ARTICLE XIV

### AMENDMENTS

14.1   These Bylaws may be altered, amended or repealed and new Bylaws may be adopted by the Board of Directors at any regular or special meeting of the Board of Directors.

11

CONFIDENTIAL – SUBJECT TO CONFIDENTIALITY ORDER

Murnane014217
**PA0027**

Document Provided Electronically

Confidential - Subject to Confidentiality Order   Hale, Mark et al. v. SFMAIC et al.

*PRIVILEGED AND CONFIDENTIAL – ATTORNEY WORK PRODUCT*

## The Civil Justice Reform Group

## Talking Points

**Background**

- The CJRG was founded in early 1994 after a small group of general counsel concluded that they had to work together if there was any hope of slowing or reversing a badly deteriorating litigation environment, especially at the state level.

- The CJRG has grown significantly since it was formed, with 43 companies currently participating in the group. Today, its membership cuts across diverse industries and includes companies from the chemical, oil, pharmaceutical, financial services, insurance and automotive sectors.

- The CJRG is the only general counsel driven civil justice reform organization in existence. General counsel are uniquely positioned to educate high level executives within their own companies, as well as other key individuals outside their organizations, regarding the importance of meaningful reform, thereby generating much needed support for these activities.

- General counsel and/or senior members of their staffs are uniquely qualified to determine the business community's civil justice reform priorities and provide the leadership/direction necessary to drive reform efforts.

- CJRG places general counsel in the position of directly participating in the group's policy decisions, rather than working through layers of committees and consultants. This approach provides member companies and their general counsel an undiluted means to determine where, when and how civil justice reform efforts are focused.

- CJRG functions as a "Brain Trust". CJRG member company representatives, from both litigation and government relations backgrounds, are especially qualified to determine which reforms will make a difference in the real world and how to get those reforms adopted. Many CJRG members also play leadership roles in other key reform groups, and thus, are uniquely positioned to ensure activities amongst the various groups are well coordinated, that there is no duplication of effort and resources are maximally leveraged.

- CJRG member support and active participation in other key reform groups enables those members to objectively assess the strengths and weaknesses of each group and ascertain its "highest and best use."

**Operations**

- Currently, there are two classes of membership; Steering Committee members contribute $150,000/year to the CJRG and General member companies contribute

*Page 1 of 2*

**PA0711**

*PRIVILEGED AND CONFIDENTIAL – ATTORNEY WORK PRODUCT*

$50,000/year. Only Steering Committee members may vote on issues impacting the group, including the final budget. Greater weight is given to Steering Committee members' budget and priority ranking recommendations. Steering Committee members also participate in bi-monthly Steering Committee calls. Both General and Steering Committee members are invited to semi-annual meetings.

- Day to day operations of the CJRG are conducted by the Operating Committee, designees of the CJRG member companies who meet approximately ten times a year and contribute "sweat equity" to the organization. Two Co-Chairs and a Treasurer lead the Operating Committee.

- "Sweat Equity." The "operating model" upon which the CJRG is based assumes that each General and Steering Committee member company will not only contribute financially, but also make an "investment" by volunteering staff time (sweat equity and brain power) to the activities of the CJRG. There is an expectation that each CJRG member would be represented at most of the Operating Committee meetings held during the year and that all Steering Committee members would be represented at the semi-annual Steering Committee meetings.

**Recent Successes**

- Class Action Fairness Act (CAFA) – Enacted February 18, 2005.

- CJRG has also been integrally involved in the Federal Rules changes on the subject of Electronic Discovery.

- CJRG led legislative reforms in Georgia, Missouri, South Carolina, Florida, Mississippi and Ohio.

- CJRG also helped pass Proposition 64 in California, amending its consumer protection statute. CJRG also participated in voter education initiatives that led to the election of Justice Karmeir in Illinois and the defeat of Justice McGraw in West Virginia.

**CJRG Current Priorities**

- CJRG's priority states include: California, Texas, Illinois, Louisiana, Florida, West Virginia, Mississippi, Alabama, Colorado, and Ohio.

- CJRG's priority issues include: State Electronic Discovery, Expert Evidence, Government Standards Defense, State Attorneys Generals' Lawsuits, Unfair and Deceptive Trade Practices Acts, Federal Rules, Judicial Education and Over Criminalization of Corporate Conduct.

**Kalene Hornsby**

| | |
|---|---|
| From: | Steve McManus |
| Sent: | Monday, November 14, 2005 7:58 AM |
| To: | William G Shepherd |
| Subject: | FW: CJRG - Illinois 2006 proposed budget |
| Attachments: | CJRG 2006 Recommended Budget - Illinois.doc |

Please handle with Mark. Thanks.

From: ANDERSON_MARK_K@cat.com [mailto:ANDERSON_MARK_K@cat.com]
Sent: Sunday, November 13, 2005 2:11 PM
To: donn.kremmel@itwfeg.com; jjmcmackin@wms-jen.com; ed.pickle@shell.com; mrabiteau@thehartford.com; gredmond@metlife.com; samina.r.schey@gm.com; William G Shepherd; John.Shewmaker@pfizer.com; daniel.steen@us.o-i.com; mark.chenoweth@kochind.com; Stuart.Schwartz@nscorp.com; joanne.mcmahon@ge.com; wayne_wilson@farmersinsurance.com; william.johanneson@farmersinsurance.com; ncohen@apcoworldwide.com
Subject: CJRG - Illinois 2006 proposed budget

To:    Illinois Subcommittee

Attached is the proposed budget document I've submitted to Marsha.

I don't believe that during our budget conference call a final number was agreed upon, but the numbers in this proposal are a bit higher than the numbers we batted around earlier.  I took the liberty of doing that upon further reflection of the priority that the Steering Committee has made Illinois, and also, I have to admit, as the chair of the committee.  Of course, if you disagree with the request that can be fully hashed out at our upcoming OC meetings.

Regards,

Mark Anderson

Mark K. Anderson
Corporate Attorney
Caterpillar Inc.
100 NE Adams Street
Peoria, IL 61629-7310
(309) 636-1253 (phone)
(309) 675-6620 (fax)

12/7/2005

Hale, Mark et al. v. SFMAIC et al.
Confidential – Subject to Confidentiality Order
HALEM00000850PROD

**PA0715**

Document Provided Electronically

Confidential - Subject to Confidentiality Order    Hale, Mark et al. v. SFMAIC et al.

**To:**       Beatrice Glass[beatrice.glass.la4x@statefarm.com]
**Cc:**       William G Shepherd[william.g.shepherd.cqyv@statefarm.com]
**From:**     Steve McManus
**Sent:**     Thur 12/18/2003 9:24:08 PM
**Subject:**  FW: Conference Call--January 16

Please calander. Bill, you're invited.

-----Original Message-----
From: pbrenn3@sears.com [mailto:pbrenn3@sears.com]
Sent: Thursday, December 18, 2003 2:57 PM
To: emurnane@icjl.org
Cc: ANDERSON_MARK_K@cat.com; Steve McManus
Subject: Conference Call--January 16


Ed, are you available for a January 16 conference call with the Illinois subcommittee of CJRG?  Does 2:00 p.m. work?  We want to go over the budget for next year and discuss the major issues that you expect in the year ahead. Peter

**PA0717**

### ILLINOIS SUBCOMMITTEE

**Subcommittee chairs:** Herman Brandau, State Farm Insurance Companies
Peter Brennan, Sears
**2002 Total Budget:** $221,000
**2002 Expenditures to date:** $34,601.97
**2002 Budget remaining:** $186,398.03

**Summary of 2002 Activities to date:**

This year was a year of rebuilding and reconstituting an active civil justice reform movement in Illinois. A substantial amount of time has been spent in reevaluating the current effort in Illinois and encouraging, if possible, a rejuvenation of the Illinois Civil Justice League (ICJL). Five thousand dollars ($5,000) was given to the ICJL for an educational mailing in the primary races for the Illinois Supreme Court. We will be contributing an additional $50,000 to the ICJL. The ICJL is developing a plan for anticipated activities for the remainder of the year and also, activities in the mid-term and long-term to improve the civil justice climate in Illinois. This plan should also include plans for gaining greater financial support for the ICJL from the Illinois business community.

We have identified class action abuse in Illinois as being a top priority for civil justice reform. We contributed $29,601.97 to the Manhattan Institute to update its report on class action activity in Madison County. In addition, we agreed to help fund an effort to reform the state class action rules in Illinois through the creation of broad-based coalition. We approved a budget of $45,000 for that activity. However, because of other legislative priorities in the Illinois General Assembly, that effort never gained traction in this session and therefore, we have not dispersed any funds.

It is expected that the Illinois Madison County update will produce additional media attention to class action abuse in Illinois which should provide a springboard to activity next year and also be of assistance in pursuing reform at the federal level. Also, a new organization, The Illinois Lawsuit Abuse Watch (I-Law) has been formed and has gained some publicity on civil justice abuse, particularly in Southern Illinois.

**Summary of Activities Planned for Remainder of 2002:**

For the remainder of 2002, we intend to continue to draw the public's attention to civil justice abuses in Illinois with major attention on class actions. We hope to use the Manhattan Institute's updated report to gain additional attention to the need for class action reform at the state and federal level.

We will examine races in the general election to see if we can play a role in public education. These include the election of, the governor, attorney general, and at least one Supreme Court justice. We will encourage the building of a broad-based coalition for class action reform so we will be ready to pursue legislation as soon as the General Assembly convenes in 2003. We will work with others in Illinois to draft legislation that has a reasonable possibility of passage. We will also coordinate our activities with I-Law so as to maximize the effectiveness of our civil justice reform message to the public.

Hale, Mark et al. v. SFMAIC et al.
Confidential – Subject to Confidentiality Order
HALEM00027243PROD

RICO statute. If State Farm's motion looks familiar, that's because it is. State Farm has raised, and the Court has previously rejected, virtually every attack that State Farm advances here. The Court previously concluded, for example, that Plaintiffs' lost interest in the *Avery* judgment is, as a matter of law, a valid RICO injury and that it was proximately caused by the RICO scheme that Plaintiffs alleged. The Court also concluded that State Farm's mailings are actionable RICO predicate acts, and that based on Plaintiffs' allegations, Plaintiffs' claims were not time-barred. In opposition to this motion, Plaintiffs now establish, at a minimum, a question of fact as to every factual predicate underpinning the Court's previous rulings.

State Farm's second motion for summary judgment is, in essence, a plea for the Court to reconsider its prior conclusions and, in so doing, lay waste to the last five years of exhaustive discovery and intensive litigation. The Court should reject this plea. Its decisions are well-supported by the law and now by the evidence advanced. The Defendants perpetrated an extraordinary scheme to cheat its insureds and to subvert the judiciary at the highest level, and their actions must now be scrutinized by the ultimate finder of facts.

## STATEMENT OF FACTS

*Avery v. State Farm Mut. Auto. Ins. Co.* was a nationwide class action filed in Illinois state court in 1997, based on allegations that State Farm specified non-original equipment manufacturer crash parts for its insureds' vehicles in breach of their contracts and in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. 835 N.E.2d 801, 810-11 (2005). In 1999, the trial court entered judgment against State Farm for over $1.1 billion. *Id.* at 810; PA1215-32. The Illinois court of appeals affirmed a judgment for $1.05 billion. *Avery v. State Farm Mut. Auto. Ins. Co.,* 746 N.E.2d 1242, 1262 (Ill. App. Ct. 2001), *aff'd in part, rev'd in part,* 835 N.E.2d 801 (Ill. 2005). The Illinois Supreme Court granted State Farm leave to appeal in 2002, and heard oral argument in May 2003. [289] ¶ 47. State Farm and others then formulated a two-phase RICO conspiracy: first, to elect a Justice beholden to State Farm, and, second, to hide what they were doing and then lie about it, so that State Farm's chosen Justice— Lloyd Karmeier—could participate in the appeal of the $1.05 billion judgment against it.

I.   **Phase I–the Set Up: Defendants Conspired to Put Justice Karmeier on the Illinois Supreme Court.**

    A.   **State Farm Exerted Considerable Influence Over the ICJL.**

State Farm's principal instrumentality in the management and funding of the Karmeier campaign was the Illinois Civil Justice League ("ICJL"), a "tort reform" group created by and serving as an instrument of the Illinois Business Round Table ("IBRT"), a group of corporations intent on placing jurists sympathetic to corporate interest on Illinois courts. PA0001-12. In 2000, after State Farm's trial court defeat in *Avery*, State Farm Chairman and CEO Edward B. Rust, Jr. became Chairman of the IBRT, which then shared offices with the ICJL. PA0013-0015. Throughout the 2004 Illinois Supreme Court election, the Rust-led IBRT supported the ICJL and was active on the ICJL's Board and Executive Committee, while the ICJL provided support for the IBRT's Civil Justice Reform Task Force. *Id.* The ICJL had only three paid employees: its President, Defendant Ed Murnane, Al Adomite, who joined in 2004 and was assigned specifically to the Karmeier campaign, and Murnane's assistant. PA0009. Murnane and the ICJL answered to Rust's IBRT as well as to the ICJL Executive Committee. PA0016; PA1236.

During 2003-04, the years critical to Justice Karmeier's election, State Farm was a powerful force on the ICJL Executive Committee, which governed the ICJL and Murnane. Murnane regularly reported to the ICJL Executive Committee, and the Executive Committee authorized his activities with the Karmeier campaign, including the initial task of recruiting Judge Karmeier to be the ICJL candidate.[2] PA0008; PA0017-27; PA1240-42; PA1246-51; PA153-58. Rust's IBRT was a member of that committee. PA0016; PA0028-29. So was State Farm, through its in-house counsel and lobbyist, Defendant Shepherd. PA0030. State Farm therefore wielded great power over Murnane, and held a majority of the votes on the committee that controlled his compensation. *Id.*; PA0028-29. In addition, Rust (State Farm's CEO) and Murnane were close. PA0031-32. Murnane boasted that "when I say I talked to the State Farm people, I mean the CEO and General Counsel." PA0033. During the campaign, moreover, Murnane met with Rust at State Farm's Bloomington offices. PA1259-60; PA1272. And on the

---

[2] Notably, Kim Brunner, State Farm's General Counsel, thought Judge Karmeier would be a good judge for the *Avery* case because of his "general feelings toward State Farm." PA1282-83.

day the Illinois Supreme Court overturned *Avery*, in 2005, it was Murnane to whom Rust turned for information. PA0034-35. When Ed Murnane sent news of the *Avery* decision to Rust, Rust responded: "Ed, have a good day!  You deserve it!!!!!" PA0036-37.

State Farm's Shepherd and Murnane were also close. Shepherd exercised State Farm's control over ICJL through emails and telephone calls at least three times per week (PA0038), through personal visits during the campaign (PA0039), and through in-person ICJL status conferences about the campaign (PA0040-42). Indeed, State Farm and the ICJL exchanged a total of 244 phone calls between January 1, 2003, and the election of Justice Karmeier on November 3, 2004. PA1390-452. Murnane appreciated Shepherd's "counsel and willingness to offer legal advice." PA0043-44. Murnane also told State Farm's Shepherd that success for "our candidate, Judge Lloyd Karmeier" would take State Farm's continued "substantial support" of "not $1000, but $10,000. Or $20,000. Or $50,000. That's what it's going to take." *Id.* State Farm answered the call, and then some. After the election, Murnane wrote Shepherd to express his appreciation for "the great support we received from State Farm." PA0045-46.

### B.   **Defendants Recruited Judge Karmeier and Managed His Campaign.**

By the end of 2002, the ICJL was actively engaged in a campaign to recruit a candidate for the open Fifth District seat on the Illinois Supreme Court. PA0041-42.[3] Murnane spearheaded the search, which led him to Judge Karmeier, then an Illinois trial judge. Judge Karmeier knew the campaign would be expensive and was concerned about using his own funds. PA0097-98. Murnane assuaged this fear in a July 26, 2003 meeting, assuring Judge Karmeier he would go to Washington, D.C. to seek $2 million on Judge Karmeier's behalf. PA0203-04.[4] By August 2003, Murnane was sharing with donors an ICJL campaign plan for Judge Karmeier, "[o]ur candidate for the Supreme Court." PA0203-15. Murnane told the State Farm-influenced Civil Justice Reform Group that, "[b]ecause of our direct involvement in this campaign . . . this is 'our baby'

---

[3] For instance, Murnane delivered a presentation to the Civil Justice Reform Group—co-chaired by State Farm's General Counsel Kim Brunner—explaining that the ICJL was looking for the "right candidate" for the open Illinois Supreme Court seat. PA0074-78.

[4] Remarkably, when Murnane informed Judge Karmeier that the ICJL would be able to help raise the funds for a million-dollar campaign, the ICJL had only $8.20 in the bank. PA1505-06.

and we have to provide the support necessary." PA1507-10.

A PowerPoint presentation that Murnane developed for the IBRT after the election confirms the State Farm-controlled ICJL's central role in recruiting and seeking funds for Judge Karmeier. It states that the ICJL: "***Found Judge Karmeier, convinced him to run***; pledged support up front; worked to build organization." PA0242-46 (emphasis added).[5] That was true. Besides recruiting Judge Karmeier, the ICJL, through Murnane, and as overseen by State Farm:

- built a coalition of organizations supporting the Karmeier campaign (PA0052);

- initially acted as Judge Karmeier's campaign manager and directed the campaign (PA1511-16; PA2322; PA1517-18);

- interviewed and hired Judge Karmeier's de facto campaign manager, Steve Tomaszewski (PA0052; PA1524-26; PA1531), hired and paid Adomite to work for the Karmeier campaign (PA1550-51; PA1553), and exercised veto authority over any campaign hiring—a power that a veteran Illinois campaign strategist and consultant for the Karmeier campaign said was typically reserved for a campaign manager (PA1556-57);

- provided guidance to the Karmeier campaign finance chairman (PA1559-60; PA1563-65), who, along with the "official" Karmeier campaign manager,[6] were only involved in small donations and not with large donors such as ATRA, the U.S. Chamber/Institute for Legal Reform, or the Civil Justice Reform Group (PA1528-29; PA1538-39; PA1561-62; PA1568-69; PA1571-73);

- assembled the campaign team, campaign staff, and the campaign finance team (PA0285-86; PA1577-80), and entered into contracts on behalf of the campaign (PA1524-26; PA1536-37; PA1261);

- developed the strategic plans for the campaign (PA1511-16; PA1581-82; PA1583; PA1527; PA1530-31);

- paid media and direct mail consultants (PA0052);

- hired a fundraising consultant for the Karmeier campaign (PA1584-86; PA1587-88), and assumed primary responsibility for fundraising (PA1589; PA1577-1580; PA1590-95);

- took Judge Karmeier around Illinois and Washington to meet donors (PA0285-86);

- helped Judge Karmeier develop a budget for the campaign (PA0287; PA1534-35);

- set up and ran the Karmeier campaign website and credit card processing (PA0288-94);

- commissioned a study to use in campaign attack ads, *which State Farm paid for directly* (PA0295-96);

---

[5] The December 18, 2003 IBRT annual meeting minutes, with Rust as Chairman, further confirm this fact. They state that "[t]he ICJL helped recruit Circuit Judge Lloyd Karmeier to run for this office, and, with the IBRT, has been working to acquire financial and political support for the campaign." PA0262-83. Moreover, a January 25, 2004 e-mail from Murnane to Judge Karmeier confirms Judge Karmeier was Defendants' hand-picked candidate: "You've passed all the tryouts we need." PA0284.

[6] Indeed, the named campaign chairman, State Senator David Luechtefeld, admitted he was "the campaign chairman in name only" (PA1576) and that Murnane ran the show.

- ran the polling and prepared press releases for the Karmeier campaign (PA0297-98);
- helped create the "Round Two" plan for conducting the campaign from July 2004 through Election Day (PA0299-300);
- handled direct mailings to voters through its paid consultants (PA0301);
- made sure that Karmeier campaign donors could remain anonymous (PA0302);
- worked with State Farm on rallies at various State Farm offices (PA0303-06); and
- served as "clearinghouse" for Karmeier campaign contributions (PA00314; PA0042), a fact State Farm was well aware of.[7]

In sum, the ICJL orchestrated Justice Karmeier's election. PA0329-30; PA0045-46 ("The ICJL's role in the 2004 Supreme Court election in Southern Illinois is well known"; "the [ICJL] took the lead role and was largely responsible—from Day One—for the success of that election"). When asked if Murnane participated in all "strategically important" aspects of the Karmeier campaign, Tomaszewski confirmed: "Very many of them, yes." PA0331-32.

### C.   State Farm Funded the Karmeier Campaign.

Judge Karmeier was described as a "Quantum Leap Forward" for Defendants, and they went to great lengths to secure his election. PA0359. Those on his campaign believed they would need at least $3 million to elect Judge Karmeier. PA0355. State Farm itself contributed even more than that,[8] and it did so covertly, through a web of intermediaries, to enable it to deny its influence and ensure that a future Justice Karmeier could participate in *Avery*, if *Avery* were still pending after the election.

State Farm had a vast infrastructure in place to coordinate these efforts. State Farm

---

[7] This is confirmed in the notes of Regina Dillard, a State Farm in-house lawyer who attended a U.S. Chamber/ILR donor meeting on May 25, 2004 in the course of her employment. PA0314. Ms. Dillard's notes of the remarks at the meeting indicate that the Fifth District Illinois Supreme Court race was the ILR's "highest priority," and the U.S. Chamber was supporting Judge Karmeier. PA0308. The *Avery* case was specifically discussed at the meeting. *Id.*; PA0315-28. State Farm's own expert, financial fraud investigator Bruce Dubinsky, conceded that this evidence demonstrated that State Farm—as part of and in conjunction with ILR—knew "that money will go to the Illinois Civil Justice League and ultimately money will go from . . . ICJL to support the Karmeier campaign." PA1634-42.

[8] Expert Thomas A. Myers is a forensic accountant and fraud investigator whose report traces the flow of funds from State Farm to the Karmeier campaign. PA0376. Myers determined, based on all the financial records and evidence, that State Farm secretly funneled more than $3.5 million to the Karmeier campaign, over three-quarters of its reported campaign funds. PA1643-1756. Professor Dolores Rinke's rebuttal report supports Mr. Myers's method and conclusions. PA2328-400. And experts Adelstein and McKenna further explain State Farm's involvement in coordinating organizations to advance the Karmeier campaign. PA1852-88; PA1889-1907.

devoted officers to coordinating its business of civil justice reform. PA1600-01; PA1613; PA1275-76; PA1278-79. It also worked to coordinate its efforts with different civil justice reform organizations (PA1599; PA1285-86), including with organizations like the Institute for Legal Reform which was conducting "voter education" activities (PA1597-98) that were tied to political candidates for legal office (PA1628). Rust himself was personally involved, approving the use of State Farm's money for these efforts. PA1758-59; PA1762-63; PA1760-61; PA1764-65. Moreover, State Farm officials held strategic positions within the leadership of the intermediaries, enabling State Farm to covertly influence the direction of funds through these intermediaries, and ultimately to the Karmeier campaign. These included:

> **U.S. Chamber of Commerce** ("U.S. Chamber") and its campaign donor organization, the **Institute for Legal Reform** ("ILR"):

- State Farm CEO Rust was a Director of the ILR in 2003 and 2004 (PA0508-22);
- State Farm Vice-President David Hill was on the ILR Elections Task Force, which had the responsibility of "approv[ing] proposed expenditures" (PA0523-24; PA0533);
- State Farm General Counsel Kim Brunner was on the ILR Audit Committee tasked with "[p]rovid[ing] oversight of annual ILR budget and fundraising program" and "[r]eview[ing] organizational capabilities and resources" (PA0534; PA0533); and
- State Farm Chief Administrative Officer James Rutrough was on the U.S. Chamber's board from 2004 to 2011 (PA0646-66; PA0684).

> **American Tort Reform Association** ("ATRA"):

- Murnane and State Farm Vice-President Hill were Directors in 2004. PA0704; PA1770.

> **Civil Justice Reform Group** ("CJRG"):

- State Farm General Counsel Brunner was Co-Chair of the Steering Committee of the CJRG (PA0713-14), which served as the "brain trust" whose members played leadership roles in other key reform groups and were positioned to ensure activities like the Karmeier election were well coordinated among those groups (PA0710-12);
- State Farm's Herman Brandau was the co-chair of CJRG's Illinois Subcommittee (PA1771), and Shepherd and Steve McManus were also members (PA0715) and worked closely with Ed Murnane in that capacity (PA0716-17); and
- Brandau and Alan Maness were on the CJRG's Coordination Committee (PA1772-99).

> **ICJL** and its political action committee, **JUSTPAC**:

- Murnane served as ICJL President (PA0016);
- State Farm's Shepherd served on the ICJL Executive Committee (PA0030), whose job it was to "supervise and direct the activities of the Finance and Membership Committee and the officers, employees, consultants and other agents of the corporation" (PA1800-01);

- State Farm's Shepherd served as one of three members of the Compensation Review Committee (PA0016);
- State Farm held a seat on the ICJL board (PA0718); and
- Murnane served as Treasurer of JUSTPAC (PA0719).

| **Illinois Chamber of Commerce** ("Illinois Chamber"): |

- State Farm executives Mike Davidson and Peggy Echols held seats on the Board of Directors. PA0720-21.

| **Illinois Coalition for Jobs, Growth and Prosperity** ("Illinois Job Coalition"): |

- Formed by the ICJL, the Illinois Chamber, and the IBRT (with Rust as IBRT Chairman) to "participate in a meaningful way in the 2004 elections." PA0722-24.

State Farm's contributions to these intermediaries led directly to large expenditures benefitting the Karmeier campaign including, but not limited to: (1) $1,940,000 funneled from State Farm through the U.S. Chamber/ILR, then to the Illinois Republican Party and then to Citizens for Karmeier; (2) $415,000 that flowed from State Farm through ATRA and then to JUSTPAC, a documented proxy for the Karmeier campaign; (3) $150,000 from State Farm through the Illinois Jobs Coalition to JUSTPAC; and (4) $100,000 from State Farm through the CJRG to the ICJL. PA0390-97; PA0725-26. During the campaign, Murnane "acknowledge[d] that many Illinois corporations, and many out-of-state corporations, are supporting the Illinois effort through the US Chamber or through ATRA." PA2270-72. In a 2004 Newsletter, State Farm provided insight into why it went to such lengths to fund the Karmeier campaign; in a moment of candor, it admitted that the Karmeier election was of special interest because State Farm expected a decision in the *Avery* case after Justice Karmeier took the bench. PA1802-18.

**U.S. Chamber/ILR.** In November 1999, soon after the *Avery* class judgment, Tom Donohue, President of the U.S. Chamber, wrote to State Farm CEO Rust asking for money and promising to do anything possible "to help [State Farm's] industry," and to "always be available when [State Farm has] a particular concern." PA0727. With the *Avery* appeal pending, State Farm availed itself of Donohue's offer to marshal the U.S. Chamber on behalf of select corporations "as a means of *anonymously* pursuing their own political ends." PA0728-32

(emphasis added).[9] Donohue later confirmed that the U.S. Chamber provided anonymity for big corporate contributors. PA1624-27.

Before the *Avery* judgment, State Farm's largest contribution to the U.S. Chamber was $26,000; afterwards, State Farm's yearly contribution ballooned to over $1 million. PA0384-85. From 2003 to 2008, State Farm was one of very few regular million-dollar donors and one of the U.S. Chamber's largest donors. PA1819. State Farm representatives had been placed on the U.S. Chamber/ILR Elections Task Force and audit committees, giving them influence over recommendations regarding targeted elections, approval of expenditures for the targeted elections, and oversight over annual ILR budgets and fundraising programs. PA1820-21; PA1824-27.[10] In all, State Farm wrote two million-dollar checks to the U.S. Chamber's ILR division in the time period critical to Judge Karmeier's campaign. PA0457-59.[11]

At the same time, *Avery* was a recurring subject in conversations between State Farm's Rust and the U.S. Chamber's Donohue (*see, e.g.*, PA0780; PA0760; PA0794; PA0799), with Rust telling Donohue "to keep an eye on [State Farm's] Supreme Court case in I[llinois]" (PA0794). Donohue did so. When Rust pledged the second of the two million-dollar donations to the U.S. Chamber's ILR in 2004, he knew State Farm could "[c]ount on [ILR] to be very helpful in [upcoming] judicial elections." PA0810-11. The ILR then designated the 2004 Illinois

---

[9] Donohue sent Rust a copy of the newspaper article in which this quote appeared explaining the corporate utility of the U.S. Chamber, with a personal letter to Rust thanking State Farm for its financial commitment. PA0737-38

[10] Donahue himself confirmed that State Farm was active in the ILR and that Rust helped the ILR raise funds and advise the organization on how to expand its activities. PA1623; PA1628; PA1630-33. State Farm also discussed with the ILR the need for coordinating campaign activities between the ILR and the ICJL to avoid duplication. PA1602-06. State Farm was particularly supportive of the ILR's efforts in Illinois in 2003/2004—which included "voter education" efforts tied to the 2004 Illinois Supreme Court (PA1607-11)—and admits it contributed to civil justice reform groups in efforts involving the 2004 Illinois Supreme Court race. PA1287; PA1829-30; PA1768. During the run up to the Karmeier election, State Farm communicated with the ILR on a regular basis, and exchanged 335 phone calls with the U.S. Chamber from January 1, 2003 through November 3, 2004. PA2757-60; PA1457-1504.

[11] State Farm contributed an additional $500,000 to the ILR in December 2000 (PA0739-55), after the *Avery* verdict and after a meeting in October 2000 where Donohue emphasized the millions in contributions the U.S. Chamber was making to influence judicial elections (PA0756; PA0740; PA0759).

Supreme Court race a "Tier I" election of the very "highest priority." PA0812-15.

On cue, the U.S. Chamber and ILR (which shared a bank account) made three contributions during a 30-day period in the fall of 2004 to the Illinois Republican Party totaling $2.05 million dollars, almost the exact amount donated by State Farm to the U.S. Chamber. PA0390-91. The Illinois Republican Party then contributed $1.94 million to Citizens for Karmeier in the 40-day period between the U.S. Chamber's initial contribution to ILR on September 24, 2004 and Justice Karmeier's election on November 2, 2004. *Id.*

The proximity of the payments and near-identical amounts prove this was no coincidence. The expenses that the Illinois Republican Party incurred to aid the Karmeier campaign moved in lockstep with the U.S. Chamber's contributions. PA0390-93 (the U.S. Chamber transferred $750,000 and $1.3 million to the Illinois Republican Party, which then passed on near exact amounts to benefit Citizens for Karmeier). State Farm was not identified as the source of any funds transferred from the Illinois Republican Party to the Karmeier campaign. PA0391.[12] Yet, the ILR considered the *Avery* reversal one of its major victories. PA1843-44.

**ATRA/JUSTPAC.** State Farm contributed almost $1 million to ATRA in late 2003 and 2004. PA0394-403. ATRA—with State Farm's Vice-President David Hill as Director—then gave $100,000 to the Illinois Chamber (whose funding of the Karmeier campaign is highlighted above), as well as $415,000 to JUSTPAC. PA0394. A donation to JUSTPAC was a donation to the Karmeier campaign (PA0725-26; PA0823-24), and ATRA's President "understood that the election of Lloyd Karmeier was JUSTPAC's top priority." PA0825-902. JUSTPAC was the largest direct contributor to the Karmeier campaign (PA0052), and its 2004 focus was "almost exclusively directed to the Supreme Court race" (PA0905).[13]

---

[12] The IBRT later noted that the U.S. Chamber "contribut[ed] more than $2 million … for use in the Karmeier campaign." PA0816.

[13] JUSTPAC ultimately contributed $1,186,453 to the Karmeier campaign. PA0397. Before 2004, JUSTPAC had never raised over $80,000 in a single year. PA0417. In 2004, it made $1.41 million in "expenditures"—$1.186 million (84%) of which went directly to the Karmeier campaign. PA0416. Murnane (JUSTPAC Treasurer and ICJL President), confirmed that "most of [JUSTPAC's] financial support is being used on behalf of the Karmeier campaign." PA0824. JUSTPAC became the largest single contributor to the Karmeier campaign, transferring donations from other groups. (Illinois Job Coalition ($150,000 to JUSTPAC—$150,000 received from State Farm); ATRA ($415,000 to JUSTPAC—$958,000 received from State Farm); the

Case 3:12-cv-00660-NJR   Document 901-1   Filed 08/21/18   Page 68 of 124   Page ID #39146
Case 3:12-cv-00660-DRH-SCW   Document 842   Filed 06/29/18   Page 17 of 48   Page ID
#34289

A later State Farm contribution further shows how State Farm secretly funneled monies through ATRA to the Karmeier campaign. On September 22, 2004, the CJRG sent an email to Steve McManus and Alan Maness of State Farm, Sherman "Tiger" Joyce of ATRA, and others emphasizing the importance of judicial elections in light of "the millions/billions verdicts we have to pay." PA1845-46. We need to "stop talking and put your money into the key judicial races now," to buy advertising for the Karmeier campaign, the email continued. State Farm took heed. Steve McManus called ATRA twice that day (PA1455), and the next day, September 23, 2004, ATRA invoiced State Farm for $50,000 (PA1847-48). State Farm received the invoice on September 27, 2004 (PA1849), and Shepherd spoke with the ICJL for 16 minutes the very next day (PA1444). On October 1, 2004, Shepherd called the ICJL again, and ICJL called back and talked to Shepherd for 22 minutes. PA1444-45. That same day, State Farm sent its check for $50,000 to ATRA. PA1848. That $50,000 was deposited into an ATRA account on October 6, 2004, and immediately transferred to JUSTPAC. PA0906-08; PA0851. That same day, Joyce confirmed with McManus "that this contribution . . . is not tax deductible" (PA0906-07), thereby confirming that the money would be used for political purposes. Indeed, the contribution was coded for ATRA's "special projects 956A," which referred to contributions to JUSTPAC. PA0906-08. Furthermore, an ICJL spreadsheet documents the transaction as "$50,000 corporate contribution en-route to JUSTPAC," revealing that ATRA was merely a conduit for State Farm's contribution earmarked for JUSTPAC. PA1850-51. ATRA and State Farm knew that JUSTPAC would apply the $50,000 to the Karmeier campaign. PA0856.

**Illinois Jobs Coalition ("IJC").** The IJC was formed to "participate in a meaningful way in the 2004 elections," to "engage in a direct voter education and outreach activity prior to 2004 election," and to "make the supreme court election in the fifth judicial district a high priority." PA0722-0724; PA1908; PA0047-67. Again, the IBRT and State Farm were founding members of the IJC (PA1909-39; PA1940-45), Murnane was on the board of directors (PA1946-47; PA0071,; PA1593; PA0285-86; PA0203-04; PA1949-51; PA1955; PA1957), and Jeff Mays was

U.S. Chamber ($200,000 to JUSTPAC—$2.2 million received from State Farm); and the Illinois Chamber ($91,000 to JUSTPAC—$37,500 received from State Farm). PA0416-17.

its vice chair (PA1940-45). Mays was also the President of the IBRT from 1998-2004 (PA1960), and served on the ICJL Executive Committee (PA1961).

The IJC told its members that it would raise money for the Karmeier campaign through JUSTPAC such that donors would not be disclosed. PA1962-63. State Farm knew this and that the IJC had already supported the Karmeier campaign when it contributed a total of $150,000 to the IJC in 2004. PA0404; PA1831-41. An important factor driving State Farm's initial $100,000 contribution to the IJC was that the contribution would not be disclosed. PA1964-66.

The day before State Farm wrote a final $50,000 check to the IJC, Shepherd called the ICJL and talked for 16 minutes. PA1444. After sending the check to the IJC, Shepherd called Murnane. *Id.* Shepherd then called the IJC. PA1389. After Shepherd called the IJC, Murnane called Shepherd, and they talked for 22 minutes. PA1445. On the same day State Farm wrote its final $50,000 check to the IJC, $150,000 was transferred to JUSTPAC, which promptly transferred it to the campaign. PA0405-07.[14] In sum, the State Farm-funded IJC played a significant role in the Karmeier campaign. PA2020-22.

**CJRG.** State Farm's many connections to the CJRG are documented above. The CJRG's Illinois Sub-Committee—on which State Farm had placed two of the four members—included Murnane in a conference about the CJRG's budget for Illinois in 2004 and discussed contributions to JUSTPAC and the ICJL. PA0716-17. The budget included a $100,000 contribution to JUSTPAC and was set with McManus, Shepherd, and Murnane all present. PA2023-25. It was thereafter approved by the Steering Committee—with State Farm's Brunner as Co-Chairman, who later noted that the CJRG was instrumental in the election and worked in partnership with the U.S. Chamber and ATRA in those efforts. PA2026-50.

With these connections in place, State Farm used the CJRG to control the flow of State Farm's contributions from different groups to the ICJL/JUSTPAC and then on (anonymously) to the Karmeier campaign—as at least one documented transaction demonstrates. State Farm contributed $150,000 to the CJRG on January 6, 2004. PA0409-10. The CJRG then transferred

---

[14] After State Farm's contributions, the IJC sent over 600,000 mailers that either attacked Justice Karmeier's opponent or were complimentary to Justice Karmeier. PA1967-97; PA1998-2019.

$100,000 to the ICJL, which was used to benefit the Karmeier campaign. PA0411-12. The CJRG also paid for and produced voter initiatives that "led to the election of Justice Karmeier." PA2051-66. In a telling 2006 memo, Brunner wrote, "I don't expect or even want CJRG to take credit for victories…. I'm not used to taking credit for success (*e.g.,… Avery*)." PA0916-17.

**ICJL.** As explained above, State Farm wielded enormous influence over the ICJL—an organization that was crucial to the Karmeier campaign and a key intermediary donor for State Farm in its efforts to fund the campaign through a web of entities without public disclosure. The ICJL's role in the campaign was, in short, to "primarily be in raising and *funneling* money" (PA2067-68) (emphasis added), and one of its primary missions was to elect judges and justices who would be favorable to the ICJL and IBRT initiatives. PA1239; PA1589; PA2069; PA1590-95; PA2070-72; PA2067-68; PA2073-74; PA2075-76; PA2078; PA2079-80; PA2081-82; PA2083-85; PA2086-88; PA2089-90; PA2091; PA2092; PA0823. The Karmeier election was the ICJL's "highest priority ever." PA2093-95.

The ICJL accomplished this mission, in part, by taking a lead role in the staffing, advertising, and polling for the Karmeier campaign. The ICJL staffed the campaign itself (PA1511-16; PA2096-97; PA1577-80; PA2098-99; PA1550; PA1552-53), and its political action committee paid an advertising agency to work on the campaign (PA2098-99), and then spent at least $250,000 for advertisements attacking Justice Karmeier's opponent (*Id.*; PA2100). It also financed a media campaign to follow the U.S. Chamber's campaign. PA2101-04.[15]

But ICJL's most important role was in building a "coalition of organizations supporting the campaign" (PA1908; PA0047-67), and utilizing them to funnel money from State Farm to the Karmeier campaign (PA2073-74; PA1962-63). Murnane made it clear that he was the one coordinating the campaign's fundraising. He referred to himself as the "traffic cop" and emphasized that all parties should coordinate with him because, "I am in close contact with the

---

[15] State Farm also paid for half of a $28,500 study the ICJL commissioned from Sequoyah Information Systems, Inc. ("Sequoyah") (PA2105-08; PA1264-67) that featured opposition research on Justice Maag (PA2119). When Murnane received the completed report, he sent it to State Farm's Shepherd (PA0295), and the ICJL passed the invoice for the study directly to State Farm (PA2105-08).

campaign." PA1511-16; PA2083-85. In October 2004, he stated that "virtually 100% of my time has been on fund-raising for the election." PA1589; PA2126-28; PA1908; PA0047; PA0285-86; PA2070-72; PA1590-95. Murnane and the ICJL were beholden to State Farm, and much of the money that came through the organization was State Farm money. Even Rust acknowledged that the ICJL used State Farm's money to further the Karmeier campaign. PA1766-67.

\* \* \*

Any of these examples would raise an eyebrow. Together, the scope of State Farm's contributions to Karmeier's campaign was extraordinary and, critically, was purposely designed to avoid public disclosure. Illinois campaign finance rules require an entity contributing to a campaign to reveal its sub-donors if any sub-donor accounts for over one-third of that entity's contributions to the campaign. State Farm kept its contributions anonymous by ensuring that the groups it used did not cross the 33% threshold. *E.g.*, PA0302. State Farm's special attention to this detail is reflected in Regina Dillard's summary of a June 22, 2004, U.S. Chamber/ILR pre-board conference call conducted by ILR President Lisa Rickard. PA0919-20. Dillard, State Farm's in-house counsel, summarized Rickard's discussion of the "ILR's efforts in the Illinois Supreme Court race, and the constraints they have had to deal with related to campaign finance rules," particularly when "fifty percent [(actually, it's 33%)] of the funds have been contributed by a donor as the rule would consider the donor to be a sponsor, requiring the disclosure of all donors to that sponsor." *Id.* State Farm General Counsel Kim Brunner thanked Dillard for her "[v]ery helpful summary," (*id.*) and State Farm's funneling efforts went undisclosed. State Farm-funded groups supplied the vast majority of the Karmeier campaign's funds, but each one remained under the one-third level to cloak State Farm's involvement in secrecy, maintain plausible deniability, and permit a future Justice Karmeier to participate in *Avery*. PA0302.[16]

### D.   Judge Karmeier Knew State Farm Played a Significant Role in His Campaign.

Judge Karmeier knew his campaign would be expensive and was told that he could not

---

[16] Plaintiffs' expert, Professor Kent Redfield opined that State Farm's willful concealment of its contributions to Citizens for Karmeier violated the Illinois Election Code. PA2574-75. The report of rebuttal expert Richard Means supports Professor Redfield's conclusions. PA2631.

win the election without the support of the U.S. Chamber and the most influential Illinois corporations, which included State Farm. PA0921-24; PA0095. Judge Karmeier also knew where many of his campaign funds were coming from and spoke to Murnane about it: "We talked about money. I remember one of the questions that he asked when we talked about him as a possible candidate, how much is this going to cost." PA0925-32; *see also* PA1243-45; PA1252; PA1270. Judge and Mrs. Karmeier were concerned about campaign funding (PA0098; PA1273), and did not want to spend their own money (PA0097; PA0133). To this end, the Karmeiers met with Illinois politico Hendren and campaign consultant Tomaszewski "to talk about the money." PA1555; PA0134; PA1543-48; PA0928. Murnane also met with Judge Karmeier several times to convince him that the ICJL could advance his candidacy effectively and raise the funds needed to get him elected. PA0933-49. The promise of campaign funds from Murnane was an important factor for the Karmeiers, but Judge Karmeier knew Murnane and the ICJL didn't have the money (PA0097; PA0109). To assuage these concerns, Murnane told Judge Karmeier that major sources for his campaign funds would include the U.S. Chamber and ATRA. PA0094-98; PA0203-04.

Judge Karmeier took an active role in the management of his campaign. PA0101; PA110. It was no secret at this time that the pending *Avery* decision—which Justice Karmeier knew of and had discussed with his campaign manager (PA0136; PA1520-21; PA1542)—was important to State Farm. And it was no secret to the Karmeier campaign that State Farm was backing the campaign from the very beginning. PA0950. On what appears to be the agenda for one of the first Karmeier campaign meetings on October 15, 2003, State Farm is listed as one of seven groups backing the campaign. *Id.* Judge Karmeier himself met privately with U.S. Chamber representatives and Murnane on November 24, 2003. PA0100; PA0951-52. After this meeting, Judge Karmeier was informed that the U.S. Chamber had contributed over $1 million to his campaign (PA0953-58), and Judge Karmeier knew his campaign finance chairman was working closely with the U.S. Chamber (PA0085). The U.S. Chamber even sent campaign ads to Judge Karmeier for approval. PA1541.

Judge Karmeier also knew of the financial support he had received from other

organizations over which State Farm exerted significant influence, such as the IBRT.[17] PA0101. He knew Rust was an integral part of IBRT leadership, and after meeting with Rust in 2004, was on a first name basis with him. PA0959-60. On December 16, 2004, shortly after winning the election, Judge Karmeier and Rust, and other corporate executives, met privately in Chicago before an IBRT meeting. PA0141; PA0959-60. Justice Karmeier was provided with the names of the IBRT officers with whom he would meet, including "Rust, CEO of State Farm Insurance." PA0959. The agenda item immediately preceding Justice Karmeier's presentation to the group (Agenda Item 5) was then-IBRT Civil Justice Task Force Chairman Phil O'Connor's report on the 2004 judicial elections, at which he announced that the State Farm-led "IBRT members played a major role in [Justice Karmeier's] Campaign" and that "IBRT members rose to the challenge . . . contributing more than $1.2 million to the Karmeier effort." PA2186-96. "IBRT's presence was felt," he continued. PA0816. He further noted that "the US Chamber of Commerce also played a major role contributing more than $2 million, most of it contributed through the [Illinois Republican Party] for use in the Karmeier campaign." *Id.* The Karmeier campaign team knew that State Farm used the U.S. Chamber to "contribute[] big" to the Karmeier campaign, and, when he decided to participate in the *Avery* deliberations, Justice Karmeier knew that the U.S. Chamber had filed an amicus brief on behalf of State Farm. And, again, Rust, with whom Justice Karmeier had met before the presentations, was chairman of the IBRT while it worked to acquire financial support for the Karmeier campaign. PA0961. Later in that meeting, Justice Karmeier heard about the hundreds of thousands of dollars IBRT gave, and he thanked them for their support. PA2186-96; PA0127. Based on this meeting alone, it is clear that Justice Karmeier knew about State Farm's involvement in his campaign before he decided to break the "deadlock[]" in the *Avery* deliberations and overturn the judgment against State Farm.

Judge Karmeier also knew of the financial support from the State Farm-led CJRG. Judge

---

[17] The IBRT was the co-founder of both the IJC and the ICJL—two of the key intermediary organizations used to direct money to the Karmeier campaign. PA2129-30; PA2183-85. The ICJL's Murnane also reported to the IBRT (PA1234; PA1236), and the ICJL claimed to have been one of the Karmeier Campaign's "most significant participants" (PA2183-85). In 2004, leading up to the election of Justice Karmeier, Rust's office had 88 phone calls with the IBRT. PA1359-77. State Farm had another 155 phone calls with the IBRT. PA1320-53.

Karmeier met privately with Murnane and the CJRG on June 9, 2004. PA2197-98; PA2199-02. Thereafter, the CJRG contributed an additional $50,000 to the ICJL, and the CJRG paid for and produced campaign initiatives that "led to the election of Justice Karmeier." PA2061.[18]

Judge Karmeier was also on notice of the ICJL's support for his campaign and of State Farm's involvement in the organization. He was on the ICJL mailing list for ICJL campaign updates from February 1, 2004, until 2013. PA2241; PA2203-39; PA2240; PA1262-63; PA0098. These ICJL updates informed Judge Karmeier that State Farm was one of five major corporations supporting his campaign (PA2083-85; PA2242-43), and that the U.S. Chamber had "committed to dumping a mountain of cash into Karmeier" (PA2244-49). Judge Karmeier knew that contributions made to the ICJL did not have to be disclosed or reported. PA2250-51; PA2252-56.[19] Furthermore, the ICJL sponsored a reception on May 20, 2004, for Judge Karmeier and select members of the ICJL. PA2264-65. State Farm CEO Rust was among those invited to attend. *Id.*; PA2266-68. And in July 2004, the ICJL held a summit meeting on the Illinois Supreme Court race, attended by State Farm, three Karmeier campaign committee members and other groups. PA2269; PA0041. ICJL Executive Committee member and State Farm lobbyist Shepherd attended Justice Karmeier's reception following his swearing in ceremony for the Illinois Supreme Court. PA1620-21.

Judge Karmeier also knew that other "tort reform" groups were holding events to promote his election and that donors who wanted to contribute to his campaign anonymously could do so. PA0962-64. Indeed, it was the policy of the campaign that Judge Karmeier oversaw that if a donor wanted to avoid public disclosure, arrangements could be made. PA1574. And Murnane, a key part of the Karmeier campaign, informed other potential donors that *State Farm*

---

[18] Murnane met with State Farm in Bloomington, Illinois on June 4, 2004 and met again with State Farm on June 15, 2004, following Justice Karmeier's meeting with CJRG. PA2197-98. Murnane called Shepherd on the day he met with State Farm in Bloomington (PA1439), and immediately thereafter, Shepherd made two calls to Dwight Kay, the Finance Chairman for Citizens for Karmeier and talked for a total of 17 minutes (PA1291-1292). Shepherd also called the Illinois Jobs Coalition that same day. PA1388.

[19] Justice Karmeier was also informed that State Farm's Hill was on the Board of ATRA, the organization that had committed to making substantial contributions to the Karmeier campaign. PA0203-04; PA2257-2262.

*particularly* had taken advantage of this policy by "contribut[ing] big *through the US Chamber*," and not directly, to the Karmeier campaign. PA2270-72 (emphasis added).

If all this wasn't enough, State Farm and its representatives hosted Judge Karmeier a number of times, and organized fundraisers on his behalf. In the last 30 days leading up to the election, Judge Karmeier attended campaign events at State Farm offices in Marion, Collinsville, and Mt. Vernon, Illinois. PA2273-92. State Farm also hosted a fundraiser for the Karmeier campaign on August 24, 2004, in Bloomington, Illinois. Shepherd promoted this event within State Farm "as an opportunity for the supporters of civil justice reform to make their opinions known." PA2293-94. Judge Karmeier knew it was State Farm that was "having an event in Bloomington on August 24," (PA2295-96), and at the event Justice Karmeier met and shook hands with many of the highest-level State Farm employees, Executive Officers—including the company's chief operating officer, chief administrative officer, chief financial officer, and vice-chairman—and in-house counsel. PA1823; PA1263; PA0306; PA2293-94; PA1618-19; PA2297-99; PA2300-11; PA2295-96.[20]

Notably, the very lawyers representing State Farm in the *Avery* case—many of the same lawyers who currently represent State Farm in this litigation—also held an in-person fundraiser with and for Judge Karmeier. PA1566-67; PA1570; PA1574-75; PA0130-31.

Finally, during the 2004 election time period, State Farm exchanged 161 phone calls with members of the Citizens for Karmeier Campaign Committee, including one phone call with Judge Karmeier on May 3, 2004; seven phone calls with the Karmeier Campaign Manager; five phone calls with the Karmeier Campaign Treasurer; two phone calls with the Karmeier

---

[20] State Farm has previously claimed that it had nothing to do with this Bloomington fundraiser, but the evidence shows otherwise. Leading up to the event, State Farm's Shepherd exchanged three phone calls with Tomaszewski—the Karmeier campaign manager (PA1292-93)—and on the day of the fundraiser, Shepherd met with Murnane at State Farm's offices. PA2312-13. State Farm officers spoke six times with Murnane in the days before the fundraiser (PA1441), and Tomaszewski exchanged two calls with State Farm's Hill and Alan Bartels. PA1293; PA2312-13. Of the 74 people identified on a list of attendees, moreover, 42 were State Farm officers, employees or spouses who contributed to the Karmeier Campaign. PA2314-18. Two more State Farm officers—Hill and Shepherd—were not on the list, but said they attended. PA1823; PA1618-19. And it is likely that even more State Farm executives attended this event, because nine additional State Farm executives contributed to the Karmeier Campaign during this time period. PA2314-18.

Campaign Finance Chairman; one phone call with a campaign media consultant for Judge Karmeier; and 142 phone calls with Murnane. PA1290; PA1291-93; PA1390-1452.

As this record makes clear, State Farm's involvement in Judge Karmeier's election was no secret to those involved with the Karmeier campaign or to Judge Karmeier himself.

### E.   Defendants Further Enhanced Judge Karmeier's Odds of Winning by Subverting the State Bar's Judicial Candidate Evaluation Process.

State Farm also helped the Karmeier campaign by placing four of its lawyers—including lead attorneys Robert Shultz (who tried *Avery* for State Farm and participated in the post-verdict appeals) and Alan Sternberg (State Farm's Associate General Counsel, who was responsible for the *Avery* case and hired Shultz to represent State Farm) (PA2320-21)—on the Illinois State Bar Association's ("ISBA") presumably independent committee to vet the two candidates for the Illinois Supreme Court. PA0965-1022. The ISBA committee rated Judge Karmeier "highly qualified," while giving his opponent, Justice Maag, a lower, "qualified" rating. PA1023-24. An article trumpeting the different ratings appeared in the U.S. Chamber's newspaper and website within *two hours* of the ratings announcement. PA1025-26. While representing State Farm on appeal, Shultz never told the Illinois Supreme Court, or counsel for the *Avery* plaintiffs, that he and Sternberg had vetted the two candidates for the ISBA, even after he knew that Justice Karmeier would rule in *Avery*. PA0990.

### II.   Phase II—the Pay Off: State Farm Deceived the Illinois Supreme Court Regarding Its Participation in and Funding of the Karmeier Campaign.

Having succeeded in placing Justice Karmeier on the Illinois high court, Defendants had to make sure Justice Karmeier was not disqualified from participating in *Avery*. At the time of Justice Karmeier's election, Illinois Supreme Court Rule 63 mandated that a Justice "*shall* disqualify himself or herself in a proceeding in which the judge's impartiality *might reasonably be questioned*." Ill. S. Ct. R. 63C (emphasis added). Moreover, on June 8, 2009—before State Farm's second offensive mailing—the United States Supreme Court held that due process requires recusal "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the

judge's election campaign when the case was pending or imminent." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009). This is exactly what State Farm had done. Murnane himself acknowledged the problems that State Farm would face should its contributions become public, when he wrote in a private email: "The U.S. Supreme Court's recent ruling last week in Caperton v. Massey Coal Co. . . . is certain to re-kindle talk of the 2004 Illinois Supreme Court election. . . . Karmeier was supported by interests with close ties to State Farm Insurance which had a case pending before the Supreme Court." PA1027.

Defendants knew that to secure Justice Karmeier's participation in the *Avery* decision they had to conceal State Farm's involvement in the Karmeier campaign. *E.g.*, *id.* That is precisely what they did. On January 26, 2005, the *Avery* plaintiffs filed a Conditional Motion for Non-Participation in the Illinois Supreme Court, suggesting that if Justice Karmeier intended to participate in the *Avery* adjudication, he should not because his campaign had received "substantial donations" from State Farm's "attorneys and law firms," a "trial witness" of State Farm, and State Farm employees and lobbyists. A00080. This motion was supported largely by newspaper articles and public campaign disclosure records. Those articles and records, however, *did not reveal* State Farm's control over the ICJL and Murnane; its involvement in the selection of Justice Karmeier; its financial support and covert direction of funds for the Karmeier campaign through intermediaries; its influence over those intermediaries; or its subversion of the ISBA's judicial candidate evaluation process. None of that information was in the public record, and Plaintiffs had no recourse to discovery to test their suspicions. Only State Farm could have confirmed its role in Justice Karmeier's election, and, pursuant to its plan, it did not do so.

In a January 31, 2005 brief mailed to the Illinois Supreme Court, State Farm falsely denied its extraordinary support for Justice Karmeier's candidacy; falsely denied that it had "engineered contributions" for "the purpose of impacting the outcome of this case"; failed to disclose that Defendants had helped recruit and vet Justice Karmeier; and failed to disclose that State Farm had organized, funded, and directed the Karmeier campaign. PA1028-130. In addition, and by way of example, State Farm's brief stated that:

- "Plaintiffs have concocted a contention that State Farm somehow engineered contributions to Justice Karmeier's campaign for the purpose of impacting the outcome of this case. This is . . . unsupported by any facts." PA1038.

- "Plaintiffs' assertion that campaign contributions from organizations like ATRA were part of an 'attempt [by State Farm] to cloak their influence over Lloyd Karmeier's election' . . . is incorrect and meritless." PA1039.

- "Although Plaintiffs attempt to link large sums in contributions by a variety of persons and organizations to Justice Karmeier's campaign to State Farm, their moving papers and supporting documentation in fact reveal that a limited number of State Farm officers and employees made *quite modest* contributions to Justice Karmeier's campaign." PA1040 (emphasis added).

The Illinois Supreme Court denied the Motion for Conditional Non-Participation without Justice Karmeier's participation, and without explaining its ruling. State Farm's Appendix ("A") 01284.

The *Avery* plaintiffs then moved for reconsideration—citing media reports that the U.S. Chamber had made significant contributions to Justice Karmeier's campaign, but again, lacking formal discovery—and requested a written decision. A00238-44. Instead, the Illinois Supreme Court vacated its order denying the Motion for Conditional Participation and entered an order stating: "Disqualification being a decision exclusively within the determination of the individual judge per Rule 63, and Justice Karmeier having advised the Court that he will not disqualify himself under Rule 63, the motion for conditional non-participation of January 26, 2005, and the motion to reconsider of March 22, 2005, are denied as moot." A01320.

Soon after plaintiffs' recusal efforts were denied, Justice Karmeier voted to overturn the *Avery* judgment. Before then, the Court had been "unable to reach a consensus on how to dispose of" the case. PA1172. According to Justice Karmeier, he broke the "deadlock[]." *Id.*

On September 8, 2011, the *Avery* plaintiffs filed in the Illinois Supreme Court a Petition to Recall Mandate and Vacate August 18, 2005 Judgment, based on new information that State Farm had played a role in Justice Karmeier's election. A00357-897. The Petition was supported by the affidavits of retired FBI Special Agent Daniel Reece and private investigator Douglas Wojcieszak based on information discovered through their own informal investigative efforts. *Id.*

Yet, at this time in 2011, there was still much that the *Avery* plaintiffs did not know and could not have uncovered without formal discovery. For example, they did not know of the close relationships Rust had with Shepherd and Murnane; or of State Farm's power over Murnane and

its decision-making influence within the ICJL; or of Justice Karmeier's contacts with and knowledge of State Farm's support. They did not know that, soon after winning the election and before Justice Karmeier was sworn in, Justice Karmeier and Rust met privately in Chicago, while the *Avery* case was pending. Nor did they know that State Farm held a fundraiser for Justice Karmeier attended by at least 44 of State Farm's top executives. They did not know that the ICJL was a "clearinghouse" for contributions to the Karmeier campaign; that State Farm had funded a study to discredit Justice Karmeier's opponent; or the extent to which Murnane, through the ICJL, recruited Justice Karmeier, selected his campaign team, raised campaign funds for him, and ran his campaign. They did not know the extent to which Justice Karmeier knew the sources of his campaign funds, and, most important, they could not specifically track the money that went anonymously from State Farm, through the intermediary organizations, to the Karmeier campaign to avoid public disclosure and accountability—especially without confirmation that Shepherd played a key role on the ICJL's Executive Committee. They could not document State Farm's influence over the activities of its intermediaries. Nor did they know that State Farm had compromised the ISBA's judicial candidate evaluation process.

State Farm moved to strike the Reece and Wojcieszak affidavits, claiming they were "plainly incompetent and entirely lacking in evidentiary value." A02426-44; A02445-62. Plaintiffs replied that they had no recourse to discovery in the Illinois Supreme Court to obtain other evidence, so they had no means other than the Petition to inform the Court of State Farm's fraud. PA2713-35; PA2736-56.

In further response to the Petition, State Farm filed a second offensive mailing, namely its September 19, 2011 brief to the Illinois Supreme Court. PA1131-70. There, State Farm again falsely denied Murnane's extensive role in the Karmeier campaign. *Id.* State Farm also failed to state that Defendants had helped to recruit and vet Judge Karmeier and helped ensure the ICJL supported the Karmeier campaign. *Id.* In addition, State Farm's submission stated:

- "State Farm itself made no contribution to the campaign" (PA1134);
- "[T]here was no 'funnel[ing]' of money from State Farm through JUSTPAC to Justice Karmeier" (PA1155-56); and

In the Matter of:

*Mark Hale, et al.*
*vs.*
*State Farm, et al.*

---

*Thomas J. Donohue*

*November 9, 2015*

---



**Court Reporting Solutions**

311 South Wacker Drive, Suite 300, Chicago IL, 60606
312.386.2000 - Fax: 312.386.2275

```
 1           MR. SAFER:  Objection, form.  Assumes
 2    facts not in evidence.
 3           MR. BURCHFIELD:  Object to form.  I'm
 4    not sure what the question means.
 5           THE WITNESS:  I don't either.
 6           MR. BURCHFIELD:  You mean manage the
 7    fund-raising relationship with the companies?
 8           MR. BLONDER:  No, I'm looking at a
 9    document from the Chamber, where it says, bullet
10    point, "Tom Donohue manages this company for the
11    Chamber."
12       A   I don't know what the document is.  If
13    you showed it to me, it might be helpful.
14           (Exhibit 13 was marked for identification
15    and attached to the deposition transcript.)
16    BY MR. BLONDER:
17       Q   I'm referring to the second bullet point
18    on the first page.
19           MR. CLIFFORD:  What has the document
20    been marked?  Is this number 13?
21           MR. BLONDER:  13.
22           David, this is USCC-3171 through 3191.
23           MR. JORGENSEN:  Thank you.
24    BY MR. BLONDER:
25       Q   Mr. Donohue, do you see the reference
```

1    progress with respect to the -- being helpful in

2    Illinois?

3        A    As I said, I believe the staff sent him

4    and all of our members the regular reports of how

5    elections ended up.

6        Q    So when you wrote this, "I'll keep you

7    informed of our progress in that regard," did you

8    mean it?

9        A    Of course I meant it, but I'll define

10   it.  The deal was that we had a process of sending

11   out reports, and our staff kept everybody informed

12   of our progress, and I didn't call every

13   contributor back on every issue in every race.  It

14   was a matter of saying we will be as helpful as we

15   can in keeping people up to speed.

16       Q    Well, when you tell someone that you

17   personally will keep them informed, is it your

18   practice to do so?

19            MR. BURCHFIELD:  Object.  Argumentative.

20   Mischaracterizes the document.

21       A    When I say that I am going to do

22   something on behalf of the Chamber, I have 400

23   people that can help me do it.  It doesn't mean

24   that I will personally grab a phone every time

25   somebody has something that they could learn.

Thomas J. Donohue    November 9, 2015

130

```
1        Q    But Mr. Rust was one of those special
2    people for the Chamber.  So for those special
3    people, did you keep them informed?
4            MR. SAFER:  Object.  Object to the form
5    of the question.
6            MR. BURCHFIELD:  I join in the
7    objection.  It's argumentative.  Mischaracterizes
8    the testimony.  You may answer.
9        A    I did not make it my business to call
10   every special person and inform them about every
11   effort on the telephone or in a letter.  We sent
12   regular reports of the results of what goes on in
13   ILR, and they were sent by the staff, whom I'm
14   very -- trust.  They're excellent people.  And
15   that was a way of us keeping him informed.  That's
16   what I remember and that's what I testified to.
17           MR. BLONDER:  I'm going to mark this as
18   Exhibit 14.
19               (Exhibit 14 was marked for identification
20   and attached to the deposition transcript.)
21           MR. BLONDER:  David, just so you know,
22   Exhibit 14 is USCC-3344.
23       A    Thank you.
24       Q    Mr. Donohue, you've been handed
25   Exhibit 14, which is a document, USCC-3344.  Do
```

Thomas J. Donohue    November 9, 2015

131

1    you see that?

2        A    Yes.

3        Q    Your signature at the bottom of the

4    page?

5        A    Yes.

6        Q    You say, "Ed" -- this is from

7    November 16, 1999 -- "your recognition of the

8    progress we've made at the Chamber is important to

9    me.  We're clearly back in the game and having an

10   effect in D.C. and around the world."

11            Do you see that?

12       A    Yes.

13       Q    And "clearly" being "back in the game

14   and having an effect in D.C." referred to your

15   legislative activities on behalf of companies or

16   groups of companies that was done under the

17   Chamber's banner, correct?

18       A    Correct.

19       Q    These are what we talked about before,

20   where a company could contribute money to the

21   Chamber but the Chamber would engage in activities

22   under the Chamber's name, granting anonymity to

23   the contributors, correct?

24            MR. SAFER:  Objection.

25       A    I don't -- let me read it again,

Thomas J. Donohue    November 9, 2015

132

1    counsel.

2            (Document review.)

3            There is no comment in this letter about

4    operating in a way that gives them anonymity while

5    we went out and did the work.  It simply -- this

6    was early on in my tenure, and it simply stated

7    how our progress was and said that we'll always be

8    available to help without all the editorial

9    comments.

10       Q    You see here it says, "We have

11   commitments from seven of the nine original

12   members of the President's Advisory Group, and I'm

13   about to close the eighth."

14           Do you see that?

15       A    Yes.

16       Q    So now, does that refresh your

17   recollection that State Farm was one of the nine

18   original members of the President's Advisory

19   Group?

20       A    It does.  Thank you, counsel.

21       Q    You say, "Simply stated, I'll put the

22   money to good use, do whatever I can to help your

23   industry and always be available when you have a

24   particular concern."

25           Do you see that?

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS


MARK HALE, TODD SHADLE, LAURIE
LOGER, and MARK COVINGTON, on
behalf of themselves and all
others similarly situated,

        Plaintiffs,

                           Case No.
     vs.                   3:12-cv-00660-
                           DRH-SCW

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, WILLIAM G. SHEPHERD,
and CITIZENS FOR KARMEIER,

        Defendants.

----------------------------

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

SHERMAN "TIGER" JOYCE

Thursday, May 21, 2015

Washington, D.C.


Reported by:

Lori J. Goodin

JOB NO. 14165

CONFIDENTIAL

Page 34

1   BY MR. CLIFFORD:

2        Q.    Go ahead.

3        A.    Well, I think that I was asked to

4   participate in this process to reconstruct what

5   happened over a decade ago.

6        Q.    Right.

7        A.    And reviewed a lot of records.  And

8   including my own communications and all of our,

9   all that we could find, and tried to determine,

10  including the use of my own memory, as to whether

11  any funding that we had received from State Farm

12  was for that purpose, the specific purpose that

13  is at issue here.

14            And to the best of my knowledge, it

15  was, I, it was not, I could not say that we had

16  used funds from State Farm specifically for the

17  purpose of this campaign.

18       Q.    When, well, you are aware that, and

19  we will get into it a little bit later.

20            You are aware that specific funds

21  were sent.  I believe, the number is around

22  $415,000, the one that comes to mind to me.

23            That during 2004 a total of $415,000

24  was sent by ATRA to JUSTPAC.  Do you know that?

25       A.    That sounds about right, yes.

CONFIDENTIAL

Page 52

1   have just had discussions with the Chairman of

2   the Board about different items, just on a

3   regular basis.

4            And, certainly the, sort of the

5   collective understanding that there was interest

6   in the state supreme court races, the AG races

7   around the country was well known within the

8   membership.

9            And, so, I would, the

10  recommendations might come to me from some`of our

11  members or perhaps from a consultant.  You saw,

12  you mentioned from Mr. Pintak.

13           But, ultimately it would have been

14  my call to make sure that, you know, that we

15  were, that whatever we did was consistent with

16  our mission.  That we weren't creating any

17  particular, that we weren't causing tax problems.

18  We weren't creating a potential conflict within

19  our membership.

20           And, so, that was the, sort of the

21  decision making process that I would undertake.

22       Q.    So, let me, at, in '03, '04, tell us

23  who from State Farm was involved in the

24  organization.

25       A.    We had a lawyer named Dave Hill, I

CONFIDENTIAL

Page 53

1    believe was, throughout the whole period was on

2    our board.

3              But, we worked with Dave pretty

4    extensively on our grassroots program --

5         Q.    Right.

6         A.    -- at the time.  Our public

7    education program.  But, that would, he would

8    probably be our principal contact.

9         Q.    And Ed Murnane was on the board

10   during that period?

11        A.    I don't recall precisely what year

12   he began.  But, certainly we knew Ed from his

13   tenure at the Civil Justice League.

14        Q.    Am I correct that Ed had two

15   hitches, if you will, with ATRA?  Where he was on

16   the board for a while, went off, and then came

17   back?

18        A.    It could be.  I don't recall.

19        Q.    Okay.  And going to your '04 956A

20   account, and the million six that you talked

21   about, so, is it your testimony that you made the

22   decisions on all of that money in terms of

23   distributing it?

24        A.    Well, I got guidance and thoughts

25   from a variety of people, but ultimately it was

# CHAMBER OF COMMERCE
#### OF THE
## UNITED STATES OF AMERICA

**THOMAS J. DONOHUE**
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

1615 H STREET, N.W.
WASHINGTON, D.C. 20062-2000
202/463-5300 • 202/463-5327 FAX

December 2, 2003

Mr. Edward B. Rust, Jr.
Chairman and Chief Executive Officer
State Farm Insurance Companies
One State Farm Plaza
Bloomington, IL  61710

Dear Ed:

Thanks very much for our helpful and pleasant meeting in your office last week.  I appreciated the opportunity to bring you up-to-date on our success on the class action legislation and the agreement we have crafted with a sufficient number of Democratic Senators to ensure passage of the bill either on the Senate's return on December 9 or immediately after the first of the year depending on their schedule. We are also currently working with the House to get them to pick up the bill to avoid a conference.  I will get you the language on the legislation as soon as possible.

Thank you for agreeing to consider my suggestion that you join the Chamber's Board of Directors.  I know you have a very busy schedule but our board meets only three times a year and attendance at two meetings is considered acceptable.  Enclosed are lists of our board members and the upcoming meeting dates.  Your participation would be very important to us and would make it possible for you to join our leadership team in the years ahead.

Please review the Chamber's Capital Campaign material I left with you and consider my proposal that State Farm support this effort in a significant way.  As we discussed, we have already received a number of significant commitments during the "quiet days" of our campaign, ranging between $5 and 20 million, and payable over a five year period of time.

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

Mr. Rust
December 2, 2003
Page Two


Ed, it would be very helpful if State Farm would be able to support this effort at the $5 million level, payable over five years and beginning in 2004. I will give you a call in the next few weeks to answer any questions. After that time, we can arrange a formal proposal for consideration by you and your colleagues.

Thanks again for your support in so many areas. Please let me know when you are coming to Washington so we can get together for another chat.

Best wishes.

Sincerely,

Tom

Thomas J. Donohue

Enclosures

USCC-003046

March 14, 2007

**MEMORANDUM TO: TOM DONOHUE**

**FROM:**          **AGNES WARFIELD**

**RE:**             **MEETING W/ EDWARD B. RUST, JR., Chairman,**
                    **President, and CEO**
                    **STATE FARM MUTUAL AUTOMOBILE INSURANCE**
                    **COMPANY**
                    **ILR BOARD MEMBER**

                    **March 15, 2007**

---

**GOAL:**

1. Formalize commitment made in 2006 on their $5M pledge for the Capital Campaign payable over five years (see attached letters) and determine payment schedule.
2. Thank him for renewing his PAG and ILR support for this year.

**Note:**

Rust also serves on the boards of The McGraw-Hill Companies, Inc. ($50K NA), Financial Services Roundtable ($15K Chamber members), Caterpillar (PAG, $25K NA, $1M ILR), Insurance Information Institute (not Chamber members), The Conference Board (not Chamber members), the National Center for Educational Accountability (not Chamber members), and Helmerich & Payne, Inc. ($1.2 billion/year, not members).  He also serves as Co-Chairman of the Business Roundtable and Vice Chairman of the Illinois Business Roundtable.

James Rutrough (Vice Chairman and CAO) is a Chamber board member.  He attended the 3/07 board meeting. He also accepted the Dennis Sheehan award on Rust's behalf in June of 2005.

State Farm is a funder of the Institute for Competitive Workforce and Kathy Havens Payne (Director of Education Leadership) is a member of the ICW Board. (Rust is a former member of the Board.)  Rust received the principal award from ICW at its summit in Dallas last fall.  In addition, Rust is Co-Chair of the Business Coalition for Student Achievement, which ICW runs in conjunction with the Business Roundtable.  Its focus is reauthorization and strengthening of No Child Left Behind.  Rust is extremely interested in education and workforce issues (see attached report).  Rothkopf requested $250,000 from State Farm, through Payne, for education efforts - $50,000 was for ICW, which was paid and the $200,000 for our legislative efforts.  This was not paid.  NCLC has a request pending with State Farm to increase their support from $30,000 to $50,000.

1

**MAJOR POINTS OF INTEREST:**

- **Sarbanes-Oxley**: Sarbanes-Oxley compliance has had a major impact on insurance companies, an industry in which future predictions, as well as past financial practices, must be reviewed. On February 26 the Chamber filed comments with the SEC proposing specific technical improvements to the implementation of Section 404 of this legislation.
- **Capital Markets Commission:** State Farm will be interested in the Chamber's Capital Markets Commission's newly-released report outlining specific legislative and regulatory recommendations on the continued competitiveness of U.S. capital markets.
- **NCLC Information:** The Chamber's NCLC has filed numerous amicus briefs on State Farm's behalf (see NCLC section).
- **Education**: State Farm has a vested interest in the Chamber's education and workforce initiative. The Chamber has recently released a bipartisan report on state educational effectiveness that graded all 50 states and Washington, DC, on nine broad categories (see attached report).
- **Protecting America:** State Farm is heavily involved with Protecting America. This organization is a coalition and Allstate and State Farm are both members. The co-chairs of the coalition are James Lee Witt (Former Director, Federal Emergency Management Agency and Chief Executive Officer, International Code Council ) and Admiral James M. Loy (National Co-Chair Former Deputy Secretary, Department of Homeland Security Commandant, U.S. Coast Guard, Retired). The group is working to improve financial protection for consumers by establishing special catastrophe backstops at the state and national level to provide recovery and rebuilding funds in case of a major natural catastrophe; to support efforts to improve prevention and mitigation programs through stronger building codes; to augment homeowner education and consumer protections to make sure people are better prepared for catastrophes before they strike; to strengthen first responders by enhancing existing emergency response protocols; and to improve relief, recovery and rebuilding by developing new processes to stage and deploy essential relief materials and to make sure there are adequate building materials, supplies and licensed contractors available in the aftermath of a catastrophe.

- State Farm is also interested in getting the Homeowners Insurance Act passed but the Chamber currently does not have a position on it. The Act would improve the way America prepares for and protects citizens from natural catastrophes. **Bruce Josten and Lisa Rickard do not recommend that we get involved in this Act or this coalition's activities because the insurance industry itself cannot reach a consensus.** In the past, Andrew Howell didn't want us to endorse Protecting America. The impression was that State Farm and others are all in a battle about how not to pay the Gulf Coast resident's claims and that impression means bad publicity. Therefore, some see Protecting America as a way to mitigate the impact of the unfavorable publicity with other initiatives.

2

In addition, Ann Beauchesne (Chamber's Homeland Security Executive Director) believes that the insurance industry is split, and that there are a lot of issues associated with the Act, not the least of which is "moral hazard" (folks investing in things that they know are bad risks because they think their downside is covered). Furthermore, the Act would establish within the Treasury Department a Fund that would sell, at actuarially sound and self-sufficient rates, federal catastrophe reinsurance directly to state catastrophe funds. A state fund would purchase the reinsurance from the federal Fund at the beginning of the contract year, and the state fund could not tap into the available federal money until both private insurers and the state fund meet their financial obligations. However, the Chamber is reviewing the Private Sector Annex for DHS' National Response Plan, which outlines activities necessary to ensure effective coordination and integration with the private sector. The Chamber will participate in DHS' National Exercise Program, including the program's cornerstone exercise, TOPOFF 4 in October. We will also continue to facilitate the dialogue between our members and the Federal Emergency Management Agency on private sector capabilities and limitations and best practices for the Federal disaster logistics supply chain.

## REVENUE:

$60 billion/year (2005) – Private

## ASSETS:

Over $89 billion

## FORTUNE 500:

# 22

## ISSUES: *(see attached analysis)*

1. **Legal Reform and Litigation Efforts**
   The nation's litigation explosion poses a threat to the entire business community, including State Farm Mutual Automobile Insurance Company (State Farm). The company has been targeted by class action lawsuits relating to hurricane damage and automobile parts. State Farm will also be interested in the Chamber's efforts specifically concerning legal reform in Illinois, the site of its corporate headquarters. The Chamber has actively campaigned for pro-reform candidates and supported reform measures in Illinois and particularly Madison County, notorious for its abusive legal system.
2. **Investment and Growth Initiative**

3

USCC-003289

As a Fortune 100 company with a net worth of $50.2B, State Farm will be interested in the Chamber's efforts to protect the health of U.S. capital markets. State Farm Mutual Funds have $7.6B in assets under management.

3. **Education and Workforce Initiative**

4. **Tax Reform**
   State Farm stands to benefit from the Chamber's tax reform efforts both in terms of minimizing its tax liability and offering the company greater financial planning opportunities in serving its clients.

5. **International Resources/Trade Efforts**
   State Farm provides insurance and financial services to households and small businesses in Canada.

6. **Global Regulatory Cooperation**
   State Farm will benefit from the Chamber's efforts to address divergent regulations across global markets that serve as barriers to trade.

7. **Health Care Initiatives**
   Based on premiums written in the United States in 2004, State Farm ranks 12th among all companies selling individual health insurance. Changes to the health care system affect companies like State Farm directly, giving them a highly vested interest in guiding the system's evolution.

8. **Labor and Employment Initiatives**
   With 68,000 employees, State Farm must manage a host of labor issues, including overtime and labor-related lawsuits.

9. **Homeland Security**
   As a property and casualty insurer, State Farm has a direct interest in the United States' developing homeland security programs and the Terrorism Risk Insurance Act (see section below). The terrorist attacks of September 11, 2001, challenged the institutional framework of the U.S. government and reordered the nation's priorities. The government has responded with its biggest reorganization in 50 years. The business community must marshal an equally strong response, which is the mission of the Chamber's Homeland Security Policy Division.

10. **Political and Lobbying Efforts**

4

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003290

**MEMBERSHIP BACKGROUND:**

**2007:**
$25,000 to ILR (Special Contribution – received 3/07)
$100,000 to PAG accrued and committed
$1 million to ILR accrued and committed

**2006:**
$1 million to ILR (received 4/06)
$250,000 to ILR (Special Voter Education Contribution – received 11/06)
$100,000 to PAG (received 8/06)
$30,000 to NCLC

**2005:**
$1 million to ILR (received 9/05)
$100,000 to PAG (received 8/05)

**2004:**
$1 million to ILR (received 5/04)
$100,000 to PAG (received 6/04)

**2003:**
$1 million to ILR (received 6/03)
$100,000 to PAG (received 7/03)
$25,000 to NCLC

**2002:**
$1 million to ILR (received 8/02)
$100,000 to PAG (received 8/02)

**2001:**
$1 million to ILR ($500K received 12/01 and $500K received 10/01)
$100,000 to PAG (received 10/01)
$26,263.07 to NCLC

**2000:**
$500,000 to ILR (received 12/00)
$100,000 to PAG (received 11/00)
$20,000 to NCLC

**1999:**
$12,000 to NCLC
$100,000 to PAG (received 12/99)

5

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003291

**1998:**
$100,000 to PAG (received 11/98)
$50,000 to ILR (received 8/98)
$10,000 to NCLC

**1997:**
$100,000 to PAG (received 12/97)
$26,000 to NA

- Rutrough and Paul N. Eckley (SVP, Investments) RSVP'ed to attend the 2007 WEF meetings in Davos.

- In 1/07 Alan Maness (Associate General Counsel) attended the ILR Donor Reps meeting.

- In 12/05 you spoke to Rust and he committed to $5M to the Capital Campaign, payable in equal installments over 5 years.

- In 7/05 you met with Rust and he committed to PAG renewal for this year and next and to $1M for ILR in 2005. You asked for $5M for the Capital Campaign over five years. He agreed to make a decision soon. You discussed the business community's role in K-12 education. You also discussed corporate governance, states attorneys general, the need for the business community to be sensitive to foreign cultures, executive compensation and TRIA. You told him we would be appointing our commission on regulation of the capital markets and talked about the prediction of quarterly earnings.

- In 2/05 you spoke with Rust regarding West Virginia, ILR, and class action. You told him you would stop by in Illinois to follow-up on your discussion. You thanked Rust for giving you a positive inclination to continue the company's support to ILR.

- In 2/05 Stan Ommen (President and CEO, State Farm Bank) and Rust attended the Financial Services Roundtable meeting that you attended.

- In 12/04 you met with Rust and discussed corporate governance. You told him that you met with others in the financial community and that you would get him a rough draft of our plan of work. You thanked him for his positive position on the Steve Hantler matter and his efforts to assure that the Roundtable and the Chamber partnership prospers. You told him that you would schedule a conference call for him with Suzanne Clark. Clark put a call into Rust several times about this, but did not hear back. You told him that you would schedule a dinner with him in the new year to discuss the Capital Campaign.

- You originally met with Rust in 1997 and afterwards he joined the PAG. You discussed civil justice reform.

6

USCC-003292

- Before 1997, when they joined the PAG, the company had been a $26K member (at their highest level) of the Chamber since 1944.

- Employees are active on our Education, Employment, and Training Committee, Emerging Technologies Committee, Employee Benefits Committee, Public Affairs Committee, and the Regulatory Affairs Committee.

- Rust spoke at BCLC's first Business Education Network Summit (October 2005).

- Rust, Kim Brunner (EVP, Secretary and General Counsel), and Maness were instrumental players in ILR's efforts with class action fairness.

- In 12/06 Regina Dillard (Federal Affairs Counsel), attended the Future of Privacy event.

- In 7/06 Maness attended the State of the American Judiciary event in 7/06.

- State Farm was a 2006 voteforbusiness.com partner.

### NCLC INFORMATION:

- NCLC has filed several State Farm friend of the court briefs over the years.  The most recent include:

**Scope of Adverse Action under the Fair Credit Reporting Act (FCRA)***; State Farm Mutual Automobile Insurance Co. et al., v. Willes*; Supreme Court of the United States
The Supreme Court agreed to hear two of the four cases in which NCLC urged review of the Ninth Circuit's disposition of class action lawsuits filed against various insurance companies for alleged willful violations of the FCRA for failure to provide applicants with adverse action notices taken against the applicants in receiving insurance premium quotes.  The Supreme Court agreed to consider whether initial insurance premium quotes provided by GEICO and Safeco constitute adverse action under FCRA, and if so, whether the actions taken by the insurance companies were willful and worthy of punitive damages.
*Amicus* brief filed 8/21/06.  *Certiorari* granted 9/26/06.

**Improper Certification of Nationwide Class Action;** *State Farm Mutual Automobile Insurance Company v. Avery, et al.*; Supreme Court of Illinois - The Illinois Supreme Court overturned an unprecedented trial court decision to grant class action status to a lawsuit involving nearly five million plaintiffs in forty-eight states.  NCLC argued that the state trial court's expansive class action ruling - which resulted in a billion dollar judgment - was based on a number of improper practices, including ex parte certification of a nationwide class and application of the state's consumer fraud statute on a nationwide basis.

7

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

NCLC warned that Illinois' failure to properly enforce class action requirements has turned certain plaintiff-friendly counties in the state into meccas for filing nationwide class actions.

**Class Action Forum Shopping;** *State Farm Mutual Automobile Insurance Company v. Gridley;* Supreme Court of Illinois

Agreeing with NCLC, the Illinois Supreme Court overruled the trial court's decision to allow a nationwide class action - filed by a Louisiana plaintiff and arising out of a Louisiana cause of action, involving Louisiana witnesses and documents as well an interpretation of Louisiana law - to be brought in Madison County, Illinois. Applying the doctrine of *forum non conveniens*, the Court found no evidence that Madison County was the more convenient forum. In its brief, NCLC had explained that Madison County is the more convenient forum for the plaintiffs' bar only and this class action complaint underscored the realities of forum shopping in a county that now has the highest per capita class action filing rate in the nation. *Amicus* brief filed 11/06/02. Oral argument held 1/22/03. Decision 11/17/05.

**Trade Secrets**; *State Farm Mutual Automobile Insurance Company v. Garamendi*; California Supreme Court

NCLC argued that a California Court of Appeals' decision allowing regulatory disclosure of confidentially filed trade secret information under the Insurance Code violates due process and threatens to undermine all trade secret privileges, including the state's longstanding recognition of trade secrets as constitutionally protected property rights. The California Supreme Court ruled that the insurers could not claim a trade secret privilege with regard to information that was legitimately related to rate information. *Amicus* brief filed 6/19/02. Decision 4/26/04.

**Excessive Punitive Damages;** *State Farm Mutual Automobile Insurance Co. v. Campbell;* U. S. Supreme Court - NCLC had urged the U. S. Supreme Court to review the ruling of the Utah Supreme Court on remand form the Court's decision in *State Farm I* which provided guidance to state and lower federal courts on how to review punitive damages award to ensure that they are not excessive, guidance which the Utah Supreme refused to follow when it reinstated a punitive damage award equal to nine times the size of the compensatory where the Supreme Court had endorsed a 1-to-1 ratio of punitive to compensatory damages. *Amicus* brief in support of certiorari filed 8/23/04. *Cert.* denied 10/4/04.

**Antitrust Class Action**; *Gilchrist v. State Farm Mutual Automobile Insurance Company;* U. S. Court of Appeals for the Eleventh Circuit

In the course of considering whether a class action was properly settled, the Eleventh Circuit became concerned about whether the plaintiffs' claims were barred by the McCarran-Ferguson Act, which creates an exemption from the antitrust laws for the business of insurance. The appellate court decided that the plaintiffs' claims fell within the scope of the exemption and ordered the district court to dismiss the case.

8

Although the court did not reach the class certification issues raised by NCLC - which argued that the standard adopted by the district court results in erroneous certifications, which in turn compels defendants to settle even meritorious cases - the dismissal is nevertheless a victory for the defendants and a loss for the class action lawyers on the plaintiffs' side.

*Amicus* brief in support of Petition to Appeal Class Certification filed 12/13/02. Motion to file *amicus* brief granted 1/2/03. Interlocutory appeal of the class action order granted 2/18/03. *Amicus* brief filed 7/17/03. Order to district court to dismiss case issued 11/18/04.

## CORPORATE BACKGROUND:

- State Farm is the leading US personal lines property/casualty company (by premiums) and is the #1 provider of auto insurance. It also is the leading home insurer and offers non-medical health and life insurance through its subsidiary companies. Its products are marketed via some 17,000 agents in the US and Canada.

- Competition has increased with the fall of barriers between the banking, securities, and insurance industries. State Farm's not-so-secret weapon is a federal savings bank charter, State Farm Bank, that offers consumer financial products through State Farm agents and by phone, mail, and the Internet.

- Since establishing itself as a financial services provider in 1999, the company has built up $12.2 billion in assets. However, insurance is still its main source of income. And, while State Farm already insures nearly 20% of the automobiles on US roads, it is looking to grab an even larger portion of that pie. Weakness in auto insurance during 2003 and 2004 spurred the company to refocus its efforts on the segment that accounts for over 50% of its policies and almost 65% of the company's property/casualty premiums.

- Meanwhile, homeowners insurance has been a thornier issue. It still insures 20% of the single-family homes in the US, but the insurer stopped writing new homeowners policies in some 15 states in an effort to improve profitability.

- Hurricanes Katrina, Wilma, and Rita brought State Farm customer claims totaling $6.3 billion in property and casualty losses. For residents along the Gulf Coast, at first it seemed like State Farm would stay put. However, as the claims keep rolling in, the company has rewritten its underwriting guidelines to limit its risk. New homeowner policies in places such as New Orleans will have steeper deductibles and less coverage, and the company has completely stopped offering new homeowners and commercial property policies in the state of Mississippi. (See news).

- Since its founding, the group's companies have been run by only two families, the Mecherles (1922-54) and the Rusts (1954-present).

9

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003295

**RECENT NEWS:**

- In 3/07 it was reported that if the federal judge overseeing Mississippi's Hurricane
  Katrina insurance cases wants a class-action settlement over 36,000 claims
  against State Farm to move forward, he will have to make his concerns better
  understood, the lawyer bringing the case suggested.  But the logjam won't affect
  the Mississippi insurance department's investigations into how State Farm
  handled hurricane claims, the insurance commissioner said, adding that his
  department will also be taking a look at Allstate's (PAG, $500K ILR) conduct.
  The class-action settlement proposed in January in the so-called Woullard case
  against State Farm would have had the insurer reopen approximately 36,000
  claims for policyholders who lived near the coast, with an eye toward paying most
  of them more money. In an interview, Mississippi's insurance commissioner
  George Dale said the case would not affect his own department's investigations
  into how insurers conducted themselves in the wake of 2005's hurricane season.
  After the State Farm investigation is over, Dale said the department will take a
  look at the next-largest insurer in the state, Allstate, which could result in similar
  orders for that insurer's claims.

- In 3/07 it was reported that State Farm Fire & Casualty Co. settled out of court
  with a couple who sued the company over Hurricane Katrina damages to a rental
  home they own, ending a federal trial just as it was to go to a jury. U.S. District
  Judge Peter Beer told jurors a settlement was reached after he ruled punitive
  damages weren't warranted under Mississippi law. Separately, Mississippi
  Insurance Commissioner George Dale said State Farm has agreed to reopen all
  800 to 1,200 cases where policyholders were left with only slabs after Katrina.
  Michael and Michelle Williams sued State Farm for denying their claim on their
  Ocean Springs rental property, which Katrina knocked off its foundation. State
  Farm and other insurers say their policies cover damage from wind but not rising
  water, including wind-driven surge.

- In 3/07 it was reported that State Farm rewarded its leader, Rust with a $5.26
  million, 82% raise after posting a record profit last year. Rust earned $11.66
  million in 2006, including a base salary of $1.77 million and results-based bonus
  of $9.89 million, spokesman Dick Luedke said. Rust made $6.4 million in 2005
  and $5.5 million in 2004. "Our goal has been to adjust his compensation to
  compare more competitively with other organizations like us," Luedke said,
  noting that Rust doesn't receive millions in stock options like top executives at
  other similarly sized, publicly traded Fortune 500 companies.  The absence of a
  major catastrophe helped the company generate a record $5.32 billion profit last
  year, compared to $3.24 billion in 2005. State Farm bases Rust's salary on more
  than financial results, Luedke said. The company also takes into account customer
  retention rates and other performance factors.

10

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

- In 3/07 State Farm introduced new advertising to coincide with the start of NCAA (revenue not available, not members) March Madness. Known as "Selection Sunday," March 11 marked the official start of March Madness. As an official corporate partner of the NCAA, State Farm is setting up a play for consumers' attention throughout the men's and women's tournament season. State Farm's NCAA campaign includes new advertising that features prominent college basketball coaches – Duke University's Mike Krzyzewski (Coach K) and University of Tennessee's women's basketball Coach Pat Summitt. "It makes perfect sense for State Farm to team up with Coach K and Coach Summitt. We're the leader in our industry and they're the leaders in their fields," said Mark Gibson, State Farm Assistant Vice President – Advertising. "As the official insurance corporate partner of the NCAA, we're building on the existing sponsorship by creating new ads with these amazing coaches."

- In 2/07 the State Farm Youth Advisory Board, in partnership with State Farm, announced that it will award $3,054,715 for youth-led, service-learning based projects to 44 organizations across the United States and Canada. The $3 million will be awarded in the following ways: $774,459 will go to 10 organizations for disaster preparedness projects. $639,270 will go to 8 organizations for projects focusing on driver safety. $1,084,914 will go to 15 organizations for higher education/closing the achievement gap projects. $533,780 will go to 11 organizations for projects focusing on financial education. The State Farm Youth Advisory Board is a diverse group of 30 youth, ages 17-20, who were chosen through a competitive process to lead and oversee this $5 million/year signature service-learning initiative.

- In 2/07 State Farm Fire and Casualty Co. asked a federal judge to disqualify himself from hearing a bid to certify a class action lawsuit against the insurer over Hurricane Katrina damages. In court papers filed in Gulfport, Mississippi, a State Farm lawyer questioned whether U.S. District Judge L.T. Senter, Jr., can be impartial in the case because a federal magistrate judge and a federal court clerk in Mississippi could be plaintiffs in a class action against the company. Senter already has recused himself from hearing the individual lawsuits that U.S. Chief Magistrate Judge John Roper and Terri Brown, a clerk for U.S. District Judge Louis Guirola Jr., filed against State Farm. Senter also should excuse himself from ruling on the bid for a class action to avoid "even an appearance of partiality" toward Roper or Brown, State Farm Attorney William Reed wrote. Senter is scheduled to hear arguments from attorneys on whether to allow a class action against State Farm by policyholders whose homes were completely destroyed. State Farm also is seeking to bar one of Senter's clerks from working on any of the lawsuits that Gulf Coast homeowners filed against the company after Katrina because he sued a different insurer over storm damage to his own home. A State Farm attorney said in court papers that it creates an "appearance of impropriety" for the clerk, Jerry Read, to assist Senter in dealing with Katrina cases in Mississippi after Read sued Allstate for denying part of his claim.

11

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003297

- In 2/07 it was reported that weeks after State Farm agreed to a proposed class-action settlement that would have it reopen thousands of Hurricane Katrina claims in Mississippi, the insurer said it would no longer write new homeowners or commercial property policies in the state. State Farm will continue to sell auto insurance and financial services in Mississippi, and the halt doesn't mean an immediate withdrawal. But it does signal State Farm's intent to steadily disengage in the Gulf region state, where Katrina caused massive damage in 2005. The decision was based on "uncertainties in the Mississippi legal and business environments," said Bob Trippel, State Farm's Senior Vice President, in a statement. "We came to this decision reluctantly," Trippel said. "But it is no longer prudent for us to take on additional risk in a legal and business environment that is becoming more unpredictable. When there's more certainty, we will reassess the situation."

- The following is an op-ed written in the *Wall Street Journal* in 2/07 about the feud between Sen. Lott and State Farm as it relates to pending insurance legislation to remove the industry's antitrust exemption. The op-ed notes that the one big question when Democrats took over Congress was which industry would be first to feel the new majority's populist rage. The op-ed says we have found out and that it is the insurance industry thanks to Trent Lott. The Mississippian was "infuriated" by the insurance industry's refusal to shell out for certain Katrina claims, most notably his own. So Lott is spearheading a ferocious campaign of political revenge that would make even Henry Waxman envious--replete with investigations, voracious trial lawyers, ambitious state attorneys general and threats of punitive federal legislation. And like most personal grievances that get morphed into policy battles, it's ending badly for consumers. Lott's beachfront property in Pascagoula--one of three homes he owned--was swept away entirely by Hurricane Katrina's waters. Like many Gulf Coast residents, Lott was soon reminded by his insurer, State Farm, that his policy only covered wind damage--not flood damage. The senator surely knew that, which is why he'd also purchased federal flood insurance. According to his flood policy that was in effect when Katrina hit, he was covered up to $350,000 in flood damages, and he presumably collected in full. State Farm, however, refused to cough up, inspiring Lott to embark on a campaign ripped straight out of the Democratic playbook. First was to pay a call to the favorite mob squad of the left, the plaintiffs' bar. Quicker than you can say "tort reform," Dickie Scruggs, the legal kingpin who engineered Mississippi's tobacco shakedown, was representing Lott in a high-profile lawsuit against State Farm.

12

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

- In 2/07 it was reported that Florida escaped last year's hurricane season without any devastating storms. But upheaval in its insurance system is intensifying, fueling a debate about the role of free markets in a turbulent industry. Florida's Legislature and its Republican governor approved legislation that would make the state a bigger player in the market for catastrophe coverage. The new law gives a state-created insurer wider latitude to compete with private insurers like Allstate (PAG, $500K ILR) and State Farm in selling homeowners insurance. The state also is expanding its hurricane fund into a $35 billion giant that will compete with companies like Warren Buffett's Berkshire Hathaway Inc. (Subsidiary: GEICO – PAG) and hedge funds to provide a backstop to the insurance industry. The moves place Florida at the center of fresh battles brewing across the country in a debate over the appropriate role of government in the insurance market. Though the economic backdrop differs from state to state, the underlying theme is the same: Who should have the back of Americans when disaster strikes?

- In 1/07 it was reported that a high-profile lawyer, Richard "Dickie" Scruggs, whose firm was paid more than $1 billion for helping negotiate a settlement with tobacco companies in the mid-1990s will earn a sizeable paycheck for his work on Mississippi's accord with State Farm Fire & Casualty Co. over Hurricane Katrina damage. Scruggs and other members of his legal team can collect up to $46 million in fees from the accord with State Farm. The company is expected to pay hundreds of millions of dollars to resolve more than 600 lawsuits and thousands of other disputed claims stemming from its refusal to pay for damage from Katrina's storm surge.

- In 11/06 it was reported that when State Farm approached Vincent J. Trosino Sr. for a job interview more than four decades ago, the 21-year-old Pennsylvania resident thought he was applying at a prison. "In Pennsylvania, the low-security prisons are called 'state farms,' " said Trosino, who at the time was fresh out of college with a degree in psychology from Villanova University. Knowing little of State Farm or the insurance industry in 1962, Trosino nabbed a $5,150-a-year job as a Unit Supervisor overlooking mail delivery and employee training. At that point, he was another face in a crowd of State Farm employees. When he retired he was second in command of State Farm. Trosino retired in 12/06 as President and Chief Operating Officer. "My wife and I are not going to travel down the Nile for seven days," Trosino joked of post-retirement plans. "I'm tired of packing a suitcase and sleeping in hotels." Instead, he plans to relax with family.

13

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003299

- In 10/06 State Farm and the NFL (revenue not available, not members) announced that they are teaming up in an exclusive marketing sponsorship. This marks the first time that the nation's largest insurer of homes and automobiles has joined forces with the nation's most popular sport. The three-year agreement presents State Farm with numerous marketing and advertising incentives, the opportunity to leverage the NFL brand, as well as the first-ever presenting sponsorship of the NFL Pro Bowl beginning with the 2007 game. "This sponsorship of the NFL allows State Farm to communicate through a channel that reaches millions of people and has an incredibly loyal fan base," said Mark Gibson, Assistant Vice President, Advertising, State Farm. "With this alliance, State Farm is able to leverage the power of the NFL, and effectively reinforce its message that it is committed to being customers' first and best choice."

## WASHINGTON OFFICE:

Regina Dillard (Counsel) heads the Washington, D.C. office.

## OTHER PAGS IN THE INDUSTRY: (38)

ACE Limited ($500K ILR)
AEGON USA, Inc. ($1M ILR)
Aetna Corporation
AFLAC Incorporated ($10K NA)
Allianz Life Insurance Company Of North America
Allstate Corporation ($500K ILR)
American Family Insurance Company
American Financial Group
American International Group ($600K, $30K NA, $1M ILR)
Arch Capital Group Limited
Chubb Corporation ($250K ILR)
CNA Financial Corporation
CUNA Mutual Group
Fairfax Financial ($100K)
Geico Corporation
Great-West Life and Annuity Insurance Company
Hartford Financial Services Group, Inc.
ING Americas ($250K ILR)
Liberty Mutual ($15K NA, $250K ILR)
MetLife, Inc.
Mutual of Omaha Companies
New York Life Insurance Company ($500K ILR)
Northwestern Mutual, Inc. ($1M ILR)
Old Republic International

14

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

Power Corporation of Canada
Prudential Financial, Inc. ($1M ILR)
RenaissanceRe Holdings Ltd.
Safeco Corporation
Swiss Reinsurance Company ($500K)
The Travelers Companies, Inc. ($500K)
UnitedHealth Group Incorporated ($500K ILR)
UNUMProvident
W.R. Berkley Corporation
Western and Southern Financial Group
Westfield Group ($100K ILR)
Willis Group Limited
XL Capital Ltd. ($1M ILR)
Zurich Financial Services (Farmers - $30K NA, $200K ILR)

### COMPETITORS THAT ARE NOT MEMBERS:

Nationwide
Philadelphia Consolidated
Progressive Corporation

### OTHER ILR CONTRIBUTORS IN THE INDUSTRY: (18)

ACE Limited (PAG, $500K ILR)
AEGON USA, Inc. (PAG, $1M ILR)
Allstate Corporation (PAG, $500K ILR)
American International Group (PAG-$600K, $30K NA, $1M ILR)
Assurant Inc.($25K NA, $250K ILR)
Chubb Corporation (PAG, $250K ILR)
CNA Financial Corporation (PAG, $100K ILR)
ING Americas (PAG, $250K ILR)
Liberty Mutual (PAG, $15K NA, $250K ILR)
Massachusetts Mutual ($50K NA, $500K ILR)
New York Life Insurance Company (PAG, $500K ILR)
Northwestern Mutual, Inc. (PAG, $1M ILR)
Prudential Financial (PAG, $1M ILR)
UnitedHealth Group Incorporated (PAG, $500K ILR)
USAA ($500K ILR, $32K NA)
Westfield Group (PAG, $100K ILR)
XL Capital Ltd. (PAG, $1M ILR)
Zurich Financial Services (PAG, Farmers - $30K NA, $200K ILR)

15

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003301

**COMPETITORS THAT DO NOT GIVE TO ILR:**

American Family Insurance
COUNTRY Insurance
GEICO
The Hartford
MetLife
Safeco

**OTHER PAGS IN THE STATE: (12)**

Abbott Laboratories
Archer Daniels Midland Company
Caterpillar, Inc.
CNA Financial Corporation
Deere & Company
Fortune Brands, Inc.
Grant Thornton LLP
Health Care Service Corporation
International Profit Associates Inc.
Old Republic International Corporation
The ServiceMaster Company
Trailmobile Corporation

**OTHER USCC BOARD MEMBERS COMPANIES IN THE STATE: (4)**

Caterpillar, Inc.
Quam-Nichols Company, Inc.
The ServiceMaster Company
Trailmobile Corporation

**ASSOCIATIONS:**

American Council of Life Insurers ($25,000 Chamber members)
Financial Services Roundtable ($15,000 Chamber members)
Business Roundtable
Foreign Policy Association
Illinois Business Roundtable
Insurance Information Institute

16

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003302

## BOARD OF DIRECTORS:

Gerald M. Czarnecki
    Affiliation: Chairman and CEO, Deltennium

Director

Michael C. Davidson
    Career: Former Senior Executive Vice President and Chief Agency and Marketing Officer, State Farm Mutual Automobile Insurance Company

Vice Chairman and Chief Agency and Marketing Officer

Christopher C. DeMuth
    Affiliation: President, American Enterprise Institute for Public Policy Research

Director

W. H. Knight, Jr.
    Affiliation: Dean (School of Law), School of Law, University of Washington

Director

Judith A. Muhlberg
    Career: Former Senior Vice President, Corporate Communications, Sprint Nextel Corporation (PAG)

Director

Susan M. Phillips
    Affiliation: Dean (School of Business), School of Business, The George Washington University

Director

Jerry I. Porras
    Affiliation: Lane Professor of Organizational Behavior and Change, Stanford University

Director

Edward B. Rust, Jr.

Chairman, President and Chief Executive Officer

James E. Rutrough

Vice Chairman and Chief Administrative Officer

Paul T. Stecko
    Affiliation: Chairman and Chief Executive Officer, Packaging Corporation of America

Director

Pamela B. Strobel
    Career: Former Executive Vice President and Chief Administrative Officer, Exelon Corporation

Director

Vincent J. Trosino, Sr.
    Career: Former Vice Chairman, President and Chief Operating Officer, State Farm Mutual Automobile Insurance Company

Vice Chairman, President and Chief Operating Officer

John D. Zeglis
    Career: Former Chairman and CEO, AT&T Wireless Services, Inc. (Parent: AT&T – PAG-$250K)

Director

17

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003303

**AUDITORS:**

PricewaterhouseCoopers (PAG, $500K ILR)

**BIO:**

**Edward B. Rust, Jr., Chairman, President, and CEO**

Edward B. Rust Jr. is Chairman of the board and Chief Executive Officer of State Farm Mutual Automobile Insurance Company, Bloomington, Ill., and the other principal State Farm® affiliates.

A native of Illinois, Rust joined State Farm® in 1975 at the Dallas, Texas, regional office. He became President and Chief Executive Officer in 1985 and was elected to the additional post of Chairman of the board in 1987.

A graduate of Illinois Wesleyan University in Bloomington, Rust holds both juris doctor and master of business degrees from Southern Methodist University, Dallas, Texas. He serves on the boards of directors of Caterpillar, Inc., Peoria, Ill.; Helmerich and Payne, Inc., Tulsa, Okla.; and McGraw-Hill Companies, Inc., New York.

Nationally recognized as a leader of the business community's efforts to improve the quality of education in the United States, he currently serves on the No Child Left Behind Commission, a bi-partisan, independent group established to make recommendations to Congress and the Bush Administration on how the federal law can be improved. He is former Co-Chairman of the Business Coalition for Excellence in Education and served on President Bush's Transition Advisory Team committee on education. He is former Chairman of the Business Higher Education Forum, former Chairman of The Business Roundtable's Education Initiative, a director of Achieve, Inc., a director of the National Center for Educational Accountability, and served on the National (Glenn) Commission on Mathematics and Science Teaching for the 21st Century.

He is Co-Chair of The Business Roundtable, Vice Chairman of the Illinois Business Roundtable. He is former Chairman of several other organizations, including the American Enterprise Institute, The Financial Services Roundtable, the Insurance Institute for Highway Safety and the National Alliance of Business. He serves on the Board of Trustees of The Conference Board and is a former member of the board of directors of the American Council of Life Insurance.

He is a trustee of Illinois Wesleyan University and former member of the advisory council of the Stanford University Graduate School of Business.

He is a former trustee of The American Institute for Property and Liability Underwriters and a former member of the board of overseers of The Institute for Civil Justice. Rust is a member of the Texas and Illinois bar associations.

18

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-003304

19

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

# CHAMBER OF COMMERCE
OF THE
# UNITED STATES OF AMERICA

THOMAS J. DONOHUE
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

1615 H STREET, N.W.
WASHINGTON, D.C. 20062-2000
202/463-5300 • 202/463-5327 FAX

December 2, 2003

Mr. Edward B. Rust, Jr.
Chairman and Chief Executive Officer
State Farm Insurance Companies
One State Farm Plaza
Bloomington, IL 61710

Dear Ed:

Thanks very much for our helpful and pleasant meeting in your office last
week. I appreciated the opportunity to bring you up-to-date on our success on the
class action legislation and the agreement we have crafted with a sufficient number of
Democratic Senators to ensure passage of the bill either on the Senate's return on
December 9 or immediately after the first of the year depending on their schedule.
We are also currently working with the House to get them to pick up the bill to avoid
a conference. I will get you the language on the legislation as soon as possible.

Thank you for agreeing to consider my suggestion that you join the Chamber's
Board of Directors. I know you have a very busy schedule but our board meets only
three times a year and attendance at two meetings is considered acceptable. Enclosed
are lists of our board members and the upcoming meeting dates. Your participation
would be very important to us and would make it possible for you to join our
leadership team in the years ahead.

Please review the Chamber's Capital Campaign material I left with you and
consider my proposal that State Farm support this effort in a significant way. As we
discussed, we have already received a number of significant commitments during the
"quiet days" of our campaign, ranging between $5 and 20 million, and payable over a
five year period of time.

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-004403

Mr. Rust
December 2, 2003
Page Two

Ed, it would be very helpful if State Farm would be able to support this effort
at the $5 million level, payable over five years and beginning in 2004. I will give you a
call in the next few weeks to answer any questions. After that time, we can arrange a
formal proposal for consideration by you and your colleagues.

Thanks again for your support in so many areas. Please let me know when you
are coming to Washington so we can get together for another chat.

Best wishes.

Sincerely,

Tom

Thomas J. Donohue

Enclosures

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

USCC-004404

February 4, 2004

To:       Lori Myers
From:     Rob Tanzola
Re:       Notes from TJD meeting with Ed Rust, CEO, State Farm on
          February 2, 2004 in Pentagon City, VA

---

1.  TJD spoke of Davos, asbestos and class action.

2.  ER spoke of closing his operations center in LA and of Mary Landrieu.

3.  TJD asked ER if he has made a decision about sitting on the USCCs board.

4.  TJD spoke of the small business members and of how to make the State Farm agents
USCC members.

5.  ER spoke of his work at the National Center for Education.  Both conversed about the
countries educational challenges.

6.  Both spoke of political races.  TJD stated that the USCC will go after Edwards if he is
nominated.

7.  TJD stated that the USCC is going after Madison County again this year

8.  TJD told ER that IBM is not a member of the USCC.   State Farm has been a customer
of IBM for 45 years.

9.  **ER offered Jim Reautreau (sp?), a senior executive vice president at State Farm,
as a board member pending JRs acceptance.  TJD accepted this but stated that he
wants ER one day.**

10.  **ER is looking at the extended USCC membership deal.  ER asked TJD to keep
an eye on their Supreme Court case in IL.  TJD asked ER to get with Lisa Rickard
and Stan Anderson next time he is in DC.  TJD gave the ILR folder.**

CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS


MARK HALE, et al.,                    )

                     Plaintiffs,   ) Case No.

            vs.                       ) 3:12-cv-00660-DRH-SCW

STATE FARM MUTUAL                     )

AUTOMOBILE INSURANCE CO.,             )

et al.,                               )

                     Defendants.   )




THE VIDEOTAPED DEPOSITION

OF

EDWARD MURNANE

October 27, 2015




Reported By:

Juliana F. Zajicek

CSR No. 84-2604

Ref: 15100

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

PA1233

Case 3:12-cv-00660-NJR   Document 901-1   Filed 08/21/18   Page 115 of 124   Page ID
#39193
Case 3:12-cv-00660-DRH-SCW   Document 842-7   Filed 06/29/18   Page 17 of 501   Page ID
#35643

Page 87

1    as circumstances dictated came with the authority

2    and informador of the governing power of the ICJL,

3    namely, the executive committee, is that correct?

4         A.    That's correct.

5         Q.    So that it's a fair statement to say

6    that on a regular basis you reported to the

7    executive committee and they authorized the

8    continued efforts that -- whatever they might have

9    been, that you were engaged in?

10        A.    That's correct.

11        Q.    And during that period of time you were

12   also in touch, though, with the Illinois Business

13   Roundtable, weren't you?

14        A.    They were a member of our executive

15   committee.

16        Q.    Okay.  And was that Jeff Mays at that

17   time then?

18        A.    At -- by this time Jeff Mays had become

19   the president.

20        Q.    Okay.  And just so we are clear about

21   the governance of the executive committee, the

22   individuals whose names we all see, they are there

23   on behalf of their company or organization?

24        A.    They are assigned by their company --

PA1240

Page 99

1    would have a good shot at retaining that.

2              And when Rarick had his heart attack,

3    and I don't wish him any ill, in fact, I understand

4    he is back in active condition, that seat became an

5    open seat and it was -- there was no candidate

6    running for the seat.  And so that changed the --

7    at least the options or changed the focus or the --

8    the possibilities for the Fifth District.

9         Q.    Okay.  And you were given a green light,

10   were you not, to go about the task of trying to

11   identify potential candidates for that race?

12        MR. JORGENSEN:  Object to form.  You can

13   answer.

14   BY MR. CLIFFORD:

15        Q.    You can answer.

16        A.    It was a -- a task that I was given by

17   the -- by the Civil Justice League to -- to come up

18   with a candidate.

19        Q.    Right.  And you eventually did?  And

20   we'll get into that.  We are going to get into

21   that.  We don't need a speech here yet right now.

22        A.    It was a painful task.  Nobody wanted to

23   run.

24        Q.    There you go.

Case 3:12-cv-00660-NJR   Document 901-1   Filed 08/21/18   Page 117 of 124   Page ID
#39195
Case 3:12-cv-00660-DRH-SCW   Document 842-2   Filed 06/29/18   Page 19 of 501   Page ID
#35645

Page 104

1      A.    Yes, you did.

2      Q.    So do you -- so it is a fact, is it not,

3    that you scoured Southern Illinois for a candidate?

4      MR. JORGENSEN:  Objection; asked and answered.

5    BY MR. CLIFFORD:

6      Q.    Well, does this refresh your memory

7    about what you did back in 2003 and '2 probably?

8      A.    2003.  It -- there was a -- an effort

9    made to find the candidate, to find a Republican

10   candidate, most likely a judicial candidate or a

11   judge, sitting judge.  We...

12     Q.    Well -- well, let me ask you this,

13   another question, Ed:

14            If I understand it correctly, you indeed

15   did scour Southern Illinois looking for candidates

16   and one of the candidates that came to your

17   attention from at least one source, that's Senator

18   Frank Watson, was Lloyd Karmeier?

19     MR. SAFER:  Objection; compound.

20   BY MR. CLIFFORD:

21     Q.    Is that correct or not?  And you can

22   answer.

23     MR. JORGENSEN:  You can answer.

24   BY THE WITNESS:

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS


MARK HALE, et al.,                    )

               Plaintiffs,    ) Case No.

       vs.                    )3:12-cv-00660-DRH-SCW

STATE FARM MUTUAL                     )

AUTOMOBILE INSURANCE CO.,             )

et al.,                               )

             Defendants.    )




THE VIDEOTAPED DEPOSITION

OF

EDWARD MURNANE

October 27, 2015




Reported By:

Juliana F. Zajicek

CSR No. 84-2604

Ref: 15100

Case 3:12-cv-00660-DRH-SCW   Document 842-7   Filed 06/29/18   Page 30 of 501   Page ID #35656

```
                                                    Page 162

1            I'll show it to you now.  He has got it

2    here.  I think we are up to No. 9.

3        A.    That is what the bylaws stated.  It was

4    a --

5        Q.    I read from 6.5.

6        A.    I would be misleading you if I said that

7    this was a work -- a working document or a --

8    something that was...

9        Q.    Well -- well, it's -- it's accurate to

10   say that the ultimate power of the organization was

11   in the executive committee?

12       A.    That's correct.

13       Q.    Okay.  And I think maybe what you were

14   alluding to is on balance the executive committee,

15   certainly during the time that you were president,

16   gave great deference to the input of the president?

17       A.    Yes.

18       Q.    Am I -- is that what you were trying to

19   say?

20       A.    They -- they generally deferred to me.

21       Q.    Yeah.  But if anyone disagreed with what

22   you were doing, they certainly had the right to

23   interject themselves?

24       A.    That's correct, and that happened on --
```

PA1253

Page 172

1     A.     If it shows that he made a contribution

2   or that they made a contribution, then they made a

3   contribution.

4     Q.     And -- and was it related to the

5   management of JUSTPAC's reporting during the

6   Karmeier election era, is it your testimony that no

7   shadow or ghost donation of any kind was made by

8   anyone?

9     A.     To?

10    Q.     To JUSTPAC.

11    A.     To my knowledge, that's correct.

12    Q.     Okay.  All right.

13           It's correct, isn't it, that as the

14  president of ICJL you reported not only the ICJL

15  financials to the executive committee, but you also

16  reported the JUSTPAC financials to the executive

17  committee?

18    A.     That's correct.

19    Q.     And during the period of time in which

20  the Karmeier campaign was underway, you regularly

21  reported to the executive committee the

22  expenditures, both of ICJL and JUSTPAC?

23    A.     Let me --

24    Q.     Well, first off, let's answer my

Case 3:12-cv-00660-DRH-SCW   Document 842-7   Filed 06/29/18   Page 32 of 501   Page ID #35658

Page 173

1    question, and then I'll -- if you -- if you want to

2    jump in with something, go -- go ahead.

3         A.   I would -- I would make the reports, but

4    JUSTPAC did have a treasurer and the reports from

5    JUSTPAC were prepared by the treasurer and given to

6    me and I would --

7         Q.   Okay.  Got it.

8         A.   -- make the report to the executive

9    committee.

10        Q.   Okay.  Thank you.

11             Who -- who was JUSTPAC's treasurer, if

12   you recall?

13        A.   For a while, I think it was Todd Maisch,

14   who is currently the president of the Illinois

15   Chamber of Commerce.  Jeff Mays, who was president

16   of the Business Roundtable, at some point may have

17   been treasurer.  I'm not sure of the exact dates.

18        Q.   Okay.  And -- and by the way, you know,

19   just to refresh, I started this by talking about

20   the power of the executive committee, so on a new

21   subject for executive committee, they -- they were

22   in charge of your compensation, is that right?

23        A.   That's correct.

24        Q.   And so that there was a compensation

Case 3:12-cv-00660-DRH-SCW   Document    Filed 06/29/18   Page 33 of 501   Page ID #35659

Page 183

1    A.    That's correct.

2    Q.    Okay.  The ICJL president and executive

3  committee spoke on a weekly basis, did they not?

4    A.    Depending on what time of the year and

5  what was -- we spoke more when the legislature was

6  in session, for example.  Perhaps during political

7  season, but not on a -- not necessarily on a

8  regular basis.

9    Q.    I remember seeing something, correct me

10  if I'm wrong, that where it was in the context of

11  expanding the size of the executive committee when

12  you reported that, you know, we don't have a lot of

13  in-person meetings, but we do have regular

14  conference calls and at times as many as three to

15  four a week?

16    A.    I don't recall ever saying that.

17    Q.    Okay.  Do you recall on a -- during an

18  election period, specifically the Karmeier election

19  period, how many times a week you'd have conference

20  calls with the executive committee?

21    A.    I -- I don't recall.  I doubt if it was

22  ever more than one.  As I said, we were involved

23  and/or paying attention to a number of judicial

24  races.

Page 186

1          Do you remember reviewing this document?

2     A.    I believe I've seen it.

3     Q.    Okay.  Referring you down to the --

4   right after the number 10, where it says, CNA

5   Financial:

6          "As most of you know, we do not ask a

7   lot of our executive committee members, at least in

8   terms of time in meetings.  We do communicate

9   fairly regularly, often three, four times per

10  week."

11         Do you see that?

12    A.    I see that.

13    Q.    So do you want to change your an --

14  prior answer at all?

15    A.    What was my prior answer?

16    Q.    It will stand.

17         Did you speak to the executive committee

18  as often as three to four times a week during any

19  period of the normal course of business?

20    A.    I think I may have spoken and probably

21  did speak to members of the executive committee.  I

22  stayed in very close contact with them.  I might

23  have talked to the Illinois State Medical Society

24  three or four or five times a week.  I might not

PA1257

Page 188

```
 1        Q.    Right.  And with the -- and with the
 2   Medical Society, that would largely have been
 3   during the legislative -- when the legislature was
 4   in session, right, because there might have been
 5   stuff going on down there?
 6        A.    Not necessarily.  There was stuff going
 7   on that everybody was interested in, but I spoke
 8   with the Medical Society just as frequently during
 9   campaigns.
10        Q.    Okay.  And certainly during the Karmeier
11   campaign, when you were reporting -- you -- you
12   raised a lot of money during the Karmeier campaign?
13        A.    A lot of money was raised.  I didn't
14   raise it all myself, certainly.
15        Q.    Well, to the extent that you raised
16   money, you raised a lot of money during the
17   Karmeier campaign and that money raising was fully
18   reported to the executive committee, was it not?
19        MR. JORGENSEN:  Objection to form.
20        MR. SAFER:  Objection; compound.
21   BY MR. CLIFFORD:
22        Q.    You can answer.
23        A.    Anything that was raised was reported.
24   And I would disagree that I raised a lot of money.
```