IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK HALE, TODD SHADLE,
and LAURIE LOGER, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, and WILLIAM G. SHEPHERD,

Defendants.                                          No. 12-0660-DRH

### MEMORANDUM and ORDER

HERNDON, District Judge:

### Introduction and Background

Pending before the Court are various motions to exclude expert testimony filed by the parties: (1) defendants' motion to exclude reports and testimony of Joanna M. Shepherd (Doc. 711); defendants' motion to exclude expert report and trial testimony of Delores K. Rinke (Doc. 712); plaintiffs' motion to exclude expert report and testimony of Justice Sheila M. O'Brien (Doc. 713); plaintiffs' motion to exclude expert report and testimony of Michael T. Reagan (Doc. 714); defendants' motion to exclude report and trial testimony of Richard K. Means (Doc. 715); defendants' motion to exclude testimony and opinions of Kent D. Redfield with respect to purported violations of election law (Doc. 716); defendants' motion to exclude testimony and reports of Bruce Green (Doc. 717) and plaintiffs' motion to

exclude the report and testimony of Bruce Dubinsky (Doc. 718).[1]  As the motions are fully briefed, the Court turns to address the merits of plaintiffs' motions first and then addresses the merits of defendants' motions.

## Legal Standard

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.,* 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009).  Rule 702, governing the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"In short, the rule requires that the trial judge ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Manpower, Inc. v. Ins. Co. of Pa.* 732 F.3d 796, 806 (7th Cir. 2013) *(citing Daubert,* 509 U.S. at 589, 113 S.Ct. 2786); *see also Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887,

---

[1] State Farm filed the motions to exclude and the responses in opposition to the motions to exclude and defendants Murnane and Shepherd joined in all these pleadings as reflected by the docket.

894 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v. Carthage College,* 714 F.3d 516, 521 (7th Cir. 2013) (explaining the current version of Rule 702 essentially codified *Daubert* and "remains the gold standard for evaluating the reliability of expert testimony"). The *Daubert* principles apply equally to scientific and non-scientific expert testimony. *See Manpower, Inc.,* 732 F.3d at 806 (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

Under the expert-testimony framework, courts perform the gatekeeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See Manpower, Inc.,* 732 F.3d at 806; *Lees,* 714 F.3d at 521; *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees,* 714 F.3d at 521–22; *see also Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013); *Pansier,* 576 F.3d at 737.

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 596). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" based on *Id.* The *Stollings* Court instructed, at page 766, "[a]n expert may provide expert testimony a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt. In *Daubert* the Supreme Court expressly envisioned this continued role for the jury when it reminded all that '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Citing *Daubert* at page 596.

Furthermore, Rule 403 states:

The Court *may* exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

### Analysis

### Justice Sheila M. O'Brien (Ret.) (Doc. 713)

Justice O'Brien, known throughout the State of Illinois as an excellent judge, served as a Justice of the Illinois Appellate Court for 16 years and as an

Illinois trial judge for 10 years. She authored nearly 150 published appellate opinions and hundreds more unpublished opinions on a wide range of issues and served as the Presiding Judge of her Division and on the Executive Committee of the Appellate Court. As a trial judge, Justice O'Brien served in all the major areas of the trial courts, including civil, chancery, foreclosures, probate, family, criminal and juvenile. Justice O'Brien graduated with her B.A. from University of Notre Dame and received her J.D. from University of Notre Dame Law School and her M.A. in theology from St. Mary-of-the-Woods College. She is licensed by the Supreme Courts of Illinois, Missouri and the United States.  Justice O'Brien is the recipient of the "Women of Achievement" (1995) and the "Edward F. Sorin" (2007) awards from the University of Notre Dame. She was granted the "Outstanding Women in America" award (1985 – 1990) and "Women's Bar Association of Illinois" award in 2007.

Defendants asked Justice O'Brien "to form opinions, based upon my expertise, experience and examination of the existing record, regarding:

(i)     Judicial elections in Illinois.
(ii)    Contributions in judicial campaigns.
(iii)   The judicial process.
(iv)    The standards for judicial recusal.
(v)     The vote and mandate in IL S Ct's 2005 opinion in *Avery v. State Farm Mutual Insurance Co.*, and its ramifications.
(vi)    Professor Joanna Shepherd's opinion in this case, based on select social-science studies, that Justice Lloyd A. Karmeier likely "influenced" the five other Justices in the *Avery* decision.
(vii)   Mark Harrison's opinion in this case that Justice Lloyd Karmeier should have recused himself from the *Avery* decision and that his failure to do so "tainted" the decision.
(viii)  Whether the briefs filed by State Farm on January 31, 2005 and September 19, 2011 before the Illinois Supreme Court conformed to

> the standards of appropriate advocacy, and the opinions of Professor
> Bruce Green and Thomas Myers to the extent the bear on that issue."

In preparing her report, Justice O'Brien based her opinions on her experience as a practicing attorney, a trial attorney, a trial judge, an appellate judge, a resident of the Fifth District of Illinois, as a resident of Cook County, a member judicial committees and councils, a candidate for office, a campaign chair for judicial campaigns and her review of many of the pleadings and documents in this case that were provided by attorneys for defendant State Farm.

Plaintiffs contend that Justice O'Brien's report is sweeping, irrelevant and unreliable as to other judges' knowledge, desires, and motivations, the weight of the evidence, the credibility of testimony, whether Justice Karmeier should have recused himself in *Avery* and whether his participation affected the outcome. Plaintiffs argue, that while Justice O'Brien is a fine jurist who served the public for years, her opinions are not admissible as she is not qualified, her opinions are not reliable and her opinions will not assist the trier of fact in understanding the issues in this case. Specifically, plaintiffs contend that Justice O'Brien does not have enough experience or specialized knowledge to render the opinions.  Also, plaintiffs argue that from her limited experience Justice O'Brien cannot opine about what all judges do and that she draws from her personal experiences to predict what other judges would do.   Defendants, in turn, argue that Justice O'Brien is qualified because of her relevant experience, knowledge, training and education; that she reliably applied her experiences and expertise to the matters

on which she opines and that her reasoning in reaching her opinions reliably ties her conclusions to the facts and to her knowledge and expertise.

Here, the Court finds that pursuant to Rule 702 Justice O'Brien's report is based on speculation, irrelevance, and lacks reliable methodology. In short, her report and testimony will not assist the jury. First, examining Justice O'Brien's report, the Court finds that she clearly is well qualified to testify about certain judicial matters. Justice O'Brien has had experience in three different courts in Illinois, spanning twenty-six years at her retirement in 2011. She does not, however, have experience with the Illinois Supreme Court as a law clerk or a member of the Court. She did not list experience practicing before the Court but did have an office in the same building as the Chicago members of the Court which gave her access to their law clerks. She has been active in several bar associations, some of which entailed committee work and presentations on a variety of topics. Moreover, owing to her state of residence and position, she has been involved in seven election campaigns for judicial positions, including her own and those of six other judicial candidates. For the topics she has been tasked with examining for this case, she is qualified to testify as an expert witness for certain topics but not all. For all of the topics, both those she would be qualified to discuss and others not likely so, there is an adverse issue of her report and testimony meeting the standard of Federal Rule of Evidence 702 and *Daubert* because of irrelevance or failed methodology, and a failure to assist the jury.

As to her opinions about judicial elections in Illinois (paragraphs 21 -27 of her report), the Court finds that these statements, while relevant in most respects, do not assist the jury because as to statutes and rules the Court, as the arbiter of the law in the case, is in a better position to instruct the jury regarding any laws that must be established for the jury's consideration.  Moreover, Justice O'Brien mixes in some opinion testimony without telling us the reason for her opinion. This lack of methodology is a common theme throughout her report and testimony creating an issue for this Court when attempting to tie her experience to her stated opinions.  For example, specifically in this segment of her report, she opines on topics such as how voters assess judicial candidates which she believes to be observing them on the campaign trail. Her supposition based on seven judicial campaigns represents just that without reliance, apparently, on any studies or interviews and the like.  One might suppose that in last ten or fifteen years most voters make their election decisions based on internet research, the local newspaper, or the literature hanging periodically from their front door knob. One has to wonder, but is not advised by any methodological support, how many of voters actually have observed a judicial candidate.  Justice O'Brien tells of appearances, but those likely are comprised of partisan rallies and fundraisers. Justice O'Brien's recitation of the law that requires judges be elected to the Illinois Supreme Court has some relevance, but since it is common knowledge an expert witness is of no help to the jury.  The rest of this section is irrelevant to this case.

In section D(ii) of her report, Justice O'Brien's opinions are inadmissible because she fails to apply reliable principles and methods to the facts in the case. In addition, the discussion contained therein will not assist the jury with the issues in the case.  Justice O'Brien opines on the subject of candidate Karmeier's knowledge of his campaign donors by drawing on her experience in her campaign and her interpretation of the judicial code of conduct rule (67(B)(2)) governing campaigns.   She does not explain how she is able to draw conclusions and opinions based on her personal experience as it relates to the issues in this case. As indicated, she does look to the code of conduct, her interpretation of it, and three advisory opinions from two different organizations.  Her conclusion is that a judicial candidate should not attempt to learn who his or her donors are.  Her discussion is not helpful to the jury and is inadmissible.  One reason her potential testimony in this area is not helpful is that her ultimate conclusion is that the rule favors a judicial candidate deliberately avoiding any knowledge of campaign contributions and once a judge knows he or she need not recuse when a donor is one of the lawyers or a party in a case.  Moreover, she would have the jury believe a judge need not disclose the nature of donations of those involved in a case.  In examining the three opinions she relied upon to support her conclusions, she highlighted the parts that infer her conclusion but in a vacuum and omitted parts which demonstrate the opposite is true.  However, it should be understood first that based the requirements of the law in the area of campaign contributions, the entire discussion is irrelevant.  The law required reporting donations of $150 or

more and those records were public.   10 ILCS 5/9-10, 11.   The campaign contributions which are at issue in this case were far greater than that threshold. Nonetheless, a fair reading of the opinions relied upon by Justice O'Brien is that the rule requires that a judge disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned (Opinion 95-11 of the Illinois Judges Association). Allowing a judge to be informed of those contributions in excess of $150 while not allowing him or her to know of those below the threshold would seem to be counterproductive, according to the opinion, and likely the reason it was never incorporated into the commentary of the Illinois Code of Judicial Conduct (Opinion 95-8 of the Illinois Judges Association).   Opinion 866 of the Illinois State Bar Association is completely irrelevant as described by Justice O'Brien and interpreted by the Court.   The issue in this case relative to a lawyer, William Shepherd, is whether he violated and conspired to violate the RICO Act.   If it was a simple matter of being wrong, the Court would let the jury decide the point.   Instead the discussions relative to this expert go to the Court's function in assessing the reliability of the witness' methodology.

The position taken in Section D(iii) is the subject of the Court's order ruling on a motion *in limine*  and this part of the report and Justice O'Brien's opinions are inadmissible.

Next, the Court notes that Justice O'Brien's comments on the judicial process in Illinois (paragraphs 40-48 of her report), are barred by the Court's ruling relative to a motion *in limine* on the subject.

Section D (iv)(a) having to do with judicial substitution is irrelevant. Substitutions of judge occur in the lower courts and is not an issue in this case. One might say, as did Justice O'Brien, that not being able to substitute judges in the Supreme Court of Illinois is a problem.  It is not.  The Illinois Constitution, Article VI, Section 3 provides that the Court is made up of seven judges and it only requires four to constitute a quorum.  This discussion does not help the jury understand the facts in this case, in particular Justice O'Brien's hypothetical regarding one plaintiff and six defendants all moving to substitute (remove) a different justice. The point raises an irrelevant set of facts and an extreme example not implicated in this case.  Clearly, with the understanding that the rule requires any judge to disqualify himself or herself from a case in which the judge's impartiality might be called into question (Illinois Supreme Court Rule 63(d) together with the Supreme Court quorum rule, the discussion in this section is irrelevant and does not help the jury understand the facts.

Section D(iv)(b) dealing with judicial recusal is likewise inadmissible. Paragraphs 55 - 59 are essentially a recitation of rules of procedure without opinion.  Paragraph 60, however, constitutes an opinion.  Paragraph 60 reads:

> I have seen no evidence that Justice Karmeir should have recused himself in 2005.  There was no case or rule requiring recusal based on campaign contributions.  In 2011, Justice Karmeier did not participate

in the Illinois Supreme Court's decision denying the plaintiffs' Petition to Recall Mandate.

Looking at the first sentence, to the extent that it represents a report of Justice O'Brien having examined whatever part of the record she actually reviewed (her deposition revealing that she did not read a number of documents she was provided), that she has "seen no evidence" of a requirement for Justice Karmeier to recuse is not helpful for the jury and will not be allowed. The Court notes that what this expert did not write was that she examined the record in *Avery* case and based on her analysis (describing what that was) she is of the opinion that Justice Karmeier was not required to recuse from the case because (and state why). Federal Rule of Civil Procedure 26, Federal Rule of Evidence 702 and *Daubert* all require a methodology that leads to reliable conclusions. Her lack of methodology is fatal to this opinion. Moreover, the opinion simply represents *ipse dixit*. The witness leaves the jury with only the bottom line and supplies nothing of value upon which jury can assess the opinion. *See*, *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), *Bourelle v. Crown Equipment Corp.,* 220 F.3d 532, 538 (7th Cir. 2000), and *Rosen v. Ciba-Giegy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

It is possible that paragraph 60 may simply be a set-up or lead-in for paragraph 61. The information and opinion in paragraph 61, where Justice O'Brien discusses a "duty to sit" has been stricken by the Court pursuant to a motion *in limine*. To the extent that paragraph 60 is inextricably tied to paragraph 61 it is deemed inadmissible for that additional reason.

In section D(v), Justice O'Brien takes on a topic which encompasses the vote and mandate in the Illinois Supreme Court's 2005 Avery Opinion (paragraphs 62-65 of her report).  Paragraph 62 is a recitation of Section 3 of Article VI of the Illinois Constitution.  The next paragraph interprets a number of Illinois appellate and Illinois Supreme Court opinions to present scenarios of what occurs when the Illinois Supreme Court is ruling on cases in the absence of a full court and therefore opines on the meaning of those cases. Justice O'Brien tracks Justice Karmeier's votes in *Avery* by examination of the opinion.  Her analysis leads to a conclusion that there is "no basis in the record to conclude that a recusal by Karmeier would have changed the outcome in the case."  There is ample debate regarding that opinion and if that were the only objection to the conclusion reached a different result may occur.  Debatable conclusions, if allowed, are always subject to cross examination and the jury is allowed to assess whatever credibility and weight it deems appropriate in light of all the evidence. Justice O'Brien's methodology and lack of a specific finding to support her opinion (aside from a generalized review of all the records, which by law do not include any information regarding the Illinois Supreme Court's deliberation), causes this Court to find her methodology for this opinion to be unreliable. Sometimes debatable conclusions sink to the level of rank speculation, as in this instance. Moreover, this part of her report and testimony falls within the prohibition of the ruling pursuant to the motion in limine regarding the vote count in the *Avery* case.  Therefore, it is inadmissible for that reason as well.

The next section in Justice O'Brien's report is a response to Professor Joanna Shepherd (paragraphs 66-74 of her report).  In her report, Professor Shepherd goes into great detail regarding the empirical research she has conducted over the years which led to her opinions in this case.  Relying on peer reviewed articles and utilizing empirical research passes the kind of scrutiny required by Rule 702 and *Daubert.*  However, Justice O'Brien's conclusions in this area are rank speculation.  Justice O'Brien casts off Professor Shepherd's opinions calling them speculation since common sense would clearly lead one to understand that it is impossible to know exactly what took place in the conference and deliberations of the Illinois Supreme Court in *Avery*.  However, Professor Shepherd relies on peer reviewed empirical studies, not speculation, and her opinions result from reliable methodology.  After having just pointed out the speculative nature of the endeavor to know exactly what happened in the *Avery* deliberations, as part of her basis to support her opinions and try to cast doubt on Professor Shepherd's opinions, in paragraphs 70 through 74 of her report, Justice O'Brien speculates about Justice Karmeier's lack of influence as well as whether Justice Karmeier has broken his promise to the people of Illinois and the voters of the Fifth District that all his rulings would be based on law and facts. Justice O'Brien does not advise how she came to that conclusion or explain her methodology for such an all-encompassing conclusion about Justice Karmeier. She so opines in the context of trying to demonstrate how one expert who relied on peer reviewed empirical studies could not possibly draw better conclusions

than her conclusions which are based on speculation and an unstated methodology.   While the defendants in this case may certainly cross examine Professor Shepherd, Justice O'Brien's speculation about the lack of Justice Karmeier's influence will not be allowed.

Next, as to section 7 (paragraphs 75-81of her report), a response to Mark Harrison, plaintiffs' expert on ethical issues, the Court once again must disallow the testimony due to the lack of a reliable methodology in arriving at her opinions. All of the contents of the report in this section run afoul of this Court's ruling on similar issues heretofore.   Paragraph 79 is stricken by the Court's ruling *in limine* regarding the duty to sit.   Moreover, the *Jorgenson* case on which Justice O'Brien relies is inapposite to the facts in the case at bar.

Lastly as to section 8 (paragraphs 82-91 of her report), Justice O'Brien's opinions regarding the propriety of State Farm's briefs from January 31, 2005 and September 19, 2011, the Court excludes these opinions as these opinions invade the province of the jury and once again lacks a reliable methodology.   Here, Justice O'Brien describes her methodology briefly.   In paragraph 86 she states:

> "To determine how to apply the Supreme Court Rules, here Rule 137, courts examine other cases involving similar situations. *Apotex Corp. v. Merck Co.*, 229 F.R.D. 142 (N.D. Ill. 2005) is similar to the *Avery* case. There, as here, a party claimed that statements made in briefs constituted fraud: 'Read fairly in context, however, the lawyers' statements in Merck's briefs were not an attempt to characterize the truth as an omniscient observer might see it.   Rather, they were comments on the sufficiency of the evidence that was submitted in the case. … It was not a "fraud" for Merck to argue the inferences from the evidence that had been presented in the case – even if it now turns out that the evidence that was presented might not have represented the full story.' *Id.* at 147."

Justice O'Brien cites an order from a trial court in Chicago, albeit from an excellent judge with a more than favorable national reputation, but aside from being a non-precedential order, the trial judge did not analyze the challenged language in the way asserted by Justice O'Brien.   The Court finds that Justice O'Brien's analysis based on her finding that witness Professor Green failed to address the way one challenges pleadings to be irrelevant.   This pervades the province of the jury and her opinion on this issue, her methodology is not reliable, the report and testimony in this regard will not be allowed.   Accordingly, the Court **GRANTS** plaintiffs' motion to exclude the testimony and expert report of Justice Shelia M. O'Brien (Doc. 713).

### Michael T. Reagan (Doc. 714)

Michael T. Reagan is an Illinois lawyer practicing law since 1972. Currently, he is a solo practitioner in Ottawa, Illinois.   Prior to that he was a partner with the law firm of Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., with offices in Ottawa and LaSalle, Illinois.   He is a member of both the Illinois Trial Lawyers Association and the Illinois Association of Defense Trial Counsel.   His practice concentrates on civil trials and appeals.   He has been recognized as a top 10 among Illinois Appellate Leading Lawyers, top 100 Illinois Super Lawyers, and Best Lawyers in America (in Appellate law).   Throughout his practice of law, Reagan has handled appeals and presented oral arguments in every district of the Illinois Appellate Court, in the Illinois Supreme Court and in

the Seventh Circuit Court of Appeals.  He has also participated in about 30 cases which were decided by the Illinois Supreme Court.

Defendants asked Reagan "to offer opinions in rebuttal to those expressed by Plaintiffs' designated experts Mark Harrison and Joanna Shepherd concerning *Avery v. State Farm Mutual Automobile Ins. Co.*, 216 Ill.2d 100 (2005), and to offer my opinions in respect to several questions relating to the decisions rendered by the Illinois Supreme Court in *Avery* which are relevant to my rebuttal opinions." (Doc. 714-1, p. 2).

In his report, Reagan, *inter alia*, provided the following opinions/observations:

- I make the following additional observations.  Based on my experience with matters before the Illinois Supreme Court, the Court is diligent in the issuance of its opinions, such that the bulk of its opinions are issued within approximately five months from the date of oral argument, with most of the opinions being issued before that time.  It is my further opinion that accordingly as time passes beyond the five-month point. [sic] it becomes increasingly likely that an opinion will issue soon.  It is my further opinion that an informed party could not reasonably believe, even in the summer of 2004, that, even if Justice Karmeier won the election in November 2004, he would be sworn in before the issuance of the *Avery* opinion.
Orders in the Illinois Supreme Court on motions generally do not provide an explanation for the ruling.  For example, no reason was provided by the Court in either its March 16, 2005 order or its November 17, 2011 order.  Consequently, it is not known whether the parties' submissions provided the basis for those rulings.
- Mark I. Harrison, in his expert report, speculates about what would have happened in *Avery* if Justice Karmeier had not participated.  We know that Justice Thomas was not participating.  Accordingly, under Mr. Harrison's hypothetical, two justices would not be participating in his hypothetical posture.  The Constitution of Illinois, 1970, Article VI, Section 3, requires that four justices of the Supreme Court concur in order to take action.  In *Perlman v. First National Bank of Chicago*, 60 Ill.2d 529 (1975), two justices recused themselves and the remaining

members of the court were divided such that the necessary concurrence of four justices could not be obtained.   As a result, the appeal in *Perlman* was dismissed.

Mr. Harrison asserts without qualifications that under his hypothetical premise, with Justice Karmeier not participating that "in *Avery*, if the Supreme Court had remained 'deadlocked' but had followed the *Perlman* decision – as it has in five other cases – the $1.05 billion judgment of the intermediate appellate court against State Farm would have been affirmed."

- While knowing that it is impossible to predict with certainty how *Avery* would have been resolved but for Justice Karmeier's participation, the actual text of the two opinions in *Avery* are strong evidence that undercuts Mr. Harrison's speculative opinion. … Based on the *Avery* text, it is exceedingly doubtful that Mr. Harrison's speculative opinion about the *Avery* outcome absent Justice Karmeier's participation would have been realized.  It would have been much more highly likely that the five remaining members of the court would have issued collective opinions vacating the appellate court's opinion. FN. 1 – Such opinions would most likely have also affirmed that portion of the appellate court judgment which affirmed the circuit court's denial of equitable relief and which reversed the circuit court's award of disgorgement damages.
- Based on legal research undertaken at my direction, in those civil cases from 2003 through 2005 in which a PLA is allowed, such as *Avery*, in a majority of the cases, the lower court was reversed, in whole or in part. … Purely as a matter of statistics, once the Court decided to hear the *Avery* appeal, it was likely that some aspect of the lower court's decision in *Avery* would be reversed.
- It is my opinion that each of those justices had clear views of the law and of their role on the court.  While each of those members of the court is respectful of the views of their fellow justices, it is my opinion that in 2005 it is unlikely that Justice Karmeier would have been able to sway their opinion to divert from what their independent view of the law was based upon their own knowledge and research, and the work of their individual clerks.  The other members of the court were each strong personalities with individualistic well-formed judicial approaches, with many years of substantial service.  They were each known to be strong, independent proponents of their own views. … Each of those justices also had strong views of the law, and they each had significant experience on the appellate court before ascending to the Supreme Court.  They, too, would vote their minds and their consciences.

(*Id.* at 714; p. ¶¶  20, 21, 22, 29, 49, 61, 63, 71 & 77).

Plaintiffs contend that Reagan's general legal experience does not qualify him to offer his specific opinions. Additionally, plaintiffs contend that his opinions are not based on sufficient facts, data or a reliable methodology. Defendants counter that Reagan is highly qualified to provide opinions about the Illinois Supreme Court and the *Avery* opinion. Further, defendants assert that his opinions are reliable based on his knowledge and experience, that his rebuttal of Professor Shepherd and Harrison are proper and that his opinions will assist the jury. The Court agrees with plaintiffs that Reagan's opinions lack a reliable methodology.

The Court finds that Reagan's report and testimony do not survive a Rule 702 analysis as the Court finds that his report and testimony will not assist the jury. A review of the report indicates that it is nothing more his "observations" which state what appears on the surface or what he gleaned from the documents. Paragraphs 1 through 19 of the report are spent establishing Reagan's qualifications and reciting the materials his considered in arriving at his conclusions. The latter materials are case specific documents in the *Avery* case. Reagan simply refers to his experience, which is extensive, and draws a conclusion about a particular hypothesis without using empirical studies or documentation for year-to-year statistics. Missing from Reagan's report is any documentation related to "statistical" analysis for his various conclusions and opinions about the Illinois Supreme Court and the occupants of that bench. Without a reliable methodology, his opinions are not reliable and will not provide

any benefit to the jury.  Further, without valid documentation upon which Reagan can rely, it is his testimony that is speculation, not Mark Harrison's testimony. Reagan's testimony throughout is based on speculation and his experience without reference to a reliable methodology.  Even when citing to the Illinois Supreme Court cases, he fails to be specific regarding his testimony.  In fact, when Mr. Clifford, during Reagan's deposition, tried to elicit information from Reagan about his methodology, Reagan generally fell back on his years of experience, which is not sufficient under these circumstances. *See Tyus v. Urban Search Management*, 102 F.3d 256 (7th Cir. 1996).

Reckoning back to a moderately popular television series, *Boston Legal,* which aired from 2004 through 2008, the aging district judge, Robert Sanders (played by Shelley Berman), would read Reagan's report and deposition and sum up both succinctly with two simple words … "jibber jabber."  Clearly, his observations do not rise to the level of expert testimony and will not help the jury. Accordingly, the Court **GRANTS** the motion to exclude expert report and testimony of Michael T. Reagan (Doc. 714).

### Bruce Dubinsky (Doc. 718)

Bruce Dubinsky is an expert on forensic accounting.  He is a certified public accountant, certified fraud examiner, certified anti-money laundering specialist, master analyst in financial forensics and certified in financial forensics. He is a Managing Director in Disputes & Investigations practices and the leader of Global Business Development & Strategy at Duff & Phelps, LLC.  Dubinsky's practice

places special emphasis on providing forensic accounting, fraud investigations and dispute analysis services to clients litigating commercial cases, as well as corporations, governmental agencies, and law enforcement bodies.  He has over 30 years of financial investigative experience and has served as an expert witness on nearly 100 occasions on cases involving financial fraud, Ponzi schemes, and SEC and FINRA enforcement.  From Dubinsky's report and an examination of his profile on his firm's website, the Court finds that Dubinsky clearly is qualified to be an expert in this matter and Plaintiffs do not seem to contest his qualifications.

In preparing his report, Defendants asked Dubinsky "to review the Supplemental Expert Report of Thomas Myers ("Myers"), a designated expert for the Plaintiff, dated September 24, 2017 (the "Myers Report") and to provide expert forensic accounting opinions (the "Assignment") related thereto.  I have read and analyzed the Myers Report, as well as reviewed additional information and provide my rebuttal opinions to the Myers Report herein." (Doc. 836-1, p. 1)(footnotes omitted).

In preparing his report, Dubinsky asserts that the information he considered amounted to documents provided by counsel upon his request, a database of documents produced by plaintiffs and defendants in the litigation, and depositions.  He additionally obtained some information by finding publicly available documents.

In summary, Dubinsky opined:

(1) Based on my thorough evaluation of the Myers Report and his sworn testimony in this case, as well as my review of additional information, I

find that Myers did not utilize commonly accepted and required forensic accounting methodology and techniques in reaching his opinions in this matter. In fact, at its core, the work he performed did not include any real accounting or complex financial analysis of any kind.   Instead, Myers employed highly subjective, ad hoc techniques that bear little, if any, resemblance to generally accepted forensic accounting profession. For these reasons, the Myers Report presents opinions and conclusions that are illogical, flawed, misleading, highly speculative, and untrustworthy.

(2) The Myers Report concludes that State Farm controlled "Affiliated Organizations." Myers claims that after annual dues payments or initial contributions, State Farm controlled the flow of the money all the way through to Justice Lloyd Karmeier's ("Karmeier") campaign, either through direct or indirect means in order to: 1) ensure Karmeier's election, and 2) ultimately have the *Avery* decision overturned.   The Myers Report, however, both 1) lacks objective evidence supporting these conclusions and 2) uses a failed and improvised "methodology" purportedly to create what he calls a money trail.

(3) The flaws in Myers' ad hoc approach is demonstrated by the fact that the precise same allegations were made in the *Price* case attributing the exact same dollars to Philip Morris for almost the exact same reasons as employed by Myers (*see* discussion *infra* on the *Price* case).

(Doc. 836-1, ps. 8-9) (footnote omitted).

Plaintiffs argue that Dubinsky erroneously criticizes Myers for not following proper "tracing" methodology set forth in the AICPA Guidelines and that he falsely asserts that the AICPA describes a clear methodology that needs to be followed in order to reliably perform tracing and that this is clearly missing from Myers' report.  Plaintiffs maintain that the AICPA Practice Aid does not provide such a standard and that the Practice Aid states as much.  Further, plaintiffs argue that Dubinsky's methodology is inadequate because he failed to review all of Myers' footnotes and much of the documentary evidence supporting Myers' Report.  In turn, defendants argue that Dubinsky opinions are reliable as they are his

characterizations and criticisms of Myers' testimony; that plaintiffs distort Dubinsky's methodology and that Dubinsky has ample foundation to use the *Price* allegations as critical evidence of the flaws in Myers' analysis.   Based on the following, the Court agrees with plaintiffs' reasoning.

Here, despite the fact that Dubinsky is more than qualified as an expert, the Court finds that Dubinsky's report and testimony do not pass the requirements of Rule 702 and *Daubert*.   Specifically, the Court concludes that Dubinsky's opinions are not based on sufficient facts or data, are not the product of any reliable methods or principles and that Dubinsky did not reliably apply the principles and methods to the facts of the case.   In reaching his conclusion that Myers did not employ any commonly accepted forensic accounting methodology, Dubinsky relies on an American Institute of Certified Public Accountants ("AICPA") Practice Guide, in which Dubinsky contends that the AICPA describes as a clear methodology that needs to be followed in order to perform reliable tracing and that methodology is missing from Myers' report.   In footnote 1 of Dubinsky's report, Dubinsky refers to the AICPA Forensic & Valuation Practice Aid, which plaintiffs' expert Dolores K. Rinke discounted as a non-authoritative source and *so did* Dubinsky, by his own admission during his deposition.[2] If it

---

[2] In her report, Professor Rinke states: "However, Dubinsky's 'standards' for forensic accounting aren't standards at all.   Even the Practice Aid states as much: … Dubinsky ignores this part of the Practice Aid, however, because he cites it as support for his opinions that: '[t]he AICPA provides an analytical framework regarding forensic accounting (including improper money tracing), detailing actions that should be taken during any analysis' and '[t]he AICPA describes clear methodology that needs to be followed in order to reliably perform tracing.'   What the Practice Aid describes is the 'Seven-Step' Method discussed above.   Though an acceptable method of investigation, it is not the only 'methodology that needs to be followed.' Neither of Dubinsky's

was a simple matter of being wrong, the Court would let the jury decide the point. Instead this issue goes to the Court's function in assessing the reliability of the witness' methodology. It appears the AICPA agrees with Rinke since the landing webpage for this practice aids contains this statement:

> "The Forensic and Valuation Services (FVS) Section of the AICPA offers access to these Practice Aids and other non-authoritative guidance to FVS Section members as a benefit of their membership or at an FVS Section member discount. "These practice aids are designed to serve as educational and reference material on technical issues and are not intended to serve as authoritative guidance. FVS members should exercise independent, professional judgment in the implementation and execution of FVS services." https://www.aicpa.org/interestareas/forensicandvaluation/resources/practaidsguidance.html.

In addition, a review of the AICPA Practice Aid reveals that it does not provide such a standard that Dubinsky criticized Myers for not following in regards to proper tracing. Specifically, the Practice Aid states:

> "This publication provides illustrative information for the subject matter covered. It does not establish standards or preferred practices. The materials were prepared by the AICPA staff and volunteers and has not been considered or acted upon by AICPA senior technical committees or the AICPA board of directors and does not represent an official opinion or position of the AICPA. ..."

Forensic and Valuation Services Practice Aid, Forensic Accounting-Fraud Investigations, p. 3. The Practice Aid merely suggests seven investigative techniques which are available to employ in an investigation depending on the circumstances. Further, the Practice Aid does not mention tracing, nor does it set

---

statements is true. ... Moreover, that same Practice Aid doesn't even mention tracing, let alone set forth a 'clear methodology that needs to be followed." (Doc. 712-2, ps. 20-21)(footnotes omitted).

forth a clear methodology that needs to be followed.  Additionally, page 9 of the

Practice Aid under hearing *Limitations of This Practice* Aid, reads:

> The guidance in this document is not a substitute for experience, professional judgment, or skepticism, but is meant to supplement your understanding of how and when these tools and techniques may be useful in obtaining additional evidence that would otherwise not be available during the course of an audit or other engagement. Forensic accounting and litigation consulting engagements often require the use of specialists who have specific training in areas such as data forensics, handwriting analysis, and private investigations. Because of the multi-disciplinary nature of these engagements, you should always be alert to situations where you are being asked by a client or counsel to perform a procedure or express an opinion that is outside of your practice area or competency. These situations present significant professional risks; engagement planning steps should include resource planning so that the necessary skill sets are appropriately provided and risk s may be avoided. Technical consulting practice aids do not purport to include everything you need to know or do in order to undertake a specific type of service. Furthermore, engagement circumstances differ and therefore your professional judgment may cause you to conclude that an approach described in a particular practice aid is not applicable. This practice aid is designed as educational and reference material for AICPA members and others who provide consulting services as defined in CS section 100.

Forensic & Valuation Services Practice Aid, Forensic Accounting-Fraud

Investigations, p. 9.  Clearly, the ACIPA provides no such standard as Dubinsky

seeks to enforce upon Myers.  Thus, his opinions and testimony do not pass the

Rule 702 and *Daubert* scrutiny.  As to Dubinsky's testimony/opinions regarding

Philip Morris and *Price*, the Court finds, pursuant to Rule 403, this evidence is

not proper as it is confusing, it is unreliable and it would mislead the jury about

the issues in this case.  Thus, the Court **GRANTS** plaintiffs' motion to exclude

expert report and testimony of Bruce G. Dubinsky.

**Joanna M. Shepherd (Doc. 711)**

Joanna M. Shepherd is a Professor of Law at Emory University School of Law and an Adjunct Professor at the Emory University Department of Economics.[3]  She has a PH.D. in Economics, with specializations in Law & Economics and Econometrics.   Professor Shepherd has had her research on judicial decision-making published in a number (ten) of peer reviewed journals[4], has been cited with favor by the United States Supreme Court, *Williams-Yulee v. Florida Bar*, 135 S.Ct. 1656, 1675 (2015)[5] and she currently teaches a course on Judicial Behavior.   In addition, Professor Shepherd has been qualified as an expert in a DEA matter and in another federal district court.   Reviewing Professor Shepherd's qualifications, obviously she has extensive experience in her field and is an expert in her field of judicial decision making.

---

[3] Out of an abundance of caution, and full disclosure, the undersigned judge advises that he is a member of the Judicial Advisory Board of the Emory University Law School Institute for Complex Litigation and Mass Claims.  The undersigned does not know Professor Shepherd and has not worked with her regarding the institute or any other reason.  Examining her photograph on the Emory website confirms that the undersigned has not worked with her, nor even seen her during the time he has spent on campus. The undersigned has no financial interest in Emory University, nor any financial connections to Professor Shepherd and receives no remuneration for his advisory work.   Therefore, the Court does not find a reason to recuse himself from the consideration of this motion or sitting in this case.  Should any party wish to be heard on this matter, the appropriate motion should be filed.

[4] Her research appeared in *Stanford Law Review*, *Michigan Law Review*, *Vanderbilt Law Review*, *Southern California Law Review*, *New York University Law Review*, *Duke Law Journal*, *UCLA Law Review*, *Journal of Legal Studies*, *University of Illinois Law Review*, and *Journal of Institutional and Theoretical Economics*.

[5]"Disproportionate spending to influence court judgments threatens both the appearance and actuality of judicial independence. Numerous studies report that the money pressure groups spend on judicial elections 'can affect judicial decision-making across a broad range of cases.' Brief for Professors of Law, Economics, and Political Science as *Amici Curiae* 14 (hereinafter Professors' Brief), see *id.,* at 5–17; J. Shepherd & M. Kang, Skewed Justice 1 (2014), available at http://skewedjustice.org (All Internet materials as visited Apr. 24, 2015, and included in Clerk of Court's case file) (finding that a recent 'explosion in spending on television attack advertisements ... has made courts less likely to rule in favor of defendants in criminal appeals')." *Williams-Yulle*, 135 S.Ct. at 1675.

In preparing her report, plaintiffs asked Professor Shepherd "to write a report that summarizes the social science research on the influence of campaign funds on judicial decision-making and draws implications from that research for the *Hale v. State Farm* case."

Defendants argue that Professor Shepherd's opinions will confuse the trier of fact and that her opinions regarding Justice Karmeier and the *Avery* decision are irrelevant.  Further, defendants argue that Professor Shepherd is not qualified to opine about the Fourteenth Amendment or constitutional standards for recusal under *Caperton*.  Lastly, defendants argue that her methodology is unreliable and flawed.  Plaintiffs counter that Professor Shepherd's expert report and opinions are based on reliable methodology, pass muster under *Daubert* and are relevant. Plaintiffs state that Professor Shepherd, in her depositions, repeatedly emphasized that she does not purport to opine on the requirements of the Constitution or the canons of ethics.  Further, plaintiffs contend that she will not opine as to whether there are any rules that mandated Justice Karmeier to step down.  The Court agrees with plaintiffs' reasoning that Professor Shepherd is qualified to offer her opinions about what the social literature and empirical research have to say about the influence State Farm's alleged campaign contributions could have upon the purported impartiality of Justice Karmeier and the impact his participation in the *Avery* decision might have had upon the other members of the Illinois Supreme Court.

Here, the Court rejects defendants' arguments and finds that pursuant to Rule 702, Shepherd's opinions and testimony are both relevant and reliable. Shepherd's extensive experience and expansive research in this field provides sufficient bases for her to offer these opinions. Her testimony relates to social science research on the influence of campaign funds on judicial decision-making. After reviewing her report, it is clear that Professor Shepherd is not making up her conclusions. Her opinions are based on the empirical studies and various articles regarding these studies; many of which she was the principle researcher.

In her lengthy report, Shepherd recounts the history of judicial selections and the increasing role of campaign funds in judicial elections, describes the significant body of empirical social science research that explores the influence that judicial elections, campaign fundraising and TV advertising have on judicial decision-making and discusses the implications of that research on the case at bar. The report explains that the alleged factors: (1) substantial contributions made by State Farm; (2) Justice Karmeier's possible knowledge of the contributions; (3) the timing of State Farm's contributions, Justice Karmeier's victory, the meeting between Ed Rust and Justice Karmeier, Justice Karmeier's reversing his decision not to participate in *Avery* and the subsequent overturning of *Avery*; and (4) State Farm's misrepresentations about its involvement in the Karmeier campaign, all converge to raise serious concerns about Justice Karmeier's impartiality. (Doc. 711-2).

Further, the report compared the facts of *Caperton* to the alleged facts surrounding the 2004 Illinois Supreme Court campaign and the *Avery* proceedings. She opined about the facts of *Caperton* and this case. Specifically, Professor Shepherd opined:

> In fact, the risk of actual bias may have been even greater in the *Avery* decision than it was in *Caperton*. If, as alleged in the Complaint, defendants played any role in selecting Justice Karmeier and managing his campaign, then the extent of State Farm's support of Justice Karmeier is seemingly more significant than Massey Coal's support of Benjamin. In addition, unlike Don Blankenship and Massey Coal who made contributions through a §527 political organization that required the disclosure of contributors, State Farm allegedly concealed its contributions and misrepresented the extent of its support for Justice Karmeier to the Illinois Supreme Court. Certainly this concealment and misrepresentation makes the appearance of impropriety worse in this case and more troubling than in *Caperton*. Moreover, secrecy may actually increase the risk of partiality; when contributions are concealed, judges can vote for contributors without fearing accusations of bias. Indeed, my own prior research reveals that judges are more likely to favor campaign contributor cases in which their impartial voting is unlikely to be noticed.

(Doc. 711-2, p. 14, footnotes omitted). Further, Professor Shepherd wrote in her report:

> Understanding the interdependency between judges' positions and votes, the Supreme Court has determined that bias on the part of a single judge can affect the way that the entire court votes. In *Williams v. Pennsylvania,* the court considered the effect on a multi-judge panel when a judge for whom there existed a serious risk of actual bias refused to recuse himself from a case, yet did not cast the deciding vote in the case. FN 92, *Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016). *Williams* involved the refusal of Justice Castille, whom had formerly been the district attorney that approved the death penalty case against Williams, to recuse himself in an application to vacate the stay of Williams' execution years later. The Court concluded that, because of his personal involvement in the case, Castille's failure to recuse presented an unacceptable risk of bias. Fn. 93, *Id.* at 1907. Importantly, the Court also determined that, even though Justice

Castille did not cast the deciding vote, his failure to recuse himself tainted the entire judicial proceeding; 'it does not matter whether the disqualified judge's vote was necessary to the disposition of the case. The fact that the interested judge's vote was not dispositive may mean only that the judge was successful in persuading most members of the court to accept his or her position.  The outcome does not lessen the unfairness to the affected party.' Fn. 94, *Id* at 1909."

(*Id.* at pg. 17).[6]  Finally, Professor Shepherd expressed:

"Similarly, based on the findings of the empirical social science literature, I would expect that Justice Karmeier's involvement in the *Avery* decision influenced the thinking and votes of the other judges deciding the case.  As such, it is my conclusion that the Avery decision was likely unfairly tainted in State farm's favor."

These are the opinions that defendants seek to exclude.  The Court finds that their arguments, however, go to the weight and/or the credibility that should be given to Professor Shepherd's opinions and not to their admissibility.  Further, defendants' specific disputes with Professor Shepherd's analysis are appropriate for subject matter for cross-examination.  Accordingly, the Court **DENIES** the motion to exclude the report and testimony of Joanna M. Shepherd (Doc. 711).

Lastly, the Court notes that counsel Michael Kenny conducted an improper examination of Professor Shepherd.  Mr. Kenny picked out language that was dicta, and misrepresented it to Professor Shepherd and ultimately to the jury because his question contained incomplete facts.  Were this to be heard by the jury, the Court is placed in the untenable position of either admitting a copy of the case for the untrained jury to read or give a jury instruction on what *Williams* actually holds and the impact it has on this case, which is substantial.  Mr. Kenny

---

[6] Reading the *Williams* case leads one to the inescapable position that Professor Shepherd is correct about the meaning and impact of the decision.

suggests by his question that Professor Shepherd has not read the case. The Court will not tolerate this type of "gotcha" questions, especially when based on a false premise. Rather than read all the relevant language in the context of that which he quoted; he instead cherry picked some language he thought would help his client when in the context of what he selected actually works against his client. The Court **SUSTAINS** the objection at page 28 lines 17-19 and this portion of the transcript will not be read to the jury for any reason. If defendants wish to cross examine in a similar vein during live testimony, the question(s) must contain a complete recitation of what the Court said regarding that particular issue. Defendants can ask if the Court used the word "taint" (it did not) without that recitation of facts but it is unlikely any other questions about the particular issue can be framed without completely reading all of the Court's statements on the issue.

### Delores K. Rinke (Doc. 712)

Next, defendants' move to exclude the report and trial testimony of Dolores K. Rinke (Doc. 712). The Court **DENIES as moot** this motion as the Court excluded Dubinsky's expert report and testimony. Thus, the Court need not address the merits of this motion. [7]

### Richard K. Means (Doc. 715)

---

[7] Plaintiffs retained Rinke "to provide objective opinions on questions of forensic accounting analysis as they relate to the reports of Thomas Myers and Bruce Dubinsky. I have been asked to review the reports and depositions of Messrs. Dubinsky and Myers to evaluate and provide comment on their materials and to specifically respond to Bruce Dubinsky's criticism and analysis of Thomas A. Myers' reports and testimony."

Richard K. Means is an Illinois election lawyer with nearly 50 years of experience in the field, and the founder, CEO and General Counsel of The Public Access Project, a civic organization/public interest law firm promoting democracy in Illinois.   He has written and lectured on chapters in the Illinois Institute of Continuing Legal Education (IICLE)'s Election Law Handbooks since the 1970s. Means has also served on the National Board and the National Executive Committee of the Americans for Democratic Action (ADA) for over 20 years, and participated in dozens of candidate recruitments. He also founded Project LEAP (Legal Elections in All Precincts). Means expertise also included his 20 years of service as the Legislative Vice-Chair, followed by a two-year stint as State Chair of the Independent Voters of Illinois and his position as a hearing officer for the Illinois State Board of Elections in several cases. Further, during his nearly 50 year career,  Means has litigated issues before local election boards, circuit courts, the Illinois Appellate Court, United States District Courts, and the Seventh Circuit Court of Appeals. Also during his lengthy career, Means has held numerous jobs at different levels within the election process. Unmistakably, Means is well-credentialed and well-qualified to testify as an expert and defendants do not seem to contest his qualifications.

In preparing his report, plaintiffs asked Means to evaluate "the expert reports and deposition testimony of defense witnesses Ronald Michaelson and Anthony Jacob on the subjects of their testimony and their criticism of the testimony of plaintiffs' witness Kent Redfield" and prepare a rebuttal report on

Jacob and Michaelson's testimony utilizing his experience and expertise. (Doc. 715-2).

In his rebuttal report, Means analyzes the facts and evidence in this case from the perspective of an Illinois election law expert and responds to the findings of Michaelson and Jacob. Specifically, Means stated:

> "I was disappointed to read the expert reports and deposition testimony of Dr. Michaelson and Mr. Jacob because they describe a body of law and administration far different from the law and its administration experienced by me and other Illinois election law experts in 2003-2004. They describe what is little more than a cynical game of "find the loophole." They describe a body of law and procedure which could be characterized as "all one can get away with."

(Doc. 715-2, pg. 4-5).   He went on to further rebut the defense experts' testimony by opining:

> In this case, the evidence shows that there were numerous instances of contributions to issue advocacy entities and the timing of those transactions, the ads the issues advocates ran and the timing of those ads, taken with the explicit and clear evidence of coordination in an effort to elect Justice Karmeier, compels the conclusion that the costs of this issue advocacy should have been reported as in-kind contributions to Citizens for Karmeier. Because this spending was not reported to Citizens for Karmeier, each of the issues advocates violated the Campaign Finance Act. Because the evidence shows that Citizens for Karmeier knew the spending for its benefit and did not report those benefits as in-kind contributions on its disclosures, Citizens for Karmeier was in violation of the Campaign Finance Act as well."

(Doc. 715-2, pg. 9-10).   Finally, Means explained that the evidence shows that the acts claimed to be campaign finance law violations were performed intentionally with the purpose of evading disclosure requirements.

Defendants argue that Means' report should be stricken because it is largely not rebuttal and, therefore, in violation of Fed.R.Civ.P. 26(a)(2)(D)(ii). Defendants also seek exclusion of Means' opinions arguing that his testimony amounts to impermissible legal conclusions, and that he cannot opine as to the intent, knowledge, purpose, or willfulness of State Farm. Finally, defendants argue that Means' testimony is more prejudicial than probative under Federal Rule of Evidence 403. (Doc. 715).

Defendants first argue that Means' report should be stricken because it is largely not rebuttal. "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008), citing *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001) (internal quotation marks omitted). Plaintiffs argue that Means' report complies with the law by directly contradicting, impeaching, and defusing the testimony of defendants' experts Michaelson and Jacobs. Specifically, plaintiffs argue that "Jacob and Michaelson's critique of Redfield's report opened the door for Means to opine on those areas, and permitted Means to support Redfield's original report" in his attempt to contradict Jacob and Michaelson's opinions.

Here, the Court agrees with plaintiffs and rejects defendants' arguments. Pursuant to Rule 702 Means' opinions are both relevant and reliable. Means' extensive experience and first-hand knowledge of Illinois campaign finance law provides sufficient basis for him to offer his opinions. Means found from his

experience, relevant regulations, statutes and case law, a mode to respond to the defense expert and approach the issues in a way that explains why the opinion being rebutted is wrong. Thus, the Court finds that Means' rebuttal is proper and falls squarely within the confines of Fed.R.Civ.P. 26(a)(2)(D)(ii), regardless of the terms employed in his report.

Next, defendants argue that Means' opinions should be excluded because his testimony amounts to impermissible legal conclusions. Defendants also assert that he cannot opine as to the intent, knowledge, purpose, or willfulness of State Farm. Here, the Court rejects defendants' arguments and does not perceive anything in Means' expert report as an attempt to offer an impermissible legal conclusion. This case involves allegations that State Farm violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Illinois campaign finance law violations are neither an element of a RICO claim, nor are they predicate acts. The same goes for the "the intent, knowledge, purpose, or willfulness of State Farm" in violating those laws.

It is clear that Means is not serving as an expert to determine where State Farm contributed funds and how those funds were funneled to the Karmeier campaign.  His testimony, like that of Redfield's, relates to campaign finance laws and State Farm's violations of campaign finance laws by concealing its contributions to the Karmeier campaign. Means rebuts the opinions of defense witnesses Ronald Michaelson and Anthony Jacob. Means' opinions regarding State Farm's violations of Illinois campaign finance laws and their intent,

knowledge, purpose, or willfulness do not usurp the role of jury because his opinions are not an ultimate issue in this case. Given that Means does not purport to answer the ultimate issue in this case as to whether there has been a RICO violation, the Court agrees with plaintiff's reasoning and finds that his testimony is admissible.

Lastly, defendants argue that Means' opinions and testimony discussing the aforementioned Illinois campaign finance laws should be excluded under FRE 403 for their prejudicial significance and for fear of confusing the issues and misleading the jury. Specifically, defendants argue that Means' opinions, testimony, and "emotionally charged rhetoric and hyperbole concerning the purported campaign finance law violations  will mislead the jury and confuse the issues (Doc. 715, pg. 18). Defendants allege that the proposed testimony would unnecessarily delay the trial and "create a significant danger that the jury would erroneously infer from his testimony that, because State Farm (and others) purportedly violated campaign finance laws, State Farm must have violated RICO." (*Id.*). Plaintiffs, in turn, argue that Means' opinions that State Farm's conduct violated Illinois campaign finance law "is relevant context to State Farm's efforts to conceal its contributions to the Karmeier campaign." (Doc. 748, pg. 18).

The Court rejects defendants' arguments and finds that Means' opinions are highly relevant and not unduly prejudicial for the reasons cited by plaintiffs. As noted above, Means does not opine on the ultimate issue in this case, and he testifies to "something more than what is 'obvious to the layperson." *Dhillon v.*

*Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). His opinions are clearly relevant to provide context to State Farm's alleged efforts to conceal its contributions supporting the Karmeier campaign. Therefore, his testimony would aid the trier of fact in this case. As noted relating to Redfield, any alleged prejudice or disagreement resulting from juror confusion or erroneous inferences from the testimony shall be eliminated through cross examination and through jury instructions that explicitly describe the elements and predicate acts of the RICO claim at issue. Accordingly, the Court **DENIES** the motion to exclude the testimony and report of Richard K. Means (Doc. 715).

### Kent D. Redfield (Doc. 716)

With regard to plaintiffs' expert Kent D. Redfield, a professor of Political Studies at the University of Illinois Springfield with 26 years of extensive experience and expansive research in the fields of campaign finance and political ethics, defendants move to exclude Redfield's opinions and testimony with respect to purported violations of Illinois campaign finance laws. Defendants do not challenge Redfield's qualifications or scientific validity under *Daubert*. Instead, defendants allege that expert's opinions referencing statutory compliance, or lack thereof, amounts to impermissible legal conclusions (Doc. 83).  Defendants also seek exclusion of Redfield's opinions arguing that the evidence presented is prejudicial under Federal Rule of Evidence 403. Plaintiffs counter that Redfield's

opinions satisfy each and every part of the Rule 702/*Daubert* analysis and the risks that defendants allege, do not substantially outweigh the probative value of Redfield's testimony and opinions. The Court agrees with plaintiffs and denies the motion to exclude.

Seventh Circuit precedent specifies that expert testimony containing a legal conclusion *that determines the outcome of a case is inadmissible*. Fed. R. Evid. 704; *RLJCS Enterprises, Inc. v. Professional Ben. Trust Multiple Employer Welfare Ben. Plan and Trust*, 487 F.3d 494, 498 (7th Cir. 2007); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir.2003). Defendants argue that Redfield's opinions on purported campaign law violations fall within the purview of an inadmissible legal conclusion. Plaintiffs, in response, contend that Redfield does not offer legal conclusions on an ultimate issue in this case, and, thus, his opinions and testimony are admissible.   The Court agrees with plaintiffs' reasoning.

In his report, Redfield opines that State Farm (and others) violated Illinois campaign finance law (Article 9 of the Illinois Election Code-10 ILCS 5/9-1.0 et al) in six specific areas:

1. Not reporting in-kind contributions of goods and services supporting a candidate for public office thereby avoiding disclosure;

2. Soliciting contributors to make contributions to a political committee or association with the understanding that the funds will be contributed to or spent on behalf of a specific candidate for public office thereby enabling the original source of contributions to support a specific candidate while  avoiding being directly linked to the candidate by disclosure;

3. Accepting a contribution with the understanding that the funds will be contributed to or spent on behalf of a specific candidate for public office thereby enabling the original source of the contribution to support a specific candidate while avoiding being directly linked to the candidate by disclosure;

4. Manipulating the amounts and timing of campaign contributions to a political committee to avoid triggering the disclosure required by the sponsoring entity provision of the Illinois campaign finance law;

5. Soliciting others to participate in the funding of in-kind contributions of electronic communications and direct mail and phone contact operations supporting the election of a candidate for public office which would not be reported thereby avoiding disclosure; and

6. Not reporting in-kind contributions of electronic communications and direct mail and phone contact operations supporting the election of a candidate for public office which would not be reported thereby avoiding disclosure.

(Doc. 716-3, pg. 2-3). As highlighted by plaintiffs, this case involves allegations that State Farm violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Illinois campaign finance law violations are neither an element of a RICO claim, nor are they predicate acts. Given that Redfield does not purport to answer the ultimate issue in this case as to whether there has been a RICO violation, the Court agrees with plaintiff's reasoning.

As a secondary argument, defendants contend that Redfield's opinions and testimony discussing the aforementioned Illinois campaign finance laws should be excluded under FRE 403 for their prejudicial significance. Specifically, defendants argue that Redfield's opinions and testimony will mislead the jury and will confuse the issues by "injecting collateral issues that have no bearing on plaintiff's

RICO claim." (Doc. 716, pg. 6). Defendants allege that the proposed testimony would unnecessarily delay the trial and "risk that the jury erroneously infer from Redfield's testimony that, because State Farm (and others) purportedly violated campaign finance laws, State Farm must have violated RICO." (*Id.* at 7).

Plaintiffs, in turn, argue that Redfield's opinions that State Farm's conduct violated Illinois campaign finance law "is relevant context to their efforts to conceal its contributions to the Karmeier campaign." (Doc. 747, pg. 12). Plaintiffs further argue that any risk of juror confusion or erroneous inferences should be dealt with through appropriate jury instructions on the elements and predicate acts of the RICO claim.

Here, the Court rejects defendants' arguments and finds that Redfield's opinions are highly relevant and not unduly prejudicial for the reasons cited by plaintiffs. As noted above, Redfield does not opine on the ultimate issue in this case, and he testifies to "something more than what is 'obvious to the layperson." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001). His testimony is clearly relevant to provide context to State Farm's alleged efforts to conceal its contributions supporting the Karmeier campaign. Therefore, his testimony would aid the trier of fact in this case, and any alleged prejudice or disagreement resulting from juror confusion or erroneous inferences from Redfield's testimony shall be eliminated through jury instructions explicitly describing the elements and predicate acts of the RICO claim.

Furthermore, defendants' disagreement with Redfield's defined legal standards is a proper subject for cross-examination. "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."" *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 596). Defendants may attack the Redfield's definitions of relevant legal standards on cross-examination or through the testimony of their own expert to contradict his proposed conclusions or definitions.

Therefore, the Court finds that Redfield's opinions and testimony are admissible, and any risks alleged by defendants do not substantially outweigh the probative value of his opinions. Accordingly, the Court **DENIES** the motion to exclude the testimony and report of Kent D. Redfield (Doc. 716).

### **Bruce Green (Doc. 717)**

Bruce Green is a full-time Professor at Fordham Law School.  At Fordham Law School, he is the Louis Stein Chair and directs the Louis Stein Center for Law and Ethics.  Previously, Green served as a law clerk to Judge James L. Oakes of the United States Court of Appeals for the Second Circuit, a law clerk to Justice Thurgood Marshall of the United States Supreme Court, and as an Assistant United States Attorney for the Southern District of New York.  He is admitted to practice law in the State of New York.

Recently, Professor Green was named the 2018 recipient of the American Bar Association's Michael Franck Professional Responsibility Award.[8] He has co-authored books on professional conduct for lawyers and has co-authored dozens of scholarly articles addressing lawyer professional conduct.  In addition, he was a reporter to the ABA Standing Committee on Ethics and Professional Responsibility, co-chair of the ABA Ethics, Gideon and Professionalism Committee, chair of the New York City Bar's Committee on Professional Ethics, and chair of the New York State Bar Association's Committee on Professional Ethics.  Unmistakably, Professor Green is well-credentialed and well-qualified to testify as an expert and defendants do not seem to contest his qualifications.

Plaintiffs asked Professor Green "to address how judicial opinions and rules of professional conduct apply to aspects of the conduct of State Farm's in-house and outside counsel in connection with the *Avery* lawsuit."  In addition, Professor Green issued a rebuttal report disagreeing with defendants' experts Thomas D. Morgan, Sheila O'Brien and Richard Painter, each of whom have opined that State Farm's 2005 and 2011 briefs conformed to the standards of appropriate advocacy.  Specifically, Green stated in his rebuttal: "I disagree with

---

[8] This award honors individuals whose: "career commitments in areas such as legal ethics, disciplinary enforcement and lawyer professionalism demonstrate the best accomplishments of lawyers.  Although a nominee's significant contributions to the work of the organized bar merit strong consideration by the selection committee, noteworthy scholarly contributions made in academic settings, creative judicial or legislative initiatives undertaken to advance the professionalism of lawyers, and other related accomplishments will also be given consideration."
https://www.americanbar.org/groups/professional_responsibility/initiatives_awards/awards/abo utthemichaelfranckaward1.html

this conclusion and with the defense experts' underlying reasoning.  This report, which supplements my earlier one, identifies the principal areas in which I disagree with the defense experts." (Doc. 717-4, p. 2)(footnote omitted).   Further in preparing his report, plaintiffs asked Professor Green to assume:

(1) in 2003-2004, State Farm provided substantial financial and other support designed to elect Justice Llyod Karmeier to the Illinois Supreme Court;

(2) State Farm's support included its expenditure of as much as several million dollars towards Justice Karmeier's election;

(3) some of State Farm's contributions were funneled to the Karmeier campaign committee through trade organizations and some were spent by trade organizations themselves for the purpose of elections Justice Karmeier; and

(4) because of the secretive nature of State Farm's expenditures, the extent of its support for Justice Karmeier's campaign was not reflected in public filings and was otherwise unknown to the *Avery* plaintiffs and to the Illinois Supreme Court in 2005 and 2011.

In his report, Professor Green opined the following:

(1) If State Farm's outside counsel in *Avery* in fact knew the general extent of State Farm's secret support for Justice Karmeier's campaign as described in the Myers Report, then those lawyers violated their professional duties and duty of candor to the Illinois Supreme Court.

(2) If State Farm's outside counsel knew of State Farm's substantial undisclosed financial support for Justice Karmeier's campaign, then a duty of candor obligated the lawyers to bring relevant facts to the Illinois Supreme Court's attention when it appeared that Justice Karmeier could participate in State Farm's appeal, even if the *Avery* plaintiffs had not moved to recuse Justice Karmeier.

(3) If State Farm's outside counsel knew the basic facts described in the Myers Report, or if they avoided making a reasonable factual inquiry before filing their 2005 opposition to the recusal

motion and their 2011 opposition to the *Avery* plaintiffs' petition
to recall the mandate, then those pleadings violated the lawyers'
duty of candor to the Illinois Supreme Court.

(4) If State Farm's in-house lawyers knew (or kept themselves in the
dark) about State Farm's extensive funding or other support to
Justice Karmeier's campaign, and if those lawyers oversaw outside
counsel or had other responsibilities with respect to State Farm's
misleading filings in 2005 and 2011, then those lawyers violated
their duty of candor to the Illinois Supreme Court.

(Doc. 717, ps. 15-24).   Further, in preparing his reports, Professor Green

identifies the many documents he was asked to review, including Thomas Myers'

expert report and its cited materials and Professor Green identifies the

professional standards for lawyers, civil practice rules, and rules of candor and

fair dealing owed to the Court.

Defendants maintain that Green's opinions are flawed and irrelevant as his

opinions are improper legal conclusions; speculative and irrelevant and his

methodology is not reliable. Further, defendants maintain that Green's opinions

are highly prejudicial and will mislead the jury.  Plaintiffs, of course, argue that

Professor Green's testimony and opinions are admissible; that defendants'

objections to his testimony and opinions are unfounded in that his opinions and

testimony are not based on speculation and his opinions and testimony are

relevant.   Further, plaintiffs contend that Professor Green's opinions and

testimony will not unfairly prejudice defendants.  The Court agrees with plaintiffs'

reasoning.

As to defendants' contention that Professor Green's reports and testimony

consist of almost entirely impermissible legal conclusions regarding the law of

attorney ethics and the application of ethical rules and the standards, the Court rejects this argument.  Defendants cite *Lanteri v. Credit Prot. Ass'n, L.P.¸* 2016 WL 4394139 at * 3 (S.D. IN. 2016)(Lawrence, J.) for the proposition that courts generally will not admit expert testimony regarding whether a party's counsel have violated the ethical rules. Here, the Court can only speculate why *Lanteri* was cited as it is an unpublished order of the trial court in the Southern District of Indiana which is without precedential value and which the trial judge cites no authority for the proposition of law he suggests.  Defendants also argue that Professor Green's opinions that State Farm's briefs are misleading and deceptive. In support defendants cite to *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 583 (7th Cir. 1989).  A review of *Amy Travel* reveals that it is not applicable to the facts of this case.  In *Amy Travel*, the expert, offered by defendants, but refused by the judge, was knowledgeable about travel marketing.  Defendants' counsel ask the witness whether defendants' sales practices were 'deceptive or misleading.' The magistrate judge, trying the case, would not allow an answer to the question, because it called for the witness to render a legal opinion, not one about consumer perception of the sales pitch used.  It was the magistrate judge's determination that the expert tendered did not have the correct expertise for such an opinion, finding that the expertise necessary would be a person who is an expert in consumer psychology or consumer behavior.  While it is not clear, it appears to the undersigned that reason for not allowing the legal issues was the same as the consumer behavior; the witness was not qualified because he was not

a lawyer, nor a consumer psychologist or a consumer behaviorist. The only citations to authority are Federal Rule of Evidence 104(a) and Federal Rule of Evidence 702, suggesting that the decision to exclude was based on qualifications and not invading the province of the jury.

Further, defendants maintain that Greens' opinions and methodology are not reliable, principally because Professor Green applied the facts given to him by plaintiffs' counsel without independently verifying those facts. The Court again rejects this argument as it previously did in its July 19, 2018 Memorandum and Order granting defendants' motion to exclude the expert reports and testimony of Adelstein and McKenna (Doc. 882, p. 7). Obviously, the defendants will have the opportunity to cross examine Professor Green on this point and the jury can decide if this issue adversely affects the credibility of the witnesses or causes them to place less of importance on the evidence.

Here, the Court disagrees with defendants and finds that Professor Green's opinions and testimony are both relevant and reliable under Rule 702. Professor Green's reports will help the jury assess matters of professional responsibility; specifically, how a lawyer's duties to a court limit what a lawyer may do to advance a client's interests. Professor Green's extensive experience and research in the field of the rules of professional and ethical conduct for lawyers provides sufficient basis for him to offer his opinions and conclusions. After reviewing the reports, it is clear that Professor Green is not making up his conclusions. Professor Green takes the facts supplied to him; then identifies the professional

conduct rules that apply, as well as the relevant case law, and then applies the facts to those rules and cases to arrive at the opinions he reaches.  As stated before, defendants are free to cross examine Professor Green to test the credibility of his testimony and to argue that the jury should not give it any weight. The Court finds that his methodology is reliable and his testimony aids the jury in deciding this theory and issue proffered by the plaintiffs.   Thus, the Court **DENIES** the motion to exclude the testimony and reports of Bruce Green (Doc. 717).

## Conclusion

Accordingly, the Court **DENIES** defendants' motion to exclude the reports and testimony of Joanna Shepherd (Doc. 711); **DENIES as moot** defendants' motion to exclude expert report and trial testimony of Delores K. Rinke (Doc. 712); **GRANTS** plaintiffs' motion to exclude expert report of Justice Sheila M. O'Brien (Doc. 713); **GRANTS** plaintiffs' motion to exclude report and testimony of Michael T. Reagan (Doc. 714); **DENIES** defendants' motion to exclude report and testimony of Richard K. Means (Doc. 715); **DENIES** defendants' motion to exclude testimony and opinions of Kent D. Redfield (Doc. 716); **DENIES** defendants' motion to exclude testimony and reports of Bruce Greeen (Doc. 717) and **GRANTS** plaintiffs' motion to exclude the report and testimony of Bruce Dubinsky (Doc. 718).

**IT IS SO ORDERED.**

Judge Herndon
2018.08.21
17:04:48 -05'00'

**United States District Judge**