IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK HALE, TODD SHADLE, and LAURIE LOGER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, EDWARD MURNANE, and WILLIAM G. SHEPHERD,<br><br>Defendants. | Case No. 3:12-cv-00660-DRH-SCW<br><br>Judge David R. Herndon<br><br>Magistrate Judge Stephen C. Williams |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION
FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

I.   **INTRODUCTION**

This extraordinary class is now more than six years old, and has been actively litigated at the trial and appellate levels. It has involved the production and review of hundreds of thousands of pages of documents, upwards of 100 depositions, numerous discovery hearings before the Magistrate Judge, and, in preparation for trial, literally dozens of motions in limine [790, 792-821, 823, 841, 843, 844-45, 849-79, 881] and *Daubert* motions challenging each parties' experts [708-20, 741-53]. All rulings on pretrial evidentiary issues have been decided, and a jury is now empaneled to hear the case. [928]. The case has been vigorously prosecuted by Counsel for the Class and vigorously defended by Counsel for the Defendants.

In addition, as a part of the class certification process and Court-approved notice plan, notice of the litigation has been mailed or emailed to over 1.5 million Class Members, and nationwide publication and social media efforts have provided notice to the millions of additional Class Members (the notice reached approximately 79.2% of all U.S. adults aged 35

and over approximately 2.4 times each). Only 479 of the approximately 4.7 million Class Members (approximately 0.01%) exercised their right to opt out of the Class. [768-2; 919; 935].

Defendants have denied and continue to deny that they are liable and expressly deny that Plaintiffs' allegations have any factual or legal merit. From Defendants' perspective, they are settling this case to benefit State Farm policyholders and to avoid protracted litigation and appeals that could continue for several more years.

On March 6, 2017, this Court first ordered the parties to pursue mediation. [594]. The parties selected Judge James F. Holderman, Ret., to mediate the dispute, and that process ran its course after the better part of a year, during which all aspects of the litigation actively continued. The parties nonetheless re-visited settlement negotiations in recent weeks, and, once the jury was empaneled, the Court appointed Randi Ellis as Settlement Master to assist the parties with settlement efforts. [933]. That process has proven successful, and the parties are now able to advise the Court that they have reached a proposed Settlement.

As explained more fully below, the proposed Settlement requires State Farm to pay Plaintiffs $250 million to settle Plaintiffs' claims. All of these monies will go to the Plaintiff Class Members, less attorneys' fees and costs, and costs of notice and settlement administration.

By this motion, Plaintiffs seek preliminary approval of the Settlement as well as approval of the proposed Notice Plan.

This Settlement represents a substantial achievement for Class Members, all of whom are eligible for monetary payments, and many of whom will receive those payments automatically, meaning without having to submit a claim form. As the Court knows, Plaintiffs were prepared and ready and willing and able to try this case to verdict. But this proposed Settlement provides significant relief to Class Members now, and avoids the risk of (1) any further delay associated

with the inevitable appeals of any successful verdict; (2) the loss of a successful verdict on appeal; or (3) an unsuccessful trial verdict.

If the Court grants preliminary approval of the Settlement, Plaintiffs anticipate that a final fairness hearing could take place this calendar year, and propose a hearing date of December 10, 2018.

## II. STATEMENT OF THE FACTS

Plaintiffs filed their lawsuit on May 29, 2012. The complaint charged Defendants with violating the RICO Act, 18 U.S.C. §§ 1962(c) and (d). Specifically, Plaintiffs alleged that Defendants engaged in a RICO conspiracy by (1) recruiting then-Judge Lloyd Karmeier to run for an open seat on the Illinois Supreme Court, before which a $1.056 billion judgment against Defendant State Farm was pending; (2) helping to organize and manage Judge Karmeier's campaign behind the scenes; (3) funneling millions of dollars to support the campaign through intermediary organizations over which State Farm exerted influence; and (4) after securing Justice Karmeier's election, obscuring, concealing and misrepresenting the degree and nature of its support so that Justice Karmeier could participate in the deliberations of the pending *Avery* case against State Farm. In furtherance of the Defendants' fraudulent scheme, Plaintiffs alleged that State Farm submitted briefs to the Illinois Supreme Court that contained false and misleading assertions or otherwise omitted material facts about its involvement in Justice Karmeier's election. Plaintiffs alleged that Defendants' conduct deprived the Plaintiffs of their right to an impartial tribunal and resulted in the loss of their property interest in that judgment.

Defendants have steadfastly denied liability and mounted a tenacious defense in all phases of the case.

As a part of the Settlement, Plaintiffs have agreed to add a claim of unjust enrichment to the Amended Complaint. The Amended Complaint is attached to the Settlement Agreement as Exhibit A.

### A. Motion Practice

The history of this case can be gleaned from the extensive and exhaustive motion practice. Defendants sought to dismiss this case on several occasions. Their first attempt was in connection with their motion to dismiss the complaint filed on July 10, 2013. [13, 32, 61]. After this Court denied that motion, Defendants sought review of the order denying the motion in the Seventh Circuit Court of Appeals. Specifically, Defendants filed a writ of mandamus. [156-1]. Plaintiffs opposed the writ. [175]. The Seventh Circuit denied it. [175].

In October 2015, Plaintiffs filed their motion for class certification. [438]. Defendants not only opposed class certification [467-68], but also sought to exclude several of Plaintiffs' experts who had provided declarations in support of their motion for class certification. [469-77]. Plaintiffs deposed and also sought to exclude several of Defendants' experts who had provided declarations and affidavits in opposition to class certification. [487-90]. Plaintiffs' class certification motion was supported by several hundred exhibits numbering thousands of pages. [438]. On September 16, 2016, the Court certified the class. [556]. Defendants then filed two Rule 23(f) petitions to the Seventh Circuit Court of Appeals, both of which were denied. [572; 618].

Defendants then filed two motions for summary judgment. Their first summary judgment motion sought dismissal pursuant to *Rooker-Feldman, res judicata,* and collateral estoppel—doctrines that would have, if applicable, resulted in dismissal of the complaint. [646]. Plaintiffs opposed this motion. [661-62]. The Court issued its decision denying that motion on February 6, 2018. [726]. Defendants then sought summary judgment on Plaintiffs' RICO

claims, arguing that there were no material facts in dispute as to whether Plaintiffs could meet the requisites of their RICO claims, which were premised upon a violation of the mail fraud statute. [694]. On July 3, 2018, the Court denied Defendants' summary judgment motion on RICO. [846].

As trial approached, the parties filed numerous motions in limine. [790, 792-821, 823, 841, 843, 844-45, 849-79, 881]. The parties also filed motions to exclude various experts from trial. [708-20, 741-53]. The Court issued omnibus rulings on many of these motions. [882, 903-04]. The parties filed trial briefs. [898, 901]. The parties also served competing jury instructions, and lodged them with the Court.

One would be hard pressed to imagine any additional motions that could have been filed to test Plaintiffs' case. By virtue of all the motion practice and rulings and appeals in this case, one thing is abundantly clear: Plaintiffs have a clear understanding of the strengths and weaknesses of their case. As such, they are well suited to judge the fairness, reasonableness, and adequacy of the proposed Settlement.

**B. Discovery**

Also informing Plaintiffs' judgment is the fact that Plaintiffs engaged in extensive discovery during the many years of this litigation. Plaintiffs propounded numerous document requests, interrogatories, and requests for admissions. Plaintiffs reviewed several hundreds of thousands of pages of documents produced in discovery. Plaintiffs then took some 67 fact depositions. Fact discovery was contentious. Magistrate Judge Williams was actively involved in discovery, assisting the parties at literally dozens of hearings over the years. Not only was the Magistrate Judge called upon to resolve discovery disputes between and among the parties, but Plaintiffs had sought discovery from numerous third parties, some of whom were alleged unnamed coconspirators. Plaintiffs took the depositions of top officials from key organizations

1615789.1

such as the U.S. Chamber of Commerce, the Illinois Chamber, the American Tort Reform Association, Illinois Business Roundtable, Illinois Civil Justice League, among others. In addition, Plaintiffs deposed all of Defendants' trial experts and class certification experts, and Defendants deposed all of Plaintiffs' experts.

In preparation for trial, the parties submitted thousands of exhibits on their list of exhibits and scores of witnesses that they intended to call at trial.

The point is that the parties had fully prepared this case for trial. Both sides fully discovered, analyzed, and understood the strengths and weaknesses of their positions and the proposed resolution of this case comes at a fully mature stage.

### C.   Mediation and Settlement

On March 6, 2017, this Court ordered the parties to mediation. [594]. After more than a year of efforts, the mediation concluded, as reflected in Judge Holderman's March 27, 2018 letter to the parties.

The parties continued the march toward trial, which had never stopped. Trial commenced on August 29, 2018. Even though Plaintiffs' trial team was entirely focused on trial, Class Counsel also had a separate team of lawyers able to pursue settlement negotiations with Defendants. As those negotiations progressed, the Court appointed Randi Ellis as Settlement Master. Over the course of several days, Ms. Ellis worked with the parties and this Settlement Agreement is the product of that effort, but also the product of six years of extremely active and hard fought litigation.

### D.   The Proposed Settlement

For purposes of preliminary settlement approval, the following summarizes the Settlement's terms:

1. **The Class**

The Class remains as previously certified by the Court, and consists of the following:

> All persons in the United States, except those residing in Arkansas and Tennessee, who, in between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) "crash parts" installed on or specified for their vehicles or else received monetary compensation determined in relation to the cost of such parts.
>
> Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, and its affiliates. In addition, the following persons are excluded from the class: (1) All persons who resided or garaged their vehicles in Illinois and whose Illinois insurance policies were issued/executed prior to April 16, 1994, and (2) all persons who resided in California and whose policies were issued/executed prior to September 26, 1996.

The Class is estimated to number approximately 4.7 million individuals.

2. **Monetary Relief for Class Members**

The Settlement Agreement requires State Farm to make a non-reversionary payment of $250 million into the Settlement Fund. After payment of all costs of notice and claims administration, Court-awarded attorneys' fees and costs, and class representative service awards, all remaining funds will be distributed in equal, per-capita shares to Class Members. At the time of distribution, payments will be made automatically—with no claim form requirement—to those Class Members for whom the Claims Administrator has a valid address (except for those with addresses in Arkansas and Tennessee, who would need to submit claim forms if they were residents of another state during the Class Period). As a result, a sizeable percentage of the Class will not have to submit a claim form to receive the benefits of the Settlement.

Because the class list used for notice includes fewer than all Class Members, other Class Members (as well as those with addresses in Arkansas and Tennessee) will be able to submit a

claim form, either online or by mail, providing evidence of their membership in the Class and requesting payment. Only those Class Members for whom the Claims Administrator does not currently have a valid email or physical address will be asked to submit a claim form. This method of claims administration is meant to maximize Class Member participation in the case.

While it is not possible to predict the precise amount of the payments to Class Members until claim forms are received, the plan for automatic payments to approximately 1.5 million Class Members, and a simple claims process for the remaining Class Members, is designed, as is the absence of any reversion, to maximize Class Member participation and payments.

### 3. Class Release

In exchange for the benefits made available under the Settlement, Class Members agree to release the Defendants from all past, present, and future claims relating to the subject matter of this lawsuit and the *Avery* lawsuit.

### 4. Class Representative Service Awards

Prior to the final fairness hearing, the Class Representatives will ask the Court to award them service awards of $25,000 each in light of the time and effort they have personally invested in this case. Defendants do not object to such service payments. The Settlement is not contingent on the Court granting such awards.

### 5. Attorneys' Fees and Costs

Also prior to the final fairness hearing, Class Counsel will apply to the Court for an award of attorneys' fees and costs from the common fund. The Settlement is not in any way contingent on Court approval of an award of attorneys' fees or costs.

### 6. Settlement Administration

The parties have jointly selected Epiq Class Action & Claims Solutions, Inc. ("Epiq") to serve as Claims Administrator. Epiq, in consultation with its notice expert, Cameron R. Azari,

Esq. of Hilsoft Notifications ("Hilsoft"), previously provided the notice to the Class and reported to the Court regarding the implementation of the prior notice plan and opt outs. [919; 935] From that effort, Epiq and Hilsoft have gained a familiarity with the nature of the Class and are ideally situated to move expeditiously going forward to implement the Settlement Notice Plan.

### 7. Class Notice

Upon entry of an Order granting preliminary settlement approval, Epiq and Hilsoft will begin implementation of the Notice Plan. Class Members for whom Epiq and Hilsoft have a valid email or physical address will receive an email or postcard informing them about the Settlement and their right to object and advising them that they will receive a payment automatically (except for those with Arkansas and Tennessee addresses). Class members who have opted out of the Class will be excluded from any recovery. In addition, Epiq and Hilsoft will publish notice of the Settlement in the same nationwide publications used in the prior notice plan and on social media. *See* Notice Plan. Class members for whom Epiq and Hilsoft do not have an email or physical address (or who have addresses in Arkansas or Tennessee) will be able to submit a claim form online or by mail to request a payment. Further, the Claims Administrator will continue to maintain and monitor the litigation website (halesvstatefarmclassaction.com), and that website will include all of the materials relating to the Settlement, including the Agreement itself, the claim form and all information relating to the final fairness hearing.

## III. ARGUMENT

### A. The Settlement Approval Process

As the Seventh Circuit has recognized, federal courts strongly favor and encourage settlements, particularly in class actions and other complex matters, where the inherent costs,

1615789.1

delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases).

The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 describes a three-step procedure for approval of class action settlements:

> (1) Preliminary approval of the proposed settlement at an informal hearing;
>
> (2) Dissemination of mailed and/or published notice of the settlement to all affected class members; and
>
> (3) A "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

This procedure, used by courts in this Circuit and endorsed by *Newberg*, safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. 4 *Newberg* § 11.25.

By this motion, Plaintiffs request that the Court take the first step in the settlement approval process by granting preliminary approval of the proposed Settlement. The purpose of

1615789.1

preliminary evaluation of proposed class action settlements is to determine whether the settlement is within the "range of possible approval," and thus whether notice to the class of the settlement's terms and holding a formal fairness hearing would be worthwhile. *Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 U.S. Dist. LEXIS 84219, at *32-33 (N.D. Ill. July 26, 2011) (citing *Armstrong*, 616 F.2d at 314).

When determining whether a settlement is fair, adequate, and reasonable at the final approval stage, courts in this Circuit consider the following factors:

    (1) the strength of plaintiffs' case compared to the terms of the proposed settlement;

    (2) the likely complexity, length, and expense of continued litigation;

    (3) the amount of opposition to settlement among affected parties;

    (4) the opinion of competent counsel; and

    (5) the stage of the proceedings and the amount of discovery completed.

*Isby*, 75 F.3d at 1199; *accord Holmes v. Roadview, Inc.*, No. 15-CV-4-JDP, 2016 WL 1466582, at *4 (W.D. Wis. Apr. 14, 2016). *See also Kaufman v. American Express*, 877 F.3d 286 (7th Cir. 2017); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002); *In re: Southwest Vouchers Litigation*, 799 F.3d 701 (7th Cir. 2015). In reviewing these factors, courts view the facts "in a light most favorable to the settlement." *Isby*, 75 F.3d at 1199. In addition, courts "should not substitute their own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel." *In re: Sears, Roebuck & Co. Front-loading Washer Products Liab. Litig.*, No. 06 C 7023, 2016 WL 772785, at *7 (N.D. Ill. Feb. 29, 2016) (citing *Armstrong*, 616 F.2d at 315).

Granting preliminary approval of this Settlement will allow all Class Members to receive notice of the proposed Settlement's terms and the date and time of the final fairness hearing

1615789.1

(Agreement § ), at which Class Members may voice approval of or opposition to the Settlement, and at which the parties and Class Members may present further evidence and argument concerning the fairness, adequacy, and reasonableness of the Settlement. *See Manual for Compl. Lit.*, at §§ 13.14, 21.632.

### B. The Proposed Settlement is Well Within the "Range of Reasonableness" for Preliminary Approval.

Plaintiffs respectfully submit that the Settlement meets all of the factors relevant to *final* settlement approval, and, as such, the Settlement should be preliminarily approved.

#### 1. The Settlement Provides Substantial Relief for Class Members, Particularly in Light of the Otherwise Inevitable Appellate Challenges.

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted). Nevertheless, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations omitted).

##### a. The Monetary Amount of the Proposed Settlement

The Settlement requires State Farm to pay the substantial sum of $250 million. After deducting Court-awarded attorneys' fees and costs, the cost of notice and claims administration, and Class Representative service awards, the entirety of the remaining monies will belong to Class Members and will be distributed to them on a per capita basis. Any monies left after an initial payment to Class Members (e.g., uncashed checks) will be paid to Class Members in a second payment. There is no reversion of any part of the Settlement Fund to Defendants.

1615789.1

Plaintiffs have argued that their damages derive from the $1.056 billion judgment that Plaintiffs alleged was lost as a result of the alleged RICO misconduct. On the other hand, the Defendants have maintained throughout the case—and would have argued on appeal from any verdict for the Plaintiffs—that there was no causal connection between their acts and the lost judgment, and that the Class could recover, at most, nominal damages for the any purported violation.

### b. The Strength of Plaintiffs' Case

To say that Class Counsel have worked hard to get this case prepared for trial is a gross understatement. Class Counsel have lived this case for years, which makes the decision to settle now, when a jury is empaneled to finally hear Plaintiffs' claims, a difficult one. Class Counsel continue to believe that their claims against State Farm have merit and were prepared to prove as much at trial. Nevertheless, the Class would face a number of difficult challenges if the litigation were to continue. Principal among them is the certainty of an appeal of a successful trial verdict. Defendants have raised numerous issues in connection with their myriad motions to dismiss Plaintiffs' claims. The statute of limitations, claim and issue preclusion, *Rooker-Feldman*, *Noerr-Pennington*, whether Plaintiffs could establish the requisites of a RICO claim, including each of the elements of mail fraud—all of these fact and legal issues would be front and center in any appeal. Plaintiffs would have to overcome each and every challenge on appeal, including the propriety of class certification, as losing any one issue could result in vacating any verdict and dismissal of the entire case. Although the Court has ruled in Plaintiffs' favor on each one of these many controlling issues, there is certainly no guarantee that the Seventh Circuit (or the United States Supreme Court) would do the same. Indeed, one Seventh Circuit judge on the panel reviewing Defendants' initial Rule 23(f) petition dissented from the decision denying leave to appeal, a possible indication that—given the issues raised—she may have voted to decertify

1615789.1

the Class. Because of these risks, Plaintiffs have determined that the proposed Settlement – which would ensure that Class Members receive a real recovery in the readily foreseeable future -- is in the best interests of the Class.

### 2. Continued Litigation is Likely to Take Several More Years.

Continued litigation would likely delay this case for several more years due to the inevitable post trial motions and appeal to the Seventh Circuit. If certiorari were granted by the United States Supreme Court, also not unlikely given the nature of this case, then resolution of the case would take still more years.

Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows Class Members to receive immediate and certain relief upon final approval. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.") (citation omitted).

### 3. There is Currently No Opposition to the Settlement.

The parties favor settlement. But because notice has not yet been sent to the Class, this factor cannot be fully evaluated prior to the final fairness hearing.

### 4. Class Counsel Endorse the Settlement.

Class Counsel endorse this Settlement. Class Counsel's opinion on the Settlement is entitled to considerable weight, particularly because: (1) Class Counsel are well qualified and experienced in class action litigation; (2) Class Counsel have been actively involved in the prosecution, discovery, and trial preparation of the action since 2012, and in prior proceedings for a predecessor case dating back to 1997; (3) Class Counsel did everything possible to prepare this case for trial; and (4) the Settlement was reached at arm's length through negotiations by experienced counsel, only after a prior mediation failed and after a second mediator was

1615789.1

appointed once trial had commenced. *See McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval"); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"). This factor therefore weighs in favor of preliminary approval.

### 5. The Late Stage of the Proceedings and the Amount of Discovery Completed Support Preliminary Approval.

That this case has completed all fact discovery, all expert discovery, all motion practice, is readied for trial, and that trial has commenced also favor preliminary approval of the proposed Settlement. The mature stage of the proceedings demonstrates that Class Counsel possess all the information necessary to properly evaluate the case and they now confirm that the Settlement is, in their estimation, fair, reasonable, and adequate.

### C. The Proposed Notice Program is Constitutionally Sound

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for Compl. Lit., supra*, at § 21.312. The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). According to the *Manual, supra*, at § 21.312, the settlement notice should do the following:

- Define the class;

1615789.1

- Describe clearly the options open to the class members and the deadlines for taking action;

- Describe the essential terms of the proposed settlement;

- Disclose any special benefits provided to the class representatives;

- Provide information regarding attorneys' fees;

- Indicate the time and place of the hearing to consider approval of the settlement;

- Explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations;

- Provide information that will enable class members to calculate or at least estimate their individual recoveries; and

- Prominently display the address and phone number of class counsel and the procedure for making inquiries.

The proposed forms of Notice, attached as Exhibits to the Notice Plan, satisfy all of the criteria above. The Notice Plan provides for direct, individual notice to approximately 1.5 million people by U.S. Mail or email. Because these addresses have previously been confirmed as a result of the recently completed Notice, this process should proceed expeditiously. In addition, publication notice will advise Class Members of the details of the Settlement. Also, notice will be provided to Class Members online through the Settlement Website.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court (1) preliminarily approve the proposed Settlement as being within the range of possible final settlement approval; and (2) approve the proposed Notice Plan and appoint Epiq as the Claims Administrator.

1615789.1

| | |
|---|---|
| Dated: September 4, 2018 | Respectfully submitted,<br><br>/s/ *Robert J. Nelson*<br>Elizabeth J. Cabraser<br>Robert J. Nelson<br>Kevin R. Budner<br>Lieff Cabraser Heimann & Bernstein, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111-3339<br>Tel: 415-956-1000 |
| Steven P. Blonder #6215773<br>Jonathan L. Loew<br>Much Shelist, P.C.<br>191 N. Wacker, Suite 1800<br>Chicago, IL 60606-2000<br>Tel: 312-521-2402 | Robert A. Clifford #0461849<br>George S. Bellas<br>Kristofer S. Riddle<br>Clifford Law Offices<br>120 N. LaSalle Street, 31st Floor<br>Chicago, IL 60602<br>Tel: 312-899-9090 |
| John W. "Don" Barrett<br>Barrett Law Group, P.A.<br>404 Court Square North<br>P.O. Box 927<br>Lexington, MS 39095-0927<br>Tel: 662-834-2488 | Brent W. Landau<br>Jeannine M. Kenney<br>Hausfeld, LLP<br>325 Chestnut Street<br>Suite 900<br>Philadelphia, PA 19106<br>Tel: 215-985-3273 |
| Patrick W. Pendley<br>Pendley, Baudin & Coffin, LLP<br>Post Office Drawer 71<br>24110 Eden Street<br>Plaquemine, LA 70765<br>Tel: 888-725-2477 | Erwin Chemerinsky<br>University of California, Berkeley<br>  School of Law<br>215 Boalt Hall,<br>Berkeley, CA 94720<br>Tel: 510- 642-6483 |
| Thomas P. Thrash<br>Marcus N. Bozeman<br>Thrash Law Firm, P.A.<br>1101 Garland Street<br>Little Rock, AR 72201<br>Tel: 501-374-1058 | Richard R. Barrett<br>Law Offices of Richard R. Barrett, PLLC<br>2086 Old Taylor Road, Suite 1011<br>Oxford, Mississippi 38655<br>Tel: 662-380-5018 |
| Gordon Ball<br>Gordon Ball PLLC<br>550 Main Street<br>Bank of America Center, Ste. 600<br>Knoxville, TN 37902<br>Tel: 865-525-7028 | Stephen A. Saltzburg,<br>The George Washington University Law School<br>2000 H. Street, NW<br>Washington, D.C. 20052<br>Tel: 202-994-7089 |

*Class Counsel*

## **CERTIFICATE OF SERVICE**

Pursuant to Local Rule 7.1(b), I certify that a copy of the foregoing was served upon counsel via the Court's CM/ECF system.

/s/ *Robert J. Nelson*