## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK HALE, TODD SHADLE, and LAURIE LOGER, on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs<br><br>    v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, EDWARD MURNANE, and WILLIAM G. SHEPHERD,<br><br>           Defendants. | Case No. 3:12-cv-00660-DRH-SCW<br><br>Judge David R. Herndon<br><br>Magistrate Judge Stephen C. Williams |

### PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT WITH DEFENDANTS STATE FARM, ED MURNANE, AND WILLIAM SHEPHERD AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................. 1

II.    BACKGROUND ............................................................................................... 1

    A.     Procedural History ............................................................................... 1

    B.     Settlement Negotiation History............................................................ 3

    C.     Class Notice ......................................................................................... 4

III.   LEGAL STANDARD....................................................................................... 5

IV.    ARGUMENT ................................................................................................... 6

    A.     All Relevant Factors Support Approval of the Settlement. ................. 6

        1.     The Strength of Plaintiffs' Case Compared to the Terms of the Settlement Supports Approval of the Settlement...................................... 7

            a.     Plaintiffs' Claims Are Uncertain. ................................... 7

            b.     The Proposed Settlement Offers Substantial Value to Class Members. ............................................................... 9

            c.     The Defendants Were Well-Funded and Well-Represented........ 10

        2.     The Complexity, Cost, and Expense of Continued Litigation Supports Approval of the Settlement.................................... 11

        3.     Though Still Early, the Reaction of the Class to Date Supports Approval of the Settlement. .................................... 12

        4.     The Settlement Was the Result of Arms' Length Negotiations, and Is Endorsed by Competent Counsel for All Parties. ............................... 13

            a.     Class Counsel Unanimously Endorse the Settlement. ................. 13

            b.     The Settlement Was the Result of Arm's Length Negotiations Without a Hint of Collusion. .................................. 14

        5.     The Amount of Discovery Completed and the Advanced Stage of the Proceedings Also Favor Approval of the Settlement........................ 15

    B.     The Plan of Distribution Should Be Finally Approved. ..................... 17

V.     CONCLUSION................................................................................................ 18

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
   No. 07 CV 2898, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ................................................... 5

*Anderson v. Torrington Co.*,
   755 F. Supp. 834 (N.D. Ind. 1991) ...................................................................................... 6

*Armstrong v. Bd. of Sch. Dirs.*,
   616 F.2d 305 (7th Cir. 1980) ...................................................................... 5, 9, 13, 16

*Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*,
   No. 85 Civ. 3048 (JMW), 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ...................................... 12

*Donovan v. Estate of Fitzsimmons*,
   778 F.2d 298 (7th Cir.1985) ...................................................................... 10, 11, 12

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
   768 F.2d 884 (7th Cir. 1985) ...................................................................... 5, 9, 10, 17

*Gautreaux v. Pierce*,
   690 F.2d 616 (7th Cir. 1982) ...................................................................... 5, 13

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
   128 F.3d 1074 (7th Cir. 1997) ...................................................................... 5

*Goldsmith v. Tech. Solutions Co.*,
   No. 92 C 4374, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ................................................... 13

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
   212 F.R.D. 400 (E.D. Wis. 2002) ...................................................................... 6

*Hispanics United of DuPage Cty. v. Vill. of Addison, Ill.*,
   988 F. Supp. 1130 (N.D. Ill. 1997) ...................................................................... 13

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) ...................................................................... 13

*In re Citigroup Inc. Sec. Litig.*,
   965 F. Supp. 2d 369 (S.D.N.Y. 2013) ...................................................................... 11

*In re Mexico Money Transfer Litig. (W. Union & Valuta)*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig.*,
   267 F.3d 743 (7th Cir. 2001) ...................................................................... 5, 6, 11, 14

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ...................................................................... 14

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...................................................................... 14

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ...................................................................... passim

*Kleen Prods. LLC v. Int'l Paper Co.*,
   No. 1:10-cv-05711, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) ...................................................................... 14

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. 2001) ...................................................................... 13

## TABLE OF AUTHORITIES
### (continued)

Page

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*,
    834 F.2d 677 (7th Cir. 1987) ..................................................................... 6

*McKinnie v. JP Morgan Chase Bank, N.A.*,
    678 F. Supp. 2d 806 (E.D. Wis. 2009).................................................... 14

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ................................................................... 13

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ................................................................... 12

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ..................................................... 12

*Seiden v. Nicholson*,
    72 F.R.D. 201 (N.D. Ill. 1976).................................................................. 12

**Rules**

Fed. R. Civ. P. 23(e) ....................................................................................... 5

## I.      INTRODUCTION

Plaintiffs filed the instant action in 2012, more than six years ago, alleging that the Defendants had engaged in a conspiracy to violate the Racketeer Influenced Corrupt Organizations Act ("RICO"), and thereby deprived Plaintiffs of an impartial forum and their property interest in the *Avery* judgment.  To counsel's knowledge, no similar lawsuit had ever been or has since been attempted. Notwithstanding the many challenges that then lay ahead, Plaintiffs believed then that the considerable risks of such an unorthodox lawsuit were outweighed both by 1) the importance of exposing what they believed to be serious misconduct involving Illinois' highest court, and 2) the possibility of providing a benefit to millions of State Farm's insureds who had been harmed when the *Avery* judgment was vacated years earlier.

As a direct result of Plaintiffs' efforts over the more than six years of this intensive litigation, an historic Settlement totaling $250,000,000 was obtained for the Class.  All of these monies will go to the Class Members, less attorneys' fees and costs.  Many Class Members will receive a monetary recovery automatically, without even having to submit a claim form.

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs, by and through Class Counsel, respectfully submit this Memorandum of Law in Support of their Motion for Final Approval of Settlement with Defendants State Farm, Ed Murnane, and William Shepherd ("Defendants"), in which they request final approval of the Settlement, final approval of the Plan of Distribution, and final approval of the Notice Plan disseminated to Class Members.

## II.     BACKGROUND

### A.      Procedural History

Plaintiffs filed their lawsuit on May 29, 2012.  Their Complaint charged Defendants with violating the RICO Act, 18 U.S.C. sections 1962(c) and (d).  Specifically, Plaintiffs alleged that Defendants engaged in a RICO conspiracy by (1) recruiting then-Judge Lloyd Karmeier to run

- 1 -

for an open seat on the Illinois Supreme Court, before which a $1.056 billion judgment against Defendant State Farm was pending; (2) helping to organize and manage Judge Karmeier's campaign behind the scenes; (3) funneling millions of dollars to support the campaign through intermediary organizations over which State Farm exerted influence; and (4) after helping to secure Justice Karmeier's 2004 election, using the U.S. mails to obscure, conceal and misrepresent the degree and nature of its support so that Justice Karmeier could participate in the Illinois Supreme Court deliberations of the *Avery* case then pending against State Farm. In furtherance of the Defendants' fraudulent scheme, Plaintiffs alleged that State Farm submitted briefs to the Illinois Supreme Court that contained false and misleading assertions or otherwise omitted material facts about its involvement in Justice Karmeier's election. Plaintiffs alleged that Defendants' misconduct deprived the Class Members of their right to an impartial tribunal and resulted in the loss of their property interest in the *Avery* judgment.

Defendants sought to dismiss this case on several occasions. Their first attempt was in connection with their motion to dismiss the complaint filed on July 10, 2012. [13, 32, 61]. After this Court denied that motion, Defendants sought review of the order denying the motion in the Seventh Circuit Court of Appeals. Specifically, Defendants filed a writ of mandamus. [159-1]. Plaintiffs opposed the writ. [170]. The Seventh Circuit denied it. [175]. In October 2015, Plaintiffs filed their motion for class certification. [438]. Defendants not only opposed class certification [467–468], but also sought to exclude Plaintiffs' experts who had provided declarations in support of their motion for class certification. [469–477]. Plaintiffs deposed and also sought to exclude several of Defendants' experts who had provided declarations and affidavits in opposition to class certification. [487, 489–490]. Plaintiffs' class certification motion was supported by several hundreds of exhibits numbering thousands of pages. [438]. On

- 2 -

September 16, 2016, the Court certified the class.  [556].  Defendants then filed two Rule 23(f) petitions to the Seventh Circuit Court of Appeals, both of which were denied.  [572; 618].

Defendants then filed two motions for summary judgment.  Their first summary judgment motion sought dismissal pursuant to *Rooker-Feldman*, res judicata, and collateral estoppel—doctrines that would have, if applicable, resulted in dismissal of the complaint.  [646].  Plaintiffs opposed this motion.  [661–662].  The Court issued its decision denying that motion on February 6, 2018.  [726].  Defendants also sought summary judgment on Plaintiffs' RICO claims, arguing that there were no material facts in dispute as to whether Plaintiffs could meet the requisites of their RICO claims, which were premised upon a violation of the mail fraud statute.  [694].  On July 3, 2018, the Court denied Defendants' second summary judgment motion.  [846].

As trial approached, the parties filed numerous motions *in limine*.  [790, 792–821, 823, 841, 843–845, 849–881].  The parties also filed motions to exclude various experts from trial.  [708–720, 741–753].  The Court issued omnibus rulings on many of these motions.  [882, 903–904].  The parties filed trial briefs.  [898–901].  The parties also served competing jury instructions, and lodged them with the Court.  Trial commenced on August 29, 2018, at which time the parties selected and the Court empaneled a jury to hear the evidence in the case.  [934].

## B.   Settlement Negotiation History

On March 6, 2017, this Court first ordered the parties to pursue mediation.  [594].  The parties selected Judge James F. Holderman, Ret., to mediate the dispute, and that process ran its course after a year, during which time all aspects of the litigation actively continued.  At the time the mediation process ended in April of 2018, the parties remained far apart in terms of their valuations of the case.  The parties re-visited settlement negotiations only several weeks prior to the August 29, 2018 date set for trial.  Once the jury was empaneled, the Court appointed Randi

Ellis as Settlement Master to assist the parties with settlement efforts.  [933].  Randi Ellis oversaw the arm's length negotiations that led to this Settlement, some of which took place in the Court's chambers.  On September 4, 2018, the same day set for the parties' opening statements, the parties reached a Settlement.  That same day, after making findings of fact on the record based on its familiarity with this intensively litigated case, from its inception through final pretrial rulings, the Court granted preliminary settlement approval.  [942].  The following day the Court approved the proposed Notice Plan and determined that the Notice Plan constituted "the best notice practicable" under the circumstances.  [947].  The Court set a final fairness hearing for December 13, 2018.  *Id.*

C.    **Class Notice**

Plaintiffs' proposed Notice Plan [945-1] is still being implemented, though nearly complete, and consists of multiple modalities:  an Email Notice has been sent to all Class Members for whom a facially valid email address is available;  for all Class Members for whom an email notice is not deliverable after a reasonable number of attempts and for all Class Members for whom an email address is not available, a Postcard Notice has been sent via First Class mail; published notice in the form of notice placements will soon appear in *People* and *Sports Illustrated* magazines.  Prominent internet banner advertisements have been displayed on a variety of websites.[1]  Coverage is further enhanced by a neutral, informational Release, Sponsored Search Listings and a Case Website.  Each element of the fully executed Notice Plan will be confirmed and detailed prior to the final Fairness Hearing.

---

[1] These have been purchased through the Conversant Ad Network, Google Display Network, and the Oath (Yahoo!) Ad Network, which together represent thousands of digital properties across all major content categories. Banners have also been purchased on Facebook.

III.   **LEGAL STANDARD**

Rule 23(e) requires court approval for a class action settlement to ensure that it is procedurally and substantively fair, reasonable and adequate.  Fed. R. Civ. P. 23(e).  A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc*., No. 07 CV 2898, 2012 WL 651727, at *10 (N.D. Ill. Feb. 28, 2012) (citation and internal quotation marks omitted).  Courts favor the resolution of a class action by way of settlement and will approve such a settlement if it is fair, reasonable, and adequate when viewed in its entirety.  *In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig*., 267 F.3d 743 (7th Cir. 2001); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *E.E.O.C. v. Hiram Walker & Sons, Inc*., 768 F.2d 884 (7th Cir. 1985); *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982).  Courts "'do not focus on individual components of the settlement but rather view them in their entirety in evaluating their fairness.'"  *Isby*, 75 F.3d at 1199 (quoting *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir. 1980)).

The Seventh Circuit has identified several factors that a Court may consider in evaluating the fairness of a class action settlement:  (1) the strength of the plaintiff's case on the merits measured against the terms of the settlement; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement among affected parties; (4) the presence of collusion in gaining a settlement; (5) the stage of the proceedings; and (6) the amount of discovery completed.  *Gen. Elec. Capital Corp. v. Lease Resolution Corp*., 128 F.3d 1074, 1082 (7th Cir. 1997); *see also Isby*, 75 F.3d at 1199.[2]  It remains the court's task to

---

[2] The amendments to Fed. R. Civ. P 23(e), which become effective on December 1, 2018, require courts to analyze a functionally equivalent set of factors, including whether: (A) the class

evaluate "the general principles governing approval of class action settlements" and not the "substantive law governing the claims asserted in the litigation." *Isby*, 75 F.3d at 1197 (citation and internal quotation marks omitted).

Because the Seventh Circuit has endorsed an overriding public interest in favor of the settling of litigation, particularly class actions, *see Isby*, 75 F.3d at 1196 ("[f]ederal courts naturally favor the settlement of class action litigation"), the proceedings to approve a settlement should not be transformed into an abbreviated trial on the merits. *See, e.g., Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987). In addition, "[a] strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's length] negotiation." *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (citing *Anderson v. Torrington Co.,* 755 F. Supp. 834, 838 (N.D. Ind. 1991)). In evaluating a proposed settlement, the court must recognize that the "essence of settlement is compromise" and will not represent a total win for either side. *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1014 (citing *Isby*, 75 F.3d at 1200).

## IV.     ARGUMENT

### A.     All Relevant Factors Support Approval of the Settlement.

Consideration and analysis of each of the six relevant Seventh Circuit fairness factors weigh strongly in favor of final approval of the proposed Settlement. Plaintiffs and their Counsel

---

representatives and adequately represented the class; (B) the proposal was negotiated at arms'-length; (C) the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal, (ii) the effectiveness of the proposed method of distributing relief to class members, and (iii) the terms of a proposed award of attorneys' fees, and (D) the proposal treats class members equitably relative to each other. As this brief demonstrates, all these factors weigh in favor of final approval.

have examined the facts, the applicable law, and the arguments Defendants have raised in defense to Plaintiffs' RICO claims; they have weighed the benefits secured by the proposed Settlement against the risks and costs of further litigation; they have conducted all of their settlement negotiations at arm's length; they have extensively and aggressively prosecuted the action and were able to discover substantial evidence from Defendants and third parties; they have entered this Settlement at a very late and mature stage of the litigation after trial had commenced; and they have determined that the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Class.

### 1. The Strength of Plaintiffs' Case Compared to the Terms of the Settlement Supports Approval of the Settlement.

Plaintiffs argue that their damages derive from the $1.056 billion *Avery* judgment that Plaintiffs alleged was lost as a result of the RICO misconduct.  On the other hand, Defendants have steadfastly maintained throughout this case—and would have continued to argue on appeal from any verdict in favor of Plaintiffs—not only that there was no causal connection between their acts and the lost judgment, but that they have numerous affirmative defenses, as detailed below, any one of which had the potential to derail Plaintiffs' entire case.

### a. Plaintiffs' Claims Are Uncertain.

Not surprisingly, Class Counsel believe that their claims against State Farm have merit and were well prepared to prove as much at trial.  Indeed, Class Counsel invested some 55,000 hours of their time and millions of dollars in out-of-pocket costs to advance Plaintiffs' case.  *See* Declaration of Robert J. Nelson ("Nelson Decl.") ¶¶ 6, 12.[3]  Nevertheless, Plaintiffs would face a number of difficult challenges if the litigation were to continue.  Specifically, Defendants

---

[3] The Nelson Declaration is attached to the Plaintiffs' simultaneously filed Motion for Attorneys' Fees and Costs, as are the Declarations of class action and attorneys' fee experts William Rubenstein, Brian Fitzpatrick, and Charles Silver.

advanced numerous affirmative defenses in connection with their myriad motions to dismiss and for summary judgment. Defendants sought to dismiss the case on *Rooker-Feldman* grounds and claim and issue preclusion, as well as on the statute of limitations and the *Noerr-Pennington* doctrine. Defendants also challenged whether Plaintiffs could establish the requisites of a RICO claim, including each of the elements of mail fraud. Each and every one of Defendants' affirmative defenses would have been front and center in any appeal if Plaintiffs were fortunate enough to win at trial. As a result, Plaintiffs would have had to overcome each and every challenge again on appeal, as losing any one issue would result in vacating any favorable verdict and a likely dismissal of the entire case. The fact that Plaintiffs had previously "run the table" and succeeded in surviving each of the affirmative defenses in the trial court might not hold sway in the court of appeals.

Additionally, successful RICO class actions are exceedingly rare. *See, e.g.*, Silver Report at 34-36 (discussing empirical study of RICO class actions). Class Counsel here "had to navigate a complex series of legal concerns involved in pursuing alleged wrongdoing within the judicial branch," and this case was far from a "straightforward enforcement of a statutory harm." Rubenstein Decl. ¶ 36(a); *see id.* ¶ 36(e) (noting the lack of obvious milestones or signposts to guide the case). Although the Court has ruled in Plaintiffs' favor on each one of the many controlling legal issues, there is certainly no guarantee that Plaintiffs would again succeed in the Seventh Circuit or potentially a third time on appeal to the United States Supreme Court. Indeed, one Seventh Circuit judge on the panel reviewing Defendants' initial Rule 23(f) petition dissented from the decision denying leave to appeal, which suggested that she may have voted to reverse this Court and to dismiss the case entirely for lack of jurisdiction. *In re: State Farm*

*Auto. Ins. Co.*, No. 16-8020, Dkt. 38 (7th Cir. Dec. 8, 2016).  Certainly, the stakes associated

with any appeal of a successful trial verdict were exceedingly high.

> **b.     The Proposed Settlement Offers Substantial Value to Class Members.**

The parties have agreed to settle this case for $250,000,000, a substantial sum.

According to Harvard Law School Professor William Rubenstein, and to state the obvious, "Put

simply, $250 million is a lot of money."  Rubenstein Decl. ¶ 37(a).  After deducting Court-

awarded attorneys' fees and costs, and the cost of notice and claims administration, the entirety

of the remaining monies will belong to Class Members and will be distributed to them on a per

capita basis.  Agreement, § A(l) (defining Distribution Plan), 12-13.  Importantly, there is no

reversion to Defendants of any portion of the Settlement funds once the Settlement becomes

effective.

This Settlement unquestionably represents a substantial achievement for Class Members,

all of whom are eligible for monetary payments, and many of whom will receive those payments

automatically.  *See* Rubenstein Decl. ¶ 37(d) ("The settlement secured in this case will deliver

cash compensation directly to class members, a form of recovery that speaks highly of the case's

outcome.").

Further, because "[t]he essence of settlement is compromise," *Hiram Walker*, 768 F.2d at

889, courts should not reject a settlement "solely because it does not provide a complete victory

to the plaintiffs."  *Isby*, 75 F.3d at 1200; *see also Armstrong*, 616 F.2d at 315 (noting that "the

essence of a settlement is compromise[,] an abandonment of the usual total-win versus total-loss

philosophy of litigation in favor of a solution somewhere between the two extremes").  Parties to

a settlement benefit by resolving the litigation and receiving "some measure of vindication for

[their] position[s] while foregoing the opportunity to achieve an unmitigated victory.  Thus, the

- 9 -

1640381.2

parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial." *Hiram Walker*, 768 F.2d at 889 (citations omitted).  So while the Settlement amount is less than the amount of the *Avery* judgment in the Illinois court of appeals, the Settlement amount is certainly "a lot of money", and represents an extraordinary recovery to Plaintiffs who advanced novel theories of recovery under the RICO statute.

**c.**      **The Defendants Were Well-Funded and Well-Represented.**

Again to state the obvious, Plaintiffs faced well-funded and well-represented Defendants who had the means and personnel to defend this case for the duration.  "Among the handful of firms that worked in this case are Dechert (with more than 900 lawyers in 27 offices worldwide) and Sidley Austin (with nearly 2000 lawyers in 20 offices worldwide)."  Rubenstein Decl. ¶ 36(h) (citations omitted).  "The well-funded defendants contested nearly every aspect of this lawsuit, often repeatedly."  *Id.* ¶ 37(e).  Moreover, State Farm "is number 36 on the Fortune 500 list of the largest corporations in the United States, with roughly $2.2 billion dollars in profit each year."  *Id.* ¶ 36(g).  Defendants had both a deep bench and a deep pocket upon which to rely to finance and field a litigation fight for years to come.

In response, Plaintiffs were able to field an army of their own, willing and able to defend each and every motion and to pursue each and every lead.  Yet despite Plaintiffs' resources, "an integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation," *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 309 (7th Cir. 1985), and here there would be significant risks and costs if the case were not settled.  There is no question but that Defendants had the resources and wherewithal to challenge each and every issue, not just at trial, but on appeal to the Seventh Circuit and to the United States Supreme Court.  As a result, the very same risks Plaintiffs faced at the very outset of the

litigation—*e.g.*, *Rooker-Feldman*, claim and issue preclusion, the statute of limitations, *Noerr-Pennington*—remained six and half years into the litigation, with the possibility of Defendants prevailing on any one of their affirmative defenses in the court of appeals.  To succeed absent some resolution, Plaintiffs would have had to win each and every issue a second time on appeal, or, potentially, even a third time before the United States Supreme Court to succeed.

In light of these considerable risks, and in light of the fact that $250 million is a substantial monetary recovery, Plaintiffs and Class Counsel endorse the Settlement.  When considering the strengths of the case against the size of the proposed Settlement, this first factor strongly favors approval of the proposed Settlement.

## 2.   The Complexity, Cost, and Expense of Continued Litigation Supports Approval of the Settlement.

The second factor to be considered focuses on the complexity, length, and expense of litigation that will be avoided by the proposed settlement.  *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1014.  As noted, Defendants were highly motivated to defend this case vigorously.  Even though this case has already been pending more than six and a half years, continued litigation would certainly last several more years.  This is because any favorable trial verdict would be appealed to the court of appeals, and, if Plaintiffs were successful in the court of appeals, to the United States Supreme Court.

"[A]n integral part of the strength of a case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation."  *Fitzsimmons*, 778 F.2d at 309.  This is because "the more complex, expensive, and time consuming the future litigation, the more beneficial settlement becomes as a matter of efficiency to the parties and to the Court."  *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 381-82 (S.D.N.Y. 2013) (citation and internal quotation marks omitted); *Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, No. 85 Civ. 3048

(JMW), 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987) ("There is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away.").

As the Court knows, Plaintiffs were prepared and were ready and willing and able to try this case to verdict. But this proposed Settlement provides significant relief to Class Members now, and avoids the risk of (1) any further delay associated with the inevitable appeals of any successful verdict; (2) the loss of a successful verdict on appeal; (3) an unsuccessful trial verdict; and (4) continued litigation costs that are paid by Class Counsel and by extension the Class as such litigations costs are typically deducted from any common fund recovery.  When compared to the continued costs and delay associated with ongoing litigation, the certainty of the significant recovery achieved by the Settlement today is especially compelling.  *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").  "To most people, a dollar today is worth a great deal more than a dollar ten years from now." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002); *see also Fitzsimmons*, 778 F.2d at 309 n.3; *Seiden v. Nicholson*, 72 F.R.D. 201, 208 (N.D. Ill. 1976) ("If this case had been litigated to conclusion, all that is certain is that plaintiffs would have spent a large amount of time, money and effort.").  This second factor, too, therefore weighs strongly in favor of final approval.

### 3.      Though Still Early, the Reaction of the Class to Date Supports Approval of the Settlement.

Notice to the Class is in progress, though almost complete.  Class Members have been provided direct notice of the Settlement, and publication notice of the Settlement is ongoing. The deadline to object is not until November 17, 2018, more than a month out, and so it is too

1640381.2

early to know the number and nature of any objections to the Settlement.  To date, however,

Class Counsel have not received any objections.  Plaintiffs will update the Court about this factor

in its Reply Brief, due December 6, 2018.  *See generally Hispanics United of DuPage Cty. v.

Vill. of Addison, Ill.*, 988 F. Supp. 1130, 1166, 1169 (N.D. Ill. 1997) ("[t]he Court may approve a

fair settlement over objections by some or even many class members"); *Mangone v. First USA

Bank*, 206 F.R.D. 222, 226-27 (S.D. Ill. 2001) (same); *Isby*, 75 F.3d at 1200 (approving

settlement where "thirteen per cent of the class submitted written objections in response to the

notice of settlement"); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,* 789 F. Supp.

2d 935, 965 (N.D. Ill. 2011) (approving settlement where objectors amounted to 0.01% of the

class).  Given the facts known to date, this factor also supports final approval of the proposed

Settlement.

## 4. The Settlement Was the Result of Arms' Length Negotiations, and Is Endorsed by Competent Counsel for All Parties.

The proposed Settlement is the product of lengthy and contentious arm's length

negotiations among skilled counsel, well-versed in the strengths and weaknesses of the case.

### a. Class Counsel Unanimously Endorse the Settlement.

Courts are to place significant weight on the unanimously strong endorsement of a

settlement class counsel.  *See, e.g.*,  *Isby*, 75 F.3d at 1200; *Goldsmith v. Tech. Solutions Co*., No.

92 C 4374, 1995 WL 17009594, at *3 n.2 (N.D. Ill. Oct. 10, 1995) (negotiations entitled to great

deference).  Further, courts are "entitled to rely heavily on the opinion of competent counsel,"

*Gautreaux*, 690 F.2d at 634 (quoting *Armstrong*, 616 F.2d at 325); *Isby*, 75 F.3d at 1200,

although they cannot rely solely on that opinion, *see Pearson v. NBTY, Inc*., 772 F.3d 778 (7th

Cir. 2014).  Nonetheless, great weight is accorded to the recommendations of counsel, "who are

most closely acquainted with the facts of the underlying litigation."  *In re PaineWebber Ltd.*

1640381.2

*P'ships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y. 1997); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008); *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval").

Here, Class Counsel have unanimously endorsed this Settlement.  *See* Nelson Decl. ¶ 19. Class Counsel are among the foremost class action lawyers and trial lawyers in the nation, having participated in some of the largest class actions and trial verdicts.  *Id.* ¶ 18.  That skilled and experienced Class Counsel fully endorse this Settlement factors in favor of approval of the proposed Settlement.

In recommending the proposed Settlement, Class Counsel are keenly aware of both the strengths and vulnerabilities of the case, having spent 55,000 hours developing the facts of the case and preparing the case for trial.  Nelson Decl. ¶ 6.  Class Counsel are also aware both that $250 million is "a lot of money" and that the proposed Settlement alleviates all uncertainties regarding the case's vulnerabilities.  *See Kleen Prods. LLC v. Int'l Paper Co.*, No. 1:10-cv-05711, 2017 WL 5247928, at *3 (N.D. Ill. Oct. 17, 2017); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 at 1020 (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").

### b.  The Settlement Was the Result of Arm's Length Negotiations Without a Hint of Collusion.

Additionally, there is no indication whatsoever that the proposed Settlement Agreement is the result of collusion.  *See Isby*, 75 F.3d at 1200; Rubenstein Decl. ¶ 37(e) ("There is here not a hint of collusion – this case has been nothing but adversarial since its inception and proceeded

all the way to trial before settling.  There is, therefore, no evidence whatsoever of class counsel selling out the class's interest.").

The first mediation lasted more than a year, from March of 2017 to April of 2018, before it ran its course. At that time, the parties remained far apart in their valuations of the case, and all of each side's energies remained focused on preparation of the case for trial.  Settlement negotiations only picked months later, just several weeks prior to the commencement of trial.  Those negotiations were ultimately overseen by mediator Randi Ellis, who was appointed by the Court.  Ms. Ellis oversaw the negotiations that lead to each provision in the Settlement Agreement.  There is no question but that the negotiations in this case were always at arm's length.  *See* Nelson Decl. ¶¶ 15-17.

Because the Settlement is the result of arm's length negotiations conducted by experienced and skilled Class Counsel, this fourth factor therefore also weighs in favor of approval of the proposed Settlement.

## 5. **The Amount of Discovery Completed and the Advanced Stage of the Proceedings Also Favor Approval of the Settlement.**

No one could seriously contest that the amount of discovery completed and the stage of the proceedings had not advanced far enough to allow the Plaintiffs sufficient insight to resolve the case responsibly.  Here, literally all fact discovery and all expert discovery had been completed.  All motion practice had been completed.  The case had been fully readied for trial, and trial had commenced.  Over six and a half years, Plaintiffs prosecuted this action:  they propounded numerous document requests, interrogatories, and requests for admissions; Plaintiffs reviewed hundreds of thousands of pages of documents produced in discovery; Plaintiffs then took and defended some 68 depositions; fact discovery was contentious, as Magistrate Judge

- 15 -

Williams was actively involved in discovery, assisting the parties at literally several dozens of hearings over the years.  *See* Nelson Decl. ¶ 2, Exs. A-C

Not only was the Magistrate Judge called upon to resolve several dozens of discovery disputes between and among the parties, but Plaintiffs had sought discovery from numerous third parties, some of whom were alleged unnamed coconspirators.  Plaintiffs took the depositions of top officials from key organizations such as the U.S. Chamber of Commerce, the Illinois Chamber, the American Tort Reform Association, Illinois Business Roundtable, Illinois Civil Justice League, among others.  *Id.*

In addition, Plaintiffs deposed all of Defendants' trial experts and class certification experts, and Defendants deposed all of Plaintiffs' experts.  *Daubert* motions challenging the experts were filed and ruled upon. In preparation for trial, Plaintiffs submitted no less than 2,134 exhibits on their list of exhibits.  Plaintiffs also listed 36 witnesses that they intended to call at trial.  *Id.*  Jury instructions and a verdict form had been prepared and submitted to the Court.  A jury was empaneled.  *Id.*

The point of course is that Plaintiffs had fully prepared this case for trial.  Plaintiffs did literally all the discovery necessary to advance their case and to understand fully their case's strengths and weaknesses.  As a result, the fifth factor also favors final approval of the Settlement.

Finally, "[t]he stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims."  *Armstrong*, 616 F.2d at 325.  That this case settled during trial, at a very late stage of the proceedings, demonstrates that Class Counsel as well as the Court possess all the information necessary to properly evaluate the case.  As the Court stated at the preliminary

approval hearing, "the lawyers on both sides of this litigation [were] more than prepared to move the Court for approval of the settlement proposal, especially when one considers that the extent of knowledge is likely as close to complete as one could ever achieve in a piece of litigation, short of knowing what the jury would do."  September 4, 2018 Hr'g Tr. at 5:25-6:5.  This sixth factor also favors final approval of the Settlement.

This proposed Settlement well satisfies each of the six factors that the Seventh Circuit uses to evaluate the fairness of a proposed settlement.  This substantial Settlement is fair, reasonable and adequate.  Plaintiffs respectfully request that the Court approve it.

**B.     <u>The Plan of Distribution Should Be Finally Approved.</u>**

As with all aspects of class action settlements, this Court must ensure that any allocation plan is reasonable and equitable to all class members.  *See Hiram Walker*, 768 F.2d at 891 (considering reasonableness of settlement disbursement).  Here, the Plan of Distribution was preliminarily approved by the Court on September 4, 2018 [942], after Class Counsel informed the Court that they believed that the Plan of Distribution provides a fair and reasonable method to equitably allocate the Net Settlement Fund among members of the Class who suffered losses as a result of the conduct alleged in this litigation.  As stated previously, the Plan of Distribution is specifically designed to maximize participation by the Class.

Allocation of the settlement funds on a *per capita* basis is consistent with the damages theory presented by Plaintiffs in the litigation and relied upon by this Court in certifying the Class, since each class member possessed an undivided interest in the *Avery* judgment:

> Plaintiffs argue that but for State Farm's petition to the Illinois Supreme Court and defendants' conspiracy to deprive plaintiffs of the *Avery* judgment, the *Avery* judgment would have been divided and distributed. Plaintiffs assert that the damages correspond to the loss of the judgment, a concrete and recognized property interest that the entire class possessed prior to the RICO misconduct. Plaintiffs propose to allocate the damages award on a per capita basis, with an equal share to each class member. . . . The Court agrees with plaintiffs' reasoning.

- 17 -

> The damages in this case are not based on State Farm's practice of equipping its insureds' vehicles with substandard non-OEM crash parts as the damages were based in *Avery*; instead the injury in this case is based on the interest the plaintiffs and the proposed class members had in a neutral forum and the damages correspond with the undivided interest in the judgment each lost as a result of the tainted tribunal. This issue is identical for all plaintiffs and class members.

[556] at 20-21.  As the Court advised, this is not a settlement of the claims involving non-OEM parts, but of claims under the RICO Act. The *Avery* case never reached the stage where an allocation among *Avery* class members took place.  As such, each class member's interest in that judgment remained undivided at the time the judgment was lost. The proposed Plan of Distribution is meant to acknowledge that essential fact and is a fair and equitable method for allocating Settlement funds among Class Members.

Plaintiffs respectfully request that the Court approve the proposed Plan of Distribution.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request the Court grant final approval to the proposed Settlement; find that the notice to the Class comports with Rule 23; and grant final approval to the Plan of Distribution contained in the Settlement.

Dated: October 16, 2018                                Respectfully Submitted,

*/s/ Robert A. Clifford*
Robert A. Clifford #0461849
George S. Bellas
Kristofer S. Riddle
Clifford Law Offices
120 N. LaSalle Street
31st Floor
Chicago, IL 60602
Tel: 312-899-9090

1640381.2

Steven P. Blonder #6215773
Jonathan L. Loew
Much Shelist, P.C.
191 N. Wacker
Suite 1800
Chicago, IL 60606-2000
Tel: 312-521-2402

John W. "Don" Barrett
Barrett Law Group, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095-0927
Tel: 662-834-2488

Patrick W. Pendley
Pendley, Baudin & Coffin, LLP
Post Office Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: 888-725-2477

Thomas P. Thrash
Marcus N. Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: 501-374-1058

Gordon Ball
Gordon Ball PLLC
550 Main Street
Bank of America Center, Ste. 600
Knoxville, TN 37902
Tel: 865.525.7028

Elizabeth J. Cabraser
Robert J. Nelson
Kevin R. Budner
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000

Brent W. Landau
Megan E. Jones
Hausfeld, LLP
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: 215-985-3273
Erwin Chemerinsky
University of California, Berkeley School of Law
215 Boalt Hall,
Berkeley, CA 94720
(510) 642-6483

Richard R. Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road
Suite 1011
Oxford, Mississippi 38655
Tel: 662-380-5018

*Class Counsel*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 7.1(b), I certify that a copy of the foregoing was served upon counsel on via the Court's CM/ECF system on October 16, 2018.

/s/ *Kristofer S. Riddle*

1640381.2