# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK HALE, TODD SHADLE, and
LAURIE LOGER, on behalf of themselves and
all others similarly situated,

                Plaintiffs

     v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, and WILLIAM G. SHEPHERD,

              Defendants.

Case No. 3:12-cv-00660-DRH-SCW

Judge David R. Herndon

Magistrate Judge Stephen C. Williams

## <u>PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT</u>

1623666.2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

    I.    Class Counsel Undertook Extraordinary Risks in Prosecuting This Action.......... 3

    II.    Class Counsel Fiercely Litigated This Case for More Than Six Years and Settled Only After Trial Had Begun. ............................................................... 5

    III.    The Settlement Is a Big Win for the Class. ........................................................... 6

ARGUMENT ...................................................................................................... 7

    I.    Class Counsel's Request Reflects a Conservative Estimate of the "Market Price" for Attorneys' Fees—Especially Given That This Case Involved Extreme Risks and Proceeded to Trial. .............................................................. 7

        A.    The market price is measured as a percentage of the fund. ..................... 7

        B.    Class Counsel's 33.33% request reflects the *ex ante* market price under the facts of this case. .............................................................. 8

            1.    Fee agreements from the named Plaintiffs and sophisticated entities in other litigation support Counsel's fee request.............. 8

            2.    Courts in this Circuit regularly award fees of 33.33% or higher. .......................................................................................... 9

            3.    The market rewards risk, and this case was tremendously risky.......................................................................................... 10

            4.    The market price typically increases when cases go to trial........ 11

            5.    Class Counsel performed well and achieved a significant result for the Class. ................................................................... 11

            6.    Under these facts, the market does not reduce or taper fee percentages for larger recoveries, and neither should courts....... 12

         C.    A lodestar cross-check, though unnecessary, also confirms the reasonableness of Class Counsel's request. ........................................... 14

            1.    Class Counsel expended a reasonable number of hours on this incredibly hard-fought litigation. ......................................... 15

            2.    Class Counsel's rates are reasonable under the facts of this case, and well below those recently approved for class action attorneys in this District. ................................................. 16

            3.    The resulting lodestar multiplier reflects the risk Class Counsel undertook and falls below the mean in comparable cases. ....................................................................................... 17

    II.    Class Counsel's Requested Costs Are Reasonable. ........................................... 18

**<u>TABLE OF CONTENTS</u>**
(continued)

<u>**Page**</u>

III.    The Named Plaintiffs' Service Awards Are Reasonable. .................................... 20

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott v. Lockheed Martin Corp.*,
   No. 06-CV-701-MJR-DGW, 2015 WL 4398475 (S.D. Ill. July 17, 2015) ............................ 20

*Banas v. Volcano Corp.*,
   47 F. Supp. 3d 957 (N.D. Cal. 2014) ................................................................................. 19

*Beesley v. Int'l Paper Co.*,
   No. 3:06-CV-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014)........................ passim

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980)......................................................................................................... 7, 18

*City of Greenville v. Syngenta Crop Prot., Inc.*,
   904 F. Supp. 2d 902 (S.D. Ill. 2012)........................................................................ 9, 16, 17, 18

*Cook v. Niedert*,
   142 F.3d 1004 (7th Cir. 1998) ............................................................................................. 20

*Cooper v. IBM Pers. Pension Plan*,
   No. CIV. 99-829-GPM, 2005 WL 1981501 (S.D. Ill. Aug. 16, 2005),
   *rev'd and remanded on other grounds*,
   457 F.3d 636 (7th Cir. 2006) .................................................................................................. 8

*Dial Corp. v. News Corp.*,
   317 F.R.D. 426 (S.D.N.Y. 2016) ......................................................................................... 19

*Florin v. Nationsbank of Georgia, N.A.*,
   34 F.3d 560 (7th Cir. 1994) ....................................................................................... 7, 17, 18

*Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc.*,
   No. 11-CV-592-WMC, 2013 WL 5745102 (W.D. Wis. Oct. 23, 2013) .................................. 9

*George v. Kraft Foods Glob., Inc.*,
   No. 1:07-CV-1713, 2012 WL 13089487 (N.D. Ill. June 26, 2012)........................................... 9

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009) ............................................................................... 3, 10

*Harman v. Lyphomed, Inc.*,
   945 F.2d 969 (7th Cir. 1991) ......................................................................................... 17, 18

*Harzewski v. Guidant Corp.*,
   No. 05-cv-01009, Dkt. 194 (S.D. Ind. Sept. 10, 2010)........................................................ 10

*In re Air Cargo Shipping Serv. Antitrust Litig.*,
   No. 06-MD1775-JG-VVP, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012)............................... 13

*In re Anthem, Inc. Data Breach Litig.*,
   No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018)............................... 13

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
   792 F. Supp. 2d 1028 (N.D. Ill. 2011) .................................................................................. 19

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Comverse Tech., Inc. Sec. Litig.*,
  No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ................................. 13

*In re Dairy Farmers of Am., Inc.*,
  80 F. Supp. 3d 838 (N.D. Ill. 2015) .......................................................................... 9, 10, 11, 14

*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*,
  251 F. Supp. 3d 1225 (N.D. Ind. 2017) ................................................................................. 12

*In re High Fructose Corn Syrup Antitrust Litig.*,
  M.D.L. 1087 (C.D. Ill. Oct. 7, 2004) .................................................................................... 14

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-02420-YGR, 2018 WL 3064391 (N.D. Cal. May 16, 2018) ................................ 13

*In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*,
  991 F. Supp. 2d 437 (E.D.N.Y. 2014), *rev'd on other grounds*, 827 F.3d 223 (2d
  Cir. 2016) ............................................................................................................................. 8

*In re Synthroid Mktg. Litig.* ("*Synthroid I*"),
  264 F.3d 712 (7th Cir. 2001) ...................................................................................... passim

*In re Synthroid Mktg. Litig.* ("*Synthroid II*"),
  325 F.3d 974 (7th Cir. 2003) ................................................................................................ 14

*In re U.S. Foodservice, Inc. Pricing Litigation*,
  No. 3:07-md-1894 (AWT), Dkt. 510-1 (Aug. 29, 2014), Dkt. 523 (Dec. 9, 2014) ................. 13

*In re: State Farm Auto. Ins. Co.*,
  No. 16-8020, Dkt. 38 (7th Cir. Dec. 8, 2016) .......................................................................... 5

*Kirchoff v. Flynn*,
  786 F.2d 320 (7th Cir. 1986) .................................................................................................. 8

*Kolinek v. Walgreen Co.*,
  311 F.R.D. 483 (N.D. Ill. 2015) ............................................................................................ 14

*Martin v. Caterpillar Inc.*,
  No. 07-CV-1009, 2010 WL 11614985 (C.D. Ill. Sept. 10, 2010) ............................................ 9

*Nolte v. Cigna Corp.*,
  No. 07-cv-2046, Dkt. 413 (C.D. Ill. Oct. 15, 2013) ................................................................ 20

*Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble*,
  924 F.2d 633 (7th Cir. 1991) ................................................................................................ 18

*Redman v. RadioShack Corp.*,
  768 F.3d 622 (7th Cir. 2014) .................................................................................................. 3

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................................................................... 9, 12, 18

*Silverman v. Motorola Solutions, Inc.*,
  739 F.3d 956 (7th Cir. 2013) ....................................................................................... 9, 10, 13, 14

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Spano v. Boeing Co.*,
No. 06-CV-743-NJR-DGW, 2016 WL 3791123 (S.D. Ill. Mar. 31, 2016)................ 8, 9, 16, 20

*Standard Iron Works v. ArcelorMittal*,
No. 08 C 5214, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014)..................................... 9

*Sutton v. Bernard*,
504 F.3d 688 (7th Cir. 2007) ......................................................................... 7

*Taubenfeld v. AON Corp.*,
415 F.3d 597 (7th Cir. 2005) ...................................................................... 9, 12

*Will v. Gen. Dynamics Corp.*,
No. CIV. 06-698-GPM, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010)................................ 9, 14

*Williams v. Rohm & Haas Pension Plan*,
658 F.3d 629 (7th Cir. 2011) ......................................................................... 7

*Young v. Cnty. of Cook*,
No. 06 C 552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017)..................................... 9

**Rules**

Fed. R. Civ. P. 23(f)................................................................................. 4

**Other Authorities**

Alicia Bannon, *The rise of dark money is a threat to judicial independence*, ABA
Journal (July 5, 2018), Available at
http://www.abajournal.com/news/article/the_rise_of_dark_money_is_a_threat
to_judicial_independence (last visited October 5, 2018)........................................... 1

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements:
An Empirical Study,* 1 J. Empirical Legal Stud. 27, 70 (2004)................................ 19

## INTRODUCTION

The rise of "dark money" in our legislative and judicial elections is one of the most important issues of our time.  As one commentator noted, the "flood of secret money leaves voters without important information about the interests trying to shape state courts, and it can obscure potential conflicts of interest for judges and litigants alike."  Alicia Bannon, *The rise of dark money is a threat to judicial independence*, ABA Journal (July 5, 2018).[1]  But "by definition, dark money is hard to trace," *id.*, and when left unchecked, it threatens to undermine the integrity of our representative democracy and the impartiality of our courts.  Through this lawsuit, Plaintiffs and Class Counsel endeavored to shine a spotlight on this issue and to vindicate the rights of millions of State Farm insureds who had been deprived of their property interest in a court judgment and their constitutional guarantee to an impartial forum.[2]

As the Court is well aware, the extraordinary facts underlying this lawsuit stretch back more than twenty years.  In 1997, consumers filed a proposed nationwide class action, *Avery v. State Farm Mutual Automobile Insurance Co.* ("*Avery*"), alleging that State Farm violated consumer protection laws and breached its contracts with policy holders by equipping their vehicles with sub-standard non-OEM parts.  A class of approximately 4.7 million insureds was certified and, after an eight week trial in 1999, they secured a $1.18 billion verdict.  That verdict was reduced to $1.056 billion by the intermediate court of appeals but otherwise upheld.  State Farm then petitioned for review in the Illinois Supreme Court, and shortly thereafter in 2002, it was announced that there would be a vacancy on that Court in 2004.

---

[1] Available at http://www.abajournal.com/news/article/the_rise_of_dark_money_is_a_threat_to_judicial_independence (last visited October 5, 2018).

[2] Class action and attorneys' fee expert Professor Charles Silver also noted the importance of this issue, observing that "[t]his lawsuit was brought to preserve the miracle [of the American Civil Justice system] by exposing a conspiracy to deprive a class of millions of people of access to a neutral court" and concluding that "[i]t is an example of private litigation at its finest." Declaration of Charles Silver ("Silver Decl.") at 1.  Professor Rubenstein similarly opined that this litigation "helped shine a light on decisionmaking at the highest level of the state's judiciary system" and that "[t]here are few more important tasks for lawyers then helping to ensure the fairness of our judicial system."  Declaration of William Rubenstein ("Rubenstein Decl.") ¶ 37.

At that time, Plaintiffs alleged in their lawsuit, State Farm and its co-defendants engaged in a scheme to (1) secretly recruit then-trial Judge Karmeier to run for the open seat on the Illinois Supreme Court, before which the billion-dollar judgment against State Farm in *Avery* was pending; (2) help organize and manage his campaign behind the scenes; (3) covertly funnel millions of dollars (well over a majority of all reported campaign funds) to support the Karmeier campaign through intermediary organizations over which it exerted considerable influence; and (4) most importantly, after securing Justice Karmeier's election, obscure, conceal, and misrepresent the degree and nature of their support so that Justice Karmeier could participate in the *Avery* deliberations.  The scheme was a success.  Justice Karmeier was elected in 2004, and his very first act as a Justice was to break the "deadlock" in the Illinois Supreme Court and vote to overturn the *Avery* verdict.[3]

In 2012, after considerable investigative efforts led by Class Counsel and their agents (including a retired FBI agent), Plaintiffs filed the instant action alleging that the Defendants' scheme violated the Racketeer Influenced Corrupt Organizations Act ("RICO"), and deprived Plaintiffs of an impartial forum and their property interest in the *Avery* judgment.  To Counsel's knowledge, no similar lawsuit had ever been, or has since been, attempted.

The litigation that ensued was, to put it mildly, intense.  Over more than six years, Plaintiffs briefed nearly 100 contested motions, took and defended dozens of depositions, reviewed hundreds of thousands of pages of produced documents, took extensive third party discovery, and argued and briefed dozens of discovery disputes.  By the time the trial began in September 2018, Plaintiffs had achieved class certification and survived a motion to dismiss, two summary judgment motions, and three trips to the Seventh Circuit.

After a jury had been selected, and on the eve of opening statements—and with the assistance of a Court-appointed mediator—the Parties reached an agreement to settle Plaintiffs'

---

[3] The *Avery* plaintiffs' efforts to seek Justice Karmeier's recusal and to recall the mandate based on his conflicts—filed without the benefit of formal discovery—were both denied without explanation, and the state court proceedings concluded in 2011.

claims for a non-reversionary fund of $250 million.  In light of the complexity of the issues and the risk of trial and appeals that would follow, this is an extraordinary result for the Class.

For the many years of risky, expensive, and labor-intensive work that Class Counsel[4] expended to achieve this result, they seek one third of the common fund (including any interest accrued therefrom, but net of administrative costs[5]) and $6,971,852.80 in expenses.  As confirmed by class action and attorney fee experts Professors William Rubenstein, Brian Fitzpatrick, and Charles Silver, Class Counsel's request is reasonable, customary, and even *conservative* in large and complex cases like this one—and is fully supported by both the facts and law.  The same is true for the requested service awards for the three Class Representatives.

## BACKGROUND

### I. Class Counsel Undertook Extraordinary Risks in Prosecuting This Action.

When this case was filed, it was in many ways without precedent.  Setting aside the unique facts and legal issues underlying this specific case, successful RICO actions are exceedingly rare.  *Gross v. Waywell*, 628 F. Supp. 2d 475, 480 (S.D.N.Y. 2009) ("[T]he statistical record indicates that in 98 percent of the RICO appellate cases surveyed, which do not include RICO actions dismissed by the district courts but not appealed, plaintiffs and counsel invested extensive time and energies in litigation only to come away with a total loss.").  Successful RICO class actions are rarer still.  *See, e.g.*, Silver Decl. at 34-36 (discussing empirical study of RICO class actions).  Furthermore, to Counsel's knowledge, no RICO action (individual or class) had ever been successfully pursued to shine a light on "dark money" in

---

[4] "Class Counsel" or "Counsel" are "Lieff Cabraser Heimann & Bernstein, LLP; Barrett Law Group, P.A.; Hausfeld, LLP; Clifford Law Offices; Much Shelist, P.C.; Thrash Law Firm, P.A.; Law Offices of Gordon Ball; Pendley, Baudin & Coffin, LLP; and Erwin Chemerinsky, Esq." Dkt. 556 at 28.  Taylor Martino P.C. and Professor Stephen Saltzburg also contributed.

[5] *See Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) ("[A]dministrative costs should not have been included in calculating the division of spoils between class counsel and class members.").  Here, the Claims Administrator estimates that the cost of Settlement notice and claims administration will be $2.1 million.  Nelson Decl. ¶ 13.  Thus, Class Counsel's fee request is $82,633,333.33 (($250 million – $2.1 million) / 3) plus interest accrued on the fund.

judicial elections or to recover a verdict lost in previous litigation.  The path to success in this case was long, steep, and narrow—and flanked by many precipitous cliffs, both factual and legal.

On the facts, it is important to note that unlike many cases where attorneys seek a substantial fee, Class Counsel here uncovered the well-concealed fraud entirely on their own (and with the assistance of the investigators they hired).  Nothing about this case was public knowledge, and it was not assisted by any governmental agencies.  This, too, is extremely uncommon.  *See, e.g.*, Fitzpatrick Decl. ¶ 23 (discussing a study finding that "private lawyers . . . were the first to discover fraud only 3% of the time").

As a result, the burden of building this case was borne entirely by Plaintiffs, and there was certainly no guarantee when they took the case that they would prevail.  In fact, two years after Plaintiffs filed their complaint, Magistrate Judge Williams ruled that Plaintiffs still had not sufficiently "connect[ed] the dots" between State Farm and Justice Karmeier.  Dkt. 300 at 5.  Through diligent discovery and advocacy, Plaintiffs ultimately defeated two summary judgment motions and, by the time the parties were able to reach agreement, were well-prepared to try their case.  But that does not undermine the complexity and uncertainty of the challenges Plaintiffs faced when they filed suit in 2012.

On the law, too, Plaintiffs faced significant risk.  Defendants repeatedly advanced a number of strong legal challenges, any one of which could have resulted in complete dismissal of the case.  Those challenges included, among others: *Rooker-Feldman*, claim and issue preclusion, RICO proximate cause, RICO damages, *Noerr-Penington*, and the statute of limitations.  As set forth below, these issues were briefed extensively in a motion to dismiss, a petition for writ of mandamus, class certification filings, two petitions for leave to appeal pursuant to Rule 23(f), and two summary judgment motions.  *See, e.g.*, Dkts. 13, 32, 61, 159, 467, 646, 694; *see also* Declaration of Robert J. Nelson ("Nelson Decl.") ¶ 2 & Ex. A (list of contested motions).  And while Plaintiffs ultimately prevailed through the beginning of trial, the Court noted that these defenses were "significant" and "difficult" and suggested they could pose obstacles on appeal.  September 4, 2018, Hr'g Tr. at 6:25-7:3 ("In addition to a significant

question regarding *Rooker-Feldman*, the plaintiffs face difficult issues having to do with *Noerr-Pennington*, perhaps res judicata, and a fact-based statute of limitations issue . . . .").  Notably, one of the Seventh Circuit judges that reviewed State Farm's initial Rule 23(f) petition dissented from the order denying State Farm leave to appeal, which suggested that she may have voted to reverse this Court and dismiss the case entirely for lack of jurisdiction.  *In re: State Farm Auto. Ins. Co.*, No. 16-8020, Dkt. 38 (7th Cir. Dec. 8, 2016).

For all these reasons, and others, Professor Silver noted that "this is one of the most important lawsuits of my lifetime[, and] . . . also one of the riskiest, as every relevant metric shows."  Silver Decl. at 33.  Similarly, Professor Rubenstein identified "[a] dozen independent factors [that] demonstrate the riskiness of this case viewed *ex ante* – and [that were] borne out by the arc of the litigation."[6]  Rubenstein Decl. ¶ 36.  Professor Fitzpatrick, too, observed that "it is a *gross* understatement to say that this case involved above-average risks."  Declaration of Brian Fitzpatrick ("Fitzpatrick Decl.") ¶ 21 (emphasis in original).

In sum, this lawsuit was always a long shot.  But the issues it addressed—the integrity of the courts and the due process and property rights of nearly 4.7 million class members—were too important to Plaintiffs and their Counsel not to forge ahead.

## II.     Class Counsel Fiercely Litigated This Case for More Than Six Years and Settled Only After Trial Had Begun.

To say this case was hard fought would be a dramatic understatement.  The principal Defendant here, State Farm, is among the biggest companies in the world.[7]  It was operating with virtually unlimited resources, and—as demonstrated in this case and in *Avery*—it had little interest in settling.  Instead, State Farm and its co-defendants mounted a formidable defense,

---

[6] In light of these risks, no other lawyers were even remotely interested in taking the case, and none opposed or otherwise contested Plaintiffs' Motion for Appointment of Co-Lead and Liaison Counsel.  Dkt. 179.  In fact, two of the firms initially prosecuting this case later withdrew due to the ongoing risks and expense of prosecuting the case.  *See* Dkts. 439 (withdrawal of Richard H. Taylor, Steven A. Martino, and W. Lloyd Copeland of Taylor Martino, P.C.) and 455 (withdrawal of Sidney W. Jackson, III of Jackson Foster, LLC).

[7] *See, e.g.*, http://fortune.com/fortune500/state-farm-insurance-cos/ (ranking State Farm 36th among the Fortune 500).

advanced by some of the largest law firms and most reputable litigators.

Unsurprisingly, then, "the motion practice and discovery in this matter" were "extraordinarily protracted and complex."  September 4, 2018, Hr'g Tr. at 6:8-10.  Over the course of the litigation, Class Counsel (1) engaged in lengthy pre-filing discovery and investigation; (2) briefed approximately 100 contested motions, including three requests for interlocutory appeal briefed in the Seventh Circuit; (3) carefully reviewed hundreds of thousands of pages of documents to construct the complex money trail and other circumstantial evidence necessary to prove their case; (4) took and defended 68 depositions; (5) participated in more than 50 discovery hearings before the Magistrate Judge, most of which were preceded by lengthy meet and confers and letter briefs not filed on the docket; (6) worked with eleven expert witnesses, many of whom prepared multiple expert reports; and (7) prepared for and began what was to be a six-week trial.  *See* Nelson Decl., Exhibits A-C.

As a result, this case took a lot of work and a lot of money.  In all, Class Counsel dedicated 55,303.10 hours (and $29,163,729.05 in lodestar) to this litigation.  *See* Nelson Decl. ¶ 6.  Class Counsel also advanced approximately $7 million in out-of-pocket costs, all of which was necessary to secure experts, jury and trial consultants, and other services necessary to go toe-to-toe with motivated and well-funded defendants.  In all, then, "Class Counsel have loaned the class tens of millions of dollars – and risked losing every penny of it on the outcome of his case."  Rubenstein Decl. ¶ 36(j).  They did so without hesitation in the years-long pursuit of the best possible result for the Class.

III.     **The Settlement Is a Big Win for the Class.**

The full terms of the Settlement, and the reasons it should receive final approval, are set forth in the simultaneously-filed motion for final approval of the Settlement, but two points are worth mentioning here.  First, "$250 million is a lot of money."  Rubenstein Decl. ¶ 37(a).  Every penny of it, less fees and costs, will go to the Class, and many Class members will receive their payments automatically.  Second, the risks at trial and beyond were significant.  Even after the Settlement was reached, State Farm insisted that "in view of its strong factual and legal

defenses in this case, it would prevail at trial, upon appeal . . . , or at both stages.  Dkt. 940 at 1.

Plaintiffs, too, believed they had a strong case, but knew that if they did win at trial, an appeal

was inevitable.  In the best case scenario, this would have meant several more years before the

Class could recover a dime.  In the worst case—a very real possibility, for all the reasons stated

above—the Class would have recovered nothing at all.  Counsel fought long and hard and would

never have inked a deal they did not feel confident was in the best interests of the Class.  *See*

Nelson Decl. ¶ 19.

## ARGUMENT

I. **Class Counsel's Request Reflects a Conservative Estimate of the "Market Price" for Attorneys' Fees—Especially Given That This Case Involved Extreme Risks and Proceeded to Trial.**

"[L]awyer[s] who recover[] a common fund . . . [are] entitled to a reasonable attorney's

fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also*

*Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007).  "[W]hen deciding on appropriate fee

levels in common-fund cases," like this one, courts in the Seventh Circuit "must do their best to

award counsel the market price for legal services, in light of the risk of nonpayment and the

normal rate of compensation in the market at the time."  *In re Synthroid Mktg. Litig.* ("*Synthroid

I*"), 264 F.3d 712, 718 (7th Cir. 2001); *accord Williams v. Rohm & Haas Pension Plan*, 658 F.3d

629, 635 (7th Cir. 2011) ("[T]he district court must try to assign fees that mimic a hypothetical

*ex ante* bargain between the class and its attorneys.").  There is little question that, under the

facts of this case, the *ex ante* market price for Class Counsel's services was no less than 33.33%

of the common fund.

A. **The market price is measured as a percentage of the fund.**

Although courts in this Circuit have the discretion to use either a percentage of the fund

or lodestar methodology, *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir.

1994), the percentage method is employed by "the vast majority of courts in the Seventh Circuit

(like other Circuits)."  Fitzpatrick Decl. ¶ 13 (citing empirical studies); *C.f. Beesley v. Int'l Paper

Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) (Herndon, J.)

("When determining a reasonable fee, the Seventh Circuit Court of Appeals uses the percentage basis rather than a lodestar or other basis.").[8]  This makes sense, because "it is essentially unheard of for sophisticated lawyers to take on a case of this magnitude and type on any basis other than a contingency fee, expressed as a percentage of the relief obtained."  *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016).  Thus, where, as here, "the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'"  *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) (emphasis in original); *accord* Silver Decl. at 9-11.

**B.**     **Class Counsel's 33.33% request reflects the *ex ante* market price under the facts of this case.**

Here, "Class Counsel's request for 33.33% is not only a good approximation of what class members would have agreed to, but it is a very conservative one."  Fitzpatrick Decl. ¶ 16.  This is true for a number of reasons.

**1.**     **Fee agreements from the named Plaintiffs and sophisticated entities in other litigation support Counsel's fee request.**

"The first benchmark" of the market rate "is actual agreements" between plaintiffs and counsel.  *Synthroid I*, 264 F.3d at 719.  Here, all named plaintiffs signed agreements calling for attorneys' fees of 40%, which is even more than Class Counsel now request.  Nelson Decl. ¶ 11.  And, while these agreements may be of limited value given the relatively low-stakes for each individual, empirical data show that sophisticated clients and sophisticated named plaintiffs regularly agree to pay 33.33% or more in risky, complex litigation, even when potential rewards are enormous.  Indeed, as Professor Silver's Declaration confirms, fee percentages in this range are common in patent and other large commercial cases, as well as in class actions led by

---

[8] *See also, e.g.*, *Cooper v. IBM Pers. Pension Plan*, No. CIV. 99-829-GPM, 2005 WL 1981501, at *3 (S.D. Ill. Aug. 16, 2005), *rev'd and remanded on other grounds*, 457 F.3d 636 (7th Cir. 2006) ("The approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class."); *Spano v. Boeing Co.*, No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *2 (S.D. Ill. Mar. 31, 2016) (same); *Nolte v. Cigna Corp.*, No. 2:07-CV-2046-HAB-DGB, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013) (same).

sophisticated business entities. *See* Silver Decl. at 17-20 (discussing empirical study finding that in patent cases "the contingent rates are similar to the 'one-third' that a stereotypical contingent personal injury lawyer charges," and that the mean rate percentage was 38.6% for flat percentage contracts); *id.* at 21 (surveying examples of business entities paying up to 40% in high-stakes contingency fee arrangements); *id.* at 26, Table 1 (identifying 12 multi-million dollar settlements in pharmaceutical antitrust cases awarding 33.33% in fees plus expenses). This in-depth analysis confirms that the market that this Court must mimic—one formed by sophisticated entities in comparable contexts—routinely produces fee agreements at or above the percentage Class Counsel request here.

### 2. Courts in this Circuit regularly award fees of 33.33% or higher.

Another relevant data point for the market price for attorneys' fees is those awarded in "analogous class action settlements." *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005); *accord Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). This metric, too, confirms the reasonableness of Class Counsel's request.

As a starting point, many courts within the Seventh Circuit have awarded percentage fees of 33.33% or higher to class counsel.[9] Moreover, the most recent empirical study on class action

---

[9] *See, e.g.*, *Young v. Cnty. of Cook*, No. 06 C 552, 2017 WL 4164238, at *6 (N.D. Ill. Sept. 20, 2017) (awarding 33.33% of $52 million common fund and overruling objections calling for sliding scale approach); *Spano*, 2016 WL 3791123, at *2 ("A one-third fee is consistent with the market rate in settlements concerning this particularly complex area of law."); *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 862 (N.D. Ill. 2015) (awarding one third plus expenses of $46 million common fund); *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) ("The Court finds that a 33% fee [of $163.9 million common fund] comports with the prevailing market rate for legal services of similar quality in similar cases."); *Beesley*, 2014 WL 375432, at *4 (Herndon, J.) (awarding one third of common fund); *Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc.*, No. 11-CV-592-WMC, 2013 WL 5745102, at *1 (W.D. Wis. Oct. 23, 2013) (same); *George v. Kraft Foods Global, Inc.*, No. 1:07-CV-1713, 2012 WL 13089487, at *4 (N.D. Ill. June 26, 2012) (same); *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 908–09 (S.D. Ill. 2012) (awarding one-third of $105 million settlement plus roughly $8.5 million in costs and holding that "[w]here the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, the normal rate of compensation in the market is 33.33% of the common fund recovered."); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 601 (N.D. Ill. 2011) (awarding one third of common fund); *Will v. Gen. Dynamics Corp.*, No. CIV. 06-698-GPM, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (same); *Martin v. Caterpillar Inc.*, No. 07-CV-1009, 2010 WL 11614985, at *2 (C.D. Ill. Sept. 10, 2010) ("[C]ourts in the

fee awards shows that the *average* fee in the Seventh Circuit—without regard to complexity, risk, duration, or results—is 31.6%.  Rubenstein Decl. ¶ 17 (citing studies); *see also* Fitzpatrick Decl. ¶ 18 (discussing empirical study demonstrating that fees in the 30-35% range were the most common).  These statistics alone, however, do not tell the full story, because they do not account for the riskiness of the case, the fact that Class Counsel took this case to trial, or the quality of Counsel's performance in getting the case to trial.  Each of these factors, as discussed below, further supports Counsel's request.

### 3.   The market rewards risk, and this case was tremendously risky.

"The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."  *Silverman*, 739 F.3d at 958; *accord, e.g.*, *Synthroid I*, 264 F.3d at 721 (The market rate must account for the "risk of non-payment a firm agrees to bear."); Fitzpatrick Decl. ¶ 21 ("[I]n order to mimic the market well, we have to adjust baseline data like this to the particular circumstances that existed at the outset of *this* case.  That is, if this case was riskier than the average case, we would have expected the lawyers in a competitive market to demand an above-average fee percentage to take it on.") (emphasis in original).  Thus, "[w]hen determining the reasonableness of a fee request, courts put a fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit."  *Dairy Farmers*, 80 F. Supp. 3d at 847-48.

For all the reasons set forth above, this case was about as risky as a case could be.  It was filed under a statute—RICO—that is notoriously unkind to plaintiffs, *Gross*, 628 F. Supp. 2d at 479-83, and even more so to class action plaintiffs, Silver Decl. at 34-36.  It also advanced an unprecedented theory of civil liability and was both discovered and prosecuted by Class Counsel alone, without the assistance of any public expose or government agency.  "This novelty presented many legal barriers," any one of which could have proved fatal to Plaintiffs' claims:

---

Seventh Circuit award attorney fees 'equal to approximately one-third or more of the recovery.'  The Seventh Circuit itself has specifically noted that 'the typical contingent fee is between 33 and 40 percent.'"); *Harzewski v. Guidant Corp.*, No. 05-cv-01009, Dkt. 194 (S.D. Ind. Sept. 10, 2010) (awarding 38% of the common fund).

> Did the earlier litigation preclude a new litigation by virtue of *res judicata* or the *Rooker-Feldman* doctrine?  Had the RICO statute of limitations run between the first and second litigation?  Could the class prove that the election of the new Justice changed the result in the first litigation?  Can a tribunal's decision to overturn a judgment establish an "injur[y]" to "business or property" as required by RICO?  Were the defendants' alleged misconducts here protected by the First Amendment?  If one goes through each step in this litigation decision tree and assigns probabilities of success to the class at each step and then multiplies all of those probabilities together, it becomes quite clear that the risks here were *much* higher than in the typical class action.

Fitzpatrick Decl. ¶ 22 (emphasis in original); *see also* Silver Decl. at 34-38 ("[T]his is one of the most important lawsuits of my lifetime.  It is also one of the riskiest, as every relevant metric shows.").  Given that courts routinely award 33.33% and that (according to at least one study) the average fee award in this Circuit is 31.6%, a market that "put[s] a fair amount of emphasis on the severity of the [*ex ante*] risk" surely would set a reasonable attorneys' fees in this outlier case at no less than 33.33%, if not higher.  *See Dairy Farmers*, 80 F. Supp. 3d at 847-48.

### 4.      The market price typically increases when cases go to trial.

Sophisticated clients also recognize that even contingent-fee attorneys' compensation should, to a certain degree, reflect the amount of work performed.  Thus, "plaintiffs in the market for legal representation often pay their lawyers with bifurcated rates that call for a higher percentage if their lawyers have to take their cases to trial, with fees as high as 50% in such circumstances."  *See* Fitzpatrick Decl. ¶ 20 (citing empirical data).  Courts recognize this as well, and award fees reflecting this market tendency.  While trials are rare and the data limited, of the 11 cases proceeding to trial that Professor Rubenstein found in his database of more than 1,000 cases, the "mean fee award . . . was 36%, with five cases having awards of 38.9% or more and three of those having fee awards of 40% or more.  The median fees and costs awarded in the 11 cases that progressed to trial with applicable data was 45%."  Rubenstein Decl. ¶ 18.  Taking this into account, Class Counsel's fee request proves even more reasonable.

### 5.      Class Counsel performed well and achieved a significant result for the Class.

Of course, courts consider not just the level of risk and amount of work performed, but

also quality of the work. *Taubenfeld*, 415 F.3d at 600 (7th Cir. 2005) (noting that the "evidence of the quality of legal services rendered" is among the "type[s] of evidence needed to mimic the market per *Synthroid I*"); *Schulte* 805 F. Supp. 2d at 597 (Compensation also depends on "the quality of [counsel's] performance."). Class Counsel's work here, and the result they achieved, are both noteworthy. As described above, over the course of more than six years and approximately 100 contested motions, Counsel navigated a veritable minefield of legal and factual challenges, certified a nationwide class, survived motions to dismiss, motions for summary judgment, and three trips to the Seventh Circuit, and took the case through the beginning of trial. Given the novelty of the claim, and the difficulty of prevailing under RICO, this was no small feat. The result of this diligent advocacy and dogged effort is a substantial Settlement that affords significant cash relief to the Class. This factor, too, supports Class Counsel's request.

### 6. <u>Under these facts, the market does not reduce or taper fee percentages for larger recoveries, and neither should courts.</u>

Both the actual market for legal services, and the Seventh Circuit, have flatly rejected the notion that counsels' fee percentages should decrease as the recoveries they secure increase. As Judge Easterbrook observed, "[p]rivate parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for more [money] from the defendants." *Synthroid I*, 264 F.3d at 718. The Seventh Circuit has therefore "disapproved" a "megafund cap" that would limit attorney fee percentages in large cases. *Id.*; *see also In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 251 F. Supp. 3d 1225, 1239 (N.D. Ind. 2017) ("Our court of appeals . . . has rejected the concept behind the 'megafund' theory").

This makes good economic sense, Fitzpatrick Decl. ¶ 26, and scores of courts in this Circuit and elsewhere have awarded high percentages to class counsel in "megafund" cases. Indeed, Professor Silver compiled a table of 63 cases (in addition to those discussed elsewhere in his report) with recoveries between $100 million and $1.08 billion in which courts awarded fee percentages of 25% or greater, 19 of which were equal to or greater than 33%. Silver Decl. at

38-44, Table 2.  There are many more examples,[10] including one that shares notable features with this case:  *In re U.S. Foodservice, Inc. Pricing Litig.*, a RICO class action with sophisticated lead plaintiffs that resulted in a $297 million settlement from which the court awarded class counsel 33.33% in fees and $7,941,358.41 litigation expenses.  No. 3:07-md-1894 (AWT), Dkt. 510-1 (Aug. 29, 2014) (fee motion); Dkt. 523 (Dec. 9, 2014) (order granting fee motion).  There is no sound reason to limit the attorneys' fee percentage in a megafund case such as this.

*Silverman* does not counsel otherwise.  739 F.3d at 956.  There, the Seventh Circuit affirmed the district court's award of 27.5% of a $200 million common fund.  In so doing, it noted that such an "award *may* be at the outer limit of reasonableness."  *Id.* at 959 (emphasis added).  But this cannot reasonably be interpreted as a *per se* ceiling (certainly not in light of *Synthroid I*) and is best understood in the context of that case, which "presented none of the *ex ante* risks of this case (for example, *Silverman* was a securities fraud case, where class certification is relatively perfunctory), and, perhaps even more importantly, did not go to trial."  Fitzpatrick Decl. ¶ 25.

In *Silverman*, as in *Synthroid I*, 264 F.3d at 721, Judge Easterbrook also suggested that courts should consider tapered fee structures that "provide for a recovery that increases at a decreasing rate."  *Silverman*, 739 F.3d at 959.  One of the concerns animating this opinion was the perceived absence of "suits seeking more than $100 million in which solvent clients agree *ex ante* to pay their lawyers a flat portion of all recoveries, as opposed to a rate that declines as the recovery increases."  *Id.*  But, as Professor Silver's Declaration confirms, such examples abound.  Silver Decl. at 28-29 (summarizing his analysis of such cases).  Moreover, outside of the securities context, sophisticated clients rarely employ declining percentages, and large

---

[10] *See, e.g., Silverman*, 739 F.3d 956 (affirming award of 27.5% of $200 million settlement); *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *9 (N.D. Cal. Aug. 17, 2018) (27% of $115 million); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420-YGR, 2018 WL 3064391, at *2 (N.D. Cal. May 16, 2018) (30% of $139.9 million); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775-JG-VVP, 2012 WL 3138596, at *5 (E.D.N.Y. Aug. 2, 2012) (25% of $198 million); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (25% of $225 million).

corporations "'have instead typically used straight percentage of the recovery formulas.'" *Id.* at 30 (quoting Declaration of John C. Coffee, Jr., submitted in *In re High Fructose Corn Syrup Antitrust Litig.*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004)).

Declining percentages are even less rational for "plaintiffs who *cannot monitor* their lawyers to contract for such awards for the very same reason such plaintiffs would not want to pay their lawyers the same percentage if they settled early or went to trial: tapering disincentivizes lawyers from working hard for the largest recovery." Fitzpatrick Decl. ¶ 27 (emphasis in original). Thus, a "'Chicago School'" analysis shows that, if we are to taper at all for clients who cannot monitor, we should taper *upward* not downward." *Id.* (emphasis in original). As it turns out, sophisticated clients sometimes do just that. *See id.* (citing examples); Silver Decl. at 30-32 (same and discussing Professor Coffee's economic argument for increasing percentage fee awards).

For these reasons, courts mimicking the market need not—and probably should not— apply declining percentages in large cases, especially under the facts of this case. This is confirmed by the result of *Silverman* itself, which affirmed a flat percentage in a megafund case. 139 F.3d at 956; *see also Dairy Farmers*, 80 F. Supp. 3d at 845 (awarding a flat one third fee notwithstanding a "seemingly tailor-made tiered-pricing arrangement" set by the Seventh Circuit in *In re Synthroid Mktg. Litig.* ("*Synthroid II* "), 325 F.3d 974, 979 (7th Cir. 2003)).

### C.   A lodestar cross-check, though unnecessary, also confirms the reasonableness of Class Counsel's request.

As a threshold matter, a lodestar cross-check is not required in this Circuit. *Rohm & Haas Pension Plan*, 658 F.3d at 636 ("[C]onsideration of a lodestar check is not an issue of required methodology."); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500 (N.D. Ill. 2015) ("[N]o Seventh Circuit case law suggests that a percentage-of-the-fund approach will yield a reasonable result only where it satisfies a lodestar cross-check."). Indeed, the "use of a lodestar cross-check has fallen into disfavor," *Beesley*, 2014 WL 375432, at *3 (Herndon, J.) (*citing Synthroid II*, 325 F. 3d at 979-80)), and, in many cases, can be "counterproductive," *Gen. Dynamics Corp.*, 2010

WL 4818174, at *3 (collecting cases).  *See also* Fitzpatrick Decl. ¶ 14 ("Rational plaintiffs would want to enter fee arrangements that give their lawyers incentives to recover as much as they can as quickly as they can (i.e., the percentage method) rather than arrangements that give them incentives to drag cases on and to be indifferent as to recovery (i.e., the lodestar method).").  Nevertheless, to the extent the Court wishes to conduct such a cross-check here, it confirms the reasonableness of Plaintiffs' request.[11]

### 1.    Class Counsel expended a reasonable number of hours on this incredibly hard-fought litigation.

As noted above, this case was intensively litigated for more than six years.  During that time, Defendants mounted a formidable defense.  As a result, and because of the extremely complex nature of both the facts and law underlying this case, "the motion practice and discovery in this matter have been extraordinarily protracted and complex."  September 4, 2018, Hr'g Tr. at 6:8-10.  A thorough, though non-exhaustive, list of the work Plaintiffs undertook to advance this case through class certification and past motions to dismiss, summary judgment motions, and interlocutory appeals, all the way to trial, is provided above.

In furtherance of those efforts, and many more, Class Counsel expended 55,303.10 hours (and $29,163,729.05 in lodestar), which breaks down to less than 8,000 hours/year over seven years (including a reasonable time for pre-filing investigation and complaint preparation), or 23.92 hours per day the case was pending.  Nelson Decl. ¶ 6; *see also* Rubenstein Decl. ¶¶ 29-32.  As confirmed by Professor Rubenstein's empirical analysis, this is well below the mean in cases in the $250 million range that progressed to trial, and even lower after accounting for the number of years this case was litigated.  *See* Rubenstein Decl. ¶¶ 29-32 (Class Counsel's hours represent 67% of mean among $250 million cases that progressed to trial and 51% of the hour/day mean, accounting for the duration of the litigation).  Class Counsel's hours are therefore reasonable in

---

[11] Plaintiffs have submitted a summary of the time expended in connection with this litigation, as well as the blended average billing rate.  *See* Nelson Decl. ¶¶ 6-9.  These summaries are sufficient.  *Beesley*, 2014 WL 375432, at *3 (Herndon, J.) ("The Court may rely on summaries submitted by attorneys and need not review actual billing records.").  However, Counsel stands ready to submit detailed records should the Court request them.

the context of this litigation. *Id.*; *see also City of Greenville*, 904 F. Supp. 2d at 909 (finding reasonable 83,300 hours for two firms over 8 years, which is approximately 10,412 hours/year).

> **2.     Class Counsel's rates are reasonable under the facts of this case, and well below those recently approved for class action attorneys in this District.**

Class Counsel calculated their lodestar using the customary billing rates of all timekeepers at the time the services were rendered (i.e., using historical rather than present rates). *See* Nelson Decl. ¶¶ 7-8. The blended average rate that results from this analysis is $527.34. *Id.* ¶ 9. Professor Rubenstein found that Class Counsel's rates were in the middle of the range of blended rates approved in 22 recent fee approvals in the Northern District of Illinois. Rubenstein Decl. ¶ 23. Even assuming customary rates are slightly lower in the Southern District, Class Counsel's blended rate is no more than 13.61% above the *average* local market rate. *Id.* ¶ 24. This is eminently reasonable given (1) the complexity of the issues and the fact that the case proceeded to trial; (2) the resulting need for a relatively high proportion of time from very experienced lawyers; and (3) the presence of counsel with national practices and national expertise, whose participation was essential to prosecuting this difficult case. *Id.*

Notably, this Court, and others in this District, have recently approved rates for contingent fee class action attorneys that significantly exceed those outlined above. In *Beesley*, for example, this Court found reasonable the following rates in 2014: "for attorneys with 15–24 years of experience, $757 per hour; for attorneys with 5–14 years of experience, $545 per hour; for attorneys with 2–4 years of experience, $394 per hour; for Paralegals and Law Clerks, $275 per hour; for Legal Assistants, $170 per hour." 2014 WL 375432, at *3. Two years later, Judge Rosenstengel used the same structure (with increased rates, accounting for the passage of time), and found reasonable the following: "for attorneys with at least 25 years of experience, $998 per hour; for attorneys with 15–24 years of experience, $850 per hour; for attorneys with 5–14 years of experience, $612 per hour; for attorneys with 2–4 years of experience, $460 per hour; for Paralegals and Law Clerks, $309 per hour; for Legal Assistants, $190 per hour." *Spano*, 2016 WL 3791123, at *4 (approving a lodestar of $18,066,346 with a blended rate of $673.74). If

Class Counsel here had applied those billing rates (even without adjustment to 2018), their lodestar would increase by more than 33% to $39,091,388.02 and yield a multiplier of 2.11. Nelson Decl. ¶ 10.  Viewed in this context, Class Counsel's historical rates, and blended average of $527.34, are not just reasonable, but conservative.

### 3.   The resulting lodestar multiplier reflects the risk Class Counsel undertook and falls below the mean in comparable cases.

"[A] risk multiplier is not merely available in a common fund case but mandated, if the court finds that counsel 'had no sure source of compensation for their services.'"  *Florin,* 34 F.3d at 565; *accord City of Greenville*, 904 F. Supp. 2d at 909 ("[W]here counsel 'had no sure source of compensation for their services,' the Court must apply a risk multiplier to compensate the attorneys for the risk of nonpayment in the event the litigation were unsuccessful.").  The Seventh Circuit has also observed that "'the need for such an adjustment is particularly acute in class action suits. The lawyers for the class receive no fee if the suit fails, so their entitlement to fees is inescapably contingent.'"  *Florin*, 34 F.3d at 565 (*quoting In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569 (7th Cir. 1992)).  It is beyond dispute that here, in this contingent class action lawsuit, there was no guarantee that counsel would secure a single penny for their services or even reimbursement for the millions of dollars in out-of-pocket expenses that they advanced. The Court must, therefore, apply a risk adjustment multiplier.

The specific multiplier that results from this fee request is 2.83, and if the Court were to use some of the above-mentioned rates recently approved in this District for contingent class representation, it would be as low as 2.11.  This is customary and reasonable in the context of this litigation for several reasons.

First, as a general matter, courts in this Circuit regularly approve multipliers between one and four.  *See, e.g.*, *City of Greenville*, 904 F. Supp. 2d at 909 (citing *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (noting that the Seventh Circuit, and courts within it, regularly approve multipliers between one and four)).  In large cases like this one, moreover, empirical studies demonstrate that a multiplier of 2.83 is actually below average.  Rubenstein Decl. ¶ 34(b)

(discussing two empirical studies finding a 3.18 mean multiplier in cases with recoveries of over $175.5 million and a 4.5 mean multiplier in cases with recoveries over $100 million); *see also id.*, Exhibit E (listing more than 100 cases with a multiplier over 3).  From a macro perspective, therefore, the multiplier requested here is entirely ordinary.

Second, and more to the point, a multiplier of 2.83 is particularly reasonable under the facts of this case.  In the Seventh Circuit, multipliers should reflect the risks counsel faces *ex ante*.  *Harman*, 945 F.2d at 976 ("The [multiplier] level selected should, to the extent possible, be without regard to most developments during discovery and litigation because it is designed to reflect the riskiness of the case at the outset.").  "The multiplier is" therefore "determined by dividing 1 by the probability of success" at the outset of the case.  *City of Greenville*, 904 F. Supp. 2d at 909 (*quoting Florin*, 60 F.3d at 1248 n. 3).  Thus, the 2.83 multiplier is justified here if Plaintiffs had less than a 35% chance of prevailing when they filed suit (1/2.83=0.3533).  For all the reasons detailed above, this is certainly the case.  Again, Professor Silver called this "one of the riskiest" cases he had ever seen, Silver Decl. at 33, and Professor Rubenstein opined "Class Counsel had far less than a 33% chance of securing a $250 million settlement in this case," Rubenstein Decl. ¶ 39.

The lodestar cross-check readily confirms the reasonableness of Class Counsel's request.

## II.   Class Counsel's Requested Costs Are Reasonable.

"It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation."  *Beesley*, 2014 WL 375432, at *3 (Herndon, J.) (citing *Boeing*, 444 U.S. at 478).  Here, Class Counsel seek reimbursement of $6,971,852.80 in litigation expenses.  *See* Nelson Decl. ¶ 12.[12]  Seven million dollars is a lot of money, but, at 2.8% of the common fund, it is

---

[12] Class Counsel have provided a detailed summaries of their expenses, broken down into sixteen different categories.  This summary is sufficient for the Court to "perform its oversight function." *Schulte*, 805 F. Supp. 2d at 600 (relying on a "summary document" of expenses); *see also Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble*, 924 F.2d 633, 643 (7th Cir. 1991).

significantly less than the average costs awarded, which is approximately "4 percent of the relief for the class." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1041 (N.D. Ill. 2011) (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27, 70 (2004)).

Such costs are also commensurate with the stakes and duration of this litigation, and include, among other things, approximately: (1) $1.75 million for eleven highly-credentialed testifying experts instrumental to achieving class certification and defeating motions to dismiss and for summary judgment—most of whom submitted multiple reports, were deposed, and had prepared extensively for trial; (2) $1 million for consulting experts who advised Class Counsel on difficult legal issues and supported the testifying experts; (3) $918,000 to effectuate the Court-approved litigation notice plan; (4) $647,000 for the document review platform and services necessary to host hundreds of thousands of pages of documents and assist Counsel's review; (5) $636,000 for travel and accommodations connected with more than one hundred hearings and depositions, several critical in-person strategy meetings, a number of mediation sessions, and trial preparation; (6) $606,000 for the investigators whose work was critical to uncovering the fraud and establishing the money trail; (7) $541,000 for jury consultants and other trial preparation experts; (8) $236,000 for legal research fees, necessary to brief the extremely high volume of motions involving complex legal issues; (9) $193,000 for transcripts and court reporters; and (10) $108,000 for a limited number of document review attorneys[13] (given the complex nature of the circumstantial evidence and its relationship to the legal claims, Class Counsel could not rely on contract attorneys for the majority of the document review).

No doubt, this was an expensive case to prosecute.  But as this Court previously recognized, "Class Counsel had a strong incentive to keep expenses at a reasonable level due to the high risk of no recovery when the fee is contingent." *Beesley*, 2014 WL 375432, at *3

---

[13] *See, e.g.*, *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016) (awarding "$7,512,915.12 in expenses," including "a little more than $1 million" in expenses for "retaining contract attorneys to review" documents); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014) (holding that document review contract attorneys may be billed as costs).

(Herndon, J.).  Moreover, here, as in *Beesley*, "the fact that Class Counsel does not seek interest as compensation for the time value of money or costs associated with advancing these expenses to the Class makes this fee request all the more reasonable."  *Id.*  Class Counsel's expenses are justified in the context of this extraordinary case.

III.   **The Named Plaintiffs' Service Awards Are Reasonable.**

Plaintiffs request a service award of $25,000 for each of the three Class Representatives: Mark Hale, Todd Shadle, and Laurie Loger.  Each of them has invested significant time and resources in this litigation for more than six years by, among other things: reviewing pleadings, responding to discovery requests, producing documents, sitting for depositions, preparing for trial, and overseeing the litigation.  Nelson Decl. ¶ 11.  Each of them also served as class representatives in the underlying *Avery* action and thus have been committed to representing this same group of policyholders for more than 20 years.  *Id.*  Under these circumstances, a service award of $25,000 to each representative (which, together, amounts to 0.003% of the common fund) is reasonable and appropriate.  *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (upholding award of $25,000 to class representative); *Spano*, 2016 WL 3791123, at *4 (awarding $25,000 to two representatives and $10,000 to a third); *Beesley*, 2014 WL 375432, at *4 (Herndon, J.) (awarding $15,000 and $25,000); *Abbott v. Lockheed Martin Corp.*, No. 06-CV-701-MJR-DGW, 2015 WL 4398475, at *4 (S.D. Ill. July 17, 2015) (awarding $25,000); *Nolte v. Cigna Corp.*, No. 07-cv-2046, Dkt. 413 at 9 (C.D. Ill. Oct. 15, 2013) (same).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court award Class Counsel $6,971,852.80 as reimbursement of reasonable litigation costs and 33.33% of the common fund—including interest accrued thereon, but net of settlement administration costs—in attorneys' fees, and award the Class Representatives service awards of $25,000 each.

Dated: October 16, 2018

Respectfully submitted,

/s/ *Robert J. Nelson*
Elizabeth J. Cabraser
Robert J. Nelson
Kevin R. Budner
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000

Steven P. Blonder #6215773
Jonathan L. Loew
Much Shelist, P.C.
191 N. Wacker, Suite 1800
Chicago, IL 60606-2000
Tel: 312-521-2402

Robert A. Clifford #0461849
George S. Bellas
Kristofer S. Riddle
Clifford Law Offices
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602
Tel: 312-899-9090

John W. "Don" Barrett
Barrett Law Group, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095-0927
Tel: 662-834-2488

Brent W. Landau
Jeannine M. Kenney
Hausfeld, LLP
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: 215-985-3273

Patrick W. Pendley
Pendley, Baudin & Coffin, LLP
Post Office Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: 888-725-2477

Erwin Chemerinsky
University of California, Berkeley School of
Law
215 Boalt Hall,
Berkeley, CA 94720
Tel: 510- 642-6483

Thomas P. Thrash
Marcus N. Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: 501-374-1058

Richard R. Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, Mississippi 38655
Tel: 662-380-5018

1623666.2

Gordon Ball
Gordon Ball PLLC
550 Main Street
Bank of America Center, Ste. 600
Knoxville, TN 37902
Tel: 865-525-7028

*Class Counsel*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 7.1(b), I certify that a copy of the foregoing was served upon counsel via the Court's CM/ECF system.

/s/ *Robert J. Nelson*