## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK HALE, TODD SHADLE, and
LAURIE LOGER, on behalf of themselves and
all others similarly situated,

                Plaintiffs

      v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, and WILLIAM G. SHEPHERD,

           Defendants.

Case No. 3:12-cv-00660-DRH-SCW

Judge David R. Herndon

Magistrate Judge Stephen C. Williams

## DECLARATION OF PROFESSOR CHARLES SILVER IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

I, Charles Silver, declare as follows:

## I.    SUMMARY OF OPINIONS

This is an exceptionally important lawsuit. As I wrote when discussing the responsibilities of judges who preside over multidistrict litigations:

> The American civil justice system is miraculous. Because of it, our nation is uniquely devoted to the rule of law and the vindication of legal claims. But we must understand the miracle, if we are to preserve it. Structurally, the civil justice system works because parties represented by loyal advocates are able to try cases in front of judges and juries that are honest, independent, and neutral.

Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations*, 79 FORDHAM L. REV. 1985, 2003 (2011). This lawsuit was brought to preserve the miracle by exposing a conspiracy to deprive a class of millions of people of access to a neutral court. It is an example of private litigation at its finest.

Given the feelings just expressed, the Court should not be surprised to learn that I think it would be almost impossible to pay the lawyers who exposed the conspiracy too much. The integrity of the courts is worth virtually any price they might ask.

In fact, the lawyers have applied to the Court for an award of one-third of the common fund recovery, with expenses to be reimbursed separately. In view of the history of this litigation and the size of the settlement, this is a perfectly ordinary and reasonable request. Judges have granted awards of this size in comparable cases many times.

An award of one-third of the recovery should also preserve the incentive to prosecute high-stakes lawsuits, and that is the crucial point. When sophisticated business clients hire lawyers to handle large lawsuits on straight contingency, they typically pay fees in the range of 25 percent to 40 percent of the recovery, the higher figure being especially common when lawyers advance expenses, as Class Counsel did here. Because Seventh Circuit judges must "mimic the market" when awarding fees in class actions, the practices engaged in by sophisticated business clients are dispositive.

## II.    CREDENTIALS

I have testified as an expert on attorneys' fees many times. Judges have cited or relied upon my opinions when awarding fees in the following enormous cases, as well as many smaller ones: *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (30 percent fee award on recovery exceeding $1 billion); *In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330 (S.D. Florida 2011) (fee award of 30 percent on recovery of $410 million); *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($688 million fee award on a $7.2 billion recovery); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014) (awarding $544.8 million fee on recovery of $5.7 billion).

Because this lawsuit is pending in the U.S. District Court for the Southern District of Illinois, it bears special emphasis that I provided an expert report on fees in *Silverman v. Motorola, Inc*., No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012).  In that case, Judge Amy St. Eve, who now sits on the Seventh Circuit, approved a fee award of 27.5 percent on a recovery of $200 million.  The award was affirmed on appeal in an opinion by Judge Frank Easterbrook.  *Silverman v. Motorola Solutions, Inc*., 739 F.3d 956 (7th Cir. 2013).  Because Judge Easterbrook expressed a few qualms about the expert report I submitted in *Silverman*, I discuss his opinion further below.

Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then I have been a Visiting Professor at University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for 30 years.  I have published over 100 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Declaration.  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE

LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

My first publication after joining the Texas Law faculty, an analysis of the restitutionary basis for fee awards in class actions, appeared in 1991. Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL LAW REVIEW 656 (1991). My most recent publication in the field, an empirical study of fee awards in securities fraud class actions, appeared in the Columbia Law Review twenty-five years later. Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015) (*Is the Price Right?*). (The CORPORATE PRACTICE COMMENTATOR chose this article as one of the ten best in the field of corporate and securities law in 2016.) The study of attorneys' fees has been a principal focus of my academic career.

Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

I have attached a copy of my resume as Exhibit 1 to this declaration.

## III.   DOCUMENTS REVIEWED

When preparing this Report, I reviewed or was provided with the items listed below which, unless noted otherwise, were generated in connection with this case. I also reviewed other items including, without limitation, reported cases, published scholarly works, and secondary materials cited herein.

- The Retention Agreements of all three class representatives;

- State Farm's Motion to Dismiss (Dkt. 13) and the order denying it (Dkt. 67);

- State Farm's Petition for Writ of Mandamus and the order denying it (Dkt. 175);

- State Farm's Opposition to Plaintiffs' Motion for Class Certification (Dkt. 467) and the order granting class certification (Dkt. 556);

- State Farm's September 30, 2016, Petition for Permission to Appeal Pursuant to Fed. R. Civ. P 23(f) and the order denying it (Dkt. 572);

- State Farm's March 27, 2017, Petition for Permission to Appeal Pursuant to Fed. R. Civ. P 23(f) and the order denying it (Dkt. 618);

- State Farm's Motion for Summary Judgment on Grounds of *Rooker-Feldman*, *Res Judicata*, and Collateral Estoppel (Dkt. 646) and the order denying it (Dkt. 726);

- State Farm's Motion for Summary Judgment on Plaintiffs' RICO Claims (Dkt. 694) and order denying it (Dkt. 846);

- Memorandum and Order Granting Motions to Exclude the Reports and Testimony of Eric Adelstein and Martha McKenna (Dkt. 883);

- Memorandum and Order re Motions to Exclude the Reports and Testimony of Joanna M. Shepherd, Dolores K. Rinke, Sheila M. O'Brien, Michael T. Regan, Richard K. Means, Kent D. Redfield, Bruce Green, and Bruce Dubinsky (Dkt. 904);

- Memorandum and Order re Motions in Limine (Dkt. 905);

- Plaintiffs' Memorandum in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement (Dkt. 939), the September 4, 2018, transcript addressing it, and the order granting it (Dkt. 942);

- The Settlement Agreement (Dkt. 941);

- The Second Amended Class Action Complaint (Dkt. 943); and

- The Settlement Notice Plan (Dkt. 945) and the order approving it (Dkt. 947).

## IV.   JUDGES SHOULD MIMIC THE MARKET WHEN AWARDING FEES IN CLASS ACTIONS

Starting with the first article I published as a law professor, I have urged judges to base fee awards in successful class actions on market rates.  *See* Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL LAW REVIEW 656 (1991) (*Restitutionary Theory*).

Market rates comport with the law of restitution, the body of law upon which lawyers' rights to fee awards are based.[1]  Market rates also create desirable incentives while protecting class members against over-payments.

The year after my article appeared, the Seventh Circuit took the same position.  In *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 568 (7th Cir. 1992). Judge Richard A. Posner wrote that "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order."  *See also id.*, at 572 ("The object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible.").  From then on, the Seventh Circuit has adhered to this doctrine consistently.[2]

The rationale supporting the Seventh Circuit's approach is straightforward.  Market rates align lawyers' interests with clients' interests by compensating them for the risks and costs they bear and for the quality of the services they deliver, while also incentivizing them to maximize clients' recoveries.  *See In re Synthroid Marketing Litig.*, 264 F.3d at 731 ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its

---

[1] *Id.*, at 700.  *See also* Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985) ("Quasi-contract proceeds on the fiction of an implied promise to pay....  If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that.").

[2] *See, e.g.*, *Silverman*, 739 F.3d at 957 ("[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.").

performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."). By mimicking the fee arrangements employed in comparable litigations, judges can achieve the same ends without fear of awarding windfall fees.

The Seventh Circuit's approach best fulfills the requirement of due process, too. As the Supreme Court has explained, the Due Process Clause permits judgments and settlements in class actions to bind absent class members only when they are zealously represented by lawyers whose interests align with theirs. *Ortiz v. Fibreboard Corp*., 527 U.S. 815, 852 (1999) (rejecting a proposed settlement partly because "[c]lass counsel [] had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class"); *Hansberry v. Lee*, 311 U.S. 32 (1940) (denying *res judicata* effect to judgment in prior class action because class counsel represented class members with conflicting interests). Because fee award practices directly impact the extent to which the interests of class members and their lawyers harmonize, it is important for judges to regulate fees in desirable ways. *See* Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TULANE LAW REVIEW 1809 (2000) (explaining that percentage-based fee arrangements align the interests of lawyers and clients better than lodestar-based approaches).

In the market for legal services, good fee-regulation practices endure while bad ones are discarded. It therefore matters greatly that when sophisticated claimants, such as businesses seeking to enforce patent, antitrust, or other commercial claims, hire plaintiffs' attorneys on contingency, they almost always use percentage-based fee arrangements and they typically pay fees in the range of 25 percent to 40 percent. *See, e.g.*, §§ V-VI, *infra*. Sophisticated clients even agree to pay fees of this size in lawsuits with the potential to generate mega-fund recoveries—recoveries that exceed

$100 million. *See id.* Their actions show that contingent fees with sizeable percentage terms align the interests of clients and lawyers' interests more closely than available alternatives.

The mimic-the-market approach also provides an objective basis for fee awards. By awarding a market-based fee, a judge transfers only the amount of resources that is needed to acquire legal services on contingency, as demonstrated by actual transactions between clients and lawyers. Other approaches, which typically base awards on judges' subjective assessments of the importance of identified factors, are so malleable as to permit awards of every conceivable size. As Judge D. Brock Hornby observed in *Nilsen v. York County*, 400 F. Supp. 2d 266, 277–78 (D. Maine 2005), the multifactor approach "offers little predictability," "would support equally a fee award of 16%, 20%, 25%, 30%, or 33-1/3%," "is not a rule of law or even a principle," "allows uncabined discretion to the fee-awarding judge," employs "factors [that] seem inconsistent with ... [the goal of] creat[ing] incentives for the lawyer to get the most recovery for the class by the most efficient manner," and "consume[s] significant lawyer and judicial resources." Judge Easterbrook made the point more memorably, writing that "a list of factors without a rule of decision is just a chopped salad." *In re Synthroid Mktg. Litig.*, 264 F.3d at 719.

Finally, as I explained decades ago in *Restitutionary Theory*, the market-based approach meshes with the law of restitution, the body of law from which the power to award fees from common funds derives. Market value, often referred to as the provider's usual and customary charge, is a standard measure of recovery in restitution when services are supplied in the absence of

a contract setting the price.  *Restitutionary Theory*, at 700 ("Quasi-contractual damages usually equal the reasonable or market value of the service provided.").  Other commentators agree.[3]

It makes sense to use the market for this purpose.  Restitution provides for payments when, for various reasons, service recipients and service providers cannot bargain directly.  Had direct negotiations been possible, however, there is every reason to think that the parties would have settled on the going rate.  The recipient would have had no reason to pay more than the market price, it being demonstrably sufficient to obtain the service.  The provider would have had no reason to work for less, other available opportunities being more profitable.  The rate prevailing in the market is thus the most reliable measure of the terms that would have been agreed to in a voluntary exchange.

By studying the market for legal services, then, judges can learn how sophisticated clients with good incentives and information use fee arrangements to encourage plaintiffs' attorneys to provide zealous representation.  By mimicking the market when awarding fees in class actions, judges can give absent class members the greatest possible assurance of receiving the faithful representation that the law of due process requires without requiring them to overpay.

## V.   PERCENTAGE-BASED COMPENSATION DOMINATES THE MARKET FOR PLAINTIFF REPRESENTATIONS

When reviewing a fee application in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014),[4] U.S. District Court Judge John

---

[3] *See, e.g.*, Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985) ("Quasi-contract proceeds on the fiction of an implied promise to pay....  If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that."); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 49(3)(c) (2011) (identifying "the market value of the benefit" as a measure of recovery that is available when nonreturnable benefits like services are supplied).

Gleeson took note of a fact of which all judges are aware: When plaintiffs hire lawyers on contingency, the lawyer's compensation is almost always a percentage of the recovery.

> [T]he contingency fee model covers all sorts of plaintiffs' litigation, including cases where sophisticated individual clients have high-stakes, complex claims worth hundreds of millions of dollars.  [… [I]t is essentially unheard of for sophisticated lawyers to take on a case of this magnitude and type on any basis other than a contingency fee, expressed as a percentage of the relief obtained.

*Id*. at 440 (internal citation omitted).  *See also Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'") (original emphasis).[5]

This case provides corroborating evidence.  All of the named plaintiffs hired Class Counsel on contingency and agreed to pay 40 percent of their recoveries as fees.

The named plaintiffs here are individuals, not sophisticated business clients with sizeable assets and extensive experience dealing with attorneys.  But in hiring lawyers on contingency, the named plaintiffs made the same decision that sophisticated business clients do.  In the history of class action litigation in this country, named plaintiffs, including named plaintiffs that are sizeable

---

[4] Judge Gleeson's decision was reversed on other grounds in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016), *cert. denied sub nom. Photos Etc. Corp. v. Home Depot U.S.A., Inc.*, 137 S. Ct. 1374 (2017).

[5] *Kirchoff* was a constitutional tort case, not a business matter.  By hiring their lawyer on contingency, the plaintiffs did what personal injury clients almost always do.  In 1998, Professor Herbert Kritzer, now of the University of Minnesota Law School, published the results of a survey of Wisconsin lawyers that produced 511 usable responses containing information on 989 cases, including 332 that were unfiled, 390 that were filed but not tried, and 267 that went to trial.  Only 3 percent of the cases "involved a fee with a contingency element that did not conform to the standard percentage fee arrangement."  Interestingly, none of the variations Professor Kritzer described resembled the lodestar method; that is, none combined a contingent hourly rate with a multiplier.  Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL LAW REVIEW 267, 284-288 (1998).

businesses, have rarely hired lawyers on any other basis.[6] When acting as plaintiffs in large commercial lawsuits that are not class actions, business clients routinely hire lawyers on contingency too.

Abundant evidence supports this contention. When a research group to which I belong studied hundreds of settled securities fraud class actions, specifically looking for terms included in fee agreements between lawyers and investors seeing to serve as lead plaintiffs, all of the agreements we found provided for contingent percentage fees. *Is the Price Right?, supra.* This was to be expected. Over the course of my academic career, I have studied or participated in hundreds of class actions, many of which were led by sophisticated business clients. (I discuss two such cases, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, and *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), further below.) To the best of my recollection, I have encountered only one instance in which a lead plaintiff paid class counsel out of pocket. Even wealthy clients that, in theory, could have borne the litigation cost themselves used percentage-based compensation arrangements instead. Because these compensation arrangements dominate the market, judges bound to mimic the market should also use them when awarding fees from common funds.

---

[6] In *Trustees v. Greenough*, 105 U.S. 527 (1881), one of the seminal cases on fee awards in class actions, the named plaintiff paid a lawyer to wage a class action out of his own pocket.

## VI.    IN RISKY COMMERCIAL LAWSUITS, SOPHISTICATED CLIENTS OFTEN PAY CONTINGENT FEES OF 33.33 PERCENT OR MORE

### A.    Analytical Background

Having explained why Class Counsel's fee award should be set as a percentage of the $250 million common fund recovery, it remains to consider how large the percentage should be.  Because millions of plaintiffs have hired lawyers on contingency to handle cases of diverse types, the market for legal services is a rich source of information about the rates that prevail in different contexts.  In this section, I survey this evidence.

Before doing that, a few background points are in order.  First, fees vary.  Clients pay larger percentages in risky cases and smaller percentages in easier ones.  This is as it should be.  Plaintiffs' lawyers lend their money and their time on contingency: they get reimbursed for the expenses they incur and paid for the time they expand only when they win.  The greater the likelihood of losing, the larger the fee percentage must be to justify the non-recourse investment.  The same relationship exists in all contexts where investments are made.  Bigger risks require rewards.  But for the prospect of earning larger returns, investors would find safer havens for their capital.

Second, because the market for legal services is highly competitive, prevailing rates should be at the lowest levels sufficient to motivate lawyers to accept requests for representation.  This means that even unsophisticated clients should generally pay competitive prices for the services they receive.  That said, in this section I focus mainly on fees paid by sophisticated clients, such as businesses involved in commercial cases.  I do so because many people believe that personal injury plaintiffs and other individual clients are sometimes overcharged.  By contrast, business clients, who can compare prices and often require lawyers to compete head-to-head for their work, are unlikely to overpay for legal services.  As the Restatement (Third) of the Law Governing Lawyers observes, "Fees agreed to by clients sophisticated in entering such arrangements (such as a fee contract made

by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34, Cmt *c*.

Third, in the market for legal services, contingent fees are set when litigation begins, not when it ends. From this *ex ante* perspective, fee setting is a positive-sum game in which both plaintiffs and lawyers do better by setting fees at levels that maximize their joint wealth. It is not a zero-sum competition in which more for one party always means less for the other. A higher fee percentage can mean a larger expected net recovery for a plaintiff because it will motivate a lawyer will to work harder and expend more resources.

To see the point, consider how class members would fare if judges always set fees in class actions at zero percent of their recoveries. At the outset of litigation, a zero percent fee looks terrible to a class member (indeed, to any claimant) because no lawyer will take a case for that amount. When the fee is zero, the expected recovery net of fees is zero too. From an *ex ante* perspective, then, class members should always prefer positive fee percentages to zero percentages. More generally, they should prefer higher percentages to lower ones whenever higher percentages increase the expected value of their claims.[7]

Unfortunately, judges often lose sight of the interest class members have in paying adequate fees when they set fees in connection with class action settlements. When litigation ends, fee-setting

---

[7] *See Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) ("The goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee*. The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee.") (emphasis added). *See also In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F. Supp. 2d 732, 754 (S.D. Tex. 2008) ("A firm charging a higher fee may earn proportionally more for the class than one that charges less.").

appears to be a zero-sum game in which more for the lawyers means less for the class.  To make matters even worse, at the end of litigation the hindsight bias exerts additional downward pressure on fees by causing judges to underestimate the severity of the risks that existed when litigation began.  Unless judges hew to market-based standards, lawyers are likely to be underpaid.

In *In re Synthroid Mktg. Litig*., Judge Easterbrook emphasized the importance of using market rates to offset the hindsight bias.  When reversing the fee award, he wrote that

> On remand the district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed). The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers *never* wait until after recovery is secured to contract for fees. They strike their bargains before work begins. Ethically lawyers must do this, but the same thing happens in markets for other professional services with different (or no) ethical codes…. Only *ex ante* can bargaining occur in the shadow of the litigation's uncertainty; only *ex ante* can the costs and benefits of particular systems and risk multipliers be assessed intelligently….. [T]he court must set a fee by approximating the terms that would have been agreed to *ex ante*, had negotiations occurred.

264 F.3d at 718–19 (emphasis in original).

One of the problems that led to the reversal in *In re Synthroid Marketing Litig*. was the district court judge's decision to apply the so-called "megafund rule," according to which fees are capped at low levels when class actions generate enormous recoveries.  The Seventh Circuit had "never suggested that a 'megafund rule' trumps these market rates, or that as a matter of law no recovery can exceed 10% of a 'megafund' even if counsel considering the representation in a hypothetical arms' length bargain at the outset of the case would decline the representation if offered only that prospective return."  264 F.3d at 718.  "Private parties would never contract for such an

arrangement," he continued, "because it would eliminate counsel's incentive" to maximize the recovery.[8] *Id*.

### B.    Contingent Fees in Personal Injury Cases and Mass Tort Cases

Turning from theory to evidence, I will begin by briefly mentioning prevailing rates in the market for personal injury representations.  There is broad agreement that, in this practice area, contingent fees normally range from 25 percent to 40 percent,[9] are often higher in mass tort contexts,[10] and are higher still in medical malpractice cases, which are exceptionally risky.[11]

_____

[8] Judge Easterbrook's opinion notwithstanding, sophisticated business clients have capped lawyers' total fees in some instances.  Below, I discuss a patent case in which fees were capped at $500 million.  Of course, a cap that high is unlikely to diminish a lawyer's incentive to maximize the recovery.

[9] On fees in personal injury cases, see Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & Table 5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997) (reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee); Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 NEW YORK UNIVERSITY LAW REVIEW 805, 846 (2011) (reporting that "every one of the twelve [high volume plaintiffs' firms she] studied charge[d] a tiered contingency fee," with most charging "at least 33%--and perhaps as high as 40%").

[10] On fees in mass tort cases, see James S. Kaklik, et al., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983) (finding that asbestos claimants whose cases closed before August, 1982, paid legal fees and other litigation equal to about 42 percent of their recoveries); James S. Kakalik et al., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984) (finding that asbestos claimants paid legal fees and expenses equal to 39 percent of their recoveries). For anecdotal reports of fees in mass tort cases, see *In re A.H. Robins Co., Inc*., 182 B.R. 128, 131 (E.D.Va. 1995) (reporting that thousands of women injured by the Dalkon Shield signed contingent fee arrangements providing for fees between one-quarter and one-half of the recovery, with most charging one-third); Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, New York Times, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html (reporting that thousands of rescue and clean-up workers who were harmed as a result of the terrorist attacks on September 11, 2001, hired lawyers on terms requiring them to pay one-third of their recoveries); Martha Neil, *Frustration Over Uncontained Gulf Oil Spill—and Tort Claim*

Somewhat lower rates prevail in commercial airplane crash cases, where liability is usually conceded.[12] These variations show that the market for legal services works for individual claimants. Fees vary across contexts because cases of different types require lawyers to bear different risks.

Many judges have acknowledged that in personal injury cases market rates normally equal or exceed one-third of plaintiffs' recoveries. For example, in *Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir.1998), where he affirmed a 38 percent fee, Judge Posner stated that the market range for contingent fee cases is 33 percent to 40 percent. Other cases contain similar observations. *See, e.g.*, *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33% to 40% of the amount recovered."); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."); *In re M.D.C. Holdings Sec. Litig.*, No. CV 89-0090 E (M), 1990 U.S.

---

*Contingency Fees of Up to 50 Percent*, ABA Journal (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill-- and_tort_legal_fees_of_up_to_5/ (reporting that thousands of clients with claims against BP arising out of the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40 percent to 50 percent).

[11] On factors affecting the size of contingent fees charged in medical malpractice cases, see ABA/TIPS Task Force on Contingent Fees, Report on Contingent Fees In Medical Malpractice Litigation (September 20, 2004), available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf.

[12] *See id.*, at 27. *See also* ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily … [made] an early settlement offer and concede[d] all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery") (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 The Brief 4, 38 (November 1982)).

Dist LEXIS 15488 at *22 (S.D. Cal. Aug. 30, 1990) (noting fees typically in the range of 30-40 percent in private contingent fee agreements).

In this case, Class Counsel requests a one-third fee.  By comparison to personal injury cases and mass tort representations, this is a reasonable request.

### C.     Contingent Fees in Large Commercial Lawsuits

Turning now to business cases, I note first that we do not know as much about this segment of the market as we might.[13]   No publicly available database collects information about the contingent fees paid by business clients, and businesses that sue as plaintiffs rarely reveal their fee agreements.  Consequently, most of what is known is drawn from anecdotal reports.[14]  That said, the evidence available on the use of contingent fees by sophisticated clients shows that marginal percentages tend to be high.

### 1.     Patent Cases

Consider patent infringement representations.  There are many anecdotal reports of high percentages in this area.  The most famous one related to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law

---

[13] I have studied the costs insurance companies incur when *defending* liability suits.  *See* Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AMERICAN LAW AND ECONOMICS REVIEW 185 (2008).  Unfortunately, this information sheds no light on the amounts that businesses play when acting as plaintiffs.

[14] Businesses sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses.  In a recent case against Bank of America, for example, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery.  Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORPORATE COUNSEL (Online) April 9, 2010.  Hybrid arrangements hold few lessons for class actions, however, because lawyers representing plaintiff classes must work on straight contingency.

firm, Wiley Rein & Fielding ("WRF"), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.  Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement,[15] after securing a $501 million jury award against Boston Scientific.  Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA JOURNAL (May 20, 2008).[16] In yet another instance, the Texas law firm of McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc.  Penalties and interest added $90 million to the total.  The firm's share, under another *partial* contingent fee agreement, was reported to be $60 million, assuming the verdict held up.  Cheryl Hall, *Patents and Patience Pay Off for Dallas Law Firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010.

These reports are typical, not aberrations, as Professor David L. Schwartz found when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.  Professor Schwartz reported that, across the board, fee percentages were comparable to the fee requested here.

---

[15] In a partial contingent fee agreement, the contingent bonus, usually but not necessarily a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate.  Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide no guidance for fee percentages in securities class actions.

[16] The parties later settled the case for $50 million.  American Lawyer, Interest Award Brings Doctor's Judgment Against Johnson & Johnson to $593 Million In Patent Fight Over Stents, April 01, 2011, http://www.dicksteinshapiro.com/files/News/264f90ee-6c20-49c9-a487-98a0b5487d82/Presentation/NewsAttachment/af4ec2e6-3255-4a0b-b3d8-996140459f30/American%20Lawyer_Saffran.pdf.

On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges. There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate. Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery. The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased. Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335, 360 (2012). In a case like this one that lasted the better part of a decade and was settled only after trial had begun, the highest graduated rates would apply.[17]

Another example of the use of scaled contingent percentages in patent litigation appears in *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.— Houston, 2003), which involved a sophisticated client with an enormous intellectual property claim. The decision reports that the plaintiff agreed to pay his attorneys on the following terms. "Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million." *Id.* at 248-249. The agreement also contained other provisions favorable to the lawyers, including a

───────────────

[17] Professor Schwartz's findings are consistent with reports found in patent blogs. The following passage appeared in Matt Cutler, Contingent Fee Patent Litigation, and Other Options, Patent Litigation, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors—a strictly results-based system.

This item can now be found at http://patentlitigationstrategy.com/?page_id=30.

promise of "$100 million if they obtained a permanent injunction." "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id.* at 249. Like NTP in the *Blackberry* litigation, Tanox agreed to pay both a high percentage and a potentially enormous amount.

The payment of significant contingent fees in patent cases is not a new phenomenon. In 1993, the AMERICAN LAWYER ran a cover story featuring patent litigator Gerald Hosier, who, by handling cases on contingency, reportedly made over $150 million in a single year, "more than the draws of all the equity partners at New York's Cravath, Swaine & Moore and Chicago's Winston & Strawn combined." Stewart Yerton, *The Sky's the Limit*, AMERICAN LAWYER (May 1993). Nor was Hosier alone. According to an article published in 1997, attorney Alfred Engelberg, who began handling patent cases on contingency in 1985, earned fees in excess of $100 million by handling seven patent challenges on contingency. "On an hourly basis, even if the cases had been fully staffed, the cases would have produced a total of no more than ten to fifteen million dollars in billing." P.L. Skip Singleton, Jr., *Justice For All: Innovative Techniques for Intellectual Property Litigation*, 37 IDEA 605, 610 (1997).

Clearly, in the segment of the market where sophisticated business clients hire lawyers to litigate patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates. The reason is obvious. When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns. Clients still prefer this arrangement to bearing the risks and costs of litigation themselves, so they are happy to do so.

### 2.    Other Large Commercial Cases

Turning from patent lawsuits to business representations more generally, many examples show that compensation as a significant percentage of recovery is common. A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E). ETSI Pipeline Project (EPP) hired

V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part

to prevent EPP from constructing a $3 billion coal slurry pipeline.  In a sworn affidavit, Harry

Reasoner, then V&E's managing partner, described the financial relationship between EPP and

V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses
> as they were incurred, but all legal fees were contingent upon a successful outcome.
> We were paid 1/3 of all amounts received by way of settlement or judgment.  We
> litigated the matter for 5 years.  At the conclusion, we had settled with all defendants
> for a total of $634,900,000.00.  As a result, a total of $211,633,333.00 was paid as
> contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities

Litigation,* MDL No. 551 (D. Ariz., Nov. 30, 1990).

Several things about this example are noteworthy.  First, the contingency fraction was one-

third of the recovery in a massive case.  Second, V&E bore no liability for out-of-pocket expenses,

whereas in this case and the one that preceded it Class Counsel advanced millions of dollars to cover

costs and bore the risk associated with the loan until the end of litigation.  Third, the ETSI Pipeline

case was enormous, ultimately generating a recovery greater than $600 million and a fee north of

$200 million.  Fourth, the client was a sophisticated business with access to the best lawyers in the

country.  No claim of pressure or undue influence by V&E could possibly be made.

Based on what lawyers who write about fee arrangements in business cases have said,

contingent percentages of one-third or more remain common today.  In 2011, THE ADVOCATE, a

journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled

"Commercial Law Developments and Doctrine."  It included an article on alternative fee

arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee
> arrangement. In this scenario, a firm receives a fixed or scaled percentage of any
> recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the
> contingency is approximately 33%, with the client covering litigation expenses;

however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

A recent case shows, in monetary terms, that lawyers who handle business disputes on contingency can earn enormous premiums over their hourly rates. In 2012, the U.S. Court of Appeals for the Tenth Circuit decided a case involving a dispute over the fee a business client owed the law firm of Susman Godfrey ("SG"). SG had handled an oil and gas matter for the client on the following terms. "Under the Fee Agreement, [the client] agreed to pay [SG] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P*., No. 10-1248, (10th Cir. Feb. 16, 2012), available at http://law.justia.com/cases/federal/appellate-courts/ca10/10-1248/10-1248-2012-02-16.html. "*[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed*." *Id*. The fee agreement thus entitled SG to be paid $50 million for a year's worth of work—and that is what an arbitrator decided SG should receive, subject to an offset of less than $2 million that, for present purposes, is irrelevant. The Tenth Circuit ultimately affirmed the attorneys' fee award.

The National Credit Union Administration's (NCUA) experience in litigation against securities underwriters provides another recent example of fee terms that were successfully used in large, related litigations. After placing 5 corporate credit unions into liquidation in 2010, the NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks. To prosecute the complaints, which centered on sales of investments in

faulty residential mortgage-back securities, the NCUA retained two outside law firms, Korein Tillery and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on straight contingency. The original contract entitled the firms to 25 percent of the recovery net of expenses. As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which the NCUA had paid $1,214,634,208 in fees.[18]

When it retained outside counsel on contingency, NCUA knew that billions of dollars were at stake. The failed corporate credit unions had sustained $16 billion in losses, and the NCUA's object was to recover as much of that amount as possible. It also knew that dozens of defendants would be sued and that multiple settlements were possible. Even so, the NCUA agreed to pay a straight contingent percentage fee in the standard market range on all of the recoveries. It neither reduced the fees that were payable in later settlements in light of fees earned in earlier ones, nor bargained for a percentage that declined as additional dollars flowed in, nor tied the lawyers' compensation to the number of hours they expended.

In *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (D. Md. 2000), the bankruptcy trustee wanted to assert claims against Ernst & Young. He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery. Ernst & Young subsequently settled for $185 million, at which point the

---

[18] The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations:   Legal Services Agreement dated Sept. 1, 2009, https://www.ncua.gov/services/Pages/freedom-of-information-act/legal-services-agreement.pdf; National Credit Union Administration, Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx; Letter from the Office of the Inspector General, National Credit Union Administration to the Hon. Darrell E. Issa, Feb. 6, 2013, https://www.ncua.gov/About/leadership/CO/OIG/Documents/OIG20130206IssaResponse.pdf.

law firm applied for $71.2 million in fees, 21 times its lodestar.  The bankruptcy judge granted the request, writing: "Viewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range."  *Id*. at 335.

Examples of sizeable contingent fees can also be found in cases involving business clients that retained lawyers to participate on their behalf in class actions.  Judge Easterbrook mentioned several in his *Synthroid* opinion.  He reported that, *after a settlement was already on the table*,

> a group of more than 100 [third party payers] … contracted with two law firms to represent them…. [T]he contracts provided for a 25% contingent fee at maximum. The "Porter Wright Group" (18 [third party payers] referred to collectively by their law firm's name) also negotiated with and hired counsel. Their setup allowed each insurance company to pick one of two fee options. Either the client paid Porter Wright's full costs and 70% of its normal hourly fees each month, with a 4% of recovery kicker at the end, or the client paid only costs each month but had to pony up 15% of the final settlement. Insurers are sophisticated purchasers of legal services, and these contracts define the market. Unfortunately, though, they identify a market mid-way through the case, after defendants already had agreed to pay substantial sums.

*In re Synthroid Marketing Litig*., 264 F.3d at 727.  In *Synthroid*, the lawyers' job was merely to garner as large a portion of the settlement fund as possible for the third-party payers.  They bore minimal risk of non-payment.  Even so, their sophisticated clients promised them large percentage fees.  An even larger fee is obviously warranted in this case, where the non-payment risk was enormous, as discussed below.

*In re High Fructose Corn Syrup Antitrust Litigation* provides additional examples. According to Professor John C. Coffee, Jr., a nationally renowned authority on class actions who served as an expert witness in the case, the two named plaintiffs—Zarda Enterprises and Publix Supermarkets Inc.—agreed to pay fees of 30 percent and "more than 25%," respectively.  Gray & Co., an opt-out claimant, promised its lawyers 33 percent to 40 percent of the recovery in parallel

litigation, depending on the time of settlement. *Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2.

        **3.**      **Fees Sophisticated Business Clients Agree to Pay when Serving as Named Plaintiffs in Class Actions**

Sophisticated business clients also agree to pay fees in the indicated range when serving as lead plaintiffs in class actions.  Here are a few examples.

- In *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014), twelve business clients signed retainer agreements which generally provided that class counsel would receive one-third of the class-wide recovery.[19]

---

[19] Typical language read as follows:

   (a) Fees As Class Counsel

     (1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.

     (2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.

   (b) Fees Owed If Recovery Is Made Outside Of Class Action.

     In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed.  (The 35 percent fee was bargained down after initially being set at over 40 percent.)

- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio—Ct of Common Pleas), seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3 percent of the gross recovery obtained by settlement as fees, with a bump to 35 percent in the event of an appeal.  Expenses were to be reimbursed separately.

- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40 percent.

A series of related pharmaceutical antitrust cases provides a particularly compelling example.  The plaintiffs in these cases were 20 or so drug wholesalers who appeared as a class.  Many were large companies—several were of Fortune 500 size or bigger—and most or all had in-house or personal counsel monitoring the litigations.  The potential damages were enormous.  In one of the cases*, King Drug Company of Florence, Inc. v. Cephalon, Inc*., No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), the plaintiffs recovered over $500 million.  In the series as a whole, they won more than $2 billion.  In all of the cases that produced recoveries, the wholesalers actively supported fee awards in the normal range.  Many submitted declarations or letters urging judges to pay such

-26-

amounts.  Seeing that these sophisticated clients believed that class counsel should receive market rates despite the number and size of the recoveries, the presiding judges gave their opinions great weight.

The table below identifies the cases in which recoveries were obtained and describes the amounts recovered and the fees awarded in each.  As is apparent, the plaintiffs supported fees equal to one-third of the recovery in most of the cases.  Even in the largest settlement, they supported a 27.5 percent fee.

| TABLE 1.  RECOVERIES AND FEE AWARDS IN PAY-FOR-DELAY PHARMACEUTICAL ANTITRUST CASES, SORTED BY SETTLEMENT DATE | | |
|---|---|---|
| Case | Recovery (millions) | Fee Award |
| *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512 | 27.5% plus expenses |
| *In re Doryx Antitrust Litig.*, No. 12-3824 (E.D. Pa. Sept. 15, 2014) | $15 | 33⅓% plus expenses |
| *In re Neurontin Antitrust Litig.*, No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-cv-83 (E.D. Tenn. June 30, 2014) | $73 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.50 | 33⅓% plus expenses |
| *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.*, No. 07-142 (D. Del. May 31, 2012) | $17.25 | 33⅓% plus expenses |
| *In re DDAVP Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | $20.25 | 33⅓% plus expenses |
| *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49 | 33⅓% plus expenses |
| *Meijer, Inc. v. Abbott Labs.*, No. C07-5985 CW (N.D. Cal. Aug. 11, 2011) | $52 | 33⅓% plus expenses |
| *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35 | 33⅓% plus expenses |
| *In re Oxycontin Antitrust Litig.*, No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |

| TABLE 1. RECOVERIES AND FEE AWARDS IN PAY-FOR-DELAY PHARMACEUTICAL ANTITRUST CASES, SORTED BY SETTLEMENT DATE | | |
|---|---|---|
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75 | 33⅓% plus expenses |
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | $74 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |

I could add examples to those already discussed, but the point has already been made. When seeking to recover money in risky commercial lawsuits involving large stakes, sophisticated business clients often pay contingent fees in the neighborhood of 33.3 percent. They pay such percentage fees when the risks and costs of litigation warrant the expenditure, because they are better off hiring lawyers at market rates than giving up on their claims. To be clear, I am not saying that sophisticated business clients always pay fees in this range; they will pay less when they can hire competent lawyers on more attractive terms. The point is just that they know how the market for legal services works: risks require offsetting rewards.

The RICO class action that is currently before the Court on a motion to approve the proposed settlement was as risky as they come, for reasons discussed immediately below. In view of this, I conclude that the requested fee award of one-third of the common fund is reasonable. It is an amount that a sophisticated business client would willingly have agreed to pay Class Counsel at the outset of litigation.

### D.     An Analysis of Concerns Raised in *Silverman v. Motorola Solutions, Inc*.

In *Silverman v. Motorola Solutions, Inc*., 739 F.3d at 958, which involved a class action in which Judge St. Eve awarded 27.5 percent fee award on a recovery of $200 million, the Seventh

Circuit raised two points that merit discussion here.  First, the court observed that the expert report on fees in that case (which I submitted) did not "identify suits seeking more than $100 million in which solvent clients agree *ex ante* to pay their lawyers a flat portion of all recoveries, as opposed to a rate that declines as the recovery increases."  *Id.* at 959.  Second, although the Seventh Circuit affirmed Judge St. Eve's award, the court was concerned that she applied a flat percentage to the entire recovery instead of a scale of percentages that declined at higher recovery levels.  After noting that the Seventh Circuit had applied a declining scale in *In re Synthroid Marketing Litigation*,[20] Judge Easterbrook explained that declining marginal percentages make sense because of economies of scale associated with litigation.  *Id.*

To address the first point, this report describes:

- The patent litigation between NTP and Research In Motion, Ltd. in which NTP paid its lawyers a flat one third of $612.5 million;

- The ETSI Pipeline antitrust litigation, which applied a flat one-third fee to a gross recovery of $634.9 million; and

- Professor David Schwartz's study of patent lawsuits, which found that flat fees in the neighborhood of 40 percent predominate.

- *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (D. Md. 2000), where the bankruptcy trustee agreed to pay a flat 40 percent of the $185 million recovery— after finding that no law firm would accept a scale of declining marginal percentages, the type of arrangement that Judge Easterbrook prefers:

---

[20] *In re Synthroid Marketing Litigation*, 325 F.3d 974, 975 (7th Cir. 2003) ("*Synthroid II*").

- A raft of class actions in which sophisticated businesses agreed to pay flat contingent percentage fees (usually, one-third of the recovery) in cases with the potential to generate large recoveries; and

- The National Credit Union Administration's agreement to pay a flat 25 percent in a series of lawsuits that collectively recovered more than $5.1 billion.

These examples also address the Seventh Circuit's concern that the fee it upheld—27.5 percent of $200 million—"may be at the outer limit of reasonableness." *Silverman*, 739 F.3d at 959. In the market, sophisticated clients often agree to pay fees at or above 27.5 percent in cases with the potential to generate enormous recoveries, particularly when those cases present the degree of risk present in this litigation. It follows that judges who are bound to mimic the market should do so to.

I now turn to the contention that declining marginal percentages are preferable to level percentages because of the economies of scale associated with litigation. The simplest response to this assertion is that the market often disagrees. Although sophisticated clients sometimes use declining percentage arrangements, they do so mainly in securities class actions, where unique forces operate. To the best of my knowledge, in other contexts declining percentages are much less common. The *Silverman* court cited no evidence to the contrary.

Professor John C. Coffee, Jr., arguably the country's leading commentator on the economics of class litigation, agrees. In the declaration he filed in *In re High Fructose Corn Syrup Antitrust Litigation* in 2004, he reported being "aware that 'declining' percentage of the recovery fee formulas are used by some public pension funds" in securities cases, but added that he "ha[d] never seen such a fee contract used in the antitrust context; nor, in any context, ha[d he] seen a large corporation negotiate such a contract." In his experience, large corporations "have instead typically used straight

percentage of the recovery formulas." *Declaration of John C. Coffee, Jr*., submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004).

My efforts to learn about fee arrangements incline me to agree with Professor Coffee. When acting as plaintiffs, sophisticated business clients typically agree to pay flat percentages. But I also know that they occasionally use scales of a variety of types. For example, in *Enron*, the Regents of the University of California System adopted a scale of rising percentages, not declining ones. *In re Enron Corp. Sec., Derivative & ERISA Litig*., 586 F. Supp. 2d 732 (S.D. Tex. 2008). Much more recently, the law firm of Robbins Geller Rudman & Dowd LLP ("RGRD") put an *ex ante* fee agreement with a rising scale of percentages into the record in the *Household International* case, which happens to have been filed in a district court in the Seventh Circuit. *Lawrence E. Jaffe Pension Plan v. Household International, Inc*., Lead Case No 02-C-5893 (N.D. Ill.).[21] The agreement entitles the firm to 19 percent of the first $50 million, 22 percent of the next $100 million, and 25 percent of any greater amount. With $1.575 billion on the table—the eighth largest recovery in the history of securities fraud litigation—RGRD stood to collect $389 million, which the district court judge, in keeping with the contract, duly awarded. (The Order Awarding Attorneys' Fees and Expenses can be downloaded at http://householdfraud.com/docs/2265.pdf.)

Although some judges may think it foolish of a client to use anything but a declining scale, it is sensible to assume that sophisticated clients know what they are doing. In *Tanox*, for example, the contingent fee scale, which started out at 25 percent, rose to 33.3 percent, increased again to 40 percent, and finally returned to the original 25 percent, was part of an intricately structured

---

[21] I served as an expert witness in this case.

compensation arrangement that also included: a payment of $100 million if the lawyers secured a permanent injunction; payments out of future royalties and licensing fees; two fee caps tied to different components of the possible recovery; and a commitment to pay the lawyers the first $8 million of any settlement.  Given the thought that went into the compensation package, it seems likely that good reasons existed for using the rising-then-falling scale, even if those reasons are not obvious to an uninformed outsider.

A straightforward microeconomic case exists for using rising percentages as well, as Professor Coffee also explained.  Rising percentages incentivize lawyers to reject cheap settlements and hold out for higher dollars that are harder to obtain.  "[I]f courts were to ask what fee structure an informed, sophisticated client would use to compensate his attorney when close monitoring is not feasible," Coffee wrote,

> the most logical answer to this problem of premature settlement would be to base fees on a graduated, increasing percentage of the recovery formula—one that operates, much like the Internal Revenue Code, to award the plaintiff's attorney a marginally greater percentage of each defined increment of the recovery. While this approach cannot be said to eliminate the inevitable tension between the interests of plaintiff's attorneys and their clients in class actions, it can at least partially counteract the tendency for premature settlements.

John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law through Class and Derivative Actions*, 86 COLUMBIA LAW REVIEW 669, 697 (1986).  Rising marginal fee percentages encourage plaintiffs' attorneys to maximize clients' recoveries by rewarding them for bearing the added risks and costs that larger recoveries entail.  Declining percentages encourage cheap settlements by discouraging lawyers from incurring risks and costs.

An interesting question is why declining scales appear more often in securities class actions than elsewhere.  The explanation could lie in differences between these cases and class actions of other types, which arise in areas where certification is a bigger area and the law is less settled.  But

Professor Coffee provided a different speculation.  In his *High Fructose Corn Syrup* declaration, he suggested that the public pension funds that often serve as named plaintiffs in securities class actions

> prefer the "declining percentage" formula largely for political reasons, while private corporations disdain such formula for economic reasons. That is, public pension funds are frequently administered by elected political officials who are potentially subject to media and political criticism for conferring "windfall" fees on their attorneys. Necessarily, the seek to avoid criticism, and the declining percentage formula seems primarily a defensive strategy to protect political officials from such criticism. Corroborating this conclusion is the rareness of its use by private corporations (as Coca-Cola, PepsiCo and Admiral Beverage have implicitly confirmed in this case [by paying straight percentage fees in the typical range].

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004).  If Professor Coffee is right, managers of public pension funds are doing investors a disservice by using inferior fee arrangements.  They may look good because they seem to be keeping lawyers' fees low, but they are actually disserving investors by using fee formulas that encourage cheap settlements.

## VII.   RISK INCURRED

### A.   Personal Experience

I said above that this is one of the most important lawsuits of my lifetime.  It is also one of the riskiest, as every relevant metric shows.  This litigation took more than 6 years, involved a litigation class that was certified despite State Farm's opposition including two attempts at Rule 23(f) appeals, relied on an unprecedented RICO theory that faced sizeable legal hurdles, and required Class Counsel to conduct an extraordinary investigation with no help from public law

enforcement officials.[22]  That Class Counsel managed to secure a $250 settlement as the trial was about to begin is truly remarkable.

The Court knows a good deal about this lawsuit, the history of which Class Counsel's fee application also covers.  Consequently, there is no need for me to repeat all the details.  Instead, I will discuss the subject of risk from the perspective of an academic who studies class actions.

Before doing that, however, I wish to report that I have first-hand experience with the risks inherent in RICO class actions.  Many years ago, I served as co-counsel in *Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205 (5th Cir. 2003), a RICO class action brought against workers compensation insurers who were accused of deceiving state regulators and overcharging businesses for coverage.  The other lawyers and I won the week-long class certification hearing before Judge David Hittner hands down, and Judge Hittner wrote an opinion certifying a nationwide RICO class that, in my opinion as a lawyer and an academic, was bullet-proof—one of the best opinions certifying a class that I have ever read.  But we suffered a stunning reversal in the Fifth Circuit, which got the law of RICO causation wrong and tortured the trial court's record.  A decade later, the Supreme Court set matters straight in *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008), effectively abrogating *Sandwich Chef* as a precedent.[23]  The Supreme Court's decision leaves no room for doubt that Judge Hittner's class certification order should have been upheld, but by that point, it was too late for the plaintiffs in *Sandwich Chef.*

---

[22] The underlying *Avery* litigation was also certified as a litigation class despite State Farm's opposition, and tried to a jury, which awarded an enormous sum.  But after a decade of litigation against this well-funded foe, the case ended with a disastrous loss in the Illinois Supreme Court.

[23] *See David v. Signal Int'l, LLC*, No. CIV.A. 08-1220, 2012 WL 10759668, at *27 (E.D. La. Jan. 4, 2012) (observing that "*Bridge* overruled cases like *Sandwich Chef* to the extent that they conflicted with the decision by requiring first-party reliance as part of a RICO fraud claim").

The lesson of *Sandwich Chef* is clear.  One can have the law and the facts on one's side, create a fantastic record, obtain a favorable class certification ruling supported by a terrific opinion, and still lose.  In this case, of course, there was no clear law when the class action commenced, and the facts were entirely hidden from view.  If *Sandwich Chef* was risky, this litigation was riskier by far.

**B.    The Odds against Certifying a Nationwide RICO Class were Enormous**

When this lawsuit was filed in 2012, RICO classes certified for litigation were few and far between.  "Many courts ha[d] adopted essentially a per se view that fraud suits involving questions of individual reliance [we]re not suitable for class certification," as Professor Robert Klonoff pointed out.  Robert H. Klonoff, *The Decline of Class Actions*, 90 WASH. U.L. REV. 729, 793 (2013) .  Several sources show that the odds against having a nationwide RICO class certified were considerable.

- A 2004 study by Professors Theodore Eisenberg and Geoffrey Miller, who examined class actions that settled between 1993 and 2002, uncovered too few fraud class actions to mention.  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 27, 51 (2004).

- A 2010 study by Professor Brian Fitzpatrick, who built a dataset containing all federal class actions that settled in 2006 and 2007, found so few fraud cases that they did not even merit a separate category.  He lumped in with other consumer protection classes.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Award*s, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 818 (2010).

- A 2010 update of the study by Professors Eisenberg and Miller, which examined class actions that settled from 1993 to 2008, did not mention fraud class actions either.  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements:* 1993–2008, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248, 274 (2010).

- Fraud class actions were still too few in number to warrant a separate category in a further 2016 update of the same study, which looked at class actions that resolved between 2009 and 2013. Theodore Eisenberg, Geoffrey P. Miller, and Roy Germano, *Attorneys' Fees in Class Actions:* 2009-2013 NYU Law School Law & Economics Research Paper Series, Working Paper No. 17-02 (draft dated December 2016), available at https://ssrn.com/abstract=2904194.

In 2013, the year after this lawsuit was filed, Professor Pamela Pierson published an article based on her study of "all the RICO opinions rendered by the federal courts of appeals between 2005 and 2011," published and unpublished. Pamela Bucy Pierson, *RICO Trends: From Gangsters to Class Actions*, 65 SOUTH CAROLINA LAW REVIEW 213, 218 (2013).  In a section revealingly titled "Class Actions: The New Frontier For Civil RICO," Professor Pierson wrote as follows.

> Fifteen of the 157 civil RICO actions included in this study (10%) are class actions. More than one-third of the opinions in these class actions were rendered recently, in 2010 and 2011.  … Health care issues dominate the RICO class action cases: more than half of the RICO class actions allege some type of health care fraud, with pharmaceutical fraud as the predominant category. Using RICO to bring pharmaceutical fraud class actions is a recent phenomenon: all of the pharmaceutical fraud opinions in this sample were rendered in 2010 and 2011. Indeed, no RICO pharmaceutical fraud decisions were rendered prior to 2010. Perhaps most telling is that all of the decisions in RICO class actions rendered in 2011 alleged pharmaceutical fraud.

*Id*. at 257-258.

Professor Pierson's count of certified RICO class actions, said to number 15 in all, is actually far too high. She includes many cases in which classes were plead but not certified or in which certification decisions by trial courts were reversed on appeal. She also includes a prisoner case and an employment discrimination case that bear no resemblance to commercial litigations. But even taking her numbers at face value, one thing stands out: When this lawsuit was filed in 2012, it had no precedent. Class Counsel set out into uncharted ground.

### C.     The Risk of Losing Before Trial, At Trial, and After Trial

The prospect that class certification would be denied was but one of the risks Class Counsel bore. The class' complaint could have been dismissed on motion before trial, either before the certification stage or thereafter. "A study by the Federal Judicial Center [] found that '[t]he vast majority of cases that were certified as class actions were also the subject of rulings on motions to dismiss, motions for summary judgment, or the setting of a trial date.'" Charles Silver, *"We're Scared to Death": Class Certification and Blackmail*, 78 NEW YORK UNIVERSITY LAW REVIEW 1357, 1392-93 (2003) (quoting Thomas E. Willging et al., EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 60 (1996)).

Although statistics for RICO class actions do not seem to be available, studies of securities fraud class actions find that dismissals on dispositive motions are common. Studying securities cases that were filed and resolved between 2002 and 2012, NERA Economic Consulting found that defendants filed dismissal motions 94 percent of the time. In 8 percent of those cases, plaintiffs responded by voluntarily dismissing their actions—suggesting that the dismissal motions drove them away. Of the cases that remained alive, judges granted these motions, in whole or in part and with prejudice or without, a whopping 58 percent of the time. Stefan Boettrich and Svetlana Starykh,

*Recent Trends in Securities Class Action Litigation: 2017 Full-Year Review* 18 (NERA Economic Consulting, 2018).

In this case, the risk of dismissal was especially great. Because securities cases are so numerous, the law has developed extensively over the years. This large body of precedent should make the sufficiency of pleadings fairly obvious and judges' rulings fairly predictable. RICO cases are far less common. Consequently, the law that governs them is less mature and predictions are less reliable.

Dismissal must have seemed especially likely here because the defendants had so many grounds to assert that might have ended the case: statute of limitations; *Rooker-Feldman*; RICO proximate cause; RICO damages; claim and issue preclusion; and *Noerr-Penington*. If the defendant's odds of winning on each of these six grounds were only slightly positive, say 10 percent, Class Counsel's prospects for defeating all six objections were only about 50 percent. If the defendant's odds of winning on each ground were 20 percent, there was only a 26 percent that the class action would remain alive.

The conventional wisdom is that once a class is certified, a hefty settlement is assured because no defendant can bear the risk of trying a class suit. This is not true. "Many [certified class actions] end in dismissals, not settlements." Silver, *"We're Scared to Death," supra*, at 1399. *Klay v. Humana Healthcare, Inc.,* 382 F.3d 1241 (11th Cir. 2004), one of the only certified RICO classes to have been upheld on appeal before 2012, punctuates the point. Despite their success on certification, the *Klay* plaintiffs lost on summary judgment. Their procedural victory was pyrrhic.

Here, even if Class Counsel had won at trial, there was no guarantee of keeping the verdict. There are several class actions, including the underlying matter, in which plaintiffs' lawyers won class-wide trial verdicts only to have them taken away by judges or vacated on appeal. *Lawrence E.*

*Jaffe Pension Plan v. Household International, Inc.*, Lead Case No 02-C-5893 (N.D. Ill.), demonstrates this risk vividly. After the case was tried to a jury, which returned a verdict for the Class in the amount of $2.46 billion, the defendant appealed and Seventh Circuit remanded the case for a new trial on loss causation, damages, and the Individual Defendants' authorship of statements upon which liability was predicated. The loss not only voided the verdict; it saddled class counsel with more than $13 million in costs—the price the defendant had paid for the supersedeas bond, which class counsel had insisted upon. *Pickett v. Tyson Fresh Meats, Inc.* 420 F.3d 1272 (11th Cir. 2005), provides another example. There, the district court judge overturned a $1.3 billion verdict and granted the defendant judgment as a matter of law.

## VIII.   FEE AWARDS IN COMPARABLE LITIGATIONS

### A.   Judges Often Reject the "Increase/Decrease" Rule

Some people contend that judges always reduce fee percentages considerably when class actions settle for enormous amounts. The belief that judges reflexively adhere to the so-called "increase/decrease" rule—the rule that fee percentages must decline as recoveries rise—is false, however, and I therefore begin this section by laying it to rest. Table 2, which occupies the next 5 pages, lists more than 60 cases with recoveries of at least $100 million and fee awards of at least 25 percent.

| TABLE 2. MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 1 | *In re TFT-LCD (Flat Panel) Antitrust Litig..*, 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) | $1,080 | 28.60% |
| 2 | *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,060 | 31.33% |

| | TABLE 2. MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 3 | *In re: Urethane Antitrust Litig.*, No. 04-1616-JWL, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016) | $974 | 33.33% |
| 4 | *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112 (N.D. Ill. Feb. 10, 2000) | $697 | 25.00% |
| 5 | *Kirk Dahl et al. v. Bain Capital Partners LLC et al.*, No. 1:07-cv-12388 (D. Mass. Jan. , 2015) | $590 | 33.00% |
| 6 | *In re Fructose Antitrust Litig.*, MDL No. 1087, Master File No. 94-1577 (C.D. Ill. Oct. 4, 2004) | $531 | 25.00% |
| 7 | *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015 | $512 | 27.50% |
| 8 | *In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 9 | *Spartanburg Regional Health Services Dist., Inc., et al. v. Hillenbrand Industries, Inc. et al.*, No. 7:03-2141-HFF (D. S.C. Aug. 15, 2006) | $468 | 25.00% |
| 10 | *San Allen, Inc. v. Buehrer, Admin., Ohio Bureau of Workers' Compensation*, CV-07-644950 (Common Pleas, Cuyahoga Cty, OH Nov. 25, 2014) | $420 | 32.70% |
| 11 | *In Re (Bank of America) Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) | $410 | 30.00% |
| 12 | *Cook v. Rockwell Int'l Corp. and The Dow Chemical Co., 1:90-cv-00181-JLK Document 2468 Filed 04/28/17* | $375 | 40.00% |
| 13 | *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 14 | *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation,* No. M:02-cv-01486-PJH, MDL-02-1486  (N.D.  Cal. Nov. 1, 2006) | $326 | 25.00% |

| | TABLE 2. MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 15 | *In re Neurontin Marketing and Sales Practices Litig.*, Civil Action No. 04-10981-PBS (Nov. 10, 2014) | $325 | 28.00% |
| 16 | *In re Rite Aid Corp. Sec. Litig. (Rite Aid I)*, 146 F.Supp.2d 706 (E.D.Pa.2001)($193 million) & *In re Rite Aid Corp. Sec. Litig. (Rite Aid II)*, 362 F.Supp.2d 587 (E.D.Pa.2005) ($126 million) | $319 | 25.00% |
| 17 | *Cooper v. IBM Personal Pension Plan*, 2005 WL 1981501 (S.D. Ill. 2005)[1] | $314 | 28.30% |
| 18 | *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-FHM (N.D. Okla. Feb. 12, 2007) | $311 | 25.00% |
| 19 | *In re Managed care Litig. (Aetna)*, 2003 WL 22850070 (S.D. Fla, Oct. 24, 2003; and *In re Managed Care Litig. (Cigna)*, 1:00-1334-MD-01334 (S.D. Fla Feb. 2, 2004)[11] | $310 | 35.50% |
| 20 | *DeLoach V. Phillip Morris Cos.*, No. 1:00CV01235, 2004 WL 5508762 (M.D.N.C. Mar. 31, 2005 | $310 | 27.00% |
| 21 | *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (S.D.N.Y. June 2003) | $300 | 28.00% |
| 22 | *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT) (D. Ct. Dec. 9, 2014) | $297 | 33.33% |
| 23 | *Sullivan v. DB Investments, Inc.*, 04-CV-2819 (SRC) (May 22, 2008) (DeBeers antitrust litigation) | $292 | 25.00% |
| 24 | *In re Tricor Direct Purchaser Litig.*, D. Del. 05-340-SLR, Doc. No. 543 (2009) | $250 | 33.33% |
| 25 | *In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz. July 24, 1990)[2] | $250 | 26.60% |
| 26 | *In re Comverse Technology, Inc. Securities Litig.*, 2010 WL 2653354, 6 (E.D.N.Y., 2010) | $225 | 25.00% |
| 27 | *In re Buspirone Antitrust Litig.*, No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[3] | $220 | 33.30% |

| TABLE 2. MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 28 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30.00% |
| 29 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30.00% |
| 30 | *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) | $200 | 27.50% |
| 31 | *In re Neurontin Antitrust Litigation*, D.N.J. 2:02-cv-01830, Doc. No. 114 | $190 | 33.33% |
| 32 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.*, No. 91-05637 (116th Dist. Ct, Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 33 | *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D.Tex.1999)[4] | $190 | 25.00% |
| 34 | *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000)[5] | $185 | 40.00% |
| 35 | *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D. Okla. Jan. 2, 1990) | $185 | 30.00% |
| 36 | *In re Relafen Antitrust Litig., No. 01-12239*, 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) | $175 | 33.30% |
| 37 | *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519 (D.N.J. Jan. 30, 2013) | $164 | 27.50% |
| 38 | *Standard Iron Works v. Arcelormittal et al.*, No. 08-C-5214 (N.D. Ill., Oct. 22, 2014) | $164 | 33.33% |
| 39 | *In re Titanium Dioxide Antitrust Litig.*, 10-CV-00318 (D. Maryland, Dec. 13, 2013) | $164 | 33.33% |
| 40 | *In re: (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Dec., 19, 2012) | $162 | 30.00% |
| 41 | *Chieftain Royalty Co. v. QEP Energy Co.*, Case No. CIV-11-212-R (W.D. Okla. May 31, 2013) | $155 | 30.00% |

| | TABLE 2. MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 42 | *MBA Surety Agency, Inc. v. AT&T Mobility LLC*, No.1222-CC09746 (Mo. Cir. Ct. Mar. 7, 2013) | $152.6 | 25.00% |
| 43 | *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) | $150 | 33.33% |
| 44 | *In re: Managed Care Litig.*, No. 00-MD-1334, MDL1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003 | $150 | 29.00% |
| 45 | *In re Apollo Group Inc. Securities Litigation*, 2012 WL 1378677, at *9 (D. Ariz., April 20, 2012) | $145 | 33.00% |
| 46 | *In re: (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Mar. 12, 2013) | $137.5 | 30.00% |
| 47 | *In re Computers assocs. Class Action Sec. Litig.*, CV-98-4839 (TCP) (E.D. NY 2003)[6] | $136 | 25.00% |
| 48 | *In re Informix Corp. Sec. Litig.*, Master File No. C-97-1289-CRB (N.D. Cal. Nov. 2, 1999) | $132 | 30.00% |
| 49 | *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36.00% |
| 50 | *In re Infant Formula Antitrut.*, MDL No. 878, (N.D. Fla. Sept. 7, 1993) | $125 | 25.00% |
| 51 | *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30.00% |
| 52 | *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475-NRB (S.D.N.Y.2005) | $120 | 28.00% |
| 53 | *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 | 27.50% |
| 54 | *In re OSB Antitrust Litig.*, Master File No. 06-826 (March 4, 2009) | $111 | 33.30% |
| 55 | *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30.00% |

| | **TABLE 2. MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE** | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 56 | *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D. Tex. Apr. 9, 2010) | $110 | 30.00% |
| 57 | *In re Cardizem CD Antitrust Litig.*, No. 99-MD-1278, at 18-20 (E.D. Mich. Nov. 26, 2002) | $110 | 30.00% |
| 58 | *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F.Supp. 97 (S.D.N.Y.1996) | $110 | 27.00% |
| 59 | *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323 (S.D.Fla.2001) | $110 | 25.00% |
| 60 | *In re Automotive Refinishing Paint Antitrust* Litigation, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 61 | *City of Greenville v. Syngenta Crop Protection,* No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 | 33.33% |
| 62 | *In re Prison Realty Sec. Litig.,* Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30.00% |
| 63 | *In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation,* 3:09-md-02032-MMC (D. N.J. 2012) | $100 | 25.00% |

[1] The Court awarded a graduated amount ranging from 17–29% of the recovery. After an appeal reversed a portion of the award, this table reflects the actual settlement and fee realized.

[2] The Court awarded an increasing graduated amount (25% of the first $150 million and 29% of any larger amount). This table reflects the values realized.

[3] The global settlement exceeded $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

[4] The Court awarded 25% in five settlements and a 15% fee award in two others. This table lists $190 million, the total recovery from all settlements.

[5] While technically not a class action, this case is equivalent to a class-action in which the fee was negotiated *ex ante*.

[6] The settlement fund was paid in shares of stock. Class counsel received a percentage of the stock as fees.

| TABLE 2. MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| [7] The attorneys' fee award was not part of the final judgment. The settlement notice stated that class counsel would request 20% of the recovery as fees and the final judgment approved the settlement. | | | |
| [8] This amount reflects only the cash relief. Additional non-cash relief was valued at $30 million. | | | |
| [9] The fund amount excludes $10 million in a "Promotional Achievement Fund" and $43.5 million in "future pay equity adjustments." | | | |
| [10] For a summary of the first four settlements in this case, which totaled $82,245,000.00, see Decl. of Anthony J. Bolognese, Esq. in Supp. of Pls.' Mot. for Interim Award of Att'ys Fees & Expenses, In re EPDM, No. 3:03md1542, Doc. #373-3 (April 27, 2007) (hereafter "Declaration"). See also id., Doc. #574 (Oct. 1, 2010) (ruling on attorneys fees and expenses regarding the final $25 million settlement) | | | |
| [11] Value of the combined settlements taken from Judge Gold's opinion in *Allapattah v. Exxon*. | | | |

The truth is simple. Judges award fees that, in their judgment, are warranted by the facts, and, when the facts warrant, they are perfectly willing to grant fees in the ordinary range in cases that generate enormous recoveries. In fact, judges' track record of awarding fees of 25 percent or more in mega-fund cases is much stronger than Table 2 indicates, for three reasons. First, Table 2 is not comprehensive. When I update it, which I do from time to time, I usually find old settlements that meet its criteria of which I was previously unaware. There are undoubtedly more class actions with settlements north of $100 million and fee awards of 25 percent or more than I have identified.

Second, I have not adjusted settlement values for inflation. Expressing them in current dollars would greatly increase the number of settlements above $100 million. For example, a case with a 25 percent fee award that settled for $54 million settlement in 1990 would merit inclusion because $54 million in 1990 dollars is worth over $100 million today. An inflation adjustment would increase the size of Table 2 greatly.

Third, an inflation adjustment would also make many of the settlements that are in Table 2 seem much larger. Consider *Allapattah Services*, case number 2 in Table 2, which settled for $1.06 billion in 2006. In current dollars, the *Allapattah Services* settlement is worth about $1.3 billion.

Likewise, the $697 million recovery won in *In re Brand Name Prescription Drugs Antitrust Litig.* in 2000, case number 4 in Table 2, is worth almost $1 billion today.  Because the failure to adjust for inflation understates the size of the settlements, it also understates judges' willingness to award fees of 25 percent or more in mega-fund cases.

Finally, it bears repeating that the Seventh Circuit has not embraced the "increase/decrease" rule.  It requires judges to mimic the private market for legal services, as previously explained.  By and large, sophisticated commercial clients have not endorsed the rule, as previously explained.  Consequently, the Court should not embrace it either.

### B.      Cases Comparable to This One

Having laid the "increase/decrease" rule to rest, I will now discuss a few class actions with comparable risks and results.  The discussion will unavoidably seem strained, because in many respects this case is unique.  It is the only case I know of in which a follow-on lawsuit was brought to recover damages in the amount of a trial verdict won and then reversed in a prior action.  It is also the only example I have in which a settlement was secured after two litigation classes were certified in separate lawsuits brought years apart.

In having gone to trial twice, once in the underlying matter and a second time here, this litigation resembles *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), case number 2 in Table 2.  *Allapattah Services* was tried twice, first to a hung jury and a second time to a plaintiffs' verdict.  When the case finally resolved almost a decade and a half after it started, the trial judge awarded class counsel 31.3 percent of $1.06 billion.

Table 2 also lists two other class actions that produced mega-fund settlements after being tried to favorable verdicts.  One is *San Allen, Inc. v. Buehrer, Admin., Ohio Bureau of Workers' Compensation*, CV-07-644950 (Common Pleas, Cuyahoga Cty, OH Nov. 25, 2014), case number 11, which yielded a $420 million recovery.  The litigation was remarkable in several respects, one of

which was that the complaint sought almost a billion dollars in damages from a sovereign state, an unheard-of sum for a governmental entity to pay.  The case resolved after 7 years of hard-fought litigation, during which class counsel prevailed on class certification after a contested trial court hearing, fended off challenges to the class on appeal (twice), won a bench trial that lasted 7 days, and obtained a judgment in excess of $859 million, $651 million of which was preserved on appeal.  The fee award was 32.7 percent.

The second tried case was *In re Urethane Antitrust Litigation*, MDL No. 1616, No. 04-MD-1616-JWL (D. Kansas July 29, 2016), case number 3 in Table 2.  There, the total recovery was $974 million, $835 million of which was wrested from a single defendant, The Dow Chemical Company ("Dow"), following a month-long jury trial that produced a $1.06 billion judgment (after trebling) for the class.  The litigation lasted about 12 years, during which time class counsel fended off two rounds of dismissal motions, convinced the Court to certify an antitrust class for trial, defeated the defendant's efforts to have certification reversed on interlocutory appeal, undertook a staggering amount of discovery that included taking depositions in foreign countries and obtaining documents located abroad, and defended the verdict on appeal.  There was also a sizeable risk that the Supreme Court would upset the applecart.  It took Dow's petition for certiorari under advisement while considering *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036 (2016).  A pro-defendant decision in *Tyson Foods* would have forced reconsideration of the class certification decision in *Urethane* and possibly wiped out the trial verdict.  The continuing dispute with Dow settled while *Tyson Foods* was pending.  The fee award was 33.3 percent.

*Lawrence E. Jaffe Pension Plan v. Household International, Inc*., Lead Case No 02-C-5893 (N.D. Ill.), which I discussed in detail above, is also comparable in several respects.  It settled for $1.575 billion on the eve of a second trial, the first trial having produced a plaintiff verdict that was

reversed on appeal.  Reflecting the contract with the lead plaintiff, which entitled class counsel to 19 percent of the first $50 million, 22 percent of the next $100 million, and 25 percent of any greater amount, the court awarded 24.6 percent of the recovery as fees—an amount just below the cutoff for Table 2.  As mentioned, *Household International* was a securities fraud case.

Finally, although it was a lawsuit of an entirely different type, the litigation arising out of pollution at the Rocky Flats Nuclear Weapons Plant, number 12 in Table 2, provides an interesting comparison.  *See Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498 (D. Colo. Apr. 28, 2017).  The case lasted 27 years, involved a certified class of property owners and a novel liability theory, was tried over a period of 4 months in 2005 and 2006, produced a verdict for $377 million which rose to $926 million when prejudgment interest was included, was tossed out on appeal, was dismissed on preemption grounds in the trial court post-reversal, was reinstated by the court of appeals, and was up for review in the Supreme Court when the parties settled for $375 million.  The trial judge awarded class counsel 40 percent of the recovery.

I cannot say which of the cases just described resembles this litigation most closely.  But I can say that all of them produced mega-fund settlements because lawyers were willing to bear enormous risks and costs.  Class Counsel has done the same here, with comparable results, and deserves a similar percentage-based fee award.  The Court has discretion to grant Class Counsel's request for one-third of the recovery as fees, and I urge it to do so.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  October 15, 2018

_____
CHARLES SILVER

**EXHIBIT 1: RESUME OF PROFESSOR CHARLES SILVER**

**CHARLES SILVER**
Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

Charles Silver holds the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the School of Law at the University of Texas at Austin.  He has published widely in law reviews and peer-reviewed journals.  His articles use economic theory, philosophical and doctrinal reasoning, and empirical methodologies to shed light on issues arising in the areas of civil procedure, liability insurance, and the professional regulation of attorneys.  He has written about group lawsuits (including class actions and other mass proceedings), attorneys' fees (including contractual compensation arrangements, common fund fee awards, and statutory fee awards), and professional responsibility (focusing on lawyers involved in civil litigation on behalf of plaintiffs and defendants).  In recent years, as Co-Director of the Center on Lawyers, Civil Justice and the Media at the University of Texas, he has worked with a group of empirical researchers on a series of studies of medical malpractice litigation in Texas.  The research group's findings are to appear in a book with the working title "To Sue is Human" on Yale University Press.

Professor Silver served as Associate Reporter on the Principles of the Law of Aggregate Litigation, published by the American Law Institute in 2010.  He taught as a Visiting Professor at the Harvard Law School, the University of Michigan Law School, and the Vanderbilt University Law School.

Professor Silver has given many presentations at academic conferences, including programs sponsored by the American Law and Economics Association, the Conference on Empirical Legal Studies, the Law & Society Association, RAND, and the Searle Center on Law, Regulation and Economic Growth.  He has also spoken at faculty colloquia at law schools across the U.S.

Professor Silver often consults with attorneys and serves as an expert witness.  He has strong ties with all segments of the litigating bar.  On the plaintiffs' side, he submitted an expert report on attorneys' fees in the massive Enron settlement and served as professional responsibility advisor to the private attorneys who handled the State of Texas' lawsuit against the tobacco industry.  On the defense side, he advises on the responsibilities of lawyers retained by insurance carriers to defend liability suits against policyholders.  Professor Silver has also testified to legislative committees and submitted amicus curiae briefs to courts on topics ranging from class certification to lawyers' fiduciary duties to medical malpractice litigation.

In 2009, the Tort Trial & Insurance Practice Section (TIPS) of the ABA awarded Professor Silver the Robert B. McKay Law Professor Award for outstanding scholarship on tort and insurance law.

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## CONTACT INFORMATION

Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705

(512) 232-1337 (voice)

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-2015
    Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
    W. James Kronzer Chair in Trial & Appellate Advocacy
    Cecil D. Redford Professor
    Robert W. Calvert Faculty Fellow
    Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
    Assistant Professor

University of Michigan Law School, Fall 2018
    Visiting Professor

Harvard Law School, Fall 2011
    Visiting Professor

Vanderbilt University Law School, Fall 2003
    Visiting Professor

University of Michigan Law School, Fall 1994
    Visiting Professor

University of Chicago, 1983-1984
    Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) 1979

# PUBLICATIONS

## SPECIAL PROJECTS

Associate Reporter, American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, (2010) (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN CLASS ACTION LITIGATION, 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MASS TORT LITIGATION, 42 Tort Trial & Insurance Practice Law Journal 105 (2006), available at http://www.jstor.org/stable/25763828

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MEDICAL MALPRACTICE LITIGATION (2004) available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf; published at 25 Rev. Litig. 459 (2006).

Co-Reporter, International Association of Defense Counsel PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

## BOOKS

MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (in progress).

OVERCHARGED: FROM MEDICARE TO OBAMACARE AND BEYOND (with David A. Hyman) (Cato Institute, 2018).

HEALTH LAW AND ECONOMICS, Vols. I and II (Edward Elgar 2016) (coedited with Ronen Avraham and David A. Hyman).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, 2nd Edition (2012) (with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (updated annually).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (2012) (with William T. Barker) (updated annually through 2017).

## ARTICLES AND BOOK CHAPTERS BY SUBJECT AREA (* INDICATES PEER REVIEWED)

### Health Care Law & Policy

1. "There is a Better Way: Give Medicaid Beneficiaries the Money," Annals of Health Law (forthcoming 2019) (invited symposium on Health Care and Policy).

2.      "Medical Malpractice," Oxford Research Encyclopedia of Economics and Finance (forthcoming 2019) (with David A. Hyman).*

3.      "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," in I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds., OXFORD HANDBOOK OF AMERICAN HEALTH LAW (2017) (with David A. Hyman).*

4.      "Compensating Persons Injured by Medical Malpractice and Other Tortious Behavior for Future Medical Expenses Under the Affordable Care Act," 25 Annals of Health Law 35 (2016) (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger).

5.      "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," 63 DePaul L. Rev. 574 (2014) (with David A. Hyman) (invited symposium).

6.      "Five Myths of Medical Malpractice," 143:1 Chest 222-227 (2013) (with David A. Hyman).*

7.      "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

8.      "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" in Ken Oliphant & Richard W. Wright, eds., MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (2013) (coauthored with David A. Hyman)*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

9.      "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).*

10.     "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

11.     "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

12.     "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

13.     "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

14.     "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

15.     "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

16.   "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).*

## Empirical Studies of Medical Malpractice Litigation

17.   "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010," 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

18.   "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

19.   "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

20.   "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

21.   "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

22.   "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

23.   "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

24.   "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

25.   "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

26.   "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

27.   "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

28.   "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

29.   "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

## Empirical Studies of the Law Firms and Legal Services

30.   "Screening Plaintiffs and Selecting Defendants in Medical Malpractice Litigation: Evidence from Illinois and Indiana," 15 J. Empirical Legal Stud. 41-79 (2018) (with Mohammad Rahmati, David A. Hyman, Bernard S. Black, and Jing Liu)*

31.   "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Legal Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

32.   "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

33.   "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

34.   "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

## Attorneys' Fees—Empirical Studies and Policy Analyses

35.   "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (forthcoming 2018).

36.   "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

37.   "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

38.   "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

39.   "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

40.   "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, Ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

41.   "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

42.  "Dissent from Recommendation to Set Fees Ex Post," 25 <u>Rev. of Litig</u>. 497 (2006).

43.  "Due Process and the Lodestar Method: You Can't Get There From Here," 74 <u>Tul. L. Rev.</u> 1809 (2000) (invited symposium).

44.  "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 <u>Tex. Rev. of Litig.</u> 301 (1993).

45.  "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 <u>Tex. L. Rev.</u> 865 (1992).

46.  "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

### Liability Insurance and Insurance Defense Ethics

47.  "Liability Insurance and Patient Safety," DePaul L. Rev. (forthcoming 2018) (annual Clifford Symposium on Tort Law) (with Tom Baker).

48.  "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 <u>Rutgers U. L. Rev.</u> 83 (2015) (with William T. Barker) (symposium issue).

49.  "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

50.  "Insurer Rights to Limit Costs of Independent Counsel," <u>ABA/TIPS Insurance Coverage Litigation Section Newsletter</u> 1 (Aug. 2014) (with William T. Barker).

51.  "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 <u>DePaul L. Rev.</u> 617 (2014) (invited symposium).

52.  "Ethical Obligations of Independent Defense Counsel," 22:4 <u>Insurance Coverage</u> (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

53.  "Settlement at Policy Limits and The Duty to Settle: Evidence from Texas," 8 <u>J. Empirical Leg. Stud.</u> 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

54.  "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 <u>Ariz. L. Rev.</u> 787 (2002) (invited symposium).

55.  "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 <u>G'town J. Legal Ethics</u> 29 (2001) (with Ellen S. Pryor).

56.  "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 <u>Tex. L. Rev.</u> 599 (2000) (with Ellen S. Pryor).

57.    "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

58.    "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

59.    "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

60.    "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 Coverage 47 (1996) (with Michael Sean Quinn).

61.    "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 Coverage 21 (1996) (with Michael Sean Quinn).

62.    "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud); reprinted in IX Ins. L. Anthol. (1996) and 64 Def. L. J. 1 (Spring 1997).

63.    "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

64.    "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

65.    "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994); reprinted in Practicing Law Institute, Insurance Law: What Every Lawyer and Businessperson Needs To Know (1998).

66.    "A Missed Misalignment of Interests: A Comment on *Syverud, The Duty to Settle*," 77 Va. L. Rev. 1585 (1991); reprinted in VI Ins. L. Anthol. 857 (1992).

### Class Actions, Mass Actions, and Multi-District Litigations

67.    "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on *Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation*," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

68.    "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

69.    "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

70.    "A Rejoinder to *Lester Brickman, On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

71.     "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

72.     "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

73.     "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

74.     "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., INT'L ENCY. OF L. & ECON. (1999).*

75.     "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

76.     "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

77.     "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

78.     "Justice in Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman).*

### General Legal Ethics and Civil Litigation

79.     "A Private Law Defense of the Ethic of Zeal" (in progress), available at http://ssrn.com/abstract=2728326.

80.     "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

81.     "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

82.     "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

83.     "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

84.     "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

85.     "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

86.     "A Critique of *Burrow v. Arce*," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

87.     "What's Not To Like About Being A Lawyer?" 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

88. "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

89. "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

90. "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

91. "The Legal Establishment Meets the Republican Revolution," 37 S. Tex. L. Rev. 1247 (1996) (invited symposium).

92. "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

93. "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 Law and Contemporary Problems 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

94. "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

### Legal and Moral Philosophy

95. "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987).*

96. "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985).*

97. "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984).*

### Practice-Oriented Publications

98. "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

99. "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

100. "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

101. "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

102. "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

**Miscellaneous**

103.    "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro).*

**PERSONAL**

Married to Cynthia Eppolito, PA; Daughter, Katherine; Step-son, Mabon.

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.