IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK HALE, TODD SHADLE, and
LAURIE LOGER, on behalf of themselves and
all others similarly situated,

             Plaintiffs

       v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, and WILLIAM G. SHEPHERD,

        Defendants.

Case No. 3:12-cv-00660-DRH-SCW

Judge David R. Herndon

Magistrate Judge Stephen C. Williams

## DECLARATION OF BRIAN T. FITZPATRICK IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

## I.     BACKGROUND AND QUALIFICATIONS

1.     My name is Brian Fitzpatrick and I am a Visiting Professor at Harvard Law School. I am also a Professor of Law at Vanderbilt University in Nashville, Tennessee. I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Lawin 2005 and 2006. I graduated from Harvard Law School in 2000. After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the Supreme Court of the United States. I also practiced law for several years in Washington, D.C., at Sidley Austin LLP. My C.V. is attached as Exhibit 1.

2.     My teaching and research at Vanderbilt have focused on class action litigation. I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt. In addition, I have published a number of articles on class action litigation in such journals as the

University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review. My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011, 2015, 2016, and 2017, and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  I was elected to the membership of the American Law Institute in 2015.

3.      In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 79 from the Seventh Circuit alone.  *See id*. at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the

Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010. This study has been relied upon by a number of scholars, testifying experts, and courts, including the Seventh Circuit.[1] I will draw upon this study in this declaration.

---

[1] *See, e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Little v. Washington Metro. Area Transit Auth.*, 2018 WL 1997257, at *7 (D.D.C. Apr. 27, 2018) (same); *Hillson v. Kelly Servs. Inc.*, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 1629349, at *17 (S.D.N.Y. Apr. 24, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016) (same); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217, 1246 (D.N.M. 2016) (same); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Federal National Mortgage Ass'n Secs., Deriv., and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Products Liability Litig.*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

4.      In addition to my empirical works, I have also published many papers on how law-and-economics theory affects attorneys and others in class action litigation. *See, e.g.*, Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "Class Action Lawyers").  The culmination of these papers will be a book published next year by the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS.    In this book, I endorse the Seventh Circuit's mimic-the-market approach to compensating class action lawyers (which I describe in more detail below).  As I explain in the book, the mimic-the-market approach in part asks courts to draw upon the "Chicago School" of law and economics to determine what rational class members would have contracted to pay class action lawyers had they had the opportunity to do so at the outset of the case.

## II.    SUMMARY OF OPINIONS

5.      I have been asked by Class Counsel to opine on the 33.33% fee they have requested in this case.  In formulating my opinion, I reviewed a number of materials, which I list in Appendix 2.  As I explain below, I believe Class Counsel's request easily satisfies the Seventh Circuit's mimic-the-market test.  In particular, my opinions are these:

- The method that class members would have selected *ex ante* to compensate Class Counsel had they had the opportunity to contract with Class Counsel would have been the so-called "percentage" method rather than the so-called "lodestar" method.

- A fee percentage equal to 33.33% is a conservative approximation of what class members would have agreed to pay Class Counsel *ex ante* in this case had they had the opportunity to contract with Class Counsel and is therefore a reasonable request under the facts of this case.

- Class members would not have contracted to pay Class Counsel a smaller percentage if the recovery was large, nor would they have contracted to cap Class Counsel's percentage at some multiple of Class Counsel's lodestar.

## III.    CASE BACKGROUND

6.       The background of this case is very well known to the court and I will not repeat it here except to note the matters that are most important to my opinions in this declaration.  In 1997, Class Counsel filed a lawsuit in Illinois state court against State Farm on behalf of a nationwide class of its automobile insureds alleging that it breached its contracts with the class by repairing their cars with so-called "imitation" parts.  The class won a trial verdict of over $1 billion and the verdict was largely affirmed on appeal.  State Farm appealed the verdict to the Illinois Supreme Court, where it remained pending for three years.  While the case was pending, one of the Justices of the Court retired and an election to replace him was held.  The victor in that race was Justice Lloyd Karmeier.

7.       The class was generally aware that State Farm had supported Justice Karmeier's election efforts, and the class filed a motion requesting that he recuse from the appeal of its verdict.  State Farm opposed the motion and it was denied.  Shortly thereafter, the Court reversed the class's verdict and decertified the class.

8.       All was thought lost, but then, three years later still, the U.S. Supreme Court held in a case from West Virginia that litigants have a due process right to courts untainted by a judge who was elected with significant aid from a litigant.  Motivated by this decision and other developments, Class Counsel hired private investigators to further probe State Farm's involvement in Justice Karmeier's election.  What they found went beyond the newspaper reports—and beyond what State Farm told the Illinois Supreme Court when it opposed the class's recusal motion.  Suffice it to say that State Farm was more heavily involved in the

recruitment of Justice Karmeier to be a candidate as well as the financing of his campaign than previously known. Based on this new information, and on additional facts, the original class filed a new lawsuit in this court alleging that State Farm and others conspired to commit fraud in violation of the federal Racketeering, Influencing, and Corrupt Organizations Act ("RICO"). After more than six years of heated litigation—including motions to dismiss, extensive discovery, class certification, summary judgment motions, motions in limine, and several interlocutory appeals—this case, too, went to trial. But after the jury was impaneled, the parties agreed to settle the case for $250 million and the trial was suspended.

9.       On September 4, 2018, the court gave preliminary approval to this settlement. The parties are now moving for final approval and Class Counsel is requesting a fee award equal to 33.33% of the settlement fund plus reasonable expenses. As I said and as I will now explain, it is my opinion that this request is a conservative approximation of what would have been found in the *ex ante* market for class representation in this case.

## IV.      THE SEVENTH CIRCUIT'S APPROACH TO ATTORNEYS' FEES IN CLASS ACTIONS

10.      In class actions, no class members other than the representative plaintiffs select the lawyers who will represent them or enter into agreements setting how much those lawyers will be paid. For everyone else, their lawyers and how much they will pay those lawyers are imposed upon them by a court. The Seventh Circuit is unique among federal circuits in that it requires district courts to hypothesize a market for legal services when it makes these decisions. *See, e.g.*, *Americana Art China v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246 (7th Cir. 2014) ("[W]e always seek to replicate the market value of an attorney's services . . . ."); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir. 2013) ("[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing

sellers of legal services."); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."); *Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) ("Because the court chose to wait until the end of litigation, it was required to set the fee by estimating what the parties would have agreed to had negotiations occurred at the outset."); *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 ("*In re Synthroid I*") ("We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services . . . .").[2]

11.     There are essentially two ways to hypothesize the market.  One way is to look at what people do when they contract for legal services voluntarily and use that information to estimate what class members would have done here.  *See, e.g.*, *In re Synthroid Marketing Litigation*, 325 F.3d 974, 976 (7th Cir. 2003) ("*In re Synthroid II*") (using fee contracts from

---

[2] An alternative to hypothesizing a market for class legal services is to *create* a market by auctioning off the class counsel position.  Although theoretically appealing, there are many practical problems with auctioning off class counsel and it is never attempted any more (and was not attempted in this case).  *See* Fitzpatrick, *Class Action Lawyers, supra*, at 2064.  In years past, the Seventh Circuit instructed district courts to at least examine fee contracts that resulted from auctions for class counsel in similar cases when hypothesizing a market for class legal services, *see Rohm & Haas*, 658 F.3d at 635; *Sutton*, 504 F.3d at 692 n.2; *Taubenfeld v. AON Corp.*, 415 F.3d at 599; *In re Synthroid I*, 264 F.3d at 719, but, given that auctions are not used anymore (and were never used much even in past years), the Seventh Circuit has since cast doubt on this consideration, *see Silverman*, 739 F.3d at 957-58 ("In many markets competition proceeds by auction.  But . . . solvent litigants do not select their own lawyers by holding auctions, because auctions do not work well unless a standard unit of quality can be defined and its delivery verified.  There is no 'standard quantity' of legal services, and verification is difficult if not impossible.").  Indeed, I am not aware of a single auction for class counsel in a RICO case.  As such, I will not consider auction data in this declaration.

large-stakes class members); *In re Synthroid I*, 264 F.3d at 719-20 (instructing courts to examine "actual agreements" between large-stakes class members and their attorneys); *Sutton*, 504 F.3d at 692 n.2 ("actual fee agreements"); *Rohm & Haas*, 658 F.3d at 635 ("'actual fee contracts that were privately negotiated for similar litigation'"); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (same). I will draw upon this information below, but it is only of limited use in cases like this one where class members have what scholars call "negative expected value claims"—claims so small that they would not be economically rational to bring on their own, and, therefore, so small that there is no similar voluntary market to draw from. Thus, the second way to hypothesize a market: assume class members are rational and would have wanted to foster incentives in their lawyers to maximize their recoveries, then ask how such people would have wanted to structure their fee arrangements. *See, e.g.*, *In re Synthroid I*, 264 F.3d 712 (Easterbrook, J.) (using economic theory to select among fee arrangements for Class Counsel); *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (Easterbrook, J.) (same). This is where the "Chicago School" of law and economics is helpful. I will draw upon this analysis below as well.

## V.   WHAT METHOD WOULD CLASS MEMBERS HAVE SELECTED TO COMPENSATE CLASS COUNSEL?

12.     Let me turn first to the best method to calculate attorneys' fees if we wish to mimic the market. There are basically two choices. The first choice is the "percentage" method, where Class Counsel is simply awarded a percentage of whatever they recover for the class. The second choice is the "lodestar" method, where Class Counsel is paid a reasonable hourly rate for the number of reasonable hours they worked on the case, enhanced by a multiplier to compensate Class Counsel for risk and other considerations. *See* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2051; Fitzpatrick, *Empirical Study, supra*, at 832. Although courts in the Seventh Circuit have

discretion to use either the lodestar method or the percentage method in awarding attorneys' fees in common fund class actions, *see Americana Art*, 743 F.3d at 247 ("[T]he choice of methods is discretionary."), the evidence from both voluntary fee contracts in the market and rational-actor models from law-and-economics theory suggest that the percentage method is the better formula in most class actions, including this one.

13.     First, as the Seventh Circuit has already recognized, when plaintiffs voluntarily hire lawyers on contingency—and especially when it is difficult for plaintiffs to monitor the work of their lawyers—they usually pay their lawyers a percentage of any recovery as opposed to an hourly rate. *See In re Synthroid II*, 325 F.3d at 979 ("Contingent-fee arrangements are used when it is difficult to monitor counsel closely; otherwise some different arrangement, such as hourly rates, is superior."). It is therefore unsurprising that, in my empirical study, I found that the vast majority of courts in the Seventh Circuit (like other Circuits) use the percentage formula rather than the lodestar formula to set fees in class actions. *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of class action settlements nationwide). The other large-scale empirical study of class action fee awards agrees. *See, e.g.*, Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017) (hereinafter "Eisenberg-Miller 2017") (finding the lodestar method used nationwide only 6.29% of the time from 2009-2013, down from 13.6% from 1993-2002 and 9.6% from 2003-2008). Nothing about this case suggests that it is outside this norm. It is well known that, when laypersons like the class members here hire lawyers to bring consumer lawsuits on contingency, they agree to compensate them as a percentage of their recoveries. SEE HERBERT M. KRITZER, RISKS, REPUTATIONS, AND REWARDS: CONTINGENCY FEE PRACTICE IN THE UNITED STATES 36 (2004). Indeed, I have seen the agreements the representative class members

here struck with Class Counsel; they all agreed to compensate them with a percentage of their recoveries.

14.     Second, the reason why plaintiffs—especially those who cannot monitor their lawyers—pick the percentage method is because it is what rational actors would do to give their lawyers the best incentives to maximize their recoveries.  It is easy to see why.  The percentage method pays lawyers more the more they recover for their clients.  The lodestar method, by contrast, pays lawyers the same regardless of how much they recover.  Instead, the lodestar method pays lawyers more the more they work.  Rational plaintiffs would want to enter fee arrangements that give their lawyers incentives to recover as much as they can as quickly as they can (i.e., the percentage method) rather than arrangements that give them incentives to drag cases on and to be indifferent as to recovery (i.e., the lodestar method).  Class members should receive no less.[3]  *See In re Synthroid II*, 325 F.3d at 979 (Easterbrook, J.) (explaining preference for percentage method); Richard Epstein, *Class Actions: The Need for a Hard Second Look*, 4 Civil Justice Report 9-10 (2002) ("One possible fee arrangement is for the informed client who is capable of monitoring his lawyer to pay an hourly fee.  [B]ut whatever is good sense in ordinary litigation, it is stillborn in class action litigation for the simple reason that diffuse class members have no real way to monitor the behavior of their lawyers.  [I] think that we can be confident that it is suicidal to allow the lawyers to collect fees on an hourly wage.").

---

[3] Perhaps the most rational fee method of all—especially, again, when lawyers cannot be monitored well—is to pay lawyers a percentage of the recovery *plus* their lodestar.  *See* Kevin Clermont & Jonathan Currivan, *Improving on the Contingent Fee*, 63 Cornell L. Rev. 529 (1978).  But I have never seen a court use this method in the 40 years since Professors Clermont and Currivan published their article.

15.     Thus, in my opinion, a hypothetical *ex ante* market for legal representation in this case would have led class members to compensate their lawyers using the percentage method.

## VI.    WHAT FEE PERCENTAGE WOULD CLASS MEMBERS HAVE SELECTED *EX ANTE*?

16.     In my opinion, Class Counsel's request for 33.33% is not only a good approximation of what class members would have agreed to, but it is a very conservative one.

17.     To begin with, 33.33% is equal to or less than what most people agree to pay when they hire lawyers in the free market.  As I noted above, I reviewed the fee agreements that the representative plaintiffs entered into here, and all of the agreements called for 40%, *more* than what Class Counsel is requesting.  It is true that none of the representative plaintiffs had much money at stake here.  But even when plaintiffs have more at stake, we know they contract for much the same rates.  For example, the most famous empirical study of contingency fees—the one I cited above by Professor Kritzer of Wisconsin lawyers—found that the most common fee percentage was 33%, but many agreements called for more than that depending on how far along the case is when it is resolved.  SEE KRIZTER, SUPRA, AT 39-40 (finding over 60% of contingency agreements set fees at a flat 33.3% and another third or so set fees at variable rates, usually escalating up to as high as 50% as the case went on); ID. AT 42-43 (canvassing prior studies).

18.     It is true that the data from agreements for individual representation are not necessarily good approximations of what would have been agreed to in the market for class representation because there may be economies of scale in class representation that would be passed along to clients in a competitive market.  *See* Fitzpatrick, *Class Action Lawyers, supra*, at 2063.  But district courts in this Circuit have found that the market rate for class representation is

only slightly lower than the market rate for individual representation.[4]  I show this in Figure 1, which depicts the distribution of all Seventh Circuit percentage-method fee awards in my empirical study.  The figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis).  As the figure shows, a 33.3% fee award would be in the most populous range of awards, 30% (inclusive) to 35%.  Indeed, *over forty percent* (i.e., 0.4) of all settlements led to fee awards in this range.

**Figure 1: Percentage-method fee awards in the Seventh Circuit, 2006-2007**



---

[4] I focus on the Seventh Circuit because that is the only Circuit where district courts are instructed to approximate the *ex ante* market rate for lawyering when setting fees in class actions. But even if one looks beyond the Seventh Circuit, class counsel's fee requests still are within the mainstream.  For example, in my empirical study, I found the most common awards nationwide were 25%, 30%, and 33%, with average and median percentages 25.4% and 25%, respectively. *See* Fitzpatrick, *Empirical Study, supra* at 833.

19.     It is true that the mean (27.4%) and median (29%) fee award in the Seventh Circuit in my study were both below the fee request here.  *See* Fitzpatrick, *Empirical Study, supra,* at 836.  But there are two considerations that lead me to conclude that the market rate in this case would have been much higher than these means and medians, and, indeed, probably much higher than even the 33% Class Counsel have requested.

20.     First, this case went to trial.  It did not go all the way to a trial verdict, but the fact that it even got so far as to begin a trial puts it in very rare company.  Professor Rubenstein reports in his Declaration in this case that he maintains a database of 1,187 cases and only 15 of them had at least one day of trial.  Rubenstein Decl. ¶ 18.  That means this case progressed further than 98.7% of class action cases.  *Id.*; *see also, e.g.*, *Recent Trends in Securities Class Action Litigation: 2015 Full-Year Review* 38 (finding that, out of thousands upon thousands of securities fraud class actions over 20 years, only 21 went to trial).   Why is this important?  It is important because we know that plaintiffs in the market for legal representation often pay their lawyers with bifurcated rates that call for a higher percentage if their lawyers have to take their cases to trial, with fees as high as 50% in such circumstances.  *See, e.g.*, Herbert Kritzer, *Seven Dogged Myths Concerning Contingency Fees*, 80 Wash U. L. Q. 739, 759 (2002) (finding 31% of contingency fee contracts in Wisconsin with bifurcated rates); David Schwartz, *The Rise of Contingency Fees in Patent Litigation*, 64 Ala. L. Rev. 335, 360 nn. 136-137 (2012) (finding that over 75% of sophisticated patent infringement plaintiffs who retained contingency fee lawyers did so with bifurcated rates).  It is therefore unsurprising that Professor Rubenstein has found that courts tend to award higher fee percentages in class actions that go to trial as well.  *See* Rubenstein Decl. ¶ 18.  All of this is perfectly consistent with law-and-economics theory: a

rational plaintiff would want to pay his lawyer more to go to trial than to settle early in order to disincentivize his lawyer from settling *too* early for *too* little. *See* Bruce L. Hay, *Optimal Contingent Fees in A World of Settlement,* 26 J. Legal Stud. 259, 259 (1997) ("[T]he article shows that the client generally benefits from a bifurcated fee structure in which the attorney gets a large fraction of the recovery in the event of trial but a small fraction in the event of settlement.").

21.     Second, the data from voluntary fee agreements and class action fee awards I cited above is very broad. It covers all kinds of cases: easy cases, hard cases, and cases in between. The Seventh Circuit has noted that, in order to mimic the market well, we have to adjust baseline data like this to the particular circumstances that existed at the outset of *this* case. That is, if this case was riskier than the average case, we would have expected the lawyers in a competitive market to demand an above-average fee percentage to take it on. *See Silverman*, 739 F.3d at 958 (affirming above-average fee percentage because district court could have found that the "suit was unusually risky" and "[t]he greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel"); *Rohm & Haas*, 658 F.3d at 636 (affirming award where district court "assessed the amount of work involved, the risks of nonpayment, and the quality of representation"); *Sutton*, 504 F.3d at 693 ("We have said the market price for legal fees 'depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case.'"); *Taubenfeld*, 415 F.3d at 600 (affirming fee award where "[t]he district court also evaluated other factors," including "the quality of legal services rendered" and "degree of risk"). In my view, it is a *gross* understatement to say that this

case involved above-average risks and therefore would have demanded an above-average fee award in a competitive market.

22.     To begin with, the legal theory in this case is, to my knowledge, entirely novel: one litigant conspired to deprive the others of fair adjudication of their claims by orchestrating the election of a new judge to hear the case and then lying about having done so.  The novelty presented many legal barriers: Did the earlier litigation preclude a new litigation by virtue of *res judicata* or the *Rooker-Feldman* doctrine?  Had the RICO statute of limitations run between the first and second litigation?  Could the class prove that the election of the new Justice changed the result in the first litigation?  Can a tribunal's decision to overturn a judgment establish an "injur[y]" to "business or property" as required by RICO?  Were the defendants' alleged misconducts here protected by the First Amendment?  If one goes through each step in this litigation decision tree and assigns probabilities of success to the class at each step and then multiplies all of those probabilities together, it becomes quite clear that the risks here were *much* higher than in the typical class action.

23.     In addition, the facts to support the theory had to be unearthed entirely by Class Counsel: as I noted above, they had to hire a private investigator to determine whether the theory had any legs at all.  This was not a situation where the government discovered wrongdoing or even a situation where a whistleblower came forward with the wrongdoing; Class Counsel discovered the wrongdoing all on their own.  This, too, is very rare.  Several years ago, three economists studied who uncovers corporate fraud: The government? Private lawyers?  Auditors? Corporate Management?  Whistleblowers?  Others?  *See* Alexander Dyck, et al., *Who Blows the Whistle on Corporate Fraud?*, 65 *The Journal of Finance* 2213 (2010).  They found that it was not private lawyers: they were the first to discover fraud only 3% of the time.  *See id*. at 2225,

tbl. II(A)(2).  (The most frequent discoverer outside of company management were employee whistleblowers.  *See id*.).

24.      In my opinion, lawyers in a free market would demand better than average rates to take on a case with an entirely novel legal theory that would rely on concealed and difficult to prove facts.  The fact that this is one of those cases is confirmed by the fact that no other counsel came forward to compete to represent the class in this case.  Again, it is a gross understatement to say that this case was not perceived by anyone—including very experienced class action lawyers—as an easy victory.

25.      I am aware that in a Seventh Circuit opinion that cited my empirical study the court said that a 27.5% award of a $200 million settlement "may be at the outer limit of reasonableness . . . ."  *Silverman*, 739 F.3d at 959 (Easterbrook, J.).  But that statement could have only meant that 27.5% was at the outer limit for the circumstances of that case.  The *Silverman* case presented none of the *ex ante* risks of this case (for example, *Silverman* was a securities fraud case, where class certification is relatively perfunctory), and, perhaps even more importantly, did not go to trial.  As I noted above, it is very common for clients to pay their lawyers higher fee percentages when cases go to trial as well as consistent with fostering the best incentives to pay them more in such circumstances.  In my opinion, Judge Easterbrook (of all judges) would have understood such things and modified his statement appropriately if the case before him had presented the circumstances of this case.

## VII.  WOULD CLASS MEMBERS HAVE REDUCED THE PERCENTAGE FOR LARGER RECOVERIES OR CAPPED IT BASED ON CLASS COUNSEL'S LODESTAR?

26.      It should be noted that the settlement here is very large: there are only a handful of settlements in federal court every year for $250 million or more.  One question that sometimes arises in other Circuits is whether the court should award a *smaller* percentage when the

settlement is *larger*.  Indeed, I found in my empirical study that enough courts follow this bigger-is-smaller practice that there is a statistically significant inverse correlation between settlement size and fee award.  *See* Fitzpatrick, *Empirical Study, supra*, at 839; *see also* Eisenberg-Miller 2017, *supra*, at 948.  But the bigger-is-smaller compensation scheme would be so irrational for a plaintiff to enter into that the Seventh Circuit has already squarely rejected it for class actions. *See In re Synthroid I*, 264 F.3d at 718 (Easterbrook, J.) ("Private parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for more [money] from the defendants.").  Consider the following example: suppose class counsel could fight moderately hard and settle a class action for $100 million and receive a 33% fee award or fight very hard and settle for $150 million but receive a 20% fee award.  In this example, class counsel would get a *bigger* fee if they settled for *less*: the $100 million settlement would lead to a $33 million fee award whereas the $150 million would lead to only a $30 million fee award.  This is the very definition of perverse incentives under a Chicago School analysis.

27.      A related question is whether the fee percentage should be *tapered* downward in cases that produce bigger settlements.  That is, instead of awarding a straight 20% of the entire $150 million settlement amount in my above example, a court might award 33% of the first $100 million and 20% of the next $50 million.  The Seventh Circuit has observed that *sophisticated* clients sometimes taper fee percentages in this way as recoveries become large.  *See Silverman*, 739 F.3d at 959; *In re Synthroid I*, 264 F.3d at 721.  But, in my opinion, it would not be economically rational for plaintiffs who *cannot monitor* their lawyers to contract for such awards for the very same reason such plaintiffs would not want to pay their lawyers the same percentage if they settled early or went to trial: tapering disincentivizes lawyers from working hard for the largest recovery.  *See In re Synthroid I*, 264 F.3d at 721 ("[D]eclining marginal percentages . . .

create declining marginal returns to legal work . . . .  This feature exacerbates the agency costs inherent in any percentage-of-recovery system . . . ."); Epstein, *supra*, at 11 ("It has been suggested that the fee . . . be 'tapered,' so that the percentage take is reduced with an increase in the size of the class settlement . . . .  In general, however, this does not seem to be the right approach.").  Rather, a "Chicago School" analysis shows that, if we are to taper at all for clients who cannot monitor, we should taper *upward* not downward.  *See, e.g.*, John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 697 (1986) ("[T]he most logical answer to this problem of premature settlement would be to base fees on a graduated, increasing percentage of the recovery formula—one that operates, much like the Internal Revenue Code, to award the plaintiff's attorney a marginally greater percentage of each defined increment of the recovery."); Jill E. Fisch, *Lawyers on the Auction Block: Evaluating the Selection of Class Counsel by Auction*, 102 Columbia Law Review 650, 678 (2002) ("[The] last dollars of recovery are generally the most costly to produce.").  Indeed, there are plenty of sophisticated clients who taper in this direction as well.  *See, e.g.*, *In re AT & T Corp.*, 455 F.3d 160, 163 (3d Cir. 2006) (describing fee agreement between class counsel and "the lead plaintiff New Hampshire Retirement Systems": "The formula provided attorneys' fees would equal 15% of any settlement amount up to $25 million, 20% of any settlement amount between $25 million and $50 million, and 25% of any settlement amount over $50 million.").

28.     Finally, some courts in other Circuits that use the percentage method "crosscheck" it with class counsel's lodestar.  Only a minority of courts do this, but it is, admittedly, a significant minority.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 833 (finding that only 49% of federal courts consider lodestar when awarding fees with the percentage method);

*Eisenberg-Miller 2017*, *supra*, at 945 (finding percentage method with lodestar crosscheck used 38% of the time nationwide versus 54% for percentage method without lodestar crosscheck). Under this approach, the court considers how much of a "multiplier" over class counsel's lodestar the percentage method would give to class counsel.  If the court believes the multiplier is "too big"—that class counsel will reap a "windfall"—then it will cut the percentage down until the multiplier is not too big.  Because it would be so economically irrational for a plaintiff who could not monitor his lawyer to contract for this compensation scheme, it, too, has been squarely rejected by the Seventh Circuit.  *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (Easterbrook, J.) ("The . . . argument . . . that any percentage fee award exceeding a certain lodestar multiplier is excessive . . . echoes [practices] we rejected [as unlikely to be adopted by rational actors in a free market].").  Consider the following examples.  Suppose a lawyer had worked on a case for 5 years and accrued a lodestar of $1 million.  If the lawyer believed that a court would award him a fee of 33% or 2 times his lodestar, whichever was lesser, then he would be completely indifferent between accepting a settlement offer at this point of $6 million and $60 million.  Needless to say, the incentive to be indifferent as to the size of the settlement is not the incentive class members interested in the maximum recovery would want in their lawyers.  Or suppose the lawyer had been offered $12 million after five years of work.  If the lawyer again believed the court would not award a fee of 33% unless it was no more than 2 times his lodestar, the lawyer would want to delay accepting the settlement until he could generate another $1 million in lodestar and thereby reap the maximum fee.  Needless to say again, dragging cases along and churning hours without adding any additional recovery is not the incentive class members would want, either.  This is probably why I have never seen a client

voluntarily enter into a fee agreement that compensates a lawyer with a percentage capped by a multiple of the lawyer's lodestar.  Class members, again, deserve no less.

29.     For all these reasons, it is my opinion that Class Counsel's fee request is a conservative approximation of what would have been found in the *ex ante* market for class representation in this case and is therefore a reasonable request under the facts of this case.

30.     My compensation in this matter has been $895 per hour.


Cambridge, MA

October 16, 2018


Brian T. Fitzpatrick

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**HARVARD LAW SCHOOL**, *Visiting Professor*, Fall 2018
- Classes: Civil Procedure, Litigation Finance

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, 2012 to present
- *FedEx Research Professor*, 2014-2015; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Complex Litigation, Federal Courts, Comparative Class Actions
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

**FORDHAM LAW SCHOOL**, *Visiting Professor*, Fall 2010
- Classes: Civil Procedure

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## BOOKS

THE CONSERVATIVE CASE FOR CLASS ACTIONS (University of Chicago Press, forthcoming 2019)

## ACADEMIC ARTICLES

*Can and Should the New Third-Party Litigation Financing Come to Class Actions?*, 19 THEORETICAL INQUIRIES IN LAW 109 (2018)

*Scalia in the Casebooks*, 84 U. CHI. L. REV. 2231 (2017)

*The Ideological Consequences of Judicial Selection*, 70 VAND. L. REV. 1729 (2017)

*Judicial Selection and Ideology*, 42 OKLAHOMA CITY UNIV. L. REV. 53 (2017)

*Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977 (2017)

*A Tribute to Justice Scalia: Why Bad Cases Make Bad Methodology,* 69 VAND. L. REV. 991 (2016)

*The Hidden Question in* Fisher, 10 NYU J. L. & LIBERTY 168 (2016)

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*Do Class Actions Deter Wrongdoing?* in THE CLASS ACTION EFFECT (Catherine Piché, ed., Éditions Yvon Blais, Montreal, 2018)

*Judicial Selection in Illinois* in AN ILLINOIS CONSTITUTION FOR THE TWENTY-FIRST CENTURY (Joseph E. Tabor, ed., Illinois Policy Institute, 2017)

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC PRESENTATIONS

*Empirical Research on Class Actions,* Civil Justice Research Initiative, University of California at Berkeley, Berkeley, California (Apr. 9, 2018)

*A Political Future for Class Actions in the United States?*, The Future of Class Actions Symposium, University of Auckland Law School, Auckland, New Zealand (Mar. 15, 2018)

*The Indian Class Actions: How Effective Will They Be?*, Eighth Annual Emerging Markets Finance Conference, Mumbai, India (Dec. 19, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 8, 2017) (panelist)

*Critical Issues in Complex Litigation*, Contemporary Issues in Complex Litigation, Northwestern Law School (Nov. 29, 2017) (panelist)

*The Conservative Case for Class Actions*, Consumer Class Action Symposium, National Consumer Law Center, Washington, DC (Nov. 19, 2017)

*The Conservative Case for Class Actions—A Monumental Debate*, ABA National Institute on Class Actions, Washington, DC (Oct. 26, 2017) (panelist)

*One-Way Fee Shifting after Summary Judgment*, 2017 Meeting of the Midwestern Law and Economics Association, Marquette Law School, Milwaukee, WI (Oct. 20, 2017)

*The Conservative Case for Class Actions*, Pepperdine Law School Malibu, CA (Oct. 17, 2017)

*One-Way Fee Shifting after Summary Judgment*, Vanderbilt Law Review Symposium on The Future of Discovery, Vanderbilt Law School, Nashville, TN (Oct. 13, 2017)

*The Constitution Revision Commission and Florida's Judiciary*, 2017 Annual Florida Bar Convention, Boca Raton, FL (June 22, 2017)

*Class Actions After* Spokeo v. Robins*: Supreme Court Jurisprudence, Article III Standing, and Practical Implications for the Bench and Practitioners*, Northern District of California Judicial Conference, Napa, CA (Apr. 29, 2017) (panelist)

*The Ironic History of Rule 23*, Conference on Secrecy, Institute for Law & Economic Policy, Naples, FL (Apr. 21, 2017)

*Justice Scalia and Class Actions: A Loving Critique*, University of Notre Dame Law School, South Bend, Indiana (Feb. 3, 2017)

*Should Third-Party Litigation Financing Be Permitted in Class Actions?*, Fifty Years of Class Actions—A Global Perspective, Tel Aviv University, Tel Aviv, Israel (Jan. 4, 2017)

*Hot Topics in Class Action and MDL Litigation,* University of Miami School of Law, Miami, Florida (Dec. 2, 2016) (panelist)

*The Ideological Consequences of Judicial Selection,* William J. Brennan Lecture, Oklahoma City University School of Law, Oklahoma, City, Oklahoma (Nov. 10, 2016)

*After Fifty Years, What's Class Action's Future,* ABA National Institute on Class Actions, Las Vegas, Nevada (Oct. 20, 2016) (panelist)

*Where Will Justice Scalia Rank Among the Most Influential Justices*, State University of New York at Stony Brook, Long Island, New York (Sep. 17, 2016)

*The Ironic History of Rule 23,* University of Washington Law School, Seattle, WA (July 14, 2016)

*A Respected Judiciary—Balancing Independence and Accountability*, 2016 Annual Florida Bar Convention, Orlando, FL (June 16, 2016) (panelist)

*What Will and Should Happen to Affirmative Action After Fisher v. Texas*, American Association of Law Schools Annual Meeting, New York, NY (January 7, 2016) (panelist)

*Litigation Funding: The Basics and Beyond,* NYU Center on Civil Justice, NYU Law School, New York, NY (Nov. 20, 2015) (panelist)

*Do Class Actions Offer Meaningful Compensation to Class Members, or Do They Simply Rip Off Consumers Twice?,* ABA National Institute on Class Actions, New Orleans, LA (Oct. 22, 2015) (panelist)

*Arbitration and the End of Class Actions?,* Quinnipiac-Yale Dispute Resolution Workshop, Yale Law School, New Haven, CT (Sep. 8, 2015) (panelist)

4

*The Next Steps for Discovery Reform: Requester Pays*, Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, FL (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, NY (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, CA (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, FL (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law, Columbia, MO (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School, Arlington, VA (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law, Lexington, VA (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School, Ann Arbor, MI (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School, Nashville, TN (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, FL (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School, Ann Arbor, MI (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School, New York, NY (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School, New York, NY (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Fordham Law School Corporate Law Center, New York, NY (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School, St. Louis, MO (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law, Chicago, IL (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School, Palo Alto, CA (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School, Chicago, IL (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School, Iowa City, IA (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School, St. Louis, MO (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School, Cleveland, OH (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School, Washington, DC (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School, St. Louis, MO (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School, Los Angeles, CA (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School, Columbus, OH (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School, South Bend, IN (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School, Palo Alto, CA (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law, Minneapolis, MN (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School, Columbia, MO (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law, Chicago, IL (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law, Ann Arbor, MI (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*9th Circuit Split: What's the math say?*, DAILY JOURNAL (Mar. 21, 2017)

*Former clerk on Justice Antonin Scalia and his impact on the Supreme Court*, THE CONVERSATION (Feb. 24, 2016)

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Where Will Justice Scalia Rank Among the Most Influential Justices*, The Leo Bearman, Sr. American Inn of Court, Memphis, TN (Mar. 21, 2017)

*Bringing Justice Closer to the People: Examining Ideas for Restructuring the 9th Circuit*, Subcommittee on Courts, Intellectual Property, and the Internet, United States House of Representatives, Washington, D.C. (Mar. 16, 2017)

*Supreme Court Review 2016: Current Issues and Cases Update*, Nashville Bar Association, Nashville, TN (Sep. 15, 2016) (panelist)

*A Respected Judiciary—Balancing Independence and Accountability*, Florida Bar Annual Convention, Orlando, FL (June 16, 2016) (panelist)

*Future Amendments in the Pipeline: Rule 23*, Tennessee Bar Association, Nashville, TN (Dec. 2, 2015)

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club, Nashville, TN (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

## PROFESSIONAL ASSOCIATIONS

Member, American Law Institute
Referee, Journal of Law, Economics and Organization
Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

## COMMUNITY ACTIVITIES

Board of Directors, Nashville Ballet, 2011-2017; Nashville Talking Library for the Blind, 2008-2009

# EXHIBIT 2

## <u>DOCUMENTS REVIEWED</u>

1. Second Amended Class Action Complaint (ECF 943)

2. Defendants' Motions to Dismiss Class Action Complaint (ECF 13, 24, 32)

3. Order denying Defendants' Motions to Dismiss Class Action Complaint (ECF 67)

4. State Farm's Petition for a Writ of Mandamus (ECF 159)

5. Seventh Circuit's order denying State Farm's Petition for a Writ of Mandamus (ECF 175)

6. State Farm's Opposition to Plaintiffs' Motion for Class Certification (ECF 467)
7. Order granting class certification (ECF 556)

8. State Farm's two Rule 23(f) Petitions for Leave to Appeal from Order granting class certification and order clarifying the order granting class certification

9. Seventh Circuit's orders denying State Farm's Rule 23(f) Petitions

10. Defendants' Motion for Summary Judgment on Grounds of *Rooker-Feldman*, *Res Judicata*, and Collateral Estoppel (ECF 646)

11. Order denying Motion for Summary Judgment on Grounds of *Rooker-Feldman*, *Res Judicata*, and Collateral Estoppel (ECF 726)

12. State Farm's Motion for Summary Judgment on Plaintiffs' RICO Claims (ECF 694)

13. Order denying State Farm's Motion for Summary Judgment on Plaintiffs' RICO Claims (ECF 846)

14. Orders on the Parties' Motions *in Limine* and trial-related *Daubert* motions (ECF 789, 847, 882, 903-05)

15. The Settlement Agreement (ECF 941)

16. Plaintiffs' Memorandum in Support of Preliminary Settlement Approval (ECF 939)

17. Order granting Preliminary Settlement Approval (ECF 942)

18. Settlement Notice Plan (ECF 945-1)

19. Order approving Notice Plan (ECF 947)

20. The Class Representatives' retention agreements