UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

MARK HALE, TODD SHADLE,
and LAURIE LOGER, on behalf of
themselves and all others similarly
situated,

    Plaintiffs,

v.     No. 3:12-cv-00660-DRH-SCW

STATE FARM MUTUAL AUTOMOBILE   Judge David R. Herndon
INSURANCE COMPANY, et al.     Magistrate Judge Stephen C. Williams

    Defendants.

**OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT,
ATTORNEY'S FEE AWARD AND SERVICE AWARDS**

Lisa D. Marlow, a class member, hereby objects to the proposed settlement, Class Counsel's request for attorneys' fees and the named Plaintiffs' request for incentive awards.[1]

**INTRODUCTION**

Plaintiffs' injuries and the damages to the class are well-known – they lost a $1.05 billion appellate court judgment, plus interest and statutory trebling. According to Plaintiffs' own expert, the total damages to the class are approximately $7.4 billion. Plaintiffs, represented by a number of nationally-known Plaintiffs' law firms and legal scholars, litigated the case for more than six years. The record shows they were well-situated to succeed at trial. For example, they had:

    ☐ defeated three separate motions to dismiss by the Defendants;

---

[1] Mrs. Marlow is a citizen of the State of Florida. Her address is 6710 Hundred Acre Drive, Cocoa, FL 32927. Her telephone number is 321-960-5009. Marlow is not one of those persons excluded from the Class as provided in the class notice. She has submitted a claim, # Q82MCKSW.

1

- □ defeated a mandamus appeal by the Defendants in the United States Court of Appeals for the Seventh Circuit ("Seventh Circuit");

- □ obtained certification of a nationwide class;

- □ defeated two separate Fed. R. Civ. P. 23(f) appeals of the class certification order;

- □ amassed substantial evidence to prove their RICO claims through dozens of depositions and voluminous written and documentary discovery;

- □ defeated two separate motions for summary judgment;

- □ repeatedly defeated the Defendants' motions to exclude testimony by Plaintiffs' experts;

- □ successfully moved the Court to exclude the testimony of some of the Defendants' experts;

- □ largely defeated the Defendants' efforts to exclude mounds of trial evidence;

- □ succeeded in moving to exclude a substantial portion of the Defendants' evidence via dozens of motions in limine; and lastly,

- □ succeeded in impaneling what they obviously believed was a favorable jury.

Having achieved such enormous success in litigating the case, Plaintiffs and Class Counsel now seek to convince the Court that their RICO claims were not nearly as strong as it objectively appears, and that the case was vulnerable to various defenses that had already been repeatedly rejected by this Court and the Seventh Circuit. These self-serving arguments are a far cry from the positions espoused in their recent summary judgment briefing [Docs. 729-730], where they vigorously extolled the strength of the evidence backing the RICO claims.

Despite their successes, Class Counsel seize on the risk factor, arguing that they were not out of the woods yet, as they still had to win at trial, survive post-trial motions and successfully defend this Court's decisions on class certification, summary judgment and the jury verdict on appeal. But the record, including the fact that the Seventh Circuit left this Court's prior decisions

intact, indicates Plaintiffs have overstated the risk that a favorable judgment could be overturned. Seen in this light, the $250,000,000 settlement – achieved despite substantial evidence supporting the RICO claims and damages of $7,400,000,000 – is a poor result for the class.

Next, Class Counsel – a group of nine law firms – seek attorney's fees of over $83 million, fully one-third of the gross settlement, along with $6,971,852.80 in litigation expenses. Class Counsel's fee request disregards the prevailing law in this Circuit, which has long-approved a downward-scaling approach to fees in megafund settlements like this one whereby the percentage of the settlement devoted to attorney's fees decreases as the dollar value of the settlement fund increases.[2] In megafund cases, the Seventh Circuit has determined that"[a]n award fixed at 27.5% of a $200 million fund is exceptionally high" and also "at the outer limits of reasonableness." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). If the Seventh Circuit believes 27.5% of $200 million is "exceptionally high" and at the "outer limits of reasonableness," surely one-third of $250 million falls well beyond those limits. As set forth below, Mrs. Marlow submits that an award of $54,549,692.38 (which equates to 21.81% of the settlement) is a reasonable award.

Third, although Plaintiffs seek service awards of $25,000 for their efforts, no plaintiff submitted so much as a declaration attesting to his or her efforts on behalf of the class, much less how the class benefitted from such efforts or how much time was expended on the case. Nothing in the record justifies such large awards. Accordingly, if the settlement receives final approval, each named Plaintiff should be awarded not more than $5,000.

---

[2]*See, e.g., In re Synthroid Marketing Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) (awarding 30% of first $10 million; 25% from next $10-$20 million; 22% from $20-$46 million; and 15% of the remainder).

Finally, if a person did not receive a postcard notifying him or her of class membership, any class member who chooses to object to the settlement must produce "proof of class membership." This requirement is unreasonable (given the required documentation would be 20-31 years old) and overly burdensome, stifling claims by otherwise legitimate class members and precluding them from participating in the settlement or the determination of its fairness.

## STANDARDS FOR SETTLEMENT APPROVAL

The Seventh Circuit has identified several factors that a Court may consider in evaluating the fairness of a class action settlement. A court in this Circuit

> must consider 'the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to the settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement.'

*Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

## OBJECTIONS

**A.    The Settlement is Inadequate, Unfair and Unreasonable in View of the Strength of Plaintiffs' Case, Their Actual Damages, Interest and Automatic Statutory Trebling and Amount of the Settlement.**

The most important factor in determining whether a settlement satisfies Rule 23 is the "strength of plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel Techs.,* 463 F.3d at 653 (citations omitted). Specifically, the court must "estimate the likely outcome of a trial" to determine the adequacy of a settlement. *Eubank v. Pella Corp.*, 753 F.3d 718, 727 (7th Cir. 2014), but should not "reject[]" a settlement "solely because it does not provide a complete victory to plaintiffs," for "the essence of settlement is compromise." *Isby v. Bayh*, 75 F.3d 1191, 12900 (7th Cir. 1996) (internal quotation marks omitted). An acceptable settlement is, therefore, properly "a bilateral exchange . . . where both sides gain as well as lose

4

something." *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1135 (7th Cir. 1979) (internal quotation marks omitted).

### 1. The strength of Plaintiffs' case was overwhelming.

Of course, there were no guarantees that Plaintiffs would have succeeded at trial and recovered a judgment exceeding the amount of the proposed settlement, but the evidence they constructed ahead of the trial – based upon Class Counsel's own trumpeting of it – and their string of evidentiary victories largely undermining Defendant's case demonstrate Plaintiffs likely would have obtained favorable verdict at trial. For example, Class Counsel characterized Plaintiffs as having amassed "substantial proof" and "a wealth of evidence to prove" their RICO claims [Doc. 729, Page ID #22883], which would establish "[t]he Defendants perpetrated an extraordinary scheme to cheat its insureds and to subvert the judiciary at the highest level." [Doc. 729, Page ID #22884].

### 2. Plaintiffs and Class Counsel have put forth expert testimony that this case is worth no less than $7.4 billion, including the lost $1.05 billion judgment, interest and RICO trebling.

Not only were Plaintiffs and Class Counsel highly confident they had amassed the evidence to prove their version of the facts and their RICO claims, but their damage calculation was so straightforward it left the jury (or the Court) with few, if any, alternatives but to award damages for the lone injury suffered by the class (loss of the $1.05 billion judgment) and add on post-judgment interest from the date of the original judgment in 1999. Moreover, any award would be automatically trebled under 18 U. S. C. § 1964(c).

Plaintiffs' expert, Mr. Thomas Myers, a preeminent expert in the field of fraudulent financial transactions – who trains federal agents on how to track and discover fraudulent

financial transactions [Doc. 847, at Page ID#: 37233-37234] – stated the following with respect to Plaintiffs' damages:

> I have performed a calculation by taking the amount of the judgment of $1,056,636,180, after remitter by the Illinois Appellate Court, added statutory post-judgment simple interest from the date of the underlying judgment at the trial court, continuing through May 1, 2015, at the statutory rate of 9%, and trebled the total amount for RICO to arrive at a total damages amount of $7,612,643,917.

[Doc. 472, at Page ID: 10073-10074] (citing Expert Rpt. of Thomas A. Myers at 66).

The $250 million settlement is a far cry from, over 96% less than, the $7.4 billion Myers projects. It isn't unusual, of course, for a plaintiff to settle for an amount less than he might reasonably expect to recover. After all, settlement is, by definition, a compromise. However, in this instance, the compromise proposed must be viewed more skeptically because of the nature of the injury to the Plaintiffs and class. In other words, if the Plaintiffs' evidence could establish the RICO violations they allege, and Class Counsel repeatedly told this Court that was the case, because the **sole** injury was the loss of the $1.05 billion judgment and the post-judgment interest lost since 1999, the jury would have been hard-pressed to consider a different amount. And that amount, whatever it was, would have been automatically trebled by the Court. Thus, before prejudgment interest, the damages would have been no less than $3.15 billion, over twelve times the amount of the proposed settlement.

### 3. Plaintiffs' and Class Counsel's assessment of the risks taken is unconvincing.

As with many class action settlements, in this case, once the settlement was reached, the parties' respective positions about the relative strengths and weaknesses of their claims or defenses took a 180-degree turn, with Class Counsel dramatically down-playing the strength of

the "substantial proof" and "wealth of evidence" they had amassed and arguing the risks of a trial was too great to avoid settlement of their claims.

Plaintiffs incredulously maintain they faced the same risks at trial as they faced at the outset of the case – Rooker-Feldman, res judicata, collateral estoppel, the statute of limitations and Noerr-Pennington – and risked the possibility Defendants might prevail on appeal. [Doc. 953, at Page ID #40467-68]. But, the Court ruled in their favor (more than once) on each one of the controlling legal issues. [Doc. 953, at Page ID #40464]. Even more importantly, Defendants' Rooker-Feldman, res judicata, collateral estoppel, statute of limitations and Noerr-Pennington arguments all made their way to the Seventh Circuit, as did the Court's class certification order, and on each occasion, Plaintiffs were the victors. [Doc. 729, at Page ID #22884].

Plaintiffs' response to Defendants' second motion for summary judgment impressively details the evidence demonstrating how State Farm recruited Judge Karmeier, organized his campaign, arranged financing for the campaign and secretly funneled millions of dollars to it. [Doc. 729, Page ID: Page ID #22884-22901]. It also details the evidence supporting Defendants' RICO violations. [*Id.*, Page ID #22901-22905].

By any reasonable account, Plaintiffs' fears are feigned, designed only to cloak the strength of their case as a means to settle their claims more cheaply, allowing Class Counsel to recover an astronomical and unprecedented fee.

> **B.  Class Counsel's $83 Million Fee Request – One-Third of the Gross Settlement Fund – Is Unreasonable in This Megafund Settlement.**

Next, Class Counsel seek one-third of the $250 million settlement as their attorneys' fees. [Doc. 954]. This Court owes the class its efforts to scrutinize Class Counsel's request, and not rubber-stamp it. The Seventh Circuit has "described the district judge as a fiduciary of the class,

7

who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotation marks omitted).[3]

"[A]ttorneys' fees in class actions should approximate the market rate that prevails between willing buyers and willing sellers of legal services." *In re Akorn, Inc. Secs. Litig.*, 2018 U.S. Dist. LEXIS 93874, at *3-4 (N.D. Ill. June 5, 2018) (quoting *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013)). It follows that the district court "must set a fee by approximating the terms that would have been agreed to ex ante, had negotiations occurred." *Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014) (internal quotation marks omitted); *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*") ("[C]ourts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.").

Ultimately, the Court must determine the rate for Class Counsel's services by "estimat[ing] the terms of the contract that private plaintiffs would have negotiated with their lawyers had bargaining occurred at the outset of the case (that is when the risk of loss still existed)." *Synthroid I*, 264 F.3d at 718.[4] In determining the "market rate," the Court is required to look at factors such as: (1) actual fee contracts that were previously negotiated for similar litigation; (2) information from other cases; and (3) the amount of legal work involved, the risks

---

[3] "A district court is certainly empowered to reduce a fee request sua sponte, and indeed it has an independent obligation to scrutinize the legitimacy of such a submission." *Jaffee v. Redmond*, 142 F.3d 409, 416 n.2 (7th Cir. 1998) (internal quotation marks omitted).

[4] Ultimately, "it is the fee applicant's burden to establish his or her market rate; if the applicant fails, the district court may make its own rate determination." *In re Southwest Airlines Voucher Litig.*, 2014 U.S. Dist. LEXIS 84072, *10 (N.D. Ill. June 20, 2014) (citing *Johnson v. GDF Inc.*, 668 F.3d 927, 933 (7th Cir. 2012)).

of non-payment and the quality of legal services rendered. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011), cert. denied, 132 S. Ct. 1911 (2012); *Synthroid I*, 264 F.3d at 721.

### 1. Actual fee contracts – little or no weight should be afforded Class Counsel's 40% contingency agreement with Plaintiffs.

Here, each of the three named Plaintiffs purportedly signed a contingency-fee contract with Class Counsel calling for a forty percent (40%) fee plus costs. [Nelson Decl. ¶ 11, Doc. 954, Page ID#: 40490]. However, the Court must be mindful that the 40% contingency-fee contracts negotiated between Class Counsel and the named Plaintiffs are probably not reflective of what would likely be hypothetically charged in a class action specifically if negotiated with the entire class. *See In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *11 (N.D. Ill. Dec. 9, 2009); *Mezyk v. U.S. Bank Pension Plan*, No. 3:09-CV-384-JPG-DGW (S.D. Ill. Nov. 5, 2012), Doc. 159 at 5. There is an inherent difference in negotiating a contingency-fee contract with a single plaintiff and negotiating a contingency-fee contract with a plaintiff class where the anticipated recovery will differ substantially. *Mezyk,*, Doc. 159 at 2.

Class Counsel tout the opinion of one of their experts, Brian Fitzpatrick, who opines that "Class Counsel's request for 33.33% is not only a good approximation of what class members would have agreed to, but it is a very conservative one." [Fitzpatrick Decl. ¶ 16, Doc. 954, at Page ID#: 40490]. But here, the record does not suggest that Class Counsel would have been negotiating in a completely non-competitive market. As one Court in this Circuit recently observed:

> in a hypothetical bargaining situation, well-informed class members would also be aware that the sliding-scale structure is, as Professor Rubenstein says, "often used in Seventh Circuit cases," Rubenstein Decl. at 3, and likely would shop around to see if any other firm would be willing to take their case and pursue a large

9

> recovery for a sliding-scale fee. It is not clear that the hypothetical class members in this case would be faced with the binary choice between a high-percentage fee with a large recovery, on the one hand, and a sliding-scale fee for a small recovery, on the other. Just as hypothetical plaintiffs may be willing to accept a higher fee percentage for a larger absolute recovery, it is also likely, all else being equal, that they would prefer the sliding-scale approach to a higher flat rate if both hypothetical law firms were willing and able to pursue a large recovery. In short, although it is possible that a hypothetical bargain would result in an agreement for a flat rate, it seems no more probable than an agreement for a sliding-scale rate, and thus the Court sees no reason to depart from the sliding-scale approach that, as noted, appears to have become the standard model in this circuit for cases of this type.

*Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 U.S. Dist. LEXIS 52645, at *17-18 (N.D. IL Apr. 6, 2017).

### 2. Information from other cases does not support a fee of one-third of the $250 million settlement.

In megafund[5] cases, the Seventh Circuit focuses on the market rates of legal services and considers fee-percentages awarded in other megafund cases. *See Synthroid I*, 264 F.3d at 718. Many of these cases rely on empirical studies that confirm a strong tendency toward a downward-scaling effect of fees as the amount of the settlement increases. These studies find that mean/median percentage awards in megafund cases lie between ten and twelve percent, a far cry from the 33⅓% sought here. The Seventh Circuit has found such evidence very persuasive. For example, in its most recent articulation of the fee standard, the Court observed that the relevant "[d]ata" – including those studies – reveal that "[a]n award fixed at 27.5% of a $200 million fund is exceptionally high" and "at the outer limits of reasonableness." *Silverman v.*

---

[5] "Mega-fund" cases are those cases where the recovery exceeds $100 million. *See In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 524 (W.D. La. 2017).

*Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013).  If 27.5% is at the "outer limits of reasonableness," then 33⅓% is well-beyond those limits.

### *The sliding-scale structure is the standard*

Although in *Silverman*, the Court approved a flat-rate award, it did so only after approving the sliding-scale approach adopted in *Synthroid II*.  739 F.3d at 959.  There can be little doubt the sliding-scale structure is now the standard model for cases like this in this Circuit. *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 U.S. Dist. LEXIS 52645, at *14 (N.D. IL Apr. 6, 2017).  Try as they may, Class Counsel cannot undo the Seventh Circuit's adoption of this standard in megafund cases.  *See Synthroid II*, 325 F.3d at 978-980; *Silverman*, 739 F.3d at 959.

Class Counsel contend that it would be inappropriate to apply the sliding scale in this case.  But Class Counsel's request for a flat percentage ignores the Seventh Circuit's repeated observation that negotiated fee agreements regularly apply a sliding scale in which the percentage devoted to attorney's fees decreases as the dollar value of the settlement fund increases.  *See Gehrich v. Chase Bank United States*, 2016 U.S. Dist. LEXIS 26184, at *49 (N.D. Ill. Mar. 2, 2016) (citing *Silverman*, 739 F.3d at 959); *Synthroid II*, 325 F.3d at 978-80.  The Seventh Circuit has described the sliding-scale approach as follows:

> Awarding counsel a decreasing percentage of the higher tiers of recovery enables them to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin (yet still preserving some incentive for lawyers to strive for these higher awards).

*Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 959 (7th Cir. 2013).

In *Synthroid II*, the Seventh Circuit awarded attorney fees in the amount of 30% of the first $10 million of the class settlement, 25% of the second $10 million, and 22% of the amount

between $20 million and $46 million. 325 F.3d at 980.  Applying the *Synthroid II* scale to the properly calculated settlement fund ($242,953,147.2) in this case yields a fee of $54,549,692.38 (30% of first $10 million ($3,000,000); 25% of second $10 million ($2,500,000); and 22% of the amount between $20 million and $242,953,147.20 ($49,049,692.38), a savings of $28,783,640.62 to the class.

That award amounts to approximately 22.5% of the properly calculated settlement fund ($242,953,147.2) (after deductions for expenses and service awards), or 21.8% of the gross settlement ($250 million), both substantially higher than the mean percentage (17.9%) and the median percentage (16.9%) that Fitzpatrick found in class settlements between $100 million and $250 million.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839 (2010).[6]

### *If the Court chooses to award a flat-percentage, the percentage must comport to a reasonable fee in a megafund case*

Class Counsel's reference to fee awards in other "multi-million dollar settlements" is, to put it mildly, not persuasive. [Doc. 954, Page ID#: 40491].  This is a quarter billion dollar megafund settlement, and while "[c]ourts in this Circuit regularly award fees of 33.33% or higher" [Doc. 954, Page ID#: 40491-93], the comparison is apples to oranges.  It is not disputed that awards of about 30% are not unusual in the Seventh Circuit in common fund cases in which recovery is less than $10 million.  *See, e.g., Taubenfeld v. Aon Corp.*, 415 F.3d 597, 598-600 (7th Cir. 2005) (holding that district court was within its discretion in awarding lead counsel 30% of a

---

[6]They also substantially exceed the mean percentage (12%) and the median percentage (10.2%) found in class settlements between $100 million and $250 million in Theodore Eisenberg's and Geoffrey Miller's 2010 study.  Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studies 248, 265 (2010).

$7.25 million settlement fund). Courts in the Seventh Circuit even regularly allow attorneys to recoup one-third of the first $10 million of the settlement fund.  *See, e.g., Synthroid II*, 325 F.3d at 980 ("We . . . give consumer class counsel 30% of the first $10 million . . . ."); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11 C 4462, 2015 U.S. Dist. LEXIS 35421, at *4 (Mar. 23, 2015) (awarding plaintiffs' counsel a sliding scale contingency fee including thirty percent of the first ten million dollars of the settlement).  But megafund settlements are different.

"Larger common funds are typically associated with smaller percentage awards, however, because even a small percentage of a very large fund yields 'a very large fee award.'" *In re Black Farmers Discrimination Litigation*, 856 F. Supp.2d 1, 39 (D.D.C. 2011) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005)).  "Where the common fund is worth many millions or even billions of dollars – in so-called 'megafund' cases – an appropriate fee may be considerably less than twenty percent of the fund." *Id*.  *See, e.g., In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509-LHK, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015) ("accepting that the median attorney's fees award in a sample of 68 'megafund' class action settlements over a 16-year period was 10.2%, an award here of 9.8% is reasonable"); *Alexander v. FedEx Ground Package Sys.*, No. 05-cv-00038-EMC, 2016 U.S. Dist. LEXIS 78087 (N.D. Cal. June 15, 2016) (16.4% of common fund consistent with the higher end of awards in megafund cases); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, 2001 WL 34312839, at *6 (D. D.C. July 16, 2001) (in cases of recoveries of $100 million plus, "fees of fifteen percent are common"); *In re Prudential Ins. Co.*, 148 F.3d 283, 339 (3rd Cir. 1998) (fee awards in class actions with recoveries exceeding $100 million "ranged from 4.1% to 17.92%.").

Here, the two megafund cases relied upon by Class Counsel in which courts awarded fees of one-third of the settlement fund are easily distinguished and unpersuasive.  In both cases, *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (a $163.9 million settlement) and *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 908–09 (S.D. Ill. 2012) (a $105 million settlement) there was not a single class member that objected, nor was there an appeal of the settlement or fee award to the Seventh Circuit.

In the face of *Silverman*, Class Counsel still maintain "[t]here is no sound reason to limit the attorneys' fee percentage in a megafund case such as this." [Doc. 954, at Page ID#: 40495].  Although they attempt to distinguish both the analysis and the result in *Silverman* [Doc. 954, Page ID #40495], there is little, if anything, to warrant a distinction.  In *Silverman*, the Seventh Circuit observed that it is "hard to justify awarding counsel as much of the second hundred million as of the first.  The justification for diminishing marginal rates applies to $50 million and $500 million cases too, not just to $200 million cases."  *Silverman*, 739 F.3d at 959.

Indeed, empirical studies – including a study by Class Counsel's own expert, Professor Fitzpatrick, confirm this now-settled rule.  *See* Brian T. Fitzpatrick, *"An Empirical Study of Class Action Settlements and Their Fee Awards,"* 7 J. Empirical Legal Stud. 811, 839 (2010); Theodore Eisenberg & Geoffrey P. Miller, *"Attorney Fees and Expenses in Class Action Settlements: 1993-2008,"* 7 J. Empirical Legal Stud. 248, 265 (2010).  These studies, relied upon by the Seventh Circuit, convincingly confirm the percentage of the settlement allocated to attorney fees tends to decrease as the total size of the settlement increases.  *See Silverman*, at 958.

### 3. The legal services rendered should be scrutinized.

Given the complexity of this litigation, it undoubtedly took highly qualified attorneys performing at a high quality level to go head-to-head with one of the largest companies in the United States. However, whatever methodology the Court decides to use, given the incredibly high lodestar disclosed by Class Counsel [Doc. 954, at Page ID#: #40497], the Court should request their full billing records in order to determine if the hours listed were reasonable and/or if the time summary includes duplication and redundant work. *See Rose v. Bank of America*, No. 11-cv-02390, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014). It should be incumbent upon the Court to satisfy itself that the hours devoted to briefing, hearings, settlement negotiations, mediation, and settlement briefing are not duplicative or excessive. *Rose*, at *23.

### 4. Class Counsel vastly overstate the risks of proceeding to trial with the evidence they amassed during over six years of litigation.

Class Counsel argues that "this case was about as risky as a case could be." [Doc. 954, at Page ID#: 40492-40493] (pointing to "approximately 100 contested motions," that Class Counsel "navigated a veritable minefield of legal and factual challenges, certified a nationwide class, survived motions to dismiss, motions for summary judgment, and three trips to the Seventh Circuit, and took the case through the beginning of trial").

Class Counsel argue that their $83 million fee request is justified because this suit was unusually risky. This argument is belied by the fact that, as the case progressed, more and more law firms and attorneys began appearing on behalf of Plaintiffs and the putative Class. In other words, when this suit got under way, four of the original Avery plaintiffs' law firms were listed as attorneys. There is no evidence that the plaintiffs' bar saw this litigation as "too risky" for their practices. Indeed, the docket evidences that while four law firms filed the original RICO action in May 2012, as the case progressed, additional law firms and attorneys joined in to

15

represent the Plaintiffs, and that by the time the case settled, seven additional law firms had appeared for the Plaintiffs and at least thirty-nine (39) attorneys entered appearances in the case for the Plaintiffs. Even early on in the case, reputable, prominent and nationally-known Plaintiffs' law firms – class action powerhouses Hausfeld LLP and Lief Cabraser, and well-known Chicago mainstays Much Shelist and Clifford Law Offices – joined the case on behalf of Plaintiffs. A significant indication of the viability and strength of the Plaintiffs' RICO claims is the appearance of University of California at Berkley Law School Dean Erwin Chemerinsky, who is considered one of the foremost and preeminent legal scholars of our time.

### C. Service Awards ($25,000) Are Excessive.

Three Plaintiffs seek incentive awards of $25,000. The Seventh Circuit recognizes incentive awards as "justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722. In determining whether an award is appropriate, and, if so, in what amount, the Court looks to "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

Here, not one of the named Plaintiffs submitted a declaration attesting to his or her efforts on behalf of the class, much less how the class benefitted from such efforts or how much time was expended on the case. Moreover, there is nothing to indicate that the named Plaintiffs required such an award to participate in the case. By any reasonable account, a review of the record reveals that the named Plaintiffs' involvement in the case prior to settlement does not justify the requested $25,000 incentive award per Class Representative. In light of the degree of

their participation in the case and the amount of time and effort they appear to have expended, if the settlement receives final approval, each named Plaintiff should be awarded $5,000.

### D. Objection Process Is Burdensome, as Few Class Members Could be Expected to Retain Documents for 20 to 31 Years.

If you did not receive a postcard notifying you of your membership in the class, any class member who chooses to object to the settlement must produce "proof of class membership." To think that class members would retain such documentation for a period of twenty (20) to thirty-one (31) years is an unrealistic burden. Moreover, this burden was not imposed on all claimants and therefore constitutes an unfair double-standard.[7] Saddling objectors with burdens not imposed on all class members is punitive, intended to intimidate class members from objecting. If the settlement requires claimants to sign the Claim Form under penalty of perjury and acknowledge all claims may be subject to audit, verification and Court review, there is no valid rationale for imposing a more burdensome requirement on objecting class members.

In all likelihood, absent any valid reason, the purpose of the stringent documentation requirement is to minimize the ability of such objectors to appeal. However, "[i]mposing too great a burden on an objector's right to appeal may discourage meritorious appeals or tend to insulate a district court's judgment in approving a class settlement from appellate review." *Vaughn v. American Honda Motor Co.*, 507 F.3d 295, 300 (5th Cir. 2007).

---

[7] This Court granted class certification despite the apparent lack of a "reliable and administratively feasible" way to identify class members (including claimants, opt-outs and objectors). Doc. 556, citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Cf 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1760 (3d ed. 2005) (The ascertainability standard under Rule 23 will not be deemed satisfied "unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.") If objectors must prove membership in the class, then Mrs. Marlow submits that all claimants and persons opting out of the settlement should suffer the same burden.

17

## CONCLUSION

For the reasons stated, the Court should deny Plaintiffs' motion for final approval, deny Class Counsel's motion for attorneys' fees or substantially reduce the award from that requested and award the named Plaintiffs a service award commensurate with their actual efforts on behalf of the class not to exceed $5,000 per person.

Respectfully submitted, this 17th day of November, 2018.

/s/ *Mark J. Downton*
Mark J. Downton, Admitted Pro Hac Vie
2706 Larmon Avenue
Nashville, TN 37204
Telephone: (615) 275-6480
Attorney for Objector Lisa D. Marlow

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 7.1(b), I certify that a copy of this Objection was served upon on all counsel of record registered for ECF notifications on November 17, 2018, via the Court's CM/ECF system, and to the following via Federal Express:

Hale v. State Farm
Class Action Administrator
P.O. Box 5053
Portland, OR 97208-5053

Steven Blonder
Much Shelist, P.C.
191 North Wacker Drive
Suite 1800
Chicago, IL 60606

Ronald S. Safer
Joseph A. Cancila, Jr.
Riley Safer Holmes & Cancila LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602

Paul E. Veith
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Russell K. Scott
Greensfelder, Hemker & Gale, P.C.
12 Wolf Creek Street, Suite 100
Belleville, IL 62226

*/s/ Mark J. Downton*
Mark J. Downton