# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARK HALE, TODD SHADLE, and LAURIE LOGER, on behalf of themselves and all others similarly situated, | |
| Plaintiffs | Case No. 3:12-cv-00660-DRH-SCW |
| v. | Judge David R. Herndon |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, EDWARD MURNANE, and WILLIAM G. SHEPHERD, | Magistrate Judge Stephen C. Williams |
| Defendants. | |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES AND COSTS

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 1

    I.    The Settlement Is Fair, Reasonable, and Adequate. ............................................. 1

        A.    The Class was well represented. ............................................................ 2

        B.    The Settlement was negotiated at arm's length without a hint of collusion. ................................................................................................ 2

        C.    The Settlement treats Class members fairly and proposes an efficient plan of distribution. ........................................................................ 3

        D.    The parties had completed all discovery and begun trial when they settled. .................................................................................................... 3

        E.    The Class overwhelmingly supports the settlement. ................................. 4

        F.    The Settlement secures substantial benefits for the Class, especially given the significant "costs, risks, and delay of trial and appeal." ...................................................................................................... 5

    II.    Class Counsel's Requested Fees and Expenses Reflect a Fair Estimate of the *Ex Ante* "Market Price" for Counsel's Services. .............................................. 9

        A.    The market rewards risk, and this case was tremendously risky. ............ 10

        B.    Class Counsel performed well and took the case all the way to trial. ...................................................................................................... 11

        C.    There is no "megafund" cap in this Circuit, and courts regularly award attorneys' fees of 1/3 or greater in large, complex cases. ............. 12

        D.    The declining percentage approach is not a "one-size-fits-all . . . Cinderella slipper" and does not fit the unique facts of this case. ........... 14

        E.    The lodestar cross-check confirms the reasonableness of Class Counsel's request. .................................................................................... 16

        F.    Class Counsel's requested expenses are reasonable and unopposed. ....... 17

    III.    The Requested Service Awards Are Reasonable. ................................................. 17

    IV.    The Single Objector May Not Be a Class Member and Did Comply with the Court's Orders; Her Objection Should Therefore Be Stricken and Overruled. .................................................................................................. 18

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

### Cases

*Aranda v. Caribbean Cruise Line, Inc.*,
  No. 12 C 4069, 2017 WL 1369741 (N.D. Ill. Apr. 10, 2017) ........................................... 14, 15

*Armstrong v. Bd. of Sch. Dirs.*,
  616 F.2d 305 (7th Cir. 1980) ...................................................................................... 4

*Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002)............................................................................... 18

*Beesley v. Int'l Paper Co.*,
  No. 3:06-CV-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014)............................... 16

*Bell Atl. Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993) ........................................................................................ 5

*Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*,
  No. 16-CV-488-SMY-RJD, 2017 WL 5724208 (S.D. Ill. Apr. 26, 2017), *aff'd*, 897
  F.3d 825 (7th Cir. 2018) ............................................................................................ 5

*Carnegie v. Household Intern., Inc.*,
  445 F. Supp. 2d 1032 (N.D. Ill. 2006) .................................................................. 18, 19

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
  Care, L.L.C.*,
  504 F.3d 229 (2d Cir. 2007) ..................................................................................... 18

*Central Laborer's Pension Fund v. Sirva, Inc.*,
  No. 1:04-cv-07644, Dkt. No. 249 (N.D. Ill. Oct. 31, 2007) ..................................................... 15

*Chambers v. Whirlpool Corp.*,
  214 F. Supp. 3d 877 (C.D. Cal. 2016) ....................................................................... 20

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974), *overruled on other grounds as recognized by U.S.
  Football League v. Nat'l Football League*, 887 F.2d 408 (2d Cir. 1989)................................. 7

*City of Greenville v. Syngenta Crop Prot., Inc.*,
  904 F. Supp. 2d 902 (S.D. Ill. 2012)................................................................... 12, 15

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
  No. CIV. 6:12-1609, 2015 WL 965696 (W.D. La. Mar. 3, 2015)........................................... 16

*County of Suffolk v. Long Island Lighting Co.*,
  907 F.2d 1295 (2d Cir. 1990) ...................................................................................... 7

*Feder v. Elec. Data Sys. Corp.*,
  248 F. App'x 579 (5th Cir. 2007)................................................................................ 18

*Gautreaux v. Pierce*,
  690 F.2d 616 (7th Cir. 1982) ...................................................................................... 4

**TABLE OF AUTHORITIES**
(continued)

Page

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
128 F.3d 1074 (7th Cir. 1997) ..................................................... 2

*Gould v. Alleco, Inc.*,
883 F.2d 281 (4th Cir. 1989) ...................................................... 18

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers,*
*L.L.P.*,
212 F.R.D. 400 (E.D. Wis. 2002) ................................................ 3

*Gross v. Waywell*,
628 F. Supp. 2d 475 (S.D.N.Y. 2009) ........................................ 10

*Heekin v. Anthem, Inc.*,
No. 1:05-cv-01908-TWP-TAB, 2012 WL 5878032 (S.D. Ind. Nov. 20, 2012) ...................... 17

*Heller v. Quovadx, Inc.*,
245 F. App'x 839 (10th Cir. 2007) .............................................. 18

*Hendricks v. Starkist Co*,
No. 13-CV-00729-HSG, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016), *aff'd sub*
*nom. Hendricks v. Ference*,
No. 16-16992, 2018 WL 5115482 (9th Cir. Oct. 19, 2018) ......................... 18

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) ............................................ 5

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ...................................................... 16

*In re Cmty. Bank of N. Virginia*,
622 F.3d 275 (3d Cir. 2010) ...................................................... 7

*In re Dairy Farmers of Am., Inc.*,
80 F. Supp. 3d 838 (N.D. Ill. 2015) ........................................ 10, 14

*In re Mexico Money Transfer Litig. (W. Union & Valuta)*,
164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer*
*Litig.*, 267 F.3d 743 (7th Cir. 2001), *cert. denied sub nom. Garcia v. W. Union Fin.*
*Servs., Inc.*, 535 U.S. 1020 (2002) ............................................ 4

*In re Sw. Airlines Voucher Litig.*,
No. 11 C 8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013), *aff'd as modified,* 799
F.3d 701 (7th Cir. 2015) .......................................................... 5

*In re Synthroid Marketing Litig.*
325 F.3d 974 (7th Cir. 2003) ................................................ 13, 15

*In re Synthroid Mktg. Litig.*
264 F.3d 712, 718 (7th Cir. 2001) .................................. 9, 10, 11, 12

*In re: State Farm Auto. Ins. Co.*,
No. 16-8020, Dkt. 38 (7th Cir. Dec. 8, 2016) .............................. 6

-iii-

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ................................................................. 9

*Jaffee v. Redmond*,
   142 F.3d 409 (7th Cir. 1998) ................................................................. 13

*Johnson v. Meriter Health Servs. Employee Ret. Plan*,
   No. 10-CV-426-WMC, 2015 WL 13546111 (W.D. Wis. Jan. 5, 2015).................. 13

*Kleen Prods. LLC v. Int'l Paper Co.*,
   No. 1:10-CV-05711, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) ........................ 5

*Lorazepam & Clorazepate Antitrust Litig.*,
   205 F.R.D. 369 (D.D.C. 2002)................................................................. 7

*Martin v. Caterpillar Inc.*,
   No. 07-CV-1009, 2010 WL 11614985 (C.D. Ill. Sept. 10, 2010) ........................ 14

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004)............................................................. 5

*Needham v. White Laboratories, Inc.*,
   847 F.2d 355 (7th Cir. 1988) ................................................................. 7

*Office & Prof'l Employees Int'l Union v. Int'l Union, United Auto., Aerospace &*
   *Agric. Implement Workers of Am.*,
   311 F.R.D. 447 (E.D. Mich. 2015) ........................................................... 5

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................. 7

*Schulte v. Fifth Third* Bank, 805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................... 11

*Silverman v. Motorola Sols., Inc.*,
   739 F.3d 958 (7th Cir. 2013) ................................................... 10, 13, 15

*Silverman v. Motorola, Inc.*,
   No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012), *aff'd sub nom.*
   *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013) ........................ 14

*Spano v. Boeing Co.*,
   No. 06-CV-743-NJR-DGW, 2016 WL 3791123 (S.D. Ill. Mar. 31, 2016)............... 13

*Standard Iron Works v. ArcelorMittal*,
   No. 08 C 5214, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014)........................... 12, 15

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d Cir. 1990) ................................................................. 5

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011) ................................................................. 7

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ................................................................. 2

-iv-

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005) ............................................................ 11

*Tennessee Ass'n of Health Maint. Organizations, Inc. v. Grier*,
    262 F.3d 559 (6th Cir. 2001) ............................................................ 18

*United States v. Lapi*,
    458 F.3d 555 (7th Cir. 2006) ............................................................ 6

*Van Lith v. iHeartMedia + Entm't, Inc.*,
    No. 1:16-CV-00066-SKO, 2017 WL 4340337 (E.D. Cal. Sept. 29, 2017) ............................ 5, 9

*White v. Experian Info. Sols., Inc.*,
    No. 8:05-CV-01070, 2018 WL 1989514 n.5 (C.D. Cal. Apr. 6, 2018) .................................. 20

*Will v. Gen. Dynamics Corp.*,
    No. CIV. 06-698-GPM, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) .................................. 17

*Young v. County of Cook*,
    No. 06 C 552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017) ............................................ 14, 15

**Statutes**

Fed. R. Civ. P. 23(e)(2) ............................................................ 1, 2

**Treatises**

4 Newberg on Class Actions § 13:22 (5th ed.) ............................................................ 18

## INTRODUCTION

After almost seven years of hard-fought litigation, and after trial had begun, Plaintiffs secured a $250 million non-reversionary cash settlement for the Class. The Court preliminarily approved the Settlement on September 4, 2018, after which a combination of direct and publication notice of the Settlement and Class Counsel's fee request was issued to an estimated 4.7 million Class members. Remarkably, despite the extent of the notice, including individual notice to approximately 1.43 million class members, only *one person* has voiced any opposition. This extraordinarily positive response to the Notice Program speaks volumes and is strong evidence in support of both the Settlement and Class Counsel's requested attorneys' fees.

The lone objector, moreover, may not even be a Class member. The initial Claim Form that she submitted under oath states unequivocally that she is not, and she has steadfastly refused to comply with this Court's Orders. If she is not a Class member, or if she does not fully comply with this Court's Orders, then her objection should be stricken. Regardless, she raises no persuasive arguments to undermine Plaintiffs' and Class Counsel's motions. The Settlement easily meets all requirements for final settlement approval, especially in light of the substantial relief it secures for the Class. Class Counsel's requested fees are also justified and reflect a reasonable estimate of the market price for their services given the enormous risk they undertook when they filed the complaint, the results they achieved, and the stage at which the case finally resolved. Plaintiffs therefore request that the Court strike the objection, grant final approval to the Settlement, and approve Class Counsel's requested fees and costs.

## ARGUMENT

### I. The Settlement Is Fair, Reasonable, and Adequate.

The Court's core task is to determine whether the proposed Settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In this Circuit, that determination requires analysis of a number of factors, including: (1) the strength of the plaintiff's case compared to the terms of the settlement; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the presence of collusion in gaining a settlement; and

(5) the stage of the proceedings and the amount of discovery completed. *See, e.g.*, *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997). The newly amended Rule 23 requires analysis of a similar set of factors, including whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). As set forth below, each of these factors favors approval of the Settlement, and indeed, most of them are not even contested.

### A.     The Class was well represented.

When the Court certified the litigation Class—which is identical to the Settlement Class—the Court concluded that both the Class Representatives and Class Counsel were adequate. [556] at 15-18. This remains true. The Class Representatives have "no conflicts of interest" (*id.* at 16) and have invested significant time and resources in this litigation for more than six years ([954-4] ¶ 11). Class Counsel have "extensive experience in prosecuting RICO claims, class actions, and various complex cases" ([556] at 17) and have litigated this case intensively, and successfully, for almost seven years ([954] at 5-6). For what it is worth, the objector agrees, calling "Hausfeld LLP and Lieff Cabraser . . . class action powerhouses," acknowledging that "Much Shelist and Clifford Law Offices . . . are well-known Chicago mainstays," and labeling Dean Erwin Chemerinsky "one of the foremost and preeminent legal scholars of our time." [961] at 16. Adequacy is uncontested and favors approval.

### B.     The Settlement was negotiated at arm's length without a hint of collusion.

There was no collusion. The settlement negotiations were conducted at arm's length and overseen by two experienced, Court-appointed mediators, and at the very late stages, by the Court itself. After considering the extensive record, the Court previously found that "the

Settlement Agreement has been negotiated in good faith at arms' length between experienced attorneys familiar with the legal and factual issues of this case, and overseen by experienced and Court-appointed mediators." [942] at 2; *cf.* [954-3] (Rubenstein) ¶ 37(e) ("There is here not a hint of collusion – this case has been nothing but adversarial since its inception and proceeded all the way to trial before settling. There is, therefore, no evidence whatsoever of class counsel selling out the class's interest."). This conclusion is well-grounded, and no objector offers any reason to disturb it. This factor, therefore, strongly favors final approval. *See Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (citation omitted) ("A strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's length] negotiation.").

## C. The Settlement treats Class members fairly and proposes an efficient plan of distribution.

All Class members are treated equally under the proposed Settlement. Because their interests in the *Avery* judgment were "undivided" when they were lost ([846] at 16-17), each Class member's damages were "identical" ([556] at 21). The proposed Settlement therefore entitles each Class member to an equal, pro-rata share of the Settlement fund. [941] § A(l). These funds, moreover, will be distributed *automatically* to the approximately 1.43 million Class members whose contact information is known, and the remaining Class members have only to submit a simple claim form attesting to their Class membership. The Settlement treats Class members fairly and proposes an efficient method for distributing their compensation.

## D. The parties had completed all discovery and begun trial when they settled.

The Settlement was reached only after trial began and after almost seven years of "extraordinarily protracted and complex" pre-trial proceedings (Sept. 4, 2018 Hr'g Tr. at 6:8-10), including extensive document review, dozens of depositions, dozens of discovery hearings, and approximately 100 contested motions ([954-4] Exs. A-C). The fact that this case went to trial is extremely uncommon. *See* [954-2] ¶ 20 (only 1.3% of class actions go to trial). Thus, as the Court concluded, "the extent of [both the Court's and Class Counsel's] knowledge" about the

case "is likely as close to complete as one could ever achieve in a piece of litigation, short of knowing what the jury would do." Sept. 4, 2018 Hr'g Tr. at 5:25-6:5; *see also Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 325 (7th Cir. 1980) ("The stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims."). Class Counsel, moreover, strongly endorse the proposed Settlement based on their significant experience and intimate knowledge of the case. *See Gautreaux v. Pierce*, 690 F.2d 616, 634 (7th Cir. 1982) (courts may "rely heavily on the opinion of competent counsel"); *In re Mexico Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1032 (N.D. Ill. 2000), *aff'd sub nom. In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001), *cert. denied sub nom. Garcia v. W. Union Fin. Servs., Inc.*, 535 U.S. 1020 (2002) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"). These factors unquestionably support final approval.

   **E.**  **The Class overwhelmingly supports the settlement.**

   The Settlement class includes approximately 4.7 million members. Approximately 1.43 million of them received individual postcard or email notice of the terms of the proposed Settlement, and the rest were notified via a robust publication program "estimated to reach 78.8% of all U.S. Adults Aged 35+ approximately 2.4 times." Declaration of Cameron R. Azari ("Epiq Decl.") ¶¶ 26, 41.[1] CAFA Notice was also properly issued to the attorneys general and insurance commissioners of all 50 states. *See id.* ¶ 17, Attachment 1. Of those millions of Class members and more than a hundred senior government officials, only *one person* (Lisa Marlow) objected—and as discussed below, she may not be a member of the Class. Even if she were, this lone voice of opposition would represent a mere 0.00002% of the Class. Adding the 471 people who previously opted out after the Class was initially certified, the percentage of the Class that has expressed any disapproval of the litigation or settlement is 0.001%. [935] ¶ 6. This remarkably low level of opposition is "strong circumstantial evidence in favor of the settlement,"

---

[1] As the Epiq Declaration confirms, the previously-approved notice program was fully implemented and complies with Due Process and Rule 23(c)(2).

especially considering that well over one million class members received individual, direct notice. *See, e.g.*, *Mexico Money Transfer*, 164 F. Supp. 2d at 1021 (the fact that more than "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlement").[2] For all the reasons set forth below, moreover, the lone objection raises no compelling arguments against final settlement approval.

**F.** **The Settlement secures substantial benefits for the Class, especially given the significant "costs, risks, and delay of trial and appeal."**

As this Court observed, it is "completely, fully, and thoroughly familiar with" the detailed history of this litigation and "singularly suited to make . . . findings" about the proposed Settlement. Sept. 4, 2018, Hr'g Tr. at 5:8-9, 16-17. With that background, having closely overseen the case from the motion to dismiss to jury selection, the Court found that "the complexity, length, and expense of this case favors a settlement such as the one proposed here today." *Id.* at 15-18. The Court also analyzed the risks ahead, and noted that the Plaintiffs faced

---

[2] *See also Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, No. 16-CV-488-SMY-RJD, 2017 WL 5724208, at *2 (S.D. Ill. Apr. 26, 2017) ("The lack of opposition from any settlement class member also militates in favor of settlement."), *aff'd*, 897 F.3d 825 (7th Cir. 2018); *Kleen Prods. LLC v. Int'l Paper Co.*, No. 1:10-CV-05711, 2017 WL 5247928, at *3 (N.D. Ill. Oct. 17, 2017) (one objector out of 158,500 class members "attests to the "fairness" of the settlement); *In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) (concluding that objections and opt outs "amount[ing] to less than 0.01%" is a "low level of opposition [that] supports the . . . settlement"), *aff'd as modified*, 799 F.3d 701 (7th Cir. 2015); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 964-65 (N.D. Ill. 2011) (concluding that 10 objections and "less than 0.01%" of opt outs was "a remarkably low level of opposition [that] supports the Settlement"); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) ("Less than 30 of approximately 1.1 million shareholders objected. This is an infinitesimal number" that "does not favor derailing settlement."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990) (where 29 of 281 (10.3%) class members objected, finding that the "response of the class members, both in numbers and in rationale, strongly favors settlement"); *Van Lith v. iHeartMedia + Entm't, Inc.*, No. 1:16-CV-00066-SKO, 2017 WL 4340337, at *14 (E.D. Cal. Sept. 29, 2017) ("Indeed, '[i]t is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.'") (citation omitted); *Office & Prof'l Emps. Int'l Union v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 311 F.R.D. 447, 458 (E.D. Mich. 2015) (objection from "[o]nly one class member" is "extremely minimal level of opposition" and "is an indication of [the] settlement's fairness") (citations omitted); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

"a significant question regarding *Rooker-Feldman*" and "difficult issues having to do with *Noerr-Pennington*, perhaps res judicata, and a fact-based statute of limitations." *Id.* at 6:25-7:3. Thus, the Court concluded, the "strength of the plaintiffs' case compared to the terms of the settlement ***heavily favor the settlement***." *Id.* at 7:7-9 (emphasis added). Plaintiffs agree, as detailed in their motion for final Settlement approval. [953] at 7-10.

Marlow—who has no experience with this litigation—is nevertheless "incredulous[]" that "Rooker-Feldman, res judicata, collateral estoppel, the statute of limitations and Noerr-Pennington" posed any risk and denies even the "possibility Defendants might prevail on appeal." [961] at 7. This is true, she claims, because all of these issues "made their way to the Seventh Circuit, . . . and on each occasion, Plaintiffs were the victors." *Id.*

This argument betrays Marlow's (and her counsel's) unfamiliarity with this case and misunderstanding of the rules of federal and appellate procedure. To begin, the statute of limitations issue was not decided conclusively in Plaintiffs' favor; rather, the Court decided merely that Plaintiffs had raised "questions of material fact" sufficient to bring the issues to the jury. *See* [846] at 20-22. Had the jury found against Plaintiffs on this issue—or, for example, the heavily contested causation element under RICO, among many other disputed matters— Plaintiffs would have come away with nothing.

Even if Plaintiffs had prevailed at trial, they would have faced inevitable appeals, and all the risks associated with them. For, contrary to Marlow's suggestion, the Seventh Circuit did *not* rule definitively on any issue either. The mandamus petition, for example, was reviewed under a "manifest error" standard, *see United States v. Lapi*, 458 F.3d 555, 560-61 (7th Cir. 2006), and the Seventh Circuit explicitly reserved the right to "review" State Farm's contentions "on appeal from a final decision." [175]. The same is true for the discretionary Rule 23(f) petitions, and, as noted in Plaintiffs' motion, one Seventh Circuit judge dissented from the decision denying leave to appeal, which suggested that she may have voted to dismiss the case entirely for lack of jurisdiction. *In re: State Farm Auto. Ins. Co.*, No. 16-8020, Dkt. 38 (7th Cir. Dec. 8, 2016). None of this is to say that Plaintiffs' many victories in the trial court and on appeal were not important

or impressive. They were both. But, as the Court observed, the road ahead remained extremely risky and, regardless of the outcome, would have resulted in potentially years of additional delay.

Still, Marlow argues that the Settlement is too cheap because, according to her, "the jury (or the Court)" had "few, if any, alternatives but to award" over $7 billion, including interest and trebled damages. [961] at 5-6. Again, this cavalier and superficial gloss misses a lot. For starters, "in determining a settlement value, the potential for treble damages should not be taken into account." *Carnegie v. Household Int'l, Inc.*, 445 F. Supp. 2d 1032, 1035 (N.D. Ill. 2006).[3] This alone undermines Marlow's supposition.

Furthermore, while Marlow treats the availability (and amount) of "post-judgment" interest as a given ([961] at 5-6), it was anything but. Marlow supports her argument by relying on the report of Thomas Myers, whom she labels a "preeminent expert in the field of financial transactions." *Id.* However, Marlow omits the deposition testimony quoted in the same paragraph of the document she cites, in which Myers stated that, as to the interest and trebling calculations, he offered no opinion and served only as a "human calculator." [472] at 18. Moreover, State Farm argued vigorously that "Plaintiffs here are not entitled to post-judgment interest" on the *Avery* judgments because "those judgments were reversed and never reinstated." [880] at 2 (citing *Needham v. White Labs., Inc.*, 847 F.2d 355 (7th Cir. 1988)). Notably, the Court granted State Farm's Motion in Limine seeking to prevent any testimony on this topic. [905] at 31-32.

---

[3] *See also, e.g.*, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) ("[C]ourts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value."); *Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 n.12 (D.D.C. 2002) ("[T]he standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages."); *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) ("[T]he district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure."); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 458-59 (2d Cir. 1974) ("[T]he vast majority of courts which have approved settlements ... have given their approval ... based on an estimate of single damages only."), *overruled on other grounds as recognized by U.S. Football League v. Nat'l Football League,* 887 F.2d 408, 415-16 (2d Cir. 1989). Although a small minority of district courts has evaluated treble damages in a settlement context, there is "no authority that *requires* a district court to assess the fairness of a settlement in light of the potential for trebled damages." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 325 (3d Cir. 2011) (quoting *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 312 (3d Cir. 2010) (emphasis in original)).

Finally, at trial and on appeal, Defendants would have argued, and a jury or appellate court may have found, that even if Plaintiffs established liability, their damages were nominal. The Court agreed, noting that "[t]he jury theoretically could find that the damages equal . . . those at stake in the *Avery* case or could decide the damages are something else entirely." *Id.* at 46. Thus, even setting aside all the risks inherent in trial and the inevitable appeals—which the Court cannot do per Rule 23—Marlow's argument that the Settlement secures only a miniscule percentage of what Plaintiffs would have necessarily recovered at trial is, in a word, meritless.

In sum, Marlow would substitute her own risk assessment for that of Counsel who litigated the case for nearly seven years, but her optimistic outlook makes no effort to calculate the odds of losing any of the myriad issues that could have resulted in complete defeat for Plaintiffs. In weighing the Settlement offer, Class Counsel had to assess, for example, their odds of prevailing at trial on the RICO elements. Assume, for the sake of argument, it was 50% (though State Farm surely believed it was lower)—the settlement value must then be cut in half. And what about the odds of winning the statute of limitations issue at trial? Assume 50%, and the settlement value is now 25% of available damages ($0.5^2 = 0.25$). And on appeal, the odds of winning on *every single issue*—including RICO causation, *Noerr-Pennington*, *Rooker-Feldman*, and much more? Assume 50% for each of these three issues, and the settlement value is 3.125% of available damages ($0.5^5 = 0.03125$).

Thus, even had Plaintiffs prevailed on the interest argument notwithstanding the fact that the *Avery* judgments were not reinstated, the maximum single damages were approximately $2.5 billion. If State Farm had prevailed on the interest issue, the maximum single damages were $1.056 billion. The $250 million proposed settlement is approximately 10% of the former and 24% of the latter. Of course, assessing litigation risk is not an exact science, but the point is that Class Counsel made a settlement determination based on their significant class action experience, extensive work with focus groups and jury consultants, and their understanding of this case that was "as close to complete as one could ever achieve in a piece of litigation." *See* Sept. 4, 2018 Hr'g Tr. at 6:3-4. Marlow, in contrast, dismisses this analysis altogether.

Accounting for all the risk noted above—as the Court must—the $250 million non-reversionary, cash settlement, reflects a "fair, reasonable, and adequate" compromise of Plaintiffs' claims. *Mexico Money Transfer*, 164 F. Supp. 2d at 1014 (quoting *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996)) (in evaluating a proposed settlement, the court must recognize that the "essence of settlement is compromise" and will not represent a total win for either side); *Van Lith*, 2017 WL 4340337, at *12 ("'It is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial.'") (citations omitted).

* * *

Each and every factor of the newly amended Rule 23, as well as each of the Seventh Circuit factors, therefore strongly favors approval of the proposed Settlement.

## II.   Class Counsel's Requested Fees and Expenses Reflect a Fair Estimate of the *Ex Ante* "Market Price" for Counsel's Services.

In awarding attorneys' fees in common fund cases, courts in the Seventh Circuit "must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.* ("*Synthroid I*"), 264 F.3d 712, 718 (7th Cir. 2001). In their motion, Class Counsel detailed the many reasons why their request reasonably approximates "the market price for [their] legal services" under the unique facts of this case. [954] at 7-20. They also advanced the detailed declarations of three experts—arguably the three most prominent scholars on class action attorneys' fees in the country—each of whom analyzed Counsel's request through a different empirical lens, and each of whom concluded that the requested award was reasonable. *See, e.g.*, [954-1] (Charles Silver Decl.); [954-2] (Brian Fitzpatrick Decl.); [954-3] (William Rubenstein Decl.). Indeed, Professor Fitzpatrick, whose studies on class action fees have been cited dozens of times within the Seventh Circuit alone, opined that "Class Counsel's request for 33.33% is not only a good approximation of what class members would have agreed to, but it is a very

conservative one." [954-2] ¶ 16. This is true for a number of reasons, none of which are undermined by Marlow's objection.

### A.      The market rewards risk, and this case was tremendously risky.

"When determining the reasonableness of a fee request, courts put a fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit." *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 847-48 (N.D. Ill. 2015). This is relevant because "[t]he greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013); *accord Synthroid I*, 264 F.3d at 721 (The market rate must account for the "risk of non-payment a firm agrees to bear."). "[T]his consideration incentivizes attorneys to accept and (wholeheartedly) prosecute the seemingly too-big-to-litigate wrongs hidden within the esoteric recesses of the law, ensuring that the attorneys are compensated for their work at the end of the day." *Dairy Farmers*, 80 F. Supp. 3d at 848.

Here, Class Counsel have already articulated the many factual and legal risks confronting this case when it was filed. [954] at 3-5, 10-11. To recap: (1) RICO cases generally, and RICO class actions specifically, have astonishingly low success rates (less than 2%, *Gross v. Waywell*, 628 F. Supp. 2d 475, 480 (S.D.N.Y. 2009)); (2) the theory of recovery here was novel and untested; (3) Class Counsel bore the burden of building their case on their own, without the assistance of any governmental agency; (4) according to the magistrate judge, even two years into the case (much less at the time they filed suit), Plaintiffs did not have enough evidence to "connect the dots" of their case; and (5) there were at least half a dozen "significant" and "difficult" legal issues—including *Rooker-Feldman*, *Noerr-Penington*, *res judicata*, statute of limitations, RICO proximate cause, and RICO damages—all of which were heavily contested, and any one of which could have sunk the case entirely. *Id.*; *see also* Sept. 4, 2018, Hr'g Tr. at 6:1-7:9. It is no surprise, then, and no insignificant fact, that Professor Silver—who has studied, analyzed, and written on class actions for over 30 years—called this case "one of the riskiest" cases of his "lifetime." [954-1] at 33; *see also* [954-3] (Rubenstein) ¶ 36 (reviewing "[a] dozen

independent factors [that] demonstrate the riskiness of this case viewed *ex ante*"); [954-2] (Fitzpatrick) ¶ 21 ("[I]t is a *gross* understatement to say that this case involved above-average risks.") (emphasis in original).

Marlow simply ignores this critical part of the Seventh Circuit's analysis. Indeed, while she seems to acknowledge that, in determining the market price for counsel's service, courts in this Circuit must assess the risk that existed "at the **outset** of the case" ([961] at 8 (quoting *Synthroid I*, 264 F.3d at 718) (emphasis added)), her actual argument focuses only on "the risks of proceeding to trial with the evidence [Class Counsel] amassed during over six years of litigation" (*id.* at 15). The risk that remained at the time of resolution (which Plaintiffs regard as significant) is irrelevant to the *ex ante* market price inquiry required in this Circuit. Moreover, Marlow's observation that more attorneys joined the litigation as it progressed is, at best, evidence that Plaintiffs' case got stronger over the course of litigation, and actually strengthens Class Counsel's argument that the risk at the outset of the case was significant. This factor overwhelmingly favors approval of Class Counsel's requested fees.

### B.     Class Counsel performed well and took the case all the way to trial.

Even Marlow concedes that Class Counsel "achieved . . . enormous success in litigating the case." [961] at 2. This fact also supports Class Counsel's fee request. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (noting that the "evidence of the quality of legal services rendered" is among the "type[s] of evidence needed to mimic the market per *Synthroid I*"); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (compensation also depends on "the quality of [counsel's] performance."). So, too, does the fact that Counsel took this case to trial. This is because "plaintiffs in the market for legal representation often pay their lawyers with bifurcated rates that call for a higher percentage if their lawyers have to take their cases to trial, with fees as high as 50% in such circumstances." [954-2] (Fitzpatrick) ¶ 20. Courts approximating the market recognize this. As Professor Rubenstein's data reveals, in class actions that progressed to trial, the mean and median fee awards were 36% and 45% respectively—both

above the 33.33% Class Counsel seek here. [954-3] (Rubenstein) ¶ 18. Again, Marlow ignores the reality of the markets that this Court is required to mimic.

### C. There is no "megafund" cap in this Circuit, and courts regularly award attorneys' fees of 1/3 or greater in large, complex cases.

Marlow does not dispute that "[c]ourts in this Circuit regularly award fees of 33.33% or higher" ([961] at 12)—even absent the extraordinary risks and results present here—but instead claims that a lower percentage is warranted because "megafund settlements are different" (*id.* at 13). Her support for this proposition, however, is a series of cases in circuits with fee jurisprudence that differs significantly from that of the Seventh Circuit. *See id.* (citing cases within the Second, Third, Ninth, and D.C. Circuits). Whatever the merits of those cases, on this issue, the Seventh Circuit found reversible error for "follow[ing] decisions of district courts in other jurisdictions, rather than decisions of the . . . Seventh Circuit" and rejected a percentage cap on megafund recoveries because "[p]rivate parties would never contract for such an arrangement." *Synthroid I*, 264 F.3d at 718.

Empirical data confirms the Seventh Circuit's market analysis. As set forth in Class Counsel's motion and Professor Silver's declaration, sophisticated parties—both in non-class fee agreements and when negotiating fee arrangements as lead plaintiffs in class actions—routinely agree to flat percentages at or above 33.33% in cases that yield megafund recoveries. *See* [954-1] at 17-28. Courts regularly follow suit, even in megafund cases. Marlow's claim that Counsel cited only "two megafund cases . . . in which courts awarded fees of one third of the settlement fund" ([961] at 14) is simply wrong. Class Counsel extensively quoted Professor Silver's declaration which cites at least ***20 cases*** in which courts awarded 33% or more of recoveries between $105 and $974 million (not accounting for inflation). [954-1] at 39-45 (Table 2); *see also* [954] at 12-14. In any event, Marlow's suggestion that this Court should ignore *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014), and *City of Greenville v. Syngenta Crop Protection, Inc.*, 904 F. Supp. 2d 902, 908-09 (S.D. Ill. 2012), because there were no objections or appeals overlooks her concession that courts have an

"independent obligation to scrutinize" fee requests. [961] at 8 n.3 (quoting *Jaffee v. Redmond*, 142 F.3d 409, 416 n.2 (7th Cir. 1998)). There is no sound reason to limit the attorneys' fee percentage in a megafund case such as this to less than one third, and Marlow offers zero empirical, or even anecdotal, evidence to the contrary.

As explained in Class Counsel's motion, *Silverman* does not counsel otherwise, and neither do any of Marlow's arguments. 739 F.3d 956. While the *Silverman* court noted that 27.5% of $200 million "*may* be at the outer limit of reasonableness" under the facts of that case, it did not dispense with the Seventh Circuit's overarching instruction to "approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Id.* at 959, 957 (emphasis added). For all the reasons previously detailed, the extraordinary facts of this case— and the novel risks it entailed—set it apart from *Silverman*, a straightforward securities case, and suggest that sophisticated parties would have negotiated no less than a fee arrangement of 1/3 for a resolution reached after the case progressed to trial. [954-2] (Fitzpatrick) ¶ 25 (*Silverman* "presented none of the *ex ante* risks of this case (for example, *Silverman* was a securities fraud case, where class certification is relatively perfunctory), and, perhaps even more importantly, did not go to trial."). Indeed, as the Seventh Circuit noted in *In re Synthroid Marketing Litig. ("Synthroid II")*, "if securities suits present less risk to the plaintiff class than does a fraud suit against a drug manufacturer, it is unsound to use a contingent fee appropriate to the former as the measure in the latter." 325 F.3d 974, 979 (7th Cir. 2003). Likewise, if *Silverman* presented less risk to the plaintiff class than did this completely novel RICO class action—as it certainly did— then here, too, "it is unsound to use a contingent fee appropriate to the former as the measure in the latter." *See id.*[4]

---

[4] Citing no authority, Marlow suggests that the percentage must be calculated from the common fund net of reimbursed expenses. *See* [961] at 12 (arguing that the "properly calculated settlement fund" is $242,953,147.20). In fact, courts in this Circuit routinely award a percentage of the gross common fund without netting out separately awarded costs. *See, e.g., Spano v. Boeing Co.*, No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *4 (S.D. Ill. Mar. 31, 2016) (awarding 33.33% of $57 million fund in addition to costs for a total of 36.51% of fund); *Johnson v. Meriter Health Servs. Empl. Ret. Plan*, No. 10-CV-426-WMC, 2015 WL 13546111, at *6 (W.D. Wis. Jan. 5, 2015) (awarding 27.5% of $82 million settlement fund plus in costs for

**D.    The declining percentage approach is not a "one-size-fits-all . . . Cinderella slipper" and does not fit the unique facts of this case.**

For similar reasons, this Court should not adopt a decreasing sliding scale fee structure. In their motion, Class Counsel explained why this approach finds little support in the sophisticated market for legal services that the Court has been instructed to emulate. [954] at 13-14; [954-2] (Fitzpatrick) ¶ 27 ("[I]t would not be economically rational for plaintiffs who *cannot monitor* their lawyers to contract for such awards for the very same reason such plaintiffs would not want to pay their lawyers the same percentage if they settled early or went to trial: tapering disincentivizes lawyers from working hard for the largest recovery."). Class Counsel do not dispute that the Seventh Circuit, and courts within it, have endorsed a sliding scale approach in some circumstances. But Marlow's claim that it is the *only* permissible model is simply false.

*Silverman* itself, which affirmed a flat percentage in a megafund case, confirms this. 739 F.3d at 956. So does *Dairy Farmers*, 80 F. Supp. 3d at 845. There, the court observed that the declining percentage approach "is not a one-size-fits-all recovery scheme, and there are many other factors to consider before declaring this pricing grid the Cinderella slipper." *Id.* Ultimately, in that case, the court concluded that a flat 33.33% fee was appropriate even though the risk was relatively low and notwithstanding a "seemingly tailor-made tiered-pricing arrangement" set by the Seventh Circuit in *Synthroid II. Id.* at 845, 848.

Similarly, in *Young v. County of Cook*, No. 06 C 552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017), Judge Kennelly distinguished his own opinion in *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *9 (N.D. Ill. Apr. 10, 2017)—a decision upon which Marlow heavily relies—and concluded that the case fell "squarely within the category of cases for which the use of a declining marginal percentage scale *is not appropriate*." *Young*, 2017 WL 4164238, *5 (emphasis added). This was true, the court found, because of the "high risk of non-

---

total of 29.66% of the fund); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388, at *5 (N.D. Ill. May 7, 2012), *aff'd sub nom. Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013) ("The Court awards attorney's fees in the amount of 27.5% of the Settlement Amount and awards $4,729,743.16 in costs." (29.86% of settlement fund)); *Martin v. Caterpillar Inc.*, No. 07-CV-1009, 2010 WL 11614985, at *6 (C.D. Ill. Sept. 10, 2010) (awarding 33.33% of gross settlement fund in addition to costs for a total of 35.24% of the fund).

payment," the "enormous amount of work [that] went into" the litigation, and the fact that counsel had turned down an earlier settlement offer in a successful effort to obtain more for the class. *Id.* at *4-5. Each of these factors is present here, in spades. *See* [954] at 3-7, 10-12 (discussing risk and extent of work); Supplemental Declaration of Robert J. Nelson ("Nelson Decl.") ¶ 2 (noting that Class Counsel turned down settlement offers of significantly less than was ultimately obtained). Thus, Judge Kennelly's finding that a "33% contingent fee of the total recovery is on the low end of what is typically negotiated *ex ante* by plaintiffs' firms taking on large, complex cases" applies with equal force here. *See Young*, 2017 WL 4164238, *6; *see also, e.g.*, *Standard Iron Works*, 2014 WL 7781572, at *1 (awarding a flat 33% of $163.9 million settlement); *City of Greenville*, 904 F. Supp. 2d at 908-09 (awarding 33% of $105 million plus roughly $8.5 million in costs); *Cent. Laborer's Pension Fund v. Sirva, Inc.*, No. 1:04-cv-07644, Dkt. No. 249 (N.D. Ill. Oct. 31, 2007) (awarding a flat 29.85% percent of $53.3 million).[5]

As detailed throughout Class Counsel's motion, this case is in a league of its own. It was brought under a statute that almost never rewards plaintiffs. It relied on a novel, untested theory. It was accompanied by extreme risk of non-payment. It required an enormous amount of work. And it settled only after trial had begun. In light of these factors, Class Counsel's request of a flat 33.33% award is reasonable and, if anything, "is on the low end" of what sophisticated parties would have negotiated for a recovery during trial. *See Young*, 2017 WL 4164238, *6.[6]

---

[5] In all the cases cited in this section, courts awarded flat percentages of common funds of approximately $50 million or greater, even though the Seventh Circuit concluded the "justification for diminishing marginal rates," when applicable, "applies to $50 million and $500 million cases." *Silverman*, 739 F.3d at 959. That justification was not present in these many cases and is not present here.

[6] Even if the Court were inclined to adopt a decreasing sliding scale approach, however, the tiers and percentages that Marlow proposes would make no sense for this case. *See* [961] at 11-12 (citing *Synthroid II*, 325 F.3d at 980). Given the damages alleged, this case was not going to resolve in the low tens of millions of dollars, and no sophisticated parties would have negotiated *ex ante* recovery bands that sliced it so thin. Moreover, even the cases that Marlow cites applied percentage point "premiums" accounting for significant risks and results. *See Aranda*, 2017 WL 1369741, at *9. Thus, to the extent the Court considers a declining percentage award—and again, such an approach is neither necessary nor appropriate under the facts of this case—Class Counsel submit that a reasonable structure would be 36% of the first $100 million; 33.33% of the next $100 million, and 30% of the next $50 million (and any interest accrued).

**E.     The lodestar cross-check confirms the reasonableness of Class Counsel's request.**

For all the reasons noted above, Class Counsel have demonstrated that the compensation they seek is fair and would not result in a windfall. The lodestar cross-check, which Marlow essentially ignores, confirms this. *See* [954-3] (Rubenstein) ¶ 10 ("The lodestar cross-check ensures against a windfall by taking the absolute dollars counsel will receive via a percentage award and considering whether that number is greater or less than counsel's lodestar.").[7]

Here, as Class Counsel's motion and Professor Rubenstein's declaration both demonstrate: (1) Class Counsel's approximately 55,000 hours are reasonable in that they are below the mean in cases in the $250 million range that progressed to trial, and even lower after accounting for the number of years this case was litigated ([954] at 15-16); (2) Class Counsel's historical billing rates are only slightly higher than the average rates in this District, and significantly below those recently approved (*id.* at 16-17); and (3) the resulting multiplier of 2.83 (or 2.11 using recently approved rates) is well within the range of customary multipliers and more than justified by the risks this case presented at the outset (*id.* at 17-18). Marlow's claim that the number of hours billed is "incredibly high" under the circumstances ([961] at 18) ignores the empirical analysis demonstrating the opposite ([954-3] at 17-23). Relatedly, her assertion that the Court needs Class Counsel's "full billing records" to "satisfy" its obligations contravenes this Court's well-supported conclusion that it "may rely on summaries submitted by attorneys and need not review actual billing records." *Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014) (Herndon, J.). The lodestar cross-check confirms the fairness of Class Counsel's requested fees and ensures that they will not receive a windfall.

---

[7] *See also, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001) (A lodestar cross-check "ensure[s] that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel."); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. CIV. 6:12-1609, 2015 WL 965696, at *9 (W.D. La. Mar. 3, 2015) ("The purpose of a lodestar cross-check of the results of a percentage fee award is to avoid windfall fees, that is, to 'ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple.'").

**F.    Class Counsel's requested expenses are reasonable and unopposed.**

Class Counsel's motion detailed the reasonableness of their out-of-pocket litigation expenses. [954] at 18-20. No objector challenges this request, and for good reason. The expenses are below average and justified by the extraordinary steps necessary to advance this heavily contested litigation to trial. *Id.* Moreover, since submitting their initial request, Class Counsel have incurred more than $500,000 in costs relating to trial-preparation and expert invoices that had not yet been submitted, and will continue to incur additional costs through final approval and the claim period. Supp. Nelson Decl. ¶¶ 3-5. Class Counsel will pay all of this out of pocket, which further supports the reasonableness of their request.

**III.    The Requested Service Awards Are Reasonable.**

In their motion, Class Counsel explained that each of the three named plaintiffs "invested significant time and resources in this litigation for more than six years by, among other things: reviewing pleadings, responding to discovery requests, producing documents, sitting for depositions, preparing for trial, and overseeing the litigation." [954] at 20. They also cited five cases, including one from the Seventh Circuit and one from this Court, granting or affirming service awards of $25,000. *Id.* Even more examples abound. *See, e.g.*, *Will v. Gen. Dynamics Corp.*, No. CIV. 06-698-GPM, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (awarding $25,000 each to three named plaintiffs, and finding such awards are "well within the ranges that are typically awarded in comparable cases"); *Heekin v. Anthem, Inc.*, No. 1:05-cv-01908-TWP-TAB, 2012 WL 5878032, at *1 (S.D. Ind. Nov. 20, 2012) (awarding $25,000 each to two class representatives based on extensive involvement over seven years of litigation).

Citing no authority, Marlow nevertheless argues that such an award is unjustified here because the Representatives did not submit declarations attesting to their efforts. [961] at 16. But the efforts of these Class Representatives were set forth in the Nelson Declaration. [954-4] ¶ 11. There is no rule requiring declarations directly from the Class Representatives, but to end the argument, those declarations are attached here. *See* Hale Decl. ¶¶ 2-3; Shadle Decl. ¶¶ 2-3; Loger Decl. ¶¶ 2-3. As they confirm, the Class Representatives worked hard over almost seven years of

the *Hale* litigation (and even more in the *Avery* litigation) to advance this case and protect the

interests of the Class. They have earned the requested service awards.

## IV.  The Single Objector May Not Be a Class Member and Did Comply with the Court's Orders; Her Objection Should Therefore Be Stricken and Overruled.

Only class members have standing to object to a proposed settlement. *See Carnegie*, 445

F. Supp. 2d at 1035 ("Mr. Williams is not a member of the certified class . . . . He is therefore

without standing to contest the settlement.").[8] Lisa Marlow—the lone objector out of millions—

initially swore under penalty of perjury that she was not a member of the certified Class. The

Class includes, in relevant part, persons who:

> (1) were insured by a vehicle casualty insurance policy issued by Defendant State
> Farm and (2) made a claim for vehicle repairs pursuant to their policy and had
> non-factory authorized and/or non-OEM (Original Equipment Manufacturer)
> "crash parts" installed on or specified for their vehicles or else received monetary
> compensation determined in relation to the cost of such parts.

[941] (Settlement Agreement) at 5; [945-1] (long form notice) at Q.5. Accordingly, the

Settlement claim form asks claimants whether they had "non-factory authorized and/or non-

OEM (Original Equipment Manufacturer) 'crash parts' installed on or specified for [their]

---

[8] *See also, e.g.*, *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 566 (6th Cir. 2001) ("[U]nder Rule 23(e), non-class members have no standing to object to a lack of notice."); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007) ("Because CareFirst is not a class member, it does not have an affected interest in the class Plaintiffs' claims against Medco so as to be able to assert its objections on behalf of its Plans."); *Heller v. Quovadx, Inc.*, 245 F. App'x 839, 842 (10th Cir. 2007) (unpublished) ("Rule 23(e)(4) of the Federal Rules of Civil Procedure provides only that 'class member[s] may object to a proposed settlement.' As such, 'non-class members have no standing to object.'") (citations omitted); *Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 580 (5th Cir. 2007) (unpublished) ("But only class members have an interest in the settlement funds, and therefore only class members have standing to object to a settlement. Anyone else lacks the requisite proof of injury necessary to establish the 'irreducible minimum' of standing."); *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 473 (S.D. Fla. 2002) ("Under Fed. R. Civ. P. 23(e), non-class members are not permitted to assert objections to a class action settlement.") *Hendricks v. Starkist Co*, No. 13-CV-00729-HSG, 2016 WL 5462423, at *8 (N.D. Cal. Sept. 29, 2016), *aff'd sub nom. Hendricks v. Ference*, No. 16-16992, 2018 WL 5115482 (9th Cir. Oct. 19, 2018) ("The Court does not consider objections from Dylan L. Jacobs because he failed to follow the procedures set forth in the class notice."); 4 Newberg on Class Actions § 13:22 (5th ed.) ("Courts regularly find that nonclass members have no standing to object to a proposed settlement.").

vehicle[s] or else received monetary compensation determined in relation to the cost of such parts." On her initial Claim Form, Marlow answered "no" to this question, thereby affirming that she is not a Class member. *See* Epiq Decl. ¶ 39, Attachment 11.[9]

In a later-submitted letter to the Claims Administrator, she changed her answer. *Id.* ¶ 39. But she has refused to submit to a deposition to resolve the questions raised by her contradictory statements notwithstanding this Court's Order expressly permitting the parties to "depose any objector to assess whether the objector has standing or motives that are inconsistent with the interests of the class." *See* [942] at 6; [964] ¶¶ 3-7, 10. Plaintiffs have made every effort to resolve this issue (*see* [964]), but Marlow has steadfastly refused to comply. Given Marlow's initial statement, signed under penalty of perjury, and her refusal to comply with the Court's Order allowing Class Counsel to take her deposition, it appears that Marlow may have no interest in the Settlement and lacks standing to object to it. *See Carnegie*, 445 F. Supp. 2d at 1035.

Even if Marlow were a Class member, however, she did not file a valid objection. Not only did she not submit to a deposition despite the Order requiring her to do, the Order granting preliminary settlement approval provides that "no objection will be valid unless it" "follow[s] the directions in the Notice" ([942] at 5-6), which requires objectors to provide "proof of [their] membership in the class, such as documentation that . . . [they] had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) "crash parts" installed on or specified for their vehicles or else received monetary compensation determined in relation to the cost of such parts" ([945-1] at Q.16). Marlow provided no such documentation in connection with either of her Settlement claim forms or her objection. [961]; Epiq Decl. ¶ 39. On December 4, 2018, two days before this reply was due, Class Counsel were served with a motion to quash the deposition notice which includes a mostly-illegible claim estimate that, according to Marlow, specifies a non-OEM bumper. [964] ¶ 7. But whatever this claim estimate reveals (and that is not clear),

---

[9] Marlow is not among the approximately 1.43 million class members whose addresses were known to State Farm and who will receive automatic payments upon final approval. Thus, to prove her class membership and receive her payment she is required to submit a claim form.

Marlow has not submitted it in connection with this matter—either with her claim form or as a part of her objection—and, again, has refused to comply with this Court's Order allowing for a deposition to clarify the matter and to further explore her motives for objecting to the Settlement. Her objection is therefore invalid and should be stricken. *See White v. Experian Info. Sols., Inc.*, No. 8:05-CV-01070, 2018 WL 1989514, at *8 n.5 (C.D. Cal. Apr. 6, 2018) (striking objections that failed "to follow the Court-approved procedure"); *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 891 (C.D. Cal. 2016) ("An objector cannot refuse to participate in discovery and still have his or her objection considered by the court.").

Marlow argues that the documentation requirement presents an "unrealistic burden" ([961] at 17), but courts have long held that asking objectors to provide "proof of class membership . . . is *not* burdensome and is a reasonable safeguard against manipulation of the process by non-class members." *See, e.g.*, *Mexico Money Transfer*, 164 F. Supp. 2d at 1032 (emphasis added). This safeguard is particularly important for an objector, like Marlow, who initially swore she was not a Class member.

Again, Marlow did not file a valid objection. Nor did she submit to a deposition despite this Court's order, Counsel's repeated requests, and the issuance of a subpoena. Her objection should be stricken. Regardless, for all the reasons set forth above, none of the arguments she raises in any way undercuts the fairness of the Settlement or Class Counsel's requested fees.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order and Judgment pursuant to Rule 23(e) striking Marlow's objection, granting final approval to the Settlement, authorizing and directing its implementation under the Settlement's terms, and retaining exclusive and continuing jurisdiction over the Settlement to effectuate its terms. Class Counsel further request that the Court award them $6,971,852.80 as reimbursement of reasonable litigation costs and 33.33% of the common fund—including interest accrued thereon, but net of the $2.1 million in settlement administration costs—in attorneys' fees, and award the Class Representatives service awards of $25,000 each.

Dated: December 6, 2018

Respectfully submitted,

/s/ *Robert J. Nelson*
Elizabeth J. Cabraser
Robert J. Nelson
Kevin R. Budner
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000

Steven P. Blonder #6215773
Jonathan L. Loew
Much Shelist, P.C.
191 N. Wacker, Suite 1800
Chicago, IL 60606-2000
Tel: 312-521-2402

Robert A. Clifford #0461849
George S. Bellas
Kristofer S. Riddle
Clifford Law Offices
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602
Tel: 312-899-9090

John W. "Don" Barrett
Barrett Law Group, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095-0927
Tel: 662-834-2488

Brent W. Landau
Jeannine M. Kenney
Hausfeld LLP
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: 215-985-3273

Patrick W. Pendley
Pendley, Baudin & Coffin, LLP
Post Office Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: 888-725-2477

Erwin Chemerinsky
University of California, Berkeley School of Law
215 Boalt Hall,
Berkeley, CA 94720
Tel: 510- 642-6483

Thomas P. Thrash
Marcus N. Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: 501-374-1058

Richard R. Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, Mississippi 38655
Tel: 662-380-5018

Gordon Ball
Gordon Ball PLLC
550 Main Street
Bank of America Center, Ste. 600
Knoxville, TN 37902
Tel: 865-525-7028

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 7.1(b), I certify that a copy of the foregoing was served upon counsel via the Court's CM/ECF system.

<u>/s/ *Robert J. Nelson*</u>