IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


MARK HALE, TODD SHADLE,
and LAURIE LOGER, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, EDWARD
MURNANE, and WILLIAM G. SHEPHERD,

Defendants.                                    No. 12-0660-DRH


**AMENDED MEMORANDUM and ORDER**

**Herndon, District Judge:**

**Introduction**

Now before the Court are Plaintiffs' Motion for Final Approval of Settlement (Doc. 953) and Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. 952). The Court has also received Defendant State Farm Mutual Automobile Insurance Company's Brief in Support of Final Approval of Class Settlement (Doc. 971). On December 13, 2018, the Court held a hearing on the motions and orally granted the motions in detail. Based on the reasons stated in the record and the following, the Court concludes that under the facts of this case: (1) the Settlement is fair, reasonable, and adequate; and (2) Class Counsel's requested fees and expenses are reasonable and reflect a fair *ex ante* price for their services.

Out of the approximately 4.7 million class members—many of whom received direct, individual notice—only one person, Lisa Marlow, objected to the proposed Settlement and fee request (Doc. 961). The Court has carefully

considered the arguments raised in Ms. Marlow's objection and finds them unpersuasive.

**Background**

The facts underlying this lawsuit stretch back more than twenty years. In 1997, consumers filed a proposed nationwide class action, *Avery v. State Farm Mutual Automobile Insurance Co.* ("*Avery*"), alleging that State Farm violated consumer protection laws and breached its contracts with policy holders by equipping their vehicles with sub-standard non-OEM parts. A class of approximately 4.7 million insureds was certified and, after a multi-week trial in 1999, they secured a $1.18 billion verdict. That verdict was reduced to $1.056 billion by the intermediate court of appeals but otherwise upheld. State Farm then petitioned for review in the Illinois Supreme Court, and shortly thereafter, in 2002, it was announced that there would be a vacancy on that Court in 2004.

At that time, as Plaintiffs alleged in this lawsuit, State Farm and its co-defendants engaged in a scheme to (1) secretly recruit then-trial Judge Karmeier to run for the open seat on the Illinois Supreme Court, before which the billion-dollar judgment against State Farm in *Avery* was pending; (2) help organize and manage his campaign behind the scenes; (3) covertly funnel millions of dollars (well over a majority of all reported campaign funds) to support the Karmeier campaign through intermediary organizations over which it exerted considerable influence; and (4) after helping to secure Justice Karmeier's election, obscure, conceal, and misrepresent the degree and nature of their support so that Justice Karmeier could participate in the *Avery* deliberations. In this *Hale* action, filed in 2012, Plaintiffs maintained that this scheme violated the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d), and deprived them of an impartial forum and their property interest in the *Avery* judgment. The operative

Complaint in this case, which was entered as part of the Settlement, the Second Amended Complaint, includes both RICO and unjust enrichment claims.

Defendants denied—and continue to deny—any wrongdoing and vigorously opposed all of Plaintiffs' claims. Defendants have asserted myriad defenses in this litigation, including *Rooker-Feldman*, *res judicata*, collateral estoppel, *Noerr Pennington*, statute of limitations, and various other RICO element specific defenses. State Farm considers this settlement to be one which it is settling under the unjust enrichment claim rather than the alleged RICO claims.

The litigation that ensued was long and extremely hard-fought. The discovery process involved dozens of disputes overseen by Magistrate Judge Williams, including no less than 50 discovery conferences, the production and review of hundreds of thousands of pages of documents, and 68 depositions. Furthermore, over the course of more than six years of litigation, the parties briefed approximately 100 contested motions, including: (1) motions to dismiss by each defendant and a petition for a writ of mandamus to the Seventh Circuit from the order denying the motions; (2) a motion for class certification, and two petitions to the Seventh Circuit for permission to leave to appeal from the orders granting class certification and later clarifying the order granting class certification; (3) two separate and extensive summary judgment motions on, among other issues, *Rooker-Feldman*, claim and issue preclusion, *Noerr-Pennington*, statute of limitations, and RICO causation and injury; and (4) dozens of motions *in limine* and *Daubert* motions. The parties then prepared fully for what was to be a six-week trial and selected a jury. On the day of opening statements—and with the assistance of a Court-appointed settlement master—the parties announced a proposed settlement.

The proposed Settlement secures a non-reversionary cash fund of $250 million. Doc. 941 ¶ 8. Each member of the class—the definition of which was set

forth both in the order certifying the identical litigation class and in the Court's preliminary approval order—is entitled to an equal, pro-rata share of the fund. *Id.* § A(l). Settlement checks will be delivered automatically to the approximately 1.43 million class members whose addresses are known. *Id.*; *see also* Doc. 973 at 4. The remaining class members must submit relatively simple claim forms to establish class membership. Doc. 941 § A(l). If any funds remain after initial distributions, efforts at re-distribution to Class members—including redistribution to claimants—will continue until redistribution become impracticable. *Id.* ¶ 15. In no event will there be a reversion to Defendants. *Id.*

The common fund will also cover the cost of settlement notice and administration as well as attorneys' fees and costs. Here, Class Counsel has requested 33.33% of the common fund—net of the $2.1 million in estimated costs for settlement notice and administration, but inclusive of interest accrued on the fund at the time of payment. Doc. 954 at 3. They also seek reimbursement of $6,971,852.80 in litigation costs and expenses and awards of $25,000 for each of the three Class Representatives. *Id.*

The Court previously granted preliminary approval to the Settlement and the notice plan (Docs. 942, 947), after which comprehensive direct and publication notice was implemented to reach the approximately 4.7 million class members. Pursuant to a schedule set by this Court, Plaintiffs moved for final approval of the Settlement and Class Counsel moved for an award of attorneys' fees and costs. Docs. 953-54. As noted above, one person objected to the terms of the Settlement and Class Counsel's fee request (Doc. 961), and her objection was thoroughly addressed in separate filings submitted by both Plaintiffs and Defendants (Docs. 971-73). The Court then held a fairness hearing and has considered all arguments raised at the hearing and in the written submissions before the Court.

**Analysis**

## I.  **Final Approval of the Settlement**

The newly amended Rule 23 requires courts to determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the                                                                              class;
> (B)       the       proposal       was       negotiated       at       arm's       length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). These considerations overlap with the factors previously articulated by the Seventh Circuit, which include: (1) the strength of the plaintiff's case compared to the terms of the settlement; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the presence of collusion in gaining a settlement; (5) the stage of the proceedings and the amount of discovery completed. *See, e.g.*, *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997). All of these factors, whether in Rule 23 or Seventh Circuit jurisprudence, favor approval of the Settlement.

### A.  **Adequacy of Representation—Rule 23(e)(2)(A)**

At the initial class certification stage, when class certification was granted for trial purposes, the Court concluded that the Class Representatives and Class Counsel were adequate. Doc. 556 at 15-18. This remains true. The Class Representatives have "no conflicts of interest" (*id.* at 16) and have invested significant time and resources in this litigation for more than six years (Doc. 954-4

¶ 11). Class Counsel have "extensive experience in prosecuting RICO claims, class actions, and various complex cases" (Doc. 556 at 17) and have litigated this case intensively, and successfully, for almost seven years (Doc. 954 at 5-6). Adequacy of representation is uncontested and favors approval.

**B. Arm's Length Negotiations and Non-Collusiveness of Settlement Process—Rule 23(e)(2)(B) and the Seventh Circuit's First Factor**

The settlement negotiations were conducted at arm's length and overseen by two experienced, Court-appointed mediators. The first mediation, overseen by Judge James F. Holderman (Ret.), failed after more than a year of effort, after which the Parties remained far apart. In the weeks leading up to trial, the Parties revived the negotiations under the guidance of Court-appointed settlement master Randi Ellis, and reached an agreement on the eve of opening statements. After considering the extensive record, the Court previously found that "the Settlement Agreement has been negotiated in good faith at arms' length between experienced attorneys familiar with the legal and factual issues of this case, and overseen by experienced and Court-appointed mediators." Doc. 942 at 2. No objector offers any reason to disturb this conclusion. This factor, therefore, strongly favors final approval. *See Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (citation omitted) ("A strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's length] negotiation.").

**C. Adequacy of the Relief Provided by the Settlement—Rule 23(e)(2)(C) and the Seventh Circuit's Second Factor**

As noted above, the Settlement secures a non-reversionary, $250 million common fund that—after deducting the cost of settlement notice and administration, attorneys' fees and costs, and class representative service awards— will be available in equal shares to all class members. The Court concludes that

this relief is more than adequate taking into account each of the Rule 23(e)(2)(C) factors.

1.     **<u>The Costs, Risks, and Delay of Trial and Appeal—Rule 23(e)(2)(C)(i)</u>**

As noted above, this case settled after a jury had been empaneled and after more than six years of intensive and extremely hard-fought litigation. Over the course of this litigation, the Court ruled on motions to dismiss filed by all Defendants, a heavily contested class certification motion, two different summary judgment motions and accompanying *Daubert* motions, and literally dozens of pre-trial *Daubert* motions and motions in limine, among many other disputed issues. The Court also oversaw and regularly communicated with Magistrate Judge Williams, who handled literally dozens of discovery disputes and held almost monthly hearings and status conferences. The Court, along with the parties, also prepared for what was to be a six-week trial. As a result of these efforts, the Court is completely, fully, and thoroughly familiar with the many complex factual and legal issues involved in this case. Indeed, the Court's and the parties' knowledge in this case is likely as close to complete as one could ever achieve in a piece of litigation, short of knowing what the jury and the court of appeals would do with the trial for which the parties, and the Court, had fully prepared.

Based on this knowledge and history, the Court concludes that the Settlement provides fair, adequate, and reasonable relief to the class in light of the costs, risks, and delay of trial and appeal. Plaintiffs faced many significant risks at trial such as, among others, establishing all the elements of their causes of action, including the disputed RICO proximate causation requirement, and a fact-based statute of limitations inquiry. On appeal (which, given the history of this litigation, would be inevitable), Plaintiffs faced additional significant and difficult issues, including *Rooker-Feldman*, *Noerr-Pennington*, res judicata, and, again, statute of

limitations and RICO-causation, among others.  These points are well captured in State Farm's brief in support of final approval, which details what State Farm believed was "the strength of [its] powerful factual and legal defenses and the serious obstacles Plaintiffs would have faced at trial and on appeal."  Doc. 971 at 2.  This brief makes clear both that significant risks remained and that, absent resolution, State Farm was fully committed to continuing its spirited defense at trial and on appeal.

Regardless of the outcome of these proceedings, there can be no question that they would have added significant costs and delay.  The parties settled at the beginning of what was to be a long and undoubtedly expensive trial.  Moreover, absent this proposed resolution, and considering the strong likelihood of post-trial motions and appeals, the parties were unlikely to achieve a final disposition any time soon.  This factor strongly favors final approval of the Settlement and is particularly compelling given the length both of this litigation and the underlying *Avery* litigation.

The sole objector, Marlow, makes two points in arguing otherwise.  First, she believes that Plaintiffs had little risk because, among other reasons, many of the issues discussed above "made their way to the Seventh Circuit, . . . and on each occasion, Plaintiffs were the victors."  Doc. 961 at 7.  Second, she claims that that the proposed settlement secures only a miniscule percentage of the over $7 billion, including interest and trebled damages, "the jury (or the Court)" had "few, if any, alternatives but to award."  *Id.* at 5-6.  Neither argument is persuasive.

As noted above, real risk remained at trial on, among other issues, the statute of limitations, RICO causation, and RICO injury.  On appeal, moreover, all issues were fair game, because, contrary to Marlow's mistaken belief, the Seventh Circuit did not issue any definitive rulings in its three orders denying State Farm's petitions for interlocutory appeal.  As to the amount of the Settlement, Marlow's assumption

that post-judgment interest would automatically have been applied is incorrect. The Court had yet to decide that issue (Doc. 905 at 31-32), and State Farm adamantly maintained that such interest was unsupported by the law (Doc. 880 at 2). Finally, Marlow's suggestion that the adequacy of the relief secured by the Settlement must be measured against potential treble damages contravenes established authority. *See, e.g.*, *Carnegie v. Household Int'l, Inc.*, 445 F. Supp. 2d 1032, 1035 (N.D. Ill. 2006) ("[I]n determining a settlement value, the potential for treble damages should not be taken into account.").[1]

To reiterate, based on its extensive history and intimate familiarity with this litigation, the Court easily concludes that the relief secured by the proposed settlement is fair, adequate, and reasonable in light of the costs, risks, and delay of trial and appeal. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996)) (in evaluating a proposed settlement, the court must recognize that the "'essence of settlement is compromise'" and will not represent a total win for either side); *Van Lith v. iHeartMedia + Entm't, Inc.*, No. 1:16-CV-00066-SKO, 2017 WL 4340337, at *12 (E.D. Cal. Sept. 29, 2017) ("'It is well-settled law that a proposed settlement

---

[1] *See also, e.g.*, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) ("[C]ourts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value."); *Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376, n.12 (D.D.C. 2002) ("[T]he standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages."); *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) ("[T]he district judge correctly recognized that it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure."); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 458-59 (2d Cir. 1974) ("[T]he vast majority of courts which have approved settlements ... have given their approval ... based on an estimate of single damages only."), *overruled on other grounds as recognized by U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415-16 (2d Cir. 1989). Although a small minority of district courts has evaluated treble damages in a settlement context, there is "no authority that *requires* a district court to assess the fairness of a settlement in light of the potential for trebled damages." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 325 (3d Cir. 2011) (quoting *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 312 (3d Cir. 2010) (emphasis in original)).

may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial.'") (citations omitted).

**2.** **The Effectiveness of Any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class-Member Claims—Rule 23(e)(2)(C)(ii)**

Under the terms of the proposed Settlement, settlement funds will be distributed automatically, with no need for a claim form, to the approximately 1.43 million class members whose contact information is known to the parties. The remainder of the class has only to submit a relatively simple claim form with basic questions about class membership. This procedure is claimant-friendly, efficient, cost-effective, proportional and reasonable under the particular circumstances of this case.

**3.** **The Terms of any Proposed Award of Attorney's Fees, Including Timing of Payment—Rule 23(e)(2)(C)(ii)**

The Court analyzes the terms of Class Counsel's request for attorneys' fees and expenses below. In short, the Court finds the requested fees and costs are reasonable and concludes that the relief that remains for the class—all of which will be distributed without any possibility of reversion—is adequate in light of all the additional factors discussed herein. This factor favors final approval.

**4.** **Any Agreement Required To Be Identified Under Rule 23(e)(3)—Rule 23(e)(2)(C)(iv)**

The parties have not identified, nor is the Court aware of, any agreement—other than the Settlement itself—that must be considered pursuant to Rule 23(e)(3). This factor is neutral.

**D.** **Equitable Treatment of Class Members—Rule 23(e)(2)(D)**

All class members are entitled to the same relief under the proposed Settlement. This proposal is fair and equitable because the class members' interests in the *Avery* judgment were undivided when they were lost and, thus, each class member's damages were identical. The proposed Settlement therefore

entitles each class member to an equal, pro-rata share of the Settlement fund.  Doc. 941 § A(l).

Objector Marlow does not dispute that the Settlement's allocation is equitable.  She does, however, claim that the objection process is unduly burdensome because it requires objectors, and not other class member claimants, to produce "proof of class membership." Doc. 961 at 17.  According to Marlow, "[s]addling objectors with burdens not imposed on all class members is punitive, intended to intimidate class members from objecting." *Id.*  The Court disagrees. Asking objectors to provide "proof of class membership . . . is not burdensome and is a reasonable safeguard against manipulation of the process by non-class members." *See, e.g.*, *Mexico Money Transfer*, 164 F. Supp. 2d at 1032.  The Court observes that objectors can play an important role in the settlement approval process.  But, by appealing from a trial court order approving a settlement, objectors can also significantly delay the implementation of a settlement and the distribution of the settlement funds for the entire class—which here includes millions of class members who have voiced no opposition to the Settlement and who have waited for over 20 years for relief.  Marlow has not convinced the Court that it erred in determining that those who wish to wield this leverage must demonstrate their standing to do so—and may be cross-examined on their standing and motives to object— particularly when, as here, there is but one objector out of millions of class members and she initially swore under penalty of perjury that she was not a class member.  Marlow has advanced no evidence or compelling argument in support of her claim that that this provision is in any way "punitive" or "intended to intimidate class members from objecting," and the Court soundly rejects such a claim.

This factor favors final approval as well.

**E.   The Amount of Opposition to the Settlement—the Seventh Circuit's Third Factor**

The Court must independently analyze all factors relevant to the settlement approval inquiry.   Nevertheless, the response from the class can provide insight into the fairness of both the settlement and, as discussed below, the requested attorney's fees and costs.

The Class here is estimated to include approximately 4.7 million members. Approximately 1.43 million of them received individual postcard or email notice of the terms of the proposed Settlement, and the rest were notified via a robust publication program "estimated to reach 78.8% of all U.S. Adults Aged 35+ approximately 2.4 times." Doc. 966-2 ¶¶ 26, 41. The Court previously approved the notice plan (Doc. 947), and now, having carefully reviewed the declaration of the Notice Administrator (Doc. 966-2), concludes that it was fully and properly executed, and reflected "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."   *See* Fed. R. Civ. P. 23(c)(2)(B).   The Court further concludes that CAFA notice was properly effectuated to the attorneys general and insurance commissioners of all 50 states and District of Columbia.

Of the millions of Class members and more than a hundred senior government officials who received notice, only *one person*—and not a single government official—objected or otherwise criticized the Settlement.   This lone voice of opposition represents a mere 0.00002% of the estimated Class.  Adding the 471 people who previously opted out after the Class was initially certified, the percentage of the Class that has expressed any disapproval of the litigation or settlement is 0.001%.   Doc. 935 ¶ 6.   This remarkably low level of opposition is "strong circumstantial evidence in favor of the settlement," especially considering that nearly one-and-a-half million class members received individual, direct notice. *See, e.g.*, *Mexico Money Transfer* , 164 F. Supp. 2d at 1021 (the fact that more

than "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlement[]").[2]  This factor strongly favors settlement approval.

**F.**  **The Stage of the Proceedings and the Amount of Discovery Completed—the Seventh Circuit's Fifth Factor**

"The stage of the proceedings at which settlement is reached is important because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 325 (7th Cir. 1980).  Here, the parties settled after trial had begun and after more than six years of intensive litigation.  The discovery process was exhaustive, and involved: hundreds of thousands of documents exchanged and reviewed, including many documents from third parties; dozens of depositions; and dozens of discovery hearings and disputes resolved by Magistrate Judge Williams.  The motion practice

---

[2] *See also Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, No. 16-CV-488-SMY-RJD, 2017 WL 5724208, at *2 (S.D. Ill. Apr. 26, 2017) ("The lack of opposition from any settlement class member also militates in favor of settlement."), *aff'd*, 897 F.3d 825 (7th Cir. 2018); *Kleen Prod. LLC v. Int'l Paper Co.*, No. 1:10-CV-05711, 2017 WL 5247928, at *3 (N.D. Ill. Oct. 17, 2017) (one objector out of 158,500 class members "attests to" the "fairness" of the settlement); *In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) (concluding that objections and opt outs "amount[ing] to less than 0.01%" is a "low level of opposition [that] supports the reasonableness of the settlement"), *aff'd as modified*, 799 F.3d 701 (7th Cir. 2015); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 964-65 (N.D. Ill. 2011) (concluding that 10 objections and "less than 0.01%" of opt outs was "remarkably low level of opposition" that "supports the Settlement"); *Henry v. Sears Roebuck & Co.*, No. 98-cv-4110, 1999 WL 33496080, at *11 (N.D.Ill. July 23, 1999) (twenty-four objections was "extremely small number" and "weighs in favor of Court approval"); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) ("Less than 30 of approximately 1.1 million shareholders objected. This is an infinitesimal number" that "does not favor derailing settlement."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990) (where 29 of 281 (10.3%) class members objected, finding that the "response of the class members, both in numbers and in rationale, strongly favors settlement"); *Van Lith*, 2017 WL 4340337, at *14 ("Indeed, '[i]t is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.'") (citation omitted); *Office & Prof'l Emps. Int'l Union v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 311 F.R.D. 447, 458 (E.D. Mich. 2015) (objection from "[o]nly one class member[]" is "extremely minimal level of opposition" and "is an indication of [the] settlement's fairness") (citations omitted); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

was also extensive. Indeed, there were approximately 100 contested motions filed in this litigation, including motions to dismiss, motions for class certification, motions for summary judgment, many *Daubert* motions and motions *in limine*, and three separate petitions to the Seventh Circuit. Finally, the parties were fully prepared for, and had in fact begun, what was to be a six-week trial that was to involve dozens of witnesses and thousands of documents. Thus, as this Court previously noted, the parties' knowledge of this case was likely as close to complete as one could ever achieve in a piece of litigation, short of knowing what the jury and the appellate court would do. This factor also strongly favors final approval.

### G.    Opinion of Qualified Counsel

In assessing the fairness of a proposed settlement, courts are "entitled to rely heavily on the opinion of competent counsel." *Gautreaux v. Pierce*, 690 F.2d 616, 634 (7th Cir. 1982) (citation omitted); *accord Isby*, 75 F.3d at 1200. As noted above, Class Counsel are experienced class action litigators whose knowledge of this case was built on years of intensive litigation and was about as complete as can ever be achieved in litigation short of completing a trial and appeal. Indeed, some of the Parties' counsel had tried the underlying *Avery* case and/or were involved in the underlying appeals. This track record of familiarity spans three decades of first-hand experience. Class Counsel's unanimous and strong endorsement therefore further supports the fairness, reasonableness, and adequacy of the proposed Settlement.

For all these reasons, and after considering all relevant factors set forth in Rule 23 and the Seventh Circuit's jurisprudence, the Court concludes that the Settlement is "fair, adequate, and reasonable" and should be granted final approval.

### II.    Class Counsel's Request for Attorneys' Fees and Costs

"[L]awyer[s] who recover[] a common fund . . . [are] entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472,

478 (1980); *see also Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007). "[W]hen deciding on appropriate fee levels in common-fund cases," like this one, courts in the Seventh Circuit "must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.* ("*Synthroid I*"), 264 F.3d 712, 718 (7th Cir. 2001); *accord Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("[T]he district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys.").

Although courts in this Circuit have the discretion to use either a percentage of the fund or lodestar methodology, *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994), the percentage method is employed by "the vast majority of courts in the Seventh Circuit (like other Circuits)." Doc. 954-2 ¶ 13 (citing empirical studies); *C.f. Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) (Herndon, J.) ("When determining a reasonable fee, the Seventh Circuit Court of Appeals uses the percentage basis rather than a lodestar or other basis.").[3] The percentage method makes sense because "it is essentially unheard of for sophisticated lawyers to take on a case of this magnitude and type on any basis other than a contingency fee, expressed as a percentage of the relief obtained." *In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016). Thus, where, as here, "the 'prevailing' method of compensating lawyers for 'similar services' is the

---

[3] *See also, e.g.*, *Cooper v. IBM Pers. Pension Plan*, No. CIV. 99-829-GPM, 2005 WL 1981501, at *3 (S.D. Ill. Aug. 16, 2005), *rev'd and remanded on other grounds*, 457 F.3d 636 (7th Cir. 2006) ("The approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class."); *Spano v. Boeing Co.*, No. 06-CV-743-NJR-DGW, 2016 WL 3791123, at *2 (S.D. Ill. Mar. 31, 2016) (same); *Nolte v. Cigna Corp.*, No. 2:07-CV-2046-HAB-DGB, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013) (same).

contingent fee, then the contingent fee *is* the 'market rate.'" *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) (emphasis in original).

Having concluded that the percentage method is appropriate, the Court must next determine whether Class Counsel's request of one-third of the common fund is reasonable and reflective of the *ex ante* market price for Class Counsel's services. This analysis is informed by a number of factors, including: (1) the actual agreements between the parties as well as fee agreements reached by sophisticated entities in the market for legal services; (2) the risk of non-payment at the outset of the case; (3) the caliber of Class Counsel's performance; and (5) information from other cases, including fees awarded in comparable cases. *See, e.g.*, *Synthroid I*, 264 F.3d at 719. These factors, when viewed separately and together, support Class Counsel's request.

### A.     Fee Agreements from the Named Plaintiffs and Sophisticated Entities in Other Litigation.

"The first benchmark" of the market rate "is actual agreements" between plaintiffs and counsel. *Id.*, at 719. Here, all named plaintiffs signed agreements calling for attorneys' fees of 40%. Doc. 954-4 ¶ 11. Perhaps more importantly, Class Counsel have advanced significant evidence and empirical analysis—much of which is reflected in the declaration of Professor Charles Silver—demonstrating that sophisticated clients and sophisticated class representatives regularly agree to pay 33.33% or more in risky, complex litigation, even when potential rewards are very large. *See* Doc. 954-1 at 17-26. This in-depth analysis confirms that the market that this Court must mimic—one formed by sophisticated entities in comparable contexts—routinely produces fee agreements at or above the percentage Class Counsel request here. Moreover, as Professor Fitzpatrick observed, sophisticated entities in the market for legal representation often negotiate fee agreements that call for higher percentages—sometimes reaching as

high as 50%—of any resolution obtained after a trial begins, as was the case here. *See, e.g.*, Doc. 954-2 ¶ 20 (citing empirical data). This factor, therefore, supports Class Counsel's requested fees.

### B. Risk of non-payment

"The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013); *accord, e.g.*, *Synthroid I*, 264 F.3d at 721 (The market rate must account for the "risk of nonpayment a firm agrees to bear."). Thus, "[w]hen determining the reasonableness of a fee request, courts put a fair amount of emphasis on the severity of the risk (read: financial risk) that class counsel assumed in undertaking the lawsuit." *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 847-48 (N.D. Ill. 2015). "[T]his consideration incentivizes attorneys to accept and (wholeheartedly) prosecute the seemingly too-big-to-litigate wrongs hidden within the esoteric recesses of the law, ensuring that the attorneys are compensated for their work at the end of the day." *Id.* at 848.

It would be difficult to overstate the risk that this case presented at the outset. As a threshold matter, successful RICO actions are exceedingly rare. *Gross v. Waywell*, 628 F. Supp. 2d 475, 480 (S.D.N.Y. 2009) ("[T]he statistical record indicates that in 98 percent of the RICO appellate cases surveyed, which do not include RICO actions dismissed by the district courts but not appealed, plaintiffs and counsel invested extensive time and energies in litigation only to come away with a total loss."). Successful RICO class actions are rarer still. *See, e.g.*, Doc. 954-1 at 34-36 (discussing study of RICO class actions). Moreover, the particular theory presented by this case was without precedent and presented a host of unique factual and legal challenges.

On the facts, it is important to note that unlike many cases where attorneys seek a substantial fee, Class Counsel here were not assisted by any governmental

investigations or prosecution, for example, as is often the case large class actions. *See*, *e.g.*, Doc. 954-2 ¶ 23 (discussing a study finding that "private lawyers . . . were the first to discover fraud only 3% of the time"); *see also In Re: Syngenta Ag Mir 162 Corn Litig.*, No. 14-MD-2591-JWL, 2018 WL 6436074, at *12 (D. Kan. Dec. 7, 2018) (concluding that attorney fee award of 1/3 in super-mega-fund case was justified, in part, by the fact that the "case did not involve a government investigation or prosecution of the defendant"). As a result, the burden of building this case was borne entirely by Plaintiffs, and there was certainly no guarantee when they took the case that they would prevail. According to Magistrate Judge Williams, who closely oversaw the discovery in this case, Plaintiffs did not have enough evidence to "connect the dots" of their case two years in, much less at the time they filed. Doc. 300 at 5. Plaintiffs did, ultimately, marshal enough evidence to defeat two summary judgment motions, but that does not mean that they would have triumphed at trial and on appeal, and more to the point, it does not undermine the complexity and uncertainty of the challenges Plaintiffs faced when they filed suit.

On the law, too, Plaintiffs faced significant risks at the outset of this case. Defendants repeatedly advanced a number of strong challenges on complex issues of law, any one of which could have resulted in complete dismissal of the case. Those challenges included, among others: *Rooker-Feldman*, claim and issue preclusion, RICO proximate cause, RICO injury, *Noerr-Penington*, and the statute of limitations. As noted herein, these challenging issues were briefed extensively in a motion to dismiss, a petition for writ of mandamus, class certification filings, two petitions for leave to appeal pursuant to Rule 23(f), and two summary judgment motions. Plaintiffs largely prevailed on these issues before this Court, but this was far from a foregone conclusion at the outset of this litigation, and many more obstacles remained at trial and on appeal.

For all these reasons, the three class action attorney fee experts supporting Class Counsel's motion—three of the most experienced and respected experts in this field—all opined that this case was as risky as they come. *See, e.g.*, Doc. 954-1 at 33 ("[T]his is one of the most important lawsuits of my lifetime[, and] . . . also one of the riskiest, as every relevant metric shows."); Doc. 954-3 ¶ 36 (identifying "[a] dozen independent factors [that] demonstrate the riskiness of this case viewed *ex ante* – and [that were] borne out by the arc of the litigation"); Doc. 954-2 ¶ 21 ("[I]t is a *gross* understatement to say that this case involved above-average risks.") (emphasis in original). This Court agrees and concludes that the risk of non-payment at the outset of the case overwhelmingly favors Class Counsel's requested one-third fee.

Marlow's arguments to the contrary miss the mark entirely. She acknowledges that, in determining the market price for counsel's service, courts must assess the risk that existed "at the outset of the case" (Doc. 961 at 8 (quoting *Synthroid I*, 264 F.3d at 718)), but her actual analysis focuses only on "the risks of proceeding to trial with the evidence [Class Counsel] amassed during over six years of litigation" (*id.* at 15). While the risk that remained at the time of resolution remained significant, as noted above, that level of risk—after having achieved victories on motions to dismiss, class certification, summary judgment and more— is irrelevant to the *ex ante* market price inquiry required in this Circuit. Moreover, Marlow's observation that more attorneys joined the litigation as it progressed overlooks the fact that some of the firms initially prosecuting this case later withdrew. *See* Docs. 439 and 455. Regardless, this point is, at best, evidence that Plaintiffs' case got stronger over the course of litigation. Finally, Marlow ignores the undisputed fact that no other lawyers were interested in taking this case when it was filed, and none opposed or otherwise contested Plaintiffs' Motion for Appointment of Co-Lead and Liaison Counsel. Doc. 179. There was no such

competition, notwithstanding the potential size of the case, presumably because of the extremely high level of risk. Again, this factor strongly favors approval of Class Counsel's requested fees.

**C.**     **The Quality of Class Counsel's Performance**

Also relevant to this analysis is the quality of Class Counsel's work. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (noting that the "evidence of the quality of legal services rendered" is among the "type[s] of evidence needed to mimic the market per *Synthroid I*"); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 597 (N.D. Ill. 2011) (Compensation also depends on "the quality of [counsel's] performance."). Class Counsel's work here, and the results they obtained, are both exemplary. As described above, over the course of more than six years and approximately 100 contested motions, Counsel achieved many significant victories. They survived motions to dismiss, two independent motions for summary judgment, and three trips to the Seventh Circuit; achieved certification of a nationwide class; and also secured a series of important wins on pre-trial motions in limine and *Daubert* motions before taking the case through the beginning of trial. These were all significant achievements, given the complexity and difficulty of both the factual and legal issues involved in this novel case. In sum, Class Counsel worked hard on this litigation and the caliber of that work was consistently first rate. This factor, too, supports Class Counsel's request.

**D.**     **Information from Other Cases**

Another relevant data point for the market price for attorneys' fees is those awarded in "analogous class action settlements." *Taubenfeld*, 415 F.3d at 600; *accord Silverman*, 739 F.3d at 958. Although it is difficult to find cases that compare to this one, this factor too supports Class Counsel's request.

Courts within the Seventh Circuit, and elsewhere, regularly award percentages of 33.33% or higher to counsel in class action litigation.[4] Professor Rubenstein—drawing upon his analysis of recent empirical studies on class action fee awards—observed that the *average* awarded fee in the Seventh Circuit is 31.6%, only slightly below the percentage requested here. Doc. 954-3 ¶ 17 (citing studies); *see also* 954-2 ¶ 18 (discussing empirical study demonstrating that fees in the 30-35% range were the most common). These statistics, however, do not account for the riskiness of this case, and this case was extremely risky. The statistics also do not account for the quality of counsel's performance, which again, was noteworthy here. And finally, they do not account for the stage at which the case resolved. This is relevant because, as discussed previously, sophisticated market players typically set higher fee percentages when a case resolves during or after trial. Courts recognize this as well, and award fees reflecting this market tendency. While trials are rare and the data limited, of the 11 cases proceeding to trial that Professor Rubenstein found in his database, the "mean fee award . . . was 36%, with five cases

---

[4] *See, e.g., Young v. Cnty. of Cook*, No. 06 C 552, 2017 WL 4164238, at *6 (N.D. Ill. Sept. 20, 2017) (awarding 33.33% of $52 million common fund and overruling objections calling for sliding scale approach); *Spano*, 2016 WL 3791123, at *2 ("A one-third fee is consistent with the market rate in settlements concerning this particularly complex area of law."); *Dairy Farmers*, 80 F. Supp. 3d at 862 (awarding one third plus expenses of $46 million common fund); *Standard Iron Works v. ArcelorMittal*, No. 08 C 5214, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) ("The Court finds that a 33% fee [of $163.9 million common fund] comports with the prevailing market rate for legal services of similar quality in similar cases."); *Beesley*, 2014 WL 375432, at *4 (Herndon, J.) (awarding one third of common fund); *Fosbinder-Bittorf v. SSM Health Care of Wis., Inc.*, No. 11-CV-592-WMC, 2013 WL 5745102, at *1 (W.D. Wis. Oct. 23, 2013) (same); *George v. Kraft Foods Global, Inc.*, No. 1:07-CV-1713, 2012 WL 13089487, at *4 (N.D. Ill. June 26, 2012) (same); *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 908-09 (S.D. Ill. 2012) (awarding one-third of $105 million settlement plus roughly $8.5 million in costs and holding that "[w]here the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, the normal rate of compensation in the market is 33.33% of the common fund recovered."); *Schulte*, 805 F. Supp. 2d at 601 (awarding one third of common fund); *Will v. Gen. Dynamics Corp.*, No. CIV. 06-698-GPM, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (same); *Martin v. Caterpillar Inc.*, No. 07-CV-1009, 2010 WL 11614985, at *2 (C.D. Ill. Sept. 10, 2010) ("[C]ourts in the Seventh Circuit award attorney fees 'equal to approximately one-third or more of the recovery.' The Seventh Circuit itself has specifically noted that 'the typical contingent fee is between 33 and 40 percent.'"); *Harzewski v. Guidant Corp.*, No. 05-cv-01009, Doc. 194 (S.D. Ind. Sept. 10, 2010) (awarding 38% of the common fund).

having awards of 38.9% or more and three of those having fee awards of 40% or more.  The median fees and costs awarded in the 11 cases that progressed to trial with applicable data was 45%."  Rubenstein Decl. ¶ 18.  Class Counsel's fee request is reasonable when viewed in the context of this data.

Marlow nevertheless argues that an award of 33.33% would be unreasonable here because "megafund settlements are different."  Doc. 961 at 13.  The Court acknowledges that some empirical studies of class action fee awards—including ones conducted by Class Counsel's expert, Professor Fitzpatrick—demonstrate that as recoveries increase attorney fee percentages tend to decrease.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839 (2010).  The Court also understands that courts in other circuits have, in some situations, enforced a "megafund cap" that limits the percentage that attorneys can recover in large cases.  On this issue, however, the Seventh Circuit found reversible error for "follow[ing] decisions of district courts in other jurisdictions, rather than decisions of the . . . Seventh Circuit" and rejected a percentage cap on megafund recoveries because "[p]rivate parties would never contract for such an arrangement."  *Synthroid I*, 264 F.3d at 718; *see also In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 251 F. Supp. 3d 1225, 1239 (N.D. Ind. 2017) ("Our court of appeals . . . has rejected the concept behind the 'megafund' theory").

Professor Silver's declaration supports this conclusion and details many examples in which sophisticated parties—both in non-class fee agreements and when negotiating fee arrangements as lead plaintiffs in class actions—agree to flat percentages at or above 33.33% in cases that yield significant recoveries. *See* Doc. 954-1 at 17-28.  Courts regularly follow suit, even in megafund cases.  Indeed, Professor Silver's declaration cites at least 20 cases in which courts awarded 33% or more of recoveries between $105 and $974 million (not accounting for inflation).

*Id.* at 39-45 (Table 2). One of those cases, *In re U.S. Foodservice, Inc. Pricing Litig.*, shares notable similarities with this case. No. 3:07-md-1894 (AWT) (D. Conn.), Doc. 510-1 (Aug. 29, 2014) (fee motion); Doc. 523 (Dec. 9, 2014) (order granting fee motion) (RICO class action with sophisticated lead plaintiffs that resulted in a $297 million settlement from which the court awarded class counsel 33.33% in fees and $7,941,358.41 litigation expenses). *Syngenta*, 2018 WL 6436074, decided after Class Counsel submitted their reply brief, provides further support. There, the court awarded counsel one-third of a $1.5 billion settlement and concluded that "a one-third fee is customary in contingent-fee cases (factor 5), or is even on the low side, as that figure is often higher in complex cases or cases that proceed to trial." *Id.* at *14. This Court agrees.

The Seventh Circuit's decision in *Silverman* does not mandate otherwise. 739 F.3d 956. In *Silverman*, the court noted that 27.5% of $200 million "may be at the outer limit of reasonableness," but it did not dispense with the Seventh Circuit's overarching instruction to "approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Id.* at 959, 957. The outer limits of a reasonable *ex ante* fee negotiation in one case may be the inner limits in another. Indeed, as the Seventh Circuit noted in *Synthroid II*, "if securities suits present less risk to the plaintiff class than does a fraud suit against a drug manufacturer, it is unsound to use a contingent fee appropriate to the former as the measure in the latter." 325 F.3d 974, 979 (7th Cir. 2003). Likewise, if *Silverman* presented less risk to the plaintiff class than did this completely novel RICO class action—as it certainly did—then here, too, "it is unsound to use a contingent fee appropriate to the former as the measure in the latter." *See id.* The Court agrees with Professor Fitzpatrick's observation that *Silverman* "presented none of the *ex ante* risks of this case (for example, *Silverman* was a securities fraud case, where class certification is relatively perfunctory), and, perhaps even more

importantly, did not go to trial."). Doc. 954-2 ¶ 25. The Court therefore concludes that the extraordinary facts of this case—and the novel risks it entailed—set it apart from *Silverman*, and that sophisticated parties would have negotiated no less than a fee arrangement of 1/3 for a resolution reached after the case progressed to trial.

For similar reasons, this Court declines to adopt a decreasing sliding scale fee structure. The Seventh Circuit explained the rationale for this approach in *Synthroid I*, but also cautioned that "systems with declining marginal percentages are [not] always best" because they "create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client." 264 F.3d at 721. Thus, while the Seventh Circuit, and courts within it, have applied the declining scale to large recoveries in some circumstances, the Court rejects Marlow's suggestion that it is the only permissible model.

*Silverman* itself, which affirmed a flat percentage in a megafund case, confirms this. 739 F.3d at 956. So does *Dairy Farmers*, 80 F. Supp. 3d at 845. There, the court observed that the declining percentage approach "is not a one-size-fits-all recovery scheme, and there are many other factors to consider before declaring this pricing grid the Cinderella slipper." *Id.* Ultimately, in that case, the court concluded that a flat 33.33% fee was appropriate even though the risk was relatively low and notwithstanding a "seemingly tailor-made tiered-pricing arrangement" set by the Seventh Circuit in *Synthroid II. Id.* at 845, 848.

Similarly, in *Young v. County of Cook*, No. 06 C 552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017), Judge Kennelly concluded that the circumstances of that case placed it "squarely within the category of cases for which the use of a declining marginal percentage scale ***is not appropriate***." *Young*, 2017 WL 4164238, *5 (emphasis added). This was true, the court found, because of the "high risk of non-payment," the "enormous amount of work [that] went into" the litigation, and the

fact that counsel had turned down an earlier settlement offer in a successful effort to obtain more for the class. *Id.* at *4-5.

The Court finds this reasoning persuasive. As in *Young*, this case presented an extremely high risk of non-payment and required an enormous amount of work. And like counsel in *Young*, Class Counsel here turned down settlement offers that were significantly lower than the $250 million settlement that was ultimately reached. "Class Counsel rejected that offer in order to obtain a better recovery for the Class, and, after considerable additional litigation, pre-trial proceedings, and after jury selection once trial had commenced, they did just that." Doc. 973-1 ¶ 2. Thus, Judge Kennelly's conclusion that a "33% contingent fee of the total recovery is on the low end of what is typically negotiated *ex ante* by plaintiffs' firms taking on large, complex cases" applies with equal force here, and justifies Class Counsel's requested fees. *See Young*, 2017 WL 4164238, *6; *see also*, *e.g.*, *Standard Iron Works*, 2014 WL 7781572, at *1 (awarding a flat 33% of $163.9 million settlement); *City of Greenville*, 904 F. Supp. 2d at 908-09 (awarding 33% of $105 million plus roughly $8.5 million in costs); *Cent. Laborer's Pension Fund v. Sirva, Inc.*, No. 1:04-cv-07644, Doc. 249 (N.D. Ill. Oct. 31, 2007) (awarding a flat 29.85% percent of $53.3 million).

In sum, the Court agrees that with Class Counsel that

[T]his case is in a league of its own. It was brought under a statute that almost never rewards plaintiffs. It relied on a novel, untested theory. It was accompanied by extreme risk of non-payment. It required an enormous amount of work. And it settled only after trial had begun. In light of these factors, Class Counsel's request of a flat 33.33% award is reasonable and, if anything, "is on the low end" of what sophisticated parties would have negotiated for a recovery during trial.

Doc. 973 at 15. The Court therefore concludes that Class Counsel's request for one-third of the common fund is reasonable and supported by the facts of this case.

Finally, the Court rejects Marlow's contention that the percentage must be calculated after deducting any awarded expenses. Courts in this Circuit routinely award a percentage of the gross common fund without netting out separately awarded costs, and this Court sees no reason to depart from that approach here. *See, e.g.*, *Spano*, 2016 WL 3791123, at *4 (awarding 33.33% of $57 million fund in addition to costs for a total of 36.51% of fund); *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, No. 10-CV-426-WMC, 2015 WL 13546111, at *6 (W.D. Wis. Jan. 5, 2015) (awarding 27.5% of $82 million settlement fund plus in costs for total of 29.66% of the fund); *Silverman*, 2012 WL 1597388, at *5 (N.D. Ill. May 7, 2012), *aff'd sub nom. Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013) ("The Court awards attorney's fees in the amount of 27.5% of the Settlement Amount and awards $4,729,743.16 in costs." (29.86% of settlement fund)); *Martin*, 2010 WL 11614985, at *6 (awarding 33.33% of gross settlement fund in addition to costs for a total of 35.24% of the fund).

### E. Lodestar Cross-Check

A lodestar cross-check is not required in this Circuit. *Rohm & Haas Pension Plan*, 658 F.3d at 636 ("[C]onsideration of a lodestar check is not an issue of required methodology."); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 500 (N.D. Ill. 2015) ("[N]o Seventh Circuit case law suggests that a percentage-of-the-fund approach will yield a reasonable result only where it satisfies a lodestar cross-check."). Indeed, the "use of a lodestar cross-check has fallen into disfavor," *Beesley*, 2014 WL 375432, at *3 (*citing Synthroid II*, 325 F. 3d at 979-80)), and, in some cases, can be "counterproductive," *Gen. Dynamics Corp.*, 2010 WL 4818174, at *3 (collecting cases). Nevertheless, because an objection to the requested fees has been raised, the Court conducts this additional analysis to further confirm that Class Counsel's fees are reasonable and will not result in a windfall.

The Court first finds that the records submitted by Counsel are sufficient for this analysis and rejects Marlow's argument that "full billing records" are necessary. Contrary to Marlow's assertion, it is well established that courts "may rely on summaries . . . and need not review actual billing records." *See Beesley*, 2014 WL 375432, at *3, n.1; *accord Gen. Dynamics*, 2010 WL 4818174, at *3 (same); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean counting . . . . [Courts] may rely on summaries submitted by the attorneys and need not review actual billing records.") (citation omitted)).

The Court further concludes that the hours worked, rates billed, and resulting multiplier are all customary and reasonable for cases of this complexity. According to their declarations, Class Counsel worked approximately 55,000 hours (totaling $29,163,729.05 in lodestar) in the seven years from pre-filing investigation to the date the settlement was announced. This number of hours is not, as Marlow suggests, "extraordinarily high" in the context of this case. In fact, it is well below the mean in cases in the $250 million range that progressed to trial, and even lower after accounting for the number of years this case was litigated. *See* Doc. 954-3 ¶¶ 29-32. It is also about 20% less than hours that have been recently approved in this district. *See, e.g.*, *City of Greenville*, 904 F. Supp. 2d at 909 (finding reasonable 83,300 hours for two firms over 8 years—approximately 10,412 hours/year). Given the complexity of this litigation, and the tremendous amount of work it involved, the Court has no trouble concluding that Class Counsel worked a reasonable number of hours to prosecute this case.

Class Counsel's historical billing rates are also reasonable. The reported blended average is $527.34. As Professor Rubenstein's analysis demonstrates, this is typical of rates approved in 22 recent class action fee awards in the Northern District of Illinois. Furthermore, courts in this District (including this Court) have

recently approved a billing structure and rates that would, if applied to Class Counsel's time here, result in a blended average rate approximately 1/3 higher than what Class Counsel have reported. *See Beesley*, 2014 WL 375432, at *3; *Spano*, 2016 WL 3791123, at *4. With these guideposts in mind, and given the complexity of this case and participation of highly-experienced lawyers with national practices and expertise, the Court concludes that the billed rates are reasonable.

The multiplier that results from Class Counsel's reported lodestar is 2.83, or if applying the rates approved in *Spano*, 2.11. Doc. 954 at 17; Doc. 954-4 ¶ 10. This is reasonable under the facts of this case. Risk multipliers are "mandated" where, as here, counsel "had no sure source of compensation for their services." *Florin*, 34 F.3d at 565; *accord City of Greenville*, 904 F. Supp. 2d at 909 ("[W]here counsel 'had no sure source of compensation for their services,' the Court must apply a risk multiplier to compensate the attorneys for the risk of nonpayment in the event the litigation were unsuccessful."). Moreover, multipliers should reflect the risks counsel faces *ex ante*. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) ("The [multiplier] level selected should, to the extent possible, be without regard to most developments during discovery and litigation because it is designed to reflect the riskiness of the case at the outset."). "The multiplier is" therefore "determined by dividing 1 by the probability of success" at the outset of the case. *City of Greenville*, 904 F. Supp. 2d at 909 (*quoting Florin*, 60 F.3d at 1248 n. 3). Thus, the 2.83 multiplier is justified here if Plaintiffs had less than a 35% chance of prevailing when they filed suit (1/2.83=0.3533). For all the reasons detailed above, this is undoubtedly the case here.

The lodestar cross-check therefore confirms the reasonableness of Class Counsel's request.

### III. Class Counsel's Requested Costs Are Reasonable.

"It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation." *Beesley*, 2014 WL 375432, at \*3 (citing *Boeing*, 444 U.S. at 478); *see also* Fed. R. Civ. P. 23(h). Here, Class Counsel seek reimbursement of $6,971,852.80 in litigation expenses. No objector challenges the fairness or reasonableness of the requested expenses.

As a threshold matter, the Court concludes that the billing records provided—which broke the costs down into 16 separate categories of litigation expenses—include sufficient detail to allow the Court to perform its oversight function. *See, e.g.*, *Schulte*, 805 F. Supp. 2d at 600 (noting that a "summary document" of expenses would suffice); *see also Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble*, 924 F.2d 633, 643 (7th Cir. 1991).

The Court further concludes that the requested expenses are reasonable under the facts of this case. As noted throughout this Order, this case was particularly hard-fought over more than six years. During that time, Counsel: secured the services of a number of highly-qualified experts, many of whom submitted multiple reports, were deposed, and prepared for trial; paid for the development and implementation of the litigation notice program; traveled to well over a hundred hearings and depositions; employed a discovery vendor to host and help analyze hundreds of thousands of pages of documents over more than six years; and worked extensively with jury consultants and other trial-preparation experts to achieve the best result for the Class. Doc. 954 at 18-21; Doc. 954-4 ¶ 12. These are but a few examples of the costs of doing business in a complex and high-stakes case such as this.

Yet, while this was certainly an expensive case to prosecute, the requested expenses are only 2.8% of the common fund, which is significantly less than the average of "4 percent of the relief for the class." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1041 (N.D. Ill. 2011) (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 70 (2004)). Moreover, as this Court previously recognized in a different case, "Class Counsel had a strong incentive to keep expenses at a reasonable level due to the high risk of no recovery when the fee is contingent." *Beesley*, 2014 WL 375432, at *3. Furthermore, here, as in *Beesley*, "the fact that Class Counsel does not seek interest as compensation for the time value of money or costs associated with advancing these expenses to the Class makes this fee request all the more reasonable." *Id.* Finally, Class Counsel incurred significant costs after submitting their motion—and will continue to do so until the settlement is finalized—for which they have not sought reimbursement. *See* Doc. 973-1 ¶ 3.

Class Counsel's expenses are therefore justified in the context of this case.

## IV. <u>Service Awards for the Class Representatives</u>

Plaintiffs request service awards of $25,000 for each of the three Class Representatives: Mark Hale, Todd Shadle, and Laurie Loger. As demonstrated by their Declarations, each of them has invested time and resources in this litigation by, among other things: reviewing pleadings, responding to discovery requests, producing documents, sitting for depositions, preparing for trial, remaining in contact with Class Counsel, and overseeing the litigation. Doc. 973-1, Exhibits 1-3. Furthermore, each of them served as a class representative in the underlying *Avery* action and thus have been representing this same group of policyholders for more than 20 years. *Id.* Service awards of $25,000 are within the range of awards granted in similar situations, and are reasonable and appropriate under the facts

of this case. *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (upholding award of $25,000 to class representative); *Spano*, 2016 WL 3791123, at *4 (awarding $25,000 to two representatives and $10,000 to a third); *Beesley*, 2014 WL 375432, at *4 (awarding $15,000 and $25,000); *Abbott v. Lockheed Martin Corp.*, No. 06-CV-701-MJR-DGW, 2015 WL 4398475, at *4 (S.D. Ill. July 17, 2015) (awarding $25,000); *Nolte v. Cigna Corp.*, No. 07-cv-2046, Doc. 413 at 9 (C.D. Ill. Oct. 15, 2013) (same); *Gen. Dynamics*, 2010 WL 4818174, at *4 (awarding $25,000 each to three named plaintiffs, and finding such awards are "well within the ranges that are typically awarded in comparable cases"); *Heekin v. Anthem, Inc.*, No. 1:05-cv-01908-TWP-TAB, 2012 WL 5878032, at *1 (S.D. Ind. Nov. 20, 2012) (awarding $25,000 each to two class representatives based on extensive involvement over seven years of litigation).

Marlow's challenge to this request is unpersuasive. She points to no authority suggesting that under comparable facts such an award is inappropriate. Instead, her primary argument is that the Class Representatives did not themselves submit declarations attesting to the work they performed. But this very information was included in the one of Class Counsel's declarations attached to the initial motion and, in any case, in response to Marlow, all three Class Representatives have submitted their own declarations. All of them confirm that they performed significant work on behalf of the class and have earned the requested service awards.

## CONCLUSION

Accordingly, the Court hereby orders, adjudges, finds and decrees as follows:

1. The Court hereby **GRANTS** Plaintiffs' motion for final approval of the Settlement.[5] The Court fully and finally approves the Settlement in the

---

[5] The Court notes that attorney Gordon Ball, co-lead counsel for plaintiffs, is also one of the responsible attorneys for the settlement-fund account.

form contemplated by the Settlement Agreement (Doc. 941) and finds its terms to be fair, reasonable and adequate within the meaning of Rule 23 of the Federal Rules of Civil Procedure. The Court directs the consummation of the settlement pursuant to the terms and conditions of the Settlement Agreement.

2. The Court finds that the Notice given to the Class Members constituted the best notice practicable under the circumstances and complied in all respects with the requirements of Rule 23 and due process.

3. The Court hereby dismisses this Action with prejudice as to the defendants, and, except as provided under the Settlement Agreement, without costs.

4. The Court hereby discharges and releases the Released Claims as to the Releasees, as those terms are used and defined in the Settlement Agreement (Doc. 941).

5. The Court hereby permanently bars and enjoins the institution and prosecution by Class Plaintiffs and any Class Member of any other action against the Releasees in any court or other forum asserting any of the Released Claims, as those terms are used and defined in the Settlement Agreement (Doc. 941).

6. The Court further reserves and retains exclusive and continuing jurisdiction over the Settlement concerning the administration and enforcement of the Settlement Agreement and to effectuate its terms.

7. The Court finds and determines pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there is no just reason for delay and directing entry of final judgment.

Further, the Court also **GRANTS** Class Counsel's motion for attorneys' fees and costs. Class Counsel are awarded (1) $6,971,852.80 as reimbursement of

reasonable litigation costs; and (2) attorneys' fees in the amount of one-third (33.33%) of the $250 million common fund, net of the $2.1 million estimated for settlement notice and administration, but inclusive of interest accrued on the fund at the time of distribution.  The three Class Representatives—Mark Hale, Todd Shadle, and Laurie Loger—are each awarded service awards of $25,000.

A separate judgment consistent with this Memorandum and Order will issue pursuant to Fed. R. Civ. P. 58.

**IT IS SO ORDERED.**

Judge Herndon
2018.12.16 18:07:34 -06'00'

**United States District Judge**