**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

MARK HALE, et al.,                    )
                                      )
                    Plaintiffs,       )
                                      )
        vs.                           ) No. 12-cv-00660-DRH-SCW
                                      )
STATE FARM MUTUAL AUTOMOBILE          )
INSURANCE COMPANY, et al.,            )
                                      ) December 13, 2018
                    Defendants.       )

**FINAL FAIRNESS HEARING**
**BEFORE THE HONORABLE DAVID R. HERNDON**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES:**</u>

**For the Plaintiffs:**        Robert A. Clifford, Esq.
                               George S. Bellas, Esq. (phone)
                               Kristofer S. Riddle, Esq.
                               Shannon M. McNulty, Esq.
                               Bradley M. Cosgrove, Esq.
                               Clifford Law Offices, P.C.
                               120 N. LaSalle St., Suite 3100
                               Chicago, IL  60602
                               (312) 899-9090

                               Steven P. Blonder, Esq.
                               Jonathan L. Loew, Esq. (phone)
                               Much, Shelist, et al.
                               191 N. Wacker Dr., Suite 1800
                               Chicago, IL  60606-1615
                               (312) 521-2000

                               Thomas P. Thrash, Esq.
                               Thrash Law Firm, P.A.
                               1101 Garland St.
                               Little Rock, AR  72201
                               (501) 374-1058

                               Robert J. Nelson, Esq.
                               Elizabeth J. Cabraser, Esq.
                               Kevin R. Budner, Esq.
                               Lieff, Cabraser, et al.
                               275 Battery St., 29th Floor
                               San Francisco, CA  94111
                               (415) 956-1000

```
 1                              Brent W. Landau, Esq.
                                Hausfeld LLP
 2                              325 Chestnut St., Suite 900
                                Philadelphia, PA  19106
 3                              (215) 985-3273

 4                              John W. Barrett, Esq.
                                Barrett Law Group
 5                              404 Court Square North
                                Lexington, MS  39095
 6                              (662) 834-2488

 7                              W. Gordon Ball, Esq.
                                Ball & Scott
 8                              550 West Main St., Suite 601
                                Knoxville, TN  37902
 9                              (865) 525-7028

10                              Richard R. Barrett, Esq.
                                Barrett Law Office
11                              2086 Old Taylor Rd., Suite 1011
                                Oxford, MS  38655
12                              (662) 380-5018

13                              Patrick W. Pendley, Esq.
                                Pendley Law Firm
14                              24110 Eden Street
                                Plaquemine, LA  70765
15                              (225) 687-6396

16    For the Defendant         Joseph A. Cancila, Jr., Esq.
      State Farm:               James P. Gaughan, Esq.
17                              Matthew C. Crowl, Esq.
                                Riley, Safer, et al.
18                              70 W. Madison St., Suite 2900
                                Chicago, IL  60602
19                              (312) 471-8700

20                              Patrick D. Cloud, Esq.
                                Heyl, Royster, et al.
21                              105 W. Vandalia St., Suite 100
                                Edwardsville, IL  62025
22                              (618) 656-4646

23    For the Defendant         Russell K. Scott, Esq.
      Shepherd:                 Greensfelder, Hemker & Gale
24                              12 Wolf Creek Dr., Suite 100
                                Swansea, IL  62226
25                              (618) 257-7308
```

| | | |
|---|---|---|
| 1 | **For the Defendant Murnane** | Andrew J. Chinsky, Esq. (phone)<br>Sidley Austin LLP |
| 2 | | 1 South Dearborn St. |
| | | Chicago, IL  60603 |
| 3 | | (312) 853-9203 |
| 4 | **Also Present** | Douglas Dunham |
| | | Sheila Birnbaum |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19   Court Reporter:      Laura A. Esposito, RPR, CRR
U.S. District Court
20                     750 Missouri Avenue
East St. Louis, IL  62201
21                     (618) 482-9481
Laura_Esposito@ilsd.uscourts.gov

22

     Proceedings recorded by mechanical stenography;
23  transcript produced by computer.

24

25

1    *(Proceedings convened in open court at 9:02 a.m.)*

2         *THE COURT:*  Let's go ahead and let the record

3    reflect that we're in open court.  We've called the matter

4    of *Hale, et al. vs. State Farm Mutual Automobile Insurance*

5    *Company, et al.*  The case number is 12-660.  We have all of

6    the appearances on our sheet here, so we'll take care of

7    that in the record.

8         The first thing we have set is the rule to show

9    cause.  I have a notice from Mr. Downton that he's unable to

10   be present.  Is he in the courtroom by any chance?  No?  All

11   right.

12        So, his declaration, as he calls it, states that he

13   has quite a number of medical problems.  He's in the process

14   of moving from Nashville to Canada, and in the midst of all

15   that has been intermittently hospitalized for gallbladder

16   issues, and so for the reasons previously stated, which are

17   his objections to being ordered to be present, together with

18   all of these medical issues, he can't be here.  Now, he did

19   not file a motion to continue.  I do have a note from -- or,

20   rather, an order from the Seventh Circuit entered last night

21   at 9:22 p.m. denying the petition for writ of mandamus.

22        So, in order to perhaps avoid an appealable issue,

23   Mr. Clifford, my thought was that I would perhaps pass on

24   the rule to show cause but rule on the merits of the

25   objection.  What's your thought about that?

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 4

1          **MR. CLIFFORD:**  That would be fine with us,

     2     Your Honor.  Robert Clifford for the record.  And, so, if I

     3     may then, I've been the designated maitre d'.  I was called

     4     last night the maitre d', not the moderator, so --

     5          **THE COURT:**  Does that mean I'm going to get to eat

     6     in this deal?

     7          **MR. CLIFFORD:**  Well, the only thing between

     8     lunch -- you know, us and lunch is you, so --

     9          **THE COURT:**  And when we're done you can show us to

    10     a fine table, I take it?

    11          **MR. CLIFFORD:**  Yes, sir.  So, with your permission

    12     then, I'd like to introduce a couple of people to you just

    13     for the record.

    14          **THE COURT:**  Absolutely.

    15          **MR. CLIFFORD:**  You know, Your Honor, this

    16     litigation has, when coupled with the *Avery* case, a couple

    17     of decades of history in the court.  And throughout that

    18     time the class representatives, Mark Hale, who's in the

    19     courtroom today from Ava, New York, which is near Syracuse,

    20     Mr. Hale has faithfully performed his duties as a class

    21     representative and has attended many proceedings and been

    22     deposed.  And I'd like to, on behalf of the class counsel,

    23     acknowledge his presence and his participation and his

    24     undying and unwavering support for this cause.

    25          Along with him is Mr. Todd Shadle, who -- from

Hale vs. State Farm, et al., #12-660

                                            12/13/18 - Pg. 5

Dallas, Texas, who similarly has participated throughout
this cause at great, not only expense, inconvenience, but
commitment to seeking a just result in this case as he has.
And then, of course, Ms. Laurie Loger, who Your Honor, I
believe, has met.  Laurie is from LaSalle, Illinois, who was
here during selection of the jury, but I would be remiss --
we would be remiss on behalf of the class if we did not
acknowledge their service and significant support and
participation in helping us prosecute this claim.

So, to that end, and skipping over the rule to show
cause matter, I'd like to introduce Mr. Robert Nelson from
the Lieff Cabraser firm who will present our motion and
arguments.

**THE COURT:**  Okay.  Thanks.  So which one's
Mr. Hale, by the way?  So, if someone tells you they heard
me say, "That darn Hale," I wasn't talking about you
personally; I was only talking about the case, sir.

**MR. HALE:**  Yes, sir.

**THE COURT:**  I'm sure glad to see you're here.

Mr. Nelson?

**MR. NELSON:**  Good morning, Your Honor.  I'm
Robert Nelson on behalf of plaintiffs.

Your Honor, it's been a long road for us, and now
we get to talk about final approval of the settlement.  When
we filed our papers in October we hadn't yet had the new

```
 1   Rule 23(e)(2) in place.  Obviously, starting December 1, it
 2   is in place and it is the law of the land, and I think it's
 3   incumbent on us, since we didn't necessarily brief it that
 4   way, that we argue it right now before Your Honor.
 5        We did mention the Rule 23(e)(2) factors in our
 6   reply papers, but I'm happy to go through them individually
 7   because I wouldn't say it's any different than what the law
 8   was before in the Seventh Circuit.  Seventh Circuit had many
 9   factors that you consider in connection with final approval
10   but I think the new rule sintolizes [phonetic] them in a
11   different way perhaps, and so with the Court's permission I
12   will go through those factors.
13        So the rule, the new Rule 23(e)(2) describes four
14   factors to be looked at in connection with final approval.
15   The first is that the class representatives and class
16   counsel have adequately represented the class.  The second
17   is that the proposal was negotiated at arms length.  The
18   third is whether or not the relief provided for the class is
19   adequate.  And, finally, the rule asks whether or not the
20   proposed settlement treats class members equitably relative
21   to each other.
22        If we were to go through each of these factors,
23   Your Honor, in terms of adequacy of representation, as
24   Mr. Clifford just advised, our class representatives have
25   been steadfast in connection with their case and in their
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 7

commitment to representing the class, and I don't think there's any issue with regard to their representation of the class's interests throughout the many years of this litigation.

I would suggest, Your Honor, the same holds true with class counsel. We have been more than adequate in terms of representing the class. We've taken on every challenge, every motion, and, as the Court knows, there have been many of them. In fact, we've counted them and there are more than a hundred motions that have been filed in connection with this case, and so I would submit that the adequacy issue should not be at issue. That is, class counsel and the class representatives have done their job and then some.

In terms of the second factor, the arms length negotiations in connection with this case, I don't think there can be any question about that. The Court is aware there was a mediation, Court-ordered mediation undertaken by Judge Holderman. That process lasted more than a year. It ended unsuccessfully. The parties were too far apart. I think that of itself suggested there was no collusion in connection with this case, but then again, we had negotiations kick up shortly before trial, and, again, those mediations and settlement discussions were overseen by a Court-appointed mediator, Randi Ellis. And as the Court is

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 8

1    well aware, those negotiations were contentious, difficult,

2    and at arms length, and very arms length.  So, again, I

3    would say there's no question as to whether or not this

4    second Rule 23(e)(2) factor is met here.

5           The third factor is whether or not the adequacy --

6    whether the relief provided is adequate in light of the

7    risks incumbent in the litigation.  And in thinking about

8    the risks of this case, there were just so many, and so many

9    that appeared insurmountable at the beginning of this

10   litigation.  And I don't necessarily need to recount them

11   all, but the Court is well aware of all the dispositive

12   motions, motions to dismiss, motions for summary judgment on

13   *Rooker-Feldman*, motions for summary judgment on the statute

14   of limitations, res judicata, one issue after the next, and

15   these were difficult, difficult issues.  The risk of

16   *Noerr-Pennington* remained until the onset of trial.  Each

17   and every one of those risks have to be considered when

18   considering the total value of the settlement and what

19   counsel were able to achieve on behalf of the class.  And

20   when you do that, I think there's no question but that the

21   $250 million settlement is adequate in light of those risks.

22        Now, the objector, Marlow, argues otherwise and

23   suggests that there was little risk here because the

24   Seventh Circuit had heard several of the major arguments and

25   so there was no question, of course, that we would have

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 9

1  prevailed on appeal, and so there was very little risk.  I

2  think we can give short shrift to that argument because it's

3  just not true.  The Seventh Circuit didn't rule

4  substantively on any matter.  It ruled pursuant to its

5  manifest error standard in connection with some of the risks

6  that were taken.  And in terms of class cert, again, it did

7  not rule on the substance, denied the motions, but whether

8  or not they would have done the same post-trial is

9  completely another story.

10        And, in addition, counsel for the objector, Marlow,

11  argues that there was really very little jury risk here,

12  that the jury, of course, would have ruled the way we had

13  hoped they would, but I don't believe the objector spent

14  hundreds of thousands of dollars and spent hours with jury

15  consultants and focus groups and the like, and class counsel

16  did, and we made realistic judgments based on the

17  information that we were able to obtain and spent a lot of

18  money and a lot of time and a lot of effort to try to really

19  understand the risks incumbent in this case.

20        Marlow also argues that the amount of settlement is

21  too small because it would -- it was obvious that we would

22  have gotten $7 billion in this case and that there was very

23  little alternative other than $7 billion.  Obviously, that

24  doesn't take into account a lot of things.  There's no

25  question that there was a real issue as to whether or not we

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 10

1    could have ever achieved post-judgment interest in this
        2    case.  There was -- we talked about post-judgment interest.
        3    In *Avery*, there was never a judgment entered, a final
        4    judgment entered in *Avery*.  It was a novel, difficult
        5    argument, but he assumes, of course, that we would win it;
        6    "he" meaning counsel for Marlow.
        7            Marlow also doesn't acknowledge that, when
        8    considering the adequacy of a settlement, courts are not to
        9    look at the trebling aspect of the settlement.  We've
       10    provided to Your Honor case law that demonstrates that in
       11    determining adequacy you do not look at the trebling value,
       12    and so we cited a number of cases to that effect.  So when
       13    you look at the value that we were able to obtain for the
       14    class relative to the substantial risks, we submit,
       15    Your Honor, that that third 23(e)(2) factor is met readily.
       16            In considering that 23(e)(2) factor, the Court --
       17    excuse me.  Rule 23 identifies a number of factors, sort of
       18    sub-factors, that is romanette (i) through (iv) in the new
       19    Rule 23(e)(2).  The second romanette is the effectiveness of
       20    any proposed method of distributing relief to the class.
       21    And I would submit, Your Honor, that, in connection with
       22    that, this settlement is quite innovative in that we have
       23    made it extremely easy for people to participate.  In fact,
       24    for over a million class members payments will take place
       25    automatically because they're in our system.  We know who

```
 1    they are, State Farm's helped identify them, and they will
 2    get payment automatically without having to submit a claim
 3    form.  And that's -- you know, the drafters of the rule, the
 4    new Rule 23(e)(2), were very concerned about that there are
 5    obstacles making it difficult for class members to make
 6    claims.  We've tried to address that and I think we've done
 7    a very good job. , And our claim form is very
 8    straightforward, easily understandable, and so I think we
 9    met that burden as well.
10          The third romanette is the terms of any proposed
11    award of attorneys fees.  And I think what the drafters are
12    getting at there is whether or not the lawyers are being
13    paid for work that didn't benefit the class in some way.
14    So, for example, if you had a claims made type settlement
15    and you said the settlement was, say, a hundred million
16    dollars, but, in fact, it only turned out to be 20 or
17    $30 million because people didn't show up to make their
18    claims, and you can't compensate the lawyers based on that
19    full value.  But here, there's no question that the class is
20    getting the full value.  That is, everything that doesn't go
21    to class counsel in terms of their fees and costs, all of
22    that goes to the class.  There's no -- there's nothing else,
23    nowhere else it can go.  It's nonreversionary, the funds, so
24    there's no question that we meet that requirement as well.
25          Finally, the fourth romanette is whether or not the
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 12

1   agreement is required to be -- whether there's any side

2   agreement in connection with the case, and here there is

3   none, so I think we meet that factor as well.  Those are the

4   four romanette factors in the 23(e)(C) provision.

5        And then, finally, there is (D), which is whether

6   or not class members are being treated equitably, and I

7   think we have done our best in that area as well because, as

8   the Court will recall, in the *Avery* case there never was a

9   final -- we never got to the damages phase in terms of

10  allocating who was going to get what, and, as such, we

11  basically concluded that all of our *Hale* class members

12  essentially had an undivided interest in that *Avery* judgment

13  way back when.  And so we think that they had an undivided

14  interest in the *Hale* judgment as well.  And so we're -- we

15  believe that it is fair and appropriate to treat all class

16  members alike, given the status of *Avery* way back when, and

17  given the nature of our RICO claim.

18       So, again, I think we have met that standard as

19  well, and I don't believe Marlow disputes that.  What she

20  does dispute is that she claims that this settlement is

21  unduly burdensome on her because it adds a deposition

22  requirement on an objector versus somebody else who's not

23  objecting.  And as we have briefed, Your Honor, there's no

24  rule that the Court cannot, in its efficient -- in its

25  efforts to efficiently run a case, insure that objectors

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 13

1   have certain obligations to come forward and to explain

 2   themselves, why they did what they did, and also to

 3   demonstrate whether or not they have standing.  We offered

 4   substantial case authority demonstrating that the Court has

 5   that ability and exercised it appropriately here.

 6           So there are also some other factors that the

 7   Seventh Circuit looks to when it's evaluating whether or not

 8   final approval is appropriate that are not explicitly

 9   mentioned in the 23(e)(2) factors, and I'm just going to

10   briefly go through those.

11           One factor that the Seventh Circuit has identified

12   that's not explicitly mentioned in 23(e)(2) is whether or

13   not -- is to look at the amount of opposition to the

14   settlement, and we submit, Your Honor, that the response to

15   our notice program has been overwhelmingly positive.  The

16   fact that we sent out individual notice to over

17   1.43 million, million class members and did a nationwide

18   publication notice, an expensive notice program, and after

19   all of that, given that we have 4.7 potential -- 4.7 million

20   members of the class potentially, we got all of one

21   objection.  That's pretty amazing, and in my practice

22   probably unprecedented to have so many people, so many

23   members of the class, millions of class members who get

24   individualized notice and yet you get only one objector.  We

25   calculate that that one objector amounts to .00002 percent

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 14

1    of the estimated class.  Obviously, that's just an extremely

2    positive response and I think it is a strong presumption of

3    the validity and excellence of the settlement itself.

4            We have cited to you many, many cases where there's

5    been a response rate of 99 percent, and here I would -- and

6    the courts say those are -- have a presumption of validity

7    for final approval.  Here, it's 99.999 percent.  I mean we

8    really were very, very pleased with our response and I think

9    it demonstrates the propriety of the settlement.

10           Another Seventh Circuit factor is the stage of the

11   proceedings and the amount of discovery that was completed

12   at the time the case settled.  I think Your Honor said it at

13   the time of preliminary approval, that you can't -- you

14   could not imagine that parties, by Your Honor included, and

15   the parties, could have known more about the strengths and

16   weaknesses of their case other than had the case gone to

17   trial because we had litigated the bejabbers out of this

18   case.  And I think that factor is a very, very favorable

19   factor for us; that is, we settled after a jury had been

20   impaneled, after all the pretrial rulings had been made.  We

21   had a very good understanding of our case, where we stood,

22   what our chances were, as good as you could possibly have in

23   litigation short of knowing what a jury or the appellate

24   court would do.

25           **THE COURT:**  So, Mr. Clifford took some umbrage with

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 15

1    "bejabbers".  I just looked in the Black's Law Dictionary.

2    It's there.

3              **MR. CLIFFORD:**  The word of the day was lowdy-dowdy.

4              **THE COURT:**  That's not in there.

5              **MR. CLIFFORD:**  I was going to look up "bejabbers".

6    Now we have two words this week.

7              **MR. NELSON:**  I used "bejabbers" because I'm in the

8    midwest and I think that might go well here.  I don't know.

9              The last factor that I think is a Seventh Circuit

10   factor that's not specifically addressed in 23(e)(2) is the

11   opinion of qualified counsel.  And, Your Honor, our team,

12   and our extensive team of very experienced class counsel

13   wholeheartedly and unanimously endorsed this settlement.

14   And so, I think, stepping back, looking at the settlement,

15   $250 million we think is an excellent settlement.  This was

16   a very difficult case, a novel case, an important case.  We

17   think we shined the spotlight on something important, and

18   our class members are all going to benefit from the work

19   that was done.  And for all these reasons, Your Honor, we

20   believe that we meet the 23(e)(2) factors as well as

21   Seventh Circuit factors, and that the Court should grant

22   final approval of the settlement.

23             **THE COURT:**  Thanks, Mr. Nelson.  Anything else?

24             **MR. NELSON:**  I'm happy to address the fee issues.

25   Obviously, that's an important motion for us, and so I can

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 16

1   do that now or if you want to -- if we want to talk further

2   about the final approval, I'm happy to do that, too.

3        **THE COURT:**  You can address the fee issue.

4        **MR. NELSON:**  Okay.  Thank you, Your Honor.

5            As the Court is aware, class counsel seek a fee of

6   one-third of the common fund.  And under Seventh Circuit

7   jurisprudence, to determine whether that is a reasonable fee

8   and reflective -- whether it's a reasonable fee requires

9   that we look to the ex ante market price for class counsel's

10  services.  And so what does that mean, the ex ante market

11  price for class counsel's services?  How do you determine

12  what that should be in this case?

13           The Court in *Synthroid*, the Seventh Circuit in the

14  *Synthroid I* decision described several factors that should

15  go into that analysis.  The first is the actual agreements

16  between the parties as well as fee agreements reached

17  between sophisticated entities in the market for legal

18  services.  The second factor is the risk of nonpayment at

19  the outset of the case.  The third factor is the caliber of

20  class counsel's performance.  And the fifth factor is the

21  information -- is to look at information from other cases,

22  including fees awarded in comparable cases.

23           And I'd like to, Your Honor, go through those

24  *Synthroid I* factors to try to assess whether or not our

25  requested fee is consistent with what the ex ante market

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 17

1    price for our services would be.

2         So the first benchmark is the actual agreements.

3    We've submitted our agreements here, Your Honor.  They are

4    40 percent retainers, but I understand that our retainers

5    with our class reps may not necessarily be reflective of

6    what a -- for example, a large corporation might do if it

7    were to retain counsel on a contingent basis.  And according

8    to the Seventh Circuit, you need to look at those types of

9    relationships to try to determine what the ex ante price

10   should be in a case such as this.  So while we do have the

11   40 percent retainers from our clients, we've also submitted,

12   Your Honor, a really extensive amount of evidence, and

13   specifically, empirical evidence from our three experts who

14   have analyzed this extensively, and we've put that

15   information before you.

16        Specifically, Professor Silver, he has included

17   empirical evidence to the effect that a one-third fee or

18   more in risky complex litigation is quite common, and he

19   also says, as well as Professor Fitzpatrick, that when a

20   case goes to trial the percentage fee typically goes up.

21   And according to Professor Fitzpatrick, it can go up as high

22   as 50 percent if a case is going to trial.  So according to

23   Professor Silver, there's substantial empirical analysis to

24   support a one-third contingent fee amongst sophisticated

25   purchasers of legal services, but then the price goes up if

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 18

1   the case goes to trial.  So when looking at this factor,

 2   Your Honor, I think it supports -- that is, the fee

 3   agreements -- it supports the request for fees.

 4          The second factor, the *Synthroid I* factor, is the

 5   risk of nonpayment.  And, according to Silverman, the

 6   greater the risk of walking away empty-handed, the higher

 7   the award must be to attract competent and energetic

 8   counsel.  I would submit, Your Honor, that the risk of

 9   walking away empty handed here was very, very high.  We've

10   talked about all the many motions that were filed and how we

11   could have lost on any one of them, certainly the

12   dispositive motions, and been out of luck and walked away

13   empty-handed.  But we've also submitted some evidence on

14   this, one of which was the fact that RICO cases in

15   particular are extraordinarily difficult and have a great

16   likelihood of litigants or plaintiffs walking away

17   empty-handed.  Apparently, the success rate -- and I'm glad

18   I didn't know this at the outset of this litigation -- is

19   2 percent.  It's unbelievable.  And that's based on a

20   statistical analysis of all -- of RICO cases, and it's

21   contained in *Gross vs. Waywell*, which is a Southern District

22   of New York case.  I'm just quoting:

23          "The statistical record indicates that

24          98 percent of the RICO appellate cases

25          surveyed, which do not include RICO actions

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 19

```
 1              dismissed by the District Court but not

 2              appealed, plaintiffs and counsel invested

 3              extensive time and energies in litigating,

 4              only to come away with a total loss."

 5         And the -- in addition to the fact that we brought

 6    our action under RICO, in terms of it being risky, we had a

 7    completely novel theory:  The idea that there was a tainted

 8    tribunal and somehow briefs could constitute RICO acts.  All

 9    of these things were extremely challenging, and extremely

10    challenging ex ante, at the outset.  You know, I started

11    thing about when my firm decided to get back into this

12    litigation.  We have an executive committee that looks at --

13    you know, decides whether to get in, and I can -- we got in,

14    obviously, and others did too, but there were not a lot of

15    firms, you know, looking to be part of this litigation.  It

16    was perceived as an extremely uphill venture.  It was also

17    perceived by us as an extremely important case, one that we

18    had to do, but we did it thinking that there was a

19    substantial likelihood that we would walk away empty-handed.

20         Another factor that goes to the risk here is that

21    we uncovered the fraud entirely on our own.  That is, most

22    of the -- the alleged fraud.  Most of the cases, most

23    successful class action cases follow upon government

24    investigations, particularly in antitrust context, sometimes

25    also in the securities context, but here we were working
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 20

1    without any kind of model.  There had never been a case like
    2    this before.  We were treading entirely on new ground
    3    throughout.
    4           According to Professor Fitzpatrick -- and I thought
    5    this was a rather remarkable statistic -- he describes that
    6    private lawyers were the first to discover fraud only
    7    3 percent of the time.  Three percent of the cases is there
    8    not some kind of governmental investigation that precedes
    9    the filing of a lawsuit.  That's an amazing statistic.  And
   10    I think for all of these reasons, our experts -- and these
   11    experts, I don't know if Your Honor is familiar with them,
   12    but they truly are the most experienced and respected
   13    experts in the field.  They've been cited, each and every
   14    one of them have been cited probably hundreds of times by
   15    courts throughout the country and including many, many times
   16    by courts in the Seventh Circuit, including the Seventh
   17    Circuit itself.
   18           But, according to Professor Silver -- I found this
   19    particularly moving -- he said, "This is one of the most
   20    important lawsuits of my lifetime and also one of the
   21    riskiest as every relevant metric shows."  That's a profound
   22    statement by a very experienced, accomplished academic who's
   23    been at this for more than 30 years.  Professor Rubenstein
   24    identified a dozen independent factors that demonstrate the
   25    riskiness of the case viewed ex ante and that were born out

Hale vs. State Farm, et al., #12-660

                                          12/13/18 - Pg. 21

1   by the arc of the litigation.  And, Fitzpatrick,
2   Professor Fitzpatrick said, "It's a gross understatement to
3   say that this case involved above average risk."
4          And yet, despite, you know, the novelty of this
5   case, the difficulties of this case, the fact that it was a
6   RICO case, the fact that we uncovered the alleged fraud on
7   our own, the fact that we had a completely novel approach
8   and theory and no model to work from, Marlow seems to
9   believe that this case was not very risky, and he -- excuse
10  me -- she argues that by the time of trial when the case
11  settled things looked pretty good for the plaintiffs and
12  that, of course, we would have gotten our $7 billion
13  verdict.
14         But when you look at -- and I think this is
15  important:  When you look at what the percentage fee should
16  be within the Seventh Circuit, you don't look at it six
17  years in, you don't look at it after you've won motions for
18  summary judgment and all of the dispositive motions and
19  gotten some very good rulings on motions in limine and
20  pretrial motions.  You look at it ex ante, in the
21  beginning -- in this case, 2011, 2012.  You don't look at it
22  at 2018, a week before trial.  The ex ante market here, we
23  think, Your Honor -- I mean it could justify a much higher
24  fee than what we're asking for, and I know we're asking for
25  a lot, but the ex ante risks here were in many respects

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 22

1    unprecedented for the reasons I've described.

 2            The other *Synthroid I* factors include the quality

 3    of class counsel's performance, and I think -- I don't know

 4    if you can -- if you're biased against us because we gave

 5    you so much to read, but --

 6            **THE COURT:**  I thought about it.

 7            **MR. NELSON:**  -- but a lot of work went into this

 8    case, high-level work, high-level litigation work.  This is

 9    not one of those cases where you have document reviewers,

10    you know, who never see the light of day and who are just

11    doing their thing.  Here you had lawyers litigating serious

12    motions day in and day out, meeting with Magistrate Williams

13    weekly pretty much for several years.  This was a different

14    kind of litigation that involved all hands on deck all the

15    time for many years at a time.

16            Another *Synthroid* factor is the information from

17    other cases.  And, again, we've provided empirical studies.

18    Professor Rubenstein, for example, he looked at

19    Seventh Circuit cases and the cases within the

20    Seventh Circuit and observed that the average awarded fee in

21    the Seventh Circuit is 31.6 percent.  31.6 percent for the

22    average fee in the Seventh Circuit.  This case was not

23    average for all the reasons that I've suggested, and it also

24    wasn't average in the sense that the case went to trial.  We

25    selected a jury, we knew everything about this case.  And

Hale vs. State Farm, et al., #12-660

                                    12/13/18 - Pg. 23

according to Professor Rubenstein, trials are very, very
rare, as we all know, but according to his data, in the
eleven cases that proceeded to trial in his database, the
mean fee award was 36 percent, with five cases having awards
of 38.9 percent or more, and three of those having fee
awards of 40 percent or more.  So it's not uncommon for
cases that go to trial to be rewarded to class counsel
because they went to trial, because they put in the work,
they put in the time, they put in the effort, and they got,
presumably, maximum value because they went to trial.

Marlow argues that a third is unreasonable here
because megafund settlements are different, that megafunds
come with a lower percentage fee.  He ignores -- or she
ignores the fact that the Seventh Circuit, in *Synthroid I*,
expressly rejected a percentage cap on megafund recoveries
because "private parties would never contract for such an
arrangement."  That's true.  Why would you ex ante penalize
your lawyers for being as successful as they could possibly
be?  Makes no sense.  And there's some academics and some
judges as well who think that the opposite should take
place; that is, you should, you know, taper upward as the
recovery goes up.  But in any event, the idea of a megafund
cap in the Seventh Circuit is not the state of the law.

Professor Silver, as I mentioned, cites at least 20
cases in which courts awarded 33 percent or more recoveries

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 24

1   between a hundred -- involving recoveries between

2   105 million and 974 million, so he -- and I would urge

3   Your Honor to look at Table 2 of his report, which recounts

4   those cases.  So the idea that there's some megafund cap or

5   megafund lowering, it just is not borne out by the empirical

6   data from the field.

7        And I'd also like to refer Your Honor to a recent

8   case, just came down this week, it's called *Syngenta*.  It's

9   out of the District of Kansas but it's a case in which there

10  was a one-and-a-half billion dollar settlement.

11       **THE COURT:**  Can I save you some time?  I'm involved

12  in that as one of the three judges deciding the fee, so just

13  skip over that part.  Keep going.

14       **MR. NELSON:**  Will do, Your Honor.

15       I'd also suggest that the Seventh Circuit's

16  decision in *Silverman* does not mandate otherwise.  In

17  *Silverman*, the Court said that 27-and-a-half percent of

18  $200 million, and I'm quoting now, "may be at the outer

19  limit of reasonableness."  But the Seventh Circuit, in

20  *Silverman*, didn't get rid of the notion that you had to

21  approximate the market rate that prevails between willing

22  buyers and willing sellers of legal services, and so

23  27-and-a-half percent might have been the outer limit of

24  reasonableness in *Silverman*.  *Silverman* was a securities

25  case.

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 25

1       We know that, in *Synthroid I*, the Court says, well,

2   why would you hold a percentage recovery in a securities

3   case, make it applicable to a difficult fraud case, which

4   Synthroid was?  You shouldn't do that.  And by the same

5   token, we would say why would you -- if *Silverman* said that

6   27-and-a-half percent might be the outer limit there, it

7   should not apply to this much more difficult case where

8   there's no -- it's not a cookie-cutter type case, there's no

9   model, there's no precedent for the work that was done or

10   the case that this was.

11       **THE COURT:**  I agree.  My reading of *Silverman* is

12   exactly the same.  That's really the outer limit perhaps for

13   *Silverman* but that really has no additional value or even

14   instruction as far as other dissimilar cases.

15       **MR. NELSON:**  So one last criticism from Marlow is

16   that the Court should adopt a declining down, a tapering

17   down of the percentage fee as the recovery goes up.  And I

18   would suggest a couple things:  One, *Silverman*, which is

19   what Marlow relies on for that, did not follow that model.

20   In fact, it affirmed a flat fee, as the Court is aware.

21       I want to just cite this dairy farmers case because

22   the quote is so fantastic.  In dairy farmers, the Court

23   observed that a -- that the declining percentage approach,

24   "is not a one size fits all recovery scheme, and there are

25   many other factors to consider before declaring this pricing

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 26

```
 1    grid the Cinderella slipper."

 2            So we would submit, Your Honor, that the Cinderella

 3    slipper, a declining approach to the percentage fee, doesn't

 4    apply here.  No sophisticated buyer, purchaser of services

 5    in a case as novel as this would ever require that, and nor

 6    would lawyers accept it.  Just shouldn't apply in this case,

 7    and for a number of reasons.

 8            And -- excuse me.  Before I get to those reasons, I

 9    want to also cite to the *Young* case, *Young vs. County of

10    Cook*, Judge Kennelly, where he also rejected the declining

11    percentage, and he said, "Why not, because of the high risk

12    of nonpayment in that case, the enormous amount of work that

13    went into the litigation, and the fact that counsel had

14    turned down an earlier settlement offer in a successful

15    effort to obtain more for the class."  And I think the

16    reasoning by Judge Kennelly makes good sense and is

17    applicable here.  We went through a year of mediation.  We

18    were offered, you know, monies.  If, you know, this

19    declining, you know, fee approach were in place, who knows

20    how -- excuse the incentives for class counsel?  Just, it

21    doesn't make sense for this kind of a case.  And I note in

22    that case, Judge Kennelly affirmed the 33 percent contingent

23    fee of the total recovery, and he said it was at the low end

24    of what is typically negotiated ex ante by plaintiffs' firms

25    taking on large complex cases.
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 27

1          So, to conclude, Your Honor, on this issue, I would

 2     say that this case is in many respects in a league of its

 3     own.  It was brought under a statute that almost never

 4     rewards plaintiffs.  It relied on a novel, untested theory.

 5     It was accompanied by extreme risk of nonpayment.  It

 6     required an enormous amount of work and it settled only

 7     after trial had begun.  And these, I would submit, are all

 8     the relevant factors that go into what an ex ante analysis

 9     should be, and in every way I think we deserve to get

10     compensated at a one-third percentage fee based upon this

11     ex ante analysis.

12          One last aside note:  Marlow contends that the

13     percentage must be calculated after deducting any awarded

14     expenses, and, in response, we've cited cases to show that

15     courts in this circuit routinely do not do that, and those

16     cases are cited in our brief.

17          We also provided the Court with a lodestar

18     cross-check.  We're not required to do that.  The

19     Seventh Circuit doesn't use it necessarily.  But out of an

20     abundance of caution we think it is appropriate for the

21     Court to at least consider it.  And we provided, as you

22     know, our timesheet, our time records, our summary time

23     records which demonstrate that we've worked over 55,000

24     hours in this case, and our lodestar's approaching

25     $30 million.  Marlow seems to argue that our lodestar is too

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 28

high.  I don't know how he could possibly know why it's too high since he wasn't around during the six years of the litigation.  But, according to Professor Rubenstein, that amount of lodestar is below the mean in cases that have settled or resolved for 200 -- in the $250 million range.  So that amount of hours is not exceptional in any way, just below the mean.

Also, we've provided you, in connection with our lodestar, our billing rates.  We would submit, according to Professor Rubenstein, that our rates are consistent with the rates in the Northern District of Illinois, a little bit higher than the local rates, market rates in St. Louis, but only marginally so.  And I would submit, Your Honor, that Your Honor's *Beesley* case, where you set rate was then followed by the *Spano* case a couple years later where they raised those rates to account for inflation.  If we applied those *Spano* rates to our lodestar, our lodestar -- our -- it would reduce our multiplier.  Our multiplier is currently 2.83, which it's really less because we've been doing a substantial amount of work since the -- since we filed our papers, but if we applied the *Spano* rates, which are higher than our rates, the multiplier would be 2.11.  And, again, that's well within a range of reasonableness and demonstrates that we're not getting a windfall as it were.

We also are submitting our costs to be reimbursed,

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 29

1    Your Honor, and Professor Rubenstein also looked at those

2    costs.  He has determined that those costs are about

3    average; in fact, somewhat low compared to the mean in large

4    cases.  Apparently, I didn't know this, but the mean is

5    approximately 4 percent of the value of the case, and here

6    it's -- our mean is 2.8 percent, so less than is typical in

7    terms of the amount of costs that we are seeking

8    reimbursement for.

9          And we also submitted a declaration indicating that

10   those costs are less than our true costs.  We have

11   considerably more costs than what we're seeking, but those

12   are the costs that we put in our fee application, which we

13   filed in October.  Many costs came in subsequent to that

14   time and we're not seeking reimbursement of those costs.

15   Those costs will be reimbursed out of any fees that the

16   Court awards.

17         Your Honor, that's all I got.

18         **THE COURT:**  I have no questions.  Thanks very much.

19         Would anybody on the defense side wish to speak?

20         **MR. NELSON:**  Your Honor, excuse me.  I apologize.

21   My co-counsel has reminded me there is an important -- one

22   remaining important issue.

23         Marlow does object to the size of the service award

24   to our class representatives, each of the three

25   representatives.  He took exception to the fact that they

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 30

did not file affidavits or declarations in connection with
our fee request and their service award request.  They have
all filed declarations now that are part of the record in
the case, and, as Mr. Clifford said at the opening of the
hearing, they've showed up.  Marlow didn't show up, but they
showed up, and they've showed up for a long time.  And, in
fact, those three representatives were here in *Avery*, so
they've showed up for the better part of 20 years in
connection with this case.  $25,000 is not atypical.  In
fact, it's pretty much right in the range.  I guess maybe a
little higher, but it's not higher given the six years of
this litigation and their commitment in *Avery*, which really
together you're talking about an unprecedented commitment to
a case and to this.  Again, they've showed up.

        Thank you.

        **THE COURT:**  All right.  Thanks.

        Someone from State Farm wish to address the Court?

        **MR. CANCILLA:**  Your Honor, Joe Cancila.

        Just a few sentences.  State Farm does support the
final approval of the settlement for the reasons we stated
in our separate written submission, Document 971.  So we
don't have anything to add beyond that on the support of
final approval.

        State Farm is not taking a position in respect to
the amount of fees that Your Honor may choose to award.

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 31

1    State Farm has commented on the objection to the extent that

2    the objector has taken issue with the sufficiency of the

3    consideration, and we've contested that argument on behalf

4    of the objector in our papers, Doc. 971.

5                 **THE COURT:**  Noted.  Thanks very much.

6                 Anybody for Mr. Murnane?

7                 **MR. CHINSKY:**  Nothing to add, Your Honor.  This is

8    Andrew Chinsky.

9                 **THE COURT:**  Mr. Scott, do you wish to add anything

10   for Mr. Shepherd?

11                **MR. SCOTT:**  No, Your Honor.  We would join in the

12   State Farm argument that they have filed.

13                **THE COURT:**  Thanks very much.

14                So I agree on all points with Mr. Nelson about the

15   analysis under 23(e)(2), and would note that his statements

16   and description of this litigation are consistent with the

17   Court's findings, that in his statement to the Court he did

18   not engage in embellishment or hyperbole but simply stated

19   the facts as they are in this litigation.  So I agree

20   entirely with Mr. Nelson's rationale and argument in this

21   case.  He's advocating but he really wasn't embellishing in

22   any way to support that advocacy, so I think he's spot on

23   with respect to his analysis of this litigation.

24                So, for the record, I would note that in this case

25   there was, in fact, a remarkable notice practice with

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 32

respect to direct notice and then general notice targeted
publications; that there were notices to 112 public
officials, including attorneys general and insurance
commissioners from all 50 states and U.S. territories, as
well as the Attorney General of the United States and the
Federal Reserve; and note that there were no objections from
any of those non-class recipients.  No class member
objected, except for the one that was mentioned by
Mr. Nelson, that being Lisa Marlow from the State of
Florida.

So opposition by only one out of over
four-and-a-half million persons and entities that have
relevant concern what the outcome of this litigation is, in
this Court's estimation, staggering and obviously favors
approval of the settlement.  Settlement was clearly an arms
length transaction, ultimately facilitated by Mediator
Randi Ellis, as pointed out by Mr. Nelson, whom this Court
has used in thousands of individual cases, complex
litigation, and MDL or mass actions.  Ms. Ellis's high
character and extraordinary integrity are without debate.  I
participated in the first segment of the negotiation session
with counsel for both sides designated to negotiate on the
day a settlement was reached; a day, by the way, when
opening statements and the ascertainment of evidence were
set to begin.  Unequivocally, no collusion can be found.  In

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 33

```
 1   fact, as pointed out by Mr. Nelson, a prior mediator

 2   appointed by this court, retired federal judge, was unable

 3   to facilitate a settlement.  There simply is no question

 4   about the arms length nature of this transaction.

 5          The case was vigorously defended by State Farm,

 6   which presented many serious legal challenges to the

 7   plaintiffs' theories of liability throughout the litigation.

 8   Defendants to this day vigorously deny the plaintiffs' right

 9   to recovery, as they have a right to do.  Seven years of

10   discovery, together with countless conferences with the

11   magistrate judge to whom this judge referred discovery

12   management, revealed not only the hard fought nature of the

13   litigation but also helped to lend credence to the true

14   value of the settlement.

15          In most cases of this magnitude I withdraw the

16   automatic referral to a magistrate for discovery issues, and

17   for some reason decided not to do that in this case, which

18   was one of the better decisions I've made in my career.  I

19   had frequent contact with the magistrate judge, often

20   directing logistical and procedural matters but had great

21   familiarity with the matters that arose during the course of

22   this discovery phase and can clearly verify that the

23   representation on both sides was not only skilled but quite

24   vigorous.

25          In fact, just as the defendants were represented in
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 34

exemplary fashion by the experienced and highly skilled

counsel who masterfully, in my opinion, pursued the

defendants' defense of this litigation, the class is

represented by what I would describe as an all-star group of

litigators, including a well-known professor, as well as a

law school dean, whose talents and skills have afforded him

really celebrity status in the legal profession, in my

opinion, regarding Dean Chemerinsky.

A person, including the objector in this

litigation, seriously overestimates the value of the Court's

ruling in plaintiffs' favor on motions to dismiss and

motions for summary judgment by suggesting that those

rulings predict a successful outcome at trial. The standard

for the defendant to prevail on either is very difficult,

and failure to do so does not equate by any means to an

assured loss at trial or appeal. To predict with any

certainty that this Court would have its decisions on

*Rooker-Feldman* doctrine and even, for that matter*,*

*Noerr-Pennington* doctrine would be a reckless exercise of

speculation.

I struggled with the motion for summary judgment

with margin for a private ruling for the plaintiffs

extraordinarily slim. In fact, my initial impression was to

grant the motion for summary judgment but could not quite

support it based on the law and the facts. The predominant

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 35

driver of the decision was the factual -- was a factual one
and the jury's needed to assess credibility in that respect.

I find it quite likely plaintiffs would not have
prevailed at trial, not only because of empirical studies
demonstrating the tremendous disadvantage plaintiffs in
these types of litigation in attempting to convince a jury
of fraud has, but clearly this case, different than a judge
sitting and looking at a motion for summary judgment, was
going to have a jury observe and watch the witnesses
testify, live for the most part from my contemplation, and
so that I think would have made the case even more
difficult, honestly, for the plaintiffs.  My perception was
that so much of the plaintiffs' success in this case was
dependent on the perception the jury had of Chief
Justice Karmeier during his expected testimony.  Having read
his deposition, as well as a personal familiarity with the
chief justice, I firmly believe a Southern Illinois jury
would have had a difficult time not believing the chief
justice and, instead, would have found him credible, and a
likely defense verdict would have resulted.

The objector, through her counsel, speaks in
concrete terms regarding just how sure she is of the likely
success plaintiffs would have in this litigation.  In doing
so, she's only privy, I presume, to the docket sheet
memorializing the in-court events of the litigation.  She

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 36

cannot possibly, nor can her lawyer, have familiarity with
this litigation, this judge, and the counsel of record
possess.  Had plaintiffs prevailed at trial the Court would
not have awarded post-judgment interest.  The plaintiffs
sought, dating back to the original *Avery* judgment, a
decision which I felt I foretold when ruling on the
defendants' motion in limine.  Whether the Court would have
trebled the damages was a serious question not yet
determined by the Court, but given the strength of the
plaintiffs' case, the trebling is rank speculation at best.
However, in light of the authority in this area, the Court's
consideration of the likelihood or not of trebling really is
not a relevant factor and is just simply a nonfactor in this
case both for that reason and because of the speculative
nature of that -- of such an order.

One of the issues for trial, as framed by the final
pretrial conference, centered around the filing of the
complaint in this case and whether the timing of that filing
comports with the statute of limitations.  The issue was a
significant impediment, it would seem, to plaintiffs' path
to a positive result.  The trial would have been heavily
dependent on expert testimony as well as Chief
Justice Karmeier's testimony, and a great many disputes were
identified relative to those experts.

Plaintiffs do not prevail in every *Daubert*

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 37

1    consideration for all their experts, neither did the

2    defendants.  It's difficult to tell how the overall impact

3    on the ability of the plaintiffs to supply to the jury all

4    the pieces of the puzzle, if you will, necessary for a

5    positive result without those experts who were excluded.

6    So, all in all, the risk factor in this case strongly

7    outweighs the likely success factor and clearly favors the

8    settlement agreed upon.

9         The amount of settlement more likely than not

10   overestimates that plaintiffs' odds of winning the day and

11   this jury but certainly there's a, I think, firm argument

12   that it comes very close to suggesting just what chance the

13   plaintiffs might have had.  That factor alone, would seem to

14   me, suggests adequate, fair, and reasonable settlement.  The

15   likely experience of trying the case clearly would have been

16   far greater than the usual class action.  Case was set to be

17   tried over a period of a month, and even though the costs

18   were below average up to that point in time, unquestionably

19   the costs would have ballooned substantially.

20        There's a large contingent of plaintiffs'

21   attorneys.  None of them are that local.  Trish Murphy is

22   from Southern Illinois but the others were, by and large,

23   from distances far and wide, which would have insured a huge

24   expense for plaintiffs for travel, lodging, and meals.  The

25   litigation support necessary for such a lengthy trial would

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 38

```
 1   have been extremely large based on the Court's experience in
 2   presiding over large, complex cases.  The cost of putting
 3   live expert testimony on, and, of course, the trial, in my
 4   experience, likewise is substantial.  Defense counsel would
 5   have experienced similar expenses as plaintiffs except they
 6   would have had less costs for needs consumed by a lesser
 7   number of lawyers.
 8            In light of the extreme risk identified by the
 9   Court, the better course of action, it strikes this Court,
10   was to avoid, to the extent possible, such high costs.  The
11   allocation of distribution plan of the settlement is fair,
12   reasonable, and efficient in its efforts to put money in the
13   hands of the millions of class members and the manner -- the
14   way in which the plaintiffs are going about that
15   distribution is extraordinarily creative and innovative and
16   places a very small burden on a class member to make that
17   claim, let alone those class members who aren't even
18   required to make a claim but would receive a benefit
19   automatically.
20            Clearly, both sides benefited greatly from a
21   settlement that established a substantial amount of money to
22   be recovered while hedging against the likelihood of a
23   result favoring the defendants while at the same time buying
24   peace in the litigation, which, from the perspective of the
25   defendants, had extended over a period of time that began in
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 39

1    1997, and included seven years in the *Hale* case alone.

2    Without a settlement, plaintiffs and defendants faced the

3    prospect of many more years of litigation and great

4    uncertainty regarding the outcome.  The settlement agreement

5    in this class action fulfills the requirements for approval

6    set out in Rule 23 and the Seventh Circuit jurisprudence.

7    Court finds the settlement agreement in this case to be

8    fair, reasonable, and adequate, and grants final approval of

9    the settlement.

10           While I have passed the rule to show cause relative

11   to Ms. Marlow, I see no need to pass on the issue of her

12   objection.  I think the rationale I just set out, and some

13   more that I'll set out with respect to attorney's fees,

14   clearly demonstrate that her objection is not well-founded.

15   Her lawyer engaged in a great deal of hypobole and

16   speculation and a suggestion of knowledge he could not

17   possibly have possessed, and even if he possessed some more

18   knowledge than simply looking at the docket sheet, he

19   clearly was wrong on every point that he brought up in the

20   course of the objection he fashioned for his client.  I

21   might say at this point, even though I passed on the

22   motion -- or the rule to show cause, he even suggested that

23   when I said that the objector would have to be prepared to

24   argue the merits of the case, he interpreted that as my

25   directing her to make those arguments, which is just

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 40

```
 1   ludicrous.  When somebody refers to the plaintiff or the
 2   defendant and making arguments, the judge isn't talking
 3   about the individual litigant, for heaven's sakes, but
 4   simply the representative for that party, and so that told
 5   me a lot about how he goes about gathering his information
 6   and how he was able in some fashion or another to make the
 7   statements he made about such things as risk and the
 8   likelihood of recovery and the amount of money, presuming
 9   that $7 million -- $7 billion was going to be awarded.  It's
10   just stunning to me.  So, all in all, there's no question
11   that no aspect of his -- of the objection that he filed on
12   behalf of Ms. Marlow is valid in the least, and the rest of
13   it will be mentioned in my rationale for the attorney's
14   fees.
15         Also note that all of the class members are being
16   treated the same, and so that aspect of Rule 23 certainly
17   has been met as well.  So, as Mr. Nelson started to allude
18   to, and I stopped him, I hope not rudely, but I am
19   participating with two other judges -- and this really goes
20   to the issue of the marketplace, I think.  And Mr. Nelson
21   pointed out that it was a settlement of $1.5 billion.  So
22   the way that mechanism is set up, there's an MDL case the
23   Kansas City, there is a -- there are mass actions here in
24   this court, and there are a number of individual cases set
25   up in Minneapolis as well as other places around the
```

Hale vs. State Farm, et al., #12-660

                              12/13/18 - Pg. 41

country, but those are the three primary places.  And so in
the settlement agreement that the Court approved, it was the
request of the plaintiffs that each of the three judges in
the major litigation areas be consulted by Judge Lungstrom,
who's running the MDL, with respect to fee issues.  So next
week we'll deal with the individual allocations to lawyers,
but at the time of the preliminary approval -- I'm sorry.
At the time of the final approval of the settlement,
Judge Lungstrom announced that the unanimously agreed upon
rate of 33-and-a-third percent in that case where the pool
is $1.5 billion, rendering a fee pool of 500, little over
$500 million.  We did that with the understanding, the
belief, and the finding that that was consistent with large
class actions across the country, and given particularly the
many complexities that that case had, though I must say I
don't think it had the complexities this case had by any
stretch of the imagination.  Because the case that we're
dealing with here is very unique, unlike any reported case,
as far as I can tell, given the posture of the case, the
legal challenges to recovery, the really decades long
disputes, and extraordinary time spent by counsel for the
plaintiff, as well as the tremendous risk taken by counsel
in pursuit of a favorable outcome, the theories pursued by
plaintiffs were unprecedented.  There's no question that the
amount of fees being requested is a reasonable request.

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 42

```
 1          Mr. Nelson was not of sure my familiarity with the

 2    three experts that he alluded to, three prominent law

 3    professors.  I'm personally acquainted with

 4    Brian Fitzpatrick and with Bill Rubenstein, having sat with

 5    them on a number of panels at conferences and having

 6    listened to Judge Rubenstein now over the last many years

 7    address the MDL judges conference.  I hold them in great

 8    esteem and find that their opinions in this matter are

 9    really the leading opinions in the country for issues with

10    respect to fees.  And I'll talk a little bit more about that

11    in a minute, but I was amazed, if not stunned, at the

12    discussion in the objection with respect to the *Silverman*

13    case.  As I stated before, I clearly have the same

14    interpretation that Mr. Nelson has, and the suggestion that

15    the Seventh Circuit has determined that the outer limits of

16    of reasonableness for attorneys fees in megafund cases is

17    27.5 percent is simply a misrepresentation of that case and

18    its holdings.  I'm not sure if it represents an intentional

19    misrepresentation or just a total lack of understanding of

20    what Judge Easterbrook did in that case.  He quoted

21    Judge Easterbrook's dicta, but as I indicated, my reading of

22    the case is that for that particular case Judge Easterbrook

23    opined that that was -- that might be the outer limit but

24    does not stand as precedent for all so-called megafund

25    cases.
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 43

He does quote other dicta from the case, though not directly, and only in reference to a quote in another case. In other words, he quoted the language, then he cites another case, and instead of just going to the *Silverman* case, he used it, the quote from another case, which didn't make sense to me, but that quote, that dicta has to do with the prevailing market rates and how they impact a Court's award of fees, but the objector simply ignores that part of the analysis, though he gave -- paid lip service to it, but simply failed to conduct further analysis in that regard.

I would acknowledge that in most class action cases it's wise to set a fee at the outset. Mr. Nelson recognized the problem with this because at the outset there was surely well-known risk that anyone could have recognized with respect to the undertaking of the theories that were pursued in this case. At first blush I looked at the complaint and thought, well, this won't take long. Well, one of the dumber decisions I've made in the course of my career. If I were to have set some fee up front or conducted some option, I can't imagine that the fee would have been less than 40 percent; likely more like 50 percent.

The methods that have been suggested by the objector in this case were really stricken by -- really eliminated by the *Synthroid* case, *Synthroid I*, suggesting that there should be a cap on the fees, as once it's

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 44

```
 1    determined the settlement -- I mean the class constitutes a
 2    megafund.  Judge Easterbrook rejected that notion about a
 3    megafund cap and said that it should not trump the market
 4    analysis.  Since the district judge had not performed such
 5    an analysis, he reversed and remanded that particular case
 6    for that purpose.
 7              The case at bar alluded to the amount of work
 8    performed by counsel in pursuing this case wholly against
 9    the odds of recovering anything, though the lodestar
10    comparison is interesting just for that, a comparison, it's
11    not favored these days and certainly should not be
12    considered by anybody as some final arbiter of the issues,
13    but if we were to engage in that comparison, class counsel
14    notes they have expended 55,300 hours to these efforts,
15    which translates, at least as of the time of their filing --
16    Mr. Nelson points out it's much higher than than that now,
17    so that their lodestar is close to $30 million, resulting in
18    a multiplier of 2.83 for the ultimately -- the ultimate
19    requested fee amount.  That lodestar is arguably low for the
20    risk in this case, as confirmed by the academic witnesses,
21    but is certainly not excessive.  Clearly, a lodestar greater
22    than that could have just as easily been supported.
23              The named representatives have been virtually
24    tortured by the subject matter of this litigation for two
25    decades.  They've expended a great deal of time, they've
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 45

1    been submitted to -- they've had to submit to depositions.

2    They've experienced exhaustion, euphoria, disappointment,

3    frustration, back to maybe a little bit of euphoria, if for

4    nothing else other than this is done.  For all of these

5    things, and particularly their involvement for all this

6    time, even if one only examines the last seven years,

7    they're entitled to at least the class representative

8    payments that have been suggested by counsel.  They're

9    consistent, by the way, with our *Syngenta* litigation where

10   we have literally dozens of representative persons, and

11   their service awards are sort of a hodgepodge sum at a

12   higher amount, not unlike the service award here, and others

13   much lower, just simply depending upon the nature of their

14   efforts.

15          So each of the declarations attached to the motion

16   for fees and expenses provides tremendous insight into the

17   efforts that went into securing a positive result for the

18   class in this case.  As for the law professors I mentioned

19   earlier, Charles Silver from the University of Texas, a

20   48-page report with his 12-page resume attached;

21   Brian Fitzpatrick, who's a Vanderbilt professor, now serving

22   in a visiting capacity at Harvard law, 20-page report with a

23   9-page resume.  Of course, he's considerably younger than

24   Charles Silver.  And William Rubenstein of Harvard Law who

25   is really, in my opinion, considered by the consensus of

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 46

```
 1   legal professionals to be the nation's leading class action

 2   expert, particularly in the areas of fees, and as I said

 3   before, a mainstay at the MDL judges conference where I have

 4   listened to him and spoken with him repeatedly.  It provides

 5   great insight into prevailing marked treatment for cases

 6   such as these.  The approach each takes on the subject of

 7   fees has always been considered by me to be a somewhat

 8   conservative approach, not unusual or unexpected given the

 9   subject matter.

10        As Mr. Nelson pointed out, Professor Silver

11   examined the market forces on fees charged by attorneys and

12   awarded by courts as well as a thorough empirical study of

13   many cases with fees awarded, including a great many

14   so-called megafund cases.  Silver's well-documented

15   conclusion was that the requested fee amount was reasonable,

16   within the Court's discretion to allow, and even went on to

17   encourage the Court to award the fee requested.  He noted in

18   the process that this case was one of the riskiest pieces of

19   litigation he had ever examined.

20        Professor Fitzpatrick noted that the

21   Seventh Circuit is unique among federal circuit courts for

22   requiring district judges to hypothesize a market for legal

23   services and to approximate the market rate.  Fitzpatrick

24   referred to this case as one where the class has "negative

25   expected value claims."  The risk in this case would
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 47

certainly insure that the class would opt to pay their
lawyers on a contingent fee basis.  He referred to empirical
data to note that the market rate in Seventh Circuit in a
great many cases, which reflect a 33-and-a-third percent
contingent contract, mean of 27.4, median of 29 percent, but
the professor opined that the higher 33-and-a-third
requested here was justified since it did go to trial.  Very
few do that, even if it didn't finish trial.  That makes
this case extremely rare when compared with the empirical
study that he refers to, which is Professor Rubenstein's
study.  This case progressed farther than 98.7 percent of
class cases.

          The market rate for cases that go to trial
typically are higher than others, commonly commanding a
50 percent fee.  In addition, the cases in the empirical
study he conducted included cases of every ilk, easy to
hard.  He opined that, to say the least, this case had above
average risks was "a gross understatement," as Mr. Nelson
likewise, and in light of that, the higher fee request is
reasonable.

          Professor Rubenstein maintains a database of over a
thousand class action lawsuits.  He had a great deal in his
declaration regarding empirical research on fee issues in
class cases and he's applied those to this case to form his
opinions.  In his opinion, the fee requested here is

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 48

reasonable.  He found a multiplier applied in this case by
class counsel to be consistent with multipliers in similar
cases; in fact, empirical data would support a higher
multiplier.  When suggesting the risk, Professor Rubenstein
examined the following factors:  Novelty, complexity,
detection, which means not based on a government
investigation, but detected, investigated, theorized, and
executed entirely from scratch.  Uncertain liability,
uncertainty of settlement, riskiness of trial, well-funded
defendant, well-represented defendants, vigorous defense,
high expense, opportunity costs, and no residual upside, all
of the factors found in the *Hale* case at the top of the
consideration of each of these factors which Mr. Ruben --
which Professor Rubenstein closely examined.  He found a
number of factors suggesting the class counsel did a great
job, achieving a positive result, such as counsel obtaining
significant monetary relief, a hundred percent of the class
being eligible, obtained cash, made claims to be very easy.
Settlement required significant contested adversarial
litigation; as Mr. Nelson alluded to, an incredible number
of contested motions in this case.  My memory may be failing
me but I think there were over a hundred, were there not?
Just an amazing amount of litigation within this litigation.
        So the professor -- that is, Rubenstein --
concluded the fee percentage is reasonable.  Class counsel's

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 49

1  blended rate was reasonable, their total number of hours

2  reasonable, the multiplier.  He thought the overall request

3  quite reasonable.

4       Court finds the evidence is in support of the fee

5  request, establishing that the fee requested is in line with

6  the market practice for large class action cases such as

7  this, with many, many adversities faced by the class

8  counsel.  The Court awards fees in the amount of

9  33-and-a-third percent of the gross settlement amount.  I

10 was made privy in these filings to the allocation among

11 various law firms, essentially reflecting an equal split

12 among each of these law firms, with the exception of the

13 Taylor Martino firm, which, if I remember correctly, was to

14 get a quarter percent -- or 25 percent of one-tenth of a

15 share.  So, I apologize, I didn't undertake that back

16 because I'm sure the Seventh Circuit would have reversed me

17 on that, so I'll leave that to the parties to allocate in

18 accordance with their fee agreement.

19       Court finds the expenses to be reasonable and

20 necessary.  The costs are only 2.8 percent of the

21 settlement, considerably less at the time of settlement than

22 one would expect when looking at similar cases.  Category

23 costs as reasonable, subject to reimbursement by the class,

24 the Court awards the costs in the amount requested.  The

25 Court -- as I've stated, the Court overrules the objection

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 50

```
 1    of the objector.  The objector, as can be gleaned from my
 2    rationale that I've just gone through, had simply no basis
 3    whatsoever for the objection that was made.
 4         At this point I take it -- and let me just ask this
 5    question:  I take it that whether or not the objector is a
 6    member of the class and, therefore, eligible for a claim
 7    will go through the regular administration process and there
 8    will be a determination within that administrative process.
 9         MR. CLIFFORD:  Your Honor, yes, sir.
10    Robert Clifford.  And I believe your comment is correct.
11    But, further, Judge, and mindful of the ruling you've just
12    made about the objection itself and overruling it, we do not
13    think that that ruling is mutually exclusive to the concept
14    of a motion that we would request that you consider, and
15    that is to strike the objection for procedural noncompliance
16    with the preliminary approval order.  This objector, in her
17    efforts and counsel's efforts, health issues
18    notwithstanding, which, by the way, were never mentioned in
19    any meet-and-confer we ever had with this gentleman -- that
20    notwithstanding, they did not comply with the requirements
21    of the preliminary approval order.  They thwarted, along the
22    way, the ability for us to make a reasonable and appropriate
23    inquiry to that.  Even today the line is open and it's a
24    matter of public record that phoning in could have occurred,
25    notwithstanding the discussion in the record that you had
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 51

```
 1   with counsel about that in your orders, but in light of his

 2   new filing, it would have been reasonable for him to be on

 3   the line.  So we would further ask that you consider, for

 4   the failure to comply with the preliminary approval order,

 5   to enforce the requirements of the preliminary approval

 6   order and further consider, therefore, to strike that

 7   objection in its entirety.  Again, we think that that can

 8   coexist with your substantive analysis of it, and denying it

 9   for the reasons in the record that you've stated.

10       THE COURT:  It's interesting, I think, that the

11   status of that objection is somewhat confusing because while

12   the Court received a notice from Mr. Downton that he and his

13   client would not be here for reasons previously stated,

14   which are quite varied, but most of which are just vicious

15   attacks on me, but -- and for the medical reasons that he

16   cited in his declaration having to do with his gallbladder

17   issues, but did not, as far as I can tell, ask that the

18   Court continue the issue of the objection, or, for that

19   matter, the rule to show cause.

20           Does anybody interpret that in any way as asking

21   for a continuance?

22       MR. CLIFFORD:  We certainly didn't, Your Honor.

23   And, frankly, we were looking for one given what was taking

24   place, and so we were -- we tried to be very vigilant about

25   that.  And to be clear, given where we're at, given the
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 52

1  record that's been made, given what we now know from the

2  objector, we're not asking for contempt, we're not asking

3  for somebody to issue a bench warrant to send out to the

4  U.S. Marshals to go get the guy.  But, that said, we think

5  an order striking the objection would suffice.

6      **THE COURT:**  So I think that -- I think, so the

7  record is clear of my thought processes with respect to that

8  objection, in a sense your motion is moot because I've

9  overruled and denied the objection.  In another sense, to

10  the extent that a reviewing court may disagree with my issue

11  in that respect, I don't think they could possibly disagree

12  with the conclusion that the objection should be stricken.

13  I want to -- I mean the record in this case is clear on what

14  has happened.  We have an objector who, under oath, verified

15  that she was not a class member by virtue of not having

16  aftermarket parts, and then some two weeks later tried to

17  withdraw or pull back that verification and in a letter to

18  the claims administrator indicated that, oh, she was

19  mistaken, she did not understand that question, that she, in

20  fact, did have aftermarket parts and, therefore, was a

21  member of the class.

22      So the process that the Court had set up with

23  respect to allowing any party to depose a class member with

24  respect to the issues of whether or not he or she is, in

25  fact, a member of the class and whether or not their

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 53

interests are inconsistent with the interests of the class
as a whole, she clearly was one who could have been and
should have been deposed in order to fully vet those issues.
But through quite a number of evasive actions taken by
Mr. Downton, I read through the emails and the letters and
it was clear that he was doing everything he could to simply
avoid her having to give a deposition, suggesting that it
was too burdensome on her, it was too burdensome a
requirement as far as the settlement approval order was
concerned, but I would suggest that the average class member
did not have a situation where they made one statement under
oath and then made an effort to withdraw that statement, and
had any other class members done that, I'm quite sure that
the plaintiffs' counsel in this case would have pursued a
deposition of that person.

        Mr. Downton took umbrage with my quick and rapid
response to the various motions that were coming through,
which I did because time was of the essence, and we were
upon this hearing, and, in any event, with each and every
result made a strong effort to protect the rights of
Ms. Marlow.  Quite frankly, she wasn't summoned here to make
her argument on her objection; she was summonsed here,
ordered to appear by the Court by virtue of the order to
show cause, the rule on the order to show cause.  So I made
it clear at one point that, frankly, that's all she was here

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 54

for.  She could have -- after that was heard, if she showed
up, she could have then left and chosen not to defend her
objection.  I thought that the nature of her objection was
part and parcel to whether or not her interests were
contrary to the interests of the class as a whole and simply
put her on notice that these are things that she can expect
when she gets here.  Frankly, I didn't want her lawyer to
say, *Judge, we didn't anticipate that you'd seek sworn
testimony from my client.  She's not prepared to do that.*  I
wanted to avoid that possibility, so I gave her notice.

        But, also, I'm a little bit surprised that somebody
would suggest, particularly a lawyer, that having somebody
come to a hearing is in deprivation of their rights.  What
better due process rights could I give someone than to have
them come here and state their case, for heaven's sakes, and
particularly defend themselves on a request that that person
be held in contempt of court?  So Mr. Downton goes through
all this machinations about how his objection and his --
what he's doing for his client is venued in Florida.  Well,
that judge made it clear that she wasn't going to interfere
with our process here.  He calls it an invalid order or
something to that extent, suggesting that, by December the
19th, we'll get -- we'll determine whether or not the
district judge ratifies that order.  That process does not
exist in that district.  It doesn't exist in any district

Hale vs. State Farm, et al., #12-660

                                    12/13/18 - Pg. 55

```
1    that I know of.  The record was clear that the original

2    judge whose --

3             UNIDENTIFIED SPEAKER:  Judge.

4             THE COURT:  Well, Judge Paul Byron referred the

5    case to Judge Carlos Valdi.  That's on the record.  And

6    under the rules, if someone disagrees with the ruling made

7    by a magistrate they can appeal that to the district judge,

8    but it doesn't call for an automatic ratification by the

9    district judge of the magistrate judge's order, and so he

10   was completely off base in suggesting that.  He suggested

11   that to the Seventh Circuit along with saying vicious things

12   about me -- which is not the first time that's happened, by

13   the way -- and suggested to the Seventh Circuit that this --

14   that dispute belonged in the Middle District of Florida.  I

15   think their denial of his petition for writ of mandamus

16   tells us all what they thought of that suggestion.

17            So, clearly the obstruction, evasion, refusal to

18   comply with the numerous requests in various forms made by

19   the plaintiffs for deposition was inappropriate and contrary

20   to the procedure approved in the settlement of this case,

21   and I agree for that reason that it should be stricken

22   because it's -- they just simply didn't follow the very

23   simple procedure that had been set up here.  So in addition

24   to denying it on its merits, as an alternative finding, I

25   would strike the objection.
```

Hale vs. State Farm, et al., #12-660

12/13/18 - Pg. 56

```
1            So do we have anything else we need to take up,
2    folks?
3            Congratulations to the named representatives.
4    Thanks for hanging in there.  Glad it turned out to be
5    worthwhile for you.
6            Congratulations to the defense buying their peace
7    in this thing and ending 20 years of litigation.  I'm sure
8    everybody feels in some way or another pretty good about all
9    of that.  I feel great.
10           So, thanks.  Congratulations.  Appreciate all your
11   work.
12       *(Proceedings adjourned at 10:42 a.m.)*
13                        *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

1

**REPORTER'S CERTIFICATE**

2

        I, Laura A. Esposito, RPR, CRR, CRC, Official Court
Reporter for the U.S. District Court, Southern District of
Illinois, do hereby certify that I reported in shorthand the
proceedings contained in the foregoing 57 pages, and that
the same is a full, true, correct, and complete transcript
from the record of proceedings in the above-entitled matter.

        Dated this 21st day of December, 2018.

Digitally signed by Laura
Esposito
*Laura A Esposito*    Date: 2019.01.03 13:24:53
-06'00'
_____
LAURA A. ESPOSITO, RPR, CRR, CRC

Hale vs. State Farm, et al., #12-660

                                    12/13/18 - Pg. 58